**EXHIBIT A**

## COURT OF COMMON PLEAS
## HAMILTON COUNTY, OHIO

| | |
|---|---|
| **FIFTH THIRD BANK**<br>38 Fountain Square Plaza<br>Cincinnati, OH 45263, | |
|      Plaintiff, | Case No. _____ |
| **v.** | Judge _____ |
| **EASTERN LIVESTOCK CO., LLC,**<br>135 West Market Street<br>New Albany, IN 47150 | |
|     <u>**Serve Registered Agent:**</u><br>Mark S. Fenzel, Esq.<br>Middleton & Reutlinger<br>2500 Brown & Williamson Tower<br>Louisville, KY 40202 | |
| and | |
| **THOMAS GIBSON**<br>135 West Market Street<br>New Albany, IN 47150 | |
|      Defendants. | |

---

## VERIFIED COMPLAINT FOR CONVERSION, UNJUST ENRICHMENT, FRAUD, PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF, AND EMERGENCY APPOINTMENT OF A RECEIVER

---

For its verified complaint against defendants Eastern Livestock Co., LLC and Thomas P. Gibson (collectively, "Eastern Livestock" or "Defendant"), plaintiff Fifth Third Bank ("Fifth Third" or "Plaintiff"), states as follows:

## NATURE OF THE ACTION

1.      This action arises out of a complicated bank fraud and check kiting scheme employed by Eastern Livestock to defraud Fifth Third of millions of dollars.

2.      Eastern Livestock has engaged in a sophisticated check-kiting scheme involving the deposit and withdrawal of thousands of checks into and out of its Fifth Third account and accounts at various other banks, even though there were insufficient funds to cover the checks that Eastern Livestock was purporting to deposit and withdraw. Taking advantage of the "float" – i.e., the delay in one bank's returning an item for insufficient funds to another, creating a provisionally credited balance in the account to which the "deposit" was made – Eastern Livestock cycled checks between its various bank accounts to create an artificially high balance among those accounts and then withdrew millions of dollars in provisionally credited funds. When Fifth Third ultimately discovered Eastern Livestock's check kite, Fifth Third froze the account. Since Eastern Livestock has been prevented from cycling checks in and out of its main Fifth Third checking account, the account has been determined to be overdrawn in the amount of at least $13 million, and possibly even more still, as items continue to be returned for insufficient funds. Eastern Livestock has withdrawn these provisionally credited funds and transferred them into other accounts held by Eastern Livestock and otherwise converted them.

3.      Additionally, by overstating its assets and accounts receivable, Eastern Livestock induced Fifth Third to lend millions of dollars to Eastern Livestock through a line of credit. In addition to the check kiting scheme above, Eastern Livestock has induced Fifth Third to lend millions of dollars on the basis of false representations as to their accounts receivable and other assets.

2

4.    Because Eastern Livestock has fraudulently obtained and withdrawn millions of dollars from Fifth Third and applied those funds to its own purposes, Fifth Third seeks (a) the emergency appointment of a receiver over Eastern Livestock to preserve and to protect Fifth Third's collateral that secures Fifth Third's loan to Eastern Livestock and (b) temporary and permanent injunctive relief to prevent Eastern Livestock from further dissipating the stolen Fifth Third funds, as well as an order that Eastern Livestock return those funds to Fifth Third. Because Eastern Livestock has refused to identify the accounts where it has transferred Fifth Third's funds and has refused to return those funds, Fifth Third requests an order from the Court preventing the dissipation of any further funds from Eastern Livestock's accounts until a receiver can be appointed to take control of the property of Eastern Livestock.

## PARTIES

5.    Fifth Third is an Ohio banking corporation with its principal place of business in Cincinnati, Ohio. Fifth Third is one of the nation's largest banks, offering commercial and retail banking services, investment advice, and data processing services.

6.    Upon information and belief, Thomas P. Gibson currently resides in and has a principal place of business in New Albany, Indiana. At all times relevant to this complaint, Gibson was an officer, organizer and owner of Eastern Livestock Co., LLC, and a signer on Eastern Livestock Co., LLC's bank accounts. Upon information and belief, Gibson has exercised improper control over Eastern Livestock Co., LLC and is the alter ego of Eastern Livestock Co., LLC.

7.    Eastern Livestock Co., LLC is a Kentucky limited liability company with its headquarters in New Albany, Indiana. Eastern Livestock Co., LLC is one of the largest cattle

3

brokers in the country, processing cattle sales in the eastern U.S. and operating branch facilities in eleven states.

## JURISDICTION AND VENUE

8.     This Court possesses subject matter jurisdiction because the amount in controversy exceeds the minimum jurisdictional threshold for this Court. This Court also possesses personal jurisdiction over Eastern Livestock because Eastern Livestock expressly consented to this Court's jurisdiction, and because Eastern Livestock entered into a credit agreement with Fifth Third and converted monies belonging to Fifth Third, an Ohio corporation. Further, Eastern Livestock presented fraudulent checks for payment to Fifth Third.

9.     Venue is appropriate in this Court because it is the county in which Plaintiff is located and because the loss was suffered here. Moreover, Eastern Livestock expressly consented to venue in this Court.

## FACTUAL ALLEGATIONS

10.     To facilitate its cattle brokerage business, Eastern Livestock entered into a Credit Agreement and a Security Agreement with Fifth Third in 2004, and has since entered into a related Eleventh Amended and Restated Revolving Credit Promissory Note ("Promissory Note"). Under the terms of the loan documents, Eastern Livestock has a revolving line of credit with Fifth Third that is secured by a security interest in, among other assets, Eastern Livestock's accounts, equipment, goods, cash, and accounts receivable. True and accurate copies of the Credit Agreement, Promissory Note, and Security Agreement are attached as Exhibits A, B, and C, respectively.

11.     The amount that Eastern Livestock may draw on this line of credit is based, in part, on the value of its accounts receivable, as evidenced by invoices representing bona fide

4

sales of Eastern Livestock's inventory. Eastern Livestock's credit line has been fully extended up to $32,500,000.

12.    On October 18, 2010, the Promissory Note expired, and the entire balance of $32.5 million became due immediately to Fifth Third. Eastern Livestock has failed to repay those funds and is therefore in default on the note.

13.    Eastern Livestock also has accounts with Fifth Third that it uses for its day-to-day operations ("Operation Accounts"), as well as one or more accounts at other banks, including Your Community Bank in New Albany, Indiana.

14.    On approximately November 1, 2010, Fifth Third concluded an audit that disclosed that Eastern Livestock had engaged in a massive check-kiting scheme through which Eastern Livestock had stolen at least $13 million from Fifth Third in provisionally credited funds.

15.    Upon investigation, Fifth Third discovered that Eastern Livestock had a pattern of entering into numerous transactions with affiliated entities and that these transactions existed on paper only. On information and belief, these transactions were designed to create the impression of higher accounts receivable to induce Fifth Third to extend additional credit on the basis of these inflated accounts receivable.

16.    Fifth Third discovered that Eastern Livestock's reported sales for the fiscal year ending September 30, 2010, had increased to $3.9 billion, after reported sales of $1.3 billion just one year earlier. Further, $2.5 billion of the $2.6 billion reported sales increase was the result of transactions with affiliated companies. In other words, Eastern Livestock was buying and selling its own goods.

5

17.    By way of example, approximately $900 million of the increased sales were allegedly to Thomas P. Gibson, Eastern Livestock's principal and two-thirds owner. Another $487 million of the increased sales were allegedly to Willie Downs, the chief operating officer of Eastern Livestock's Lexington, Kentucky branch.

18.    Despite Fifth Third's inquiries of Eastern Livestock, no records to support these purported cattle sales have been produced. Indeed, after conducting a "ship test" in which Fifth Third sampled twenty-six invoices from Eastern Livestock's recent sales, no shipping documentation existed for any of those transactions.

19.    In addition, Eastern Livestock has a significant amount of uncollected funds from, and outstanding checks to, related entities. As of September 30, 2010, Eastern Livestock had $14.5 million in uncollected funds from its principal and owner, Thomas P. Gibson, and from G.P. Cattle Company, an affiliate of Eastern Livestock. Eastern Livestock also has outstanding checks to the same entities for roughly the same amount. Notably, the principals of several of these third-party entities are also signers on Eastern Livestock's Operation Accounts with Fifth Third. Based on these transactions, Eastern Livestock has been moving funds between various accounts to create the illusion of account balances that do not exist.

20.    Eastern Livestock and its principals have also commingled personal and corporate funds. Eastern Livestock has deposited checks written from Thomas P. Gibson's account into Eastern Livestock's Operation Accounts. By way of example, on September 30, 2010 alone, checks from Gibson deposited into Eastern Livestock's Operation Accounts totaled $7.9 million. Similarly, funds have been withdrawn by Gibson from Eastern Livestock and deposited into his personal account at Your Community Bank. When asked about these checks, Eastern Livestock

explained that they reflected "short term loans" from Gibson to Eastern Livestock, but Eastern Livestock has provided no documentation to substantiate or memorialize any such loan.

21.    Through its audit, Fifth Third also discovered a pattern in which Eastern Livestock Co., LLC has been sending approximately $20 million back and forth each day between its Operation Accounts and an account that Thomas P. Gibson held at Your Community Bank in New Albany, Indiana. The only apparent purpose of these transactions is to manipulate the communications lag between financial institutions, or float period, in order to create artificial balances from which Eastern Livestock could withdraw Fifth Third's real funds.

22.    On November 2, 2010, Fifth Third placed a hold on Eastern Livestock's accounts and returned all checks drawn on its accounts. In the last week, Fifth Third has returned deposited items of approximately $75 million to Your Community Bank. Your Community Bank has, likewise, returned tens of millions of dollars in checks drawn on Thomas P. Gibson's account at Your Community Bank for insufficient funds.

23.    At the time that Fifth Third froze Eastern Livestock's accounts, its main account appeared to have a positive balance of approximately $40 million. That balance has since been revealed to be fictitious, as tens of millions in checks written on Your Community Bank have now been returned to Fifth Third by Your Community Bank for insufficient funds. Currently, Eastern Livestock's checking accounts at Fifth Third are overdrawn in the amount of $13 million.

24.    Based on the foregoing facts, Fifth Third has identified at least two massive frauds that Eastern Livestock has perpetrated on Fifth Third. First, Eastern Livestock engaged in sham transactions to artificially inflate its accounts receivable, thereby inducing Fifth Third to extend it credit. Second, Eastern Livestock has perpetrated a check kite between Fifth Third and

its various other banks, removing millions of dollars in funds that were only provisionally credited to Eastern Livestock's Fifth Third account.

25.     Through its fraudulent check-kiting scheme, Eastern Livestock has wrongly deprived Fifth Third in an amount not less than $13 million, and likely much more.

26.     On Friday, November 5, 2010, Fifth Third representatives confronted Eastern Livestock's principal, Thomas P. Gibson, as to the apparent check-kiting scheme and to determine whether there were any legitimate funds in the accounts or any legitimate business reasons for the check transactions.   Eastern Livestock initially agreed to allow Fifth Third representatives to visit Eastern Livestock's offices on Monday, November 8, 2010, to review documents and discuss the matter with Eastern Livestock personnel.  Upon the arrival of Fifth Third representatives at Eastern Livestock's offices, however, Fifth Third representatives were turned away and directed to speak only with Eastern Livestock's legal counsel.  Eastern Livestock's counsel indicated that Eastern Livestock's personnel would not answer any of Fifth Third's questions.

27.     The full extent of Eastern Livestock's fraud is not yet known.  Fifth Third is currently continuing its investigation into Eastern Livestock's activities and will likely uncover additional misconduct.

28.     Although Fifth Third has placed a hold on all of Eastern Livestock's accounts at Fifth Third, Eastern Livestock remains free to continue dissipating funds that it stole from Fifth Third through its check-kiting scheme and transferred to other banks, and to otherwise dissipate any real and/or personal property acquired with those stolen funds.

29.    Unless this Court provides temporary injunctive relief and appoints a receiver to monitor Eastern Livestock's continued business operations, Fifth Third will be irreparably harmed and will be left without a remedy.

## FIRST CLAIM FOR RELIEF
### Conversion

30.    Fifth Third hereby incorporates the allegations set forth in the paragraphs above, as if the same were fully rewritten herein.

31.    As set forth above, Eastern Livestock has engaged in a sophisticated check-kiting scheme to defraud Fifth Third of at least $13 million.  By artificially inflating its accounts receivable and writing checks to create the illusion of large account balances, Eastern Livestock induced Fifth Third to pay out many millions of dollars of real funds, which Eastern Livestock has retained, paid to other creditors, or used to operate its business.

32.    Eastern Livestock has no legal right to retain these monies.  It has wrongfully exercised dominion and control over the stolen monies and has unlawfully retained and spent those amounts.

33.    Unless Eastern Livestock is ordered to return any and all monies misappropriated from Fifth Third and enjoined and restrained from further transferring or dissipating those monies, Fifth Third will suffer actual and irreparable harm for which it has no adequate remedy at law.

## SECOND CLAIM FOR RELIEF
### Unjust Enrichment

34.    Fifth Third hereby incorporates the allegations set forth in the paragraphs above, as if the same were fully rewritten herein.

9

35.     The Fifth Third monies misappropriated and retained by Eastern Livestock constitute a benefit to Eastern Livestock.

36.     By refusing to return the misappropriated funds, Eastern Livestock has been unjustly and inequitably enriched at Fifth Third's expense.

37.     Unless Eastern Livestock is directed to immediately transfer to Fifth Third all misappropriated monies and enjoined and restrained from further dissipating, transferring, assigning, or otherwise depleting those monies and property, Fifth Third will suffer actual and irreparable harm for which it has no adequate remedy at law.

## THIRD CLAIM FOR RELIEF
### Fraud

38.     Fifth Third hereby incorporates the allegations set forth in the paragraphs above, as if the same were fully rewritten herein.

39.     As set forth above, Eastern Livestock intentionally deceived Fifth Third regarding the status of its business operations and the funds available in its accounts. Specifically, Eastern Livestock concealed the nature of its dealings with affiliates, and represented that these transactions were actual sales when they were, in fact, sham transactions designed to inflate the alleged value of accounts receivables and other assets.

40.     Eastern Livestock's representations were false, were known to be false when made, and were made with the intention of misleading Fifth Third into relying upon them and transmitting monies to Eastern Livestock.

41.     Justifiably relying on Eastern Livestock's material misrepresentations, Fifth Third transmitted real funds to Eastern Livestock under the belief that Eastern Livestock had money in its accounts that would cover those payments.

42.     Eastern Livestock has no legal right to retain the approximately $4 million that it misappropriated from Fifth Third and has retained, paid to other creditors, or used to operate its business.

43.     Unless Eastern Livestock is ordered to return to Fifth Third any and all funds misappropriated from Fifth Third and enjoined and restrained from further transferring or dissipating those monies, Fifth Third will suffer actual and irreparable harm for which it has no adequate remedy at law.

