**EXHIBIT A,**
**CONTINUED**

Exhibit 1.1 to CREDIT AGREEMENT
"Consent and Waiver of Liens"

# CONSENT AND WAIVER OF LIENS

WHEREAS, _____ (whether one or more, "Operators") operate a facility located at _____, _____ (the "Facility"), where existing or future livestock ("cattle") belonging to Eastern Livestock Co., LLC, a Kentucky limited liability company ("Eastern"), are kept from time to time, and where Operators otherwise do business with Eastern; and,

WHEREAS, _____ (whether one or more, "Owners") own the real property on which the Facility is located; and,

WHEREAS, Fifth Third Bank ("Bank") may extend credit to Eastern that is secured, in part, by a security interest in existing and future cattle (and all products and proceeds thereof) belonging to Eastern that may be from time to time in the possession, custody, care, or control of Operators ("Collateral") and which may be on the real property of Owners; and,

WHEREAS, to induce Bank to extend credit to Eastern secured, in part, by the Collateral, and in consideration of the mutual benefits enjoyed by Eastern and Operators and Owners through Eastern's acquisition of rights in and ownership of cattle that are Collateral, and by the keeping of Collateral at the Facility;

NOW, THEREFORE, IT IS HEREBY AGREED AS FOLLOWS:

1.      Operators and Owners hereby waive and relinquish to Bank any and all security interests or other liens (statutory, common law, contractual or otherwise, including, but not limited to, the liens of a landlord and of an agister), claims, demands, rights, or other interests which Operators or Owners may now have or hereafter acquire in, on or to any or all of the Collateral, including, without limitation, the right to levy, distrain, or distraint, retain or take possession of, or sell any of the Collateral for sums due Operators or Owners. Operators and Owners acknowledge Eastern's title to, and ownership of, the Collateral, and Bank's security interest in the Collateral.

2.      Operators and Owners hereby grant permission to Bank and Bank's agents and designees to enter onto any property owned, leased, occupied, or operated by Operators or Owners, including, but not limited to, the Facility, at any time and from time to time for any one or more of the following purposes: taking possession of, removing or selling Collateral. Bank may sell, transfer, or otherwise dispose of any and all Collateral, without notice to Operators or Owners, free and clear of all liens, claims, demands, rights, and interests of Operators or Owners.

3.      Operators agree: (a) to cause all of the Collateral to be located or stored on the Facility separate and apart from all property belonging to Operators or any third parties, (b) not to issue any documents of title to evidence any Collateral located at the Facility, (c) that Eastern and Bank each is hereby authorized to file Uniform Commercial Code ("UCC") financing statements and other filings under applicable law to give notice to third parties of: (i) the bailment relationship between Operators and Eastern with regard to the Collateral, (ii) Eastern's title to the Collateral,

and (iii) Bank's security interest in the Collateral, and (d) if requested by Bank, to use good faith efforts to cause each of Operators' creditors that have security interests in farm products or inventory (or the products or proceeds thereof) to sign a letter in a form acceptable to Bank confirming, among other things, that such creditors have no interest in the Collateral. Operators further acknowledge and agree that, pursuant to the UCC and other applicable law, Operators hold possession of the Collateral for the benefit of Bank.

4.   Operators agree not to at any time: (a) use the Collateral or any part of it for any purpose other than for agreed-on functions and keeping for Eastern, (b) represent to any third party or parties that Operators are the owner of the Collateral, or (c) purport to or grant a security interest in, pledge, assign, mortgage or grant any other lien on any of the Collateral.

5.   The terms of this agreement will continue in effect until all of Eastern's obligations and liabilities to Bank are paid and satisfied in full and all financing arrangements between Bank and Eastern, including any extensions or renewals thereof, are terminated in a writing signed by Bank. This agreement shall be binding upon Operators and Owners and their heirs, executors, administrators, successors, and assigns and may be recorded in the real estate records if elected by Bank.

IN WITNESS WHEREOF, on this ____ day of July, 2004, Operators and Owners have caused this Consent and Waiver of Liens to be duly executed.

_____

_____, Operator
[print name]


_____

_____, Operator
[print name]


_____

_____, Owner
[print name]


_____

_____, Owner
[print name]

2

**Exhibit 2.1 to CREDIT AGREEMENT**
"Revolving Note"

## A FIFTH THIRD BANCORP BANK

REVOLVING CREDIT PROMISSORY NOTE

OFFICER NO. _____                                                    NOTE No. _____

$22,500,000                                                              August 9, 2004
                                                                         (Effective Date)

<u>Promise to Pay</u>.  On or before July 31, 2006 (the "<u>Maturity Date</u>"), the undersigned, EASTERN
LIVESTOCK CO., LLC, a Kentucky limited liability company ("<u>Borrower</u>"), with an address of
135 West Market Street, New Albany, Indiana 47150, for value received, hereby promises to pay
to the order of FIFTH THIRD BANK, an Ohio banking corporation (together with its successors
and assigns, "<u>Lender</u>"), at 38 Fountain Square Plaza, MD #10AT63, Cincinnati, Ohio 45263, or
such other address as Lender may provide from time to time, the sum of TWENTY-TWO
MILLION FIVE HUNDRED THOUSAND AND 00/100 Dollars ($22,500,000), plus interest as
provided herein, or so much thereof as is loaned by Lender to Borrower as Revolving Loans
pursuant to the Credit Agreement between Lender and Borrower dated of even date herewith (as
the same may be amended, renewed, consolidated, restated or replaced from time to time, the
"<u>Credit Agreement</u>").  The outstanding balance of this Note shall appear on supplemental bank
records and is not necessarily the face amount of this Note, which record shall evidence the
balance due pursuant to this Note at any time.  As used herein, "<u>Local Time</u>" means the time at
the office of Lender specified in this Note.

This Note, and any request by Borrower from time to time for an advance of a specified principal
amount hereunder, shall be subject to the terms and conditions of the Credit Agreement.
Capitalized terms used herein which are not otherwise defined in this Note shall have the
meanings set forth in the Credit Agreement.  This Note is entitled to the benefits and security of
the Credit Agreement, including, without limitation, acceleration upon the terms provided
therein, and of the other Loan Documents.

The entire principal balance of this Note, together with all accrued and unpaid interest and any
other charges, advances and fees, if any, outstanding hereunder, shall be due and payable in full
on the earlier of the Maturity Date or upon acceleration of the Indebtedness evidenced by this
Note, notwithstanding any other inconsistent or contradictory provisions contained in this Note.

Upon the occurrence and during the continuance of any Event of Default, the entire principal
balance of this Note, together with all accrued but unpaid interest, and all other Obligations,
shall, at Lender's option, become immediately due and payable, except that if there occurs an
Event of Default of the type described in <u>Sections 6.1(d)</u>, <u>6.1(e)</u>, or <u>6.1(k)</u> of the Credit
Agreement, the entire principal balance of this Note, together with all accrued but unpaid
interest, and all other Obligations shall become automatically and immediately due and payable
without notice, which Borrower hereby waives.

<u>Interest</u>.  Principal amounts outstanding under this Note shall bear interest commencing on the
date of the first advance hereunder at the rate or rates per annum set forth below, which rate or
rates shall be designated by Borrower as more fully set forth herein (the "<u>Interest Rate</u>").  At any

time and from time to time during the term of this Note, so long as no Event of Default has occurred and is continuing and so long as such outstanding principal amounts hereunder are not then subject to a LIBOR Election, Borrower may exercise its right to adjust the rate of interest accruing on amounts of principal outstanding under this Note to one of the rates set forth below upon notice to Lender as set forth below; *provided, however,* that once the rate of interest accruing against any amounts outstanding hereunder is adjusted to one of the following LIBOR Rates during a particular LIBOR Interest Period, Borrower may not elect to adjust such Interest Rate to a different Interest Rate until the expiration of such LIBOR Interest Period:

(a)    LIBOR Rate. Upon telephonic notice to Lender by 10:00 a.m. Local Time given at least two Business Days prior to the beginning of a LIBOR Interest Period, Borrower may elect to have advances under this Note bear interest at a rate per annum equal to the rate (adjusted for reserves if Lender is required to maintain reserves with respect to relevant advances) being asked on an amount of Eurodollar deposits approximately equal to the amount of the advances subject to a LIBOR Election on the first day of a LIBOR Interest Period and which has a maturity corresponding to the maturity of the LIBOR Interest Period, as reported by the Dow Jones Telerate news service (or any successor or other reporting service selected by Lender) as determined by Lender by noon on the effective date of the LIBOR Interest Period (the "LIBOR Rate") plus the Applicable LIBOR Rate Margin (as defined herein) (the "LIBOR Election"). Each determination by Lender of the LIBOR Rate shall be conclusive in the absence of manifest error. Interest shall be: (i) calculated based on a 360-day year and charged for the actual number of days elapsed and (ii) payable on the first day of each calendar month. The rate of interest applicable to a particular advance shall remain at the rate elected for the remainder of the subject LIBOR Interest Period.

The "LIBOR Interest Period" for each advance is a period of 30, 60, or 90 days, at Borrower's election, which period shall commence on a Business Day selected by Borrower subject to the terms of this Note. If a LIBOR Interest Period would otherwise end on a day that is not a Business Day, such LIBOR Interest Period shall end on the next succeeding Business Day; *provided* that, if the next succeeding Business Day falls in a new month, such LIBOR Interest Period shall end on the immediately preceding Business Day.

In addition, notwithstanding anything herein contained to the contrary, if, prior to or during any period with respect to the LIBOR Rate, any change in any law, regulation or official directive, or in the interpretation thereof, by any governmental body charged with the administration thereof, shall make it unlawful for Lender to find or maintain its funding in Eurodollars of any portion of the advance subject to the LIBOR Rate or otherwise to give effect to Lender's obligations as contemplated hereby: (i) Lender may, by written notice to Borrower, declare Lender's obligations in respect of the LIBOR Rate to be terminated forthwith, and (ii) the LIBOR Rate with respect to Lender shall forthwith cease to be in effect, and interest shall from and after such date be calculated at the Prime Rate as if a Prime Rate Election had been made, and interest shall be paid on the first (1st) day of each calendar month. Borrower hereby agrees to reimburse and indemnify Lender from all increased costs or fees incurred by Lender subsequent to the date hereof relating to the offering of rates of interest based upon the LIBOR Rate.

Borrower's right to make a LIBOR Election shall be terminated automatically if Lender, by telephonic notice, shall notify Borrower that Eurodollar deposits with a maturity corresponding to the maturity of the LIBOR Interest Period, in an amount equal to the advances to be subject to the LIBOR Election are not readily available in the London Inter-Bank Offered Rate Market, or that, by reason of circumstances affecting such Market, adequate and reasonable methods do not exist for ascertaining the rate of interest applicable to such deposits for the proposed LIBOR Interest Period. In such event, amounts outstanding hereunder shall bear interest at a floating rate of interest per annum equal to the rate of interest per annum established by Lender at its principal office as its "Prime Rate" or such other rate of interest as may be agreed to between Lender and Borrower.

If any amount as to which a LIBOR Election is in effect is repaid on a day other than the last day of the applicable LIBOR Interest Period, or becomes payable on a day other than the last day of the applicable LIBOR Interest Period due to acceleration or otherwise, Borrower, whether or not a debtor in a proceeding under Title 11, United States Code, shall pay, on demand by Lender, such amount (as determined by Lender) as is required to compensate Lender for any losses, costs or expenses ("LIBOR Breakage Fee"), which Lender may incur as a result of such payment or acceleration, including, without limitation, any loss, cost or expense (including loss of profit) incurred by reason of liquidation or reemployment of deposits or other funds acquired by Lender to fund or maintain such amount bearing interest at the applicable Interest Rate.

(b)    Prime Rate.  Upon telephonic notice by Borrower to Lender by 10:00 a.m. Local Time, Borrower may elect to have all or any portion of the Revolving Loans outstanding hereunder (provided such amounts are not then subject to a LIBOR Election), bear interest at a rate floating per annum equal to the rate of interest per annum established from time to time by Lender at its principal office as its "Prime Rate" plus the Applicable Prime Rate Margin (as defined below) (the "Prime Rate Election") (it being understood by Borrower that such Prime Rate is established for reference purposes only and not as Lender's best loan rate).  Any adjustment in the interest rate resulting from a change in Lender's Prime Rate shall become effective as of the opening of business on the date of change (or if not a Business Day, the beginning of the day).  Interest on the principal amount subject to a Prime Rate Election shall be calculated based on a 360-day year and charged for the actual number of days elapsed, and shall be payable on the first day of each calendar month.

On or before the date of any advance hereunder bearing interest with reference to the LIBOR Rate, and on or before the date which is two Business Days prior to the expiration of the applicable LIBOR Interest Period, Borrower shall notify Lender of each of the following: (a) the LIBOR Interest Period Borrower has elected regarding each advance hereunder, (b) the amount of each such advance, and (c) the commencement date of each LIBOR Interest Period. Borrower may have advances outstanding hereunder bearing interest with reference to the LIBOR Rate in minimum amounts of $1,000,000 (and integral multiples of $100,000) bear interest at the applicable interest rate for different LIBOR Interest Periods so long as (i) the last day of any LIBOR Interest Period does not exceed the Maturity Date hereof; (ii) no LIBOR Interest Period election with respect to any advance commences prior to the expiration of the applicable LIBOR Interest Period in effect with respect to such advance; and (iii) at no time may Borrower have more than four outstanding LIBOR Elections in the aggregate and one Prime Rate Election.  If,

at any time during the term hereof, Borrower fails to designate a LIBOR Interest Period or if Borrower has not elected another LIBOR Interest Period in accordance with this Note at least two Business Days prior to the expiration of the LIBOR Interest Period then in effect, Lender may assume that Borrower has elected a Prime Rate Election.

