# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF INDIANA - NEW ALBANY

===============================

IN THE MATTER OF:          . Case #10-93904-BHL-11

                                .

EASTERN LIVESTOCK CO., LLC   . New Albany, Indiana

                                . **January 12, 2011**

                    Debtor   . 10:37:39 a.m.

===============================

### TRANSCRIPT OF TELEPHONIC HEARINGS RE:
**(#60) MOTION TO ABANDON, IN ADDITION TO MOTION FOR RELIEF FROM STAY AND REFUSAL TO WAIVE 30-DAY PRELIMINARY AND 60-DAY FINAL HEARING TIME REQUIREMENT, FILED BY CREDITOR REPUBLIC BANK & TRUST COMPANY; (#161) OBJECTION BY TRUSTEE JAMES A. KNAUER; (#60) MOTION TO ABANDON, IN ADDITION TO MOTION FOR RELIEF FROM STAY AND REFUSAL TO WAIVE 30-DAY PRELIMINARY AND 60-DAY FINAL HEARING TIME REQUIREMENT, FILED BY CREDITORS J&F OKLAHOMA HOLDINGS, INC., CACTUS GROWERS, INC., AND FRIONA INDUSTRIES, LP; (#149 - #163) OBJECTIONS BY CREDITOR FIRST BANK & TRUST COMPANY AND (#162) BY TRUSTEE JAMES A. KNAUER; (#141) EMERGENCY MOTION FOR AUTHORITY EMERGENCY MOTION REGARDING PAYMENTS ON DEBTOR'S CATTLE SALES, FILED BY TRUSTEE JAMES A. KNAUER;  (#177) OBJECTIONS BY CREDITORS CACTUS GROWERS, INC., FRIONA INDUSTRIES, LP, AND J&F OKLAHOMA HOLDINGS, INC.;**
-----------continued------------>
**BEFORE THE HONORABLE BASIL H.  LORCH, III, J.U.S.B.C.**

**APPEARANCES: (See Next Page)**

<u>Electronic Sound Recording Operator</u>:    Amy Bruckert

Proceedings Recorded by FTR Gold Digital Sound Recording
Transcript Produced by Certified Transcription Service

## GCI TRANSCRIPTION SERVICES
**210 Bayberry Avenue**
**Egg Harbor Township, NJ  08234-5901**
**1-609-927-0299     FAX 1-609-927-9768     1-800-471-0299**
**e-mail - irwingloria@comcast.net**

Page 2 Cover
#10-93904
1-12-2011

**CAPTION - continued**

**(#143) EMERGENCY MOTION FOR AUTHORITY EMERGENCY MOTION
REGARDING TRUSTEE SELLING DEBTOR'S CURRENT CATTLE INVENTORY,
FILED BY TRUSTEE JAMES A. KNAUER;
(#176) OBJECTION THERETO FILED BY CREDITORS CACTUS GROWERS, INC.,
FRIONA INDUSTRIES, LP, AND J&F OKLAHOMA HOLDINGS, INC.;
(#174 & #198) RESPONSES IN SUPPORT OF MOTION FOR RELIEF FROM STAY,
FILED BY CREDITOR CPC LIVESTOCK, LLC, AND CREDITOR EDDIE EICKE
BEFORE THE HONORABLE BASIL H. LORCH, III, J.U.S.B.C.**

**APPEARANCES:**

For Petitioning Creditors, Moseley Cattle          JOHN W. AMES, ESQ.
Auction, Moseley Cattle Auction, et al:            C.R. "CHIP" BOWLES, ESQ.
                                                   Greenebaum, Doll & McDonald, PLLC
                                                   3500 National City Tower
                                                   101 S. 5th Street
                                                   Louisville, KY 40202


For the U.S. Trustee:                              CHARLES R. WHARTON, AUST
                                                   Office of the U.S. Trustee
                                                   101 W. Ohio Street   Suite 1000
                                                   Indianapolis, IN 46204


For Republic Bank & Trust Company:                 ALLEN L. MORRIS, ESQ.
                                                   Stites & Harbison, PLLC
                                                   323 E. Court Avenue
                                                   Jefferson, IN 47131
                                                         -- continued----------->


Electronic Sound Recording Operator:  Amy Bruckert

Proceedings Recorded by FTR Gold Digital Recording
Transcript Produced by Certified Transcription Service

GCI TRANSCRIPTION SERVICES
210 Bayberry Avenue
Egg Harbor Township, NJ  08234-5901
1-609-927-0299      FAX 1-609-927-9768      1-800-471-0299
e-mail - irwingloria@comcast.net

Page 3 Cover
#10-93904
1-12-2011

**APPEARANCES: (continued)**

For Fifth Third Bank:                    EDWARD M. KING, ESQ.
                                          Frost, Brown & Todd, LLC
                                          400 W. Market Street    3nd Fl.
                                          Louisville, KY 40202

                                          RANDALL D. LaTOUR, ESQ. *(Via phone)*
                                          Vorys, Sater, Seymour & Pease, LLP
                                          52 East Gay Street
                                          Columbus, OH   43216

For First Bank & Trust Company:          STEPHEN A. WEIGAND, ESQ.
                                          DANIEL J. DONNELLON, ESQ.
                                          Faruki, Ireland & Cox, PLL
                                          201 East Fifth Street   Suite 1420
                                          Cincinnati, OH 45202

                                          JOHN R. CARR, III, ESQ.
                                          BRET S. CLEMENT, ESQ.
                                          Ayers, Carr & Sullivan, P.C.
                                          251 E. Ohio Street   Suite 500
                                          Indianapolis, IN   46204

For Bluegrass Stockyards, LLC, and       LAURA DAY DELCOTTO, ESQ.
related entities:                        DelCotto Law Group, PLLC  *(Via phone)*
                                          200 North Upper Street
                                          Lexington, KY 40507
                                                   ---------continued ---------->

Electronic Sound Recording Operator:   Amy Bruckert

Proceedings Recorded by FTR Gold Digital Recording
Transcript Produced by Certified Transcription Service

GCI TRANSCRIPTION SERVICES
210 Bayberry Avenue
Egg Harbor Township, NJ  08234-5901
1-609-927-0299      FAX 1-609-927-9768      1-800-471-0299
e-mail - irwingloria@comcast.net

Page 4 Cover
#10-93904
1-12-2011

**APPEARANCES - Continued**

For Friona Industries:                          JOHN FREDERICK MASSOUH, ESQ.
                                                JOHN T. HUFFAKER, ESQ.
                                                Sprouse Shrader Smith, P.C.

                                                701 S. Taylor   Suite 500
                                                Amarillo, TX   79105

For Cactus Growers, Inc.:                       JOHN HUNT LOVELL, ESQ.
                                                Lovell, Lovell, Newson & Isern, LLP
                                                112 W. 8th Avenue   Suite 1000
                                                Amarillo, TX 79101

Local counsel for Friona Industries, Cactus     MARK ROBINSON, ESQ.
Growers, Inc., and J&F Oklahoma Holdings, Inc.: Valenti, Hanley & Robinson, PLLC
                                                1950 One Riverfront
                                                401 W. Main Street
                                                Louisville, KY 40202

For J&F Oklahoma Holdings, Inc.                 DAVID L. LeBAS, ESQ. *(Via phone)*
                                                Namen, Howell, Smith & Lee, PLLC
                                                Suite 490
                                                8310 N. Capital of Texas Highway
                                                Austin, TX    78731

For Stockman Oklahoma:                          ROSS PLOURDE, ESQ.   *(Via phone)*
                                                McAfee & Taft, P.C.
                                                211 N. Robinson Ave.
                                                Oklahoma City, OK 73102
                                                ----------continued--------->

Electronic Sound Recording Operator:   Amy Bruckert

Proceedings Recorded by FTR Gold Digital Recording
Transcript Produced by Certified Transcription Service

GCI TRANSCRIPTION SERVICES
**210 Bayberry Avenue
Egg Harbor Township, NJ  08234-5901
1-609-927-0299      FAX 1-609-927-9768      1-800-471-0299
e-mail - irwingloria@comcast.net**

Page 5 Cover
#10-93904
1-12-2011

**APPEARANCES: (continued)**

Trustee for Thomas Gibson Bankruptcy Estate:      KATHRYN L. PRY
                                                  P.O. Box 6771
                                                  New Albany, IN   47151


For Chapter 11 Trustee, James Knauer:             TERRY E. HALL, ESQ.
                                                  DUSTIN R. DeNEAL, ESQ.   *(Via phone)*
                                                  Baker & Daniels
                                                  300 N. Meridian Street   Suite 2700
                                                  Indianapolis, IN 46204


Chapter 11 Trustee:                               JAMES A. KNAUER, ESQ.
                                                  Kroger Gardis & Regas, LLP
                                                  111 Monument Circle   Suite 900
                                                  Indianapolis, IN   46204


For Northern Livestock:                           JARED M. LE FEVRE, ESQ.   *(Via phone)*
                                                  Crowley Fleck, PLLP
                                                  490 N. 31st Street     #500
                                                  Billings, MT   59101


For Athens Stockyards:                            JOHN ANDERSON, ESQ. *(Via phone)*
                                                  No information available




Electronic Sound Recording Operator:     Amy Bruckert

Proceedings Recorded by FTR Gold Digital Recording
Transcript Produced by Certified Transcription Service

GCI TRANSCRIPTION SERVICES
**210 Bayberry Avenue**
**Egg Harbor Township, NJ  08234-5901**
**1-609-927-0299      FAX 1-609-927-9768      1-800-471-0299**
**e-mail - irwingloria@comcast.net**

1  (At 10:37:39 a.m.)

