IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| EASTERN LIVESTOCK CO., LLC | § | |
| | § | |
| Debtor. | § | CASE NO. 10-93904-BHL-11 |

RESPONSE AND BRIEF IN SUPPORT TO MOTION FOR
EXAMINATION AND PRODUCTION OF DOCUMENTS PURSUANT
TO FED. R. BANKR. P. 2004 FILED BY FIRST BANK AND TRUST

J & F OKLAHOMA HOLDINGS, INC., FRIONA INDUSTRIES, L.P. and CACTUS GROWERS, INC. ("Respondents"), submit this Response and Brief in Support to Motion for Examination and Production of Documents pursuant to Fed. R. Bankr. P. 2004 filed by First Bank and Trust Company ("Movant" or "First Bank") [Doc. #401]:

I. SUMMARY OF RESPONSE AND BRIEF

1. This Response and Brief shows the following:

- Movant seeks to use Rule 2004 to support claims of liability to Movant, rather than liability to the Debtor. This is an improper use of Rule 2004.

- Movant has asked Respondents to generate and produce summaries of transactions, followed by production of the underlying records if requested. In the spirit of cooperation, Respondents have agreed to generate and produce summaries that are consistent with, and in some instances, outside the scope of permitted discovery under Rule 2004, subject to entry of an appropriate protective order. The agreed summary will describe Respondents' cattle purchases from all sources that occurred from October 1, 2010 to March 31, 2011, and all cattle placed by named entities or persons affiliated with the Debtor. The procedure Respondents have agreed to is attached as Exhibit "A."

- Movant further requests information as to cattle placements (in addition to cattle purchases) by all persons or entities that placed cattle in Respondents feedyards. This would require disclosure of customer information of Respondents' customers other than named

>    parties that were affiliated with the Debtor.  This disclosure should not be allowed.
>
> - The Movant should be required to produce information concerning its claims before further inquiry occurs.

## II.   THE LIMITED SCOPE OF RULE 2004

1. Rule 2004 provides as follows regarding the scope of the examination:

   (b) *Scope of Examination.* The examination of an entity under this rule or of the debtor under § 343 of the Code ***may relate only to the acts, conduct, or property, or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate, or to the debtor's right to a discharge.*** (emphasis added)

Notwithstanding the broad scope of a Rule 2004 examination, "it must *first* be determined that the examination is proper." *In re GHR Energy Corp.*, 35 B.R. 534, 538 (Bankr. D. Mass. 1983). "While it is obvious that particular rights of a creditor are affected when one of its debtors files for protection under the Bankruptcy Code, it cannot be said that a creditor necessarily loses the protections afforded by the Federal Rules of Civil Procedure especially in the context of an action arising under non-bankruptcy law." *Id.*  While the purpose of Rule 2004 is broad, it is not without limits.  "The examination of a witness [under Rule 2004] as to matters having no relationship to the debtor's affairs or no effect on the administration of the estate is improper." *In re Continental Forge Co., Inc.,* 73 B.R. 1005, 1007 (Bankr. W.D. Pa. 1987); *see also Matter of Wilcher*, 56 B.R. 428, 433 (Bankr. N.D. Ill. 1985)(examination of entity was improper).

2. Although Rule 2004 permits examinations of "third parties" the language of the rule makes it "evident that an examination may be had only of those persons possessing knowledge of a debtor's acts, conduct or financial affairs so far as this relates to a debtor's proceeding in bankruptcy." *In Re GHR Energy Corp.,* 35 B.R. at 537.  Therefore, "it is clear that Rule 2004 may not be used as a device to launch into a wholesale investigation of a non-debtor's

private business affairs." *Matter of Wilcher*, 56 B.R. at 434; *see also In re Continental Forge Co., Inc.,* 73 B.R. at 1007(recognizes the non-debtor's right to privacy in its business affairs).

