UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | |
|---|---|
| IN RE: § | |
| § | CASE NO. 10-93904-BHL-11 |
| EASTERN LIVESTOCK CO., LLC, § | |
| § | CHAPTER 11 |
| Debtor. § | |

**CACTUS GROWERS, INC.'S, FRIONA INDUSTRIES, L.P.'S AND J&F OKLAHOMA HOLDINGS' MOTION FOR PROTECTIVE ORDER FROM §2004 EXAMINATION REQUEST**

**TO THE HONORABLE UNITED STATES BANKRUPTCY COURT JUDGE**:

Comes now Cactus Growers, Inc., Friona Industries, L.P., and J&F Oklahoma Holdings, parties in interest in this case and in the case of *In re: Eastern Livestock Company, LLC*. (10-93904 BHL11). As grounds for this Motion for Protective Order From §2004 Request, Cactus Growers, Friona Industries and J&F Oklahoma Holdings would show the Court as follows:

**I.**

**BACKGROUND**

**Business of Movants**

1. Cactus Growers purchases cattle for use by Cactus affiliated companies in the Cactus feedyard operations. Cactus Growers also purchases cattle for joint investment with Cactus' feedyard customers. Cactus operates ten feedyards, seven in Texas and three in southwestern Kansas.

2. J&F Oklahoma Holdings ("J&F") owns cattle in feedyards owned by another entity. That entity has twelve feedyards located in seven states. J&F owns cattle located in these twelve feedyards. Other feedyard customers feed cattle in these twelve feedyards.

3.     Friona Industries, L.P. ("Friona") operates four feedyards, all located in Texas.

4.     For many years, Eastern Livestock was the largest, or one of the largest, feeder cattle[1] dealers in the United States. Cactus Growers purchased cattle for the Cactus feedyards from many persons and businesses, but Eastern Livestock was one of the larger suppliers of feeder cattle to Cactus Growers. J&F also bought large numbers of cattle from Eastern Livestock.

5.     Cactus and J&F feed cattle owned by their own businesses. Cactus also feeds cattle for customers who wish to feed their own cattle in the Cactus feedyards. The feedyards in which J&F feeds its cattle[2] also feed cattle for other customers. Thus, both Cactus and the feedyards which feed J&F's cattle have information and documentation regarding the cattle and finances of their customers, cattle which Cactus and J&F do not own. In many instances, cattle feeding customers place cattle with the Feedyards which the customers have themselves raised or purchased, so that these Feedyards have no involvement in the acquisition of the cattle which these customers place in the feedyards.

**First Bank's and Intrust Claims**

6.     Tommy Gibson was the owner and principal of Eastern Livestock. In the first week of November, 2010, the secured lender to Eastern Livestock, Fifth Third Bank, began returning Eastern Livestock checks which had been issued to cattle producers who were selling their feeder cattle to Eastern Livestock. On November 19, 2010, Fifth Third Bank filed suit in Ohio asking the Ohio state court to place Eastern Livestock into a receivership.

---

[1] Feeder cattle are cattle in the weight range of approximately 600-800 lbs per head, generally coming off pasture. Typically, they are purchased as "feeder cattle" to put on feed in confined feeding operations, such as those operated by Cactus.

[2] Friona Industries has chosen to not feed cattle for customers. Thus, all of the cattle in its feedyards are "company [Friona] owned."

7. The returned checks and the Ohio receivership caused Eastern Livestock's cattle business to come to an abrupt halt in mid-November, 2010.

8. Tommy Gibson filed his personal voluntary bankruptcy petition in this Court on December 1, 2010. An involuntary bankruptcy petition was filed against Eastern Livestock in this Court on December 6, 2010, and an order for relief was entered in the *Eastern Livestock* case on December 28, 2010.

