UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| EASTERN LIVESTOCK CO., LLC, | ) | CASE NO. 10-93904-BHL-11 |
| | ) | |
| Debtor. | ) | |

## REPLY BRIEF TO OBJECTION TO EXAMINATION AND PRODUCTION OF DOCUMENTS PURSUANT TO FED. R. BANKR. P. 2004

This is a motion designed to get at the heart of $10 to $24 million of assets that were confirmed to be in the possession of Debtor Thomas Gibson in October, 2010, but for which he can no longer account as of his petition date. Rather than randomly hunt for a needle in a haystack, the proposed subpoena seeks a logical, unburdensome, phased plan of discovery, all under the rigorous protection of a comprehensive protective order, to allow the Trustee and the creditors to locate the perishable assets while being certain to expose the identity of those who may wish to keep them concealed. First Bank has every understanding that **Phase 1** of the subpoena requested may require the disclosure of a multitude of customers of the Three Major Feedlots that have nothing to do with efforts of the Debtors to conceal the assets of the bankruptcies. Therefore, it has proposed a substantial protective order to address those concerns. But, with the mobile and perishable nature of the assets that comprise these bankruptcies, the state of the records of the Debtors, and the dearth of information available from those who last saw the assets, the final feed and finishing locations is the only remaining "key to the kingdom." This Bankruptcy Court cannot countenance any efforts by those who did business with the Gibsons for decades to conceal these assets for any reason.

The First Bank and Trust Company ("First Bank"), submits this reply to the opposition to its motion under Fed. R. Bankr. P. 2004 filed jointly by Cactus Growers, Inc. ("Cactus"), Friona Industries, L.P. ("Friona"), and J&F Oklahoma Holdings, Inc.[1] ("J&F") (collectively, "Three Major Feedlots").

I.    FIRST BANK'S MOTION IS A PROPER AND REASONABLE ATTEMPT TO IDENTIFY MISSING ASSETS OF THE DEBTOR'S ESTATE THAT ARE OR WERE LOCATED AT THE THREE MAJOR FEEDLOTS

       1.       After raising this threshold issue to the Court during the last omnibus hearing, to the oral support of another creditor and the Gibson Trustee, on March 18, 2011, First Bank filed its Motion for Examination and Production of Documents Pursuant to Fed. R. Bankr. P. 2004 ("Motion") [Doc. No. 401]. The Court ostensibly recognized the urgency of this issue and ordered expedited briefing and hearing on the then proposed Motion. On April 4, 2011, the Three Major Feedlots filed their Response and Brief in Support to Motion for Examination and Production of Documents Pursuant to Fed. R. Bankr. P. 2004 Filed by First Bank and Trust ("Response") [Doc No. 418]. The Three Major Feedlots' Response (1) erroneously characterizes First Bank's Motion as a private crusade to launch claims against third parties, (2) conflates the orderly discovery into a request for millions of documents and, thereby, overstates any burden to comply with First Bank's proposed three-phased plan for production of documents and examinations; and (3) overlooks the role of a protective order (and this Court's authority to enforce the same) in guarding against disclosure of any purportedly confidential information. For the reasons set forth herein and in First Bank's Motion, this Court should order the production of documents from and examinations of the Three Major Feedlots in accordance with

---

[1] For purposes of this motion, any accompanying order, or subpoena, J&F includes the affiliated entity JBS Five Rivers and any JBS-affiliated feedlots.

First Bank's proposed order (attached as Exhibit B to the Motion [Doc. No. 401-2]).  Simply put, the Three Major Feedlots are making far too much out of a simple Rule 2004 request for a subpoena that calls for orderly phases of discovery, and their actions are antithetical to these bankruptcy proceedings:

> "Discovery should not be a sporting contest or a test of wills, particularly in a bankruptcy case where the parties' resources are limited and the dollar value of the stakes is often low."

In re Spoonemore, 370 B.R. 833, 844 (Bankr. D. Kan. 2007).  Here, the dollar value of the stakes is exceedingly high and the resources of these once flush Debtors have vanished.

