**National Cattlemen's Beef Association**

August 19, 2011

The Honorable Basil H. Lorch III
United States Bankruptcy Judge
United States Bankruptcy Court
Southern District of Indiana
121 W. Spring St. Rm 110
New Albany, IN 47150

RECEIVED
AUG 2 2 2011
BANKRUPTCY COURT
NEW ALBANY, INDIANA

Re: Eastern Livestock Co., LLC Case No. 10-93904-BHL_11

Dear Judge Lorch:

I am writing to express our deep concerns with the "Trustee's Purchase Money Claims Report, Motion to Transfer Funds and Notice of Release of Proceeds from Account" (the "Report") filed on May 23, 2011 as Doc. 501. I understand the Trustee's motion is scheduled for hearing on Monday, August 22, 2011.

After reviewing the Report and the multiple objections filed by various parties in interest, it appears the Trustee is interpreting the law regarding cattle transactions in a simplistic manner that is inconsistent with the Packers and Stockyards Act, 1921, 7 U.S.C. § 181 et seq., disruptive to these bankruptcy proceedings and illustrates substantial confusion concerning the complex structure of the cattle industry in the United States. According to the Report, "the provisions of the PSA that require funds from the sale of cattle to be held in trust only apply to "Packers" (a term defined in the [sic] section 191 of the PSA). Because Debtor was a 'dealer' and not a 'packer,' ELC was not obligated by the PSA to hold cattle or proceeds thereof in trust for the benefit of unpaid sellers of cattle." Report at 3, n. 4.

While this legal conclusion may be accurate since it is, on its face, limited to the provisions of the PSA, it is not a correct statement of the law when the controlling regulations issued by the United States Department of Agriculture, Grain Inspection Packers & Stockyards Administration ("GIPSA") are considered. In addition, the Trustee has ignored that the Debtor was licensed by GIPSA as both a "dealer" and "market agency." See In re: Easten Livestock Company, LLC, P & S Docket No. D-11-0062.

The regulations are clear that payments received by a market agency are trust funds. 9 C.F.R. § 201.42(a). In addition, each market agency is required to establish and maintain custodial accounts in which to hold such trust funds. 9 C.F.R. § 201.42(b). Such trust funds may be used only for payments to consignors or to "any person that the market agency knows is entitled to payment," lawful charges or amounts due the market agency. 9 C.F.R. § 201.42(d). Each packer, market agency or dealer who uses the services of an agent (e.g., a livestock auction barn) to purchase livestock is required to promptly pay such agent "the full amount of the purchase price." 9 C.F.R. § 201.43(c).

To adopt the interpretation of the PSA and its implementing regulations as suggested by the Trustee would, in our view, have a major impact on future cattle transactions and may cause significant marketplace disruption. In order to assist the Court in its consideration of these issues we are offering a brief overview of the beef industry which outlines the scope and complexity of the industry and Eastern Livestock's role in it.

**Overview of the Beef Industry**

The beef industry is the largest livestock and meat production industry in the United States. The industry comprises a large number of interrelated sectors that encompass numerous producers, stockers, feeders, packers, processors, distributors, retailers and exporters across a large number of geographic locations.

A.      **Beef Cattle Production**

The majority of cattle operations are relatively small in scale. More than 97% of all beef cattle operations have less than 500 head, and approximately 79% have less than 100 head.[1] Despite the large proportion of small cattle operations, almost half of U.S. cattle come from large operations. Operations with 500 or more head maintain 42% of cattle inventories, and half of those cattle are held on operations with 1,000 or more head. Figure 1 below outlines the stages of growth for beef cattle.



Figure 1[2]

1.      Cow-Calf, Stocker, and Backgrounding Operations.

In many regions of the country, beef calves are born primarily in the spring and graze pasture with the cow during the summer. Calves are weaned during the fall of their birth year and marketed at 400 to 600 pounds. These animals are referred to as calves or weaned calves in the marketing system. Some female animals (about 16% of total inventory) are held back or are not marketed and become breeding stock replacements. The method of raising cattle can vary depending on the available resources and the desired finished weight.

