# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF INDIANA - NEW ALBANY

===============================

IN THE MATTER OF:         .   Case #10-93904-BHL-11

                            .

EASTERN LIVESTOCK CO., LLC   .   New Albany, Indiana

                            .   **December 13, 2010**

                 Debtor    .   2:02:50 p.m.

===============================

## TRANSCRIPT OF EMERGENCY TELEPHONIC HEARING RE:
### (#27) - Page 4 - EMERGENCY MOTION TO APPOINT TRUSTEE, AND AUTHORIZING AND DIRECTING INTERIM TRUSTEE TO OPERATE DEBTOR'S BUSINESS, FILED BY PETITIONING CREDITORS MOSELEY CATTLE AUCTION, LLC, DAVID L. RINGS, SOUTHEAST LIVESTOCK EXCHANGE, LLC;
### (#52) - Page 10 - MOTION FOR AUTHORITY TO OPERATE IN THE PRE-APPOINTMENT PERIOD, FILED BY OTHER PROFESSIONAL, ELIZABETH M. LYNCH
### BEFORE THE HONORABLE BASIL H. LORCH, III, J.U.S.B.C.

**APPEARANCES:**

For Petitioning Creditors, Moseley Cattle           JOHN W. AMES, ESQ.
Auction, Moseley Cattle Auction, et al:           C.R. "CHIP" BOWLES, ESQ.
                                            Greenebaum, Doll & McDonald, PLLC
                                            3500 National City Tower
                                            101 S. 5th Street
                                            Louisville, KY 40202

For the U.S. Trustee:                         CHARLES R. WHARTON, AUST
                                            Office of the U.S. Trustee
                                            101 W. Ohio Street   Suite 1000
                                            Indianapolis, IN  46204

                                             -------------continued----------->

Electronic Sound Recording Operator:     Not identified

Proceedings Recorded by FTR Gold Digital Sound Recording
Transcript Produced by Certified Transcription Service

## GCI TRANSCRIPTION SERVICES
**210 Bayberry Avenue**
**Egg Harbor Township, NJ  08234-5901**
**1-609-927-0299      FAX 1-609-927-9768      1-800-471-0299**
**e-mail - irwingloria@comcast.net**

Page 2 Cover
#10-93904
12-13-2010

**APPEARANCES: (continued)**

For First Bank & Trust Company:          STEPHEN A. WEIGAND, ESQ.
                                          DANIEL J. DONNELLON, ESQ.
                                          Faruki, Ireland & Cox, PLL
                                          201 East Fifth Street   Suite 1420
                                          Cincinnati, OH 45202

                                          JOHN R. CARR, III, ESQ.
                                          BRET S. CLEMENT, ESQ.
                                          Ayers, Carr & Sullivan, P.C.
                                          251 E. Ohio Street   Suite 500
                                          Indianapolis, IN   46204

For Fifth Third Bank:                     EDWARD M. KING, ESQ.
                                          Frost, Brown & Todd, LLC
                                          400 W. Market Street    3nd Fl.
                                          Louisville, KY 40202

                                          RANDALL D. LaTOUR, ESQ.
                                          Vorys, Sater, Seymour & Pease, LLP
                                          52 East Gay Street
                                          Columbus, OH   43216

For Republic Bank & Trust Company:        WILLIAM ROBERT MEYER, II, ESQ.
                                          Stites & Harbison, PLLC
                                          400 West Market Street
                                          Louisville, KY 40202
                                               -- continued------------>


Electronic Sound Recording Operator:   Not identified

Proceedings Recorded by FTR Gold Digital Recording
Transcript Produced by Certified Transcription Service

GCI TRANSCRIPTION SERVICES
210 Bayberry Avenue
Egg Harbor Township, NJ  08234-5901
1-609-927-0299      FAX 1-609-927-9768      1-800-471-0299
e-mail - irwingloria@comcast.net

**APPEARANCES: (continued)**

For Receiver, Elizabeth M. Lynch:

KIM MARTIN LEWIS, ESQ.
Dinsmore & Shohl, LLP
255 E. Fifth Street   Suite 1900
Cincinnati, OH   45202

JEREMY S. ROGERS, ESQ.
Dinsmore & Shohl, LLP
1400 PNC Plaza
500 West Jefferson Street
Louisville, KY   40202

For Bluegrass Stockyards, LLC, and
related entities:

LAURA DAY DELCOTTO, ESQ.
DelCotto Law Group, PLLC   *(Via phone)*
200 North Upper Street
Lexington, KY 40507

Trustee for Thomas Gibson Bankruptcy Estate:

KATHRYN L. PRY *(Via phone)*

For Friona Industries:

JOHN FREDERICK MASSOUH, ESQ.
Sprouse Shrader Smith, P.C. *(Via phone)*
701 S. Taylor   Suite 500
Amarillo, TX   79105

For Cactus Growers, Inc.:

JOHN HUNT LOVELL, ESQ. *(Via phone)*
Lovell, Lovell, Newson & Isern, LLP
112 W. 8th Avenue   Suite 1000
Amarillo, TX 79101

Electronic Sound Recording Operator:   Not identified

Proceedings Recorded by FTR Gold Digital Recording
Transcript Produced by Certified Transcription Service

GCI TRANSCRIPTION SERVICES
**210 Bayberry Avenue**
**Egg Harbor Township, NJ  08234-5901**
**1-609-927-0299      FAX 1-609-927-9768      1-800-471-0299**
**e-mail - irwingloria@comcast.net**

Page 4 Cover
#10-93904
12-13-2010

**APPEARANCES: (continued)**

For Wells Fargo Capital Finance:

JEFFERY T. WEGNER, ESQ. *(Via phone)*
Kutak Rock, LLP
The Omaha Building
1650 Farnam Street
Omaha, NE 68102

For CPC Livestock:

JESSICA YATES, ESQ. (Phonetic)
(No further information provided)

For Cactus Growers, Inc.:

JOHN HUNT LOVELL, ESQ. *(Via phone)*
Lovell, Lovell, Newson & Isern, LLP
112 W. 8th Avenue   Suite 1000
Amarillo, TX 79101

General Counsel, Farm Credit West:

CHRISTOPHER BRUMFIELD, ESQ.
Farm Credit West   *(Via phone)*
No address known or provided

For J&F Oklahoma Holdings, Inc.

