## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF INDIANA - NEW ALBANY

==============================

IN THE MATTER OF:        .  Case #10-93904-BHL-11
.
EASTERN LIVESTOCK CO., LLC  .  New Albany, Indiana
.  **August 22, 2011**
Debtor  .  1:51:25 p.m.

==============================

## TRANSCRIPT OF TELEPHONIC HEARINGS RE:
## CONTINUED STATUS CONFERENCE ON:
## (#501) TRUSTEE JAMES KNAUER'S MOTION FOR AUTHORITY (TRUSTEE'S PURCHASE MONEY CLAIMS REPORT, MOTION TO TRANSFER FUNDS, AND NOTICE OF RELEASE OF PROCEEDS FROM ACCOUNT, WITH OBJECTIONS AND AMENDED OBJECTIONS AND RESPONSES THERETO FILED;
## CONTINUED TELEPHONIC HEARING ON:
## (#616) MOTION TO QUASH ORDER GRANTING MOTION FOR 2004 EXAMINATION UPON THE US DEPARTMENT OF AGRICULTURE, GRAIN INSPECTION, PACKERS & STOCKYARDS, FILED BY USDA GRAIN INS.;
## (#630) RESPONSE IN OPPOSITION TO [#616] FILED BY FLORIDA ASSOCIATION LIVESTOCK MARKET;
## (#634) MOTION TO EXTEND TIME TO FILE THE GIBSON TRUSTEE'S PURCHASE MONEY CLAIMS (SECOND EXTENSION) FILED BY KATHRYN FRY;
## (#664) TRUSTEE JAMES KNAUER'S MOTION FOR ORDER APPROVING LEASE BY AND BETWEEN TRUSTEE AND REPUBLIC BANK & TRUST CO.
## BEFORE THE HONORABLE BASIL H.  LORCH, III, J.U.S.B.C.

**APPEARANCES: (See Next Page)**

Electronic Sound Recording Operator:    Amy Bruckert

Proceedings Recorded by FTR Gold Digital Sound Recording
Transcript Produced by Certified Transcription Service

## GCI TRANSCRIPTION SERVICES
**210 Bayberry Avenue**
**Egg Harbor Township, NJ  08234-5901**
**1-609-927-0299    FAX 1-609-927-9768    1-800-471-0299**
**e-mail - irwingloria@comcast.net**

Page 2 Cover
#10-93904
8-22-2011

**APPEARANCES:**

For Petitioning Creditors, Moseley Cattle
Auction, Moseley Cattle Auction, et al:

JOHN W. AMES, ESQ.
C.R. "CHIP" BOWLES, ESQ.
CHRISTIE A. MOORE, ESQ.
Greenebaum, Doll & McDonald, PLLC
3500 National City Tower
101 S. 5th Street
Louisville, KY 40202

For Republic Bank & Trust Company:

ALLEN L. MORRIS, ESQ.
Stites & Harbison, PLLC
323 E. Court Avenue
Jefferson, IN 47131

For Fifth Third Bank:

RANDALL D. LaTOUR, ESQ. *(Via phone)*
Vorys, Sater, Seymour & Pease, LLP
52 East Gay Street
Columbus, OH 43216

For First Bank & Trust Company:

STEPHEN A. WEIGAND, ESQ. *(Phone)*
DANIEL J. DONNELLON, ESQ.
Faruki, Ireland & Cox, PLL
201 East Fifth Street   Suite 1420
Cincinnati, OH 45202

For Peoples Bank:

DAVID LAIRD, ESQ. *(Via phone)*
1400 16th Street   6th Fl.
Denver, CO 80202
------------ continued------------>

Electronic Sound Recording Operator:   Amy Bruckert

Proceedings Recorded by FTR Gold Digital Recording
Transcript Produced by Certified Transcription Service

GCI TRANSCRIPTION SERVICES
210 Bayberry Avenue
Egg Harbor Township, NJ 08234-5901
1-609-927-0299      FAX 1-609-927-9768      1-800-471-0299
e-mail - irwingloria@comcast.net

Page 3 Cover
#10-93904
8-22-2011

**APPEARANCES: (continued)**

For First Bank & Trust Company:        JOHN R. CARR, III, ESQ.  *(Via phone)*
        BRET S. CLEMENT, ESQ. *(Via phone)*
        Ayers, Carr & Sullivan, P.C.
        251 E. Ohio Street   Suite 500
        Indianapolis, IN   46204

For Bluegrass Stockyards, LLC, and related entities:        LAURA DAY DELCOTTO, ESQ.
        DelCotto Law Group, PLLC
        200 North Upper Street
        Lexington, KY 40507

For Cactus Growers, Inc.:        JOHN HUNT LOVELL, ESQ. *(Phone)*
        Lovell, Lovell, Newson & Isern, LLP
        112 W. 8th Avenue   Suite 1000
        Amarillo, TX 79101

For J&F Oklahoma Holdings, Inc.        DAVID L. LeBAS, ESQ. *(Via phone)*
        Namen, Howell, Smith & Lee, PLLC
        Suite 490
        8310 N. Capital of Texas Highway
        Austin, TX    78731

For Stockman Oklahoma:        ROSS PLOURDE, ESQ.   *(Via phone)*
        McAfee & Taft, P.C.
        211 N. Robinson Ave.
        Oklahoma City, OK 73102
        ---------continued ----------->

Electronic Sound Recording Operator:   Amy Bruckert

Proceedings Recorded by FTR Gold Digital Recording
Transcript Produced by Certified Transcription Service

GCI TRANSCRIPTION SERVICES
**210 Bayberry Avenue**
**Egg Harbor Township, NJ  08234-5901**
**1-609-927-0299      FAX 1-609-927-9768      1-800-471-0299**
**e-mail - irwingloria@comcast.net**

Page 4 Cover
#10-93904
8-22-2011

**APPEARANCES - Continued**

For Chapter 11 Trustee, James Knauer:

TERRY E. HALL, ESQ.
KEVIN TONER, ESQ.
Baker & Daniels
300 N. Meridian Street   Suite 2700
Indianapolis, IN 46204

Chapter 11 Trustee:

JAMES A. KNAUER, ESQ.
Kroger Gardis & Regas, LLP
111 Monument Circle   Suite 900
Indianapolis, IN   46204

For CPC Livestock:

JESSICA E. YATES, ESQ.   *(Via phone)*
Snell & Wilmer, LLP
1200 Seventeenth Street   Suite 1900
Denver, CO   80202

For Florida Livestock Markets and
Creditors:

W. SCOTT NEWBERN, ESQ. *(Via phone)*
2982 E. Giverny
Tallahassee, FL 32309

For Superior Livestock Auction and
Joplin Regional Stockyards:

JOHN M. ROGERS, ESQ. *(Via phone)*
Rubin & Levin, P.C.
500 Marott Center
342 Massachusetts Avenue
Indianapolis, IN 46204-2161

For Russell deCordova d/b/a deCordova
Cattle Company:

JEFFREY R. ERLER, ESQ. *(Via phone)*
1500 One McKinney Plaza
3232 Mc Kinney Avenue
Dallas, TX 75204

----------continued-------->

Electronic Sound Recording Operator:   Amy Bruckert

Proceedings Recorded by FTR Gold Digital Recording
Transcript Produced by Certified Transcription Service

GCI TRANSCRIPTION SERVICES
**210 Bayberry Avenue**
**Egg Harbor Township, NJ  08234-5901**
**1-609-927-0299     FAX 1-609-927-9768     1-800-471-0299**
**e-mail - irwingloria@comcast.net**

Page 5 Cover
#10-93904
8-22-2011

**APPEARANCES: (continued)**

| | |
|---|---|
| For Kathryn Pry RE: Gibson: | DEBORAH J. CARUSO, ESQ. *(Via phone)* |
| | Dale & Eke, P.C. |
| | 9100 Keystone Crossing,   Suite 400 |
| | Indianapolis, IN 46204 |
| | |
| For Michael Walro Trust in East West Trucking: | CHRIS TRAPP, ESQ. *(Via phone)* |
| | |
| For William Downs: | ANDREW D. STOSBERG, ESQ. |
| | Lloyd & McDaniel |
| | 11405 Park Road, Suite 200 |
| | Louisville, KY 40223 |
| | |
| For Coffeyville Livestock Market, LLC: | WILLIAM E. SMITH, III, ESQ. |
| | Kightlinger & Gray, LLP |
| | Bonterra Building, Suite 200 |
| | 3620 Blackiston Boulevard |
| | New Albany, IN 47150 |
| | |
| For Bank First Financial Services and Edward Strickland: | ERIC REDMAN, ESQ. |
| | |
| For National Cattlemen's Beef Association: | ALI DECINE, ESQ. |
| | |
| For Indiana Department of Revenue: | COURTNEY SCOTT, ESQ. |
| | |
| For U.S. Department of Agriculture: | MARGARET SCHUTTE, AUSA |
| | |
| Electronic Sound Recording Operator: | Amy Bruckert |

Proceedings Recorded by FTR Gold Digital Recording
Transcript Produced by Certified Transcription Service

GCI TRANSCRIPTION SERVICES
210 Bayberry Avenue
Egg Harbor Township, NJ  08234-5901
1-609-927-0299      FAX 1-609-927-9768      1-800-471-0299
e-mail - irwingloria@comcast.net

1 (At 1:51:25 p.m.)

2          THE COURT:   Good afternoon.   Be seated.   All

3 right, we're on the record in the matter of Eastern Livestock.

4 The courtroom deputy has already taken the appearances of

5 those appearing on the phone.   I would just ask and remind

6 those on the phone and here to state your name before you

7 speak so that we can try to make a record and hold you

8 accountable for what you say.

9          The other matter about those on the phone is don't

10 put us on hold, and please keep your phone on mute unless you

11 intend to speak.

12          Would we have the attorneys in the courtroom state

13 the appearances, please?

14          MS. HALL:   Terry Hall and Kevin Toner for the

15 Trustee of the debtor's estate, and we have Jim Knauer,

16 Trustee.

17          MR. BOWLES:   Chip Bowles, Christie Moore, and John

18 Ames -- Greenebaum, Doll & McDonald, for Superior Livestock,

19 Joplin, and several other clients, Your Honor.

20          MR. LaTOUR:   Good afternoon, Your Honor.   Randall

21 LaTour from Vorys, Sater, Seymour & Pease representing Fifth

22 Third Bank.

23          MS. DELCOTTO:   Good afternoon, Your Honor.   Laura

24 Day Delcotto appearing for Alton Darnell, Blue Grass

25 Stockyards of Campbellsville, Blue Grass Stockyards of

1  Richmond, Blue Grass Stockyard 8, Blue Grass Naples

2  Stockyards, Blue Grass South Livestock Market, East Tennessee

3  Livestock Market, Piedmont Livestock Company, Southeast

4  Livestock Exchange, and in the Friona Interpleader, all of

5  those parties, in addition to Moseley Cattle Auction.

