## UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF INDIANA - NEW ALBANY

===============================

IN THE MATTER OF:           .   Case #10-93904-BHL-11
                            .
EASTERN LIVESTOCK CO., LLC  .   New Albany, Indiana
                            .   **March 11, 2011**
                  Debtor    .   10:14:07 a.m. O'Clock

===============================

### TRANSCRIPT OF TELEPHONIC HEARING RE:
### (#78) PRE-TRIAL CONFERENCE AND FINAL HEARING ON:
### MOTION FOR RELIEF FROM STAY AND REFUSAL TO WAIVE 30-DAY PRELIMINARY AND 60-DAY FINAL HEARING TIME REQUIREMENT, FILED BY CREDITORS J&F OKLAHOMA HOLDINGS, INC., CACTUS GROWERS, INC., FRIONA INDUSTRIES, LP; (#143, 149) & (#163) OBJECTIONS BY FIRST BANK & TRUST CO.; (#162) OBJECTION BY TRUSTEE, JAMES A. KNAUER; (#259) TRUSTEE'S MOTION TO PAY POST-PETITION RECEIVER AND ATTORNEY FEES AND EXPENSES AND CERTAIN VENDOR EXPENSES; (#260)  MOTION OF DINSMORE & SHOHL AND RECEIVER FOR PERMISSION TO SEEK ALLOWANCE OF PRE-PETITION ATTORNEY AND RECEIVER FEES AND REIMBURSEMENT OF PRE-PETITION EXPENSES IN THE RECEIVERSHIP COURT, FILED BY OTHER PROFESSIONAL ELIZABETH M. LYNCH; (#325) OBJECTION TO MOTION FOR AUTHORITY FILED BY CREDITOR FIRST BANK & TRUST COMPANY
### (#263) MOTION FOR RELIEF FROM STAY AND WAIVER OF 30-DAY PRELIMINARY AND 60-DAY FINAL HEARING TIME REQUIREMENT, FILED BY CREDITOR GENERAL ELECTRIC CAPITAL CORPORATION;
### BEFORE THE HONORABLE BASIL H.  LORCH, III, J.U.S.B.C.
------------------continued------------------>

**APPEARANCES:**    (See following pages)

Electronic Sound Recording Operator:    Amy Bruckert

Proceedings Recorded by FTR Gold Digital Sound Recording
Transcript Produced by Certified Transcription Service

## GCI TRANSCRIPTION SERVICES
**210 Bayberry Avenue**
**Egg Harbor Township, NJ  08234-5901**
**1-609-927-0299      FAX 1-609-927-9768      1-800-471-0299**
**e-mail - irwingloria@comcast.net**

Page 2 Cover
#10-93904
3-11-2011

**CAPTION CONTINUED:**

**(#271) FINAL HEARING RE: TRUSTEE'S MOTION TO APPROVE TRUSTEE'S BORROWING AND USE OF CASH COLLATERAL, MODIFY THE AUTOMATIC STAY, PROVIDE ADEQUATE PROTECTION PAYMENTS, PROTECT CONFIDENTIAL INFORMATION, AND SCHEDULE FINAL HEARING;**

**(#317) PRELIMINARY HEARING RE: CORRECTED MOTION TO ABANDON, CORRECTED MOTION FOR RELIEF FROM STAY (REFUSAL TO WAIVE TIME REQUIREMENT FILED PREVIOUSLY) FILED BY CREDITOR PEOPLES BANK & TRUST COMPANY OF PICKETT COUNTY;**

**(#334) OBJECTION TO CORRECTED MOTION FILED BY JAMES A. KNAUER;**

**(#337) RESPONSE IN SUPPORT OF OBJECTION BY TRUSTEE JAMES A. KNAUER, FILED BY OTHER PROFESSIONAL KATHRYN PRY**

**(#324, #326, #327,# 328) OBJECTIONS THERETO BY: PETITIONING CREDITOR SUPERIOR LIVESTOCK AUCTION, INC; CREDITOR FIRST BANK & TRUST CO.; OTHER PROFESSIONAL KATHRYN PRY; CREDITORS CACTUS GROWERS, INC., FRIONA INDUSTRIES, LP, AND J&F OKLAHOMA HOLDINGS; CREDITOR PHILLIP TAYLOR. REED; (#340) RESPONSE IN OPPOSITION TO OBJECTION OF SUPERIOR LIVESTOCK AUCTION, BY TRUSTEE JAMES A. KNAUER;**

**(#349) RESPONSE IN SUPPORT OF MOTION FOR USE OF CASH COLLATERAL, FILED BY CREDITOR FIFTH THIRD BANK;**

**(#279) MOTION TO ABANDON, MOTION FOR RELIEF FROM STAY, AND REFUSAL TO WAIVE 30-DAY PRELIMINARY AND 60-DAY FINAL HEARING TIME REQUIREMENT, FILED BY CREDITOR FPC FINANCIAL;**

**(#315) OBJECTION THERETO BY TRUSTEE JAMES A. KNAUER;**

**(#281)  MOTION TO ABANDON, MOTION FOR RELIEF FROM STAY, AND REFUSAL TO WAIVE 30-DAY PRELIMINARY AND 60-DAY FINAL HEARING TIME REQUIREMENT, FILED BY CREDITOR DEERE & COMPANY;**

**(#316) OBJECTION THERETO BY TRUSTEE JAMES A. KNAUER;**

**(#320) EXPEDITED HEARING RE: APPLICATION TO EMPLOY THE BMC GROUP, INC., AS NOTICE AND CLAIMS AGENT, FILED BY TRUSTEE JAMES A. KNAUER; BEFORE THE HONORABLE BASIL H.  LORCH, III, J.U.S.B.C.**

**APPEARANCES: (See next page)**

APPEARANCES: (See next page)

Electronic Sound Recording Operator:  Amy Bruckert

Proceedings Recorded by FTR Gold Digital Recording
Transcript Produced by Certified Transcription Service

GCI TRANSCRIPTION SERVICES
210 Bayberry Avenue
Egg Harbor Township, NJ  08234-5901
1-609-927-0299      FAX 1-609-927-9768      1-800-471-0299
e-mail - irwingloria@comcast.net

Page 3 Cover
#10-93904
3-11-2011

**APPEARANCES: (continued)**

| | |
|---|---|
| For Petitioning Creditors, Moseley Cattle Auction, Moseley Cattle Auction, et al: For Greenebaum, Doll & McDonald: | JOHN W. AMES, ESQ. C.R. "CHIP" BOWLES, ESQ. CHRISTIE A. MOORE, ESQ. Greenebaum, Doll & McDonald, PLLC 101 S. 5th Street   #3500 National City Tower Louisville, KY 40202 |

Chapter 11 Trustee:                         JAMES A. KNAUER, ESQ.
                                            Kroger Gardis & Regas, LLP
                                            111 Monument Circle, Suite 900
                                            Indianapolis, IN 46204

For the Chapter 11 Trustee:                 JAMES M. CARR, ESQ.
                                            ROBERT K. STANLEY, ESQ.
                                            TERRY HALL, ESQ.   *(Via phone)*
                                            Baker & Daniels, LLP
                                            300 North Meridian   Suite 2700
                                            Indianapolis, IN 46204

For First Bank & Trust Company:             DANIEL J. DONNELLON, ESQ.
                                            Faruki, Ireland & Cox, PLL
                                            201 East Fifth Street   Suite 1420
                                            Cincinnati, OH 45202

                                            BRET S. CLEMENT, ESQ.
                                            Ayers, Carr & Sullivan, P.C.
                                            251 E. Ohio Street   Suite 500
                                            Indianapolis, IN   46204
                                            -------------- -- continued----------->

Electronic Sound Recording Operator:   Amy Bruckert

Proceedings Recorded by FTR Gold Digital Recording
Transcript Produced by Certified Transcription Service

GCI TRANSCRIPTION SERVICES
**210 Bayberry Avenue**
**Egg Harbor Township, NJ  08234-5901**
**1-609-927-0299      FAX 1-609-927-9768      1-800-471-0299**
**e-mail - irwingloria@comcast.net**

**APPEARANCES: (continued)**

For Fifth Third Bank:                    EDWARD M. KING, ESQ.
                                         Frost, Brown & Todd, LLC
                                         400 W. Market Street    3nd Fl.
                                         Louisville, KY 40202

                                         RANDALL D. LaTOUR, ESQ.
                                         Vorys, Sater, Seymour & Pease, LLP
                                         52 East Gay Street
                                         Columbus, OH   43216

For Kathryn Pry RE: Gibson:              DEBORAH J. CARUSO, ESQ. *(Via phone)*
                                         Dale & Eke, P.C.
                                         9100 Keystone Crossing,   Suite 400
                                         Indianapolis, IN 46204

For Friona Industries:                   JOHN FREDERICK MASSOUH, ESQ.
                                         JOHN HUFFAKER, ESQ.   *(Via phone)*
                                         Sprouse Shrader Smith, P.C. *(Via phone)*
                                         701 S. Taylor   Suite 500
                                         Amarillo, TX   79105

For Cactus Growers, Inc.; Friona Indus-  MARK A. ROBINSON, ESQ.
tries, and J&F Oklahoma Holdings, Inc.:  Lovell, Lovell, Newson & Isern, LLP
                                         112 W. 8th Avenue   Suite 1000
                                         Amarillo, TX 79101

                                         CURCY PEOPLES (sic)   *(Via phone)*
                                              ---------continued---------------->

Electronic Sound Recording Operator:   Amy Bruckert

Proceedings Recorded by FTR Gold Digital Recording
Transcript Produced by Certified Transcription Service

GCI TRANSCRIPTION SERVICES
**210 Bayberry Avenue**
**Egg Harbor Township, NJ  08234-5901**
**1-609-927-0299      FAX 1-609-927-9768      1-800-471-0299**
**e-mail - irwingloria@comcast.net**

Page 5 Cover
#10-93904
3-11-2011

**APPEARANCES: (continued)**

For Eddie Eicke:                              JAMES BRYAN JOHNSON, ESQ. *(Via phone)*
                                             Easterwood, Boyd & Simmons, P.C.
                                             623 N. Main Street   PO Box 273
                                             Hereford, TX 79045

For J&F Oklahoma Holdings, Inc.              DAVID L. LeBAS, ESQ. *(Via phone)*
                                             Namen, Howell, Smith & Lee, PLLC
                                             Suite 490
                                             8310 N. Capital of Texas Highway
                                             Austin, TX    78731

For Intrust:                                 SARAH STITES FANZINI, ESQ.
                                             JEFFREY E. RAMSEY, ESQ.
                                             Hopper Blackwell, P.C.
                                             111 Monument Circle, Suite 452
                                             Indianapolis, IN 46204

For Bluegrass Stockyards, LLC, and           LAURA DAY DELCOTTO, ESQ. *(Via phone)*
related entities:                            DelCotto Law Group, PLLC
                                             200 North Upper Street
                                             Lexington, KY 40507

For CPC Livestock:                           JESSICA E. YATES, ESQ.    *(Via phone)*
                                             Snell & Wilmer, LLP
                                             1200 Seventeenth Street    Suite 1900
                                             Denver, CO    80202

For Florida Livestock Market:                W. SCOTT NEWBERN, ESQ.
                                             2982 E. Giverny
                                             Tallahassee, FL 32309
                                                    -----------continued-------->

Electronic Sound Recording Operator:    Amy Bruckert

Proceedings Recorded by FTR Gold Digital Recording
Transcript Produced by Certified Transcription Service

GCI TRANSCRIPTION SERVICES
210 Bayberry Avenue
Egg Harbor Township, NJ  08234-5901
1-609-927-0299      FAX 1-609-927-9768      1-800-471-0299
e-mail - irwingloria@comcast.net

Page 6 Cover
#10-93904
3-11-2011

**APPEARANCES - Continued**

<u>For Stockman Oklahoma</u>:                    ROSS PLOURDE, ESQ.   *(Via phone)*
                                              McAfee & Taft, P.C.
                                              211 N. Robinson Ave.
                                              Oklahoma City, OK 73102


<u>For Deere & Company</u>:                       KAREN L. LOBRING, ESQ.
                                              Lobring & Associates, LLP
                                              5977 West State Road 252
                                              Edinburgh, IN 46124


<u>For G.E. Capital Corporation</u>:             THEODORE A. KONSTANTINOPOULOS, ESQ.
                                                  *(Via phone)*
                                              Javitz, Block & Rathbone
                                              1100 Superior Avenue    19th Fl.
                                              Cleveland, OH   44114


<u>For Agribeef</u>:                             JUSTIN A. STEINER, ESQ.
                                              Givens Pursley, LLP
                                              601 W. Bannock Street
                                              Boise, Idaho  83702


<u>For First Bank & Trust Company</u>:          STEPHEN A. WEIGAND, ESQ.   *(Via phone)*
                                              Faruki Ireland & Cox, P.L.L.
                                              201 East Fifth Street    Suite 1420
                                              Cincinnati, OH   45202

                                              BRET S. CLEMENT, ESQ.
                                              Ayers, Carr & Sullivan, P.C.
                                              251 E. Ohio Street   Suite 500
                                              Indianapolis, IN   46204
                                                  ------continued------------>


<u>Electronic Sound Recording Operator</u>:    Amy Bruckert

Proceedings Recorded by FTR Gold Digital Recording
Transcript Produced by Certified Transcription Service

GCI TRANSCRIPTION SERVICES
**210 Bayberry Avenue**
**Egg Harbor Township, NJ  08234-5901**
**1-609-927-0299      FAX 1-609-927-9768      1-800-471-0299**
**e-mail - irwingloria@comcast.net**

