## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF INDIANA - NEW ALBANY

==============================

| | |
|---|---|
| IN THE MATTER OF: | .  Case #10-93904-BHL-11 |
| | .     #10-93867 |
| EASTERN LIVESTOCK CO., LLC | .  New Albany, Indiana |
| | .  **September 28, 2011** |
| Debtor | .  10:17:06 a.m. O'Clock |

==============================

### TRANSCRIPT OF TELEPHONIC CONTINUED HEARING RE:
### MOTION TO QUASH ORDER GRANTING MOTION FOR 2004 EXAMINATION UPON THE UNITED STATES DEPARTMENT OF AGRICULTURE, GRAIN INSPECTION, PACKERS & STOCKYARDS, FILED BY US DOA, GRAIN INSPECTION, WITH A BRIEF IN SUPPORT OF MOTION TO QUASH, FILED BY JOINED PARTY IN RESPONSE TO OPPOSITION TO MOTION TO QUASH FILED BY CREDITOR FLORIDA ASSOCIATION LIVESTOCK MARKETS; <u>OTHER MATTERS IN THE ADVERSARIES</u>:
### 11-59086, 11-59087, 11-59088, 11-59093, 11-19098, 11-59104, 11-59108
### BEFORE THE HONORABLE BASIL H.  LORCH, III, J.U.S.B.C.


**APPEARANCES:**   **(See following pages)**

| | |
|---|---|
| <u>For Petitioning Creditors, Moseley Cattle</u> | JOHN W. AMES, ESQ. |
| <u>Auction, Moseley Cattle Auction, et al</u>: | C.R. "CHIP" BOWLES, ESQ. |
| <u>For Greenebaum, Doll & McDonald</u>: | CHRISTIE A. MOORE, ESQ. |
| | Greenebaum, Doll & McDonald,  PLLC |
| | 101 S. 5th Street   #3500 National City Tower |
| | Louisville, KY  40202 |
| | |
| | |
| <u>For the Chapter 11 Trustee</u>: | KEVIN TONER, ESQ. |
| | TERRY HALL, ESQ.   *(Via phone)* |
| | Baker & Daniels, LLP |
| | 300 North Meridian   Suite 2700 |
| | Indianapolis, IN 46204 |

<u>Electronic Sound Recording Operator</u>:    Amy Bruckert

Proceedings Recorded by FTR Gold Digital Sound Recording
Transcript Produced by Certified Transcription Service

GCI TRANSCRIPTION SERVICES
**210 Bayberry Avenue**
**Egg Harbor Township, NJ  08234-5901**
**1-609-927-0299     FAX 1-609-927-9768     1-800-471-0299**
**e-mail - irwingloria@comcast.net**

Page 2 Cover
#10-93904
9-28-2011

**APPEARANCES: (continued)**

Chapter 11 Trustee:                    JAMES A. KNAUER, ESQ. *(Via phone)*
                                       Kroger Gardis & Regas, LLP
                                       111 Monument Circle, Suite 900
                                       Indianapolis, IN 46204

For the U.S. Trustee:                  CHARLES R. WHARTON, AUST *(Via phone)*
                                       Office of the U.S. Trustee
                                       101 W. Ohio Street    Suite 1000
                                       Indianapolis, IN   46204

For First Bank & Trust Company:        DANIEL J. DONNELLON, ESQ.
                                       Faruki, Ireland & Cox, PLL
                                       201 East Fifth Street   Suite 1420
                                       Cincinnati, OH 45202

                                       BRET S. CLEMENT, ESQ. *(Via phone)*
                                       JOHN R. CARR, III, ESQ. *(Via phone)*
                                       Ayers, Carr & Sullivan, P.C.
                                       251 E. Ohio Street   Suite 500
                                       Indianapolis, IN   46204

For Fifth Third Bank:                  RANDALL D. LaTOUR, ESQ.
                                       Vorys, Sater, Seymour & Pease, LLP
                                       52 East Gay Street
                                       Columbus, OH   43216

For Friona Industries:                 JOHN FREDERICK MASSOUH, ESQ.
                                       Sprouse Shrader Smith, P.C.
                                       701 S. Taylor   Suite 500
                                       Amarillo, TX   79105
                                                ------ continued----------->

Electronic Sound Recording Operator:   Amy Bruckert

Proceedings Recorded by FTR Gold Digital Recording
Transcript Produced by Certified Transcription Service

GCI TRANSCRIPTION SERVICES
210 Bayberry Avenue
Egg Harbor Township, NJ  08234-5901
1-609-927-0299     FAX 1-609-927-9768     1-800-471-0299
e-mail - irwingloria@comcast.net

Page 3 Cover
#10-93904
9-28-2011

**APPEARANCES: (continued)**

For Bankfirst Financial Services, a
Mississippi Corp:

ERIC C. REDMAN, ESQ.   *(Via phone)*
Redman Ludwig, P.C.
151 N. Delaware Street    Suite 1106
Indianapolis, IN   46204


For Kathryn Pry RE: Gibson:

DEBORAH J. CARUSO, ESQ. *(Via phone)*
Dale & Eke, P.C.
9100 Keystone Crossing,   Suite 400
Indianapolis, IN 46204


Trustee For Thomas & Patricia Gibson:

KATHRYN L. PRY
P.O. Box 6771
New Albany, IN 47151


For Thomas P. Gibson & Patsy M. Gibson:

RICHARD A. SCHWARTZ, ESQ.
Kruger & Schwartz
3339 Taylorsville Road
Louisville, KY 40205


For Bluegrass Stockyards, LLC, and
related entities:

LAURA DAY DELCOTTO, ESQ.
DelCotto Law Group, PLLC
200 North Upper Street
Lexington, KY 40507


For Diamond B Ranches:

JAMES E. SMITH, JR., ESQ. *(Via phone)*
Akins Smith, P.A.
400 W. Capitol Avenue, Suite 1700
Little Rock, AR 72201
---------continued---------------->


Electronic Sound Recording Operator:   Amy Bruckert

Proceedings Recorded by FTR Gold Digital Recording
Transcript Produced by Certified Transcription Service

GCI TRANSCRIPTION SERVICES
**210 Bayberry Avenue**
**Egg Harbor Township, NJ  08234-5901**
**1-609-927-0299      FAX 1-609-927-9768      1-800-471-0299**
**e-mail - irwingloria@comcast.net**

Page 4 Cover
#10-93904
9-28-2011

**APPEARANCES: (continued)**

For Cactus Growers, Inc.:          JOHN HUNT LOVELL, ESQ. *(Via phone)*
                                         MARK A. ROBINSON, ESQ.   *(Via phone)*
                                         Lovell, Lovell, Newson & Isern, LLP
                                         112 W. 8th Avenue   Suite 1000
                                         Amarillo, TX 79101

For CPC Livestock:                  JESSICA E. YATES, ESQ.    *(Via phone)*
                                         Snell & Wilmer, LLP
                                         1200 Seventeenth Street    Suite 1900
                                         Denver, CO   80202

For Robert Nichols, Jane Nichols, and    JACK S. DAWSON, ESQ. *(Via phone)*
Nichols Livestock:                  Miller Dollarhide, P.C.
                                         100 Park Avenue   2nd Fl.
                                         Oklahoma City, OK   73102

OTHER TELEPHONIC APPEARANCES, IF ANY, NOT PROVIDED.

Electronic Sound Recording Operator:    Amy Bruckert

Proceedings Recorded by FTR Gold Digital Recording
Transcript Produced by Certified Transcription Service

GCI TRANSCRIPTION SERVICES
**210 Bayberry Avenue**
**Egg Harbor Township, NJ  08234-5901**
**1-609-927-0299      FAX 1-609-927-9768      1-800-471-0299**
**e-mail - irwingloria@comcast.net**

1  NOTE:   Attorneys appearing via telephone transmission, VERY

2  difficult to hear.   Low audibility, fuzzy reception, not near

3  any microphone that could be isolated and enhanced.   Many

4  "(unclear)" notations are the result of reduced audibility.

5                    * * * * * * * * * *

6  (At 10:17:06 a.m.)

7            THE COURT:   Good morning.

8            ATTORNEYS:   Good morning, Your Honor.

9            THE COURT:    All right, we're on the record both in

10 the Thomas and Patsy Gibson matter and the Eastern Livestock

11 Company case.   The attorneys that are on the phone, we've

12 already taken your appearances.   I'd ask that the attorneys in

13 the courtroom state the appearances for the record, please.

14            MR. TONER:   Kevin Toner, counsel for the Trustee,

15 Jim Knauer, Eastern Livestock, the debtor.

16            MS. MASSOUGH:   John Massough for Friona Industries.

17            MS. CARUSO:   Debora Caruso for Kathy Pry, the

18 Trustee for the Gibson estate.

19            MR. DONNELLON:   Good morning, Your Honor.   Dan

20 Donnellon for First Bank & Trust.

21            MR. LaTOUR:   Good morning, Your Honor.   Randall

22 LaTour from Vorys, Sater, Seymour & Pease representing Fifth

23 Third Bank.

24            MR. SCHWARTZ: Rick Schwartz, counsel for the debtors

25 Thomas and Patsy Gibson.

1          MS. MOORE:   Christie Moore, counsel for Superior

2   Livestock, Stock Auction, Joplin, and several other of the

3   creditors.

4          MR. LEVIN:   Good morning, Your Honor.  Elliott

5   Levin of Rubin & Levin, counsel for Superior and Joplin.

6          MR. BOWLES:   Good morning, Your Honor.  Chip Bowles

7   of Greenebaum, Doll & McDonald, counsel for Superior, Joplin,

8   and a host of others.

9          MR. AMES:   John Ames, for the same, Your Honor.

10         MR. EARL:   Trevor Earl for Your Community Bank, Your

11   Honor.

12         MS. DELCOTTO:   Good morning, Your Honor.  Laura Day

13   DelCotto for the Bluegrass entities.

14         MS. PRY:   Kathryn Pry, Trustee for Tommy Gibson and

15   Patsy Gibson.

16         MR. McCLAIN:    Your Honor, Mike McClain for John

17   Gibson and Grant Gibson.

18         THE COURT:   All right.  Let's start then with the

19   Gibson matters.  I'm going to work off the Court's calendar.

20   I think it coincides fairly well with the agenda, although I

21   think there have been a couple things added to the Court's

22   calendar that aren't on the agenda, so that's why I'm working

23   off of that, but we'll try to stay coordinated, and I'll

24   certainly try to make it clear which matter we're on.

25         The first matter is the adversary that's been filed

1  in the Gibson case.   That's Kathryn Pry vs. Grant Gibson and

2  others.  And who do we have appearing in that matter?

