Westlaw.

182 B.R. 1007, 28 UCC Rep.Serv.2d 855
**(Cite as: 182 B.R. 1007)**

▷

United States Bankruptcy Court,
D. Minnesota.

In re John D. MORKEN and Dorothy M. Morken,
Debtors.
MONFORT, INC., a Colorado Corporation,
Plaintiff,
v.
Phillip L. KUNKEL, as Trustee of the Bankruptcy
Estate of John D. Morken and Dorothy M. Morken,
Charles W. Ries, as Trustee of the Bankruptcy Es-
tate of Spring Grove Livestock Exchange Inc., a
Minnesota Corporation, Farm Credit Services of
Southern Minnesota, ACA, a Minnesota Corpora-
tion, Firstar Bank Milwaukee, N.A., Sprague Na-
tional Bank, Sioux County State Bank, First Na-
tional Bank of Farragut, Iowa, Lanny Minnaert,
Equity Cooperative Livestock Sales, a Wisconsin
Corporation, Zumbrota Livestock, a Minnesota
Corporation, Fuchs Livestock Inc., a Wisconsin
Corporation, Lanesboro Sales Co., a Minnesota
Corporation, Roger and Jessie DeJager, First Na-
tional Bank of Sioux Center, an Iowa Corporation,
Bill Morgan, Merwin Heitritter, Dr. Dan Murphy,
Kane Livestock, a Wisconsin Corporation, H & L
Cattle Co., a Wisconsin Corporation, Haas Live-
stock, a Minnesota Corporation, and United Live-
stock, an Iowa Corporation, Defendants.

Bankruptcy No. 4–94–2954.
Adv. No. 4–94–430.
June 16, 1995.

Interpleader action was filed to determine
parties' respective rights in proceeds generated from
Chapter 7 debtor-buyer's resale of cattle allegedly
sold to debtor at time when debtor was already in-
solvent. The Bankruptcy Court, Robert J. Kressel,
J., held that: (1) cattle producers' sale of cattle to
debtor had to be treated as credit sales, for purposes
of evaluating producers' state law reclamation
rights; (2) cattle producers could not assert reclam-
ation claims in buyer's bankruptcy case, having
failed to make reclamation demands until after
cattle were sold to third party; (3) cattle producers
were not entitled to statutory trust under the Pack-
ers and Stockyards Act (PASA); and (4) cattle pro-
ducers were not entitled to constructive trust in pro-
ceeds from debtor-buyer's resale of cattle.

So ordered.

West Headnotes

**[1] Bankruptcy 51 ☞2742**

51 Bankruptcy
   51V The Estate
     51V(I) Reclamation
       51k2742 k. Seller's Reclamation Rights.
Most Cited Cases
   Bankruptcy statute providing that rights and
powers of trustee are subject to state law reclama-
tion rights of seller of goods to debtor does not cre-
ate independent right of reclamation, but merely re-
cognizes any such existing right that seller may
have under either common or statutory law.
Bankr.Code, 11 U.S.C.A. § 546(c).

**[2] Bankruptcy 51 ☞2742**

51 Bankruptcy
   51V The Estate
     51V(I) Reclamation
       51k2742 k. Seller's Reclamation Rights.
Most Cited Cases
   Once seller establishes state law reclamation
right in goods sold to debtor, its must also comply
with any requirements of bankruptcy reclamation
statute in order to enforce that right against trustee.
Bankr.Code, 11 U.S.C.A. § 546(c).

**[3] Antitrust and Trade Regulation 29T ☞402**

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and
Consumer Protection

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

182 B.R. 1007, 28 UCC Rep.Serv.2d 855
(Cite as: 182 B.R. 1007)

29TIII(E) Enforcement and Remedies
29TIII(E)7 Relief
29Tk399 Other Particular Remedies or Forms of Relief
29Tk402 k. Packers and Stockyards Act, Remedies and Relief Under. Most Cited Cases
(Formerly 382k872 Trade Regulation)

Unless parties expressly agree in writing to the contrary, sales subject to the Packers and Stockyards Act (PASA) are cash and not credit transactions. Packers and Stockyards Act, 1921, §§ 1–317, as amended, 7 U.S.C.A. §§ 181–217a.

**[4] Sales 343 ☞316(1)**

343 Sales
343VII Remedies of Seller
343VII(C) Recovery of Goods Delivered or Proceeds Thereof
343k316 Right to Reclaim Goods in General
343k316(1) k. In General. Most Cited Cases

Regardless of whether cattle producers' sales of cattle to Chapter 7 debtor were properly characterized as "cash" or "credit" sales under the Packers and Stockyards Act (PASA), they had to be treated as "credit sales" for purposes of determining producers' statutory reclamation rights under Minnesota law, given uncontroverted evidence that producers consistently accepted payments from debtor from four to ten days after sale; by allowing debtor to pay for cattle after cattle were delivered, producers extended credit to debtor and became unsecured creditors. Packers and Stockyards Act, 1921, §§ 1–317, as amended, 7 U.S.C.A. §§ 181–217a; M.S.A. §§ 336.2–507(2), 336.2–702.

**[5] Sales 343 ☞82(1)**

343 Sales
343II Construction of Contract
343k82 Time of Payment and Terms of Credit
343k82(1) k. In General. Most Cited Cases

**Sales 343 ☞202(1)**

343 Sales
343V Operation and Effect
343V(A) Transfer of Title as Between Parties
343k198 Specific Articles or Goods
343k202 Payment of Price
343k202(1) k. Necessity and Effect in General. Most Cited Cases

Although "cash transactions" under Minnesota Uniform Commercial Code usually requires simultaneous payment upon delivery of goods, absolute simultaneity is not necessary if title is not meant to pass until payment is actually made.

**[6] Sales 343 ☞82(1)**

343 Sales
343II Construction of Contract
343k82 Time of Payment and Terms of Credit
343k82(1) k. In General. Most Cited Cases

Under Minnesota Uniform Commercial Code (UCC), cash seller's consent to become general creditor for even one hour terminates cash transaction and establishes credit relationship between parties, even if it was not intended to have that effect.

**[7] Bankruptcy 51 ☞2742**

51 Bankruptcy
51V The Estate
51V(I) Reclamation
51k2742 k. Seller's Reclamation Rights. Most Cited Cases

Cattle producers' compliance with Minnesota statutory requirements for exercising right of reclamation against cattle delivered to insolvent buyer was not sufficient to support claim of reclamation in buyer's Chapter 7 case, unless cattle producers also complied with requirements of bankruptcy reclamation statute. Bankr.Code, 11 U.S.C.A. § 546(c); M.S.A. § 336.2–702.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

182 B.R. 1007, 28 UCC Rep.Serv.2d 855
**(Cite as: 182 B.R. 1007)**

**[8] Bankruptcy 51 ☞2742**

51 Bankruptcy
  51V The Estate
    51V(I) Reclamation
      51k2742 k. Seller's Reclamation Rights.
Most Cited Cases
    To assert reclamation rights in buyer's bankruptcy case, seller must, in addition to satisfying state law requirements, establish that its sale to buyer was in ordinary course of its business, that buyer received goods while insolvent, that seller demanded reclamation within ten days after delivery, that reclamation demand was in writing, and that goods were identifiable and remained in possession of buyer on date reclamation demand was made. Bankr.Code, 11 U.S.C.A. § 546(c).

**[9] Bankruptcy 51 ☞2743**

51 Bankruptcy
  51V The Estate
    51V(I) Reclamation
      51k2743 k. Demand. Most Cited Cases
    Cattle producers could not enforce whatever state law reclamation rights they possessed in buyer's Chapter 7 case to extent that, at time producers' written reclamation demands were served on debtor-buyer, cattle in question had already been sold to and slaughtered by subsequent buyer; at time producers' reclamation demands were made, cattle were no longer identifiable and no longer in debtor-buyer's possession. Bankr.Code, 11 U.S.C.A. § 546(c).

**[10] Bankruptcy 51 ☞2742**

51 Bankruptcy
  51V The Estate
    51V(I) Reclamation
      51k2742 k. Seller's Reclamation Rights.
Most Cited Cases

**Sales 343 ☞317**

343 Sales
  343VII Remedies of Seller
    343VII(C) Recovery of Goods Delivered or
Proceeds Thereof
      343k317 k. Right to Follow Proceeds.
Most Cited Cases
    Language of neither bankruptcy nor Minnesota reclamation statutes permitted cattle producers to assert right of reclamation in proceeds from the resale of their cattle; cattle producers could assert reclamation rights only in cattle themselves, to extent that cattle were still in debtor's possession and still identifiable at time their reclamation demands were made. Bankr.Code, 11 U.S.C.A. § 546(c); M.S.A. §§ 336.2–105, 336.2–702(2).

**[11] Statutes 361 ☞212.6**

361 Statutes
  361VI Construction and Operation
    361VI(A) General Rules of Construction
      361k212 Presumptions to Aid Construction
        361k212.6 k. Words Used. Most Cited Cases
    If statutory language is unambiguous, one should start with assumption that legislative intent is expressed by ordinary meaning of words used.

**[12] Sales 343 ☞316(1)**

343 Sales
  343VII Remedies of Seller
    343VII(C) Recovery of Goods Delivered or
Proceeds Thereof
      343k316 Right to Reclaim Goods in General
        343k316(1) k. In General. Most Cited Cases
    Whatever reclamation rights cattle producers may have had under Minnesota law in cattle sold to insolvent buyer, such reclamation rights were terminated by buyer's transfer of goods to subsequent good faith purchaser. M.S.A. § 336.2–702.

