UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| IN RE: | : | CASE NO. 10-93904-BHL-11 |
| EASTERN LIVESTOCK CO., LLC, | : | (Judge Basil H. Lorch III) |
| Debtor. | : | |
| | : | **OBJECTION TO PROFESSIONALS' APPLICATIONS FOR COMPENSATION AND** |
| | : | **REIMBURSEMENT OF EXPENSES** |
| | : | |

_____

This Court should deny the Professionals' Fee Applications (as defined below) – or defer ruling until the objections can be addressed fully – because the Trustee's Special Counsel Hoover Hull has investigated inadequately the conduct of the largest creditor in this bankruptcy proceeding – Fifth Third Bank.  Moreover, the Trustee's primary counsel has repeatedly overstepped its role and filed briefs in response to Fifth Third and taken legal positions favorable to Fifth Third, which the Trustee previously stated would be reserved to Hoover Hull.  The First Bank and Trust Company ("First Bank"), by counsel, objects to the following:  (1) Second Interim Application of James A. Knauer for Compensation and Reimbursement of Expenses as Chapter 11 Trustee [Dkt. 816]; (2) First Interim Application of Hoover Hull LLP for Compensation and Reimbursement of Expenses as Special Counsel for James A. Knauer, Chapter 11 Trustee [Dkt. 819] ("Hoover Hull Application"); and (3) Second Interim Application of Baker & Daniels LLP for Compensation and Reimbursement of Expenses as Counsel for James A. Knauer, Chapter 11 Trustee [Dkt. 820] (collectively, "Professionals' Fee Applications").  In support of this Objection, First Bank further states as follows:

I.          INTRODUCTION

This Bankruptcy Estate was commenced through an Involuntary Petition after the primary lender, Fifth Third Bank, dishonored millions of dollars of checks with full knowledge that Eastern Livestock bought and re-sold millions of dollars of cattle on a daily basis. It then filed an ex parte state court receivership. At the same time Fifth Third unleashed Eastern Livestock on the cattle industry with a worthless checkbook, it collected another $24.5 million for cattle Eastern Livestock resold in the industry and positioned itself to assert a first-priority security interest in the cattle Eastern Livestock purchased from the innocent dupes who held Fifth Third commercial paper. While these actions on the part of Fifth Third obviously operated to the benefit of Fifth Third and to the detriment of third parties doing business with the Debtor; such actions standing solely alone *may* not constitute the kind of inequitable conduct that would give rise to a claim for equitable subordination. It remains completely unknown, however, whether Fifth Third engaged in any additional conduct in conjunction with the above actions that would form a basis for an equitable subordination claim.[1] To date, however, after this Estate has accrued almost $4 million in professional fees, no one has conducted any investigation of the actions of Fifth Third to determine whether, and to what extent, it played any role in this collapse that may expose it to preference claims, equitable subordination or tort claims.

The Trustee promised such an investigation to all his other constituents, then terminated it, before it began, in April, 2011, for his own, undisclosed reasons. Nonetheless, the

---

[1] First Bank sought general discovery in the State Court action that Fifth Third filed relating to the conduct of Fifth Third leading to its actions thrice extending the Eastern Livestock credit facility even after conducting an investigation into potential check kiting. Fifth Third delayed its response under a promise counsel was "working on" responses. But, counsel then responded with absolutely no evidence and a blanket of objections that the discovery was "irrelevant." Then, when First Bank moved to compel responses, Fifth Third successfully moved to "stay" the action and directed First Bank to obtain the discovery as part of the bankruptcy. Thus, after one year, it has successfully evaded any factual inquiry into its conduct.

Trustee, through his primary counsel who conceded a conflict of interest with Fifth Third before retention, has repeatedly taken actions that can only "benefit" Fifth Third and "cost" the remaining creditors.  It was not until the instant flurry of year-end fee applications that any of the remaining creditors first learned that the Trustee abandoned the role of Special Counsel several months ago.  First Bank forecast this unfortunate scenario when it objected to the retention of primary counsel who had turned down the representation of First Bank due to its loyalty to Fifth Third; but First Bank was misled into withdrawing the objection under the representations that Special Counsel would serve the role of watchdog over the conflicts – a representation these fee applications prove has never been fulfilled.  Moreover, as set forth herein, not only did the Trustee terminate the investigation, but the Trustee's primary counsel, apparently without any input from Special Counsel, has filed responses in this Case that may serve to undermine Special Counsel's ability to assert the very claims it was employed to investigate.

