## UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF INDIANA - NEW ALBANY

```
============================
IN THE MATTER OF:             .   Case #10-93904-BHL-11
                              .
EASTERN LIVESTOCK CO., LLC    .   New Albany, Indiana
                              .   December 14, 2011
                     Debtor   .   10:10:58 a.m.
============================
```

### TRANSCRIPT OF TELEPHONIC HEARINGS RE:
### CONTINUED TELEPHONIC HEARING ON:
**(#317) FINAL HEARING RE: MOTION TO ABANDON, CORRECTED MOTION FOR RELIEF FRO STAY, FILED BY CREDITOR PEOPLES BANK & TRUST COMPANY OF PICKETT COUNTY; (#867) TRUSTEE'S SUPPLEMENTAL OBJECTION TO CORRECTED MOTION TO ABANDON, CORRECTED MOTION FOR RELIEF FROM STAY;**
### FEE APPLICATIONS:
**(#816) TRUSTEE JAMES KNAUER'S APPLICATION FOR COMPENSATION AND/OR REIMBURSEMENT OF EXPENSES PURSUANT TO §330;**
**(#905) OBJECTIONS BY VARIOUS CREDITORS;**
**(#857) FIRST INTERIM APPLICATION OF HOOVER HULL, LLC FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE, JAMES KNAUER;**
**(#895) OBJECTIONS BY VARIOUS CREDITORS;**
**(#820) APPLICATION FOR COMPENSATION AND/OR REIMBURSEMENT OF EXPENSES FOR JAMES CARR, TRUSTEE'S COUNSEL, PURSUANT TO §330;**
**(#896, #903, #904) OBJECTIONS BY VARIOUS CREDITORS;**
**----------continued---------->**
### BEFORE THE HONORABLE BASIL H. LORCH, III, J.U.S.B.C.

**APPEARANCES: (See Next Page)**

Electronic Sound Recording Operator:      Amy Bruckert

Proceedings Recorded by FTR Gold Digital Sound Recording
Transcript Produced by Certified Transcription Service

# GCI TRANSCRIPTION SERVICES
**210 Bayberry Avenue**
**Egg Harbor Township, NJ 08234-5901**
**1-609-927-0299      FAX 1-609-927-9768      1-800-471-0299**
**e-mail - irwingloria@comcast.net**

Page 2 Cover
#10-93904
12-14-2011

**CAPTION - CONTINUED**

**(#821) APPLICATION FOR COMPENSATION AND/OR REIMBURSEMENT OF EXPENSES FOR DEVELOPMENT SPECIALISTS, INC. CONSULTANT, FILED BY CHAPTER 11 TRUSTEE JAMES KNAUER, PURSUANT TO §330;**
**(#828) MOTION TO APPROVE AN INFORMAL AD HOC COMMITTEE;**
**(#879) OBJECTION BY U.S. TRUSTEE;**
**(#865) TRUSTEE'S MOTION TO COMPROMISE ND SETTLE UNDER FRBP 9019 MOTION TO APPROVE SALE AGREEMENT AND COMPROMISE OF CLAIMS CONCERNING CATTLEMEN'S FEED LOT, LTD.;**
**(#871) TRUSTEE'S  MOTION FOR JOINT ADMINISTRATION OF CASES #10-93904 AND #11-93144;**
**(#887) MOTION IN LIMINE WITH RESPECT TO PROPOSED TESTIMONY OF PATRICK O'MALLEY, FILED BY CREDITOR PEOPLES BANK AND TRUST CO. OF PICKETT COUNTY; (#893) RESPONSE IN OPPOSITION, FILED BY TRUSTEE; CONTINUED ORAL ARGUMENT RE: TRUSTEE'S PURCHASE MONEY CLAIMS REPORT/ DISPOSITIVE MOTION (CONSTRUCTIVE TRUST; CONTINUED ORAL ARGUMENT RE: TRUSTEE'S PURCHASE MONEY CLAIMS REPORT/KREMLIN ISSUE**
**BEFORE THE HONORABLE BASIL H.  LORCH, III, J.U.S.B.C.**

**APPEARANCES:**

For Chapter 11 Trustee, James Knauer:        TERRY E. HALL, ESQ.
        KEVIN TONER, ESQ.
        HARMONY MAPPES, ESQ.
        DUSTIN R. DENEAL, ESQ. *(Via phone)*
        Baker & Daniels
        300 N. Meridian Street   Suite 2700
        Indianapolis, IN 46204
        ---------continued--------->

Electronic Sound Recording Operator:   Amy Bruckert

Proceedings Recorded by FTR Gold Digital Recording
Transcript Produced by Certified Transcription Service

GCI TRANSCRIPTION SERVICES
**210 Bayberry Avenue**
**Egg Harbor Township, NJ  08234-5901**
**1-609-927-0299      FAX 1-609-927-9768      1-800-471-0299**
**e-mail - irwingloria@comcast.net**

Page 3 Cover
#10-93904
12-14-2011

**APPEARANCES: (continued)**

| | |
|---|---|
| Chapter 11 Trustee: | JAMES A. KNAUER, ESQ. |
| | Kroger Gardis & Regas, LLP |
| | 111 Monument Circle   Suite 900 |
| | Indianapolis, IN   46204 |
| | |
| For Fifth Third Bank: | RANDALL D. LaTOUR, ESQ. |
| | MELISSA GIBERSON, ESQ. |
| | EDWARD M. KING, ESQ. |
| | Vorys, Sater, Seymour & Pease, LLP |
| | 52 East Gay Street |
| | Columbus, OH   43216 |
| | |
| For J&F Oklahoma Holdings, Inc. | DAVID L. LeBAS, ESQ. |
| | Namen, Howell, Smith & Lee, PLLC |
| | Suite 490 |
| | 8310 N. Capital of Texas Highway |
| | Austin, TX    78731 |
| | |
| For First Bank & Trust Company: | DANIEL J. DONNELLON, ESQ. |
| | Faruki, Ireland & Cox, PLL |
| | 201 East Fifth Street   Suite 1420 |
| | Cincinnati, OH 45202 |
| | |
| For Superior Livestock Auction and | JOHN M. ROGERS, ESQ. |
| Joplin Regional Stockyards: | ELLIOTT D. LEVIN, ESQ. |
| | Rubin & Levin, P.C. |
| | 342 Massachusetts Avenue |
| | Indianapolis, IN 46204-2161 |

----------continued--------->

Electronic Sound Recording Operator:   Amy Bruckert

Proceedings Recorded by FTR Gold Digital Recording
Transcript Produced by Certified Transcription Service

GCI TRANSCRIPTION SERVICES
210 Bayberry Avenue
Egg Harbor Township, NJ  08234-5901
1-609-927-0299      FAX 1-609-927-9768      1-800-471-0299
e-mail - irwingloria@comcast.net

Page 4 Cover
#10-93904
12-14-2011

**APPEARANCES - Continued**

For Superior Livestock Auction and          JOHN W. AMES, ESQ.
Joplin Regional:                            C.R. "CHIP" BOWLES, ESQ.
                                            CHRISTIE A. MOORE, ESQ.
                                            Greenebaum, Doll & McDonald,  PLLC
                                            3500 National City Tower
                                            101 S. 5th Street
                                            Louisville, KY  40202


For the U.S. Trustee:                       CHARLES R. WHARTON, AUST
                                            Office of the U.S. Trustee
                                            101 West Ohio Street,   Suite 1000
                                            Indianapolis, IN  46204


For Friona Industries, LP, and Cattlemen's:  JOHN F. MASSOUH, ESQ.
Feedlot, Limited:                            JOHN HUFFAKER, ESQ. *(Via phone)*
                                             Sprouse Shrader Smith, P.C.
                                             701 S. Taylor, Suite 500
                                             Amarillo, TX 79101


For Florida Livestock Markets and           W. SCOTT NEWBERN, ESQ.
Creditors:                                  2982 E. Giverny
                                            Tallahassee, FL 32309


For Blue Grass Stockyards, Alton Darnell,   LAURA DAY DELCOTTO, ESQ.
East Tennessee Livestock, Moseley Cattle    AMELIA MARTIN ADAMS, ESQ. *(Ph.)*
Auction, Piedmont Livestock, and Southeast  DelCotto Law Group, PLLC
Livestock:                                  200 North Upper Street
                                            Lexington, KY    40507
                                                 ------continued----------->


Electronic Sound Recording Operator:   Amy Bruckert

Proceedings Recorded by FTR Gold Digital Recording
Transcript Produced by Certified Transcription Service

GCI TRANSCRIPTION SERVICES
**210 Bayberry Avenue**
**Egg Harbor Township, NJ  08234-5901**
**1-609-927-0299      FAX 1-609-927-9768      1-800-471-0299**
**e-mail - irwingloria@comcast.net**

Page 5 Cover
#10-93904
12-14-2011

**APPEARANCES:**   **Continued**

For Michael Walro Trustee in East West
Trucking:

ELIZABETH M. LALLY, ESQ.
JOHN M. ROGERS, ESQ.
ELLIOTT LEVIN, ESQ.
Rubin & Levin, P.C.
342 Massachusetts Avenue
Indianapolis, IN 46204-2161

For Peoples Bank & Trust Co. Of Pickett County:

LISA KOCH BRYANT, ESQ.
ANTHONY G. RALUY, ESQ.
JERRY BURNS, ESQ.
Foley Bryant & Holloway
500 West Jefferson Street, Suite 2450
Louisville, KY   40202

For Your Community Bank:

MICHAEL WAYNE OYLER, ESQ.
Reed Weitkamp Schell & Vice, PLLC
500 W. Jefferson Street   Suite 2400
Louisville, KY   40202

Special Counsel for The Trustee:

SEAN T. WHITE, ESQ.
Hoover Hull, LLP
111 Monument Circle, Suite 4400
Indianapolis, IN   46244

For First Bank & Trust Company:

JOHN R. CARR, III, ESQ.  *(Via phone)*
BRET S. CLEMENT, ESQ. *(Via phone)*
STEPHEN A. WEIGAND, ESQ. *(Via phone)*
Ayers, Carr & Sullivan, P.C.
251 E. Ohio Street   Suite 500
Indianapolis, IN   46204
------continued---------->

Electronic Sound Recording Operator:   Amy Bruckert

Proceedings Recorded by FTR Gold Digital Recording
Transcript Produced by Certified Transcription Service

GCI TRANSCRIPTION SERVICES
210 Bayberry Avenue
Egg Harbor Township, NJ  08234-5901
1-609-927-0299      FAX 1-609-927-9768      1-800-471-0299
e-mail - irwingloria@comcast.net

**APPEARANCES:**    **Continued**

For Cactus Growers, Inc.:                JOHN HUNT LOVELL, ESQ. (*Phone*)
                                         Lovell, Lovell, Newson & Isern, LLP
                                         112 W. 8th Avenue   Suite 1000
                                         Amarillo, TX 79101


For Stockman Oklahoma:                   ROSS PLOURDE, ESQ.    *(Via phone)*
                                         McAfee & Taft, P.C.
                                         211 N. Robinson Ave.
                                         Oklahoma City, OK 73102


For CPC Livestock:                       JESSICA E. YATES, ESQ.    *(Via phone)*
                                         Snell & Wilmer, LLP
                                         1200 Seventeenth Street    Suite 1900
                                         Denver, CO    80202


For Kathryn Pry RE: Gibson:              DEBORAH J. CARUSO, ESQ. *(Via phone)*
                                         Dale & Eke, P.C.
                                         9100 Keystone Crossing,   Suite 400
                                         Indianapolis, IN 46204


For Rex Elmore:                          JASON W. COTTRELL, ESQ. *(Via phone)*
                                         Stuart & Branigan, LLP
                                         300 Main Street, Suite 900
                                         Lafayette, IN 47902


For Peoples Bank of Coldwater, Kansas:   DAVID A. LAIRD, ESQ.
                                         Moye, White, LLP
                                         1400    16th St.  6th Fl.
                                         Denver, CO    80202
                                                 ---------continued ----------->


Electronic Sound Recording Operator:  Amy Bruckert

Proceedings Recorded by FTR Gold Digital Recording
Transcript Produced by Certified Transcription Service

GCI TRANSCRIPTION SERVICES
**210 Bayberry Avenue**
**Egg Harbor Township, NJ  08234-5901**
**1-609-927-0299      FAX 1-609-927-9768      1-800-471-0299**
**e-mail - irwingloria@comcast.net**

**APPEARANCES:**    **Continued**

For Bill Davis, Bobby Bynum, Bynum Ranch Co.,     JAMES BRYAN JOHNSTON, ESQ. *(Ph)*
Davis Quarter Horse, Eddie Eicke, Frank Powell     Easterwood, Boyd & Simmons, P.C.
Johnny Mayo, Tom Svoboda:                          623 N. Main Street
                                                   Hereford, TX    79045

For Bank First Financial Services and             ERIC REDMAN, ESQ.
Edward Strickland:

For Superior Livestock Auction:                   CHRIS BRUMFIELD, ESQ. *(Via phone)*

For DSI:                                          PATRICK O'MALLEY, ESQ. *(Via phone)*

For Robert Nichols, Jane Nichols, and Nichols     JACK S. DAWSON, ESQ. *(Via phone)*
Livestock:                                        Miller Dollarhide, P.C.
                                                  100 Park Avenue   2nd Fl.
                                                  Oklahoma City, OK,    73102

Electronic Sound Recording Operator:     Amy Bruckert

Proceedings Recorded by FTR Gold Digital Recording
Transcript Produced by Certified Transcription Service

GCI TRANSCRIPTION SERVICES
**210 Bayberry Avenue**
**Egg Harbor Township, NJ  08234-5901**
**1-609-927-0299      FAX 1-609-927-9768      1-800-471-0299**
**e-mail - irwingloria@comcast.net**

1 (At 10:10:43 a.m.)

2          THE COURT:   Good morning.

3          ATTORNEYS:    Good morning, Your Honor.

4          THE COURT:   Be seated.   All right, we're on the

5 record in Eastern Livestock.   I would advise -- remind those

6 parties that are on the phone please do not put us on hold.

7 We don't want to hear the music in your phone system; and if

8 you could keep us on mute --

9          CONFERENCE TELEPHONE OPERATOR:   Joining the

10 meeting.

11          THE COURT:   -- until you speak, that would be

12 great.  And please identify yourself before you speak, or it

13 will be impossible to have a record.  I'd also remind the

14 parties in the courtroom to state their names before they

15 speak also.

16          I'd now ask those attorneys that are in the

17 courtroom to state their appearances, please.

