UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION


IN RE:                          .        Case No. 10-93904-BHL-11
                                .
                                .
EASTERN LIVESTOCK CO., LLC,     .        110 U.S. Courthouse
                                .        121 West Spring Street
                                .        New Albany, IN 47150
                                .
                    Debtor.     .        February 13, 2012
. . . . . . . . . . . . . . .            10:10 a.m.


TRANSCRIPT OF TELEPHONIC HEARING
BEFORE HONORABLE BASIL H. LORCH, III
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For Your Community          Reed, Weitkamp, Schell & Vice, PLLC
Bank:                       By:  MICHAEL WAYNE OYLER, ESQ.
                            500 West Jefferson St., #2400
                            Louisville, KY 40202-2856


For Superior Livestock:     Greenebaum, Doll & McDonald
                            By:  C.R. BOWLES, JR., ESQ.
                                 JOHN W. AMES, ESQ.
                                 STEVE GRAHAM, ESQ.
                                 IVANA B. SHALLCROSS, ESQ.
                            101 S. 5th Street
                            Louisville, KY 40202




Audio Operator:             Amy Bruckert

Proceedings recorded by electronic sound recording, transcript
              produced by transcription service
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311   Fax No. (609) 587-3599**

APPEARANCES (Cont'd.):

For James A. Knauer:        Faegre, Baker, Daniels, LLP
                            By:  TERRY E. HALL, ESQ.
                                 KEVIN M. TONER, ESQ.
                                 WENDY W. PONADER, ESQ.
                                 SEAN WHITE, ESQ.
                            300 N. Meridian St., Suite 2700
                            Indianapolis, IN 46204-1750

For Kathryn Pry:            Dale & Eke
                            By:  DEBORAH CARUSO, ESQ.
                            9100 Keystone Crossing, Suite 400
                            Indianapolis, IN 46240-2159

For Kathryn Pry:            Rubin & Levin, P.C.
                            By:  JOHN C. HOARD, ESQ.
                                 ELIZABETH LALLY, ESQ.
                            500 Marott Center
                            342 Massachusetts Avenue
                            Indianapolis, IN 46204-2161

For Fifth Third Bank:       Vorys, Sater, Seymour and Pease, LLP
                            By:  RANDALL D. LaTOUR, ESQ.
                                 KENT A. BRITT, ESQ.
                                 MELISSA S. GIBERSON, ESQ.
                            52 East Gay Street, P.O. Box 1008
                            Columbus, OH 43216-1008

For Fifth Third Bank:       Frost, Brown, Todd, LLC
                            By:  EDWARD M. KING, ESQ.
                            400 W. Market Street, 32nd Floor
                            Louisville, KY 40202

For Alton Darnell, et       DelCotto Law Group, PLLC
al:                         By:  LAURA DAY DELCOTTO, ESQ.
                            200 North Upper Street
                            Lexington, KY 40507-1017

For Joplin and Superior:    Rubin & Levin, P.C.
                            By:  ELLIOT D. LEVIN, ESQ.
                                 JOHN M. ROGERS, ESQ.
                                 CHRISTOPHER M. TRAPP, ESQ.
                            500 Marott Center
                            342 Massachusetts Avenue
                            Indianapolis, IN 46204-2161

APPEARANCES (Cont'd.):

For First Bank:            Faruki, Ireland & Cox, P.L.L.
                           By:  DANIEL J. DONNELLON, ESQ.
                           201 East Fifth Street, Suite 1420
                           Cincinnati, OH 45202

For Willie Downs:          Lloyd & McDaniel, PLC
                           By:  ANDREW D. STOSBERG, ESQ.
                           11405 Park Road, Suite 200
                           Louisville, KY 40223-0200

For Cactus Growers:        Lovell, Lovell, Newson & Isern, LLP
                           By:  JOHN HUNT LOVELL, ESQ.
                           112 W. 8th Avenue, Suite 1000
                           Amarillo, TX 79101

For Republic Bank         Stites & Harbison, PLLC
and Trust and Rosenbaum   By:  WILLIAM ROBERT MEYER, II, ESQ.
Feeder Cattle LLC:         400 West Market Street
                           Louisville, KY  40202-3352

TELEPHONIC APPEARANCES:


For Arcadia, et al:        Walter Scott Newbern, III
                           By:  W. SCOTT NEWBERN, ESQ.
                           2982 East Gevemy
                           Tallahassee, FL 32309

For J&F Oklahoma          Naman, Howell, Smith & Lee, PLLC
Holdings:                  By:  DAVID L. LeBAS, ESQ.
                           8310 N. Capital of Texas Highway
                           Suite 490
                           Austin, TX  78731


                              ---

1          THE COURT:  Good morning.  Be seated.

2          UNIDENTIFIED ATTORNEY:  Good morning.

3          UNIDENTIFIED ATTORNEY:  Good morning.

4          THE COURT:  All right.  We're on the record in both

5    the Eastern Livestock and in the Gibson matters.  Would the

6    attorneys state the appearances for the record, please?

7          MS. HALL:  Terry Hall, Kevin Toner, Wendy Ponader,

8    and Sean White for the debtor, and we have Jim Knauer from the

9    trustee.

10         MR. LaTOUR:  Good morning, Your Honor.  Randall

11   LaTour from Vorys, Sater.  With me in the courtroom is Kent

12   Britt and Melissa Giberson from my office.  I wonder if I could

13   ask an indulgence.  I'm fighting a vertigo problem, and I

14   wonder if it would be a problem if I address the Court while

15   seated?

16         THE COURT:  That would be quite all right.

17         MR. LaTOUR:  Thank you, Your Honor.

18         MR. LOVELL:  John Lovell for Cactus Growers.

19         MR. DONNELLON:  Dan Donnellon for First Bank & Trust.

20         MR. ROGERS:  John Rogers and, also, Chris Trapp here

21   on behalf of Superior and Joplin.

22         MR. BOWLES:  Claude Bowles, Bingham Greenebaum Doll

23   on behalf of Superior, Joplin and all the other creditors.  We

24   have two thousand nineteen.  It would take a half hour to read

1  it.  Also, from my office, John Ames, Steve Graham and Ivana

2  Shallcross.  (indiscernible).

3         MS. CARUSO:  Debbie Caruso, Your Honor, representing

4  the Trustee Kathy Pry.

5         MS. LALLY:  Elizabeth Lally appearing for Trustee

6  Kathy Pry.

7         MS. DelCOTTO:  Good morning, Your Honor.  Laura Day

8  DelCotto representing a number of different unpaid sellers.

9         THE COURT:  Well, we don't have many paid ones here.

10                   (Laughter)

11         MR. LEVIN:  Elliott Levin, Your Honor, I'm with the

12  same office John Rogers.

13         THE COURT:  I thought maybe you were.

14         MR. STOSBERG:  Good morning, Judge.  Andrew Stosberg

15  on behalf of Willie Downs.

16         MR. MEYER:  Rob Meyer for Rosenbaum Feeder Cattle

17  LLC.

18         MR. OYLER:  Mike Oyler, Your Community Bank.

19         MR. HOARD:  John Hoard, Kathryn Pry, Your Honor.

20         MR. KING:  Ed King, Fifth Third, Your Honor.

21         COURT CALL OPERATOR:  Joining the meeting

22         THE COURT:  All right.  I already have a list of the

23  attorneys that are appearing by phone.  I think maybe someone

24  just joined.  Who just joined?

25         MR. LeBAS:  It's Dave LeBas.

1        THE COURT:  Okay.  Do you have that?

2        COURT CLERK:  Yes.

3        THE COURT:  All right.  I believe we want to take a

4   matter in Gibson first, and what would that be?

5        MS. CARUSO:  Thank you, Your Honor.  We are

6   addressing today the application filed by the trustee, Kathy

7   Pry to hire the Law Firm of Rubin and Levin, specifically Mr.

8   Hoard and Ms. Lally, to prosecute, to investigate and to

9   prosecute preference actions, Your Honor.  If I may -- and

10  there have been two objections filed.  One was filed by the

11  trustee for the Eastern case and one was filed by Fifth Third

12  Bank.

13       Your Honor, I do not believe we need to address the

14  fact that these are very complex cases that will inevitably

15  involve some avoidance actions.  I do not believe we have to

16  address the fact that the trustee has the duty to investigate

17  these potential cases, and I do not believe we need to address

18  the fact that Rubin and Levin is eminently qualified to perform

19  an investigation and to prosecute any cases that would have to

20  be prosecuted, nor do I believe we need to address the fact

21  that their fee arrangement is reasonable.

22       So, let's get right to the objections.  The

23  objections, basically, involve the facts that Rubin and Levin

24  is representing two creditors of the Eastern case; one is

25  Superior Livestock and the other one is Joplin.

1      Rubin and Levin also is representing the trustee of

2  East-West Trucking.  So, the argument is that creates a

3  conflict in the Gibson case.  Joplin, Superior and East-West

4  Livestock have not filed any claims in the Gibson case.

5  Superior has filed a financing statement against Mr. Gibson,

6  but has not pursued any action with respect to that financing

7  statement or asserted any right to any assets in the case.

8      Pursuant to Rule 1.7(a) of the Indiana Rules of

9  Professional Conduct, conflict waivers have been signed.  The

10  East-West Trucking Trustee has signed a conflict waiver,

11  Superior has signed a conflict waiver and Kathy Pry, the

12  trustee has signed a conflict waiver.

13      Joplin has not asserted any type of an action or

14  claim, whatever, in the Gibson case.  I, also, believe that

15  satisfies, Your Honor, Rule 326 of the Bankruptcy Code and that

16  Rubin and Levin is disinterested in the Gibson case.  If, in

17  fact, they're -- and I think part of the objection is that

18  preference actions may be brought against Superior in the

19  Eastern case, and that perhaps Superior would file some sort of

20  claim in the Gibson case, even though the bar date has passed.

21  To the extent that would happen, Your Honor, my firm will

22  handle all matters with respect to Superior, a review of any

23  claim that would be filed and also any objections that would be

24  filed.

25      Another objection that has been asserted -- well,

1  there's a lot of fighting.  If you notice the Gibson Estate has

2  not been involved in the fray, Your Honor.  We don't have a dog

3  in that fight.  And I think that it is very conceivable that

4  Rubin and Levin, which they're just doing avoidance actions.

5  They will not do investigating claims against the Third Bank,

6  they will not pursue any claims against the Third Bank.  They

7  will not invest claims against Superior.  They will not pursue

8  claims against Superior.  So -- and there was an argument that

9  Superior has the goal --

10       THE COURT:  So, that I understand that they'll be

11  limited to the avoidance actions.

12       MS. CARUSO:  Right.  And there's been 143 that have

13  potentially been identified, so there's a lot of work involved

14  here.

15       THE COURT:  All right.  But, that creates a fiduciary

16  responsibility to the Gibson Estate.

17       MS. CARUSO:  That's right.

18       THE COURT:  All right.  So, do they want -- would

19  Rubin and Levin then want Eastern to prevail in terms of a

20  claim that it might have against the Gibson Estate, or would

21  they not want Gibson or Eastern to prevail, or do they not

22  care?  Can they be neutral in that?

23       MS. CARUSO:  Well, yes.  Well, let me answer it this

24  way.  Kathy Pry, the trustee, would want Mr. Knauer to prevail

25  to the extent it was going to create dollars in the Eastern

1 Estate that would flow through to the Gibson Estate.

2          THE COURT:  Which would mean that she would want

3 Superior to fail.

4          MS. CARUSO:  But, I don't think it matters, because

5 Superior has not filed a claim in the Gibson case.  Superior is

6 not involved in any litigation.

7          THE COURT:  But, if Superior wins on a forward

8 contract theory --

9          MS. CARUSO:  Right.

10          THE COURT:  -- then there's a lot of money that is

11 not in the Eastern Estate.

12          MS. CARUSO:  Which will probably never get to our

13 case because they're going to try to subordinate Mr. Gibson's

14 claim, and I think it would kind of be silly to think that's

15 not going to happen, but, Your Honor, let's assume that

16 happens.  It doesn't matter because --

17          THE COURT:  Well, let's go back.  Before we assume

18 that's going to happen, I mean, that is one good point, is that

19 does Gibson really have a valid claim against Eastern, or do

20 most of the claims flow the other way?

