FIRST REPORT OF JAMES A. KNAUER, TRUSTEE OF THE ESTATE OF EASTERN
LIVESTOCK CO., LLC PURSUANT TO 11 U.S.C. 1106(a)

March 16, 2012

Submitted to the Honorable Basil H. Lorch III

United States Bankruptcy Court
Southern District of Indiana
New Albany Division

Disclaimer:  The Trustee provides this report pursuant to 11 U.S.C. §1106(a)(3),(4).  This report
summarizes certain facts currently believed by the Trustee to be true resulting from investigation
conducted by the Trustee and his financial and legal advisors as well as investigations conducted
by outside entities.  The Trustee has filed numerous pleadings and instituted numerous causes of
actions against parties to make recoveries for the purposes of distribution on valid claims.  To the
extent that such litigation remains pending, the Trustee directs parties to the pleadings as a
supplement to this report.  This report may be supplemented from time to time as necessary and
as additional or different facts and circumstances become known to the Trustee that are material
to his statutory duties.  The Trustee does not intend by this report to make any admissions against
his or the estate's interests in any pending or future litigation.  Moreover, the Trustee does not
intend to waive any attorney-client or other professional privilege or the work product
protections that may apply to his or his professionals' work product.

TABLE OF CONTENTS

**I. INTRODUCTION AND BACKGROUND**                                                    1
**II. DEBTOR'S BUSINESS**                                                             4
**III. RELATED PARTIES**                                                             7
*A.*     *Tommy Gibson Companies*                                                    7
*B.*     *Branches of the Debtor and Related Parties*                                9
**IV. DEBTOR'S FINANCING**                                                          10
**V. INVESTIGATION AND RECOVERY OF THE DEBTOR'S ASSETS**                            11
*A.*     *Debtor's cash and accounts*                                               15
*B.*     *Debtor's contracts for cattle purchases and sales*                        16
*C.*     *Debtor's inventory of cattle*                                             16
*D.*     *Debtor's accounts receivable*                                             17
*E.*     *Debtor's real property*                                                   18
*F.*     *Debtor's interests in other entities and cattle equity transactions*      18
*G.*     *Debtor's promissory notes*                                                18
*H.*     *Preferences and fraudulent transfers*                                     19

## I.  INTRODUCTION AND BACKGROUND

On December 6, 2010 (the "Petition Date"), an involuntary chapter 11 bankruptcy

petition was filed to commence a chapter 11 case (the "Case") against Eastern Cattle Co., LLC

("Debtor") in the United States Bankruptcy Court for the Southern District of Indiana, New

Albany Division (the "Court").  On December 27, 2010, the Court entered an order approving the

appointment of James A. Knauer ("Trustee") and on December 28, 2010, entered an order for

relief.

Originally organized as a C corporation in 1982, the Debtor was reorganized as an

Indiana limited liability company in 2000.  As of the Petition Date, the membership interests in

the Debtor were held 61% percent by Thomas P. Gibson, 34.86% by the Thomas P. Gibson

Generation Skipping Trust, and 4.14% by Patsy Gibson.  Thomas P. Gibson, was the Chief

Executive Officer of the Debtor and Patsy is his wife.  The beneficiaries of the Thomas P.

Gibson Generation Skipping Trust are four children, eleven grandchildren, and one great

grandchild of Thomas and Patsy Gibson.

The Case was preceded by the appointment of a receiver on November 11, 2010 ordered

under a foreclosure complaint filed on November 9, 2010 by the Debtor's senior secured lender,

Fifth Third Bank ("Fifth Third") in the Court of Common Pleas in Hamilton County, Ohio, Case

No. A1010267.  The receiver, Elizabeth Lynch of Development Services, Inc. ("DSI") was

appointed as an interim custodian in the Case pending the appointment of the Trustee.  DSI was

subsequently approved to serve as the financial advisor to the Trustee.  By the time the Trustee

assumed his duties, the Debtor had ceased business operations and the management of the

Debtor had been removed.  Thomas and Patsy Gibson filed their own joint bankruptcy petition

under chapter 7. East-West Trucking, LLC, a related entity to the Debtor also filed a bankruptcy petition under chapter 7. Both cases remain pending.