## FOURTH CLAIM FOR RELIEF
### Judgment on the Credit Agreement and Promissory Note

44.     Fifth Third hereby incorporates the allegations set forth in the paragraphs above, as if the same were fully rewritten herein.

45.     Fifth Third Bank is the holder of the Credit Agreement and Promissory Note and has complied with all of its obligations thereunder.

46.     Eastern Livestock defaulted on the terms of the Credit Agreement and Promissory Note by virtue of its failure to make payment when the note was due by virtue of its check-kiting scheme and other fraudulent conduct and its conversion of Fifth Third's funds.

47.     By virtue of Eastern Livestock's default, Fifth Third Bank has the right to and has declared the entire indebtedness under the Credit Agreement and other loan documents to be immediately due and payable.

48.     Fifth Third has suffered damages in an amount in excess of $32,500,000.

## FIFTH CLAIM FOR RELIEF
### Emergency Appointment of Receiver

49.     Fifth Third Bank incorporates the foregoing allegations as if fully restated herein.

50.    Section 8 of the Security Agreement specifically provides for the appointment of a receiver in circumstances such as these:

> Moreover, Secured Party may, without notice to Debtor, apply for and have a receiver appointed under state or federal law by a court of competent jurisdiction in any action taken by Secured Party to enforce its rights and remedies under this Agreement and, as applicable, the other Loan Documents in order to manage, protect, preserve, and sell and otherwise dispose of all or any portion of the Collateral and/or continue the operation of the business of Debtor, and to collect all revenues and profits thereof and apply the same to the payment of all expenses and other charges of such receivership, including the compensation of the receiver, and to the payment of the Obligations until a sale or other disposition of such Collateral is finally made and consummated.

51.    The conditions of the Security Agreement have been broken by Eastern Livestock, and a receiver is necessary to possess, hold, manage, control, and protect Fifth Third's collateral.

52.    Fifth Third Bank is, therefore, entitled to the appointment of a receiver as provided for in the Security Agreement.

## RELIEF REQUESTED

**WHEREFORE**, Fifth Third requests judgment in its favor as follows:

1.    That the Court immediately appoint a receiver to oversee Eastern Livestock's business operations as provided under Fifth Third's Security Agreement with Eastern Livestock to protect Fifth Third's collateral that secures the loan to Eastern Livestock and to ensure that Eastern Livestock cannot continue its fraudulent check-kiting scheme and bank fraud;

2.    That a temporary restraining order and preliminary and permanent injunction be issued against Eastern Livestock, preventing it from accessing, dissipating, transferring, assigning, selling, or otherwise depleting the at least $13 million in Fifth Third funds misappropriated by Eastern Livestock;

3.     That a temporary restraining order and preliminary and permanent injunction be issued against Eastern Livestock forcing it to disburse to Fifth Third, or pay to the Clerk of the Court of Common Pleas or into an escrow account the Fifth Third monies misappropriated by Eastern Livestock;

4.     That a constructive trust be placed on the $13 million in Fifth Third funds misappropriated by Eastern Livestock, preventing Eastern Livestock from accessing, dissipating, transferring, assigning, or otherwise depleting those funds or any real or personal property purchased therewith;

5.     That Fifth Third be awarded judgment for Eastern Livestock's theft in an amount not less than $13 million for that theft, plus attorney fees, costs and all other sums which become known to Fifth Third through the course of this action; and

6.     That Fifth Third be awarded judgment for Eastern Livestock's breach of the Credit Agreement and Promissory Note in an amount in excess of $32,500,000.00, plus interest and attorneys' fees, court costs, and other costs incurred by Fifth Third Bank in enforcing payment of the Credit Agreement and the Revolving Credit Promissory Note; and

7.     That the Court award such other and further relief, including but not limited to damages, costs, prejudgment and post judgment interest and attorney's fees, as is proper.

13

Case 10-93904-BHL-11    Doc 14-1    Filed 12/06/10    EOD 12/06/10 23:23:31    Pg 15 of 55

Respectfully submitted,

Victor A. Walton, Jr. (0055241)
Eric W. Richardson (0066530)
Kent A. Britt (0068182)
Vorys, Sater, Seymour and Pease LLP
Suite 2000, Atrium Two
221 East Fourth Street
Cincinnati, OH 45202
Telephone: (513) 723-4000
Fax: (513) 723-4056
Email: vawalton@vorys.com
         ewrichardson@vorys.com
         kabritt@vorys.com

**Trial Attorneys for Plaintiff, Fifth Third Bank**

## INSTRUCTIONS TO CLERK

Please serve by certified U.S. mail, return receipt requested, a copy of the Summons and

Complaint upon Eastern Livestock Co., LLC at the addresses listed in the caption.

Eric W. Richardson

14

## VERIFICATION

STATE OF OHIO       )
                            )   SS:

COUNTY OF HAMILTON  )

       Timothy Spurlock, being duly sworn, deposes and states that he has personal knowledge of the matters alleged herein, that he has read the foregoing Verified Complaint, and that the allegations contained therein are true to the best of this knowledge, information and belief.

FIFTH THIRD BANK

BY: _____
          Timothy Spurlock
TITLE:   Assistant Vice President
              Special Investigations

Sworn to before me and subscribed in my presence this ___ day of November, 2010.

_____
Notary Public

My commission expires:

HELENA OETURAH BLACKWELL
Notary Public, State of Ohio
My Commission Expires
May 17, 2012

15

# CREDIT AGREEMENT

This Credit Agreement (this "Agreement") is entered into as of August 9, 2004 by and between **EASTERN LIVESTOCK CO., LLC**, a Kentucky limited liability company ("Borrower") and **FIFTH THIRD BANK**, an Ohio banking corporation ("Lender").

Section 1.  Definitions; Construction.

1.1  Definitions.  Certain capitalized terms have the meanings set forth on any exhibit hereto or in a Security Document.  All financial terms used in this Agreement but not defined on the exhibits or in the other Loan Documents have the meanings given to them by GAAP.  All other uncapitalized terms have the meanings given to them in the Uniform Commercial Code, as now or hereafter enacted in the State of Ohio.  The following definitions are used herein:

"Affiliate" means, as to Borrower, (a) any Person which, directly or indirectly, is in control of, is controlled by or is under common control with, Borrower, or (b) any Person who is a director (or manager in the case of a limited liability company), officer, or employee: (i) of Borrower or (ii) of any Person described in the preceding clause (a). For purposes of this definition, "control" of a Person means the power, direct or indirect, (1) to vote 5% or more of the Ownership Interests having voting power for the election of directors (or managers in the case of a limited liability company) of the Person or (2) otherwise to direct or cause the direction of the management and policies of the Person, whether by contract or otherwise.  Without limiting the generality of the foregoing, each member and manager of Borrower is an Affiliate of Borrower.

"Agricultural Laws" means the Food Security Act of 1985, 7 U.S.C. § 1631 *et seq.* ("FSA"), the Packers and Stockyards Act of 1921, 7 U.S.C. § 181 *et seq.* ("PASA") and any other federal, state, county, municipal, local or other statute, law, ordinance, regulation, guideline, directive, order or any common law (including common law that may impose strict liability), which may relate to or deal with the purchase, sale, marketing, storage, or care of livestock or any other aspect with respect to, or arising out of, Borrower's business, operations or properties.

"Borrower's Facilities" means, collectively, those facilities described on Schedule 1.1 which, as of any date: (i) are owned or leased by Borrower or (ii) constitute Eligible Branch Locations.  "Borrower's Facility" means each of the foregoing facilities.

"Business Day" means (a) any day on which commercial banks in Cincinnati, Ohio are required by law to be open for business and (b) with respect to all notices and determinations in connection with, and payments of principal and interest on, Loans bearing interest with reference to the LIBOR Rate, any day (other than a Saturday or Sunday) on which commercial banks are open for business in New York, New York.  Periods of days referred to in this Agreement will be counted in calendar days unless Business Days are expressly prescribed.

EXHIBIT
A

"Closing Date" means August 9, 2004 or such later date as is mutually agreeable to Borrower and Lender.

"Collection Account" has the meaning given in Section 2.2(b).

"Commodity Account Control Agreement" means the Security Agreement Assignment of Hedging Account dated as of August 9, 2004 among Borrower, Lender and Man Financial Inc.

"Dollars" and "$" means dollars in lawful currency of the United States of America unless otherwise indicated.

"Eligible Branch Locations" means, collectively, those facilities of Borrower's Representatives that are the subject of a valid and enforceable Consent and Waiver of Liens agreement in the form of **Exhibit 1.1** attached which has been duly executed and delivered by such Representative and, as applicable, its landlord to Lender. "Eligible Branch Location" means each of the foregoing facilities.

"Fiscal Year" has the meaning given in Section 5.9(d).

"GAAP" means generally accepted accounting principles in the United States of America, consistently applied, as in effect at the time any determination is made or financial statement or information is required or furnished under this Agreement.

"Guaranties" means, collectively, each guaranty made by a Guarantor to, and for the benefit of, Lender and its affiliates contemporaneously with this Agreement with respect to the Obligations.

"Guarantors" means, collectively, John S. Gibson, Patsy Gibson, and Thomas P. Gibson.

"Indebtedness" means all of a Person's indebtedness, obligations, and liabilities to any other Person, including: (a) the Obligations in respect of Borrower, including any and all Rate Management Obligations, (b) all indebtedness, obligations, and liabilities of Guarantors under the Guaranties, (c) all indebtedness, obligations, and liabilities of any Person secured by a Lien on property owned by a Person, even though such Person has not assumed or become liable for the payment therefor, (d) all indebtedness, obligations, or liabilities created or arising under any guaranty or any lease of real or personal property, or conditional sales contract or other title retention agreement with respect to property used or acquired by a Person, even though the rights and remedies of the lessor, seller or lender thereunder are limited to repossession of such property, and (e) all other debts, claims and indebtedness, contingent, fixed or otherwise, heretofore, now and from time to time hereafter owing, due or payable, however evidenced, created, incurred, acquired or owing and however arising, whether under written or oral agreement, operation of law, or otherwise.

"LIBOR Rate" has the meaning given in the Revolving Note.

"LIBOR Rate Loan" means a Revolving Loan bearing interest at an interest rate per annum equal to the LIBOR Rate plus the applicable margin as set forth in the Revolving Note.

"Lien" means any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, charge, security interest, encumbrance, lien (statutory or other), or any preference, priority or other security agreement or any preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any lease deemed under the Uniform Commercial Code to be intended for security, and the authorized filing by or against a Person as debtor of any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction).

"Life Insurance" means the life insurance policies owned by Borrower in respect of Thomas P. Gibson, having a death benefit in the aggregate face amount of not less than $2,000,000, issued by Pacific Life Insurance Company, Policy Numbers 1A22850690 and 1A22916930.

"Life Insurance Assignment" means an assignment of the Life Insurance made by Borrower to Lender pursuant to the Collateral Assignment dated as of the date of this Agreement.

"Livestock" means cattle that are then living which have been purchased by Borrower for purposes of resale by Borrower that were or will be raised or maintained in captivity by Persons (other than Borrower) for the production of meat and other products.

"Livestock Insurance" means the policy of insurance maintained by Borrower having livestock premises and mortgaged and stolen livestock coverages on Borrower's livestock from an insurance company reasonably acceptable to Lender.

"Loan Collateral" means, collectively, the Collateral (as defined in the Security Agreement), the Life Insurance, the Livestock Insurance, the Trademark Collateral (as defined in the Trademark Security Agreement), and any other security or collateral provided from time to time by, or on behalf of, Borrower or any other Person for the Obligations.

"Loan Documents" means, collectively, this Agreement, the Note, the Security Documents, each Guaranty, each Rate Management Agreement, every other document or agreement executed by any Person evidencing, governing, guarantying or securing any of the Obligations, and "Loan Document" means any one of the Loan Documents, and as now in effect or as at any time after the date of this Agreement amended, modified, supplemented, restated, or otherwise changed and any substitute or replacement agreements, instruments, or documents accepted by Lender or an affiliate of Lender.

"Loans" means the Revolving Loans (as defined in Section 2.1) and any other loans or other extensions of credit or financial accommodations from time to time from Lender or its affiliates to Borrower.

"Material Adverse Effect" means a material adverse effect on: (a) Borrower's: (i) business, property, assets, operations or condition, financial or otherwise or (ii) ability to perform any of its payment or other obligations under this Agreement or any of the other Loan Documents, (b) the recoverable value of the Loan Collateral or Lender's rights or interests therein, (c) the enforceability of any of the Loan Documents, or (d) the ability of Lender to exercise any of its rights or remedies under the Loan Documents or by law provided.

"Note" means, collectively, the Revolving Note (as defined in Section 2.1) and any other promissory note made from time to time by Borrower in favor of Lender to evidence any of the Obligations.

"Obligations" means the Loans, the Rate Management Obligations, all other loans, advances, and Indebtedness of Borrower owed to any one or more of Lender, the affiliates of Lender and the other affiliates of Fifth Third Bancorp of every kind and description, whether now existing or hereafter arising, including those owed by Borrower to others and acquired by Lender or any affiliate of Fifth Third Bancorp, by purchase, assignment or otherwise, whether direct or indirect, primary or as guarantor or surety, absolute or contingent, liquidated or unliquidated, matured or unmatured, related or unrelated, whether arising out of overdrafts on checking, deposit or other accounts or electronic funds transfers (whether through wire transfers, automatic clearing houses or otherwise) or out of Lender's non-receipt of, or inability to collect, funds or otherwise not being made whole in connection with depository transfer checks or other similar arrangements, and whether or not secured by additional collateral, and including all liabilities, obligations and Indebtedness arising under this Agreement and the other Loan Documents, all obligations under all treasury and cash management agreements, all obligations to perform or forbear from performing acts, all amounts represented by letters of credit now or hereafter issued by Lender for the benefit of or at the request of Borrower, and all expenses and reasonable attorneys' fees incurred by Lender and any affiliate of Fifth Third Bancorp under this Agreement or any other Loan Document.

"Okie Farms" means Okie Farms, L.L.C., an Oklahoma limited liability company and its successors.

"Operating Agreement" means the Operating Agreement among Borrower and its members dated November 19, 2000, as amended.

"Ownership Interest" means all shares, interests, participations, rights to purchase, options, warrants, general or limited partnership interests, limited liability company interests or other equivalents (regardless of how designated) of or in a corporation, partnership, limited liability company or equivalent entity, whether voting or nonvoting, including common stock, preferred stock or any other "equity security" (as such term is defined in Rule 3a11-1 of the Rules and Regulations promulgated by the Securities and Exchange Commission (17 C.F.R. § 240.3a11-1) under the Securities and Exchange Act of 1934, as amended).

"Permitted Liens" has the meaning given in Section 3.9.

-4-

"Person" means any individual, partnership, joint venture, trust, limited liability company, business trust, joint stock company, unincorporated association, corporation, institution, entity, or any governmental authority.

"Prime Rate" has the meaning given in the Revolving Note.

"Prime Rate Loan" means a Revolving Loan which bears interest at an interest rate per annum equal to the Prime Rate plus the applicable margin as set forth in the Revolving Note.