(c)     Pricing Grid.     As used herein, the terms "Applicable Prime Rate Margin" and "Applicable LIBOR Rate Margin" (hereafter sometimes collectively referred to as the "Applicable Margins") mean, as of any date, the applicable per annum rate shown in the applicable column in the table below based on the then applicable Senior Debt to EBITDA Ratio. "Senior Debt to EBITDA Ratio" means, as of any Determination Date, the ratio resulting from dividing Senior Debt as of such Determination Date by EBITDA for the applicable 12 Month Period ended on such Determination Date. "Senior Debt" means, as of any Determination Date, the average outstanding principal balance of the Revolving Loans during the immediately preceding ninety (90) day period ended on such Determination Date.

| Pricing Grid Level | Senior Debt to EBITDA Ratio | Applicable Prime Rate Margin | Applicable LIBOR Rate Margin |
|---|---|---|---|
| I | > 4.000 to 1.0 | 1.00% | 3.00% |
| II | > 3.250 to 1.0 to ≤ 4.000 to 1.0 | 0.75% | 2.75% |
| III | ≤ 3.250 to 1.0 | 0.50% | 2.75% |

For purposes of determining the Applicable Margins: (i) the Senior Debt to EBITDA Ratio will, on and after the First Pricing Grid Determination Date, be determined as of the end of each Fiscal Quarter and Fiscal Year ending on or after the First Pricing Grid Determination Date (each such date being a "Determination Date") and (ii) EBITDA will be determined in the same manner used to determine the Fixed Charge Coverage Ratio set forth in Section 5.9 of the Credit Agreement. The "First Pricing Grid Determination Date" is the end of the first Fiscal Quarter that began on a day that is ninety or more days after the Closing Date (e.g., if the Closing Date is August 9, 2004, the First Pricing Grid Determination Date would be March 31, 2005). On Lender's receipt of the financial statements and Compliance Certificate required to be delivered to Lender pursuant to Sections 4.3(a) (and 4.3(b) in the case of annual financials) and 4.3(d) of the Credit Agreement, the Interest Rate will be subject to adjustment in accordance with the table set forth above in this subparagraph (c) based on the then Senior Debt to EBITDA Ratio so long as no Event of Default is existing as of the applicable effective date of adjustment. The foregoing adjustment, if applicable, will become effective on and after the first day of the first calendar month following delivery to Lender of the financial statements and Compliance Certificate required to be delivered to Lender pursuant to Sections 4.3(a) (and 4.3(b) in the case of annual financials) and 4.3(d) of the Credit Agreement until the next succeeding effective date of adjustment pursuant to this subparagraph (c). Each of the financial statements and Compliance Certificate required to be delivered to Lender must be delivered to Lender in compliance with Section 4.3 of the Credit Agreement. If, however, either the financial statements or the Compliance Certificate required to be delivered to Lender pursuant to Sections 4.3(a) (and 4.3(b) in the case of annual financials) and 4.3(d) of the Credit Agreement have not been delivered in accordance with Section 4.3 of the Credit Agreement, then, at Lender's option, commencing on the date upon which such financial statements or Compliance Certificate should have been delivered in accordance with Section 4.3 of the Credit Agreement and continuing until such financial statements or Compliance Certificate are actually delivered in accordance with

-4-

Section 4.3 of the Credit Agreement, it shall be assumed for purposes of determining the Applicable Margins, that the Senior Debt to EBITDA Ratio was greater than 4.00:1.0 and the pricing associated therewith (*i.e.*, Pricing Grid Level I) will be applicable on the then applicable Determination Date. As of the Closing Date, the Applicable Prime Rate Margin is 1.00% per annum and the Applicable LIBOR Rate Margin is 3.00% (*i.e.*, Pricing Grid Level I).

Maximum Rate. In no event shall the Interest Rate provided for hereunder exceed the maximum rate legally chargeable by Lender under applicable law for loans of the type provided for hereunder (the "Maximum Rate"). If, in any month, the Interest Rate, absent such limitation, would have exceeded the Maximum Rate, then the Interest Rate for that month shall be the Maximum Rate, and, if in future months, that Interest Rate would otherwise be less than the Maximum Rate, then that Interest Rate shall remain at the Maximum Rate until such time as the amount of interest paid hereunder equals the amount of interest which would have been paid if the same had not been limited by the Maximum Rate. In the event that, upon payment in full of the Obligations, the total amount of interest paid or accrued in respect of the indebtedness evidenced by this Note is less than the total amount of interest which would, but for this paragraph, have been paid or accrued if the Interest Rate otherwise set forth in this Note had at all times been in effect, then Borrower shall, to the extent permitted by applicable law, pay to Lender an amount equal to the difference between (a) the lesser of (i) the amount of interest which would have been charged if the Interest Rate had, at all times, been in effect or (ii) the amount of interest which would have accrued had the Interest Rate otherwise provided for in this Note at all times been in effect and (b) the amount of interest actually paid or accrued in respect of the indebtedness evidenced by this Note. In the event that a court of competent jurisdiction determines that Lender has received interest and other charges in respect of the indebtedness evidenced by this Note in excess of the Maximum Rate, such excess shall be deemed received on account of, and shall automatically be applied to reduce, the Obligations owed to Lender other than interest, in the inverse order of maturity, and if there are no Obligations to Lender outstanding, Lender shall refund to Borrower (or to such Person to which Lender is directed by a court of competent jurisdiction) such excess.

Use of Proceeds. Borrower certifies that the proceeds of the Revolving Loans will be used for business purposes in accordance with the Credit Agreement.

Default Rate; Fees. If any payment is not paid when due (whether by acceleration or otherwise), Borrower agrees to pay to Lender a late payment fee equal to 5% of the payment amount. After the occurrence and during the continuation of an Event of Default, Borrower agree that Lender may, without notice, increase the Interest Rate by 3.0% per annum (the "Default Rate"); *provided* that this paragraph shall not be deemed to constitute a waiver of any Event of Default or an agreement by Lender to permit any late payments whatsoever.

Prepayment. Borrower may prepay all of this Note at any time, without penalty, except that if any prepayment results in any LIBOR Breakage Fee, Borrower will pay the LIBOR Breakage Fee due in accordance with this Note.

Entire Agreement. Borrower agrees that there are no conditions or understandings which are not expressed in this Note and the other Loan Documents.

-5-

Severability.  If any provision of this Note is held to be invalid by a court of competent jurisdiction in a final order, the invalid provision will, subject to the provisions of this Note with respect to the Maximum Rate of interest, be deemed severed from this Note and shall not affect any part of the remainder of the provisions of this Note.

Assignment.  Borrower agrees not to assign any of Borrower's rights, remedies or obligations described in this Note without the prior written consent of Lender, which consent may be withheld in Lender's sole discretion.  Borrower agrees that Lender may assign some or all of its rights and remedies described in this Note without prior consent from Borrower, *provided* that Lender will promptly notify Borrower of a total assignment of this Note.

Modification; Waiver of Lender.  The modification or waiver of any of Borrower's obligations or Lender's rights under this Note must be contained in a writing signed by Lender and Borrower.  Lender may perform Borrower's obligations, or delay or fail to exercise any of its rights or remedies, without causing a waiver of those obligations or rights.  A waiver on one occasion shall not constitute a waiver on another occasion. Borrower's obligations under this Note shall not be affected if Lender amends, compromises, exchanges, fails to exercise, impairs or releases (i) any of the obligations belonging to any co-borrower, indorser or guarantor, (ii) any of its rights against any co-borrower, guarantor or indorser, or (iii) any of the Loan Collateral.

Waivers of Borrower.  Demand, presentment, protest and notice of dishonor, notice of protest and notice of default are hereby waived by Borrower, and any indorser or guarantor hereof. Borrower and all co-makers and accommodation makers of this Note hereby waive all suretyship defenses, including, but not limited to, all defenses based upon impairment of collateral and all suretyship defenses described in Section 3-605 of the Uniform Commercial Code (the "UCC"). Such waiver is entered to the fullest extent permitted by Section 3-605 of the UCC.

Governing Law; Consent to Jurisdiction.  This Note is delivered in, is intended to be performed in, will be construed and enforceable in accordance with and governed by the internal laws of, the State of Ohio, without regard to principles of conflicts of law.  Borrower agrees that the state and federal courts in Hamilton, County Ohio where Lender is located shall have exclusive jurisdiction over all matters arising out of this Note, WITHOUT LIMITATION ON THE ABILITY OF LENDER, ITS SUCCESSORS AND ASSIGNS, TO INITIATE AND PROSECUTE IN ANY APPLICABLE JURISDICTION ACTIONS RELATED TO THE REPAYMENT AND COLLECTION OF THE OBLIGATIONS AND THE EXERCISE OF ALL OF LENDER'S RIGHTS AGAINST BORROWER WITH RESPECT THERETO AND ANY SECURITY OR PROPERTY OF BORROWER, INCLUDING DISPOSITIONS OF THE LOAN COLLATERAL, and that service of process in any such proceeding shall be effective if mailed to Borrower at the address set forth herein by certified mail, return receipt requested, if such service of process is received by Borrower.

**JURY WAIVER.  BORROWER AND ANY INDORSER OR GUARANTOR HEREOF WAIVE THE RIGHT TO A TRIAL BY JURY OF ANY MATTERS ARISING OUT OF THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY.**

IN WITNESS WHEREOF, Borrower has executed this Note by its duly authorized officer as of the date first above written.

**EASTERN LIVESTOCK CO., LLC**

By:_____
    Thomas P. Gibson, Manager

**EXHIBIT 4.3(d)**
**(Officer's Compliance Certificate)**

**For the [Quarterly] [Annual] Period**
**from _____, ___**
**to _____, ___**

To:     Fifth Third Bank pursuant to that certain Credit Agreement (the "<u>Agreement</u>"), dated as of August 9, 2004, by and between Fifth Third Bank and Eastern Livestock Co., LLC.

Ladies and Gentlemen:

This Officer's Compliance Certificate (this "<u>Certificate</u>") is delivered to you pursuant to <u>Section 4.3(d)</u> of the Agreement.  Unless otherwise stated in this Certificate, capitalized terms used in this Certificate are defined in the Agreement.

The undersigned hereby certifies to you as follows:

1.      The undersigned is, and at all times mentioned herein has been, the duly elected, qualified and acting chief executive or chief financial officer of Eastern Livestock Co., LLC (the "<u>Company</u>").

2.      The undersigned has reviewed the provisions of the Agreement and the other Loan Documents (collectively, the "<u>Documents</u>"), and has reviewed the activities of the Company during the period from _____, 200__, to _____, 200__ (the "<u>Subject Period</u>"), which are under the supervision of the undersigned, with a view towards determining whether, during the Subject Period, the Company has kept, observed, performed and fulfilled all its obligations under the Documents.

3.      The financial statements of the Company and its Subsidiaries delivered to you concurrently herewith have been prepared in accordance with generally accepted accounting principles ("<u>GAAP</u>") and fairly present in all material respects (subject to year-end adjustment) the financial condition and results of operations of the Company and its Subsidiaries, on a consolidated and consolidating basis, at the date and for the period indicated therein. **[Delete parenthetical for Annual Certificate.]**

4.      To the actual knowledge of the undersigned, no Event of Default has occurred and is continuing, nor any event which upon notice, lapse of time, the satisfaction of any other condition, or all of them, would constitute such an Event of Default, except for such defaults, if any, described on <u>Schedule A</u> attached.  (If any are described, state nature and status thereof and actions proposed to be taken with respect thereto.)

5.      The calculations shown on <u>Schedule B</u> attached hereto demonstrate compliance with <u>Sections 5.2</u> (Capital Expenditures), <u>5.9</u> (Fixed Charge Coverage Ratio) and <u>5.10</u> (Minimum Tangible Net Worth) of the Agreement.

Exhibit 4.3(d)
Form of Compliance Certificate

6.     Attached hereto as <u>Schedule C</u> are summaries of accounts payable agings, accounts receivable agings and inventory.

7.     Attached hereto as <u>Schedule D</u> are projections of Borrower for the period from _____, 200__ to _____, 200__ ("Projections"). <u>Schedule D</u> states (i) the assumptions on which the Projections were prepared and (ii) that the assumptions, except as otherwise noted on <u>Schedule D</u>, were prepared on a consistent basis with the operation of Consolidated Group's business during the immediately preceding Fiscal Year and with factors known to exist as of the date of this Certificate or reasonably anticipated to exist during the periods covered by the Projections.  The undersigned certifies that he has no reason to believe that the Projections, subject to the assumptions stated on <u>Schedule D</u>, are false or misleading in any material respect.

8.     Attached hereto as <u>Schedule E</u> is a list of all Indebtedness for borrowed money of Borrower outstanding on the date hereof, including the outstanding principal amount of each such debt issue or loan and the amount of unpaid and accrued interest with respect to each such issue or loan.

9.     Attached hereto as <u>Schedule F</u> is a narrative report of the business and affairs of Borrower and its subsidiaries which includes, but is not limited to, a comparison of the actual results of Borrower's operations during the Subject Period [and during the portion of the fiscal year then ended] to those budgeted for such period[s], along with a brief description and explanation of any budget variances.  **[Delete second and third parenthetical references for Annual Certificate.]**

The undersigned certifies to you that the foregoing Certificate is true and correct and in accordance with the terms of the Credit Agreement.

By: _____

Name: _____

chief executive/chief financial officer

Schedules:
A - Defaults
B - Calculations
C - Summaries of Accounts, Payables and Inventory
D - Projections
E - Indebtedness for Borrowed Money
F - Narrative Reports

Exhibit 4.3(d)
Form of Compliance Certificate

**<u>Schedule A</u>**
**<u>to</u>**
**<u>Officer's Compliance Certificate</u>**


**<u>Defaults</u>**

[See Attached]

Exhibit 4.3(d)
Form of Compliance Certificate

**Schedule B**
**to**
**Officer's Compliance Certificate**


**Covenant Calculations**

[See Attached]

Exhibit 4.3(d)
Form of Compliance Certificate

Exhibit 4.3(d)
Form of Compliance Certificate

## Schedule B
### to
### Officer's Compliance Certificate

For the [Fiscal Quarter]/[Fiscal Year] Ended _____, 200_

All calculations are in accordance with Credit Agreement definitions and provisions:

**A.    Capital Expenditures § 5.2**

| During Fiscal Year: | 10-01-03 to 09-30-04 | 10-01-04 to 09-30-05 |
|---|---|---|
| 1. Plant | | |
| 2. Maintenance | | |
| 3. Machinery | | |
| 4. Equipment | | |
| 5. Capital Lease obligations | | |
| | | |
| Capital Expenditures: 1+2+3+4+5= | | |
| | | |
| Maximum Allowed Capital Expenditures: | $750,000 | $750,000 |

B. **Fixed Charge Coverage Ratio § 5.9.**

| Fiscal Quarter ending on: | 06-30-04 | 09-30-04 | 12-31-04 | 03-31-05 | 06-30-05 | 09-30-05 |
|---|---|---|---|---|---|---|
| 1. EBITDA: | | | | | | |
| a. Net Income § 5.9(b) | | | | | | |
| b. Depreciation/Amortization § 5.9(b)(i) | | | | | | |
| c. Interest § 5.9(b)(ii) | | | | | | |
| d. Income Taxes (excluding tax distributions) § 5.9(b)(iii) | | | | | | |
| e. Extraordinary Gains § 5.9(b)(iv) | | | | | | |
| 2. 1a+1b+1c+1d-1e = | | | | | | |
| 3. Fixed Charges: | | | | | | |
| a. Principal Payments § 5.9(e)(i) | | | | | | |
| b. Capital Lease Payments § 5.9(e)(ii) | | | | | | |
| c. Interest § 5.9(e)(iii) | | | | | | |
| d. Unfinanced Capital Expenditures § 5.9(e)(iv) | | | | | | |
| e. Income Taxes § 5.9(e)(v) | | | | | | |
| f. LLC Tax Distributions § 5.9(e)(vi) | | | | | | |
| 4. 3a+3b+3c+3d+3e+3f = | | | | | | |
| 5. Fixed Charge Coverage Ratio = 2 divided by 4: | | | | | | |