2          THE COURT:   Good morning.  Be seated.

3          ATTORNEYS:   Good morning, Your Honor.

4          THE COURT:    All right, we're on the record in

5  Eastern Livestock Company, LLC.   It's my understanding that

6  the Courtroom Deputy has already gotten all the appearances of

7  record.  I'm not going to go through those all again.  I would

8  just ask that when you do speak that you identify yourself and

9  who you're representing.

10          There are several matters on the docket this

11  morning.  The first motion that I have is a motion to abandon,

12  and for relief, filed by Mr. Morris on behalf of Republic

13  Bank.

14          MR. MORRIS:   Yes, Your Honor.  That's my motion.

15  We have an agreement, Your Honor.  There was an objection

16  filed by the Trustee, and we've reached an agreement, and,

17  Your Honor, the stay will be terminated.   The Trustee will

18  remain in possession of the property without rent for six

19  months from the -- from today's date.

20          They will -- Republic will maintain the right, upon

21  reasonable notice, to inspect the premises.   The Trustee will

22  maintain insurance on both the contents and the building, and

23  will pay utilities for the building during that six-month

24  period.   A foreclosure action will be filed in Floyd State --

25  or Floyd County State Court, and the Trustee will be named;

1   and if the proceeds of the Sheriff's Sale exceed the claim of

2   Republic, those proceeds will be turned over to the Trustee

3   following the Sheriff's Sale.

4           I believe that's our agreement.

5           MS. HALL:   That's correct, Your Honor.

6           THE COURT:   All right.

7           MR. MORRIS:   We'll submit an order within ten days,

8   Your Honor, with the Court's permission.

9           THE COURT:   Very good.   Thank you.

10          MR. MORRIS:   Permission to depart, Your Honor.

11          THE COURT:   Well, I wish I could go with you.

12          MR. MORRIS:   Well, I'll buy lunch, Judge.

13          THE COURT:   All right.   It's my understanding now

14  that I've already made a mistake --

15          CLERK:   (unclear) appearances.

16          THE COURT:   They have not made appearances.

17          CLERK:   They have not --

18          THE COURT:   All right.   I thought everyone had done

19  appearances.   Apparently only the attorneys on the phone have

20  done appearances, so let's state the appearances in the

21  courtroom, and you can start, Mr. Morris, since you're

22  leaving.

23          MR. MORRIS:   Allen Morris on behalf of Republic

24  Bank, Your Honor.   I'm accompanied by Jerry Brockman

25  (phonetic), Assistant Vice-President.

1            THE COURT:   All right.   Thank you.

2            MS. HALL:   Terry Hall on behalf of the Trustee in

3    the debtor's case, Jim Knauer; and Jim Knauer is with me, as

4    well as Elizabeth Lynch, who is -- was the prior Receiver and

5    has been proposed to be a consultant to the Trustee.

6            MR. WHARTON:   Chuck Wharton for the United States

7    Trustee.

8            MR. KING:   Good morning, Your Honor.   Ted King for

9    Fifth Third Bank.

10            MR. CLEMENT:   Brett Clement and John Carr, III, for

11    the First Bank & Trust Company.

12            MR. DONNELLON:   Good morning, Your Honor.   Dan

13    Donnelon, and with me is Steve Weigand.   We are also for First

14    Bank.

15            MR. AMES:    Judge, John Ames and Chip Bowles from

16    Greenebaum, Doll & McDonald.   We representing the original

17    petitioning creditors, involuntary, as well as Superior

18    Livestock currently, Ike's Trucking, Glenn Franklin -- there

19    will probably be a couple more we'll submit to the Court a

20    2019 when we feel we have our arms around how many folks we'll

21    be representing.

22            MR. LeBAS:   David LeBas for J&F Oklahoma Holdings,

23    Inc., one of the moving parties on the motion to lift stay

24    concerning an interpleader matter this morning.

25            MR. LOVELL:   John Lovell on behalf of Cactus

1    Growers, another movant on the lift stay.

2            MR. MASSOUH:    John Massouh on behalf of Friona

3    Industries.

4            MR. HUFFAKER:    John Huffaker for Fiona Industries,

5    Cattlemen's Live --  Cattlemen's Feed Lot (unclear).

6            MR. ROBINSON:    Mark Robinson, local counsel with

7    Mr. Massouh, Mr. Lovell, and Mr. LeBas.

8            MS. PRY:    Kathryn Pry, Trustee for the Gibson

9    estate.

10            THE COURT:    All right.    The next matter I have is

11    the motion for relief from stay filed by Mr. Robinson on

12    behalf of J&F Oklahoma Holdings, Cactus Growers, Inc., Friona

13    Industries, with objections filed by creditor, First Bank &

14    Trust, and the Trustee.

15            CONFERENCE TELEPHONE OPERATOR:    Joining the

16    meeting.

17            THE COURT:    Are you ready to proceed on that

18    motion?

19            MR. ROBINSON:    The movants are ready, Your Honor.

20            THE COURT:    All right, come forward --

21            MR. LeBAS:    We're going to need a little space to

22    (unclear)

23            THE COURT:    Mr. King, can we maybe give them that

24    table?

25            MR. KING:    That would be fine, Your Honor.

1          THE COURT:    If they need another -- how many chairs

2   are you all going to need?

3          MR. LeBAS:    Probably four.

4          THE COURT:    Scoot up a couple of those chairs

5   there.

6      (Pause to 10:45:48 a.m.)

7          MR. LeBAS:    If Your Honor is ready.

8          THE COURT:    I'm ready.

9          MR. LeBAS:    All right.

10          THE COURT:    Why don't you make an opening

11   statement.  I've read the briefs and the objections and the

12   motion, and --

13          MR. LeBAS:    I think that might be helpful, Your

14   Honor.  In view of that, what we have prepared -- and this

15   would be actually one of the exhibits books -- I think it

16   might be helpful for the Court -- it's the one that had the

17   round logo on the front, that's the joint exhibit book?

18          THE COURT:    Mmhmm.

19          MR. LeBAS:    What we're calling that.  The last tab

20   to that document is a flow chart that I would refer the Court

21   and counsel to in connection with the opening remarks I'm

22   going to deliver.

23          THE COURT:    All right.

24          MR. LeBAS:    And what I'd like to begin with is a

25   very brief summary of what we see what Eastern Livestock's

1  business was and how that business was connected to the

2  business of the feed growers.

3          MR. LeBAS:   Eastern Livestock during its

4  operations, the pleadings have suggested, was a very large

5  order company that bought and sold cattle, and it did so in

6  two primary ways of doing business, one of which involved

7  purchasing on order for another, is called an "order-buying

8  business."

9          As time developed we believe that part of its

10 business became a much smaller part of what it did.  And the

11 other aspect of its business in which it bought and sold

12 cattle for its own account, hoping to sell them for more than

13 what it paid for them, was the larger part of its business.

14 And the folks that -- the movants in this case had

15 arrangements with Eastern, which were in that second category:

16 That is, buying cattle from Eastern that Eastern had purchased

17 from third parties.

18          And this flow chart is intended to illustrate how

19 that process worked and who the parties were.  There's one for

20 each of the interpleader parties:   The one on top for mine is

21 -- let's see, who's this for?

22          THE COURT:   I have Friona.

23          MR. LeBAS:   This one is for Friona.   All of these

24 are similar.   The dollars are different because the parties

25 have somewhat different amounts that were interplead -- pled

1   into the Texas case.   But generally, what would happen is,

2   just starting from right to left, sellers, ranchers, auctions,

3   so forth, would sell cattle to Eastern.   Eastern then

4   contracted at various times to sell cattle to the feed yards.

5   The feed yards would pay Eastern.   And when the crisis hit,

6   the feed yards were in possession of cattle that were in the

7   process of payment, some of which had not been paid for yet

8   because the checks hadn't been processed; others of which

9   checks had been issued but were in a stage that provisional

10  credit could be pulled back.

11          And so both of those situations occurred in the

12  funds that developed from those two situations were then held

13  for some time, as some efforts were made to try to figure out

14  what to do, ultimately resulting in an interpleader case with

15  a joinder by the three parties:   Friona, then Cactus, then

16  J&F Oklahoma -- which was completed and filed and funds

17  actually deposited in the Amarillo Court, approximately

18  $6,700,000, shortly before the involuntary bankruptcy was

19  filed.