3.      Movant is seeking discovery under Bankruptcy Rule 2004 in an effort to find a claim against Respondents.  Rule 2004 does not permit creditors to "transform the rule from an investigatory device, designed to expedite the administration of the bankruptcy estate, into something not unlike a proceeding supplemental, which creditors could use in an effort to collect the amounts due them outside the bankruptcy proceeding."  *In re J & R Trucking, Inc.*, 431 B.R. 818, 821 (Bankr. N.D. Ind. 2010).   In *J & R Trucking, Inc.*, Judge Grant described this key limitation as follows:

> Rule 2004 of the Federal Rules of Bankruptcy Procedure allows the court to authorize the examination of any entity as to "the acts, conduct, or property, or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate or to the debtor's right to a discharge." Fed. R. Bankr. P. Rule 2004(b).  The opportunity for such an examination is available to "any party in interest," Fed. R. Bankr. P. Rule 2004(a), but whether or not the court allows the examination is a matter committed to its discretion, *In re Rosenberg*, 303 B.R. 172, 175 (8th Cir. BAP 2004); *Dinubilo*, [*In re Dinubilo*, 177 B.R. 932, 943 (E.D. Cal. 1993)], 177 B.R. at 939, and requires a sufficient cause.  *Dinubilo*, 177 B.R. at 943; *In re Symington*, 209 B.R. 678, 687 (Bankr. D. Md. 1997); *Matter of Wilcher*, 56 B.R. 428, 434 (Bankr. N.D. Ill. 1985). *See also*, NORTON BANKRUPTCY RULES, 2009-10 ed., Rule 2004 ed. comment (c), pp. 136-37 (Creditors do not have an absolute right to conduct examinations under rule 2004 "which provides that the court 'may order' an examination. One can readily visualize a situation where creditors may want to use this section to deal with their special problems and use the section as a substitute for discovery.").
>
> Although a Rule 2004 examination is obviously an investigatory device and it is conducted under oath, it should not be confused with discovery or a discovery deposition. *See generally, Dinubilo*, 177 B.R. at 939-40; *Symington*, 209 B.R. at 683-85; *Wilcher*, 56 B.R. at 433-34; NORTON, RULE 2004 comment (c), p. 137.  The two are different, both in terms of the context in which they occur and the scope of the requested examination.  Discovery can only take place in the context of some type of dispute-be it an adversary proceeding or a contested matter-and the scope of the inquiry is limited to issues which are relevant to that dispute.  *See*, Fed. R. Civ. P. Rule 26(b)(1).  A 2004 examination, on the other hand, not only does not require the existence of litigation to justify the inquiry,

> but, such a dispute prevents recourse to it. A 2004 examination is not a substitute for discovery; if the traditional discovery tools are available the potential examiner is required to use them and may not take advantage of Rule 2004. The fact that a Rule 2004 examination is taking place outside the context of an identifiable dispute influences not only its availability but also its scope. Unlike traditional discovery, which narrowly focuses on the issues germane to the dispute, Rule 2004 has been rightly characterized as a "fishing expedition." It is a broad-ranging inquiry into the debtor's assets, liabilities, financial affairs and anything else that might affect the administration of the bankruptcy estate.

*J & R Trucking, Inc.*, 431 B.R. at 821.

4. In an effort to be cooperative, the Respondents have agreed to the discovery protocol as set forth in the attached Exhibit "A." Such an agreement by Respondents already goes beyond the permitted scope of Rule 2004, but in no way is intended to waive the requirements or scope of Rule 2004. Therefore, Movant is not entitled to any additional information beyond what the Respondents have already agreed to produce. Accordingly, Movant's motion should be denied with respect to Movant's request for information not already encompassed within Exhibit "A."