9. Although neither First Bank nor Intrust has yet filed a proof of claim in the *Eastern Livestock* or *Gibson* bankruptcies, according to the allegations espoused by their respective attorneys, both banks provided financing to Tommy Gibson in his individual capacity for his personal pasture cattle operations. According to the affidavit of Ernest S. Copenhaver, Jr., filed by First Bank on January 6, 2011 [*Eastern Livestock* Docket #149-1], in late September of 2010, a First Bank cattle inspector inspected pastures containing approximately 8,000 of Tommy Gibson's individually owned cattle. However, First Bank claims that when those same pastures were inspected again in late November of 2010, there were no cattle. First Bank claims it received no sales proceeds, and no notice of the sale of these 8,000 cattle. First Bank is therefore looking for the "8,000 missing cattle".

10. The underlying transactions and lien status between Intrust and Tommy Gibson in the fall of 2010 has not yet been disclosed to the Feedyards. The Feedyards do not yet understand the Intrust – Tommy Gibson relationship. The inquiries from Intrust appear directed toward validating Tommy Gibson's receivables, rather than tracing Tommy Gibson's cattle.

## II.

## FIRST BANK'S REQUEST FOR SECTION 2004 EXAMINATION

**First Bank's §2004 Request Still Exceeds Permissible Scope**

11. The permissible scope of a §2004 examination is transactions and assets of a debtor, and matters which have a bearing upon the administration of a bankruptcy estate. [*See* Feedyards' Brief in Response to First Bank § 2004 Examination Request, ¶ II, 1. *Eastern Livestock,* Docket No. 418, *Gibson* Docket No. 221.] *In re GHR Energy Corp.*, 35 B.R. 534, 538 (Bankr. D. Mass. 1983). The scope of examination sought by First Bank is all cattle and all cattle transactions of the Feedyards, – millions of cattle – with the apparent hope that once First Bank has records on everything these Feedyards have, First Bank can then figure out how to decipher a connection to an estate.[3]

**First Bank Has Not Shown That the Requested Information is Reasonably Calculated to Identify the Missing 8,000 Head**

12. First Bank has not disclosed how it believes it can identify the "missing 8,000" head by looking at the Feedyards' records on millions of cattle. To the knowledge of the Feedyards, the 8,000 cattle had no identifying brands, marks or tags. There is no apparent reason for First Bank to seek these documents from the Feedyards[4], and not the other 86.3% of the United States' feedyard capacity[5], except that the three Feedyards have appeared in the *Eastern Livestock* bankruptcy case, because of the Texas interpleader case, and are therefore "handy."

---

[3] And of course, even if First Bank obtains every document on every head of cattle in all the three Feedyards, First Bank will have records on only approximately 13.7% of the cattle on feed in the United States, (and not have any records regarding the remaining 86.3% of the U.S. feedyard capacity.)

[4] Cactus, J&F Oklahoma Holdings, and Friona.

[5] See ¶ 11, *supra*.

**First Bank's Requests for §2004 Examination**

13.     As part of its quest or investigation to locate the 8,000 cattle which were once in Tommy Gibson's pastures, on March 18, 2011, First Bank filed its Motion for §2004 Examination [*Eastern Livestock,* Docket #401, *Gibson* Docket #198], wherein it requested a §2004 examination of the three Feedyards which are interpleader plaintiffs in the Texas interpleader case, Cause No. 2:10-CV-00266-J, Amarillo Federal District Court. (The three interpleader plaintiffs in the Texas interpleader case are collectively referenced as "the Feedyards."). On March 23, 2011, counsel for Intrust indicated by letter that it would soon file a "me too" motion for §2004 examination which largely duplicated the §2004 request by First Bank, but was directed toward Tommy Gibson's representations regarding his receivables, rather than an inventory of Tommy Gibson's cattle. Intrust has indicated that it initially seeks information covering a longer time period than First Bank's current request.