A.    First Bank's Motion Seeks Information that Is Necessary to Identify Assets that Are Part of Eastern Livestock's and the Gibsons' Estates

2.    The Three Major Feedlots create a "straw man" argument by mischaracterizing First Bank's request as "an attempt by a private litigant to use Rule 2004 to support a potential private litigant's efforts to find a claim."  Response, ¶ 9.[2]  To the contrary, First Bank's Motion is an attempt to identify assets or proceeds of the Gibson or Eastern Livestock estates.

---

[2] Although First Bank agrees with the general principles of many of the cases cited by the Three Major Feedlots, many of the cases applying Fed. R. Bankr. P. 2004 are factually distinguishable. E.g., In re J & R Trucking, Inc., 431 B.R. 818, 820-21 (Bankr. N.D. Ind. 2010) (cited in Response, ¶¶ 3, 5, 9-10) ("[M]ovants argue that, if third parties are identified who may be liable to them for either debtor's obligations, collecting from those other entities would reduce their own claims against the estate, yielding more money for other creditors, as would the recovery of avoidable transfers.  This, movants contend, makes the requested inquiries relate to the conduct and financial condition of the debtors, and to matters which might affect the administration of their estates . . . . If [movants' argument were accepted], it would transform the rule from an investigatory device, designed to expedite the administration of the bankruptcy estate, into something not unlike a proceeding supplemental, which creditors could use in an effort to collect the amounts due them outside the bankruptcy proceeding.").

First Bank, unlike the movants in J & R Trucking, is not seeking information through its Motion to collect monies from parties that are due outside of bankruptcy.  Instead, First Bank is seeking information about cattle and proceeds that belong (but are currently absent from) the Gibson estate; this use of Fed. R. Bankr. P. 2004 is proper under J & R Trucking and all other cases cited by the Three Major Feedlots.  J & R Trucking, 431 B.R. at 821 ("It is a broad-ranging inquiry into the debtor's assets, liabilities, financial affairs and anything else that might affect the administration of the bankruptcy estate."); In re Coffee Cupboard, Inc., 128 B.R. 509, 514 (Bankr. E.D.N.Y. 1991) ("The purpose of a Rule 2004 examination is 'to show the condition of the estate and to enable the Court to discover its extent and whereabouts, and to come into possession of it, that the rights of the creditor may be preserved.'" (quoting Cameron v. United States, 231 U.S. 710, 717, 34 S. Ct. 244, 246 (1914)) (cited in Response, ¶ 21).

3.      As set forth in the Affidavit of Ernest E. Copenhaver, Jr., First Bank loaned money to Thomas and Patsy Gibson for their purchases of cattle, which were located at various farms or feedlots.  April 11, 2011 Affidavit of Ernest E. Copenhaver, Jr., ¶¶ 3-4 (attached as Exhibit A, "Copenhaver Affidavit").  These cattle were owned personally by Debtors Thomas and Patsy Gibson.  Id. ¶ 3.  First Bank regularly inspected the cattle owned by Thomas Gibson in which First Bank had security.  Id. ¶ 5.  In late September 2010, First Bank confirmed the existence of thousands of cattle that Thomas Gibson owned by traveling to the locations of farms and pastures at which the Gibsons held cattle.  Id. ¶ 6.  However, First Bank later discovered that approximately 8,000 head of cattle that First Bank financed were not among Thomas Gibson's bankruptcy assets.  Id. ¶ 7.  The caretakers provided little to no information about who moved the cattle, how they were moved, or where they were sent.  Id.  In addition, the Gibsons could no longer account for these cattle -- worth millions of dollars -- as of the filing of their bankruptcy petition.  Id.