---

[1] USDA, 2006 Agricultural Statistics Annual (2006) available at http://www.nass.usda.gov/Publications/Ag_Statistics/2006/index.asp.
[2] GIPSA Livestock and Meat Marketing Study, RTI Project Number 0202230 (January, 2007). A copy of the GIPSA LMMS can be found on the GIPSA website at http://www.gipsa.usda.gov/GIPSA/webapp?area=home&subject-Imp&topic=ir=mms.

The marketed weaned calves are placed in preconditioning lots, grown in backgrounding operations, or placed on winter wheat pasture. Animals may or may not be confined in a lot with other animals. Preconditioning lots and backgrounding lots may involve confinement, but pasture systems do not. Calves are fed forage or hay and some nutritional and protein supplements in confined operations. Grazing largely involves open-range feeding and some supplements. Backgrounding operations use inexpensive feed to add weight to the animal. At this stage, the animal primarily grows bone frame and some muscle, as opposed to heavy muscling and fat of later feeding stages. Animals sold from these backgrounding enterprises are referred to as feeder cattle, yearlings, or stocker cattle. At that time, the feeder cattle enter a feedlot or are placed onto summer pasture.

Throughout the growing of calves, producers, not packers, own the livestock. Cow-calf and backgrounding or stocker operations are widely distributed across the U.S. The majority of operations are concentrated in the Midwest and southern U.S. where climates are mild and forage plentiful. Cow-calf operations are also predominant and highly valued in the western U.S.

2.   Cattle Feeding (feedyards or feedlots).

Animals that enter the feedlot are fed a high-energy ration for 4 to 6 months. The length of the feeding period depends on the cost of feeder cattle, the cost of feed, the price of fed animals, the premiums or discounts associated with meat quality, and the size of the animal entering the feedlot. Corn or corn byproducts are the main cattle feed, but sorghum and barley also are often used. The diet also contains some forage to support the ruminant animal stomach and some high-protein feed, such as soybean meal. Again, a large variety of roughage feeds is used, including grass hays, corn silage, green-chopped hays, sugar beet pulp, and citrus and other fruit pulps. Cattle-feeding operations tend to locate near inexpensive sources of forage feeds and energy feeds.

Cattle-feeding operations (also called feedyards) are concentrated in the southern Plains States, High Plains States, and the Midwest. The arid weather conditions of the Plains coupled with grain and forage supplies are ideal conditions for animal growth performance and management of animal waste. Cattle-feeding operations are specialized operations. These feedlots grow a portion of their feed supplies, such as corn silage and other forages, but also purchase grain. Many cattle-feeding operations own several feedyards. These feedyards are operated by on-site management, but central management may make decisions and capture economies in feed purchasing, feed manufacturing, animal procurement and marketing, financing, and risk management. Ownership of livestock within a feedyard varies. Feedyards typically feed livestock for customers who own the cattle. Other feeding arrangements exist wherein the feedyard and a customer may share an interest in the livestock. Feedyards often feed some cattle that they own completely. The types of arrangements depends upon markets, financing, and customer preference for assumption or shifting of risk.

3.   Packers or Processing Facilities.

After feeding on a high-energy ration, fed cattle are marketed as fed or finished steers and heifers. These cattle are marketed to packers through the cash market or marketing agreements. The decisions as to how, when and on what terms the cattle are marketed are made by producers. Generally, title to the livestock does not pass to the packer until delivery and slaughter. Packers are businesses that specialize in the slaughter of live animals, production of beef carcasses, and processing and marketing of animal by-product. Most packers are combined with fabrication enterprises that process the carcass into cuts that are a portion of the carcass or specific muscles, but both parts of the enterprise are likely separate profit centers. Cuts are referred to as boxed beef and are vacuum sealed in plastic bags and packaged in cardboard boxes.