DAVID L. LeBAS, ESQ. *(Via phone)*
Namen, Howell, Smith & Lee, PLLC
Suite 490
8310 N. Capital of Texas Highway
Austin, TX    78731

Electronic Sound Recording Operator:    Not identified

Proceedings Recorded by FTR Gold Digital Recording
Transcript Produced by Certified Transcription Service

GCI TRANSCRIPTION SERVICES
**210 Bayberry Avenue**
**Egg Harbor Township, NJ  08234-5901**
**1-609-927-0299     FAX 1-609-927-9768     1-800-471-0299**
**e-mail - irwingloria@comcast.net**

1  (At 2:02:50 p.m.)

2  NOTE: Speaker identification, when uncertain, is noted as

3  "ATTORNEY"

4                    * * * * * * * *

5          THE COURT:   Everybody's on the phone for this one,

6  and the phone calls are already in here, and it's not easy to

7  shift in midstream.

8          SPEAKER: (unclear) anticipating another hearing,

9  so --

10     (Long pause)

11         MR. AMES:   Judge, I guess with the exception of

12  Ms. Lewis, who may be in the restroom at the moment, I think

13  everybody else that was originally here is now back here, so

14  by the time we all become recognized, she may be back.

15         THE COURT:   Okay.   Let's take the appearances for

16  the record, please.

17         MR. AMES:   Your Honor, for the movants, John W.

18  Ames and Chip Bowles of Greenebaum, Doll & McDonald.

19         MR. ROGERS:   Your Honor, for the state court

20  appointed Receiver, Jeremy Rogers; and joining me shortly

21  hopefully will be Kim Lewis.

22         MR. CARR:   John Carr and Bret Clement for First

23  Bank & Trust; and also Dan Donnellon and Steve Weigand, who

24  pre-filed their motions for *pro hac* admission this morning,

25  Your Honor.

```
 1              THE COURT:   All right.

 2              MR. LaTOUR:   Good morning, Your Honor.  Randall

 3   LaTour from Vorys, Sater, Seymour & Pease, representing Fifth

 4   Third Bank.

 5              MR. KING:   Ted King as local counsel for Fifth

 6   Third, Your Honor.

 7              MR. WHARTON:   Chuck Wharton for the United States

 8   Trustee.

 9              MS. PRY:   Kathryn Pry.  I'm the Trustee on Thomas

10   Gibson personal bankruptcy (unclear, not near microphone;

11   voice dropped)

12              MR. MEYER:   Rob Meyer, for Republic Bank & Trust

13   Company.

14              THE COURT:   And appearing by phone.

15              MS. DEL COTTO:   Good afternoon, Your Honor.  Laura

16   Day DelCotto, DelCotto Law Group, appearing for Bluegrass

17   Stockyards, LLC, and certain of its affiliated entities.

18              MR. WEGNER:   Good afternoon, Your Honor.  Jeff

19   Wegner of the law firm Kutak Rock appearing on behalf of

20   Wells Fargo Capital Finance.

21              MR. BRUMFIELD:  Your Honor, this is Chris

22   Brumfield, and I'm general counsel for Farm Credit West,

23   which owns the stock, Superior Livestock Option.

24              MR. LOVELL:   John Lovell on behalf of Cactus

25   Growers.
```

1        MR. LeBAS:   David LeBas on behalf of J&F Oklahoma

2    Holdings.

3        MR. MASSOUH:   John Massouh on behalf of Friona

4    Industries.

5        MS. YATES:   Jessica Yates (phonetic) on behalf of

6    CPC Livestock (phonetic).

7        THE COURT:   All right.  We're here this afternoon

8    on two matters.   There's a motion to appoint the Trustee,

9    and authorizing the Interim Trustee to operate debtor's

10   business; and a motion for authority to operate in the pre-

11   appointment period, filed by Mr. Rogers on behalf of

12   Elizabeth Lynch.   Mr. Ames.

13       MR. AMES:   Your Honor, I can proceed.   Should we

14   see if Ms. Lewis is on her way back?

15       ATTORNEY:   I can go get her, Your Honor --

16       THE COURT:   All right.

17       ATTORNEY:   I appreciate it.

18       MR. AMES:   Maybe Liz might be better suited to go

19   get her.

20     (Long pause)

21       THE COURT:   All right, Mr. Ames.

22       MR. AMES:   Your Honor, once again, we thank the

23   Court for -- for -- may I please remain seated, Your Honor?

24       THE COURT:   You may.

25       MR. AMES:   We'd like to thank the Court for

1   accommodating us once again on such short notice.  As this

2   Court is aware, last Tuesday, less than one day after the

3   involuntary petition was filed, the Court held a telephonic

4   hearing.   That hearing resulted in an order from December

5   8th that basically appointed Elizabeth M. Lynch the Receiver

6   in the Ohio state action to continue as the Custodian, to

7   administer the debtor's property under certain limitations.

8        The second order was also entered that day that

9   dealt with providing protocol for the safekeeping, sale, and

10  segregating of the sales proceeds, while recognizing that

11  there are multiple interests; and also allowing the Custodian

12  to pay those expenses that -- that are necessary in incurring

13  the sale -- carrying out the sale.

14       The debtor management, Your Honor, did not appear,

15  nor did anyone assert a defense or contest that motion.

16  There have been -- there were no objections at that time, and

17  in think this spoke volumes not only to the Court but to the

18  intervening movants, the petitioning creditors in this

19  action.  And as the Court found that there was cause to --

20  for the entering of that order at that time, and a cause

21  exists again today, Your Honor.

22       Today is the next and the logical step in this

23  proceeding, and we wish to have the Court order the U.S.

24  Trustee's Office to appoint the U.S. Trustee.

25       Now since that -- since we met last Tuesday by

1  telephone, there's been certain things that have happened,

2  certain things that haven't happened; and one of the things

3  that hasn't happened, Your Honor, is there has been no

4  objection to this motion.   And as far as I'm aware, there

5  has not been an appearance by the debtor, nor any of the

6  respondents, or the management.

7       Now we have had informal contact with Ms. Pry, who

8  is present in the courtroom today, with the -- hoping to have

9  an indication -- and Ms. Pry is very new to the case and is

10 seeking counsel, and certainly will be able to speak in a

11 bit.

12      One of the other things that's happened is that

13 additional parties have stepped forward, both in becoming

14 intervening petitioners for the involuntary, but also in

15 becoming movants in this action.   And I'd like to take just

16 a second, Your Honor, because last Tuesday there might have

17 been a little bit of confusion with respect to Superior

18 Livestock.

19      Superior has a very sizeable claim, and their claim

20 is somewhere in the neighborhood of twenty million dollars,

21 and there were certain statements made at that hearing that

22 may not have accurately reflected Superior's position.   And

23 since that time Superior has employed Greenebaum, Doll &

24 McDonald, and Mr. Brumfield is on the line with us right now;

25 but I'd like to just indicate to the Court, to eliminate any

1  misunderstanding that Superior is a very supportive -- fully

2  and completely supportive of the motion to appoint an Interim

3  Trustee, and certainly any aspersions that were cast toward

4  the Receiver and the Custodian were ill-placed.