6          MR. DONNELLON:   Good afternoon, Your Honor.   Dan

7  Donnellon for First Bank & Trust.

8          MR. STOSBERG:   Good afternoon, Judge.   Andrew

9  Stosberg on behalf of Willie Downs.

10          MR. SMITH:   Bill Smith on behalf of Coffeyville

11  Livestock Market, LLC.

12          MR. MORRIS:   Allen Morris on behalf of Republic

13  Bank & Trust, Your Honor.

14          THE COURT:   All right.   We have an agenda which I

15  hope you all have seen.   The first matter I show is the

16  Trustee's motion to transfer funds, and the variety and extent

17  -- extensive objections and responses filed thereto, going up

18  to KK; and I'm not sure that includes everything filed today.

19          Let's -- I've read your pleadings, including I think

20  most of which was filed today -- maybe I'm not quite current

21  either, but there seems to be some common themes that run

22  through this dispute.   And I guess the issue, the first issue

23  as far as the Court is concerned is whether or not we need a

24  -- some sort a preliminary determination of fact and/or law

25  in order to resolve this matter.

1          The -- you know, the parties have raised -- I'm not

2     going to try to remember off the top of my head all the

3     different objections; but I guess the first question is:

4     Specifically, which of those issues that *have* been raised --

5     you know, whether or not the debtor held these funds in trust

6     because of some definition -- whether or not only a small

7     portion of these proceeds for the debtors is a commission --

8     you know, the -- which of these in any party's -- by any

9     party's assertion -- would require a factual determination by

10    this Court?

11          Ms. Hall, do you want to take a first stab at that?

12    I know your opinion is different than most other people's in

13    the room, but --

14          MS. HALL:  I'm not convinced of that.  Your Honor,

15    I think it would be helpful if we just -- and I'll try not to

16    take too much of the Court's time, because I know there are

17    some issues that are specific that people in the room who

18    don't have an interest in this issue at all, so I'll try to

19    move quickly through here.

20          The Court may remember that this whole matter

21    started with the very, very, very early motion filed by the

22    Trustee in the case to complete cattle sales and allow the

23    estate to bring in funds from people who the estate had sold

24    cattle to who owed the estate money but to whom other people

25    were saying, "No, you need to pay me," and yet those people

1  felt that they needed to pay the estate.

2         So we offered a motion that was approved by the

3  Court that allowed the estate to finish those sales of cattle,

4  receive those proceeds into the estate, indemnify the person

5  who was providing them to us.   In other words, do not get --

6  not get more interpleaders filed while we had a bankruptcy

7  case going on.

8         And then we started giving opportunity to people in

9  the case to raise specifically why they believed they had a

10 claim to these kinds of proceeds, these particular

11 transactions superior to the estate.  In other words, if they

12 had a particular transaction and they pled the facts, or if

13 they had a particular transaction and they pled the law that

14 said, "Here's why this belongs to us and not to the estate,"

15 and the Trustee -- you wouldn't know it from the pleadings,

16 but the Trustee had a fiduciary duty to all the parties in the

17 case, and his duty is to get as much recovery for all persons.

18        Anytime you have a particular party that's going to

19 take funds out of the property of the estate, that reduces the

20 recovery for everyone.

21        So first, we gave people an opportunity to object to

22 the cattle sales motion.  Then we gave people an opportunity

23 to file a claim specific to those proceeds.   That was the

24 purchase money claim bar date.   Then we gave people an

25 opportunity to file a general claim.   Then we gave people an

1  opportunity to file a notice when we listed -- we went through

2  all the claims.  Nobody pled in particularity why any of these

3  accounts belonged to them and no one else.

4        We gave them an opportunity to file an objection.

5  People filed *general* objections and said, "Well, I may, but I

6  don't know, so I need more information."   So we gave them

7  more time.  We filed more information.  We gave them access to

8  that data base.   We gave them another opportunity to file an

9  objection, and according to the Court's order plead with

10  particularity the facts and the law as to why they would have

11  a claim to those proceeds outside of property of the estate.

12        You need to remember that all we're trying to do is

13  to remove property from escrow and just leave it in the

14  general estate.  We're not trying to move it to Fifth Third at

15  this point.  If there is a dispute over the proceeds between

16  Fifth Third and somebody else, that's not part of this

17  proceeding right now.

18        Then we gave them -- so we had four more people file

19  objections, but again they didn't plead any particularity, law

20  or facts -- as to why any of these accounts belong to *them* and

21  not the general creditors of the estate.

22        So then we had late-filed objections, again pleading

23  general law that we take exception to, including the letter

24  that was filed today, because it's misrep -- in our opinion,

25  misrepresenting the law related to how Eastern operated under

1  GIPSA.

2          You may also remember that people objected on the

3  basis of asserting they might have a state lien, or they might

4  have an agricultural lien, or they might have particular state

5  law that applied to their particular state transaction.  And

6  yet no one pleaded that.  No one filed a claim about it.  No

7  one filed an objection about it; and saying that you didn't

8  know the specific facts, and you needed more information from

9  the Trustee, you certainly didn't need to know the state that

10 might apply, because they're in charge of the transaction.

11 They know what state they sold the cattle in, and if there was

12 a state law or a state lien that applied, they should have

13 pled it.  It didn't get pled.

14          So the question from the Court is, is there a

15 factual determination -- and I guess one more point.  People

16 will raise the issue of constructive law, that outside of

17 bankruptcy, because there was fraud involved, that there may

18 be a constructive law claim that people could raise.  The

19 Trustee in its response to the first wave of objections laid

20 out the law the way the Trustee understands it, as to how

21 common constructive trust applies or doesn't apply in

22 bankruptcy.  It's the Trustee's position it doesn't apply in

23 bankruptcy.

24          No one responded to that legal brief.  They had an

25 opportunity to respond to it.  No one responded.

1    So while I understand that there is frustration

2  among the parties related to "we don't know all the facts,"

3  the difficulty that the Trustee has is that we have given

4  opportunity -- the estate has afforded opportunity after

5  opportunity after opportunity for people to plead specifically

6  why something that belongs to the estate belongs only to them

7  and not to any other creditors, and no one's taken that

8  opportunity.

9    Now we have agreed when people identify the specific

10 account, even though we don't particularly agree with their

11 legal basis, if they've complied somewhat with what the

12 Trustee and the Court had asked them to do, we agreed to set

13 those transactions aside; and we are proceeding down, in a

14 contested matter, with those particular people.

15    But to now step back and say, "You're not going to

16 be -- you can't do anything until we set forth another set of

17 pleadings or another set of briefings related to constructive

18 trust or some state statutory lien, or a UCC filing, or, you

19 know, a simple reading of a definition of GIPSA," when it's

20 -- the facts really aren't in dispute, on addition to the idea

21 that, "You may not have known everything that the ELC did, but

22 you certainly knew what your own people did when they sold the

23 cattle; and if you had some facts or some law that supported

24 why you should recover above anybody else in the estate, then

25 you certainly had five separate opportunities to lay that

1  before the Court."

2          We also need to remember that the only thing that

3  we're trying to do is to remove -- remove these monies from a

4  separate set-aside escrow account that we kept there for

5  people to have the opportunity to say why it couldn't belong

6  to the estate and just release it into the estate.  We're not

7  trying to move it anywhere else.

8          THE COURT:  So to that extent is your motion kind

9  of like a 363 sale in that you would tr -- you would change

10  the character of the asset, but subject to any liens and

11  encumbrances that might exist on it?

12          MS. HALL:  That's what it says.

13          THE COURT:  In other words, are they prejudiced by

14  asserting a lien or a right to these monies just because

15  they've been transferred out of that escrow account into the

16  bankruptcy estate?

17          MS. HALL:  Well, Your Honor, I don't think so.

18  There's a separate part under our cash use order that says if

19  we take the money anywhere else we have to, you know, do

20  something with it.

21          Now we -- we've already transferred 1.6 million

22  dollars.  Nobody objected to that.  And that money is being

23  used under cash use and DIP motion for operating the estate;

24  but I believe our Cattle Proceeds Sale motion said that it

25  would be -- you give us this, and it's subject to all liens,

1  claims, and encumbrances that may exist.

2          So I don't think it's going to -- I don't think it

3  prejudices anybody, but we have -- I guess there's a-- I

4  understand the frustration on the part of the cattle sellers;

5  but as far as we can tell, this was an industry that sort of

6  ran on a handshake and a trust -- and I don't mean a "trust"

7  statutorily.  I just mean trust.

8          And unfortunately, the statutes and the regulations

9  don't provide an omnibus trust for everybody that deals in

10  this industry.  It's just some very specific types of

11  transactions, and ones that we were not involved in.

12          THE COURT:  Well, that's what they say is a legal

13  conclusion on your part, that they disagree with.

14          MS. HALL:  Well, Your Honor, they had -- they had

15  five opportunities to tell us why -- to plead that in their

16  objections.  But that's not what they do.   They simply use

17  the term "market agency," and that's where we've come down to

18  now.  Everybody agrees, I think, that we're not a packer.

19          THE COURT:  Everybody agrees with --

20          MS. HALL:  Or a poultry dealer.

21          THE COURT:   -- you're -- whether you're a dealer or

22  a market agency, is that a determinative fact?

23          MS. HALL:  The difficulty is, the term "market

24  agency" has two different definitions.   "Market agency,

25  buying on commission," and "market agency, selling on

1  commission." We don't think there's any evidence that we've

2  found so far that we were ever a market agency, period. But

3  assuming that we were, we weren't a market agency selling on

4  commissions.

5         So the regulations and the statutes that they're

6  citing regarding custodial trusts applies only to a market

7  agency selling on commission. Like Superior. Like Joplin.

8  Like the auction houses. That's what an auction house does.

9  We weren't an auction house. We were simply a dealer. And

10  Mr. Akers, the CEO of Blue Grass, in his article that we

11  attached to our responses, very clearly lays that out. He

12  says that, you know, "farmers and producers, ranchers who sell

13  their cattle can sell it through a market agency like mine --

14  like Blue Grass -- and be protected by a custodial account.

15  Or you can sell it to a dealer, like Eastern. And

16  unfortunately, your only remedy is the bond."