**APPEARANCES: (continued)**

For Kentucky Cattlemen's Association:    ROBERT H. FOREE, ESQ.
2440 Eminence Road
Eminence, KY 40019

For Peoples Bank & Trust Co. Of
Pickett County:    LISA KOCH BRYANT, ESQ.
Foley Bryant Holloway & Raluy
500 West Jefferson Street   Suite 2450
Louisville, KY   40202

For Wells Fargo Capital Finance:    JEFFREY T. WEGNER, ESQ.  *(Via phone)*
Kutak Rock, LLP
The Omaha Building
1650 Farnam Street
Omaha, NE   68102

For the U.S. Trustee:    CHARLES R. WHARTON, AUST *(Via phone)*
Office of the U.S. Trustee
101 W. Ohio Street   Suite 1000
Indianapolis, IN   46204

For Receiver, Elizabeth M. Lynch:    KIM MARTIN LEWIS, ESQ.
Dinsmore & Shohl, LLP
255 E. Fifth Street    Suite 1900
Cincinnati, OH   45202
-------continued-------------->

Electronic Sound Recording Operator:    Amy Bruckert

Proceedings Recorded by FTR Gold Digital Recording
Transcript Produced by Certified Transcription Service

**APPEARANCES: (continued)**

For Superior Livestock Auction and          JOHN M. ROGERS, ESQ.
Joplin Regional Stockyards:                 ELLIOTT LEVIN, ESQ.
                                            Rubin & Levin, P.C.
                                            500 Marott Center
                                            342 Massachusetts Avenue
                                            Indianapolis, IN 46204-2161

General Counsel, Farm Credit West:          CHRISTOPHER  BRUMFIELD, ESQ.
                                                *(Via phone)*
                                            No address known or provided

Electronic Sound Recording Operator:    Amy Bruckert

Proceedings Recorded by FTR Gold Digital Recording
Transcript Produced by Certified Transcription Service

GCI TRANSCRIPTION SERVICES
**210 Bayberry Avenue
Egg Harbor Township, NJ  08234-5901
1-609-927-0299      FAX 1-609-927-9768      1-800-471-0299
e-mail - irwingloria@comcast.net**

1  (At 10:14:07 a.m.)

2  NOTE:   Terry Hall, and others via telephone transmission, VERY difficult to hear.   Low

3  audibility, fuzzy reception, not near any microphone that could be isolated and enhanced.

4  Many "(unclear)" notations are the result of poor audibility.

5                                  * * * * * * * * *

6          THE COURT:   All right, we're on the record.

7  We're going to take up matters in the Thomas and Patsy Gibson

8  case as well as Eastern Livestock.   There are several

9  lawyers here in the courtroom and twenty-some-odd on the

10  phone, so I'm going to ask if you'd all try to remember to

11  identify yourself before you speak.   We're trying to make a

12  record here.

13  (Go to 10:19:31 a.m.)

14          THE COURT:   All right.   In the matter of Eastern

15  Livestock.   Let's take up -- let's go through and identify

16  the motions that are either not going to be heard today or

17  there's no objection to.

18          Who wants to take me through the agenda?   Ms. Hall,

19  you want to do that?

20          MS. HALL:   I can, Your Honor, if you want to start

21  with the matters that are probably not contested or (unclear,

22  low-voice on telephone transmission)

23          THE COURT:   Yes.

24          MS. HALL:   I direct attention to item #2 under

25  Roman numeral (unclear)   starts on page 3 of the agenda.   The

1  motion of the Trustee to pay post-petition fees and a motion

2  of Dinsmore & Shohl (unclear remainder of sentence.  VERY low

3  audibility with telephone transmission).

4          THE COURT:  I would remind everybody that's on the

5  phone, if you're not speaking to please put your phone on

6  mute.  We're getting a little bit of some background noise.

7  And as always, don't put us on hold, especially if your phone

8  system plays music.

9          MS. HALL:  There is one objection filed by First

10 Bank & Trust Company.  And my understanding is that objection

11 has been resolved and that no other objections have been

12 filed and we'd ask for approval of the motions.  Mr.

13 Donnellon or someone representing First Bank & Trust here?

14          THE COURT: Yes.

15          MR. CLEMENT:  Yes, Your Honor.

16          THE COURT:  Name, please.

17          MR. CLEMENT:  Bret Clement representing First Bank

18 & Trust.

19          We've talked to Dinsmore & Shohl, and I think we've

20 got an understanding.  Basically the motion -- well, we

21 objected to two things.  One was the lack of an accounting.

22 We've been directed to where they filed an accounting in the

23 State Court receivership and we're satisfied with that.

24          The other question that presents is simply who

25 should be making the determination to allow their fees.  The

1  Bankruptcy Code clearly provides that the Bankruptcy Court

2  should make a determination to allow those fees in cases

3  where you have a pre-petition custodian.

4       There are some cases where the Bankruptcy Judge just

5  sent it back to the State Court for like an advisory opinion

6  or a recommendation.  I mean, if Your Honor thinks that's

7  required, we don't have any objection to that.  And it's my

8  understanding, and Kim Lewis can speak to it, that they don't

9  really care who approves it, just so somebody does.

10      THE COURT:  I imagine that's true.  Well, it's

11  going to be paid by the estate.

12      MR. CLEMENT:  Actually it's my understanding that

13  there were some monies advanced by Fifth Third to --

14      THE COURT:  Right.

15      MR. CLEMENT:  -- the Receiver, and they're sitting

16  in Dinsmore & Shohl's IOLTA account, and that would be the

17  source of payment.

18      THE COURT:  Yes, ma'am?

19      MS. LEWIS:  Yes, Your Honor.  Kim Martin Lewis from

20  Dinsmore & Shohl on behalf of DSI and Dinsmore & Shohl.

21      The Receiver did receive funds from Fifth Third Bank

22  as well as receipts during that period of time.  There were

23  monies put into Dinsmore & Shohl's IOLTA account during the

24  receivership period.  There's sufficient funds in there to

25  cover the amounts for the pre-petition receivership period to

1  cover both Dinsmore & Shohl and DSI's fees.

2          THE COURT:  All right, I'll approve it.

3          MS. LEWIS:  Thank you, Your Honor.

4          MR. WHARTON:  Your Honor, this is Chuck Wharton from

5  the United States Trustee's Office.

6          THE COURT:  Yes.

7          MR. WHARTON:  And our office reviewed the exhibits

8  attached to both applications, and we find nothing

9  objectionable, although perhaps not discrete and specific as

10  we'd like, but we don't object to it.

11          THE COURT:  Thank you, Mr. Wharton.

12          MS. LEWIS:  Thank you, Your Honor.

13          THE COURT:  Did you want to address something?

14          MR. FOREE:  Your Honor, I'm Robert Foree,

15  representing the Kentucky Cattlemen's Association.

16          Our Board of Directors saw a list of these fees, and

17  they were just concerned that primarily we wanted to support

18  this action to protect the rights of the cattlemen.  We're

19  hoping that you will use your discretion and closely

20  scrutinize the motion for fees.  We didn't file an objection,

21  but at the same time we would hope that the estate will be

22  protected at all costs for the cattlemen.  That's our concern,

23  and we hope that you'll closely monitor it.

24          I did look at some of the exhibits, and I would

25  question whether some of those are reasonable and necessary.

1  Thank you.

2          THE COURT:  So -- so this is a non-objecting

3  objection?

4          MR. FOREE:  Well, we're trusting your discretion to

5  review them closely.

6          THE COURT:  All right, they're approved.

7          MR. FOREE:  Thank you.

8          THE COURT:  Thank you.

9          MR. CLEMENT:  May I clarify, Your Honor?

10          THE COURT:  You may.  Ms. Hall, this is one of the

11  simple matters that we're taking up first.

12          MS. HALL:  (Unclear telephone -- low audibility).

13          THE COURT:  That's all right.

14          MR. CLEMENT:  The motion sought it to be sent back

15  to State Court to allow it, and when you say you're allowing

16  it, I'm not sure what it is you're allowing.

17          THE COURT:  Well, I'm granting the motion that's

18  before me, which was the motion of Dinsmore & Shohl and

19  Receiver for permission to seek allowance of pre-petition

20  attorney and Receiver fees and reimbursement.  So --

21          MS. LEWIS:  We will -- excuse me, Your Honor.

22          THE COURT:  No, go ahead.

23          MS. LEWIS:  We will submit a revised order because

24  the order provided in the alternative either the Court, this

25  Court, having reviewed the fees with Mr. Wharton approving

1  them, or sending it back to State Court for their review.  We

2  didn't want to suggest the Court could do -- the Court could

3  do either one.

4        THE COURT:  I think it should go back to State

5  Court.  The -- they're the ones that created the receivership,

6  and they're the ones that I think -- I'm just -- I'm willing

7  to sign the order that says as far as this Court's concerned,

8  the fees are fine.  But I think you need an order out of the

9  State Court that created the entity would be my impression.

10       MR. DONNELLON:  Your Honor, Dan Donnellon for First

11 Bank.  As the attorney who objected to the State Court action,

12 I'll work with Ms. Lewis to promptly put on an order that we

13 can send to Judge Winkler to get back to you.

14       THE COURT:  Okay.  All right.  Thank you.

15       MS. LEWIS:  Thank you.

16       THE COURT:  All right, Ms. Hall.

17       MS. HALL:  Item #4, filed by (unclear) Capital

18 Corporation for relief from stay (unclear).  The Trustee

19 examined the motion, did not object, reached out to Mr.

20 Konstantinopoulos (unclear) G.E. and said they do not believe

21 there's any equity in the equipment and had no objection to

22 having (unclear) G.E. recover the equipment.  The only

23 (unclear) The Trustee does not know where the (unclear) are.

24       THE COURT:  All right.  Is anybody here for G.E.?

25       MR. KONSTANTINOPOULOS:  Yes, Your Honor, Ted

1  Konstantiniopoulos on behalf of G.E.

2         I have spoken to the Trustee's Office.  We are aware

3  that they not (unclear) to the location of the two Peterbilt

4  trucks.  We have worked on putting together an agreed order

5  (unclear) this hearing.

6         THE COURT:  That will be fine.  I'm sure the

7  motion's granted.

8         MR. KONSTANTINOPOULOS:  Thank you, Your Honor.

9         MS. HALL:  The next item that we hope is not

10 (unclear)  Your Honor, is Item #6, the motion for relief from

11 stay by FPC Financial.  This is related to a small piece of

12 equipment that is an agricultural gator.  We filed a limited

13 only as to the request for abandonment under the stay.  We do

14 not believe that -- we are not sure whether or not this

15 equipment has any equity in it and thus have no objection as

16 to FPC recovering the piece of equipment (unclear) and

17 providing accounting to the Trustee and permitting any

18 (unclear) of proceeds.

19        MS. LOHBRING:  Your Honor, Karen Lohbring for FPC

20 Financial.  That's fine, Your Honor.  We have discussed that

21 with the counsel, and that's fine with us.

22        THE COURT:  All right, submit me an agreement and

23 I'll approve it, causing that disposition of the property.

24        MS. HALL:  And that would move us to Item #7 which

25 is the motion for relief from stay filed by John Deere -- by

1  Deere & Company. The same situation, Your Honor.  A piece of

2  equipment, I'm not sure whether there's any equity.  We don't

3  have an objection to the stay relief.  We do object to the

4  motion for abandonment and we ask that you (unclear) an

5  accounting received by the Trustee and we ask that proceeds

6  (unclear) back to the estate.

7          THE COURT:  Ms. Lohbring.

8          MS. LOHBRING:  Karen Lohbring for Deere & Company.

9  Yeah, that's fine, Your Honor.

10          THE COURT:  All right.  I show that that's approved.

11          MS. HALL:  The last item that -- Item #8 on the

12  agenda has already been dealt with by the Court in a prior --

13  as part of the Gibson bankruptcy.

14          Item #9 IS --

15          THE COURT:  I'm sorry, Ms. -- I  couldn't hear what

16  you said about item #8.

17          MS. HALL:  Item number 8 is the Peoples Bank and

18  Trust that we felt was related to, when you were taking up the

19  Gibson bankruptcy.

20          THE COURT:  Oh, yes, yes, yes.

21          MS. HALL:  So that one's been resolved.

22          Item #9 is an application by the Trustee to retain

23  BMC for (unclear) for (unclear) The local rules of the Court

24  requires (unclear)  an agreement for (unclear) failure to

25  enforce.  We talked with BMC, and we would like to hire them

1 in a limited capacity to provide the noticing part for when we

2 have, you know, all creditors noticing, and also to accept the

3 claims and do a (unclear) them in, put them on a spreadsheet

4 and deliver them to Financial -- to DSI for analysis.

5          THE COURT:  And --

6          MS. HALL:  On an expedited basis, I don't think

7 (unclear) --

8          THE COURT:  Does anybody object to that?  That is a

9 requirement of the local rules that if the creditor body

10 reaches a certain number, you have to have a claims agent.  So

11 I'll approve that motion.

12          MS. HALL:  And with that, Your Honor, I think the

13 rest of the matters will be taken up by attorneys in the

14 courtroom.

15          THE COURT:  Okay, thank you.

16          First let's take up, I know we had a phone

17 conference a few days ago about the -- the relief motion.

18 Why doesn't someone status -- I think we were just going to

19 status that this morning.  Go ahead.

20          MR. STANLEY:  Thank you, Your Honor.  Robert Stanley

21 for the Trustee.

22          We did have an attorneys' conference as you

23 requested that occurred yesterday morning by telephone, that

24 someone described as very well attended.  It was.  There were

25 twenty some participants in the conference, in which we

1 discussed how to handle what we've been calling the Texas

2 interpleader.  So it's Friona, et al.  There are three

3 interpleader plaintiffs that are together in the case in

4 Amarillo, Texas in Federal Court that is -- will be headed

5 this way presumably, assuming that the Texas Court grants the

6 motion, if that's what everyone has agreed to.