3          MS. CARUSO:   Your Honor, Debbie Caruso for the

4  Trustee, Kathy Pry.

5          MR. EARL:   Your Honor, Trevor Earl for Your

6  Community Bank.

7          MR. McCLAIN:   Your Honor, Michael McClain for Grant

8  Gibson and John Gibson.

9          THE COURT:   All right.  As I understand it, this is

10 a -- you basically are seeking a partition -- or this is a

11 complaint that's going to seek like a partition of the real

12 estate to sell, or to sell the real estate.   You want to hold

13 the phones until it's determined who's entitled to what.  Is

14 that a one-sentence summary of what you're --

15         MS. CARUSO:   Well, kind of.

16         THE COURT:   What else.

17         MS. CARUSO:   It is a complaint under 363 to sell

18 property of -- that is co-owned.  There is one, two, three,

19 four -- approximately five parcels of farmland, Your Honor.

20 Four of those are owned jointly with John Gibson and Grant

21 Gibson and the debtor, Tommy Gibson.  One of the tracts is

22 just owned by Tommy and Patsy.

23         We seek authority from the Court to sell all of the

24 farm property under 363(h), and to sell that property free and

25 clear of all liens.

1          As far as the disbursement of the proceeds at

2  closing, I think Mr. Earl and I are going to continue to talk

3  about that and try to work through some sort of an agreement,

4  an arrangement, if the proceeds would be held by the estate

5  with respect to Your Community Bank's claim, or if they would

6  be distributed to Your Community Bank's claim at closing.

7          My concern, Your Honor, would be obviously Your

8  Community Bank is going to want the ability to credit bid; and

9  to credit bid they have to have an allowed claim, and I would

10 want reservations that  --

11          CONFERENCE CALL OPERATOR:   Joining the meeting.

12          MS. CARUSO:   I would want reservations that any

13 allowed claim would be solely for the purposes of credit

14 bidding, and that the estate would reserve all of their rights

15 and claims that they may otherwise have.

16          THE COURT:   Okay, and so I'm just saying, first of

17 all, that you have not established by -- and I guess you're

18 intending to bring another adversary, but you've not

19 established any sort of a fraudulent transfer to the sons at

20 this point in time.

21          MS. CARUSO:   Your Honor, I haven't and we're

22 working to that.  Mr. McClain and I just met today, and we

23 talked on our way down, and I am hopeful that they will

24 provide us information that they believe would support the

25 transfer of this farm in 2007, and would support their

**Page 6**

1    allegation that there was sufficient consideration.

2            THE COURT:    And the other thing, a suggestion I

3    think they made was that maybe this -- the farms could be sold

4    sequentially, so that once the debtor's interest in them was

5    determined, there might be some interest left that belongs to

6    the sons that would not have to be sold, or a farm, for

7    example, that didn't have to be sold.    Are you all discussing

8    that also?

9            MS. CARUSO:    We are, and I think that would be

10   their partition-in-kind allegation.    Obviously under 363(h)

11   they do have a right of first refusal, so we have to keep that

12   into -- in mind; but if there would be a proposal where the

13   farms could be partitioned in kind and the value would be

14   commensurate with what the estate believes would be realized

15   from a sale of the whole, we would certainly listen to it.

16           These farms are all cross-collateralized by

17   Community Bank, so it would have to involve -- they're

18   involved, and I would imagine their agreement to release on

19   some of the farms, or -- but we're talking about it here.    In

20   fact, we're meeting today after our proceedings here.

21           THE COURT:    Okay.  Well, it sounds like we're at a

22   -- we're at a stage in the proceedings where negotiations are

23   ongoing, and maybe for my purposes all I need to do -- I think

24   I'll give you a telephone conference date for just -- so the

25   three of us -- the three of you and I can see where we are.

1  What do you think about -- ?

2          Now here, I always know that if you're talking about

3  a sale of land, and you're talking about it either in the fall

4  or the spring --

5          MS. CARUSO:   We're trying to do it this year, Your

6  Honor.

7          THE COURT:   Yeah.  So this is the 28th.  Do you

8  want to talk as soon as next week to me -- with me, or the

9  following week?

10          MS. CARUSO:   I can --  I'd be happy to --

11          THE COURT:   Now I want to give you all time to do

12  some serious negotiating here.  I mean, it seems to me like

13  you ought to be able to work this out with the bank.  I mean,

14  the bank -- unless somebody has a question about their

15  mortgage, which I haven't seen anybody raise that -- then, you

16  know, that's just a situation we commonly deal with with 363

17  sales.

18          I don't have any problem with them getting paid at

19  closing.

20          MS. CARUSO:   No, I just would like to reserve any

21  claims that we would have against (unclear)

22          THE COURT:   Well, I understand, and you all can

23  talk about that.  Yeah.

24          MS. CARUSO:   Okay.   Two weeks?

25          MR. EARL:   I think two weeks is -- makes sense,

1  Your Honor.

2          THE COURT:   All right.  (Pause)   I can do it on

3  the afternoon of the 10th or 11th.

4          MS. CARUSO:   The 11th I have 341 hearings --

5          THE COURT:   Or I could do it --

6          MS. CARUSO:   -- and I wouldn't be available until

7  four.

8          THE COURT:   You would *not* be available --

9          MS. CARUSO:   Would not be available until four; but

10  the afternoon of the 10th works for me.

11          THE COURT:   Yeah, but I'll be -- I'm sure most law

12  offices are closed on Columbus Day.

13      (Laughter)

14          THE COURT:   But I'm going to be working.  Now

15  actually, I'll be in Bloomington for my class, and I could

16  talk to you all that afternoon on a phone conference if you

17  give me a dial-in.

18          MS. CARUSO:   Okay.

19          THE COURT:   And so one of  -- you set it up --

20          MS. CARUSO:   I can do that.

21          MR. EARL:   Was that the 10th, Your Honor?

22          THE COURT:   Yes.

23          MR. EARL:   I have depositions in Cincinnati on the

24  10th.   They may be over in the afternoon.   They're asbestos

25  cases.   Sometimes they end early, sometimes they don't.

1          THE COURT:   Okay.

2          MR. EARL:   The 11th is better for me, or really

3  even later that week.

4          THE COURT:   How about the 14th?

5          MS. CARUSO:   That works for me.

6          MR. EARL:   That's fine, Your Honor.

7          THE COURT:   Let's do it at ten o'clock on the 14th.

8          MS. CARUSO:   Okay.

9          THE COURT:   And still, I want the plaintiff to set

10 it up with a dial-in.

11          MS. CARUSO:   I would be happy to that --

12          THE COURT:   And docket the information.

13          MS. CARUSO:   I will do that.  Thank you.

14          THE COURT:   Thank you.

15          MR. EARL:   Thank you.

16          THE COURT:   Also in the Thomas and Patsy Gibson

17 case we've got some motions, a number of motions to extend

18 time to file dischargeability, and we've got Mr. Schwartz

19 saying, "Let's fish or cut bait here."  Is that a --

20          MR. SCHWARTZ:   Yes, Judge, I think --

21          THE COURT:   -- summary of what you said?

22          MR. SCHWARTZ:   -- if you could deal with the First

23 Bank & Trust one, that's different from all the other ones.

24          THE COURT:   All right.

25          MR. SCHWARTZ:   Because that one we believe is out

1  of time.

2          THE COURT:   Is out of time?

3          MR. SCHWARTZ:   Yes.  They -- all of the other ones

4  have previously requested extensions of time, but First Bank

5  has not; and the deadline, the original deadline for filing a

6  non-dischargeability complaint expired on March 7th, 2011; so

7  we believe that that one should be overruled because it's not

8  timely.

9          THE COURT:   All right, who's on for First Bank?

10          MR. DONNELLON:   Your Honor, Dan Donnellon for First

11  Bank.  I think Mr. Clement is on the line as well -- I hope

12  so -- because he can address the timeliness issue.  My point

13  on the dischargeability is the game-changing indictments that

14  just came down last week, that I think that certainly that's

15  going to make things more difficult to proceed on issues of

16  dischargeability, at least in the short run; and the other

17  motion, the Trustee's motion has been granted, I believe, in

18  that regard, so I'll allow Mr. Clement or Mr. John Carr to

19  address that, if they're on the line.

20          MR. CLEMENT:   Okay, this -- I can talk about that.

21   (unclear, muffled distorted telephone transmission) to the

22  point of the docket, we believe it was timely filed.

23          THE COURT:   I'm sorry.  First of all, identify

24  yourself and then say that again.

25          MR. CLEMENT:   This is Bret Clement.

1           THE COURT:   Bret Clement.

2           MR. CLEMENT:   (unclear, muffled distorted telephone

3    transmission again) pulling up the docket we believe it was

4    timely filed, but we're going to check the docket and verify

5    that.

6           THE COURT:   All right.

7           MR. SCHWARTZ?:   I mean, the deadline was March 7th,

8    2011.

9           THE COURT:   Okay.  Well, I certainly don't know.

10   The -- let's talk about all the other ones.

11          MR. SCHWARTZ?:   Okay.  All right.

12          THE COURT:   Yeah, I mean -- I mean, I think the one

13   point that you make, obviously I don't now who rep -- well,

14   you're not representing them criminally.

15          MR. SCHWARTZ?:   No.

16          THE COURT:   No.

17          MR. SCHWARTZ:   No.

18          THE COURT:   But, I mean, I can assume that they're

19   going to take the Fifth.  So -- but I don't know that we can

20   wait forever.

21          MR. DONNELLON:   We -- we are -- we are currently

22   researching the issue of whether, testifying and at the 341

23   hearing where Mr. Gibson freely and openly testified relating

24   to the assets and liabilities, and in particular so some of

25   the cattle transactions of Eastern, would operate as a waiver

1  of its Fifth Amendment rights.

2          The case law on that, it's a two-part test, but it

3  essentially says you can't testify as to so much of the facts

4  and then say, "All right.  That's all I'm telling you.  I'm

5  exercising my Fifth Amendment."  Certainly, he was aware of

6  the FBI investigation at the time of the 341, so we think

7  that's an issue we may pursue as a waiver, but we don't even

8  have any current discovery pending toward Mr. Gibson

9  personally, or any kind of deposition schedule.

10          But it's my understanding that we are all on the

11  second motion for extension of dischargeability, that there

12  was one timely filed previously, so I'll defer to Mr. Clement

13  on that.

14          MR. JOHN CARR:   Your Honor --

15          THE COURT:   Yes.

16          MR. JOHN CARR: (telephone, difficult to hear

17  clearly)  Your Honor, John Carr.  First Bank filed its motion

18  to extend time on February 25th, Docket Entry 152 -- Docket

19  Entry 152.  The order was granted by the Court at Docket

20  Entry 194 on March 16th, 2011, the same time as it granted the

21  other motions to extend, all set for the same deadline of

22  September 6th.  We, in fact, were either the first or second

23  ones to file, I believe.