**[13] Bankruptcy 51 ☞2742**

51 Bankruptcy

182 B.R. 1007, 28 UCC Rep.Serv.2d 855
**(Cite as: 182 B.R. 1007)**

51V The Estate
  51V(I) Reclamation
    51k2742 k. Seller's Reclamation Rights.
Most Cited Cases

**Bankruptcy 51 &#128065;2851**

51 Bankruptcy
  51VII Claims
    51VII(B) Secured Claims
      51k2851 k. In General. Most Cited Cases

**Bankruptcy 51 &#128065;2871**

51 Bankruptcy
  51VII Claims
    51VII(C) Administrative Claims
      51k2871 k. Administrative Expenses in
General. Most Cited Cases
    Cattle producers who failed to establish right of
reclamation in cattle delivered to Chapter 7 debtor,
based on their failure to serve written demand for
reclamation while cattle were still identifiable and
still in debtor's possession, had no right either to
administrative expense or to secured claim; bank-
ruptcy statute provided administrative expense or
secured claim only as alternative to valid right of
reclamation. Bankr.Code, 11 U.S.C.A. § 546(c)(2).

**[14] Antitrust and Trade Regulation 29T &#128065;
286**

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and
Consumer Protection
      29TIII(E) Enforcement and Remedies
        29TIII(E)1 In General
          29Tk286 k. Notice and Demand Re-
quirements; Opportunity to Cure. Most Cited Cases
    (Formerly 382k872 Trade Regulation)
    Cattle producers' noncompliance with notice
requirements under the Packers and Stockyards Act
(PASA), in failing to give required notice of their
trust rights either to debtor-packer or to Secretary
of Agriculture, precluded producers from asserting
statutory trust under the PASA in proceeds gener-

ated by debtor's resale of cattle. Packers and Stock-
yards Act, 1921, § 206(b), as amended, 7 U.S.C.A.
§ 196(b).

**[15] Agriculture 23 &#128065;11**

23 Agriculture
  23k10 Agricultural Liens
    23k11 k. Right to Lien. Most Cited Cases
    Agricultural lien provided under Minnesota
statute to sellers of agricultural commodities was in
rem remedy only, which was not available to cattle
seller who sold and delivered in Illinois cattle
which were subsequently shipped to Iowa for
slaughter, and which were never present within
Minnesota. M.S.A. § 514.945.

**[16] Agriculture 23 &#128065;11**

23 Agriculture
  23k10 Agricultural Liens
    23k11 k. Right to Lien. Most Cited Cases
    Whatever lien rights cattle seller had under
Minnesota law in cattle sold and delivered to debt-
or-buyer outside the state, such interest was termin-
ated pursuant to federal statute upon debtor's resale
of cattle to buyer in ordinary course of business.
Food Security Act of 1985, § 1324(d), 7 U.S.C.A. §
1631(d).

**[17] Sales 343 &#128065;202(8)**

343 Sales
  343V Operation and Effect
    343V(A) Transfer of Title as Between Parties
      343k198 Specific Articles or Goods
        343k202 Payment of Price
          343k202(8) k. Waiver by Seller.
Most Cited Cases
    Even if cattle producers' sale of cattle to debt-
or-buyer were regarded as cash sales, cattle produ-
cers changed nature of sales, and allowed debtor to
obtain title to cattle, by accepting debtor's late pay-
ments from four to ten days after cattle were de-
livered. M.S.A. § 336.2-401(2).

**[18] Sales 343 &#128065;203**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

182 B.R. 1007, 28 UCC Rep.Serv.2d 855
**(Cite as: 182 B.R. 1007)**

343 Sales
  343V Operation and Effect
    343V(A) Transfer of Title as Between Parties
      343k198 Specific Articles or Goods
        343k203 k. Sale on Credit. Most Cited
Cases
    Retention of title clause in cattle producer's
sales agreement with debtor gave cattle producer an
Article 2 security interest in cattle which it sold to
debtor on credit, which creditor could perfect in ac-
cordance with provisions of Article 9 of the Min-
nesota Uniform Commercial Code (UCC). M.S.A.
§§ 336.2–401(1), 336.9–113, 336.9–302(1)(f).

**[19] Bankruptcy 51 ⚖2576.5(2)**

51 Bankruptcy
  51V The Estate
    51V(D) Liens and Transfers; Avoidability
      51k2576.5 Security Interests in General
        51k2576.5(2) k. Particular Cases and
Problems. Most Cited Cases
    Cattle producer's unperfected Article 2 security
interest in cattle which it had delivered to debtor
pursuant to sales agreement which contained reten-
tion of title clause was not enforceable against cred-
itor with perfected blanket security interest in all of
debtor's assets or against Chapter 7 trustee, absent
evidence that debtor obtained cattle unlawfully.
M.S.A. § 336.9–113.

**[20] Trusts 390 ⚖91**

390 Trusts
  390I Creation, Existence, and Validity
    390I(C) Constructive Trusts
      390k91 k. Nature of Constructive Trust.
Most Cited Cases
    Under Minnesota law, equitable lien is form of
constructive trust.

**[21] Bankruptcy 51 ⚖2125**

51 Bankruptcy
  51II Courts; Proceedings in General
    51II(A) In General

      51k2124 Power and Authority
        51k2125 k. Equitable Powers and Prin-
ciples. Most Cited Cases
    Imposition of constructive trust is equitable
remedy, which bankruptcy court has discretion to
grant or deny.

**[22] Bankruptcy 51 ⚖2125**

51 Bankruptcy
  51II Courts; Proceedings in General
    51II(A) In General
      51k2124 Power and Authority
        51k2125 k. Equitable Powers and Prin-
ciples. Most Cited Cases

**Bankruptcy 51 ⚖2572**

51 Bankruptcy
  51V The Estate
    51V(D) Liens and Transfers; Avoidability
      51k2572 k. Liens and Security Interests in
General. Most Cited Cases
    Imposition of equitable lien in bankruptcy is
good only if it would be sufficient under applicable
state law.

**[23] Bankruptcy 51 ⚖2543**

51 Bankruptcy
  51V The Estate
    51V(C) Property of Estate in General
      51V(C)2 Particular Items and Interests
        51k2543 k. Property Held by Debtor as
Trustee, Agent, or Bailee. Most Cited Cases
    State law must be applied in manner consistent
with federal bankruptcy law, in deciding whether
creditor is entitled to constructive trust in assets of
debtor.

**[24] Trusts 390 ⚖91**

390 Trusts
  390I Creation, Existence, and Validity
    390I(C) Constructive Trusts
      390k91 k. Nature of Constructive Trust.
Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

182 B.R. 1007, 28 UCC Rep.Serv.2d 855
(Cite as: 182 B.R. 1007)

**Trusts 390 ☞94.5**

390 Trusts
   390I Creation, Existence, and Validity
      390I(C) Constructive Trusts
         390k94.5 k. Fraud in General. Most Cited
Cases
    (Formerly 390k941/2)

**Trusts 390 ☞102(1)**

390 Trusts
   390I Creation, Existence, and Validity
      390I(C) Constructive Trusts
         390k102 Breach of Duty by Person in Fi-
duciary Relation in General
            390k102(1) k. In General. Most Cited
Cases

**Trusts 390 ☞103(1)**

390 Trusts
   390I Creation, Existence, and Validity
      390I(C) Constructive Trusts
         390k103 Contracts and Transactions
Between Persons in Confidential Relations
            390k103(1) k. In General. Most Cited
Cases
    Under Minnesota law, constructive trust will be
imposed in cases of fraud, of taking improper ad-
vantage of confidential or fiduciary relationship,
and of unjust enrichment.

**|25| Trusts 390 ☞94.5**

390 Trusts
   390I Creation, Existence, and Validity
      390I(C) Constructive Trusts
         390k94.5 k. Fraud in General. Most Cited
Cases
    (Formerly 390k941/2)
    Under Minnesota law, cattle producers that de-
livered cattle to buyer at time when buyer was
already insolvent were not entitled to constructive
trust in proceeds received by buyer upon resale of
cattle, in order to gain priority over creditor with
perfected security interest in all of debtor's assets,
where cattle producers had ample opportunity to se-
cure their interest in cattle but chose not to do so;
mere fact that debtor had failed to meet its payment
obligations for cattle was not sufficient to demon-
strate any fraud on debtor's part, such as might per-
mit imposition of constructive trust under Min-
nesota law.

**|26| Bankruptcy 51 ☞2543**

51 Bankruptcy
   51V The Estate
      51V(C) Property of Estate in General
         51V(C)2 Particular Items and Interests
            51k2543 k. Property Held by Debtor as
Trustee, Agent, or Bailee. Most Cited Cases
    Unless court has already impressed construct-
ive trust upon certain assets, claimant cannot prop-
erly represent to bankruptcy court that he was, at
time of commencement of case, beneficiary of con-
structive trust held by debtor.

**|27| Bankruptcy 51 ☞2543**

51 Bankruptcy
   51V The Estate
      51V(C) Property of Estate in General
         51V(C)2 Particular Items and Interests
            51k2543 k. Property Held by Debtor as
Trustee, Agent, or Bailee. Most Cited Cases
    Even assuming that unpaid sellers of cattle
would have been entitled, under Minnesota law, to
constructive trust in proceeds from debtor-buyer's
resale of cattle, no such trust would be recognized
in debtor-buyer's Chapter 7 case, as inconsistent
with Bankruptcy Code's detailed treatment of cred-
itors; fact that cattle sellers' loss resulted in part
from their own failure to utilize other laws which
would have enabled them to perfect their security
interest mitigated against imposition of constructive
trust.