Before the Court can scrutinize these actions, and the improper handling of primary counsel's conflict with Fifth Third, the Court must uphold the integrity the bankruptcy process and deny the applications in their entirety.  "The Bankruptcy Code forbids reimbursing trustees for expenses incurred in actions not 'reasonably likely to benefit the debtor's estate,' 11 U.S.C. § 330(a)(4)(A)(ii)(I) . . . . . Not 'reasonably likely to benefit the debtor's estate' may well be a correct description of this suit."  Maxwell v. KPMG LLP, 520 F.3d 713, 718 (7th Cir. 2008).  The services provided by professionals must be "actual and necessary" to the estate and can only be awarded up to the value such services provided to the estate.  Matter of Taxman Clothing Company, 49 F.3d 310, 314 (7th Cir. 1995).

3

II.        BACKGROUND OF THE CONFLICT AND RETENTION OF SPECIAL COUNSEL

On December 30, 2010, Trustee James A. Knauer ("Trustee") filed an application to employ Baker & Daniels LLP as Trustee's counsel [Dkt. 113].  On January 10, 2011, First Bank objected to the Trustee's application due to questions as to whether Baker & Daniels was disinterested within the meaning of Bankruptcy Code § 327(a) because of the relationship between Fifth Third Bank and Baker & Daniels LLP [Dkt. 181].  As noted in that filing, the fundamental precept for the objection was the fact that Baker & Daniels turned down a request by First Bank to serve as its counsel due to a conflict with the firm's representation of Fifth Third.  The objection was rather straightforward:  if Baker & Daniels had a significant enough conflict to reject the representation of First Bank, then how could that conflict free the firm from the high standard of "disinterestedness" under the bankruptcy rules?[2]

The Trustee thereafter filed an application to hire Hoover Hull as special counsel on January 18, 2011 [Dkt. 219]. And, Baker & Daniels filed on January 24, 2011, an amended

---

[2] A "disinterested person" is defined, in relevant part, as one who "does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest, in the debtor, or . . . for any other reason."  11 U.S.C. § 101(14).  This definition of "disinterested person" is "sufficiently broad to include any professional with an 'interest or relationship that would even faintly color the independence and impartial attitude required by the Code.'" Kravit, Gass & Weber, S.C. v. Michel (In re Crivello), 134 F.3d 831, 835 (7th Cir. 1998) (citations omitted).  In addition to the requirement of disinterestedness, a trustee's employment of a professional requires that the professional "not hold or represent an interest adverse to the estate."  11 U.S.C. § 327(a).  This phrase may include an instance where a professional "possess[es] a predisposition under circumstances that render such a bias against the estate." Crivello, 134 F.3d at 835 (citation omitted).

"Together, the statutory requirements of disinterestedness and no interest adverse to the estate 'serve the important policy of ensuring that all professionals appointed pursuant to section 327(a) tender undivided loyalty and provide untainted advice and assistance in furtherance of their fiduciary responsibilities." Id. at 836 (quoting Rome v. Braunstein, 19 F.3d 54, 58 (1st Cir. 1994)).

Although disqualification may not be appropriate if a conflict is solely due to the professional's prior representation of a creditor, a creditor's "deep involvement in [a] case" and a law firm's "dependence on [that creditor's] present and future law business" could involve a conflict that is not exempted under 11 U.S.C. 327(c). In re Am. Printers & Lithographers, Inc., 148 B.R. 862 , 867 (Bankr. N.D. Ill. 1992).

4

affidavit with additional disclosures in support of the application to hire Baker & Daniels LLP [Dkt. 235]. On January 27, 2011, First Bank withdrew its objection to the Trustee's application to employ Baker & Daniels **"[i]n reliance upon the amended affidavit and the retention of Hoover Hull as special counsel."** The First Bank and Trust Company's Withdrawal of Objection to Employment of Baker & Daniels LLP as Counsel to Chapter 11 Trustee [Dkt. 241] (emphasis added).

In his application to employ Hoover Hull, upon which First Bank expressly relied, the Trustee stated, "Hoover Hull's primary role as special counsel to the Trustee will be to investigate and prosecute claims and objections against Fifth Third <u>or claims asserted by Fifth Third in this case</u>." Paragraph 3 [Dkt. 219] (emphasis added). In addition, the Trustee explained that Hoover Hull would "serve as Trustee's special counsel with respect to the investigation and prosecution of any and all claims or objections that may be asserted by the Trustee against Fifth Third, N.A. . . . or with respect to any claim that may be asserted herein by Fifth Third." Id. (introductory paragraph).