18          MS. HALL:   Terry Hall, Jim Toner (sic) -- Jim Carr,

19 Kevin Toner, and Harmony Mappes for the Trustee, Jim Knauer.

20 Jim Knauer is also in the courtroom.

21          MR. LaTOUR:   Good morning, Your Honor.   Randall

22 LaTour: Vorys, Sater Seymour & Pease representing Fifth Third

23 Bank.   With me at counsel table is my associate, Melissa

24 Giberson.

25          MR. LeBAS:   David LeBas:   Namen, Howell, Smith &

1   Lee for J&F Oklahoma Holdings, Inc.

2           MR. DONNELLON:   Dan Donnellon:   Faruki, Ireland &

3   Cox, for First Bank & Trust.

4           MR. ROGERS:   John Rogers, and with me is Elliott

5   Levin on behalf of Superior Livestock Auction and Joplin

6   Regional.

7           MR. BOWLES:   John Ames and Chip Bowles, Greenebaum,

8   Doll & McDonald, for Superior Livestock Auction and Joplin.

9           MS. MOORE:   And Christie Moore also --

10          MR. BOWLES:   Ms. Moore --

11          MS. MOORE:   -- for Superior and Joplin.

12          MR. BOWLES:   Sorry.

13          MR. WHARTON:   Chuck Wharton for the United States

14   Trustee.

15          MR. MASSOUH:   John Massouh for Cattlesmen's Feedlot

16   Limited, and Friona Industries.

17          MR. AMES:   John Ames with those two, Your Honor.

18          MR. NEWBERN:   Scott Newbern for the Florida

19   Livestock Markets.

20          MS. DELCOTTO:   Good morning, Your Honor.   Laura

21   Day DelCotto appearing for the Blue Grass Stockyards, Mr.

22   Alton Darnell, East Tennessee Livestock, Moseley Cattle

23   Auction, Piedmont Livestock, and Southeast Livestock.

24          MS. LALLY:   Elizabeth Lally appearing for Trustee

25   Walro of East West Trucking.

1          MS. BRYANT:    Your Honor, Lisa Bryant on behalf of

2   Peoples Bank of Pickett County.

3          MR. RALUY:    Anthony Raluy, Your Honor, on behalf of

4   Peoples Bank of Pickett County.

5          MR. BURNS:  Jerry Burns on behalf of Peoples Bank as

6   well.

7          MR. OYLER:   Mike Oyler, Your Community Bank.

8          MR. WHITE:    Sean White, Special Counsel for the

9   Trustee.

10          TELEPHONE CONFERENCE OPERATOR:    Joining the

11   meeting.

12          ROY HIDESCHMEIR??:   (Fuzzy telephone transmission).

13   Roy Hideschmeir (phonetic).

14          THE COURT:   All right.   Thank you all for coming.

15   We've got a lot on the agenda today, and I have some concerns

16   and global questions that I want to address and have input

17   from the attorneys.

18          Maybe the first thing to do would be to see if there

19   are any matters that we could deal with quickly.

20          MS. HALL:   Your Honor, this is Terry Hall for the

21   Trustee.   I believe that if we go under new matters, #8, the

22   sale agreement, and then the East-West Trucking matters, and

23   the Okie Farms, that is -- those are three related areas where

24   we have -- I believe have an agreement with all the parties,

25   and a potential agreed order.

1            So if we -- if we do those, which would be #8 on

2  page 5 of the agenda under New Matters, and then --

3            THE COURT:   So you've resolved the limited

4  objection that I think had to do with the acknowledgment of

5  the bank's entitlement to the proceeds, and you've resolved

6  that?

7            MS. HALL:   I believe so.

8            THE COURT:   Or you've agreed to wait to resolve

9  that?

10           MR. CARR:   No, we've resolved it, Your Honor.

11           THE COURT:   You have.

12           MR. CARR:   Yes.

13           THE COURT:   Okay.

14           MS. HALL:   So, Jim, do you want to --

15           MR. CARR:    Yeah, I -- Your Honor --

16           MS. HALL:   Would that be okay, Your Honor, to go

17  through those --

18           THE COURT:   Yes, let's do that.

19           MS. HALL:   -- items first?

20           MR. CARR:   I'm going to try to compress this, but

21  make it somewhat understandable.   Since June of 2003, Eastern

22  Livestock has owned all of an entity called Okie Farms, LLC.

23  Okie Farms, in turn, owns ownership interest in Cattlemen's

24  Feed Lot, Limited, a Texas limited partnership; and the

25  interests its owns are either direct or indirect ownership

1    interests as part of it is through the ownership of a part of

2    the general partner, and the other party's a limited

3    partnership interest.   It owns about 48 per cent of

4    Cattlemen's.

5              One of the early things that happened in these cases

6    was a dispute about a transaction that involved Eastern, East-

7    West Trucking, and Cattlemen's.   And I think one of the very

8    first things we faced in these cases was a motion for relief

9    from stay from Cattlemen's, who -- and it was all based on a

10   fairly convoluted triangular transaction among Eastern, East-

11   West Trucking, and Cattlemen's -- and too confusing to get

12   into now -- maybe we don't even have to get into it again; but

13   in any event, there's been a number of claims that have been

14   asserted about cattle that were sold in that transaction and

15   proceeds, at the same time, operating on effectively a

16   parallel path.

17             We've been talking with Messrs. Massouh and Huffaker

18   who represent Cattlemen's about the disposition, the sale or

19   redemption of the 48 per cent interest that Okie owns in

20   Cattlemen's.   And we've come to an agreement, and we were

21   pushed from our side to come to that agreement because the 48

22   per cent interest was a minority position.   We had a minority

23   position in the general partner.   We had no control over the

24   feed lot, no ability to force distributions; and no ability to

25   force a redemption, except for in one circumstance --

1  interestingly enough, or macabre enough -- if Mr. Gibson were

2  to die, then we had a right to redeem; but, you know, nobody

3  knew if and when -- well, we know it's going to happen, I

4  guess; but we certainly didn't know when.  And so we couldn't

5  -- it was a sort of a trapped minority position.

6        What they have been doing for years, which I

7  understand is typical of the feed lot industry, is they feed

8  all the cows, but they don't sell all the cows in a given

9  year.  And they take the expense for income tax purposes for

10 all the feed that they buy, but they don't have all the

11 corresponding income; and so they built up over the years a

12 rolling tax roll-forward liability of something on the order

13 of 18 million dollars.

14       And so when we negotiated their purchase of our

15 interest in Cattlemen's, they agreed to pay us three million

16 dollars for our interest; but they asked, because we were

17 going to stop the merry-go-round with regard to this rolling

18 tax liability, that we go ahead and recognize the next eight

19 million dollars in change, which was our share of that tax

20 roll-forward liability.

21       Now what's of utmost interest to us is the fact that

22 the way that Okie is organized, it's a limited liability

23 company with a single member owner, ELC; and ELC is a limited

24 liability company whose members are Mr. Gibson, Mrs. Gibson,

25 and the Gibson Trust.  All tax -- all income passes through to

1  the Gibsons.   That's the way it is.  That's the way it has

2  always been, so that doing this transaction and recognizing

3  the eight million dollars of income will have no impact --

4  should have no impact, tax impact, on either ELC or Okie,

5  because the income will pass through to the Gibsons.

6          The difficulty is that the way that the federal

7  regulations governing the taxation of limited liability

8  companies work, it is arguable -- outside of bankruptcy, at

9  least -- that these ultimate owners can at virtually any time

10 change the tax status by doing what's called in the parlance,

11 "check the box."  It's our belief that once Eastern -- and by

12 "checking the box," they would then change the tax status so

13 those two entities -- Okie and Eastern -- would be taxed as

14 corporations where the income would get trapped in the entity.

15         It is our position that once there are bankruptcies,

16 and there will always -- you know, there has been one for

17 Eastern for a year, and we recently filed one for Okie -- that

18 tax status is property of those bankruptcy estates, and those

19 owners no longer have the ability to change the tax status of

20 those entities.  Only -- only the debtor, only the Trustee has

21 that ability.

22         However, it's such an important issue that we want

23 to make sure.  And so not only did we file a motion in the ELC

24 case for authorization to do this transaction, and then put

25 Okie in the Chapter 11 to file a motion to seek approval of a

1   363 sale of the partnership interest, but we also filed two

2   adversary proceedings seeking preliminary injunctions to

3   enjoin the Gibsons from attempting to change the tax status of

4   those entities, and the Court has scheduled those two

5   preliminary injunction matters and I think has accelerated the

6   trial on the merits for next week -- December 22.

7           So what's here before us today is the approval of

8   the sale, but it's -- but it -- what we're asking for is

9   authorization to do the transaction, not requiring us to do it

10  because we have to remain satisfied through the result of

11  those hearings next week that we don't have any risk that the

12  tax status will change.

13          So that's what we proposed.  We have negotiated an

14  order that has been signed.  We had one objection, of course,

15  and that was from Ms. DelCotto.   We've negotiated an order.

16  I circulated last night effectively what we've -- we've

17  modified it slightly, and effectively what it does is make

18  sure that what we want to do after this transaction is over is

19  upstream the three million dollars from Okie, because as far

20  as we can tell Okie has no other business, no other activity

21  -- we want to upstream it up into Eastern; but the ownership

22  -- but that upstreaming, that dividending of the three million

23  dollars of Okie up to Eastern would be on account of Eastern's

24  ownership of Okie; and Fifth Third has a pre-petition lien

25  generally on all general intangibles, and I think I've

1  convinced the folks -- convinced myself, and then I think I've

2  convinced the folks here that when that money gets dividended

3  up to Eastern, it would become the proceeds of the -- the

4  equity interest that was liened to Fifth Third, and so the

5  lien would continue in the proceeds in Eastern, subject to the

6  provisions of our financing order, which reserves all the

7  rights and defenses with respect to Fifth Third, including,

8  you know, some -- a right that continues to exist that the

9  estate could seek equitable subordination of Fifth Third's

10  lien, all of that.

11       So that's the order we would give to the Court,

12  which would in the two bankruptcy cases approve the sale,

13  authorize us to close, but not require it, because of the need

14  to complete the adversary hearings next week.  So if all that

15  happens and all that goes as we hope it will, then the estate

16  should receive -- first Okie should receive three million

17  dollars, which will then be upstreamed up to Eastern and will

18  go into the Trustee's general operating account, all subject

19  to the financing order.

20       The other piece of this is that I believe the East-

21  West Trustee is seeking -- I know the East-West Trustee is

22  seeking approval today of the settlement with Cattlemen's of

23  that whole dispute that we had way back when; and we're

24  willing to agree with that and go along with it, subject to

25  the closing of this transaction, and this order provides for

1  that as well.

2          THE COURT:   All right.

3          MR. CARR:   That they would get approval for that,

4  except for the conditional objections that have been filed by

5  the Eastern Trustee and Fifth Third, which will go away once

6  the transaction is consummated and closed, which we all hope

7  will happen before the end of the year.

8          THE COURT:   All right.   So is anybody else going

9  to be heard on the motion to approve sale agreement and

10  compromise the claims?

11          MR. MASSOUH:   Your Honor, John Massouh on behalf

12  of Cattlemen's Feedlot.   I think Mr. Carr accurately

13  summarized the situation here, and I think the objections have

14  been resolved, and the order as proposed by Mr. Carr is

15  satisfactory.   Cattlemen's main concern was that they

16  purchase this interest in Okie Farms, and obviously they get

17  the interest free and clear of any liens, interest, claims

18  whatsoever; and I think that the order proposed by Mr. Carr

19  satisfies that, so we ask the Court to approve the sale motion

20  in the Eastern case, and then likewise to approve the motion

21  to compromise with the East-West Trustee on the East-West

22  proceeds, as that relating to the Cattlemen's motion for

23  relief from stay.

24          THE COURT:   All right.

25          MR. CARR:   Can I say one more thing, Your Honor?

1  Just out of caution.   As often is the case, this order asks

2  the Court to make a finding that the negotiation of the sale

3  happened in good faith.   We don't propose to put -- have

4  either Mr. Ruffinock (phonetic) or anybody else testify.   I

5  will represent to the Court that this was negotiated at arm's

6  length between representatives of Okie and the Trustee and

7  representatives of Cattlemen's; and I guess I would ask that

8  we can get that finding as part of the order.

9          Of course what that allows us to do then is close--

10         THE COURT:   I understand.

11         MR. CARR:   -- without waiting through the appeal

12 period.

13         THE COURT:   Does anybody else want to be heard?

14         MS. CARUSO:   Yes, Your Honor.   I'm Debbie Caruso.

15 I'm obviously for the estate of the Gibsons, and I wanted to

16 clarify an understanding that we do have, that the Gibson

17 bankruptcy estate abandoned the interest of ELC.   All tax

18 reporting will be done under Mr. Gibson's individual Tax I.D.

19 number, Social Security number.

20         MR. CARR?:   That's correct, Your Honor.

21         THE COURT:   That's -- he's indicated that's part of

22 the agreement.

23         MS. CARUSO:   Okay.   Thank you, Your Honor.

24         THE COURT:   All right, I'll grant the motion, and I

25 will including a finding of good faith.   What about the

1  joint administration motion.  Ms. Hall -- that's #9.

2          MS. HALL:  Yes, Your Honor.  We could probably do

3  that and the move over to the East-West Trucking case that has

4  the complementary thing --

5          MR. MASSOUH:  I just wanted to make sure we

6  addressed the East-West Trucking motion as well, Your Honor.

7          THE COURT:  We're going to.

8          MS. HALL:  #9 --

9          THE COURT:  So no one has objected to the joint

10  administration, have they?

11          MS. HALL:  No, Your Honor.

12          THE COURT:  I'll show that that's granted also.

13  Then moving into the East-West Trucking case --

14          MS. HALL:  Item # -- starting with Item #15, Your

15  Honor.

16          THE COURT:  Yes, the motion for relief filed by

17  Cattlemen's.  That's withdrawn, is that correct?

18          MR. MASSOUH:  That's correct, Your Honor.

19          THE COURT:  The Trustee's -- #16 is the Trustee's

20  motion for authority to pay certain priority claims of Connie

21  Pruitt.

22          MS. LALLY:  Yes, Your Honor.  Elizabeth Lally on

23  behalf of Trustee Walro.  We -- this is the third pre-

24  petition wage claim that we had, and it's for $4,086, and we

25  do not believe that paying this is a priority and would have

1 │ any effect on distribution to other creditors.

2 │ THE COURT:  I'll show that motion's granted.  We

3 │ have the motion to assume the executory contract with

4 │ Cattlemen's Feed Lot.

5 │ MS. LALLY:  Yes, Your Honor.  Elizabeth Lally on

6 │ behalf of the Trustee Walro for Docket #238.   The motion to

7 │ assume the executory contract with Cattlemen's is a precursor

8 │ to Docket #239, which is the motion to compromise and settle

9 │ with Cattlemen's as well.

10 │ THE COURT:  I'll show that's granted.   And then

11 │ there is the motion to compromise and settle, #18.