21          MS. CARUSO:  Well, Your Honor, we filed the proof --

22 Your Honor, I'm not going to sit here today and say we don't

23 have a valid claim.  We filed the proof of claim as a

24 protective measure.  It was a bar date.  I fully anticipate

25 they will ask the subordinate to claim and they will object to

1  the claim.  But, even if we have a claim, and even if I do not

2  think it's a problem that Rubin and Levin will be representing

3  Superior in litigation, the trustee --

4       THE COURT:  But, what about the fact that Superior

5  objects to the preference protocol suggested in Eastern, are

6  they going to come in with a similar protocol in the Gibson

7  case?  I mean, it's --

8       MS. CARUSO:  They're not a creditor.  I mean,

9  Superior is not a creditor in the Gibson case.

10      THE COURT:  No, no, I'm talking -- no, I'm saying the

11 firm.  The firm -- I forget who signed it on behalf of Superior

12 or Mr. Bowles, but Rubin Levin is co-counsel for Superior.  And

13 one of the objections is, for example, if I recall, that this

14 is, in effect, a confidentiality request to not have to divulge

15 amounts of settlements, which is, that I recall, I've done

16 things like that before to try to enhance settlement

17 negotiations because if somebody knows that they only paid 50

18 percent to settle this claim, they're never going to pay more

19 than -- offer more than -- that sort of thing.  I assume you'll

20 be doing something like that in Gibson, or maybe you'll want

21 every settlement you reach in Gibson posted publically, I don't

22 know.

23      MS. CARUSO:  You know, Your Honor, I haven't come

24 across any facts that would ask us to make those settlements

25 happen, but we might.  But, I'm still having a problem seeing

1  how that would connect with Rubin and Levin's responsibility in

2  the case to pursue unrelated preference actions and --

3          THE COURT:  It's a step removed.  I'll grant you

4  that.  But, it's -- I mean, not that I've never seen law firms

5  take different positions in different cases.  I've seen that

6  before.

7          MS. CARUSO:  Well, can I -- I tell you, as least, the

8  trustee wanted to hire Rubin and Levin and Mr. Hoard and Ms.

9  Lally, and it didn't really come on my recommendation.  They

10  were my counsel as trustee in the <u>Champ Car</u> (phonetic) case,

11  and they did an exemplary job, probably one of the best jobs

12  that I've seen a firm do in pursuing avoidance actions, and we

13  returned 40 percent to the creditors.  They're good and they're

14  -- you look at all these lawyers on this case on both sides,

15  there has to be some additional workforce other than myself and

16  Ms. Hannus (phonetic) to pursue these preference actions and,

17  you know, quite frankly, Your Honor, I don't know who's going

18  to do it --

19          THE COURT:  Okay.

20          MS. CARUSO:  -- $175 an hour with a contingency fee

21  ceiling.  If someone in this room wants to do it --

22          THE COURT:  All right.  Let us hear the objections.

23          MS. HALL:  Well, Your Honor, I --

24          THE COURT:  That I haven't already raised.

25          MS. HALL:  We don't disagree that Rubin and Levin is

1  qualified.  We don't disagree that you might have struck a good

2  deal.  I do disagree that on behalf of the trustee somewhat

3  that the entire legal community in the State of Indiana has

4  been tapped out, and that the only people that can represent

5  conflicting parties in this case is Rubin and Levin.

6          I think that the trustee's primary concern is that we

7  already have severe litigation going on with Superior, probably

8  with Joplin.  Rubin and Levin as counsel to Superior are going

9  to be tasked in the Gibson Estate with the fiduciary duty to

10 investigate the actions of Mr. Gibson with relation to his

11 creditors and the parties that he did business with, one of

12 which may have been Superior.  And the trustee is aware of

13 transactions between Mr. Gibson and Superior that have not

14 possibly yet been disclosed among all the pleadings, and we

15 just believe that there is a conflict of interest related to

16 the same lawsuit -- the same law firm being involved in

17 specific litigation within the Eastern case, representing the

18 trustee in a related entity case that was owned by Mr. Gibson

19 and then now representing the Gibson Estate, related to

20 investigating the actions of Mr. Gibson and his creditors, and

21 contract parties and others who he did business with.

22         THE COURT:  Well, tell me more specifically, how that

23 might put Rubin and Levin in a conflict situation.

24         MS. HALL:  Well, I think that Your Honor brought up

25 one of which -- one of them is the relation to the objection

1  that they proposed to the preference protocols that this estate

2  has proposed, related to the preference protocols, or no

3  preference protocols that they may have related to the 147

4  cases that they've got going over there in the Gibson Estate.

5  We are going to be bringing preferences against Superior and

6  against Joplin, more than likely, and that's going -- those

7  parties are represented by Rubin and Levin.

8          MS. CARUSO:  Your Honor, these are two separate cases

9  and they're large cases and lots of attorneys in this room have

10  conflict waivers.  It's very difficult to find attorneys that

11  do not have some conflict with this case.  Rubin and Levin will

12  not do anything related to Superior in the Gibson case.  I will

13  do that.  And might I say this, too, that the people that are

14  required to object have signed conflict waivers.

15          MS. HALL:  Well, Your Honor, on that note --

16          MS. CARUSO:  Or, I should say are tentative.

17          MS. HALL:  If Rubin and Levin uncovers what's in

18  their preference investigation, material that is adverse to

19  Superior or that it is -- has to do with Superior or Joplin,

20  what are they going to do with it?  Are they going to turn it

21  over to Ms. Caruso, so that she can then prosecute that on

22  behalf of the Gibson Estate against their clients?

23          MS. CARUSO:  You know, I just --

24          THE COURT:  So, wait a minute.  I don't --

25          MS. CARUSO:  -- don't think that's going to happen,

1    quite frankly.

2            MR. AMES:  Your Honor, I may have a thought with

3    respect to what Ms. Hall just mentioned.  She's bringing up the

4    issue of what if, and what if Eastern brings a sort of

5    avoidance action against Superior and/or Joplin.  First of all,

6    it's our position that that's not going to -- that can't happen

7    for various reasons, but should they do and should they try, I

8    doubt if Rubin and Levin will be representing Superior at that

9    point.  Rubin and Levin is here, in this case, as conflict

10   counsel for any actions that are directly pursuant to Fifth

11   Third, not against the Gibsons --

12           THE COURT:  So, is Rubin and Levin's representation

13   of Superior -- and I understand this was the primary purpose of

14   it, initially, was the conflict that your firm had with Fifth

15   Third, right?

16           MR. AMES:  Yes, sir.

17           THE COURT:  Is that the limit of their representation

18   of Superior?

19           MR. AMES:  Yes, sir.  If the Court will notice, we've

20   been very, very precise in everything we say in court and in

21   our pleadings that Bingham Greenebaum Doll is representing

22   Superior Joplin in all matters other than those that directly

23   involve conflicts with Fifth Third.

24           UNIDENTIFIED ATTORNEY:  Your Honor, while I --

25           THE COURT:  Is that a new firm?

1                           (Laughter)

2              MR. AMES:  I had to think twice before I said --

3              UNIDENTIFIED ATTORNEY:  Rubin and Levin is not a new

4    firm.  It's the same old guys, okay.

5              THE COURT:  No.  I've heard of that one.  I've heard

6    of that one.

7              MS. HALL:  Your Honor, while I understand that that

8    may be the case represented in the court and the pleadings,

9    it's certainly not represented that way in the negotiations

10   that have been going on in this case, as to limitation of Rubin

11   and Levin's representation of Superior and Joplin only as

12   against Fifth Third.

13             MR. ROGERS:  What do you mean by that?

14             MS. HALL:  You know --

15             MR. ROGERS:  It's not clear.  It's just -- well, I

16   understand.

17             MS. HALL:  Your Honor, this is -- okay, because now

18   you're just going to convince the judge that this stuff is

19   going to happen, okay.  This is probably the last time you're

20   going to see Mr. Hoard and Ms. Lally in this courtroom with all

21   of these folks.  You won't see them anymore in here.  We're

22   going to do our preference actions and move on.

23             THE COURT:  All right.  Yes.  I'll let the bank speak

24   and then let's move on.

25             MR. LATOUR:  All right.  Your Honor, the engagement

1    letter attached to the application indicates that Rubin and

2    Levin is being retained to pursue all Chapter 5 causes of

3    action.  That does not square with the representation that

4    they're being retained for 187 identified preference actions,

5    nor was, in the proposed order, a limitation indicating that

6    they would not investigate Fifth Third, or otherwise be engaged

7    in analyses of actions against Superior, or against Joplin or

8    the other players.  Now, I made --

9        THE COURT:  So, if those changes were made in the

10   engagement letter would that satisfy your objections?

11       MR. LATOUR:  It would satisfy my client's objections

12   as they relate to Fifth Third.  I guess as an officer of the

13   court, the Court still has to ask itself, if Rubin and Levin

14   has an unlimited duty of loyalty to Superior its current

15   client, and has an unlimited duty of loyalty to the newly

16   proposed client, it doesn't matter whether they, themselves,

17   are prosecuting the action or not, the client is prosecuting

18   the action.  And if the two clients' positions are

19   diametrically opposed, I believe that raises an irreconcilable

20   conflict.

21       If the Court decides that I'm wrong, fine, I accept

22   that.  But, at that point, I would still want the limitation

23   that Rubin and Levin is not investigating Fifth Third, or in

24   pursuit of Chapter 5 causes of action that are different from

25   547 of the Bankruptcy Code because, as you just heard, they

1  were specifically hired by Superior to represent Superior

2  against Fifth Third.  And I don't see any possible way they

3  could evaluate whether there are valid or invalid causes of

4  action against Fifth Third, wearing a different hat in a

5  different case.

6          THE COURT:  All right.  I'm going to take this under

7  advisement.  I'll get you an order in a few days.

8          MS. CARUSO:  Thank you, Your Honor.

9          THE COURT:  Let's move on.  Going back to the Eastern

10  agenda.

11          MS. HALL:  The first item on the agenda, Your Honor,

12  under continued matters, is the motion to quash.  I believe

13  that involves Mr. Donnellon and companion Your Community Bank.

14  Yes, no, motion to quash?

15          UNIDENTIFIED ATTORNEY:  I guess Mr. Newbern.

16          MR. NEWBERN:  No, Your Honor.

17          MS. HALL:  I'm sorry, it's Mr. Newbern with

18  (indiscernible).

19          UNIDENTIFIED ATTORNEY:  Yes.

20          MR. NEWBERN:  Your Honor, this is Scott Newbern.

21          THE COURT:  Yes, Mr. Newbern?

22          MR. NEWBERN:  I've been in ongoing conversations with

23  the U.S. Attorney.  We've reached agreement to continue this

24  matter.  We're working towards resolving what is needed.  I

25  proposed -- propounded, pardon me, the discovery on the trustee

1  two or three weeks ago.  I anticipate that what I get back in

2  response to that will alleviate some of the requirements I have

3  on Gibson and, also, what may also be in the record that is, as

4  well, in the document file, document room.

5          It makes a lot of sense to put this off, since I

6  filed an agreed motion, the U.S. Trustee is in agreement with

7  this.  That's where we're at.

8          THE COURT:  How far out do you want to go, Mr.

9  Newbern?

10          MR. WHARTON:  Your Honor, this is Chuck Wharton of

11  the U.S. Trustee.  I think I perhaps Mr. Newbern meant the U.S.

12  Attorney's Office.

13          MR. NEWBERN:  I believe I said -- I may have

14  misspoke.

15          MR. WHARTON:  That's fine.

16          THE COURT:  How far out do you want to go?

17          MR. NEWBERN:  I think my motion asked for 60 days, 60

18  or 90, somewhere in there should be plenty.

19          THE COURT:  Do we have another -- we have other

20  omnibus dates set.

21          COURT CLERK:  Other than March 12 --

22          THE COURT:  All right.  Let's set some omnibus dates

23  beyond March 12th and then you can choose one that's 60 to 90

24  days out.  Let me see.

25          MR. NEWBERN:  Okay, Your Honor.  Thank you.

1          THE COURT:  I'll give you a date in just a moment.

2          I've got April 9th or April 23rd, any preference?  Do

3  you think we need it as quickly --

4          UNIDENTIFIED ATTORNEY:  23rd, Your Honor.

5          THE COURT:  All right.  April 23rd we'll do an

6  omnibus.  Did the -- the Gibson attorneys left, didn't they?

7          We have a trial scheduled in Gibson on the 14th of

8  April.  I don't know if that's anticipated that's going to go.

9  How about the 21st of April?  Oh, I've got a trial, excuse me.

10         MS. HALL:  Are we talking April or May?

11         THE COURT:  Oh, I'm sorry.  May.  How about May 14th?

12         That's a Gibson trial?

13         COURT CLERK:  (Inaudible)

14         THE COURT:  Well, if it is we'll have the trial after

15  the omnibus.  So, May 14th and just so that we have some

16  scheduled, June 11th.  So --

17         MR. NEWBERN:  Your Honor --

18         THE COURT:  Yes, go ahead.

19         MR. NEWBERN:  This is Scott Newbern again.  May 14

20  seems fine for purposes of continuing the first matter.