It is difficult to determine the date of the start of the demise of the Debtor. The Metcalf County, Kentucky indictment[1] filed by the Kentucky Attorney General, asserts that the Debtor's check kiting scheme traces back to 2004. In a reported Eight Circuit decision dating from 1975[2] (and describing activities that occurred in as early as 1969), a party named "Tom Gibson"[3], part owner of a company named Gibson Cattle, engaged in activity that involved kiting checks between two banks and encouraging a third bank to give immediate credit on deposited but yet uncollected funds supported by the kite. There have also been rumors of prior bankruptcy filings by Tommy P. Gibson or companies owned by him, however the Trustee has of yet not discovered any such earlier filings.

While it is clear that the Debtor engaged in numerous wrongful activities such as check kiting, inventory inflation, falsifying its books and records, and numerous tangled transactions among related parties, it is also clear that the Debtor sustained a certain level of legitimate business activity of buying and selling cattle. While the Trustee's investigation remains ongoing, it initially appears that much of the Debtor's precipitous increase in the volume of cattle purchases and sales in the year before its doors were closed were "invented" transactions recorded on invoices among the Debtor and its "branches" and certain other affiliated parties to inflate the volume of business and lend support to the check kiting activities.

The circumstances precipitating the check kiting scheme are not known, but the Debtor's business model was a high volume, low margin business dealing in goods (cattle) where, for a time at least, transactional losses could in fact be made up by volume. Like most Ponzi schemes,

---

[1]  See Trustee's blog: www.easternlivestockbkinfo.com.
[2]  *First National Bank of Sikeston v. Transamerica Company*, 514 F.2d 981 (8th Cir. 1975).
[3]  Thomas Parrish Gibson, the principal of the Debtor was born in 1940.

at some point, the pace was unsustainable because there was not enough of the real stuff (in the Debtor's case, actual cattle) to buy and sell to stay ahead of the need to pay for the real cattle purchases. Thus enter the kiting transactions and the buying and selling of "air cattle," or "paper cattle," i.e. false records of non-existent purchases and sales. If the Debtor's volume of daily transactions had been backed up by buying and selling actual cattle, the Debtor would have been responsible for a majority of the cattle market in the United States by the time the ride ended.

When a hold was placed on the Debtor's controlled disbursement accounts on November 2, 2010, $28.8 million in checks written by the Debtor for actual cattle purchases went unpaid, a $32.5 million line of credit with Fifth Third was fully drawn and the Debtor's operating account was overdrawn by almost $19 million (subsequently reduced by customer deposits of asserted Fifth Third cash collateral resulting in a net overdraft of $2.7 million).[4] At that time, the Debtor had cattle, contracts, and investments scattered all over the United States, and books and records that had been falsified, erased, and removed. In addition, in the days after its bank accounts were frozen, a receiver was imminent and word got out that the Debtor was failing. The Debtor's officers attempted to direct customer payments away from the Debtor, non-debtor parties that were owed money by the Debtor asserted control over some of the Debtor's assets, and in some cases, cattle were loaded up and taken back or were mysteriously reported as having "failed to thrive."

Unraveling the real transactions from the fake ones, reconstructing purchases and sales that were erased from the books, locating the cattle that disappeared or "died," tracking down the transfer of assets, getting cattle sold before their market value declined, and collecting from parties that received cattle but had not paid were all simultaneous and immediate duties of the Trustee.

---

[4] See Claim #13 filed by Fifth Third.

Much of the Trustee's investigations into the Debtor's business is described in the litigation initiated by the Trustee and the responses the Trustee has filed to actions initiated by others. As of the date of this report, all of Debtor's cattle that the Trustee could take possession of have been disposed of, the Trustee has initiated numerous proceedings against parties that owe the Debtor money or who have asserted control over the Debtor's assets. The Trustee is asserting the Debtor's estate's rights to funds interpled in four different interpleader actions that have been removed to the Bankruptcy Court. In addition, the Trustee has settled and sold certain interests of the Debtor in other entities and is negotiating sales of other identified assets. A preliminary analysis of the top 150 recipients of what appear to be preferential transfers has been completed and the Trustee is initiating actions to recover those monies for the creditors of the Debtor's estate. Actions to collect on promissory notes held by the Debtor from various parties are in the process of being filed, and the Trustee is completing his investigation into the actions and assets of certain Debtor-affiliated parties who may have retained assets of the Debtor or were transferees of the Debtor's assets. Finally, the Trustee has begun negotiations on and the development of a chapter 11 plan to present to creditors on an "opt in" basis that could result in a significant recovery for creditors and materially reduce administrative and litigation.