"Rate Management Agreement" means any agreement, device or arrangement providing for payments which are related to fluctuations of interest rates, exchange rates, forward rates, or equity prices, including, but not limited to, dollar-denominated or cross-currency interest rate exchange agreements, forward currency exchange agreements, interest rate cap or collar protection agreements, forward rate currency or interest rate options, puts and warrants, and any agreement pertaining to equity derivative transactions (e.g., equity or equity index swaps, options, caps, floors, collars and forwards), including, without limitation, any ISDA Master Agreement between Borrower and Lender or any affiliate of Fifth Third Bancorp, and any schedules, confirmations and documents and other confirming evidence between the parties confirming transactions thereunder, all whether now existing or hereafter arising, and in each case as amended, modified or supplemented from time to time.

"Rate Management Obligations" means any and all obligations of Borrower to Lender or any affiliate of Fifth Third Bancorp, whether absolute, contingent or otherwise and howsoever and whensoever (whether now or hereafter) created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor), under or in connection with (i) any and all Rate Management Agreements, and (ii) any and all cancellations, buy-backs, reversals, terminations or assignments of any Rate Management Agreement.

"Remittances" means cash, checks, drafts, items, money orders or other media of payment with respect to the proceeds or collection of the Accounts, General Intangibles, or other Loan Collateral.

"Representatives" means those Persons with whom Borrower has contracted from time to time to have such Persons purchase and sell Livestock solely on Borrower's behalf and, in some cases, temporarily store and care for such Livestock until such Livestock is sold to Borrower's customers.

"Revolving Loan Availability" means, as at any time, an amount, in U.S. Dollars, equal to:

(a)    an amount equal to the lesser of: (i) the then Borrowing Base or (ii) $22,500,000; and

less   (b)   the then aggregate outstanding principal amount of all Loans and all due but unpaid interest on the Loans, and all fees, commissions, expenses and other charges posted to Borrower's loan account with Lender.

"Security Agreement" means the Security Agreement dated as of the date of this Agreement between Borrower and Lender.

"Security Documents" means the Commodity Account Control Agreement, the Deposit Account Control Agreement among Borrower, Lender, and Fifth Third Bank, a Michigan banking corporation, the Life Insurance Assignment, the Trademark Security Agreement, the Security Agreement and all security agreements, pledge agreements, collateral assignments, mortgages, deeds of trust and other documents executed in connection with this Agreement and granting to Lender and Lender's affiliates Liens on the Loan Collateral, together with all financing statements and other documents necessary to record or perfect the Liens granted by any of the foregoing.

"State Agricultural Authority" means, as applicable to Borrower or its operations, the various states' departments of agriculture or other state regulatory authority over livestock.

"Subsidiary" means any Person as to which any Person owns, directly or indirectly at least 50% of the outstanding shares of Ownership Interests or other interests having ordinary voting power for the election of directors, officers, managers, trustees or other controlling Persons.

"Tax Payment Agreement" means the Tax Payment Agreement dated August 9, 2004 between Borrower and its members, in respect of distributions to Borrower's members to pay their federal, state and local income tax liabilities on their allocable shares of taxable net income from the business and operations of Borrower, to which Lender is a third party beneficiary.

"Termination Date" means the earlier of (a) July 31, 2006 and (b) the date upon which the entire outstanding balance under the Revolving Note shall become due pursuant to the provisions hereof (whether as a result of acceleration by Lender or otherwise).

"Trademark Security Agreement" means the Trademark Security Agreement dated as of the date of this Agreement between Borrower and Lender.

"USDA" means The United States Department of Agriculture or any successor thereof.

1.2   Construction.  "Hereunder," "herein," "hereto," "this Agreement" and words of similar import refer to this entire document; "including" is used by way of illustration and not by way of limitation, unless the context clearly indicates the contrary; the singular includes the plural and conversely; and any action required to be taken by a Person is to be taken promptly, unless the context clearly indicates the contrary.  The term "good faith" means honesty in fact in the conduct or transaction concerned.  The definition of any agreement, document or instrument

includes all schedules, attachments and exhibits thereto and all renewals, extensions, supplements, modifications, restatements and amendments thereof but only to the extent such renewals, extensions, supplements, modifications, restatements or amendments thereof are not prohibited by the terms of any Loan Document. All references to statutes include (a) all regulations promulgated thereunder, (b) any amendments of such statutes or regulations promulgated thereunder, and (c) any successor statutes and regulations, including any comparable provision of the applicable statute, ordinance, code, regulation or other law as amended or superseded after the date of this Agreement.

Section 2.     Loans.

2.1.     Revolving Loans. (a) Subject to the terms and conditions hereof and in reliance upon the representations and warranties of Borrower herein, Lender hereby extends to Borrower a line of credit facility (the "Line of Credit") pursuant to which Lender will make loans to Borrower on a revolving basis upon Borrower's request from time to time during the term of this Agreement (the "Revolving Loans") in an amount not exceeding, in the aggregate, the lesser of: (i) $22,500,000 (the "Revolving Commitment") or (ii) the Borrowing Base. Lender may create and maintain reserves against the Borrowing Base from time to time based on such credit and collateral considerations as Lender may deem appropriate, in the exercise of Lender's judgment in a commercially reasonable manner, to reflect contingencies or risks which may adversely affect any or all of the Loan Collateral, the business, operations, financial condition or business prospects of Borrower or the security of the Obligations ("Borrowing Base Reserves"). If, at any time, Lender implements Borrowing Base Reserves ("Borrowing Base Reserve Implementation"), Lender will give Borrower 5 Business Days advance written notice of such Borrowing Base Reserve Implementation unless an Event of Default then exists, in which case Lender will give Borrower contemporaneous oral or written notice of such Borrowing Base Reserve Implementation. Borrower may borrow, repay, in whole or in part, and reborrow under the Line of Credit; provided that if the Revolving Loan Availability shall at any time be less than zero Dollars (such condition being an "Overadvance"), Borrower shall immediately, without demand or notice, reduce the then outstanding balance of the Revolving Loans so that such Overadvance shall no longer exist.

(b)     (i) The initial drawing of the Line of Credit shall be used to effectuate the payoff of all of the Indebtedness owing by Borrower to National City Bank other than the Promissory Note dated August 6, 2001 in the original principal amount of $790,500, and (ii) the proceeds of the Line of Credit, after the repayments of the foregoing Indebtedness to National City Bank, shall be used by Borrower solely for general working capital purposes.

(c)     Borrower shall execute and deliver to Lender a Revolving Credit Promissory Note in the form of **Exhibit 2.1** (the "Revolving Note"), dated as of the Closing Date, in the principal amount of $22,500,000, and bearing interest at such rates, and payable upon such terms, as specified in the Revolving Note.

(d)     The entire unpaid balance of the Line of Credit, plus all accrued and unpaid interest, any other charges, advances and fees, if any, outstanding with respect to the Revolving Loans and all other Obligations shall be due and payable in full on the Termination

-7-

Date.  Subject to the terms of the Revolving Note, Borrower may prepay the Revolving Note in whole or part at any time.

(e)    "Borrowing Base" means, as of the relevant date of determination, the sum of: (i) 85% of the net amount of Eligible Accounts (*i.e.*, less sales, excise or similar taxes, and less returns, discounts, claims, credits and allowances of any nature at any time issued, owing, granted, outstanding, available or claimed), plus (ii) 70% of the net amount of Eligible Inventory valued at the lower of fair market value or cost determined in accordance with GAAP, and less (iii) all then applicable Borrowing Base Reserves. The portion of the Borrowing Base attributable to Eligible Inventory shall not exceed $6,000,000 at any time and the dilution percentage with respect to Borrower's Eligible Accounts (*i.e.*, reductions in the amount of Accounts because of returns, discounts, price adjustments, credit memoranda, credits, contras, allowances and other similar offsets) may not increase above 5%.  If the dilution percentage increases above 5%, then Lender will have the right, to be exercised in good faith, to decrease the advance rate against Eligible Accounts during that time period that the dilution percentage is above 5%.  If, at any time, Lender decreases the then stated advance rate against Eligible Accounts as a result of an increase in the dilution percentage ("Dilution Advance Rate Decrease"), Lender will give Borrower 5 Business Days written notice of such Dilution Advance Rate Decrease, unless an Event of Default then exists, in which case Lender will give Borrower contemporaneous oral or written notice of such Dilution Advance Rate Decrease.

(f)    "Eligible Accounts" means, as of the relevant date of determination, those trade accounts owned solely by Borrower, evidenced by Borrower's standard invoice therefor, payable in cash in U.S. Dollars and which arise out of an outright, bona fide, lawful and final sale of Eligible Inventory in each case in the ordinary course of Borrower's business as presently conducted by it to a Person who has made a valid and binding contract with Borrower therefor, and with respect to which the Livestock covered by such purchase contract has been delivered to the account debtor or its designee and accepted by such account debtor or designee: (i) that are due and payable within 21 days after the invoice date, (ii) that are subject to the first priority security interest of Lender and are not subject to any Lien of any other Person, (iii) that strictly comply with all of Borrower's warranties and representations to Lender in the Loan Documents, and (iv) with regard to which Borrower strictly complies with its covenants with Lender in the Loan Documents; *provided* that Eligible Accounts shall not include the following: (A) Accounts with respect to which 45 or more days have elapsed since the date of the original invoice applicable thereto; (B) Accounts with respect to which the account debtor is a stockholder, member, partner, officer, manager, employee or agent of Borrower or any other Affiliate of Borrower except that Accounts, which are otherwise Eligible Accounts, owing from Affiliates of Borrower for the purchase of Livestock from Borrower in arms'-length transactions arising in the ordinary course of Borrower's business as presently conducted by it will be considered Eligible Accounts for a period of up to seven days after the date of the invoice applicable thereto; (C) Accounts with respect to which the account debtor is not a resident of the United States with respect to an individual and with respect to other Persons, is not organized and qualified to do business under the laws of any State of the United States; (D) Accounts with respect to which the account debtor is the United States or any department, agency or instrumentality of the United States unless the applicable Borrower has assigned its interests in such Accounts to Lender pursuant to Federal Assignment of Claims Act or Lender has expressly waived that requirement

with respect to specific Accounts; (E) Accounts with respect to which the account debtor is any State of the United States or any city, town municipality or division thereof that requires (1) Borrower to support its obligations to such account debtor with a performance bond issued by a surety company or (2) Lender to comply with any State or municipal assignment of claims law or equivalent; (F) Accounts of a particular account debtor if Borrower is liable to that account debtor for goods sold or services rendered by that account debtor to Borrower or its Affiliates or for any other indebtedness, liabilities or obligations, *provided* that (1) the net amount owed by such account debtor to Borrower [exclusive of a Specified Contra as provided in the immediately following clause (2)] in respect of such Account, as determined by Lender in its discretion exercised in good faith, will, if otherwise eligible, be an Eligible Account and (2) Accounts, which are otherwise Eligible Accounts, from arms'-length transactions arising in the ordinary course of Borrower's business as presently conducted by it will, nonetheless, be considered Eligible Accounts if subject to a potential set-off (a "Specified Contra") by the account debtor of such Accounts so long as the Specified Contra is a result of purchases of Livestock made by Borrower in the ordinary course of business for which Borrower is required under PASA to exchange payments with such account debtors with respect to such Accounts and such accounts payable of Borrower; (G) Accounts owing from any single account debtor to the extent, as of any date, that the total amount of such account debtor's Indebtedness to Borrower exceeds 25% of the face amount (less maximum discounts, credits and allowances which may be taken by, or granted to, such account debtor in connection therewith) of the then outstanding Eligible Accounts of Borrower; (H) Accounts owed by a particular account debtor when 25% or more of the total Accounts of such account debtor are 45 days or more past the invoice dates thereof or are otherwise ineligible under the terms of this definition; (I) Accounts owed by any account debtor which has filed or has had filed against it or its affiliates a petition for bankruptcy, insolvency, reorganization or any other type of relief under insolvency laws; (J) Accounts owed by an account debtor which has made an assignment for the benefit of creditors; (K) Accounts with respect to which the account debtor (the "Subject Customer") is located in any one or more of New Jersey, Minnesota, or West Virginia to the extent that the Accounts owing from the Subject Customer, when added to the Accounts of all other then account debtors located in any one or more of New Jersey, Minnesota, or West Virginia, exceed 1% of the face amount of the then outstanding Eligible Accounts owing to Borrower (whether evidenced by such Accounts or otherwise), unless, (1) with respect to Accounts with respect to which Subject Customer is located in New Jersey, the applicable Borrower has properly qualified to do business in New Jersey or has filed a Notice of Business Activities Report with the New Jersey Division of Taxation for the then current year, (2) with respect to Accounts with respect to which Subject Customer is located in Minnesota, the applicable Borrower has properly qualified to do business in Minnesota or has filed a Notice of Business Activities Report with the Minnesota Division of Taxation for the then current year, or (3) with respect to Accounts with respect to which Subject Customer is located in West Virginia, the applicable Borrower has filed, or is exempt from filing, a Business Activity Report with the Tax Commissioner of the State of West Virginia for the then current year; (L) Accounts with respect to which the terms or conditions prohibit or restrict assignment or collection rights or which are evidenced by a promissory note, chattel paper or other instrument or which are subject to progress billing; (M) Accounts which (1) consist (or to the extent consisting) of deferred sales or deposits or (2) consist (or to the extent consisting) of credit balances over 45 days; and (N) Accounts deemed to be ineligible by Lender based upon such other credit and collateral considerations as Lender may deem appropriate, in Lender's

judgment exercised in good faith. Accounts which are deemed to be Eligible Accounts, but which subsequently fail to meet the foregoing criteria for Eligible Accounts, shall immediately cease to be Eligible Accounts for the purpose of determining the Borrowing Base.