Exhibit 4.3(d)
Form of Compliance Certificate

Exhibit 4.3(d)
Form of Compliance Certificate

| Fiscal Quarter ending on: | 12-31-05 | 03-31-06 | 06-30-06 |
|---|---|---|---|
| 1. EBITDA: | | | |
| a. Net Income § 5.9(b) | | | |
| b. Depreciation/Amortization § 5.9(b)(i) | | | |
| c. Interest § 5.9(b)(ii) | | | |
| d. Income Taxes (excluding tax distributions) § 5.9(b)(iii) | | | |
| e. Extraordinary Gains § 5.9(b)(iv) | | | |
| | | | |
| 2. 1a+1b+1c+1d-1e = | | | |
| | | | |
| 3. Fixed Charges: | | | |
| a. Principal Payments § 5.9(e)(i) | | | |
| b. Capital Lease Payments § 5.9(e)(ii) | | | |
| c. Interest § 5.9(e)(iii) | | | |
| d. Unfinanced Capital Expenditures § 5.9(e)(iv) | | | |
| e. Income Taxes § 5.9(e)(v) | | | |
| f. LLC Tax Distributions § 5.9(e)(vi) | | | |
| 4. 3a+3b+3c+3d+3e+3f = | | | |
| | | | |
| 5. Fixed Charge Coverage Ratio = 2 divided by 4: | | | |

C.   Minimum Tangible New Worth § 5.10.

| Fiscal Quarter ending on: | 06-30-04 | 09-30-04 | 12-31-04 | 03-31-05 | 06-30-05 |
|---|---|---|---|---|---|
| 1. Tangible Net Worth (consolidated with Okie): | | | | | |
| a. Book Net Worth § 5.10(b) | | | | | |
| b. Intangibles § 5.10(b)(i) | | | | | |
| c. Affiliate Accounts (excluding Eligible Accounts) §5.10(b)(ii) | | | | | |
| d. Write Up of Assets § 5.10(b)(iii)(A) | | | | | |
| e. Gain from cancellation of debt § 5.10(b)(iii)(B) | | | | | |
| f. Gain/Loss in Goodwill § 5.10(b)(iii)(C) | | | | | |
| g. Extraordinary Gains § 5.10(b)(iii)(D) | | | | | |
| 2. 1a-1b-1c-1d-1e-1f-1g = | | | | | |
| 3. Minimum Tangible Net Worth | $5,000,000 | $5,000,000 | $5,000,000 | $5,500,000 | $5,500,000 |

| | 09-30-05 | 12-31-05 | 03-31-06 | 06-30-06 |
|---|---|---|---|---|
| 1. Tangible Net Worth (consolidated with Okie): | | | | |
| a. Book Net Worth § 5.10(b) | | | | |
| b. Intangibles § 5.10(b)(i) | | | | |
| c. Affiliate Accounts (excluding Eligible Accounts) §5.10(b)(ii) | | | | |
| d. Write Up of Assets § 5.10(b)(iii)(A) | | | | |
| e. Gain from cancellation of debt § 5.10(b)(iii)(B) | | | | |
| f. Gain/Loss in Goodwill § 5.10(b)(iii)(C) | | | | |
| g. Extraordinary Gains § 5.10(b)(iii)(D) | | | | |
| 2. 1a-1b-1c-1d-1e-1f-1g = | | | | |
| 3. Minimum Tangible Net Worth | $6,000,000 | $6,000,000 | $6,000,000 | $6,000,000 |

Exhibit 4.3(d)
Form of Compliance Certificate

**<u>Schedule C</u>**
**<u>to</u>**
**<u>Officer's Compliance Certificate</u>**


**<u>Summaries of Accounts, Payables and Inventory</u>**

[See Attached]

Exhibit 4.3(d)
Form of Compliance Certificate

**Schedule D**
**to**
**Officer's Compliance Certificate**


**Projections**

[See Attached]

Exhibit 4.3(d)
Form of Compliance Certificate

<u>**Schedule E**</u>
<u>**to**</u>
<u>**Officer's Compliance Certificate**</u>

<u>**Indebtedness for Borrowed Money**</u>

[See Attached]

Exhibit 4.3(d)
Form of Compliance Certificate

**Schedule F**
**to**
**Officer's Compliance Certificate**


**Narrative Reports**


[See Attached]

Exhibit 4.3(d)
Form of Compliance Certificate

**EXHIBIT 4.3(g)**
**(Borrowing Base Certificate)**

**FIFTH THIRD BANK**
**COLLATERAL REPORT**

Borrower:      Eastern Livestock Co., LLC
                      Certificate No.: _____
                      Date: _____

To induce Fifth Third Bank ("Lender") to make a loan advance pursuant to the Credit Agreement dated as of August 9, 2004, as well as amendments thereto, between Eastern Livestock Co., LLC ("Borrower") and Lender, Borrower hereby certifies as of the above date, the following:

<u>Collateral Balances:</u>

| | | |
|---|---|---|
| [1] | Previous Certificate AR Balance | $ _____ |
| | (a)   Gross Sales since last Certificate | _____ |
| | (b)   Collections since last Certificate | _____ |
| | (c)   Credits since last Certificate | _____ |
| [2] | Total AR now being certified to Lender:  [1]+(a)-(b)-(c) | _____ |
| [3] | Total Ineligible AR (see attached breakdown) | _____ |
| [4] | Net Amount of Eligible AR: [2]-[3] | _____ |
| [5] | Total Loan value of AR @ 85% of [4] | _____ |
| [6] | Total Value of Inventory as of _____ | _____ |
| [7] | Total Ineligible Inventory (see attached breakdown) | _____ |
| [8] | Net Amount of Eligible Inventory: [6]-[7] | _____ |
| [9] | Total Loan value of Inventory @ 70% of [8] or $6,000,000 whichever is less | _____ |
| [10] | Borrowing Base Reserves | _____ |
| [11] | Total Avail. Collateral ([5] + [9] – [10]) or $22,500,000 whichever is lesser | _____ |

Exhibit 4.3(g)
Form of Borrowing Base Certificate

Loan Balances:

| | | | |
|---|---|---|---|
| [12] | Revolving Loan Balance per previous Certificate | | _____ |
| | (i) | Net total collections since last Certificate | _____ |
| | (ii) | Advance Request | _____ |
| [13] | New Revolving Loan Balance [12]–(i)+(ii) but in no event shall [13] be greater than [11] | | $ _____ |

As used herein, "AR" means "Eligible Accounts" and "Inventory" means "Eligible Inventory", each as defined in the Credit Agreement. Ineligible AR and Ineligible Inventory should be calculated by reference to the respective definitions of Eligible Accounts and Eligible Inventory.

Borrower, by execution hereof, warrants and represents the following:

a) There exists no Event of Default (as defined in the Credit Agreement); and there does not exist a condition which may precipitate an Event of Default under the terms of the Credit Agreement; and

b) Borrower represents, warrants and certifies that the above representations are true and correct and subject to all conditions of the Credit Agreement.

_____

Prepared By

_____

Authorized Signature

Date:_____

For Bank Use Only

Date Of Advance:

_____

Amount: $_____

Exhibit 4.3(g)
Form of Borrowing Base Certificate

**(Ineligible Details)**

I.    <u>A/R Ineligibles</u>:

| | |
|---|---|
| Past Due (45 days and over): | _____ |
| Due from Affiliates (>7 days): | _____ |
| Deferred Sales (Deposits): | _____ |
| Contra Accounts: | _____ |
| 25% Cross-Age: | _____ |
| 25% Concentration: | _____ |
| Credit Balances (>45 days): | _____ |
| Other: | _____ |
| Total A/R Ineligibles: | $ _____ |

II.    <u>Inventory Ineligibles</u>:

| | |
|---|---|
| Locations not on perpetual: | _____ |
| Others: | _____ |
| Total Inventory Ineligibles: | $ _____ |

Exhibit 4.3(g)
Form of Borrowing Base Certificate

Schedule 1.1 to CREDIT AGREEMENT
"Borrower's Facilities"

| | | | |
|---|---|---|---|
| Branch #3 | Kenny Plowman<br>1010 Tattle Branch Road<br>Chilhowie, VA 24319 | Branch #29 | Bill Arnett<br>600 Columbia Ave.<br>Monticello, KY 42633 |

Branch #4      Vernon Inman
               4460 Pulaski Highway
               Culleoka, TN 38451

Branch #12     Bernie Wallace
               East West Land & Cattle
               2441 Highway 473
               Kendalia, TX 78027

Branch #13     Edmonton Buying Station (Leased Location)
               310 North Main Street
               Edmonton, KY 42129

Branch #14     Robert Nichols
               Route 2, Box 27
               Snyder, OK 73566

Branch #19     West Kentucky Livestock Market, LLC
               1781 Highway 60 East
               Marion, KY 42064

Branch #22     Oaklake Cattle Company
               P.O. Box 1284
               Okeechobee, FL 34973

Branch #23     LeMaster Livestock
               1831 Boiling Springs Highway
               Gaffney, SC 29341

Branch #24     James Ed Edens IV
               P.O. Box 55
               Okolona, MS 38860

Branch #25     Darrell Beachamp
               Rusty Rat Cattle Co., Inc.
               NFO Barn, Hardin County Fairgrounds, Old Dixie Highway (Highway 31)
               Elizabethtown, Kentucky

Schedule 3.6 to CREDIT AGREEMENT
Livestock Licenses

1. United States Dept. of Agriculture, Grain Inspection Packers and Stockyards Administration, Registration No. 31-93477, Bond No. 785363 in the amount of $635,000.00
2. Alabama Department of Agriculture and Industries Livestock Dealers Financial Responsibility License No. 155057
3. Colorado Department of Agriculture Dealer License No. 30-31646-04
4. Indiana State Board of Animal Health Dealer License No. 2002629
5. Kentucky Department of Agriculture Division of Animal Health Livestock Dealers License No. 173
6. Mississippi Department of Agriculture and Commerce Permit to Engage in the Sale or Purchase of Livestock by Weight, License No. 73-05
7. Missouri Department of Agriculture Livestock Dealer Registration No. MODL-00616
8. Ohio Department of Agriculture Division of Animal Industry Licensed Dealer in Livestock License No. D252
9. Oklahoma Department of Agriculture Food and Forestry Livestock Dealers License No. 2004276

Schedule 3.9 to CREDIT AGREEMENT
Permitted Liens

<u>Personal Property</u>:

        **DEBTOR:**     **Eastern Livestock Co., LLC**

        <u>**Jurisdiction:**</u>

    i.    **Indiana Secretary of State**

        a.    Secured Party:    Case Credit Corporation
                Filing Number:    200300000283402
                Filing Date:      01/09/03 . . . . . . . . . .

    ii.    **Kentucky Secretary of State**

        a.    Secured Party:    INTRUST Bank, N.A.
                Filing Number:    1971803-74
                Filing Date:      12/03/03

        b.    Secured Party:    INTRUST Bank, N.A.
                Filing Number:    1980232-71
                Filing Date:      01/12/04

    iii.    **Jefferson County, Kentucky**

        a.    Secured Party:    Associates Commercial CRP
                Filing Number:    99-05435
                Filing Date:      07/28/99

<u>Real Property</u>:

    135 West Market Street, New Albany, IN 47150
    Mortgage Granted to National City Bank of Kentucky dated August 6, 2001 and
    recorded on August 16, 2001 in the County Recorder of Floyd County, Indiana to
    secure payment of Promissory Note dated August 6, 2001 in the original principal
    amount of $790,5000.00.

    579 NE Plantation Road, #N-109, Ocean House at Indian River Plantation, Stuart,
    FL 34994
    Mortgage Granted to Fidelity Federal Bank & Trust, West Palm Beach, FL dated
    December 30, 2002 and recorded on January 3, 2003 in Mortgage Book 01718,
    Page 0127 in the County Clerk of Martin County, Florida to secure payment of a
    Fixed/Adjustable Rate Note dated December 30, 2002 in the original principal
    amount of $262,500.00.

## Schedule 3.12 to CREDIT AGREEMENT
### Affiliates

| **Affiliate:** | **Ownership:** | **FEIN:** |
|---|---|---|
| Okie Farms, L.L.C. | 100% Eastern Livestock Co., LLC | 73-1519032 |
| Eastern Cattle Co., LLC | 66.6% Thomas P. Gibson<br>33.4% John S. Gibson | 41-2090895 |
| Rocking E Feeders, L.L.C. | 66.6% Thomas P. Gibson<br>33.4% John S. Gibson | 48-1182253 |
| Crow Hollow, L.L.C. | 66.6% Thomas P. Gibson<br>33.4% John S. Gibson | 75-2775793 |
| Gibson Farms, L.L.C. | 50% Thomas P. Gibson<br>50% John S. Gibson | 31-1526531 |
| Olim, L.L.C. | 98% TPG Trust<br>1% Thomas P. Gibson<br>1% Patsy Gibson | 61-1333968 |
| Taylor County Stockyards, L.L.C. | 100% Thomas P. Gibson | 61-1338063 |
| West Kentucky Livestock Market, LLC | 66.6% Thomas P. Gibson<br>33.4% John S. Gibson | 20-0511561 |

Schedule 3.14 to CREDIT AGREEMENT
Ownership Interests of Borrower

| Member | LLC Units |
| --- | --- |
| Thomas P. Gibson | 666 2/3 Class A<br>83,357 Class B |
| John S. Gibson | 333 1/3 Class A<br>43,678 Class B |
| Patsy Gibson | 5,698 Class B |
| Thomas P. Gibson Irrevocable Generation Skipping Trust dated December 26, 2000, Nancy G. McDonald and John F. Gibson, Co-Trustees | 4,000 Class B |
| Total Units: | 1,000 Class A<br>136,733 Class B |

Thomas Parrish Gibson
John Shirley Gibson
Patsy Gibson
Thomas P. Gibson Irrevocable Generation Skipping Trust dated 12/26/2000

Schedule 5.1 to CREDIT AGREEMENT
Existing Indebtedness

Personal Property:

Certain livestock trailers are financed by Intrust Bank, N.A., Wichita, KS as evidenced by a Promissory Note dated 11/25/03 in the original principal amount of $450,634.00 and subject to a Security Agreement of the same date.

Real Property:

135 West Market Street, New Albany, IN 47150
Mortgage Granted to National City Bank of Kentucky dated August 6, 2001 and recorded on August 16, 2001 in the County Recorder of Floyd County, Indiana to secure payment of Commercial Installment Note dated August 6, 2001 in the original principal amount of $790,500.00.

579 NE Plantation Road, #N-109, Ocean House at Indian River Plantation, Stuart, FL 34994
Mortgage Granted to Fidelity Federal Bank & Trust, West Palm Beach, FL dated December 30, 2002 and recorded on January 3, 2003 in Mortgage Book 01718, Page 0127 in the County Clerk of Martin County, Florida to secure payment of a Fixed/Adjustable Rate Note dated December 30, 2002 in the original principal amount of $262,500.00.