20          Both before and after the involuntary bankruptcy was

21  filed, many of the parties who were named as the interpleader

22  claimants appeared in the case, and as of today there will be

23  some parties who will make announcements in support of our

24  motion.   We're not aware of parties who are opposed to the

25  motion, other than the two parties that had filed:   First

1  Bank & Trust, which we understand is a creditor of the

2  Gibsons, not Eastern Livestock -- and the Trustee.

3         I don't know that the parties who were -- all of the

4  parties who are named here -- but after I'll stop my opening

5  I'll ask those parties who I think are on the phone here to

6  make known what their position is.

7         As we understand it, legal argument relates to two

8  points, and the first is whether the interpleader action

9  should proceed as its own process or should come into this

10 Court in -- for resolution; and if the Court makes that

11 decision that it should come to this Court for resolution,

12 then there are two subsidiary issues:   Should the stay be

13 lifted for cause under (d)(2) -- 362(d)(2), which is our

14 primary argument:   That is, no equity, and not necessary for

15 organization --- or under (d)(1), for cause?

16        And our primary argument that we think presents

17 perhaps the most interesting legal issue pertains to the

18 question of whether these funds represent property of the

19 estate so that this Court should or could assert jurisdiction

20 over those funds.   We think the rules are clear, and we've

21 put that in the brief, that in this situation, as odd as it

22 may seem, because the funds are in the hands of another court,

23 they constitute a *res* which not property of the debtor, the

24 debtor may have a claim to it; but it's not property that

25 belongs to the debtor yet.

1          What the cases say is once the debtor's claim is

2    established, if it may be, in those funds, would go to the

3    Bankruptcy Court for administration, but as it stands --

4          THE COURT:   How would the debtor's -- how would the

5    debtor's rights be protected in the Texas litigation?

6          MR. LeBAS:   The debtor would -- has been named as a

7    party, and the debtor could appear and assert what interest it

8    may have.

9          THE COURT:   So the Trustee's going to have to go to

10   Texas to participate?

11         MR. LeBAS:   I think so, yes.   I would -- and

12   that's -- and the question of relative balance of whether

13   that's more efficient to do in one place or another, I think

14   that would be addressed in the sense of a (d)(1) analysis:

15   that is, what's the cause?   There are some factors that the

16   Courts have looked at, not -- not hard and fast rules as in

17   the interpleader or the (d)(2) issue, but think that's where

18   that issue would arise.

19         We have had --

20         THE COURT:   Well, there's -- go ahead.

21         MR. LeBAS:   Yes.

22         THE COURT:   I'm sorry.  Go ahead.

23         MR. LeBAS:   The -- I'd speak for a minute to the --

24   my understanding of what the opposition of this question of

25   whether this is property of the estate or not had been.

1  There have been a couple of cases that have been presented to

2  the Court in opposition.  One of those is a Sixth Circuit

3  case.  The other is the *New Colorado* case.    The Sixth Circuit

4  opinion appears to us to be one in which the debtor was --

5  actually owned the property or had title to it up front,

6  similar to the *Grogg* case, which is an Indiana case, or a

7  Seventh Circuit case, I should say; and to me, that does make

8  sense, that is, if the debtor has ownership of the property

9  either by statutory *fiat* as in the *Grogg* case or in the other

10 case because it owned the property anyway, then that, to me,

11 would certainly constitute a reason for property of the estate

12 taking control over the interpleader action.

13          In the *New Colorado* case, there was an interpleader

14 filed.  After the interpleader was resolved, that left claims

15 against the bankrupt party.  The bankrupt party wanted those

16 claims to be maintained in the original case where the

17 interpleader was filed, and the Court refused to do that,

18 which would be proper.    It wasn't an interpleader case at

19 all.

20          So we think the governing rule is, the interpleader

21 cases make the decision as to whether the -- who -- who is the

22 owner of the property.    Once that is determined, if it turns

23 out that the debtor is an owner, then the property that the

24 debtor is entitled to receive goes to the Trustee or to the

25 estate for administration.

1          The -- and I would ask if the other parties have

2   something to add to what I've said; and if not here, then

3   perhaps some of the parties who are in support of our motion

4   might want to speak to that by telephone.

5          THE COURT:   All right.   I would remind those that

6   are on the phone to keep your phones on mute, unless you are

7   speaking.   There has been an invitation now for any party that

8   wishes to speak in support of the motion, to do so.   Again, I

9   remind you to identify yourself for the record.

10         MR. LOVELL:   John Lovell on behalf of Cactus

11  Growers.   Your Honor, in regard to your question about the

12  Trustee having to go to Texas, that -- Mr. LeBas's statement

13  is correct, although I would point out that with Fifth Third's

14  lien apparently perfected and in place, the practical reality

15  is that it's going to be Fifth Third competing and litigating

16  to try to establish their lien claim on that -- on those

17  funds; and, of course, to do that they're going to have to

18  establish the ownership of Eastern Livestock to those funds.

19          So in this case, as a practical matter, we don't

20  believe it's going to be that much of a burden on the Trustee

21  because the Trustee is not going to be the actual ultimate

22  party in interest.   It's going to be Fifth Third.   Fifth Third

23  already -- they have appeared, and they have local counsel,

24  John Ben Blanchard.   They're in Amarillo.   So as a practical

25  matter, we don't think that'll actually impair or burden the

1  Trustee.

2          MR. LaTOUR:   Your Honor, this is Randall LaTour

3  representing Fifth Third.   May I respond to that observation?

4          THE COURT:   You may.

5          MR. LaTOUR:   First of all, the movant's counsel has

6  already admitted that the debtor has a claim against the fund,

7  which makes it cash collateral under 363, which makes it

8  property of the estate under 541.

9          Second of all, it *is* a burden on Fifth Third to go

10 litigate in that case and potentially have a contrary result

11 in other similar cases that are being considered by this Court

12 here.   The situation really cries out for one tribunal to

13 hear all the cases and apply one standard to each of them.

14          And so I would join the objection of the Trustee and

15 -- and refute the observations that the fund doesn't have an

16 issue there, and two, that it's not inconvenient for anybody.

17          THE COURT:   Well, expand upon that a little bit.

18 I know that the Trustee in its -- in his brief talked about

19 the possibility of inconsistent rulings.   Tell me more how

20 that might happen and how you see that to be a problem.

21          MR. LaTOUR:   Well, Your Honor, one of the key

22 issues of this case is going to be the identification of

23 collateral, and there is the possibility that one court could

24 decide that a herd belongs to Party A, and a different court

25 decides that that same herd belongs to Party B.

---

THE COURT:   Well --

MR. LaTOUR:   The way to avoid that risk is to have one court to make the determinations as to everybody.

THE COURT:   Well, I guess that's -- that's still where I get confused.   Why would I be making a determination about this herd if that herd is in Texas, and that court there is adjudicating that issue?   How does that come before me then for an inconsistent or consistent adjudication?

MR. LaTOUR:   Well, for example, Your Honor, part of the claim will be to -- of the estate will be dependent upon the nature of the contract rights that are involved.   That's a situation that has not been developed by evidence at this point.   The Trustee is still trying to do what amounts to forensic accounting to reconstruct the transaction.

Second of all, Your Honor, the East West Trucking case, you have a trucking company that owns cattle; and in the Eastern case you have a cattle company that doesn't have as much cows as it's supposed to have.   So you have the possibility that as between the bankruptcy estates that exist, there may need to be a re-alignment of property of the estate, and then an assessment of who has what lien and what the priorities are.   If you start having piecemeal determinations by interpleader actions in various state courts, you may have a situation where the holdings are inconsistent to the point that you can't resolve them.

1       THE COURT:   And what about -- that's -- that is a

2 point that has been raised also, and that is  that we have the

3 other bankruptcy case pending here, and there might be

4 allegations that property has -- or title or property has

5 passed between one debtor to another, with competing claims,

6 depending upon who you're a creditor of -- which entity you're

7 a creditor of.

8       Isn't that -- couldn't that be confused if we go to

9 Texas and -- and get a ruling strictly as to the rights of

10 Eastern, but not determining whether East West has any role in

11 this?

12       MS. CARUSO:   Your Honor, Debbie Caruso.   Don't

13 forget about the Gibson estate also.

14       THE COURT:   And the Gibson estate, which is the

15 individual estate also, yes.

16       MS. CARUSO:   Correct.

17       MR. LeBAS:   And I'm not sure what particular cattle

18 they're referring to.   We have about -- we counted it this

19 morning -- approximately 7,800 to 8,000 cattle that are

20 represented by proceeds in the interpleader case.   The

21 ultimate disposition of those cattle now is up to the owners

22 who have acquired possession and delivery and now title to

23 them.

24       With respect to claims to the funds that may be

25 made, if one of the claimants believes that their cattle were

1   sold to Eastern and then sold to one of the feed yards, or

2   perhaps misdirected, misnamed, or otherwise improperly

3   described so that they flowed this way, then they need to go

4   to that place and make the assertion with respect to that

5   fund.  I don't see how you would end up with a different

6   result somewhere, because the party who is making the claim is

7   going to have an obligation to track through where their

8   cattle is; and if they can't prove their cattle went to the

9   Texas case as opposed to some other case, they won't get

10  recovery.

11         THE COURT:  Well, now isn't there also -- aren't

12  there also interpleader cases in other states?