### III. MOVANT'S REQUEST IS AN IMPROPER PRIVATE FISHING EXPEDITION

5. Although Rule 2004 Motions are sometimes described as "fishing expeditions" they are not permitted for private purposes like the one advanced by Movant. First Bank's Motion was described accurately in *J&R Trucking*: "One can readily visualize a situation where creditors may want to use this section to deal with their special problems and use the section as a substitute for discovery." *See J&R Trucking, Inc.*, 431 B.R. at 821(*citing* NORTON BANKRUPTCY RULES, 2009-10 ed., Rule 2004 ed. comment (c), pp. 136-37). First Bank is an alleged creditor of Thomas P. Gibson and Patsy M. Gibson and it is looking for 8,000 cattle the Gibsons pledged to it and that it cannot find. To Respondents knowledge, First Bank was not a cattle lender to any

other Debtor involved in the Eastern Livestock related bankruptcy proceedings.[1]

6. In its pleadings in the Gibson Bankruptcy Case, and in a Bankruptcy Case filed by East-West Trucking, Inc. (Case no. 10-93799 in this Court), First Bank says that in loaned money on the basis of invoices presented by Mr. and Mrs. Gibson. The invoices described cattle by "total and average weight of the cattle, number of head of cattle purchase, and the location of the farm or feedlot to which the cattle were shipped." [East-West Doc. #50-1, paragraph 4].

7. First Bank further says that in late September of 2010 it inspected, and located, the Gibson cattle on pasture, which comprised its cattle collateral, but that in November and December it made the "discovery that approximately 8,000 cattle financed by First Bank were missing, as these cattle could not be found at the locations specified on the November Inventory Report." [East-West Doc. #50-1, paragraphs 6 and 7].

8. First Bank's lending officer says he thinks the cattle must have gone somewhere, but he doesn't know where. [East-West Doc. #50-1, paragraph 10].

9. The Motion is nothing more than an attempt by a private litigant to use Rule 2004 to support a potential private litigant's efforts to find a claim. The Rule does not allow this: "Movants understandably want their money, but that does not justify turning a tool that has been developed to efficiently administer bankruptcy estates into a private collection device for creditors. Movants have other tools and other fora which they can use to investigate their rights against third parties and to collect the amounts they are owed. They should use them and not Rule 2004." *J&R Trucking*, 431 B.R. at 823. Put simply by the court, "movants desire to identify third parties who may be liable to them…is [not] the purpose of Rule 2004. *Id* at 822.

---

[1] The Eastern Livestock related bankruptcy proceedings include the following matters, all pending in this Court: In re Eastern Livestock Co. LLC, Case No. 10-93904; In re Thomas and Patsy Gibson, Case No. 10-93867; and In re East-West Trucking Co. LLC, Case No. 10-93799.

IV. THE MOTION IS OVERBROAD

10. *J&R Trucking* noted that a decision to grant a Rule 2004 motion is a matter within the Court's discretion and that the decision must be based on "sufficient cause." *J&R Trucking*, 431 B.R. at 821 (citations omitted). Movant's request would require production of records concerning an enormous number of cattle and would involve disclosure of sensitive customer information, all for its search for 8,000 cattle that it has not identified. These 8,000 cattle could be anywhere in North America along with over 11,000,000 other cattle.[2] The Three Major Feedyards, though larger than most, only comprise approximately 13% of the feedyard capacity in the United States. Rather than seeking records that have some logical relationship to the 8,000 cattle in question, or which have some realistic chance of revealing the location of those 8,000 cattle, First Bank is seeking to obtain records of ALL the cattle coming into the Three Major Feedyards over a period of six (6) months, even cattle not purchased or owned by the Three Major Feedyards. First Bank is seeking across-the-board production of records of over 1,500,000 cattle in the unsubstantiated hope that once they have the records on 1,500,000 cattle, it can figure out a way to identify some of them as having been one of the 8,000 Tommy Gibson cattle.

11. This is not a fishing expedition—it is draining the lake in the hope of finding a fish.

12. The Court should exercise its discretion to limit the scope of permitted disclosure to what the Respondents have agreed to in Exhibit "A."