**First Bank's Request Is Overly Broad, Too Voluminous, and Consists of Vast Quantities of Irrelevant Information**

14.     First Bank's initial request for §2004 Examination was absolutely breathtaking, both in scope and volume. Initially, on January 31, 2011, Creditor The First Bank and Trust Company served its First Request for Production of Documents on the three Feedyards. Those requests asked for virtually all documents and information that the feedyards had or generated on all cattle handled by the Feedyards for approximately 15 months. During this time period, the three Feedyards have handled approximately 5 million cattle. On or about March 2, 2011, the Feedyards served detailed objections to the First Bank requests.

15.     First Bank could not possibly process all the data it requested, and each of the Feedyards would have had to employ additional staff for months just to process First Bank's request.

First Bank has now reduced the scope and volume of its requests somewhat, at least initially. However, the scope and volume of what it still continues to seek remains unreasonably broad and voluminous. First Bank has still not explained how reviewing the purchase and feeding information for 5,000,000 cattle purchased by the three Feedyards during a 15 month period, or 2,000,000 cattle during a six month period will allow it to identify the 8,000 cattle viewed in September of 2010 during First Bank's inspection. The 8,000 missing cattle could have gone anywhere in the United States.

16. Further, not only does First Bank still want documentation on approximately 2 million cattle *purchased* by the Feedyards between October 1, 2010 and March 31, 2011. First Bank is also insisting upon the production of the Feedyards' customer lists and other information on *all* customer transactions of *all* the Feedyards' customers during the time period in question.

**First Bank's Requests Seek Confidential and Proprietary Information, Including Confidential Customer Information**

17. Much of the information requested of the Feedyards regarding the Feedyards' business is confidential and proprietary. Indeed, as a part of the document production, all three Feedyards have agreed and insisted that procedures must be put in place so that none of these Feedyards may see any of the information of the other Feedyards. First Bank is still demanding a complete list of all third parties which placed cattle with any of the three Feedyards, as well as some detail regarding these customers' transactions with the Feedyards. These customers are not parties in interest in this case, have not been notified of First Bank's request for their information, and have not been afforded an opportunity to object. First Bank has made this request for customers' information despite the fact that it shown no connection between the Feedyards' customers and the estates of *Eastern Livestock* or *Tommy Gibson*.

**First Bank Has Not Met its Burden to Show a Nexus Between Its Requests and Bankruptcy Estates**

18.     In all these requests, First Bank is not limiting its requests to cattle which have some logical nexus to Eastern Livestock or to Tommy Gibson. The three Feedyards have already agreed to provide information regarding cattle shipments and placements by persons and entities related to Tommy Gibson or Eastern Livestock [*See Eastern Livestock,* Docket No. 418-1, Exhibit A, Letter Agreement, *Gibson* Docket No. 221].

19.     The three Feedyards have also agreed, subject to an appropriate protective order, to produce a computer generated summary list of their own purchases from Eastern Livestock for October 1, 2010 through March 31, 2011. [6] First Bank continues to demand information including highly confidential customer lists, and confidential information of all the Feedyards' customers. First Bank insists upon obtaining a complete listing of all cattle which all customers have arranged for themselves to place in the Feedyards.  This breathtaking request has been made without any bona fide attempt to narrow the scope of the customers to those customers with some logical connection to the bankruptcies, and with no attempt to narrow the scope of the customer information requested to that which has some logical relevance to a debtor or the administration of a bankruptcy estate. Indeed, counsel for First Bank has been adamant that  he wants complete data sets for *all* cattle handled or fed by the Feedyards over the October 1, 2010- March 31, 2011 time period.

20.     Counsel for the Feedyards have had numerous discussions and emails with counsel

---

[6] First Bank has not explained how this data it will receive on approximately 2 million cattle will allow it to trace the cattle once found in Tommy Gibson controlled pastures.  Neither has it explained how the 8,000 cattle could be identified from the Feedyards' records of cattle delivered to the Feedyards months after they "disappeared" from Tommy Gibson's pastures.  Intrust's request will encompass approximately 5,000,000 cattle.

for First Bank in an attempt to reach an agreement on the documents and information to be produced. At this point, the Feedyards are not certain whether any agreement on anything can be reached with First Bank. What the Feedyards have agreed to produce is set out as Exhibit A to the Feedyards' response and brief, *Eastern Livestock* Docket No. 418-1, *Gibson* Docket No. 221, which response and brief is hereby incorporated by reference.