4.      First Bank has a reasonable belief that millions of dollars worth of some or many of the missing 8,000 cattle were **shipped to the Three Major Feedlots** for at least three reasons: (a) Thomas Gibson routinely transacted business with them over many years and Cactus admits that "Eastern Livestock was one of the largest suppliers of feeder cattle to Cactus Growers;[3] (b) The Three Major Feedlots have identified over a half-million dollars in cattle that had belonged to Thomas Gibson in the pre-petition interpleader action as part of the small window of time Eastern Livestock dealt cattle between the freezing of its accounts and the receivership; and, (c) documents recently reviewed from the records of Trustee Knauer and his financial advisor DSI show cattle transported from locations where Thomas Gibson had cattle

---

[3] See Doc. No. 447, p.2; likewise J&F Oklahoma admits it bought "large numbers of cattle from Eastern Livestock."

assets directly to locations of the Three Major Feedlots under suspicious circumstances. Id. ¶¶ 6-8. The latter has only recently come to the attention of First Bank and is quite astonishing with insight into the efforts of the Three Major Feedlots' efforts to resist this discovery. Attached to the Copenhaver Affidavit as Exhibit 1, is a 4 page excerpt from hauling and trucking records relating to Eastern Livestock Co., LLC that came directly from the Eastern Livestock Trustee and Patrick O'Malley of DSI. The highlighted portions of these records show cattle hauled from locations at which Mr. Copenhaver previously confirmed the presence of Thomas Gibson's assets. But, instead of listing the origin location of the shipments as Thomas Gibson affiliated pastures, the haulers were instructed to "say" or "write down" other origin locations. The highlighted suspicious transactions show final destinations of Yuma Feedyard and Kuner Feedyard both of which are owned by JBS Five Rivers, the feedyard affiliate of J&F Oklahoma Holdings, and Friona Feedyard, owned by Friona Industries. Moreover, on September 26, 2010, just a few weeks before the Eastern Livestock receivership, one of the caretakers specifically mentioned to Mr. Copenhaver that he expected some 2500 head of cattle under his care (worth over $2 million) to ultimately be finished at a feedlot in Texas. Id. ¶ 6. As these 8,000 cattle were owned by Thomas Gibson -- and subject to First Bank's perfected purchase money security interest -- First Bank filed its Motion to seek crucial information from the Three Texas Feedlots that will assist First Bank, Trustee Kathryn Pry, and other creditors in identifying and locating some of the missing cattle or proceeds that properly belong in the Gibson estate that were transferred to the Three Major Feedlots. Contrary to the Three Major Feedlots' allegation, First Bank is searching for cattle, not claims.

B.    First Bank's Motion Minimizes the Expense, Burden, and Number of Documents
Produced

5.    The Three Major Feedlots conflate the three-phased approach to the

production of documents and examinations and thus continually attack yet another straw man in

their Response.  Federal courts, however, have praised the use of this precise tool of "phased

discovery" in crafting a plan to minimize burden and expense on the producing party while

yielding potentially valuable results for the requesting party.[4]  In addition, the Three Major

Feedlots' Response criticizes First Bank's three-phased approach generally, even though the

Three Major Feedlots stated that they "have agreed to the discovery protocol as set forth in the

attached Exhibit 'A.'"  Response, ¶ 4.  The Response, therefore, clouds the primary point of

disagreement between First Bank and the Three Major Feedlots, namely the necessity of First

Bank's obtaining a summary report under Phase 1 of its proposed three-phased plan that <u>does not</u>

<u>exclude</u> cattle that the Three Major Feedlots placed on feed, but did not purchase.  Quite

tellingly, on March 17, 2011, just one day before First Bank promised the Court it would file the

pending Rule 2004 request, one counsel speaking for all the Three Major Feedlots, wrote First

Bank with a proposal (attached as Exhibit B)  to produce these same computer reports that did

not draw the present distinction between cattle "purchased" and cattle "on feed."

6.    In an attempt to characterize First Bank's Motion as "overbroad," the

Three Major Feedlots now ignore the terms of the three-phased approach and assert:

> "Movant's request would require production of records concerning
> an enormous number of cattle . . . .  First Bank is seeking to obtain

---

[4] The use of multiple phases of production of documents and information is intended to minimize the burden on the
Three Major Feedlots and First Bank, and to permit First Bank to request lot file information only for specific and
limited lot files based on its review of two computer-generated reports produced in Phase 1.  <u>Mancia v. Mayflower</u>
<u>Textile Servs. Co.</u>, 253 F.R.D. 354, 365 (D. Md. 2008) (stating that the court previously "suggested that [the parties]
consider 'phased discovery,' so that the most promising, but least burdensome or expensive sources of information
could be produced initially, which would enable [the requesting party] to reevaluate their needs depending on the
information already provided").

records of ALL the cattle coming into the Three Major Feedyards over a period of six (6) months, even cattle not purchased or owned by the Three Major Feedyards. First Bank is seeking across-the-board production of records of over 1,500,000 cattle in the unsubstantiated hope that once they have the records on 1,500,000 cattle, it can figure out a way to identify some of them as having been one of the 8,000 Tommy Gibson cattle."