Carcasses are inspected for wholesomeness by the U.S. Department of Agriculture's (USDA's) Food Safety and Inspection Service (FSIS) or by a state government inspection system and may be

quality graded by USDA's Agricultural Marketing Service (AMS). Federal inspection by FSIS is required for shipment of meat in interstate trade. Grading is not required but is usually performed.

Carcasses are quality graded and yield graded. Quality grade refers primarily to carcass maturity and amount of intramuscular fat. Mature carcasses cannot receive a high-quality grade. USDA Quality Grades are Prime, Choice, Select, and Standard. Cattle that will grade Standard are typically not graded and are referred to as "No-Roll."[3] Connective tissue in meat is more substantial in older animals, and meat flavor may be stronger and "gamier." Intramuscular fat, the fat tissues that are within the muscle as opposed to fat layers between muscles, impart mild flavors and hold moisture in cooking. Thus, intramuscular fat is desirable and results in a higher quality grade. Yield grade is the amount of meat or salable meat in the carcass. USDA Yield Grades are numbered 1 through 5. Increases in the amount of fat cover between the hide and carcass and fat deposits close to edible organs result in a lower yield grade. Smaller muscles also result in lower yield grades.

Cattle slaughtering and processing operations are located close to cattle-feeding regions. Given advances in technology, it is more economical to move meat to people than to move cattle to people. Meatpacking operations that are not located close to cattle-feeding operations are located in regions with larger numbers of beef and dairy herd animals. Most cow slaughter plants are located in Wisconsin and Pennsylvania to be close to dairy production in the Northeast and Southeast.

**B.    Eastern Livestock Co., LLC Roles in the Trade**

Eastern Livestock Co., LLC was in the business of facilitating transactions between the various sectors of the beef industry. Eastern did this through a variety of transactions including but not limited to:

- Buying for themselves and reselling.
- Buying and then selling cattle to their own related entities or individuals.
- Buying on order for others.
- Buying contracts for future delivery on internet, video and board sales.
- Buying on behalf of another and simply charging a commission.
- Clearing business for other order buyers carrying out potentially all of the above transactions.
- Placing cattle they could not sell in feedyards.
- Accepting down payments for future delivery contracts from feeders.
- Making down payments for future delivery from farmers or markets.
- Buying directly from the farm and writing checks on the spot or at some future time
- Buying directly off the farm for future delivery.

The PSA and the regulations anticipate these roles and require "market agents," "dealers" and "stockyard service" to register with USDA and maintain bonds, and custodial accounts to assure prompt payment and solvency for the protection of livestock sellers. These roles include:

**"Market agency,"** defined by PSA Section 301(c) (7 U.S.C. § 201(c)) as "any person engaged in the business of (1) buying or selling in commerce livestock on a commission basis or (2) furnishing stockyard services. Every day, thousands of head of cattle are purchased from producers by "market agents" who, in turn, deliver those cattle to buyers. As noted above, the PSA regulations require a market agency to maintain a custodial account for shippers proceeds. In a typical transaction, cattle would be transported directly from the sellers' facility to the buyer's facilities. The market agent seldom takes

---

[3] The term "No-Roll" originated from an earlier practice in which the USDA Quality Grade was rolled on the fat along the length of the carcass using an ink wheel. Carcasses that were "No-Roll" did not receive a quality grade.

possession of the livestock in such transactions. This type of service transaction is critical to the cattle industry since it provides a mechanism for the delivery of feeder cattle (raised in the grasslands portions of the United States) to commercial cattle feeders in the High Plains by market agents. It appears that, on occasion, Eastern was acting as a "market agent" and may not be entitled to any proceeds beyond the amount of the commission (payment) for its services. Based upon the record, it also appears likely that Eastern comingled custodial account proceeds with other proceeds. We believe it is necessary to examine each transaction to determine the roles and rights of the parties.