5      THE COURT:  Okay, let me -- let interrupt for just

6  a second.  I don't -- I don't think we're going to appoint

7  an Interim Trustee.  I don't really think the Interim Trustee

8  provision applies, although I understand there are some cases

9  where it's been used.  I think what we're going to decide

10  this afternoon is whether to appoint a Trustee under 1104.

11  So let's -- let's proceed on that basis.

12      MR. AMES:  Your Honor, I was hoping Your Honor

13  would say that, because I think the quantum of proof in the

14  standards are relatively the same for both.   As a matter of

15  fact, the statutory authority, 11 USC Section 303(g) has this

16  Court having the ability to so place under 1104 and also 11

17  -- in Section 105.

18      Your Honor, we had, both in the emergency motion

19  that was filed last week, in a memo -- I hope the Court has

20  had an opportunity to file -- we just filed it this morning

21  -- supply the Court with case law.  And one of the things

22  that is a little bit unusual is that we were asking for

23  relief prior to an order for relief for -- for the Chapter 11

24  that we're also seeking which (unclear) will come at another

25  time.

1        However, there is ample case law that allows for

2    such, and in all probability the voluntary will be not

3    contested, and ultimately there will be an order for relief

4    granted by the Court.

5        Now, Your Honor, there is no question but that

6    there is ample cause existing under 1104, taking 1104 by its

7    individual requirements:   Fraud, dishonesty, incompetence,

8    gross mismanagement of the affairs of the debtor.  These are

9    all certainly non-exclusive, but we hone in on is what's in

10   the best interest of the estate, and we think that that

11   certainly -- without there being any management, any control

12   over these assets, it almost -- it just speaks for itself.

13       There is undisputed submission of evidence by

14   dishonored checks, the appointment of the Trust -- of a

15   Receiver in the state action of Ohio; non-appearance of the

16   management in either that Ohio action or in this Court; the

17   numerous governmental investigations by GIPSA; the findings

18   of fact and conclusions of law of the Ohio State Court; and

19   we have included as exhibits the complaint, the order of

20   Judge Winkler, and the declaration of John Mosely and David

21   Rings.

22       And Mr. Rings and Mrs. Rings are here.  They've

23   driven up from Russell Springs, Kentucky this morning --

24   three hours in the snow -- to indicate to the Court that

25   they've got a check that was returned, "Refer to Maker" for

1  $7,145; and there are many other creditors that -- and

2  claimants that stand ready to testify, so -- should the Court

3  so desire.

4       THE COURT:   Was there any dispute in this case

5  that there are millions of dollars of checks that have not

6  been honored, that had been dishonored?  Is that undisputed?

7       MS. LEWIS:   Your Honor, this is Kim Martin Lewis

8  on behalf of the Receiver.   I believe it is undisputed at

9  the ledger that we had received from the bank after the

10  Receivership, is there was approximately 82 million dollars

11  of dishonored checks for that period immediately prior to the

12  Receivership.

13       THE COURT:   Okay.

14       MR. AMES:   So, Your Honor, between that and the

15  ability to take judicial notice of what all has occurred,

16  both with GIPSA and their investigations, their -- their

17  administrative proceedings that had been filed, and these are

18  also submitted as Exhibit C to our motion.

19       The ample proof that we can put on is certainly --

20  we've got folks here.  We have folks that probably are on the

21  way still; but we think that this Court has the ability to

22  make a judicial finding by clear and convincing evidence, and

23  we can proceed how the Court so desires, after comment from

24  other counsel of interest.

25       THE COURT:   Would anybody like to comment or speak

1  in favor or in opposition to the motion for the appointment

2  of a Trustee?

3      (No response)

4      THE COURT:   All right, the Court is convinced,

5  after having reviewed the pleadings in this matter and having

6  determined that two crucial facts are undisputed.  I mean, I

7  don't know what any government investigations will reveal,

8  but I do know there is a -- there is at present a lack of

9  management.  There is nothing -- there is no one running the

10 business, other than the Receiver; and there was no

11 opposition to the Receiver motion.

12      I do know there are millions of dollars of checks

13 that have been returned unsatisfied; and I think those two

14 findings alone are sufficient and establish cause under

15 1104(a)(1) and certainly indicate that the appointment is in

16 the best interest of creditors, as set forth as a basis under

17 1104(a)(2).

18      There is also -- well, I really think that's the

19 only findings we need, really, is I will find that there is

20 basis for 11 -- under (1) and (2) for the appointment of a

21 Trustee.  As I indicated earlier, I think that the Interim

22 Trustee provision is only applicable to 7s, that this is the

23 appointment of a Chapter 11 Trustee who will have the

24 authority to operate the debtor in possession, liquidate the

25 debtor in possession; basically stand in the shoes of the

1    debtor in possession and do whatever is necessary to fulfill

2    his or her fiduciary responsibilities to the creditors in

3    this case.

4         Now, Mr. Wharton, what's the current status of the

5    inquiries I'm sure you have already made concerning the

6    appointment of a Chapter 11 Trustee?

7         MR. WHARTON:   Your Honor, our office anticipating

8    today's hearing and the Court's likely ruling, we -- from my

9    level have provided and anticipated, and Ms. Gargula is aware

10   that this order would likely happen today.   To the extent

11   I'm able to assure the Court, we will expedite the process of

12   selection as quickly as we can.   I don't have the ability to

13   give you a number of days or an amount of time that that

14   process will take.   The case has a lot of facets to it, and

15   I think that she's going to want to carefully consider the

16   suggestions of what people -- the parties in interest tell

17   her as far as who the Chapter 11 Trustee should be.

18        So with that, we've -- I've got the process started

19   as quickly and as expeditiously as we can.

20        THE COURT:   All right, I appreciate that.  And

21   that, of course, leads right into the second emergency motion

22   that's on file today, which is to asking the Court to allow

23   the Receiver to operate to some extent until there is a

24   Trustee in place.

25        So let's talk a little bit about that -- about what

1  the Receiver has been doing since we were in court last time;

2  whether there's any confusion about the scope of duties;

3  whether the scope of duties need to be expanded or reduced

4  going forward until we get a Trustee in place.