17         The other -- the other part of this is that this was

18  in an regulated industry under GIPSA, and under the Packers &

19  Stockyards Act. GIPSA, every year Eastern would file its

20  annual report. GIPSA would come in and investigate whether

21  their bond was big enough. GIPSA never said, "You have to

22  have a custodial account." GIPSA never said, "Where *is* your

23  custodial account?" Eastern never had a custodial account.

24  We're a dealer. That's it. We had a bond. We were a dealer.

25  And if you dealt with us and you let your cattle go where you

1  got good funds, I'm sorry, but that's what happens when

2  dealers fail.

3          And when the bankruptcy was filed, you have to go

4  with what the law says; and the law says that we -- we, as the

5  debtor, if people owe us money it goes into the estate for the

6  benefit of all creditors; and we're not allowed to prefer --

7  although Mr. Gibson apparently did, and we'll have to address

8  that at some time in the case -- certain people, and pay them.

9          We are trying to recover for everyone, and every --

10 every person who continues to fight this and use up estate

11 resources on a very simple issue of law, its one definition,

12 is wasting the assets of the estate that could go to pay the

13 creditors.

14          So all -- we're not trying to take things away from

15 people; and, you know, the estate -- this case is kind of

16 strange because we are essentially in a claims resolution

17 process litigating in four interpleaders and in this motion.

18 And that's --

19          THE COURT:   All right.

20          MS. HALL:   -- essentially what we're doing.

21          THE COURT:   Okay.   Who wants to address this

22 issue?

23          MR. LaTOUR:   Your Honor, Randall LaTour for Fifth

24 Third Bank.

25          You asked two questions I'd like to address.   I'd

1   like to expand on one point that Ms. Hall made in response to

2   your question on market agencies.

3           It is not determinative of the custodial

4   characterization or trust characterization if you say that

5   Eastern Livestock is a market agency.  That is, by itself,

6   not determinative.  You have to determine, was the market

7   agency selling on commission, or a market agency buying on

8   commission, or something else?  And the something else would

9   be a dealer or one of the other characterizations that are

10  being thrown around by some of the other creditors.

11          In addition, there are two statutory bases for

12  custodian/trust characterization under the Packers &

13  Stockyards Act, and nobody that has objected, or anyone else,

14  has ever said that Eastern is a packer or engaged in selling

15  poultry; so that leaves us solely with the basis established

16  in 9 CFR 201.42, and it says that,

17              "A payment that a livestock buyer makes to a market

18              agency selling on commission is a trust fund."

19  When you give a money to a market agency selling on

20  commission, those monies are a trust fund until you get what

21  you are supposed to buy:   The cattle.

22          In today's motion we're talking about cattle that

23  got delivered and got paid for.   So this 9 CFR 201.42(a) is

24  completely in apposite.   So on the undisputed facts of

25  today's controversy, there is no Packers & Stockyards Act

1  custodian account or trust account issue because nobody was a

2  livestock buyer that paid to a market agency selling on

3  commission that failed to get their cattle, on today's

4  controversy.

5        There's plenty of other controversies where the

6  facts are different, but on today's controversy, we're talking

7  about cattle that got delivered and paid for, which means that

8  9 CFR 201.42(a) is not applicable.  It can't be.

9        And so your first question was, "Could you resolve

10 today whether there is a statutory trust imposed by the

11 Packers & Stockyards Act?"  With respect to these monies that

12 are being discussed today, the answer to that is Yes.  You can

13 dispose of it because it's impossible to have a trust

14 characterization imposed because none of the three conditions

15 -- or three situations eligible are even being alleged by

16 anybody.  So those are not there.

17       Now the question of, "Well, is it a small portion

18 instead of all?"  Okay.  These are transactions in which the

19 party who paid thought they were dealing with Eastern because

20 they had contracts with Eastern, they paid the money to

21 Eastern.  And so any way you shave that to say, "Well, maybe

22 it's some, maybe it's all, maybe it's part," it's at least

23 property of the bankruptcy estate.   Those monies are at least

24 property of the bankruptcy estate.

25       But if somebody's going to carve something out of

1  that, they're going to have to do it in some manner other than

2  what we're talking about today.  They're going to have to file

3  an adversary of their own to determine, and they're going to

4  have to meet a burden of proof to determine that those monies

5  are not Eastern's, in the face of what is apparently the

6  agreement between Eastern and the buyer.

7        Now I am disheartened, again, to hear that the money

8  is really not going to Fifth Third, it's going into this

9  account; but it seems to me that rather than having the sort

10 of shadow boxing that's going on, we ought to take those

11 issues head on.  If it goes into th at account -- to answer

12 your question, "Is it prejudicing anybody in any of these

13 other proceedings?"  No.  It's not.  "Does Fifth Third get it

14 immediately?"  No, they don't.  We'll probably have to have

15 the resurrection of this proceeding, you know, another -- yet

16 another time.

17        But there is really no reason today not to grant the

18 Trustee's motion.

19        MS. DELCOTTO:  Your Honor, I have tried to have

20 many discussions with Ms. Hall and tried to come up with

21 common themes of fact.  I mean, I hear you say month after

22 month that we need to come up with these protocols; and I

23 think all the lawyers agree with that, but we have not been

24 able to accomplish anything.  So I have clients who have some

25 interest in adversaries and some interest in this money, and

1  the reason we can't grant this motion today is just a

2  fundamental 541(b), which is what is property of the estate?

3  And that has just got to be by an adversary.

4        So there have been discussions, do we need one big

5  giant declaratory judgment adversary to determine property of

6  the estate.  Some of the other creditors who are frustrated

7  have tried to work up proposals of common legal issues.  What

8  -- how is Eastern acting factually, which then will determine

9  what is Eastern's rights in the money?

10        Eastern called itself a broker.  Fifth Third's

11  representative in state court -- which, by the way, that

12  action is still actively proceeding, which nobody in the

13  bankruptcy is even aware of -- Fifth Third has given one

14  deposition in the state court action where the witness says

15  Fifth Third thought Eastern was a broker.

16        Well, the definition of a broker is somebody who

17  buys and sells on commission; and a broker does not own 100

18  per cent of the money that passes through their hand.   A

19  broker owns their commission fees.

20        So I feel like everybody's being prejudiced if you

21  grant this motion today because you're basically saying it's

22  property of the estate, and it's Fifth Third's cash

23  collateral, which then to me wipes out all the arguments about

24  what is Eastern's rights in the money?  And I feel like that's

25  -- we've got procedural complexity, we've got factual

1  complexity, and we've got legal complexity, and -- I mean, I

2  know how to file ten adversaries, and I will, if that's the

3  direction the Court gives today.

4        I'd like to get some direction today about whether

5  we're going to do formal discovery, and we're going to all

6  litigate, and whoever wants to file an adversary, just file

7  it; or whether we're going to come up with some kind of

8  protocol because we've got people trying to intervene in one

9  adversary, and people saying, "You don't belong in that one,"

10 and I'm trying to figure out if somebody's going to do

11 document requests and production in an adversary, how am I

12 supposed to get my hands on those documents?

13        So I hope we can get some guidance today, Your

14 Honor, but I do feel like that this motion is just

15 procedurally improper and should be denied.

16        MR. DONNELLON:    Thank you, Your Honor.    Dan

17 Donnellon on behalf of First Bank.    There's three points I

18 want to make, and I'll try to be brief with the Court.    The

19 first is what my role is in making these -- the objections

20 that we filed; and the second will be to get to the heart of

21 the question about is this really a 363 change of character,

22 and the third is, What are we trying to accomplish with the

23 transfer of this money?

24        With respect to the first, my client objected to

25 four specific transactions, and it was my understanding that

1  the 670 -- $680,000 of that was going to be off limits for any

2  transfer.  That was the arrangement that I had with Ms. Hall

3  and with Mr. Knauer, and we had filed our August 1, very

4  specific as we could, identification of those particular

5  transactions.

6          The more recent supplemental objection we filed, it

7  was simply to draw the Court's attention, regardless of what

8  happens with those four transactions -- we are in a situation

9  where we have the cart clearly before the horse here with

10  respect to this money, the interpleader money, the money that

11  was in Eastern's account before the Receiver took over; the

12  money that was in Eastern's account before the petition was

13  filed -- it's all the same money -- it's money that was

14  collected by this broker/dealer/clearer/market agent --

15  whatever you want to call them, and it's all the same money,

16  and we shouldn't be treating any of it differently from one

17  respect to another.

18          After the last proceeding -- and probably a well-

19  deserved name -- I was given the title of "the person who

20  objects to everything," because we objected to Mr. Dietrich

21  being paid, solely because of the procedural complexity of

22  that, we're adding a new layer, and we didn't -- as I said,

23  before you, we didn't mind Mr. Dietrich getting at his

24  $50,000.  Somebody should get some money here.

25          But the problem was, to piecemeal carve out

1  individual things was what I said I objected to, and I took on

2  the mantle before Your Honor saying, "I'll start submitting a

3  protocol to get the low-hanging fruit out of the way," and I

4  tried to do that, to identify a procedure we would follow and

5  identify threshold issues we could brief.  And I got one

6  response from Fifth Third that rebuffed the process, and no

7  response from anybody else.   And so, yeah, I object to that

8  as well.

9         But I'm trying to move this forward in a way that we

10  can identify money and get people paid, and I'm not getting

11  anywhere with it.

12         Second, let's talk about this particular transaction

13  in itself, and why it shouldn't be treated as just a 363, is

14  what I believe Your Honor referred to.   Ms. Hall said, "We're

15  trying to recover for everyone," was, I believe I tried to

16  write down as close as I could, "We're trying to recover money

17  for all creditors of the estate."

18         But the motion that was filed on May 23rd doesn't

19  say that.  It says, "Nobody has any interest in this money

20  except Fifth Third.  It's not that we're trying to recover

21  everybody.  This motion says, 'This is Fifth Third's money,'

22  and no one has any interest in it because it's an accounts

23  receivable.  All the money belonged to Eastern -- every penny

24  of it, whether it was a commission or a clearing fee at fifty

25  cents per hundredweight, or whatever else it was, it all

1   belongs to Fifth Third, and we want it transferred now."

2           And that's why we have the cart before the horse.

3   Ms. Hall referred to five opportunities for people to state

4   specific objections, and essentially saying, "We've put the

5   cart in front of the horse, and nobody's gotten the cart,"

6   because we all realize the cart's not going anywhere at this

7   point.  We're talking about transferring money from one

8   account to another; and Your Honor said, "Is this just

9   changing the character and everybody's objection's preserved?"

10          And the most telling was Ms. Hall saying, "I think

11  so.  We've asked to see an order that would specifically carve

12  out the concerns that several of the creditors have here, and

13  we haven't seen anything," --

14          THE COURT:   Like --like -- like what --

15          MR. DONNELLON:   -- "-- in that respect, so why

16  transfer it?"