7          Those cases present some complexity because they are

8 overlapped with a larger overarching dispute between the

9 Trustee and Superior Livestock.  A sizable portion of the

10 interplead funds are funds that Superior claims ownership in,

11 and the Trustee disputes that.   Then in addition to the

12 Superior piece of the interplead funds, you have interplead

13 funds from a variety of other independent cattlemen producers

14 and sellers.

15          The overarch with Superior is that the interplead

16 funds are part, or some of 500 some contracts that Superior

17 claims were assigned to it by the debtor pre-petition as its

18 falling.  And that we have disputes about that.

19          So I've had discussions with counsel for Superior,

20 Mr. Bowles, how to address the larger dispute, and then we

21 took that up yesterday.

22          Then to just add one more layer of complexity, there

23 are three State Court interpleader actions out there that are

24 in some way smaller versions of the Texas interpleader.  One

25 in Kansas, one in Colorado and one in Wisconsin.  And at least

1  some of those also have a Superior element to them.

2          THE COURT:  They're all stayed at this time.

3          MR. STANLEY:  They're all stayed as to the debtor.

4  The Texas interpleader case, the Judge stayed it entirely.  In

5  the State Courts I believe, and I could be wrong about this,

6  but I believe they've been stayed only as to the debtor, but I

7  think that effectively stays them because you can't really

8  adjudicate the claim, the claims.

9          The solution -- a solution that we discussed

10 yesterday and that the Trustee has proposed in a memorandum

11 that I just sent out yesterday, so I'm not saying that

12 everyone has had a chance to fully vet it, would be in essence

13 to sever the Superior piece of the interpleaders from the non-

14 Superior pieces.  And then for Superior to file an independent

15 adversary proceeding that would put at issue all of the

16 disputes between the Trustee and Superior.  And then you

17 could consolidate that adversary proceeding with the

18 bifurcated Superior parts of the interpleader.

19         So the idea would be then to get all of the

20 Superior-related disputes in one consolidated proceeding, and

21 allow the non-Superior pieces that involve the independent

22 producers, to proceed without getting drawn into what is going

23 to be I think a protracted case of litigation with Superior.

24         THE COURT:  Well, let me interrupt you.

25         I can see, and I'm aware that Superior has disputes

1  with the estate, or the estate has disputes with Superior,

2  outside the scope of the interpleader funds, the funds that

3  have been interpled.

4         But as to the funds that have been pled, don't we

5  have to adjudicate Superior's claim with everyone else in

6  order to determine priority?  Doesn't that portion of their

7  claim have to be -- I mean, we don't want inconsistent

8  adjudications.

9         MR. STANLEY:  Right.  I don't think so, because each

10 -- if you think of each lot of cattle that came in, each load

11 as a separate dispute --

12        THE COURT:  Okay.

13        MR. STANLEY:  -- the problem is that because, let's

14 say if you're Friona, well, you have these coming in from all

15 directions, and they put them all in one case, which makes

16 sense from their perspective.

17        But the issues that get resolved with relation to

18 Superior shouldn't have any, I mean, any direct overlap with

19 the non-Superior.

20        THE COURT:  Because of several lots, is that what

21 you're telling us?

22        MR. STANLEY:  Yes.  And they're each on their own

23 different facts.

24        The Superior facts, the Superior disputes will all

25 involve a common nucleus of facts.  But let's take for example

1  Bynum who we have.  Whether Bynum has ownership of those

2  cattle or not has absolutely nothing to do with the Superior

3  dispute.

4        And the solution that we have proposed of

5  bifurcating the Superior and non-Superior pieces should allow

6  the non-Superior piece to go forward on a more expedited basis

7  and get those people's claims resolved more quickly than if

8  they have to be as part of the same proceeding as Superior.

9        THE COURT:  I understand.

10        MR. STANLEY:  And what we have proposed in response

11  to some concerns that have been expressed, would be as part of

12  these, the order that would create this procedure, it would

13  provide that, that preclusion doctrine such as collateral

14  estoppel, law of the case, wouldn't apply from one proceeding

15  across another.

16        So a ruling in the Superior consolidated piece of it

17  wouldn't be deemed to be binding on the independent producers.

18  That way they wouldn't have to monitor --

19        THE COURT:  All their lawyers wouldn't have to come

20  to the hearing and be worried with otherwise --

21        MR. STANLEY:  Exactly.  They wouldn't feel compelled

22  to follow along in the Superior case.

23        Now, obviously, I guess I say obviously, the

24  plaintiffs, Friona, et al, would end up participating in both

25  pieces because they have interpled funds that would be both in

1  the Superior component and the non-Superior component.  Then I

2  really don't know how to -- the other -- they're going to be

3  dragged down into that one way or the other, and they have

4  offset claims that apply to both of them.

5          So that's the solution that we had proposed.  We

6  believe that if we could put this in place, I would project

7  that we could complete discovery on the non-Superior pieces

8  within six months.

9          We do have 40, 50 some claims.  And if you look at

10 any one of them individually, you could say, "Well, I could

11 get buyouts done quickly," but we can't do them all at once

12 quickly.

13         The Superior piece we think is much more complex.

14 As I say, it involves 500 assignments.  There's much that we

15 don't know about what has happened since the assignments that

16 we'd have to have discovery on.  And just assembling all the

17 documents I think is going to take some time in addition to

18 the depositions.  We think it's something more like a 12-month

19 discovery period on the, to resolve all the Superior disputes.

20         THE COURT:  All right.

21         MR. STANLEY:  That's my report.

22         THE COURT:  Mr. Ames.

23         MR. AMES:  Yes, Your Honor, John Ames and Chip

24 Bowles for Superior with respect to this.  We would not be

25 participating in various other portions of the case due to a

1  conflict with Fifth Third, but Mr. Rogers and Mr. Levin will

2  be speaking for them.

3         Mr. Stanley is correct.  We did have an extensive

4  call yesterday and he circulated a memo which we're assessing

5  now.  But in essence, that's the general aspects are accurate.

6         It's been the position of Superior that first of

7  all, the Court has to determine what is property of the estate

8  and what isn't, and it's our position that a good bit of the

9  claims will not adhere to what we are saying is Superior's

10  property.  That will be handled or maybe other aggregate

11  claims, other claims that we brought, but not with respect to

12  the debtor's interest.

13         And that's what we're going to be working on.  So

14  that will be clearly a more efficient way I think to handle

15  it.  To sever it, to bifurcate it as Mr. Stanley said, and

16  that way the Court won't have to go over to Young Center and

17  take out that because you'd have your lawyers.

18         But I think we're working through that, and it looks

19  like we'll be able to -- we're hoping that Mr. Stanley's

20  estimate of twelve months for discovery is going to be way

21  long.  We would like to have it completed before then.

22         THE COURT:  So I hear you saying that this is --

23  this blueprint which I understand the details have not been

24  locked down yet, but this blueprint is acceptable to Superior

25  in terms of bifurcation of their disputes from the other

1  parties' disputes, and that you all can work up an agreement

2  to that effect.

3          MR. AMES:  We're working at it, we're waiting for

4  instruction from counsel.  They're in California so we

5  obviously are having a delay.

6          MR. DONNELLON:  Your Honor -- oh, go ahead.  Dan

7  Donnellon on behalf of First Bank.  I want to just address a

8  threshold issue here that in some respects, as with this

9  blueprint, has the cart in front of the cow, to excuse the

10 pun.

11         If the Court will indulge me for just a brief two

12 minutes, the threshold issue relates to, no one disputes

13 Eastern Livestock was one of the largest if not the largest

14 cattle broker in the world.   Eastern Livestock started

15 bouncing the checks and went out of business in November.  The

16 stream of cattle that was in the United States that would go

17 in a matter of six to seven months from calving -- from

18 calving to feed lot to finish to slaughter, did not slow down

19 in the least bit.

20         So when Eastern fell off the face of the earth, the

21 cattle didn't.  And the threshold issue that may make some of

22 these premature is where did the cattle go?  It relates not

23 only to these interpleader actions, but tangentially to the

24 more robust issue we will discuss later with respect to the

25 financing motion.

1        On behalf of First Bank, we issued several discovery

2   requests over a month ago.  We inquired as to the Court's

3   preference in this respect and issued 2004 discovery requests

4   indicating we haven't filed a motion yet but we'd like to work

5   this expeditiously.  If we do need to file one, we will.

6        The primary focus of that is to the three cattle lots,

7   the larger feed lots in the country that are in the

8   interpleader action.  That interpleader action in Texas

9   relates to a small window of cattle that was at the time

10  Eastern was bouncing checks.  So it's the tip of this iceberg

11  of cattle that went into the feed lots, ultimately slaughtered

12  and into steaks.

13        And we've asked those feed lots to get us a report

14  out of their computer database that simply says, "From

15  November or late October of 2010 through the current, a very

16  short four or five-month period, tell us all the cattle that

17  came to your feed lot, tell us the origin, the weight, the

18  source," so that we can see was there self help going on, were

19  these cattle that was paid into Eastern that somehow

20  disappeared?  Is it money that's owing to Eastern now?  Were

21  there people bypassing Eastern's producer contracts?  And we

22  have gotten absolutely no cooperation from those three feed

23  lots.

24        I sent a proposal.  "Give us just a computer

25  report."  At first they said, "You're going to have two years

**#10-93904**                                              **3-11-2011**

1   of paperwork to go through because we have such huge

2   operations."  Of course that's not what we're asking.  My

3   client doesn't want to pay me to do that.

4            We asked for just a computer-generated report

5   showing all of *Eastern's* cattle sales to these feed lots in

6   the May, June, July time frame when the alleged kite was going

7   on so we could see what was really being sold and fed.

8            Then we've asked for this narrow window of all, not

9   just Eastern, but, "-- all sources that you got cattle from,

10  from November, October, through the present," so we can look

11  at the computer reports and say, "Wow, it looks like this is

12  cattle that's secured by my client, by Mr. LaTour's client, by

13  Mr. Ramsey's client.  So we can see where the cattle went."

14           And that's why we're not necessarily short-cutting

15  the process filing this separate Superior interpleader when we

16  don't know what cattle are involved in the separate Superior

17  interpleader.  And it's not going to narrow the issue if we

18  say only people who have an interest in that cattle need to

19  intervene because we don't know yet who has an interest in

20  that cattle.  And until we can break that logjam and have the

21  Court compel these feed lots to respond to very simple

22  discovery requests, we are not going to be able to move this

23  case forward.

24           THE COURT:  All right.

25           MR. HUFFAKER:  Your Honor, John Huffaker for Friona.

1  We have been in a number of communications with Mr. Donnellon

2  over this issue.   What he is talking about and what

3  supposedly is simple is not simple.   In that time period that

4  he's talking about our client alone probably (unclear)

5  acquired 200,000 head of cattle in maybe a thousand, 2,000

6  different shipments.

7          But that's the cart before the horse.   That

8  discovery dispute is something that we would continue to work

9  on, but I simply object to trying to take it up with part of

10  this discussion.

11          THE COURT:  All right.

12          MR. RAMSEY:  Judge, Jeff Ramsey on behalf of

13  Intrust, and pardon me for quoting one of my favorite old

14  movies, but Howard Johnson's right.   You know?  I'm pretty

15  sure, we all discussed this yesterday and I would be the first

16  to admit that although (unclear)  and I came into this --

17          MR. HUFFAKER: (unclear, low-volume telephone

18  transmission, overspeaking)

19          MR. RAMSEY:  I hear voices.

20          MR. HUFFAKER:  (Unclear, very poor telephone

21  transmission) all records of all sorts of (unclear) which is

22  on behalf of a (unclear) Gibson, (unclear)  for example the

23  debtor (unclear)  for purposes of (unclear).

24          MS. CARUSO:  Your Honor, Debbie Caruso.  Mr. Gibson

25  is (unclear) bankruptcy; and the Trustee has also (unclear) in

1  getting these records, but I spoke with Mr. Donnellon and Mr.

2  Ramsey about (unclear) got cut off.

3          THE COURT:  Thank you.  Now we're going to let

4  somebody in the courtroom speak.

5          MR. RAMSEY:  Is it my turn?

6          THE COURT:  Yes, go ahead.

7          MR. RAMSEY:  All right.  It's not the first time

8  I've heard voices, Your Honor, so --

9          I'm going to have to ride on Mr. Donnellon's coat

10  tails, and no offense to Mr. Stanley's hard work, but, I mean,

11  it seems to me we just don't have enough, as one of the banks

12  here, eventually Mr. Donnellon and I will probably be fighting

13  over who's on first with these cattle.

14          But in the meantime, for the short time that Ms.

15  Fanzini had to review this stuff and read the only two

16  depositions I think that have been done thus far in this case,

17  it's abundantly clear, these cattle, these are motel cattle.

18  They were checking them in and out all over the place.  And

19  once these various entities that all seem to be somehow

20  related to the Gibsons.

21          So the problem I have with this is, I appreciate

22  we're trying to figure out how to do this, but at this point

23  it, (a), seems to be soon.  We simply don't have these

24  threshold issues answered yet.

25          Plus in all honesty, with twenty lawyers on the

1  phone, I'm worried now that we probably made this even more

2  complicated.  Because it seems to me, and I don't know because

3  I'm in this -- you can tell me if I'm wrong, but we bring the

4  interpleader in, call it the interpleader or the adversary or

5  whatever, I know a lot of these people are worried about their

6  smaller claims and getting out fast, but it seems to me the

7  mechanism there would simply be to go ahead and file their

8  motions for summary judgment as to their issues, rather than

9  -- my fear is, you know, my bank's already owed nine million,

10  and now I'm going to have to join into a whole slew of

11  adversaries and monitor all those, too.