24          THE COURT:   Okay.

25          MR. CARR:   But it is timely. I don't know--

1          MR. SCHWARTZ?:  Well --

2          THE COURT:   All right.

3          MR. SCHWARTZ?:   Okay, that wasn't decided in the

4    motion, and I must have missed that.  The other ones have all

5    been decided (unclear) the previous extension; but

6    nevertheless, we have the other basis for objecting, so if I--

7          THE COURT:   Which is?

8          MR. SCHWARTZ?:   Which essentially is that there has

9    been a previous six-month extension granted.   We've been in

10   this case now for about ten months.  There's been no discovery

11   related to the issues that would form a basis for a non-

12   dischargeability complaint.   There's been plenty of time.

13   There's been no depositions taken of Mr. Gibson or Mrs. Gibson

14   outside of the initial (unclear)

15         THE COURT:   Well, doesn't it make sense -- I mean,

16   I understand all that, but doesn't it make sense to deal with

17   the Trustee's 727 complaint before we deal with all of the 523

18   complaints?

19         MR. SCHWARTZ?: Yes.

20         THE COURT:   I mean, if there's a discharge denied

21   under 727 --

22         MR. SCHWARTZ?: It's all moot

23         THE COURT:   It's all moot.

24         MR. SCHWARTZ?: Right.

25         THE COURT:   Right.

1        MR. SCHWARTZ?: And I guess just -- -- just if I can

2 just finish this, that the other -- my other fifth point is is

3 that now that there is a criminal indictment, it appears that

4 -- well, first of all, all of the property that the Gibsons

5 have that's not exempt is going to be -- is in the possession

6 of the Trustee, will be.  It's going to be liquidated.

7        If there are criminal convictions that result in

8 restitution, that's obviously going to be non-dischargeable.

9 So my argument is what's the point of spending all this time,

10 legal fees, litigation in Bankruptcy Court when we've got an

11 ongoing criminal investigation.  Anything -- any convictions

12 resulting from that is going to be non-dischargeable.   You

13 have the Trustee in possession of the property.   What's --

14 what's the point of continuing with this dischargeability

15 litigation in Bankruptcy Court?

16        THE COURT:   Well, isn't that -- isn't that, in

17 part, what they're saying when they're saying, "We're not --

18 we don't really want to pursue these right now"?   Is that

19 they're saying, "Let's hold on and see if this is something

20 that we really need to pursue or becomes moot because of

21 change in circumstances."   Or if not moot, at least not

22 meaningful in terms of any possibility of recovery.

23        MR. SCHWARTZ?: Well, I mean, at some point the

24 debtors are entitled to have their day in court and either get

25 their discharge and move on, or -- or -- or not; and just to

1   hold it up forever, I don't think --

2           THE COURT:   Well, now I --

3           MR. SCHWARTZ?:   -- it's fair to them.

4           THE COURT:   I agree that I don't -- I don't want it

5   forever.   What about -- Ms. Caruso, what about your 727

6   complaint?

7           MS. CARUSO:   Well, Your Honor, let me just explain

8   to the Court what's been going on with this case, okay?   And

9   quite frankly, suing Mr. Gibson on his discharge has not been

10  a high priority at this point in time *because* we have been

11  working very hard to identify assets.   Mr. Gibson filed

12  Schedules with 33 unknown values on assets, one of which was

13  4.7 million dollars, a bank account that was seized by the

14  FBI.

15          THE COURT:   Well, what's the status of that?

16          MS. CARUSO:   There's a seizure complaint that has

17  been filed by the FBI.   We met with the FBI, the U.S. Attorney

18  on three separate occasions.   We're trying to come to some

19  sort of resolution, but it's very difficult dealing with a lot

20  of branches in the government; and I think one of the problems

21  was that they weren't going to disclose a lot until the

22  indictments were filed.

23          And the second problem is going to be we need

24  records from them, and they actually seized records from the

25  premises; and until the criminal trial is over, Your Honor, I

1    doubt very much we're going to get our hands on any of those

2    records.    Now we have to put together, Your Honor -- and- --

3                 THE COURT:    I've worked that out before in other

4    cases where they would allow copying of records, and they

5    retained the originals.

6                 MS. CARUSO:    Well, in this case that's not working

7    out, so -- let me tell you what we've done, okay?    In response

8    to Mr. Schwartz -- we haven't done anything.    We questioned

9    Mr. Gibson for seven hours, and it basically created more

10   confusion on where everything was.

11                We have been trying to identify assets.    He owns --

12   I don't know -- twenty, thirty, forty entities.    The Schedules

13   were completely unhelpful.    We have sold two feed lots.    We

14   have subpoenaed bank accounts in Chicago.    We have recovered

15   1.2 million dollars from an ABM account.    We have subpoenaed

16   M.L. Global and fought with the government about that.    They

17   got half the money, we got half the money.

18                We have served production requests on Your Community

19   Bank on at least two occasions.    We have gotten thousands of

20   documents from Your Community Bank.    Fifth Third Bank has

21   supplied us with thousands of documents.    Your Honor, this

22   was a huge check-kite that was going on -- huge -- between two

23   banks.    Mr. Gibson didn't create this overnight.    It took him

24   thirty years to get here.    This is not getting unwound in one

25   year.    Maybe not two years.

1          I anticipate we'll ask for another extension.   As
2    we speak, we're scanning and copying documents.   It took
3    awhile --
4          THE COURT:   All right, how long does everyone --
5    how long is everyone seeking on their extensions?
6          MS. CARUSO:   Well, I'd at least like another six
7    months; and, you know, -- and these type of --
8          THE COURT:   All right, I'll grant everybody a six-
9    month extension to file claims.
10         UNIDENTIFIED ATTORNEYS:   Thank you, Your Honor.
11         TELEPHONE ATTORNEY:   Thank you, Your Honor.
12         THE COURT:   All right.   Moving on.   Eastern
13   Livestock.
14         MS. CARUSO:   (unclear) have one little other
15   motion.
16         THE COURT:   (unclear)
17         MS. CARUSO:   (unclear)
18         THE COURT:   What was it?  Oh, for the 2004 exams?
19         MS. CARUSO:   No, for the bank fees.
20         THE COURT:   Oh, motion for authority to pay bank
21   and technology service fees, as administrative expense.
22         MS. CARUSO:   Right.
23         THE COURT:   Is there any -- there was no objection
24   to that, was there?
25         MS. CARUSO:   No, Your Honor.

1          THE COURT:   I'll grant that.  But Mr. Donnellon did

2   have a motion for a 2004 exam also, I believe.

3          MR. DONNELLON:   Yes, and we have that -- that would

4   be directed to Community Bank, and when we were last before

5   Your Honor we said that the short answer to that would be  --

6          THE COURT:   Oh, wait a minute.  The one I have in

7   front of me is directed to the First Bank & Trust Company.

8          MR. DONNELLON:   That's my client.

9          THE COURT:   Oh, on behalf of -- excuse me.  All

10  right.  Yeah.

11          MR. DONNELLON:   They -- my client's been fully

12  cooperative in giving me documents.

13      (Laughter)

14          THE COURT:   Well, that's good.   Yeah, you're

15  right.

16          MR. DONNELLON:   With Community Bank, what we said

17  the last time is we're going to allow the Trustee to get what

18  records the Trustee can; and if there's anything else that we

19  need, Mr. Earl and I can talk about it.  That's still ongoing

20  is my understanding.  There's been some production, but I

21  don't know that it's complete; and Ms. Caruso can speak to

22  what she's recently asked for, but I would suggest we simply

23  put that over to the next omnibus --

24          THE COURT:   All right.

25          MR. DONNELLON:   -- and see where that stands.

1          THE COURT:   And when is the next omnibus?

2          CLERK:   October 25th.

3          THE COURT:   October 25th.

4          MS. GOSS:   October 25th at three.

5          THE COURT:   October 25th, three o'clock.   Okay,

6    anything else in the Gibson matter?

7          SPEAKER:   No.

8          THE COURT:   All right, Eastern Livestock.  I think

9    we have only things in the adversaries in Eastern today.   The

10   first adversary that I have is Trustee vs. Willie Downs.

11         MR. TONER:   Kevin Toner, Your Honor.  A new

12   complaint was filed on Monday.  It narrowed the number of

13   Counts.  It added some additional parties -- the Bluegrass

14   entities and Laurel Stockyards who are secondary transferees

15   of endorsed checks that Mr. Downs came into possession of.

16   They'll answer that, I would expect in the coming month, and

17   we could have a proper pre-trial I think at the next omnibus.

18         THE COURT:   All right, we've not issues summonses

19   yet for the added parties, I don't believe.  Are these parties

20   that are already here and are going to appear, or do we need

21   to issue some --

22         MR. TONER:   Ms. DelCotto I guess could answer that.

23         MS. DELCOTTO:   I can accept for the Bluegrass

24   entities, Your Honor.

25         THE COURT:   All right.  We'll show that -- are

1   there others, other than hers?

2           MR. TONER:   Laurel --

3           VOICE: (unclear) Laurel --

4           MR. TONER:   I'm not sure if Laurel has appeared,

5   Your Honor.   We'll check on that.

6           THE COURT:   All right.   Well, stay in touch with

7   Kristin about that because we need to get the summonses issued

8   if they need to be issued, so that we can keep this moving.

9   Do you want to just set this to the next omnibus then?

10          MR. TONER:   Yes, please.

11          THE COURT:   All right, we'll set it to the next

12   omnibus.   In the Friona Industries matter -- (pause) -- well,

13   before we do that -- because I know there's a motion to stay

14   that, and as well as I think the Kansas interpleader -- maybe

15   we ought to go to Superior Livestock adversary, because that's

16   the basis for wanting to stay the other ones.

17          MS. MOORE:   That's fine, Judge.

18          THE COURT:   Right.

19          MS. MOORE:   We did file a motion to stay only with

20   respect to Superior and these other interpleaders.   There is

21   -- there are funds that relate to the interpleaders that are

22   involved in the Superior AP.

23       The Trustee filed a response on Friday, and we

24   received another response just Monday -- two days ago.   We

25   just wanted to have a chance, without doing a fire drill, to

1  go ahead and reply to that; let the briefing be done for the

2  Court, and then (unclear) court hearing.

3          THE COURT:  A reply to what?  The motion in --

4          MS. MOORE:  A reply in support --

5          THE COURT:  Of the motion to stay.

6          MS. MOORE:  Correct.

7          THE COURT:  Okay.

8          MS. MOORE:  Correct.  And then we can set it for

9  the Court's next omnibus, or handle it however the Court would

10  like to do.

11          THE COURT:  All right.

12          MS. MOORE:  I think one of the responses that was

13  filed just Monday also requests once again a full

14  consolidation of all the interpleaders in the Superior AP.  So

15  it's worth having an opportunity to kind of pull it all

16  together for the Court.

17          THE COURT:  Well, here -- well, I'm not directing

18  this to -- just to your statement there, although it kind of

19  triggered this thought that I've been having about all this.

20  I've been more than happy to let everybody try, as we've

21  discussed several times now, expedite these matters,

22  consolidate these matters, find a way to, you know, address

23  issues that might be determinative, and broadly determinative,

24  or applicable; and, you know, find a way to -- to in any way

25  shorten this.