**\*1010** Mark D. Stephenson, Minneapolis, MN.

Thomas J. Whorley, Sheldon, IA.

Thomas P. Melloy, St. Cloud, MN.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

182 B.R. 1007, 28 UCC Rep.Serv.2d 855
**(Cite as: 182 B.R. 1007)**

Kenneth R. White, Mankato, MN.

Clark T. Whitmore, Minneapolis, MN.

Virginia A. Bell, Minneapolis, MN.

Timothy A. Murphy, Caledonia, MN.

G. Jeffrey George, LaCrosse, WI.

Randall A. Roos, Sioux Center, IA.

Bradley K. De Jong, Orange City, IA, Council
Bluffs, IA.

Eric D. Cook, St. Paul, MN.

Steven H. Krohn, Council Bluffs, IA.

Malcolm MacGregor, Minneapolis, MN.

Rodney A. Honkanen, Minneapolis, MN.

Marc R. Soderbloom, Baraboo, WI.

Faye Knowles, Minneapolis, MN.

William J. Rameker, Madison, WI.

Robert V. Ginn, Omaha, NE.

John A. Nelson, St. Cloud, MN.

Bruce Zito, Eau Claire, WI.

Daniel A. Beckman, Minnetonka, MN.

Tom Riley, Cedar Rapids, IA.

Gary Koch, New Ulm, MN.

Clark A. Tuttle, III, New Ulm, MN.

Steven R. Jensen, Sioux City, IA.

Fred R. Kraft, Edina, MN.

Stephen F. Grinnell, Minneapolis, MN.

*ORDER*

ROBERT J. KRESSEL, Bankruptcy Judge.

This proceeding came on for hearing on mo-
tions for summary judgment by defendants Firstar
Bank Milwaukee, N.A., and Charles W. Ries. Clark
T. Whitmore appeared for Firstar Bank and Charles
W. Ries appeared in propria persona. Mark Steph-
enson and John P. Sullivan appeared for the
plaintiff. Gary W. Koch appeared for Farm Credit
Services of Minnesota. Malcolm D. MacGregor ap-
peared for Zumbrota Livestock Auction Market,
Inc., Kane Livestock Sales, Inc., H & L Cattle Co.,
Inc., and Lanesboro Sales Co., Inc. Paul W. Henke
appeared for Lanny Minnaert. Daniel A. Beckman
appeared for Haas Livestock Selling Agency, Inc.
Randall A. Roos appeared for Dr. Dan Murphy and
Roger and Jessie DeJager. Phillip L. Kunkel ap-
peared in propria persona.

This court has jurisdiction pursuant to 28
U.S.C. §§ 157(a) and 1334 and Local Rule 201.
This is a core proceeding within the meaning of 28
U.S.C. § 157.

## BACKGROUND

Spring Grove Livestock Exchange, Inc., a Min-
nesota corporation, and John D. and Dorothy M.
Morken were engaged in the business of raising,
fattening and marketing cattle in the Upper Midw-
est. On June 10, 1994, Spring Grove filed a petition
under Chapter 7 and the Morkens filed a petition
under Chapter 11. Ries was appointed trustee in the
Spring Grove case and Kunkel was appointed trust-
ee in the Morken case. The Morken case was con-
verted to a case under Chapter 7 on February 22,
1995, and Kunkel was reappointed trustee.

This interpleader action was commenced by
Monfort, Inc., a packer, on July 7, 1994, to **\*1011**
determine the defendants' rights regarding
$671,433.24 held by Monfort. This sum is owed by
Monfort on the outstanding balance of 21 lots of
cattle that Monfort purchased from Spring Grove
prior to Spring Grove's filing for bankruptcy. These
motions deal with the claims asserted by Firstar
Bank, a secured creditor claiming a perfected lien
on all of Spring Grove's instruments, receivables,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

182 B.R. 1007, 28 UCC Rep.Serv.2d 855
**(Cite as: 182 B.R. 1007)**

and general intangibles; Ries, the trustee in the Spring Grove case; and Zumbrota Livestock, Lanesboro Sales Co., Kane Livestock, Haas Livestock, Lanny Minnaert, H & L Cattle Co., Fuchs Livestock Inc., and Equity Cooperative Livestock Sales, entities who sold the lots of cattle at issue to Spring Grove but who were ultimately not paid or whose payment checks were later dishonored. Other claims have been settled or remain to be resolved.

The defendants are making the following claims:

1. *Firstar Bank Milwaukee, N.A.*

Firstar claims that it is entitled to $558,889.18 of the interpled funds, plus interest, on the grounds that it holds a first priority perfected blanket security interest on Spring Grove's assets. Firstar argues that these funds are assets of Spring Grove free of the other defendants' claims and, as such, are subject to its security interest. It also counterclaimed against the plaintiff for $555,816.86 claiming to be a holder in due course of checks issued by the plaintiff but not paid. Firstar withdrew its motion as to its holder in due course claim.

2. *Charles W. Ries*

Ries, as trustee in the Spring Grove case, claims a right to the interpled funds subject to any perfected security interest of Firstar. The trustee argues that these funds were generated by the sale of cattle owned by Spring Grove to Monfort and that, as such, these funds are property of the estate, and that the defendant sellers' claims are those of unpaid, unsecured creditors.

3. *Lanesboro Sales Co., Inc., Zumbrota Livestock Auction Market, Inc., Kane Livestock Sales, Inc., and H & L Cattle Co., Inc.*

These four defendants filed a Joint Memorandum of Law opposing the motions for summary judgment and have substantially similar claims and defenses. They all have a long history of selling cattle to Spring Grove [FN1] and, perhaps because of the length of these relationships, none of them have

express agreements with Spring Grove as to the terms of payment for the cattle at issue. These defendants contend that it was understood between Spring Grove and the selling parties that payment was due within 24 hours of delivery of the cattle to Spring Grove. Yet, by their own admission, they regularly and routinely accepted Spring Grove's payments anywhere from 2 to 4 days after delivery to as long as 7 to 10 days. These defendants argue that the cattle was sold on a cash sale basis and that they retained title to the cattle as they were not paid. In addition, they contend that they are beneficiaries of a statutory trust pursuant to the Packers and Stockyards Act, 7 U.S.C. § 196 [FN2], and a constructive trust created by Spring Grove's improper transfer of the cattle to the plaintiff. The defendants also assert, as cash sellers, a right of reclamation of the proceeds generated by the resale of the cattle from Spring Grove to Monfort. The individual claims of the defendants are:

> FN1. With the exception of Kane, the length of these relationships go back decades.

> FN2. 7 U.S.C. § 196 imposes a statutory trust for the benefit of unpaid cash sellers of livestock to packers.

a. *Lanesboro Sales Company*

Lanesboro, which is in the business of conducting auctions at which cattle are bought and sold, claims an interest in lot 946 in the amount of $33,573.59 and lot 958 in the amount of $752.09. Lanesboro sold forty-four head of cattle, which were placed in lot 946, to Spring Grove on June 1, 1994, which resold them on June 2, 1994, to Monfort. On that date, Monfort slaughtered the cattle. On June 1, 1994, Spring Grove also purchased 1 head of cattle from Lanesboro which was placed in lot 958. This head of cattle was sold to Monfort on June 1, 1994, and slaughtered on June 2, *1012 1994. Lanesboro mailed two letters to Spring Grove, one on June 10, 1994, and another on June 11, 1994, asserting a right of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

182 B.R. 1007, 28 UCC Rep.Serv.2d 855
**(Cite as: 182 B.R. 1007)**

reclamation to these cattle. Neither of these let-
ters specified which cattle Lanesboro was trying
to reclaim.

b. *Kane Livestock*

Kane, a livestock company, asserts an interest
in lot 954 in the amount of $15,862.07 and lot
959 in the amount of $23,951.40. Kane sold 23
head of cattle to Spring Grove on June 1, 1994,
19 head of which were placed in lot 954. Spring
Grove sold this lot of cattle to Monfort on June 2,
1994, which slaughtered the cattle on June 2,
1994. On June 2, 1994, Spring Grove also pur-
chased 78 head of cattle from Kane, 32 head of
which were placed in lot 959. These cattle were
sold to Monfort on June 3, 1994, which
slaughtered them on that date. On June 6, 1994,
Kane sent a letter to Spring Grove asserting a
right of reclamation for this cattle.

c. *Zumbrota Livestock*

Zumbrota, a livestock auction company, asserts
an interest in lot 942 in the amount of $5,954.18.
Zumbrota sold 46 head of cattle to Spring Grove
on May 31, 1994, which were placed in lot 942.
Spring Grove then sold this cattle to Monfort on
June 1, 1994, which slaughtered the cattle on that
date. On either June 9 or 10, 1994, Zumbrota
faxed a letter to Spring Grove asserting a right of
reclamation to these cattle. This letter did not
specify what cattle it was trying to reclaim.

d. *H & L Cattle Co.*

H & L, a livestock company, asserts an interest
in lot 958 in the amount of $24,819.02. H & L
sold 46 head of cattle to Spring Grove on June 2,
1994, which were placed in lot 958. On June 3,
1994, Spring Grove sold these cattle to Monfort,
which slaughtered the cattle on that date. On June
13, 1994, H & L sent a letter to Spring Grove as-
serting a right of reclamation to the cattle. This
letter did specify what cattle it was trying to re-
claim.