III.     THE INSTANT FEE APPLICATIONS DEMONSTRATE THAT HOOVER HULL HAS SERVED NO ROLE TO THE ESTATE

The instant fee applications demonstrate that from the outset of these proceedings, Special Counsel has been relegated to the role of passive observer. Specifically, on February 11, 2011, the Trustee filed his Motion to Approve Trustee's Borrowing and Use of Cash Collateral, Modify the Automatic Stay, Provide Adequate Protection Payments, Protect Confidential Information and Schedule Final Hearing ("Financing Motion") [Dkt. 271], which sought not only to establish Fifth Third Bank as a fully secured priority creditor, but also to grant Fifth Third, extraordinary "super-priority administrative expense claim, and valid, binding, enforceable and

5

first perfected liens and security interests given and granted to Fifth Third in and against the Chapter 5 Actions and shall be repayable from the first recoveries from the Chapter 5 Actions." Financing Motion, p. 5.  At that time, however, the Special Counsel watchdog had billed only 15.9 hours over four days essentially doing nothing more than confirming that Fifth Third had properly filled out its UCC financing statements.  Several objectors, including First Bank, asked the Court to put the brakes on such a runaway train and to preserve, at the very least, the ability to examine preferences and equitable subordination as to Fifth Third.  At the March 11, 2011 hearing on the Trustee's motion, this Court asked the essential question that, after one year of proceedings, has now proven to answer itself:

> THE COURT:  Which brings us to the fundamental question in this case that this motion I think poses.  Are we just – are we administering this case for the benefit of Fifth Third?
>
> MR. CARR: No.
>
> MR. ROGERS: Yes.
>
> MR. CARR:  No, we're not.  No, you're – you want me to answer or do you want Mr. Rogers to answer?
>
> THE COURT:  I want you to answer first.[3]

This exchange even prompted the Court to urge primary counsel to remove his "agreeable-with-the-bank hat"[4] and to urge the parties to negotiate a resolution.  The parties then carefully crafted an agreed order that would limit the allowance of the Fifth Third claim and preserve rights after a full investigation of the Bank's conduct.  But, little did the constituent creditors know, what the Court properly forecast was precisely what would continue for the next several months.  Despite

---

[3] March 11, 2011 Transcript of Proceedings, p. 57.

[4] March 11, 2011 Transcript of Proceedings, pp 58-59.

6

millions in professional fees, we are "administering this case for the benefit of Fifth Third" through virtually every course and action.

At the time of the March 11 hearing, the Trustee's constituent creditors had every reason to believe that Special Counsel would be proceeding with a diligent and robust investigation of Fifth Third.  Such was not the case.  Just 48 days after the hearing, Hoover Hull, presumptively at the direction of the Trustee, ceased ALL ACTIVITY in the engagement. Exhibit A to Hoover Hull Application [Dkt. 819-1].  Quite simply, the Trustee and Hoover Hull have not adequately investigated the conduct of Fifth Third.  At the same time, Baker & Daniels has overstepped its role by repeatedly engaging in conduct and taking legal positions on behalf of the Trustee that were properly reserved for Hoover Hull.  Despite the Trustee's representations in the request to retain Hoover Hull, the Trustee has stated that he has never requested Hoover Hull to weigh in on any of the positions he has taken that could benefit "claims asserted by Fifth Third in this case."

IV.     UPON SHUTTING DOWN THE INVESTIGATION OF FIFTH THIRD, THE TRUSTEE'S ACTIONS CONTINUALLY DEMONSTRATE WE ARE "ADMINISTERING THIS CASE FOR THE BENEFIT OF FIFTH THIRD"

While the constituent creditors remained unaware the investigation had been shut down, Baker & Daniels continued to assert positions on behalf of the Trustee essentially disregarding the reservations against Fifth Third in the Financing Order and the Trustee actively led the creditor constituents to believe a full investigation was ongoing.

First, despite the lack of a determination that Fifth Third is fully secured and highest priority, and despite the constituent creditors believing this issue was still under investigation, on May 23, 2011, the Trustee filed the Trustee's Purchase Money Claims Report,

7

Motion to Transfer Funds and Notice of Release of Proceeds from Account [Dkt. 501] ("Purchase Money Claims Report") asserting that Fifth Third's security and priority position had been resolved:

> "After review of the timely filed 'Purchase Money Claims' and legal and factual research conducted regarding such claims, the Trustee has concluded that no person other than Fifth Third can assert a valid perfected lien in or to the Cattle Sales Proceeds . . . ." Purchase Money Claims Report, pp. 1-2.
>
> "Since entry of the Cattle Payments Order, the Trustee has further researched the facts relating to Debtor's business operations, applicable state law and the PSA and determined that the only Third Party that holds a valid lien in or claim against the Cattle Sales Proceeds is Fifth Third. Other than Fifth Third, no Third Party can assert a valid perfected lien in or to the Cattle Sales Proceeds." Purchase Money Claims Report, p. 3.
>
> "The Cattle Sales Proceeds to be transferred to the Trustee's general operating account represent funds as to which no third party other than Fifth Third can assert a valid lien or claim." Purchase Money Claims Report, p. 6.