12 │ MS. LALLY:  Yes, Your Honor.   We did have the

13 │ limited objection filed by Mr. Knauer as Trustee for Eastern

14 │ Livestock, which we've just been through, which was at first

15 │ joined by Fifth Third Bank as well.   We feel that since the

16 │ matters have been resolved, there are now no objections to our

17 │ motion to compromise with Cattlemen's.

18 │ Of a particular note, though, I would like to point

19 │ out that we do believe that the settlement is in the best

20 │ interest of the estate and its creditors in that Eastern

21 │ Livestock had a liability of about $10,697 prior to the

22 │ settlement and compromise.   And because of the settlement and

23 │ compromise, it will have $47,000 in the estate.

24 │ THE COURT:  All right, I'll show that that motion

25 │ is granted.

1          MALE SPEAKER:  And, Your Honor --

2          THE COURT:  And I understand --

3          MALE SPEAKER:  -- it's been our understanding it's

4   going to be conditional upon our closing --

5          THE COURT:  Everybody understands that it's a

6   condition -- a condition on the closing.

7          MS. LALLY:  Yes, Your Honor.  Thank you.

8          THE COURT:  Okay.

9          MS. HALL:  And that would move us into the new

10  bankruptcy case, related case, IN RE: Okie Farms, for items 19

11  and 20.

12         THE COURT:  Right.  And I'll grant the motion for

13  joint administration, and I'll grant the motion to approve the

14  sale agreement.

15         MS. HALL:  After that, Your Honor, the other items

16  on the agenda, which the exception of the adversary

17  proceedings, which are all set for status conference only, and

18  Item #6, the application of DSI for compensation, are

19  contested matters.

20         THE COURT:  I think people must have forgotten to

21  object to that one.

22      (Chuckling)

23         MS. HALL:  I think that someone representing DSI is

24  on the phone.

25         THE COURT:  Does anyone want to be heard on the DSI

1  application for compensation?

2       (No response)

3            THE COURT:   I'll show that that motion is granted.

4  That's Item #6.

5            MR. CARR:    Terry, we have one settlement

6  (unclear).

7            MS. HALL:   On the adversary proceeding?

8            MR. CARR:    No, it's 183.

9            MS. HALL:   I guess at this point, Your Honor, it's

10 -- you may take, retake control --

11            THE COURT:   All right.

12            MS. HALL:   -- related to the -- you know, the

13 adversary proceeding status conferences, or the contested

14 matters.   Mr. Carr does tell me that there is--

15 (This is Sandy's part from this point on).HERE   10:32:39

16            THE COURT:  All right, well, let's deal with the

17 Peoples Bank matter.  I think we've -- I had a telephone

18 conference with the parties on that yesterday, and we're not

19 going to go forward with the evidentiary hearing today, but I

20 want to just deal with some preliminary matters there.

21            The -- I have set for February the 2nd, is that

22 correct?  I don't have a --

23            UNIDENTIFIED COUNSEL:  Your Honor, I wrote the 1st

24 down but --

25            THE COURT:  Well, you're probably right.  I'm going

1  by --

2          UNIDENTIFIED COUNSEL:  Your case.  Whatever you'd

3  like --

4          THE COURT:  -- memory.  Let's see.  Okay, February

5  1st.  The motion for relief from stay, the objection thereto,

6  the trial on the adversary, and you're all going to get me a

7  scheduling order on the -- on an expedited discovery, or

8  whatever it is that you need, is that correct?

9          UNIDENTIFIED COUNSEL:  Yes, Your Honor.  I can stay

10 and work with Mr. Toner immediately after this hearing.

11         MR. TONER:  Will do.

12         THE COURT:  Okay.  And then so -- well, I know we've

13 got the motion in limine with the -- with respect to the

14 proposed testimony of Patrick O'Malley.  But is there anything

15 else that we need to deal with today?

16         UNIDENTIFIED COUNSEL:  No, Your Honor, just the

17 motion *in limine*.

18         UNIDENTIFIED COUNSEL:  Just the motion.

19         THE COURT:  Okay, do you all want to argue in

20 addition?  I've read what you've filed and looked at the

21 cases.  Do you want to supplement that in any way?

22         MR. RALUY:  Your Honor, I'm a lawyer so I'm always

23 willing to talk.  If the Court thinks it would be helpful, I'd

24 be more than happy to argue it, Your Honor.

25         THE COURT:  All right.  I don't think it would be

1 | too helpful.

2 |        I'm going to deny the motion *in limine*.  I think

3 | that the motion -- I think the objection and the points that

4 | you raise go primarily to the weight that the Court will give.

5 | I understand the expert's relationship with the Trustee, but I

6 | don't think it's a disinterestedness standard when we're not

7 | talking about employment.  I think he's entitled to give his

8 | opinion.  So I'm going to deny the motion.

9 |        You all -- the only other thing I'll add is, since

10 | we did put this on such a tight schedule, if you need me to

11 | resolve any minor disputes or bumps in the road in the next 45

12 | days or so before we try it, just call Kristen and we'll set

13 | up a very prompt phone conference to do that.

14 |        MR. TONER:  The only thing I might anticipate would

15 | be third-party discovery, and we'll make that known to those

16 | parties, that we can move swiftly with your help.

17 |        THE COURT:  Yeah.  I don't know if -- yeah, you

18 | might run into some problem.  We have a harder time

19 | controlling third parties than we do actual parties, so

20 | hopefully that's not going to delay matters.  Because I'm

21 | sensitive to the issue that you raised yesterday, that the

22 | bank wants to get this resolved, and I'd love to get anything

23 | resolved in this case, so I'm all for it.  We'll go in

24 | February.

25 |        MR. TONER:  Thank you, Your Honor.

```
 1              THE COURT:  Okay.  All right, well --
 2              MS. HALL:  We do have one other item on Item #1
 3   under continued matters that we've reached agreement on.
 4              THE COURT:  All right, what's that?
 5              MR. CARR:  Your Honor, in Roman II, paragraph
 6   (1)(a)(3) is -- well, let's see --
 7              THE COURT:  Fifth Third's objection to --
 8              MR. CARR:  I'm sorry, it's the --
 9              MS. HALL:   (unclear)
10              MR. CARR:   No, it's not -- it's the Brent Kuehny
11   and Kremlin Crumpler Brothers matter --
12              THE COURT:  Yeah.
13              MR. CARR:  -- which this is one that, the way I
14   understand the basic facts, and Mr. Plourde graphed this out
15   in one of his pleadings, cattle were sold from Mr. Kuehny to
16   Eastern.  Eastern in turn sold them to Mr. Hoenberg
17   (phonetic).  Mr. Hoenberg sold them on.  And Mr. Hoenberg has
18   not paid Eastern.
19              And what he hasn't -- what he's --the 158 what he
20   owes Eastern or --
21              UNIDENTIFIED COUNSEL: 158, Your Honor, is what is
22   owed to Mr. Kuehny.  It's approximately what's owed to
23   Eastern.
24              THE COURT:  Okay.
25              MR. CARR:  So there's about $158,000 at issue.
```

1      What we've agreed -- and we just did it in classic

2  fashion in the hallway today as the hearing was starting, so

3  there's some roughness to this that Mr. Plourde and I have to

4  work out -- but what we've agreed is that we'll split that

5  158, but we're talking about the money that we actually

6  received from Mr. Hoenberg, and that money is going to come

7  some place -- 90 for his client and 68 for the estate, in that

8  proportion.

9      We're going to figure out how we're going to get Mr.

10  Hoenberg to pay it, but if we do that and we split that 158 in

11  that proportion, 90 to 68, then all of Mr. Kuehny and the

12  Kremlin and whoever else who is in that transaction will give

13  up any other claim they have in the estate with respect to

14  that.

15      MR. PLOURDE:  Right, that's right.  Again, it's

16  agreed in principle at this point, Your Honor, but I think it

17  gives us a basis to go forward in trying to resolve the

18  matter.

19      THE COURT:  All right, you'll memorialize it in a

20  proposed settlement and it will go out on notice --

21      MR. CARR:  Yes, Your Honor.

22      THE COURT:  -- and give everybody an opportunity to

23  object to that.

24      MR. CARR:  Right.

25      THE COURT:  Okay.  And was that Roman numeral little

1  iii?

2           MR. CARR:  I guess it's -- Mr. Plourde represents

3  all the people in (1)(a); he represents Stockman, Oklahoma

4  Livestock Market, and Brent Kuehny and the Crumpler Brothers.

5           So I guess we'll be taking care of Brent Kuehny and

6  the Crumpler Brothers or -- ?

7           MR. PLOURDE:  No, it doesn't cover Crumpler

8  Brothers.

9           MR. CARR:   Okay, just Brent Kuehny --

10          MR. PLOURDE:  It does -- it does solve the Kremlin

11  issue, Judge.  We've divided this up into two issues:  The

12  Kremlin issue, which involves Kuehny, his bank Kremlin, Mr.

13  Hoenberg.

14          THE COURT:  All right, so I think that is little

15  iii.

16          MR. CARR:  Yes.

17          MR. LeBAS:  Your Honor, David LeBas for J&F

18  Oklahoma.  We entered an appearance in this case because the

19  cattle actually went ultimately to JF Oklahoma.  JF Oklahoma

20  paid money to Mr. Hoenberg, and Mr. Hoenberg is the source of

21  those funds.  He's been holding those in sort of a private

22  escrow account since last November.

23          Our position is that if there are claims that come

24  out of this against JF, that those need to be decided under

25  some other procedure, a contested matter or adversary

1  proceeding, which at this point has not been asserted or

2  filed.

3          THE COURT:  Well, raise an objection to the proposed

4  settlement.

5          MR. LeBAS:  I don't think we're going to object to

6  that.   That was -- I just wanted to tell the Court that was

7  the reason --

8          MR. PLOURDE:  Your Honor, we agree with his position

9  on this basis.

10          THE COURT:  Well, then maybe I misunderstood what

11  you said.  Say that again.

12          MR. LeBAS:  We're not objecting to it.  We filed a

13  pleading in the case in order to make sure that if there are

14  claims that are asserted against JF Oklahoma, that they be

15  asserted in a separate proceeding, adversary or --

16          THE COURT:  All right, I see what you're saying,

17  okay.

18          MR. CARR:  We can roll that into the settlement,

19  Your Honor.

20          THE COURT:  All right.

21          MS. HALL:  We'll also identify the pleadings that

22  are involved in that particular settlement because I think

23  there's more than just little iii.

24          THE COURT:  All right.  Yes?

25          MR. PLOURDE:  I'm just waiting for the next one,

1  Judge.

2          THE COURT:  Oh, okay.  Well, --

3          MR. PLOURDE:  I didn't want to go back and sit down

4  and then --

5          THE COURT:  What --

6          MS. HALL:  The next one, there is another matter in

7  (1)(a), and that's Stockman Oklahoma, and that resolved --

8  that is the constructive trust issue that's been talked about.

9  And it's been fully briefed --

10         THE COURT:  All right, let's talk about the

11 constructive trust issue, and then let's talk about how that

12 ties into other issues.  I've --

13         You know, I've talked to the parties here on

14 numerous occasions about how we're going to manage this case

15 and keep it from getting out of control, and obviously we

16 failed in that respect.

17         You know, I think maybe I have ten summary judgment

18 motions now, and then we've got this motion of the Trustee

19 that a lot of people don't even think ought to be a motion;

20 and then we've got Mr. Bowles muddying the water with his

21 forward contracts arguments and -- and you know, so I have --

22 and then we've got everybody saying that the Trustee's in bed

23 with the bank.  Although I think most people would get in bed

24 for four million dollars, maybe, I don't think there's any

25 proof that the Trustee has at this point.  Although I'm not

1 ruling on that today.

2         There's a lot of issue -- overriding issues in this

3 case.  And you know, I've got two and a half law clerks and me

4 trying to keep up with you all, and that's almost impossible

5 at this point, but we're going to start deciding some issues,

6 and, you know, I'm close on some of these questions; but then

7 that raises other issues.

8         For example -- and this is out of context -- but how

9 many different appeals do we really want out of this case?

10 For example, you know, Mr. Bowles, the more I think about your

11 issue, the more I'm convinced that no matter which way I rule,

12 somebody's going to appeal that, and what's going to be the

13 impact of that pending appeal on the other matters in the

14 adversaries that are pending?  Because I'm sure if you

15 prevail, as everyone has warned me before, that if you

16 prevail, you're going to come prancing into the adversary

17 saying this is issue preclusion as to certain -- certain

18 matters of law which have already been determined, and -- but

19 those issues will actually be on appeal.  I mean, I'm certain

20 the bank and probably Trustee and I don't know who else is

21 going to appeal if you prevail.

22         And I'm certain -- I'm not certain but I would

23 imagine you're going to appeal if you don't prevail.  I mean,

24 everybody -- and let me just, you know, make this clear.  I

25 don't care who appeals in this case.  I think a lot of these

1 questions ultimately are probably going to be answered by a

2 higher court.  But I want to try to put this case in a posture

3 where we can keep moving on.  There's a lot of things to be

4 done if we're going to -- if we're going to stay in this

5 Court.

6          And that's another overriding question that's

7 started coming to my mind.  And if the Trustee reaches the

8 conclusion -- and I understand the Trustee is fighting back

9 against the charges that the Trustee has already conceded

10 every -- that the bank gets everything.  And I'd like a little

11 status on that today.  There's someone here from Hoover Hull,

12 right?  Yes.

13          MR. WHITE?:  Yes, Your Honor.

14          THE COURT:  Yeah, we'll talk about that.

15          But if the Trustee finally does come to that

16 conclusion, then -- and if the constructive trust arguments

17 don't prevail, then why are we here?  I mean, the only thing

18 we're doing at that point is keeping the bank from litigating

19 in Oklahoma and Texas and Wisconsin and wherever else the bank

20 might have to go.  Do we exist just as a forum of convenience

21 for the bank to marshal the assets in this case?

22          I mean, if that's right, and I know that one of the

23 arguments that the bank likes to make against the constructive

24 trust -- and this is kind of an ironic argument that the bank

25 likes to make, I think, is that it -- and I've read a lot of

1  cases about constructive trusts, and I could probably argue

2  both sides of this question to you.  But, that it disrupts --

3  and other Courts have said it -- disrupts the distributive

4  scheme of the Bankruptcy Court.

5        Well, the distributive scheme of the Bankruptcy

6  Court, as far as the bank's concerned, is everything goes to

7  the bank.  I mean, there's not going to be -- if the bank is

8  right, there's nothing here for unsecured creditors.  The only

9  thing we're talking about is carving out administrative

10  expenses.  And I'm going to allow you to speak.

11        The only thing we're talking about is we're carving

12  out administrative expenses to gather together the flock.  Or

13  I guess it's the herd in this case.

14        So, you know, that's an overriding concern that I

15  have.