21         THE COURT:  All right.  I'll show that's continued to

22  May 14th.

23         MR. NEWBERN:  Thank you, Your Honor.

24         THE COURT:  Thank you.  Then we have the motion to

25  compel the trustee to produce budgets and financial information

1  with a response filed the 8th saying that they were posted on

2  the website.  I don't know if what's been posted is

3  satisfactory to the movant or not.

4         MS. DelCOTTO:  Your Honor, what's been posted is the

5  current budget for the first quarter and that is fine, the

6  trustee still will not provide all past budgets.  Whatever the

7  Court rules, I would still like to see those.  I've been saying

8  that for a year and I just think -- I finally come to realize,

9  it took me a long time, I just have a very fundamental

10 difference of philosophy on Chapter 11 Trustee should be

11 transparent to all parties.  And in my mind the fact that this

12 case is where it is today is partly because of the lack of

13 prior transparency, which has just created a number of

14 perceptions that might have been avoided.

15        So, I would still like to see all the budgets.  I

16 believe all the litigants are entitled to those, so that's my

17 motion.

18        MS. HALL:  Your Honor, we don't -- I don't think we

19 ever said we wouldn't post the past budgets.  Maybe we

20 misunderstood that that's what -- and she wanted the budgets

21 that we had.  I mean, the original DIP order had sealed the

22 budgets, and then decided to unseal them.

23        We were remiss.  I forgot to have it posted after the

24 November hearing.  If you want us to go back we'll post the

25 back budget.  They look exactly like the current budgets.

1              THE COURT:  Post the past budgets.  I'll show the

2    motion is granted, to the extent that I'm ordering that the

3    past budgets be posted within 10 days.

4              MS. HALL:  That's fine.

5              THE COURT:  Motion to consolidate -- is that doable,

6    the ten days?

7              MS. HALL:  Yes.

8              UNIDENTIFIED ATTORNEY:  Yes.

9              THE COURT:  All right.

10             MR. NEWBERN:  It's me again, Your Honor, Scott

11   Newbern in Florida.

12             THE COURT:  Yes, Mr. Newbern?

13             MR. NEWBERN:  We have, before the Court an

14   interpleader in which (indiscernible), some of my unpaid

15   clients are being held and also a payment that was made into --

16   as purchase money into the trustee, both of those involve

17   substantially the same kinds of matters, identical

18   transactions, just different parties.  The money wound up in

19   two different pots.

20             The interpleader is a natural adversary proceeding

21   in Wisconsin that has been assumed by the trustee under the

22   jurisdiction of this court.  I ask that the other matter filed

23   which includes a payment by a Lynn Miller, and then there's

24   some residual issues regarding receivables on the trustee's

25   report that's being due, which actually represents payments

1  that bypass Eastern, once they failed to clear the transaction.

2  So, we're just trying to put all these issues in one pot.

3      I filed a motion after circulating it amongst trustee

4  counsel and the Fifth Third, as well.  They generally agreed to

5  the consolidation of the claims, but when it came to my motion,

6  they disagreed with it being filed under Paragraphs 10 and 11.

7      I received an objection filed by the trustee, four or

8  five pages, and I replied to that with documents that I believe

9  the Court has it for under a motion to seal.  Basically, I

10 think that we separated it in two parts.  The consolidating of

11 the claims is agreed upon by the trustee and Fifth Third where

12 and what the litigation will follow and how it will track I

13 think is where the disagreement resides.

14     We contend that Eastern acted in a particular way in

15 Florida.  The trustee disagrees, Fifth Third disagrees, and

16 that's the nature of how this case is going to get sorted out.

17 We also believe that --

18         THE COURT:  Well, let me interrupt you for just a

19 second, here.

20         MR. NEWBERN:  Yes, sir.

21         THE COURT:  Yes, I think -- didn't you even in your

22 motion talk about claims against Fifth Third?

23         MR. NEWBERN:  I don't believe so, Your Honor, though

24 we do have claims, we've made a demand on Fifth Third for bad

25 checks and some other reasons, but we hadn't filed any claims

1  or made claims against Fifth Third at this point.  We -- in my

2  motion I talk in Paragraph 11 about some issues that are before

3  the Court that may come up if this issue regarding a clearing

4  status or some other rule, depending on how the court rules on

5  those matters.  I think I talk about issues of subordination --

6           THE COURT:  Right.  That's exactly what I was

7  referring to.

8           MR. NEWBERN:  Issues of constructive trust, I don't

9  consider those necessarily a claim against Fifth Third.  That's

10  just my view.  I apologize if that's wrong, Your Honor.

11          THE COURT:  Well, you talk about subordinating their

12  claim, right?

13          MR. NEWBERN:  Talk about subordinating -- yes, I

14  guess I did.  You're right.

15          THE COURT:  Yes.

16          MR. NEWBERN:  It's only, it's only --

17          THE COURT:  Well, let me just interrupt you, again,

18  and say, I don't know what we'll do as far as this

19  consolidation motion is concerned.  Maybe we can resolve among

20  the parties.  I mean, I'm in favor of consolidating any issues

21  that will help us resolve things just once and I want to talk

22  about some of those things as to other issues this morning.  I

23  don't think this is -- we have a vehicle here that would

24  properly raise any -- I don't want to -- let me say it more

25  directly.  We're not going to handle the subordination --

1  attempted subordination of Fifth Third's claim in this motion.

2  If we do that, if anybody raises that, that's going to be in an

3  adversary where everyone who thinks that ought to be done is a

4  party or has the opportunity to become a party, and I can

5  decide it once.

6          So -- and then somebody can appeal once, if they want

7  to, if everyone is not happy.  So, why don't -- I think there

8  ought to be further discussions with the trustee as to this

9  motion, and I want to see if you all can reach some sort of

10  agreement as to -- and get me some sort of proposal, as to what

11  could be consolidated, and then at the next omnibus I'll rule

12  on any issues that remain.

13          MR. NEWBERN:  Your Honor, I'm happy to do that, but

14  I'm a little confused because when I speak to the issues of the

15  constructive trust and subordination, they're only in the

16  context of they may be part, not necessarily of this one issue,

17  or this one consolidated piece, but simply issues raised across

18  the spectrum of all the cases.

19          THE COURT:  Well, that's true and I've --

20          MR. NEWBERN:  Separate claims by Florida creditors,

21  is simply another issue that's been raised.  Constructive

22  trust perhaps become part of -- well, it's already an issue

23  before the Court and in another matter and --

24          THE COURT:  Well, it's already an issue that I issued

25  an order on, on Friday, and that's one of the discussions that

1    I want to have this morning is, how do we then publish or

2    broadcast this order into other matters in this case, which by

3    short orders that say for the reasons set forth in the Court's

4    order of, whatever date that was, the Court enters this ruling

5    as to constructive trust?

6         MR. NEWBERN:  I was unaware that you made a ruling on

7    constructive trust, Your Honor.

8         THE COURT:  Yes.  I'm against them.  So -- and in

9    light of that, why don't -- I still think I'm going to continue

10    this matter to the next -- when is the next omnibus, March?

11         COURT CLERK:  March 12th.

12         THE COURT:  March 12th.  I want you and the trustee

13    to have further discussions and the bank as to what -- I want

14    something in front of me on that day that specifically says

15    what can be consolidated, and then I want to talk to you on

16    that day, Mr. Newbern, about the you want consolidated that

17    they're opposing.

18         MR. NEWBERN:  Yes, Your Honor.

19         THE COURT:  All right.  Thank you.  The preference

20    avoidance protocols.  Yes?

21         MS. PONADER:  Good morning, Your Honor.  Indulge me

22    for a moment.  Sorry.

23            (Attorney conversation)

24         MR. DONNELLON:  Your Honor, this is Dan Donnellon.  I

25    know this isn't our agenda, but before you skip to the next

1   one, there was -- the Florida creditors also had a motion to

2   -- motion to seal reply.  The way I read it is there's some

3   documents that are stamped confidential.  The protocol says if

4   they're stamped confidential, you try to address it with each

5   other and determine whether that can be removed under the 7th

6   Circuit's <u>Jessup</u> standard --

7           THE COURT:  Correct.

8           MR. DONNELLON:  -- and I didn't want to just skip

9   over that part of the agenda, and it's Mr. Newbern's motion,

10  but it looked like, before we move on with Ms. Ponader, we

11  might want to, at least, see if that needs to be addressed

12  before the next omnibus.

13          MS. DelCOTTO:  I have a very similar motion, so

14  whenever we're going to address that, Your Honor.

15          THE COURT:  All right.  Well, I think we can address

16  that pretty quickly.  First of all, what's the trustee's

17  position?  I mean, do you want these matters to remain, or the

18  bank's position to remain confidential?

19          MR. DONNELLON:  I believe they're bank records, Your

20  Honor.  The banks asserted confidentiality.  The trustee

21  doesn't really have a position.

22          THE COURT:  So, then the bank wants them to remain

23  confidential?

24          MR. LATOUR:  Your Honor, the documents -- I'm not

25  entirely sure what the range of the documents that we're

1  talking about because I was unaware of what Mr. Newbern had

2  filed.  And a number of the bank documents contain personal

3  information that under various privacy laws have to be

4  maintained as secret.  The bank doesn't have a concern about

5  sharing those documents with the parties who have already seen

6  them, pursuant to the discovery protocol.  Those parties have

7  already signed confidentiality agreements.

8          The concern would be letting the documents get out

9  into the public domain prior to having two filters applied.

10 One, to remove the personal information, the Federal Law

11 requires be redacted, and second of all, to not have the bank's

12 proprietary information released out into the public, how the

13 bank does business.  So, in terms of sharing it amongst the

14 litigants that have signed the confidentiality agreement as

15 part of the --

16         THE COURT:  Well, the litigants have it.  I don't

17 think that's any -- I mean, they've attached them, or some of

18 the documents to motions they've filed with me and not filed

19 with the court, just brought to chambers.  So, in other words,

20 you want them -- the bank's position is that you would still

21 like them filed under seal?

22         MR. LATOUR:  Yes, sir.

23         THE COURT:  All right.  All right.  I'm going to --

24         MR. NEWBERN:  Your Honor?

25         THE COURT:  Go ahead.

1          MR. NEWBERN:  This is Scott Newbern.  I -- the bank

2   documents that I've, specifically, attached in a reply include

3   no personal information, whatsoever.  They are loan committee

4   kind of documents.  There are some financial evaluations.

5   There are some issues regarding, some discussions regarding a

6   debtor or borrower.

7          THE COURT:  I don't know that I've seen yours,

8   actually.  The two that I looked at on Friday, I think, were

9   both filed by Ms. DelCotto in two different adversaries, right?

10         MS. DelCOTTO:  That's right, Your Honor.

11         THE COURT:  Those are the ones I saw.  When did you

12  file yours Mr. Newbern?

13         MR. NEWBERN:  The same day, Your Honor.  They were

14  hand-delivered to your offices on Friday afternoon.  Most of

15  the documents were similar to what Ms. DelCotto filed

16  (indiscernible).  I'm not sure I have the same documents that

17  she has, but I think some of them are.

18         THE COURT:  All right.  Well, I think you missed me

19  on Friday because I didn't have a chance to look at those.

20  Yes?

21         MR. TONER:  Kevin Toner for the trustee.  I think

22  this does raise a, perhaps, recurring issue.  When folks are

23  submitting things under seal, I'm not sure they're remembering

24  to serve the other parties in the adversary proceeding.  We are

25  all subject to the confidentiality stipulation.  We should be

1  able to see what Your Honor has seen and I don't believe I was

2  served with a copy of what Mr. Newbern has tendered.

3         MS. DelCOTTO:  Your Honor, I did certify e-mail Mr.

4  Toner and Mr. LaTour only, because I'm not sure I know who all

5  is in the confidentiality protocol --

6         THE COURT:  Right.

7         MS. DelCOTTO:  -- and I did -- I was out.  I did not

8  get a chance to speak to you.  I spoke to Mr. LaTour and

9  actually with your ruling on Friday now about the 90 days for

10  evidence, I'm happy to table mine just as part of this global

11  discussion about what are we going to do.  I mean, part of what

12  you just said is --

13         THE COURT:  Well, that's why I thought is was ironic

14  that I saw this motion on Friday and I had already -- was

15  getting ready to issue the order and that's exactly the

16  conclusion I had come to before I saw this motion, that the

17  parties had a right to see more information regarding to the

18  Packers' and Stockyards' issue before making a determination.

19  So, I am going to table your motion, Mr. Newbern, and Ms.

20  DelCotto's two motions, to March 12th.

21         It sounds to me like Mr. LaTour might want to spend

22  some time with the documents, or someone in his office might

23  want to spend some time with the documents and see what we're

24  really talking about in terms of personal information and/or

25  bank information that he thinks should not be released.  So,

1  I'd like the bank by March 12th to formulate -- if they

2  maintain an objection, to formulate a more specific objection

3  so that we can talk, specifically, about certain documents and

4  information in them, and I'd like Mr. Newbern and you to engage

5  in negotiations with the bank about that.