## II. DEBTOR'S BUSINESS

The Debtor was engaged primarily in the buying and selling of cattle for its own account and was registered as a dealer with Grain Inspection Packers & Stockyards Administration ("GIPSA"), a division of the United States Department of Agriculture and the department that regulates and enforces the laws and regulations under the Packers & Stockyards Act of 1921 (as amended) ("PSA"). As a dealer under PSA, the Debtor was required to post a bond for the benefit of parties from whom it purchased cattle but did not pay. On the Petition Date, the bonding amount required by GIPSA and posted by the Debtor was $875,000. Over $33 million

4

of claims were asserted against the bond. The Trustee has filed an action in the United States District Court for the Southern District of Indiana to resolve the asserted claims against the bond.

The Debtor may have also acted at times as a "clearing agent" for certain individuals who were buying and selling cattle but were not themselves registered as dealers. The Debtor listed on its bond those parties (known as "Clearees") for which it might clear transactions with GIPSA. These Clearees for the most part were also buyers of cattle for the Debtor. They placed orders to buy and sold cattle for the Debtor's account as well as potentially for their own accounts. As a clearing agent, the Debtor would issue a check drawn on the Debtor's account to pay for the cattle bought by a Clearee and issue an invoice on the Debtor's own invoice forms for cattle sold by a Clearee. For its services as a clearing agent, the Debtor would receive various fees that would be deducted from the sales proceeds when received. Clearing transactions are the focus of one kind of dispute involved in one of the four interpleader actions. The Trustee is continuing to examine how alleged clearing transactions were recorded on the Debtor's books and records. Certainly, and at a minimum, if the Debtor paid for the cattle but did not itself get paid for the cattle, the party who bought the cattle owes the Debtor's estate, whether the transaction was supposed to be a clearing transaction or not.

The Debtor's business of buying and selling cattle was conducted both at its main office and through its eighteen branches located in twelve states (see *Related Parties, Branches* listing below). The cattle bought and sold by the Debtor are located in ranches and farms throughout the country, where calves are born and raised up to a certain age at which time they may begin a journey that involves multiple transfers of ownership and multiple transfers of location until finally being sold to a packer for slaughter and delivery to the consumer/retail markets. The aggregation of these small and large lots of cattle through a process from cow to meat has given

rise to an industry with certain defined roles among the players.  There are the cattle growers who maintain the cows that produce the calves.  There are dealers (like the Debtor) that buy the calves and other cattle that are somewhere on their journey to the packers and then sell the cattle (perhaps after sorting them into like lots) to feedlots that may specialize in certain types or life stages of cattle or to growers who pasture the cattle until they reach a certain size and weight to continue the journey.  Then there are the feedlots that may sell to other feedlots for finishing the cattle or sell directly to the packers.  A party wanting to sell cattle may sell directly to a dealer, like the Debtor, or it may use an intermediary such as a livestock auction house and sell to successful bidders at the auction like the Debtor.

The Debtor bought both from individual cattle sellers and from livestock auction houses and sold to individuals and to feedlots.  The Debtor did not sell to packing houses.  The Debtor arranged for trucking the cattle it bought to the Debtor's buyer's premises, but rarely took physical possession of cattle.  Most of the cattle purchased were identified to a buyer on the same day that Debtor purchased the cattle.  The cattle were either immediately delivered to the buyer or were left at the seller's premises until they reached the contract size and weight and then delivered to the buyer.  In the latter instance, the Debtor had two contracts – one to buy and one to sell. The Debtor would often, but not always, pay "down money" to the seller and receive "down money" from its buyer, with the final payment to the seller and the final receipt of monies from the buyer completed when the cattle were delivered.  In a few instances, the Debtor entered into a sort of "equity" arrangement, where the cattle bought by the Debtor would be sent to a feedlot or a pasturing operation, with the Debtor and the feedlot/pasture operator both owning the expected proceeds less the costs charged by the feedlot/pasture operator.

## III.  RELATED PARTIES[5]

As stated earlier, the business of the Debtor was conducted through its branches, including the main office in Indiana.  These branches were not analogous to divisions within a single company, but operated more like associated parties with the Debtor (or agents for the Debtor) in that the branch managers appeared to buy and sell for their own accounts, in addition to buying and selling for the Debtor.  In addition, Tommy Gibson bought and sold for his own account and owned (or operated) companies that were also buying and selling cattle.  In some instances, these transactions were run through the Debtor and in some cases not.

The Trustee is still investigating and determining the extent of related parties and related party transactions, and the summary below is what is known or believed at this time.