(g)    "Eligible Inventory" means, as of the relevant date of determination, Inventory owned solely by Borrower and held at a Borrower's Facility (or is then Qualified In-Transit Inventory) which is comprised of Livestock to be resold by Borrower in the ordinary course of business as presently conducted by it, and excluding the following Inventory which will be ineligible: (i) Livestock that is not readily salable at normal market prices in the ordinary course of Borrower's business as presently conducted by it, including Livestock which is the subject of any disease or condition which, under applicable law, renders such Livestock not readily salable in the ordinary course of Borrower's business as presently conducted by it, (ii) Livestock which is, as of such date, dead, in a dying condition, or a condemned or failed inspection condition under applicable law, (iii) any Inventory in which Lender does not have a valid, first priority and fully perfected security interest, (iv) Inventory located outside the continental United States, (v) any Livestock held at a Borrower's Facility longer than 45 days, (vi) any Inventory: (A) not in the actual possession and control of Borrower or (B) located at any leased location or any location owned or controlled by a third party except in either case (subject to any additional requirements imposed by Lender, in its discretion exercised in good faith, to protect Borrower's title thereto or Lender's Lien thereon): (1) Eligible Inventory in the actual possession and control of a Representative to the extent such Livestock is then held at an Eligible Branch Location and (2) Eligible Inventory located on premises leased by Borrower if Lender has received a landlord's waiver acceptable to Lender with respect to such premises, (vii) any Inventory subject to a Lien (exclusive of the Liens to the extent expressly permitted by Section 3.9(a)) or subject to a claim of title by a government authority under 48 C.F.R. Section 52.232.16, (viii) Inventory which has been consigned to or by Borrower or has been sold to Borrower in any sale on approval or sale and return transaction except *de minimus* deliveries of Livestock by Borrower on consignment to livestock auction houses in the ordinary course of Borrower's business as presently conducted by it which do not exceed, as of any date, 2% of Borrower's then aggregate Eligible Inventory, (ix) Inventory that is in transit to or from a Borrower's Facility, other than Qualified In-Transit Inventory, (x) Inventory (1) with respect to which insurance proceeds, if any, are not payable to Lender as loss payee in accordance with the Loan Documents or (2) which is subject to a negotiable warehouse receipt or other negotiable instrument, and (xi) any other Inventory deemed ineligible by Lender, in its discretion exercised in good faith, based on such credit and collateral considerations as Lender may deem appropriate. Inventory which is deemed to be Eligible Inventory, but which subsequently fails to meet the foregoing criteria for Eligible Inventory, shall immediately cease to be Eligible Inventory for the purpose of determining the Borrowing Base.

(h)    "Qualified In-Transit Inventory" means Livestock which has been purchased and paid for by Borrower in the ordinary course of its business as presently conducted by it with respect to which neither Borrower nor any Representative is then in physical possession thereof at a Borrower's Facility and which meets each of the following conditions: (i) the Livestock is owned solely by Borrower and is otherwise Eligible Inventory (*i.e.*, but for being in transit); (ii) the Livestock is in transit and is solely within the United States of America; (iii) the Livestock has not been in transit for more than two days; (iv) Lender has a first priority

security interest in all documents of title applicable to the Livestock, and all documents of title applicable to that Livestock constitute non-negotiable documents; and (v) adequate insurance exists for the Livestock while in transit which names Borrower solely as loss payee in a manner reasonably acceptable to Lender.

2.2    Funding of Revolving Loans; Collections.

(a)    Prior to the Termination Date and subject to the other terms and conditions of this Agreement, all disbursements of Revolving Loans will initially be made into a non-interest bearing, disbursement funding account maintained at Lender or an affiliate of Lender (the "Funding Account") structured and utilized for that purpose in accordance with Lender's (or as applicable, the applicable Lender affiliate's) policies and procedures, current account number 7140510673. Prior to the Termination Date and subject to the other terms and conditions of this Agreement, funds in the Funding Account will then be made available to Borrower via non-interest bearing controlled disbursement accounts maintained by Borrower at Lender or an affiliate of Lender (collectively, the "Controlled Disbursement Account") in accordance with Lender's (or as applicable, the applicable Lender's affiliate's) policies and procedures (current account numbers: 7480493837 [manual checks] and 7480493779 [system checks]); *however*, Lender may, at any time hereafter, elect not to credit proceeds of Revolving Loans to the Controlled Disbursement Account, but Lender instead may establish non-controlled disbursement account or accounts (such as an operating account but exclusive of the Funding Account) for Borrower at Lender or an affiliate of Lender and disburse proceeds of the Revolving Loans by crediting such non-controlled disbursement account(s) of Borrower at Lender or an affiliate of Lender. Borrower hereby authorizes Lender without any further written or oral request of Borrower to make advances of Revolving Loans to Borrower in amounts necessary for the payment of checks and other items drawn on the Controlled Disbursement Account as such checks and other items ("Presentments") are presented to Lender or the applicable Lender affiliate for payment, subject to the terms and conditions of this Agreement. In addition to advances of Revolving Loans made pursuant to Lender's (or as applicable, Lender's affiliate's) controlled disbursement account system, Lender will, from time to time prior to the Termination Date and subject to the other terms and conditions of this Agreement, make advances of Revolving Loans via wire transfers so long as Borrower has given Lender written notice, via facsimile transmission, electronic mail or otherwise, no later than 1:00 p.m. Cincinnati, Ohio time on the date Borrower shall request that such Revolving Loan be advanced in the case of wire transfers. The making of each Revolving Loan, whether via the controlled disbursement account system or a written request by Borrower, will be deemed to be a representation by Borrower that: (i) the Revolving Loan will not violate the terms of Section 2.1 and (ii) all Eligible Inventory and Eligible Accounts then comprising the Borrowing Base meet all of Lender's criteria for Eligible Inventory and for Eligible Accounts.

(b)    Borrower has established and will maintain an account at Lender or an affiliate of Lender (the "Collection Account") in accordance with Lender's (or as applicable, the applicable Lender's affiliate's) policies and procedures (current account number: 7140510731). Each Business Day, Borrower will deposit at Lender's New Albany, Indiana branch all Remittances to the Collection Account. Any Remittance received by Borrower shall be deemed held by Borrower in trust and as fiduciary for Lender. Pending such deposit in the Collection

-11-

Account, Borrower will not commingle any such Remittance with any of Borrower's other funds or property, but Borrower will hold it separate and apart therefrom in trust for Lender. All deposits to the Collection Account will be Lender's property to be applied against the Obligations in such order and method of application as may be elected by Lender in its discretion exercised in good faith and will be subject only to the signing authority designated from time to time by Lender, and Borrower shall have no interest therein or control over such deposits or funds.

(c)     Each Business Day, conditional upon final collection, Lender will, or will cause the applicable Lender affiliate, automatically and without notice, request or demand by Borrower, in accordance with Lender's (or as applicable, the applicable Lender affiliate's) automatic sweep program, transfer all funds in the Collection Account: (i) for application against the unpaid principal balance of all Prime Rate Loans and (ii) to be held in the Collection Account to the extent of any LIBOR Rate Loans. Pursuant to that automatic sweep program, Lender will either make Prime Rate Loans to the extent necessary to cover Presentments to the Controlled Disbursement Account or to maintain a minimum collected, positive (i.e., "peg") balance in the Funding Account of $50,000 at all times; however, in no event will the principal amount of the Revolving Loans advanced pursuant to the herein described automatic sweep program exceed the maximum available amount provided for in Section 2.1(a). Without limitation of the provisions in the Security Agreement, Lender shall have, and Borrower hereby grants to Lender, a Lien on all funds held in the Funding Account, the Controlled Disbursement Account, and the Collection Account as security for the Obligations. The Funding Account, Controlled Disbursement Account, and Collection Account will not be subject to any deduction, set-off, banker's lien or any other right in favor of any Person other than Lender or an affiliate of Lender. If any Remittance deposited in the Collection Account is dishonored or returned unpaid for any reason, Lender, in its discretion, may charge the amount of such dishonored or returned Remittance directly against Borrower and any account maintained by Borrower with Lender or the applicable Lender affiliate and such amount shall be deemed part of the Obligations. Neither Lender nor the applicable Lender affiliate shall be liable for any loss or damage resulting from any error, omission, failure or negligence on the part of Lender or the applicable Lender affiliate with respect to the operation of the Funding Account, Controlled Disbursement Account, Collection Account, or the treasury and cash management services to be provided by Lender or the applicable Lender affiliate under this Agreement except to the extent, but only to the extent, of any direct damages, as opposed to any consequential, special or lost profit damages, suffered by Borrower from Lender's or its affiliate's lack of good faith or ordinary care. For purposes of determining whether Lender or its affiliate has failed to exercise "ordinary care", action or inaction approved by the UCC, Federal Reserve regulations and operating circulars, clearing-house by-laws, rules and regulations and the like, Lender's and its affiliates' general operating rules, regulations and procedures, the express terms of the Loan Documents, and general banking usage will, without limitation on others, be the exercise of ordinary care. Until a payment is received by Lender for Lender's account in finally collected funds, all risks associated with such payment will be borne solely by Borrower.

(d)     For the purposes of determining Revolving Loan Availability and the amount of Eligible Accounts, all Remittances deposited into the Collection Account shall be credited (conditional on final collection) against the outstanding Revolving Loan balance and the

then Eligible Accounts on the Business Day of receipt by Lender in the Collection Account. For purposes of determining interest and the fees and charges of Lender in the operation of the Collection Account, Remittances comprised of checks deposited into the Collection Account before 12:00 noon (Louisville, Kentucky time) on a Business Day will be credited to Borrower's loan account at the end of business on the next Business Day (conditional upon final collection), and Remittances comprised of checks deposited into the Collection Account on or after 12:00 noon (Louisville, Kentucky time) on a Business Day will be credited to Borrower's loan account at the end of business on the second Business Day following the Business Day of deposit, all subject to Lender's standard policies and procedures. Remittance items other than checks will be credited to Borrower's loan account based on Lender's standard availability policies and procedures. Until such funds are credited to Borrower's loan account in accordance with the immediately preceding two sentences of this Section 2.2(d), such funds will constitute a negative collected balance and will bear interest at the Prime Rate plus 2.5% per annum.

(e)    From time to time, Lender or the applicable Lender affiliate may adopt such regulations and procedures and changes as it may deem reasonable and appropriate with respect to the operation of the Funding Account, the Controlled Disbursement Account, the Collection Account, the automatic sweep program and the other services to be provided by Lender or the applicable Lender affiliate under this Agreement, and such regulations, procedures and changes need not be reflected by an amendment to this Agreement in order to be effective.

(f)    All reasonable service charges and costs related to the establishment and maintenance of the Funding Account, the Controlled Disbursement Account, Collection Account, the automatic sweep program, and Lender's and its affiliates' treasury and cash management services shall be the sole responsibility of Borrower, whether the same are incurred by Lender, Lender's affiliates or Borrower, and Lender, at its discretion, may charge the same against Borrower and any account maintained by Borrower with Lender or the applicable Lender affiliate and the same shall be deemed part of the Obligations.

2.3    Payment; Time of Payment; Late Payments.

(a)    Borrower promises to pay and to perform, observe and comply with when due all of the Obligations. All payments to be made by Borrower on account of the Obligations will be made by Borrower without setoff, deduction, offset, recoupment or counterclaim in immediately available funds. As an accommodation to Borrower, on the date any payment of interest or principal of the Loans, or any fee, charge or other amount under the Loan Documents is due, Lender is hereby authorized, in its discretion, to charge such amounts to the loan account with Lender as an advance of the Revolving Loans as a Prime Rate Loan. All payments by Borrower under this Agreement will be in lawful money of the United States of America, and, unless otherwise provided in this Agreement or instructed by Lender in writing from time to time, Borrower will make all payments required under this Agreement and under any of the other Loan Documents in immediately available funds to an account designated by Lender from time to time.

(b)    With regard to any payments not made when due under this Agreement or any of the other Loan Documents, Borrower shall pay to Lender a late payment fee equal to five

-13-

percent (5%) of any payment not paid when due (whether by maturity, acceleration or otherwise). In addition, all Obligations shall, after the occurrence and during the continuance of an Event of Default, bear interest at the Default Rate without notice to Borrower; *provided* that this Section 2.3(b) shall not be deemed to constitute a waiver of any Event of Default or an agreement by Lender to permit any late payments whatsoever. "Default Rate" means the applicable rates of interest set forth in the Note with respect to Prime Rate Loans and LIBOR Rate Loans plus an additional 3.0% per annum. In no event shall the interest rate accruing under the Note be increased to be in excess of the maximum interest rate permitted by applicable state or federal usury laws then in effect.

2.4    One General Obligation; Cross-Collateralized.   All advances of credit to, or for the benefit of, Borrower under this Agreement and under any other Loan Document constitute one loan, and all of the Obligations constitute one obligation. The Loans and all other advances or extensions of credit to, or for the benefit of, Borrower under this Agreement or the other Loan Documents and all other Obligations are made on the security of all of the Loan Collateral. The limits on outstanding advances against the Borrowing Base are not intended and shall not be deemed to limit in any way Lender's security interest in, or other Liens on, the Accounts, Inventory, Equipment, General Intangibles, or any other Loan Collateral.

2.5    Unused Facility Fee.   Commencing October 1, 2004 and continuing on the first day of each and every calendar quarter thereafter until the Obligations are fully paid and satisfied (and, as applicable, on the date this Agreement is terminated), Borrower will pay to Lender a fee ("Unused Facility Fee") in an amount equal to the result obtained by multiplying: (i) the difference between: (a) $22,500,000 and (b) the average daily Revolving Loans advanced to Borrower during the preceding calendar quarter (or portion thereof during which any portion of the Revolving Loans was outstanding or during which this Agreement was in full force and effect) for which the Unused Facility Fee is being determined by (ii) the result obtained (expressed as a percentage) by multiplying 0.25% by a fraction, the numerator of which is the sum of days in such calendar quarter during which this Agreement was in full force and effect (or during which any portion of the Revolving Loans was outstanding) and the denominator of which is 360.

2.6    Closing Fee.   Borrower shall pay to Lender on the Closing Date a closing fee in the amount of $50,000 (the "Closing Fee"). The Closing Fee is fully-earned and non-refundable as of the Closing Date.

Section 3.    Representations And Warranties.

Borrower hereby warrants and represents to Lender the following:

3.1    Organization and Qualification. Borrower is a duly organized and validly existing limited liability company under the laws of the State of Kentucky, has the power and authority to carry on its business and to enter into and perform this Agreement and the other Loan Documents to which it is a party or otherwise bound, and is qualified and licensed to do business in each jurisdiction in which the failure to be so qualified and in good standing would have a

Material Adverse Effect. All information provided to Lender with respect to Borrower and its operations is true and correct in all material respects.

3.2    Due Authorization. The execution, delivery and performance by Borrower of this Agreement, the Note and the other Loan Documents to which it is a party or otherwise bound have been duly authorized by all necessary limited liability company action, and shall not contravene any law or any governmental rule or order binding on Borrower, charter or other governing documents of Borrower, nor violate any agreement or instrument by which Borrower is bound nor result in the creation of a Lien on any assets of Borrower except the Lien granted to Lender under the Loan Documents. Borrower has duly executed and delivered to Lender this Agreement and the other Loan Documents to which it is a party or otherwise bound and they are valid and binding obligations of Borrower enforceable according to their respective terms, except as limited by equitable principles and by bankruptcy, insolvency or similar laws affecting the rights of creditors generally. No notice to, or consent by, any governmental body is needed in connection with this transaction.

3.3    Litigation.   There are no suits or proceedings pending or to Borrower's knowledge, threatened against or affecting Borrower, and no civil, criminal or administrative action, suit, demand, claim, hearing, notice of violation from, investigation or proceeding is pending before, any governmental body, authority or agency or, to Borrower's knowledge, threatened or instituted against Borrower except those actions which do not have a Material Adverse Effect either in the aggregate or individually.

3.4    Margin Stock. No part of the Loans shall be used to purchase or carry, or to reduce or retire or refinance any credit incurred to purchase or carry, any margin stock (within the meaning of Regulations U and X of the Board of Governors of the Federal Reserve System) or to extend credit to others for the purpose of purchasing or carrying any margin stock. If requested by Lender, Borrower shall furnish to Lender statements in conformity with the requirements of Federal Reserve Form U-1.