EXECUTION VERSION

## A FIFTH THIRD BANCORP BANK

### ELEVENTH AMENDED AND RESTATED REVOLVING CREDIT PROMISSORY NOTE

OFFICER NO. _____                          NOTE No. _____

$32,500,000.00

August 9, 2004
First Amendment and Restatement November 8, 2004
Second Amendment and Restatement February 9, 2005
Third Amendment and Restatement October 25, 2006
Fourth Amendment and Restatement October 31, 2008
Fifth Amendment and Restatement January 30, 2009
Sixth Amendment and Restatement March 2, 2009
Seventh Amendment and Restatement May 4, 2009
Eighth Amendment and Restatement May 26, 2009
Ninth Amendment and Restatement May 3, 2010
Tenth Amendment and Restatement July 3, 2010
Eleventh Amendment and Restatement September 3, 2010
(Effective Date)

Promise to Pay.  On or before October 18, 2010 (the "Maturity Date"), the undersigned, EASTERN LIVESTOCK CO., LLC, a Kentucky limited liability company ("Borrower"), with an address of 135 West Market Street, New Albany, Indiana 47150, for value received, hereby promises to pay to the order of FIFTH THIRD BANK, an Ohio banking corporation (together with its successors and assigns, "Lender"), at 38 Fountain Square Plaza, MD #10AT63, Cincinnati, Ohio 45263, or such other address as Lender may provide from time to time, the sum of THIRTY-TWO MILLION FIVE HUNDRED THOUSAND AND 00/100 Dollars ($32,500,000.00), plus interest as provided herein, or so much thereof as is loaned (subject to the limitations to the Revolving Commitment as stated in Section 2.1(a) of the Credit Agreement) by Lender to Borrower as Revolving Loans pursuant to the Credit Agreement between Lender and Borrower as of August 9, 2004, as amended by the First Amendment to Credit Agreement dated as of November 8, 2004, by the Second Amendment to Credit Agreement dated as of November 8, 2004, by the Third Amendment to Credit Agreement dated as of February 9, 2005, by the Fourth Amendment to Credit Agreement dated as of October 25, 2006, by the Fifth Amendment to Credit Agreement dated as of October 31, 2008, by the Sixth Amendment to Credit Agreement dated as of January 30, 2009, by the Seventh Amendment to Credit Agreement dated as of March 2, 2009, by the Eighth Amendment to Credit Agreement dated as of May 4, 2009, by the Ninth Amendment to Credit Agreement dated to be effective as of May 26, 2009, by the Tenth Amendment to Credit Agreement dated to be effective as of May 3, 2010, by the Eleventh Amendment to Credit Agreement dated to be effective as of July 3, 2010, and by the Twelfth Amendment to Credit Agreement dated to be effective as of September 3, 2010 (as the same may be further amended, renewed, consolidated, restated or replaced from time to time, the "Credit Agreement").  The outstanding balance of this Eleventh Amended and Restated Revolving Credit Promissory Note (this "Note") shall appear on supplemental bank records and is not necessarily the face amount of this Note, which record shall evidence the balance due

**EXHIBIT
B**

pursuant to this Note at any time. As used herein, "Local Time" means the time at the office of Lender specified in this Note.

This Note, and any request by Borrower from time to time for an advance of a specified principal amount hereunder, shall be subject to the terms and conditions of the Credit Agreement. Capitalized terms used herein which are not otherwise defined in this Note shall have the meanings set forth in the Credit Agreement. This Note is entitled to the benefits and security of the Credit Agreement, including, without limitation, acceleration upon the terms provided therein, and of the other Loan Documents.

The entire unpaid principal balance of this Note, together with all accrued and unpaid interest and any other charges, advances and fees, if any, outstanding hereunder, shall be due and payable in full on the earlier of the Maturity Date or upon acceleration of the Indebtedness evidenced by this Note, notwithstanding any other inconsistent or contradictory provisions contained in this Note.

Upon the occurrence and during the continuance of any Event of Default, the entire unpaid principal balance of this Note, together with all accrued but unpaid interest, and all other Obligations, shall, at Lender's option, become immediately due and payable, except that if there occurs an Event of Default of the type described in Sections 6.1(d), 6.1(e), or 6.1(k) of the Credit Agreement, the entire unpaid principal balance of this Note, together with all accrued but unpaid interest, and all other Obligations shall become automatically and immediately due and payable without notice, which Borrower hereby waives.

Interest. Principal amounts outstanding under this Note shall bear interest commencing on Effective Date at the rate or rates per annum set forth below, which rate or rates shall be determined as more fully set forth herein (the "Interest Rate"). At any time and from time to time during the term of this Note, so long as no Event of Default has occurred and is continuing and so long as such outstanding principal amounts hereunder are not then subject to a LIBOR Tranche Election, Borrower may exercise its right to make a LIBOR Tranche Election (as defined below) upon notice to Lender as set forth below; provided, however, that once the Interest Rate accruing against any amounts outstanding hereunder is adjusted to a Tranche LIBOR Rate for a particular LIBOR Tranche Interest Period, Borrower may not elect to adjust such Interest Rate to a different Interest Rate until the expiration of such LIBOR Tranche Interest Period.

(a)    Tranche LIBOR Rate. Upon telephonic notice to Lender by 10:00 a.m. Local Time given at least two Business Days prior to the beginning of a LIBOR Tranche Interest Period, Borrower may, subject to the terms of this Note, elect to have advances under this Note bear interest at a rate per annum equal to the Tranche LIBOR Rate (as defined herein) plus the Tranche LIBOR Rate Margin (as defined herein) (a "LIBOR Tranche Election"). The "Tranche LIBOR Rate" is, as of any date of determination, the greater of: (i) 1.0% or (ii) the rate of interest (rounded upwards, if necessary, to the next 1/8th of 1% and adjusted for reserves if Lender is required to maintain reserves with respect to relevant advances) fixed by the British Bankers' Association at 11:00 a.m., London, England time, relating to quotations for the one month, two month, or three month London InterBank Offered Rates, as selected by Borrower in its LIBOR Tranche Election,

-2-

on U.S. Dollar deposits as published on Bloomberg LP, or, if no longer provided by Bloomberg LP, such rate as shall be determined in good faith by Lender from such sources as Lender shall determine to be comparable to Bloomberg LP (or any successor) as determined by Lender at approximately 10:00 a.m. Local Time on the date of request by Borrower. Notwithstanding anything to the contrary contained in this Note, at any time during which a Rate Management Agreement with Lender is then in effect with respect to any Tranche LIBOR Rate Loan under this Note, the provision contained in the immediately preceding sentences that rounds up the Tranche LIBOR Rate to the next 1/8 of 1% (as set forth in the above definition of "Tranche LIBOR Rate" set forth above) shall be disregarded and no longer of any force and effect with respect to such Tranche LIBOR Rate Loan that is subject to such Rate Management Agreement with Lender. Each determination by Lender of the Tranche LIBOR Rate shall be conclusive in the absence of manifest error. Interest accruing based on the Tranche LIBOR Rate shall be: (A) calculated based on a 360-day year and charged for the actual number of days elapsed and (B) payable in arrears on the last day of the applicable LIBOR Tranche Interest Period. The Interest Rate applicable to a particular LIBOR Tranche Election shall remain at the rate elected for the remainder of the subject LIBOR Tranche Interest Period.

The "LIBOR Tranche Interest Period" for each Tranche LIBOR Rate Loan is a period of one month, two months, or three months, at Borrower's election, which period shall commence on a Business Day selected by Borrower subject to the terms of this Note. When a LIBOR Tranche Interest Period in respect of a Tranche LIBOR Rate Loan begins on a day which has no numerically corresponding day in the calendar month during which such LIBOR Tranche Interest Period is to end, it shall end on the last Business Day of such calendar month. If a LIBOR Tranche Interest Period would otherwise end on a day that is not a Business Day, such LIBOR Tranche Interest Period shall end on the next succeeding Business Day; *provided, however*, that if the next succeeding Business Day falls in a new month, such LIBOR Tranche Interest Period shall end on the immediately preceding Business Day.

On or before the date that is two Business Days before the making of any Tranche LIBOR Rate Loan, and on or before the date which is two Business Days prior to the expiration of any applicable LIBOR Tranche Interest Period, Borrower shall notify Lender of each of the following: (a) the LIBOR Tranche Interest Period Borrower has elected regarding any such Tranche LIBOR Rate Loan or any continuation of a LIBOR Tranche Election with respect to a Tranche LIBOR Rate Loan, (b) the amount of each such Tranche LIBOR Rate Loan or continuation, and (c) the commencement date of each LIBOR Tranche Interest Period. Borrower may have Tranche LIBOR Rate Loans in minimum amounts of $1,000,000 (and integral multiples of $100,000) and such Tranche LIBOR Rate Loans may bear interest at the applicable Interest Rate for different LIBOR Tranche Interest Periods so long as (i) the last day of any LIBOR Tranche Interest Period does not exceed the Maturity Date hereof; (ii) no LIBOR Tranche Election with respect to any Tranche LIBOR Rate Loan commences prior to the expiration of the applicable LIBOR Tranche Interest Period in effect with respect to such Tranche LIBOR Rate Loan; and (iii) at no time may Borrower have more than four outstanding Tranche LIBOR Rate Loans, in the aggregate, under this Note. If, at any time during the term hereof, Borrower fails to designate a LIBOR Tranche Interest Period or if Borrower has not elected another LIBOR Tranche Interest Period in accordance with this Note at least two Business Days prior to the expiration of the LIBOR Tranche Interest Period then in effect,

-3-

Lender may assume that Borrower has elected to have the principal amount applicable to such expiring LIBOR Tranche Interest Period accrue interest based on the Daily LIBOR Rate.

(b)     Daily LIBOR Rate.  All amounts outstanding under this Note, as of any date, which are not then subject to a LIBOR Tranche Election, will automatically bear interest at a floating rate equal to the Daily LIBOR Rate plus the Daily LIBOR Rate Margin (as defined below).  As used herein, "Daily LIBOR Rate" means, as of any date of determination, the greater of: (i) 1.0% or (ii) the rate of interest (rounded upwards, if necessary, to the next $1/8^{th}$ of 1% and adjusted for reserves if Lender is required to maintain reserves with respect to relevant advances) fixed by the British Bankers' Association at 11:00 a.m., London, England time, relating to quotations for the one month London InterBank Offered Rate on U.S. Dollar deposits as published on Bloomberg LP, or, if no longer provided by Bloomberg LP, such rate as shall be determined in good faith by Lender from such sources as Lender shall determine to be comparable to Bloomberg LP (or any successor) as determined by Lender at approximately 10:00 a.m. Local Time on the relevant date of determination.  Each determination by Lender of the Daily LIBOR Rate shall be conclusive in the absence of manifest error.  The Daily LIBOR Rate shall be reset each Business Day by Lender based on the Daily LIBOR Rate then in effect.  Any adjustment in the Interest Rate resulting from a change in the Daily LIBOR Rate shall become effective as of the opening of business on the date of each change.  Lender shall not be required to notify Borrower of any adjustment in the Daily LIBOR Rate; *however*, Borrower may request a quote of the prevailing Daily LIBOR Rate on any Business Day.  Interest accruing based on the Daily LIBOR Rate shall be: (A) calculated based on a 360-day year and charged for the actual number of days elapsed and (B) payable in arrears on the first day of each calendar month.

(c)     Applicable Margins.  As used herein, (i) "Tranche LIBOR Rate Margin" means 4.75% and (ii) "Daily LIBOR Rate Margin" means 4.75%.

(d)     LIBOR Rate Costs.  Borrower hereby agrees to reimburse and indemnify Lender from all costs or fees incurred by Lender subsequent to the date hereof relating to the offering of rates of interest based upon the Tranche LIBOR Rate and Daily LIBOR Rate.  Without limiting the generality of the foregoing, if any change in any law, regulation or official directive, or in the interpretation thereof, by any governmental body charged with the administration thereof, shall:

       (i)      increase the cost to Lender, by an amount which Lender deems to be material, of making, converting into, continuing or maintaining Tranche LIBOR Rate Loans or Daily LIBOR Rate Loans, as applicable, or to reduce any amount receivable hereunder in respect thereof, or

       (ii)     have the effect of reducing the rate of return on Lender's capital as a consequence of its obligations hereunder to a level below that which Lender could have achieved but for such change by an amount deemed by Lender to be material,

then, in any such case, after submission by Lender to Borrower of a written request therefor, Borrower shall pay Lender any additional amounts necessary to compensate Lender for such increased cost or reduction.  Lender agrees that, upon the occurrence of any event giving rise to the operation of this paragraph, it will use reasonable efforts to designate another lending office (if possible) for any Tranche LIBOR Rate Loans or Daily LIBOR Rate Loans affected by such

-4-

event with the object of avoiding the consequences of such event; *provided* that no such designation shall be required unless such designation can be made on terms that, in the judgment of Lender, cause Lender and its lending office(s) to suffer no material economic, legal or regulatory disadvantage.

In addition, if any amount as to which a LIBOR Tranche Election is in effect is repaid on a day other than the last day of the applicable LIBOR Tranche Interest Period, or becomes payable on a day other than the last day of the applicable LIBOR Tranche Interest Period due to acceleration or otherwise, Borrower, whether or not a debtor in a proceeding under Title 11, United States Code, shall pay, on demand by Lender, such amount (as determined by Lender) as is required to compensate Lender for any losses, costs or expenses ("LIBOR Breakage Fee"), which Lender may incur as a result of such payment or acceleration, including, without limitation, any loss, cost or expense (including loss of profit) incurred by reason of liquidation or reemployment of deposits or other funds acquired by Lender to fund or maintain such amount bearing interest with respect to the Tranche LIBOR Rate.

A certificate of Lender setting forth the amount or amounts necessary to compensate Lender as specified in this paragraph (d) and delivered to Borrower shall be conclusive absent manifest error. Borrower shall pay Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

(e)     Availability of Tranche LIBOR Rate and Daily LIBOR Rate. Notwithstanding anything herein contained to the contrary, if:

(i)     any change in any law, regulation or official directive, or in the interpretation thereof, by any governmental body charged with the administration thereof, shall make it unlawful for Lender to fund or maintain its funding in Eurodollars of any portion of the advances subject to the Tranche LIBOR Rate or the Daily LIBOR Rate, as applicable, or otherwise to give effect to Lender's obligations as contemplated hereby, or

(ii)     Lender, by telephonic notice, shall notify Borrower that: (A) with respect to Tranche LIBOR Rate Loans, Eurodollar deposits with a maturity corresponding to the maturity of the LIBOR Tranche Interest Period, in an amount equal to the advances to be subject to the LIBOR Tranche Election are not readily available in the London Inter-Bank Offered Rate Market, (B) with respect to Daily LIBOR Rate Loans, one-month Eurodollar deposits in an amount equal to the unpaid principal balance of this Note not then subject to a LIBOR Tranche Election are not readily available in the London Inter-Bank Offered Rate Market, (C) by reason of circumstances affecting the London Inter-Bank Offered Rate Market or other economic conditions, adequate and reasonable methods do not exist for ascertaining (1) the rate of interest applicable to such deposits for the proposed LIBOR Tranche Interest Period or, as applicable, (2) the Daily LIBOR Rate, or (D) the Tranche LIBOR Rate or, as applicable, the Daily LIBOR Rate as determined by Lender will not adequately and fairly reflect the cost to Lender of making or maintaining the unpaid principal balance of this Note at an interest rate based on the Tranche LIBOR Rate or, as applicable, the Daily LIBOR Rate, or

(iii)     an Event of Default exists:

-5-

(1) Lender may, by written notice to Borrower, declare Lender's obligations in respect of the Tranche LIBOR Rate and the Daily LIBOR Rate, as applicable, to be immediately terminated (an "Immediate LIBOR Rate Termination"), and (2) upon such Immediate LIBOR Rate Termination, (x) the Tranche LIBOR Rate and the Daily LIBOR Rate, as applicable, with respect to Lender shall cease to be in effect and (y) the unpaid principal balance of this Note shall bear interest from and after such notice at a floating rate equal to the rate of interest per annum established from time to time by Lender at its principal office as its "Prime Rate" (the "Prime Rate") plus 2.0% (it being understood by Borrower that such Prime Rate is established for reference purposes only and not as Lender's best loan rate) or such other rate of interest as may be agreed to between Lender and Borrower.