13         MS. HALL:    Yes, Your Honor.

14         MR. LeBAS:    That's correct.

15         MS. HALL:    Terry Hall for the Trustee.  That's

16  the -- probably the over-arching issue here is that we're at

17  the very beginning of this case -- it's a Chapter 11 case.

18  There are currently, as we know, four interpleaders that have

19  been filed in Wisconsin, Colorado, Texas, and Kansas.  All of

20  them have received Notice of Bankruptcy.

21         There are other, as put in our motions that will be

22  heard later on in the docket, people that are contacting the

23  Trustee and earlier the Receiver saying, "We've got cattle

24  proceeds as well, but we're concerned about conflicting

25  claims," and that's one of the reasons why we put on our

1  motions, to provide them with a forum to deliver those

2  proceeds.

3          Under the movant's theory, we should just tell those

4  people to go file an interpleader, and then the Trustee will

5  run all over the country adjudicating those claims.

6          The other issue is, a lot of cattle, money, and

7  contracts have disappeared, based on what the debtor's books

8  and records says it should have.  And we are at the beginning

9  of trying to find those and determine those relationships.

10 Some of the claimants that are named in the Texas interpleader

11 are, (a), the petitioning creditors who started this case, so

12 I don't think it's quite right that everybody's happy to be in

13 Texas adjudicating over there.

14         The other thing is that a couple of the claimants

15 are related entities, including Gibson Cattle Company.  This

16 debtor, we're just beginning to realize, had a lot of

17 affiliated companies --

18         THE COURT:   (Sneezed) Excuse me.

19         MS. HALL:   -- a lot of inter-related relationships.

20 The branches that the debtor worked through, the branch

21 managers themselves, in addition to working with Eastern's

22 cattle, were selling and buying cattle on their own accounts.

23 The possibility that there could be an adjudication in the

24 Texas case that is ultimately undone due to a fraudulent

25 transfer or a bankruptcy action that should be brought in this

1   Court, does subject the debtor to differing judgments and is a

2   -- it just -- it seems to be inconsistent with the purpose of

3   why the creditors originally started this case, and why this

4   Court appointed a Trustee, which was to provide a forum in

5   this case and in the two related cases in order to bring all

6   those -- all that information together, we can adjudicate all

7   the claims.

8          This Chapter 11 case is not taking away anybody's

9   right to assert any lien they want to include or assert,

10  including the Agister's liens or liens that are possessory.

11  Simply -- and in addition, the Trustee is in the process of

12  either having these cases removed, dismissed, or transferred

13  here to the Chapter 11 case, which is the proper forum to do

14  it.

15         The other -- one thing that we also need to keep in

16  mind is that both the USDA and the FBI are investigating the

17  operations of these debtors.  It would be difficult, not only

18  for the Trustee to travel all over the country and litigate in

19  all of these different forums -- that would be inefficient;

20  but this Chapter 11 case will also provide a single place for

21  the accumulation of all of the information, and the debtor's

22  books and records fill two full floors of the building that we

23  just got six months to stay in for free.

24         So that all of those records, and the Court's powers

25  here under the 2004 rules will allow us to get a final

1  resolution in some -- one way or the other -- of all of the

2  claims, protecting all of the parties who have a claim to that

3  money, and --

4         THE COURT:   How -- how would the -- these

5  particular creditors -- this -- the parties to the

6  interpleader action in Texas -- how -- how do you foresee

7  their rights being protected here, and how would  -- or how

8  would those be adjudicated?   In what context do you see those

9  being resolved if the matter remains in Bankruptcy Court?

10        MS. HALL:   Well, it could be resolved in two or

11 three ways, depending on which way is the most efficient that

12 the Court wants to proceed in.   We have proposed a claims

13 process that the Court is used to.   I know that there's forty

14 claimants or forty-seven claims I believe over there now, but

15 this Court is used to adjudicating cases with 5,000 claims.

16        So we have proposed a bar date where people would

17 assert those claims, provide the information; that bar date is

18 very soon.   We would hopefully resolve that -- those issues

19 and those claims against the funds -- at least those funds

20 that are interpled, fairly quickly -- probably more quickly

21 than in the interpleader action.

22        We could also transfer the whole case over here and

23 proceed in an adversary proceeding.

24        THE COURT:   What about the point that even if there

25 is property identified -- or some of these proceeds are

1  identified to be property of the debtor, that it's liened --

2  that it's blanketed by Fifth Third and there's really no

3  benefit to the estate here.  It's really a fight between Fifth

4  Third and competing claims?

5          MS. HALL:  Well, I think that's somewhat of a false

6  analogy, Your Honor.  They are analogizing or comparing Fifth

7  Third's entire claim to one receivable.  That's not the entire

8  case.  There are interpled funds in the other cases.  There

9  are also, the debtor believes -- the Trustee believes a lot of

10 fraudulent transfers that occurred, a lot of sales in which

11 the Trustee has not been -- the debtor didn't get paid.  So

12 it's --

13         THE COURT:  So you're saying -- you're telling me

14 you're not really in a position to evaluate the extent of

15 Fifth Third's claim *vis-á-vis* the assets available to satisfy

16 that claim?

17         MS. HALL:  Yes, Your Honor.  I believe it's way

18 too early in this case to determine there's no equity or no

19 payments to unsecured creditors.  If the Trustee truly

20 believed that, we wouldn't be here.

21         MR. LeBAS:  Your Honor, the proof that we would

22 submit today is -- is that we have discrete sets of cattle

23 which were purchased by the -- by the movants; that they were

24 paid for in the way I've already said; that Eastern

25 identified, or the persons who were named as claimants said

1  that Eastern had given them bad checks, or Eastern didn't pay

2  for some set of cattle.   So we're able to say it's these 248

3  head that came in on October the 15th, 2009 that are the

4  subject of the case.

5           THE COURT:   Well, now let me ask you this then:

6           MR. LeBAS:   Okay.

7           THE COURT:   Has the Trustee been provided with that

8  information?

9           MR. LeBAS:   Yes, sir.   That information is set out

10 in our pleadings in the state court case.

11          THE COURT:   I mean, have you all sat down and

12 talked, other than through pleadings, and said, "Look, there's

13 really no dispute about this batch, because here's the

14 paperwork and the paper trail pertaining to this batch."  Have

15 those sort of negotiations taken place and you're all at a

16 loggerhead?  Or have we just not had those kind of

17 negotiations?

18          MR. MASSOUH:   Your Honor, I have attempted to

19 contact the Trustee on two occasions and have received no

20 response, and specifically e-mailed the Trustee to discuss our

21 particular motion that we're here today on and received no

22 response, and we have not had any discussions with the

23 Trustee.

24          MR. LeBAS:   Concerning the question of the (d)(2)

25 motion, the Court's touched on that, maybe is where we -- what

1  do we -- what does the Trustee care?  Because this money's not

2  going to go to the unsecureds anyway.   Our understanding is

3  that the Trustee's objection says in -- in one of their

4  pleadings that the bank lien is not contested, and I don't

5  understand the remarks today to suggest that maybe it is.

6            THE COURT:   I think what she --

7            MR. LeBAS:   I understand if --

8            THE COURT:   I don't she said it was contested.  I

9  think what *she* said is they don't know the full extent of

10  collateral that the bank has to look to.

11            MR. LeBAS:   All right.

12            THE COURT:   And that there may be fraudulent

13  conveyances of property to weigh that might come back in that

14  would further serve as collateral.   Is that what you said?

15            MS. HALL:   Yes.  Yes, Your Honor.

16            MR. LeBAS:   All right, and --

17            MS. HALL:   And the other thing is we *don't* have

18  all of the information, and I haven't -- I'm sorry, David.  I

19  don't believe *I* was contacted to discuss this, and Mr. Knauer

20  is not --

21            MR. KNAUER:   If I have an e-mail from Mr. -- I'm

22  not aware of it, but I won't say I don't have one, Judge.

23  I've gotten, since this case started, I'm such -- a little bit

24  overwhelmed, and I -- but --

25            MS. HALL:   The other thing is, these -- these

1  cattle were not necessarily just sold once.  If you read

2  through the pleadings, they were sold three, four, five, six,

3  or seven times.  So the fact that they -- you know, there's

4  been one final sale that transferred out, it may be in that

5  third situation or something, where we need to do an

6  investigation.

7       MR. LeBAS:  To the extent that there may be

8  recoveries for the estate for the fraudulent transfer actions

9  or later readjustments, that really doesn't -- that's not what

10  we're here to decide today, that is, on our motion the

11  question is, is there a showing of no equity?  Is there a

12  showing of necessary reorganization?

13       THE COURT:  Well, obviously it's not necessary for

14  reorganization, because there's not going to be a

15  reorganization.

16       MR. LeBAS:  Right.

17       THE COURT:  The equity is the question, and how are

18  you going to put -- I mean, to show me that there's no equity,

19  you can't just show me the value of what *you* have.  You have

20  to show me the whole picture as to Fifth Third's collateral

21  base and their debt, right?

22       MR. LeBAS:  My understanding is that what we have

23  to show is that the claims against the interpled fund are in

24  excess of those which the debtor might assert.  And that what

25  we've got today is a claim from the bank --

1          THE COURT:   Why do you think that's all you have to

2 show?  I mean --

3          MR. LeBAS:   The statute -- that's my reading of the

4 statute.