13. Although First Bank's pleadings in this Court describe the existence of inspection

---

[2] Over the time period in which First Bank requests information from the Three Major Feedyards (October 1, 2010 through March 31, 2011), over 11,000,000 cattle were placed at feedyards in the United States. *See* Affidavit of James G. Robb attached to this pleading as Exhibit "B." The National Agricultural Services Service, Agricultural Statistics Board, United States Department of Agriculture Cattle on Feed Report released March 18, 2011 also shows that 114 million head were on feed in the United States as of March 1, 2011, attached as Exhibit "C."

reports that identify these cattle, First Bank's counsel has refused to provide copies. If First Bank were to produce those records, the Feedyards could probably focus their inquiry, investigation and document request to those transactions which have a realistic possibility of relating to the 8,000 head in question. (for example, by gender, weight or other description of the cattle, by origin of the cattle coinciding with the location of the missing 8,000 cattle when last in Tommy Gibson's possession, by identity of trucker, etc.) But as events now stand, the Feedyards have no way to know where these cattle were shipped from, when they were shipped, what their size or sex were, or any other identifying characteristic that might permit them to determine whether or not they received any of these cattle. And, by not disclosing this basic information, First Bank is preventing the Feedyards from eliminating the need to examine the thousands of files regarding cattle which logically could not be part of the 8,000 cattle in question. First Bank's request virtually guarantees that over 99% of the Feedyard files reviewed will have nothing whatsoever to do with the 8,000 cattle in question.

14.   The Feedyards have agreed to generate and produce summaries, subject to entry of an appropriate protective order, that describe Respondents' cattle purchases from all sources from October 1, 2010 to March 31, 2011, and all cattle placed by the following named entities or persons affiliated with the Debtor from June 1, 2010 through December 31, 2010: Eastern Livestock Co, LLC, Thomas Gibson, and Patsy Gibson.[3]  These records reflect at least the total number of cattle purchased during this time:  J&F – 826,101; Friona – 309,488; Cactus – 382,368, a total of 1,517,957 head.  This agreement is extremely generous given the limited scope of Rule 2004 as detailed above.

15.   The Responding Parties are not the only potential recipients of cattle that may

---

[3] The Feedyards acknowledge that it is logical, and reasonable, to inquire about cattle placed in their feedyards by related persons.

have originated from First Bank's alleged collateral. According to the USDA, feedyards with one time capacity of 1000 head or more received 2,463,000 cattle in September 2009, 2,505,000 in October, 1,959,000 in November, and 1,789,000 in December throughout the United States. *See* Ex. B, Cattle on Feed, Placements and Marketings, prepared by Livestock Marketing Information Center. The specific cattle Movant is looking for could have gone to any of these other feedyards, or to pastures anywhere in North America. Movant is looking for a needle in a haystack and will not describe either the needle or the hay, while insisting on the production of all the haystacks

16. Without information from First Bank as to the identity, location or description of the 8,000 head it claims were its collateral, the Responding Parties cannot determine whether any of the over 1,500,000 cattle they purchased during this time constituted part of the alleged collateral of First Bank.

17. As a secured creditor, presumably pursuing some form of conversion suit, First Bank would be required to identify its collateral as part of a claim. Moreover, First Bank may have been paid for these cattle. The Trustee in this Case alleges that during the 90 days preceding bankruptcy, $365,000,000 was paid by Eastern to Thomas P. Gibson. (See Trustee's Blog dated March 7, 2011). Further, as reported in his blog on January 25, 2011, the Eastern Trustee stated: "I have been advised that on Thursday, January 20th, the FBI seized approximately $4.7 million dollars in bank accounts of Tom Gibson and possibly Eastern Livestock at Your Community Bank in New Albany, Indiana." This may be cattle sales proceeds from First Bank's alleged collateral. Movant's claims pertaining to the Responding Parties' records, therefore, are so attenuated they fall outside of the scope of discovery permitted by Rule 2004. Alternatively, any production should be tailored to fit Movant's claims.

V.     THE MOTION SEEKS DISCLOSURE OF SENSITIVE CUSTOMER INFORMATION

18.    First Bank's Motion seeks records pertaining both to Respondents' purchases of cattle from third parties, and placements by customers of their own cattle with Respondents for feeding and care. Information about identity of customers is very sensitive information in the competitive "custom"[4] cattle feeding industry. First Bank has not alleged any demonstrable need for this information.