**The Feedyards Move for a Protective Order for the Information Which Is Produced**

21.     The information and documentation which the Feedyards have agreed to produce is conditioned upon a protective order being entered to maintain the confidentiality of the produced information. Cactus, Friona and J&F presume that if the parties cannot agree on a protective order, the Court will enter an appropriate order. Cactus, Friona and J&F each move for the entry of a protective order for all confidential information produced.

**The Feedyards Move That the Court Order No Customer Lists or Customer Information be Produced Without Proof of a Nexus, and Notice to Each Customer With Opportunity to Object**

22.     On those matters on which no agreement was reached and none can be reached, Cactus Growers, Friona and J&F request the aid and assistance of this Court in limiting the scope of any §2004 order to that which is appropriate under §2004, that which is reasonable, that which is not harassing, and that which does not breach trade secrets or other confidential information of either the Feedyards or the customers of the Feedyards.

23.     In regard to Feedyard customers, Cactus Growers and J&F will show that unless a nexus is made as to a specific customer or a specific shipment, (based upon First Bank's required showing that the requested information is reasonably calculated to be relevant to an asset or

transaction of a debtor, or to the administration of an estate, *In re GHR Energy Corp.*, 35 B.R. 534, 538 (Bankr. D. Mass. 1983), *In re Continental Forge Co., Inc.*, 73 B.R. 1005, 1007 (Bankr. W.D. Pa. 1987), this highly sensitive commercial information should not be produced at all.  Cactus Growers and J&F do not have the authority to disclose the identity of their customers or information regarding their customers' transactions, as that information is also a confidential trade secret of the Feedyards' customers.  The Feedyards' customers are not parties in interest in these cases, and have not been notified regarding First Bank's request for §2004 examination.  The information has not been requested of the customers, the owners of the information, and they have not been given the opportunity to exercise their Due Process rights to appear and object to the production of such information, and assert all claims of confidentiality, privilege and lack of relevance.

24. Cactus Growers and J&F further pray that the Court enter an appropriate order for the costs of this production to place the burden of such cost on the requesting parties, First Bank (and Intrust, if it joins in First Bank's request for §2004 examination.)

### III.

### SPECIFIC TOPICS OF INQUIRY

**First Bank's Request Is Backwards; It Should Trace the Missing Cattle Forward – Not Try to Trace 13.7% of the U. S. Fed Cattle Inventory Backwards to Tommy Gibson's Pastures**

25. The eight thousand (8,000) cattle First Bank seeks could have gone anywhere in the United States.  At any given time there are approximately 11 million cattle on feed in the United States.  Approximately 11 million head were placed on feed during the inquiry period of October 1, 2010 through March 31, 2011.  During Intrust's requested inquiry period, January 1, 2010 through March 31, 2011, approximately 25 million cattle were placed on feed.  The three Feedyards which

have received the § 2004 request only constitute approximately 13.7% of the national feedyard capacity. There has been no explanation why First Bank or Intrust believe those 8,000 cattle only went to three Feedyards. In addition to the fact that the 8,000 head of missing cattle could just as easily have gone to other feedyards comprising 86.3% of the national capacity, First Bank has apparently not considered that those 8,000 head could have easily been hauled to livestock auctions and sold. There are more than one hundred livestock auctions within in a day's driving distance of Tommy Gibson's pastures.