Response, ¶ 10 (emphasis in original).

7.      The Three Major Feedlots' contentions ignore the terms of First Bank's three-phased plan. In particular, the Three Major Feedlots overlook Phase 1 of First Bank's proposed plan (i.e., the production of two computer-generated reports) and allege that First Bank intends to seek "across-the-board production of records of over 1,500,000 cattle." Id. Under Phase 1, First Banks seeks the production of only two computer-generated reports.[5] First Bank has no interest in reviewing all, or even a significant number of, lot files for cattle that were placed on feed at the Three Major Feedlots since October 1, 2010. Instead, First Bank is interested in reviewing lot files only for transactions that could relate to cattle that were owned by Thomas Gibson and which should be the rightful inquiry of his bankruptcy. The review of actual documents comprising lot file information, however, is part of First Bank's proposed Phase 2 of the subpoena before the Court, which will involve requests to review only a limited number of lot files based on First Bank's analysis of the totality of available identifiers (e.g., shipment-related information, origin city, number of head, weight, price, etc.) included in the

---

[5] Motion, ¶ 11 ("PHASE 1: . . . [T]he Three Major Feedlots shall each produce at least two computer-generated reports from their cattle tracking software. First, the Three Major Feedlots shall each produce one report that summarizes all cattle received from transactions with Eastern Livestock Co., LLC or Thomas P. Gibson or Patsy M. Gibson in the period from June 1, 2010 to December 31, 2010. Second, the Three Major Feedlots shall each produce a report summarizing all cattle on feed that entered their respective feedlots from October 1, 2010 to March 31, 2011."). Therefore, if there is any undue burden reviewing data on thousands of head of cattle that may have nothing to do with the Gibsons or Eastern Livestock, then it is First Bank, and not the Three Major Feedlots, who will endure this burden. The generation of two simple computer reports, given the millions of dollars at stake, hardly appears to place an undue burden on the feedlots.

two computer-generated reports produced by the Three Major Feedlots under Phase 1.[6]  Finally,

First Bank would be authorized to take examinations of representatives, as necessary, of the

Three Major Feedlots under Phase 3.[7]

        8.     The Three Major Feedlots have also characterized First Bank's requests as

"draining the lake in the hope of finding a fish" (Response, ¶ 11) or "looking for a needle in a

haystack" (id. ¶ 15).  However, the Three Major Feedlots have failed to mention that First Bank

has already identified some "fish" and "needles," including approximately $365,000 of cattle

shipped to Friona Industries that were owned personally by Thomas Gibson (and for which Mr.

Gibson was never paid); over $100,000 of cattle shipped to JBS Five Rivers that were also

owned personally by Thomas Gibson (and for which Mr. Gibson was never paid); and the

suspicious shipments with the origin locations deceptively listed as locations other than the true

pasture.  Moreover, First Bank has proposed a three-phased plan for the production of documents

and examinations under Fed R. Bankr. P. 2004 that permits First Bank to expeditiously sift

through two computer-generated summary reports before requesting lot files for only specific

transactions that appear to involve cattle owned by Thomas Gibson.  This three-phased plan thus