**"Dealer"** is defined by PSA section 301(d) to mean "any person, not a market agency, engaged in the business of buying or selling in commerce livestock, either on his own account or as the employee or agent of the vendor or purchaser. The record reflects that Eastern and its affiliated companies performed a variety of services. It appears that in some cases Eastern Livestock Co., or an affiliated company may have acted as a "dealer" buying and selling livestock on their own account or as an agent of another-or had persons acting as their agents. Again, what Eastern is entitled to in these types of transactions is dependent upon the facts of the deal. Each transaction must be examined to determine whether Eastern was acting on its own behalf to purchase the cattle. A clear indicator would be whether possession of the cattle was ever obtained, and whether Eastern had the infrastructure: contracts, feed supplies, labor, working capital and facilities to acquire and maintain all such livestock.

Providing **"stockyard services"** as defined in PSA section 301(a) to mean "services or facilities furnished at a stockyard in connection with the receiving, buying or selling on a commission basis or otherwise, marketing, feeding, watering, holding, delivery, shipment, weighing, or handling, in commerce, of livestock." The record reflects activities and transactions by Eastern that may be considered stockyard services. Again, the particular facts of a transaction will determine what roll Eastern was playing and the nature and extent of the compensation to which it is entitled in such transactions.

In outlining these transactions and definitions under the PSA, we are pointing out to the Court that there were hundreds of daily transactions throughout the United States in which Eastern was a party. Eastern's role was dependent upon the nature of the transaction. Eastern may have acquired cattle for its own account in some, brokered cattle in others and merely cleared payments in still more transactions. However, the rights and entitlements of third parties will necessarily depend upon the nature of each transaction.[4] It will be a painstaking undertaking to unravel the transactions and examine the actions of Eastern. In the interest of justice to the hundreds of sellers who have gone unpaid, it is imperative that this detailed analysis be done.[5]

The Trustee has asserted in the Report that "the Trustee has concluded that no person other than Fifth Third can assert a valid perfected lien in or to the Cattle Sales proceeds…(text omitted)" . This conclusion fails to recognize that the multiple roles played by Eastern and its limited interest in cattle in which it was purchasing for its customers. In essence, the Trustee has either ignored Eastern's status as an agent of third parties or has concluded, without citation to either facts or law, that it held sufficient rights in all cattle which passed through its accounting records to encumber them to Fifth Third Bank. While this assertion may ease the administration of this case, it ignores the nature of cattle industry

---

[4] In addition to the potential trust fund claims of livestock sellers and markets, feedyards and input suppliers may assert agricultural liens against the cattle proceeds held by the Trustee. Such agricultural liens may have priority over any security interest of a lender. See, UCC § 9-322(g). The Trustee has not attempted to account for any such agricultural liens. Finally, many states provide agricultural producers liens to sellers of agricultural commodities. Those liens must also be assessed in order to finally determine the validity, priority and extent of parties' interests in the funds held by the Trustee.

[5] However, the PSA rules impose an obligation on every market agency to make available its records for inspection. 9 C.F.R. § 201.45. If such records are made available to parties in interest in an organized and orderly manner, such a review would, of course, be facilitated.

transactions and could have a devastating affect on the industry. If the Trustee's interpretation becomes precedent, the very essence of the Packers and Stockyards Act will be negated and producer/sellers will be left unprotected and the cattle industry as a whole will suffer significant disruption as market agencies, dealers, stockyard, feedyard, stockers, cow-calf operators and packers, as well as their lenders, struggle to cope with a new reality - namely that a market agency's lender's security interest enjoys rights which are more extensive than those of its borrower.

We recognize that such an inquiry into the transactions of Eastern will likely be extremely time consuming for the parties and the Court. However, the short cut offered by the Trustee in his Report could have grave consequences for the cattle industry. Should the Court or the Trustee believe the NCBA could assist in this process, we would be more than willing to offer our expertise, ideas and suggestions to assist both the Trustee and the Court in attempting to resolve an extremely complex matter.

Respectfully submitted,

*Bill Donald*

Bill Donald
President