5       MR. WHARTON:    And, Your Honor, my concern with

6  regard to that -- I don't object to (unclear) motion in

7  principle, and part of what was about to be and has been

8  made, discussed this afternoon is funding for either the

9  operations of the current Custodian or the projected Chapter

10 11 Trustee, and the secured creditors who are here and

11 represented, along with the other parties, had been

12 brainstorming some potential ways to either assure that or at

13 least somehow equitably allocate those necessary costs.

14       And so as we go forward with this, I'd like that to

15 be at least part of what's in front of the Court's mind as

16 far as what we're looking to see happen.

17       THE COURT:    All right.  Ms. Lewis --

18       MS. LEWIS:    Your Honor --

19       THE COURT:    -- do you want to address your motion?

20       MS. LEWIS:    -- since the last hearing, the

21 Trustee -- or the Receiver did, in fact, sell some cattle --

22 some of the cattle that was listed in our Exhibit A.  They

23 were completed last Thursday of last week to get proceeds

24 into the escrow account.

25       The Receiver has not continued to make phone calls

1  for the accounts receivable;  however, there were a

2  significant amount of correspondence that the Receiver had

3  sent out to parties, to, number one, find out whether or not

4  there were receivables due and owing, and how much is due and

5  owing because I think, as you've heard a little bit on the

6  phone last time, the records are very difficult to get

7  through, and we are trying to work with both -- both sides --

8  Our customers as well as those people that we have allegedly

9  sold cattle to -- to determine whether or not we have cattle

10 there, or whether or not there are accounts receivable due

11 and owing.

12         So since the last hearing we haven't made phone

13 calls, though we have responded to inquiries, and there have

14 been obviously significant amount of inquiries to the

15 Receiver to determine -- and a lot of people have come out of

16 the woodwork and said, you know, "We've got some cattle here.

17 You've got it's listed as a receivable, but that's really not

18 how our arrangement worked.  Our arrangement was that you

19 shipped your cattle here, they grazed on our land, and at the

20 end of the day those were your cattle, and you were just

21 financing the feed."

22         So there are about four or five different

23 arrangements that Eastern Livestock was engaged in prior to

24 the Receivership, of which the Receiver is finding out which

25 categories each one of these falls into.

1       There are employees that are still at Eastern

2   Livestock.  It has been critical for the Receiver to have

3   those parties to help build what isn't in the computer

4   databases.  So in other words, to -- a partic -- if there was

5   a receivable for seven million dollars, she has used some of

6   the people that participated in the conversations with those

7   parties in the past to help try to build what that receivable

8   is based on.  It's been necessary for her to use those people

9   to assist her in building a lot of the records that are going

10  to be used in this case ultimately for the benefit of all

11  creditors.

12       The -- one of the other line items that was in the

13  budget was a computer line item, software line item -- where

14  is it? -- (pause) -- Computer Technical Support.  What

15  happened last week is we got viruses that invaded the

16  computers.  We need someone to assist to get those viruses

17  cleared so that we're able to continue the process of

18  identification of cattle and identification of receivables.

19       Also, the computer systems are very antiquated, so

20  prior to the involuntary being commenced, Ms. Lynch, on

21  behalf of the Receivership estate did, in fact, employ

22  someone to take images of all of the computers so that they

23  are save capped at this point in time, but we're not able to

24  access that data because we've got viruses on it right now.

25  So that's the purpose of the $3,200 that we need this week in

1    order to access the information for both inventory and

2    receivables.

3            The utility costs are included in there, and also

4    the cost of the feed is included in there.  We did not

5    include in there, although the mortgage payment on the

6    building, which is owned by Eastern Livestock, is due this

7    week; and Republic Bank is -- is here today.  We did not

8    include that in the emergency budget because we thought that

9    was something that would have to be discussed as far as the

10   valuation and whether or not they're over- or under-secured,

11   which at this point in time I couldn't tell Your Honor

12   whether we're over- or under-secured.

13           And the health --

14           THE COURT:   Who -- whether who's over- or under-

15   secured?   Republic, or -- ?

16           MS. LEWIS:   Republic.  Correct.  Their sole

17   security interest is on the building itself, where Eastern

18   Livestock's headquarters are.

19           And we kept -- we tried to keep the budget to very

20   minimal.  As you'll note in the budget there are no payments

21   for a Receiver or DSI that is supporting the Receiver, or

22   counsel for the Receiver.  As the parties are all aware,

23   those are just accumulating expenses, but they're -- that's

24   not something that is going to be paid out of the emergency

25   budget.

1          When I talked to Mr. Wharton on Friday, he

2    indicated to me that he would probably not be in a position

3    to appoint a Trustee today, in which case I asked DSI to put

4    together a one-week budget so that we could put something

5    before the Court because we knew payroll was due tomorrow,

6    and that was -- it was critical for us to make those payroll

7    amounts and the health insurance and other things, which we

8    would have to ask obviously everyone to go home if we were

9    not going to be making payroll.

10          THE COURT:   Well, these employees, these are not

11    the principals of the debtor, right?

12          MS. LEWIS:   These are not the principals, Your

13    Honor.  How many employees --

14          MS. LYNCH:   There's --

15          MS. LEWIS:   Your Honor, this is Ms. Lynch, and

16    she's the Receiver.

17          MS. LYNCH:   Good afternoon, Your Honor.  There are

18    six employees, two of whom had worked in the shipping area,

19    which has been critical to us, to help to try to track and

20    identify where the inventory has been shipped to.  The four

21    others are accounts receivable and other folks involved in

22    the contractual side of the business, and they've really been

23    helping recreate and rebuild the records, both related to the

24    returned check activity for which there needed to be

25    reconstruction of the books and records related to that, as

1  well as further identifying the granular -- every account

2  filed that we've encountered, there appears to be some --

3  there's a story with it; and we are documenting that and

4  building those account records so that we can better

5  understand who owes this money, who doesn't, and what the

6  potential claims are to each of those balances.   It's very

7  manually intensive.

8         THE COURT:   But it -- prior to the filing of the

9  bankruptcy, how did you anticipate the Receiver being paid?

10         MS. LYNCH:   It was funded both by advances from

11  Fifth Third and their participant, as well as from cash

12  collections.   To date, Your Honor, we have collected about

13  $700,000 from the collection of accounts receivable, most of

14  which pre-date the involuntary action; and a smaller amount

15  -- 64,000 -- a subset of that was from the sale of the cattle

16  on Thursday.

17         THE COURT:   But when you say "from cash," I'm

18  assuming that that cash is claimed by Fifth Third as part of

19  its collateral and may be claimed by somebody else as part of

20  *their* collateral.   So in the state court Receivership, other

21  than Fifth Third, were other secured creditors participating?