17          THE COURT:   What would that order say?

18          MR. DONNELLON:   That's my concern is, there's no

19  real way to put that together, so why transfer any money?

20  It's all the same -- it's the same as the money in the

21  interpleader.  Those are monies collected by Eastern

22  Livestock.  Instead of paying them to Eastern Livestock, I'm

23  paying them to the Court.

24          THE COURT:   Well, let's get to it.  I mean, isn't

25  that -- is the reason we need money in this estate account to

1   operate?

2          MS. HALL:   Some of it is, Your Honor.   We have to

3   be able to run the case.

4          THE COURT:   Right.

5          MS. HALL:   So we need operating funds.

6          THE COURT:   So what's going to happen if the estate

7   doesn't have money to operate?   Where -- will you all go--

8   will you all go to somebody else's court and leave me alone?

9          MR. DONNELLON:   It doesn't sound like a bad idea.

10  The concern is --

11         THE COURT:   It doesn't sound bad here either.

12         MR. DONNELLON:   And frankly, that's why I

13  personally had no problem with the 1.6 million dollars moving

14  because we realized there has to be some ability to operate

15  this estate.   But what we're doing right now is we've posted

16  up on the secure website -- some, not all, but some of the

17  data necessary for these transactions.

18         THE COURT:   All right.   Okay.   We have funds that

19  may or may not ultimately be property of the estate subject to

20  Fifth Third's lien.   Those funds have been paid over to the

21  debtor by people who wanted to pay, who they thought they were

22  supposed to pay and get out of the way.

23         If this was any other case, wouldn't then somebody

24  come forward and say, "Hey, this doesn't -- this isn't

25  property of the estate.   This is mine.   I have a constructive

1   trust.  I have a lien.  I," -- you know, "this was being held

2   in trust."   Whatever.   And probably you're right, that would

3   prob -- usually almost exclusively be in the form of an

4   adversary which determines the extent and priority of liens.

5          So isn't that the way this would happen in a less

6   complicated case, where somebody paid some money to the

7   debtor?  Let's say the debtor built a building, and the person

8   who he built it for paid the money to the debtor, and the

9   subcontractors would then come in and say, "Hey, that's not

10  all his money.  Some of that is mine."

11         So what I'm getting to from a practical standpoint

12  is, if we do that in this case, how -- or keep it in the

13  current account, how are the debtor -- how are the creditors

14  prejudiced?  And I guess one answer is, "Well, some of this

15  money might be used for case administration and then not

16  available to pay all the claims that might be ultimately

17  determined to be due."  Is that right?

18         MR. DONNELLON:   That's just one example.  Another

19  example would --

20         THE COURT:   All right, what's another one.

21         MR. DONNELLON:   Another example would be, if we're

22  just going -- if we're going to take enough money, four

23  million dollars, to operate the estate and pay the estate's

24  professionals, what we're doing here in the process as it's

25  been proposed, is to carve up individual adversary proceedings

1  with respect to the 74 transactions.  And that only took us

2  through March, so there should be -- Mr. Knauer may be able to

3  update us -- more transactions that will come forward.

4         And so now what we're doing is we're taking those

5  individual transactions, using individual adversary

6  proceedings, some at the range of 80,000 and 75,000 a clip,

7  and forcing those persons to come forward and litigate their

8  interests when the professionals are being paid out of money

9  that may end up being their money to begin with, or being

10 money that belongs to somebody else in another adversary when

11 this war of attrition is going to occur in 75 and $80,000

12 clips, when --

13        THE COURT:   Sounds kind of like an interpleader

14 action, doesn't it?

15        MR. DONNELLON:   I'm sorry?

16        THE COURT:   It sounds kind of like an interpleader

17 action, where the professionals get paid by the money that's

18 in the pot, and then ultimately it's determined who it belongs

19 to.

20        MR. DONNELLON:   And that's precisely the reason,

21 and my third point is, why do we need to move any money at

22 this point, before some of these threshold issues are

23 addressed?  And that's why I found it welcoming that --

24        THE COURT:   All right.  Now let me -- let me be

25 clear.  Are you making the point that to handle this as we

1  would normally, as I described a moment ago -- and that is,

2  let it come in, then let people say, "This isn't yours," and

3  bring an adversary, would be a waste of money because of all,

4  you know, the multiple cases that would have to be filed, and

5  the costs associated with that; and it's just going to drive

6  up administrative expenses.

7             MR. DONNELLON:   Exactly.  And that's why --

8             THE COURT:   Well, that's a good point, and that's

9  why I have said several times at these hearings, you know, if

10 you have particularized facts that give rise to a claim on a

11 particu -- on a certain sum of money, let the Trustee know

12 that, and we won't -- we'll segregate that, those monies.

13            But what else can we do in terms of a universal

14 resolution?  I mean, are -- if we had to brief -- I mean, I

15 know several of you have suggested that we ought to brief

16 certain legal issues.  What legal issue do you think, or legal

17 issues could we brief that would have some universal

18 application and help reduce the number of cases?

19            MR. DONNELLON:   A few of us has tried to get that

20 together.  Ms. DelCotto, I believe, has the list.  We've

21 started by trying to identify what are the global issues that

22 could make this easier administratively?  Such as, did

23 Eastern, acting as a broker, retain any interest in the

24 account receivable other than its commission?  She has a

25 complete list, but once we have craft those, have people brief

1  them, and Your Honor decides --

2           THE COURT:   Well, now that --

3           MR. DONNELLON:   -- yes, to get all the money.

4           THE COURT:   That -- that sounds like that's a mixed

5  question of law and fact.  I mean, that's not going to be

6  resolved by briefs.  I mean, you're -- everybody wants to

7  address that fact already.

8           MR. ROGERS:   Sorry, Your Honor --

9           THE COURT:   Mr. Rogers, I'll let you go.  You

10 haven't had a chance to say anything.

11          MR. ROGERS:   I apologize.  I'm here on behalf of

12 Superior and Joplin.

13          Certainly, this is not a typical case.  I would say

14 in part that's because what -- the Trustee filed an emergency

15 motion saying to stabilize this market we've got all these

16 different claims being made.  People pay their money in.  It

17 will be subject to all liens, claims, interests, whatsoever.

18          And so if an order was entered that said the fact

19 the Court's granting of the motion has no impact legally,

20 factually, equitably, or otherwise, on any lien, claim,

21 encumbrance or interest.  So that having been done, the

22 Trustee is essentially kind of taking the position, "Well,

23 this is property of the estate, unless you prove otherwise."

24          And the big issue here is, the Trustee hasn't proven

25 anything.  The motion that was filed, the Trustee says we

1  haven't given facts, we haven't given law, in the Trustee's

2  claims report that's not only to transfer money but that it be

3  found to be cash collateral to Fifth Third offers no evidence

4  and no law.   It offers the opinion of the Trustee.

5            THE COURT:   All right, so what concerns you about

6  that?   I mean, what if -- what if the order ordering transfer

7  said, "to the extent that the monies are determined to be

8  property of the estate, they are cash collateral of Fifth

9  Third"?

10           MR. ROGERS:   (unclear)

11           THE COURT:   I mean, because that's -- that's the

12 truth of the matter, right?

13           MR. ROGERS:   And that is, and I don't know if I

14 would have a problem with that.

15           THE COURT:   I mean, I would not be willing to make

16 a determination in light of the controversy that exists at

17 this moment that this is property of the estate.

18           MR. ROGERS:   And that is exactly, however, what the

19 Trustee has asked for.

20           MS. HALL:   Your Honor, that's not --

21           MR. ROGERS:   And --

22           MS. HALL:   -- that's not true, John.

23           MR. ROGERS:   -- I can read the motion.

24           MS. HALL:   But we  -- we haven't -- we haven't --

25 sorry.  Let me say one thing:   He -- John's correct that in

1    the beginning --

2              THE COURT:    In the beginning --

3              MS. HALL:    -- in the beginning, I mean --

4              MR. ROGERS:    And (unclear)

5              MS. HALL:    -- one of -- wait a minute, wait -- no

6    -- one of the things --

7              MR. ROGERS:    Okay, the Fifth Third today --

8              MS. HALL:    Well --

9              MR. ROGERS:    -- said that.

10             MS. HALL:    Just a second, John.    One of the things

11   that's ironic here is that the Court is right -- normally

12   money comes into the estate, it's presumed to be property of

13   the estate, and it is the -- it is the duty of the people who

14   think it's not property of the estate to bring an adversary

15   proceeding and say why it's not property of the estate.

16             We thought we were doing -- and people have said

17   there needs to be a procedure to acclimate all that.    We

18   thought that's what we did.    We put together a procedure

19   whereby, "Here's all the money we've brought in from people

20   who owed us money.    You think you may have a claim to it.

21   Here is a procedure for you to follow so that we don't have to

22   file adversary proceedings to get money turned over to the

23   estate, and you don't have to file adversary proceedings

24   against us, so that we don't have multiple adversary

25   proceedings."

1            So we gave them the procedure, we set up the

2    process, and now we're being asked to set up yet another

3    process, when people have had ample opportunity.

4            MR. ROGERS:   Because --

5            MS. HALL:   Now it is true --

6            MR. ROGERS:   Because --

7            MS. HALL:   -- it is true --

8            MR. ROGERS:   -- the Trustee did not set up a

9    process.

10            MS. HALL:   We did.

11            MR. ROGERS:   The Trustee filed a motion which said,

12    "In the Trustee's opinion nobody but Fifth Third has a valid

13    claim to these funds."   That's all the motion says.   Not one

14    bit of evidence, not a citation to a case, to a statute,

15    anything.

16            THE COURT:   All right.   Well, let's come forward

17    in time to where we are today, and if the -- if the Court

18    orders -- would grant the motion in terms of transferring the

19    money into the bankruptcy estate, we could then proceed in a

20    couple of ways.  We could still have some sort of procedure

21    whereby the Court will resolve certain legal issues:   For

22    example, whether the debtor is -- was a market agency selling

23    on commission, and so -- and if so, subject to holding money

24    in trust in behalf of certain parties.

25            I mean, I would assume that there could be some

1  facts on that question, but that's primarily a question of law

2  and documents, right?   Everyone -- don't you think there's a

3  lot of facts involved there?

4         MS. DELCOTTO:   I do, Your Honor.   The cattle

5  lawyers tell us that it's course of dealing, what did the

6  people intend, what was the relation between Eastern and its

7  customer, so it goes beyond the documents factually.