12         So I've got two beefs with this, a number -- I

13  didn't mean that one, Judge, you know me well enough.  Number

14  one, I agree with Mr. Donnellon.  We're  -- and I'm just

15  trying to fill you in, I'm not trying to kill all the work we

16  did yesterday.  I just think we're ahead of ourselves because

17  we don't know who has the cattle yet and where they are.

18         THE COURT:  All right.

19         MR. RAMSEY:  And number two, I think this is

20  probably going to be too convoluted in all honesty.

21         THE COURT:  Okay.

22         MR. RAMSEY:  Thank you, Your Honor.

23         THE COURT:  Well, I agree that it's going to be

24  convoluted.  But I'm not sure there's a non-convoluting path

25  that we can go down here.  Yes?

1          MR. LATOUR:  Thank you, Your Honor.

2          THE COURT:  Name please for the record.

3          MR. LaTOUR:  I'm sorry, Your Honor.  Randall LaTour

4   representing Fifth Third Bank.

5          The blueprints and the time line's generally

6   acceptable.  Having heard what I just heard, I'm wondering if

7   the time lines of six months and twelve months might be

8   ambitious.

9          But I have not reviewed the memo that was circulated

10  yesterday.  And I really want to consider at some length the

11  *res judicata* issue preclusion law of the case implications of

12  separating issues for a lot of common fact and legal matters,

13  and then deciding that the results in one case will not affect

14  the results in the other. Because it's actually a two-sided

15  coin.  You want to avoid the unintended claim preclusive

16  effect on the one hand, but on the other hand, you don't want

17  to try the same case twice with a now smarter opponent.

18         So it seems to me that what we probably ought to do

19  is schedule another pre-trial of this and let us all bang our

20  heads a little longer on Mr. Stanley's memo, and see if we can

21  kind of figure out how to address those issues.

22         The little claimants are always going to have a

23  problem being involved with the large claimants' long drawn

24  out proceeding, and the large claimants are always going to be

25  concerned that something will happen in the little case that

1  will unduly affect their case.

2         I think Mr. Stanley's bifurcated proceeding, in

3  combination with perhaps scheduling orders of maybe hearing

4  the smaller matters first or setting them for summary judgment

5  proceedings or something like, may clear out some of that.

6  But some of this is just going to be inherently complicated.

7         THE COURT:  I agree with you.

8         All right, let me say something.  We could spend all

9  morning on this, and I -- or we could spend a lot longer than

10 that on this, but we're not going to resolve this today.  Let

11 me just set out a -- let me say a few things, and then let's

12 -- I think we've made some progress, and I think we need to

13 continue to make some progress.

14        First of all, I think you all need to keep in mind

15 one basic principle that I'm going to operate under, and that

16 is, you know, whereas the Bankruptcy Judge might have -- might

17 be involved and is involved on case administration matters and

18 takes up motions and all of those sort of things, when you

19 talk -- when you get more in the adversary realm, then you're

20 talking lawsuits.

21        And you've got to remember what the Court's role is

22 in a lawsuit.  And that is I can't really tell a party "Well,

23 you can't file your" -- I can't say to Superior, "You can't

24 sue until you've got more information."

25        They can sue whenever they want to sue.  And if, you

1  know, and the parties can -- if they agree not to bring their

2  claim within the same adversary that another party has, that's

3  fine.

4       Now, of course, where I do get involved is in areas

5  of overlap and trying to think about the issues of judicial

6  economy and not trying the same issue two or three times.  I'm

7  concerned -- I understand the reason for not wanting to have

8  preclusive effect, but I also immediately thought of the

9  concerns that Mr. LaTour raised.  And that is, you know, I

10 think that has to be refined to some -- to some degree.

11      I don't want to -- I don't want twenty lawyers

12 showing up to monitor a case that really they're not parties

13 to.  But on the other hand, I'm not likely to say -- and this

14 is just for example purposes only.  Superior has no lien on X,

15 and in this case say Superior has a lien on X.  I'm not going

16 to -- there would be -- I'm not going to have inconsistent

17 adjudications to that regard.

18      And so, just to skim the surface this morning, I

19 think there's some more work to do.  I think that just from my

20 exposure to this case so far, and the Superior, I think it

21 makes sense to bifurcate Superior, and I think it might be a

22 benefit to all the other parties to do so.  I think you need

23 to get certain things before me.  I mean, you need to get a

24 motion to compel before me if you've got discovery problems.

25      And I understand, you know, nobody wants the lots to

1  produce a million pages of documents, and they're not going

2  to.  And I'm not going to require them to.  In this day and

3  age with computerized records, the discovery issues as you all

4  know can get complex, and we may have to deal with some of

5  that because a lot of times it depends on -- I mean, always it

6  depends on what records they do keep routinely or how long it

7  would take to go into their system and extract just selected

8  information.

9          This is an argument we have, we've had frequently.

10 So we'll deal with those.  And I don't know why those two

11 things can't proceed simultaneously to some extent.

12         So, and if you've got a motion to bifurcate, and I

13 guess that would be filed in -- once the action is brought in

14 here, the interpleader action to bifurcate the Superior

15 portion, file it as a motion, I'll take up objections and

16 we'll hear the pros and cons.

17         But basically I'm going to let you all decide how

18 you're going to litigate your respective parties' claims in

19 this case.  I'm encouraging there to be conversation and

20 cooperation, but if there isn't, you know, I'll sit here and

21 hear the lawsuits as they're brought and decide them as best

22 we can.

23         The -- another point that Mr. LaTour made that I

24 agree with is that, and several of you I think have made this

25 point, and that is I think it's going to be complex no matter

1  which way we go.  I just, I can just see that this is --

2  there's no easy resolution here of some of these issues.

3          I am, I am going to keep encouraging the parties

4  though.  I mean, I'm -- to proceed expeditiously.  I don't

5  know if the six-month time frame is reasonable.  I don't know

6  if twelve-months' time frame is reasonable. But one of the

7  things that could be incorporated into your procedures that

8  you come up with is, as a way to extricate the small players,

9  and that's always a problem as someone has pointed out.  A

10 smaller player gets dragged along in complex litigation, and

11 it's really a problem in terms of them expending the funds

12 necessary when they have just a small slice of the pie.

13         I mean, I've seen various ways that that can be

14 approached.  Sometimes they can agree on common

15 representation, depending on the similarity of their claims,

16 or if there's any conflict between them.  Sometimes we can --

17 you can agree without going into complete preclusion of

18 issues, that as to defendants X, Y, and Z, this case has no

19 impact on their claims, something along those lines.

20         It's not exactly the same as preclusion.  It's just

21 excluding them, making sure that you make no determination

22 about their claim in the first case.  It's a fine line, but

23 there is a difference.

24         So I am going to pre-try this again and see if

25 there's any additional motions.  Why don't we do that on the

1  date that we just set this morning, and that is April 15th at

2  9:30.  Let's do that telephonically.  We will do it on the

3  record since I'll be in here on the Eastern -- I mean, the

4  East West and the Gibson matters that we set earlier today.

5  Plus you all will probably be sad on April 15th and won't want

6  to travel.  Yes?

7         MR. DONNELLON:  Your Honor, so that I'm clear, I'm

8  authorized -- this is Dan Donnellon for the First Bank &

9  Trust.  I am authorized to file a motion to compel at this

10  point, even though there's not been an actual 2004 order to --

11         THE COURT:  Why don't you file for a 2004 first.  I

12  wasn't sure what the status of your request -- I know you said

13  you've been trying to do it informally, and we all, you know,

14  encourage that, but at some point you've just got to start

15  going down the road.

16         MR. DONNELLON:  I understand that.  My only concern

17  is if we have that 2004 heard on the 15th of April, and then

18  they have 30 days to respond to that, there is a May 2 date

19  for persons to identify purchase money security interests, and

20  that will come and go before we even know -- Mr. Ramsey and I

21  and others, know, or Ms. Caruso even -- whose cattle is

22  involved with Eastern to identify that.

23         THE COURT:  We'll move the date.

24         MR. DONNELLON:  Okay, thank you.  I'll file a motion

25  next week.

1          THE COURT:  Yes.  I mean, we're just going to have

2  to adjust as we go along here.

3          All right, anything else on that matter?  Okay.

4          Let's get into the cash collateral motion.  Has

5  there been -- I've read the motion and the objections.  Has

6  there been any progress made between the parties?

7          MR. CARR:  Maybe a little, Your Honor.  But we're

8  still going to have to try it.  May I proceed?

9          THE COURT:  You may.  Identify yourself for the

10  record first.

11          MR. CARR:  My name is Jim Carr, Baker & Daniels,

12  represent the Trustee.

13          Your Honor, I -- as we've talked with the objectors,

14  they all seem to say the same thing.  They understand the

15  Trustee's desire to arrive at a financing arrangement, but

16  they all want to do it differently.  And that's really part of

17  the problem in this case, and part of the discussion the Court

18  just heard.

19          We have Mr. Knauer as a neutral, who's trying to

20  move through this morass, and it is a morass.  And yet we have

21  lots of people who think they know how to do it better, or

22  think they know how to do it differently and want to do it

23  differently.  And so we spent a lot of time negotiating with

24  Fifth Third about this financing, and now we have a lot of

25  people who want to rewrite it or renegotiate it.

1        We don't believe that it's merited.  We don't

2   believe that to do so will be done timely.  What we're

3   involved in, in this morass I talked about, is moving through

4   a lot of very complicated legal issues, some of which is going

5   to become litigation of the kind the Court's talked about.

6        The people we're fighting with or going to fight

7   with are financed.  They're substantial entities, they're

8   banks or cattle entities, and they and their lawyers are

9   financed, but the Trustee's not.  And so we need to get a

10  financing so that the Trustee can afford to, in effect, fight

11  with these parties, take the actions that need to be taken to

12  liquidate these assets and create a pot for everyone that's

13  concerned.

14       THE COURT:  All right.  Let me ask you some basic

15  questions.

16       MR. CARR:   Yes.

17       THE COURT:   Honing in on some of the objections, as

18  I recall them.  First of all, I think there was the question

19  as to where there was really any new money advanced in the use

20  of cash.

21       MR. CARR:  Can I drop back and I'm going to drill

22  right into your question.

23       THE COURT:  All right.

24       MR. CARR:  Because I think some people have

25  misunderstood this.  There are two basic components to our

1  financing.  The first component is a, quote, "use of cash

2  collateral," up to two million dollars.  And the concept there

3  is there are a number of actions that we're taking to

4  liquidate assets, in other words sell cattle, or collect

5  receivables, or adjust contract rights.

6          And as to that, as we bring that money in, to the

7  extent that money is Fifth Third's cash collateral, they'll

8  let us have two million dollars, up to two million dollars, to

9  be used to pay fees that you'll allow later on.  They'll never

10 get that money back.  So that use of cash collateral is really

11 taking that collateral.

12         Now their debt, their debt doesn't go away.  So

13 they're owed 35 million dollars at the end of the day.  If we

14 bring in cash and we use -- that constitutes their cash

15 collateral and we use two million of it to pay fees and

16 administrative expenses, they're still owed 35 million

17 dollars.  But their cash collateral has been diminished by

18 that two million dollars.  That's number one.

19         THE COURT:  All right.

20         MR. CARR:  Number two is, they've agreed to loan us

21 up to another two million dollars to pursue other kinds of

22 claims.  Generally those are fraudulent transfer and

23 preference actions, but also some litigation.  It's the kind

24 of thing that is more speculative in terms of whether we

25 should go after those things or not.  And we will constantly

1  be analyzing whether we should or we shouldn't.

2          And as to that second two million dollars, if and to

3  the extent those efforts lead to recoveries, they -- and that

4  two million dollars is used to pay the fees and expenses that

5  were incurred to create that pot, they'll get their two

6  million dollars back.  That's a loan and it will get repaid.

7  Without interest, without fees.  Now --

8          THE COURT:  Only out of recoveries.

9          MR. CARR:  Only out of recoveries.  And, and now the

10  issue is, did they loan any new money?  Well, here's the

11  point:  Let's go back to the recovering their cash collateral

12  and bringing the money in from the disposition of their

13  collateral.

14          If we bring in, let's just say we brought in six

15  million dollars, which is close to the amount of money we

16  currently have on hand.  Let's just say we brought in six

17  million dollars.  And let's say we had all of the two million

18  dollars of cash use covered, and there was four million

19  dollars sitting there that we were absolutely certain was

20  Fifth Third's cash collateral, okay?  And that we weren't

21  going to need for administrative uses.  That's what we call

22  excess cash collateral.  And at some point that money might be

23  transferred to Fifth Third.

24          At that point they may loan us back that two

25  million.  And that's where the loan comes from.  So it's new

1  money in the sense that they would otherwise have it.  And

2  they could use it and they could apply it to their 35 million

3  dollar debt.  But, instead up to two million dollars they'll

4  loan us back to pursue those fraudulent transfer preference

5  actions.

6           THE COURT:  All right.

7           MR. CARR:  So is it newly printed dollars?  No.  Is

8  it money that we determined is their money?  Yes.  And they're

9  loaning it back to us.   So that's where those two elements

10 come from.

11          THE COURT:  All right.  Let me ask you another

12 question.