1          But I'm also getting to the point where, you know,

2  I'm just going to start pushing these a little bit because it

3  seems like we -- we keep coming back here, and there's not a

4  heck of a lot that's happened.

5          Now I know there are some things that are happening,

6  and I know that the Judge is often the last one to know what's

7  happening; but I'm just saying I want to get these things

8  moving.  So let's talk about Superior first.   Let's talk

9  about that first.

10          It's my understanding -- well, first of all, who's

11  appearing today in that adversary:   Superior vs. Eastern?

12          MR. TONER:   Kevin Toner for the Trustee.

13          MR. MASSOUH:   John Massouh for Friona Industries.

14          MR. LaTOUR:   Randall LaTour for Fifth Third.

15          MS. MOORE:   And Christie Moore for Superior, along

16  with Mr. Bowles and Mr. Ames.

17          THE COURT:   Along with a host of others.   And

18  appearing on the phone?  Is anyone on the phone?

19          MR. SMITH:   Jim Smith representing Diamond B

20  Ranches, Inc.

21          MR. LOVELL:   John Lovell for Cactus Growers.

22          MR. ROBINSON:   Mark Robinson for Cactus and Friona.

23          THE COURT:   Okay.  In -- in that AP, do you -- we

24  had -- first -- I guess the first question is, is everybody

25  now in?

1          MS. MOORE:   I believe so, Judge.  I believe the

2  added parties accepted service, so I think that -- and we have

3  -- Superior has answered the counterclaims of Eastern; and I

4  even have  -- Mr. Toner -- I certainly won't speak for him,

5  but he expects to file his response now to our motion for

6  judgment on the pleadings.

7          THE COURT:   Well, that was my next question.

8          MS. MOORE:   That should be filed -- tomorrow?

9          MR. TONER:   We're prepared to file the Trustee's

10  response tomorrow.  We've been waiting for Superior to answer

11  the counterclaims.

12          THE COURT:   Okay, so you're going to --

13          MS. MOORE:   And we would expect a reply, and that

14  will be ready for the Court.

15          THE COURT:   Mr. LaTour.

16          MR. LaTOUR:   Your Honor, I'd like to take a

17  different view on whether that's ready for consideration.

18  You entered an order on September 1 allowing the amendment of

19  the complaint to add the additional parties.  We decided to

20  accept service.  Under Rule 4 that gives us 60 days to answer.

21          The very earliest you could calculate that, that

22  would be October 31st.  Under Rule 5 -- excuse me, under Rule

23  12 for judgment on the pleadings, the Rule's not ripe for a

24  consideration until the pleadings have been closed.  If four

25  of the parties haven't answered, the pleadings are not closed.

1           And we have -- we have the right to state our

2    position with respect to this motion, not least of which is

3    that it's an advisory opinion with respect to documents that

4    have not been admitted into evidence.  It's an argument you

5    ought to hear and consider, and not just rush off because

6    they're impatient because they filed something and they'd like

7    to see if it works.

8           We have the right to answer, and we have the right

9    to be heard on that motion.

10          MS. MOORE:   I think, Judge, that this is one of the

11    -- of the reasons why Superior did not want its AP to become a

12    party, because the motion got judgment on the pleadings

13    presents a discrete and single issue for the Court to

14    determine that is based on the relationship between Eastern,

15    the debtor, and Superior.

16          The other parties that may want to chime in are

17    going to be providing basically *amicus* briefs because they

18    have no other stake in what Superior's position was *vis-á-vis*

19    the debtor.   And that's why we want to try and narrow the

20    things that the whole party gets involved in, because we are

21    trying to move it along.  We filed this some ago.

22          I mean, we believe that as between us and the party

23    in interest, the pleadings are closed, and Mr. Toner agreed to

24    that.

25          MR. LaTOUR:   Your Honor, Superior would like you to

1  hear ten minutes of the movie and not play the entire movie

2  for you.  We want you to believe that it's a narrow issue of

3  law with respect to a contract that's plain on its face.  So I

4  pulled out one contract, and it says,

5           "No assignment or delegation.  No right or interest

6           in this contract shall be assigned by either party,

7           buyer or seller."

8           That means something, but we wouldn't even know that

9  that was in play if the contract is not in evidence; and

10 attaching a form of contract to a complaint is not the same

11 thing as entering 500 separate contracts into evidence.  These

12 are parties in different states with different delivery terms,

13 different time frames; and all of them matter as to whether

14 the transaction fits within the 546(e) and 546(g) safe

15 harbors.

16          And let's talk about that for a minute.  Those are

17 statutory affirmative defenses.  They are the limitations on

18 the Trustee's ability to avoid the transfer.  The Trustee

19 hasn't sought to avoid any transfers with respect to payments

20 under these 500 contracts.  He got backed into objecting to

21 the assignment -- the assignment was the basis by which they

22 created a hook for a declaratory judgment action.

23          The Trustee has responded and said, "The assignment

24 is fraudulent, preferential, and otherwise subject to the

25 strong-arm powers."  That alone answers the question whether

1  you can have a judgment on the pleadings; but more

2  importantly, none of the four things request in the motion for

3  judgment on the pleadings remotely go to the assignment.   The

4  word "assignment" is not even mentioned in the motion.

5          What they're attempting to do is show you part of

6  the story, get an opinion from you that means something that

7  they can use later -- I still have not figured out what; but

8  it is essentially asking for an advisory opinion on a

9  hypothetical question.   And to say that we're slowing the

10  process down by making that point is ridiculous.   We have a

11  right to participate in something that is an attempt to take

12  the proceeds of our collateral and to interfere with an

13  avoidance action which I have a two million dollar lien to be

14  repaid.

15          We absolutely have standing.   You've already ruled

16  that we do.   The Rules give us a right to respond, and we

17  should be allowed to exercise that right.

18          MS. MOORE:   First of all, Your Honor, if the

19  Trustee for the debtor believes that there are arguments to be

20  made against this motion for judgment on the pleadings, the

21  Trustee can make those arguments, and the Court can consider

22  them.

23          Whether or not we have Mr. LaTour on behalf of his

24  client offering additional arguments is immaterial.   But we're

25  also got Mr. LaTour putting the cart before the horse.   There

1  are legal decisions that can be made before you start talking

2  about factual issues as respect to the contracts themselves.

3  We're looking at the status of Superior in this bankruptcy.

4  What is our status?   What is our legal status?

5         That *is* going to answer some questions down the

6  road, but it is not a hypothetical.  We are who we are, and

7  the business was as it was, and I think the Court can make the

8  decision without the *amicus* brief, or Mr. LaTour seems to be

9  fully briefed on the issue.  If he would like to go ahead and

10  file quickly a response, it would appear that he's loaded --

11  locked and loaded and ready to go.

12         We are trying to move things along with some legal

13  issues.  No one else has moved forward trying to produce legal

14  issues.

15         THE COURT:   All right, now let me ask you this:

16  The -- I think the issue, the narrow issue that I'm thinking

17  about at this moment in terms of timing is what the Rule means

18  when it says that the pleadings are closed, or the -- does

19  that -- are you taking the position that that refers only to

20  the party that you originally sued and not the parties that

21  they brought in under a third-party complaint?

22         You're saying -- you're taking the position that

23  that means it's closed between the original two parties to the

24  motion.  Is that correct?

25         MS. MOORE:   That's -- practically speaking, that's

1  exactly right.  The underpinning of that is the fact that

2  there really are no claims as against these parties that were

3  added.  They were added because they may have an interest in

4  the proceeds.  There are no real claims made by the debtor

5  against these parties.

6         THE COURT:  So you're -- just a minute, Mr. LaTour.

7  You're taking the position that when they file -- when the

8  Trustee files his answer or his response to the motion that

9  the pleadings will be closed for purposes of the Rule.

10         MS. MOORE:   Our position was that when Superior

11  filed its answer to the counterclaim of the debtor, so we had

12  our complaint, the debtor answered, counterclaim.

13         THE COURT:   And then counterclaim, and then --

14         MS. MOORE:   We have replied --

15         THE COURT:   -- Superior filed its answer to the

16  counterclaim, right.

17         MS. MOORE:   Correct.  We've replied to the

18  counterclaim.

19         THE COURT:   Right.

20         MS. MOORE:   When we did that, for all intents and

21  purposes our pleadings were closed.

22         THE COURT:   Okay.

23         MS. MOORE:   Yes, Judge.

24         MR. TONER? (No log sheet ID):    If I may, Your

25  Honor, I did a fair amount of research just a few months ago

1  when we started talking about whether these folks would come

2  into this case or not, and I think I said something like, "The

3  Trustee doesn't intend to stand on the Rules."   But what the

4  Rules say and what the case law says is that until all the

5  pleadings are answered, they're not closed for purpose of

6  their Rule 12(c) motion.

7       I think we have a duty to be practical here in

8  Bankruptcy Court, and the good news is that folks, like Fifth

9  Third and the other parties that are now in this case as a

10  result of your ruling, are answering and are moving diligently

11  to join in the briefing to get this resolved.

12       I had been waiting to hear the answer of the movant

13  to our claims, because I didn't want to be surprised after I

14  filed my brief.  That's happened, and so I feel comfortable

15  that the Trustee can respond, but I don't want to speak for

16  the other parties who would have been brought in a lot earlier

17  had we not had objections to appearances and things like that.

18       THE COURT:   Well, who hasn't answered yet?

19       MR. MASSOUH:   Your Honor, I think the added

20  parties, the Texas feed yards, which are Friona, Cactus, and

21  J&F, and including Fifth Third, our time to respond has not

22  come yet.

23       And, you know, to back up a little bit this whole

24  Superior lawsuit is just -- it was filed six months after the

25  existing interpleader.  What they've attempted to do is file

1  their own separate private action, carve out all the claims

2  against them in the existing Texas interpleader, and try to

3  relitigate them in the Superior litigation.

4         And in that regard, if that is even going to go

5  forward as a separate suit, we have an absolute right to

6  respond to any motion on the judgment on the pleadings, and

7  answer the lawsuit, and participate in the matter.

8         MS. MOORE:  I think, Judge, to have parties with no

9  dog in the fight, muddying up the record and extending time

10 that we're trying to move.

11        THE COURT:  Well, what about the bank -- I mean,

12 isn't the bank right that -- that a decision in your favor is

13 going to affect their collateral that they claim to have a

14 lien on, so I don't see how you can't say they don't have a

15 dog in the fight.

16        MS. MOORE:  Well, first of all, Judge, they only

17 have collateral.  They have a lien on collateral, of that

18 which the debtor owns.

19        THE COURT:  Well, I --

20        MS. MOORE:  If the debtor does not own it, then

21 they are two steps away.  But if the debtor owns it, then

22 they step in as to those funds that they may have a lien on.

23        But for purposes of this legal motion, that question

24 doesn't even come into play.