4. *Haas Livestock*

Haas, a livestock commission firm, asserts an
interest in lot 939 in the amount of $8,846.71 and
lot 958 in the amount of $4,189.01. On May 26,
1994, Haas sold 11 head of cattle to Spring Grove
which were placed in lot 939. Spring Grove sold
these cattle to Monfort on May 31, 1994, which
slaughtered the cattle on that date. Haas contends
that it sold 4 head of cattle on June 1, 1994, and 1
head of cattle the next day to Spring Grove which
were placed in lot 958. These cattle were sold by
Spring Grove to Monfort on June 3, 1994, which
slaughtered them on that date. On June 6, 1994,
Haas sent a letter to Spring Grove asserting a right
of reclamation. Haas also contends that it has a se-
curity interest in the proceeds of the cattle superior
to any rights of the trustee and Firstar.

5. *Lanny Minnaert*

Minnaert, an individual engaged in the raising
and selling of livestock, asserts an interest in lot
939 in the amount of $6,436.60 and lot 943 in the
amount of $3,291.68. On May 27, 1994, Minnaert
sold 43 head of cattle to Spring Grove which were
placed in lot 939. These cattle were sold to Monfort
and slaughtered on May 31, 1994. Minnaert also
sold 45 head of cattle to Spring Grove on May 31,
1994, which were placed in lot 943. These cattle
were sold to Monfort and slaughtered on June 1,
1994. On June 9, 1994, Minnaert sent a letter as-
serting a right of reclamation to Spring Grove. Min-
naert also asserts both a perfected agricultural lien
on the proceeds from the resale of this livestock su-
perior to that of Firstar's and an equitable claim to
these proceeds.

6. *Fuchs Livestock and Equity Cooperative*

Fuchs and Equity do not oppose the motions
for summary judgment.

### DISCUSSION
**I. Summary Judgment May Be Granted When
There Are No Genuine Issues of Material Fact.**
FN3

*FN3. See generally,* William W. Schwar-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

182 B.R. 1007, 28 UCC Rep.Serv.2d 855
**(Cite as: 182 B.R. 1007)**

zer, Allan Hirsch, David J. Barrans, *The Analysis and Decision of Summary Judgment Motions; A Monograph on Rule 56 of the Federal Rules of Civil Procedure,* 139 F.R.D. 441 (1992); George Loewenstein, *Second Thoughts about Summary Judgment,* 100 Yale L.J. 73 (1990); Louis, *Federal Summary Judgment Doctrine: A Critical Analysis,* 83 Yale L.J. 745 (1974); Currie, *Thoughts on Directed Verdicts and Summary Judgment,* 45 U.Chi.L.Rev. 72 (1977).

Summary judgment plays a very important role in the judicial process by allowing the judge to "pierce the pleadings and to assess the proof in order to see whether there is a ***1013** genuine need for trial." Fed.R.Civ.P. 56 advisory committee note. The importance of summary judgment cannot be overemphasized. Indeed, "[s]ummary judgment ... is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action'." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1).

Summary judgment will be granted if there is no issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).[FN4] "The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552.

FN4. Rule 56 applies in this proceeding pursuant to Fed.R.Bankr.P. 7056.

## A. The Burdens.
### 1. The Moving Party
Initially, the burden is on the party seeking summary judgment. It is the moving party's duty to inform the court of the basis for the motion and to identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 324, 106 S.Ct. at 2553. The moving party must show the court that there is an absence of evidence to substantiate the non-moving party's case. *Id.* at 325, 106 S.Ct. at 2553–54. To that end, the movant discharges its burden by showing that the record does not contain a triable issue and by identifying that part of the record which supports the moving party's assertion. *See Id.* at 323, 106 S.Ct. at 2552–53; *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.,* 838 F.2d 268, 273 (8th Cir.1988).

### 2. The Non-moving Party
Once the movant has made its showing, the burden of production shifts to the non-moving party. The non-moving party must "go beyond the pleadings and by [its] ... own affidavits, or by the depositions, answers to interrogatories, and admissions on file" to establish that there are specific and genuine issues of material fact warranting a trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56(c)). The non-moving party cannot cast some metaphysical doubt on the moving party's assertion. *Matsushita Elec. Indust. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Rather, the non-moving party must present specific, significant, and probative evidence supporting its case, *Johnson v. Enron Corp.,* 906 F.2d 1234, 1237 (8th Cir.1990) which is sufficient enough "to require a ... judge to resolve the parties' differing versions of the truth at trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)). Any affidavits must "be made on personal knowledge, must set forth such facts as would be admissible in evidence, and shall affirmatively

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

182 B.R. 1007, 28 UCC Rep.Serv.2d 855
**(Cite as: 182 B.R. 1007)**

show that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e). If, however, the evidence tendered is "merely colorable" or is "not significantly probative", the non-moving party has not met its burden and the court must grant summary judgment to the moving party. *Id.* at 249–50, 106 S.Ct. at 2510–11.

**B. The nature of the sales by Defendants Zumbrota, Kane, Lanesboro and H & L to Spring Grove, whether on a cash or credit sale basis, does not present a genuine issue of material fact.**

Defendants Zumbrota, Kane, Lanesboro and H & L argue that the motion for summary *1014 judgment should be denied because genuine issues of material fact exist. They contend that, contrary to the movants' arguments, their sales of cattle to Spring Grove were conducted on a cash sale basis rather than on a credit sale basis, and that resolution of this factual issue is material to the determination of their rights. I disagree. Regardless of their claimed intent, the evidence presented by all parties clearly indicates that the sales were not in fact cash sales. Also, regardless of whether these sales were credit or cash transactions, the rights and remedies of the defendant sellers do not change and, thus, the nature of the sales is immaterial to the issues at hand. Accordingly, summary judgment may be entered as a matter of law.

**II. Defendants Minnaert, Zumbrota, Lanesboro, Kane, Haas and H & L fail to establish their reclamation claims to both the cattle and the proceeds generated from the resale of the cattle. Furthermore, the defendants are not entitled to either administrative expense or secured creditor status.**

[1][2] It is well established that Section 546(c) of the Bankruptcy Code provides the exclusive remedy for a seller seeking to reclaim goods from a debtor in bankruptcy.[FN5] *Flav-O Rich, Inc. v. Rawson Food Service (In re Rawson Food Service),* 846 F.2d 1343, 1346 (11th Cir.1988); *In re Dynamic Technologies Corp.,* 106 B.R. 994, 1004 (Bankr.D.Minn.1989); *In re Video King of Illinois,*

*Inc.,* 100 B.R. 1008, 1013 (Bankr.N.D.Ill.1989). Section 546(c)[FN6] states in relevant part:

> FN5. Section 546(c) applies to both cash and credit sale transactions. *In re Microwave Products of America, Inc.,* 94 B.R. 967, 969 (Bankr.W.D.Tenn.1989), *citing* 124 CONG.REC. H11097 (daily ed. Sept. 28, 1978); *In re Tom Woods Used Cars, Inc.,* 24 B.R. 529, 531 (Bankr.E.D.Tenn.1982).

> FN6. The statute was changed slightly for cases filed on or after October 22, 1994. Pub.L. 103–394, 108 Stat. 4106 (1994). The changes do not apply in this case.

... the rights and powers of a trustee ... are subject to any statutory or common-law right of a seller of goods that has sold goods to the debtor, in the ordinary course of such seller's business, to reclaim such goods if the debtor has received such goods while insolvent, but—

> (1) such a seller may not reclaim any such goods unless such a seller demands in writing reclamation of such goods before ten days after the receipt of such goods by the debtor; ...

11 U.S.C. § 546(c). The Bankruptcy Code does not create an independent right of reclamation. Rather, it recognizes any such existing right that a seller may have under either common or statutory law. *In re Coast Trading Co., Inc.,* 744 F.2d 686, 689 (9th Cir.1984) (whether a seller has a statutory or common law right of reclamation is a matter of state law). However, once a party establishes a state law reclamation right, it must also comply with any requirements of § 546(c).

Defendants Zumbrota, Kane, H & L and Lanesboro argue that, pursuant to 9 C.F.R. § 201.43(b)(2)(i), they were cash sellers of cattle to Spring Grove and that, as such, they have a right of reclamation pursuant to Minn.Stat. § 336.2–507(2).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

182 B.R. 1007, 28 UCC Rep.Serv.2d 855
**(Cite as: 182 B.R. 1007)**

FN7 Even if these defendants were cash sellers under 9 C.F.R. § 201.43(b)(2)(i), their right of reclamation under Minn.Stat. § 336.2–507(2) fails.

> FN7. These defendants argue that, pursuant to Minn.Stat. § 336.2–507, Spring Grove did not obtain title to the cattle because, as this was a cash sale, transfer of title to Spring Grove was conditional upon full payment. Although they concede that Spring Grove could have transferred title to Monfort as a bona fide purchaser under Minn.Stat. § 336.2–403, these defendants contend that Firstar's blanket security interest could not have attached to the cattle as Spring Grove never obtained title to the cattle. The defendants contend that their sales transactions with Spring Grove could not have been credit transactions as Minn.Stat. § 513.33 requires an extension of credit to be in writing and there was no such written agreement. However, Minn.Stat. § 513.33 is inapplicable here as it applies to situations where a debtor seeks to enforce a verbal credit agreement against a creditor rather than those where a creditor seeks to obtain payment for credit already extended, as happened here.