Of course, it goes without saying that if no party has priority over the lien of Fifth Third, then that lien must be senior and not subject to any subordination. But, Special Counsel had no role in the motion and, in fact, it had ceased all investigatory work to even assist the Trustee in reaching such a conclusion.

Second, on August 3, 2011, the Trustee voluntarily appeared at the annual meeting of the National Cattlemen's Beef Association and made a presentation to a large number of creditor constituents in attendance. Curiously, although Special Counsel was doing absolutely nothing to investigate Fifth Third or to advise the Trustee with respect to Fifth Third's claims, the Trustee included the following bullet point slide as part of his presentation:

8

## The Bank

- Why aren't you suing the bank?
- Fifth Third Bank is owed $32 million
- Lien on most ELC assets
  - Vaildity of 5/3 lien
- Claims against 5/3
  - Independent counsel – their sole job
- Negotiations with 5/3

Certainly, the creditor constituents in attendance had every reason to believe something was still active for the "sole job" of "independent counsel."  Moreover, since we now know that Special Counsel had done absolutely nothing in the 100 days prior to this presentation, who precisely was advising the Trustee on the "validity of 5/3 lien" and conducting "negotiations with 5/3" when primary counsel had an admitted conflict of interest raised unanswered, and troubling, questions.

      Most recently, and perhaps most egregiously, on November 21, 2011, Baker & Daniels – not Hoover Hull – drafted and filed the Trustee's Reply to Fifth Third Bank's Counterclaim in the Superior Livestock Adversary Proceeding (No. 11-59088) [Dkt. 97], despite the Trustee's statement that Hoover Hull would handle "any claim" asserted by Fifth Third.  Fifth

Third alleged in Paragraph 13 of its counterclaim that "Fifth Third possesses a first priority blanket security interest and lien against all the personal property of ELC, including, without limitation, all of the Eastern Livestock Contracts, Cattle, Lots, Cattle Proceeds and Part Payments that are claimed in this adversary proceeding."  In response, the Trustee stated (in a pleading prepared by Baker & Daniels, not Hoover Hull) that "The Trustee admits the allegations contained in Paragraph 13 of the Counterclaim." Such an admission goes far beyond the vigorously negotiated Financing Order which merely "allowed" Fifth Third's claim with a full reservation of all rights to contest priority, equitable subordination, and other remedies.  Moreover, unless and until this improper Answer is stricken from the record, there is a possibility the Trustee could have waived the very claims that his Special Counsel was allegedly to investigate.

In addition, as set forth in the Objection to First Interim Fee Application of Hoover Hull LLP [Dkt. 857], the allegations of which are expressly incorporated by reference herein, Hoover Hull's investigation of Fifth Third has been limited and was ostensibly on at least a four-month hiatus, as no time was billed between April 28, 2011 and August 31, 2011.  Hoover Hull's fee application, however, shows no entries that suggest any fact investigation of Fifth Third had been completed.  Only recently has Hoover Hull taken any action to investigate Fifth Third, when it served limited discovery requests on Fifth Third on or about November 4, 2011.  Regardless of the reason for renewing some appearance of investigation, such actions are too little and too late as the course of conduct over the broad span of 2011 has set in motion procedures designed to benefit Fifth Third – including the sharp tactics of making admissions in the pleadings which should be stricken – and counsel and the Trustee have consistently failed to

10

live up to the promises "in reliance upon" which First Bank withdrew its objection to the retention of Baker & Daniels.

First Bank reserves its right to renew its objection to the Trustee's employment of Baker & Daniels. First Bank further reserves its right to modify or withdraw this Objection to Professionals' Fee Applications after appropriate discovery has been completed.

WHEREFORE, First Bank requests that this Court deny the Professionals' Fee Applications or delay consideration of the Professionals' Fee Applications until a more detailed investigation of Fifth Third Bank can be completed.