16        To get a little more specific, you know, I'm ready

17  -- or I'll be ready in a few weeks, probably because of the

18  holidays it's going to take a little bit longer, to issue a

19  decision as to whether I think the forward -- what I think

20  about the forward contract issue, what I think about the

21  constructive trust issue.

22        But the question that I have is where should I do

23  that?  I mean, I know -- and how should I do that, and not

24  just put the brakes on this case why those issues go up.

25  Because I suppose that whoever loses is going to have to

1  protect their arguments by appeal.

2        Mr. Toner, you look like you want to take the first
3  shot at this.

4        MR. TONER:  Well, as usual, thank you, Your Honor.
5  Kevin Toner for the Trustee.

6        We agree with what you said.  We've been through
7  this a lot this summer, trying to think exactly this through.
8  And, many of us in this room feel your frustration in trying
9  to bring some order to this and present things in an order
10  that makes a difference.

11        There's very little agreement about that order, and
12  I think Your Honor came to the correct conclusion that to be
13  fair to the litigants, and to make sure folks got notice and
14  an opportunity and a proper scale of an order that might be on
15  an appeal, we take them one at a time as they were fully
16  briefed and ready for decision.  And in doing that sort of
17  approach, I think we encouraged results like we saw here this
18  morning with the settlement of just of these issues out in the
19  hallway.

20        If we go forward with these things when they're
21  ready, on the proper scope --

22        THE COURT:  No, but let me interrupt you just
23  briefly.

24        I don't know which settlement you're referring to,
25  but you're referring to the sale of -- is that what you're

1   referring to?

2          MR. TONER:  I was referring to the bank Kremlin

3   issues that overlap with many of the others in the --

4          THE COURT:  Well, those aren't fully settled because

5   the bank's going to object to your settlement, right?

6          UNIDENTIFIED COUNSEL:  I don't know.  I haven't

7   heard the settlement.

8          THE COURT:  Right.

9          UNIDENTIFIED COUNSEL:  I may well not object.

10          THE COURT:  Right.  I mean they might.  I understand

11   it's not fully settled at this point.

12          But I get your point, and I agree that some things -

13   - but let's get specific here, all right.

14          If we -- and you know, some of them point the finger

15   at the Trustee for -- because of this motion that you filed.

16   And I think one of the bank's arguments early on in one of its

17   briefs that I found some credence with is by doing that,

18   you've in effect -- and not doing this in the context of an

19   adversary, and that is determining the validity of these

20   claims, of the parties that have constructive trusts.  You may

21   have shifted the burden of proof in some way.

22          Or you -- but and it really is, isn't it really just

23   a claims objection?

24          MR. TONER:  I thought the way we presented it in the

25   Friona case, and I think that's where the objections have been

1    filed, was to tee up an issue of law as to whether federal law

2    speaks to the constructive trust issue.

3            THE COURT:  All right.  Well, that's where I -- on

4    the constructive trust issue, don't you think that the Friona

5    adversary is the best vehicle to issue some sort of an order

6    determining the validity of the constructive trust?  *You* do.

7            MR. TONER:  I do.

8            THE COURT:  Do other parties agree or disagree with

9    that?

10           MR. LaTOUR:  Your Honor, may I jump in?

11           THE COURT:  You may.  Please state your name for the

12   record.

13           MR. LaTOUR:  Randall LaTour from Vorys/Sater

14   representing Fifth Third.

15           I'd like to address several points so I'm going to

16   backtrack a little bit.  But I'd like to answer the first

17   question you had, or the last question you just asked.

18           There was an attempt made early on to coordinate

19   issues that cut across several different contested matters

20   under Rule 7042.  That was rejected by people that felt that

21   they -- well, I don't -- I won't ascribe a motive to them, but

22   they're rejected.

23           And now we find ourselves in this situation.  Does

24   it make sense on a constructive trust issue that is going to

25   touch so many claims to deal with it once across the board?

1 Yeah, I think so.  That's what I said three months ago, and I

2 still believe that.

3          Now, I'd like to address the Court's concern --

4          THE COURT:  Well, before you move off that.

5          MR. LaTOUR:  Yeah.

6          THE COURT:  Because I want to get a framework today,

7 I want to leave here with a framework for dealing with the

8 constructive trust issue.

9          MR. LaTOUR:  Well, the framework is simple, Your

10 Honor.  If you don't want to hear arguments about it, you want

11 to rely on the briefing, then you consider all the briefing

12 that has been filed in the Friona case, in the Kremlin matter,

13 and in any other contested matter that involves constructive

14 trust.  You consider all those pleadings and you issue an

15 order that's effective as to that contested matter or this

16 adversary proceeding and address this across the board.

17          If you want to hear argument, then I would suggest

18 to the Court that a notice goes out that says, "On such and

19 such omnibus date I will hear argument," and everybody can

20 come in and argue.

21          THE COURT:  Well, no, I know how to hear argument.

22 That's not my concern.

23          My concern is -- well, I mean, I've thought just,

24 you know, exactly what you said, and that is come up with one

25 opinion.  And then in two or three other instances, you know,

1  issue the same order.  Now, it's not as easy as it might

2  sound, because if you find that constructive trusts might be

3  valid, then I think they're a fact, they're fact-sensitive.

4         MR. LaTOUR:  Well, Your Honor, that's exactly --

5         THE COURT:  It's only if you issue an order that

6  says, "We're not going to recognize constructive trusts in

7  bankruptcy," or something that's broad along those lines, that

8  you can issue the same order in every case.

9         MR. LaTOUR:  That's correct, Your Honor.  If you

10 determine that the constructive trust issue requires an

11 examination of fact --

12        THE COURT:  Right.

13        MR. LaTOUR:  -- you will have to look at each

14 transaction separately, and everybody is going to have their

15 opportunity to develop their evidence and make their argument

16 and you'll have to deal with those seriatim.

17        If you decide that it's a question of law that cuts

18 across the board, then under Rule 7042 you can simply say, "I

19 declare that I'm consolidating this issue," and --

20        THE COURT:  Right.

21        MR. LaTOUR:  -- and put out a single order.

22        THE COURT:  All right.  Move on to another issue.

23 I'm sure you don't think that the Trustee is administering the

24 case solely for the benefit of the bank.

25        MR. LaTOUR:  Well, Your Honor, I have good reason to

1  believe that, and that's because the Trustee and I have been

2  in negotiations for quite a long time, and the Trustee has

3  exacted from the bank an agreement in principle to allow the

4  concession of millions of dollars to be available for

5  distribution to allow the claims for unsecured creditors in

6  this case.

7          Now, like everything in this case, there are a lot

8  of details attendant to that.  The Trustee has been in the

9  process of -- at least my understanding is, I haven't been at

10 the meetings, but my understanding is, is that he's talking to

11 creditors and explaining what that structure is.

12         My own belief is the best explanation would be to

13 file a plan because people are then going to worry the

14 language.  But the plan does contemplate two funds, one of

15 which is essentially recoveries under preferences, and another

16 fund which is essentially the bank's collateral with a carve-

17 out for unsecured creditors that have specified conditions,

18 the primary one of which is that they grant third-party

19 releases.

20         This case has absolutely not been administered for

21 the benefit of the bank.  The bank, despite having an order

22 that says that it's supposed to get adequate protection

23 payments, has not received a single payment of any amount at

24 all.  The bank's collateral to the tune of some four million

25 dollars has been expended.

1          THE COURT:  So what's going to happen on that now?

2   I mean, that's one thing that worries me about this case also.

3          MR. LaTOUR:  Well, again --

4          THE COURT:  No, wait a minute, let me finish my

5   question.

6          MR. LaTOUR:  I'm sorry, Your Honor.

7          THE COURT:  Yeah, I understand, the bank's financing

8   the case.  What -- what's to say that they, the bank in six

9   months decides *not* to finance the case?  Then what happens?

10         MR. CARR:  May I speak to that, Your Honor?

11         THE COURT:  Yes.

12         MR. CARR:  I think if that's the case, then this is

13  going to get converted.  Or dismissed.

14         THE COURT:  Well, I was going to say, I'd hate to

15  dump this on -- well, how can we convert it?  It's already a

16  7.

17         MR. CARR:  No, it's an 11, Your Honor.

18         THE COURT:  Oh, it's an 11.

19         MR. CARR:  Which is what -- let me go back to --

20         THE COURT:  I keep thinking of it as a 7 because

21  it's like a 7.

22         MR. CARR:  Well, let me go back to what -- to what

23  Mr. LaTour was talking about, because I don't think you heard

24  the magic words yet.

25         THE COURT:  I heard the magic words.

1          MR. CARR:  Well, but what you didn't hear is 20 per

2    cent.  And what we've been talking about is carving out for

3    unsecured creditors 20 per cent of the bank's collateral, the

4    net collateral.  That's the plan.  And the whole point is --

5          THE COURT:  All right, let me ask you a question.

6    That makes me -- I mean, everybody likes to hear that.  That

7    changes things a little bit in my mind, but I'm not to a point

8    of making a decision about that sort of thing anyway, but let

9    me ask you this.

10          What is the bank's position, I mean the Trustee's

11    position as to the bank's claim as we stand here today?

12          MR. CARR:  Can I speak to that?

13          THE COURT:  Yes.

14          MR. CARR:  Now this is going to take a little bit of

15    time, because now we're going to start getting into. you know,

16    some of the main event here.

17          THE COURT:  And I'm sorry -- you can sit in the

18    witness stand if you want to.

19          MR. CARR:  If I can, Your Honor, let me talk for a

20    few minutes about what we've done and where we are.

21          And of course, the Court recognizes that we all fell

22    in here a year ago.  Nobody -- we didn't choose to be in

23    Chapter 11 and it was an involuntary, Trustee was appointed.

24    And obviously we had a mess.  We had -- all of the management

25    had resigned, waiting to be indicted.  We had books and

1   records that had been, in some cases we believe pilfered.

2          And what we decided to do -- and when I say "we",

3   I'm going to talk about the Trustee and the Trustee's

4   professionals, is try to start amassing as much of an estate

5   as we could, and really going after those things that we

6   thought if we don't go after these, they're going to get away

7   from us.

8          And so the theory has been let's build a pot and

9   figure out what kind of pot we have before we start talking

10  about how we're going to divvy up this pot.  And, you know, it

11  was quite possible, we weren't going to have much of a pot.

12         The fact is, as we sit here today, assuming the Okie

13  case closes, and assuming a couple other things happen that we

14  think are going to happen pretty quickly, we're going to have

15  recovered about 17 and a half million dollars.  Now that's

16  before this massive litigation that we've been talking about

17  gets resolved.

18         You know, we have a claim against Superior of

19  somewhere 12 to 15 million dollars.  We have a number of other

20  claims.  We have preference claims.  We took -- and somebody's

21  going to have to help me with this number because I have too

22  many floating around my brain, but when we started looking at

23  this initially, I think that there were several hundred

24  million dollars I think of checks written in the 90 days

25  before the bankruptcy.

1           And as opposed to just sending out preference

2   demands to all those people, we've tried to do a very careful

3   analysis to make sure we weren't just going to start suing

4   people who have already been harmed, if they had legitimate

5   defenses.  And we think after going through that analysis, we

6   may have preference claims in the 20 million dollar range.

7           So, there is substantial -- there is substantial

8   money that's coming in here.

9           We were faced with the commercial fact, we couldn't

10  change this fact, that for a number of years the bank had a

11  lien on virtually all the assets of the estate, and we

12  couldn't offer up any particular adequate protection for the

13  use of the bank's cash collateral because we were just going

14  to eat it up trying to recover money and bring it in.

15          And so we had to have a financing order.  We had to

16  come up with a vehicle that we could have some fuel to go

17  forward with this recovery effort.

18          And what we've been trying to get to is a place then

19  where we had a handle on what this pot was going to be like,

20  and effectively we're going to reach a fork in the road where

21  we're going to do one of two things, or somebody's going to do

22  one of two things.  We're either going to have an agreed deal

23  about dividing this up, and that's the -- that's the Chapter

24  11 plan that we've been talking about.  And I know all these

25  creditors are just chomping at the bit.  They want to see what

1  this is.  Well, it doesn't exist yet.  And they keep -- they

2  keep yelling at me for not showing them something that doesn't

3  exist.  We've been going back and forth with the bank trying

4  to find a term sheet that we can show people.

5          But essentially the deal involves, if we put that

6  deal together, giving creditors the opportunity to get 20 per

7  cent of the bank's collateral.  And then the bank and

8  unsecured creditors are going to share *pro rata* to the extent

9  that they had an unsecured claim, a deficiency, so it's an

10 unsecured creditor, its collateral doesn't cover it, and the

11 unsecured creditors, they're going to share in the unsecured

12 creditor pot which is the preferences and several other

13 things, including one of the wild cards here -- I know you

14 heard some about this, but there's about 4.7 million dollars

15 that was in an account that got seized by the United States

16 Attorney down in Kentucky, and that's -- we hope is going to

17 be part of the unsecured money that gets distributed out here.

18         We think -- and part of the problem is timing.

19 Because if we would have filed this kind of plan and this kind

20 of disclosure statement two or three months ago, it would have

21 been incredibly vague and very difficult for people to decide

22 what they want to do because we couldn't get a handle on what

23 the pot was going to be.

24         It's now starting to come into focus.  And it's

25 going to be in a place at some point here in the near future

1  where we think people can make an intelligent decision whether

2  they take that fork in the road, which is to release their

3  claims against the bank and share in the bank's collateral,

4  and then share *pro rata* in the non-bank collateral, they're

5  going to share 20 percent of the bank's collateral and share

6  *pro rata* the non -- or go after the bank.  Go after the bank

7  for equitable subordination or whatever else people think we

8  can do.

9          But the problem with that is, somebody's going to

10  have to figure out, you know, they're going to have to weigh

11  those things.

12          Now the bank has not been released from anything.

13  There have not been any give up of claims against the bank.

14  The bank has not been distributed a penny.  Nothing we've done

15  has prejudiced either one of those forks.  And those are still

16  available to us.

17          And of course, one thing that's available to

18  everybody is anybody who wants to sue the bank, can.  And

19  people have.

20          And the problem, one of the problem that the Trustee

21  sees as it looks at this situation, is that the Trustee's

22  ability to sue the bank is much different than the ability of

23  individual creditors to sue the bank.

24          We have a series of decisions now that have come out

25  of the **Madoff** bankruptcies, where the Trustee has gone after

1  banks involved in the Madoff Ponzi scheme, and the Trustee is

2  consistently losing, because the Trustee has to stand in the

3  shoes of Madoff.

4         Our Trustee has to stand in the shoes of Eastern

5  Livestock.  There are *pari delicto* problems, there are

6  standing problems.  Those problems don't exist with respect to

7  individual creditors.  They're going to all have to consider

8  their own individual claims against the bank and compare those

9  to what we think we're going to be able to offer them.