6         So, the bank's to do an initial review and then send

7  you a correspondence to say, here's what we don't like, and you

8  two see if you work that out before March 12th.

9         MR. NEWBERN:  Yes, Your Honor.  I believe I did serve

10  that, so we'll be able to work that out.

11         THE COURT:  Okay.  thank you.

12         MR. DONNELLON:  Thank you, Your Honor.  I apologize

13  to Ms. Ponader.  I just wanted to make sure they were on the

14  agenda.

15         THE COURT:  That's all right.

16         MS. PONADER:  Good morning, Your Honor.

17         THE COURT:  Good morning.

18         MS. PONADER:  Wendy Ponader on behalf of James

19  Knauer, Trustee of Eastern Livestock.

20         Your Honor, in the 90 days prior to the filing of

21  this bankruptcy case, several hundred million dollars were paid

22  out by ELC to some 850 transferees.  Among the duties of Mr.

23  Knauer as trustee of the Eastern Livestock Estate is to

24  investigate preference actions.  As Mr. Knauer considered the

25  undertaking of investigating preference actions and the

1  constituency of the transferees in this case and the several

2  hundred number of the transferees in the case, he asked the

3  -- he asked counsel, if, with the help of DSI, we could look at

4  enough data to develop protocols for determination, as under

5  Rule 408, Your Honor, as to what likely preference defendants

6  under 547(c), these many transferees would have, because the

7  objectives, Your Honor -- I should say I'll address the

8  Superior objection after Mr. Ames speaks on behalf of Superior,

9  but his objectives, Your Honor, could not be more diametrically

10  opposed than those that -- of which Superior accuses the

11  trustee in this case.

12          His objectives were to fairly and sensibly do an

13  analysis of preferences to come up with and identify wherever

14  possible estimated net preference recovery on a basis that

15  would be uniform across the board, as a starting point.  Yes,

16  he purposes to send those settlement letters out, Your Honor,

17  without a preview to the broader community as to what he is

18  purposing to settle at.

19          I will go through an analysis of how this trustee's

20  (indiscernible) will actually work because, frankly, Your

21  Honor, there is no absolute sort of overlay that one could

22  achieve here and we absolutely believe there would be an

23  opportunity for mischief if those settlements were made public

24  at any time.  If, in fact, transferees are agreeing to settle

25  at the trustee's estimate of the (indiscernible) preference

1  exposure.

2          Certainly, Your Honor, if in fact, there is no
3  settlement reached and in accordance with the authority that we
4  ask the Court to grant to us today, the trustee will then
5  commence an action against the transferee.  The assumptions
6  that the trustee will have made that are, as the Court will see
7  are largely and almost exclusively favorable to the transferee
8  and for the purposes of meeting the discrete objectives under
9  547(c) defenses, contemporaneous exchange, ordinary course and
10  subsequent new value, those transferees, in accordance with the
11  burdens of proof, as established by the Bankruptcy Code, will
12  indeed have to then prove those defenses and that is a new
13  burden that they will have.  But, the trustee at the front end,
14  Your Honor, is working to minimize unnecessary cost to this
15  estate, unnecessary burden and concerns among the transferee
16  population, Your Honor, and to do this in a fair and sensible
17  way.

18          The reason, Your Honor, that we were able to identify
19  conventions is what the trustee has called them, Your Honor,
20  conventions that would likely in almost all instances arguably
21  constitute ordinary course, subsequent new value is because
22  these transferees overwhelmingly are made up of just two
23  categories of persons, Your Honor, cattle sellers and truckers,
24  and that's not to a person, Your Honor, but overwhelmingly the
25  largest number of transferees are cattle sellers.  The terms of

1 sales in connection with these transactions, Your Honor, are in

2 most all cases identical, or were purported to be identical,

3 and the records of the company indicate that overwhelmingly,

4 the terms of the transfers were identical.

5 So, those similarities allow the trustee to identify

6 conventions as to what would constitute ordinary course in

7 connection with the sale by these cattle sellers to ELC of

8 cattle.  Likewise, what would constitute in ordinary course

9 with respect to trucking companies, moving cattle at the

10 request of ELC to different feed lots.

11 I think probably, Your Honor, the next thing to do

12 here would be to go through some -- to go through the analysis

13 that the trustee undertook in a couple of fictional cases.  I'm

14 sorry, I hope everyone can see.  Your Honor, I'd like to --

15 let's do this first, okay.  This is the fictional transferee,

16 Ponader Perry Farms.  Ponader Perry Farms under this analysis,

17 Your Honor, received four transfers -- would you rather I be

18 closer to you, or are you okay?

19 THE COURT:  I'm all right.

20 MS. PONADER:  Ponader Perry Farms under this analysis

21 would have received four transfers from the estate in the 90

22 days prior to filing.  The aggregate of those transfers would

23 have been $450,000 in that 90-day period.  The ordinary course

24 convention, or assumption the trustee for the purposes of his

25 analysis, in connection with Ponader Perry Farms was that a

1  payment made in connection with the purchase of cattle, where

2  the check was delivered to the seller on the date of the

3  delivery of cattle, or within one business day thereafter,

4  would indeed constitute a likely ordinary course defense, and

5  the trustee is, for the purposes of settlement under these

6  letters that the trustee is proposing to send, will give the

7  transferee the benefit of that assumption.  Again, under Rule

8  408, that would have to be proven at trial if no settlement is

9  forthcoming.

10         But, for the purposes of seeming to systematically,

11  efficiently, and fairly collect preferences with minimal cost

12  to the estate and, frankly, also, Your Honor, with minimal

13  difficulties, alarms, concerns, burdens to the transferees, if

14  everybody understands preferences have to pursue, this

15  convention where ordinary course for the seller of cattle for a

16  payment that's made within one date, one business day delivery

17  appear to be an appropriate ordinary course for Ponader Perry

18  Farms.

19         So, you see that a delivery date in this case

20  occurred on September 9, 2010.  The check date is dated

21  September 9, 2010 and the clear date is September 16, 2010.

22  This transfer would have met the protocol of the trustee and

23  over the $150,000 transfer (indiscernible) exposure of that

24  transfer is zero.  One week -- just a few days later, September

25  15, 2010.  Your Honor, the check date wasn't until September

1   18, 2010.  The trustee looked at the calendar, September 15 is

2   a Friday.  One business day, thereafter, would be Monday

3   September 18, indeed, this transfer of $100,000, where the

4   check date is September 18, 2010 and the clear date within a

5   reasonable time thereafter.  As Your Honor said, there's no

6   expectation of problems in terms of delivery of the check, and

7   time of delivery which would raise concerns in terms of the

8   reasonableness of the trustee's ordinary course assumption here

9   was not triggered.  So, in fact, this $100,000 transfer results

10  in a cumulative net preference exposure of zero.

11          We now look at a subsequent transfer October 11,

12  check date October 11, clear day the 19th, 18 days later,

13  ordinary course.  This is a $50,000 transfer, so after these

14  three transfers, during the 90-day period Ponader Perry Farms

15  would have already received $300,000.  There's -- Ponader Perry

16  Farms is still at zero cumulative preference exposure.

17          We get to the fourth transfer, October 15, this check

18  date, Your Honor, is not until October 19.  This October 19th

19  check clearing on October 25, triggers the exposure where this

20  transfer would, in fact, not be consistent with the conventions

21  as established by the trustee after reviewing the data, and the

22  trustee would identify this transfer as creating cumulative

23  preference exposure.  And because the prior transfer is zero,

24  this $150,000 transfer, in fact, does result in exposure to the

25  Ponader Perry Farms at $100,000.  Thereafter, Your Honor, ELC

1 made one more transfer to Ponader Perry Farms, the check

2 bounced.  The $50,000 transfer you paid, we have Ponader Perry

3 Farms under the scenario has filed a proof of claim.  We looked

4 at the check, we know it bounced, we will go ahead and apply

5 that subsequent  value to reduce that -- the cumulative net

6 preference exposure and resulting -- mathematically in a

7 cumulative net preference exposure to Ponader Perry Farms,

8 $700,000.  So, this case Ponader Perry Farms will get a letter

9 saying, you've received $450,000 in transfers.  We looked -- we

10 had done an analysis, we've made assumptions favorable to you,

11 we will settle at $100,000.

12          Certainly, in view of Ponader Perry Farms is that it

13 does not want to settle at that sum, it can decline and the

14 trustee will go ahead and initiate the action, and consistent

15 with its responsibilities say any further settlement

16 negotiations are resolved in that case will be subject to the

17 Court's review.

18          THE COURT:  All right.  Before you go on, that's very

19 good preference analysis and I think I taught it almost exactly

20 that way last semester, but what do you need from me?

21          MS. PONADER:  Your Honor, the trustee is doing

22 something somewhat irregular here.  Normally, you would expect

23 the trustee to be sending letters out to 800 plus transferees

24 with a demand, and Ponader Perry Farms would have gotten demand

25 for $450,000, and Ponader Perry Farms would have engaged a

1   lawyer.  They would have paid someone to do the analysis I just

2   went through with you, and would have come back and said, no,

3   we think that Ponader Perry Farms only gets exposure of

4   $100,000.

5           THE COURT:  Correct.  That's normally how it happens?

6           MS. PONADER:  That would be normally how it happens.

7   The trustee wants -- would like you, Your Honor, and this court

8   to go ahead and approve settlement at the trustee's calculation

9   of the estimated net exposure of this case.  This is not -- and

10  the reason that we are asking for approval of the settlement at

11  this level, not after we compiled a preference action, Your

12  Honor, but in connection with a demand letter, is because as

13  you will see as we go through these other analysis, we have

14  widely disparate percentages of recovery here because exposures

15  are widely disparate.  There are preference (indiscernible),

16  Your Honor,  and I will tell you we are running well over half

17  that based on what the trustee knows now in this case as to the

18  analysis, there will be no demand at all, and no expectation of

19  demand.  And frankly, at this point, no expectation of a

20  preference action to be initiated, unless and until during the

21  next eight months in this case, up to the point of -- or ten

22  months, excuse me -- up to the point of the statute of

23  limitations period, we, the trustee learns of information that

24  causes him to rethink the some of the assumptions we would have

25  made that wouldn't have up til that point essentially insulated

1  that transferee from having a demand made, and certainly a suit

2  filed thereafter.

3          THE COURT:  Well, I mean, I guess I like the idea

4  that a trustee is subjecting his preference claims to an

5  ordinary course review before issuing them because generally,

6  like you say -- or I don't know what generally happens.  I

7  haven't practiced law in a long time, but I know that a lot of

8  demands just go out based upon the amount of payments.

9          MS. PONADER:  Right, it's (indiscernible)

10          THE COURT:  Right.  And then the negotiations begin,

11  as you've indicated.  But -- and so, you want an order from

12  this Court that if the settlement -- if you reach an agreement

13  --

14          MS. PONADER:  At the estimated net exposure.

15          THE COURT:  -- at the estimated net exposure, you can

16  settle the case?

17          MS. PONADER:  Correct.

18          THE COURT:  And why do you need that before, instead

19  of after?

20          MS. PONADER:  Well, Your Honor, we wanted to bring

21  additional efficiency to the system and to the proposals that

22  the trustee was undertaking, and also, in order to be able to

23  advise these transferees that --

24          THE COURT:  See there's the problem that I have.  I

25  mean, I'm all, as I've said several times in this case, I'm all

1  in favor of efficiency, but I don't want a demand from a

2  trustee to go out with some sort of a feeling or -- that it's

3  been, you know, the Court's already said you ought to pay this

4  amount because that's not what I would be saying, you know.

5          MS. PONADER:  I understand.

6          THE COURT:  They still -- they may -- I mean as you

7  know, you know, after BAPCPA, ordinary course can be industry

8  ordinary course or this -- of the relationship between the

9  parties, either/or.  So, I don't know what I'll do and if an

10  individual comes in here in defense a preference case, and I

11  don't want any indication that I have -- I have stamped,

12  pre-stamped approval of saying you've got to pay this.