A.    *Tommy Gibson Companies*

In addition to the Debtor, Tommy Gibson has or had ownership interests in the following companies:

- Eastern Cattle Co., LLC ("Eastern Cattle") was organized as a limited liability company in 2003 for the purpose of owning and feeding long term cattle.  The only member was Tommy Gibson.  Eastern Cattle had a line of credit with Intrust Bank, N.A. which matured and was reduced to a note.  Cattle were held in Kansas, Colorado, Oklahoma and Texas.

- Tommy Gibson had a line of credit with First Bank & Trust for the purpose of buying cattle for holding for an intermediate period of 30 to 180 days and then selling.  The purchases and sales of cattle by Tommy were apparently accomplished using the Debtor's bank account and invoices.

- Okie Farms, LLC ("Okie") was owned 100% by the Debtor.  Okie owned 47.92425% of Cattlemen's Feedlot, Ltd. ("Cattlemens").  Cattlemens was involved in a transaction with East West Trucking, LLC ("EW Trucking") (see below) related to cattle bought by the Debtor and sold to EW Trucking with the purchase by EW Trucking financed by Cattlemens.  This transaction was the subject of litigation in the EW Trucking bankruptcy case.  Under a settlement approved by the Bankruptcy Court with Cattlemens and EW

---

[5] The listings herein are based on information that the Trustee has located in the books and records of the Debtor and through additional investigation.  The Trustee has not been able to independently verify all the information contained herein and this list may be amended, extended, and corrected.

Trucking, the Debtor's interest in Okie was sold for $3 million and those monies are now in the Debtor's estate.

- Culleoka Stockyards ("Culleoka") is a partnership owned 33.3% by Tommy Gibson, 16.7% by John Gibson (Tommy's son) and Vernon Inman (50%) and owns (or owned) a sorting facility and realty in Culleoka, Tennessee. Culleoka was Branch 4 of the Debtor.

- West Kentucky Livestock Market, LLC ("West Kentucky") is a Kentucky limited liability company owned 66.6% by Tommy Gibson and 33.4% by Grant Gibson (Tommy's son) and owns and operates a stockyard in Marion Kentucky that was leased to the Debtor.

- Edmonton Cattle Co., LLC is a Kentucky limited liability company and owns and operates a stock yard in Edmonton, Kentucky that it leased to the Debtor for $1.00 per head. Edmonton is owned 16.7% by Tommy Gibson, 50% by Grant Gibson, and 33% by the Tommy P. Gibson Generation Skipping Trust. Edmonton operated as Branch 13 of the Debtor.

- East West Trucking Co., LLC ("EW Trucking") is an Indiana limited liability company owned 100% by Tommy Gibson and organized to own and operate livestock trailers and transport cattle primarily for the Debtor. EW Trucking is in chapter 7 bankruptcy and its assets have been liquidated. First Bank & Trust was EW Trucking's lender.

- Bluegrass Stockyards LLC ("Bluegrass") is a Kentucky limited liability company that operates six stockyards and buying stations in Kentucky. Tommy Gibson owns or owned 8.33% of the membership interests in Bluegrass.

- Rocking E Feeders, LLC ("Rocking E") is a Kansas limited liability company in Ulysses Kansas and was owned 2/3 by Tommy Gibson and 1/3 by the Thomas P. Gibson Irrevocable Generation Skipping Trust. Rocking E had lines of credit and notes with Intrust Bank, N.A. that were personally guaranteed by Tommy Gibson. Rocking E may have been sold and the circumstances are being investigated.

- Crow Hollow, LLC ("Crow Hollow) is a Texas limited liability company that operates a feed yard in Hedley, Texas that was owned 2/3 by Tommy Gibson and 1/3 by John Gibson and financed by Intrust Bank, N.A. Crow Hollow was sold to Cattlemen's Feedlot in 2007.

- Gibson Farms, LLC ("Gibson Farms") is a Kentucky limited liability company that owns and operates a cattle facility in Providence, Kentucky. Gibson Farms is owned 50% by Tommy Gibson and 50% by John Gibson.

- Taylor County Stockyards, LLC ("Taylor") is a Kentucky limited liability company that owns and operates a stockyard in Campbellsville, Kentucky originally owned 100% by Tommy Gibson. The assets of Taylor were sold to Bluegrass Stockyards of Campbellsville, LLC in 2007.

- TPG Cattle is a DBA designation of Tommy Gibson under which he bought and sold cattle usually through the Debtor's books and bank accounts.