3.5    Business; Supplier and Distribution Agreements. Borrower is not a (a) party to or subject to any agreement or restriction that may with reasonable certainty have a Material Adverse Effect or (b) party to a distribution or supplier agreement with any supplier of Inventory to Borrower which limits the disposition of Inventory by Borrower or its successors, assigns or creditors.

3.6    Licenses; Agricultural Law matters.

(a)    Borrower has obtained any and all licenses, permits, franchises, governmental authorizations, patents, trademarks, copyrights or other rights necessary for the ownership of its properties and the conduct of its business. Borrower possesses adequate licenses, patents, patent applications, copyrights, trademarks, trademark applications, and trade names to continue to conduct its business as heretofore conducted by it, without any conflict with the rights of any other Person. All of the foregoing are in full force and effect and none of the foregoing are in known conflict with the rights of others.

(b)     Set forth on Schedule 3.6 is list of Borrower's licenses and bonds with the USDA and applicable State Agricultural Authorities (the "Livestock Licenses"). All of the Livestock Licenses are in full force and effect, and Borrower is in compliance with such Livestock Licenses except for such violations which could not with reasonable certainty have a Material Adverse Effect. No claim has been made under any bond issued on behalf of Borrower or its Representatives under PASA.

(c)     Borrower is in compliance with all Agricultural Laws except for such violations which could not with reasonable certainty have a Material Adverse Effect. Borrower is not aware of, and has not received notice of, any past, present or future events, conditions, circumstances, activities, practices, incidents, actions or plans which could, with reasonable certainty, either: (i) interfere with or prevent compliance or continued compliance, with any Agricultural Laws or (ii) give rise to any common law or legal liability, or otherwise form the basis of any claim, action, demand, suit, proceeding, hearing, study or investigation, based on any Agricultural Law.

(d)     Except any Livestock in transit in the ordinary course of business, the only Persons in possession of any Eligible Livestock are Borrower or any Representative at an Eligible Branch Location.

(e)     Borrower's business is comprised of buying and selling cattle in commerce for Borrower's account.

3.7     Laws and Taxes. Borrower is in compliance with all laws, regulations, rulings, orders, injunctions, decrees, conditions or other requirements applicable to or imposed upon Borrower by any law or by any governmental authority, court or agency except for such violations which could not with reasonable certainty have a Material Adverse Effect. Borrower has filed all required tax returns and reports (or filed appropriate extensions therefor) that are now required to be filed by it in connection with any federal, state and local tax, duty or charge levied, assessed or imposed upon Borrower or its assets, including unemployment, social security, and real estate taxes. Borrower has paid all taxes which are now due and payable. No taxing authority has asserted or assessed any additional tax liabilities against Borrower which are outstanding on the Closing Date, and Borrower has not filed for any extension of time for the payment of any tax. There are not in effect any waivers of applicable statutes of limitations for federal, foreign, state or local taxes for any period. Borrower is not a party to any tax-sharing agreement or arrangement.

3.8     Financial Condition. All financial information relating to Borrower which has been or may hereafter be delivered by Borrower or on their behalf to Lender is and will be true and correct and fairly presents and will present in all material respects the financial condition and results of operations of Borrower at the date and for the period indicated therein and has been prepared in accordance with GAAP, consistently applied. Borrower does not have any material Indebtedness of any kind not disclosed in that financial information, and there has been no material adverse change in the financial condition of Borrower nor has Borrower suffered any damage, destruction or loss which has had a Material Adverse Effect since the submission of the most recent financial information to Lender. Without limiting the generality of the foregoing,

Borrower has not guaranteed the obligations of any Person except by indorsement of negotiable instruments payable at sight for deposit or collection or similar banking transactions in the usual course of Borrower's business.

3.9    Title.  Borrower has good title to the assets reflected on the most recent balance sheet submitted to Lender, free and clear from all Liens and encumbrances of any kind, except for (collectively, the "Permitted Liens"): (a) current taxes and assessments not yet due and payable; (b) any Liens granted to Lender or its affiliates to secure the repayment or performance of the Obligations; (c) any Liens arising from a Contest Claim in the manner, and to the extent, provided for in Section 4.5; (d) purchase money security interests granted by, or capital lease obligations incurred by, Borrower in connection with the acquisition of any Equipment if each of the conditions is satisfied ("Permitted Purchase Money Indebtedness"): (i) the total amount of Indebtedness secured by the purchase money security interests granted or capital lease obligations incurred during any period does not, together with any other capital expenditures made by Borrower, exceed the maximum amount permitted during such period for capital expenditures pursuant to Section 5.2, (ii) such purchase money Indebtedness and capital lease obligations will not be secured by any of the Loan Collateral, (iii) such purchase money security interests and capital leases do not encumber any property other than the specific property financed thereby or the identifiable cash proceeds thereof, and (iv) the principal amount of such capitalized lease or purchase money Indebtedness will not, at the time of the incurrence thereof, exceed the value of the property so acquired; (e) the Liens listed on Schedule 3.9; and (f) the mortgage Liens on Borrower's owned real estate and improvements described on Schedule 3.9.

3.10    Defaults.  Borrower is in compliance with all material agreements applicable to it and there does not now exist any default or violation by Borrower of or under any of the terms, conditions or obligations of: (a) its charter or other governing documents, or (b) any indenture, mortgage, deed of trust, franchise, permit, contract, agreement or other instrument to which Borrower is a party or by which it is bound, and the consummation of the transactions contemplated by this Agreement shall not result in such default or violation.

3.11    Environmental Laws.  (a)  Borrower has obtained all permits, licenses and other authorizations or approvals which are required under Environmental Laws, and Borrower is in compliance in all material respects with all terms and conditions of the required permits, licenses, authorizations and approvals, and is also in compliance in all material respects with all other limitations, restrictions, conditions, standards, prohibitions, requirements, obligations, schedules and timetables contained in the Environmental Laws.

(b)    Borrower is not aware of, and has not received notice of, any past, present or future events, conditions, circumstances, activities, practices, incidents, actions or plans which could, with reasonable certainty, either (i) interfere with or prevent compliance or continued compliance, with Environmental Laws, or (ii) give rise to any common law or legal liability, or otherwise form the basis of any claim, action, demand, suit, proceeding, hearing, study or investigation, based on or related to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling or the emission, discharge, release or threatened release into the environment, of any pollutant, contaminant, chemical, or industrial, toxic or hazardous

-17-

substance or waste which, individually or collectively, could with reasonable certainty have a Material Adverse Effect.

(c)    "Environmental Laws" means all federal, state and local laws relating to pollution or protection of the environment, including laws relating to emissions, discharges, releases or threatened releases of pollutants, contaminants, chemicals, or industrial toxic or hazardous substances or wastes into the environment (including without limitation ambient air, surface water, ground water or land), or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of pollutants, contaminants, chemicals or industrial, toxic or hazardous substances or wastes, and any and all regulations, codes, plans, orders, decrees, judgments, injunctions, notices or demand letters issued, entered promulgated or approved thereunder.

3.12    Subsidiaries; Partnerships; Affiliates.  All Persons who are Borrower's Affiliates are identified in Schedule 3.12.  No Loan Party has any Subsidiaries other than as set forth on Schedule 3.12, and no Loan Party is a party to any partnership agreement or joint venture agreement. Except as set forth on Schedule 3.12, no Affiliate of Borrower: (a) sells or leases any goods or real property to Borrower, (b) sells any services to Borrower, (c) purchases or leases any goods or real property, or purchases any services from, Borrower, or (d) is a party to any contract or commitment with Borrower.

3.13    ERISA.  Borrower and all Persons that, along with Borrower, would be treated as a single employer under ERISA or the Internal Revenue Code of 1986, as amended (an "ERISA Affiliate"), are in compliance with all of their obligations to contribute to any "employee benefit plan" as that term is defined in Section 3(3) of ERISA except for such violations which could not with reasonable certainty have a Material Adverse Effect.  Borrower and each of its ERISA Affiliates are in compliance with ERISA, and there exists no event described in Section 4043(b) thereof ("Reportable Event").    "ERISA" means the federal Employee Retirement Income Security Act of 1974, and any regulations promulgated thereunder from time to time, as amended or as may be replaced by a successor statute.

3.14    Capitalization.  Schedule 3.14 sets forth the percentage Ownership Interests of Borrower which are authorized and the number of such Ownership Interests which are outstanding.  All outstanding Ownership Interests of Borrower are duly authorized, validly issued, and fully paid and nonassessable.  Set forth in Schedule 3.14 is a complete and accurate list of all Persons who are record and beneficial owners of the Ownership Interests of Borrower.  All warrants, subscriptions, options, instruments, agreements and rights under which any Ownership Interests of Borrower are or may be redeemed, retired, converted, encumbered, bought, sold or issued are described in Schedule 3.14.

3.15    Specifically Designated National and Blocked Persons.  Neither Borrower nor any of its Affiliates is a country, individual, or entity named on the Specifically Designated National and Blocked Persons (SDN) list issued by the Office of Foreign Asset Control of the Department of the Treasury of the United States.

-18-

3.16    Tax Shelter Regulations.    Borrower does not intend to treat the Loans and/or Letters of Credit and related transactions as being a "reportable transaction" (within the meaning of Treasury Regulation Section 1.6011-4).    If Borrower determines to take any action inconsistent with such intention, it will promptly notify Lender thereof and deliver to Lender a duly completed IRS Form 8886 or any successor form.    If Borrower so notifies Lender, Borrower acknowledges that (a) Lender may treat the Loans and/or Letters of Credit as part of a transaction that is subject to Treasury Regulation Section 301.6112-1, and Lender will maintain the lists and other records required by such Treasury Regulation and (b) Lender may disclose without limitation of any kind, any information with respect to the "tax treatment" and "tax structure" (in each case, within the meaning of Treasury Regulation Section 1.6011-4) of the transactions contemplated hereby and all materials of any kind (including opinions or other tax analyses) that are provided to Lender relating to such tax treatment and tax structure.

Section 4.    Affirmative Covenants.    Borrower covenants with, and represents and warrants to, Lender that, from and after the Closing Date until the Obligations are paid and satisfied in full:

4.1    Access to Business Information.    Borrower shall maintain proper books of account and records and enter therein complete and accurate entries and records of all of its transactions in accordance with GAAP and give representatives of Lender access thereto at all reasonable times, including permission to: (a) examine, copy and make abstracts from any such books and records and such other information which might be helpful to Lender in evaluating the status of the Loans as it may reasonably request from time to time, and (b) communicate directly with any of Borrower's employees, officers, managers, members, partners, accountants or other financial advisors and agents with respect to the business, financial conditions and other affairs of Borrower.

4.2    Inspection of Collateral.    Borrower shall give Lender reasonable access to the Loan Collateral and the other property securing the Obligations for the purpose of performing examinations thereof and to verify its condition or existence.

4.3    Financial Information; Reporting.    Borrower shall maintain a standard system for accounting and Borrower shall furnish to Lender:

(a)    Within 30 days after the end of each month and Fiscal Quarter, a copy of Borrower's consolidated and consolidating financial statements for that month and, as applicable, Fiscal Quarter and for the year to date in a form reasonably acceptable to Lender, prepared and certified as complete and correct, subject to changes resulting from year-end adjustments, by the principal financial officer of Borrower;

(b)    Within 120 days after the end of each Fiscal Year, a copy of Borrower's consolidated and consolidating financial statements for that year audited by a firm of independent certified public accountants acceptable to Lender (which acceptance shall not be unreasonably withheld), and accompanied by a standard audit opinion of such accountants without qualification;

(c)    All of the statements referred to in (a) and (b) above shall be in conformance with GAAP;

(d)    With the Fiscal Quarter end statements submitted under (a) above and the Fiscal Year end statements submitted under (b) above, a Compliance Certificate in the form attached hereto as **Exhibit 4.3(d)** signed by the principal financial officer of Borrower, (i) stating among other things, that he or she is familiar with all Loan Documents and that to the knowledge of such principal financial officer no Event of Default specified in this Agreement or in any of the other Loan Documents, nor any event which upon notice, lapse of time, the satisfaction of any other condition, or all of them, would constitute such an Event of Default, has occurred, or, if any such condition or event existed or exists, specifying it and describing what action Borrower has taken or proposes to take with respect thereto and (ii) setting forth, in summary form, figures showing the financial status of Borrower in respect of the financial covenants and restrictions contained in this Agreement, including showing the following amounts on a per fiscal quarter basis: Fixed Charges and EBITDA, the gross amount of capital expenditures, and the amount of capital expenditures which are financed;

(e)    No later than 30 days after the end of each Fiscal Year, a projected balance sheet, cash flows, and income statement for the subsequent Fiscal Year;

(f)    Upon request, copies of all federal, state and local income tax returns and such other information as Lender may reasonably request.  With the annual financial statements delivered to Lender under Section 4.3(b), Borrower will deliver to Lender a certificate of Borrower's independent certified public accountant as to the federal, state, and local tax liability of each of Borrower's members with respect to the net income of Borrower that has passed through to them in such calendar year under applicable law, including Subchapter K of the Internal Revenue Code;

(g)    Daily, a borrowing base certificate substantially in the form of **Exhibit 4.3(g)** ("Borrowing Base Certificate") and any related documents required by Lender, (A) containing a summary of Accounts created since the last Borrowing Base Certificate, (B) collections and non-cash charges, and (C) reporting the value of Borrower's perpetual Inventory balance since the last Borrowing Base Certificate which is listed separately for each Borrower's Facility; *provided* that with respect to the amount of ineligible Accounts and Inventory, values for such ineligibles reported on the Borrowing Base Certificate will be as of the immediately preceding month-end.  Values shown on reports of Inventory shall be at the lower of fair market value or cost in accordance with GAAP consistently applied; and

(h)    By no later than the 30th day after the end of each calendar month, or sooner if available, (A) monthly agings of Accounts, broken down by invoice date, in each case reconciled to the Borrowing Base Certificate for the end of such month and Borrower's general ledger, and setting forth any changes in the reserves made for bad debts or any extensions of the maturity of, any refinancing of, or any other material changes in the terms of any Accounts, together with such further information with respect thereto as Lender may require; and (B) a monthly summary accounts payable report, in each case reconciled to Borrower's general ledger for the end of such month.

4.4    <u>Insurance</u>.  At its own cost, Borrower shall obtain and maintain: (a) insurance against loss, destruction or damage to its properties and business of the kinds and in the amounts customarily insured against by firms with established businesses engaged in the same or similar business as Borrower and, in any event, sufficient to fully protect Lender's interest in the Loan Collateral, (b) insurance against public liability and third party property damage of the kinds and in the amounts customarily insured against by firms with established businesses engaged in the same or similar business as Borrower, (c) the Life Insurance, and (d) the Livestock Insurance. All such policies shall (i) be issued by financially sound and reputable insurers, (ii) name Lender as an additional insured and, where applicable, as loss payee under a Lender loss payable endorsement satisfactory to Lender, and (iii) shall provide for thirty (30) days written notice to Lender before such policy is altered or canceled.  All of the insurance policies required hereby shall be evidenced by one or more certificates of insurance delivered to Lender by Borrower on the Closing Date and at such other times as Lender may request from time to time.