Any adjustment in the Interest Rate resulting from a change in Lender's Prime Rate shall become effective as of the opening of business on the date of change (or if not a Business Day, the beginning of the day). Interest based on the Prime Rate shall be calculated based on a 360-day year and charged for the actual number of days elapsed, and shall be payable in arrears on the first day of each calendar month.

Maximum Rate. In no event shall the Interest Rate provided for hereunder, together with all fees and charges as provided for herein or in any other Loan Document which are treated as interest under applicable law (collectively with interest, the "Charges"), exceed the maximum rate legally chargeable by Lender under applicable law for loans of the type provided for hereunder (the "Maximum Rate"). If, in any month, the Charges, absent such limitation, would have exceeded the Maximum Rate, then the Charges for that month shall be at the Maximum Rate, and, if in future months, such Charges would otherwise be less than the Maximum Rate, then such Charges shall remain at the Maximum Rate until such time as the amount of Charges paid hereunder and under the other Loan Documents equals the amount of Charges which would have been paid if the same had not been limited by the Maximum Rate. In the event that, upon payment in full of the Obligations, the total amount of Charges paid or accrued in respect of the Indebtedness evidenced by this Note and the other Obligations is less than the total amount of Charges which would, but for this paragraph, have been paid or accrued if the Charges otherwise set forth in this Note and in the other Loan Documents had at all times been in effect, then Borrower shall, to the extent permitted by applicable law, pay to Lender an amount equal to the difference between: (a) the lesser of: (i) the amount of Charges which would have been charged if the Maximum Rate had, at all times, been in effect or (ii) the amount of Charges which would have accrued had such Charges otherwise provided for in this Note and in the other Loan Documents at all times been in effect and (b) the amount of Charges actually paid or accrued in respect of the Indebtedness evidenced by this Note or any of the other Loan Documents. In the event that a court of competent jurisdiction determines that Lender has received any Charges in respect of the Indebtedness evidenced by this Note and the other Loan Documents in excess of the Maximum Rate, such excess shall be deemed received on account of, and shall automatically be applied to reduce, the Obligations owed to Lender other than any Charges, in the inverse order of maturity, and if there are no Obligations to Lender outstanding, Lender shall refund to Borrower (or to such Person to which Lender is directed by a court of competent jurisdiction) such excess.

<u>Use of Proceeds</u>. Borrower certifies that the proceeds of the Revolving Loans have been, and will be, used for business purposes in accordance with the Credit Agreement.

<u>Default Rate; Fees</u>. If any payment is not paid when due (whether by acceleration or otherwise), Borrower agrees to pay to Lender a late payment fee equal to 5% of the payment amount. After the occurrence and during the continuation of an Event of Default, Borrower agrees that Lender may, without notice, increase the Interest Rate by an additional 3.0% per annum (the "<u>Default Rate</u>"); *provided* that this paragraph shall not be deemed to constitute a waiver of any Event of Default or an agreement by Lender to permit any late payments whatsoever.

<u>Prepayment</u>. Borrower may prepay all of this Note at any time, without penalty.

<u>Entire Agreement</u>. Borrower agrees that there are no conditions or understandings which are not expressed in this Note or the other Loan Documents.

<u>Severability</u>. If any provision of this Note is held to be invalid by a court of competent jurisdiction in a final order, the invalid provision will, subject to the provisions of this Note with respect to the Maximum Rate of interest, be deemed severed from this Note and shall not affect any part of the remainder of the provisions of this Note.

<u>Assignment</u>. Borrower agrees not to assign any of Borrower's rights, remedies or obligations described in this Note without the prior written consent of Lender, which consent may be withheld in Lender's sole discretion. Borrower agrees that Lender may assign some or all of its rights and remedies described in this Note without prior consent from Borrower, *provided* that Lender will promptly notify Borrower of a total assignment of this Note.

<u>Modification; Waiver of Lender</u>. The modification or waiver of any of Borrower's obligations or Lender's rights under this Note must be contained in a writing signed by Lender and Borrower. Lender may perform Borrower's obligations, or delay or fail to exercise any of its rights or remedies, without causing a waiver of those obligations or rights. A waiver on one occasion shall not constitute a waiver on another occasion. Borrower's obligations under this Note shall not be affected if Lender amends, compromises, exchanges, fails to exercise, impairs or releases (i) any of the obligations belonging to any co-borrower, indorser or guarantor, (ii) any of its rights against any co-borrower, guarantor or indorser, or (iii) any of the Loan Collateral.

<u>Waivers of Borrower</u>. Demand, presentment, protest and notice of dishonor, notice of protest and notice of default are hereby waived by Borrower, and any indorser or guarantor hereof. Borrower and all co-makers and accommodation makers of this Note hereby waive all suretyship defenses, including, but not limited to, all defenses based upon impairment of collateral and all suretyship defenses described in Section 3-605 of the Uniform Commercial Code (the "<u>UCC</u>"). Such waiver is entered to the fullest extent permitted by Section 3-605 of the UCC.

<u>Prior Note</u>. This Note is issued, not as a refinancing or refunding of or payment toward, but as a continuation of, the Obligations of Borrower to Lender pursuant to that certain Tenth Amended and Restated Revolving Credit Promissory Note dated as of July 3, 2010, in the principal amount of $32,500,000 (together with all prior amendments thereto or restatements thereof, the "<u>Prior</u>

-7-

Note"), together with any and all additional Revolving Loans incurred under this Note; *provided* that the unpaid principal balance of such Indebtedness under the Prior Note, together with any and all such additional Revolving Loans incurred under this Note, shall not exceed the maximum principal amount of this Note (the "Principal Amount Cap"). Accordingly, this Note shall not be construed as a novation or extinguishment of the Obligations arising under the Prior Note, and its issuance shall not affect the priority of any Lien granted in connection with the Prior Note. Interest accrued under the Prior Note prior to the Effective Date remains accrued and unpaid under this Note and does not constitute any part of the principal amount of the Indebtedness evidenced hereby. This Note amends and restates the Prior Note in its entirety. All Revolving Loans created or existing under, pursuant to, as a result of, or arising out of, the Prior Note shall, together with any and all additional Revolving Loans incurred under this Note, continue in existence under this Note up to the Principal Amount Cap, which Obligations Borrower acknowledges, reaffirms, and confirms to Lender. The Indebtedness evidenced by this Note will continue to be secured by all of the collateral and other security granted to Lender under the Prior Note and the other Loan Documents.

Governing Law; Consent to Jurisdiction. This Note is delivered in, is intended to be performed in, will be construed and enforceable in accordance with and governed by the internal laws of, the State of Ohio, without regard to principles of conflicts of law. Borrower agrees that the state and federal courts in Hamilton County, Ohio shall have exclusive jurisdiction over all matters arising out of this Note, WITHOUT LIMITATION ON THE ABILITY OF LENDER, ITS SUCCESSORS AND ASSIGNS, TO INITIATE AND PROSECUTE IN ANY APPLICABLE JURISDICTION ACTIONS RELATED TO THE REPAYMENT AND COLLECTION OF THE OBLIGATIONS AND THE EXERCISE OF ALL OF LENDER'S RIGHTS AGAINST BORROWER WITH RESPECT THERETO AND ANY SECURITY OR PROPERTY OF BORROWER, INCLUDING DISPOSITIONS OF THE LOAN COLLATERAL, and that service of process in any such proceeding shall be effective if mailed to Borrower at the address set forth herein by certified mail, return receipt requested, if such service of process is received by Borrower.

**JURY WAIVER. BORROWER, AND ANY INDORSER OR GUARANTOR HEREOF, WAIVE THE RIGHT TO A TRIAL BY JURY OF ANY MATTERS ARISING OUT OF THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY.**

*[Signature Page Follows]*

IN WITNESS WHEREOF, Borrower has executed this Note by its duly authorized officer as of the Effective Date.

EASTERN LIVESTOCK CO., LLC

By: _____

Thomas P. Gibson, Manager

## A FIFTH THIRD BANCORP BANK

### SECURITY AGREEMENT

**EASTERN LIVESTOCK CO., LLC**, a Kentucky limited liability company, with its principal place of business and mailing address at 135 West Market Street, New Albany, Indiana 47150 (hereinafter "Debtor"), hereby grants to Fifth Third Bank, an Ohio banking corporation (hereinafter sometimes "Lender"), for itself and as agent for each affiliate of Fifth Third Bancorp (hereinafter collectively, "Secured Party"), a continuing security interest in and to, and a Lien on, and hereby assigns to Secured Party as collateral, all of the "Collateral", as defined in Section 2 of this Agreement.

1.    **OBLIGATIONS:** The security interest hereby granted shall secure the full, prompt and complete payment and performance of the "Obligations", as that term is defined in the Credit Agreement dated of even date herewith between Debtor and Lender (as the same may be amended, renewed, consolidated, restated or replaced from time to time, the "Credit Agreement").

2.    **COLLATERAL:** The collateral in which a security interest is hereby granted comprises all of the assets and property, real and personal, tangible and intangible, of Debtor, whether now owned or existing or hereafter arising or acquired, regardless of where any such assets and property are located, including all of Debtor's rights, titles and interests in and to the following, whether now owned or existing or hereafter arising or acquired, regardless of where any such assets and property are located (all of such assets and property and all of the below described assets and property being, collectively, the "Collateral"):

(a)    all Accounts, all Inventory, all Equipment, all General Intangibles, and all Investment Property (each as defined in Section 3 of this Agreement);

(b)    without limiting the description of the property or any rights or interests in the assets and property described above in this definition of Collateral, all goods, deposit accounts, instruments, chattel paper (including tangible chattel paper and electronic chattel paper), documents, securities, money, cash, letters of credit, letter-of-credit rights, promissory notes, warrants, dividends, distributions, the commercial tort claims listed on **Exhibit B** attached to this Agreement, contracts, agreements, contract rights and other property owned by Debtor or in which Debtor has any rights or an interest, including those which are now or hereafter in the possession or control of Secured Party or in transit by mail or carrier to or in the possession of any third party acting on behalf of Secured Party, without regard to whether Secured Party received the same in pledge, for safekeeping, as agent for collection or transmission or otherwise or whether Secured Party had conditionally released the same, all rights to payment from, and all claims against Secured Party, and any deposit accounts of Debtor with Secured Party, including all demand, time, savings, passbook or other accounts and all deposits therein, all as-extracted collateral, leases, lease contracts, lease agreements, and proceeds of a letter of credit;

(c)    without limiting the description of the property or any rights or interests in the assets and property described above in this definition of Collateral, all supporting obligations;

**EXHIBIT C**

(d)    without limiting the description of the property or any rights or interests in the assets and property described above in this definition of Collateral, all farm products, including all livestock and the born and unborn offspring thereof; and

(e)    all products and cash proceeds and noncash proceeds (including all rents, revenues, issues, and profits arising from the sale, lease, license, encumbrance, collection, or any other temporary or permanent disposition of any and all of the assets and property described above in this definition of Collateral or any interest therein) of any and all of the assets and property described above in this definition of Collateral, and all additions, accessions, attachments, parts, appurtenances and improvements to, replacements and substitutions of, and all supporting obligations for, guaranties of, insurance or condemnation proceeds of, and documents covering, the assets and property described above in this definition of Collateral, all sales of accounts, all tort or other claims against third parties arising out of damage or destruction of property described above in this definition of Collateral, and all property received wholly or partly in trade or exchange for property described above in this definition of Collateral.

3.    **DEFINITIONS:** As used herein, the following capitalized terms will have the following meanings:

(a)    "Accounts" means all accounts, accounts receivable, health-care-insurance receivables, credit card receivables, contract rights, instruments, documents, chattel paper, tax refunds from foreign, federal, state or local governments and all obligations in any form including those arising out of the sale or lease of goods or the rendition of services by Debtor; all guaranties, letters of credit and other security and supporting obligations for any of the above; all merchandise returned to or reclaimed by Debtor; and all books and records (including computer programs, tapes and data processing software) evidencing an interest in or relating to the above; all winnings in a lottery or other game of chance operated by a governmental unit or Person licensed to operate such game by a governmental unit and all rights to payment therefrom; and all "accounts" as the same is now or hereinafter defined in the Ohio UCC (as hereafter defined).

(b)    "Equipment" means all goods (other than Inventory, farm products or consumer goods), machinery, machine tools, equipment, fixtures, office equipment, furniture, furnishings, motors, motor vehicles, tools, dies, parts, jigs (including each of the items of equipment set forth on any schedule which is either now or in the future attached to Secured Party's copy of this Agreement), and all attachments, accessories, accessions, replacements, substitutions, additions and improvements thereto, all supplies used or useful in connection therewith, and all "equipment" as the same is now or hereinafter defined in the Ohio UCC.

(c)    "General Intangibles" means all general intangibles, choses in action, causes of action, obligations or indebtedness owed to Debtor from any source whatsoever, payment intangibles, software and all other intangible personal property of every kind and nature (other than Accounts) including patents, trademarks, trade names, service marks, copyrights, patent applications, trademark or service mark applications, copyright applications and goodwill, trade secrets, licenses, franchises, rights under agreements, tax refund claims, insurance refunds, insurance refund claims, pension plan refunds, pension plan reversions, and all books and

records including all computer programs, disks, tapes, printouts, customer lists, credit files and other business and financial records, the equipment containing any such information, and all "general intangibles" as the same is now or hereinafter defined in the Ohio UCC.

(d)      "Inventory" means all goods (other than Equipment, farm products or consumer goods), supplies, wares, merchandises and other tangible personal property, including all livestock, raw materials, work in process, supplies and components, and finished goods, whether held for sale or lease, or furnished or to be furnished under any contract for service, or used or consumed in business, and also including products of and accessions to inventory, packing and shipping materials, all documents of title, whether negotiable or non-negotiable, representing any of the foregoing, and all "inventory" as the same is now or hereinafter defined in the Ohio UCC.

(e)      "Investment Property" means all securities, whether certificated or uncertificated, financial assets, security entitlements, securities accounts, commodity contracts or commodity accounts; and all "investment property" as the same is now or hereafter defined in the Ohio UCC.

(f)      "Uniform Commercial Code" means the Uniform Commercial Code as adopted in each applicable jurisdiction, as amended or superceded from time to time. The "Ohio UCC" means the Uniform Commercial Code, as adopted in Ohio, as amended or superceded from time to time.