5          THE COURT:   Oh.

6          MR. LeBAS:   No equity --

7          MR. LaTOUR:   Your Honor, this is Randall LaTour.

8 May I speak to this issue?

9          THE COURT:   Yes.

10          MR. LaTOUR:   The issue here is not one of equity

11 and relief from stay, because those issues go to the merits.

12 The motion today is a procedural one, which is what tribunal

13 should be the decider of this issue?   And everybody keeps

14 admitting that the debtor has a claim to these funds -- not

15 necessarily the first claim, but a claim.  That makes it cash

16 collateral under 363.   That makes it property of the

17 bankruptcy estate, and that puts the issue in *this* Court.

18          To -- to say that a motion for relief from stay to

19 have an interpleader action is converted into a motion for

20 relief from stay is to complain two separate issues.

21          MR. LeBAS:   Your Honor, that makes perfect sense,

22 except it's not the Rule.   I'd read here from the **Rouse** case

23 that we've cited, I hold that because the purpose of the

24 interpleader is to determine title to the *res*.  The *res* is not

25 at this point property of the debtor within the meaning of the

1  automatic stay provision.

2        MR. CLEMENT:   Your Honor, could I address the

3  interpleader actions (unclear, someone coughing directly into

4  microphones)

5        THE COURT:   Yes.

6        MR. CLEMENT:   (unclear)

7        THE COURT:   You may.

8        MR. CLEMENT:   The cases that the movants cite are

9  basically cases where it's been held that the nature of the

10  action was though the debtor was proceeding to establish a

11  claim to a fund so that the purpose of the Court in the

12  interpleader action would be determining whether the debtor

13  has an interest in those funds.

14        As our objection points out, that isn't really the

15  case here.   Rather, if you read the pleadings in the

16  underlying interpleader action, there's no dispute that cattle

17  were sold, and the debtors owed this money.   That money is

18  property of the estate.   Rather, the purpose of the

19  interpleader action is to determine whether other parties can

20  assert a claim.   They claim that they sold cattle, or that

21  the debtor failed to deliver cattle, and they have a claim

22  that they're seeking to set off against the estate's money.

23  They also joined a number of parties as defendants in those --

24  in the interpleader action, without describing what their

25  interest is.

1          As originally filed, it appeared that one result in

2   the Texas action might be that monies would go to unsecured

3   creditors of this estate.  Once they raised the argument that

4   an interpleader action isn't staying -- and I took a closer

5   look at the pleadings, if you look at one exhibit you'll

6   notice that perhaps these are reclamation claims that are

7   being asserted.   But again, that's a claim against property

8   of the estate, proceeds from cattle.

9          This isn't a case where it's -- a state court's

10  going to determine whether the estate has an interest in the

11  first instance.  We're clearly owed -- the estate's clearly

12  owed the money.  The Court is only determining whether someone

13  else has a claim to those monies.   That's a function of

14  Bankruptcy Courts to determine, not some court in Texas or a

15  state court in Kansas or Wisconsin.

16         MR. LeBAS:   It -- I think that goes to the same

17  point just raised, and that is, is it property of the estate

18  or is it not?   Cases that we've cited support the proposition

19  and flat say that funds that are in the Registry of another

20  Court, pursuant to the federal interpleader statute, to which

21  there are contests, including contests asserted by debtors in

22  bankruptcy, don't constitute property of the estate.   Why?

23  Because the property interest of the debtor has not been

24  established.   The prior litigation has already been

25  established.   That will determine whether it is property of

1   the estate or not.

2          Once that decision is made, the property -- and if

3   it is in favor of the debtor's position, then that fund or

4   those properties go back to the bankruptcy for administration.

5          MS. HALL:   Your Honor --

6          MR. MASSOUH:   Real quick, Your Honor, on behalf of

7   Friona, Friona was the one that initiated the Texas

8   interpleader action, and because of that we have -- we have

9   gotten in several answers already to our complaint; and

10  without fail, almost all the answers have asserted

11  counterclaims as against Friona, claiming that, you know, that

12  the cattle were sold directly to Friona, or some kind of like

13  claim.

14          And so not only is there these various claims to the

15  fund, but there's also these various asserted counterclaims as

16  against the interpleading plaintiffs, and we anticipate those

17  same kind of counterclaims to be filed as against Cactus

18  Growers and J&F Oklahoma Holdings, so there's more to it than

19  just a simple -- simple claim to the fund.  And we have -- in

20  the exhibit notebook, we've kind of outlined in Tab 5 the

21  number of claimants who have filed an answer and filed a

22  counterclaim as against Friona.

23          MS. HALL:   Your Honor, if I could, just briefly.

24  Under this theory, the best thing that somebody could do if

25  they owe money to a debtor is to file an interpleader action

1  and put the funds in the Registry, and thereby, by their own

2  affirmative action, remove property from the estate.

3          That -- that is not the black-letter law, and the

4  movants are quoting sort of black-letter law based on a

5  journal article in *Am.Jur*, and some case law.  But as -- I'm

6  sorry, I can't remember the case -- pointed out that those

7  cases don't necessarily -- don't deal primarily when you've

8  got essentially claims against the debtor.

9          If you read the interpleader action, it's a breach

10 of contract, recovery of fees and costs.   There are claims

11 asserted by the answerers against Friona and the other count

12 -- and the claimants; but they're also counterclaims against

13 the debtor.  I mean, this is an action against the debtor's

14 proceeds.   The interpleader action itself specifically says

15 -- and I can't remember which one of them it is -- but that

16 they actually were paying the -- in the process of paying the

17 debtor, and stopped payment on the checks.

18          So this is property of the estate, and if you look

19 at the Sixth Circuit case, the only -- the case that they say

20 is in the Seventh Circuit is an Illinois case.  It's not

21 actually a Circuit case, and it simply lists the case law.  It

22 doesn't adopt it or unadopt it, one way or the other.  And it

23 lists the case law that talks about insurance interpleaders,

24 and it lists the case law from the Sixth Circuit.

25          The Sixth Circuit case specifically says that,

1          "When plaintiff, NLT, instead paid the sums due into
2          the Registry of the District Court, the Clerk of
3          that Court became the custodian of that property and
4          was charged to hold it until the Court properly
5          directed how to dispose of it.  In that sense, the
6          Clerk was acting much like a Trustee in bankruptcy.
7          Thus, under our interpretation of **United States vs.**
8          **Whiting Pools, Incorporated** -- "
9  -- which is the U.S. Supreme Court case --
10          " -- and the relevant statutes.  Once the bankruptcy
11          had intervened, the Clerk of the Court had a duty as
12          a custodian to deliver those funds as property of
13          the debtor to the Trustee in bankruptcy for
14          disposition."
15  It is not black-letter law that you can remove property from
16  the estate by interpleading it.   The debtor has claims to
17  that -- those proceeds.  Those proceeds were supposed to be
18  given to the debtor.   Others may have claims to those
19  proceeds, and that's the purpose of the Chapter 11 case.
20          A couple of other points.   Some of the petitioning
21  creditors who started the involuntary bankruptcy here are the
22  very parties who were -- who were sued in the interpleader.
23  So it's -- it is true that a lot of people perhaps want to
24  stay in Texas, but not everybody.
25          The other thing is, it is not true that most -- the

1 majority of the plaintiffs in Texas are in Texas.    About a

2 third of them are in Texas and Oklahoma.  The rest are in

3 Florida, Kentucky, Indiana, Illinois, Georgia, Missouri.  It's

4 -- it's not all of just Texas over there.

5           So from a convenience point of view, from a single

6 jurisdiction, from "Let's bring it all here and get it all

7 done," as far as an efficiency point of view, the Chapter 11

8 case is recognized as the proper forum to adjudicate all of

9 those competing claims.

10           THE COURT:   All right.  I'm not going to lift the

11 stay today, for a number of reasons.   One of the -- that's

12 not to say that I might not lift the stay at some point and

13 allow various litigations to occur in other jurisdictions.  I

14 think it's too soon.  I think the competing claims are too

15 ambiguous at this time.  I think that there needs to be the

16 kind of discussion, whether it's informal (sic) or informal

17 discovery that occurs, exchange of information.

18           The -- there is an overriding policy to -- and in

19 support of judicial economy to bring claims together in

20 Chapter 11.  It's in the first chapter of the Chapter 11

21 textbook that I use when I teach a seminar; and when -- this

22 is a perfect example of when you have litigation in various

23 states, it makes a lot of sense to bring them into one forum.

24           Having said that, I have on many occasions lifted

25 the stay to allow discrete  -- claims against discrete

1  properties or, for example, to proceed against an insurance

2  policy or that sort of thing, and said that's best handled by

3  a state court.

4        This fits somewhere in the middle.  I looked at the

5  cases that you've both cited concerning whether or not this is

6  property of the estate.  Obviously there's some disagreement

7  here, but I do think at least it's property that the estate

8  has a claim on, and I think at this point of the case I don't

9  see any great prejudice in -- in -- to the claimants, to the

10  Texas claimant remaining here at least for awhile.

11        The -- it may be that after further investigation

12  the Trustee determines they have no interest in these funds.