19.    We have found one case that addressed a contested disclosure of customer information in a Rule 2004 setting. *In re Summit Corp.*, 891 F.2d 1 (1st. Cir. 1989), involved a dispute that arose in John Grant's chapter 7 case. Grant's estate owned 70% of the stock of Atlantic Packaging Corporate ("APC") and his Trustee wanted to sell that stock. The bidders were Andrew D'Elia, who owned the other 30% of APC stock, and a major business competitor of APC, Rand-Whitney Robinson Corporation ("Rand"). Rand wanted to examine APC's records so it could determine the amount of its bid, and sought an order under Rule 2004 to allow this. The Court of Appeals noted that the bankruptcy court "tailored the discovery so as to achieve a balance between the confidentiality of APC's affairs and the need for competitive bidding. The court specifically withheld from Rand sensitive information concerning customer lists, as well as cost and price information." Based on this, and on the entry of a Confidentiality Stipulation between Rand and APC, the limitations were upheld.

A.     **Scope of Rule 2004 Examination Is Improper Because First Bank Seeks Production of Documents with No Connection to the Debtor or the Bankruptcy Estate**

20.    First Bank seeks disclosure of highly sensitive customer information, regarding ALL the customers of the Feedyards, with no showing of any connection of those customers or

---

[4]  The industry describes "custom" operations as feeding and care provided by feed yards for cattle owned by third parties, and describes feeding and care for cattle owned by feed yards as "company" operations. The Respondents have varying degrees of both types.

that information to the Debtor. Examination of third parties under Rule 2004 is limited to issues concerning the debtor's business or assets. *In re Financial Corporation of America*, 119 B.R. 728 (Bankr. C.D. Calif., 1990); *In re Fearn*, 96 B.R. 135 (Bankr. S.D. Ohio, 1989). Although Rule 2004 allows for a broad range of discovery, as set forth above, that scope is not limitless. First Bank's request seeks the discovery of Feedyard customers who are not parties to these bankruptcy proceedings. First Bank bears the burden of proving to this court that good cause exists for obtaining *any* discovery from or regarding third parties, such as the Feedyards' customers. *In re Metiom, Inc.*, 318 B.R. 263, 268 (Bankr. S.D. N.Y., 2004). Much of that third party customer information which First Bank seeks is confidential and privileged. As a result, First Bank's request for a 2004 examination of transactions of the Feedyards customers should be denied[5].

21. In *Coffee Cupboard, Inc.*, the Bankruptcy Court for the Eastern District of New York addresses the legitimacy of a 2004 examination request. 128 B.R. 509 (Bankr. E.D. N.Y.) at 511. In *Coffee Cupboard*, creditors filed a motion to reopen a Chapter 11 bankruptcy and convert to a Chapter 7 on the basis of the debtor's failure to substantially consummate the plan, as well as fraud. *Id*. The creditors' allegations of fraud concerned two specific transactions. *Id*. As the case progressed, the creditors, with the support of the trustee, requested a 2004 examination into the financial affairs of the debtor. *Id*. at 511-513. The court allowed the 2004 examination to proceed only on a limited basis. The court restricted discovery to the two transactions at issue, *Id*. at 514-517, and said: "[t]he examination of a witness about matters having no relationship or no effect on the administration of an estate is improper." *Id*. at 514.

---

[5] The Feedyards have agreed to produce information regarding cattle or persons which are related to or affiliated with a debtor.

The court excluded all documents not specifically related to the transactions at issue from discovery. *Id.* at 514-17.

22. As did the movants in *Coffee Cupboard*, First Bank has requested voluminous information that has no relationship to any debtor or to the administration of any estate. The requested customer documents, of ALL customers who brought cattle into the Feedyards during the requested period, that have no relation to Debtor or the administration of the bankruptcy estate is an improper use of Rule 2004 and should be denied.