26.     Further, First Bank has given no explanation how a list of customers from the Feedyards, or information regarding Feedyards' customers' cattle, could be matched or tied to the missing 8,000 cattle. Cattle do not have serial numbers. Unless specifically tagged, individual cattle are generally unidentifiable. Brands are of some assistance in identifying cattle, but if First Bank has brand information on the 8,000 head, it has not disclosed that fact. Brand inspection and registration laws vary widely between states. Groups of cattle change numbers as they are split into smaller groups, or combined into larger groups when shipped. Groups of cattle are commonly resorted, mixed, and shipped to different places, whether to auctions, feedyards, or to pastures of other cattle feeders or other cattle producers.

27.     First Bank has given no explanation why it should be allowed to start its inquiry by obtaining information on *all* the cattle in the 22 feedyards operated by the three Feedyards, and then, after information on *all* the cattle is produced, try to figure out a way to connect feedyard records on between 2 and 5 million cattle purchased by the three Feedyards[7] back to the 8,000 missing cattle.

---

[7] Depending upon the time period of inquiry being 6 months, or 15 months.

First Bank has provided no indication what information it is expecting to find regarding the Feedyards' cattle or shipments with a logical nexus to Tommy Gibson's cattle. Rather, First Bank is asking for information on *all* cattle in the three Feedyards. Clearly, all the cattle and all the transactions regarding all the 2 million to 5 million cattle purchased by the Feedyards and all the records regarding those 2 million to 5 million cattle cannot possibly be relevant to the 8,000 head. Even if each of the 8,000 cattle went to one of the Feedyards, (which seems very unlikely), and the inquiry period is the lesser 6 month period, only .4% of the cattle reviewed could be Tommy Gibson's missing cattle. As requested by First Bank, at most, 99.6% of the cattle reviewed would **not** be part of the 8,000 in question.

    28.    First Bank has given no explanation why it cannot or should not:

        1.    Inquire only regarding cattle originating from a specific location (regarding a given area or county of Kentucky, Tennessee, Indiana, or Virginia, or where Tommy Gibson's cattle were located in September).

        2.    Cattle originating from an identified producer or which contracted to deliver cattle to Eastern Livestock but never delivered, (the *Eastern Livestock* trustee certainly has such a list).

        3.    Cattle hauled by a given trucker, or shipped by a given custodian or affiliated business, (East-West Trucking being the obvious beginning point).

        4.    Cattle originating from a given *Eastern Livestock* customer.

        5.    Cattle hauled for or originating from one of Tommy Gibson's pasture caretakers or an entity affiliated with Tommy Gibson's pasture caretakers.

        6.    First inquire only of the October and November 2010 time period.

29.     It appears to the Feedyards that First Bank is starting its inquiry backwards. First Bank's document demands are made to three of hundreds of possible ultimate feedyard destinations[8], and once First Bank has information on all the 2,000,000 or so cattle in 13.7% of the U.S. feedyard capacity, to then hope to be able to work backwards to the Tommy Gibson pastures in Virginia, Tennessee, Kentucky and Indiana. Apparently, First Bank is not making any attempt to inquire of the other 86.3% of the U.S. feedyard capacity, or the other thousands of cattle producers, or the hundreds of cattle auctions, which may have acquired the 8,000 missing cattle. Rather, First Bank should start with the origin of the cattle, the pastures and persons who where last known to have the cattle, and trace them forward. Inquiries regarding persons or businesses that have some nexus to Tommy Gibson or the caretakers of his pastures certainly are a proper object of §2004 examination. Seeking to obtain all the information on all the cattle handled by three Feedyards, when those three Feedyards only comprise 13.7% of the national capacity and are only a minute fraction of all the possible destinations for the missing 8,000 cattle, creates an unnecessary burden and expense on the Feedyards, and unnecessarily and wastefully subjects the Feedyards, their attorneys and staff, as well as their customers to the disclosure of confidential information, to the expense of doing unnecessary, and probably unproductive "busy work" in an attempt to satisfy First Bank's desire to "do something." Feedyards specifically object to the following specific terms in First Bank's proposed § 2004 protocol:

    a.    First Bank wishes to obtain all information on all cattle *received* by the Feedyards, and not just all cattle *purchased* by the Feedyards. The Feedyards have already agreed,