---

[6] Motion, ¶ 11 ("PHASE 2:  On or before May 6, 2011, First Bank shall specify in writing specific transactions or specific lots of cattle from the reports produced by the Three Major Feedlots, for which the Three Major Feedlots shall produce additional information.  On or before May 20, 2011, for each of the transactions or lots identified by First Bank, the Three Major Feedlots shall produce the entire lot file constituting or relating to transactions or lots identified by First Bank; as used herein 'lot file' includes, but is not limited to receiving sheets, receiving notifications, receiving reports, processing records, purchase agreements for cattle, security agreements, promissory notes, financing statements, assignments, bills of sale, note histories, note summary analyses, hauling logs, bills of lading, documentation showing from where cattle were shipped, financial summaries, yard sheets, comprehensive yard sheets, checks, check stubs, invoices, and close out sheets.  If copying and production of these portions of lot files identified by First Bank would be unduly burdensome, then the Three Major Feedlots shall permit First Bank to inspect and copy such lot files as maintained in the ordinary course of business at mutually convenient times and places.").

[7] Motion, ¶ 11 ("PHASE 3:  If First Bank states in writing that it intends to examine representatives of the Three Major Feedlots after First Bank has had adequate time to review documents produced by the Three Major Feedlots, then the Three Major Feedlots are directed to designate appropriate representatives who shall submit to examinations by First Bank.  Such examinations shall begin at mutually convenient times and places and continue from day to day thereafter until completed.").

functions more like a net dragged across a lake, or as a metal detector sweeping over hay with the "burden," if any, squarely upon the requesting party to identify potential Phase 2 productions if the net yields a fish or the metal detector alerts to a needle.

9. The Three Major Feedlots' general criticism of First Bank's proposed three-phased plan for production of documents in their Response muddies the primary issue for which this Court's intervention is needed -- the necessity of a summary report relating to cattle that the Three Major Feedlots placed on feed since October 1, 2010, which does not exclude cattle that the Three Major Feedlots placed on feed but chose not to purchase.

10. As First Bank addressed in its Motion, the request for information will likely involve identifying cattle that were transferred to the Three Major Feedlots by individuals who engaged in "self-help" to recover their own losses after Eastern Livestock began to bounce checks and ultimately was taken over by a state court receiver. To the extent that the Three Major Feedlots were concerned about prospective self-helpers, such as non-bankrupt members of the Gibson family or "branch managers" against whom Trustee Knauer had already filed actions, then it is unlikely the Three Major Feedlots would have taken title to them through a purchase. Rather, if there were self-helpers, such as Gibson affiliates operating under new names, then the cattle would rationally be taken "on feed" for their benefit. Whether the cattle were purchased by the Three Major Feedlots or merely placed on feed has no bearing on the most important issue in these requests for information -- namely determining whether any of these cattle (and proceeds) were owned by Thomas Gibson and are now properly part of the Gibson estate. In addition, the demonstrable nature of the lengths gone to in order to conceal the origin locations by the time the cattle arrived on feed simply begs the question whether those persons would also have changed the names of the persons or entities placing the cattle on feed. Thus, the invitation of the Three

Major Feedlots to limit the request to "known affiliates" or "known locations" accomplishes very little to decipher the identity of the persons who confiscated assets.

11.    With regard to the issue of burden or scope, the Three Major Feedlots have offered no explanation in their Response as to how a summary report for all cattle placed on feed (including cattle that the Three Major Feedlots did not purchase) would place any greater burden on the Three Major Feedlots.  The Three Major Feedlots argue only that they should not have to produce a summary report that includes cattle on feed (but not purchased) due to purported concerns about confidentiality.  But, as addressed below, there is absolutely no reason a Comprehensive Protective Order -- such as First Bank has proposed (attached as Exhibit C) -- would protect the identity of customers who "sold cattle" to the Three Major Feedlots and at the same time risk disclosure of the identity of persons who only placed cattle "on feed."  These objections ring hollow.