22         MS. LYNCH:   Save their participant, no, sir.

23         MR. DONNELLON:   I (unclear)

24         THE COURT:   Save their participant -- oh, their

25  loan participant.

1           MS. LYNCH:    That's right.

2           MS. LEWIS:    Other -- although, Your Honor, right

3  before the involuntary was commenced, there was a motion to

4  intervene on behalf  --

5           MR. DONNELLON:    Yes.  Dan Donnellon for First Bank

6  and Trust.  We moved to intervene in that action, and there

7  was scheduled to be a hearing before Judge Winkler, I believe

8  the day after the involuntary was filed.  So that's still out

9  there pending our granting of intervention, but that was the

10 only action that we took was to -- to intervene in the

11 action, file a proposed answer and counterclaim, and

12 objections to some of the issues in the Receiver order.

13          THE COURT:    All right.  Does anybody other -- I'm

14 sorry.  Go ahead.

15          ATTORNEY -- MR. KING? Or MR. LaTOUR?: (no

16 identification on log sheet)  If I could join that

17 discussion, Your Honor.   At that point in time that Fifth

18 Third moved the state court to appoint a Receiver, it was the

19 belief of Fifth Third that the accounts receivable was

20 approximately 75 million dollars; that the live inventory was

21 approximately 45 million dollars; that the costs of the

22 Receivership and the so funding -- although the funds might

23 at various points in time need to be advanced by Fifth Third

24 to get it going, there would end up being a surplus.

25          The most recent information -- and I may have to

1  ask Ms. Lynch to fill that in -- is that those numbers are

2  considerably overstated, and if I may, although she's not on

3  the stand, Ms. Lynch, could you tell us the currently likely

4  accounts receivable and known inventory?

5  MS. LYNCH:  We have, based on calls that were

6  commenced at the beginning of the Receivership, we estimate

7  currently collectable accounts receivable to be approximately

8  eight million dollars, and we've identified 5,500 head of

9  cattle in the Eastern system, which has a gross value range

10 of three-and-a-half to four-and-a-half million dollars.

11 We further anticipate accrued feed costs to date in

12 those animals is a million five, which is a direct offset to

13 the recoverable value.

14 MS. LEWIS:  There are also approximately 3.7

15 million dollars of interpled funds in four state courts

16 throughout the country in which, after the appointment of a

17 Trustee, that I believe that the Trustee would bring those

18 actions and seek to have those removed before Your Honor.

19 So there's approximately 3.7 million dollars outstanding out

20 there.

21 THE COURT:  And what's Fifth Third's claim amount?

22 ATTORNEY:  MR. LaTOUR? OR MR. KING?:  Your Honor,

23 Fifth Third has a claim of at least 35 million dollars.

24 In addition, Your Honor, I'd like to inform the

25 Court that the budget for the Receiver was being dealt with

1  on a week-to-week basis, and that at the time that the

2  recovery started to outstrip what the expectations were,

3  there had already been discussions about limiting the

4  expenditure.

5         I don't think it would be an appropriate assumption

6  on anybody's part that because Fifth Third was funding

7  something in the state court Receivership action, that that

8  necessarily follows that they will, ought to, or are required

9  to so fund in this situation.

10        The reason that the parties were not all in the

11 courtroom from the time you took the bench, Your Honor, is

12 because the secured creditors were negotiating amongst

13 themselves to try to find a way to deal with the problem of a

14 liquidating 11 that is not an operating business.

15        If you use a debtor in possession loan, there is no

16 means to repay the loan.  If you use the use of cash

17 collateral, there's no real way to provide adequate

18 protection.  You're actually dissipating the collateral, but

19 it's not being replaced.  There are no new cattle being

20 purchased, no new accounts receivables being generated.

21        So that's going to require some creative thinking

22 to figure out how to do that, and it's going to require some

23 equitable thinking to determine how that load should be

24 spread across all the creditors in this case.  The cost of

25 administration of this case is not solely a secure creditor

1    problem.  It's the problem of all of these creditors.  It

2    will take some money to avoid losses that can be avoided.  It

3    will take some money to liquidate cattle that currently

4    exist, but that's the limit of benefits to the creditors, and

5    so that's -- that's the feeling out process that we're going

6    to have to engage in, to figure out how to fund this case on

7    a going-forward basis.

8              As I stand before you today, Your Honor, I do not

9    have authority from my bank to agree to the use of cash

10   collateral.  My client did not know that this motion existed

11   until about twenty minutes before the hearing time.  I have

12   not had an opportunity to get their permission to agree to

13   what this says, no matter what I personally think --

14             THE COURT:   Agree to what -- what says?

15             ATTORNEY -- MR. LaTOUR? OR MR. KING?:   Well, the

16   $92,000 expenditure.

17             THE COURT:   I thought your bank is the one that

18   put the Receiver in place.

19             ATTORNEY: -- MR. LaTOUR? OR MR. KING:   Well, as I

20   said, Your Honor, we put the Receiver in place when we

21   thought we had 75 million dollars of accounts receivable --

22             THE COURT:   Well, I know; but let's say this

23   bankruptcy had never been filed, and what would you do then

24   once you've learned that the accounts receivable were less?

25   Get rid of your own Receiver?  I mean, what -- what's the --

1  where do you go?

2         ATTORNEY: -- MR. LaTOUR? OR MR. KING:   Well, first

3  of all, on the order appointing the Receiver, there was not a

4  commitment to fund that Receiver.   There was the

5  authorization to make a loan to the Receiver, if appropriate.

6  So one of the things the bank could have decided to do, and

7  was on the verge of deciding to do, was to not make further

8  loans, because it was becoming wildly expensive, without a

9  return that was going to come to the bank.

10         THE COURT:   So the bank can go into a state court,

11  ask for appointment of a Receiver, get a Receiver; that

12  Receiver starts collecting the accounts, and then the bank

13  can say, "Well, we're not going to pay the Receiver"?

14         ATTORNEY: -- MR. LaTOUR? OR MR. KING:    No, Your

15  Honor, that's -- that's not -- if I gave that inference, I

16  misspoke.

17         THE COURT:   Well, when you say "stop funding,"

18  that's the impression I get.   Maybe I misunderstood.

19         ATTORNEY: -- MR. LaTOUR? OR MR. KING:   Well, what

20  I should have said was "stop making the loan."   Let me

21  explain briefly Receivership law under Ohio law, which is

22  where this Receiver was appointed.