8         MR. ROGERS:   The problem is that Eastern --

9         THE COURT:   Well --

10         MR. ROGERS:   -- Eastern could be one of those

11  things, on one occasion, with one party; and I think the

12  difficulty is -- we've got a case here  --

13         THE COURT:   Well, then --

14         MR. ROGERS:   -- where everybody agrees.

15         THE COURT:   -- then it seems to me, Mr. Rogers,

16  that *you're* saying do these things need to be resolved

17  individually in maybe seventeen different adversary

18  proceedings because the facts are different in each case.

19         MR. ROGERS:   Unless -- and the only qualification I

20  think to that is, if the Trustee and the bank put on evidence,

21  cite the law, and say, "Based on these facts, we're entitled

22  to these funds, this is property of the estate," then I think

23  we have an issue that -- that we can determine whether it has

24  to be addressed or not.   But the Trustee has filed a blanket

25  objection and says --

```
 1                THE COURT:   All right.

 2                MR. ROGERS:   -- "I think none of you have claims."

 3                THE COURT:   Well, maybe -- go ahead -- well, I

 4   think maybe part of the problem we're having here is that

 5   we've been trying to find a different way to do things, and,

 6   you know, the parties have not been able to do that; and so

 7   I'd say as a Judge, we'll do things the way we always do

 8   things:   And that is, I'm going to grant the motion, you pay

 9   the money in.  Anybody has a claim against those funds, bring

10   your -- bring your adversary.

11                Now it may well be that you can have an adversary

12   that you think illustrates a lot of the issues that could

13   resolve several cases; and I'd be willing -- I don't know that

14   we're into any statute of limitation problem at this time.  I

15   don't think we're close, but I'd be willing to extend statutes

16   if you want to litigate, find a primary vehicle.

17                But if, as Mr. Rogers says and even as I hear some

18   from this table saying some of the cases are different, and

19   Eastern may have dealt differently with a party in one

20   instance than they did in another, then I don't know it's

21   going to do much good to reach a universal -- find a universal

22   truth, because it might not be universal.

23                I will say that if the parties want to continue

24   their discussions and they think that -- that they do have a

25   question of law that would be broadly applicable, I'm willing
```

1  to decide a question of law on the -- being submitted on

2  briefs, and I -- if a party wants to do that -- either do it

3  by agreement or come forward with a motion, I'm still open to

4  that suggestion.   But it's not going to do me any good to

5  reach a conclusions of law and then have a party come forward

6  and say, "Well, in my case the facts are different, so that

7  doesn't apply to me."

8            Yes, Mr. Latour.

9            MR. LaTOUR:   Your Honor, I agree with you that it's

10 inescapable that this will end up being resolved by adversary

11 proceedings.   The parties are working hard, however, to

12 figure out pursuant to Rule 7042 a way to address common

13 issues of facts, common issues of law.   The wait has been for

14 the pleadings to close.  Now that there are going to be

15 additional adversaries, there may be some additional delay in

16 that.

17           I have been trying to chart the topics that are

18 involved.  I'm now up to page 5 on the spreadsheet, of the

19 various topics that are potential candidates; and once

20 everybody's cards are on the table about what their theories

21 are, we may be able to suggest a batting order of potentially

22 dispositive issues.   That is being worked on.   That time line

23 just extended because of the ruling that you're going to make

24 today.

25           THE COURT:   All right.

1          MR. LaTOUR:   There has also been a discussion

2    amongst the parties in the interpleader actions on how to deal

3    with evidentiary issues, and so the comment that I squashed it

4    is inaccurate.  What I said was, "Are you aware of the Rule 16

5    conversation that outlines what went on before," and gave him

6    a copy of it, that discussion is still going on because of the

7    electronic stored information issues involved, but that is

8    also being worked on.

9          But it is inescapable that you're going to have to

10   decide a series of adversary proceedings on factual

11   determinations on -- I pray not -- but close to transaction by

12   transaction because of the possibility that Eastern was one

13   thing in one transaction and something else in another

14   transaction; and that's what we're going to have to do.

15         But I do want to go to the one point that you made

16   about running the case, because if money gets transferred out

17   of this escrow account into the operating account and then it

18   gets spent, my client's cash proceeds, from my point of view,

19   is being dissipated; but I'm not getting any adequate

20   protection payments at all.   And part of that was a two

21   million dollar post-petition loan, which is certainly not

22   objectionable by anybody because it's post-petition and it's

23   new money.

24         So if there is a question of transferring some money

25   to the case so that it should be -- that it can operate, that

1  two million dollar payment ought to be made, at least.

2          MR. ROGERS:   If it's -- it's not part of your

3  collateral, if it's not property of the estate.

4          MR. LaTOUR:   Then it's inures to the benefit of

5  your client, and your guy should pay.  You owe me two million

6  dollars.

7          MR. ROGERS:   You know, my feeling is it's

8  unfortunate the Trustee has handled it in this fashion, by

9  making an omnibus objection and offering no evidence, and

10  taking several months to do it; but that isn't our fault.  And

11  it prejudges all of our claims to say, "Well, let us pay it to

12  Fifth Third, and let us use it to operate the case."

13          At that point, where did our rights go?  What are we

14  fighting over?

15          THE COURT:   Well, I'm not going to --

16          MR. ROGERS:   You're using the funds.

17          THE COURT:   I'm not going to determ -- there's no

18  motion in front of me to pay anything to Fifth Third as far as

19  I'm concerned, and I'm not going to consider it today.

20          MR. DONNELLON:   May I briefly be heard on one

21  issue, Your Honor?

22          THE COURT:   Yes.

23          MR. DONNELLON:   Well, it's -- I'm sorry, to what

24  you said:  transfer the money.  We do have a carve-out I

25  believe still exists for the four transactions that we have at

1  issue.

2          THE COURT:    If that's the deal you all have, that's

3  the deal you have.

4          MR. DONNELLON:    The problem is I see from what Mr.

5  Rogers was saying is -- and to use your example, the building

6  being built -- why wouldn't it be the burden of proof in the

7  first instance on the Trustee to say, "This is money of the

8  estate that I am collecting," before it gets transferred

9  (unclear)."

10          THE COURT:    Why are you -- why are you in any

11  different position as to that point when it's in an escrow

12  account controlled by the Trustee or in the Trustee's account?

13  I mean, it's still there, and you're going to have to go get

14  it in some way.    It's not in your possession.    It's not in

15  your bank account.

16          At some point, if you want to remove it from the

17  account that it's in and have a check written to you, or your

18  client, or anyone, somebody's going to have to come forward

19  and show something, right?

20          MR. DONNELLON:    Absolutely.    And my concern is

21  only moving it from one account to another, Mr. LaTour is

22  saying he wants to grab two million of it as a loan.

23          THE COURT:    I haven't let him grab two million yet,

24  though, have I?    I mean, people will want a lot of things.

25          MR. DONNELLON:    I will be seated.

1           MR. PLOURDE:    Your Honor, might I chime in here

2   for a moment?

3           THE COURT:    Yes.

4           MR. PLOURDE: (telephone transmission sometimes

5   unclear)  This is Ross Plourde on behalf of Stockman Oklahoma

6   Livestock Marketing, Brent Kuehny, and Crumpler Brothers.

7           Ms. Hall indicated that -- I'm sorry.  Ms. Hall

8   indicated that she had briefed the issue of constructive

9   trust, and nobody responded.  Actually, we did -- we responded

10  to the Trustee's motion in the first place, briefing the issue

11  of constructive trust, and they responded to that.  We've

12  established a briefing schedule pursuant to a scheduling order

13  by the Court,  (unclear) that and some other issues, and I

14  would hope that any ruling of the Court would apply to

15  abrogate that -- that agreed scheduling order that's already

16  been entered, that governs that issue.

17          MS. HALL:  Your Honor, this is -- Ross, this is

18  Terry.  With those -- I can't remember if it's four, five, or

19  six people that we have made agreements with, including Mr.

20  Donnellon's client, to either segregate specific accounts or

21  set up specific issues for further determination, because you

22  responded with particularity we will honor those agreements,

23  and those accounts and those issues will proceed down their

24  normal path that we've agreed to.

25          MR. PLOURDE:    Thank you.

1            ATTORNEY: Your Honor --

2            MR. NEWBERN:    Your Honor, this is  -- Your Honor,

3    this is Scott Newbern, if I may speak briefly for the Florida

4    creditors.

5            THE COURT:    You may.

6            MR. NEWBERN:    Can you hear me?

7            THE COURT:    Yes.

8            MR. NEWBERN:    Thank you.   We responded to the

9    objections specifically and indicated, at least in our

10   instances, as we were dealing with Eastern for the most part

11   as a clearing agency, that the monies that we were owed were

12   not part of the bankruptcy estate, and we've been objecting to

13   any move out of this suspense account, if you will, or

14   whatever account, to place funds into the trust operating

15   account -- Trustee's operating account, and have it dissipated

16   with the fees.   Because we were one of fourteen clearees

17   across the country, where our client is one of fourteen, and

18   (unclear)  don't know how much money was involved in a similar

19   situation.   That was our objection.

20           Now from what I've heard already today is that we

21   need to proceed in adversary proceedings for all of this, I

22   understand that.   I believe that Ms. DelCotto has a proposed

23   order or at least some legal issues that may help consolidate

24   matters, and certainly we would like some guidance on that.

25           MS. HALL:    Mr. Newbern is one of the ones that we

1  have an agreement with to set aside certain accounts and not

2  transfer.   Most of his client's money is caught up in the

3  Kansas interpleader, I believe.

4            ATTORNEY:   Wisconsin.

5            MS. HALL:   Wisconsin interpleader?

6            MR. NEWBERN:   About half -- about half of it's in

7  the interpleader, Your Honor, out of Wisconsin; and the other

8  half -- the debtor's half of it came in via a payment from a

9  Lynn Miller who --

10           MS. HALL:   Right.

11           MR. NEWBERN:   -- (unclear) but then there's a whole

12 series of five or six others that are listed as asset accounts

13 receivable on the claims report, the monthly report, that have

14 already paid for cattle directly to the sellers; and if

15 anything, Eastern's only claim will be for the commission as

16 clearing agency, even though they didn't clear the account.

17           MS. HALL:   Mr. --

18           MR. NEWBERN:   (unclear) that's a separate issue,

19 but it's part of the same legal concept (unclear).

20           MS. HALL:   It is -- it is a separate issue.  Mr.

21 Newbern is speaking about the receivables listed on the

22 operating report filed by the Court -- I mean, filed by the

23 Trustee that says we have not collected these receivables.

24 We have not collected those receivables.  They're going to be

25 in controversy at some point.   We will agree to set aside the

1  account that Mr. Newbern's -- of Mr. Newbern's client, not in

2  general for anybody who's a clearee.   So that particular

3  account we're setting aside.