13          MR. CARR:  Sure.

14          THE COURT:  Are you going to attempt to bind people

15 other than the Trustee as far as challenging the validity of

16 Fifth Third's security interest?

17          MR. CARR:  Yes.  Yes.  What we've agreed with Fifth

18 Third, on February 4, 2011, Fifth Third filed a proof of

19 claim, and they filed a proof of claim for a pre-petition debt

20 of 35 million dollars and some change, and they attached all

21 the loan documents and all the security documents and all of

22 the perfection documents.  And our proposal is to agree to the

23 allowance of that claim, not designating to what extent it's

24 secured and what extent it's unsecured, but to allow that

25 claim.  And it's based on the due diligence that's been done

1   by the Trustee and his advisor.  And he's prepared to testify

2   why he's comfortable with the allowance of that claim.

3          Now what that doesn't do -- so what that says is, in

4   our minds, those documents are valid, and they're effective to

5   create a lien that is perfected with the perfection shown in

6   those documents.

7          Now if there's an asset that there's a contest about

8   whether or not it was an Eastern asset and therefore whether

9   or not their lien attached to it, that's perfectly open for

10  somebody else to contest whether or not their lien attached to

11  an asset, because whether it was or wasn't Eastern's.

12         It's also perfectly open for somebody to say that

13  they have a lien that's superior to Fifth Third's lien.

14  Nobody's precluding the ability to say, "Yeah, you have a lien

15  on this asset, Fifth Third, but so do I; my lien's superior."

16         THE COURT:  So the -- so really the only preclusion

17  would be that you would want a determination by the Court that

18  their documents are in order.

19         MR. CARR:  That -- and that their claim is allowed.

20  That their pre-petition debt is the right amount, and that

21  their claim is allowed.

22         THE COURT:  So the amount has been calculated

23  correctly, and they're secured and perfected, according to

24  your review of their documents.

25         MR. CARR:  Yes.  Now Mr. LaTour's just anxious to

1   jump up and talk because it is very important to Fifth Third

2   that we're not just doing that.  We are allowing their claim.

3   Now I would say to you --

4           THE COURT:  Allowing it how?  I mean, if you allow

5   it as a secured --

6           MR. CARR:  We can't object later on to their claim.

7           THE COURT:  You can't.

8           MR. CARR:  Right.  I don't think -- and others -- I

9   think the process, once the claim is allowed, the process if

10  somebody else wants to object to it, is they have to proceed

11  under Section 308, or Bankruptcy Rule 308, to ask for a

12  reconsideration of the allowance of the claim.  I think that

13  would be their remedy if somebody else, because the claim

14  would have been allowed.

15          THE COURT:  All right.  What about -- what about the

16  superpriority status?

17          MR. CARR:  That is -- remember I had two things, the

18  cash use and the loan.  This only applies to the loan.  This

19  is if they loan us two million dollars, up to two million

20  dollars, to pursue preferences, fraudulent transfers, and --

21          THE COURT:  Are they only going to lend you two

22  million dollars if they have more than two million dollars --

23  if you --

24          MR. CARR:  Yes.

25          THE COURT:  -- collect more than two million

1  dollars?

2      MR. CARR:  Yes.  They're not, they're not going to

3  go out and loan us new money that they haven't recovered from

4  this case.

5      THE COURT:  So how is the second two million dollars

6  any different than the first?

7      MR. CARR:  Because they will have been paid over --

8  it's different in two ways.  One is they will have been paid

9  proceeds of their collateral from this case before they make

10 the second loan.

11     THE COURT:  So the difference is, instead of you

12 getting to keep it, you give it back, and they get it back.

13     MR. CARR:  And they -- and the other big difference

14 is, they can get it paid back.  The first part, they're never

15 going to get repaid the two million dollars of their cash

16 collateral we used.  They're never going to get that, they're

17 never going to get that collateral back.

18     THE COURT:  All right.

19     MR. CARR:  Okay?  And so, so --

20     THE COURT:  Why do you say that?  I mean, you don't

21 know --

22     MR. CARR:  Well, they can get the debt repaid.  They

23 could get it paid back from other collections --

24     THE COURT:  Right.

25     MR. CARR:  -- but that collateral is going to be

1  gone.

2          THE COURT:  All right.

3          MR. CARR:  Now in the case of the two million

4  dollars they loan us, they're owed 35.  If they get a million

5  dollars and it pays down their debt to 34, and then they loan

6  us a million dollars, they're back up to 35.

7          THE COURT:  I understand.

8          MR. CARR:   Yes.

9          THE COURT:   All right, what about -- well, those

10 were the main three things.  Those were the --

11         MR. CARR:  Well, let me tell you what some of the

12 others are, Judge, and this may refresh your recollection.

13         One of the things that the objectors said is, "We

14 don't -- we don't like the idea that you're sharing with Fifth

15 Third your projected budget, telling Fifth Third how you're

16 going to spend this money but you're not telling us."

17         And the point is, of course, the people who are

18 objecting are some of the people we're going to be litigating

19 with.  And we don't want to necessarily show them, for

20 example, you know, who are the 36 people that we have on our

21 deposition list.  And the whole point is we're never going to

22 get paid any of this money unless we apply to you for payment

23 and it's approved, and at that point, they'll get to chime in

24 any way they want to about the appropriateness of paying these

25 fees and expenses and administrative expenses for the Trustee.

1        But they don't need to see the roadmap in advance as

2   to how we're going to spend, how we're going to accrue these

3   fees in taking the litigation steps that involve their

4   clients.

5        THE COURT:  Okay.

6        MR. CARR:  Another -- another basic objection, and

7   this is something we may have actually resolved, Your Honor.

8   I said we may have resolved it a little bit.

9        There's a provision in the agreement that says that

10  if Fifth Third had a valid lien on an asset or cash before it

11  was transferred to someone else, and we recover back that

12  asset or the cash by way of a fraudulent transfer action or a

13  preference action, that it comes back with Fifth Third's lien

14  on it, and the -- the -- the suggestion was that really needs

15  to say that we're only talking about the case where Fifth

16  Third's lien was on that asset or cash immediately *after* the

17  transfer as opposed to before the transfer.  And we've agreed

18  to make that change, and I think that resolves some concerns

19  that some of the objectors had.

20       Their concern was that the transfer itself in some

21  circumstances may have stripped off Fifth Third's lien.  And

22  so the idea was the lien will only be on that recovered asset

23  to the extent it was there immediately after the transfer to

24  whoever the transferee was that we've now gone after to

25  recover the money back.

1          THE COURT:  Explain that -- so in other words, if

2   the lien, if the Fifth Third lien was somehow extinguished by

3   the transfer, then it's not reattached.

4          MR. CARR:  Here's the example that I think people

5   were thinking about.  We have a cattle.  Fifth Third has a

6   lien on it.  It gets transferred to somebody for a less than

7   reasonably equivalent value when the debtor was insolvent.

8   It's a fraudulent transfer.

9          The concern seemed to be that maybe that, the act of

10  transferring outside the ordinary course of business somehow

11  stripped off Fifth Third's lien.

12         So we've agreed -- the question isn't what is Fifth

13  Third's lien on the cattle before the transfer?  That's not

14  the question.  The question will now be:  immediately after

15  the transfer what's Fifth Third's lien on the cattle.

16         THE COURT:  All right.  So if there was --

17         MR. CARR:  If it was and you bring back the value of

18  the cattle, then Fifth Third's lien is still on it.

19         THE COURT:  So, for example, to change your example,

20  if it was sold for a fair price, but the money was just never

21  forwarded to Fifth Third, was somehow diverted somewhere else,

22  then it might come back without -- of course the cattle's not

23  going to come back --

24         MR. CARR:  No.

25         THE COURT:  I don't think that's how this works.

1          MR. CARR:  I don't think that's how it works.

2          THE COURT:  All right, I understand what you're

3    saying.

4          MR. CARR:  Okay.  And Your Honor, I think, I think

5    you understand where *we* are, what *we* would do to provide the

6    support for the motion, because I think the main concern is

7    the allowance of Fifth Third's claim.   We're prepared to

8    provide testimony as to why the Trustee exercising his

9    business judgment has concluded that it makes sense and is in

10   the best interest of the estate to allow the Fifth Third claim

11   as part of this financing.

12         And so you probably want to hear from others but we

13   would then propose to have Mr. Knauer testify to that fact.

14         THE COURT:  All right.  All right, thank you.  Mr.

15   LaTour.

16         MR. LaTOUR:  Thank you, Your Honor.  Randall LaTour

17   for Fifth Third.   I want to comment on two things that Mr.

18   Carr said because I don't want to leave any incorrect

19   impressions of what I think I agreed to.

20         With respect to the liens re-attaching as they

21   existed before the tran -- or as they existed before the

22   transfer, after the transfer, at the time of the transfer, to

23   re-establish the same priorities they had, the issue there is

24   if there had never been a bankruptcy, and a commercial

25   transaction took place, would the liens be scrubbed off or

1  would the liens still remain attached and tied to the property

2  or the cash proceeds or both?

3          And this mechanism of saying that the liens

4  re-attach, if they would have immediately after the transfer,

5  is to take account of the situation where you may have

6  transfers in the ordinary course of business of a -- by

7  certain kinds of individuals and certain kinds of transactions

8  where the lien would attach to the cash proceeds, but that the

9  item, the property itself, would be transferred free and

10  clear.

11          THE COURT:  Right.

12          MR. LaTOUR:  The conventional merchant situation.

13          You could have situations where the transaction took

14  place outside the ordinary course, and the liens would attach

15  not only to the cash proceeds but also to the item that was

16  moved.   And so if that item that was transferred is recovered

17  in a subsequent fraudulent transfer action, then the liens

18  would be reasserted against that property or the proceeds of

19  it.

20          THE COURT:  So you're saying the test will be

21  whether, what the effect will be outside of bankruptcy, not

22  taking into consideration any avoidance (unclear) of a

23  Trustee?

24          MR. LaTOUR:  Well, sort of.   What the problem was,

25  Your Honor, the perceived potential effect of saying that the

1   liens would be restored at the time of the transfer, would be

2   to transform one of those situations where you had an ordinary

3   course transaction where the lien would not go on with the

4   item transferred, but then it got avoided in a bankruptcy, and

5   the wording would create a lien where one would not have been

6   there outside of bankruptcy.

7           So the language change is to prevent the accidental

8   improvement of position of liens just because we're in

9   bankruptcy, as opposed to what would have happened if a

10  bankruptcy had never occurred.

11          THE COURT:  All right.

12          MR. LaTOUR:  So that's the intent of that language.

13          With respect to the allowance of the claim, it's

14  Fifth Third's position that, yes, this order is allowing this

15  claim for all purposes and with respect to all parties.

16          Now the Trustee and I differ a little bit about what

17  that means, and so when you say it merely means that the

18  documents are in order and were filed in the right places and

19  that sort of thing, I think that's too narrow interpretation

20  of what it means.

21          I don't think anybody needs to resolve today what it

22  means, because we don't have an actual controversy to apply it

23  to.  I'm confident the Trustee is going to take a narrow

24  interpretation of what it means.  I think it has a broader

25  interpretation.  What the negotiation said was the claim would

1  be allowed.

2          The Bankruptcy Code addresses what that means.

3  Section 502(j) -- or 50 -- let me get the right number here,

4  yeah, 502(j) says that an allowed claim can be reconsidered

5  for cause.  So there's -- if there is some gigantic reason why

6  this is a miscarriage of justice, somebody has an opportunity

7  later to, you know, to bring that kind of action.

8          But what we can't have is the continual second-

9  guessing of what the Trustee is accomplishing in the case.

10  You know, "Prove it to me," and the next guy comes in and

11  says, "Prove it to me", the next guy comes in and says, "Prove

12  it to me."  We'll never get anything accomplished.

13          I don't think it should be surprising to anybody

14  that a bank --

15          THE COURT:  Well, what about some sort of a

16  mechanism here that is so commonly used in Chapter 11s to have

17  additional time for a Creditors' Committee or some similar

18  situated group to challenge?

19          MR. LaTOUR:  Well, the reason you don't need that in

20  this case, Your Honor, is that independent fiduciary is

21  sitting right there.  He's already done the work that you're

22  suggesting would be appropriate in a case that did *not* have an

23  independent set of eyes on this.

24          THE COURT:  But see, I understand that.  I mean, in

25  some -- in most respects you're right.  But Mr. Carr has

1  already pointed out also that this independent has an

2  adversarial relationship to other creditors.  So they may not

3  see him as quite such a neutral party.  I mean, he's not

4  wanting to share his budget with them because they're

5  adversaries.  Well, we want to take his word for the fact that

6  everything's fine.

7          I mean, you see the conflict there?

8          MR. LaTOUR:  Your Honor, I do not see that as a

9  conflict.  And the reason I don't is because Chapter 7

10  Trustees, Chapter 11 Trustees are routinely faced with a

11  situation where they have a case that's going to require

12  actions that at some point somewhere is going to ruffle the

13  feathers of someone.

14          THE COURT:  Well, let me just get to the bottom

15  line.

16          MR. LaTOUR:  Nobody doubts that they're independent.

17          THE COURT:  Can the bank live with some sort of an

18  open period for additional challenges?

19          MR. LaTOUR:  No.

20          THE COURT:  Okay.  Can the bank live with

21  characterizing its whole four million dollar of use the same

22  way --

23          MR. LaTOUR:  I'm sorry --

24          THE COURT:  -- as use of cash?

25          MR. LaTOUR:  I'm lost.  What we've been calling the

1 Trustee loan, can we characterize that as use of cash

2 collateral?

3                    THE COURT:  Yes.

4                    MR. LaTOUR:  Well, Your Honor, what we have in this

5 case right at this moment, you have to start with the

6 definition of what the funds that are going to be loaned is.

7 They can only be money that is indisputably the proceeds of

8 Fifth Third Bank's pre-petition secured claim.

9                    THE COURT:  Right.

10                   MR. LaTOUR:  Okay.  Which in a liquidating Chapter

11 11 means it's absolutely Fifth Third's money.