25        THE COURT:  Well, but if I -- if you succeed, then

1  I guess you would want an order that, what?  The debtor

2  doesn't own the property?

3          MS. MOORE:    Our declaratory action is pretty clear.

4  We are seeking only the status of Superior as to those two

5  broad categories:    The forward contracts and then the swap

6  agreement --

7          THE COURT:    Right.

8          MS. MOORE:    -- merchant (? low mumble).    And from

9  there there will be other decisions that the Court needs to

10  make.

11          THE COURT:    Right.

12          MS. MOORE:    But in this motion we are keeping it

13  very narrow.

14          THE COURT:    Okay.  Yep.

15          MR. LaTOUR:    Your Honor, her last statement

16  indicates what the problem is.    From there there will be

17  other decisions premised upon them having under their arm a

18  characterization, the contracts that have not been subject to

19  discovery or cross-examination are now anointed with the

20  status of "forward contract."

21          THE COURT:    All right.

22          MR. LaTOUR:    They think that means something.

23  They're not letting people participate in that.

24          THE COURT:    Well, *I've* let people participate.

25          MR. SMITH:    May I -- Judge, if I might, this is Jim

1  Smith representing Diamond B Ranch.  We oppose (unclear)  it,

2  we are (unclear fuzzy telephone transmission) claimant

3  (unclear) Friona litigation.  We are a defendant in the

4  Friona litigation.

5       The position taken by Superior creates some

6  problems, but right now we're willing to let Friona go to

7  battle with them, and I think you've got some serious due

8  process issues with all the defendants in the Friona issue if

9  the Court undertakes to determine ownership of those funds

10 without their presence -- whether it's --

11      TELEPHONE OPERATOR:   Joining the meeting.

12      MR. SMITH:   -- whether it's by proxy through

13 Friona, by agreement, or whether we do an intervention under,

14 what is it -- 2014?  Somewhere around there -- under the

15 Rules.  I think certainly our interests are entitled to be at

16 least adjudicated.  I think your findings and our presence are

17 a necessary part of this whole litigation hearing.

18      THE COURT:  All right.  Anything further?

19      MS. MOORE:  You know, only, Judge, that this would

20 go to Mr. Massouh's comment about the consolidation issues, we

21 would like to reply to that.

22      But we -- we have gone ahead today.  We've entered

23 the confidentiality agreement that most all the parties,

24 larger entry (injured? *not clear*) parties have agreed to.

25 The discovery protocol should be filed today.  We ran into a

1 snag with the noticed parties and how logically that would

2 work.

3          So the issue of people being left out or not having

4 an opportunity to participate, the discovery protocol will

5 apply to each of the matters, so that's now in the Court's

6 (unclear, noise interference) to try to take a look at that.

7          MR. MASSOUH:   Your Honor, just to speak to the

8 Friona, Cactus, and J&F interest in the Superior, if you

9 recall that the feed yards have a two million dollar offset

10 claim that is at issue, and the determination of these issues

11 that Superior wants to litigate without any other parties

12 involved will certain affect the feed yards.

13          And to follow up on Mr. Smith's comment, what

14 Superior forgets and wants to ignore is they've sued everyone.

15 They've counterclaimed and cross-claimed against everyone in

16 the Texas interpleader case, yet they want to carve out all

17 those claims into its own case and not join any of those

18 parties and not let any of those parties participate in the

19 Superior lawsuit.

20          MR. SMITH:   Jim Smith again.   By (unclear,

21 microphone bumped?   Interference with transmission).

22          THE COURT:   Pardon?   I couldn't understand that

23 last part.

24          MR. SMITH:   I'm sorry.   I was -- I said -- you

25 know, I agree with everything he just said, without agreeing

1  to his offset claim.

2          THE COURT:   Yeah.   All right, well, let me just

3  say this:   I mean, I said earlier that, you know, I've got to

4  get these things moving.

5          I will say that whether I made the right decision or

6  the wrong decision, I have ruled a couple times now that these

7  other parties are coming into the Superior -- this case.  So I

8  do think that we've got to go -- we're going to treat the

9  pleadings as closed when their answer date runs out, which is

10 the end of October.

11         And then I'm going to decide in this adversary this

12 forward contract question:   I think that the due process is

13 adequate.  The -- I mean, there's parties -- there's plenty of

14 parties in here that are opposing it; and as you said, there's

15 procedures for other parties that want to join.  I think

16 there's a lot of notice.   There's a lot of actual notice here

17 as to what's going on.

18         I'll treat them as fully closed, and I'm -- and then

19 I'm going to rule on this motion for partial judgment on the

20 pleadings once it's -- once the pleadings are fully closed.

21         Now whether that should have been done in the Friona

22 lawsuit is something that others can argue; and whether other

23 matters with Superior other than this discrete question as to

24 this legal interpretation of this contract ought to be handled

25 in Friona, I'll take up in conjunction with your motion to

1    consolidate, or -- and their response.

2            But I don't want to slow down -- I mean, I don't

3    want to just keep circling over these issues.  You know, we've

4    got to land occasionally and decide some of them.

5            So this one -- I don't see any reason, since I have

6    allowed the other parties to be brought in whose rights might

7    be affected, they have a right to do whatever they think will

8    protect their interest in this issue, we're going to resolve

9    this issue here.   But I am going to wait until the pleadings

10   are closed, as required by the Rules; and I thank you for

11   clarifying for me that that means everything.

12           Yes, Ms. DelCotto.

13           MS. DELCOTTO:   Your Honor, you don't have a

14   problem, do you, if we just enter an appearance to get the ECF

15   notices and we'll make it very clear we're not a party in the

16   action, but just to get the pleading --

17           THE COURT:   I have no problem with that.

18           MR. TONER:   Is now an appropriate time to talk

19   about a briefing schedule on the motion Your Honor is anxious

20   to decide?

21           THE COURT:   I wouldn't say "anxious."

22           MR. TONER:   Well --

23           THE COURT:   But --

24           MR. TONER:   -- what I mean is, I anticipate these

25   remaining answers may arrive earlier than --

```
 1                THE COURT:   Yeah.

 2                MR. TONER:   -- the end of October.  Superior --

 3                THE COURT:   Well, you can answer -- you're going

 4   to--

 5                MR. TONER:   We have answered.

 6                THE COURT:   You're going to answer now.

 7                MR. TONER:   Yeah.  But Superior needs to think

 8   about what it wants to reply, and there are timing issues

 9   about these other briefs.

10                THE COURT:   All right.  Well, what -- does anyone

11   have a suggestion?   Any party that wants to file a response

12   -- how about this:   Any party that wants to file a response

13   to the pending motion should do so within fifteen days of

14   filing their answer.

15                MS. MOORE:   And, Judge, we are not going to want to

16   file our reply now.  Of course --

17                THE COURT:   You don't file a reply -- you file a

18   reply -- what?

19                MS. MOORE:    Until we get everybody's.

20                THE COURT:   How long do you need after the last

21   one?   So that the latest --

22                MS. MOORE:   So I guess we're going to back up from

23   October --

24                THE COURT:   -- that would -- the latest that would

25   be would be the middle of November.  You want until the end of
```

1 November to file your reply?

2          MS. MOORE:   That would be fine, Judge.

3          THE COURT:   All right.  End of November to file

4 your reply.

5          MS. MOORE:   Thank you, Judge.

6          THE COURT:   And I'll just say -- let me see what

7 date.   The latest that any response to the motion can be

8 filed is Monday, November 14th; and the latest that the reply

9 could be filed is Monday, November 28th.  And plaintiff submit

10 a scheduling order reflecting the rulings --

11          MS. MOORE:   Thank you, Judge.

12          THE COURT:   -- on today.

13          All right.  Let's move on.  In Friona, well, I guess

14 the first question in have in Friona is the same question I

15 had in the other case, and that is, is everybody in now?   Or

16 do we know?

17          MR. MASSOUH:   I think so.  I know there has been a

18 motion to intervene by some of these additional Bluegrass

19 entities that I don't believe there's been any objection to,

20 and so there may be -- I think that motion is on the docket

21 this morning.  If those parties are allowed to intervene, then

22 those -- I think those would be the --

23          THE COURT:   All right, let's take that motion then.

24          MR. MASSOUH:   I think those would be the final

25 part.

```
 1          THE COURT:   The motion to intervene that was filed

 2  by Bluegrass South Livestock Market, and Bluegrass Stockyards,

 3  and Bluegrass Stockyards of Campbellsville, and lot of

 4  Bluegrass Stockyards.

 5          MS. DELCOTTO: (difficult to hear; audibility low,

 6  some words can't be distinguished), Your Honor.  We've been

 7  working with BSI just trying to find all of our proceeds and

 8  cattle. It came to our attention that there was some

 9  additional claim and that Friona finds, and I don't believe

10  there's any objection.  We've shared the information on the

11  cattle with the plaintiff.

12          THE COURT:   I'll show that that's motion granted.

13          MS. DELCOTTO:   Thank you.

14          THE COURT:   Just upload an order, please.

15          MS. DELCOTTO:   Thank you.

16          THE COURT:   Motion -- oh, we had -- you've amended

17  the complaint, and you added -- let's see here.  Amended

18  complaint filed -- or *did* you add any parties to your amended

19  complaints?

20          MR. MASSOUH:   Yes, Your Honor.  When we filed our

21  amended complaint in May we added First Bank & Trust.   We

22  added Kathryn Fry, as the Gibson Trustee.

23          THE COURT:   Right.

24          MR. MASSOUH:   And then we added a handful of other

25  -- we call them Bynum Entities that are tied together, and
```

1  those are the parties we added.  I can't speak for J&F or

2  Cactus.  Mr. Lovell, I think, is on the phone.  He can speak

3  to whether he added any additional parties.  Or I thought he

4  was on the phone.

5        THE COURT:  Mr. Lovell?

6        MR. LOVELL:   Judge, John --

7        THE COURT:  Go ahead.

8        MR. LOVELL:   This is John Lovell for Cactus.  We

9  did not add any additional parties.

10        THE COURT:  Okay.  So everybody's accepted service.

11  Do we have any summonses that need to issue in this case?

12        MR. MASSOUH:  I don't think so.  I think -- I think

13  everyone has accepted service.  Everyone has answered.  The

14  only outstanding answer on the Friona side that we have is the

15  Bynum Group, which I've talked to their attorney, and they

16  intend on getting an answer in this week.

17        My understanding, I know in the Cactus side I think

18  there are several parties who have not -- who have not

19  answered the lawsuit, and Mr. Lovell can speak to that.

20        THE COURT:  All right.

21        MR. LOVELL:  Yes, Judge, we have several parties

22  that have been served but have not answered, and my plan is to

23  send them a reminder notice that they've been served and that

24  I intend to move to take a default against them if they don't

25  promptly answer.  So I will renotify them to make sure that

1  they are actually aware there's a move for a default.

2        THE COURT:   Well, I appreci -- that's a very

3  civilized way to handle that.  And that'll be fine; and then

4  if they don't answer, you file your default.