**\*1015** [3][4] These defendants turn to the Packers and Stockyards Act (PASA), codified at 7 U.S.C. §§ 181–217a, to support their contention that they were cash sellers of livestock to Spring Grove. The regulations under PASA state in pertinent part:

> No packer, market agency, or dealer purchasing livestock for cash and not on credit, whether for slaughter or not for slaughter, shall mail a check in payment for the livestock unless the check is placed in an envelope with proper first class postage prepaid ... in a post office, ... to be collected (A) before the close of the next business day following the purchase of the livestock and transfer of possession thereof, ...

9 C.F.R. § 201.43(b)(2)(i). Although these regulations speak to when payment must be made in a cash sale transaction, it does not mandate that all sales of livestock are to be made on a cash sale basis. *Fillippo v. S. Bonaccurso & Sons, Inc.,* 466 F.Supp. 1008, 1019 (E.D.Pa.1978) (finding by implication that as PASA does not "require next day payment nor create a statutory trust to insure payment for sales on credit", sales made pursuant to PASA can be on a credit basis); *In re Arbogast and Bastian, Inc.,* 42 B.R. 633, 634 (Bankr.E.D.Pa.1984). However, a reading of both PASA and the case law indicates that, unless the parties expressly agree in writing to the contrary, sales subject to PASA are cash transactions.[FN8] *In re Gotham Provision Co., Inc.,* 669 F.2d 1000, 1005 (5th Cir.1982), *cert. denied,* 459 U.S. 858, 103 S.Ct. 129, 74 L.Ed.2d 111 (1982); *Fillippo v. S. Bonaccurso & Sons, Inc.,* 466 F.Supp. at 1020; *In re Arbogast and Bastian, Inc.,* 42 B.R. at 635. Here, as the parties did not have express, written credit agreements, it is arguable that these transactions were cash transactions under PASA. However, for the following reasons, the nature of the sale transactions is immaterial to my determination of whether these defendants, as either cash or credit sellers, have established their right of reclamation to the cattle.

> FN8. It is important to note, however, that although PASA requires a credit transaction to be express and in writing, these requirements are pertinent only to sales subject to PASA and cannot be imposed on credit transactions outside the scope of PASA.

Minn.Stat. § 336.2–507(2) states:

> Where payment is due and demanded on the delivery to the buyer of goods or documents of title, his right as against the seller to retain or dispose of them is conditional upon his making the payment due.

Minn.Stat. § 336.2–507(2). Minn.Stat. §

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

182 B.R. 1007, 28 UCC Rep.Serv.2d 855
(Cite as: 182 B.R. 1007)

336.2–507(2) allows a cash seller a right of reclamation upon a buyer's default when the seller has made delivery of goods conditional upon receiving payment at the time of delivery.[FN9] It speaks to situations where the buyer's payment is issued in response to the seller's "due and demand" condition but is later dishonored.[FN10]

> FN9. The remedy granted by § 336.2–507(2) is one of a seller against a buyer; it does not speak to the rights of a seller against a third party, such as Monfort in this instance. *Stowers v. Mahon (In re Samuels & Co., Inc.)*, 526 F.2d 1238, 1244 (5th Cir.1976), *cert. denied*, 429 U.S. 834, 97 S.Ct. 98, 50 L.Ed.2d 99 (1976).

> FN10. This section is often applied to situations where the buyer's check is issued upon delivery of the goods but later dishonored. *See Burk v. Emmick*, 637 F.2d 1172, 1174 (8th Cir.1980); *In re Mort Co.*, 208 F.Supp. 309 (E.D.Penn.1962).

[5][6] Key to the application of this statute is the "due and demand" requirement; the seller must demand and receive payment as a condition to delivering the goods. Although cash transactions usually require simultaneous payment upon delivery of the goods, absolute simultaneity is not necessary if title is not meant to pass until payment is actually made. *In re Helms Veneer Corp.*, 287 F.Supp. 840, 843 (W.D.Va.1968) (finding that a seller's acceptance of a check instead of cash as payment did not change a cash sale into a credit sale). However, "the consent to become a general creditor for an hour, that was imported, even if not intended to have that effect, by the liberty allowed" terminates the cash transaction and establishes a credit relationship between the buyer and seller. *National City Bank v. Hotchkiss*, 231 U.S. 50, 34 S.Ct. 20, 21, 58 L.Ed. 115 (1913); *In re Colacci's of America, Inc.*, 490 F.2d 1118, 1120–1121 (10th Cir.1974) (cash sale became a credit transaction where **1016** the seller acquiesced to the buyer's retention of the goods for four months without payment); *In re*

*Helms Veneer Corp.*, 287 F.Supp. at 843 (cash seller extended credit where seller voluntarily released goods into the buyer's possession upon receiving promises of future payment or accepted a credit instrument such as a note or a postdated check); *In re Valley Steel Products Co., Inc.*, 1993 WL 90462 (Bankr.E.D.Mo.1993) (finding that seller's delivery of goods to buyer without receiving payment created an extension of credit); *In re Wathen's Elevators, Inc.*, 32 B.R. 912, 918 (Bankr.W.D.Ky.1983) (when payment due upon delivery was deferred until a later date, general unsecured credit was extended).

Here, even if the sale transactions were "cash sales" under PASA, the defendants failed to make the necessary "due and demand" requirement upon delivery of the cattle. As a result, Minn.Stat. § 336.2–507(2) does not apply. In other words, whether the sales were "cash sales" as defined by PASA is irrelevant. Section 336.2–507(2) does not incorporate explicitly or implicitly PASA's definition. In fact, it does not use the phrase "cash sale" at all but rather requires that payment be "due and demanded" on delivery. It was not. By the defendants' own admission, they consistently accepted Spring Grove's payments from 4 to 10 days after the sale. By so doing, the defendants extended credit to Spring Grove and became unsecured creditors.[FN11] As such, any right of reclamation that these defendants, like defendants Minnaert and Haas, may have is as credit sellers under Minn.Stat. § 336.2–702 and not as cash sellers under Minn.Stat. § 336.2–507(2).

> FN11. These creditors could have obtained a perfected security interest in the goods or required payment by certified check but chose not to do so at their own risk. *See Szabo v. Vinton Motors, Inc.*, 630 F.2d 1, 4 (1st Cir.1980).

[7] The credit seller's right of reclamation is defined under Minn.Stat. § 336.2–702.[FN12] This statute states in pertinent part:

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

182 B.R. 1007, 28 UCC Rep.Serv.2d 855
**(Cite as: 182 B.R. 1007)**

FN12. Minn.Stat. § 336.2–702 by its own terms does not apply to cash sellers nor does it suggest a right to recover goods delivered by a cash seller to a breaching buyer. *Stowers v. Mahon (In re Samuels & Co. Inc.),* 526 F.2d at 1244.

(2) Where the seller discovers that the buyer has received goods on credit while insolvent he may reclaim the goods upon demand made within ten days after the receipt, ...

Minn.Stat. § 336.2–702. Although this statute is "akin" to § 546(c), compliance with its requirements is insufficient to support a claim of reclamation unless the requirements of § 546(c) are also met. *In re Rawson Food Service, Inc.,* 846 F.2d at 1346.

[8][9] Section 546(c) specifically lays out several requirements that the seller must meet in addition to the requirements of state law in order to preserve its right of reclamation. These additional requirements are:

(1) the sale to the buyer was in the ordinary course of the business of the seller;

(2) the buyer received the goods while insolvent;

(3) the seller demanded reclamation of the goods within ten days after the buyer received the goods; and

(4) the demand was in writing.

*In re Dynamic Technologies Corp.,* 106 B.R. at 1003; *In re Continental Airlines, Inc.,* 125 B.R. 415, 417 (Bankr.D.Del.1991). Furthermore, courts have consistently construed § 546(c) to include two additional requirements which a seller must satisfy in order to maintain a successful reclamation action. *Party Packing Corp. v. Rosenberg ( In re Landy Beef Co., Inc.),* 30 B.R. 19, 20 n. 4 (Bankr.D.Mass.1983). These requirements are that the goods must be identifiable and in the possession of the debtor on the date the reclamation demand is made. *In re Rawson Food Service, Inc.,* 846 F.2d at

1344 (finding that "an implicit requirement of a § 546(c) reclamation claim is that the debtor must possess the goods when the reclamation demand is made and therefore that the seller must prove possession as part of its prima facie case"); *Oliver Rubber Co. v. Griffin Retreading Co., Inc.,* 56 B.R. 239, 241 (D.Minn.1985) ("A seller seeking reclamation ... must make a demand for the goods ... while the goods remained in the insolvent **\*1017** buyer's possession"), *aff'd sub nom. Griffin Retreading Co., Inc. v. Oliver Rubber Co. (In re Griffin Retreading Co.),* 795 F.2d 676 (8th Cir.1986); *In re Braniff, Inc.,* 113 B.R. 745, 751 (Bankr.M.D.Fla.1990); *Eighty–Eight Oil Company v. Charter Crude Oil Co. (In re Charter Co.),* 54 B.R. 91, 93 (Bankr.M.D.Fla.1985); *In re Landy Beef Co., Inc.,* 30 B.R. 19, 20–21 (Bankr.D.Mass.1983) (the goods must be in the debtor's possession and identifiable as those of the seller on the date of the demand).