Respectfully submitted,

/s/ Daniel J. Donnellon
Daniel J. Donnellon (pro hac vice)
Stephen A. Weigand (pro hac vice)
FARUKI IRELAND & COX P.L.L.
201 East Fifth Street, Suite 1420
Cincinnati, OH 45202
Telephone: (513) 632-0300
Telecopier: (513) 632-0319
Email: ddonnellon@ficlaw.com
sweigand@ficlaw.com

Attorneys for The First Bank and Trust Company

11

## **CERTIFICATE OF SERVICE**

I certify that on the 7th day of December, 2011, I electronically filed the foregoing Objection to Professionals' Applications for Compensation and Reimbursement of Expenses with the Clerk of Courts using the CM/ECF system, which will send notification of such filing to CM/ECF participants:

| | | |
|---|---|---|
| David L. Abt<br>davidabt@mwt.net | Robert Hughes Foree<br>robertforee@bellsouth.net | Jessica E. Yates<br>jyates@swlaw.com |
| C.R. Bowles, Jr<br>crb@gdm.com | Kim Martin Lewis<br>kim.lewis@dinslaw.com | John Huffaker<br>john.huffaker@sprouselaw.com |
| John Hunt Lovell<br>john@lovell-law.net | Jeremy S Rogers<br>Jeremy.Rogers@dinslaw.com | Matthew J. Ochs<br>matt.ochs@moyewhite.com |
| Mark A. Robinson<br>mrobinson@vhrlaw.com | Ivana B. Shallcross<br>ibs@gdm.com | Laura Day Delcotto<br>ldelcotto@dlgfirm.com |
| Jeffrey R Erler<br>jeffe@bellnunnally.com | Deborah Caruso<br>decaruso@daleek.com | Kelly Greene McConnell<br>lisahughes@givenspursley.com |
| Edward M King<br>tking@fbtlaw.com | Meredith R. Thomas<br>mthomas@daleeke.com | T. Kent Barber<br>kbarber@dlgfirm.com |
| Randall D. LaTour<br>rdlatour@vorys.com | William Robert Meyer, II<br>rmeyer@stites.com | Ross A. Plourde<br>ross.plourde@mcafeetaft.com |
| John R. Carr, III<br>jrciii@acs-law.com | Allen Morris<br>amorris@stites.com | Walter Scott Newbern<br>wsnewbern@msn.com |
| James M. Carr<br>jim.carr@bakerd.com | Charles R. Warton<br>Charles.R.Wharton@usdoj.gov | Kirk Crutcher<br>kcrutcher@mcs-law.com |
| Robert K. Stanley<br>robert.stanley@bakerd.com | James Bryan Johnston<br>bjtexas59@hotmail.com | Todd J. Johnston<br>tjohnston@mcjllp.com |
| Terry E. Hall<br>terry.hall@bakerd.com | James T. Young<br>james@rubin-levin.net | Timothy T. Pridmore<br>tpridmore@mcjllp.com |
| Dustin R. DeNeal<br>dustin.deneal@bakerd.com | David L. LeBas<br>dlebas@namanhowell.com | Theodore A Konstantinopoulos<br>ndohbky@jbandr.com |
| John Frederick Massouh<br>john.massouh@sprouselaw.com | Judy Hamilton Morse<br>judy.morese@crowedunlevy.com | Karen L. Lobring<br>lobring@msn.com |
| John W. Ames<br>jwa@gdm.com | John M. Thompson<br>john.thompson@crowedunlevy.com | Sandra D. Freeburger<br>sfreeburger@dsf-atty.com |

Lisa Kock Bryant
courtmail@fbhlaw.net

Elliott D. Levin
robin@rubin-levin.net
edl@trustesoultions.com

John M. Rogers
johnr@rubin-levin.net

John David Hoover
jdhoover@hovverhull.com

Sean T. White
swhite@hooverhull.com

Robert H. Foree
robertforee@bellsouth.net

Sarah Stites Fanzini
sfanzini@hopperblackwell.com

Michael W. McClain
mike@kentuckytrial.com

William E Smith
wsmith@k-glaw.com

Susan K. Roberts
skr@stuartlaw.com

James Edwin McGhee
mcghee@derbycitylaw.com

Thomas C Schere
tscherer@binghammchale.com

David A. Laird
david.laird@moyewhite.com

Jerald I. Ancel
jancel@taftlaw.com

Jeffrey J. Graham
jgraham@taftlaw.com

Trevor L. Earl
tearl@rwsvlaw.com

David Alan Domina
dad@dominalaw.com

Kent A Britt
kabritt@vorys.com

Joshua N. Stine
jnstine@vorys.com

Jill Zengler Julian
Jill.Julian@usdoj.gov

Jeffrey L. Hunter
jeff.hunter@usdoj.gov

Amelia Martin Adams
aadams@gldfirm.com

Michael Wayne Oyler
moyler@rwsvlaw.com

Jason W. Cottrell
jwc@stuartlaw.com

Robert A. Bell
rabell@vorys.com

/s/ Daniel J. Donnellon
Daniel J. Donnellon

577690.4