10        Now if they decide not to give up their claims

11 against the bank and go after the bank, they'll still get what

12 they're going to get as an unsecured creditor.  They're not

13 going to give that up.   But that's --

14        THE COURT:  But they're not going to get the 20 per

15 cent.

16        MR. CARR:  They're not going to get the 20 per cent

17 because that's -- unless somebody, unless somebody is able to

18 step up here and come up with a valid theory to equitably

19 subordinate the bank's liens.

20        And we're looking at it.  We're looking at that.

21 We're looking at preference claims.  But we've done a lot of

22 legal research, and this isn't an easy task and --

23        THE COURT:  All right, so as far -- is it fair to

24 say then that as far as the Trustee is concerned, as far as

25 the security interest -- and maybe the attorney from Hoover

1  Hull should be heard on this also, but as far as the security

2  interest in the assets of the estate, that the bank was

3  properly perfected and the -- they are a secured creditor as

4  to basically all tangible and intangible assets of the estate.

5          MR. CARR:  That's what -- that's what was in the

6  financing order, Your Honor.

7          THE COURT:  Right.

8          MR. CARR:  Subject to all claims and defenses, and

9  that includes the ability to seek -- to equitably subordinate

10  the lien.

11          THE COURT:  I'm not talking about equitable

12  subordination at this point.

13          MR. CARR:  That's right.  But that finding was made

14  by the Court in connection with the financing order.

15          THE COURT:  All right.  And does --

16          MR. WHITE:  Sean White, Your Honor.

17          THE COURT:  Why don't you step forward so we make

18  sure we get you on the record.

19          MR. WHITE:  Sean White, Your Honor, on behalf of the

20  Trustee.

21          I agree with Mr. Carr, that was -- what the Court

22  questioned, the Court just asked was answered in the financing

23  order as to the bank's security interest.

24          And I would echo just what Mr. Carr said, that the

25  Trustee, as he steps into the shoes of the debtor, has unique

1    problems which Mr. Carr identified in terms of --

2              THE COURT:  I understand those problems.

3              MR. WHITE:  Okay.  We have served a subpoena on

4    Fifth Third.  Fifth Third has responded -- sorry, produced

5    about seven -- I want to say approximately 9,000 pages of

6    documents. We're in the process of reviewing those.  We don't

7    have all the documents.  We understand they are forthcoming.

8    And we're in the process of reviewing those to advise the

9    Trustee whether there's any other claims that we might be able

10   to bring against the bank.

11             THE COURT:  All right.  And who else wants to be

12   heard?  And this kind of blends into the fee apps also so --

13             MR. CARR:  Could I speak --

14             THE COURT:  No, we'll let somebody else speak for a

15   moment.

16             MR. CARR:  All right.

17             MR. DONNELLON:  Your Honor, Dan Donnellon for First

18   Bank and Trust.

19             I think Your Honor framed this issue well, that we

20   need to look at the elephant in the room.  The constructive

21   trust issues, all of those, the related pleadings that have

22   been filed, all involve or get back to at heart is Eastern

23   Livestock's assets as a whole properly valid priority first

24   lien of Fifth Third Bank.  No matter how you slice those

25   issues.

1      We were here over a year ago, or about a year ago,

2 when the issue came up we were appointing the Trustee and we

3 were going to look at this issue.  At that time, and this is

4 all in the objections -- we have very fine honorable lawyers

5 in the room.

6      But it was, at least my client's understanding that

7 we were going to retain Hoover Hull to answer that question,

8 is there an elephant in the room or not?  Because if Fifth

9 Third is white as Caesar's ghost, then the estate should be

10 administered for the benefit of Fifth Third or liquidated.

11      THE COURT:  I thought it was Caesar's wife.

12      MR. DONNELLON:  Caesar's wife, sorry.

13      UNIDENTIFIED COUNSEL:  He killed her, that's right.

14      MR. DONNELLON:  That's right.

15      But the point being, when that financing order went

16 on, and in the Trustee's blog he said in February, or we have

17 to answer this question, why am I not suing the bank, what are

18 these questions, we're going to answer those by March 11th,

19 we came into that hearing.  There were questions made to give

20 Fifth Third super priority over everything.  Several of us

21 objected.  We went into the conference room, and we came up

22 with an order that said, "You're going to allow Fifth Third's

23 claim and we're going to reserve everything and we're going to

24 look into that."

25      And it was just a few weeks later, unbeknownst to

1   all the other creditors, that there was no investigation

2   whatsoever ongoing at that time.  That it was truncated on

3   some cost benefit analysis.

4           At that time, I was relying on the fact that we're

5   going to get into all these issues and someone's going to

6   discover these issues to determine whether the Trustee should

7   be administering this case for Fifth Third or not.

8           At the same time I was involved in the State Court

9   proceeding that Fifth Third initiated that Judge Winkler

10  reminded me last week, if you're going to set it back, he's

11  happy to have it.

12          At that time the State Court proceeding, in July I

13  took one partial deposition and asked --

14          UNIDENTIFIED ATTORNEY:  Your Honor --

15          THE COURT:  Wait a minute.  Let him finish. We're

16  going to take turns.

17          MR. DONNELLON:  -- and sought some discovery, some

18  document discovery, so at least I could do my own discovery

19  investigation.   That was -- I got a request for an extension.

20  I got a blanket relevance objection, and then on my motion to

21  compel, that case was stayed.  I was told go to the Bankruptcy

22  Court.

23          At that point I thought, well, at least an

24  investigation is ongoing.  I will be able to discover what

25  happened here, and nothing has happened.

1      All I'm saying is if we want to put this case on the

2 proper order, we need to first find out exactly what happened,

3 is there an elephant in the room, should Fifth Third be

4 equitably subordinated --

5      THE COURT:  When does Hoover Hull, Hoover Hull said

6 that their investigation of this issue will be completed?

7 Give me a time frame.

8      MR. WHITE:  Your Honor, I would say we would try and

9 complete the investigation within the next 120 days.

10      THE COURT:  Okay.  Now, you can speak.  Wait a

11 minute, Mr. Levin, I'm going to let him go next.  Okay.

12      MR. LaTOUR:  Your Honor, this is really taking a

13 turn that's completely inappropriate.

14      Fifth Third is not the subject of an adversary

15 proceeding or a contested matter here today, but Fifth Third

16 is being flayed (filleted) alive by the imagination of some

17 people in the absence of any number of corroborating facts or

18 witnesses or testimony.  That is completely inappropriate.

19      Collateral attack, what happened in the Court, in

20 the State Court in Cincinnati, is completely inappropriate.

21      And while we're on the subject, let's talk about

22 First Bank's participation on this issue.  And --

23      THE COURT:  I don't really want to go into this.

24 You're not being flayed (filleted).  I mean, the only person

25 that can flay (fillet) you is me and I'm not going to flay

1  (fillet) you.

2          So the only reason that I'm taking -- I'm letting

3  this argument go on these issues is because it's been raised

4  in the objections to the fee apps.

5          MR. LaTOUR:  Well, let me help on that issue then,

6  Your Honor.

7          THE COURT:  All right.

8          MR. LaTOUR:  Number one, the Trustee has not

9  released the bank from anything.  The bank is being governed

10 by the terms of the financing order which has language that

11 everybody agreed to that reserved their rights.  All their

12 rights are intact.

13         Number two, no money has been distributed to the

14 bank.

15         Number three, money coming into the estate cannot be

16 distributed to the bank without prior notice of a hearing

17 pursuant to the finance order.  So there's no risk that money

18 gets loaded in the trucks and moved off to the bank at the end

19 of the day.

20         Number four, all of the evidence that is being

21 turned over to Hoover Hull by agreement with the bank is going

22 to be placed on the internet access under the discovery

23 protocol.  So if people want to wade through 9,000 pages of

24 documents, they can.

25         So there isn't a big secret here, and there's no

1   elephant in the room other than the lack of standing of First

2   Bank.  There is no dive being taken on the behalf of the bank.

3              THE COURT:   All right.

4              MR. LaTOUR:    If those kinds of accusations are

5   going to be made, they should be made formally, we should have

6   a trial on it, and I should be allowed the opportunity to

7   present evidence and a defense.

8              THE COURT:  All right, I understand your position.

9              MR. ROGERS:  Your Honor --

10             THE COURT:  And I think -- all right, you're going

11  to speak?

12             MR. ROGERS:  If I can yeah, just touch on a couple

13  of the points that have been raised on behalf of Superior.

14  And maybe a few points that the Court might not be aware of.

15             Certainly the concern maybe of the objecting

16  parties, and I don't think any of us are filleting Fifth

17  Third, we're just questioning whether the job that was to be

18  done by Hoover Hull was done, and whether it's being done.

19             As their application shows, but has been sort of de-

20  emphasized in Hoover Hull's response, for roughly six months

21  Hoover Hull wasn't doing anything to investigate Fifth Third,

22  whether inequitable subordination, lawsuits, anything else.

23             It essentially stopped its investigation in April --

24             THE COURT:  I saw that --

25             MR. ROGERS:   -- effectively in March really --

1          THE COURT:  -- objections -- yeah.

2          MR. ROGERS:   -- and only recently resumed, for what

3   reason we're not sure.

4          It's our belief that it was stopped because the

5   Trustee asked them to stop, because it was not worth the

6   benefit to the estate in the Trustee's view.  Whether that's

7   the case or not, certainly part of the harm to the estate is,

8   during that six months, we've got the Trustee conferring with

9   the bank, and nobody else, about how to pursue litigation in

10  the case, strategies in the case, discussing a plan of

11  reorganization which Mr. LaTour can explain to us, because

12  he's familiar with it --

13          THE COURT:  Well --

14          MR. ROGERS:  -- that we have learned about only

15  recently.

16          THE COURT:  Well, but they're the ones that are

17  going to have to fund it.  I mean, they're obviously going to

18  have to come to the first agreement before it can go forward.

19          Let me ask you this:  I know you do a lot of work,

20  attorney work for Trustees.  Isn't the point that Mr. Carr

21  raised correct, that the -- that it might be more difficult

22  for the estate to sue the bank than it would be for another

23  party to sue the bank because the estate stands in the shoes

24  of the debtor?

25          MR. ROGERS:  I think, Your Honor, that's probably

1 | true, so far as a lawsuit is concerned.  Probably not true so
2 | far as an equitable subordination claim is concerned.
3 | But the difficulty is, nobody's been looking into
4 | equitable subordination claim.  And certainly I understand --
5 | THE COURT:  Well, they are --
6 | MR. ROGERS:  Excuse me.
7 | THE COURT:  They are now, I gather.  I mean, isn't
8 | that what Hoover Hull is looking into?
9 | MR. CARR:  Yes, Your Honor, could I speak?
10 | THE COURT:  No, not yet.
11 | MR. ROGERS:  Well, I'm really not finished yet.
12 | THE COURT:  Mr. Rogers has got the floor.
13 | MR. ROGERS:  I have to remember where I was.
14 | Certainly we understand that, yes, the Trustee's got to talk
15 | to the bank; they're crucial to any kind of plan of
16 | reorganization.
17 | On the other hand, it's certainly important when the
18 | Trustee does that, that he have some understanding of whether
19 | he's got claims against the bank, whether they're claims for
20 | equitable subordination, what the facts are that 9,000
21 | documents Mr. White has referred to are documents he just
22 | received.  He could have received them back in April.
23 | THE COURT:  I've heard that point.  I'm aware of
24 | that.
25 | MR. ROGERS:  So, and meanwhile, of course the

1  counsel is asking to be paid by the estate for these

2  conferences that have taken place, during which time he didn't

3  have any opinion on the estate's causes of actions.

4          So how is that -- then of course a bigger point is,

5  is regular counsel can't take any action adverse to Fifth

6  Third, that's why Hoover Hull was brought in, the Trustee's

7  own firm represents Fifth Third.  So we have, you know,

8  counsel who has a conflict, a Trustee who has a conflict --

9          THE COURT:  Superior has a conflict.

10          MR. ROGERS:  Correct, Your Honor, and that's why

11  there are two of us.

12          THE COURT:  I understand.  Fifth Third has got a lot

13  of tentacles out there, don't they?

14          MR. ROGERS:  And, you know, basically here, yes,

15  there is a conflict.  We understood Hoover Hull was going to

16  solve that.  But if Hoover Hull -- when Hoover Hull stops

17  working --

18          THE COURT:  Okay, but are you happy now that they

19  started up again, does that fall --

20          MR. ROGERS:  No, at least I can only speak for us.

21  But the question is, if they felt it was appropriate for them

22  to stop --

23          THE COURT:  All right.

24          MR. ROGERS:  -- in April because the Trustee didn't

25  think it was worth it, how -- what kind of job are they going

1  to do.

2          THE COURT:  All right.  Yes?  Please come forward

3  and state your name for the record.

4          MS. DelCOTTO:  Laura Day DelCotto, Your Honor, and I

5  know you are searching for solutions.  And from my client's

6  perspective, all roads have always led to Fifth Third, because

7  my client's issues are the relative weights and merits of my

8  unpaid cattle producers versus the bank.  And whether I get

9  into the law, but Article 2, a constructive trust, unless you

10 just say you can never ever ever have one, analyzing a

11 proposed settlement and a plan, I cannot do that in any way

12 until I know facts about Fifth Third.

13         And I don't see how you can rule on anything until

14 we all know facts about Fifth Third.  And there's a lot of

15 frustration because we're a year into the case, and we still

16 don't know anymore facts than we knew at the beginning,  and

17 the case seems to be moving forward with plans that are

18 already negotiated, and summary judgments about title, and

19 other things that in my mind all go to Fifth Third.

20         So my proposed solution is --

21         THE COURT:  Well, let me ask you this.  All right,

22 people want to talk about equitable subordination of Fifth

23 Third's claim, and some of the pleadings talk about, you know,

24 Fifth Third is responsible for all these checks bouncing all

25 over the United States and millions of -- tens of millions of

1  dollars in checks.

2          What do you have to show to equitably subordi --

3  we're not going to try the case today, Mr. LaTour, so don't

4  get nervous.  The -- I mean, you'd have to show -- I mean, I

5  haven't seen their security agreement.  I'll bet you there's a

6  clause in there at some point if they feel insecure or

7  whatever the clauses always say, they can cut off their line

8  of credit.  Or if they're out of trust, or you know -- any --

9  I'm sure by the time we get to this, if we do, they're going

10 to point to four or five legitimate reasons under the contract

11 that Eastern was not in compliance.

12          I mean, Eastern, hardly anybody in here is going to

13 disagree that Eastern was not doing business properly.  And

14 so --

15          MS. DelCOTTO:  Who at the bank knew what, when about

16 that very point.  Eastern was not doing business properly.

17          THE COURT:  All right.

18          MS. DelCOTTO:  Apparently DSI has now opined since

19 2008.