13          MS. PONADER:  I appreciate that, Your Honor.  That's

14  why we attached --

15          THE COURT:  That's what --

16          MS. PONADER:  -- that's why we attached the demand

17  letter.

18          THE COURT:  Correct.

19          MS. PONADER:  So that the Court would -- it would be

20  clear that the trustee is taking great pains to not say to

21  these folks you need to do this because this is what the Court

22  said you're going to have to pay.  We have not said that.

23          We have in fairness in this demand letter, Your

24  Honor, advised these transferees that if settlement doesn't

25  occur as proposed, that the trustee will be obliged to bring

1 action and that the transferees will pass burden as they do as

2 a matter of law.  This is not a threat.  This is not a coercive

3 tactic.

4        THE COURT:  No, I understand.

5        MS. PONADER:  It is the burden as a matter of law

6 that they will have to prove those assumptions.

7        THE COURT:  I don't mind you saying any of that.  I

8 mean, that's just --

9        MR. KNAUER:  Judge, I'd like to --

10       THE COURT:  Yes.

11       MR. KNAUER:  -- make one other point.  This isn't so

12 much about trying to get Court approval that would somehow

13 pre-decide the issue with regard to the people we make claims

14 against.

15       What this is in part about is, there's four or five

16 hundred people that we don't think we should sue.  But, if

17 creditors in this room are going to insist we sue every

18 potential preference holder, let's get that out in the open

19 now.

20       What we really don't want is people coming back later

21 and saying you should have sued all these people.  We want to

22 tell the judge and the creditors present how we arrived at

23 these protocols and why we don't think we should make demand or

24 sue, at least based on what we know now, more than half of the

25 people who have received payments in the 90 days.  That's a

1  significant part of what we are doing here.

2         THE COURT:  I'm going to let him respond for a moment

3  before we go on.

4         MS. PONADER:  Sure.

5         MR. BOWLES:  Your Honor, on the last point Mr. Knauer

6  raised, that would be wonderful news.  Your Honor, while we

7  filed this under Superior, we actually represent a lot of the

8  smaller people.  When this came in, I believe we have 23 people

9  who were in the voluntary petition, mostly small cattle

10 producers and I believe in one case temporarily a trucking

11 company.

12        But, Your Honor, the main reason we filed this

13 objection is what you just said.  First of all, let's go over

14 what the trustee's motion does not do.  Mr. Knauer has said,

15 we'd like you to know that we're not going to sue these people.

16 That's wonderful.  We will be overjoyed if that's what this

17 motion said.

18        This motion does not say I won't sue anybody who's

19 going to do that.  It's been pointed out in here this motion

20 leaves that open.  So while Mr. Knauer says, oh, that's our

21 intent, this order doesn't say I want to get rid of those.  My

22 client would be overjoyed to get rid of the smaller people out

23 here, but they don't ask for that.

24        Secondly, Your Honor, they said the statement of, oh,

25 you'd be suing the checkbook.  Not anymore, Your Honor.  The

42

1  Supreme Court has had two new cases, Iqbal and Twombly.  You

2  can't just go out and say, geez, are there ever any reasonable,

3  possible, conceivable (indiscernible) there that could win.

4  You have to do the analysis they did.

5          And if they filed a demand letter or filed a lawsuit

6  for the ones that they knew were here in course of business,

7  that, Your Honor, would violate both Iqbal and Twombly and

8  perhaps other parts of the Bankruptcy Code we don't need to get

9  into.

10          THE COURT:  Have you seen any cases on that?

11          MR. BOWLES:  Their duty is only to file on their net

12  recovery they would analyze.

13          THE COURT:  Do you see any cases on that?

14          MR. BOWLES:  Yes, Your Honor, constructing one in

15  Delpine (phonetic), plus several other ones.  In other words

16  you have to be able to show it's plausible, Your Honor, out of

17  that or otherwise the case will automatically be dismissed and

18  in fact there are sanctioning Rule 11 (indiscernible).  I

19  didn't  send your court the conflicts, but that's what we've

20  had, including ones that pursued on --

21          THE COURT:  All right.  What do you really have

22  against this?

23          MR. BOWLES:  Well, mainly --

24          THE COURT:  Why -- how are you -- how are your

25  clients harmed by this?

1          MR. BOWLES:  To be honest, Your Honor, the clients

2    who call me aren't harmed because we'll just take the trustee's

3    letter and address it appropriately.

4          The thing we really have, Your Honor, is the two

5    points we've already made.  First of all, no matter what they

6    say -- Your Honor, when you were a trustee how many of the

7    people that came in front of you thought you were the Court?  I

8    mean, and I don't need an answer, but the answer is a lot.

9          Most of the people that you're talking about here are

10   in fact farmers and cattle sellers.  They're going to get this

11   letter.  They're going to say --

12         THE COURT:  All right.  If they hadn't come in here,

13   Mr. Bowles, they're still going to get letters.  I mean --

14         MR. BOWLES:  That would be fine.

15         THE COURT:  -- preference letters are going to go out

16   whether I approve this or not.

17         MR. BOWLES:  That would be fine, Your Honor.  What we

18   have is what you've said.  This is the imprimatur of the Court

19   to prove this.

20         THE COURT:  Well, I was just looking at the letter.

21   Why do you say -- I mean where -- I mean, that is a concern I

22   had just expressed.  You're absolutely right.  And I don't want

23   that.  But, I don't know that I see that in the letter.

24         MR. BOWLES:  Ah, but, Your Honor, the main thing is

25   it's going to be the order that comes along with the letter.

1  Now we can't police every discussion they ever had with these

2  people.

3          UNIDENTIFIED SPEAKER:  We can't hear what you're

4  saying.  I'm sorry.

5          MR. BOWLES:  Okay.

6          THE COURT:  The order approving this motion will give

7  the Court -- it would appear to give the Court's blessing to

8  the settlement.

9          MR. BOWLES:  To the amounts, yes.

10          THE COURT:  To the amounts.

11          MR. BOWLES:  And that, Your Honor -- no, because I'm

12  not even going to worry about whether they can say they can't

13  do it.  But, the fact that that's not going to come up in

14  conversation at some point or somebody looks on the trustee's

15  blog where all the documents are printed, somebody will find

16  that.  Our main thing is, Your Honor, you know, there are lots

17  of --

18          THE COURT:  Well you --

19          MR. BOWLES:  -- there are lots of settled protocols.

20  We wouldn't have a problem with one that seemed to make sense.

21          THE COURT:  What would make sense to you?

22          MR. BOWLES:  If you wanted to use -- I mean there's

23  several, the Delpine model was you look at preferences over a

24  certain amount and you go below that.  If you go --

25          THE COURT:  Well that wouldn't make sense here.

1    Give me one that -- tell me what you would be happy

2  with in this case.

3    MR. BOWLES:  Basically, Your Honor, they can send out

4  the letters that they can do in their good faith commands.

5  They don't need your blessing.  That was the main thing that

6  just got us to supply what you wanted, the Court's blessing.

7    Now if they want to -- I'll tell you the other one

8  that would make sense.  Go ahead and move to say we aren't

9  going to sue any of the people we think we have a net zero

10  against.  I don't think any of my clients have a problem with

11  that.  I don't think the vast majority of the people have a

12  problem with that.

13    MS. HALL:  Your Honor.

14    MS. PONADER:  Your Honor.

15    THE COURT:  All right.  Go ahead.

16    MS. PONADER:  Your Honor, the suggestion that the

17  trustee is -- would at this point of this case waive any right

18  to this estate is preposterous.  It does not know everything.

19  The trustee has -- we have done a serious analysis, Your Honor.

20  We have made -- the trustee has made its best efforts with the

21  help of its professionals to do this investigation.

22    But, it is entirely possible, Your Honor, that

23  somewhere down the road even though the Court may not want to

24  indulge me with another one of my charts, but I can show you

25  the transferee who is Toner Trails Farms (phonetic), Your

1  Honor, who received $450,000 of (indiscernible) transfers who

2  comes in at a net zero because everything would appear based on

3  the trustee's favorable assumptions to be ordinary course.

4        If down the road we find out that Harcow Company

5  (phonetic) paid Toner Trails Farms a receivable that we're not

6  trying to collect and there's a $40,000 transfer that we didn't

7  know about because it was not reflected by the company's books

8  and records --

9        THE COURT:  Well I'm not going to ask you to give

10  passes to everybody that you're not presently intending to sue

11  right now.  I mean you don't know -- I don't know any trustee

12  that's ever done that and the statute of limitations usually

13  takes care of that.

14        MS. PONADER:  It does, Your Honor.  We have until

15  December 6th of this year.

16        THE COURT:  So but the only question here is I mean I

17  can't -- I'm having a hard time thinking of the last time, if

18  ever, I didn't approve a settlement on a preference.  Maybe

19  that's happened, but -- do any of you remember that happening?

20        MS. PONADER:  Well --

21        MS. HALL:  Your Honor --

22        MS. PONADER:  Go ahead.

23        MS. HALL:  I mean, the main difference that I think,

24  I mean and the objection says in it, that the difference

25  between what the trustee is asking for and what sometimes is

1  normally asked for is authority to settle without further order

2  of the Court in an amount less than X.  Instead of an amount

3  less than X we have put together a standard.

4          THE COURT:  Correct.

5          MS. HALL:  That's really in those kinds of motions

6  are fairly standard.  Well I think there is somehow a belief

7  that we manipulated the standard or we use it to intimidate

8  people but.

9          MS. PONADER:  That's right, Your Honor, and there is

10 accusations in the Superior filing that the trustee did this to

11 beat transferees into submission.  That the process is intended

12 to intimidate the unsophisticated creditors.

13         To the contrary, Your Honor, and with respect to the

14 settlement authority we wanted to be more -- we couldn't really

15 establish that standard as Ms. Hall talks about because in fact

16 -- and there are cases, Your Honor, where transferees will have

17 received $450,000 and then get $30,000 of exposure.  We would

18 need to take that number down to five percent.

19         So a more candid and transparent approach rather than

20 seeking authority under the auspices that Ms. Hall described as

21 ordinary which in fact they are, we wanted to actually lay out

22 for the Court this is what we've done and this is what we

23 propose to do.

24         THE COURT:  All right.  I understand the issue.

25 Anything last on the issue?  I'm ready to move on.  Last word,

1  Mr. Bowles?

2          MR. BOWLES:  Nothing.  Nothing more, Your Honor.

3          THE COURT:  All right.  I'll issue an order.  Motion

4  to compel.  This is Superior's motion to compel the trustee to

5  file a mandatory report.  The trustee is basically saying they

6  want to wait at least until the investigation that's -- report

7  in March is made.  Isn't that basically what you said?

8          MS. HALL:  Yes, Your Honor.  Well part of it was the

9  budgets and the financial statements.  We did that with Ms.

10  DelCotto's.

11          THE COURT:  And you don't want to amend your

12  statement of affairs until the investigation is complete and

13  you've determined what you're going to do?

14          MS. HALL:  Well I mean the statement of financial

15  affairs and the snapshot on the petition date, if it's -- if

16  they're looking for us to amend that so that they can find out

17  what's happened since.

18          MR. ROGERS:  No.

19          MS. HALL:  That's not really the case.

20          THE COURT:  That's not what they asked I don't

21  believe.

22          MS. HALL:  And we don't --

23          MR. ROGERS:  No, that's --

24          MS. HALL:  -- we don't believe we have to do it

25  numerous times.

1          MR. ROGERS:  What we're really seeking here is

2    information as of the petition date which is crucial

3    information, we think, for creditors in the case trying to

4    evaluate it.  In particular it would be relevant from our point

5    of view to assessing what is Fifth Third's collateral?  Did

6    they improve their position?

7          Key questions in the case and the schedules

8    understandably when they were filed don't really communicate

9    the information about assets.  As the trustee points out the

10   books and records were a mess, they're all kinds of fraud going

11   on.

12         So the -- everything in the schedules is highly

13   qualified to the point of the operating account, the balance is

14   indicated as unknown, accounts receivable.  Inventory schedules

15   indicate $35 million of inventory, but we think 20 million of

16   this is undocumented.

17         THE COURT:  All right.  When do you think you'll be

18   in a position to do that?  After the report --

19         MR. KNAUER:  Could I make a couple of comments,

20   Judge?

21         THE COURT:  Yes.

22         MR. KNAUER:  The schedules will not -- amending the

23   schedules will not provide the kind of information that Mr.

24   Rogers is talking about.  This is a moving party and if I amend

25   the schedules and I put down $15 million is the claim against

1  Superior Livestock, I'll probably get a letter from Mr. Ames,

2  and I have in the past, saying I shouldn't be making claims

3  like that especially in the public domain.