  B.      *Branches of the Debtor and Related Parties*

In addition to the above, certain of the branches operated companies either as organized companies or as sole proprietorships. A listing of the Debtor's branches, the managers of the branches and the names of companies or DBA's used by the branch managers is below:

| Branch Rep | Branch | Location | Primary Office | Bookkeeper | Farm Name |
|---|---|---|---|---|---|
| Ben Gibson * | 2 | New Albany, IN | Marion | | |
| Kenny Plowman * | 3 | Chilhowie, VA | Marion | | K & S Farms |
| Vernon Inman * | 4 | Culleoka, TN | New Albany | Vickie Weidman | Culleoka Cattle |
| Monte Haiar | 7 | Fairfax, SD | New Albany | Vickie Weidman | Haiar Cattle Co |
| Bill Chase * | 13 | Edmonton, KY | Marion | | Chase Cattle Co |
| Robert Nichols* | 14 | Snyder, OK | New Albany | Susie Abbott | Nichols Lvstck |
| Willie Downs* | 15 | Bardstown, KY | Marion | | D&S/D&T Farms |
| Gary Seals * | 16 | Dunlap, TN | New Albany | Susie Abbott | Seals Lvstck |
| Jim Byrd * | 22 | Okeechobee, FL | Marion | | Oaklake Cattle |
| Ed Edens * | 24 | Okolona, MS | Marion | | E4 Cattle Co |
| Darrell Beauchamps * | 25 | Elizabethtown, KY | Marion | | Rusty Rat Cattle |
| Jerry Wolfe * | 27 | Richardson, TX | New Albany | | Wolfe Cattle Co |
| Chad Schuchmann | 28 | Bois d'Arc, MO | Marion | | Schuchmann Farm |
| Tommy Gibson* | 31 | Lanesville, IN | New Albany | | TPG Cattle |
| Grant Gibson* | 31 | Lanesville, IN | New Albany | | GP Cattle |
| Scott Dean * | 32 | El Paso, TX | New Albany | Susie Abbott | |
| A. W. (Buddy) Jenkins** | 33 | Altus, OK | New Albany | | |
| Robert Brown | 34 | Herndon, KY | New Albany | Susie Abbott | Robert Brown Cattle |
| Scott Gibson | 35 | New Albany, IN | New Albany | | |

Examination of the Debtor's records continues, however the Trustee has identified certain of the Debtor's branch managers and branches that appear to have been involved in transactions

9

or activities that adversely affected the Debtor.  Grant Gibson, manager of branch 31 and Tommy Gibson's son, is currently under indictment for his participation in the kiting activity. Gary Seals and Willie Downs (the Trustee has filed an adversary proceeding against Mr. Downs), appear to have been involved in diverting customer deposits to the payment of preferred creditors and potentially participation in the kite.  The Trustee is also examining the actions of Ed Edens, manager of branch 24.  As additional records are located, the Trustee intends to evaluate the cost effectiveness of conducting examinations of certain of the former branch managers.  One area of investigation into the branches has been to reconcile the cattle inventory records at the branches.  As further explained in the asset section of this report, on the Petition Date, the Debtors records indicated that the value of the cattle inventory at all the branches (including the main office) totaled some $35,241,836.00.  After adjusting for $20.14 million of "paper cattle" that was on the books supporting the kiting activity, there was still about $3.4 million of inventory recorded that was not supported by other documents, including $2.7 million at branch number 24 where Ed Edens was branch manager.  Some of the cattle on the records at the branches had been reported as being in inventory since 2008.  Since "inventory" is a temporary collateral designation indicating that a check has been cut to a seller (debiting cash and crediting inventory) and an invoice is being created to send to the buyer (debiting inventory and crediting accounts receivable), cattle should not remain in inventory longer than 24-48 hours.

### IV.  DEBTOR'S FINANCING

The Debtor's bank financing was provided under a line of credit by Fifth Third with a maximum credit amount of $32.5 million under which availability was based on a borrowing base formula of a percentage of the Debtor's receivables and inventory.  The Debtor was limited by the borrowing base as to the number of cattle that could be in its "inventory" – that is

purchased, but not yet sold.  The Debtor's desire (or necessity in order to stay ahead of the kite) to hold greater levels of inventory  appears to have caused the use off-balance sheet transactions with related parties or branches to transfer inventory and finance the purchase using the related party's separate banking relationship or financing the purchase under an "equity" split transaction as described previously.  Fifth Third granted the Debtor provisional credit on deposits, thereby increasing the amount of monies available for the Debtor to write checks against, and the Debtor took advantage of this to create a kiting scheme that by the time the Debtor ceased business was running at some $20 million per day.  When the account was frozen and the Bank began returning checks, 124 checks totaling $54,658,888 payable to Tommy Gibson and Grant Gibson (as part of the kite) were returned.  An additional 22 checks payable to Ed Edens, Gary Seals, and Willie Downs (all branch managers and potentially implicated in the fake invoicing and kiting activity) totaling $3,158,736 were also returned.  Checks returned that were owed to unrelated parties for what would appear to be real cattle transactions totaled $28,752,965 of which $8,957,675 was written to Superior Livestock Auction, Inc.