4.5    <u>Taxes; Contested Claims</u>.  Borrower shall pay when due all taxes, assessments and other governmental charges imposed upon it or its respective assets, franchises, business, income or profits before any penalty or interest accrues thereon, and all claims (including claims for labor, services, materials and supplies) for sums which by law might be a Lien or charge upon any of its assets, *provided* that no such charge or claim need be paid if and for so long as each of the following conditions continues to be met ("<u>Contested Claims</u>"): (a) such Contested Claim is being diligently contested in good faith so long as Lender is notified in advance of such contest, (b) Borrower establishes an adequate reserve or other appropriate provision for the payment of such Contested Claim and all other Contested Claims required by GAAP, (c) any Lien arising from such Contested Claim does not, when added to all amounts secured by all other then Contested Claims, secure amounts in excess of $50,000 in the aggregate as of any date, (d) no material property would be lost, forfeited or materially damaged as a result of such Contest Claim; and (e) any Lien arising from such Contest Claim, or from any other then Contested Claim, does not prevent Lender from having a perfected first priority security interest in, or as applicable, mortgage Lien on, the Loan Collateral or with respect to future advances made hereunder.

4.6    <u>Existence; Business</u>.  Borrower shall (a) maintain its existence as a limited liability company, (b) continue to engage primarily in business of the same general character as that now conducted, and (c) refrain from entering into any lines of business substantially different from the business or activities in which Borrower is presently engaged.

4.7    <u>Compliance with Laws</u>.  Borrower shall comply with all federal, state and local laws, regulations and orders applicable to it or its assets, including all Agricultural Laws and Environmental Laws, in all respects material to Borrower's business or assets and shall immediately notify Lender of any material violation of any Agricultural Law or any rule, regulation, statute, ordinance, order or law relating to the public health or the environment and of any complaint or notifications received by Borrower with regard to any material environmental or safety and health rule, regulation, statute, ordinance or law.  Borrower shall obtain and maintain any and all licenses, permits, franchises, governmental authorizations, patents, trademarks, copyrights or other rights necessary for the ownership of its properties and the conduct of its business and as may be required from time to time by applicable law.

4.8    Notice of Default and Labor Matters; Operating Agreement.    Borrower shall, within one (1) Business Day of its knowledge thereof, give written notice to Lender of: (a) the occurrence of any event or the existence of any condition which would be, after notice or lapse of applicable grace periods, an Event of Default, (b) the occurrence of any event or the existence of any condition which would prohibit or limit the ability of Borrower to reaffirm any of the representations or warranties, or to perform any of the covenants, set forth in this Agreement, (c) any labor dispute to which Borrower may become a party and which may have a Material Adverse Effect, (d) any strikes, walkouts, or lockouts relating to any of its plants or other facilities, and (e) the entering into of any labor contract relating to any of its plants or other facilities.

4.9    Costs.    Borrower shall reimburse Lender for any and all fees, costs and expenses including reasonable attorneys' fees, other professionals' fees, appraisal fees, environmental assessment fees (including Phase I and Phase II assessments) if Borrower has received notice that it may have violated any applicable Environmental Law, expert fees, court costs, litigation and other expenses (collectively, the "Costs") all of which shall be reasonable in amount, incurred or paid by Lender or any of its officers, employees, affiliates or agents in connection with: (a) the preparation, negotiation, procurement, review, administration or enforcement of this Agreement, any other Loan Documents or any instrument, agreement, document, policy, consent, waiver, subordination, release of lien, termination statement, satisfaction of mortgage, financing statement or other lien search, recording or filing related thereto (or any amendment, modification or extension to, or any replacement or substitution for, any of the foregoing), whether or not any particular portion of the transactions contemplated during such negotiations is ultimately consummated, and (b) the defense, preservation and protection of Lender's rights and remedies thereunder, including its security interest in the Loan Collateral or any other property pledged to secure the Loans, whether incurred in bankruptcy, insolvency, foreclosure or other litigation or proceedings or otherwise. The Costs shall be due and payable upon demand by Lender. If Borrower fails to pay the Costs upon such demand, Lender is entitled to disburse such sums as an advance under the Line of Credit. Thereafter, the Costs shall bear interest from the date incurred or disbursed at the Default Rate. This provision shall survive the termination of this Agreement and/or the repayment of any amounts due or the performance of any Obligation. Notwithstanding anything to the contrary in this Section 4.9, in connection with each field examination or verification by Lender of the Loan Collateral or Borrower conducted after the Closing Date, Borrower will pay to Lender a fee at the rate of $750.00 per day (based on an 8 hour day plus reasonable out-of-pocket expenses incurred, including travel, lodging and meals) per auditor or field examiner for the services of its auditors and field examiners.

4.10    Depository/Banking Services.    So long as this Agreement is in effect, Lender shall be the principal depository in which substantially all of Borrower's funds are deposited, and the principal bank of account of Borrower.

4.11    Other Amounts Deemed Loans.    If Borrower fails to pay any tax, assessment, governmental charge or levy or to maintain insurance within the time permitted or required by this Agreement, but subject to Section 4.5, or to discharge any Lien prohibited hereby, or to comply with any other Obligation, Lender may, but shall not be obligated to, pay, satisfy,

-22-

discharge or bond the same for the account of Borrower, and to the extent permitted by law and at the option of Lender, all monies so paid by Lender on behalf of Borrower shall be deemed Loans and Obligations.

4.12    Further Assurances.  Borrower shall execute, acknowledge and deliver, or cause to be executed, acknowledged or delivered, all such further assurances and other agreements or instruments, and take or cause to be taken all such other action, as shall be reasonably necessary from time to time to give full effect to the Loan Documents and the transactions contemplated thereby.

Section 5.    Negative Covenants.  Borrower covenants with, and represents and warrants to, Lender that, from and after the Closing Date until the Obligations are paid and satisfied in full:

5.1    Indebtedness.  Borrower will not, and will not cause or permit any Subsidiary to, incur, create, assume or permit to exist any: (a) additional Indebtedness for borrowed money (other than the Obligations and such Indebtedness to the Persons described on Schedule 5.1 in existence as of the Closing Date); (b) Rate Management Obligations except as approved in writing by Lender; (c) Indebtedness on account of deposits, advances or progress payments under contracts, notes, bonds, debentures or similar obligations or other Indebtedness evidenced by notes, bonds, debentures, capitalized leases or similar obligations except cash deposits paid by Borrower's customers to Borrower in connection with certain long term livestock delivery contracts entered into by Borrower with such customers in the ordinary course of business as presently conducted by it; (d) Indebtedness secured by a Lien on or payable out of the proceeds or production from any property of Borrower regardless of whether such liability has been assumed by Borrower; (e) Indebtedness representing the deferred purchase price of property; or (f) other Indebtedness evidenced by notes, bonds, debentures, installment contracts, capitalized leases or similar obligations except: (i) other Indebtedness not otherwise authorized by this Section 5.1 that has been specifically approved in writing by Lender and (ii) Permitted Purchase Money Indebtedness (as defined in Section 3.9).

5.2    Capital Expenditures.  Borrower will not make or incur, in any Fiscal Year, any expenditures for real estate, plant, machinery, equipment, or other similar expenditure (including all renewals, improvements and replacements thereto, and all obligations under any lease of any of the foregoing) that would be capitalized on the balance sheet of Borrower in accordance with GAAP in excess of $750,000 in the aggregate.

5.3    Pledge or Encumbrance of Assets.  Other than the Permitted Liens, Borrower will not, and will not cause or permit any Subsidiary to, create, incur, assume or permit to exist, arise or attach any Lien in any present or future asset comprising the Loan Collateral.  Borrower will not, and will not cause or permit any Subsidiary to, create or permit, directly or indirectly, any prohibition or restriction on the creation or existence of a Lien in favor of Lender upon the assets of Borrower, nor create any contractual obligation which may restrict or inhibit Lender's rights or abilities to sell or otherwise dispose of all or any part of the Loan Collateral after the occurrence of an Event of Default.

-23-

5.4    Guarantees.  Borrower will not enter into any direct or indirect indemnities or guarantees other than by indorsement of checks for deposit in the ordinary course of business.

5.5    Dividends and Distributions.  Borrower will not: (a) declare or pay any dividend or distributions on its Ownership Interests (including any return of capital), (b) make any payments of any kind to its members (including debt repayments, payments for goods or services or otherwise, but excluding ordinary salary payments and sales commissions to members employed by Borrower in the ordinary course of Borrower's business), or (c) redeem, retire, purchase, repurchase or otherwise acquire, directly or indirectly, or exercise any call rights relating to, any of its Ownership Interests in any Fiscal Year except that Borrower make the distributions to its members expressly permitted by the Tax Payment Agreement ("Tax Distributions") unless an Event of Default has occurred and is continuing or would be created thereby.

5.6    Merger; Amendment of Material Documents; Disposition of Assets.  Borrower shall not, and shall not cause or permit any Subsidiary to: (a) change its capital structure or Fiscal Year, (b) merge or consolidate with any Person or otherwise reorganize, liquidate or wind-up or dissolve itself, (c) amend or change, or allow to be amended or changed, Borrower's Articles of Organization or the Operating Agreement, or (d) sell, lease, transfer or otherwise dispose of, or grant any Person an option to acquire, or sell and leaseback, all or any substantial portion of its assets, whether now owned or hereafter acquired, except for bona fide sales of Inventory in the ordinary course of business; provided, however, a sale in the ordinary course of business will not include a transfer in total or partial satisfaction of Indebtedness.

5.7    Transactions with Affiliates; Representatives.

(a)    Borrower shall not: (i) directly or indirectly make any loans or advances to, or investments in, any of its employees, managers, members or other Affiliates or (ii) enter into any transaction with any of its Affiliates except for: (A) such transactions entered into in the ordinary course of business upon fair and commercially reasonable terms determined by Lender to be no less favorable to Borrower than could be obtained in a comparable arms-length transaction with an unaffiliated Person and (B) loans and advances to employees, members, Affiliates, and Representatives of Borrower: (1) to the extent that such loans and advances do not exceed, as of any date, an amount equal to $1,000,000 in the aggregate and (2) so long as an Event of Default does not then exist and would not be created thereby ("Permitted Related Party Loans").

(b)    Borrower shall not: (i) directly or indirectly make any loans or advances to, or investments in, any of its Representatives except Permitted Related Party Loans or (ii) enter into any transaction with any of its Representatives except for such transactions entered into in the ordinary course of business upon fair and commercially reasonable terms determined by Lender to be no less favorable to Borrower than could be obtained in a comparable arms-length transaction with any other Person.  Borrower will give Lender prompt notice of any additions or deletions of its list of Representatives after the Closing Date if any such Representative takes possession or control of any Livestock.

-24-

5.8    Investments.  Borrower shall not, without the prior written consent of Lender, purchase or otherwise acquire: (a) all or substantially all of the assets of any Person or the assets comprising any line of business or business unit or division, (b) any partnership, joint venture or limited liability company interest in or with any Person, or (c) the securities of, create, form or invest in any Person (including a Subsidiary), or hold beneficially evidences of Indebtedness of, or make any investment or acquire any interest in, or make any advance or loan to, or assume any liability on behalf of, any other Person other than:  (i) as expressly provided in this Agreement; and (ii) short term investments of excess working capital in one or more of the following so long as no Revolving Loans are then outstanding: (A) investments (of one year or less) in direct or guaranteed obligations of the United States, or any agencies thereof; and (B) investments (of one year or less) in certificates of deposit of banks or trust companies organized under the laws of the United States or any jurisdiction thereof, *provided* that such banks or trust companies are insured by the Federal Deposit Insurance Corporation and have capital in excess of $250,000,000.

5.9    Fixed Charge Coverage Ratio.

(a)    Borrower will not permit the ratio resulting from dividing EBITDA for the applicable 12 Month Period by Fixed Charges for the applicable 12 Month Period to be less than 1.10 to 1 for the applicable 12 Month Period ending as of the end of any Fiscal Quarter or Fiscal Year ending on or after June 30, 2004.

(b)    "EBITDA" means the total (without duplication), in U.S. Dollars, of Net Income, for the applicable 12 Month Period, determined in accordance with GAAP, plus (i) the aggregate amount of Borrower's depreciation and amortization expense determined in accordance with GAAP for such period to the extent deducted in the determination of Net Income, plus (ii) the aggregate amount of Borrower's interest expense determined in accordance with GAAP for such period to the extent deducted in the determination of Net Income, plus (iii) the aggregate cash amount of Borrower's income and franchise tax expense (exclusive of Tax Distributions as defined in Section 5.5) for such period to the extent deducted in the determination of Net Income, minus (iv) all extraordinary gains and extraordinary items of income during the applicable 12 Month Period to the extent included in the determination of Net Income.  EBITDA will be calculated for each 12 Month Period ending as of the end of each Fiscal Quarter or Fiscal Year.

(c)    Fiscal Quarter" means, in respect of a date as of which the applicable financial covenant is being calculated, any fiscal quarter of a Fiscal Year, the first Fiscal Quarter beginning on October 1 and ending on December 31, the second Fiscal Quarter beginning on January 1 and ending on March 31, the third Fiscal Quarter beginning on April 1 and ending on June 30, and the fourth Fiscal Quarter beginning on July 1 and ending on September 30.

(d)    "Fiscal Year" means Borrower's fiscal year for financial accounting purposes, beginning on October 1 and ending on September 30.

(e)    "Fixed Charges" means, for the applicable 12 Month Period, the total (without duplication), in U.S. Dollars, of (all as determined in accordance with GAAP): (i) the

principal amount of Borrower's long-term debt and obligations, in each case paid or which were scheduled to be paid during the applicable 12 Month Period; plus (ii) scheduled capital lease payments by Borrower during the applicable 12 Month Period; plus (iii) Borrower's aggregate interest expense for the applicable 12 Month Period, including interest (paid or accrued) on the Obligations, all capital lease obligations and any other Indebtedness for the applicable 12 Month Period (including amortization of original issue discount and non-cash interest payments); plus (iv) the total amount of capital expenditures for such period, as determined in accordance with GAAP, made by Borrower determined exclusive of those capital expenditures made from funds borrowed by Borrower (for purposes of this clause (iv) "funds borrowed" will not include funds borrowed from Lender as a Loan) or pursuant to any capitalized lease; plus (v) the aggregate cash amount of Borrower's income and franchise tax expense (exclusive of Tax Distributions as defined in Section 5.5) for the applicable 12 Month Period; and plus (vi) the aggregate cash amount of Tax Distributions (as defined in Section 5.5) for the applicable 12 Month Period.