All of the uncapitalized terms contained in this Agreement which are now or hereafter defined in the Ohio UCC will, unless the context expressly indicates otherwise, have the meanings provided for now or hereafter in the Ohio UCC, as such definitions may be enlarged or expanded from time to time by amendment or judicial decision.

4.      **REPRESENTATIONS AND WARRANTIES:**  To induce Lender to make Loans and other extensions of credit pursuant to the Loan Documents, Debtor represents to Secured Party that the following statements are, and will continue throughout the term of the Credit Agreement to be, true:

(a)      Debtor is a limited liability company with its chief executive office and mailing address located in Indiana and is organized in the Commonwealth of Kentucky. Debtor's registered office in the Commonwealth of Kentucky is at the address set forth on **Exhibit A**. Debtor further warrants that its exact legal name and organizational number is set forth on **Exhibit A**. Debtor's federal tax identification number is as set forth on **Exhibit A**. **Exhibit A** attached to this Agreement lists the location of any and all of the Collateral. Except for inventory in transit, none of the Inventory or Equipment in existence as of the Closing Date has, while under the possession or control of Debtor, been at any location during the five year period preceding the date of this Agreement other than those locations set forth on **Exhibit A**;

(b)      Debtor is, and as to any property which at any time forms a part of the Collateral, shall be, the owner of each and every item of the Collateral, or otherwise have the right to grant a security interest in the Collateral, free from any Lien except to the extent, if any, of Permitted Liens;

(c)     Debtor has full right to grant the security interest hereby granted; and that Debtor shall defend the Collateral and each and every part thereof against all claims of all Persons at any time claiming any of the Collateral or claiming any interest therein adverse to Secured Party except to the extent, if any, of Permitted Liens;

(d)     as to any Accounts which are or become part of the Collateral, each such Account is a valid Account and that no such Account shall be sold, assigned, transferred, discounted (other than as expressly allowed pursuant to Section 5(a)(xii)), hypothecated, or otherwise subjected to any Lien, and Debtor shall defend such Accounts against all claims of any Person whosoever;

(e)     if any of the Collateral is or will be attached to real estate in such a manner as to become a fixture under applicable state law, Debtor will secure from the lien holder or the party in whose favor it is or, at Secured Party's option, will become so encumbered a written consent and subordination to the security interest hereby granted or a written disclaimer of any interest in the Collateral, in such form as is acceptable to Secured Party;

(f)     all trade names, assumed names, fictitious names and other names used by Debtor during the five year period preceding the date of this Agreement are set forth on **Exhibit A**, and Debtor has not, during the preceding five year period, except as may be set forth on **Exhibit A**, acquired any of its assets in any bulk transfer;

(g)     except as set forth on **Exhibit B**, Debtor has no rights, titles or interests in, or with respect to, any investment property, deposit accounts, letters of credit, electronic chattel paper, or any instruments, including promissory notes, except checks received in the ordinary course of business in payment of Accounts; and

(h)     Debtor represents and warrants that each item of Inventory shall be valued by Debtor at the lower of cost or market in accordance with GAAP.

5.     **DEBTOR'S RESPONSIBILITIES:**

(a)     Until the Obligations are fully paid, performed and satisfied and this Agreement is terminated, Debtor will:

(i)     furnish to Secured Party in writing upon Secured Party's request a current list of all Collateral for the purpose of identifying the Collateral and, further, execute and deliver such supplemental instruments, in the form of assignments or otherwise, as Secured Party shall require for the purpose of confirming and perfecting Secured Party's security interest in any or all of the Collateral, or as is necessary to provide Secured Party with control over the Collateral or any portion thereof;

(ii)     at its expense and upon request of Secured Party, furnish copies of invoices issued by Debtor in connection with the Collateral, furnish certificates of insurance evidencing insurance on the Collateral in accordance with the Credit Agreement, furnish proof of

payment of taxes and assessments on the Collateral, make available to Secured Party, any and all of Debtor's books, records, written memoranda, correspondence, purchase orders, invoices and other instruments or writings that in any way evidence or relate to the Collateral;

        (iii)    maintain all farm products and Inventory in good and salable condition and will handle, maintain and store all farm products and Inventory in a safe and careful manner in accordance with all applicable laws, rules, regulations, ordinances and governmental orders. Debtor will care for and maintain all livestock in a good and husband-like manner and will pay, or will cause to be paid, any and all feed costs and all veterinary or other medical costs and all other expenses related thereto in ordinary course of business;

        (iv)    notify Secured Party immediately in writing of any information which Debtor has or may receive which might in any way materially adversely affect the value of the Collateral or the rights of Secured Party with respect thereto;

        (v)    notify Secured Party at least 30 days in advance in writing of any change in Debtor's (A) chief executive office, principal place of business, or other places of business, or the opening of any new places of business, (B) exact legal name as set forth in the first paragraph of this Agreement, (C) names from those set forth on **Exhibit A**, or (D) the adoption by Debtor of trade names, assumed names or fictitious names;

        (vi)    pay all costs of filing any financing, continuation or termination statements with respect to the security interest created hereby;

        (vii)    pay all expenses and reasonable attorneys' fees of Secured Party incurred by Secured Party in the exercise (including enforcement) of any of Secured Party's rights or remedies under this Agreement or applicable law; and Debtor agrees that said expenses and fees shall constitute part of the Obligations and be secured by the Collateral and all other Loan Collateral;

        (viii)    maintain possession or control of all tangible Collateral at the locations set forth on **Exhibit A** and not remove the Collateral from those locations (except for inventory in transit and sales of inventory in the ordinary course of business) without giving Secured Party and Secured Party's counsel at least 30 days prior notice of such action and complying with the other terms of this Agreement; *provided* that such location is within the continental United States;

        (ix)    promptly notify Secured Party in writing of any contract with respect to which the account debtor is (A) the United States of America or any state, city, county or other governmental authority or any department, agency or instrumentality of any of them, or any foreign government or instrumentality thereof or (B) a business which is located in a foreign country;

        (x)    take any other and further action necessary or desirable as requested by Secured Party to grant Secured Party control over the Collateral, including the execution and/or authentication of any assignments or third party agreements; to obtain delivery of the Collateral

to the possession of Secured Party; or to obtain acknowledgments of the Lien of Secured Party from third parties in possession of any Collateral. Debtor agrees to consent to and authorize any third party in an authenticated record or agreement between Debtor, Secured Party, and the third party, including depository institutions, securities intermediaries, and issuers of letters of credit or other supporting obligations to accept direction from Secured Party regarding the maintenance and disposition of the Collateral and the products and proceeds thereof, and to enter into agreements with Secured Party regarding same, without further consent of Debtor;

(xi)    if Debtor shall at any time commence an action to assert a commercial tort claim, promptly notify Secured Party in a writing signed by Debtor of the particulars thereof and grant to Secured Party in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance reasonably satisfactory to Secured Party;

(xii)    in addition to the Borrowing Base Certificate to be delivered in accordance with the Credit Agreement, notify Secured Party promptly upon Debtor's learning thereof, in the event any Eligible Account becomes ineligible for any reason, other than the aging of such Account, and of the reasons for such ineligibility. Debtor shall also notify Secured Party promptly of all material disputes and claims *(i.e.,* involving an amount equal to 10% or more of the Account giving rise to such dispute and claims) with respect to its Accounts, and Debtor will settle or adjust such material disputes and claims at no expense to Secured Party; *however,* Debtor may not, without Secured Party's prior consent, grant: (A) any discount, credit or allowance in respect of its Accounts (1) which is outside the ordinary course of business and (2) which discount, credit or allowance exceeds an amount equal to $10,000 in the aggregate with respect to any individual account debtor or (B) any materially adverse extension, compromise or settlement to any customer or account debtor with respect to any then Eligible Account;

(xiii)    deliver to Secured Party, immediately on Secured Party's request, any instrument (whether negotiable or non-negotiable) or any chattel paper that evidences any amount payable under or in connection with any of the Collateral, which, in each instance, is duly indorsed to Secured Party in a manner acceptable to it, to be held as Collateral pursuant to this Agreement;

(xiv)    not, without the prior written consent of Secured Party, change the form of or the jurisdiction of Debtor's organization;

(xv)    not back date, post date or redate any invoice issued by Debtor with respect to any Account;

(xvi)    in addition to the Borrowing Base Certificate to be delivered in accordance with the Credit Agreement, notify Secured Party promptly of all material returns and recoveries of Inventory. Without first obtaining Secured Party's prior consent and complying with the applicable terms of this Agreement, Debtor will not (A) accept any returns of Inventory outside the ordinary course of business, (B) enter into any agreement, practice, arrangement, or transaction under which title to, or ownership of, any Inventory which is being sold by Debtor is, or purports to be, transferred to, or held by, a Person other than Debtor before such Inventory is

-6-

delivered to such Person by Debtor, (C) make a sale of Inventory to any customer on a bill-and-hold, guaranteed sale, sale and return, sale on approval, consignment (except to the extent expressly permitted by the Credit Agreement), or any other repurchase or return basis, or (D) store any Inventory with, or place any Inventory in the possession or control of, any bailee, processor, warehouseman, consignee or any other Person under any arrangement, practice or agreement (oral or written) except Inventory: (1) in transit, (2) which is located at an Eligible Branch Location, and (3) which is located at premises covered by a landlord waiver agreement in favor of Secured Party; and

(xvii)   on Secured Party's request, deliver to Secured Party any and all evidences of ownership of the Collateral, including any certificates of title and applications for title pertaining to Debtor's motor vehicles so that Secured Party may cause its security interest and Lien to be noted on such certificates of title.  Debtor will not permit any of the Equipment to become an accession to other personal property not constituting part of the Collateral.

(b)      To protect, perfect, or enforce, from time to time, Secured Party's rights or interests in the Collateral, Secured Party may, in its discretion (but without any obligation to do so), (i) discharge any Liens (other than Permitted Liens so long as no Event of Default has occurred) at any time levied or placed on the Collateral, (ii) pay any insurance to the extent Debtor has failed to timely pay the same, (iii) maintain guards where any Collateral is located if an Event of Default has occurred and is continuing, and (iv) obtain any record from any service bureau and pay such service bureau the cost thereof.  All costs and expenses incurred by Secured Party in exercising its discretion under this subparagraph (b) will be part of the Obligations, payable on Secured Party's demand and secured by the Collateral and all other Loan Collateral.

(c)      Debtor shall remain liable under any contracts and agreements included in the Collateral to perform all of its duties and obligations thereunder to the same extent as if this Agreement had not been executed, and Secured Party shall not have any obligation or liability under such contracts and agreements by reason of this Agreement or otherwise.

6.    **ACCOUNTS:**

(a)      Debtor hereby agrees that Secured Party may, upon the occurrence and during the continuation of an Event of Default, serve written notice on Debtor instructing Debtor to deliver to Secured Party all subsequent payments on Accounts which Debtor shall do until notified otherwise.

(b)      Secured Party may, upon the occurrence and during the continuation of an Event of Default, notify the account debtor(s) of its security interest and instruct such account debtor(s) to make further payments on Accounts to Secured Party instead of to Debtor.

(c)      Secured Party may also, at any time and from time to time, in its own name or in the name of others, periodically communicate with Debtor's account debtors, customers and other obligors to verify with them, to Secured Party's satisfaction, the existence, amount and terms of any sums owed by such account debtors, customers or other obligors to Debtor and the nature of any such account debtor's, customer's or other obligor's relationship with Debtor.

-7-

(d)     Secured Party may, upon the occurrence and during the continuation of an Event of Default, serve written notice upon Debtor that all subsequent billings or statements of account rendered to any account debtor shall bear a notation directing the account debtor(s) to make payment directly to Secured Party. Any payment received by Secured Party pursuant to this Section shall be retained in a separate non-interest bearing account as security for the payment and performance of all Obligations of Debtor.

(e)     Nothing in this Section 6 shall limit Debtor's obligations under Section 2.2 of the Credit Agreement with respect to the collection of the Accounts.

7.     **POWER OF ATTORNEY:** Debtor hereby makes, constitutes and appoints Secured Party its true and lawful attorney in fact to act with respect to the Collateral in any transaction, legal proceeding, or other matter in which Secured Party is acting pursuant to this Agreement. Debtor: (i) specifically authorizes Secured Party as its true and lawful attorney in fact to execute and/or authenticate on its behalf and/or file financing statements reflecting its security interest in the Collateral and any other documents necessary or desirable to perfect or otherwise further the security interest granted herein; (ii) specifically authorizes Secured Party to act as its true and lawful attorney in fact to execute and/or authenticate any third party agreements or assignments to grant Secured Party control over the Collateral, including third party agreements between Debtor, Secured Party, and depository institutions, securities intermediaries, and issuers of letters of credit or other supporting obligations which third party agreements direct the third party to accept direction from Secured Party regarding the maintenance and disposition of the Collateral and the products and proceeds thereof; and (iii) specifically authorizes Secured Party, upon the occurrence of an Event of Default, to issue, without further consent of Debtor, all (a) instructions to any bank at which any deposit account is maintained with respect to all existing or future funds held in such deposit account and (b) exclusive entitlement orders to all securities intermediaries with respect to all existing or future investment property held in any securities account maintained by such securities intermediary.

8.     **DEFAULT:** If an Event of Default occurs, then, in any such event, Secured Party may, without further notice to Debtor, at Secured Party's option, declare the Note and any or all of the Obligations to become immediately due and payable in the aggregate amount thereof. Secured Party may resort to the rights and remedies available at law, in equity and under the Loan Documents, including the rights and remedies of a secured party under the Uniform Commercial Code, including the right (i) to enter any premises of Debtor, with or without legal process and take possession of the Collateral and remove it and any records pertaining thereto and/or remain on such premises and use it for the purpose of collecting, preparing and disposing of the Collateral; (ii) to ship, reclaim, recover, store, finish, maintain and repair the Collateral; and (iii) to sell the Collateral at public or private sale, and Debtor will be credited with the net proceeds of such sale, after payment in full of all Obligations, only when they are actually received by Secured Party; any requirement of reasonable notice of any disposition of the Collateral will be satisfied if such notice is sent to Debtor 10 days prior to such disposition. Debtor will, upon request, assemble the Collateral and any records pertaining thereto and make them available at a place designated by Secured Party. Moreover, Secured Party may, without notice to Debtor, apply for and have a receiver appointed under state or federal law by a court of competent

jurisdiction in any action taken by Secured Party to enforce its rights and remedies under this Agreement and, as applicable, the other Loan Documents in order to manage, protect, preserve, and sell and otherwise dispose of all or any portion of the Collateral and/or continue the operation of the business of Debtor, and to collect all revenues and profits thereof and apply the same to the payment of all expenses and other charges of such receivership, including the compensation of the receiver, and to the payment of the Obligations until a sale or other disposition of such Collateral is finally made and consummated. Secured Party may use, in connection with any assembly or disposition of the Collateral, any trademark, tradename, tradestyle, copyright, patent right, trade secret or technical process used or utilized by Debtor. No remedy set forth herein is exclusive of any other available remedy or remedies, but each is cumulative and in addition to every other remedy given under this Agreement, the other Loan Documents or now or hereafter existing at law or in equity or by statute. Secured Party may proceed to protect and enforce its rights by an action at law, in equity or by any other appropriate proceedings. No failure on the part of Secured Party to enforce any of the rights hereunder shall be deemed a waiver of such rights or of any Event of Default and no waiver of any Event of Default will be deemed to be a waiver of any subsequent Event of Default. Moreover, Debtor acknowledges and agrees that Secured Party shall have no obligation to, and Debtor hereby waives to the fullest extent permitted by law any right that it may have to require Secured Party to, (a) clean up or otherwise prepare any of the Collateral for sale, (b) pursue any Person to collect any of the Obligations, or (c) exercise collection remedies against any Persons obligated on the Collateral. Secured Party's compliance with applicable local, state or federal law requirements, in addition to those imposed by the Uniform Commercial Code, in connection with a disposition of any or all of the Collateral will not be considered to adversely affect the commercial reasonableness of any disposition of any or all of the Collateral under the Uniform Commercial Code.