13  Then they may come to agree with your position; but I'm not

14  going to -- this soon into the case, and less than a few weeks

15  of having a Trustee in place, I think that's premature at this

16  time.

17        Now what I can do so that you don't have to refile

18  your motion and would like an evidentiary hearing on it at a

19  later date, I can just deny it preliminarily and set a final

20  hearing date at a later time.  Now that has to be held within

21  thirty days, unless the parties waive.

22        Let me say this, though.  I don't think there's a

23  lot of evidence as to the first portion of the motion, and

24  that is, where should we hear it?  I mean, that's -- that's a

25  policy question.

1          The other side -- the other thing is, if it's going

2    to be treated as more of a traditional motion for relief, and

3    that is there's no equity, there's -- under (d)(1) or (d)(2),

4    if we're going to hear it like that, then that's obviously an

5    evidentiary question, I would think that's the question that

6    the parties need to exchange information about, and as I said

7    earlier, conduct discovery either formally or informally.

8          Would you all like a date --

9          CONFERENCE TELEPHONE OPERATOR:   Joining the

10   meeting.

11         THE COURT:   I'm going to -- I'm going to set some

12   omnibus dates here.   I'm thinking about the 11th of February

13   and the 11th of March as two possible omnibus dates.   Both of

14   those are Fridays.

15      (Pause)

16         MS. HALL:   Your Honor, you sort of -- this is Terry

17   Hall.  You sort of threw out the idea unless the parties waive

18   the thirty days, and the Trustee will need to devote a

19   tremendous amount of efforts to this one area of the case if

20   that thirty days is not waived.   Hearing nothing from the

21   other side, are you willing to waive the thirty days' final

22   hearing?

23         MR. LeBAS:   I think we need to get a date certain so

24   that we understand what we're dealing with.   We've got a

25   lawsuit that we need to either pursue or not pursue, with

1  claims that being asserting both internally -- that is, for

2  example, the cross-claims that Mr. Massouh has described.  We

3  don't want those to just sit there open-ended.

4          So I would say that to the extent the Court can give

5  us a date, if it --

6          THE COURT:  Well, let me -- let me say this:

7          MR. LeBAS:  -- certainly, after thirty days, I

8  wouldn't see a problem with that.

9          THE COURT:  Give you -- I'm sorry.  I interrupted

10 you, and I didn't hear the last part of your sentence.

11         MR. LeBAS:  Yes.  I would say that if it's a

12 reasonable time, if it's -- if it's not thirty, but it's

13 forty, for example, or something--

14         THE COURT:  Right.

15         MR. LeBAS:  -- I wouldn't see a problem with that.

16         THE COURT:  Well, are -- isn't it true that --

17 number one, isn't it true that the information that you're --

18 you can be obtaining here with -- through an exchange of

19 information with the Trustee is the same information you'd be

20 trying to get if you were back in Texas doing discovery,

21 number one?  So -- and number two, is it -- it might well be

22 possible that I could make a -- sign an order that made it

23 clear that the stay was *not* in place as to competing claims

24 among third parties?

25         MR. LeBAS:  Our concern --

1          THE COURT:   As far as discovery.

2          MR. LeBAS:   Our concern about the third-party

3   claims is two-fold, and one is how do we process those?   The

4   second would be, as a defense to the interpleader itself,

5   claimants have access to the funds to defend themselves.   We

6   don't want to see that fund dissipate --

7          THE COURT:   That's a good point.

8          MR. LeBAS:   -- go into the Trustee's hands, and now

9   we've got no shot to defend ourselves with that fund.   That's

10  part of the reason for filing the interpleader.

11         THE COURT:   Okay.

12         MR. LeBAS:   The -- I've --if the Court -- and that

13  was one of the problems that we were discussing off-line, if

14  you will; that is, with the Court's ruling today I think it's

15  more of a continuance, we have evidence we can present, but as

16  I understand the Court's thought process now, you don't want

17  to hear the evidence, you're -- and so a ruling that you would

18  make would not be evidentiary in the sense it held against

19  either party for not having put evidence on to support its

20  position.

21         THE COURT:   That's correct.

22         MR. LeBAS:   Have I got that right?

23         THE COURT:   That's correct.

24         MR. LeBAS:   And I would say -- suggest that perhaps

25  -- that does the Court have a date that you would like us to

1  (unclear).

2          THE COURT:   Well, do you want to present evidence

3  on the -- ?   Well, why are you two standing?

4          MS. HALL:   Just to irritate you.

5          THE COURT:   That's all right.  Go ahead.  Say

6  something.

7          MR. KNAUER:   I wanted to make a comment on the

8  timing issue.  Our efforts currently, and probably for most of

9  the next thirty days, are on asset identification, securing

10 assets, locating them, which has proven to be a difficult task

11 because a lot of the records that we need are not there.   And

12 while -- I'm not saying we couldn't make some progress on our

13 analysis of the claims because we do have a lot of the

14 information now -- I can't say we don't have it all, but I

15 think we're -- we have a lot, for this case.

16         I could -- don't think we could stand up and say

17 that we could -- we could be prepared to come to court or have

18 our view of how the claims should be resolved, ready in thirty

19 days or even forty days.  I -- you know, -- I'm sure sixty is

20 -- is, we'd need that time, because the next thirty days I

21 foresee we're still going to be -- Ms. Lynch and I talked to a

22 Sheriff in one county in Texas yesterday.  I talked to four

23 cattle ranchers.  She's talked to several feed lots.  We're --

24 we're just chasing assets right and left, and resolving claims

25 at this point, this next thirty days, is almost impossible for

1  us.

2          Whether we were in the interpleader or  -- we'd be

3  saying the same thing if we were in Texas.  It would -- the

4  story wouldn't change.

5          THE COURT:   All right, let's do this:  I mean,

6  there are two questions here.  I keep coming back in my own

7  mind the fact that there are two separate issues here.   First

8  of all, does this need to be heard in the Bankruptcy Court?

9  And in my mind, as I think I've indicated by several of my

10 questions and comments, the answer to that is going to be

11 fact-sensitive.  And that is, as I said earlier, do we have a

12 discrete asset here that is going to ultimately be of no value

13 to the estate, that's liened up over its value, that some

14 parties want to go to Texas and fight about who gets it?

15          If that's the case, I'd say, "Let them go to Texas

16 and fight about who gets it."  You know, if this -- I'm only

17 interested in what -- in it if it is, in fact, an asset or

18 potential asset of this estate.   And whether or not there's

19 prejudice to any party, a claimant in this Court, by having to

20 fight in different courts and litigate in different

21 jurisdictions -- and, of course, there is the concept or the

22 concern of inconsistent adjudications also.

23          So those are the thoughts that are going through my

24 mind on the forum question.   I was hopeful, and the reason I

25 asked the question, you know, "Have you all really had a sit-

1   down and exchanged information?"  And I was hopeful that maybe

2   some of that might go a way to res -- to the Trustee coming to

3   the conclusion he doesn't care.  I don't know if he will ever

4   get to that point, and I'm not prejudging that.  But it

5   happens a lot in other cases.

6          So let's do this:  Let's -- let's continue this

7   hearing until March 11th.  That's a Friday.  I'll give you a

8   9:30 a.m. hearing time.  I want a -- I want to pre-try it on

9   February 11th, thirty days from today.  And I understand that

10  the Trustee is burdened with a lot of responsibilities and has

11  been thrown into the deep end of the pool here; but I do think

12  at least that it's -- there should be time in this next thirty

13  days to at least have a meaningful discussion and to ship off

14  some documents to one side or the other, and maybe even in a

15  face-to-face conference.  And I'm going to -- or it could be

16  telephonic since you all are so far apart.  I'm not going to

17  insist upon anybody travel for that.

18         But let's have at least one meaningful conference

19  between now and then and exchange of some documents.  We'll

20  pre-try it on the 11th, which is going to be an omnibus date

21  in this case.  So if it's -- the only thing that you all are

22  involved in that day is a pre-trial, you can participate

23  telephonically.

24         The final hearing will be set on the 11th of March.

25  The only -- and I want to talk to you on the 11th of February

1  -- when I talk to you about -- to make -- I may make a

2  decision that day as to whether it's going to stay here, or

3  whether I'm still entertaining the thought of sending it back.

4          If it's going to stay here, then I get back to the

5  question I asked Ms. Hall earlier:   How are we going to

6  resolve it?   Are we going to do it through the claims

7  process?   Are we going to do it through an adversary?   Are we

8  going to remove?   I don't think you can remove that action.

9  But we would need to discuss those specifics at that time.

10 Okay?   Any further questions on that motion?   Comments?

11          MR. LaTOUR:   The March 11th hearing is in New

12 Albany?

13          THE COURT:   Everything is in New Albany, unless

14 otherwise indicated.

15          MR. LeBAS:   And will the pre-trial on February

16 11th, will that be at 9:30?