> **B.  Rule 2004 Examination Is Improper Because First Bank Seeks Production of Confidential and Privileged Information**

23. Not only is First Bank's request improper because it seeks to discover information that has no relevance to any debtor, nor to the administration of any estate, but also the request is improper because it seeks to discover confidential and privileged information of and regarding customers of the Feedyards. This issue was litigated in *In re Jewelers Shipping Association* in the Bankruptcy Court for the District of Rhode Island. In *In re Jewelers Shipping Association*, 97 B.R. 149, 150 (Bankr. Rhode Island, 1989) creditors of a jewelry consignor filed a 2004 request seeking the production of a list of the debtor's customers. *In re Jewelers Shipping Association*, 97 B.R. 149, 150 (Bankr. R. I., 1989). In denying the creditors' 2004 request, the *Jewelers Shipping Association* court held:

> On July 28, 1988, we entered an order protecting the JSA membership list, as confidential commercial information. Although Cross Con argues that it is not seeking a list of JSA's members [customers], that is precisely what it would obtain if the requested examination were authorized. "Examinations under Rule 2004 will not be permitted where the court determines that while the entity seeking the examination is generally entitled to the Rule's broad utility, the circumstances do not justify the granting of a motion to conduct such an examination, given its proposed scope." 6 Bankr. L.Ed., Rules Commentary and Analysis § 52:21, p. 31. Here, an examination by Cross Con would necessarily lead into matters held

> confidential by our July 28th Order and therefore, cannot be allowed. Cross Con's assurances that the list would be kept confidential are illusory, given the adversary stance it has taken in the case.

*Id*. Clearly, customer information the court deemed "confidential" – including a list of the *debtor's* customers, was outside the scope of a 2004 examination. *Id*.

24. First Bank has made an even broader request for a confidential customer lists. First Bank is not seeking a list of customers of a **debtor**; rather, it is seeking information about and that belongs to all the customers of the Feedyards who brought cattle to the Feedyards during the requested time period.[6] Customer information of the Feedyards is confidential and proprietary. Clearly, the Feedyards have information of and about their customers which the **customers** own, and which both the Feedyards and the **customers** consider confidential and proprietary. It is also clear that in making its request to the Feedyards for their customer lists and customer information, First Bank is not even attempting to limit the scope of its requests to matters involving a debtor or the administration of an estate. As a result, this information is not subject to discovery under Rule 2004, and First Bank's request should be denied. *See Id.* at 150-52.

25. In *In re Bounds*, 2010 WL 3447683 *1-2 (Bankr. W.D. Tex., Aug 31, 2010) the court held the disclosure of another's confidential information is improper under Rule 2004. In *In re Bounds*, a law firm that had represented the individual debtor and his former corporations moved to quash a Rule 2004 examination requested by the Chapter 7 Trustee and a creditor who had purchased the debtor's corporations. *In re Bounds*, 2010 WL 3447683 *1-2 (Bankr. W.D. Tex., August 31, 2010). In limiting the production required in a 2004 examination by allowing a

---

[6] Given the size of Eastern Livestock's business, one would suppose that **most** of the feedyards and cattle buyers in the entire United States have bought, sold and fed cattle that at some point were sold by Eastern Livestock.

law firm to abstain from producing work product containing confidential information of the individual debtor, the court held:

> Fernea's [creditor] access to the Corporation's documents will be limited, however. A client's ownership of the contents of his attorney's file is a matter of state law. When an attorney creates documents on behalf of a client, they generally belong to the client. A client's right to has attorney's file is not absolute, however. The court can deny a client access to the work product of his attorney, if such documents contain the confidential information of another.
>
> In the instant case, this Court finds that Fernea is not entitled to the work product generated on behalf of the Corporations insofar as it contains the Debtor's own confidential information. Handing over all the work product of the Corporations, for whom the Debtor once served as an officer, would almost certainly result in a disclosure of the Debtor's own confidential information. This is especially true because the Debtor and the Corporations were represented by the same counsel throughout the course of he state court proceedings. Nevertheless, Fernea is entitled to any of the Corporations' work product that is routine or that does not contain the Debtor's own confidential information.