---

[8] And of course, there are many thousands of possible non-feedyard destinations for these 8,000 head.

subject to a protective order, to produce a summary sheet of all the cattle purchased by them during the inquiry period, as that is their information. However, to include all cattle "received" or "fed" by the Feedyards includes information regarding all the customers of Cactus and the feedyards containing J&F's cattle. The identity of customers is a closely held trade secret in the cattle feeding industry, and the customers' personal business information is considered confidential by both Feedyards and cattle feeding customers. Further, 99+% of the information requested will undoubtedly NOT involve Eastern Livestock or Tommy Gibson, and therefore be irrelevant. First Bank is seeking a "needle in a hay stack," but First Bank has not proposed a method by which it can identify the needle once it gets the haystack.

        b.      For the same reason, the Feedyards object to producing information on all cattle on feed during the October 1, 2010 through March 31, 2011[9] time period. The §2004 inquiry should be limited to that which the Feedyards have already agreed to produce, which is those cattle purchased by the Feedyards during the inquiry period.

        c.      First Bank purports to define what a "lot file" contains. Undoubtedly, the Feedyards' record keeping varies from Feedyard to Feedyard. The financial information requested from Cactus Growers, for example, is not in the custody of Cactus Growers. Neither is that information kept at the same location as the lot files. Thus, the scope of First Bank's requests for "lot files" should be restricted to lot files as they are kept in the respective Feedyards' ordinary course of business. The Feedyards should not be required to assemble or create files to suit the preconceived notions of First Bank regarding what should be contained in a lot file.

---

[9] Or, in regard to Intrust, the fifteen month January 1, 2010 through March 31, 2011 time period.

WHEREFORE, PREMISES CONSIDERED, Cactus Growers, Friona Industries, and J&F Oklahoma Holdings pray that this motion be set for hearing, and upon hearing Movants pray that the Court enter an appropriate protective order quashing the improper and unreasonable requests of First Bank's § 2004 request, limiting the scope of the Requests to that which is appropriate under §2004 and relevant, ordering a reasonable payment to the Feedyards for the costs of production, protecting the confidentiality of the information agreed to be produced by the Feedyards, and ordering that the remaining information and documentation not be produced. Movants pray for general relief.

DATED this 11th day of April, 2011.

Respectfully submitted,

LOVELL, LOVELL, NEWSOM & ISERN, L.L.P.
John H. Lovell, State Bar No. 12609300
112 West 8th Avenue, Suite 1000
Eagle Centre Building
Amarillo, Texas 79101-2314
Telephone: (806) 373-1515
Facsimile: (806) 379-7176


By: /s/ John Lovell
       John H. Lovell

ATTORNEYS CACTUS GROWERS, INC.

        John F. Massouh
        John T. Huffaker
        SPROUSE SHRADER SMITH, PC
        701 S. Taylor, Suite 500
        P.O. Box 15008
        Amarillo, Texas 79105-5008
        (806) 468-3300; (806) 373-3454 FAX

        By: /s/ John Massouh
            John F. Massouh

        ATTORNEYS FOR FRIONA INDUSTRIES, LP

        David L. LeBas
        NAMEN HOWELL SMITH & LEE, PLLC
        8310 N. Capital of Texas Highway, Ste. 490
        Austin, Texas 78731
        (512) 474-0300; (512) 474-1901 FAX

        By: /s/ David LeBas
            David L. LeBas

        ATTORNEYS FOR J&F OKLAHOMA HOLDINGS

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that a copy of the foregoing was served on this 11th day of April, 2011 via electronic and/or U.S. Mail upon all parties entitled to receive such notice as provided by the electronic case filing system used by the court

        /s/ John Lovell
        John H. Lovell