C.    A Protective Order Adequately Addresses Any Concerns that the Three Major Feedlots Have Regarding Confidentiality of Information Produced

12.    The Three Major Feedlots oppose First Bank's request for information for cattle that were placed on feed (but not purchased) on the basis that such information is purportedly confidential and propriety.  First Bank, which is not a competitor to the Three Major Feedlots (or any other feedlot), has no interest in using such information to gain any competitive advantage or otherwise disclosing purportedly confidential information of the Three Major Feedlots.[8]  In fact, counsel for First Bank drafted a comprehensive protective order and

---

[8] The cases that the Three Major Feedlots relating to confidentiality are inapposite.  For example, the Three Major Feedlots cite to In re Summit Corp., 891 F.2d 1 (1st Cir. 1989), which is distinguishable as the party seeking information under Fed. R. Bankr. P. 2004 was "a major business competitor" and the party seeking examination wanted to examine the responding party's records "so it could determine the amount of its bid, and sought an order under Rule 2004 to allow this."  Response, ¶ 19.  Notwithstanding the court's limited withholding of sensitive information, the bankruptcy court "ordered [the responding party] to disclose most of the items it had objected to [and t]he court also allowed [the requesting party] the costs, including reasonable attorney's fees, incurred in attempting to obtain compliance with the discovery order."  Summit, 891 F.2d at 4.

circulated the order to counsel for the Three Major Feedlots on April 1, 2011. To date, counsel for the Three Major Feedlots have not responded, proposed changes, or signed the protective order which suggests that their concerns about confidentiality have been overstated and must beg the question of their true concern.

        13.     Regardless of whether the Three Major Feedlots' concerns with confidentiality have been overstated, the Three Major Feedlots have not explained why this Court should draw a distinction for purposes of the sufficiency of a protective order between those customers who have sold and continue to sell cattle to the Three Major Feedlots -- whom it only stands to reason are non-Gibson affiliated ordinary course business persons -- and those customers (some of whom may also sell to the Three Major Feedlots) who keep cattle on feed at the Three Major Feedlots. In other words, the Three Major Feedlots have taken an inconsistent position that, while a protective order is sufficient to protect the confidentiality of information relating to cattle that the Three Major Feedlots purchased, the protective order is somehow insufficient to protect information relating to cattle that is merely kept on feed (presumably by some of the same customers who have sold and continue to sell cattle to the Three Major Feedlots).

        14.     The Three Major Feedlots have also asserted (in the context of their argument relating to the purported confidentiality of information) that First Bank's request "has no relevance to any debtor, nor to the administration of any estate." Response, ¶ 23. This

---

Likewise, the Three Major Feedlots overstate the holding of In re Bounds, No. 09-12799, 2010 Bankr. LEXIS 2983, at *4 (Bankr. W.D. Tex. Aug. 31, 2010), as standing for the general proposition that "the disclosure of another's confidential information is improper under Rule 2004." Response, ¶ 25. The Bounds decision, however, does not support this general proposition, but limits its analysis to the facts. As the Three Major Feedlots acknowledge in their summary of Bounds, the scope of Fed. R. Bankr. P. 2004 was limited in Bounds so that a law firm did not have to disclose work product based on its prior representation of an individual debtor and his corporations.

assertion is false, and the Three Major Feedlots cannot hide behind the guise of confidentiality and withhold information that may relate to the Gibson estate.

15.     In sum, First Bank identified millions of dollars of assets of Thomas Gibson in late September 2010, and those mobile and perishable cattle assets were unaccounted for as of the petition date for the Gibsons' personal bankruptcy. Many of these cattle were likely shipped to the Three Major Feedlots, and the Three Major Feedlots have the best sources of information about the location and condition of millions of dollars worth of cattle that belong to the Gibsons' estate. The phased discovery plan, which minimizes the burden on the subpoenaed party while potentially yielding the most relevant information, is the proper Rule 2004 Order.

WHEREFORE, First Bank requests that the Court issue an order (attached as Exhibit B to its Motion):

(1)     directing the Three Major Feedlots to produce documents, pursuant to Fed. R. Bankr. P. 2004, in accordance with the terms of the proposed order attached to its Motion [Doc. No. 401-2], at locations to be agreed to by the parties;

(2)     directing the Three Major Feedlots to designate representatives who shall submit to examinations by First Bank, pursuant to Fed. R. Bankr. P. 2004, if First Bank states in writing that it intends to examine representatives of the Three Major Feedlots.