23         THE COURT:   Briefly.

24         ATTORNEY: -- MR. LaTOUR? OR MR. KING:  Very

25  briefly, Your Honor.   First of all, the Receiver is an

1    officer of the Court.  The Receiver is not an agent of the

2    party who moved for the appointment of the Receiver.  So the

3    -- as an officer of the Court they are not indebted to

4    anybody, they're not obliged to anybody, they don't take

5    instruction from anybody; but comcomitantly, the bank, having

6    asked for that relief, is not obligated to pay for it,

7    because under Ohio law there's a statute that says that the

8    Receiver will be paid out of the proceeds of the

9    Receivership, as the Court finds is appropriate.  It's, in

10   effect, Your Honor, an analog to the Bankruptcy Code Section

11   506(c), where, if there is a conferred benefit on creditors

12   then they share in that cost.

13          So the cost to the Ohio Receivership would not have

14   been borne solely by Fifth Third Bank.  It would have been

15   shared across all of the creditors --

16          THE COURT:   How's that --

17          ATTORNEY: -- MR. LaTOUR? OR MR. KING:   -- of

18   (unclear)

19          THE COURT:   How's that possible?   If -- if you're

20   fully -- if you're undersecured, and you have a lien for 35

21   million dollars, and the assets are less than that, aren't

22   you going to pay for the Receiver?   Nobody else is getting

23   anything, right?   Under those facts.

24          ATTORNEY: -- MR. LaTOUR? OR MR. KING:   If the

25   entirety of what was collected went to the secured creditors,

1  under those facts, that's who would be paying for the

2  Receiver.

3        THE COURT:   And in that -- isn't that what's going

4  to happen in this case?

5        ATTORNEY: -- MR. LaTOUR? OR MR. KING:   I don't

6  know that we know that, Your Honor.

7        MS. LEWIS:   Your Honor, if I may, on that

8  particular point, there are various parties who are asserting

9  priority with respect to various claims.

10        THE COURT:   I understand.

11        MS. LEWIS:   And so it may all be Fifth Third, or

12  it may be shared among other secured creditors or other

13  parties that are asserting ownership in the cattle.

14        THE COURT:   So it could just say *pro rata*, that

15  the costs will be shared *pro rata* according to what each

16  secured creditor receives.

17        ATTORNEY: -- MR. LaTOUR? OR MR. KING:   That was in

18  the nature of what was being discussed in the hallway, Your

19  Honor -- but that -- that it's not a deal --

20        THE COURT:   I should have been a lawyer.

21        ATTORNEY: -- MR. LaTOUR? OR MR. KING:   Your Honor,

22  (unclear)

23        MR. BOWLES:   To be clear, Your Honor, I mean, we

24  had to -- we had to reach some kind of accord among and

25  between ourselves about what we could advise our clients that

1    they ought to agree do --

2              THE COURT:   Well, why don't --

3              MR. BOWLES:  -- and then our clients have to agree

4    to it.

5              THE COURT:   Oh, I understand that.   Well, then

6    what -- why don't you guys have a seat for a second, and let

7    me ask Mr. Ames this question.

8              If now it is -- if we determine that the secured

9    creditors are going to get all these assets, I mean, they may

10   fight among themselves as to who gets what, but what are we

11   doing here?

12             MR. AMES:   Judge, there is probably going to be

13   significant other claims that will be made in addition to

14   just cattle itself.  Causes of action in it, and that has to

15   be coordinated and certainly can't be lost.  It could be very

16   significant in dollar amounts.

17             THE COURT:   Preference claims.

18             MR. AMES:   And they're not going to be subject--

19             THE COURT:   Fraudulent conveyance claims.

20             MR. AMES:   Yes.  Perhaps fraudulent conveyances,

21   maybe a lot of them, and other claims that could exist.

22             THE COURT:   All right.  Well, go ahead.  Do you

23   want to say something on behalf of the Receiver?

24             MS. LEWIS:   No -- I was just doing to say that it

25   kinds of brings us back to we don't have the appointment of a

1  Trustee, and we were talking to the secured creditors a

2  little bit before the hearing, but that in order to get to

3  the appointment of a Trustee, we certainly need to deal with

4  the expenses the Receiver has, and obviously on a go-forward

5  basis we were hopeful that we'd be able to reach some kind of

6  consensus when a Trustee is appointed for some type of 506(c)

7  proceeding or some type of settlement to deal with how these

8  expenses were going to be paid.

9       THE COURT:  Well, you have three choices:   You

10  can -- the secured creditors can agree as to how you'll be

11  paid; you -- two, you can bring-- you can go forward without

12  the assurance that you'll be paid and bring a 506(c) motion;

13  or, three, you can shut down, and we'll wait for the Trustee

14  to come in.

15       If you don't want to go forward without the

16  assurance of being paid, you can stop working, and we'll get

17  a Trustee in a few days; and if something happens in that

18  interim, that's the risk the secured creditors were willing

19  to take because they weren't willing to pay it.

20       I mean, those are the three choices.  Right?  Does

21  anybody have a fourth?  I'd be willing to listen to a fourth.

22       ATTORNEY: (Not ID'd on log sheet) Well, I suppose a

23  conversion motion might be (unclear, not near microphone;

24  voice dropped)

25       THE COURT:   Well, a conversion motion is possible,

1   but what -- that doesn't gain us anything, though.

2          MR. AMES:    (unclear)

3          THE COURT:    I mean, other than an immediate

4   Interim Trustee who -- I mean, we might get a few days

5   quicker Trustee, but the -- you know, I would say that the

6   secured creditors are probably more open to the idea of

7   having some input into the selection of a Chapter 11 Trustee

8   who may have some more expertise in this matter.  I don't

9   know.

10          MR. DONNELLON:    Your Honor, one of the ideas

11   being kicked around is the debtor in possession loan, but it

12   would be required to be a priming lien, so that first monies

13   recovered would repay the loan; my thought being that if

14   other people find that objectionable, that they be invited to

15   participate in that on themselves, they'll find that putting

16   money into the situation is not that enjoyable an experience,

17   but they're invited.

18          But in terms of conferring a benefit to the

19   situation generally, in terms of having a finite term of what

20   that lending commitment would be, both in time and in dollar

21   amount, that would be something that could be discussed.

22          Now I need to stress, Your Honor, I have zero

23   authority from my client for any of the brainstorming that's

24   going on in this discussion; but in an attempt to try to

25   figure out how to find the balance point between not

1   incurring avoidable losses on the one hand, and not running

2   roughshod over somebody that happens to be a lender on the

3   other -- now this case is going to have implications on lots

4   of ways; and one of the way it's going to have implication is

5   what happens to banks to loan money to agricultural

6   operations.

7        So I would urge that while everyone else is being

8   protected, that some thought be given to protecting banks

9   that have made these kinds of loans, because it could have a

10  chilling effect in the future if the situation doesn't work

11  out in balance.