4          The other accounts we haven't collected and are not

5  part of this motion yet, so he should be okay.

6          THE COURT:   Did you hear that, Mr. Newbern?   That

7  you should be okay?

8          MR. NEWBERN:   I did, and I understand that the

9  money has been set aside, and if we're successful, we get it

10  all undiminished from operating costs to the trust estate.

11          THE COURT:   Right.   As to the money that's been set

12  aside, yes.

13          MR. NEWBERN:   Yes -- Yes, Your Honor.

14          THE COURT:   Yes.   That's correct.   All right.   I

15  want to move past this motion.   Is there anything further?   I

16  -- I --

17          MS. HALL:   The only thing is how to get an order.

18  Do you have a process?

19          THE COURT:   You mean how we're going to draft an

20  order that people want to object to?   Well, let me give you

21  some guidance.

22          I -- I want it to be as simple as possible and at --

23  and not include conclusions as to the estate's ultimate

24  entitlement to this -- to these funds.   I don't mind if it

25  says that to the extent that it is subsequently determined

1  that as property of the estate it's subject to Fifth Third's

2  lien.

3          But I want it short and sweet because I don't want

4  you to try to -- I don't want you to try to put in legal

5  conclusions that refute any of the arguments about market

6  agency or dealers or anything like that in the order.  I don't

7  -- there's no way we could write an order that would -- and we

8  really -- I've really decided here today not to resolve all

9  those things, that resolution of all those things is not

10 necessary for this particular transfer.

11         MR. ROGERS:   I --

12         THE COURT:   Mr. Rogers.

13         MR. ROGERS:   I might briefly add one thing to that

14 list, in trying to clarify the order.   The constructive trust

15 issue, it's -- the Trustee's counsel has made the argument of

16 why didn't anybody respond to this issue?

17         We just didn't respond because we had cited a number

18 of cases supporting it, and the Trustee's brief itself says

19 there's a split of authority on this, and they relied on a

20 Sixth Circuit case that they liked.

21         So, yeah, there really wasn't a need to respond to

22 the brief because what it stands for is the proposition that

23 courts are undecided.

24         THE COURT:   Well, I'm a little -- what do you want

25 her to --

1        MR. ROGERS:   I just want to-- I feel like the

2   constructive trust issue, along with all the others, is --

3   remains an open issue.

4        THE COURT:   I don't want to put in the order

5   everything that remains an open issue.

6        MR. ROGERS:   All right.

7        THE COURT:   It would be a very long order.

8        MR. ROGERS:   I understand, Your Honor.  I just

9   wanted to make clear, that was part of it.

10       THE COURT:   I understand your position.

11       MR. ROGERS:   Thank you.   Yes, Mr. LaTour.

12       MR. LaTOUR:   Just a question, Your Honor.  I think

13  I understand you to say that the motion is granted with the

14  limits that you've just mentioned.  Can the estate spend any

15  of that money on running the case; and if they are doing so,

16  where does my -- where does Fifth Third stand with --

17       THE COURT:   Does the --

18       MR. LaTOUR:    -- with respect to that?

19       THE COURT:   Does the estate need to spend any of

20  the money to run the case?

21       MS. HALL:   Well, plus, Your Honor, at this point

22  the only money that we have authorized, have been authorized

23  to spend is two million dollars in carve-out, and two million

24  dollars in loans, is that right?

25       MR. LaTOUR:   That is correct.

1          MS. HALL:   So I think we are -- I think we're past

2   the 1.6 that's been transferred; so, yes, the answer is Yes.

3          MR. LaTOUR:   Well, the reason for my question, Your

4   Honor, is that once they put the limit on the prior use of

5   cash collateral order, they'll then be in the non-consensual

6   use of my client's cash collateral, and I don't want to allow

7   that.   So --

8          MS. HALL:   So we may (unclear, both speaking at the

9   same time)

10          MR. ROGERS:   And has that been proven to be their

11   cash collateral.  These are sums that were paid into escrow --

12          THE COURT:   I -- I don't know.  I mean, what's your

13   response?

14          MS. HALL:   Well, the way (unclear) make it tee'd up

15   is when we attempt to pay back the loan, is that right?  Or is

16   that -- you're taking it past the post-petition DIP loan?

17          THE COURT:   I don't understand your question, Ms.

18   Hall.

19          MS. HALL:   I'm not sure I do either.

20          THE COURT:   Well --

21          MS. HALL:   (unclear, multiple speakers)

22          MS. DELCOTTO:   Your Honor, the rest of us don't

23   even know if this loan's been funded.  We don't know what's

24   being spent.  We're behind on monthly operating reports.  We

25   don't get to see the budgets.  The bank and the Trustee talk

1  every week and go through the budget, and the rest of us don't

2  even have the budgets.

3         Are we saying that we funded two million dollars and

4  we spent a million six so we're past 3.6 million, and we need

5  more money?

6         MS. HALL:   The operating reports explain what's

7  been spent in the case, and I know we may be a week behind,

8  but we are not months behind in filing these operating

9  reports.

10         It is -- the only money to run this case, Your

11  Honor, are what we collect and put into the property of the

12  estate, and it's highly likely that some of these accounts

13  that are being moved over from escrow to operating will be

14  used to fund the case.

15         THE COURT:   Well, I mean --

16         MS. HALL:   Will all of it be used?  No.

17         THE COURT:   I guess the question is, first of all I

18  don't know where you stand in terms of your cash use agreement

19  with Fifth Third.   I mean, I assume you two know that.   I

20  don't have the slightest idea, as I sit here, where you are in

21  terms of that budget.

22         MR. LaTOUR:   Well, Your Honor, it does not have a

23  temporal limit, but it has a dollar limit; and so when they

24  exhaust -- they've already exhausted, I believe, most of the

25  carve-out and are spending some of the DIP lending portion of

1  it.   When they exhaust the four million they are out of

2  authority to use Fifth Third's cash collateral.

3        I noted a tendency in this room that everybody is

4  perfectly willing to let Fifth Third's cash collateral to be

5  used when it's being spent, and completely against the idea

6  that Fifth Third is going to get any payments back.   But

7  Fifth Third's money that is spent is not being adequately

8  protected.  It's being dissipated.

9        THE COURT:   Well, I understand that, and, you know,

10 as I said -- and I -- you know, I was -- spoke a little bit in

11 jest about your wanting to be paid, and that's not been

12 determined.  But I mean, obviously, this case has to be

13 funded, and, I mean, I said this earlier, again, kind of in

14 jest; but, I mean, if we can't fund the case, we can't have a

15 case.

16        The -- maybe that would make a lot of people happy

17 and they could back to fifty other courts and fight about

18 these issues, but it kind of makes sense -- or at least

19 Congress thought so -- to bring everybody into the same room

20 and see if we can't resolve things in this forum.  But it's

21 got to be paid for, and it is true that so far Fifth Third is

22 the only source of that payment.

23        Now obviously I know some of you will say that, you

24 know, whether their liens are valid or anything else hasn't

25 been determined, and that's true.  Well, no, no, no.  That's

1  not true.   The -- as far as the debtor is concerned, the --

2  but their priority on -- as to claims to certain funds has not

3  been established.

4          The -- but the issue here is, you know, if we're

5  going to go forward with this case -- I mean, I do think that

6  some of the comments that various counsel have made today is,

7  we need to find ways to do so economically.   It's very

8  difficult with this many parties and this many different

9  claims, as we found, to try to do anything that can cover

10  everyone or blanket a lot of issues.   I haven't given up on

11  that, but we found it difficult.

12          The -- the debtor and the bank are going to have to

13  reach agreement as to cash use, as they have.   They'll have to

14  reach agreement as to continuing cash use.   They'll have to

15  come forward and seek to have that approved; and the parties

16  that object to that will have to object, and we'll have a

17  hearing.   That's really about all I can say in that regard

18  today.   I don't have it in front of me.

19          As far as -- I didn't say that this money was

20  transferred into anything other than the debtor's normal

21  account, so I did not put any restrictions on the debtor's use

22  of monies today.   If the parties think there should be, they

23  can come forward.   If the bank thinks they need an adequate

24  protection payment today or tomorrow or soon, they can come

25  forward very quickly.

1        MR. LaTOUR:   Your Honor, you've previously ruled

2  that the money -- the proceeds of the liquid -- I'm sorry.

3  I'm starting to sum up.

4        You previously ruled that Fifth Third has a blanket

5  lien on the property of the estate, and that the liquidation

6  of those prop -- or of that property turns into cash

7  collateral subject to that finance order.   And so to say that

8  the money could be handed over and that it's just not subject

9  to that order is not right.

10        THE COURT:   I didn't say it wasn't -- I retract --

11  I stopped myself in mid-sentence a moment ago, to not say that

12  there was not a termination that you had a lien on the cash

13  collateral.

14        MR. LaTOUR:   All right, well, then I -- I

15  apologize.  I apparently misunderstand where we were going.

16        THE COURT:   It got -- it got you excited, but I

17  corrected that.  I'm just -- I'll -- the only question mark

18  hanging over that is other parties' claims that it's not

19  property of the estate.  The same thing we've been talking

20  about all afternoon.

21        MR. ROGERS:   Part of the dilemma we have, Your

22  Honor, is -- is, you know, those of us making those arguments,

23  if it's used by the Trustee because the budgets are secret, we

24  don't even know what is being used and when or how.

25        THE COURT:   All right.  All right, what about more

1   transparency in terms of the use -- on cash use.

2         MS. HALL:   I think the reasons the budgets are

3   secret is because the estate is pursuing litigation in certain

4   parties, that we'd rather not -- or preparing litigation in

5   certain parties that (unclear) not sure why -- it's in the

6   operating reports, it says exactly -- I mean, it says how much

7   professionals are getting paid, it says how much ESI is

8   getting paid --

9         MR. ROGERS:   Oh, but we see after the fact what's

10  -- what's been paid --

11        MS. HALL:   It's --

12        MR. ROGERS:   -- or incurred.

13        MS. HALL:   -- it's, I don't know, fifteen days

14  later?  Twenty days later.  I mean, what -- do you want pre-

15  approval?