12                   THE COURT:  Right.

13                   MR. LaTOUR:  And if we didn't have a loan today,

14 that two million dollars should be remitted to Fifth Third,

15 and Fifth Third would have it in their hand.  There would be

16 no challenges to it.  There wouldn't be any possibility of

17 non-payment.  They would have it in their hand.

18                    In this instance --

19                   THE COURT:  Well, it could be a 506(c) claim.

20                   MR. LaTOUR:  To the very limited extent the benefit

21 could be demonstrated to have accrued, yes, that's right.

22 There could be some degree of 506(c) claim.  Not four million

23 dollars' worth.

24                   THE COURT:  No. Probably not.

25                   MR. LaTOUR:  Or anything close.  But what is

1  happening in this case is that same money is now being exposed

2  to the risk of non-payment.  To secure against that risk,

3  there's a grant of security interest in the Chapter 5 action,

4  but it is not a grant of the security interest in all property

5  of the bankruptcy estate.  Consequently, there's also a grant

6  of a superpriority status --

7           THE COURT:  Well, wait a minute.  Let's take that

8  last --

9           MR. LaTOUR:  Okay.

10          THE COURT:  Let me parse that for a minute.

11          Well, isn't any future recovery that the Trustee's

12  looking for here going to be a Chapter 5 action?

13          MR. LaTOUR:  Isn't any recovery, is that what you're

14  asking?

15          THE COURT:  Yes.  I mean, what else has he got?

16          MR. LaTOUR:  Well, for example, the FBI has seized

17  monies.  They may or may not turn them over to the Trustee.  I

18  don't know off the top of my head if those are Chapter 5

19  recoveries or not.  I can imagine somebody arguing that

20  they're not, if that's going to make a difference on whether

21  somebody's getting paid or not.  To preclude those kinds of

22  arguments and to not have that risk of non-payment we would --

23  is why we have the superpriority lien for that limited two

24  million dollars and why there's the grant of additional

25  collateral.

1          Now if we're going to just treat it as the use of

2     cash collateral, you run up against the problem of what

3     constitutes adequate protection when you're spending the

4     money.  Well, you have to give collateral of indisputable

5     value to recover that.  You have to have a payment schedule.

6     You would have to pay a market rate of the time value of the

7     money, some kind of interest factor.

8          The deal actually would get worse for the estate to

9     provide adequate protection rather than what was proposed.

10          THE COURT:  That's a good point.  I like that point.

11     And I'd like to hear the -- I want the other side to respond

12     to that point.

13          All right, let's hear from some of the objectors.

14          MS. CARUSO:  (difficult to hear with low telephone

15     audibility) Your Honor, I hate to be selfish but I actually

16     have to leave for a (unclear).

17          All of the points are going to be addressed by the

18     parties in Court.  Very quickly, Mr. Carr (unclear) the

19     distribution of excess cash, that's my primary concern.  The

20     motion provides that the excess cash will be distributed to

21     Fifth Third; it doesn't describe when or how; it just says it

22     will be distributed immediately free and clear of any claims

23     or interest of the Trustee or any other party.

24          It sounds like Mr. Carr addressed that and before

25     any money is paid out to Fifth Third (unclear) motion filed

1  with the Court, an opportunity to be heard by all parties, is

2  that correct?

3          THE COURT:  Were you able to hear that question, Mr.

4  Carr?

5          MR. CARR:  Yeah.

6          THE COURT:  Could you restate the question?

7          MR. CARR:  The question as I understand it is, Ms.

8  Caruso is asking is, are we going to file a motion with the

9  Court and give people an opportunity to object before

10 distributing excess cash collateral.

11         MS. CARUSO:  That's correct.

12         MR. CARR:  It's not our intention to be bound by

13 that as a mandatory matter.  If we have any doubt about

14 whether something constitutes Fifth Third's cash collateral,

15 or if we have any doubt about whether anybody else has an

16 interest in the cash, we will certainly do that.

17         MS. CARUSO:  Your Honor, I have a problem with that.

18 Because how will we know, we being the (unclear) of the

19 creditors, (unclear) the Trustee is (unclear)

20         THE COURT:  Yes.

21         MS. CARUSO:  -- (unclear) belong to Fifth Third,

22 (unclear) there really have been no (unclear) reporting

23 regarding (unclear).

24         THE COURT:  All right, I think her point, and I

25 think this is a good question.

1        If you collect money and you say, "We've got this
2   excess collateral, we're going to pay it to the bank," how
3   does the Trustee for the Gibson estate know that that's not
4   really Gibson money and not Eastern money?  At what point are
5   they able to make that determination?

6        MR. CARR:  Yes, Your Honor, the way we look at it is
7   people obviously should be telling us, if we have a bar date
8   coming up, they should be telling us what they claim and what
9   they assert that they have liens in or an interest in.

10        And, for example, a good example is one of the
11   things that we've done is collect monies with respect to
12   contracts under which people bought cattle from Eastern; and
13   in the order that we got authorizing us to go ahead and
14   resolve those contracts and collect the money, it provides
15   that that money is going to be separately set aside so as to
16   protect those people from double payment, and we would not
17   disburse that money without having a determination made that
18   nobody's going to make a claim against it.

19        If we -- we will account for monies that come in.
20   And what I'm saying is, the only monies we would ever disburse
21   without first coming to the Court would be those monies as to
22   which we felt highly confident that no one had asserted an
23   interest.

24        THE COURT:  So Ms. Caruso or anyone else would be
25   able to review your accounting for funds received and make a

1  determination as to whether they think they have a claim on

2  those.

3           MR. CARR:  That's right.  That's right, Your Honor.

4           MS. CARUSO:  (unclear)

5           THE COURT:  Wait a minute.

6           MS. CARUSO:  (unclear)

7           THE COURT:  It's hard for us to hear you.

8           MS. CARUSO:  I'm sorry.

9           THE COURT:  Go ahead.

10          MS. CARUSO:  Your Honor, with all due respect,

11 (unclear) be required to continually review what they have on

12 hand and without notice the money's going to be distributed

13 and it's going to be gone?   And really, that's not how a

14 Chapter 11, a liquidating 11 should work.

15          And we've heard Mr. Donnellon's problem and getting

16 back to the (unclear), he (unclear) Bank (unclear)  bank or

17 other creditors may have a claim for the money that's

18 presently being held, but they won't know if somebody

19 (unclear).  This could take (unclear) doing that, Your Honor,

20 (unclear) because Trustee has made a determination that's

21 substantive of (unclear) cash collateral, but the other

22 parties have not had the opportunity to (unclear).

23          THE COURT:  All right.  I understand your concern.

24 Thank you.

25          MS. CARUSO:  Okay, well, I'm going to drop off

1  because other people have some concerns and (unclear).

2          THE COURT:  Thank you.

3          UNIDENTIFIED COUNSEL:  Your Honor, as to this point

4  too.  Everyone should keep in mind, the Trustee files monthly

5  reports, accounting for all the money that's coming in for the

6  estate.  Filed reports yesterday with respect to all the

7  receipts and disbursements from the beginning of the case

8  through the end of January.

9          This stuff isn't happening behind a curtain.  People

10  see what's coming in, what expenditures are being made.  And

11  once again, I think it's incumbent upon people who have claims

12  to make those claims.

13          THE COURT:  Right.

14          MR. ROGERS:  Your Honor, my name is John Rogers.

15  I'm here with Elliott Levin on behalf of Superior Livestock.

16          On that point, the Trustee's essentially trying to

17  shift the burden to us and say, "You have to raise any

18  interest you may have in what I think is the cash collateral

19  of Fifth Third."

20          The motion doesn't identify any cash collateral.

21  They're talking about funds on hand, but the motion doesn't

22  identify anything; and the responses that have been filed on

23  behalf of the Trustee, they say specifically, "We're not

24  talking about any particular funds.  We're talking about a

25  hypothetical concept."

1          So when I heard the Trustee say today there's six

2  million dollars on hand, that's the first we knew of that.

3  The Schedules don't contain that information.

4          UNIDENTIFIED COUNSEL:  Because they exist on the

5  petition.

6          MR. ROGERS:  The schedules show it on the petition

7  date there was seven million in one account, and an unknown

8  amount in the operating account.  Now how it can be unknown

9  when it's a Fifth Third account, I'm not sure.  But that's

10  what the Schedules say.  But the motion doesn't say that

11  either of those or any of that is necessarily the cash

12  collateral of Fifth Third.  And yet, I gather that the

13  assumption on the Trustee's part is that that's the case.

14          The proposed order says any excess cash collateral

15  will be immediately turned over to Fifth Third.

16          THE COURT:  All right.

17          MR. ROGERS:   The motion says "immediately."

18          THE COURT:  I understand that concern.

19          MR. ROGERS:  So I don't know, we don't even know

20  what they're claiming to be the cash collateral.  So how can

21  we raise our interest with respect to it?

22          And rather than making their burden that it *is* their

23  cash collateral, they're saying we should prove that their

24  assumptions are wrong.  And of course the Trustee has already

25  indicated that he disagrees with my client about what our

1  ownership rights are *vis-á-vis* the estate.  So I would guess

2  that our beliefs and his might be very different, but

3  fortunately he's not saying what he says is the cash

4  collateral.  And in that respect, I'm not sure even what the

5  motion accomplishes, because if it doesn't contemplate being

6  able to be able to use any particular funds, then it's sort of

7  a hypothetical structure that has no immediate effect, except

8  to provide a lot of benefits to Fifth Third.  And the benefits

9  are, as the Court has indicated, is basically a cash use order

10 that treats it as if it were post-petition financing --

11        THE COURT:  But if it was -- the point -- if it is

12 cash use, they're entitled to adequate protection.  What can

13 the estate give them in terms of adequate protection?

14        MR. ROGERS:  And I think we have two responses to

15 that, Your Honor.

16        One, I think Fifth Third's ignoring the 506(c)

17 issue.  To the extent the Trustee's efforts are a benefit to

18 Fifth Third in realizing its collateral, they wouldn't be

19 entitled to get that money.  He would be entitled to

20 surcharge.

21        I don't know that we would have a problem with

22 replacement liens on recoveries not presently covered by Fifth

23 Third's interest, to the extent that funds are expended that

24 don't benefit Fifth Third.

25        THE COURT:    All right, about the -- assume for the

1  purposes of this question that the Trustee is right, and that

2  the bank has blanketed its assets.  Then the only thing that

3  the estate has to offer the bank in terms of adequate

4  protection would be avoidance actions, right?

5          MR. ROGERS:  Correct, Your Honor.

6          THE COURT:  So would you be more comfortable with

7  this being characterized as a -- as strictly a cash use

8  matter, with additional collateral securing the cash use of

9  avoidance actions?

10         MR. ROGERS:  And subject to the 506(c) rights.

11         THE COURT:  Well, if --

12         MR. ROGERS:  If the Trustee's correct that it's all

13 Fifth Third's collateral, then it's something of a bargain if

14 the maximum 506(c) claim is two million dollars to recover

15 what the Trustee indicates may be many, many millions of

16 dollars of collateral.  So.

17         THE COURT:  All right.  So -- but that would be more

18 acceptable to you to leave open a 506(c) claim and give them

19 the preference and fraudulent conveyance actions?

20         MR. ROGERS:  Only to the extent that it was proved

21 to be their collateral used by the Trustee in ways that didn't

22 benefit Fifth Third, and therefore was not subject to the

23 surcharge.

24         THE COURT:  So -- but how is the present proposal

25 more prejudicial to you as that would be, compared to that?

1          MR. ROGERS:  In a number of respects, Your Honor.

2          First of course, it provides for the allowance of

3    the claim, and we would have no right to challenge anything

4    relating to it, except the value of collateral.   It limits

5    potential 506(c) claims to the two million.  So even if the

6    Trustee spends all of his time collecting their collateral,

7    there will never be a 506(c) claim in excess of that amount.

8          It of course gives the, give Fifth Third all the

9    protections of 364 --

10          THE COURT:  How would a 506(c) claim benefit your

11    client?

12          MR. ROGERS:  It would -- it would mean that the

13    administrative claim of Fifth Third for its, quote, "loan"

14    would not be paid out of the recoveries that are not subject

15    to, to Fifth Third's lien.   It would make those recoveries

16    available for other creditors.

17          THE COURT:  It would mean that the Trustee's and the

18    Trustee's professionals would be paid from avoidance action

19    recoveries, as opposed to paid out of proceeds of sales of

20    secured goods.   Is that what you're telling me?

21          MR. ROGERS:  Well, no.  I think the Trustee would be

22    paid from both of those.  He would still, pursuant to the

23    506(c), be repaid from recoveries that benefited Fifth Third,

24    but could additionally be paid from recoveries that were not

25    subject to their lien.

1            I think in effect what we're saying is that --

2            THE COURT:  But I mean how -- does any of that flow

3   to you in either regard, in any event though?

4            MR. ROGERS:  It --

5            THE COURT:  Or flow to anyone other than Fifth

6   Third?

7            MR. ROGERS:  Well, to the degree that Fifth Third

8   does not have this continually reviving administrative claim

9   and lien with respect to the preference recoveries and so

10  forth, it would mean that more funds would be available to

11  other creditors.

12           THE COURT:  But I'm going to have to give them that,

13  aren't I, if I don't -- I mean, if I -- if I let the debtor

14  use case over objection of the bank, I'm going to have to give

15  them adequate protection.  Right?

16           MR. ROGERS:  Except that it all would be subject to

17  the 506(c).