5        All right, well, let's talk about then what will be

6  happening next, and what effect the motion to stay filed by

7  Superior would have; and what, if any, part of it should be

8  stayed or not be stayed.  What -- do you want to address that?

9        MR. MASSOUH:   Sure, Your Honor.  I mean, obviously

10 we believe no part of the Texas interpleader should be stayed

11 for any reason.  As I've talked about earlier, the Texas

12 interpleader was filed on November 11th, 2010 -- six months

13 prior to Superior's adversary proceeding.

14       We were the first ones to initiate all this.  Cactus

15 and J&F joined into it and deposited seven million dollars

16 into the account.  Superior and various other parties have now

17 answered in counterclaims and cross-claims against basically

18 every other party in this suit, especially Superior has cross-

19 claims and counterclaims against every single party.  And

20 then in their motion to stay they seek to stay all claims

21 relating to Superior.  That's in essence staying the entire

22 Texas interpleader, because they have claims against everyone.

23       And if all the claims related to Superior are

24 stayed, then in essence the entire Texas interpleader is

25 stayed.

1          THE COURT:   All right, well, go back one step, and

2  that is, what do you want to do now?   What -- I mean, have

3  you thought about where you want to begin your discovery?   Or

4  what -- what steps do you want to take right now?

5          MR. MASSOUH:   Yes, absolutely, Your Honor.   I

6  mean, we are -- we are in the process of issuing written

7  discovery to all of our claims, and to seek discovery from all

8  of our claimants, from all the defendants.   We're trying to

9  get that process up and going in terms of getting written

10 discovery, getting any kind of depositions that need to be

11 taken scheduled and done.

12          In addition that, if there are any legal issues, I

13 know Mr. LaTour will want -- may want to address the

14 constructive trust issues and some other legal issues that are

15 addressed in there that may be able to be taken care of on a

16 motion for summary judgment basis.   That's one thing we're

17 moving to get done pretty quickly.

18          I know these producers have sat around for ten

19 months now, and they're begging us --

20          THE COURT:   Well --

21          MR. MASSOUH:   -- to get this thing moving, and so

22 we're trying to do it.

23          THE COURT:   -- before we come back on October 25th,

24 will you have done anything other than the written discovery?

25          MR. MASSOUH:   Well, I know my plan is to do some

1  written discovery.  I know there's going to be some briefing

2  done related to the Trustee's -- what do you call it --

3          MR. TONER:   We anticipate a couple summary judgment

4  motions in the case.

5          THE COURT:   Against -- ?

6          MR. TONER:   Against every --

7          THE COURT:   -- particular --

8          MR. TONER:   Against everyone --

9          THE COURT:   -- against everyone.

10         MR. TONER:   -- on some gating legal issues, exactly

11  right.

12         THE COURT:   All right.

13         MR. SMITH:   Your Honor, if I may, this is Jim Smith

14  again, representing Diamond B.  We are a claimant in Friona.

15  Some of us have claims asserted against Friona.  We'll ask

16  that these be adjudicated, and I think this Court has

17  jurisdiction because of the jurisdiction (unclear mumbling).

18  But I think -- (unclear muffled mumbling on telephone) from

19  doing anything, wait and see how this turns out.

20         THE COURT:   All right.

21         MR. SMITH:   But I think we're going to be noticing

22  up at least several depositions, so I don't think

23  realistically we can have that done by the 25th of October,

24  but (unclear) my concern about the stay.

25         THE COURT:   All right.  Why --

1          MR. SMITH:   We're all kind of waiting.

2          THE COURT:   Thank you, Mr. Smith.   Why do we need

3  to stay these?  If we've separated that one issue, and we're

4  going to go ahead and pursue that in the Superior case, why

5  can't we just get rolling in Friona.   Mr. Bowles, do you want

6  to address that?

7          MR. BOWLES:   Oh.  No, Your Honor.   The discovery

8  they're talking about we have no problem with that.  As we'll

9  address in our actual response there seems to be confusion as

10 to what we asked for.

11         In each of these interpleaded cases, Your Honor,

12 Superior has said that there are certain amounts in the

13 interpleaded funds that they have claims to.  There's 700,000

14 in Friona and various amounts in the other ones.

15         What we're saying by our answer that we had to file

16 is not that we are asserting claims against anyone else; what

17 we're saying is our claim is -- this is an interpleader.  This

18 is not a lawsuit of,"You hit me, you did anything."  It's

19 simply "I have a claim to that sum of money."  And no one else

20 has a claim to it, and we state the reasons why.

21         That, we simply said in the Friona cases rather than

22 having that issue taken up at the same time would also be in a

23 Superior case taken up at -- that would be just kind of

24 doubling the amount of money that we'd have to spend.   As for

25 discovery, the discovery protocol I think helped moves that

1   along -- if that's not a problem, that's not anything we want

2   stayed at all.

3         MR. MASSOUH:  Your Honor, what's left out here is

4   that we sued Superior in our lawsuit, and they said, "We don't

5   want to litigate our claims in your lawsuit.  We want to file

6   our own lawsuit, litigate that."  And now we're dragging two

7   lawsuits because it's the exact same issues involved.

8         And so -- and then everyone is stayed the issues in

9   the Texas interpleader and litigated over here while all those

10   other parties have no say.

11         THE COURT:  Well, here's what I -- here's what I --

12         MR. MASSOUH:  And that's the big problem.

13         THE COURT:  Well, I understand that.  I mean,

14   that's the same -- that's the same dance we've been dancing

15   all morning, and the -- and what I've tried to say and what

16   I'm going to say one more time is, as to that one legal issue,

17   yes, you are in the other lawsuit, and I've already said

18   you've got a right to say whatever you want and file whatever

19   you want to in that other lawsuit, and I'm going to try to

20   resolve that issue in that lawsuit.

21         As to everything else, it's over here.   Right now.

22   And you may succeed in convincing me to bring whatever's left

23   of Superior over here, if there is anything left of the

24   Superior; but that's not on today's docket -- I mean, I'm not

25   going to deal with that today.

1          So I'm not going to stay any discovery in Friona.

2   I'll continue this motion to stay to the 10/25 with the

3   understanding that as far as discovery, every -- it's --

4   everybody's free to begin any discovery they want to begin.

5   And to file any motions they want to file, for summary

6   judgments or whatever.

7          And as I've also said several times, let's get these

8   things moving.

9          All right.  Innovative Livestock vs. Eastern.

10         MS. MOORE:   That's -- I think those are basically

11   the same issues, Judge, you've just decided.

12         THE COURT:   Okay.  So we'll allow all discovery.

13   I'll just basically continue the motion to stay to 10/25.

14   Nothing is stayed at this time.  Is there anything else that

15   needs to be done in that?

16         MS. MOORE:   Your Honor, I apologize, because I know

17   we did a (5)(c) motion that going to allow, at least in the

18   Texas interpleader, if a cross-claim was filed that the

19   parties did need to answer those cross-claims or

20   counterclaims.  I just want to confirm in Innovative, in the

21   Kansas interpleader, we have the same assumptions with the

22   parties?

23         MR. TONER:   It's not my assumption, Your Honor.

24   These are much narrower cases with many, many fewer parties.

25   The beauty of the Friona case is it has the most parties, the

1  most issues, the most money.  The stakes are the highest, and

2  I think it's the perfect case to pull other things into and

3  decide.

4          The forward contract issue, as asserted by other

5  parties in the Friona case -- that's the one to focus on.  And

6  so I think these other cases are nice because they can maybe

7  go ahead more quickly towards settlement or something like

8  that.  We should focus on the Friona case as much as

9  possible.

10          THE COURT:  But you want them to answer the cross-

11  claims.

12          MR. TONER:  Yes.

13          MS. MOORE:  Thank you, Judge, because I was lost.

14          THE COURT:  Okay.  He wants you to answer the

15  cross-claims.

16          MS. MOORE:  We will do that.

17          THE COURT:  We don't have an order --

18          MR. TONER:  No.

19          THE COURT:  That's a (5)(c) order.

20          MR. TONER:  It hasn't been proposed.  It hasn't

21  been granted.

22          THE COURT:  Yeah.

23          MS. MOORE:  Thank you, Judge.

24          THE COURT:  Well, go ahead and answer in the normal

25  course of affairs.

1      MS. MOORE:   Thank you.

2      MR. MASSOUH:   Just a question, Your Honor, with

3  regard to the (5)(c) motion that's been entered, you have a

4  (5)(c) order that's been entered in the Friona case.

5      One thing that doesn't take into account are the

6  various affirmative defenses that Friona wants to assert as to

7  counterclaims; and what I was intending on doing was filing

8  kind of an omnibus pleading to assert just -- to assert

9  affirmative defenses without having to answer each of the

10  things.  Is that okay with the Court?

11      THE COURT:   That's fine.

12      MR. MASSOUH:   Thank you.

13      THE COURT:   And you can do a little order that

14  allows that, if you'd like -- if you feel the need for it.

15      MR. TONER:   I hate to create something where

16  everyone felt the need to suddenly file something new on

17  affirmative defenses.

18      THE COURT:   All right, then don't do that.  Just

19  file -- just file your affirmative defenses, and state in the

20  pleading that it applies to all -- all the cross-claims,

21  counterclaims, whatever they are, against you.

22      MR. MASSOUH:   Will do.

23      THE COURT:   Okay.   So who represents Innovative

24  Livestock?

25      ATTORNEY:   Is it Jessica Yates?

1          THE COURT:   Mr. Ron -- Mark Rondeau?   He's not

2  here?   Okay, well, we need to get him involved pretty quickly

3  if he's going to pursue this; or maybe he feels like he's kind

4  of out of it?  I don't know.

5          MR. TONER:   We'll raise his awareness, Your Honor.

6          THE COURT:   All right, 10/25 at three o'clock I'll

7  continue this.   Tell him if he's going to stay on this, the

8  parties -- representing the parties, named party/plaintiff, we

9  need him.

10          MR. TONER:   I guess I would say that is more of a

11  classic interpleader, where there are no  --

12          THE COURT:   There really is --

13          MR. TONER:   -- set-off claims, and he wants to

14  disappear.

15          THE COURT:   He wants to disappear.

16          MR. TONER:   Yes.

17          THE COURT:   Well, at some point is he going to want

18  to assert the interest of Innov --

19          MR. TONER:   Of Innovative?

20          THE COURT:   -- of Innovative?

21          MR. TONER:   I would think so.

22          THE COURT:   I would think so.  So I don't think you

23  could completely disappear.

24          MR. TONER:   We'll raise his awareness.

25          THE COURT:   I don't think he has to take the lead

1  role, maybe, because of the nature of the suit.  I understand

2  what you're saying.  It's not a typical -- as Mr. Bowles

3  pointed out, not a typical plaintiff vs. defendant.  But he

4  needs to at least pursue his rights.