Here, the parties do not dispute that the debtor was insolvent when the goods were delivered and that the reclamation notices were timely and in writing.[FN13] Therefore, to establish their prima facie case, the defendants need only show that the cattle were identifiable and in the debtor's possession at the time their reclamation demands were made. However, the debtor did not have possession of the cattle on the dates the reclamation demands were made as all of the cattle had been sold to Monfort and slaughtered prior to any of these dates. Moreover, since the cattle had already been slaughtered, they were no longer identifiable.[FN14] Thus, as defendants Haas, Minnaert, Zumbrota, H & L, Lanesboro and Kane cannot meet the requirements of § 546(c), their reclamation claims to the cattle must fail.

FN13. Minnaert's demand of reclamation for the cattle in lot 939 was not made until June 6, 1994, thirteen days after he had sold and delivered the cattle to the debtor. For purposes of this motion, the trustee does not contest that the other notices of reclamation were timely.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

182 B.R. 1007, 28 UCC Rep.Serv.2d 855
**(Cite as: 182 B.R. 1007)**

FN14. The cattle had been purchased by Monfort on a grade and yield basis. As the grade and yield report from Monfort does not identify each head of cattle slaughtered, it is impossible to identify the specific livestock each party would be entitled to reclaim.

[10][11] The defendants also contend that their right of reclamation extends to the proceeds from the resale of the cattle by Spring Grove to Monfort. However, the plain language of both § 546(c) and Minn.Stat. § 336.2–702(2) refers to "goods", a term that is defined under Minn.Stat. § 336.2–105.[FN15] If the statutory language is unambiguous, one should start with the assumption that the legislative intent is expressed by the ordinary meaning of the words. *See Russello v. United States,* 464 U.S. 16, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983); *Richards v. United States,* 369 U.S. 1, 9, 82 S.Ct. 585, 590–91, 7 L.Ed.2d 492 (1962). Here, the language of § 546(c) and Minn.Stat. § 336.2–702(2) specifically speaks to "goods" and not to "proceeds". Creating a right of reclamation to the proceeds of goods sold prior to the date a reclamation demand is made is beyond the scope of both § 546(c) and Minn.Stat. § 336.2–702(2). *In re Coast Trading Co.,* 744 F.2d at 691; *In re Landy Beef Co., Inc.,* 30 B.R. at 21.

FN15. Minn.Stat. § 336.2–105 defines goods as:

... all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is paid, investment securities (article 8) and things in action. "Goods" also includes the unborn young of animals and growing crops and other identified things attached to realty as described in the section on goods to be severed from realty (section 336.2–107)
...

[12] Furthermore, several courts have held that,

even if a seller makes a timely, written request for reclamation, its rights may be terminated by the debtor's transfer of the goods to a good faith purchaser. *In re Coast Trading Co., Inc.,* 744 F.2d at 691 (finding that a reclaiming seller may not recover the proceeds from the resale of the goods); *In re Samuels & Co., Inc.,* 526 F.2d at 1245 (stating that neither § 2.507 nor § 2.702 grants a seller a right of reclamation to the proceeds of goods); *In re Landy Beef Co.,* 30 B.R. at 20–21; *In re Kentucky Flush Door Corp.,* 28 B.R. 808, 810 (Bankr.W.D.Ky.1983). Here, the parties agree that the cattle was sold and slaughtered prior to the dates the reclamation demands were made. The sellers, therefore, have no right of reclamation to either the cattle or the proceeds generated by the resale to Monfort.

[13] Finally, the defendants cite *Griffin Retreading Co., Inc. v. Oliver Rubber Co. (In re Griffin Retreading Co.),* 795 F.2d 676 (8th Cir.1986), and *In re Landy Beef Co., Inc.,* 30 B.R. 19 (Bankr.D.Mass.1983), for the proposition that, if reclamation is denied a credit seller, the court must grant the seller either **\*1018** an administrative expense or a secured claim. The defendants have misconstrued the holdings in *Griffin* and *Landy Beef.* If a seller has a right of reclamation and the court denies the seller that right, then, and only then, should the court grant that seller a priority or secured claim in lieu of that right. *In re Coast Trading Co., Inc.,* 744 F.2d at 692 (finding that a seller is entitled to an administrative claim only if it were entitled to reclaim the goods and was denied that right by the court); *In re Video King of Illinois, Inc.,* 100 B.R. at 1016. If a seller cannot establish a right of reclamation, it has no right to the priority or secured claim that the statute provides as an alternative to reclamation. The statute itself clearly states that these alternatives are available only when the court denies reclamation to a seller "with such a right of reclamation". 11 U.S.C. § 546(c)(2).

**III. Defendants Zumbrota, Lanesboro, H & L and Kane are not entitled to a statutory trust**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

182 B.R. 1007, 28 UCC Rep.Serv.2d 855
**(Cite as: 182 B.R. 1007)**

pursuant to PASA.

[14] Defendants Zumbrota, Lanesboro, H & L and Kane assert that they are beneficiaries of a trust created pursuant to 7 U.S.C. § 196(b). 7 U.S.C. § 196(b) states in pertinent part:

All livestock purchased by a packer in cash sales, ... shall be held by such packer in trust for the benefit of all unpaid sellers of such livestock until full payment has been received by such unpaid sellers: ... Payment shall not be considered to have been made if the seller receives a payment instrument which is dishonored: Provided, that the unpaid seller shall lose the benefit of such trust if, in the event that a payment instrument has not been received, within thirty days of the final date for making a payment under subsection 228b of this title, or within fifteen business days after the seller has received notice that the payment instrument promptly presented for payment has been dishonored, the seller has not preserved his trust under this subsection. The trust shall be preserved by giving written notice to the packer and by filing such notice with the Secretary.

7 U.S.C. § 196(b). To preserve its rights under this statute, an unpaid seller must give written notice to both the debtor packer and the Secretary of Agriculture within the specified time limits. *In re Gotham Provision Co., Inc.,* 669 F.2d at 1013 (the unambiguous language of the statute states Congress' intent that formal written notice must be filed with the Secretary); *Liberty Mutual Insurance Co. v. Bankers Trust Co.,* 758 F.Supp. 890, 893 (S.D.N.Y.1991) (an unpaid seller will lose the benefits of the trust if it fails to comply with the written notice provisions); *In re G & L Packing Co., Inc.,* 41 B.R. 903, 906 (N.D.N.Y.1984) (unpaid sellers must comply with notice and filing provisions in order to preserve their interests in the trust).

Here, the defendants failed to file the requisite notices to preserve any possible rights they may have had under this statute. Therefore, whether these defendants are intended beneficiaries under this statutory trust provision [FN16] or whether the sales of cattle were indeed cash transactions is immaterial to my determination. The critical fact here is that, regardless of any of these concerns, the defendants' claims pursuant to 7 U.S.C. § 196(b) will always fail because of their noncompliance with its notice requirements.

> FN16. The defendants sold the cattle to Spring Grove which then sold the cattle to Monfort, a packer. One of the issues raised by Ries and Firstar is whether the defendants qualify as sellers of livestock to a packer for purposes of the statute. Spring Grove posted a bond in the amount of $255,000 to cover seller losses pursuant to 7 U.S.C. § 204 which applies to dealers of livestock. This posting of the bond appears to indicate that, prior to these proceedings, the parties all agreed that Spring Grove had purchased the cattle from the defendants as a dealer and that the defendants did not consider themselves protected by the trust provisions intended for sellers of livestock to packers.

### IV. Defendant Minnaert fails to establish an agricultural lien pursuant to Minn.Stat. § 514.945.

[15] Minnaert asserts an agricultural lien pursuant to Minn.Stat. § 514.945 for the contract price of livestock sold by Minnaert to Spring Grove which resold the livestock to Monfort. Minn.Stat. § 514.945 creates a lien *1019 for a perfecting seller of agricultural commodities [FN17] for the contract price of those commodities.

> FN17. Minn.Stat. § 17.90 includes livestock under its definition of "agricultural commodities".

The cattle at issue were never in the state of Minnesota as they were sold and delivered to Spring Grove in Illinois and then shipped to Iowa for slaughter. The agricultural lien intended by Minn.Stat. § 514.945 is an *in rem* remedy only and is inapplicable here, a conclusion that is clearly

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

182 B.R. 1007, 28 UCC Rep.Serv.2d 855
(Cite as: 182 B.R. 1007)

supported by the enforcement provisions of the statute which speak of actions only against property located in Minnesota.[FN18]

FN18. Minn.Stat. § 514.945 subd. 8 states:

An agricultural producer's lien may be brought in district court where the property to which the lien attaches is located or the county where the agricultural commodity was originally delivered....

Furthermore, Minnaert failed to properly perfect any lien it may have held under Minn.Stat. § 514.945. Perfection is defined under Minn.Stat. § 514.945 subd. 2 which states:

An agricultural producer's lien is perfected ... until 20 days after the agricultural commodity is delivered without filing. An agricultural producer's lien may continue to be perfected if a lien statement ... is filed in the appropriate filing office under section 336.9–401 by 20 days after the agricultural commodity is delivered.

Minn.Stat. § 514.945 subd. 2. Minn.Stat. § 336.9–401(1)(a) states:

(1) The proper place to file in order to perfect a security interest is as follows:

(a) when the collateral is ... farm products[FN19] ... [and] the debtor is a corporation, partnership or other organization then in the office of the secretary of state ...

FN19. Minn.Stat. § 336.9–109(3) includes livestock under its definition of "farm products".