20          THE COURT:  All right.

21          MS. DelCOTTO:  So who at the bank knew what, when

22 and what did they do about it?  And those are just facts, and

23 I can't even answer your question about good faith purchaser

24 for value, or unjust enrichment, or equitable subordination

25 until I know what the facts are.  When I know the facts, I'm

1   going to stand up here and tell you I lose, they did

2   everything right, I might have a claim against them.

3           So that's all -- I just think the answer is we stop

4   all the papers and motions, and we either talk or we do

5   discovery, and we do depositions and get Fifth Third's

6   documents, and then we come back in 120 days or six months or

7   whatever it is, when we know what the facts are, and by then

8   we may have worked out, if we knew what the facts are.  We

9   might say 20 per cent's a great deal, we'll vote in favor of

10  your plan.  But we can't do anything in my mind until we know

11  the facts.

12          MR. ROGERS:  And one thing I might add to that

13  point, Your Honor, is from our point of view, it's not really

14  a coincidence that the Trustee and the bank have filed summary

15  judgment motions dealing with constructive trusts, these

16  threshold issues at this stage when everyone understands

17  discovery hasn't occurred.  Nobody knows anything about what

18  Fifth Third knows.

19          Hoover Hull hasn't investigated anything.  And the

20  strategy of the case, when to do what, is being determined by

21  who?  Fifth Third.

22          MR. CARR:  That's not true.

23          MR. ROGERS:  That's the debtor's agreement.  That's

24  what the time records show, that's what the financing order --

25          MR. CARR:  (Unclear)

**Page 53**

1          THE COURT:  There's already one standing.

2          All right, I'll let you respond, Mr. Carr.  And then

3    we're going to go down the agenda and finish off the things

4    that are set for today.

5          MR. CARR:  Let me answer, I want to answer your last

6    question about equitable subordination and make a suggestion

7    to you and your law clerk.

8          Take a look at 205 BR 149 which is a Bankruptcy

9    Court decision in Minnesota in 1997.  It's the ***Spring Grove***

10   ***Livestock Exchange*** case.  A case very much like this case, a

11   case where the Trustee sought to equitably subordinate the

12   bank and the factual circumstances very much like this with

13   check kiting, et cetera, and you're going to see.

14         And here's the point about the stuff that Mr. Rogers

15   just started talking about.  A year ago when we got employed,

16   we filed two affidavits with the Court and advised the Court

17   exactly about what our firm's position was --

18         THE COURT:  Well, I know, and nobody objected to

19   that.

20         MR. CARR:  No, but I want -- there's a point on

21   this.

22         The only limitation that was imposed upon us is that

23   we, our firm, couldn't sue them.  There's no limitation that

24   we can't advise the Trustee, that we can't analyze these

25   things.  Mr. Rogers stands there and says Fifth Third is

1  directing this case?  Fifth Third is not directing this case.

2  We are.

3           I have -- I've been practicing law for 36 years.  I

4  can't remember back all of them, but I don't believe I've ever

5  billed an hour to Fifth Third Bank.  I know Ms. Hall hasn't, I

6  know Mr. Toner hasn't.  I don't think that Mr. Knauer has.

7           We told the Court back then, Fifth Third fees for

8  our case, for our firm, represented one-half of one per cent.

9  And the idea that we're going to take a dive or pull a punch

10 on that basis is absolutely offensive, Your Honor, and it just

11 makes no sense at all.

12          And we haven't, and what's going on here is people

13 that we're litigating with want to substitute their judgment

14 for how we approach this for ours --

15          THE COURT:  Right.

16          MR. CARR: -- and their perspective for ours.

17          THE COURT:  Okay.  Let's -- I've let everybody go,

18 and I started it so I take blame for it.  But I think it's

19 been helpful.  But I'm going to -- I'm going to retake control

20 of the agenda here, and I've -- I think it's been helpful to

21 me in a number of ways, and we're going to -- and here's what

22 I'm going to do.

23          I mean, as to the constructive trust issue, I think

24 the point that Ms. DelCotto made is true, but that doesn't

25 mean -- I mean, if I decide that you can't have constructive

1    trusts, then I issue an order that I'll enter into several

2    adversaries and into the motion -- and if I decide that they

3    can exist and they're fact sensitive, then obviously there'll

4    be a need for additional discovery and they're going to be --

5    they'll have to be determined on a case -- more of a case-by-

6    case basis.

7            So I'll issue an order that does one of those two

8    things.  Do you want to -- I know you tried to come up here

9    before and --

10           MR. PLOURDE:  If I could, Your Honor --

11           THE COURT:  Please --

12           MR. PLOURDE:  I understand what you're saying and I

13   think that's the best -- the appropriate way to --

14           THE COURT:  Please state your name for the record.

15           MR. PLOURDE:  I'm sorry, Ross Plourde here on behalf

16   of Stockman Oklahoma Livestock Marketing, Crumpler Brothers,

17   Inc.

18           Let me, if I could, just kind of put that a little

19   bit into context, because the issue that was teed up for

20   argument today was, as structured by the Court's scheduling

21   order, a very limited issue as to whether Omegas (phonetic)

22   precluded the existence of a constructive trust in bankruptcy

23   absent a pre-petition judgment.

24           THE COURT:   [reading]

25           "Whether an average state law can operate to impose

1            a constructive trust over proceeds of the debtor's

2            sale of cattle, absent a pre-petition judicial

3            determination impressing such a constructive trust

4            over debtor's assets."

5        MR. PLOURDE:  And we did that, because we understood

6   that there was a pure legal issue.  We stipulate to the fact

7   that there was no pre-petition judgment in our case, and that

8   was a pure legal issue that the Trustee said was preclusive.

9        Now the briefing on that -- I tried to address just

10  that issue.  The Trustee's briefs and the other briefs that

11  have been filed have gone pretty far afield from that.  And

12  the issues that are encompassed in what has been briefed by

13  the opposing parties on that, encompass a lot of issues that I

14  would like to do discovery on.

15       And I think that's the situation with the adversary

16  proceedings. with the motion for summary judgment pending the

17  adversary proceedings.  It's something that requires some

18  discovery.

19       THE COURT:  Well, I think it --

20       MR. PLOURDE:  And so --

21       THE COURT:  I may -- we may get to that point.  I

22  don't know when I'm going to rule on the constructive trust

23  issue.  I've been into it pretty deeply the last ten days or

24  so, and it's an interesting question.  I think even the

25  treatises might disagree as to whether constructive trust is a

1  remedy, whether it exists as of the date of any wrongdoing.

2  The Sixth Circuit has a line of cases that go one way.  I've

3  seen a couple decisions from Oklahoma, and I've seen a lot of

4  decisions that I didn't think were too helpful, but I've seen

5  some that raise a lot of interesting questions.

6        The interesting thing about the dispositive issue

7  question, and I don't want to be critical, but, you know,

8  whether -- if you answer Yes -- of course if you answer No,

9  that's fairly clear what the answer is.  If you answer yes,

10 that doesn't mean there was a constructive trust.  All the

11 question asks is can they exist, absent a judicial determina

12 -- a prior judicial determination.

13        Now --

14        MR. PLOURDE:  There's a reason for that, because we

15 understood that if you answered Yes, then it was going to

16 require a bunch of discovery.

17        THE COURT:  And I still think that's where we are.

18 If I answer Yes, then we're going to see if it's possible that

19 there is one.  And where.  You know, because there's some that

20 might be -- there are some that are alleged to have occurred

21 in Texas and Oklahoma and various -- various different --

22 obviously state law differs, which is one of the points that

23 the judges and Courts say that it's a matter of federal law

24 and it shouldn't exist in Bankruptcy Court, frequently rely

25 on.

1    So this -- there's interesting decisions going both

2    ways.  And I'll -- I'll get you an answer on that question.

3    So here's what I think we ought to do in terms of

4    moving this case along.  I'm going to issue an order on the

5    constructive trust issue.  That will probably be issued

6    sometime in January, no later than early February.  It depends

7    on how delayed we get by the holidays and et cetera.

8    As I've indicated today, that could lead -- that

9    could lead to other things, or it could be an order saying

10   that you're not -- I don't think there are constructive trusts

11   in Bankruptcy Court.  Maybe not quite that broad, but it could

12   be a No for a variety of reasons.

13   The other issue is the information.  I'd like for

14   the Hoover Hull firm to file within 90 days a preliminary

15   report to the Court as to its position on equitable

16   subordination.

17   I'd like any party -- and I assume this is already

18   going on.  But as documents have been conveyed to the

19   Trustee's counsel, Hoover Hull, I assume they're -- are they

20   made immediately available to other parties or how does that

21   work?

22   MR. WHITE:  (not near microphone) We just got

23   permission from Fifth Third that the documents we have will be

24   delivered to Baker & Daniels so they can be uploaded to the

25   Trustee's data(unclear).

1              THE COURT:   All right.

2              MR. WHITE:   And any further documents that we

3    receive, we'll do that as well, Your Honor.

4              THE COURT:   So all documents that you receive are

5    going to be uploaded and available for purview by other

6    parties, so that they can come in here at a status, or a

7    hearing that we have in about 90 days, and we can discuss your

8    preliminary -- I understand you said you needed 120 days.

9    That's why I said preliminary --

10             MR. WHITE:   Your Honor, is that report filed and

11   cleared -- is that available to anyone or is that just for the

12   Court?    (Pause)  Can I make a suggestion?

13             THE COURT:  You can make a suggestion.  I was

14   thinking that it would be available.  But I understand that if

15   there is going to be litigation, you don't want to give away

16   your --

17             MR. WHITE:   Exactly.

18             THE COURT:   -- litigation strategies.

19             MR. WHITE:   Exactly.  What theor -- we had in mind

20   that their investigation was going to lead to was of course a

21   disclosure statement, so that people could make an intelligent

22   decision with regard to this plan.

23             The --

24             THE COURT: Well, I don't know.  I mean, let's put it

25   this way.  I think if the conclusion is that you don't think

1  you should pursue that or you don't think the Trustee should

2  pursue that, then I think you can explain why.

3           MR. WHITE:  Thank you.

4           THE COURT:  Because that would be the same kind of

5  information that you would anticipate would be in your

6  disclosure statement anyway.

7           Obviously if you think that you do want to pursue

8  it, then I think you should request from the Court some

9  guidelines as to how to release that information.  You may

10 want confidentiality agreements with parties that are going

11 to, you know, that you're going to convey information to.  But

12 they're going to be looking at the same documents and they

13 may, they may have questions for you in the event that your

14 division is No.  And that's kind of what I'm hoping that this

15 release of information will accomplish.

16          Yes, Mr. Levin?

17          MR. LEVIN:  Thank you, Your Honor.  I understand the

18 issues involving standing and *pari delicto,* but could their

19 report also include any other causes of action that may exist

20 or why they do not exist, other than equitable subordination?

21 Equitable subordination is just one item here.

22          THE COURT:  Well, that's fine.  I think you've

23 already determined that certain other causes of action don't

24 exist.  I mean, I've already ascertained that it's the

25 Trustee's position that as far as, for example, the perfection

1   of the security interest that you think their liens are valid,

2   is that correct?

3            UNIDENTIFIED COUNSEL:  Yes.

4            THE COURT:  And yeah, I'd like for you to -- if you

5   have considered other claims or causes of action, and decided

6   not to pursue those, the same format.

7            MR. LEVIN:  Thank you, Your Honor.

8            THE COURT:  If you are thinking that you're going

9   to, there again, I'm not going to as you to splash that on the

10  record if it's going to be a matter of litigation.

11           MR. LEVIN:  Thank you.

12           THE COURT:  Okay.

13           MS. YATES:   (Very difficult to hear, telephone

14  transmission) Jessica Yates for CPC Livestock.

15           May I ask a clarifying question?  From the first

16  (unclear) trust order is that the procedure the Court will be

17  following, then the Trustee filed a reply on December 8th in

18  support of its motion for partial summary judgment.  They

19  raised two new arguments:  One based on CPC's Section 702 and

20  another based on the Bankruptcy Code, and this is something

21  that I know my client would like to respond to, and that there

22  may be other (unclear) also respond to that.

23           THE COURT: All right, how long do you need?  How

24  long do you need?

25           MS. YATES:  Your Honor, I was thinking it would be

1   helpful to have a couple weeks (unclear) to file a (unclear)

2          THE COURT:  You can have until January the 3rd.

3          MS. YATES:  Thank you, Your Honor.

4          UNIDENTIFIED FEMALE:  That's for anyone, Your Honor?

5          THE COURT:  Anyone that wants to file that, a

6   surreply to that reply by the Trustee on its motion for

7   summary judgment.   Mr. Rogers.

8          MR. ROGERS:  If I may, Your Honor.  On the general

9   subject of disclosure and information, I know one thing that's

10  come up on a number of occasions that I would request on

11  behalf of Superior relates to the Trustee's budgets.

12         There's been a lot of discussion about what, what

13  has occurred and what has not occurred and what role Fifth

14  Third played in it.  We of course don't know anything other

15  than what we could glean from the time records.  And I know

16  the Court has on occasion indicated surely there's something

17  in there they could give us.  We received nothing in that

18  regard.

19         We also requested the preliminary report from Hoover

20  Hull (unclear).  We never received any answer to that request,

21  whether we can see it or not see it.

22         MS. HALL:  Your Honor, just briefly.  In the second

23  Trustee's status update conference call with all the creditors

24  that we had right before this hearing, we -- I admit, we did

25  not disclose the budget.  And I think a couple hearings ago we

1    said we would without litigation, disclosure in there.  And I

2    told everybody that we would do that.  So we will get that on

3    the blog today.  As to the preliminary report  Mr. Rogers

4    wasn't at the meeting, so maybe he doesn't remember, but I

5    don't know that.

6          MR. ROGERS:  I was not there.  But certainly in

7    responding to the fee applications, information like that

8    would be helpful.

9          THE COURT:  All right.  I want to move through, I

10   want to move through the agenda now.  All right, this is it.

11         MR. LaTOUR:  I just want to give you a hopeful fact,

12   Your Honor.

13         THE COURT:  Go ahead.

14         MR. LaTOUR:  Third Bank did not veto any action

15   taken by or contemplated by the Trustee on the basis of the

16   budget.  There was no action taken with respect to the budget.

17   So the budget is not going to be very insightful to prove the

18   point that Fifth Third's running the case because we had no

19   input at all on it.

20         THE COURT:  All right.  Look, I'm not -- well, I'm

21   not going to get into that because I already made this way too

22   freewheeling already.  But maybe it's been helpful to a

23   certain extent.

24         All right, let's move through the matters on the

25   agenda.  The -- under continued matters, matter (1)(a) is the

1  Stockman Oklahoma Livestock Marketing, Inc.  This is the

2  Trustee's --

3           ATTORNEY:   That's the constructive trust matter.

4           THE COURT:   -- that's the constructive trust

5  matter.  And we've got the interpleader, plaintiff's joint

6  dispositive issue and memorandums that we've seen.  And I

7  think this is just all the responses to that, right?