4       If I put down that we have $25 million worth of

5  preference claims then they're going to want to have the

6  creditor call to go over each one of them.

7       All of the assets that have been liquidated are in

8  the reports.  All of the money that's been collected are in the

9  reports.  All of the money that we started with, for example

10 beginning bank accounts, are in the reports.

11      These creditors are about as well informed in a

12 liquidation case as any group of creditors could be as to what

13 I think most of the asset values are and the remaining kinds of

14 things we're going to put down are the amounts of the claims

15 that are in litigation.

16      We're not going to put down on the schedules that we

17 think this interpleader case is worth less than the face value

18 of it.  We're not going to put down in the schedules that this

19 claims against Superior or Joplin or anybody else is worth less

20 than the face value of it.

21      THE COURT:  Correct.

22      MR. KNAUER:  So I don't think that amending the

23 schedules in that way is going to be particularly enlightening

24 to a creditor.

25      MR. ROGERS:  Well --

1          MR. KNAUER:  And it changes from week to week or

2   month to month for sure.

3          THE COURT:  But didn't I see in your reply that you

4   were also awaiting the report of special counsel as to --

5   that's due in March --

6          MS. HALL:  Well there were three requests in the

7   motion.

8          THE COURT:  Correct.

9          MS. HALL:  One was the budgets financial, one was the

10  1106(a) report, and one was the amendment of the motion -- of

11  the schedules.  I think the 1106(a) report had to do with the

12  Fifth Third.

13         MR. ROGERS:  And from our point of view that's sort

14  of a mis-reading of the request.  And what we're talking about

15  here of course are the duties of the trustee, you know, the

16  schedules, they need to provide the best information they have

17  whether -- whether they think it's useful or not it's a duty.

18         THE COURT:  Well I mean I don't want them amending

19  their schedules every week as discovery is ongoing in this

20  litigation and the numbers change or now they have a claim for

21  an asset that might -- they now want to list for more than they

22  thought it was worth at the time of trial.  I mean how do we

23  get around that, Mr. Rogers?

24         MR. ROGERS:  And I understand that and I think it's

25  taken as a given that whatever is put out there isn't

1  absolutely precise.  But this is a case where we've had $4

2  million of professional fees, lots and lots of analysis of all

3  the things we're talking about.

4          And what I'm saying is shouldn't we have the benefit

5  of this is our best view now of what the inventory was worth on

6  that day.  This is our best --

7          THE COURT:  All right.  Let's take these one at a

8  time.  That's your first request that there be a revised filing

9  as to the value of the inventory on the date of the petition,

10  is that correct?

11          MR. ROGERS:  Correct, Your Honor.

12          THE COURT:  All right.  What about that?  Do we have

13  better information now than we --

14          MR. KNAUER:  We've sold all the inventory.  We know

15  what those figures are in the reports and we can summarize

16  them.

17          THE COURT:  All right.  Summarize those.  The motion

18  is granted to that respect that you summarize the results of

19  the sales of inventory that were available as of the petition

20  date.  What's the second one?

21          MR. ROGERS:  It's not in the schedule but it's

22  related.  One of the questions that's not answered in the

23  statement of financial affairs relates to set offs and bank

24  accounts.

25          We spoke with the trustee, I don't know, ten days

1  ago, who indicated that analysis was done, completed in March

2  of last year.  The DSI was prepared to testify about that issue

3  and that they would forward the analysis to us.  We haven't

4  received it and I gather from their response that they're not

5  going to forward it.

6          THE COURT:  What about that?

7          MS. HALL:  That's not true.  It's not that we're not

8  going to forward it.  March 10th was a long time ago.  It

9  wasn't testified to.  We asked DSI to provide the report to us

10  again so we could look at it and talk to them about it so that

11  we understood it and we'll provide another report.

12          THE COURT:  All right.  I'll grant that so that's to

13  be provided within 30 days.  What's the third thing you want?

14          MR. ROGERS:  Accounts receivable and the schedule is

15  kind of the same issue as inventory.  They're highly qualified

16  statements to the effect of, you know, we're not sure if this

17  is --

18          THE COURT:  Do we have better information about --

19          MS. HALL:  Accounts receivable are listed on every

20  single monthly operating report.

21          MR. ROGERS:  But those are the current accounts

22  receivable, not as of the petition date.

23          MS. HALL:  If you go back and look at every one of

24  them you will find it.

25          MR. ROGERS:  But they're mixed in with cattle sales.

1          THE COURT:  I'm going to deny that portion of the

2    request.  What else?

3          MR. ROGERS:  I think as far as the schedules and the

4    statement of financial affairs, that covers it.  The report,

5    the concern there is the trustee in their response is kind of

6    focused on the investigation of Fifth Third and that cause of

7    action.

8          That isn't really what this motion was intended to

9    address.  We understand Hoover Hull is doing that.

10          THE COURT:  What was the motion intended to address

11   then?

12          MR. ROGERS:  Well the trustee of course was brought

13   into the case at the request of Superior and others to

14   investigate fraud, to sort through the financial affairs of the

15   debtor and make sense out of them, find out causes of action.

16          I understand Hoover Hull is going to report on Fifth

17   Third, but obviously there are causes of action.  The trustee's

18   been pursuing them.  The trustee wants a protocol.  The report

19   that the statute requires says tell us what the causes of

20   action are.  We don't have any information about that.

21          It's my understanding they've been sharing with Fifth

22   Third not only the causes of action but the estimated

23   recoveries on the causes of action.  So the trustee is telling

24   us we can't give you even a description of the causes.

25          THE COURT:  So you're asking that they file pursuant

1  to that report a list of the causes of action that they're

2  pursuing?

3      MR. ROGERS:  As well as the other thing the statute

4  specifically talks about is fraud.  And we've all talked about

5  fraud in this case.  We say there's fraud, Fifth Third says

6  only it was defrauded, check kiting.  A fundamental reason the

7  trustee was brought in was to sort out what was the fraud.

8      The Court's recent opinion talks about what role did

9  the debtor play?  Did they know these checks were going to be

10  bad?  Did they not know?

11      To the extent the trustee's investigated the fraud it

12  could say here is the evidence of check kiting, here is the

13  evidence of what they did with the sellers, whatever the fraud

14  is, that's their role here to report it.

15      THE COURT:  Mr. LaTour?

16      MR. ROGERS:  So that we're not trying to figure it

17  out.  And that's what $4 million has been spent on.

18      THE COURT:  Well not exclusively.

19      MR. ROGERS:  Certainly.

20      MR. LaTOUR:  Your Honor, I'd like to weigh in on a

21  couple of points.  First of all whatever values are placed in

22  the schedules by the trustee in this retrospective are not

23  determinative of the outcome and don't have evidentiary weight.

24  So the urgency of the task and the, you know, the purported

25  value of the information is rather suspect in my opinion.

1        A report of all the causes of action and everything

2   else that the trustee knows in a liquidating case, this is a

3   liquidating 11, ten months before the end of the time period in

4   which a trustee is going to do that is also highly suspect as

5   to its probative value.  One, some things haven't been

6   determined and, two, some things could change.

7        What really is driving people is the urge to know

8   what the answer is going to be.  We all want to know what the

9   answer is going to be and I suspect if we knew to the penny how

10  many dollars there were on the table that this collection of

11  attorneys which must have some 200 years of experience among us

12  could probably sit down and make a deal and divide up the

13  money.  The problem is we don't know how much money is there

14  yet because the litigation hasn't concluded yet.

15        THE COURT:  All right.  Do you want to respond to the

16  last thing that Mr. Rogers said, Mr. Knauer?

17        MR. KNAUER:  Judge, when we --

18        (Brief break in audio - 11:30:48-11:31:05)

19  filed these budgets on the website, we didn't just file the

20  budgets.  We had a call with everyone that wanted to

21  participate so they could ask questions about them and a

22  statement was made during that call that someone said is that

23  everything that's been given to the bank and we said these

24  budgets, except we changed the format slightly in this quarter,

25  but these budgets are identical except for this one change in

1 format to what has been given the bank.

2          And then they said was the bank given anything else

3 and we made the statement that we had reported to the bank our

4 assessment of some of the pending litigation, where we thought

5 it might go in terms of a recovery.

6          The creditors then asked if they could have that and

7 I told them no.  The reason I told them no is the same reason

8 if Mr. LaTour asked me how we were doing on our investigation

9 of the bank and where we thought it might be headed.  I'd tell

10 him no.

11          And I told the other creditors with regard to

12 litigation in which they're participating, we were not going to

13 give our opponents our evaluation of that litigation or where

14 it might come out any more than we would give Mr. LaTour our --

15 a report on how we were doing investigating the bank.

16          THE COURT:  All right.

17          MR. KNAUER:  So --

18          THE COURT:  All right.

19          MR. KNAUER:  -- other than that we gave the creditors

20 everything that we had given to the bank.  I think they were a

21 little disappointed that it wasn't -- I think they thought the

22 bank was getting a lot more detail and a lot more involvement

23 and I think they were surprised that it wasn't.

24          MR. ROGERS:  Your Honor?

25          THE COURT:  All right.  Last word.

1          MR. ROGERS:  Okay.  It will be very brief, Your

2  Honor.  I think that sort of summarizes the problem here with

3  the comment that the perception that everyone in the case is

4  the trustee's opponent with the exception of Fifth Third.

5          These are reports the trustee is required to file

6  and, yes, we know the information in the schedules is not

7  absolute, not everybody can rely on it.  But we do want the

8  benefit of the analysis that's been done.

9          THE COURT:  All right.  The trustee is required to

10  file that report.  I'll order the trustee to file that report

11  within 30 days.  You don't have to put your litigation strategy

12  and I mean you can figure out how to file and comply with the

13  provision that requires that the report be filed.

14          I don't think this is going to be any great benefit

15  to you, but I think you're right that it is a requirement.  So

16  I'll grant the motion to that extent.  Anything else on that?

17          Let's move on.  Motion to extend deadlines.  I don't

18  think there was any objection to that.  I'll show that that's

19  granted.

20          MR. DONNELLON:  Thank you, Your Honor.

21          THE COURT:  Motion for a protective order of Fifth

22  Third.  I understand Fifth Third's concern.  I'm just a little

23  bit concerned that -- and I understand the creditor's concerns

24  also.

25          I'm just a little bit of the initial impression that

1  this might be a little premature and that we don't know what

2  the bank -- I mean obviously I'm not going to let every single

3  person, you know, take depositions of the bank and we're not

4  going to do -- keep repeating depositions of bank officers.

5          But I'm not willing to give you something today that

6  says so and so will only have to give one deposition and it

7  could be so many hours.  Yes?

8          MR. LaTOUR:  Your Honor?

9          THE COURT:  Why don't you stay seated.  I don't want

10  any incidents here.

11          MR. LaTOUR:  Don't want me falling over.  Okay.

12          THE COURT:  No.

13          MR. LaTOUR:  I'd like to address that if I could.

14  Hoover Hull has a time line that it's trying to meet.

15          THE COURT:  Right.

16          MR. LaTOUR:  And the adversary proceedings have their

17  own time line.  And you are correct that Fifth Third, who has

18  been noticed that some 11 of its employees or former employees

19  are to be deposed and in addition another party, so that would

20  be 11, potentially 11 times 7 different adversaries which would

21  be 77 hours of deposition.

22          And all I was trying to do was to put the issue in

23  front of us and let us figure it out rather than be here with

24  serial objections or serial motions to compel or serial motions

25  for a protective order.

1          Now I thought that on Friday that we had worked out a

2   way to make this work and that did not turn out to be the case.

3              (Brief break in audio - 11:36:05-11:36:36)

4          MR. LaTOUR:  Since that time the special counsel has

5   filed a motion for a 2004 exam.

6          Now what's not a problem is, is we had a conference

7   before this hearing.  We believe that the paper discovery will

8   be completed this week, hopefully by Wednesday, maybe as early

9   as tomorrow.

10         The witnesses are available one way or the other

11  either in the week of the 20th or in the week of the 27th.  So

12  that part of the time line can be squared away.

13         The question then becomes does Hoover Hull's counsel

14  because its notice is a 2004 exam, is Hoover Hull the only

15  questioner in the examinations or not and then if that answer

16  is yes then the next question becomes when we have seven

17  overlapping fact patterns in these adversary proceedings does

18  that turn into seven sets of depositions?  My suggestion --

19         THE COURT:  The answer to that is no.

20         MR. LaTOUR:  Yes, Your Honor.  My suggestion there

21  is, is that if the order says that Hoover Hull will conduct

22  exclusive the 2004 questioning and that you're not going to

23  rule now on the basis of how to handle these other adversaries,

24  it seems to me that the parties can get together and figure out

25  how to do a deposition protocol that sort of mirrors what we

1  did with the evidence protocol.