Further details related to the Debtor's relationship and financial interaction with Fifth Third Bank will be reported in the reports of Hoover Hull LLP, the Trustee's special counsel charged with investigating the same.

## V. INVESTIGATION AND RECOVERY OF THE DEBTOR'S ASSETS

There is no question that the Debtor, its officers, and some of the branch managers engaged in fraudulent activities including falsely inflating the Debtor's inventory and accounts receivable by creating fake purchases and sales, purposely running a kite among Fifth Third, Your Community Bank, N.A. and other banks, and running off-balance sheet equity cattle deals to leverage financing from other parties and their banks. Criminal investigations were begun by the Federal Bureau of Investigation and the Kentucky Attorney General's Office and indictments

have been handed down by both, alleging criminal conspiracy, theft by deception, mail fraud, and bank fraud.  Copies of the indictments are available at the Trustee's blog site, www.easternlivestockbkinfo.com.

It is also highly probable that cattle purchased using the Debtor's funds disappeared from the Debtor's records and were moved to locations unknown to the Trustee and this remains part of the Trustee's investigation. The use of the Debtor's finances and accounting systems to accomplish the purchase and sale of cattle for the personal accounts of insiders (whether legitimately as Clearee transactions or illegitimately) is yet another layer of deception that is continuing to being teased out of the Debtor's records.  Finally, the long history of the Gibson family in the cattle business establishes a trail of involvement in numerous entities in the cattle industry, including current and prior ownership in entities that are asserting claims against the Debtor's estate or were involved in activities in the days surrounding November 2, 2010 that resulted in assets of the Debtor being swept from the Debtor's estate.

However, it is also clear that among the fraudulent activity, the Debtor had a real and non-fraudulent business of buying and selling cattle averaging $10 to $20 million a day.  In 2008 and 2009, the Debtor had net cattle sales of $1.027 billion and $1.29 billion, respectively according to the Debtor's audited financial statements.[6]  The ramp up of fraudulent sales supporting the kite activity appears to have begun in late 2009.  The Trustee is currently constructing the Debtor's 2010 financial statements to prepare the tax returns.  It is expected that after adjusting for the fraudulent sales created to support the kiting activity that the level of legitimate purchases and sales will be roughly the same as before the kiting activity took off. The total of non-kiting checks to cattle sellers and auction houses that were returned unpaid

---

[6] The 2008 and 2009 audited financial statements and tax returns are posted on the Trustee's blog site www.easternlivestockbkinfo.com.

when the Debtor's accounts were put on hold tends to indicate that the Debtor's level of

legitimate business activity remained fairly constant (though there are indications that because

the Debtor needed to maintain a certain level of activity, the Debtor paid less attention to making

profitable buy-sell transactions and the Debtor's percentage of upside down transactions

increased.  When complete, the 2010 financial statements and tax returns will be posted on the

Trustee's blog.

The Debtor has the following types of assets that could be available for its creditors:

- cash

- contracts for the purchase of cattle for which the Debtor had paid "down" money

- contracts for the sale of cattle for which the Debtor may have received "down" money

- cattle in "inventory" that had been paid for and sold to a buyer but for which the Debtor had not yet received payment

- cattle delivered to a buyer for which the Debtor had not yet been paid

- real property

- ownership interests in other entities

- stock and memberships in dividend type organizations

- off-balance sheet transactions with related parties

- promissory notes to related parties and others

- preference and fraudulent transfer recoveries

Having identified the types of assets that should be available for liquidating, the actual

task of accomplishing the liquidation was complicated by several factors, some of which are

outlined here and others are just being uncovered.  First, the Debtor's business was primarily

conducted on paper invoices, written notations from phone calls and facsimile transmittal and the

Debtor's two story building was packed full of shelves and boxes of paper records and though the