(f)    "Net Income" means, for the applicable 12 Month Period, Borrower's net income as determined in accordance with GAAP and consolidated with Okie Farms in accordance with GAAP, exclusive of: (i) gain arising from any write-up of assets; (ii) the income of any Person in which Borrower has an Ownership Interest unless the income of that Person has been included in the income of Borrower accordance with GAAP; and (iii) the income of any Subsidiary of Borrower to the extent that the declaration or payment of dividends or similar distributions by that Subsidiary of that income is not at that time permitted by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Subsidiary.

(g)    "12 Month Period" means, in respect of a date as of which the applicable financial covenant is being calculated, the four consecutive Fiscal Quarters immediately preceding the date as of which the Financial Covenant is being calculated (i.e., a rolling four Fiscal Quarter (or 12 month) period).

5.10    Minimum Tangible Net Worth.

(a)    Borrower will not permit its Tangible Net Worth to be less than the following amounts set opposite the following periods as of the end of any Fiscal Quarter or Fiscal Year ending during the following periods (including any Fiscal Quarter which ended on the first day of the following periods):

| Period | Minimum Tangible Net Worth |
|---|---|
| September 30, 2004 through, and including, March 30, 2005 | $5,000,000 |
| March 31, 2005 through, and including, September 29, 2005 | $5,500,000 |
| September 30, 2005 and as of the end of each Fiscal Quarter and Fiscal Year ending after September 30, 2005 | $6,000,000 |

-26-

(b)    "Tangible Net Worth" means Borrower's book net worth, determined in accordance with GAAP (including the sum of common stock, paid in capital, and earned surplus) and consolidated with Okie Farms in accordance with GAAP, minus the sum of: (i) all intangibles under GAAP; (ii) all Affiliate, employee, officer, member, and manager Accounts including any Permitted Related Party Loans but exclusive of those Account which are Eligible Accounts; and (iii) any (A) gain from any write-up of assets, (B) gain from the acquisition of debt securities or Ownership Interests of Borrower or from cancellation or forgiveness of Indebtedness, (C) gain or income from accretion of any negative goodwill, or (D) gain recognized by Borrower as earnings which relate to any extraordinary accounting adjustments or non-recurring items of income or include any amounts attributable to extraordinary gains or extraordinary items of income or any other non-operating, non-recurring gain from time to time occurring to the extent, in each case, the gains or items of income are non-cash.

Section 6.    Events of Default and Remedies.

6.1    Events of Default.  The occurrence of any of the following events, whether or not caused by or within the control of Borrower, shall be an Event of Default (each, an "Event of Default"):

(a)    Any representation or warranty made by or on behalf of Borrower, or any of its Affiliates, in any of the Loan Documents or in any other statement, certificate or document delivered to Lender pursuant to any such Loan Document, is incorrect when made or reaffirmed; or

(b)    Borrower defaults in the payment of any Obligation when due and payable, by acceleration or otherwise; or

(c)    Borrower fails to observe, comply with or perform any other covenant, condition or agreement herein or in any of the other Loan Documents (i.e., exclusive of those defaults covered by the other clauses (a), (b), and (d) through (u) of this Section 6.1) and fails to cure such default by the date that is 30 days after the earlier of the date: (i) Lender notifies Borrower of such default or (ii) on which Borrower has knowledge of such default; provided that such 30-day grace period shall not apply to: (A) a breach of any covenant that, in Lender's good faith judgment, cannot be cured; (B) any failure to maintain insurance in accordance with Section 4.4 or any Security Document or to permit inspection by Lender, or its agent, of the Loan Collateral or of the books and records of Borrower in accordance with Sections 4.1 or 4.2, (C) any breach of Sections 4.3(g), 4.8(a) or Section 4.8(b), (D) any breach in any negative covenant set forth in Section 5; (E) a breach or default of any other Loan Document if a period of cure is expressly provided for in such other Loan Document with respect to a breach or default under such other Loan Document; or (F) any breach if, within the 12 calendar months immediately preceding the occurrence of such current breach, Borrower has previously breached the same provision of this Agreement or any other applicable Loan Document; or

(d)    A court enters a decree or order for relief with respect to Borrower, any of its Subsidiaries, or any Guarantor in an involuntary case under any applicable bankruptcy, insolvency or other similar law then in effect, or appoints a receiver, liquidator, assignee,

custodian, trustee, sequestrator (or other similar official) of Borrower, any of its Subsidiaries, or any Guarantor for any substantial part of their respective property, or orders the wind-up or liquidation of its, his, her or their affairs; or a petition initiating an involuntary case under any such bankruptcy, insolvency or similar law is filed and is pending for sixty (60) days without dismissal; or

(e)    Borrower, any of its Subsidiaries, or any Guarantor commences a voluntary case under any applicable bankruptcy, insolvency or other similar law in effect, or makes any general assignment for the benefit of creditors, or fails generally to pay its, his, her or their respective debts as such debts become due, or takes any authorizing action in furtherance of any of the foregoing; or

(f)    Borrower defaults under the terms of any Indebtedness or lease that, individually or in the aggregate, involves total Indebtedness in excess of $100,000 and such default gives any creditor or lessor the right to accelerate the maturity of any such Indebtedness or lease payments, which right is not contested by Borrower or is determined by any court of competent jurisdiction to be valid; or

(g)    Any judgment, order or decree for the payment of money in excess of $100,000 is rendered against Borrower and remains undischarged for 10 days during which time execution is not effectively stayed, vacated, or discharged; or

(h)    Any event occurs which could, in Lender's opinion exercised in good faith, with reasonable certainty have a Material Adverse Effect; or

(i)    There occurs a Change of Control. "Change of Control" means any of the following (or any combination of the following) whether arising from any single transaction or event or any series of transactions or events (whether as the most recent transaction in a series of transactions) which, individually or in the aggregate, results in: (A) a change in the ownership of Borrower such that John S. Gibson and Thomas P. Gibson, together, fail to: (1) own legally and beneficially, free and clear of any Liens, at least 100%, on a fully diluted basis, of the voting Ownership Interests of Borrower or (2) have the power to direct or cause the direction of the management and policies of Borrower; (B) a change in the ownership of Okie Farms such Borrower fails to: (1) own legally and beneficially, free and clear of any Liens, 100%, on a fully diluted basis, of the voting Ownership Interests of Okie Farms or (2) have the power to direct or cause the direction of the management and policies of Okie Farms; (C) a change in the percentage ownership of Borrower among the Persons who are members of Borrower as of the Closing Date which Lender, in its discretion, deems materially adverse; or (D) Thomas P. Gibson or an Approved Successor ceasing for any reason: (1) to serve as the chief executive of Borrower actively involved in Borrower's management or (2) to be a manager of Borrower under the Operating Agreement. For purposes of the foregoing, an "Approved Successor" is the chief executive of Borrower elected by the members of Borrower not more than 30 days after Thomas P. Gibson or any Approved Successor ceases to serve as the chief executive officer of Borrower and who is acceptable to Lender in its discretion exercised in a commercially reasonable manner; or

-28-

(j)    An Event of Default or default occurs under any Loan Document (exclusive of those defaults covered by the other clauses of this Section 6.1); or

(k)    The dissolution of Borrower; or

(l)    The commencement of any foreclosure proceedings, proceedings in aid of execution, attachment actions, or levies by any Person against, or the filing by any taxing authority of a Lien against any of the Loan Collateral or any property securing the repayment of any of the Obligations which have not been vacated, discharged or stayed within 10 days after the commencement thereof; or

(m)    There occurs an uninsured casualty loss with respect to any of the Loan Collateral having an aggregate fair market value greater than $100,000; or

(n)    Lender ceases to be Borrower's (i) principal depository bank in which substantially all of Borrower's funds are deposited or (ii) principal bank of account; or

(o)    (1) the validity or effectiveness of any of the Loan Documents or its transfer, grant, pledge, mortgage, or assignment by the party executing such Loan Document is materially impaired; (2) any party (other than Lender) executing any of the Loan Documents asserts that any of such Loan Documents is not a legal, valid and binding obligation of the party thereto enforceable in accordance with its terms; (3) the security interest or other Lien purporting to be created by any of the Loan Documents shall for any reason cease to be a valid, perfected Lien subject to no other Liens other than Liens permitted by the terms of this Agreement; or (4) any Loan Document is amended, hypothecated, subordinated, terminated or discharged, or any Person is released from any of its covenants or obligations under any of the Loan Documents except as permitted by Lender in writing; or

(p)    A contribution failure occurs with respect to any employee benefit plan maintained by Borrower or Borrower's ERISA Affiliate sufficient to give rise to a Lien under Section 302(f) of ERISA; or

(q)    the filing of any Lien against the Loan Collateral or any part thereof (exclusive of Permitted Liens) which is not removed to the satisfaction of Lender within a period of 30 days thereafter; or

(r)    the abandonment by Borrower of any Loan Collateral having an aggregate fair market value of greater than $100,000; or

(s)    (1) a Guarantor defaults under his or her Guaranty or demand for payment is made on a Guarantor under his or her Guaranty, (2) a Guarantor denies his or her obligation to guarantee the Obligations or attempts to limit or terminate his or her obligation to guarantee the Obligations subject to the terms of his or her Guaranty, or (3) any Guarantor dies; or

(t)    There occurs a nonpayment by Borrower of any Rate Management Obligation when due or the breach by Borrower of any term, provision or condition contained in any Rate Management Agreement; or

(u)    (1) Borrower is enjoined, restrained or in any way prevented by order of the USDA or a State Agricultural Authority from conducting any material part of Borrower's business affairs, including the sale of Livestock and such order is not completely stayed, to the satisfaction of Lender, or dissolved within one Business Day from the effective date of such order or (2) any Livestock License ceases to be in full force and effect, the result of which is that Borrower is unable to conduct any material part of Borrower's business affairs, including the sale of Livestock.

6.2    Remedies.  If any Event of Default occurs and after the lapse of any applicable cure, Lender may cease advancing money hereunder, and Lender may elect to exercise any one or more of the following remedies, all without presentment, demand, protest or notice of any kind, as the same are hereby expressly waived by Borrower, unless otherwise required by applicable law:

(a)    cease advancing any Revolving Loans, declare all Obligations to be immediately due and payable, whereupon such Obligations shall immediately become due and payable, and terminate this Agreement and all obligations of Lender under this Agreement;

(b)    proceed to enforce payment of the Obligations and to realize upon the Loan Collateral or any property securing the Obligations, including causing all or any part of the Loan Collateral to be transferred or registered in its name or in the name of any other Person, with or without designation of the capacity of such nominee, and Borrower shall be liable for any deficiency remaining after disposition of any Loan Collateral;

(c)    offset and apply to all or any part of the Obligations all moneys, credits and other property of any nature whatsoever of Borrower now or at any time hereafter in the possession of, in transit to or from, under the control or custody of, or on deposit with (whether held by Borrower individually or jointly with another Person), Lender or its affiliates, including certificates of deposit;

(d)    apply all Life Insurance and/or Livestock Insurance proceeds to the outstanding balance of the Obligations; and/or

(e)    exercise any and all rights and remedies provided by applicable law and the Loan Documents.

6.3    No Remedy Exclusive.  No remedy set forth herein is exclusive of any other available remedy or remedies, but each is cumulative and in addition to every other remedy available under this Agreement, the Loan Documents or as may be now or hereafter existing at law, in equity or by statute, and each may be exercised together, separately and in any order. Borrower waives any requirement of marshaling of assets that may be secured by any of the Loan Documents.

-30-

6.4     Effect of Termination.  The termination of this Agreement shall not affect any rights of any party or any obligation of any party to the other, arising prior to the effective date of such termination, and the provisions hereof shall continue to be fully operative until all transactions entered into, rights created or Obligations incurred prior to such termination have been fully disposed of, concluded or liquidated.  The security interest, other Liens and rights granted to Lender hereunder and under the Loan Documents shall continue in full force and effect, notwithstanding the termination of this Agreement or the fact that no Loans are outstanding to Borrower, until all of the Obligations have been paid in full.

6.5     No Adequate Remedy at Law.  Borrower recognizes that no remedy at law shall provide adequate relief to Lender in the event that Borrower shall fail to pay, perform, observe or discharge any of the Obligations under this Agreement or the other Loan Documents to which it is a party or otherwise bound, and, accordingly, Lender and Borrower agree that Lender shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving that it has incurred actual damages.

Section 7.     Conditions Precedent.

7.1     Conditions to Initial Loans.  Lender shall have no obligation to make or advance the initial Revolving Loans until each of the following conditions precedent shall have been satisfied:

(a)     Borrower shall execute and deliver, or cause to be executed and delivered by the applicable Person, as applicable, to Lender, in form and substance satisfactory to Lender, each of the following:

(i)     The Note and the Security Documents;

(ii)     A Borrowing Base Certificate completed as of the Closing Date;

(iii)     Certificate regarding actions taken by the members of Borrower in a form acceptable to Lender;

(iv)     A favorable opinion of counsel to Borrower and Guarantors in form and substance acceptable to Lender;

(v)     The Guaranties duly executed and delivered by Guarantors;

(vi)     The certificates of insurance as described in Section 4.4;

(vii)     UCC searches, tax lien and litigation searches, insurance certificates, notices or other documents which Lender may require to reflect, perfect or protect Lender's first priority lien in the Loan Collateral and all other property pledged to secure the Obligations and to fully consummate this transaction;

-31-

(viii)   All requisite releases of, or requisite commitments from the holders thereof acceptable to Lender to release, all liens and file all termination statements necessary to release all Liens (other than Permitted Liens) against the Loan Collateral and any other property pledged to secure the Loans and all requisite waivers and subordination agreements, in a form satisfactory to Lender, to be executed and delivered by Borrower's and its agents' landlords, warehousemen and mortgagees which Lender deems necessary;

(ix)   Signed payoff letters from National City Bank in a form acceptable to Lender;

(x)   Signed letter from Intrust Bank, N.A. confirming that there are no guarantees or other contingent obligations from Borrower in a form acceptable to Lender; and

(xi)   Such additional information, materials and Loan Documents as Lender may request.

(b)   Minimum excess Revolving Loan Availability of $1,000,000 at closing (*i.e.*, taking into account all applicable borrowing limits, reserves, ineligibles and closing costs, whether or not paid at closing and on disbursement of funds and repayment of debts to be paid at closing) and after subtracting therefrom the total, as of such date, of the amount, if any, (i) of Borrower's accounts payable which remain unpaid greater than forty-five (45) days past the date of the original invoices applicable thereto, or with respect to accounts payable for which Borrower has received extended terms, which remain unpaid as of the due date thereof, and (ii) any book overdraft of Borrower.

(c)   Borrower shall reimburse Lender for any and all fees, costs and expenses including reasonable attorneys' fees and other professionals' fees, appraisal fees, and other expenses incurred or paid by Lender or any of its officers, employees or agents in connection with the preparation, negotiation, procurement, review or execution of this Agreement, the other Loan Documents and all other instruments, agreements, documents, policies, consents, waivers, subordinations, releases of liens, termination statements, satisfaction of mortgages, financing statements, lien searches, recordings, or filings related thereto, whether or not any particular portion of the transactions contemplated during such negotiations is ultimately consummated.