9.      **GENERAL PROVISIONS:**

(a)      All rights of Secured Party shall inure to the benefit of its successors, assigns and affiliates and all obligations of Debtor shall bind the successors and assigns of Debtor.

(b)      Debtor acknowledges and agrees that, in addition to the security interest granted herein, Secured Party has a banker's lien and common law right of set-off in and to Debtor's deposits, deposit accounts, securities, and other accounts and credits held by Secured Party and Secured Party may apply or set-off such deposits or other sums against the Obligations, whether or not matured or then due, upon the occurrence of an Event Default, and Secured Party has the right at any time following an Event of Default to refuse to allow withdrawals from any account of Debtor.

(c)      This Agreement and the other Loan Documents contain the entire agreement of the parties with respect to the subject matter of this Agreement and supersede all previous understandings and agreements relating to the subject matter hereof, and no oral agreement whatsoever, whether made contemporaneously herewith or hereafter shall amend, modify or otherwise affect the terms of this Agreement.

(d)     All rights and liabilities hereunder shall be governed and limited by and construed in accordance with the local laws of the State of Ohio (without regard to Ohio conflicts of law principles).

(e)     If any provision of this Agreement is found invalid by a court of competent jurisdiction, the invalid term will be considered excluded from this Agreement and will not invalidate the remaining provisions of this Agreement.

(f)     Debtor hereby irrevocably authorizes Secured Party at any time and from time to time to file in any filing office in any jurisdiction any initial financing statements and amendments thereto that (i) indicate the Collateral (A) as all assets of Debtor, whether now owned or hereafter acquired or arising, and all proceeds and products thereof and (B) as being of an equal or lesser scope or with greater detail, and (ii) provide any other information required by Part 5 of Article 9 of the Uniform Commercial Code for the sufficiency or filing office acceptance of any financing statement or amendment, including whether Debtor is an organization, the type of organization and any organizational identification number issued to Debtor. Debtor hereby irrevocably authorizes Secured Party at any time and from time to time to correct or complete, or to cause to be corrected or completed, any financing statements, continuation statements or other such documents as have been filed naming Debtor as debtor and Secured Party as secured party. Secured Party is hereby authorized to give notice to any creditor, landlord or any other Person as may be necessary or desirable under applicable laws to evidence, protect, perfect, or enforce the security interest granted to Secured Party in the Collateral.

(g)     Secured Party shall have no duty of care with respect to the Collateral except that Secured Party shall exercise reasonable care with respect to the Collateral in Secured Party's custody. Secured Party shall be deemed to have exercised reasonable care if (A) such property is accorded treatment substantially equal to that which Secured Party accords its own property or (B) Secured Party takes such action with respect to the Collateral as Debtor shall reasonably request in writing. Secured Party will not be deemed to have, and nothing in this subparagraph (g) may be construed to deem that Secured Party has, failed to exercise reasonable care in the custody or preservation of Collateral in its possession merely because either (1) Secured Party failed to comply with any request of Debtor or (2) Secured Party failed to take steps to preserve rights against any Persons in such property. Debtor agrees that Secured Party has no obligation to take steps to preserve rights against any prior parties.

(h)     Any capitalized term used but not defined herein shall have the meaning ascribed thereto in the Credit Agreement. The definition of any document, instrument or agreement includes all schedules, attachments and exhibits thereto and all renewals, extensions, supplements, restatements and amendments thereof. All schedules, exhibits or other attachments to this Agreement are incorporated into, and are made and form an integral part of, this Agreement for all purposes. As used in this Agreement, "hereunder," "herein," "hereto," "this Agreement" and words of similar import refer to this entire document; "including" is used by way of illustration and not by way of limitation, unless the context clearly indicates the contrary; the singular includes the plural and conversely; and any action required to be taken by Debtor is to be taken promptly, unless the context clearly indicates the contrary.

-10-

(i)     SECURED PARTY AND DEBTOR HEREBY WAIVE THE RIGHT TO TRIAL BY JURY OF ANY MATTERS ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

[Remainder of this Page Left Intentionally Blank]

This Security Agreement (as used hereinabove, this "Agreement") is made and dated as of August 9, 2004.

FIFTH THIRD BANK                         EASTERN LIVESTOCK CO., LLC

By: _David G. Fuller, VP_____            By: _Thomas P. Gibson, Manager_____
   David G. Fuller, Vice President           Thomas P. Gibson, Manager

SIGNATURE PAGE TO
EASTERN LIVESTOCK CO., LLC
SECURITY AGREEMENT

## **EXHIBIT A**

<u>Debtor's Exact Legal Name</u>:  Eastern Livestock Co., LLC


<u>Debtor's Organizational Identification
Number in the Commonwealth of Kentucky</u>: 0504359


<u>Debtor's Federal Tax Identification Number</u>:  61-1378425


<u>Debtor's Chief Executive Office and Mailing Address</u>:      135 West Market Street
New Albany, Indiana 47150


<u>Debtor's Registered Office in the Commonwealth of Kentucky</u>:      534 Justice Lane
Providence, KY  42450


<u>Debtor's Offices or Locations Where any Collateral is Located</u>:

| | | | |
|---|---|---|---|
| <u>Branch #3</u> | Kenny Plowman<br>1010 Tattle Branch Road<br>Chilhowie, VA  24319 | <u>Branch #29</u> | Bill Arnett<br>600 Columbia Ave.<br>Monticello, KY 42633 |
| <u>Branch #4</u> | Vernon Inman<br>4460 Pulaski Highway<br>Culleoka, TN  38451 | | |
| <u>Branch #12</u> | Bernie Wallace<br>East West Land & Cattle<br>2441 Highway 473<br>Kendalia, TX  78027 | | |
| <u>Branch #13</u> | Edmonton Buying Station (leased)<br>310 North Main Street<br>Edmonton, KY  42129 | | |
| <u>Branch #14</u> | Robert Nichols<br>Route 2, Box 27<br>Snyder, OK  73566 | | |
| <u>Branch #19</u> | West Kentucky Livestock Market, LLC<br>1781 Highway 60 East<br>Marion, KY  42064 | | |

Branch #22    Oaklake Cattle Company
              P.O. Box 1284
              Okeechobee, FL  34973

Branch #23    LeMaster Livestock
              1831 Boiling Springs Highway
              Gaffney, SC  29341

Branch #24    James Ed Edens IV
              P.O. Box 55
              Okolona, MS  38860

Branch #25    Darrell Beachamp
              Rusty Rat Cattle Co., Inc.
              NFO Barn, Hardin County Fairgrounds, Old Dixie Highway (Highway 31)
              Elizabethtown, Kentucky

Trade Names, Assumed Names and Fictitious Names:

A.    Currently in Use: Eastern Livestock Co., LLC

B.    Used During Last Five Years but not Currently in Use: None.

Assets Acquired in Bulk Transfer: Assets acquired from eMerge Interactive, Inc. pursuant to the
Asset Purchase Agreement dated August 5, 2002 among eMerge Interactive, Inc., Debtor, and
Thomas P. Gibson.

**EXHIBIT B**

<u>Commercial Tort Claims</u>:  Claims against American State Bank f/k/a Security State Bank for conversion of a deposit in the action *Eastern Livestock Co., LLC v. American State Bank f/k/a Security State Bank*, Case No. CI-01E-086, 222nd District Court of Deaf Smith County, Texas.

<u>Investment Property</u>: Man Financial Inc Acct. E 359 764 76149, Man Financial Inc Acct. E 359 764 76449

<u>Electronic Chattel Paper</u>: None

<u>Instruments</u>: None

<u>Deposit Accounts</u>: None other than with Secured Party and accounts maintained with National City Bank during the transition of the credit facilities from National City Bank to Secured Party

<u>Letters of Credit</u>: None

FILED

**COURT OF COMMON PLEAS**
**HAMILTON COUNTY, OHIO**

FILED

**FIFTH THIRD BANK**

2010 NOV -9 1 A 4:42

CLERK OF COURTS
CRIMINAL TRAFFIC DIV
HAMILTON COUNTY OHIO

Plaintiff

**v.**

CRIMINAL

**EASTERN LIVESTOCK CO., LLC, et al.,**

Defendants.

Case No. _____

2010 NOV 09 024642

CLERK OF COURTS
CRIMINAL TRAFFIC DIV
HAMILTON COUNTY OHIO

Judge _*ROBERT WINKLER*_

---

### TEMPORARY RESTRAINING ORDER

---

This matter came on for hearing before the Court on plaintiff Fifth Third Bank's ("Fifth Third") Motion for Temporary Restraining Order.

Having considered the Verified Complaint for preliminary and permanent injunctive relief executed by Mr. Timothy Spurlock, Assistant Vice President Special Investigations for Fifth Third, the motion for temporary restraining order, and the memorandum in support, the Court finds that it clearly appears, from the specific facts shown, that Fifth Third will be irreparably harmed in the event that the defendants, Eastern Livestock Company, LLC and Thomas Gibson (collectively, "Eastern Livestock"), is permitted to retain control over, and access to, the approximately $13 million of Fifth Third's funds diverted and held by Eastern Livestock.

Additionally, the Court finds that Fifth Third will be irreparably harmed in the event that Eastern Livestock is permitted to continue to access and disburse the funds in Eastern Livestock's accounts or to dispose of any of the real or personal property purchased therewith; or to sell, assign or otherwise transfer any interest in the real estate owned by Eastern Livestock; or

1

to sell, assign, or otherwise transfer any interest in any personal property owned by Eastern Livestock.

The Court also finds that Fifth Third has demonstrated a substantial likelihood that it will prevail on its claims for conversion, unjust enrichment, replevin and/or indemnification and damages.

Further, the Court finds that unless Eastern Livestock is immediately prevented from accessing, transferring or otherwise assigning the foregoing funds, and similarly barred from selling, assigning or otherwise transferring any the real estate owned by Eastern Livestock, and the personal property listed above, Fifth Third will suffer immediate and irreparable injury and the irretrievable loss of the funds Eastern Livestock has diverted from Fifth Third. Fifth Third has no adequate remedy at law for such harm. The Court further finds that, pursuant to Rule 65 of the Ohio Rules of Civil Procedure, it is equitable to grant the motion on the basis of the foregoing facts and circumstances.

It is, therefore, ORDERED, ADJUDGED, and DECREED that:

A. Eastern Livestock is hereby prohibited and enjoined from accessing, dissipating, transferring, assigning, or otherwise depleting any of the funds being held in any bank, financial institution or any other entity where Defendant has currently deposited funds;

B. Eastern Livestock is hereby prohibited and enjoined from selling, assigning, or otherwise transferring any interest in real property owned by Eastern Livestock, or any personal property owned by Eastern Livestock until further order of this Court;

C. Service of this Order may be made by fax or overnight mail delivery to any entity or by any other method authorized by Ohio Rule of Civil Procedure 65;

D. Any bank, financial institution or other entity receiving notice of this Order shall be prohibited from permitting Eastern Livestock to access, dissipate, transfer, assign, or otherwise deplete any of the funds being held by that bank, financial institution or other entity;

2

E.    A hearing on Fifth Third's motion for preliminary injunction shall be held on _23_

_NOVEMBER._____, 2010, at _10:00_ a.m./~~p.m.~~; and

G.    Bond is set at $_____1000.00_____.

SO ORDERED.

_____

Judge, Hamilton County Court of Common Pleas

3

**FILED**

**COURT OF COMMON PLEAS**
**HAMILTON COUNTY, OHIO**

2010 NOV -9 | A 4: 43

FIFTH THIRD BANK                        :

    Plaintiff,                        :

                         :

v.                        :

EASTERN LIVESTOCK CO., LLC, et al.    :

    Defendants.                        :

Case No. A 1 0 1 0 2 6 7

OF COURTS
CRIMINAL TRAFFIC DIV
HAMILTON COUNTY OHIO

CRIMINAL

Judge *ROBERT WINKLER*

---

## ORDER FOR THE IMMEDIATE APPOINTMENT OF RECEIVER

Upon motion of plaintiff, Fifth Third Bank ("Fifth Third" or "Plaintiff"), for the Appointment of Receiver (the "Motion"), which included a request for the immediate appointment of a receiver for all of the personal property, general intangibles, and other assets of defendant Eastern Livestock Co., LLC ("Eastern Livestock") of whatever kind or nature, and the Court having considered the motion, and being duly advised in the premises, the Court now finds as follows:

    A.    Fifth Third filed a Verified Complaint for conversion, unjust enrichment, fraud, preliminary and permanent injunctive relief, and emergency appointment of a receiver against Eastern Livestock, among others, on November 9, 2010.

    B.    Eastern Livestock is in default of its obligations to Fifth Third and is at great risk of insolvency.

    C.    Eastern Livestock is indebted to Fifth Third in an amount in excess of $32,500,000.00 under the parties' Credit Agreement and Eastern Livestock's Eleventh Amended and Restated Revolving Credit Promissory Note to Fifth Third.

D.      Fifth Third has a security interest in all of Eastern Livestock's assets and property, real and personal, tangible and intangible, including but not limited to, all of Eastern Livestock's Accounts, Inventory, Equipment, Investment Property, and General Intangibles as defined under Fifth Third's Security Agreement with Eastern Livestock.

E.      Pursuant to Eastern Livestock's Credit Agreement and Eleventh Amended and Restated Revolving Credit Promissory Note with Fifth Third, Eastern Livestock has expressly consented to this Court's jurisdiction.

F.      Fifth Third has provided to Defendants of its intend to the seek the appointment of a receiver and served a copy of the motion for appointment of receiver on Defendants' counsel by email.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED:

1.      Elizabeth M. Lynch of Development Specialists, Inc. (the "Receiver") is hereby appointed receiver for all of the real and personal property, general intangibles, and all other assets of Eastern Livestock of whatever kind or nature, and the Receiver shall have all authority and power of a receiver under Ohio law and as ordered by this Court.