17          THE COURT:   10:30.

18          MR. HUFFAKER:    Your Honor, John Huffaker for

19 Friona.   One other point of clarification.   The Court has

20 expressed this issue of are these discrete assets or not?   And

21 certainly the documents that we'll be producing to the Trustee

22 we believe will absolutely demonstrate that.

23          Now whether, when we come to February 11th and the

24 Court is trying to grapple with that decision, we'd probably

25 need some clarification about the extent to which that is or

1  is not evidentiary.

2          THE COURT:   It's not going to be evidentiary.

3          MR. HUFFAKER:   And we might need some help from

4  them in terms of cooperating of what is (unclear)

5          THE COURT:   If you've convinced them, and they tell

6  me that they agree, then you've got me.

7          MR. HUFFAKER:   Right.  But what I'm saying is if we

8  come to February 11th, and you're attempting to decide, and we

9  have no agreement, then it seems to me like the Court's going

10 to have to hear some evidence some way.

11         THE COURT:   I'm not going to hear evidence on the

12 11th.  If I do have to hear evidence on that question -- and

13 we'll -- I mean, the word that keeps going through my mind

14 here -- and I've tried to avoid saying it -- is "bifurcate."

15 But at some point we might need to talk about bifurcating this

16 issue because there really are two separate issues:   Where

17 should we hear this?  And then there's the hearing on the

18 merits, you know, on the relief from stay merits, under --

19 under the Code Section.  So you -- we'll talk about that at

20 that point, but I don't want anybody -- we're not -- we're

21 going to try to be clear, the fact that at least on this issue

22 there won't be evidence on the 11th of February.

23         MR. LeBAS:   Your Honor, I --

24         THE COURT:   Yes.

25         MR. LeBAS:   -- a further point of clarification,

1   and that deals with this anticipation that the Court may rule

2   that it wants to move to the next step, that is, a (d)(1) and

3   (d)(2) analysis; and particularly on the (d)(2) issue with

4   respect to is there equity, how do we find out what the status

5   of the bank claim is, how big it is, how much money they've

6   got in the account, what other collateral they may have --

7              THE COURT:    Well, see, that's my whole--

8              MR. LeBAS:    -- if there's an argument, and so --

9              THE COURT:    That's my question, too.

10             MR. LeBAS:    Well, but -- but --can we start -- do

11  we have access to the discovery process that would otherwise

12  be available if this were an adversary, for example, to

13  prepare for that particular dispute, if it comes up?

14             ATTORNEY: (unclear) contested motion.

15             MR. LeBAS:    We've got a -- we've got an interim

16  time period here.  I hate to see it run to waste.   Would the

17  Court permit limited access to some discovery on questions

18  that might pertain to the (d)(1) or (d)(2) motions?

19             THE COURT:    Well --

20             MR. LaTOUR:    Your Honor, this is Randall LaTour for

21  Fifth Third Bank, if I could make a suggestion, I would have

22  Fifth Third Bank file a proof of claim that has the

23  documentation available for the creation, attachment, or

24  perfection of the secured interests, which I think is the

25  information that was requested.   I don't want to have some

1  kind of a discovery window where we spend time figuring out if

2  we're in compliance or not.

3           MR. LeBAS:   Yeah.  Assuming it had the debt in

4  documentation, supporting it, I think that would be

5  satisfactory for the Court to take notice of, what the claim

6  is, and what the status of these items are, their value

7  compared to the debt.

8           THE COURT:   All right.  Now what about my

9  suggestion earlier that do you all want any order that allows

10  anything to proceed as far as these third-party disputes that

11  you have in Texas?   To make clear that the stay -- I don't

12  think the stay -- they're stayed anyway.

13           MS. HALL:   Well, the District Court in Texas issued

14  -- when we filed the Notice of Bankruptcy, they stayed the

15  entire case.

16           THE COURT:   Okay.  Do you want anything indicating

17  that you can start discovery as to those third parties?

18           MR. LeBAS:   Not at the present time, Your Honor.  I

19  think it would be confusing to everybody as to whether we're

20  in or out.

21           THE COURT:   Okay.  All right.   Anything else on

22  this motion?   All right, let's move on.

23           Ms. Hall, you've got two motions.   One has to do

24  regarding payments of the sales.

25           MS. HALL:   Yes, Your Honor.  We have two motions

1   on, and they're sort of complementary to the motion that you

2   heard last week relating to the contracts, and this is simply

3   to give the Trustee what could be ordinary course authority,

4   but in order to allow the Trustee to properly administer the

5   assets of the estate.

6        We have people who have -- we have sold cattle to

7   who are concerned about providing the money payments to us

8   because they're concerned about conflicting claims, and they

9   *didn't* file an interpleader.  And so we'd ask for authority

10  for the Trustee to accept those proceeds and provide a limited

11  indemnification to those parties that give us those proceeds,

12  up to the amount of the proceeds that they give us, from

13  conflicting claims.

14       It also sets up a mechanism for people to file

15  claims, so that we would have a bar date for people to file

16  claims.  They'd file all their documentation.  That bar date I

17  believe is proposed to be March 31st.  We'd advertise it in

18  all of the various and sundry forums that's in the cattle

19  industry and that Eastern provided in, and that would give us

20  an early indication and give us a lot more information, and it

21  would give people -- the parties that are involved -- some

22  certainty about giving the money into the estate; and also,

23  the estate's ability to start adjudicating all of those claims

24  quickly.  We have six months' free rent, and we intend to --

25  to get this case moving.

1          The second motion is, we do have cattle that are

2    still in our inventory that need to be sold, and we want to

3    continue to -- we want to be able to sell those cattle.

4          There is a misstatement in that pleading.  It's not

5    36,000 cattle.  That's the number of cattle that were

6    identified in the contracts.   It's four to 6,000 cattle that

7    we still need to actually physically get sold.

8          We're probably -- we're just wanting to use the

9    normal mechanisms that are available in the industry.  We may

10   be working with one of the primary auction houses that's been

11   providing information to us.  And it's -- essentially that's

12   what the motions -- both motions say is to just give the

13   Trustee the ability to start administering the assets of the

14   estate, get the money in, get the cattle out.

15         There have been some -- a couple of objections that

16   have been raised to it, primarily on the basis -- if I

17   understand it correctly -- is that the motions are vague,

18   because we're not exactly sure of which cattle and which

19   proceeds.

20         If the concern is that the Trustee is going to try

21   to undo cattle that have already been sold or gone, that's why

22   we have two motions.  If we've identified cattle in the cattle

23   inventory that have already been sold, then we have the

24   proceeds motion to "Please pay us."  So if that's a concern,

25   we don't in -- I don't believe -- intend to try to undo sales

1    -- to the extent -- unless it was a fraudulent transfer.

2              The other issue has to do with whether we would, in

3    our sales costs, pay for feed and care of the cattle that

4    occurred pre-petition and post-petition; and on that issue I

5    think we've set -- I think we have to pay for any post-

6    petition amounts of feed that were sold?  I'm not exactly sure

7    whether -- but it's something we can talk about as to whether,

8    if you had a properly documented pre-petition feed bill that

9    you need to deduct from those sales proceeds, then we would

10   discuss that.

11             THE COURT:   All right.

12             MS. HALL:   But I'm talking about their objection.

13             MR. HUFFAKER:   Your Honor, John Huffaker for the

14   movants Friona and J&F and Cactus.

15             We filed objections to both of the Trustee's

16   motions.  One motion entitled "Emergency Motion Regarding

17   Payments on Debtor's Cattle Sales," and one motion called

18   "Emergency Motion Regarding Trustee Selling Debtor's Current

19   Cattle Inventory."

20             That second one is the one that recited the 36,000

21   head, and our objection really to both of these motions is

22   lack of clarity as to whether the Trustee is attempting to

23   deal with cattle that are already distinctly identified to

24   other contracts and other proceedings.

25             For example, all of the cattle in the Texas

1 interpleader are identifiable cattle, identified in the

2 contracts.   Yet I don't hear counsel saying they're trying to

3 somehow back-door gather those into the -- into the Bankruptcy

4 Court, but I'm not sure.

5        THE COURT:   I think that would be "corral" them

6 into the --

7     (Laughter)

8        MR. HUFFAKER:   Well, we've got them in corrals,

9 Judge.

10        MS. HALL:   The small cattle.

11        MR. HUFFAKER:   We've got them in pens.  So what

12 we're concerned about is some overly unclear order as to what

13 cattle are what, and whether they're trying to --

14        THE COURT:   All right, well, let's talk about that.

15        MR. HUFFAKER:   -- trying to --

16        THE COURT:   So you're not talking about cattle that

17 are in other contracts.

18        MS. HALL:   Well --

19        THE COURT:   Well, I mean, for example, you're not

20 talking about these cattle that are down in Texas, the

21 proceeds that --

22        ATTORNEY:   We're not talking about any of the

23 cattle in the interpleader, if that answers Mr. Huffaker's

24 question.

25        MR. HUFFAKER:   That  -- that's helpful, Your Honor.

1  And then with respect, so that -- so that feed charges,

2  finance charges, all of that on those cattle will be separate.

3  We won't have to adjudicate that through the Trustee's Office,

4  so to speak.  Right?