*Id.* at 2-3. Consequently, the disclosure of another's confidential information is improper under Rule 2004. *Id.*

26. Not only has First Bank requested confidential information of the Feedyards, but its 2004 request also seeks the discovery of confidential information of ALL the Feedyard's customers which brought cattle into their feedyards during the requested period. The production of confidential information of another is improper under Rule 2004. *Id.* As a result, First Bank's request to discover confidential information of Respondent's customers must be denied. *See Id.*

### C. The Information Requested by First Bank is Privileged and Obtaining it From the Feedyards Denies the Customers their Due Process Right to Notice and Opportunity to Assert Their Privileges.

27. Finally, the information requested by First Bank is privileged under federal common law[7]. Both the Feedyards and the Feedyards' customers hold the privilege as to the customers' confidential information. A person has a qualified privilege to protect trade secrets or similar confidential information. *Federal Open Mkt. Cmte. of the Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 362 (1979); *Centurion Indus. v. Warren Steurer & Assocs*, 665 F.2d 323, 325 (10th Cir. 1981); *see Drexel Heritage Furnishing, Inc. v. Furniture USA, Inc.,* 200 F.R.D. 255, 260 (M.D.N.C. 2001); Fed. R. Evid. 507.

28. The customers are not parties, have not been notified of the requests for their information, and have not been afforded their Due Process right to assert their own privileges. Rule 2004 requests are subject to the rules of privilege. *In re Financial Corp. of America*, 119 B.R. 728, 733-39. (Bankr. C.D. Cal., 1990). The information contains privileged trade secrets of the Feedyards' customers, who are not parties to this proceeding, and who have not been given the opportunity to assert privilege. Neither have the customers been afforded the opportunity to assert the lack of relevance of their confidential information to a debtor or a debtor's estate.

29. As Rule 2004 requests are subject to the law of privilege, *In re Financial Corp. of America*, 119 B.R. at 7330, First Bank's request for 2004 examination of privileged documents must be denied.

---

[7] This information is also privileged under Tex R. Evid. 507, Texas' trade secret privilege. Respondents recognize that in bankruptcy courts, federal common law provides the applicable rules of privilege in 2004 examinations. *In re Bounds* (Bankr. W.D. Tex., 2010) WL 3447683; Rules of Bankr. Proc. 9017.

VI. CONCLUSION AND PRAYER

While Rule 2004 allows for broad discovery, there are limits, and First Bank's Motion clearly exceeds the permissible bounds of discovery. First Bank's requests information that has no connection to the bankruptcy and that is confidential and/or privileged outside the scope of Rule 2004. Therefore, First Bank's 2004 must be denied to the extent it seeks information and discovery beyond the scope of Exhibit "A."

Respectfully submitted,

David L. LeBas, SBN 12098600
Naman Howell Smith & Lee, PLLC
8310 N. Capital of Texas Highway, Ste. 490
Austin, Texas 78731
(512) 479-0300
FAX (512) 474-1901

By: /s/ David L. LeBas
        David L. LeBas
*Attorneys for J & F Oklahoma Holdings, Inc.*

John H. Lovell
LOVELL, LOVELL, NEWSOM & ISERN, LLP
112 West 8th Avenue, Suite 1000
Eagle Centre Building
Amarillo, Texas 79101-2314
(806) 373-1515; FAX (806) 379-7176

By: /s/ John H. Lovell
        John H. Lovell
*Attorneys for Cactus Growers, Inc.*

John F. Massouh
SPROUSE SHRADER SMITH, PC
701 S Taylor, Suite 500
Amarillo, TX 79105-5008
(806) 468-3300 ; FAX (806) 373-3454

By: /s/ John F. Massouh
        John F. Massouh
*Attorneys for Friona Industries, L.P.*

**C**ERTIFICATE OF **S**ERVICE

The undersigned attorney hereby certifies that a copy of the foregoing was served on this ____day of April, 2011 via electronic and/or U.S. Mail upon all parties entitled to receive such notice as provided by the electronic case filing system used by the court.

/s/ John Massouh<br>John Massouh