Respectfully submitted,


/s/ Daniel J. Donnellon
Daniel J. Donnellon, pro hac vice
Stephen A. Weigand, pro hac vice
FARUKI IRELAND & COX P.L.L.
201 East Fifth Street, Suite 1420
Cincinnati, OH  45202
Telephone:  (513) 632-0300
Telecopier:  (513) 632-0319
Email:  ddonnellon@ficlaw.com

Attorneys for The First Bank and Trust
Company

## CERTIFICATE OF SERVICE

I hereby certify that on April 12, 2011, a true and correct copy of the foregoing Reply Brief to Objection to Examination and Production of Documents Pursuant to Fed. R. Bankr. P. 2004 was filed electronically.  Notice of this filing will be sent to all parties through the Court's Electronic Case Filing System.  Parties may access this filing through the Court's system.

| | | |
|---|---|---|
| David L. Abt<br>davidabt@mwt.net | Robert Hughes Foree<br>robertforee@bellsouth.net | Judy Hamilton Morse<br>judy.morse@crowedunlevy.com |
| C. R. Bowles, Jr<br>crb@gdm.com | Kim Martin Lewis<br>kim.lewis@dinslaw.com | John M. Thompson<br>john.thompson@crowedunlevy.com |
| John Hunt Lovell<br>john@lovell-law.net | Jeremy S Rogers<br>Jeremy.Rogers@dinslaw.com | Jessica E. Yates<br>jyates@swlaw.com |
| Mark A. Robinson<br>mrobinson@vhrlaw.com | Ivana B. Shallcross<br>ibs@gdm.com | John Huffaker<br>john.huffaker@sprouselaw.com |
| Jesse Cook-Dubin<br>jcookdubin@vorys.com | Deborah Caruso<br>dcaruso@daleeke.com | Matthew J. Ochs<br>matt.ochs@moyewhite.com |
| Edward M King<br>tking@fbtlaw.com | Meredith R. Thomas<br>mthomas@daleeke.com | Laura Day Delcotto<br>ldelcotto@dlgfirm.com |
| Randall D. LaTour<br>rdlatour@vorys.com | William Robert Meyer, II<br>rmeyer@stites.com | Kelly Greene McConnell<br>lisahughes@givenspursley.com |
| John Frederick Massouh<br>john.massouh@sprouselaw.com | Allen Morris<br>amorris@stites.com | T. Kent Barber<br>kbarber@dlgfirm.com |
| John W. Ames<br>jwa@gdm.com | Charles R. Wharton<br>Charles.R.Wharton@usdoj.gov | Ross A. Plourde<br>ross.plourde@mcafeetaft.com |
| James M. Carr<br>jim.carr@bakerd.com | James Bryan Johnston<br>bjtexas59@hotmail.com | Jeffrey E. Ramsey<br>jramsey@hopperblackwell.com |
| Robert K. Stanley<br>robert.stanley@bakerd.com | James T. Young<br>james@rubin-levin.net | Walter Scott Newbern<br>wsnewbern@msn.com |
| Terry E. Hall<br>terry.hall@bakerd.com | David L. LeBas<br>dlebas@namanhowell.com | Kirk Crutcher<br>kcrutcher@mcs-law.com |

Todd J. Johnston
tjohnston@mcjllp.com

Lisa Koch Bryant
courtmail@fbhlaw.net

Sean T. White
swhite@hooverhull.com

Timothy T. Pridmore
tpridmore@mcjllp.com

Elliott D. Levin
robin@rubin-levin.net
edl@trustesolutions.com

Robert H. Foree
robertforee@bellsouth.net

Theodore A Konstantinopoulos
ndohbky@jbandr.com

John M. Rogers
johnr@rubin-levin.net

Sarah Stites Fanzini
sfanzini@hopperblackwell.com

Karen L. Lobring
lobring@msn.com

Cathy S. Pike
cpike@weberandrose.com

Michael W. McClain
mike@kentuckytrial.com

Sandra D. Freeburger
sfreeburger@dsf-atty.com

John David Hoover
jdhoover@hooverhull.com

David A. Domina
ddomina@dominalaw.com

/s/ Daniel J. Donnellon
Daniel J. Donnellon

469737.4

- 15 -