12       THE COURT:   Well, do we -- what you just said fits

13  into the -- what I set forth as a first alternative; and that

14  is that the creditors figure out some way to fund it.  Now I

15  don't care how -- what the funding mechanism is.  If it's a

16  loan or it's an agreement to share expenses *pro rata*, or

17  somebody agrees to pick it up, or you do it with a cap.  I

18  don't care what kind of arrangement you come to.

19       But all I'm saying is I only see -- I mean, if you

20  don't agree to it, then they have to decide whether they want

21  to work and file a motion to say that they have benefited the

22  estate and should be treated accordingly under 506(c), or

23  they don't have to work.   I mean, I can't -- can't make them

24  work for nothing.

25       ATTORNEY (Not ID'd on log sheets):   Similarly,

1  they have proposed a Chapter 11 Trustee will have similar

2  decisions (unclear)

3          THE COURT:   Dissimilar -- I mean, yeah -- I mean,

4  this isn't going to be limited to the Receiver, as everybody

5  knows.  We're going to be in the same situation going

6  forward.   I mean, the only advantage to its -- me converting

7  the case I guess is that, you know, the Chap -- the Interim

8  Trustee doesn't have a lot of choice but to take the case.

9          ATTORNEY: (unclear)

10          THE COURT:   You know?  So --

11          ATTORNEY:   (unclear) surprised, being a little

12  nervous (unclear)

13          THE COURT:   Yeah.  I mean, that -- but, I mean, if

14  we don't -- we can't fund it going forward, then I don't know

15  what else we do at that point.   Do the petitioning creditors

16  have any other suggestions?

17          MR. AMES:   We'll be doing some heavy thinking in

18  the next day or so, Judge.

19          THE COURT:   All right, well, you all need to

20  negotiate that.   That's fine.  Continue the discussions.

21          What about expanding the role of the Receiver?  One

22  of the things that you touched upon, which we touched upon at

23  the last hearing was the collection of accounts receivable.

24  I think there was some reluctance by at least some creditors

25  for that activity to continue, maybe cause there is some

1  dispute as to who has priority on the accounts.

2       MS. LEWIS:   Your Honor, I believe that the dispute

3  was raised from one the counsel -- the prior counsel to

4  Superior.  I do not know that Superior has that concern

5  anymore.   It is something that the Receiver would like to

6  continue to do.  The Receiver does believe that it is

7  important to make these phone calls, because what we're

8  determining -- I had a proffer for Your Honor to go through

9  everything the Receiver had been doing to give the Court some

10 color; but one of the things the Receiver is finding out is

11 as they make these phone calls for the receivables, they're

12 finding out that their cattle are grazing there, but no money

13 is due and owing -- owing to the Receiver other than

14 ultimately upon the sale of cattle.  So we are finding a lot

15 of information out as we are making those phone calls and

16 following up and sending letters.

17       THE COURT:   Okay.

18       MS. LEWIS:   So from the Receiver's standpoint, it

19 is in the Receiver's business judgment, for the best interest

20 of the creditors, that it continues to look for and follow up

21 with receivables as well as other assets.

22       And -- oh, the other think that this -- which

23 reminded me of is that we have made some inventory site

24 visits, but that was on our list of things that we were going

25 to do is continue to make inventory site visits, so that we

1   are able to get lots of yard sheets and that kind of thing

2   from the various feed lots, so that we're able to determine

3   whose cattle are at the various feed lots.

4           And, in fact, one site visit produced some yard

5   sheets that were not -- it was not listed as Eastern

6   Livestock, but in fact, was listed as East-West Trucking

7   Livestock.  So I had a conversation with Mr. Walro last week,

8   provided him the information, and we're not sure whether

9   they're Eastern Livestock's cattle or East-West Trucking's

10  cattle, but it has been very helpful to have those site

11  visits and phone calls so that we're able to identify

12  collateral which -- whatever company and whatever secured

13  parties ultimately will benefit, some creditor will benefit.

14          THE COURT:  All right.  Does anybody object to the

15  Receiver attempting to collect and further investigate the

16  status of accounts receivables in this interim period?

17          ATTORNEY: (Not ID'd on log sheet) Your Honor, I --

18          THE COURT:  Yeah, go ahead.

19          ATTORNEY:  The only thing -- yeah -- I think the

20  only issue that was raised at hearing from the secured

21  creditors' side was that which the secured creditors would

22  willingly pay for or allow their collateral to be used for,

23  and that was those direct sale expenses.

24          The only objection to having a larger role on the

25  part of the Receiver as Custodian to do other things was on

1    the part of (unclear) that former counsel.   But we did not

2    -- we were not consenting to the use of our -- what we deemed

3    to be our cash collateral, which this estate is in possession

4    of, to pay for investigations or ongoing administrative

5    expenses of this proceeding unless we work something out.

6            So we didn't object to their dunning people for

7    receivables.  We simply said our 200 and -- what we think are

8    our 260 head of cattle, if they're sold, you pay those

9    expenses in the protocol order, and everything else goes into

10   -- goes into escrow until we work out a funding mechanism, if

11   one can be worked out, for the Receiver.

12           THE COURT:   Well, go ahead.

13           ATTORNEY (Not ID'd on log sheet) MR. LaTOUR? OR MR.

14   KING?:   Your Honor, I think that we're talking about the

15   time period between now and the appointment of a Trustee.

16           During that time period the only reservation that

17   Fifth Third Bank would have would be that significant

18   compromises of the claims not occur, so that if it's

19   something that should be noticed under 9019, that that would

20   happen; but if it's account reconciliation or clean-up, that

21   sort of thing, it makes sense to me to collect for the

22   accounts receivable.

23           THE COURT:   Are you compromising the accounts?

24           MS. LYNCH:   No, sir.

25           THE COURT:   So you're not entering into deals to

1    take fifty per cent or whatever?

2              MS. LYNCH:    No.

3              THE COURT:    You're just --

4              MS. LYNCH:    I -- it -- it would be all I called,

5    defined as "identification and validation."

6              THE COURT:    All right.  You can continue to do

7    that.  Or you can begin again doing that, or -- let's don't

8    do any on-site visits, though, because unless they -- unless

9    the banks come to an agreement and they're willing to pay for

10   them.

11             But if the banks don't come to an agreement -- if

12   the secured lenders don't come to an agreement to fund this

13   (unclear) Trustee, I'll be looking for your motion, Mr.

14   Wharton, to convert the case.

15             MR. WHARTON:    Or perhaps and/or dismiss.  And

16   perhaps right back to the state court Receiver.