16        MR. ROGERS:   Well, (unclear)

17        MS. HALL:   I don't think that was the plan.

18        MR. ROGERS:   Well (unclear)

19        MS. HALL:   I don't -- how much more -- I don't

20  know.  That's probably up to the bank, I mean (unclear)

21        MR. ROGERS:   I mean, there's a creditor --

22        MS. HALL:   (unclear, both talking at the same time)

23        MR. ROGERS:   -- if we're saying it's not property

24  of the estate but the Trustee is --

25        MS. HALL:   But you haven't (unclear)

1          MR. ROGERS:   -- spending it, and -- and right now

2   the professional fees incurred are something like two and a

3   half million dollars, and for the most part we have no idea

4   what for, it -- it's -- it's not hard to imagine that, you

5   know, we may be losing a lot of the money we're fighting

6   about.

7          THE COURT:   You mean you can't tell from the

8   operating reports what they're spending money on?

9          MR. ROGERS:   Not in specific terms, no.

10         THE COURT:   What do you mean by that?

11         MR. ROGERS:   It's sort of a cash-in/cash-out report

12  and "professional fees incurred," but we don't know for --

13  what litigation is the Trustee pursuing?  Is it --

14         THE COURT:   Well, I assume that the -- as far as

15  professional fees, the debtor's attorney -- I mean, the

16  Trustee's attorneys are keeping their time like in any other

17  case, and there's time sheets that support the professional

18  activities, right?

19         MR. ROGERS:   Yes --

20         MS. HALL:   And we file fee applications.

21         MR. ROGERS:   Yes, Your Honor.  That is-- that is

22  certainly true as to that.

23         MR. LaTOUR:   Your Honor, fee applications were

24  filed and were available for review; and monthly reports are

25  filed.   The reason for the budget secrecy, as I understand

1  it, was the Trustee's desire not to let people who are about

2  to be sued know that the Trustee was coming.  And I think

3  this is sort of a red herring discussion because you should

4  really pick what assumption do you want to make.  Do you want

5  to assume that it's property of the estate or do you want to

6  assume that it's not?

7          The Bankruptcy Code answers that question for you.

8          MR. ROGERS:  We have a court order here that says

9  it's not assumed to be anything.

10          MR. LaTOUR:  I have a court order that says a lot

11  of things, and so far I haven't got one paragraph of it

12  enforced yet.

13          MR. ROGERS:  Well --

14          THE COURT:  Now let me -- let me say, Mr. Rogers,

15  that I said the court order should be silent on certain

16  things, but I have ordered the money paid into the Trustee's

17  account, and I have said that probably parties that have

18  claims in that are going to bring adversaries, so you can draw

19  whatever conclusions you want as to what presumptions might

20  exist.

21          MR. ROGERS:  Well, I think what's sort of in the

22  background here that maybe ought to be brought forward is,

23  that under the existing financing order, anything that the

24  Trustee has on hand that is not -- that is under its current

25  budget and projection has to be promptly surrendered to Fifth

1  Third.

2          We don't know what the projections are; we don't

3  know what the budget are.   Yes, they will give us a notice of

4  that, but I assume that's going to happen in a week or two,

5  and we'll be back here.

6          But that, at least, is what the existing order says.

7  And so it becomes kind of crucial to decide, is this property

8  of the estate?

9          MR. LaTOUR:   But, Your Honor, I return to the

10  Bankruptcy Code, Section 541 says if the estate has any

11  interest in monies, that those monies are property of the

12  bankruptcy estate.   So we don't have to speculate are the

13  monies property of the bankruptcy estate or not?   The answer

14  is Yes, by definition.

15          Now if they have claims against that, they can

16  assert them.  You've already instructed them how to do, and I

17  bow to the inevitable:   There'll be another round of

18  adversary proceedings.

19          So there really isn't --

20          THE COURT:   All right, I --

21          MR. LaTOUR:    -- an argument.

22          THE COURT:   All right, I'm tired of this motion.

23  Let's move on to the next one.  Motion to quash.  Is there

24  still any -- still any dispute as to that motion, or has that

25  been resolved?

1        MS. SCHUTTE: (low-volume telephone pick-up)  Your

2 Honor, this is Margaret Schutte on behalf of the USDA.   We

3 received a (unclear) request on August 5th, and under the

4 federal regulations the USDA has twenty days to respond to

5 that.   My understanding is they have already responded in

6 part, and it's their intention to respond to the remainder of

7 the outstanding requests by the end of the week.

8        THE COURT:   All right.  So should we just put this

9 on for the next omnibus date to see if there's any remaining

10 dispute?

11        MS. SCHUTTE:   That would be appropriate, Your

12 Honor.

13        THE COURT:   September 28th at ten a.m.

14        MS. SCHUTTE:    I'm sorry, Your Honor.  Could you

15 repeat that?

16        THE COURT:   September 28th, at ten a.m.

17        MS. SCHUTTE:   Great.  Thank you.

18        THE COURT:   Next we have a motion to approve lease.

19        MS. HALL:   Yes, Your Honor.  This is the Trustee's

20 request to approve a month-to-month lease with Republic Bank

21 (unclear, not near microphone; ambient noise in courtroom;

22 loud door banging shut; beep phone conference disconnects

23 interfering with audibility) No objections were filed, and

24 we'd ask that it be granted.

25        MR. MORRIS:   Allen Morris on behalf of Republic.

1  It was (unclear) negotiations it's a month-to-month lease,

2  Your Honor (unclear) Trustee beyond one month.

3            THE COURT:   All right.  I'll grant the motion.

4            MR. MORRIS:   Thank you, Your Honor.

5            THE COURT:   Submit -- submit an order.  Is some --

6  one of you going to submit an order?

7            MS. HALL:   We will, Your Honor

8            THE COURT:   All right.

9            MR. MORRIS:   Thank you, Your Honor.

10            THE COURT:   All right, in related matters there's

11  --- in the Thomas and Patsy Gibson case, First Bank & Trust

12  motion for examination and production of documents, 2004 exam.

13            MR. DONNELLON:   Your Honor, we ask that that be

14  continued.  We are discussing with the Gibson Trustee and Your

15  Community Bank an agreed resolution of that, and there's been

16  no status change.  That was Friday we discussed that, and I --

17  counsel for Community Bank, I informed them that we were going

18  to inform the Court that this will continued; he agreed, and

19  he's not in attendance, so I assume that will be just

20  continued to the next omnibus?

21            THE COURT:   Yes.   September 28th, ten a.m.

22            Also, in the Thomas and Patsy Gibson matter, there

23  has been a motion to extend time to file complaint to

24  determine dischargeability, filed by Bret Clement on behalf of

25  the First Bank & Trust Company.   And a motion to extend time

1  to file complaint filed on behalf of the Trustee of the--

2          MS. HALL:   Well, I think both the Gibson Trustee

3  and the ELS.

4          THE COURT:   The Gibson Trustee and the Eastern

5  Trustee.

6          MR. LaTOUR:   Your Honor, in addition, Fifth Third

7  also filed a similar motion.

8          THE COURT:   You did file a similar motion.

9          COURTROOM DEPUTY:   (unclear)

10          THE COURT:   I'll grant those motions if the -- if

11  your note-- if the motion has already been noticed out we'll

12  wait for the notice time to run, but I'll see that all the

13  motions are granted.

14          East West Trucking, there's been a motion by

15  Cattlemen's Feed Lot for relief from stay.   I think there's

16  an agreed continuance.

17          MS. HALL:   There is, Your Honor.

18          THE COURT:   So we'll continue that to the 9/28 ten

19  a.m. omnibus date.   There's the Trustee's motion to pay

20  priority claims.

21          MR. TRAPP:   Chris Trapp here for the Trustee,

22  Judge.   The Trustee has about $78,000 in priority claims for

23  earned by unpaid wages.   He's got plenty of cash to pay any

24  claims that have priority over that but wants to get the

25  earned but unpaid wages paid out right away.

1           THE COURT:    I'll --

2           MR. TRAPP:    We have no objections to it.

3           THE COURT:    I'll grant that motion.  Submit an

4  order.

5           MR. TRAPP:    Will do.

6           THE COURT:    Motion for determination of tax

7  reporting requirements filed by the Trustee.

8           MR. TRAPP:    That's also our motion, Judge.   The --

9  this is a single -- East West Trucking is a single-member LLC.

10  That member was Mr. Gibson.   His membership interests were

11  abandoned by the -- by the bankruptcy Trustee presiding over

12  Gibson's individual case.   Essentially the  -- prior to the

13  bankruptcy petition, the (unclear) preparing and filing all

14  the tax returns, there's a Form 1065 that the IRS created for

15  partnerships, the informational form that the LLC needs to

16  file, we're looking for an order that things are going to

17  continue in the status quo; that the informational forms don't

18  have to be filled out by the Trustee, but they'll be filled

19  out as part of the obligations of Mr. Gibson.

20          MS. CARUSO:    Your Honor, Debbie Caruso.

21          THE COURT:    Yes.

22          MS. CARUSO:    The only qualification I would put to

23  that in any order that was entered, that that is specifically

24  directed to Mr. Gibson individually and not the Gibson entity.

25          MR. TRAPP:    Yeah, we, of course --

1            THE COURT:   All right, I'll grant that motion.

2            MR. TRAPP:   Thank you, Judge.

3            THE COURT:   All right, into the adversary

4  proceedings.    The first matter is the Downs case.   Trustee

5  vs. Willie Downs.

6            MR. TONER:   Kevin Toner for the Trustee, Your

7  Honor.   We'll be amending that complaint to add a couple

8  secondary transferees.   The defendant hasn't answered yet, by

9  agreement.    An answer I'm sure can be done quickly.   We've

10 been cooperating in exchange of informal information and

11 discussion the claims, but I would just continue that, I

12 think, until the next omnibus.

13           THE COURT:   All right.   We'll put it on 9-28 at

14 ten a.m.   Superior.

15           MS. MOORE:

16  Yes, Judge, Christie Moore for Superior.   We have a couple

17 of things on the Court's agenda.    To quickly talk about the

18 issue of consolidation that I think was kind of a hold-over

19 from some previous motions, Superior and Mr. Toner we've been

20 working very hard on the two documents that we thought might

21 help coordinate some discovery and get things moving for

22 purposes of that area.

23           We've circulated at least amongst counsel for the

24 Superior AP both a confidentiality stipulation that will work

25 for the parties, as well as a protocol; and those are very,

1   very close to being approved, at least within this group of

2   counsel.   I think that the discovery protocol is waiting for

3   Mr. LaTour's business folks to take a peek at it, but it

4   basically provides a really nice approach to streamlining some

5   of the discovery, and we seem very pleased that it'll work

6   easily.

7          At that point that I think we would like to do, with

8   the Court's approval, is bring both of these documents to the

9   Court and ask the Court to approve them and provide simply a

10  notice time for everybody through the bankruptcy to -- so that

11  we don't spend weeks and weeks waiting for responses.   We

12  think that if we -- if these five or six lawyers present them

13  to the Court, that maybe the Court can then, through the

14  bankruptcy, ask for objections if there are any.