18           THE COURT:  It might be subject to that ultimately,

19  and who knows what the outcome of that would be, and to the

20  extent, and, you know, that's -- yeah, you're right.  That

21  could be hanging there for a later determination.  But

22  initially, before that determination is made, I'm going to

23  have to give them adequate protection.

24           MR. ROGERS:  And that would make sense, yes, that

25  they would have a lien for that.   But as it's structured in

1   the Trustee's proposal, the Trustee would surrender to the

2   bank any excess cash collateral, and free of any claim by any

3   party thereafter, and then would be re-loaned back as

4   necessary with the cap of two million dollars on the 506(c).

5           THE COURT:  All right.

6           MR. ROGERS:  So -- so, in effect, it would be very

7   possible that the two million would be repaid from preference

8   recoveries to the bank, and that the Trustee would spend all

9   the rest of his time collecting their collateral with no

10  further surcharge.

11          THE COURT:  Which brings us to a fundamental

12  question in this case that this motion I think poses.  Are we

13  just -- are we administering this case for the benefit of

14  Fifth Third?

15          MR. CARR:  No.

16          MR. ROGERS:  Yes.

17          MR. CARR:  No, we're not.  No, you're -- you want me

18  to answer or do you want Mr. Rogers to answer?

19          THE COURT:  I want you to answer first.

20          MR. CARR:  No, we're not.  There are a lot of assets

21  that we're collecting that are subject to Fifth Third's lien,

22  but there were 800 million dollars of payments made within the

23  90-day preference period.  So there are a lot of claims that

24  may not be subject to Fifth Third's lien.

25          THE COURT:  All right, I want you to take off -- I

1  want you to take off your agreeable-with-the-bank hat and put

2  on your --

3          MR. CARR:  I can't stand them, Your Honor.

4          THE COURT:  -- your Trustee hat and let me ask you

5  this question.

6          MR. CARR:  Yes.

7          THE COURT:  Or debtor-in-possession who would

8  normally answer this question.  Do you think you can provide

9  the bank adequate protection over -- if they objected to your

10 use of cash collateral?

11         MR. CARR:  No.  Not -- I mean, other than giving

12 them a lien on the preference recoveries --

13         THE COURT:  Right.

14         MR. CARR:  -- and the fraudulent transfers, no.

15         I want to make sure we go back, because Mr. Rogers

16 just continues to talk about the two million dollars.  It's

17 four million dollars that we're getting from Fifth Third.  And

18 the first two million dollars that we're getting, we're not

19 really giving them any adequate protection other than allowing

20 their claim.  They're never going to get that money back, and

21 they're not getting anything for it.

22         MR. ROGERS:  Well, all of these are conditions

23 precedent to that.  So they're getting everything.

24         MR. CARR:  Well, but they only get the lien on the

25 preferences if they loan us the money.  If they loan us the

1   second two million dollars.

2           THE COURT:  Right.

3           MR. CARR:  So they don't get that to begin with.

4           THE COURT:  I don't know that you answered my

5   question entirely, but if you came in here and you and Mr.

6   LaTour were at loggerheads and you said, couldn't you just

7   say, "Judge, I can give them --" you know, "We can have," --

8   how many did you just tell me, payments in the last --

9           MR. CARR:  Eight hundred million dollars.

10          THE COURT: "We have 800 million dollars of payments

11  in 90 days, I can give them adequate protection for use of

12  their cash."

13          MR. CARR:  I can give them a lien on their recovery

14  actions.  But the point, you know, I guess --

15          THE COURT:  Why is this deal better for you than

16  that?

17          MR. CARR:  Because I'm *not* giving them a lien on the

18  recovery actions for the first two million dollars.  I'm not

19  giving them anything, other than allowing their claim.

20          THE COURT:  Well, and so I guess that's really what

21  it boils down to, really.

22          MR. CARR:  That's what it boils down to.

23          THE COURT:  Is that -- is, are these other creditors

24  better off with their claim allowed instead of them having a

25  lien on additional two million dollars of recovery actions,

1  right?

2          MR. CARR:  That may be.  And --

3          THE COURT:  Is that the bottom line here?

4          MR. CARR:  I think that may be the bottom line, Your

5  Honor.  Because certainly -- you know, Mr. Rogers says to me,

6  "Well, Jim, you know, why don't you just go surcharge them?"

7          Well, that's real nice, but they've already agreed

8  to be surcharged for two million dollars, and that's good

9  enough for me for right now, without having -- you know, what

10 we don't need to do is multiply and multiply and multiply the

11 legal actions.  What we need to do is be out there recovering

12 these assets and bringing them in here, and -- instead of this

13 kind of activity.

14         THE COURT:  Okay.  Let me ask you -- let me ask

15 another preliminary question.   There's been some discussion

16 here about the Trustee testifying.  I know that you had the

17 Hoover --

18         MR. CARR:   Hoover Hull.

19         THE COURT:   -- law firm and --

20         MR. CARR:   And DSI.

21         THE COURT:  -- in your response you said that you

22 were satisfied based upon that examination as to the validity

23 of the Fifth Third lien.

24         MR. CARR:  Yes.

25         THE COURT:  Would parties like the opportunity to

1    cross-examine the Trustee on that question today?

2           MR. DONNELLON:  Good morning, Your Honor.  Dan

3    Donnellon on behalf of First Bank.

4           Yes, sir.  And we put in our objection that we would

5    reserve the right to ask for a continuance of this hearing so

6    that we can conduct a deposition.  I don't want to be cross-

7    examining on the fly and wasting the Court's time with

8    inquiries and issues that don't need to be brought up before

9    the Court.

10          And I think we can shortcut this that we may not

11   even need the Trustee to testify, because you've nailed the

12   core issue, is that Mr. Carr on the one hand says there's 800

13   million dollars out there, and on the other hand says Fifth

14   Third will never get this two million back.

15          MR. CARR:  No --

16          MR. DONNELLON:  And if there were some conditional--

17          MR. CARR:  No, I didn't say that --

18          MR. DONNELLON:  I'm speaking.

19          MR. CARR:  -- I said they won't get the first two

20   million dollars back because it's not secured by the

21   preference recoveries, and they're not going to get it paid

22   back.

23          MR. DONNELLON:  I'm going to address Your Honor and

24   not counsel.  Your Honor, the issue here being, if there's

25   adequate protection, some conditional allowance of up to four

1  million dollars of the claim, that may work, and we don't need

2  to be going down any of these roads at this point in time;

3  but the question being, they may get some prefer -- may get

4  some advantage and security in the use of their cash --

5          THE COURT:  All right.

6          MR. DONNELLON:  -- solely by that conditional

7  allowance.  If there are issues --

8          THE COURT:  All right, I understand your -- I

9  understand your concerns, and I understand both sides.

10          Let's think about our roadmap here as to how we're

11 going to resolve this.  My inclination was to -- is to take

12 about an hour and a half here, and then have Mr. Knauer

13 testify, and subject to -- and then be subject to cross-

14 examination.

15          Do you -- I mean, do you feel like though that, that

16 -- you have some due process concerns in that regard and that

17 you have not been privy to any of the information?

18          MR. DONNELLON:  Particularly that there was -- the

19 schedule was filed last night.  There was nothing, no

20 affidavit to begin this process that could form the construct

21 of a cross-examination.  I would be learning this information

22 new on the stand.

23          THE COURT:  Well, see, and let me -- everybody just

24 relax now.  What I'm thinking is that, you know, we're

25 arguing about one issue that might very easily go away, and

1  that is the validity of the Fifth Third lien.

2         The -- you know, it's been my experience that these

3  liens are usually valid.  I have no idea if this one is.  But

4  I do know the Trustee even went to the unusual extent of

5  hiring a third-party counsel to look into that for him, and I

6  haven't heard what that third-party counsel has to say either.

7         But there's no use us getting all in a big fight.

8  This is why I said we normally have an open period for the

9  Creditors' -- an extended period for the Creditors' Committee

10 to satisfy themselves, and they usually come back satisfied.

11        Now -- no -- what I'm saying here is that by, by

12 taking this tes -- maybe by taking this testimony this

13 afternoon or maybe by taking it in ten days or seven days or

14 something like that, or letting you do an exam, we can put

15 that issue to rest very quickly, because you all are

16 sophisticated commercial lawyers, and you know what the good

17 docs look like; and Mr. LaTour, I'm sure you have good docs

18 here, although I'm sure you're not the one that prepared them.

19 I could be wrong about that.  Yeah.

20        So here's what we're going to do.  We're going to

21 take a lunch break.  And I want the parties to carry in

22 something and use my large conference room here.  And here are

23 some of the issues that I think you ought to try.

24        I think you ought to try for some quick resolution

25 on the issue of the validity of the Fifth Third lien.  I think

1  you ought to try to resolve this issue as to the immediate

2  transfer of surplus funds.  I think you could build into that

3  some sort of a process like a noticing on the Trustee's

4  website of the proposal to transfer funds.  I think that keeps

5  the burden on them to put you on notice that they're going to

6  do that with some sort of a lead time.  It can be seven days,

7  you know, it doesn't have to be a long delay, but just say

8  that you know, "Trustee proposes a transfer of excess

9  collateral on March 15th consisting of the final recoveries to

10 Fifth Third."

11         Talk about -- you all might be able to come up with

12 a better idea than I have, but talk about some sort of a way

13 to satisfy the notice issues that were raised by Ms. Caruso

14 and Mr. Rogers.

15         And then I think, you know, you get down to the core

16 issue as to whether or not the -- there's really -- I mean, I

17 understand your all's point, and I was kind of making a little

18 bit of light of the fact of you know, how can you cause a new

19 loan, you know, "We get it, we gave it to you, you give it

20 back."  But at the bottom line, how does that harm the other

21 creditors?

22         I mean, as I said a moment ago, aren't you really

23 down to allowance of the claim versus an additional lien on

24 avoidance actions?  Isn't that the heart of what the substance

25 is?  And then maybe I can hear some arguments as to what the

1    better way to proceed.  So we'll -- yes, Mr. Levin?

2         MR. LEVIN:  Elliott Levin, Your Honor, on behalf of

3    Superior.

4         It's not only an issue of whether or not they have

5    valid documents properly perfected; the issue is whether or

6    not any claims exist against them.

7         THE COURT:  Well, Mr. Levin, I understand that.  But

8    I'm under the impression that -- that this would not preclude

9    anyone from saying they had a superior claim to these funds.

10        MR. LEVIN:  Well, what if they did something wrong

11   that caused the estate to lose money pre-petition?  Mr. LaTour

12   thinks that he is getting that claim against Fifth Third

13   waived.  Mr. Carr doesn't know if he is or not.

14        MR. CARR:  No, I -- no, I don't think he is.

15        MR. LEVIN:  But Mr. LaTour thinks he is.  So we have

16   a dispute there.

17        There is one thing, Your Honor, I don't think we

18   don't have a dispute about, and Mr. Carr and I talked about it

19   earlier.  On document 340, which is the Trustee's response to

20   objections, the Trustee's financing motion, on page 5, there

21   is a paragraph that deals with certain claims that may be

22   asserted against Superior.

23        Mr. Carr and I have agreed that that paragraph will

24   come out and will be substituted by a paragraph that says the

25   Trustee may assert claims against Superior.

1        The definition is something that Superior had some

2   difficulty with.  Mr. Carr has agreed to redo that.

3        MR. CARR:  That's right.  We'll put back something

4   more generically that says we may have claims against

5   Superior, and we believe that Superior may not be a creditor

6   in this case.  That was the point.  That was the thrust of

7   that paragraph.

8        THE COURT:  All right.

9        MR. LEVIN:  Thank you, Your Honor.

10       THE COURT:  Okay.  Well, as to the first point that

11  you raise, I mean I guess the answer to that question is going

12  to be based upon whatever language is in the order.  And if

13  you -- if you all disagree as to the language that you're

14  proposing be in the order, then you all ought to sort that out

15  between yourselves.  And if you've agreed on the language but

16  you read it one way and you read it the other way, then maybe

17  there needs to be some further discussions.

18       MR. CARR:  It's not so much the language, Your

19  Honor.  It's the impact of allowing the claim.  And it's --

20       THE COURT:  The legal impact of allowing the claim,

21  yeah.

22       MR. CARR:  Yeah.  It's our view that the Trustee

23  doesn't have compulsory counterclaims, if you will, when

24  somebody files a proof of claim.  Somebody files a proof of

25  claim, I think Bankruptcy Rule 3007 that discusses objections

1  to claims actually provides that you cannot join claims that

2  you have against the claimant to an objection unless you

3  commence a separate adversary proceeding.

4          So that it contemplates the idea that you would

5  object to claims and treat claims separately from claims that

6  the estate might have against the claimant.  There's not a

7  compulsory counterclaim.

8          THE COURT:  All right.

9          MR. LEVIN:  But I think that has to be resolved now

10  rather than leaving it open to interpretation later.

11          THE COURT:  All right.  Well, why don't you all

12  discuss that.  Why don't you discuss -- I mean, why don't you

13  all look at what you can.  I understand you have a short

14  lunchtime, but -- and I'll give you until 1:30, and then we're

15  going to have to come back, especially if we're going to take

16  evidence.

17          I can find a day for you in the next ten days or so

18  to complete that portion of it.  And we may have to think

19  about a situation where there's a very limited time period

20  cash use here for a few days.  So you ought to talk about that

21  also.    All right.  1:30.

22              [Off the record at 11:57:16 a.m.]

23                      *  *  *  *

24              [On the record at 2:33:13 p.m.]

25  (NOTE:   The following portion had no log sheet notations for

1   speaker identification; hence, "UNIDENTIFIED ATTORNEY" had to

2   be used)

3                UNIDENTIFIED COUNSEL:  Good afternoon, Your Honor.

4             THE COURT:  All right, we're back on the record in

5   Eastern Livestock.   Who wants to report to the Court as to

6   your progress?