5           All right, Rush Creek Ranch vs. Knauer, Trustee.

6           MR. TONER:  The same situation, Your Honor.

7           THE COURT:  That's the  -- which removal action is

8  that?

9           MR. TONER:  I can't remember the state as I stand

10 here, but it is one of these smaller interpleaders.

11          THE COURT:  Is it --

12          MR. TONER:  Colorado?

13          THE COURT:  Is it -- are the pleadings closed?

14          MR. TONER:  I believe so, Your Honor.  And another

15 plaintiff wants to be excused -- pay the money and run.

16          THE COURT:  Rush Creek does?

17          MR. TONER:  Yes.

18          THE COURT:  Is anybody on for Rush Creek?

19          (No response)

20          THE COURT:  Okay, so in two of these removed

21 interpleaders, plaintiffs have paid the money in, and --

22          MR. TONER:  Have no claims of their own.

23          THE COURT:  They have no claims?

24          MR. TONER:  I don't believe so.

25          THE COURT:  Well, then --

1        MR. TONER:   I believe only the Friona case is

2 really one where the plaintiff is contesting things.

3        THE COURT:   So Innovative and Rush Creek --

4        MR. TONER:   There are no counterclaims, for

5 example, that I'm aware of.

6        THE COURT:   Well, then maybe they don't need to

7 participate if they don't want -- they're not seeking any

8 relief.  They don't want any of the money?

9        MR. TONER:   I hate to put words in their mouth, but

10 I -- my understanding of their claim is they would like a

11 quick ruling that allows them to leave.

12        THE COURT:   Well, now they're asking for a lot

13 there.

14     (Laughter)

15        THE COURT:   We -- well, I mean, they can -- they

16 can file something to get out if they want to get out.  All

17 right.  What about -- well ,what's the Trustee going to do in

18 these last two interpleaders to get them moving?  What -- or

19 what's anybody going to do to get them moving?

20        MR. TONER:   Litigate with the other parties who are

21 named as defendants to determine who's entitled (unclear).

22        THE COURT:   So you're going to file motions?  Or

23 are you going to conduct discovery?  And is that going to be

24 beginning in these two?

25        MR. TONER:   Your Honor, we hope -- we hope it's a

1   lot more streamlined.  If necessary we will file summary

2   judgments on really the same issues we're going to be tee'ing

3   up in Friona.

4          THE COURT:  All right.  I'll status them for 10/25

5   at three o'clock.  But it may be that you don't have to file

6   motions in these cases because the legal issue will be

7   resolved in Friona, and then you'll file some sort of a

8   pleading in these, asking the Court to --

9          MR. TONER:  Ideally, our Friona briefs would be so

10  persuasive that we would move quickly to a resolution in these

11  cases.  But as Your Honor knows, those cases need to wait for

12  rulings in Friona, the more hotly contested -- they might not

13  move as swiftly.

14         THE COURT:  Okay.  So what we're going to do then

15  for the next few months is we're going to concentrate on

16  Friona, and with the exception that we've mentioned several

17  times of this one forward contract issue which we're going to

18  initially look at in Superior.

19         MR. TONER:  That's described -- The Trustee

20  (unclear) yes.

21         THE COURT:  All right.  Okay.  Eastern -- Fredin

22  Brothers vs. Bankers Bank.  That's another --

23         MR. TONER:  Yes.

24         THE COURT:  -- same -- same deal?

25         MR. TONER:  Yes.

1          THE COURT:   And nobody -- is anybody up for Fredin

2  Brothers?

3          MS. YATES:  (poor telephone clarity) Yes, Your Honor.

4   This is Jessica Yates for Fredin Brothers.

5          THE COURT:   And what's Fredin Brothers' position

6  *vis-á-vis* the monies that have been interpled here?

7          MS. YATES:   This is more of a classic interpleader,

8  Your Honor.  Fredin is indeed trying to extract itself from

9  the suit.   There have been some cross- or counterclaims, I'm

10 not sure which, that have been pled, and we're probably

11 (unclear) just issue a general (unclear)  on waiver to any of

12 the proceeds (unclear).

13         THE COURT:   Would that be the right way for these

14 parties to get out?  Just file a disclaimer saying they don't

15 have any interest in the funds that have been pled and --

16         MR. TONER:   Yes, I would think so.

17         THE COURT:   Okay.   Yeah, I think if you want to

18 plead -- if you want to file some sort of a disclaimer, we can

19 start leaving you alone.

20         MS. YATES:   Good.   Thank you, Your Honor.

21         THE COURT:   And -- yeah, we'll look for that then,

22 and then we'll just -- we're basically going to hold on; and

23 which state did this come out of, by the way?

24         MS. YATES:   Colorado, Your Honor.

25         THE COURT:   Okay, this is the Colorado.   Okay.

1          MR. REDMAN:  Your Honor, this is Eric Redman for

2   Bankfirst.  I had filed a motion for summary judgment in this

3   particular adversary.

4          THE COURT:  Oh, you have.  I didn't -- I don't have

5   that on.  Did you just file that?

6          MR. REDMAN:  Yes.  The responsive pleadings are

7   due, I think, October 10th or 11th.

8          THE COURT:  Okay.  Very good.  Well, maybe we can

9   move this along.

10          MR. REDMAN:   That was the idea.

11          THE COURT:  All right.  I'll status it, Mr. Redman,

12   on the 25th at three o'clock.

13          MR. REDMAN:  Very good.

14          THE COURT:  Okay.  The last one I have is Cactus

15   Growers vs. Nichols.

16          MR. LOVELL:  Yes, Your Honor.  John Lovell for

17   Cactus Growers.  As a reminder at the July omnibus you gave

18   us a 60-day discovery period and told us we could also take

19   depositions on the claims that are pending between Cactus and

20   Nichols in the Friona adversary.

21          We've done that.  The 60-day period has passed.

22   Cactus has filed a motion to compel some further discovery,

23   and when that is said and heard then, I think, based on your

24   ruling on the motion to compel, I think we'll be ready to set

25   a trial in the adversary complaint on the stay violations.

1              Also, the discovery that we got in those

2    depositions, Cactus will be ready to file a motion for summary

3    judgment against Nichols in the Friona adversary as soon as we

4    get the transcripts back.

5              THE COURT:  All right, but in this particular

6    adversary you have -- you have a pending motion to compel, is

7    that right?

8              MR. LOVELL:    Yes.

9              THE COURT:   Yeah, I see it.

10              MR. LOVELL:    It was filed this week --

11              THE COURT:  Just filed a couple days ago.

12              MR. LOVELL:    Yes.

13              THE COURT:  Is anybody on for Nichols?

14              MR. DAWSON:   Yes, Your Honor.   Jack Dawson.

15              THE COURT:   Okay, and you're going to respond to

16    that motion, I assume?

17              MR. DAWSON:   Yes, sir.

18              THE COURT:   Do you all just want to take that up

19    with me telephonically then, once your response is on file?

20              MR. DAWSON:   That would be great.

21              MR. LOVELL:    That would be acceptable, yes.

22              THE COURT:   All right, let me give you a time for

23    that.   (Pause)   How about on -- a week from Friday, the 7th

24    of October at 10:30 Eastern time?

25              MR. LOVELL:   Judge, I have a hearing in another

1  court near Houston.  I could have it that afternoon.  You are

2  speaking about October 7th?

3          THE COURT:    Yes.

4          MR. LOVELL:    Yes.

5          THE COURT:    How about the following Monday

6  afternoon, or Tuesday afternoon?

7          MR. LOVELL:    That would be fine.  I'm open either

8  time the 10th or the 11th.

9          MR. DAWSON:    I don't care -- either one -- I mean,

10  the 10th is Columbus Day.

11          THE COURT:    Okay, well, let's do it the 11th then

12  at two o'clock.

13          MR. LOVELL:    Two p.m. Eastern, right?

14          THE COURT:    Eastern time, right.  Or do you want it

15  -- I can do it a little bit later if you'd rather.

16          MR. LOVELL:    No, that's fine.

17          THE COURT:    All right.  And that'll be on your

18  motion --

19          MR. LOVELL:    (unclear) Eastern.

20          THE COURT:    -- motion to compel.  I want you all to

21  have a -- you may have already done this, but I want you to

22  have a conference about that motion before you talk to me, see

23  if you can't resolve it.

24          MR. LOVELL:    Okay.

25          THE COURT:    Okay.  And I'll talk to then about your

1  -- the summary judgments, and that sort of thing.  We'll just

2  treat it as a general pre-trial in that case also.

3          MR. LOVELL:    All right.

4          THE COURT:    All right, thank you.

5          MR. DAWSON:    Thank you, Judge.

6          THE COURT:    All right, is there anything else to

7  come before the Court this morning in either of these cases?

8          MR. AMES:    Your Honor -- ?

9          THE COURT:    Yes, Mr. Ames.

10          MR. AMES:    I don't know if Mr. Wharton is on the

11  phone?  Chuck Wharton?

12          MR. WHARTON:    I am, John.

13          MR. AMES:    Yesterday, Your Honor, we had contacted

14  Mr. Wharton at the excellent initiative of Laura Day DelCotto

15  with Bluegrass, several creditors with interests that were

16  pretty much aligned or at least alike, gathered telephonically

17  for the past few days.

18          It became apparent that in an attempt to economize

19  where we're going so we don't all repeat what's going on, and

20  to fit in with the new discovery protocol we had decided that

21  it might be an idea to come up with another unique bankruptcy

22  BAO type of concept; and since there's not an official general

23  Unsecured Creditors' Committee that's been appointed in this

24  case, would it not be an idea to have an *ad hoc* Creditors'

25  Committee where there wouldn't be any funds used by the

1 estate, yet these creditors -- and in this case it was Mr.

2 Scott Newbern and Laura J., and Dan Donnellon and Superior --

3 would be able to at least gather and move our joint interests

4 along in procuring information from the Trustee, since we

5 haven't had anything posted since July on that website, and

6 the creditors are wondering what's going on, especially in

7 light of the fees that are accumulating.

8            So in that respect, I sent a letter, and I think it

9 was confirmed by the other three creditors and Mr. Donnellon

10 to request that -- or to Mr. Wharton -- requesting that; and

11 I'm not really sure where it is.  We -- we couldn't find

12 anything in the Rules once again that kind of covers this

13 situation, but we thought there may not be sufficient funds to

14 attract professionals.  We don't anticipating hiring

15 professionals.  It would just be someone that might -- might

16 be an additional party in this case.   Mr. Wharton is going to

17 check on that.

18            MR. WHARTON:   Your Honor, I did receive a letter

19 from Mr. Ames yesterday afternoon, and I've had the

20 opportunity at least briefly to discuss it with my superiors.

21 I don't think that they need nor even want *imprimatur* of our

22 office appointing this Committee.   It's an *ad hoc* Committee

23 they've created themselves.  My concern would be that if

24 they're going to have duties and responsibilities to other

25 creditors then I'm not sure exactly what more than can achieve

1    as a Committee.