Minn.Stat. § 336.9–401(1)(a). Minn.Stat. § 336.9–401(2) makes improperly filed security interests effective against persons who have knowledge of the contents of the financing statements. Here, defendant Minnaert erroneously filed its financing statement with the county recorder in the county where Spring Grove had its principal place

of business rather than with the secretary of state as mandated by the statute. However, subsection (2) is inapplicable here as Minnaert does not contend that Monfort had knowledge of its lien much less the contents of the financing statement.

[16] More importantly, Minnaert ignores the negative effect of 7 U.S.C. § 1631(d) on any lien it may possibly hold. Even if Minnaert had an effective lien on the cattle, 7 U.S.C. § 1631(d) enables a buyer in the ordinary course of business, like Monfort,[FN20] to take the cattle free of any security interests Minnaert may have. Section 1631(d) states:

FN20. 7 U.S.C. § 1631 defines a "buyer in the ordinary course of business" as "a person who, in the ordinary course of business, buys farm products from a person engaged in farming operations who is in the business of selling farm products." Here, there is no contention that Monfort was anything other than a buyer in the ordinary course of business.

Except as provided in subsection (e) of this section and notwithstanding any other provision of Federal, State, or local law, a buyer who in the ordinary course of business buys a farm product from a seller engaged in farming operations shall take free of a security interest created by the seller, even though the security interest is perfected; and the buyer knows of the existence of such interest.

7 U.S.C. § 1631(d).[FN21] Both Monfort's status as a buyer in the ordinary course of business and Minnaert's failure to comply with the notice and filing requirements of both 7 U.S.C. § 1631(e) and (g) and *1020Minn.Stat. § 336.9–401 support Monfort's right to the cattle free of any lien Minnaert may have held.

FN21. Subsections (e) and (g), which are substantively similar, are inapplicable to the facts at hand as it mandates that the secured party must file a financing statement with the secretary of state. FDIC v. Bowles

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

182 B.R. 1007, 28 UCC Rep.Serv.2d 855
**(Cite as: 182 B.R. 1007)**

*Livestock Comm'n Co.,* 739 F.Supp. 1364, 1376 (D.Neb.1990), rev'd on other grounds, 937 F.2d 1350 (8th Cir.1991) (secured party failed to preserve its security interest under 7 U.S.C. § 1631(g) because financing statements were filed with the county clerk rather than the secretary of state); *In re Julien Company,* 141 B.R. 384 (Bankr.W.D.Tenn.1992) (to take advantage of 7 U.S.C. § 1631(e) or (g), the secured party must have filed an effective financing statement with the secretary).

**V. Spring Grove held title to the livestock it purchased from the defendants.**

[17] All of the defendants argue that, for various reasons, title to the cattle at issue never passed from them to Spring Grove. Defendants Zumbrota, Lanesboro, H & L and Kane assert that, as the sales of the cattle were cash transactions and Spring Grove failed to make valid payment, Spring Grove never obtained title. I have previously addressed the issue of the nature of the defendants' sale transactions and found that, even if these transactions were thought by some to be cash sales, the defendants changed the nature of the sales by extending unsecured credit in the form of accepting late payments. Thus, pursuant to Minn.Stat. § 336.2–401(2) [FN22], Spring Grove obtained title to the cattle upon their delivery.

FN22. Minn.Stat. § 336.2–401(2) states:

Unless otherwise explicitly agreed title passes to the buyer at the time and place of delivery at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; ...

Here, these defendants had no agreement with Spring Grove that affects the application of this statute.

[18] Defendants Minnaert and Haas assert a reservation of title [FN23] to the cattle they sold to Spring Grove pursuant to Minn.Stat. § 336.2–401 (1). Minn.Stat. § 336.2–401(1) [FN24] effectively creates a seller's security interest when that seller retains title in goods delivered to a buyer. This article 2 security interest is subject to the provisions of article 9. As Minnaert did not have a retention of title agreement pursuant to Minn.Stat. § 336.2–401 (1), it does not have an article 2 security interest in the cattle. Haas did have a retention of title clause in its sale agreements with Spring Grove and therefore holds an article 2 security interest in the cattle.

FN23. The reservation of title was included in the unsigned sale agreements between Haas and Spring Grove. Ries objects on the basis that Spring Grove never explicitly agreed to these terms and that the reservation of a security interest is inconsistent with the manner in which these parties conducted their business. However, these objections are immaterial to my determination and need not be discussed here.

FN24. Minn.Stat. § 336.2–401(1) states in part:

... Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest. Subject to these provisions and to the provisions of the article on secured transactions (article 9), title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties.

However, Haas failed to perfect its security interest pursuant to the provisions of article 9. As such, it is junior to Firstar's perfected security interest and subject to the trustee's avoidance powers under 11 U.S.C. § 544. Haas cites Minn.Stat. § 336.9–302(1)(f) for the proposition that a financing

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

182 B.R. 1007, 28 UCC Rep.Serv.2d 855
**(Cite as: 182 B.R. 1007)**

statement does not have to be filed to perfect a security interest arising under article 2. This is only partially correct as this statute expressly refers to and incorporates Minn.Stat. § 336.9–113 into its provisions.

[19] Minn.Stat. § 336.9–113 speaks to the enforceability and perfection of article 2 security interests. It states:

A security interest arising solely under the article on sales (article 2) is subject to the provisions of this article except that to the extent that and so long as the debtor does not have or does not lawfully obtain possession of the goods

(a) no security agreement is necessary to make the security interest enforceable; and

(b) no filing is required to perfect the security interest; and

(c) the rights of the secured party on default by the debtor are governed by the article on sales (article 2).

Minn.Stat. § 336.9–113. Thus, Haas can enforce its unperfected article 2 security interest against Firstar and the trustee only if Spring Grove obtained the cattle unlawfully. *In re Dynamic Technologies Corp.,* 106 B.R. at 1005; *In re Microwave Products of America, Inc.,* 94 B.R. at 969–970 (a reservation of **\*1021** title under § 2–401(1) was ineffective as the seller failed to file a financing statement).

Haas offers no evidence to this effect but rather cites *In re Hillcrest Foods, Inc.,* 40 B.R. 360 (Bankr.D.Me.1984) in support of its position. However, Haas's position is very different to that of the seller in *Hillcrest Foods.* There, the carrier wrongfully delivered goods without receiving the bill of lading simultaneously as demanded by the seller. Here, Haas did not make delivery of the cattle conditional upon receiving payment. In fact, Haas, by its own admission, voluntarily and willingly delivered the cattle into Spring Grove's pos-

session [FN25] in exchange for Spring Grove's promise of future payment. Minn.Stat. § 336.9–113 and the case law speak to "unlawful possession" which is simply not the situation here. By accepting Spring Grove's payment several days after delivery without protest and by failing to perfect its security interest, Haas extended unsecured credit to Spring Grove. *In re Samuels and Co., Inc.,* 526 F.2d at 1246 (once a seller has voluntarily surrendered possession to a buyer, the seller's retention of title in the goods is limited in effect to a reservation of a security interest).

> FN25. "Possession" is defined as "having control over a thing with the intent to have and exercise such control." BLACK'S LAW DICTIONARY 1163 (6th ed. 1992).

Haas cites a law review article for the proposition that a seller who is defrauded by a buyer's misrepresentation of solvency is entitled to the benefits of § 9–113. *See* Jackson & Peters, *Quest for Uncertainty: A Proposal for Flexible Resolution of Inherent Conflicts Between Article 2 and Article 9 of the Uniform Commercial Code,* 87 Yale L.J. 907 (1978). Minn.Stat. § 609.535 subd. 2 provides that it is a misdemeanor for a person to issue a check which the issuer intends shall not be paid. Minn.Stat. § 609.535 Subd. 3 and 4 define the requisite intent as proof that, at the time of issuance or presentment, the issuer did not have sufficient funds or credit with the drawee to pay the check and also failed to pay the check after notice of dishonor within a reasonable time. *State v. Roden,* 384 N.W.2d 456, 457 (Minn.1986) (the offense of issuance of a worthless check is proved by showing that the defendant issued a worthless check, intending at the time of issuance that the check not be paid); *State v. Roden,* 380 N.W.2d 520, 524–525 (Minn.Ct.App.1986) (defendant must know or believe that he is not entitled to issue the check and must intend at the time of issuance for the check to never be paid). In this case, the issuance of the checks is really irrelevant. They were all issued *after* delivery of the cattle so even if there was

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

182 B.R. 1007, 28 UCC Rep.Serv.2d 855
**(Cite as: 182 B.R. 1007)**

something unlawful about the issuance of the checks, Spring Grove had already obtained possession of the cattle.

Haas offers no evidence that Spring Grove either misrepresented its solvency or intended, upon issuance of the checks, not to honor them. Haas merely puts forth the argument that 11 U.S.C. § 547 's presumption of insolvency on and during the 90–day period immediately preceding the date of the filing of the petition proves Spring Grove's insolvency at the time of the sales and its intent to dishonor the checks.[FN26] However, the presumption of insolvency is for preference purposes only. 11 U.S.C. § 547(f). Haas also cites no precedence for the proposition that a merchant commits fraud if he accepts delivery of goods from another merchant in the ordinary course of business while insolvent, a common situation, especially when merchants and other businesses file for bankruptcy. Reclamation under 11 U.S.C. § 546(c) remains the exclusive remedy for an unsecured seller like Haas, whose rights under this section have previously been discussed, and any other argument, no matter how couched, still amounts to actions under this section. *In re Dynamic Technologies Corp.,* 106 B.R. at 1005.

> FN26. It is more likely that Spring Grove intended for the checks to be honored.