8           MR. CARR:  That's right, Your Honor.

9           THE COURT:  And I've indicated that the Court's

10 going to rule on the constructive trust issue as promptly as

11 possible.

12          We've dealt with Item #2, the Peoples Bank and Trust

13 item.  That's set for trial and hearing on the motion for

14 relief in February.

15          We've got the -- then we've got the three fee apps

16 with multiple objections.  Does anybody want to add anything

17 to that matter?

18          MR. CARR:  I'd like to say a few more things.  I

19 never quite got to respond.  We've never had a chance to

20 respond to these objections.

21          THE COURT:  All right.

22          MR. CARR:  And a lot of what I was going to say I've

23 already said, so --

24          THE COURT:  All right, you don't need to respond.

25 I'm going to grant the fee apps.

```
 1              MR. CARR:  Great.

 2              THE COURT:  The Ad Hoc Committee, there are

 3  objections from the U.S. Trustee and the -- I think also the

 4  Trustee.

 5              MR. LaTOUR:  And Fifth Third, Your Honor.

 6              THE COURT:  And Fifth Third, yes.  Mr. Wharton, you

 7  want to be heard on that?

 8              MR. WHARTON: (not near microphone) Our claim is

 9  pretty simple.  Our concerns are twofold.  We don't want them

10  to have a privileged protection (unclear) and we want to make

11  certain they continue to and comply with Rule 2019.

12              MS. HALL:  And that's essentially the Trustee's

13  objection.

14              THE COURT:  Yes, what about that?  I mean, I don't

15  see -- I don't want to create a new privilege.  Is that a deal

16  breaker as far as you're concerned, Mr. Ames?

17              MR. AMES:  Your Honor, since you put it like that, I

18  guess it isn't.

19              THE COURT:  Okay.  And the other -- the compliance

20  with the rule would entail what, Mr. Wharton?

21              MR. WHARTON:  Just for the disclosure to the extent

22  there's any change in the ownership or the counsel's

23  involvement.

24              MS. HALL:  The only other kind of just procedural

25  issue, Your Honor, in the interest of not injecting yet
```

1  another party into the case, they're not hiring counsel for

2  the Ad Hoc Committee.  So it would be -- I don't know if Mr.

3  Rogers contacts me, whether he's speaking for the Ad Hoc

4  Committee, whether he's speaking for Superior or Ms. DelCotto,

5  if she's speaking for one of her 20 clients or for the Ad Hoc

6  Committee.

7        THE COURT:  Well, yeah.  I mean, for example, I

8  mean, I'm a little bit unclear as to how this will work, too,

9  because it is kind of an unusual situation.  But, for example,

10  you know, today everybody had to file an objection to the fee

11  app.

12        Do you anticipate that if there is a sort of Ad Hoc

13  Committee, that still every party will file an objection to a

14  motion, or that there'll be one?  Because when you say that

15  there's not going to be counsel for that Ad Hoc Committee,

16  then that makes me wonder for really if there's any economies

17  that are being realized here.

18        MR. AMES:  Well, Your Honor, when this first came

19  up, it was too hot outside, and I think we first thought of it

20  in the summer, after four attorneys were out in the hallway

21  expressing frustrations as to a number of issues, one having

22  to do with a lack of information.  And there becomes a point I

23  think in any case where enough perception becomes fact.  And

24  these four parties, who are all signatories, and I guess by

25  virtue of (unclear), I'm on first, they can say what they

1  feel, but we all felt that we had common issues, common ways

2  to proceed in this case, and to move it along and get the sort

3  of information that we wanted.  We felt that it would be more

4  of (unclear) coming from an Ad Hoc Committee since there was

5  no official Creditors' Committee been appointed in this case.

6          And I think in Laura Day's response, she said that

7  typically you have that  -- that third leg of the stool in

8  order to kind of counterbalance the situation.

9          THE COURT:  I guess my question more specifically,

10 let's say, for example, the next fee petition you object to,

11 all of you object.  Will I get an objection from the Ad Hoc

12 Committee, or will I get a objec -- and signed by whom, if

13 there is no -- signed by all four attorneys?

14         MR. AMES:  Probably all four.

15         THE COURT:  So I get an objection, one pleading

16 that's from the Ad Hoc Committee but it will be signed by all

17 four attorneys.  Is that how you anticipate?

18         MR. AMES:  Yes.

19         MR. LaTOUR:  Yes, sir.

20         THE COURT:  All right.

21         MS. HALL:  They can do that already.

22         ATTORNEY:   (unclear, not near microphone), they can

23 do that now (unclear)

24         THE COURT:  Well, as long as -- I mean, what's the

25 harm if they're not going to get paid by the Court, they're

1  not going to have a privilege, an additional privilege, and

2  they need to comply with the disclosure?

3           MS. HALL:  Are they waiving now any right to recover

4  from the estate for any benefit by the virtue of the Ad Hoc

5  Committee, is that what --

6           THE COURT:  What do you mean by that?

7           MR. AMES:  Well, under --

8           MR. AMES:  (Unclear) contribution, I think, Judge,

9  is all the same.

10          THE COURT:  Oh.

11          MR. AMES:  And if they had a different conflict.

12          MS. HALL:  There also doesn't seem to be any

13  statutory basis for the Court to recognize an Ad Hoc Committee

14  or appoint it.  I mean, if they want to be one, they can be

15  one.  But they can't have all the other stuff that they want.

16          THE COURT:  What other stuff do they want now?

17          MR. LaTOUR:  Your Honor, can I address a couple of

18  things?  First of all, they want to manufacture standing

19  situations that are inappropriate.

20          THE COURT:  Like when?

21          MR. LaTOUR:  Okay, let's take First Bank for

22  example.  First Bank has filed a proof of claim in the case

23  asserting a 7.5 million dollar secured claim.  The basis for

24  the claim is that some cattle that should have been somebody

25  else's than Eastern's got mixed into the Eastern estate and

1  got turned into money.  Technically, that's really an argument

2  that those proceeds are not property of the bankruptcy estate

3  rather than a secured claim.

4          But for conversation ease, call it a secured claim,

5  if it's ever substantiated.  But what it definitely is not is

6  an unsecured claim, even if there is a deficiency.  Because

7  First Bank never lent a dime to Eastern Livestock.  First Bank

8  never did any transactions with Eastern Livestock.  It can

9  never be an unsecured creditor in this case, even if its

10 theory is upheld 100 per cent.

11         And yet, First Bank proposes to be a very active

12 member on this Committee that's being proposed so there is

13 some more oomph to provide a little more gravitas to the

14 opinions, should not be participating on things like equitable

15 subordination which would only benefit unsecured creditors, or

16 constructive trust issues, things that are actually against

17 his client's interest really because they are trying to get

18 cattle into the estate and then saying it's his rather than

19 keep cattle out, but that's beside the point.

20         He doesn't -- his client does not have standing on

21 these issues, but if he's part of a Committee that's then

22 granted standing, they can come in on any issue they want any

23 time.  And if you look at the literature of Ad Hoc Committees,

24 standing is figured out for those committees based on what the

25 participants already have.  They don't get new standing.

1        And it's *ad hoc* in total.  So if there are twelve

2   people on the committee, and nine of them want to do A and

3   three of them want to do B, there's nothing that prohibits the

4   three outliers from filing whatever they want or disagreeing.

5   But now there will be significant conversations about whether

6   a privilege was being abused because one of them wants to use

7   a fact learned in a conversation with the other one.

8        And the most important point is, is all the

9   economies they want to assume they can do with a joint defense

10  agreement that doesn't require any kind of order from this

11  Court or any kind of new entity or any new complexity in this

12  case or yet another, you know, size of the table to argue

13  about.

14        THE COURT:  Okay.  Next.

15        MR. ROGERS:  Your Honor, if I can interject a couple

16  of comments on this.

17        We already have a situation that involves many of

18  the same elements that counsel is talking about, in that we

19  have motions being filed by the Trustee on behalf of the

20  estate, and being briefed as well by Fifth Third whose

21  interests are derived from the estate.  And Fifth Third being

22  joined as a --

23        THE COURT:  All right, talk about your -- talk

24  about your situation.

25        MR. ROGERS:  Well --

1          THE COURT:  I mean, let's talk about, well, first

2     of all, is there -- I mean, do you have a secured creditor as

3     part of your Ad Hoc Unsecured Creditors' Committee?

4          MR. ROGERS:  It's not really denominated as

5     unsecured.

6          THE COURT:  It's not unsecured.  It's just ad hoc.

7          MR. ROGERS:  I mean I think everybody understands

8     from the disclosures that have been filed the nature of our

9     interests.

10          THE COURT:  Right.

11          MR. ROGERS:  But it's --

12          THE COURT:  Well --

13          MR. ROGERS:  I don't see how it complicates things

14     in any way --

15          THE COURT:  What about their concern that you're

16     going to come in at the end of the case and say you're

17     entitled to administrative expenses because of substantial

18     contribution?  I mean what would be -- go ahead.

19          MR. ROGERS:  We've never suggested that we intended

20     to do that, nobody's asked.  I don't know if we even have any

21     opinion that hasn't been thought about.

22          MR. AMES:  Your Honor, the only person that suggests

23     that is Ms. Hall, and if that was an offer, we may accept it.

24          MR. ROGERS:  The confidentiality is certainly

25     important to us.  I don't know how it's any different from the

1  confidentiality that the Trustee and the bank requested

2  regarding their discussions about budgets, our budgets.  If

3  this is advisory, I don't understand why that wasn't advisory,

4  and that was entered in an order.

5            MR. CARR:    Your Honor --

6            MR. ROGERS:   If it's (unclear, both talking at the

7  same time, neither near a microphone.   UNCLEAR)

8            MR. CARR:   There is no order that says that the

9  discussions between the Trustee and the bank are confidential.

10 There's no such thing.

11           MR. ROGERS:  The financing motion --

12           MR. CARR:  It says the budgets are confidential.

13           MR. ROGERS:  And if you read the motion, the motion

14 says, "Here's why, because we're going to have these

15 discussions about strategy."

16           MR. CARR:  It doesn't say that the discussions are

17 confidential.

18           MR. ROGERS:  Can I --

19           MR. CARR:  (Unclear)

20           THE COURT:  All right, all right.

21           MR. DONNELLON:  I can make a suggestion that we take

22 a brief break and let the persons who are on this Committee

23 chat about this as new developments that occurred today may be

24 something that we can jointly discuss, that may address some

25 of these concerns.  Would that be beneficial?

```
1            I really wanted to stand up between Mr. Rogers and
2    Mr. Carr.  Five, ten minutes might be appropriate to move some
3    of this along.
4            THE COURT:  All right, we'll come back to this.
5            MR. DONNELLON:  Okay.
6            THE COURT:  And then I'll allow you to do that.  But
7    I want to see what else we've got.
8            We got the adversary proceedings then.  We've got
9    Superior.  Go back to the very beginning of today's case, or
10   hearing, Mr. Bowles, and tell me why me ruling on forward
11   contracts isn't going to just delay getting things done in the
12   rest of the case.
13           MR. BOWLES: (not near microphone) Well, first of
14   all, you've got to remember what we've asked for, partial
15   judgment on the pleadings --
16           THE COURT:  Right.
17           MR. BOWLES:   -- is something that says what was our
18   status.  This won't delay anything because it comes down to
19   this:  It is possible, probably not, likely given Mr. Carr's
20   statements, he may never sue Superior or anybody knows who
21   might have formed contracts, but they haven't sued them yet.
22           This is basically something that we said we want to
23   (unclear) them to try to clear (unclear) because if it turns
24   out that --
25           THE COURT:  Well, why do you need a dec action now
```

1  that you're actually in an action action?

2          MR. BOWLES:  They're in an action action.

3          THE COURT:  Well, you responded to the Trustee's

4  motion for summary judgment, right?

5          MR. BOWLES:  Yes, but the Trustee's motion for

6  summary judgment wasn't on any of those issues of preferences.

7  Those have been tabled.

8          The only thing that we've responded to in the

9  motions for summary judgment is their motion on constructive

10  trust, an entirely different issue, we got a surreply and I

11  won't -- bite my tongue and not go into there.

12          But on this one,  ruling on this basically resolves

13  issues, because it's going to be disagreed about no matter

14  what.  If Your Honor rules and says -- and Your Honor could

15  go, "Yes, we automatically (unclear) on everything; no, we

16  don't (unclear) anything," or someplace in the middle, that at

17  least gives us an idea of where we're going.

18          Otherwise, if there was ever a chance for discussion

19  of settlement, they have one position, we have another one,

20  and probably there would be credibility (unclear).

21          So this doesn't complicate anything.

22          It also, Your Honor, goes for other people.  These

23  people keep saying these aggressive creditors want stuff for

24  themselves.  No, Your Honor.  First of all, we aren't

25  particularly aggressive.  We are vigilant in our rights, but

1  not aggressive.

2        Secondly and more importantly, Your Honor, if you

3  establish as a matter of law that what we've said is correct,

4  then any other party who had this type of contract, you don't

5  have to hear all those preference suits.  They might get rid

6  of the 150 preference suits, and that doesn't (unclear)

7  because basically it's what Congress has provided.

8        That's why it doesn't hurt anything, Your Honor.

9        THE COURT:  All right.  I'll rule on your motion as

10 I've indicated I would in the past, and I will do -- Friona,

11 go ahead, Mr. Donnellon.

12        MR. DONNELLON:  Can I just interrupt since you said

13 you were going to table that.  We -- it's been whispered to me

14 why don't we suggest that we pass on the ruling on the Ad Hoc

15 Committee motion until the next omnibus so we can discuss this

16 more fully.

17        THE COURT:  All right, why don't we do this, too.

18 Why don't you, if you're still seeking that, amend your motion

19 and set forth that (a), you're not seeking confidentiality, or

20 privilege I should say.  And (b), that you're reserving the

21 right to ask for administrative payment as making a

22 substantial contribution, or you're not.  You reserve it or

23 don't reserve it.

24        And then I'll set it for the next omnibus.

25        Friona, I think we've got briefed.  Is it fully

1  briefed, summary judgment.

2      MR. LaTOUR:  Your Honor, I'm sorry to interrupt.
3  Superior, there was a motion to defer briefing that was not
4  addressed.

5      THE COURT:  Oh, yes, there is a motion to defer
6  briefing.

7      MR. LaTOUR:  Your Honor, I don't understand why
8  there should be a deferral because the rules don't contemplate
9  that if there's one motion pending, everybody else is
10 precluded from filing their own motions.  Because the 12(c)
11 motion exists, there's nothing that precludes my client from
12 filing a Rule 56 motion.