2         THE COURT:  Well I think that's exactly what I was

3  thinking.  That there should be a Hoover Hull 2004 limited to

4  Hoover Hull because they're under a special mandate to conduct

5  this investigation and they're under a deadline.

6         And the other parties who are still conducting

7  discovery and reviewing documents need to work out then a

8  protocol for deposing the bank at a later time if they feel

9  it's necessary.  I mean Hoover Hull may still cover most if not

10 all they wanted to ask anyway.  And they certainly will have a

11 right to review that.

12        And they're going to have to come up with something

13 like lead counsel and the other attorneys probably can be

14 present and but if you all can't come with a protocol I'll help

15 you develop one because we're not going to do seven different

16 depositions of the bank officers.  Yes?

17        MR. DONNELLON:  Your Honor, this is Dan Donnellon for

18 First Bank just to be heard on this issue is as I put down in

19 our objection on this issue, depositions were being scheduled.

20 The only question on the table at all was will these be noticed

21 up as a 2004 limited to bankruptcy or notice across everything

22 and Mr. White agreed to do that.

23        Then it became well let's limit it one shot, we'll

24 just have Hoover Hull, then you can get a transcript and come

25 back.  And the problem at all with that is given your most

1  recent order on the issue on Packers and Stockyards, the

2  additional creditors are now also under a gun.  It's not a

3  short a time line as Hoover Hull, but theirs is still only

4  assigned as, to my knowledge, as a preliminary report of where

5  are we going.

6          THE COURT:  That's a good point.

7          MR. DONNELLON:  The other creditors have been trying

8  to assist Hoover Hull in the deposition and I can certainly

9  understand working out a lead counsel or a quorum of some sort

10 that would try to cover as much as we can.  There may

11 ultimately be a need for a second deposition in another set of

12 circumstances.

13         Mr. Newbern from Florida has issues under Florida law

14 that the rest of us don't have.  But to put any limitation on

15 it now --

16         THE COURT:  What limitation do you think we're

17 putting on it now?  I mean --

18         MR. DONNELLON:  Mr. LaTour as I understand it said

19 we'll notice of a deposition, Hoover Hull will appear, ask its

20 2004 questions.  Then if anybody else wants to do it at a later

21 date we can come back in after we've got that transcript.  And

22 that's not workable.  That's a premature limitation on that.

23         THE COURT:  Well what would your suggestion be?  I

24 mean if it is a 2004 don't -- I mean I agree that Hoover Hull

25 should be asking their questions at a 2004.

1          MR. DONNELLON:  No doubt.  No doubt.  And we've tried
2    to do that.  That's why when we had this, this telephonic
3    conference I was getting questions of well, Dan, you've never
4    even noticed of a deposition because I'm not -- I'm trying to
5    not get in the way of what Hoover Hull is trying to do here.
6    I'm trying to help Hoover Hull in its investigation, not impede
7    it at all.

8          And on the other hand when we get dates scheduled and
9    we can't get everything then the dates --

10         THE COURT:  All right.

11         MR. DONNELLON:  -- go away and they're abandoned.

12         THE COURT:  I don't have.  All right.  Why don't you
13   all -- I mean do you think you all have discussed this as much
14   as is going to be possible or do you want me to figure it out
15   for you today or --

16              (Brief break in audio - 11:41:36-11:41:47)

17         THE COURT:  -- there discussions ongoing.  But let me
18   make a couple points before I say this.  You made a good point
19   that I hadn't really thought about and that is that, you know,
20   I have put some time -- a time line on you in terms of the
21   Packers Stockyard issue.

22         I don't think the bank representative, it's probably
23   not in his or her best interest to have to come back again in
24   two weeks or three weeks and give a deposition on the stockyard
25   issue.  So I think it might be useful for you to ask that some

1   of that be included in the 2004 exam.

2          MR. DONNELLON:  May I make a suggestion for the

3   protocol?

4          THE COURT:  Yes.

5          MR. DONNELLON:  I wanted to.  I was the one who

6   arranged the conference call and I wanted to flesh this out and

7   we got nothing but resistance from the bank.

8          And I think the idea of saying we're going to have

9   Hoover Hull do the investigation and we will -- the other

10  creditors can get together and say we'll have two or three

11  other lawyers who can ask questions as long as it doesn't

12  foreclose the possibility of doing another deposition.

13         Nobody wants to harass the deposition by doing seven

14  depositions and no one is going to.  My client doesn't want to

15  pay me to depose somebody who's been deposed six times.  But

16  there may be discreet issues down the road.

17         So if we can have a protocol that says Hoover Hull

18  will take the lead, will ask all the questions to Mr. White's

19  satisfaction, and then if there's one, two, three other lawyers

20  who we agree will be prepared to ask additional questions that

21  may not be on his agenda, and we'll try to complete the

22  depositions in an orderly fashion, that way in accordance with

23  schedules that Fifth Third sets and holds to, I think that's

24  the most reasonable way to accomplish this.

25         THE COURT:  Well here's the problem with that. I've

1  been at depositions before where the secondary I mean the first

2  lawyer goes through and covers most of it.  Then the secondary

3  lawyer comes on and takes three times as long as the first

4  lawyer did.

5          MR. DONNELLON:  I wouldn't expect it to be the case

6  because I know Mr. White's firm and I know they're quite

7  skilled.  But there are situations where if the first lawyers

8  comes in and doesn't complete the discovery to my satisfaction,

9  I'm going to continue to ask questions until I've satisfied

10  myself.  But I'm not going to be duplicating questions that

11  were already asked that's --

12          THE COURT:  Mr. White?  Is -- who's here for Hoover

13  Hull?

14          MR. WHITE:  I am, Your Honor.

15          THE COURT:  Yes.

16          MR. WHITE:  From our perspective, Your Honor, we want

17  to advance our investigation.  That's why we filed the motion

18  for Rule 2004.  There was an issue that was raised about

19  whether or not to notice the depositions in the bankruptcy and

20  the adversary proceedings and after some lack of good

21  communication we made clear to the bank that we're willing to

22  do them bother in the bankruptcy and adversary proceeding.

23          What we couldn't agree to and obviously we don't have

24  the authority to bind any of the other parties in the room, is

25  to one deposition of seven hours.  What I understood from the

1  bank is that these witnesses are available next week, the 20th

2  and 27th.

3       As the Court and some of the parties have recognized,

4  we're operating under a deadline to report back to the Court a

5  preliminary report by March the 13th and we're trying to meet

6  that Court's deadline.  That's why we asked for the depositions

7  back in January and actually to begin tomorrow.

8       With the time line we're getting with these

9  depositions it's going to be very difficult to meet that

10  deadline, Your Honor, and if we're going to now include

11  information relating to the Packers and Stockyards Act, that's

12  going to further delay our schedule.

13       THE COURT:  How could we incorporate the Packers and

14  Stockyard issue into your examination?  What would be your

15  suggestion there?

16       MR. TONER:  It's not obvious to me, Your Honor.

17       MR. LaTOUR:  Your Honor, if I could jump in.  The

18  deal that fell apart on Friday contemplated two rounds of

19  depositions.  I had reconciled myself to the necessity of it so

20  that Hoover Hull can complete its investigation timely.

21       THE COURT:  All right.

22       MR. LaTOUR:  And I recognize that the Packers and

23  Stockyards issue was going to come up at a later time.  In

24  terms of the witness information that it does not make sense to

25  try to push those two together.

1          THE COURT:  All right.  I don't -- I agree with that.

2   And here's what I'll do.  If you need me to I'll extend the

3   Packers and Stockyards deadline.  But I think it needs to be

4   done separately.  I think trying to jam it all together or

5   trying to have him ask your questions is not going to work,

6   it's not going to be fair to you.

7          I still want you to work on a protocol for the second

8   round of depositions.  But on a simple motion you let me know

9   when you're able to get that scheduled and I'll extend the

10  Packers and Stockyards deadline.

11         UNIDENTIFIED SPEAKER:  Then just for clarification

12  will Mr. White be the only attorney permitted to ask a question

13  or even to attend?

14         THE COURT:  You can attend and listen if you'd like.

15         UNIDENTIFIED SPEAKER:  Okay.

16         THE COURT:  But he'll be the only one permitted to

17  ask questions at the 2004.

18         UNIDENTIFIED SPEAKER:  In round one, in the 2004

19  round.

20         THE COURT:  In the 2004, yes.

21         UNIDENTIFIED SPEAKER:  I will be happy to work on a

22  protocol.

23         THE COURT:  All right.

24         UNIDENTIFIED SPEAKER:  Your Honor?

25         THE COURT:  Go ahead.

1          UNIDENTIFIED SPEAKER:  Mr. Donnellon's client is

2    First Bank & Trust and its claim is that some of its collateral

3    has been commingled into the estate of Eastern.  Why First Bank

4    & Trust takes the lead on working on a protocol on causes of

5    action that it has nothing to do with is --

6          THE COURT:  I don't care if he takes the lead.  He

7    wants to suggest a protocol.  You can reject it and suggest

8    your own protocol.  Protocol discussions can be ongoing.  I'm

9    not restricting anyone.

10          I mean he's an experienced attorney.  He may have a

11   good idea.  I'm, you know, listen to is.  That's all I'm

12   saying.  Okay.

13          MR. LEBAS:  Your Honor, David LeBas with a request to

14   inject a question of these procedures.  I can understand the

15   limitation with respect to the 2004 examination as it

16   originally started.

17          But over time the parties to that discussion remain

18   very limited which is the Hoover Hull folks, the bank folks,

19   and evidently Mr. Donnellon and I'm not sure who else.

20          But we did not learn of the prospect for who it was

21   and when it would be until very late in the game.  And so I ask

22   that as the deposition schedule goes forward that the -- that

23   all the parties be told about it so they can be given an

24   opportunity to make a decision about whether they think it's

25   important to protect their client's interest or not.

1          I also ask that the parties consider setting up some

2   sort of remote attendance facility for the depositions.  Again,

3   parties may or may not –

4          THE COURT:  Now are you talking about the depositions

5   or the 2004 exam?

6          MR. LEBAS:  Both.

7          THE COURT:  All right.  I think that's a good idea.

8   Try to arrange it in a room that has a conference phone

9   available so that people can monitor it without physically

10  attending.

11         MR. DONNELLON:  So that we're clear on this, Your

12  Honor.  I wasn't trying to exclude anybody.  I've been letting

13  Mr. White schedule and assumed he would ultimately have a

14  notice or a subpoena that everyone -- that would be filed --

15         THE COURT:  Right.

16         MR. DONNELLON:  -- and everyone would know that.

17         THE COURT:  I understand.  And if you all --

18         MR. LEBAS:  I'm not suggesting that.  I would ask if

19  possible that whoever is setting this up consider whether video

20  capacity would be available.  Sometimes that's a lot easier to

21  handle than to just simply by listening on the telephone.

22         THE COURT:  All right.  You ought to consider that.

23  I know a lot of it's done that way these days.  All right.  Now

24  as to the protocol.  I think you've pretty well worked out how

25  the first -- are there still issues as to the 2004 exam or is

1    that pretty well resolved?

2              UNIDENTIFIED SPEAKER:  No, sir.

3              THE COURT:  That's resolved.  All right.  The second

4    one you're all going to make suggestions and suggest protocols

5    and if you run into a disagreement I'll be happy to resolve it

6    by phone.  You don't have to wait for another omnibus date.

7    I'll clear up any issues you have in that regard.  All right.

8    Let's move on.

9              MS. HALL:  I think we're just down to the adversary

10   proceedings.

11             THE COURT:  We're down to the adversary proceedings.

12   Let me bring up -- let me go back and resolve some of the

13   issues that I didn't rule on today and talk about some of the

14   other issues.

15             All right.  As to the motion to hire Rubin & Levin on

16   the preferences.  I'm going to grant that motion on this

17   condition.  First of all that there be a new letter of

18   engagement or maybe that the new letter of engagement specify

19   what was represented here today that's going to be dealt with

20   and that is the preferences.

21             Second of all that it be clarified and the parties

22   strictly follow the fact that all Rubin & Levin will be doing

23   in Eastern is the stuff that related to Fifth Third Bank.

24             If they want to take a broader role in Eastern than

25   that, which they may decide they'd like to do, then I'm not

1  going to grant the application in the other case.  But I will

2  grant it on the condition that that's their only role over

3  here.  We've got waivers that cover it.  And this is their only

4  role over here and we've got waivers to cover it.  So that will

5  be granted.