Trustee had the services of some of the Debtor's former employees, management was gone and it appeared that so were some of the records.  Second, it appears that when Tommy Gibson realized in early November 2010 that the Debtor's bank accounts were or were going to be shut down, he either directed (and/or acquiesced to the direction of others) a series of actions that resulted in customer payments received by the Debtor being diverted, some of which was used to pay preferred customers, erased recorded cattle purchases and cattle sales from Debtor's books; alerted certain customers to come and pick up cattle from locations where they had already been delivered; and purportedly assigned millions of dollars of the Debtor's valuable contracts to other parties.  Third, the fake invoices for cattle sales and cattle purchases that had been created as a paper trail to support the kiting activity and to further support the borrowing base were recorded on the books as if such purchases and sales had in fact taken place, thereby inflating the accounts receivable and the cattle inventory.  Fifth, because the business of the Debtor was in dealing live animals, cattle under contract or that had been purchased and were ready to be sold or hauled to the buyer needed immediate attention so as not to lose the value to the estate.  Sixth, the "equity" transactions that the Debtor had entered into with other parties, such as East West Trucking, in order to finance cattle purchases, were off book transactions and difficult to find except by the absence of matching information for buy/sell transactions.  Seventh, it appears that some of the branch records had their own reconciliation problems that appear to have nothing to do with the Debtor's actions, but were in fact mini-frauds on the Debtor.  Finally, the regular use of the Debtor's accounts to host the personal cattle buying and selling of Tommy Gibson and certain of the branch managers resulted in paper trails leading to nowhere.

While Tommy Gibson was acting, certain customers and trade partners of the Debtor were taking their own actions.  The Trustee is still uncovering records that indicate that some

14

parties engaged in self-help by moving cattle from locations where they were supposed to be according to the Debtor's records, reporting a high percentage of dead cattle in a lot the Debtor had paid for or held contract rights taking over the Debtor's contracts, and/or soliciting payment to themselves from parties who owed the Debtor. In those instances where Tommy Gibson or others had erased such transactions from the Debtor's records, the Trustee has only been able to determine that a transaction had existed and a payment or asset was diverted. The true extent of those kinds of actions (diversion of payments and/or cattle) may never be known, however, discovery and informal investigations are under way.

As a result of the Trustee's investigations, the Trustee has recovered certain assets for the Debtor's estate and is engaged in litigation with parties whom the Trustee believes diverted or converted property of the Debtor's estate and to claim property of the estate that has been interpled by certain parties in legal actions that have been transferred to the Bankruptcy Court. A link to dockets of all pending litigation may be found on the Trustee's website.

      A.     *Debtor's cash and accounts*

On the Petition Date, the Debtor had no cash and a significant negative balance in its accounts at Fifth Third. However, about $4.8 million was located in accounts owned by Tommy Gibson at MF Global Inc. and at Your Community Bank in New Albany, Indiana ("YCB"). The trustee for the Gibson estate recovered about $84,000 held in MF Global, Inc. and one of the accounts at YCB, and the United States Government seized about $4.75 million in the remaining account at YCB and those funds are currently the subject of an asset forfeiture action pending before the United States District Court for the Western District of Kentucky. The Trustee has preserved the Debtor's estate's rights to assert claims to the forfeited funds and has been engaged in discussions with the Justice Department attorneys related to the forfeited funds. Currently, the forfeiture action is stayed by agreement into June, 2012.

B.    *Debtor's contracts for cattle purchases and sales*

On the Petition Date, the Debtor's records indicated that it had numerous contracts to purchase cattle that were matched with contracts to sell cattle with the net value to the Debtor of an estimated $1.6 million and for which the Debtor had already paid $528,170 in down money. The Trustee began to try and recover this value for the estate by either negotiating with the contract buyers and also marketing the contracts for sale.  As part of this process the Trustee became aware that many more contracts that had been on the Debtor's books had purportedly been "assigned" by Tommy Gibson to Superior Livestock Auction, Inc., Agri Beef Co., Stockman Oklahoma Livestock Marketing, Inc., and others and as part of those purported assignments, the Debtor's down money had been forfeited.  In addition, parties to other contracts were reporting that there were no cattle, they did not have any paperwork on any contract, or the cattle had already been sold to someone else.  These clouds of doubt surrounding the ability of the Debtor to assume and assign any of the contracts due to the actions taken by the contract parties caused the entities that had expressed an interest in purchasing the contracts to withdraw their interest. The Trustee subsequently learned of additional contracts that had purportedly been assigned or unilaterally cancelled with in some instances the forfeiture of large dollars in down money that the Debtor had paid.