(d)   Lender shall have completed to its satisfaction an audit of the books and records of Borrower, including the Loan Collateral. It is understood, however, that any such audit by Lender shall in no respect waive Lender's rights to pursue remedies upon an Event of Default.

7.2   <u>Conditions to Each Revolving Loan</u>.  Lender shall have no obligation to advance additional Revolving Loans unless, as to each such Loan, the following statements shall be true and correct:

(a)   Each of the representations and warranties contained herein and in the Loan Documents shall be correct, and each shall be deemed to be reaffirmed as of the date of each such Revolving Loan with the same effect as though such representations and warranties

had been made again on and as of each day of the term of this Agreement subject to such changes as are not prohibited hereby or do not constitute Events of Default;

(b)    No event shall have occurred and be continuing, or would result from such Revolving Loan, which constitutes an Event of Default, or would constitute an Event of Default but for the requirement that notice be given or lapse of time or both;

(c)    The aggregate unpaid principal amount of the Revolving Loans after giving effect to such Revolving Loan shall not violate the lending limits set forth in Section 2.1 of this Agreement; and

(d)    No law or regulation prohibits, and no order, judgment or decree of any arbitrator or governmental authority enjoins or restrains Lender, from making the requested advance.

The acceptance by Borrower of the proceeds of each Revolving Loan shall be deemed to constitute a representation and warranty by Borrower that the conditions in this Section 7.2 of the Agreement, other than (i) those that have been waived in writing by Lender, or (ii) the type described in clause (d) of this Section 7.2, have been satisfied.

Section 8.    Participations.

8.1    Participation.    Lender, in the ordinary course of its commercial banking business and in accordance with applicable law, will on the Closing Date, and may at any time after the Closing Date, sell to one or more lenders or other entities ("Participants") participating interests in the Loans, the Loan Collateral or other security provided to Lender, or any other interests of Lender under this Agreement or the other Loan Documents; *provided* that, unless an Event of Default has occurred, Borrower will have the right to approve of any Participant selected by Lender, such approval not to be unreasonably withheld, delayed, or conditioned by Borrower.

8.2    Participant Consents.    Borrower acknowledges that Participants have and will have certain rights under their respective participation agreements with Lender that may, subject to the terms of the participation agreements, require Lender to obtain the consent (collectively, "Participant Consents") of some or all of the Participants before Lender takes or refrains from taking certain actions (other than as expressly required by the Loan Documents) or grants certain waivers, consents or approvals in respect of the Loans, the Loan Documents or the Loan Collateral. None of the Participants, however, will have Participant Consent rights which are greater than those rights and remedies Lender has under the Loan Documents. In addition, from time to time, Lender may request instructions from the Participants in respect of the actions, waivers, consents or approvals which by the terms of any of the Loan Documents Lender is permitted or required to take or to grant or to not take or grant ("Participant Instructions"). If the Participant Consents are, pursuant to the terms of the respective participation agreements, required or Participant Instructions are requested, Lender will (i) be absolutely empowered to take or refrain from taking any action (other than as expressly required by the Loan Documents) or withhold any waiver, consent or approval and (ii) not be under any liability whatsoever to any

-33-

Person, including Borrower and any Participant, from taking or refraining from taking any action or withholding any waiver, consent or approval under any of the Loan Documents until it has received the requisite Participant Consents or, as applicable, the Participant Instructions. Further, in the event a Participant fails to fund its portion of any of the Loans, Lender shall be under no obligation to fund any portion of any of the Loans that was not funded by such Participant. Borrower does hereby indemnify, defend, save and hold Lender, its affiliates, and their respective officers, directors, attorneys, and employees harmless of, from and against all claims, demands, liabilities, judgments, losses, damages, costs and expenses, joint or several (including all accounting fees and reasonable attorneys' fees), that Lender or any such indemnified party may incur as a result of a Participant failing to fund its portion of any Loan or failing to give a Participant Consent.

    8.3    Information.    Borrower authorizes Lender to disclose to any Participant or prospective Participant (who, subject to Section 8.1, has been approved by Borrower) or any assignee or prospective assignee of Lender's rights under the Loan Documents any and all financial information in Lender's possession concerning Borrower which has been delivered to Lender by Borrower pursuant to the Loan Documents or in connection with Lender's credit evaluation of Borrower or which has been obtained independently by Lender in its credit evaluation or audit of Borrower.

    8.4    Law Requirements.    Nothing in the Loan Documents will prohibit Lender from pledging or assigning its interests in the Loans to any Federal Reserve Lender in accordance with applicable law.

Section 9.    Miscellaneous Provisions.

    9.1    General.    This Agreement, the exhibits and the other Loan Documents are the complete agreement of the parties hereto and supersede all previous understandings and agreements relating to the subject matter hereof. This Agreement may be amended only in writing signed by all of the parties hereto. This Agreement may be executed in counterparts. If any part of this Agreement is held invalid, illegal or unenforceable, the remainder of this Agreement shall not in any way be affected. This Agreement is and is intended to be a continuing agreement and shall remain in full force and effect until the Loans are finally and irrevocably paid in full and the Line of Credit is terminated. Any documents delivered by, or on behalf of, any Person by fax transmission (i) may be relied on by all Persons as if the document were a manually signed original and (ii) will be binding on all Persons for all purposes of the Loan Documents. If there is any conflict, ambiguity, or inconsistency, in Lender's judgment, between the terms of this Agreement or any of the other Loan Documents, then the applicable terms and provisions, in Lender's judgment, providing Lender with greater rights, remedies, powers, privileges, or benefits will control.

    9.2    Waiver by Borrower.    Borrower waives notice of non-payment (except as expressly required by this Agreement or the other Loan Documents), demand, presentment, protest or notice of protest of any Accounts or other Loan Collateral, the benefit of all valuation and appraisement laws following the occurrence and during the continuance of an Event of Default, and all other notices (except those notices specifically provided for in this Agreement).

Borrower hereby waives all suretyship defenses, including all defenses set forth in Section 3-605 of the Uniform Commercial Code (the "UCC"). Such waiver is entered to the full extent permitted by Section 3-605(i) of the UCC. To the fullest extent not prohibited by law, Borrower waives and agrees not to assert any claim against Lender under any theory for consequential, special, indirect or punitive damages.

9.3     Binding Effect. This Agreement shall be binding upon and inure to the benefit of the respective legal representatives, successors and assigns of the parties hereto; *however*, Borrower may not assign or transfer any of its rights or delegate any of its Obligations under this Agreement or any of the Loan Documents to which it is a party or otherwise bound, by operation of law or otherwise. Lender (and any subsequent assignee) may transfer and assign any of its rights or delegate any of its duties under this Agreement or may transfer or assign partial interests or participations in the Loans to other Persons. Lender may disclose to all prospective and actual assignees and Participants all financial, business and other information about Borrower which Lender may possess at any time.

9.4     Subsidiaries. If Borrower has any Subsidiaries at any time during the term of this Agreement with the consent of Lender, the term "Borrower" in each representation, warranty and covenant herein shall mean Borrower and each Subsidiary, individually and in the aggregate, and Borrower shall cause each Subsidiary to be in compliance therewith. The existence of references to Borrower's Subsidiaries any place in this Agreement is for a matter of convenience only. Any references to Subsidiaries of Borrower set forth herein shall not in any way be construed as consent by Lender to the establishment, maintenance or acquisition of any Subsidiary.

9.5     Security. The Obligations are secured as provided in this Agreement, the Security Documents, in the other Loan Documents and in each other document or agreement that by its terms secures the repayment or performance of the Obligations.

9.6     Survival. All representations, warranties, covenants and agreements made by Borrower herein and in the other Loan Documents shall survive the execution and delivery of this Agreement, the other Loan Documents and the issuance of the Note.

9.7     Delay or Omission. No delay or omission on the part of Lender in exercising any right, remedy or power arising from any Event of Default shall impair any such right, remedy or power or any other right remedy or power or be considered a waiver or any right, remedy or power or any Event of Default nor shall the action or omission to act by Lender upon the occurrence of any Event of Default impair any right, remedy or power arising as a result thereof or affect any subsequent Event of Default of the same or different nature.

9.8     Notices. Any notice required, permitted or contemplated hereunder shall, except as expressly provided in this Agreement, be in writing and addressed to the party to be notified at the address set forth below or at such other address as each party may designate for itself from time to time by notice hereunder and shall be deemed duly sent: (a) when delivered in hand, (b) on completion of a facsimile transmission to the number listed below, so long as (i) receipt of confirmation of the telecopy is made by the sending party and (ii) an original notice is also sent to the receiving party contemporaneously with facsimile by overnight courier or certified U.S.

mail as provided in this <u>Section 9.8</u>, (c) the next Business Day after such notice was delivered to a regularly scheduled overnight delivery carrier with delivery fees either prepaid or an arrangement, satisfactory with such carrier, made for the payment of such fees, or (d) when mailed by registered or certified mail, return receipt requested, addressed as follows:

| | |
|---|---|
| To Borrower: | 135 West Market Street |
| | New Albany, Indiana 47150 |
| | Attention: General Counsel |
| | Fax: (812) 949-9063 |
| | |
| To Lender: | 38 Fountain Square Plaza |
| | MD #10AT63 |
| | Cincinnati, Ohio  45263 |
| | Attention:  Structured Finance Dept. |
| | Fax: (513) 534-8400 |

Any party may change such address by sending written notice of the change to the other party.

9.9    <u>No Partnership</u>.  Nothing contained herein or in any of the Loan Documents is intended to create or shall be construed to create any partnership, joint venture or other relationship between Lender and Borrower other than as expressly set forth herein or therein and shall not create any joint venture, partnership or other relationship.

9.10    <u>Electronic Communication</u>.  Lender may, in its discretion, elect, from time to time, to receive certain information, including reports, otherwise required by the terms of this Agreement or the other Loan Documents ("<u>Reports</u>") from Borrower via electronic mail transmission ("<u>e-mail</u>").  Lender will designate from time to time its e-mail address to Borrower (the "<u>Lender E-mail Address</u>").  All e-mail transmissions of Reports from Borrower shall contain the information as specified in this Agreement, shall be formatted or displayed in a manner and order substantially similar to that shown in this Agreement or otherwise required by Lender and shall conform to the specifications described in this Agreement. Borrower will be solely responsible for the confidentiality of the contents of e-mail transmissions during transmission to the Lender E-mail Address.  Borrower will be responsible for the accuracy of all information provided to Lender via e-mail transmission to the Lender E-mail Address, and any information so received by Lender will be deemed to have been submitted by and received from Borrower. In the event of a failure of the transmission of the Reports, it is the responsibility of Borrower to transmit the contents of any pending transmission to Lender using an alternative method which is timely and in accordance with this Agreement.  Borrower agrees that, by sending Lender the Reports via e-mail transmission, Borrower is certifying the truthfulness and accuracy in all material respects of the Reports submitted each and every time Borrower sends Lender the Reports.  Borrower further agrees that, on each occasion when Borrower sends Lender e-mail transmissions containing Reports, Borrower is warranting and representing to Lender the truthfulness and accuracy in all material respects of the representations and warranties relevant to that Report set forth in the relevant Loan Document. Borrower consents to and represents that it is Borrower's intent that by Borrower's insertion of Borrower's name in the subject line of the

transmitting e-mail, or on the Reports (including the header and/or the certification line), Borrower intends such to constitute a legally binding and enforceable signature of Borrower, and in all aspects the legal equivalent of Borrower's handwritten signature

9.11    <u>Indemnification</u>.  If after receipt of any payment of all or part of the Obligations, Lender is for any reason compelled to surrender such payment to any Person because such payment is determined to be void or voidable as a preference, impermissible setoff, or diversion of trust funds, or for any other reason, this Agreement shall continue in full force and effect and Borrower shall be liable to, and shall indemnify, save and hold Lender, its officers, directors, attorneys, and employees harmless of and from the amount of such payment surrendered.  The provisions of this Section shall be and remain effective notwithstanding any contrary action which may have been taken by Lender in reliance on such payment, and any such contrary action so taken shall be without prejudice to Lender's rights under this Agreement and shall be deemed to have been conditioned upon such payment becoming final, indefeasible and irrevocable.  In addition, Borrower shall indemnify, defend, save and hold Lender, its affiliates, and their respective officers, directors, attorneys, and employees harmless of, from and against all claims, demands, liabilities, judgments, losses, damages, costs and expenses, joint or several (including all accounting fees and reasonable attorneys' fees), that Lender or any such indemnified party may incur arising out of this Agreement, any of the other Loan Documents or any act taken by Lender hereunder except to the extent of the willful misconduct or gross negligence of such indemnified party, as determined by a court of competent jurisdiction in a final non-appealable judgment or order.  The provisions of this Section shall survive the termination of this Agreement.

9.12    <u>Power of Attorney</u>.  Borrower hereby appoints Lender, as its attorney-in-fact to indorse its name on all instruments and other documents payable to Borrower in order for Lender to perform its services under this Agreement, including under <u>Section 2.2</u>.  Upon the occurrence and during the continuation of an Event of Default, Lender shall be entitled, but not required, to perform any action or execute any document required to be taken or executed by Borrower under this Agreement and the other Loan Documents; *provided* that Borrower shall not be relieved of such obligation under this Agreement and the other Loan Documents.  The powers of attorney described in this Section are coupled with an interest and are irrevocable.

9.13    <u>Governing Law; Jurisdiction; Waiver of Jury Trial</u>.    This Agreement and the other Loan Documents shall be governed by the domestic laws of the State of Ohio.  Borrower agrees that the state and federal courts in Hamilton County, Ohio, or any other court in which Lender initiates proceedings has exclusive jurisdiction over all matters arising out of the Loan Documents, WITHOUT LIMITATION ON THE ABILITY OF LENDER, ITS SUCCESSORS AND ASSIGNS, TO INITIATE AND PROSECUTE IN ANY APPLICABLE JURISDICTION ACTIONS RELATED TO THE REPAYMENT AND COLLECTION OF THE OBLIGATIONS AND THE EXERCISE OF ALL OF LENDER'S RIGHTS AGAINST BORROWER WITH RESPECT THERETO AND ANY SECURITY OR PROPERTY OF BORROWER, INCLUDING DISPOSITIONS OF THE LOAN COLLATERAL, and that service of process in any such proceeding shall be effective if mailed to Borrower at the address described in the Notices section of this Agreement.  LENDER AND BORROWER HEREBY WAIVE THE RIGHT TO TRIAL BY JURY OF ANY MATTERS ARISING OUT OF THIS AGREEMENT

OR THE TRANSACTIONS CONTEMPLATED HEREBY OR ANY OF THE OTHER LOAN DOCUMENTS.


[REMAINDER INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, Borrower and Lender has executed this Agreement by their duly authorized officers as of the date first above written.

EASTERN LIVESTOCK CO., LLC

By: _Thomas P. Gibson_ _Manager_

Thomas P. Gibson, Manager

FIFTH THIRD BANK

By: _David G. Fuller_ _VP_

David G. Fuller, Vice President

492609.8