2.      The Receiver shall take immediate possession, control, management, operation and charge of Eastern Livestock's businesses.  Pursuant to Ohio Revised Code Section 2735.04 and under the control of this Court, the Receiver shall have all authority and power of a receiver under Ohio law, including the following powers and duties:

a)      The Receiver shall take immediate possession, control, management, and charge of Eastern Livestock's accounting books and records of whatever nature and wherever located, in the possession of Eastern Livestock or any other person or entity, including all information regarding the assets, liabilities, equity, income, and expenses of Eastern Livestock.

The Receiver shall take immediate possession, control, management, and charge of all of Eastern Livestock's financial statements, ledgers and journals, balance sheets, trial balances, statements of cash flows, income statements, statements of retained earnings, accounting journals and books of original entry, including, but not limited to, (1) accounts receivable agings and any other documentation which indicate the amounts owing from customers on accounts receivable and from whom such amounts are or were owing and when any amounts were collected and deposited, and the use, application or disposition thereof; (2) fixed asset ledgers, schedules or records documentation and/or appraisals of Eastern Livestock's equipment, inventory, furnishings, and supplies; (3) inventory listings or other detail; (4) all lists, schedules or records pertaining to Eastern Livestock's stocks, bonds, shares or interests in any mutual fund, proprietorship, general or limited partnership, or corporation, all notes or other instruments owing to Eastern Livestock, and information regarding any other intangibles of Eastern Livestock; (5) all information and documentation which relates or pertains to any checking, saving, banking and money management accounts of any kind or nature of Eastern Livestock, or into which any proceeds of the collection or sale of any asset (including accounts receivable) of Eastern Livestock has been deposited; (6) all accounts payable and receivable documentation and information and all correspondence or written documents regarding negotiations with current accounts or proposed accounts; (7) all information of whatever type or nature, regarding the payroll and benefits of the owners, management, officers and employees of Eastern Livestock, including wage or salary information, expense reimbursement information, medical insurance information, or other employee deductions withheld or to be withheld, and all information regarding the trust fund or withholding taxes whether federal, state, or local and any information regarding any and all of the employer matching obligations or the employer payroll tax

obligations; (8) all information and documentation of any asset transfers by Eastern Livestock in the past four years; (9) all information and documentation regarding the federal, state and local tax liabilities of Eastern Livestock, including any and all federal, state and local tax returns filed or unfiled, and any documents generated during the preparation and filing of tax returns; (10) all contracts (including, without limitation, insurance policies) and leases to which Eastern Livestock is a party or has been a party; (11) all information and documentation of any other financial transaction or interest in and to any asset of Eastern Livestock which may be necessary or pertinent to the Receiver's operation and management of Eastern Livestock's assets; and (12) any documentation that relates or pertains to Eastern Livestock and is kept in the ordinary course of its business in connection with the record-keeping or accounting. The information described in this subparagraph shall hereinafter be referred to as the "Books and Records."

b)    The Receiver shall take immediate possession, control, management and charge of all assets and property of Eastern Livestock of whatever nature or kind (the "Property"), consisting of all personal property and all real property (including leasehold interests) and all cash or cash equivalents including, but not limited to, rights, title and interest in and to all bank accounts of Eastern Livestock, all interests under insurance policies and proceeds thereof, all accounts and notes receivable, all inventory of any type or nature, all furniture, fixtures, equipment, tooling, computers (hardware and software), and all general intangibles of Eastern Livestock, all claims, choses in action and causes of action, including, but not limited to, avoidance actions for transfers of any of the assets of Eastern Livestock for less than equivalent value or other improper transfers against the transferees of those assets, and any other asset or interest owned by Eastern Livestock or in which Eastern Livestock asserts an interest which has

any value, and the Books and Records and the Property are hereby placed in *custodia legis* and are subject to the exclusive jurisdiction of this Court.

c)    The Receiver shall have the authority to operate and manage the business of Eastern Livestock as he deems prudent in her sole discretion throughout this litigation, subject any applicable regulations or laws, such as The Packers and Stockyards Act of 1921 (7 U.S.C. §§ 181-229b, the Livestock Mandatory Reporting Act of 1999, and any amendments to this acts, and further order of this Court.  The Receiver shall preserve and care for any and all of the Property and utilize any and all of the Property to preserve and maximize the value of the Property.

d)    The Receiver is authorized to collect all profits, rents, proceeds and revenues of any nature whatsoever generated from the Property and/or the business operations of Eastern Livestock (including, without limitation, insurance proceeds) and to pay all necessary expenses including the reasonable and necessary expenses of the receivership relating to said operations, as he deems prudent in her sole discretion.

e)    The Receiver shall have the authority to maintain or purchase insurance from any agent or carrier, of any type reasonably necessary or desirable, on all the Property, subject to maintaining adequate coverage appropriately assigned to Fifth Third and naming Fifth Third as a loss payee thereof.

f)    The Receiver is authorized to establish or maintain one or more bank accounts in the Receiver's name for her operations as Receiver in this matter at any federally insured bank with offices in Ohio.  The Receiver shall keep a true and accurate account of any and all receipts and disbursements which the Receiver shall receive or make as Receiver in the course of the operation of Eastern Livestock's business.

g)    Subject to the terms of this Order, the Receiver is authorized to negotiate and effect an orderly sale, transfer, or assignment of all or a portion of any of the Property (including collection of accounts receivable and proceeds of available insurance) in or outside of the ordinary course of business of Eastern Livestock or of all or a portion of Eastern Livestock's business as a going concern and, from the proceeds thereof, to pay the secured and unsecured indebtedness of Eastern Livestock, including indebtedness which arises during the course of the Receiver's operation of Eastern Livestock's business, in accordance with the respective priorities of such obligations.  The Receiver is authorized to conduct such a sale of the Property (or undertake such collection) in any manner which he, in her good faith and reasonable discretion, believes will maximize the proceeds received from the sale (or collection) including, without limitation, by conducting a secured party sale in conjunction with Fifth Third and/or by retaining the services of an auctioneer.

h)    Any sale of Property consummated by the Receiver pursuant to the authority granted by this Order shall be free and clear of all liens, claims and interests of any nature or kind with such liens, claims or interests, if any, attaching to the proceeds of sale.  Upon receipt of sale proceeds, the Receiver shall be authorized, without further order of this Court, to disburse such proceeds to those entities having valid liens on the Property sold, in accordance with the priority of such liens.  In the event there is a dispute regarding such lien priorities or if the Receiver is unable to determine the holders and/or priority of such liens, then so much of the sale proceeds that are subject to dispute shall be retained in escrow by the Receiver pending the further order of this Court.

i)    Any sale of Property (unless the proceeds thereof will satisfy Eastern Livestock's obligations to Fifth Third in full), outside the ordinary course of Eastern Livestock's

-6-

business during the operation thereof by the Receiver under this Order, shall be subject to the prior approval of Fifth Third.

j)    The Receiver is authorized to institute, prosecute, or intervene in any lawsuit, summary proceeding or investigation against any other person(s) or entity(ies) to preserve and/or maximize the value of the Property or to obtain possession of any of the Property unlawfully in the possession of third parties.  Pursuant to Ohio law and to the Barton Doctrine,[1] no action may be commenced or maintained against the Receiver without Leave of this Court being first obtained.

k)    The Receiver is authorized but not required to defend actions against Eastern Livestock and may incur expenses to defend such actions to the extent that he believes, in her sole discretion, that it will protect and preserve the Property.

l)    The Receiver is authorized but not required to perform pursuant to the terms of any existing contracts (including leases) executed by Eastern Livestock in connection with Eastern Livestock's businesses or to reject such contracts (or leases) to the extent that the Receiver determines, in her sole discretion, that such performance or rejection will preserve and maximize the value of the Property.

m)    The Receiver is authorized to negotiate with any and all interested person(s) concerning the use, assignment, sale, collection, or lease of any of the Property.

n)    The Receiver shall be compensated based upon her normal billing rate of $375.00 per hour.  The Receiver shall be reimbursed for all reasonable and necessary out of pocket costs and expenses.  With respect to seeking compensation and reimbursement of costs and expenses for the Receiver, her agents or legal counsel, the Receiver shall describe such

---

[1]  *See* Barton v. Barbour, 104 U.S. 126, 129 (1881).

-7-

compensation, expenses and reimbursements in applications which will be submitted to the Court for approval prior to payment.

o)    The Receiver is authorized to employ any assistants, servants, agents, counsel or other persons deemed necessary or desirable to assist the Receiver in diligently executing the duties imposed upon the Receiver by this Order and Ohio law.

p)    The Receiver is hereby authorized to take any and all actions, not specifically enumerated herein, which are necessary to properly and adequately manage, control, operate, maintain and protect the business operations and assets of Eastern Livestock during the pendency of this action.

q)    The Receiver shall file with this Court and serve on all parties a monthly report summarizing its expenses and revenues. The Receiver and its counsel shall also file on a monthly basis applications specifically itemizing all of their respective fee charges and expenses. Such report of expenses and revenues and such fee applications shall be filed within twenty days of the end of each month and shall be served on all parties to this action together with a notice providing for a twenty-day period for objections and the opportunity for a hearing in the event that a timely objection is filed, and further providing that unless a timely objection is filed, such report and fee applications shall be deemed approved by this Court and all parties, and the Receiver shall then be authorized to pay itself and its counsel from funds of the receivership estate. It is understood that this Court may, *sua sponte*, schedule a hearing on any such report or fee application.

3.    Notwithstanding the foregoing, the Receiver and the Receivership estate shall not be liable for the payment of taxes, assessments or utility charges pre-dating the date of this Order.  Any individual or entity receiving a copy of this Order is hereby enjoined and

-8-

restrained from discontinuing service to the Receiver or the Receivership estate based upon the non-payment of such taxes or utilities prior to the date of this Order and from attempting to collect taxes and utility charges from the Receiver pre-dating the date of this Order.

4.    Eastern Livestock and any persons, firms or entities acting under the direction of Eastern Livestock, and any third parties, persons, firms or entities, shall, upon presentation of a copy of this Order, identify the location of and deliver to the Receiver, any and all receivership property, both the Books and Records and the Property, in the possession or under the control of such parties; and all persons are enjoined and restrained (a) from payment of any amounts owing to Eastern Livestock to anyone other than the Receiver and (b) from in any way disturbing or interfering with the collection, management or sale of any of the Property.

5.    All creditors, claimants, bodies politic, parties in interest, and their respective attorneys, servants, agents, and employees, and all other persons, firms, and corporations be, and they hereby are, jointly and severally, enjoined and stayed from commencing or continuing any action at law or suit or proceeding in equity to foreclose any lien or enforce any claim against Eastern Livestock or its Books and Records or Property, or against the Receiver in any court. The parties are further stayed from executing or issuing or causing the execution or issuance out of any Court of any writ, process, summons, attachment, subpoena, replevin, execution, or other process for the purpose of impounding or taking possession of or interfering with, or enforcing any claim or lien upon any property owned by or in the possession of Eastern Livestock or the Receiver, and from doing any act or thing whatsoever to interfere with the Receiver in the discharge of her duties in these proceedings, or with the exclusive jurisdiction of this Court over Eastern Livestock, its Books and Records and Property and the

said Receiver. Eastern Livestock and its agents and employees, and any other party shall immediately turn over to the Receiver any and all Books and Records and Property.

6.      Eastern Livestock and its agents and employees, and any other party shall immediately turn over to the Receiver, all sums in existence on the date hereof that are related or pertain to, or derived from the Property, including, but not limited to (a) all cash on hand; (b) all cash equivalents and negotiable instruments (such as checks, notes, drafts or other related documents or instruments); and (c) all sums held in accounts in any financial institutions, including but not limited to, all sums of any kind relating to the use, enjoyment, possession, improvement or occupancy of all or any portion of the Property.

7.      Except as directed by the Receiver, Eastern Livestock, its affiliates, agents, officers, directors, shareholders, members, employees, representatives or creditors, and all other persons or entities, are hereby prohibited from undertaking any act for or on behalf of Eastern Livestock, interfering in any way with the acts of the Receiver, and from in any way, manner or means, wasting, disposing of, transferring, selling, assigning, pledging, canceling, concealing, interfering with, or hypothecating any of the Books and Records or the Property. Upon the request of the Receiver, the foregoing persons and entities shall cooperate and affirmatively assist the Receiver in making available to the Receiver or her agents, the Books and Records and the Property. Nothing in this paragraph shall be construed to require a waiver of any attorney-client privilege.

8.      The Receiver, and her agents, including her counsel and any accountants that are appointed by the Court, shall be entitled to reasonable compensation for services rendered and reimbursement for expenses (a) related to the Receiver's duties, rights, and obligations under this Order or any future orders of the Court and applicable law; (b) related to

-10-

the administration, management, protection or liquidation of the Property; or (c) related to the defense or prosecution of any claim or suit brought against the Receiver or by the Receiver against any person or entity. Such compensation of the Receiver and her agents, her counsel and her accountants shall be reviewed by the Court and awarded from the Receivership estate and/or pursuant to Ohio Revised Code Section 2333.27.

        9.    The Receiver shall have full and unrestricted access to all of the Property, and Eastern Livestock and its officers, directors, shareholders, employees and agents, and any other party are directed to take all steps necessary to give the Receiver access to the premises and to give the Receiver all keys to the facilities.

        10.    In carrying out the duties as set forth herein, the Receiver is entitled to act in the exercise of her own sound business judgment as he deems appropriate within her sole discretion. The Receiver shall not be liable for any action taken or not taken by him in good faith and shall not be liable for any mistake of fact or error of judgment or for any acts or omissions of any kind unless caused by the willful misconduct or gross negligence on the part of the Receiver.

        11.    Nothing in this Order shall be read or interpreted as requiring Fifth Third, and its successors and assigns, to continue to extend credit to Eastern Livestock, and Fifth Third, and its successors and assigns, shall continue to have all rights and remedies to which it is entitled under its agreements with Eastern Livestock and pursuant to Ohio law, subject to the terms of this Order. Additionally, the Receiver may enter into borrowing transactions with Fifth Third (if Fifth Third so permits) on such terms and in such amounts as are necessary in the Receiver's judgment to continue operating or liquidating Eastern Livestock, and; such terms and conditions shall provide that Fifth Third retains a first and best lien and priority upon all the

-11-

assets of Eastern Livestock and that any Receiver borrowing, without need for further action, is immediately secured, in favor of Fifth Third, by all of the Property.

12.     The Receiver may, from time to time, make payments to Fifth Third, and its successors and assigns, from realization of its collateral, including, but not limited to collection of accounts receivable and insurance proceeds and sale of the real and personal property in which Fifth Third, and its successors and assigns, has a perfected mortgage and/or security interest, provided however, that no sale of the Fifth Third collateral shall take place without the express consent and authorization of Fifth Third, and its successors and assigns.

13.     The Bond of the Receiver is set at $ _5000.00_.

14.     This Order shall be effective immediately upon entry.

15.     The terms of this Order shall continue in full force and effect unless and until further order of this Court.

16.     The Receiver shall serve a copy of this Order upon defendant, Eastern Livestock Co., LLC, by facsimile, by overnight mail delivery, or by any other method authorized by the Ohio Rules of Civil Procedure at 135 West Market Street, New Albany, IN 47150.

IT IS SO ORDERED.

_11/9/10_
Date

_Robin Wenchel_
Judge

-12-