5         ATTORNEY:   That's part of the interpleader.

6         MR. HUFFAKER:   Yes, that's right.

7         ATTORNEY:  Whatever happens with that interpleader--

8         MR. LeBAS:   I would say it's actually not part of

9  the interpleader, because these cattle have been delivered

10 under contract of sale --

11        THE COURT:   What -- when you say "these cattle,"

12 which ones do you mean?

13        MR. LeBAS:   That give rise to the purchased funds

14 that were in the interpleader case itself.

15        THE COURT:   Okay.

16        MR. LeBAS:   If we got 100 head over in Pen 426 at

17 Cactus Growers' yard, then those cattle will be fed out to a

18 customer -- perhaps Cactus owns them.   Cactus can do whatever

19 it wants to with them.   The money representing the purchase

20 price for those cattle, which Eastern may have a claim to, the

21 Trustee, the bank -- we don't know right now -- might have a

22 claim to -- those funds stand for something, and somebody has

23 claims to them.   But what happens to those cattle ought to,

24 in our view, go with who is -- who is paid for and who has

25 possession of them, and under who they were delivered.

1        So our concern with the objection is, is the Trustee

2   attempting to assert some measure of control over the feeding,

3   the care, the slaughter, eventually, and disposition of

4   slaughter proceeds from those cattle, we've already taken

5   possession of and paid for.

6        THE COURT:   No --

7        MR. HUFFAKER:   And that are identified in the

8   contract.

9        THE COURT:   And you're not.

10       ATTORNEY:   We're not trying to sell cattle that

11  have been paid for.

12       THE COURT:   Right.  No --

13       ATTORNEY:   This motion has to do with cattle that

14  we have not yet sold.

15       MR. HUFFAKER:   Well, again, Your Honor --

16       ATTORNEY:   They've paid the money to the Court.

17       MR. HUFFAKER:   Right.  Okay.  So if the money's in

18  the Court, you're not going try to (unclear, multiple speakers

19  on the same microphones, can't separate voices)

20       ATTORNEY:   We're not trying to sell cattle for

21  which the proceeds have been tendered into court in that

22  interpleader.

23       THE COURT:   Well, can we put something in the order

24  that says this -- this does not in any way pertain to the

25  cattle that are the subject matter of the interpleader action

1  in Texas?

2         ATTORNEY:   Yes.

3         MS. HALL:   But as far as the cattle inventory.

4  The cattle inventory does not -- doesn't have anything to do

5  with the cattle that are identified in the interpleader

6  (unclear)?  Is that what you're talking about?

7         ATTORNEY:   Right.

8         ATTORNEY:   That's correct.

9         MS. HALL:   Would that work?

10         THE COURT:   Is that --

11         MR. HUFFAKER:   I think that would be fine, Your

12  Honor, if we can get some clarification as to --

13         THE COURT:   All right, we'll put that language --

14         MR. HUFFAKER:   -- what the powers are.

15         THE COURT:   -- in the order.   Mr. Ames.

16         MR. AMES:   Yes, Your Honor.   I'm

17  uncharacteristically quiet so far, but the Kentucky

18  Cattlemen's Association as well as other clients are

19  supportive of the motions, and, in fact, that is one of the

20  reasons why the original involuntary was brought, to make sure

21  that there was a certainty as to where the assets were, how

22  they were going to be identified; and we feel the Trustee is

23  going along with that process.   And now that, if we can clear

24  up which cattle are being sold, the -- you know, we've talked

25  with Trustee's counsel yesterday and added some language that

```
 1   made us a little more comfortable with the order.

 2           The one thing that did get passed us yesterday was

 3   the March 31st bar date might be a tad soon.   The level of

 4   sophistication is not -- not as great as it is in

 5   manufacturing types and other types of cases.  We would ask

 6   that that be extended to give these farmers and various other

 7   parties an opportunity to submit and to contact and to become

 8   more aware of what's going on.

 9           THE COURT:   Is April 30th satisfactory?

10           ATTORNEY:   That's --

11           MR. AMES:   Yes, sir.

12           THE COURT:   All right, we'll change it to then.

13           MR. LeBAS:   Your Honor, may I go back to issue that

14   was addressed in our earlier motion?  And it has to do with

15   the bank's proof of claim filing of its debt?  I know that

16   counsel has represented what will be done, but it would be

17   helpful if we could know when so we know what we're dealing

18   with?  Might that --

19           THE COURT:   When -- when do we anticipate the

20   filing of the Fifth Third proof of claim?

21           MR. LaTOUR:   Your Honor, I would propose to have

22   that in place before the February 11th, -- perhaps on the

23   heels of the February 11th pre-trial, with the other

24   information being exchanged.

25           MR. LeBAS:   I think we need to know that somewhat
```

1  in advance of it, because the exchange is if they're going to

2  do that we don't need to do discovery if we get -- we need to

3  know what we're dealing with.

4         THE COURT:   Could you have that in -- I don't have

5  -- oh, yes, I do.  (Pause)   Could we have it -- could we have

6  it the week before February 11th?

7         MR. LaTOUR:   (unclear) Your Honor.

8         THE COURT:   All right.

9         MR. LeBAS:   (unclear)

10        THE COURT:   February 4th.

11        MR. LeBAS:   Thank you.

12        MR. LaTOUR:   (unclear) February 4th.

13        MR. LeBAS:   Thank you.

14        THE COURT:   All right --

15        MR. HUFFAKER:   Your Honor, one other word of

16  clarification on the motion -- the Trustee's motion.  It's my

17  understanding, and I just want to make this clear -- that with

18  respect to the order that they're going to enter, it's also

19  not going to try to require payment of the interpled monies--

20        THE COURT:   No. --

21        MR. HUFFAKER:   -- into the Trustee's account.

22        THE COURT:   -- it is not.

23        MR. HUFFAKER:   Okay.

24        THE COURT:   It is not.  We're not at that -- we're

25  not at that point yet.  We may never get there.   All right.

1  Then -- anybody else want to be heard on those two motions?

2  Those related motions?  I'll show --

3            MS. HALL?:   Your Honor, could I ask one question?

4  On the ability of -- to pull defense costs from the interpled

5  funds, is that -- is that -- do you do that -- I don't

6  (unclear) do you do that now?   Have you done it before?  Or

7  do you (unclear)

8            ATTORNEY:   Defense costs, like -- ?

9            FEMALE ATTORNEY:   Well, you've asked for attorneys'

10  fees and costs.

11            ATTORNEY: Oh.

12            FEMALE ATTORNEY:   (unclear)

13            ATTORNEY:   No, that'd be a matter of adjudication

14  in the final --

15            FEMALE ATTORNEY:   At the end.

16            ATTORNEY:   Yeah.

17            FEMALE ATTORNEY: Oh.

18            THE COURT:   I think that's one thing you all ought

19  to talk about, too, as part of your negotiations.

20            Okay, then we had a couple parties that joined the

21  motion.   I believe those joinders were now restyled as

22  responses to the original motion for relief.

23            And then I believe that brings us to East West

24  Trucking case?  I've got a motion to approve agreed order with

25  Cattlemen's Feed Lot.

```
 1              CLERK:    That's this afternoon.

 2              THE COURT:   Oh, that's this afternoon.   Well, then

 3   we won't do that.   I'm glad.   If there's nothing else in --

 4   well, is East West going to take any time?   Is everybody here?

 5              MR. HUFFAKER:    Your Honor, John Huffaker.   We

 6   represent Cattlemen's in that motion to lift stay, and

 7   basically that is a hearing on 800 and some 44 -- 844 head of

 8   cattle that we contend we are the only lienholder on, and we

 9   want to sell them in the due ordinary course of business and

10   apply the funds to the existing debt and existing lien.

11              We have evidence for that.   I would say that

12   evidence can be put on fairly quickly.   I'm not sure it can be

13   put on before the noon hour.

14              MR. CARR:  Your Honor, it doesn't -- Your Honor, may

15   it please the Court, John Carr for First Bank.   East West's

16   counsel isn't here, and the Trustee is holding 341 meetings.

17              THE COURT:   That's fine.   That's what I was

18   wondering if everybody was here.   Everybody's not here.   We'll

19   hear it at 1:30.   Anything else in Eastern?

20              CLERK: (unclear)

21              THE COURT:   Oh, any parties that are participating

22   by phone, we're using the same dial-in number this afternoon.

23   All right, we're adjourned.

24              [Off the record at 1:52:01 p.m.]

25          (See separate transcript for afternoon hearing)
```

1                    *  *  *  *  *  *  *  *  *  *  *  *

2            I certify that the foregoing is a true and accurate

3    transcript from the digitally sound recorded record of the

4    proceedings.


/s/  *Gloria C. Irwin*                                    1/23/2011

**GLORIA C. IRWIN**
**Certified Transcriber NJ AOC200**                                    **Date**
    **Federal  CERT #122**
**GCI TRANSCRIPTION SERVICES**
**210 Bayberry Avenue**
**Egg Harbor Township, NJ  08234-5901**
**609-927-0299  1-800-471-0299**
    **FAX  609-927-9768**
**e-mail  irwingloria@comcast.net**
✔

**#10-93904**                                    **1-12-2011**