17             THE COURT:    One or the other, but we can't operate

18   a Chapter 11 if we don't -- if we're not going to have a

19   carve-out for a Trustee.  I mean, particularly in a situation

20   where the Court has no choice but to appoint a Trustee when

21   there's no op -- nobody there running the store, and there's

22   80 million dollars of bad checks out -- floating -- we have a

23   Trustee.   The integrity of the system demands it.   There

24   has to be a neutral party in charge.

25             So I have no choice in that way.  It would either

1   be an Interim Trustee, a Receiver, or a Chapter 11 Trustee,

2   and that's something the parties should keep in mind as

3   they're negotiating.

4        Okay, anything else today?   Yes.

5        ATTORNEY (not ID'd on the log sheet):   Your Honor,

6   I just wanted clarification.  There is a motion before you

7   that I don't think you've ruled on -- the motion to operate,

8   pending the appointment of a Trustee.  I think I know what

9   you're going to rule --

10       THE COURT:   Oh, I'm granting that motion.

11       ATTORNEY:   Okay.  You said --

12       THE COURT:   I'm sorry.

13       ATTORNEY:   You haven't said the words yet.

14       THE COURT:   I probably have not said the words,

15  but I am granting that motion.

16       We have a -- there was a motion filed also for

17  relief from stay.  Was that your motion, Mr. Meyer?

18       MR. MEYER:   Yes.  (unclear, not near microphone)

19       THE COURT:   And that's been --

20       MR. MEYER:   Yeah, it was filed about a half an

21  hour ago.

22       THE COURT:   Filed about a half an hour ago?  Well,

23  I'm right on top of these matters, with a little assistance.

24       (Pause)

25       ATTORNEY:   (unclear, not near microphone) this

1  one?  Because if he grants this one, this has an authority to

2  pay.  (unclear) determine which -- (unclear) which order,

3  which motion was being granted, (unclear) docket number.

4       MS. LEWIS:  I'm assuming this is my motion of the

5  Receiver to --

6       THE COURT:  There was a new one --

7       MS. LEWIS:  (unclear) with respect to --

8       ATTORNEY:  Your Honor, the only reason I mentioned

9  this Docket #52, that motion was -- the payment by the

10  Receiver costs, for which there may not be any money.

11       MS. LEWIS:  Well, there *is* money.  It's a question

12  of (unclear) Receiver's bank account, and I guess the real

13  question is whether or not we're going to be refusing to

14  consent to that, or whether or not the Court can order the

15  approval of that motion out of the money that is in the

16  Receiver's account, which would come out --

17       THE COURT:  I'm only granting -- I'm only order --

18  allowing the Receiver to operate in the pre-appointment

19  period.  I'm not ruling on -- I'm not authorizing the payment

20  of the Receiver.  As I said earlier, that would have to be

21  done by agreement -- are you talking about the budget?

22       MS. LEWIS:  I'm talking about, Your Honor, the

23  budget, which is the employees --

24       THE COURT:  Oh, the budget,

25       MS. LEWIS:  -- because we will have to go back

1  across the street and ask all the employees to leave, because

2  I can't ask the Receiver --

3          THE COURT:   No, I am authorizing the budget.   If

4  they can't come to an agreement to pay that -- if they won't

5  fund that, then you go -- then you shut it down because you

6  don't have any money to operate.   But I'm authorizing you to

7  expend those monies, if you have those monies.

8          MS. LEWIS:   Thank you, Your Honor.

9          ATTORNEY:   Ms. Lewis, you have those.

10          ATTORNEY:   You have the money.

11          MS. LEWIS:   We have -- we have approximately

12  $700,000 in a bank account, which we will be using to make

13  payroll tomorrow and make the expenses that were listed on

14  the attached budget.

15          MS. LYNCH:   And just -- just for the record, that

16  does not include the money from the proceeds of the disputed

17  cattle, which were sold first.   Those are in a separate

18  account.

19          THE COURT:   All right.

20          ATTORNEY:   Thank you.

21          MS. LYNCH:   Thank you.

22          THE COURT:   Okay, yeah, then you pay those

23  amounts.

24          MS. LEWIS:   Thank you, Your Honor.

25          THE COURT:   All right.

1          MS. LEWIS:   And I am not aware of the relief from

2    stay motion, Your Honor.

3          THE COURT:   Well, I didn't think anyone would be.

4    I was just going to look, as far as calendaring -- yep --

5    now, Mr. Morris, you filed a refusal to waive with that?

6          MR. MORRIS:   That's correct, Your Honor.

7          THE COURT:   Are you busy on the 24th?

8          MR. MORRIS:   Your Honor, I will be here, or

9    somebody will be here (unclear)

10         THE COURT:   Well, it's going to have to be next

11   week or the 12th of January.

12         MR. MORRIS:   The 12th of January is fine, Your

13   Honor.

14         THE COURT:   All right, we'll do it the 12th of

15   January.

16         MR. MORRIS:   What time, Your Honor?

17         THE COURT:   Let's say ten a.m.

18         MR. MORRIS:    Thank you.

19         THE COURT:   And that will be also an omnibus day

20   in this matter.   Any other motions that are filed between

21   now and then will be scheduled for the 12th of January at ten

22   a.m.

23         MS. LEWIS:   Your Honor, if I may, I am hopeful

24   that the secured creditors in this case will come together

25   and come up with a proposal for funding the Chapter 11, and I

1   wanted to raise that to the Court because I would expect that

2   if there is a proposal, that you would need to seek more

3   immediate relief from the funding of the case sooner than

4   that.  So I wanted to at least alert the Court to that fact.

5           THE COURT:   We can do it on an emergency basis.

6   Probably we'll do it telephonically.

7           MS. LEWIS:   Okay. Thank you, Your Honor.

8           THE COURT:   All right, anything else?  Okay.

9   We're adjourned.

10          ATTORNEYS:   Thank you, Your Honor.

11  (End at 2:56:15 p.m.)

12                  * * * * * * * * * * *

13          I certify that the foregoing is a true and accurate

14  transcript from the digitally sound recorded record of the

15  proceedings.

/s/ *Gloria C. Irwin*                                    1/5/2011

**GLORIA C. IRWIN**
**Certified Transcriber NJ AOC200**                                    **Date**
     **Federal  CERT #122**
**GCI TRANSCRIPTION SERVICES**
**210 Bayberry Avenue**
**Egg Harbor Township, NJ  08234-5901**
**609-927-0299  1-800-471-0299**
     **FAX  609-927-9768**
**e-mail  irwingloria@comcast.net**
✔