15          THE COURT:   All right.

16          MS. MOORE:   And we should have those within the

17  next five days or so, depending on Mr. LaTour's folks.

18          MR. TONER:   These protocols, Your Honor, were

19  written with an eye towards global application.   As we

20  already heard today from Ms. DelCotto, there's a lot of

21  interest in getting documents easily.   What we envision is an

22  FTP site where electronic information could be deposited at

23  nominal expense.   Those signing off on confidentiality

24  stipulation would then be given access to download the

25  discovery materials.

1          Those parties who aren't comfortable with posting

2   their things would take on the responsibility of service and

3   dealing with all the interested people, but those who want to

4   use the Trustee's FTP site to make things available would have

5   that advantage.

6          THE COURT:   That sounds good.

7          MS. MOORE:   And we would also, of course, as part

8   of the understanding is that parties would not be given the

9   password to the FTP site and to have access to it unless they

10  sign off on the confidentiality stipulation, just to protect

11  all the parties going forward.   So it would not be a public

12  site.

13         THE COURT:   Okay.

14         MS. MOORE:   So I think those -- that's going to get

15  us a pretty far way (sic).

16         I think the only other issue that we have that we

17  really need to talk about today is the objection to the motion

18  to amend, and we did file that motion on behalf of Superior,

19  Your Honor.   We did it because we believed that the motion to

20  amend kind of put a spotlight on some of the flaws of bringing

21  these parties in, given the fact they weren't parties, and

22  they're not a counterclaim.

23         We just wanted to bring that back to the Court's

24  attention.   We also have some concerns more on a logistical

25  area that we want to be able to present issues of law that are

1  unique between Superior and the debtor as soon as possible,

2  and we want to make sure that the addition of these parties

3  doesn't prolong the period of time that we're all waiting.

4         And so we believe that again we just want to make

5  our position known on the fact that this really -- they're not

6  necessarily parties.  We understand the Court's inclination to

7  bring them into this AP, but just wanted to kind of bring

8  these issues back to the forefront, given the fact that the

9  clerk couldn't issue the summons because they weren't truly

10 counterclaim defendants.

11        MR. TONER:  The motion is the Trustee's, Your

12 Honor, to amend the pleadings, and formally add the same

13 counterclaim defendants with the label "third party

14 defendants" so that our ECF system can properly issue

15 summonses.  The counsel for all those parties have agreed to

16 accept service, because we've raised this in the last

17 successive omnibuses.  We are trying to move it quickly, Ms.

18 Moore; and at that point the pleadings will be quickly closed,

19 and they'll be off to briefing.

20        But there's no additional reason I saw in the

21 objection that was filed that Your Honor didn't deal with last

22 month when he allowed those parties to come in as proper

23 parties to answer whatever interests they have as to whether

24 these things are assets of the estate or not, the stuff that's

25 in the possession of Superior, the contracts that Superior

1  seeks judgments about.

2          These -- these new pleadings are no different except

3  that it makes clear that these folks are very interested in

4  the declaratory relief that's been sought and in the attendant

5  belief that might result in this -- in this proceeding.

6          THE COURT:   All right.   Well, I'm going to stay

7  consistent with what I said last month and let them in, so

8  I'll grant the motion for leave to amend and overrule the

9  objection.

10          MS. MOORE:   Thank you, Judge.

11      (Pause)

12          MR. SMITH:   I'm sorry.   This is Jim Smith.   I

13  represent Diamond B Ranch.   I could not hear the Court's last

14  comment, and I think (unclear telephone transmission)

15          THE COURT:   Um --

16          MS. MOORE:   I think he said you're going to be

17  consistent -- I heard the word "consistent."

18          THE COURT:   I granted the motion.   Did you hear

19  that?

20          MR. SMITH:   Yes, Your Honor.   That's where I lost

21  you.   I'm sorry.

22          THE COURT:   All right, we'll we're just talking

23  about --

24          MR. SMITH: (unclear garbled telephone transmission)

25  have to speak closer to the mike.

1          THE COURT:   All right.   Well, the Courtroom Deputy

2    was just asking me how we're going to issue the summonses, so

3    are they just going to file appearances?

4          MR. TONER:   Some have already done that, over

5    objections of Superior.   The -- if summonses are necessary,

6    we thought the matter was addressed by calling them also

7    third-party defendants, with us filing a third-party complaint

8    so that the folks who have set up the ECF system could have a

9    complaint on file.

10         THE COURT:   So they -- just -- we don't need a --

11   we don't need a summons for anything that, if a lawyer is

12   coming in and appearing.   If they're not, then you talk to

13   the Clerk's Office about issuing a third-party summons.

14         MR. TONER:   Every one of these counsel have already

15   appeared in the general bankruptcy.

16         THE COURT:   Well, I don't care about that now.

17         MR. TONER:   Yeah.

18         THE COURT:   I just mean, are they going to come

19   forward and -- and file an answer --

20         MS. MOORE:   I think they've filed notices of

21   appearance in our Superior AP, Your Honor.

22         THE COURT:   Okay.

23         MR. LaTOUR:   Your Honor, Fifth Third has filed a

24   notice of appearance; and I believe the Texas group, too, but

25   I'm not absolutely certain of that.

1          THE COURT:   Okay, if they appeared you can just

2    mail it to them, or e-mail it them, or however you get it to

3    them, regular, and they can just answer.

4          MR. TONER:   Okay.  If that's sixty days, yes.

5          THE COURT:   All right.

6          MR. TONER:   There is an extra appearance I think

7    that Superior wanted to talk about.

8          MS. MOORE:   I think we've taken care of the other

9    one, Your Honor.

10          CLERK: (unclear)

11          THE COURT:   Okay.  For whom?   You need the

12    corporate ownership statement filed by the plaintiff.

13          MS. MOORE:   Your Honor, I thought we did that, but

14    I will follow up and make sure we did.   Thank you.

15          THE COURT:   All right, Friona.   Status update.

16          MR. TONER:   My memory on that is that Your Honor

17    has allowed everyone until September 1 to make whatever

18    amendments to their pleadings they feel are necessary.  We've

19    had that Rule 5 order saying that folks don't need to respond

20    to cross-claims and counterclaims --

21          THE COURT:   Right.

22          MR. TONER:   -- in addition to what they've done.

23    We had on the docket here a discussion of consolidating

24    issues, but counsel for Superior and I feel that once

25    September 1 comes and goes, hopefully those discussions will

1  be better framed, and we take a look at Mr. LaTour's

2  spreadsheet and Ms. DelCotto's spreadsheet about legal issues,

3  and we'll be better positioned in September to tell you what

4  we think the batting order should be.

5           THE COURT:  All right.  We'll continue that to

6  September 28th at ten a.m.  Innovative Livestock vs. Eastern.

7           MR. TONER:  Same -- same situation, except there we

8  proposed --

9           THE COURT:  Now which one is that?  Is that -- is

10 that one of the interpleaders?

11          MR. TONER:  Innovative, I believe, is --

12          MS. MOORE:  I think that's Kansas, Your Honor.

13          MR. TONER:  Yes.

14          THE COURT:  The Kansas --

15     (Low-voiced multiple discussions)

16          MS. MOORE:  Rush Creek is Colorado.

17          MR. TONER:  Right, Breeding Brothers is Colorado.

18

19          MS. MOORE:  So Rush Creek is Wisconsin.

20          MR. TONER:  Rush Creek is Wisconsin.  All of these

21 we have proposed that September 16 be a deadline for any

22 parties to amend their pleadings, do any changes they feel are

23 necessary, and then by the end of September whatever responses

24 to counterclaims or cross-claims are necessary to have those

25 filed.  Those deadlines have been well-received, and

1  hopefully we'll have something more formal to tender to make

2  that official.

3          THE COURT:   All right.   So for all the interpleader

4  actions, that includes Rush Creek and Breeding Brothers, we're

5  going to continue those to the next omnibus date?

6          MR. TONER:   That's right, and at that time

7  hopefully the pleadings will be just about closed in those

8  cases.   There are couple of service issues still lagging out

9  there in Colorado, I believe; but otherwise it looks like

10  folks have shown up.

11          THE COURT:   So we have -- are we -- right now we

12  just have four interpleader actions?

13          MR. TONER:   Yes.

14          THE COURT:   All right.   Friona, Innovative, Rush

15  Creek, and Breeding Brothers.

16          MR. TONER:   Correct.

17          MS. MOORE?:   Superior.

18          THE COURT:   I'm sorry, did somebody on the phone

19  say something?   Okay.   All right, that's all I have on my

20  agenda this afternoon.   Do parties have other matters to

21  bring before the Court?

22      (No response).

23          THE COURT:   All right, I just want to continue to

24  encourage the parties to do some of the things they're

25  obviously already doing in terms of trying to streamline

1  matters whenever possible.  I want to restate what I've said

2  earlier that even though I've said there need to be

3  adversaries, or it looks like there needs to be adversaries to

4  resolve some of their remaining issues about the monies that

5  are now going to be paid to the estate, that that doesn't

6  foreclose the possibility of resolving a discrete issue here

7  and there by -- by motion.

8          And, you know, the other underlying issue that we've

9  touched upon or danced around today, and that is the fact that

10 there's a lot of work that's going to have to be done in this

11 estate.  Hopefully we are going to be able to administer this

12 estate for the benefit of the creditors.  That's what we're

13 supposed to be doing, and everyone has to be conscious of

14 their clients' interests and of the fact that we have to pay

15 to administer the estate, that there's a cost to doing

16 business in this Court, and that's going to be ongoing.  It's

17 going to be reviewed, it's going to be reasonable, and it's

18 -- but it's going to be there, so I want everybody to keep

19 that in mind, too.

20          Anything further this afternoon?

21     (No response)

22          THE COURT:   We're adjourned.

23 (End at 3:22:41 p.m.)

24              *  *  *  *  *  *  *  *  *  *  *

25

1       I certify that the foregoing is a true and accurate

2 transcript from the digitally sound recorded record of the

3 proceedings.


/s/ *Gloria C. Irwin*                               9/9/2011

**GLORIA C. IRWIN**
**Certified Transcriber NJ AOC200**                                     **Date**
     **Federal  CERT #122**
**GCI TRANSCRIPTION SERVICES**
**210 Bayberry Avenue**
**Egg Harbor Township, NJ  08234-5901**
**609-927-0299  1-800-471-0299**
    **FAX  609-927-9768**
**e-mail  irwingloria@comcast.net**
✔