7             MR. LaTOUR:  Your Honor, Randall LaTour for Fifth

8   Third Bank.

9             I'm pleased to report that the parties have reached

10  an agreement in principle, subject to a definitive writing.  I

11  would like, if the Court will allow, to describe the concept

12  of this deal so that we have something memorialized.

13            THE COURT:  All right.

14            MR. LaTOUR:  The proof of claim of Fifth Third would

15  be allowed, pursuant to the terms already described in the

16  first order secured to the extent of Section 506.

17            The new language that will come in is that such

18  allowance is not a release or waiver by the estate or by any

19  other party.

20            Similarly, there will be new language that indicates

21  that the insertion of that language is not a release by Fifth

22  Third of any defenses that it may have, and that all of its

23  defenses are reserved and preserved.

24            There will be a new provision in the order to

25  provide a notice mechanism for intended disbursements of cash,

1  and this would occur for both use of cash collateral by the

2  Trustee or his professionals, or to pay the so-called excess

3  cash collateral to Fifth Third.  That notice provision would

4  include identification of the source of the cash, provide a

5  minimum of seven days' notice prior to intended distribution,

6  with one reservation, and that is that if the distribution had

7  been previously authorized by the Court, or otherwise vetted

8  by agreement of the parties, that no objection period would

9  obtain in that instance.

10       There will be a clarification that to the extent

11  that surcharge monies are returned by other secured parties

12  because the other secured party ultimately prevailed in a

13  priority fight as to whose collateral it was, that the

14  surcharge return that they pay is defined as excess collateral

15  and would be reimbursed to Fifth Third Bank.

16       The order will specifically now indicate that it

17  controls over the motion, so that to the extent there's any

18  ambiguity or difference between the two, that the order

19  prevails.

20       The language regarding the reinstitution of liens in

21  the order of the priority that obtained previously will be

22  inserted along the lines of our discussion this morning, with

23  the attempt to not create liens that wouldn't otherwise exist.

24  And I think we hashed out this morning; that language will be

25  added.

1      A new issue that arose that is also going to be

2 resolved was in paragraph 11(e) of the first order, that had

3 an ambiguity that seemed to suggest the estate could not hire

4 other parties where the intent of the paragraph was to prevent

5 other borrowing, and so that language will be cleaned up as

6 well.

7      And that, I believe, is a recitation of what we just

8 agreed to.

9      THE COURT:  All right.  Anyone want to add or

10 clarify or -- all right, so that's the agreement of all the

11 parties represented here at counsel table, the banks, and

12 Superior --

13      MR. DONNELLON:  Your Honor, Dan Donnellon on behalf

14 of First Bank & Trust.

15      I think Mr. LaTour read what adequately reflects

16 what the parties agreed to.  Our objection remains on file

17 until such time as Mr. LaTour said we had a definitive

18 agreement, which will moot and resolve all of the objections.

19      The only thing I would add is it sounded a little

20 awkward the way Mr. LaTour saying that the allowance does not

21 waive -- does not constitute release or waiver by the Trustee

22 or any party, and reserves the defense of Fifth Third.  I

23 think it just needs to say "not waive or release any rights

24 and preserves defenses," so that we have some clarity as to

25 what that is.

1          MR. LaTOUR:  I'm sure we'll get the language

2   circulated, and we'll hammer that out, Your Honor.

3          THE COURT:  All right.

4          MR. NEWBERN:  Your Honor, if I might, this is Scott

5   Newbern.  I represent the Florida Livestock Market.

6          My understanding we're going to get a copy of an

7   agreement to review prior to this being approved, is that

8   correct?

9          THE COURT:  You're going to get a copy of a proposed

10  order.

11         (To Mr. LaTour) You'll circulate a proposed order to

12  the parties that have participated in these proceedings?

13         MR. LaTOUR:  Yes.

14         MR. CARR:  Your Honor, he needs, Your Honor, if you

15  will, to e-mail me so that I know how to get to him, because I

16  don't know who he is.

17         THE COURT:  Yeah.  Anybody that wants to be included

18  in the circulation of that order who's not here, e-mail Mr.

19  Carr at Baker Daniels -- is that just JAC?

20         MR. CARR:  It's Jim, J-I-M, dot Carr, C-A-R-R, at

21  B-A-K-E-R-D dot com.

22         THE COURT:  And --

23         MR. NEWBERN:  Was that Bake.com or Baker?

24         MR. CARR:  Baker, D, B-A-K-E-R-D, Baker D.

25         MR. NEWBERN:  Great, thanks.

1          THE COURT:  I'm sure it's on the website also.

2          MR. NEWBERN:   I'm sure.

3          THE COURT:  All right.  Yes?

4          MR. LaTOUR:  Your Honor, I just wanted to clarify,

5   Mr. Carr is the party charged with circulating that order, and

6   not me.

7          THE COURT:  We'll --

8          MR. CARR:  Which means it's not going to get done in

9   a hurry.

10         THE COURT:  Mr. Carr I'm sure won't remain for long

11  the person responsible for circulating it.

12     (Laughter)

13         MR. CARR:   I think Ms. Hall is going to have a busy

14  weekend.

15         THE COURT:  Okay.  Well, the Court will approve that

16  use of cash along the lines of -- that have been spelled out

17  and compromised here today.

18          And I want -- I want everyone to be clear that even

19  though the order is not typed up and circulated at this point,

20  I think the major points have been covered.  They've either

21  been covered in the original proposed order and/or motion, or

22  they've been covered by the presentation that changed that

23  based upon the negotiations.

24          And while there might be a word here or two -- a

25  word here or there that we have to change, the Court

1  understands what the basic understanding is and reserves the

2  right to resolve any of those disputes.  In other words, we're

3  not going to open this back up.  We're going to nail it down

4  in accord to the agreement that has been reached.

5          UNIDENTIFIED COUNSEL:  Thank you, Your Honor.

6          UNIDENTIFIED COUNSEL:  Thank you.

7          UNIDENTIFIED COUNSEL:  Thank you very much.

8          THE COURT:  All right.  Anything else?

9          MR. CARR:  I think that's it, Your Honor.

10         THE COURT:  I think my -- Ms. Hall, are you on the

11  line?

12         MS. HALL:  I am, Your Honor.

13         THE COURT:  My Courtroom Deputy points out to me

14  that I don't think we explicitly, when talking about the

15  Receiver matter, there were actually two motions.  And we may

16  have mainly only talked about one of those.

17         MS. HALL:  On item 2 and 3 of the agenda, there was

18  the Trustee's payment motion which was a motion to pay the

19  post-petition Receiver's fees.  And then there was the motion

20  of Dinsmore Shohl to be allowed for the attorneys' fees for

21  the Receiver.

22         I think -- my memory is that the Court did address

23  both of those.  It may have been in one sentence, but you

24  mentioned both payment to the receiver and payment to the

25  counsel for the Receiver.

1          THE COURT:  Very good.  Does anyone disagree with

2   that?

3          UNIDENTIFIED COUNSEL:  I don't disagree but I think

4   -- I just want to be clear.  The item #2 on the agenda is for

5   the custodial period, and it covers both Receiver's fees,

6   Dinsmore's fees, and there are about five bankers that are

7   listed on the Schedule.  And the purpose of those vendors are

8   people that were either security bankers or provided feed or

9   trucking during that custodial period that were previously

10  (unclear).  So that's what's in that motion.

11         THE COURT:  Yes, and that motion's been granted.

12  Was that your understanding, Ms. Hall?

13         MS. HALL:  Yes, Your Honor.

14         THE COURT:  Yes.  That's the Court's recollection

15  also.  All right, anything further now?  So the next matter

16  that we have scheduled is April the 15th.  Do we have another

17  omnibus date in this matter?  Do we need --

18         UNIDENTIFIED COUNSEL:  We'll need to have one.

19         THE COURT:  Do we need one?

20         UNIDENTIFIED COUNSEL:  Yeah, and I --

21         THE COURT:  Do we have a May one?

22         MS. HALL:  I don't believe we've set omnibus dates

23  down in this matter -- this case.

24         THE COURT:  Well, let's do that while everyone's

25  here, just like -- at least we'll weed out the known conflicts

1  at this time.  Well, we'll use that -- we'll use that April

2  15th date.  Although I'd like to keep that telephonic in that

3  so far I know of nothing that would need to be heard in terms

4  of evidentiary hearing.

5       (Pause)

6            THE COURT:  How about May 2nd, which is a Monday?

7            UNIDENTIFIED COUNSEL:  Your Honor, when we were

8  speaking this morning about the Rule 2004 motion and/or motion

9  to compel, I was under the impression that April 15 would be

10 the omnibus that would hear that.  If that's in one of the

11 other two proceedings, that may slow down --

12           THE COURT:  Oh, you're right, we did say that,

13 didn't we? All right, we'll do that on April 15th.  So that

14 will not be totally telephonic is your point, yes.  That's

15 fine.  I have that time available.

16           Well, then, do you think we'll need one as soon as

17 May 2nd then, or should we --

18           UNIDENTIFIED COUNSEL:  Currently, no.

19           THE COURT:  Let's go -- that's only like two weeks

20 after.

21           UNIDENTIFIED COUNSEL:  Yeah, you might want to go to

22 the middle of May.

23           MR. LeBAS:  Your Honor, David LeBas for J&F and

24 Cactus.  I think I'm going to get a motion to compel from Mr.

25 Donnellon.  Is the 15th April going to be a day on which the

1    Court would hear that motion?  Is that what I'm to understand?

2            MR. DONNELLON:  2004 motion and/or compel.  That was

3    my understanding, is that I said I'd file that next week, and

4    we'll have that teed up on the 15th.

5            THE COURT:  Does that not work for you?

6            MR. LeBAS:  I just wanted to make sure I understand

7    what the process is.

8            MR. MASSOUH:   And this is John Massouh for Friona.

9            I recall the process being that First Bank was going

10   to first file a motion for 2004 and give us an opportunity to

11   respond to that prior to filing a motion to compel.  Am I

12   wrong on that?

13           THE COURT:  No, I think that's right.  I mean --

14           MR. DONNELLON:  That's right.

15           THE COURT:  There's nothing to compel until you

16   don't do something that they've asked for to be produced as

17   part of the 2004.

18           MR. MASSOUH:  Correct.

19           MR. DONNELLON:  Correct.  We've asked for it

20   informally, but we'll formalize that in a 2004.  That's why I

21   said and/or compel.  I was unclear exactly how to caption it

22   but we'll proceed under 2004 and hopefully obviate that

23   through the extra judicial means we're exploring.

24           MR. MASSOUH:  If necessary, there'll be an

25   evidentiary hearing or presentation on the 15th, is that where

1  we are?

2          MR. DONNELLON:  Yes, sir.

3          THE COURT:  If things are at a point where you know

4  that you've identified the issue, and there's a legitimate

5  dispute as to what should or should not be produced, I'd like

6  to bring that to a head as quickly as possible.  I can't sit

7  here today and tell you if we're going to be in a position to

8  do that on the 15th or not, but it's going to depend on how

9  you respond I think to the 2004 notice initially.

10         All right, I'm not having much luck here, do you see

11 any dates?  The 14th I was looking at but --

12         MR. DONNELLON:  Would we be able to set up a

13 response time that's prior to the 15th?  As Mr. LeBas is

14 saying we all are under the understanding it's going to be

15 heard then.  I'll make every effort to file it as early as

16 possible next week, but I don't have a response that's due

17 after the 15th.

18         THE COURT:  All right.  You'll serve it next week

19 which is the week beginning the 14th of March.  Can you

20 respond to that by the 5th of April?

21         MR. MASSOUH:  (unclear). Assuming that we're looking

22 at something that's similar to what's been set before, I think

23 we can get it served by April 4th, yes.

24         THE COURT:  All right.  April 4th.

25         MR. DONNELLON:  Thank you.

1              THE COURT:  Okay.

2              COURTROOM DEPUTY: (unclear)

3         (Pause)

4              THE COURT:  All right, I can give you May 11th which

5    is a Wednesday, or May 13th.

6              UNIDENTIFIED ATTORNEY:   Either one, Your Honor.

7              THE COURT:  All right, let's do May 11th at ten a.m.

8              MR. DONNELLON:  That will be consistent with our 11

9    hearing, I have three 11's --

10             THE COURT:  There you go.

11             MR. LeBAS:  Thank you.  I'm sorry, this is David

12   LeBas again.

13             As far as the response on April 4, what I envision

14   would be their response to the pleading, and specific

15   documents are requested, and so forth; I don't know what will

16   be asked for until after (unclear) on April 4 other than

17   (unclear).

18             THE COURT:  All right, I think that's what they're

19   anticipating also.

20             MR. LeBAS:  Okay.

21             THE COURT:  All right.  Anything further today?

22   Thank you all.  We're adjourned.

23             ALL COUNSEL:  Thank you, Your Honor.

24                        (End at 2:50:07 p.m.)

25                             *  *  *  *

```
1                    * * * * * * * * * * * *

2            I certify that the foregoing is as true and accurate

3   a transcript as can be produced from the digitally sound

4   recorded record of the proceedings with low-volume telephonic

5   appearances.
```

/s/ Gloria C. Irwin                                    10/13/2011
_____
**GLORIA C. IRWIN**
**Certified Transcriber NJ AOC200**                                  **Date**
    **Federal  CERT #122**
**GCI TRANSCRIPTION SERVICES**
**210 Bayberry Avenue**
**Egg Harbor Township, NJ  08234-5901**
**609-927-0299  1-800-471-0299**
    **FAX  609-927-9768**
**e-mail  irwingloria@comcast.net**
✔