2            I have no objection to them appearing that way, but

3    I just don't think it's going to be under the authority of the

4    DOJ or appointment of a Committee in that context.

5            THE COURT:   What would be the advantage of such an

6    *ad hoc* Committee?  I mean, would then -- would they, for

7    example, just file one brief in a case?  Or would they --

8    would they -- would just one of -- just their representative

9    speak at these hearings?   I mean, I'm not quite clear what --

10   what you're aiming at, Mr. Ames.

11           MR. AMES:   Well, Your Honor, as we were discussing

12   things it seems that all at least four individual creditors

13   that were on the call yesterday were asking for similar types

14   of information and either not receiving it or not receiving it

15   in a timely fashion; and we were going at it more from an

16   informational standpoint than --

17           THE COURT:   So for discovery purposes, this -- this

18   *ad hoc* Committee would seek discovery from the bank or seek

19   discovery from the Trustee or whatever?  Or information from

20   the Trustee, and then disburse it to its members.

21           MR. AMES:   Yes, sir.  Or make it available.

22           MR. KNAUER: Your Honor, this is Jim Knauer.

23           THE COURT:   Yes.

24           MR. KNAUER:   I'm not sure exactly, other than

25   discovery requests, what hold-up they're talking about the

1  Trustee's in.  I know that Ms. DelCotto has complained about

2  not getting information, and I have offered several times to

3  set up conference calls for she and her clients, informally,

4  and discuss any questions they have.  I met one of her clients

5  down in Orlando in the National Cattle Feed Association and

6  made the same offer.  I've never had that request followed up

7  on.

8         All of the pleadings and some of the news articles

9  are posted on the website within normally a few days after

10 they're filed.  I think the only thing that's really not up to

11 date is the blog.  We're working on a number of entries to post

12 on that as I speak, but if they're talking about informal

13 information, I don't know of anyone who's requested information

14 to me informally that hasn't gotten it.

15        THE COURT:  Put it -- put it in the form of a

16 motion, and I'll -- I'll rule on it.  If it'll streamline

17 things, I'm not opposed to it.  I just don't now much benefit

18 there will be.  Mr. Levin.

19        MR. LEVIN:  Your Honor, if I may speak, I think it

20 would -- as you know from past hearings there's been a little

21 bit of friction in this case, and I think this will help in the

22 transparency of the case, allowing the debtor to be able to

23 provide information that will be shared with all the creditors,

24 and it's just a way to try to streamline and get the case

25 moving a little bit quicker.

1        THE COURT:   Well, I'm in favor of all those things.

2        MR. LEVIN:   Okay.

3        THE COURT:   And as long as you're not talking about

4   money, then I don't see that you'll raise a lot of opposition.

5   And I'm -- even so far as informal requests, I'm sure the

6   Trustee would rather get one than four or five, so put it in

7   the form of a motion.   I'll take it up at the 10/25 hearing.

8   Yes, Mr. Donnellon.

9        MR. DONNELLON:   Your Honor, one last issue, and I

10  think it's related to this very notion, is that when we were

11  here at the July omnibus, Mr. Wharton had said, "We haven't had

12  any update on the blog that was communicating to all of the

13  creditors.   We haven't had that since March, and can we have

14  some sort of communication on that?"   And we were promised

15  orally in court, "Yes, we're -- that's going to be updated."

16       And then at the last omnibus there was objections

17  raised about budgets and there's weekly skull sessions with

18  Fifth Third and the Trustee that are reported in the fee

19  applications, and the other creditors are getting no

20  information, and there was a discussion then about, "Let's have

21  some transparency.   You can redact confidential things in the

22  budget, but let's produce and operating budget," and I still

23  haven't seen anything there.

24       And is this something we need to journalize and

25  submit an entry to you that there will be these updates, and we

1  will have some operating budgets.  I would just as soon that we

2  could accept the word that these things will happen, but they

3  haven't; and if we want to file a formal motion, if that's what

4  you'd like, on this issue -- or we can submit a proposed order,

5  because I believe Your Honor was clear in that we want to have

6  some communication from the Trustee and the creditors; we want

7  to have some transparency at least in what's going on with the

8  money that's being used, and neither of those things has

9  happened.

10      MR. KNAUER: (No name on log sheet, low volume,

11  muffled telephone reception) Well, as to what's going on with

12  the money that's being used, there are reports filed every

13  month that shows every single dollar that's disbursed in this

14  case, Mr. Donnellon.

15      THE COURT:  All right --

16      MS. HALL:  Your Honor, this is Terry Hall.  We don't

17  have a problem with providing a budget if the Court would like.

18  And it will be redacted and summarized and filed on that blog,

19  which is what we talked about before.  There is a motion to

20  seal the budget in Fifth Third.  So if the Court would like to

21  give us permission to file a modified redacted budget, we're

22  happy to do that.

23      THE COURT:  I'll give you permission to do that.

24  Run it by Fifth Third.  Make sure that -- I mean, I don't want

25  -- I don't want them to come in here screaming as soon as you

1   post it, but I'll give you permission to do that, number one.

2   Number two, I mean, I think all of you realize that probably

3   blogging has not been at the top of the Trustee's list.  I'm

4   sure you all spend a lot of time blogging, but I doubt if Mr.

5   Knauer does.   But we need to blog more.

6           MR. TONER:   If the litigators can take some of the

7   heat off Mr. Knauer, we have a lot of adversary proceedings

8   going on and --

9           THE COURT:   Right.

10          MR. TONER:   -- we are traditionally cautious about

11  what we say on these subjects.  That may be part of the hold-

12  up.

13          THE COURT:   Well, I do think that's part of the

14  problem here, and we've discussed this a little bit, too.  You

15  know, transparency is important in a Chapter 11, and there are

16  certain things that the debtor has to let everybody know; and I

17  do think the financial affairs of what's coming in and what's

18  going out is certainly part of that, but as Mr. Knauer says, I

19  would assume that's included in their monthly reports.  But I

20  think that some budgets would be helpful also.

21          But also, when you're in an adversarial relationship

22  to -- with a lot of the parties, you don't want to lay out your

23  litigation strategy, and I'm not anticipating that anybody

24  expects you to do that.

25          But you're wearing more than one hat here, you know.

1 You're also a fiduciary for the creditors, and they're entitled

2 to certain information, even if they're defendants.

3        MR. TONER:   And the Trustee is, in addition to

4 what's going on in Court, the Trustee is approaching the point

5 where we could discuss an arrangement where we want to start

6 negotiating with the bank and meeting with trade groups about

7 some things that might simplify what's going on here.  It's

8 preliminary, but there may be a proposal coming soon.

9        THE COURT:   All right.  Mr. Levin.

10        MR. LEVIN:   Thank you, Your Honor.  And I'll just

11 take a second.  Part of the problem that arises is that in

12 pleadings that need to be filed at sometime, there might be

13 actions against Fifth Third.   We don't now what the Trustee is

14 doing relative to Fifth Third.  We don't know if they have a

15 cause of action.  We don't know if they are preparing a cause

16 of action.  We don't know if they are not going to bring a

17 cause of action because there's no money to bring a cause of

18 action, but it's putting all the creditors kind of in a hole

19 until we know what's going on with them; and they won't at this

20 point share any of that information.

21        So I think there has to come a period of time when

22 the Trustee needs to sit down with creditors and tell us what's

23 going on with Fifth Third.

24        THE COURT:   Well, I think that's true.  I don't know

25 if that's -- if we're at that time yet; but I do think

1  obviously the creditors are going to need to know, and this

2  case is going to be  -- head off in a -- maybe an entirely

3  different direction if the Trustee decides to somehow challenge

4  Fifth Third.

5          And I don't -- I'm not going to ask you obviously if

6  you've made that determination, or if it's being considered.

7  But I do think at some point you're going to have to come to

8  that point.  I'm sure I'm not surprising you by saying that.

9  And the creditors will need to know which way you're going to

10 go.

11         I'm not -- but I don't know that I'm going to say to

12 you -- I'm not going to say to you today, "Tell me what you're

13 going to do," because I bet the answer would be, "Well, we

14 haven't decided."

15         So I don't know what else to say on that.  File your

16 motion, and -- and Mr. LaTour wants to say that you obviously

17 have no cause of action against the bank, and it's even

18 frivolous of us to discuss that.

19         MR. LaTOUR:   Actually, Your Honor, that was not my

20 point.

21         THE COURT:   Okay, well --

22         MR. LaTOUR:   It is now.  Thank you.  I wanted to

23 simply correct one misconception.  Fifth Third agreed to a

24 confidentiality of the budget.  We did not request it.

25         THE COURT:   Okay.  All right.  And then the other

1 point that, you know, came up early this morning -- and then

2 we're done -- you know, we've -- as I said, we've had these

3 fights before about money that's taken by law enforcement, and

4 records that are taken by law enforcement, and the interplay of

5 bankruptcy and the criminal justice system.  It's not a fresh

6 -- I mean, it's not a new issue as far as this Court's

7 concerned.

8          I'm not going to tell you that I know any definite

9 answers, but I will say this:  Is it's my experience that

10 they're going to totally ignore whatever the Bankruptcy Court's

11 doing unless somebody finds some way to make them become

12 involved to some extent.   They're going to stay in their own

13 isolated world, which is perfectly proper for them to do, and

14 pursue their remedies and whatever they think they are in the

15 criminal context.  And they're going to try to ignore that it

16 might overlap the Bankruptcy Court.   Just a heads up, based --

17          MS. CARUSO: Are you inviting us to perhaps --

18          THE COURT:   I'm not --

19          MS. CARUSO:   -- bring it (unclear)

20          THE COURT:   -- inviting you to do anything.   I'm

21 just telling you what I've seen happen in other cases.

22          MS. CARUSO:   I agree with that.

23          THE COURT:   And you can -- you can litigate your own

24 case.   All right, thank you.  We're adjourned.

25          ATTORNEYS:   Thank you, Judge.

1  (End at 11:43:23 a.m.)

2              * * * * * * * * * * * *

3          I certify that the foregoing is as true and accurate

4  a transcript which could be produced from a sound recorded

5  record of the proceedings involving a telephonic conference

6  hearing of reduced audibility and clarity, and from log notes

7  which do not identify speakers intermittently, does not always

8  indicate speaker changes, and which has 3-4 minute gaps in

9  logging information.  This certification is limited to what was

10  clearly heard and reflects speakers who were clearly identified

11  or identifiable.


/s/ *Gloria C. Irwin*                              10-13-2011

**GLORIA C. IRWIN**
**Certified Transcriber NJ AOC200**                              **Date**
    **Federal  CERT #122**
**GCI TRANSCRIPTION SERVICES**
**210 Bayberry Avenue**
**Egg Harbor Township, NJ  08234-5901**
**609-927-0299  1-800-471-0299**
    **FAX  609-927-9768**
**e-mail  irwingloria@comcast.net**
✔