**VI. Defendants Zumbrota, Lanesboro, H & L and Kane are not entitled to a constructive trust on the proceeds.**

Defendants Zumbrota, Lanesboro, H & L and Kane assert a right to a constructive trust on the proceeds from the cattle held by Montfort. They further contend that there exists genuine issues of material fact that *1022 warrant a trial. I disagree. The facts as claimed by the defendants do not reach the level required to impose a constructive trust under state law. Moreover, even if they did, such a trust would be inconsistent with 11 U.S.C. § 546(c).

**A. Minnesota law does not provide for a constructive trust in this situation.**

[20][21][22][23] Under Minnesota law, an equitable lien is a form of constructive trust. *Fredin v. Farmers State Bank of Mountain Lake,* 384 N.W.2d 532, 535 (Minn.Ct.App.1986). "The imposition of a constructive trust is an equitable remedy which the court has discretion to grant or deny." *In re Dynamic Technologies Corp.,* 106 B.R. at 1007, *citing Thompson v. Nesheim,* 159 N.W.2d 910 (Minn.1968). The imposition of an equitable lien in bankruptcy is good only if it would be sufficient under applicable state law. *Small v. Beverly Bank,* 936 F.2d 945, 949 (7th Cir.1991). Ultimately, "state law must be applied in a manner consistent with federal bankruptcy law." *Torres v. Eastlick ( In re North American Coin & Currency, Ltd.),* 767 F.2d 1573, 1575 (9th Cir.1985).

[24][25] Minnesota law applies a constructive trust in cases of, among others, fraud, taking improper advantage of a confidential or fiduciary relationship, and unjust enrichment, allegations of which are present here. *Thompson v. Nesheim,* 159 N.W.2d at 917. However, although the defendants allege that Firstar and Spring Grove's conduct were fraudulent,[FN27] they present no facts to this effect. Rather, the facts here indicate that no misrepresentations were made by either Firstar or Spring Grove; in fact, Firstar was never a party to any of the transactions between Spring Grove and these defendants. *See Faribo Oil Co. v. Tatge Oil Co., Inc.,* 501 N.W.2d 699 (Minn.Ct.App.1993) (buyer of business could not recover from seller on claim of fraudulent and negligent misrepresentation absent evidence that seller negligently or intentionally misrepresented facts). Secondly, the facts do not indicate that the duties, if any, owed by either Spring Grove or Monfort to these defendants rise to the level of a fiduciary relationship.

> FN27. Under Minnesota law, fraud requires a false representation as to a past or present material fact which is made with the intent to deceive and to induce another person to rely and act upon the misrepresentation to his detriment. *Hanson v. Ford*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

182 B.R. 1007, 28 UCC Rep.Serv.2d 855
**(Cite as: 182 B.R. 1007)**

*Motor Co.,* 278 F.2d 586 (8th Cir.1960).

The defendants' claim that Firstar would be unjustly enriched is also without merit. Firstar, as a priority secured creditor of Spring Grove, stands first in line for the proceeds from the cattle. The defendants had ample opportunity to secure their interests in the cattle but chose not to.[FN28] They cannot now try to rectify their failure to obtain secured status and improve their claims by trying to impose a constructive trust. Here, Spring Grove did not obtain the cattle through fraud but by purchasing it on credit. Like many other debtors in bankruptcy, Spring Grove has merely failed to meet its payment obligations which it incurred through the ordinary course of business, a situation that does not meet the requirements establishing fraud.

> FN28. The defendants could have perfected their security interests by filing a financing statement, taken a purchase money security interest in the cattle, or insisted upon cash upon delivery.

**B. Even if a constructive trust would have been appropriate under Minnesota law, no court imposed such a trust before bankruptcy and it would be inappropriate for a bankruptcy court to do so.**

[26][27] "Unless a court has already impressed a constructive trust upon certain assets ... the claimant cannot properly represent to the bankruptcy court that he was, at the time of the commencement of the case, a beneficiary of a constructive trust held by the debtor." *XL/Datacomp, Inc. v. Wilson ( In re Omegas Group, Inc.),* 16 F.3d 1443, 1449 (6th Cir.1994). No court imposed a constructive trust before these cases were filed.

Furthermore, the imposition of a constructive trust is inconsistent with the Bankruptcy Code's detailed treatment of creditors and it would be extremely inappropriate for a bankruptcy**\*1023** court to impose a constructive trust.[FN29] *In re Omegas Group, Inc.,* 16 F.3d at 1453 (constructive trusts are "anathema to the equities of bankruptcy since they

take from the estate, and thus directly from competing creditors, not from the offending debtor"); *Small v. Beverly Bank,* 936 F.2d at 949 (under the Act, "equitable liens were 'declared to be contrary to the policy' of bankruptcy law"), *citing Matter of Einoder,* 55 B.R. 319, 328 (Bankr.N.D.Ill.1985); *Oxford Organisation, Ltd. v. Peterson ( In re Stotler and Co.),* 144 B.R. 385, 388 (N.D.Ill.1992) (imposing a constructive trust "clearly thwarts the policy of ratable distribution and should not be impressed cavalierly"); *Bast v. Johnson (In re Johnson),* 174 B.R. 537, 542 (Bankr.W.D.Mo.1994) (allowing a particular creditor to recover under a constructive trust theory enables that creditor to "lop off a piece of the estate" and circumvents completely the Bankruptcy Code's system of distribution); *Shubert v. Jeter (In re Jeter),* 171 B.R. 1015, 1022 (Bankr.W.D.Mo.1994) (imposing a constructive trust in favor of a creditor who is "speediest" or best able to afford the expense of litigation undermines the Bankruptcy Code's policy of pro rata distribution). By seeking a constructive trust here, these defendants are attempting to recover through a back door what they cannot recover directly. *In re Jeter,* 171 B.R. at 1022.

> FN29. The Eighth Circuit has imposed constructive trusts under totally different circumstances. *See, e.g., Chiu v. Wong,* 16 F.3d 306 (8th Cir.1994); *Abramowitz v. Palmer,* 999 F.2d 1274 (8th Cir.1993). However, these decisions are not inconsistent with the principle that constructive trusts conflict with the Bankruptcy Code's policy of pro rata distribution. Both Eighth Circuit cases involved creditors who had asserted ownership interests in exempt properties not property of the estate. Thus, the constructive trusts were imposed on the debtors' properties and were not detrimental to the estates' creditors. Both these cases concerned misappropriated funds which were invested by the debtors in exempt homestead properties in attempts to hide the funds from creditors to whom the funds

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

182 B.R. 1007, 28 UCC Rep.Serv.2d 855
**(Cite as: 182 B.R. 1007)**

legally belonged. There was never an extension of credit or any other type of voluntary creditor-debtor relationship. As such, these cases are easily distinguishable from the case at hand. Here, the funds at issue are property of the estate and the creditors have no ownership interest in the assets. To impose a constructive trust under these circumstances would be to prefer particular creditors over the rest of the estate's creditors.

Moreover, the fact that the defendants' loss resulted in part from their own failure to utilize other law which would have enabled them to perfect their security interests mitigates against the imposition of a constructive trust. *In the Matter of Samuels & Co., Inc.,* 526 F.2d at 1248. Finally, equity would not be achieved here by imposing a constructive trust as doing so would result in these creditors being favored over the debtor's other unsecured creditors similarly situated. *In re Omegas Group, Inc.,* 16 F.3d at 1451–1453; *In re Dynamic Technologies Corp.,* 106 B.R. at 1007.

**CONCLUSION**

The claims pursuant to 11 U.S.C. § 546(c) asserted by defendants Zumbrota, Lanesboro, Kane, H & L, Minnaert and Haas fail as these defendants have not established the elements of reclamation required under either 11 U.S.C. § 546(c), Minn.Stat. § 336.2–507 or Minn.Stat. § 336.2–702. Furthermore, none of these defendants have valid secured claims against the cattle or the proceeds resulting from the resale of the cattle. Rather, these defendants hold general unsecured claims. Defendants Zumbrota, Lanesboro, Kane and H & L are not beneficiaries of either a statutory trust pursuant to 7 U.S.C. § 196(b) or a constructive trust under Minnesota law. Defendant Minnaert is not entitled to an agricultural lien pursuant to Minn.Stat. § 514.945 as it does not apply to transactions outside of Minnesota, he failed to comply with the perfection requirements of the statute and Monfort purchased the cattle free of any possible lien Minnaert may

have had. Spring Grove acquired title to the cattle at issue, which it obtained by possession under Minn.Stat. § 336.2–401(2). Trustee Ries is entitled to the interpled funds subject to Firstar's security interest.

THEREFORE, IT IS ORDERED THAT:

1. Firstar Bank Milwaukee, N.A.'s motion for summary judgment is granted.[FN30]

> FN30. As there are still claims outstanding, no judgment will actually be entered at this time. FED.R.CIV.P. 54(b) and FED.R.BANKR.P. 7054(a).

**\*1024** 2. Charles W. Ries' motion for summary judgment is granted.

3. Defendants Zumbrota Livestock Auction Market, Inc., Kane Livestock Sales, Inc., Lanesboro Sales Co., Inc., H & L Cattle Co., Inc., Lanny Minnaert, Haas Livestock, Fuchs Livestock and Equity Cooperative Livestock Sales have no interest in the interpled funds.

Bkrtcy.D.Minn.,1995.
In re Morken
182 B.R. 1007, 28 UCC Rep.Serv.2d 855

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.