13      And as a practical matter, it doesn't slow anything
14 down because we're talking about the exhibits that they
15 uploaded as evidence for their motion, and we're talking about
16 the same legal issues.  It provides a procedural basis for
17 Your Honor that if you decide that they --

18      THE COURT:  Isn't your -- isn't his motion, and I
19 might be confusing this, because it's been -- isn't his motion
20 just basically the opposite of yours?

21      UNIDENTIFIED COUNSEL:  Your Honor, let me first say,
22 I don't know if there's a huge issue to us, but it is the
23 opposite of ours but goes beyond it.  And really I think the
24 point of our motion to defer, we don't challenge their right
25 to file the motion.  We understand that.  But a significant

1   part of it deals with the same issues.  And because, you know,

2   -- we're trying to economically represent our client as best

3   we can.

4          Does the Court want us to brief the same issues

5   multiple times because they're raised by two motions?

6          THE COURT:  Well, I would hope that you know, as to

7   the -- the issues that have been fully briefed on your motion,

8   that you're all not going to give me briefs on the same issues

9   again.

10          UNIDENTIFIED COUNSEL:  That's our view, Your Honor,

11  but it wasn't clear.

12          THE COURT:  I mean, but he is right, isn't he, that

13  the scope of your motion is somewhat broader than the scope of

14  his motion?

15          MR. LaTOUR:  On their motion, seeking judgment on

16  the pleadings, if you said No, all that happens is everybody's

17  back to square one.

18          THE COURT:  Right.

19          MR. LaTOUR:  If, in addition, in response to my

20  motion you said Yes, then those issues are disposed of.  I

21  filed the motions to give you the opportunity to decide is it

22  Yes, they win; middle of the road, nobody wins; or yes, Fifth

23  Third wins?

24          THE COURT:  I'm going to defer for 60 days for this

25  reason.  I'm going to rule on theirs.  And that's a point that

1  I hadn't really thought of that you just -- because after all,

2  nobody will really have to appeal that decision because it

3  really is just back to square one.

4           MR. LaTOUR:  Right.

5           THE COURT:  And so in order not to have an immediate

6  pending appeal, I'm going to defer for 60 days the briefing

7  schedule on your motion for summary judgment.

8           MR. LaTOUR:  Thank you, Your Honor.

9           Now may I address the comment made about whether

10  their motion is helpful or not?  Your Honor, I would

11  respectfully submit that even if you rule in favor of them,

12  it's not helpful at all.

13          A Chapter 5 avoidance action is transaction

14  specific.  It's going to depend on each actor, whether there

15  was a transfer from the estate, whether that transaction was

16  the kind of transaction that fits into a forward contract or

17  something like it.

18          So if you drape them with the status of doing

19  forward contracts sometimes somewhere in some circumstances,

20  that does not answer the question on any particular transfer,

21  whether that status is appropriate.   And so for any so-called

22  advisory opinion on the status, really doesn't help with

23  anything.

24          THE COURT:  Well, I do think you're right in terms

25  of there are different factual -- I mean, I think even they

1  have acknowledged that some of these contracts are different

2  than others.  So I --

3          MR. LaTOUR:  Well, I point out, Your Honor, that the

4  sequence is completely backwards.  Normally the Trustee files

5  an action to avoid the specific transfer, and you've got to

6  say who, what, where, when, where, how.  And then defenses are

7  raised, and a 546(d) or (g) defense would be appropriate,

8  because then you know what transaction you're talking about.

9          THE COURT:  I understand.  But Mr. Bowles decided to

10  bring it as a declaratory judgment action, and as far as I can

11  tell, the rules allow him to do that.  Believe me, I've tried

12  to see if they don't.

13          MR. LaTOUR:  I'm not disputing that he can tee it up

14  that way.  I'm suggesting that the holding is ultimately not

15  useful at all because you still have to go look at every

16  transaction that is under attack to determine whether the

17  holding is applicable or not.

18          THE COURT:  All right, I understand.  We're having a

19  sale on useless holdings in this case.  All right.

20          Friona, I asked the question if that's fully

21  briefed.

22          MR. TONER:  Not as to the first one on our trust

23  issues.  You just still have the surreply briefing to go

24  forward --

25          THE COURT:   Yes, (unclear) yes.

1          MR. TONER:    -- but then it will be fully briefed.

2          There is another summary judgment by Superior on

3    five lots of cattle that's not fully briefed as yet.  And I

4    don't know where the Cactus, Robert Nichols summary judgment

5    is, but I don't think it's fully briefed either.

6          UNIDENTIFIED: (unclear) right, Jim?

7          THE COURT:   So the --

8          MR. TONER:  He's not here.  He might be on the

9    phone, but I don't think it's fully briefed either.  So

10   discovery is going forward while this briefing gets complete.

11         THE COURT:  All right.  But --

12         MS. YATES: (poor phone audibility) Your Honor, this

13   is Jessica Yates speaking to you.  If I might offer a

14   (unclear) impression to the Trustee's comment on the fully

15   briefing the motion for summary judgment and partial summary

16   judgment.

17         The Trustee has also filed a motion for relief

18   (unclear) evidence, (unclear) filed a motion for partial

19   summary judgment.  And that motion was filed on the 8th.  We

20   have not had an opportunity to object to that, and so that's

21   again, along with a surreply, would be one long (unclear)

22   another (unclear) for additional briefing.  So I did want to

23   make that (unclear).

24         THE COURT:  All right.

25         MR. TONER:  Perhaps that could be done by the 6th,

1  as one response.

2            MS. YATES:  Your Honor --

3            MR. TONER:  I mean the 3rd.

4            THE COURT:  Could you respond by the 3rd on that

5  also then?

6            MS. YATES:  Yes, Your Honor.

7            THE COURT:  All right, that will be fine.

8            MR. DAWSON:  If the Court please, this is Jack

9  Dawson.  I represent Nichols Livestock, an adversary with

10 Cactus, and I am finishing up a motion for summary judgment as

11 we speak, and probably will have it filed later today.

12           THE COURT:  All right.  Thank you.

13           MS. MOORE:   Your Honor, I --

14           THE COURT:   I've been hoping for a motion for

15 summary judgment.  Yes?

16           MS. MOORE:  You may have to settle for a surreply.

17           THE COURT:  All right.

18           MS. MOORE:  Christy Moore for Superior.

19           We had filed a motion for judgment on the pleadings

20 on a discrete issue with respect to specific sales.  It

21 involved about $380,000 --

22           THE COURT:  Right.

23           MS. MOORE:   -- for some specific clients.

24           We filed our reply brief on November 28th which

25 should have closed the pleadings last night.  There were some

1 additional papers filed that in all honesty I have not looked

2 at them in depth but they look to be some supplementaries,

3 some reply replies.

4          I would just like for Superior to have an

5 opportunity to do a surreply if --

6          THE COURT:  This is in Friona, your motion --

7          MS. MOORE:  It is in the Friona, yes.

8          THE COURT:  Your motion for a partial summary

9 judgment.

10          MS. MOORE:  I believe so, Your Honor.

11          MR. MASSOUH: Your Honor, John Massouh on behalf of

12 Friona.

13          I think Ms. Moore might be a little confused --

14          MS. MOORE:  I could be.  It was late last night.

15          MR. MASSOUH:  Is she referring -- there's two

16 motions for judgment on the pleadings filed by Superior.

17 There's one in the Superior adversary and one in the Friona

18 adversary.

19          THE COURT:  Right.

20          MR. MASSOUH:  The Superior adversary deals with all

21 the (unclear) contract, we've already discussed that.

22          MS. MOORE:  Correct.

23          MR. MASSOUH:  I think the pleadings are closed on

24 that, and Your Honor can issue an opinion at some point.

25          THE COURT:  Right.

1          MR. MASSOUH:  The other motion for judgment on the

2   pleading filed by Superior in the Friona adversary deals with,

3   I believe four or five specific sets of cattle --

4          MS. MOORE:  Correct.

5          MR. MASSOUH:  -- delivered to Friona in Cactus.

6   There's some confusion whether or not that was a motion for

7   judgment on the pleadings, whether it a motion for summary

8   judgment.  What we did was, under the deadline we filed a

9   response as if it was a motion for judgment on the pleadings.

10  They've attached a bunch a evidence, we deemed it (unclear,

11  not near microphone; fuzzy pick-up).

12          In the conclusion, I believe the request was for

13  partial summary judgment, so we didn't know what it was, and

14  so late yesterday when the deadline is today to file a

15  response if it was a motion for summary judgment, we filed our

16  response to that as if it was a motion for summary judgment.

17  Obviously she'll have an opportunity to reply to our response

18  and so the briefing on that is not yet complete.

19          MS. MOORE:  That's what I wanted to make sure.

20          THE COURT:  Okay.

21          MS. MOORE:   Okay.

22          THE COURT:   So that, I believe if you all have your

23  agendas, I believe that's on page 7, item F.

24          MR. MASSOUH:  I think that's -- yes, item F, yes,

25  Your Honor.

1          THE COURT:  Yes.  Okay.  So that's not -- the

2  pleadings are not closed in that matter.

3          MR. MASSOUH:  Correct.  And we filed our responses

4  to the motion for summary judgment yesterday, and they haven't

5  had an opportunity to reply yet.

6          THE COURT:  All right.  The Innovative Livestock vs.

7  Eastern.

8      (Low-voiced discussions)

9          MR. CARR:  There was a withdrawal of the motion to

10  stay proceedings in that, by Superior I believe, so I don't

11  think that's still pending.

12          THE COURT:  So that's still -- so the --

13          MS. HALL:  There's just nothing going on.

14          THE COURT:  There's nothing going on.

15          MR. CARR:  There is not.

16          THE COURT:  All right.  Let's don't touch it then.

17  Rush Creek Ranch.

18          MR. NEWBERN:  Your Honor, this is Scott Newbern on

19  behalf of the Florida Livestock Markets.

20          I understand that we have consolidated the matter

21  with respect to the Rush Creek Ranch with some other matters

22  that are covered by virtually the same set of fact patterns

23  that includes the Miller matter and some of the receivables

24  that the Trustee claims are receivables, and we object to

25  that.

1          We have not yet set up a schedule.  We're going to

2    be working on that, and we'll have something within the next

3    month I would anticipate.

4          MR. TONER??:  That's right.

5          THE COURT:  All right, so when you say consolidate--

6          MR. NEWBERN:  We're consolidating a number of

7    matters into one, either through an adversary proceeding or --

8          THE COURT:  But it's not been accomp -- this

9    consolidation has not been accomplished yet.

10          UNIDENTIFIED COUNSEL:  I don't believe it has --

11          MR. NEWBERN:  Only by agreement.

12          UNIDENTIFIED COUNSEL:  -- by the Court yet.

13          MS. HALL:  A lot of Mr. Newbern's issues with the

14    Trustee came out of the purchase made claims report, and

15    rather than set up another contested matter, he's flowing into

16    Rush Creek.

17          MR. NEWBERN:  Yes.  If we could do it that way,

18    whatever is --

19          THE COURT:  Well, that's fine.  I don't care

20    procedurally how you bring it to a head, as long as you all

21    agree --

22          MR. NEWBERN:  Right.

23          THE COURT:  -- how to do it.

24          ATTORNEY:   We do.

25          THE COURT:   Very good.  So I'll show that matter as

1 continued for status.   Fredin Brothers.

2          MR. TONER:  The only thing, Your Honor, is the

3 Trustee's motion to amend our answer out of caution to assert

4 our -- filed in ordinary course affirmative defense.  I don't

5 think there's even been an objection to that.

6          THE COURT:  I'll grant that motion.

7          MR. LAIRD:  Your Honor, this is David Laird on

8 behalf of Peoples Bank (unclear) again.

9          THE COURT:  Yes.  I'm sorry, did you want to say

10 something?

11          MR. LAIRD:  Yes, Your Honor, can you hear me?

12          THE COURT:  Yes.  Yes.

13          MR. LAIRD: Back to the Trustee (unclear, poor

14 telephone audibility) but we want to make two additional quick

15 related points.

16          The motion to amend the cross claim was brought in

17 response to the motion for summary judgment, brought by

18 Peoples Bank, related to priority security interest in

19 interpleading funds.  I wanted to bring that to the attention

20 to the Court because it's now been fully briefed with

21 responses from the Trustee and Fifth Third.

22          THE COURT:  All right.  So we've got a -- we've got

23 a fully briefed, what, motion for summary judgment that you've

24 brought?

25          MR. LAIRD:  Yes, Your Honor.

1          THE COURT:  I didn't have that on my docket, but

2   I'll -- is that --

3          MR. TONER:  Let me double check that and make sure

4   that's correct.  I think it is, but I'll need to check.

5          THE COURT:  All right.  Well, check that also, and

6   if it is a fully briefed motion for summary judgment, we'll

7   take that under submission and --

8          MR. TONER:  The confusion is one summary judgment

9   was withdrawn and another -- a cross-motion for summary

10  judgment remained pending, so we'll need to check.

11         THE COURT:  All right.  Okay.

12         MR. CARR:  Your Honor, one more thing.

13         THE COURT:  Yes.

14         MR. CARR:  I think it's good news.  I want to tell

15  the Court that, and we've discussed this with creditors.  The

16  Trustee is going to file a motion very shortly asking the

17  Court to appoint sort of a standing mediator, a la, Mr.

18  Fishman who we used in the Loft case that would allow people,

19  if they choose to do so, to have issues mediated.

20         And I just want to tell the Court we're going to be

21  putting that on file very shortly.  We've identified somebody

22  that was recommended to us by the National Association --

23         UNIDENTIFIED COUNSEL:  National Cattlemen's Beef

24  Association.

25         MR. CARR:  And so that motion will be coming.  The

1  concept will be that that will be off the side, off the scene,

2  and the Court won't be apprised of that, but hopefully it can

3  lead to some resolutions.  And I think we already have one

4  request from a party to mediate a matter under that.

5          THE COURT:  All right.  Very good.  Anything else to

6  come before the Court today?

7          Hearing nothing, we are adjourned.

8  (End at 12:09 p.m.)

9              * * * * * * * * * * *

10         I certify that the foregoing is as true and accurate

11 a transcript as can be produced from a low-volume telephonic

12 hearing with many, many lawyers on the telephone, low echoing

13 audibility in the courtroom, and lack of adequate microphones

14 for all attorneys in the courtroom.  It was produced, with

15 difficulty, from the digitally sound recorded record of the

16 proceedings.

/s/ *Gloria C. Irwin*                        12/26/2011
**GLORIA C. IRWIN**
**Certified Transcriber NJ AOC200**                          **Date**
**    Federal  CERT #122**
**GCI TRANSCRIPTION SERVICES**
**210 Bayberry Avenue**
**Egg Harbor Township, NJ  08234-5901**
**609-927-0299  1-800-471-0299**
**    FAX  609-927-9768**
**e-mail  irwingloria@comcast.net**
**SC✔**