6          As to the objection -- as to the motion for the

7  protocol on the preferences, I'm going to grant that over the

8  objections.  And I'd like an order approving that.

9          As to the ruling that I made on Friday as to the

10  constructive trusts, I need the trustee or someone, I mean

11  we're doing this but I need to make sure that we have an order

12  in all appropriate instances and a suggestion as to where we

13  think we might need those orders.

14          I know that you had a pending motion that was -- that

15  started this mess.  In the case in chief you had a motion.  I

16  think there are adversaries, other adversaries that raise the

17  same issues.

18          MR. TONER:  That's right.  The <u>Downs</u> case for

19  example.

20          THE COURT:  The <u>Downs</u> case for example.  So --

21          MR. TONER:  Kevin Toner for the trustee.  As to the

22  pending adversaries, I think the parties in those adversaries

23  could figure out how to submit it into that record.

24          THE COURT:  Well, that's what I'm saying.  We need to

25  get it in the record in the appropriate adversaries.

1        MR. TONER:  But, as far as notice to the world, like

2  we've heard today, that wasn't quite sufficient.  We'll put it

3  on the trustee's blog, we'll put it in the repository so that

4  everyone has a copy of it so they can see what happened.

5        THE COURT:  All right.  Superior's -- other matters

6  that I have under advisement, and I want to make sure the

7  parties are aware of what I have -- we have Superior's motion

8  for declaratory judgment on the forward contract issue.  I

9  still haven't issued an order on that.

10        The dispositive motions concerning the Nicholas and

11  the Texas <u>Cactus v. Nichols</u> (sic).  That's being worked on.

12        And then well the stipulated question concerning

13  constructive trusts in the contested matter and the objection

14  to claim issue in the case in chief which will be covered by an

15  order concerning the constructive trust issue.

16        And we still of course have the Packers and Stockyard

17  issue that's not resolved in any case.  And what else?

18        MR. TONER:  As I was writing I'm not sure if I heard

19  you mention the five lots of cattle that's subject to a summary

20  judgment motion.  I think that's now been fully brief.  Am I

21  right, Mr. Ames?

22        MR. AMES:  Yes.

23        THE COURT:  Do we have that on -- is that on -- what

24  --

25        MR. TONER:  That is in the Superior adversary I

1 believe.  Yes.

2            THE COURT:  Yes, okay.

3            MR. TONER:  Motion for partial summary judgment.

4            THE COURT:  Okay.  I don't know that that –

5            MR. TONER:  And there is one on delivered cattle also

6 in the Superior adversary.

7            THE COURT:  Delivered cattle?

8            MR. TONER:  Delivered cattle.

9            THE COURT:  Yes.  Okay.  Both in the Superior

10 adversary.

11            MR. TONER:  Correct.

12            THE COURT:  All right.  Let's go through the pending

13 motions very quickly in the adversaries and see if -- Superior

14 versus Eastern.  That motion of Fifth Third for protective

15 order.  Mr. Bowles.

16            MR. BOWLES:  Your Honor, on Superior versus Eastern

17 the protective order was definitely just copied, filed, and the

18 same thing on the protective order for all depositions.

19            THE COURT:  Oh, that's what I thought.

20            MR. BOWLES:  Yes, Your Honor.

21            THE COURT:  So that's been resolved.

22            UNIDENTIFIED SPEAKER:  That's right, Your Honor,

23 we've already resolved it.

24            THE COURT:  All right.

25            MR. BOWLES:  And since you say you have it under

1  advisement, the other two motions go to Fifth Third's motion

2  for a summary judgment, those were stayed pending the Court's

3  ruling.  So that's the only thing.  Other than I think that Mr.

4  Toner said that there is our motion also for partial summary

5  judgment on what we call the non-debtor cattle which I believe

6  is one of the two you talked about so.

7          THE COURT:  All right.  Friona.  We've got a motion

8  for leave to file answer out of time for defendants Nichols.

9          MR. DAWSON:  Yes, Your Honor.

10         THE COURT:  Response.

11         MR. LOVELL:  John Lovell from Cactus Growers.

12         MR. DAWSON:  And Jack Dawson for the Nichols', Your

13 Honor.

14         THE COURT:  Go ahead.  Mr. Dawson, you want to go

15 first?

16         MR. DAWSON:  Yes, sir.  It came to our attention as

17 we were briefing the motion for summary judgment that we have

18 not filed an answer.  We have filed a motion to dismiss in the

19 injunction stage.  We have filed motions -- a motion for

20 summary judgment in this case.  We've responded to Cactus'

21 motion for summary judgment in this case.  And we've conducted

22 discovery, we've appeared at depositions.  I've appeared on

23 nearly every one of these omnibus hearings.  And then it came

24 to my attention that I have failed to file an answer.

25         MR. LOVELL:  Your Honor.

1          THE COURT:  Response?

2          MR. DAWSON:  And affidavit.

3          MR. LOVELL:  The response, Your Honor, is that this

4   was a conscious litigation decision on behalf of the Nichols.

5   They have been trying to figure out a way to avoid jurisdiction

6   of this Court so they could avoid res judicata out of this

7   Court so they could continue the litigation in Oklahoma when

8   their role up here is finished.

9          So that they have -- matter of fact their attorney

10  was served at the same time they were.  So they've been aware

11  of this litigation and the claims made against them.  They've

12  made the decision consciously to not appear until we finally

13  filed a motion for default judgment.

14         Don't believe they've stated any grounds that would

15  allow them to file an answer late since they -- it was a

16  conscious decision.

17         MR. DAWSON:  And then I forgot to add, Your Honor, we

18  also filed a joint statement at a pre-trial conference.  I

19  forget exactly if it was a joint pre-trial conference statement

20  or after the Nichols were served.  I did not know that the

21  Nichols had been served a summons.  That information came to me

22  later.

23         THE COURT:  Well how would not filing an answer have

24  helped them escape the binding?  I mean if they submit -- if

25  they're briefing the summary judgment motion and there is a

1  summary judgment issued against them, I don't think any Court

2  is going to say well they didn't file an answer so that doesn't

3  count do you?  No?

4            MR. LOVELL:  No.

5            THE COURT:  I'll grant the motion.  I'll let them

6  file an answer and I'll rule --

7            MR. DAWSON:  May I be excused, Your Honor?

8            THE COURT:  Yes, you may.

9            MR. DAWSON:  Thank you, sir.

10           THE COURT:  Can I?

11                      (Laughter)

12           THE COURT:  Not yet.  Innovative.  That's the same

13  protective order I believe that we've dealt with.  Rush Creek.

14  That's the --

15           MS. HALL:  That's the motion to consolidate.

16           THE COURT:  -- that's the consolidation motion that I

17  have continued.  And the same for protective order of Fifth

18  Third and their response to the consolidation.  So that will be

19  dealt with at the next omnibus.  Breeding Brothers' motion to

20  Fifth Third.  Same thing.  Gibson case.  I just ruled on that.

21           Now is there anything that didn't make the docket or

22  that any other party wants to bring before the Court this

23  morning?  Mr. Levin?

24           MR. LEVIN:  Thank you very much, Your Honor.  I would

25  like just for a moment to revisit the one ruling that the Court

1 has made this morning.

2        Pam Donaldson and John Rogers from my office have a

3 great deal of knowledge and have done a great deal of research

4 in matters involving Fifth Third.  I think that the limitation

5 that the Court has put on the 2004 examination should be

6 modified to allow just two other attorneys, Pam Donaldson and

7 John Rogers, to be present for that examination for the simple

8 reason that Sean does not have the background that these two

9 people have.

10        I asked the trustee if he has any objection to that

11 and he does not.  The only objector seems to be Fifth Third who

12 is limiting the individual who is going to make the

13 examination, who has limited knowledge about what has

14 transpired here.

15        And I think including Mr. Rogers and Mr. -- I hope

16 you don't get mad at me, John -- including Mr. Rogers and

17 Deanna, it would be beneficial.  Now we tried to do this

18 through the ad hoc committee and have one attorney be able to

19 do these things.  And that letter went to this Court.

20        But to limit this 2004 examination which will be very

21 important, one of the central matters of this -- the action

22 against Fifth Third if there is an action, is one of the

23 central matters of this proceeding.

24        And to limit Sean to be the only one to question

25 right now I think is a mistake and I don't think it's fair to

1  the other creditors.

2         MR. LaTOUR:  Your Honor, I'd like to speak to that if

3  I could please.

4         THE COURT:  Okay.

5         MR. LaTOUR:  What you've just heard is another

6  example of people who want to substitute their judgment for the

7  judgment of the trustee and his professionals.

8         They've already now indicted Sean White as being

9  unable to ferret out whatever there is to ferret out.  One,

10  it's a preliminary report; two, they're going to get their

11  chance to depose the witnesses and cover any kind of ground

12  that wasn't asked before; three, First Bank is pursuing a

13  different agenda in this case than everybody else.

14         And what we're going to have if this suggestion is

15  taken is the tail wagging the dog here.  You're going to have

16  the very situation you announced where Hoover Hull spends two

17  hours and somebody else spends five hours and they're not

18  spending five hours investigating the subject at hand but they

19  are instead pursuing their own agenda.

20         Now there is really utterly no need to assume the

21  problem that is being assumed here.  They should let Hoover

22  Hull do the job and if there is a subsequent deposition on

23  point it can be raised.

24         I have no doubt whatsoever that any and all theories,

25  suppositions, and accusations that can be made in this case

1  against Fifth Third will be made because they're constantly

2  being made without regard to factual basis.  So there is just

3  no need to lard an extra layer of questioners into this 2004

4  examination.

5          MR. LEVIN:  Before I raised this to the Court I asked

6  Mr. Knauer if he had any objection and he has no objection

7  whatsoever.  So I want to correct Mr. LaTour on that point.

8          I just think that it makes the proceedings a little

9  bit more open, more transparent, and it helps to remove the

10  suspicion that some creditors have.

11          THE COURT:  What's the time limitation you've put on

12  the questioning?

13          MR. LaTOUR:  Your Honor, the Federal Rules put a

14  seven hour limitation on.  It's not my limitation, it's --

15          THE COURT:  And is that --

16          MR. LaTOUR:  I'm sorry?

17          THE COURT:  Well I didn't finish the sentence.  And

18  is that what you've agreed to, Mr. White?

19          MR. WHITE:  Well, Your Honor, there's still some

20  outstanding documents so to the extent we don't get a full

21  production prior to the depositions we have the right to go

22  back and complete the deposition.

23          MR. LaTOUR:  That's correct, Your Honor.  It's still

24  limited to seven hours.

25          THE COURT:  All right.  Here's the way I'll amend it.

1  If you want -- if you want to give any attorney any of your

2  time you can do that.  If you don't, you don't have to.  That's

3  up to you.  This is your exam to try to -- to file your report.

4  If you decide it would be useful to you to have somebody who

5  has investigated it, ask some of the questions, I'll let you do

6  that.

7            THE ATTORNEYS:  Thank you, Your Honor.

8            MR. LEVIN:  Thank you very much, Your Honor.  Now the

9  only thing we need to do is find somebody to talk real fast.

10           THE COURT:  Well --

11                      (Laughter)

12           MR. LaTOUR:  Your Honor, what is the scope of inquiry

13  of this examination?

14           THE COURT:  I think the scope of inquiry is to

15  whether or not the estate has claims against Fifth Third,

16  right?

17           MR. LaTOUR:  That's correct, Your Honor.  The estate

18  has claims.

19           THE COURT:  Right.

20           MR. LaTOUR:  Not whether First Bank has claims.  Not

21  whether Superior has claims.  The estate.  And I'm going to

22  urge that that's the limitation that this --

23           THE COURT:  That's the --

24           MR. LaTOUR:  -- examination sticks with.

25           THE COURT:  -- that is the subject matter of the 2004

1  is whether the estate has claims.  And if the trustee -- if

2  special counsel wants to allow another creditor to ask some

3  questions, they can do that.  But that's going to take away

4  your time to ask, Mr. White, you understand that?

5          MR. WHITE:  Understood.

6          THE COURT:  Anything else this morning?  We're

7  adjourned.

8                    *  *  *  *  *

9              **C E R T I F I C A T I O N**

10         We, ANNEMARIE DeANGELO and JANET D. PERSONS, court

11  approved transcribers, certify that the foregoing is a correct

12  transcript from the official electronic sound recording of the

13  proceedings in the above-entitled matter, and to the best of

14  our ability.

15

16  /s/ Annemarie DeAngelo

17  ANNEMARIE DeANGELO

18

19  /s/ Janet D. Persons

20  JANET D. PERSONS

21  J&J COURT TRANSCRIBERS, INC.     DATE:  February 24, 2012

22

23

24

25