The Trustee is currently in litigation with Superior Livestock Auction, Inc. and has almost completed his investigation into other purported assignments of the Debtor's contract rights and additional actions are being prepared to recover the assets to the Debtor's estate for the benefit of creditors.

C.    *Debtor's inventory of cattle*

DSI has recently completed its final reconciliation of the Debtor's cattle inventory.  That reconciliation reveals that the Debtor should have had about $11.6 million in real cattle inventory

16

at the time the Debtor ceased business.  Cattle inventory represents cattle for which the Debtor

had paid, but not yet sold or had not yet received payment for the sale of the cattle.  In most

instances cattle were carried in inventory for 24 to 48 hours representing the time between the

cutting of a check for payment to sellers and the invoicing of a sale to buyers.  However, in some

cases, cattle were kept at some branches that had grow lots for short periods of time usually less

than 45 days.  Of that $11.6 million in cattle inventory per the Debtor's records (including the

branch records), DSI was able to locate or create invoices for only $4.2 million as part of the

reconciliation of the accounts receivable.  While the cattle in the inventory are of course long

gone, this reconciliation will allow the Trustee to further investigate those branch operators

whose records indicate high levels of inventory unmatched by corresponding invoices to

determine what happened to the cattle or the sales those cattle represented.  In some instances,

the Trustee has already determined that branch managers may have directed the Debtor's buyers

to pay the Debtor's sellers directly, thus at least removing both the down money and the potential

profit from the Debtor's estate.  In other instances, the Trustee believes that cattle belonging to

the Debtor may have been physically moved to other locations.  These kinds of activities may

have also resulted in recoverable preferences and/or reversible fraudulent transfers and the

Trustee is investigating this as part of the avoidance actions analysis that has begun and is

ongoing.

      D.    *Debtor's accounts receivable*

      DSI has similarly recently completed an analysis of the Debtor's accounts receivable as of

the Petition Date.  The total of accounts receivable is reconciled at $43,212,879.  Approximately

$10 million of the receivables are part of the interpleader actions currently being litigated in the

Bankruptcy Case where feed yards and others interplead monies owed to the Debtor when they

were notified of competing claims.  A further portion of the receivables are claimed by Superior

Livestock Auction, Inc. and others as part of the purported contract assignments. The Trustee is currently in litigation with some of the account debtors that are not part of the interpleaders or the contract disputes and additional actions will be filed unless settlements can be reached.

       *E.     Debtor's real property*

The Debtor owned real properties that was its headquarters in New Albany, Indiana however the mortgage on the properties exceed the value and the properties have been returned to the mortgage holder. The Debtor also owned other real property that is currently being sold under a settlement agreement with a mortgage holder with a portion of the resulting proceeds being paid into the Debtor's estate.

       *F.     Debtor's interests in other entities and cattle equity transactions*

The Trustee has sold the Debtor's interest in Okie Farms, LLC and is marketing the Debtor's interests in US Premium Beef.[7] The Debtor also has ownership interests in a company called Clicker-weight, LLC and may own a portion of Blue Grass Stockyards, LLC. The Trustee is continuing his investigation into the prior dispositions of the Debtor's ownership of other entities as well as investigating the Debtor's involvement in the various off-book equity transactions to recover monies that were owed to the Debtor under those arrangements, including arrangements where the Debtor used a related party to front these transactions, though the Debtor made the actual investment.

       *G.     Debtor's promissory notes*

The Trustee has discovered numerous promissory notes in the Debtors files, some of which were recorded on the Debtor's records and some of which were not. These notes include related party notes as well as unrelated parties. The Trustee is in the process of sending demand letters to the holders of these notes. As part of this process, the Trustee will be reconciling the

---

[7] To date, the US Premium Beef investment has brought in roughly $600,000 to the Debtor's estate.

Debtor's branch managers accounts where commissions were credited and shortages should have been debited to determine if the Debtor is owed monies from the branch manager accounts.

H.     *Preferences and fraudulent transfers*

Finally, the Debtor has undertaken a full analysis of the potential avoidance actions of the Debtor's transfers.  This analysis has been undertaken simultaneously with evaluating the filed claims against the Debtor and evaluating the value of valid defenses that may be raised.  The first series of demand letters has been mailed to preference defendants that are not insiders.  The Trustee's evaluation of insider transfers continues as part of the investigation into the actions of the insiders in the year preceding the Petition Date, and in some instances looking back longer under fraudulent transfer laws.