UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| EASTERN LIVESTOCK CO., LLC, | : | Case No.: 10-93904-BHL-11 |
| | : | |
| Debtor. | : | |
| | : | |

## REPORT OF THE TRUSTEE, JAMES A. KNAUER
## REGARDING INVESTIGATION AND ANALYSIS OF POTENTIAL
## CLAIMS AGAINST FIFTH THIRD BANK

### Introduction

James A. Knauer, the Trustee in this chapter 11 case, respectfully submits this

report (the "Report"). The Report[1] is as follows:

### Retention of Special Counsel

1.     On February 10, 2011, the Court entered its "Order Granting Application to

Employ Hoover Hull LLP as Special Counsel" [Docket #267] (the "Special Counsel

Order"). The Special Counsel Order approved the Trustee's employment of Hoover

Hull, LLP (hereafter "Hoover Hull" or "Special Counsel") (a) to provide legal advice and

litigation analysis to the Trustee regarding the proof of claim filed by Fifth Third Bank

("Fifth Third"), including whether Fifth Third has a valid, perfected, first priority pre-

petition claim in the amount asserted in the proof of claim;[2] and (b) to represent the

Trustee in the prosecution of claims, if any, asserted against Fifth Third.

---

[1] This Report is filed at the direction of the Court. Although this Report discusses topics on which advice was provided to the Trustee by his counsel and professional advisors, it is not the Trustee's intention to waive in full or in any part the attorney-client or other privileges or protections from disclosure provided to the Trustee regarding those communications or to waive or prejudice in any manner "work product" or other protections provided to the Trustee's counsel or other professional advisors.

[2] See Special Counsel's March 16, 2012 Preliminary Report Regarding Special Counsel's Investigation of Fifth Third's Proof of Claim.

**Overview Of Investigation**

2.      To assist the Trustee's understanding of the pre-petition banking practices of Eastern Livestock Co. LLC ("ELC"), Hoover Hull reviewed more than 40,000 pages of records, e-mails and other documents.  Subpoenas duces tecum were issued to Fifth Third; Wells Fargo Business Credit, Inc. ("Wells Fargo"); Agribusiness Consulting Group LLL ("ACG"); Stoffel Consulting Services, Inc. ("Stoffel Consulting") and Wayne Stoffel ("Stoffel").  In response to the subpoenas, Special Counsel received approximately 30,000 pages of documents and e-mails from Fifth Third; 7,000 pages of documents and e-mails from Wells Fargo; and 3,000 pages of documents and e-mails from Stoffel and ACG.  The documents were scanned and processed into litigation support software to assist Special Counsel in identifying key witnesses and prepare follow-up requests for additional materials.  Following a thorough review, all of the documents produced by Fifth Third, ACG, Stoffel Consulting, Stoffel and Wells Fargo were uploaded to the Trustee's shared website repository located at http://eastlivestock.brickftp.com.  These documents are now available to other counsel of record at no additional charge.

3.      Special Counsel also received and processed approximately 1,300 pages of documents from Middleton Reutlinger, the Debtor's pre-petition counsel.  Special Counsel also reviewed audited financial statements of ELC and related work papers for ELC's fiscal years ending September 30, 2007, 2008, and 2009.  The financial statements and work papers were provided by Buetow, LeMastus & Dick PLLC, ELC's pre-petition auditor.  Those materials are also now available on the Trustee's repository.

4.      The Trustee's financial advisor, Development Specialists, Inc. ("DSI") also prepared analytical reports and summaries of financial information concerning ELC and

its relationships with Fifth Third, insiders, affiliates and other banks.  DSI performed this work using subpoenaed bank records and accounting information from ELC's own books and records related to ELC's pre-petition business and banking transactions.

## 2004 Examinations

5.      Special Counsel conducted twelve Bankruptcy Rule 2004 examinations of former and current employees of Fifth Third – six members of the "bank protection" business unit, three members of the "line of business" business unit, one member of the credit department, and two members of the field examination group.  Specifically, Special Counsel conducted Rule 2004 examinations of: (i) Sean Kelly, national field exam manager – February 23, 2012; (ii) Shannon Hughes, investigative analyst – February 24, 2012; (iii) Tim Spurlock, investigator – February 24, 2012 and April 27, 2012; (iv) David Fuller, Team Lead Structured Finance Group – February 27, 2012; (v) Sara Chapman, fraud manager – February 28, 2012; (vi) Amber Whitehouse, former fraud detection and prevention manager – February 29, 2012; (vii) Darrin Steinmann, Director of Investigations – February 29, 2012; (vii) Anne Kelly, Relationship Manager – March 1, 2012 and May 6, 2012; (ix) Lori Hart, manager of account coordinators – March 2, 2012; (x) Devon Morse, former loss mitigation investigator – March 5, 2012; (xi) Patty Voss, field exam manager – March 6, 2012 and April 27, 2012; and (xii) Doug Hoffner, Vice President, Credit Officer – May 15, 2012.

6.      In addition, Special Counsel conducted a Rule 2004 examination of Wayne Stoffel, an agricultural business consultant who performed the May 2010 and October 2010 field exams of ELC for Fifth Third.  Special Counsel also interviewed Michael Herr, the former head of Fifth Third's Fraud Prevention and Detection Team

from April 2010 to February 2011.  The full transcripts of the testimony and copies of the exhibits used in the Rule 2004 examinations are now available on the Trustee's repository- http://eastlivestock.brickftp.com.

7.      Daniel Donnellon, counsel for First Bank and Trust, and John Rogers, counsel for Superior Livestock Auction, Inc., attended most of the Rule 2004 examinations.[3]  Messrs. Donnellon and Rogers suggested questions to Special Counsel prior to and throughout each examination and were permitted to pose questions to some witnesses when and to the extent time permitted.  Other counsel in the case also monitored the examinations telephonically as well as the Trustee.

8.      At various times counsel who have been active in the case have suggested to the Trustee lines of factual inquiry, legal theories and supplied the Trustee with case and statutory citations all related to potential claims against Fifth Third.  The Trustee has endeavored to consider all of this information in arriving at his conclusions described herein and preparing this report.

**Indictments/Guilty Pleas**

9.      On September 21, 2011, Thomas Gibson, President of ELC, and Michael Steven McDonald, office manager for ELC, were indicted by a federal grand jury for the Western District of Kentucky.  In that indictment Messrs. Gibson and McDonald are alleged to have defrauded Fifth Third (a national bank) by engaging in a check kiting scheme.  *Indictment* ¶8.[4]  Certain checks payable to ELC by Thomas Gibson and by affiliates of ELC were deposited in ELC's collateral account and those deposits

---

[3] Stephen Weigand and Christopher Trapp, colleagues of Messrs. Dan Donnellon and John Rogers respectively, attended certain Rule 2004 examinations when Messrs. Donnellon and Rogers had scheduling conflicts.
[4] Copies of the federal and state indictments are attached to Special Counsel's March 16, 2012 Preliminary Report as Exhibits B and C.

artificially inflated the account balance.  Fifth Third granted provisional credits to ELC

with respect to the deposited checks (some of which were issued in connection with

bogus cattle transactions purportedly with ELC) and ELC wrote checks against a

disbursement account to cause Fifth Third to make loan advances in excess of the

amounts that should have been available to ELC under its revolving line of credit

arrangement with Fifth Third.  *Id.*  The indictment alleges that McDonald was

responsible for management and oversight of the line of credit.  McDonald permitted

ELC to 1) deposit "bogus" checks payable to ELC by Gibson affiliates and other

participants in the "Kite" and 2) write checks for cattle purchases and other purposes

well in excess of amounts that should have been available to ELC under the credit line.

*Indictment* ¶3.  McDonald, allegedly with the consent of Gibson, prepared fraudulent

borrowing base certificates which contained falsely inflated accounts receivable and

inventory figures to obtain additional funds from Fifth Third.  *Indictment* ¶9.

10.    The Commonwealth of Kentucky has also indicted Thomas Gibson and

Steve McDonald, as well as Grant Gibson, Thomas Gibson's son and Vice President of

ELC, and Darren Brangers, the controller for ELC.  The Commonwealth of Kentucky

charged all of the defendants with criminal syndication; engaging in an organized crime

Class B Felony (1 count); theft by deception over $10,000.00, Class C Felony (17

counts); theft by deception over $500.00 less than $10,000.00, Class D Felony (144

counts); and theft by deception under $500.00, Class A Misdemeanor (11 counts).

11.    On March 27, 2012, Thomas P. Gibson, Michael Steven McDonald, Grant

Gibson and Darren Brangers pled guilty to certain of the charges brought by the

Commonwealth of Kentucky.  Copies of the judgment entries accepting the guilty pleas

of Mr. T. Gibson, Mr. McDonald, Mr. G. Gibson and Mr. Brangers are attached as **Exhibits A, B, C, and D** respectively. Special Counsel contacted counsel for the four judgment defendants seeking information, cooperation, and testimony.  However, counsel for each judgment defendant informed Special Counsel that his client would refuse to answer any questions posed by Special Counsel until the client is sentenced, asserting the client's rights under the Fifth and Fourteenth Amendments.  Sentencing is currently scheduled for June 12, 2012 for Mr. G. Gibson, Mr. Brangers and Mr. McDonald and June 26, 2012 for Mr. T. Gibson.

12.    The Metcalfe County Court where the criminal case commenced by the Kentucky indictment is pending ordered that certain discovery materials be made a matter of public record.  Those materials include the following items:

a.  documents produced by Fifth Third to the Kentucky Attorney General;

b.  documents produced by Your Community Bank to the Kentucky Attorney General;

c.  audio recordings of interviews of non-defendants; and

d.  bank records from Fifth Third, Town & Country Bank and Your Community Bank.

Special Counsel was able to obtain and review copies of all of these items subject to the restrictions of a strict confidentiality order entered by that court.

## Scope of the Investigation

13.    Special Counsel analyzed all of the written records and testimony described above and provided legal and litigation advice to the Trustee related to the following:

a.  the borrowing relationship between ELC and Fifth Third which commenced on August 9, 2004, when ELC and Fifth Third executed a Credit Agreement, Promissory Note and Security Agreement for a revolving line of credit ("RLOC") in the amount of $22.5 million;

b.  the twelve amendments to the Credit Agreement, the increases to the RLOC and the credit extensions Fifth Third granted ELC;

c.  Fifth Third's 2009 and 2010 investigations of ELC for suspicious activity including possible check kiting, the recommendations made by Fifth Third's bank protection department and responses by Fifth Third's line of business personnel, and the subsequent monitoring of ELC's accounts;

d.  ELC's request to increase the RLOC from Fifth Third to $42.5 million and communications with Fifth Third regarding the same;

e.  Fifth Third's field exams of ELC, recommendations made therein based upon findings in the field exams and the Relationship Manager's responses thereto;

f.  the maturity of the RLOC in September and October 2010 and changes to ELC's accounts as a result;

g.  May and October/November 2010 field exams of ELC led by Wayne Stoffel at the request of Fifth Third;

h.  Fifth Third's decision to place a hold on ELC's operating and disbursement accounts on November 2, 2010, the amount of the hold, the timing of the hold and notice to ELC of the hold; and

i.    the application of deposits to the collection account received by Fifth Third after the hold was implemented.

**Claims Against Fifth Third**

14.    Based upon the foregoing, Special Counsel, with the assistance of DSI and Faegre Baker Daniels, LLP, Trustee's general counsel, analyzed and advised the Trustee concerning potential claims against Fifth Third, including possible state and Federal law claims and claims under the Bankruptcy Code.  The possible claims which were considered include:

a)  Fraud;

b)  Aiding and abetting, or conspiracy to commit fraud;

c)  Breach of fiduciary duty;

d)  Liability for failure to place a hold at some earlier point in time on ELC's accounts (based upon presumed earlier knowledge of check kiting) or the alleged failure to promptly advise ELC of the implementation of the freeze on ELC's accounts;

e)  Contribution arising from joint tortfeasor liability;

f)  Common law claims belonging to a judgment creditor by virtue of 11 U.S.C. §544(a);

g)  Improvement in position and other preference claims under 11 U.S.C. § 547;

h)  Setoff avoidance under 11 U.S.C. §553;

i)  Equitable subordination of Fifth Third's claim; and

j)   Avoidance of Fifth Third's security interest based on the theory that

Fifth Third must (and cannot) demonstrate that it had the standing

of a "good faith purchaser" under U.C.C. § 2-403(1).

### Common Law Claims

15.   The Trustee has amassed considerable evidence that until the fall of 2010

Fifth Third failed to heed the internal and external safeguards designed to alert the bank

to the existence of check kiting and the fraudulent reporting of receivables and

inventory.  It is not beyond the realm of possibility that an inference could be drawn from

the bank's repeated decisions to ignore such warnings, that it willfully ignored them in

the pursuit of profits from the account.

16.   Yet, as expressed by Fifth Third's officers in their Rule 2004 examinations,

the idea of shutting down a business with revenues of several billion dollars a year and

the inevitable repercussions (especially lender liability) from such an action gave pause

to the bankers, as it would to anyone with an ounce of common sense.[5]  "[E]ven when a

kite is suspected, there may be a number of reasons banks move slowly to accuse an

account holder of kiting.  *See First Nat'l Bank in Harvey v. Colonial Bank*, 898 F.Supp

1220, 1223 (N.D. Ill. 1995) (describing the difficulties in determining whether a customer

is kiting or engaging in a legitimate movement of funds, and noting that banks may be

reluctant to take any action on a suspected kite for fear of liability to a customer for

---

[5]One court considered a defendant bank's motion for summary judgment seeking to dismiss claims based upon the assertion that a bank would risk a loss of $22 million to reap less than $1 million in fees earned by ignoring a check-kiting scheme.  The Court indicated that if the court were the trier of fact (as opposed to entertaining a motion for summary judgment), it would dismiss the claims against the bank as economically implausible, i.e. "They make no economic sense," *Firstar Bank v. Beemer*, 976 F. Supp 1233, 1243 (N.D. Iowa 1997).

wrongful dishonor of checks or defamation, or for fear of angering a large customer, if no kiting is in fact occurring." *Firstar Bank 976 F. Supp at 1241.*

17.     Assuming for purposes of this report that some or all of the potential common law claims have some validity, virtually all counsel active in these proceedings are aware that analysis of the success of such claims (common law claims described above in paragraph 13. a) through d), regardless of the strength of the factual underpinnings, requires the Trustee to consider his standing to actually bring such claims (as opposed to the standing of creditors of ELC) and, if standing exists, the necessity of overcoming the defense of *in pari delicto.*

*Standing*

18.     A "[t]rustee lacks standing under the Bankruptcy Code ... to pursue claims that properly belong to creditors—....  Instead, he is empowered to pursue only those claims that properly belonged to the debtor before it entered bankruptcy." *Picard v. JPMorgan Chase & Co.*, 460 B.R. 84, 91 (S.D.N.Y. 2011)

19.     When a third party has injured not the bankrupt corporation itself but a creditor of that corporation, the trustee in bankruptcy cannot bring suit against the third party. He has no interest in the suit. *Steinberg v. Buczynski,* 40 F.3d 890, 892–93 (7th Cir.1994).

> *It is well settled that a bankruptcy trustee has no standing generally to sue third parties on behalf of the estate's creditors, but may only assert claims held by the bankrupt corporation itself. Wagoner, 944 F.2d at 118 (citing Caplin v. Marine Midland Grace Trust Co. of N.Y., 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972)); see also Wornick v. Gaffney, 544 F.3d 486, 490 (2d Cir.2008); Wight, 219 F.3d at 86; In re Mediators, Inc., 105 F.3d 822 (2d Cir.1997);*

10

> *Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1093 (2d Cir.1995).*

*Picard v. JPMorgan Chase & Co.,* 460 B.R. 84, 91 (S.D.N.Y. 2011).

20.     In the now infamous bankruptcy case of Madoff Securities, the liquidating trustee, Irving H. Picard, brought an action against JPMorgan Chase and other financial institutions arguing that they aided and abetted the debtor's fraud by facilitating or willfully failing to uncover the Madoff Ponzi scheme. The trustee asserted common law damage claims for aiding and abetting fraud, breach of fiduciary duty, "fraud on the regulator," unjust enrichment, conversion, aiding and abetting conversion, knowing participation in a breach of trust, and contribution.  In considering Picard's standing, as trustee, to bring those claims, U.S. District Court Judge McMahon noted:

> To determine whether an action accrues individually to a claimant or generally to the corporation, a court must look to the injury for which relief is sought and consider whether it is peculiar and personal to the claimant or general and common to the corporation and creditors.

*Picard,* 460 B.R. at 96 *(quoting Koch Refining v. Farmers Union Cent. Exchange, Inc.,* 831 F.2d 1339, 1349 (7th Cir.1987)). In analyzing the Seventh Circuit's Koch decision, the Madoff Securities judge agreed that a claim which is common to all creditors could be brought by a trustee, but unless every creditor could bring it, then the claim does not belong to the estate.  The district court found that the Madoff Securities trustee was pursuing claims that were held by some creditors, but not others.

> It is true that allowing the Trustee to pursue claims that belong properly to individual creditors would accrue to the benefit of all creditors by augmenting the bankruptcy estate. But under settled law, this is not enough to make them "general" within the meaning of *Koch* and *St. Paul Fire. See Pereira,* 413 F.3d at 342; *In re Stanwich Financial Services Corp.,* 317 B.R. 224 (Bnkr.D.Conn 2004). Rather, any recovery on these claims will not necessarily accrue to the benefit of all creditors harmed by the fraud, at least not in the same way.

*Picard,* 460 B.R. at 96.

21.     Assuming liability were established on the part of Fifth Third under one or more of the common law theories, an argument exists that not all creditors of ELC were harmed the same way.  For example, a cattle seller who received a bad check might be entitled to seek relief against the Bank, assuming the seller could prove the Bank's complicity or willful disregard of ELC's activities in running a kiting scheme and the subsequent decision to freeze ELC's disbursement account constituted an actionable wrong as to the seller.  Yet many other creditors of ELC are merely owed money because they never received a check from ELC at all.  Whether the Trustee might have standing to assert such claims is difficult to predict.

22.     At the time of the submission of this report, at least one party in interest The First Bank & Trust Company ("First Bank"), has filed a lawsuit against Fifth Third in the state of Ohio. First Bank's suit encompasses, at least in part,[6] many of the same common law theories considered by the Trustee. While First Bank's lawsuit seeks special damages unique to First Bank, it also asserts the same claims upon which an action by the Trustee might proceed.  Creditors and a Debtor cannot assert the same claims against a third party.  One or the other's suit will be dismissed.  This typifies the standing problem that would face the Trustee in pursuing such claims against Fifth Third.

### *In Pari Delicto*

---

[6] First Bank's suit seeks damages for conversion, fraud, aiding and abetting, negligent misrepresentation and Ohio RICO.  Although First Bank distinguishes itself to some degree in asserting a security interest in specific ELC account deposits, nevertheless, it seeks recovery, for the most part based on many of the same claims that might be brought by the Trustee.

23. The expression '*in pari delicto'* is a portion of the longer Latin sentence, *'In pari delicto potior est conditio defendentis,'* which means that where the wrong of both parties is equal, the position of the defendant is the stronger. Or, as it is more often described, one who is of equal fault cannot maintain a cause of action against others alleged to be involved in the same act or omission. *See*, *e.g., Theye v. Bates*, 337 N.E.2d 837, 844 (Ind. Ct. App. 1975).

24. Bankruptcy trustees for debtors that have committed fraud face a heady burden in suing third parties who are alleged to have facilitated the fraud in some fashion absent being able to prove the third party's active participation coupled with receipt of a "benefit". The 6th, 8th, 10th, and 11th Circuits all have opined that *in pari delicto* applies to a bankruptcy trustee and provides a defense to a third party allegedly participating with the debtor's agents in bad acts. *See Grassmueck v. Am. Shorthorn Ass'n*, 402 F.3d 833, 837 (8th Cir.2005); *Terlecky v. Hurd* (*In re Dublin Sec.*), 133 F.3d 377, 381 (6th Cir.1997); *Sender v. Buchanan* (*In re Hedged-Inv. Assocs.*), 84 F.3d 1281, 1285 (10th Cir.1996); *Official Committee of Unsecured Creditors of PSA, Inc., et al., on Behalf of PSA, Inc., et al.* 437 F.3d 1145 (11th Cir. 2006).

25. Application of the *in pari delicto* doctrine to insolvency proceedings has also been criticized. See generally Jeffrey Davis, Ending the Nonsense: the In Pari Delicto Doctrine Has Nothing to Do with What is Section 541 Property of the Bankruptcy Estate, 21 Emory Bankr.Dev. J. 519 (2005); Gerald L. Baldwin, In Pari Delicto Should Not Bar a Trustee's Recovery, 23-8 Am. Bankr.Inst. J. 8 (2004); Tanvir Alam, Fraudulent Advisors Exploit Confusion in The Bankruptcy Code: How In Pari Delicto Has Been Perverted To Prevent Recovery for Innocent Creditors, 77 Am. Bank. L.J. 305

(2003); Robert T. Kugler, The Role of Imputation and In Pari Delicto in Barring Claims Against Third Parties, 1 No. 14 Andrews Bankr.Litig. Rep. 13 (2004); Making Sense of the In Pari Delicto Defense: "Who's Zoomin' Who?" 23 No. 11 Bankr. Law Letter 1 (Nov.2003).

26.    Yet, despite such criticism, in this district and in the Seventh Circuit, *in pari delicto* remains a viable defense; except in cases where the target defendant participated knowingly and reaped the benefits of the scheme (other than fees or charges it received) or received a fraudulent conveyance. *Knauer v. Jonathon Roberts Fin. Group, Inc.*, IP 01-1168-C-K/T, 2002 WL 31431484 (S.D. Ind. Sept. 30, 2002) aff'd, 348 F.3d 230 (7th Cir. 2003); *Marwil v. Farah*, 1:03-CV-0482-DFH, 2003 WL 23095657 (S.D. Ind. Dec. 11, 2003); *Baker O'Neal Holdings, Inc. v. Ernst & Young LLP,* 1:03-CV-0132-DFH, 2004 WL 771230 (S.D. Ind. Mar. 24, 2004).

27.    As evidenced by the first citation in the foregoing paragraph, this Trustee has more than a passing experience with the *in pari delicto* defense as does his Special Counsel. *See*: *Baker O'Neal, supra*.

28.    Departing somewhat from other circuits, the Seventh Circuit has recognized that where a receiver sues to recover a fraudulent conveyance, *in pari delicto* will not necessarily be an available defense.  *Scholes v. Lehmann,* 56 F.3d 750, 754-55 (7th Cir.1995) (citing *McCandless v. Furlaud,* 296 U.S. 140, 160, 56 S.Ct. 41, 80 L.Ed. 121 (1935)). In a number of instances, plaintiff bankruptcy trustees (and some legal writers) have claimed that *Scholes* puts the Seventh Circuit at odds with other circuits in terms of allowing exceptions to the *in pari delicto* defense. Just this past April, the Seventh Circuit commented on *Scholes*:

14

We added: "Put differently, the defense of *in pari delicto* loses its sting when the person who is *in pari delicto* is eliminated." That sentence is dictum; *Scholes* did not entail a *pari delicto* defense. It has nothing to do with § 541 of the Bankruptcy Code; *Scholes* was not a bankruptcy proceeding. And it does not stand for the proposition that federal law overrides state-law defenses; ... More importantly, the law of fraudulent conveyances—both in Illinois and under the Bankruptcy Code, see 11 U.S.C. §§ 547–50—is one of those bodies that does supersede private-law definitions of legal entitlements. The recipient of a fraudulent or preferential transfer usually has a right to the money as a matter of contract, but when the transfer injures other creditors it can be recouped for their benefit. ***Scholes* should not be generalized beyond the law of fraudulent conveyances and preferential transfers**.

*Peterson v. McGladrey & Pullen, LLP,* 676 F.3d 594, 599 (7th Cir. 2012)

[emphasis supplied].

29.    One recognized exception to the availability of the *in pari delicto* defense

is the "adverse interest exception".  Essentially, "[a]n agent's knowledge will not be

imputed to the principal where the agent's conduct creates a presumption that the agent

would not communicate his knowledge. *Mid–Continent Paper Converters, Inc. v. Brady,*

*Ware & Schoenfeld, Inc.,* 715 N.E.2d 906, 910 (Ind.Ct.App.1999); *Knauer, supra.*  Thus,

the acts of the agent are not the acts of the principal and the participation of a third party

will not render the entity "of equal fault".  However, where the person(s) committing the

fraud and the owners of the entity are the same, the adverse interest exception will not

apply.

30.    The Sixth Circuit's decision in *In re Dublin Secs., Inc.*, 133 F.3d 377, 380

(6th Cir. 1997) is instructive.  In *Dublin*, a debtor corporation had engaged in fraudulent

securities transactions.  The debtor's bankruptcy trustee brought state law claims of

negligence, breach of fiduciary duty, negligent misrepresentation, recklessness,

common law fraud, and right of contribution against a law firm who had represented the

debtor corporation.  The Sixth Circuit affirmed the district court's dismissal based on *in pari delicto*.  *Dublin*, 133 F.3d at 379.  The court reasoned that although the individual officers and directors acted adversely to the corporation's interest, the trustee recognized that they "so dominated and controlled the corporations that the corporation had no separate mind, will, or existence of its own." *Id*. at 380.  The court concluded that the officers and directors were the "alter egos" of the debtor corporation and, therefore, their malfeasance was directly attributable to the debtor corporations.  *Id.*

31.     The actions of ELC's key officers (as described in the indictments)  can hardly be distinguished from *Dublin,* so the adverse interest exception will not operate to preclude an *in pari delicto* defense. Merely concluding that the Bank's conduct could be actionable by the Trustee under one or more common *law the*ories is problematic in that such claims may not be property of the *estate (and the*refore the Trustee lacks standing to pursue them).  Even if the claims are property of the estate, the Trustee's ability to successfully recover against the Bank requires overcoming the defense of *in pari delicto.*

## Joint Tortfeasor Liability

32.     The Trustee considered whether Fifth Third might have liability as a joint tortfeasor with the debtor and its principals, assuming that Fifth Third was acting in concert with or aiding and abetting ELC in its unlawful activity. Among joint tortfeasors there is no defense of *in pari delicto*. However, the claim that arises between joint tortfeasors is one for co*ntribution.*  The Trustee assumed that the applicable law would be either Indiana or Ohio.  Indiana does not recognize a right for one joint tortfeasor to seek contribution from another.  Ohio does allow contribution among joint tortfeasors,

however the right arises only after the tortfeasor seeking contribution has paid his

share.  As this applies to ELC, the Trustee cannot conceive that ELC's liability could

ever be less than 50% of the damages to its creditors (assuming that only Fifth Third

and ELC were liable).  Thus until ELC were to pay its creditors more than 50% of their

claims, no claim for contribution against Fifth Third could exist.

### Trustee's Right to Stand in the Shoes of a Judgment Creditor Under 11 U.S.C. 544 (a)

33.      11 U.S.C. §544(a) states:

> (a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, o*r may avoid any* transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—

> (1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;

> (2) a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists ...

34.      The Trustee considered whether he could bring any of the identified

potential common law claims as a judgment creditor under this section. The weight of

authority precludes this.  The principal reason is that the claim is deemed to be acquired

"at the commencement of the case".  Thus, the hypothetical creditor in whose shoes the

Trustee would seek to stand was not the holder of a claim when the complained of

actions occurred since he acquired his claim at the moment of the bankruptcy. "[I]f the

hypothetical judgment lien creditor extended credit only on the date of commencement

of the bankruptcy case, how can she sue based on a wrong that occurred before the

extended credit?" *In re Greater Southeast Community Hospital Corp.,* 333 B.R. 506,

520 (Bnkr.D.D.C.2005).

## Equitable Subordination

35.     The Trustee considered whether it would be proper for the Court to

equitably subordinate part or all of Fifth Third's claim.  The Sixth and Seventh Circuits,

like most courts, apply the equitable subordination standard set forth in *Matter of Mobile*

*Steel Co.*, 563 F.2d 692 F.2d 692, 699-700 (5th Cir. 1977).  *See In re Baker & Getty*

*Financial Services*, 974 F.2d 712, 717 (6th Cir. 1992) (noting that "[m]ost courts have

uniformly followed and applied the *Mobile Steel* test); *In re Lifschultz Fast Freight*, 132

F.3d 339, 344-45 (7th Cir. 1997) (applying *Mobile Steel* in Seventh Circuit).  Under the

*Mobile Steel* test, a party seeking equitable subordination must demonstrate, by a

preponderance of the evidence, three conditions:

a.     The claimant must have engaged in some type of inequitable conduct[7].

b.     The misconduct must have resulted in injury to the creditors of the
bankrupt or conferred an unfair advantage on the claimant.

c.     Equitable subordination of the claim must not be inconsistent with the
provisions of the Bankruptcy Act.

*Id.* at 718 (citing *Mobile Steel*, 563 F.2d at 699-700).

---

[7] Although courts offer various permutations of what constitutes "inequitable conduct," it is clear that
courts require more than mere negligence.  "[M]ere negligence cannot be basis for inequitable conduct
sufficient to support a claim for equitable subordination."  *Southwest Bank of Texas v. Whippler*, No. 4:03-
cv-1816, 2005 WL 2647948, *5 (E.D. Mo. Oct. 17, 2005) (citing *Maryland Nat'l Bank v. Vessel Madam
Chapel*, 46 F.3d 895, 901 (9th Cir. 1995)).

36.     The critical inquiry, and the first step in any equitable subordination

analysis, is whether there has been "inequitable conduct."  *See Lifschultz*, 132 F.3d at

344 (noting that, if there is no inequitable conduct, "then the bankruptcy court cannot

subordinate a claim").  Where the claimant is a non-insider, as is the case with Fifth

Third, the severity of inequitable conduct that must be demonstrated is much higher

than in cases dealing with insiders:

> Where the claimant is a non-insider, egregious conduct must be
> proven with particularity.  It is insufficient for the objection in such
> cases merely to establish sharp dealing; rather, he must prove that
> the claimant is guilty of gross misconduct tantamount to "fraud,
> overreaching or spoliation to the detriment of others."

*In re Baker & Getty Financial Services*, 974 F.2d at 718 (quoting *Matter of Teltronics

Serv., Inc.*, 29 B.R. 139, 169 (Bankr. E.D.N.Y. 1983) (citations omitted)).[8]  Other courts

have noted that "inequitable conduct" generally falls within the following categories: "(1)

fraud, illegality, breach of fiduciary duties; (2) undercapitalization; and (3) claimant's use

of the debtor as a mere instrumentality or alter ego."  *In re Lifschultz Fast Freight*, 132

F.3d at (quoting *In re Missionary Baptist Found. of America*, 712 F.2d 206, 212 (5th Cir.

1983)); *see also In re Bellanca Aircraft Corp.*, 850 F.2d 1275, 1282-82 (8th Cir. 1988).

37.     In considering equitable subordination, assuming a case can be

successfully made, the extent to which a claim is actually subordinated is also a factor.

It is not axiomatic that a creditor's entire claim is to be subordinated.  For example, one

scenario is that a successful subordination of Fifth Third's claim would result in a

subordination to the extent of the Bank's profits on the account received over some

---

[8] "Where the claimant is an insider, his dealings with the debtor will be subjected to more exacting
scrutiny."  *In re Baker & Getty Financial Services, Inc.*, 974 F.2d at 718.

period of time. Conversely, successful subordination of the Bank's entire claim would likely be a massive windfall from which creditors might receive 100 cents on the dollar.

38.     The Trustee believes that a colorable cause of action may exist to seek equitable subordination regarding Fifth Third's claim. However, such cases are difficult to successfully prosecute and, on balance, many more have been lost than have been successful, indicating the reluctance of courts to subordinate secured claims of institutional, non-insider lenders absent proof of actual culpability and even then, not necessarily the entirety of the claim.  *See, e.g.,* 2003 Ann. Surv. Of Bankr. Law 19, 24 (2003); *see also Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1356 (7th Cir. 1990) ("Cases subordinating the claims of creditors that dealt at arm's length with the debtor are few and far between."); *In re Hedged-Investments Associates, Inc.*, 380 F.3d 1292, 1302 (10th Cir. 2004) (refusing to apply equitable subordination even where lender was arguably negligent in extending credit to debtor engaged in Ponzi scheme); *Stratton v. Equitable Bank, N.A.*, 104 B.R. 713, 731 (D. Md. *1989) (imposing no equitable subordination even where lender was* arguably negligent in continuing to lend to grossly undercapitalized debtor).

39.     In *In re Hedged-Investments Associates, Inc.*, the Tenth Circuit held that a *lender's lack of due diligence in making* a loan to a thinly capitalized corporate debtor that was being operated by its principal as part of a Ponzi scheme did not rise to the level of inequitable conduct required for e*quitable subordination.  380 F.3*d at 1302. The court reasoned that "[f]ailure to conduct due diligence was certainly bad business practice, . . . but these facts do not amount to blatant fraud or other illegality at the expense of . . . other creditors."  *Id.*

40.     Similarly, in *Stratton v. Equitable Bank, N.A.*, the United States Bankruptcy Court for the District of Maryland granted summary judgment to a lender on an equitable subordination claim where the lender was not certain that the debtor was engaging in fraud but may have acted negligently in continuing to lend to a grossly undercapitalized debtor committing potential illegalities.  104 B.R. at 731.  The court reasoned that, while the lender's "business decisions were ill-advised, . . . these facts fall far short of establishing the type of self-dealing or otherwise inequitable conduct which courts have found necessary for . . . equitable subordination."  It further noted that, while the lender "did know of irregularities in the debtor's operations, and some of its employees may even have suspected that [borrower] was engaging in fraudulent activities[,] . . . knowledge of bookkeeping irregularities of a depositor or suspicions of a few employees of a large banking institution are not equivalent of knowledge that another party doing business with the bank's depositor is being defrauded."  *Id.* at 731.  Indeed, the bank itself was being defrauded by the depositor.  *Id.*

41.     On facts similar to those in this case, the Spring Grove Livestock Exchange trustee moved the court to equitably subordinate the claims of two banks, contending that the banks' return of kited checks constituted misconduct that conferred an unfair advantage on the banks, while unfairly affecting other creditors.  See *In re Spring Grove Livestock Exchange, Inc.*, 205 B.R. 149 (Bankr. D. Minn. 1997) .  The United States Bankruptcy Court for the District of Minnesota rejected the trustee's claims, and applying the *Mobile Steel* factors, concluded that the banks' actions could not be construed as misconduct:

> In light of the facts of this case, I felt it would require a creatively strained judicial construction to construe the defendants' actions as

misconduct.  Simply put: The defendants' legal dishonor of kited checks does not rise to the level of misconduct necessary to warrant the equitable subordination of their claims.  In fact, I am hard pressed to describe the defendants' actions as *mis*conduct at all.  Furthermore, I find it somewhat incongruous for the trustees to invoke an equitable remedy in the wake of the debtor's multi-million dollar check kiting scheme.  Indeed, a bankruptcy court may not invoke its equitable powers to perpetrate inequity.

*Id.* at 162-63 (citing *Pepper v. Litton*, 308 U.S. 303-05 (1939)).

42.    Similarly, in *In re Summit Financial Services, Inc.*, 240 B.R. 105 (Bankr. N.D. Ga. 1999), although the trustee did not specifically seek equitable subordination, the court noted that the equitable allocation theory proposed by the trustee could be "likened to the theory of equitable subordination."  *Id.* at 123, n. 16.  The court found that the banks were not aware of the check kite and upon learning of the kite, both banks stopped honoring the debtors' checks.  The court did not view the bank's seizure of some money in the debtors' account as inequitable conduct.  *Id.*  The court noted that "[t]here is no evidence of bad faith or misconduct in this case."  *Id.*

### Improvement in Position

43.    The Trustee (with assistance from Special Counsel, DSI and Faegre Baker Daniels) analyzed potential preference avoidance claims against Fifth Third.  The improvement in position test under 11 U.S.C. § 547(c)(5) provides that a creditor with a floating security interest in inventory and/or accounts receivable, may be subject to the avoidance of its security interest attaching to inventory and receivables during the 90-day period before bankruptcy, if and to the extent that the secured creditor improved its position during that period.  The test compares two points in time, and requires determination of the secured creditor's relative secured position 90 days before the petition (September 7, 2010) and on the date of the petition (December 6, 2010).  To

22

evaluate the improvement in position test, courts generally determine the amount of

debt and the value of such collateral at the two dates:

> 1.      "[D]etermine the amount of the loan outstanding 90
> days prior to filing and the 'value' of the collateral on that
> day. The difference between these figures is then
> computed." *In re Ebbler Furniture*, 804 F.2d at 89-90.
>
> 2.      "[T]he same determinations are made as of the date
> of filing the petition." *Id.* at 90. That is, calculate the amount
> of the loan outstanding and the value of the collateral on the
> date of filing the petition, and calculate the difference.
>
> 3.      "A comparison is made, and, if there is a reduction
> during the 90 day period of the amount by which the initially
> existing debt exceeded the security, then a preference for
> section 547(c)(5) purposes exists." *Id.*

44.      To avoid such a transfer (represented by the relative improvement in

collateral position), the transfer must be "to the prejudice of other creditors holding

unsecured claims." § 547(c)(5).

45.      Unfortunately, the unique circumstances surrounding the actual filing of

ELC's bankruptcy case make analysis and comparison of Fifth Third's position on the

two relevant dates exceedingly difficult.  The existence of a highly publicized interim

receivership that did not provide the benefits of an automatic stay (inherent in a typical

bankruptcy) complicates the analysis.  For almost 30 days between the appointment of

the receiver and the chapter 11 petition date, many things occurred that would almost

certainly not have happened (or would have been more readily avoidable had they

occurred) had a bankruptcy been filed on September 7 without an intervening

receivership.  For example, immediately before and during the receivership, millions of

dollars of ELC's receipts were diverted away from ELC's Fifth Third collection account.

Interpleader actions that would have been barred under 11 U.S.C. §362 were filed in six

23

states resulting in enormous litigation expenses. Cattle were repossessed or taken without legal right.  Records were removed or destroyed. Superior Livestock arranged for an assignment from ELC (disputed by the Trustee) to Superior of 500 of ELC's cattle purchase contracts.  On the basis of that "assignment" Superior caused many persons who had agreed to purchase cattle from ELC to make payments to Superior.

46.    DSI prepared an analysis of Fifth Third's secured position on the two relevant dates.  DSI attempted in good faith to account for many of the apparent differences discussed above.  Reasoned arguments can be made that Fifth Third's position did - or did not - improve during the 90 days prior to bankruptcy.  The outcome of the Superior Livestock litigation by itself could sway the conclusion on improvement in position one way or another. Given the numerous variables, the likelihood of success and, if successful, the amount of damages, improvement in position in the value of the Bank's collateral is a very difficult claim to assess at this time.

### Claim for Avoidance of Setoff

47.    The Trustee also investigated and considered (1) whether the application of cash proceeds from Fifth Third's collateral that were used to repay debt owed to Fifth Third constituted an avoidable preference; (2) whether an antecedent debt arose when Fifth Third granted provisional credit to ELC and if an antecedent debt arose at the time, whether there was a transfer from ELC to Fifth Third on account of that antecedent debt when Fifth Third revoked the provisional credit.  Generally, during the 90-day preference period ELC deposited checks payable to ELC and that represented proceeds of Fifth Third's collateral into the Collection Account maintained at Fifth Third.  ELC had no right to withdraw funds that has been deposited into that Collection Account.  The ELC/Fifth

Third loan documents provide Fifth Third complete dominion over the Collection

Account.  They make clear that Fifth Third had the unfettered right to apply deposited

funds to all of ELC's obligations to Fifth Third.  Therefore the deposit of funds did not

give rise to any obligation from Fifth Third to ELC of the kind that might arise when

funds are deposited into a debtor's checking account.  Fifth Third's application of those

proceeds to payment of unsecured debts owing by ELC to Fifth Third did not constitute

a "set off" governed by Bankruptcy Code § 553.

### Was Fifth Third Required to be a Good Faith Purchaser for Value

48.    The Trustee analyzed the assertion[9] that 1) Fifth Third was not a "good

faith purchaser for value" to the extent that Fifth Third's floating security interest

purported to attach to cattle acquired by ELC but for which ELC failed to make full

payment its sellers and 2) as a result Fifth Third's security interest failed to attach to

such cattle and receivables.  That assertion is based upon the argument that Fifth

Third's security interest failed to attach to the "voidable title" held by ELC in the "unpaid

for" cattle pursuant to U.C.C. § 2-403(1).  However, the attachment of Fifth Third's

security interest in cattle purchased by ELC (or the proceeds of receivables arising from

ELC's resale of such cattle) is governed by Article 9 of the U.C.C. (specifically § 9-203)

not Article 2 (including U.C.C. § 2-403).  For Fifth Third's security interest to attach

under U.C.C. § 9-203 to the cattle or resulting receivables, ELC only needed to acquire

"rights in the collateral".  Whether ELC held full "title" to such collateral is not material.

*See First Nat'l Bank of Elkhart v. Smoker*, 286 N.E.2d 203 (Ind. Ct. App. 1972).  *Kunkel*

*v. Sprague Nat'l Bank*, 128 F.3d 636, 641-643 (8th Cir. 1997) also supports the

---

[9] One of the creditor's counsel suggested this theory in an email to the Trustee and his Special Counsel dated March 14, 2012.  Several other creditor counsel have also asked the Trustee to similarly consider this claim.

attachment of Fifth Third's security interest to the cattle and the resulting receivables notwithstanding the failure of ELC to fully pay for the cattle and irrespective of any acts or omissions of Fifth Third of the kind discovered in Special Counsel's investigation.

49.   The Trustee has not found any reported decision that has ever held that a secured lender's security interest can be avoided on the theory that the lender needed to qualify as a good faith purchaser for value.

50.   For these reasons the Trustee believes this theory is not actionable.

### Conclusion

The Trustee and his professionals have considered the written materials, witness testimony, interviews, legal research and analysis described above.  This analysis included consideration of many facts and other legal theories suggested by several creditors' counsel.  The Court generously allowed the Trustee to conduct an investigation that, at least according to the reckoning of Fifth Third, went substantially beyond a typical pre-suit inquiry contemplated by Bankruptcy Rule 2004.  The costs of the investigation have been substantial, yet in light of the expressed creditor concerns, they are justified in that the Trustee was enabled to better assess the viability of possible bank claims without actually filing a lawsuit.  As the Trustee's opinions crystallized over the ensuing months of the investigation, it enabled him to independently discuss settlement of all potential estate claims with Fifth Third without actually revealing his conclusions or his theories and their strength and weaknesses.

The Trustee has evaluated the costs and benefits of proceeding with litigation against Fifth Third as opposed to some type of settlement.  Based upon discussions to date, the Trustee believes that Fifth Third is willing to make meaningful concessions to

its claims and interests such that a Chapter 11 liquidation plan can be presented to the

Court and unsecured creditors which should result in a significant distribution to

creditors and avoid years of delay and cost that would inevitably result if the Trustee

filed a lawsuit against Fifth Third.  In the exercise of the Trustee's business and

professional judgment, it is in the best interest of the ELC estate to pursue approval of a

chapter 11 plan containing the material terms negotiated with Fifth Third which will

include a settlement of any ELC estate claims.  The Trustee intends to file in due course

such a proposed chapter 11 plan and disclosure statement.

Respectfully submitted,

KROGER, GARDIS & REGAS, LLP

By:   /s/ James A. Knauer
   James A. Knauer, Chapter 11 Trustee
   111 Monument Circle, Suite 900
   Indianapolis, Indiana 46204-5125
   Telephone: 317-692-9000
   Facsimile: 317-777-7451
   jak@kgrlaw.com

### CERTIFICATE OF SERVICE

I hereby certify that on June 5, 2012, a copy of the foregoing pleading was filed

electronically.  Notice of this filing will be sent to the following parties through the Court's

Electronic Case Filing System.  Parties may access this filing through the Court's system.

David L. Abt
davidabt@mwt.net

Mark A. Robinson
mrobinson@vhrlaw.com

Randall D. LaTour
rdlatour@vorys.com

Daniel J. Donnellon
ddonnellon@ficlaw.com

John W. Ames
jwa@gdm.com

C. R. Bowles, Jr
crb@gdm.com

Jeffrey R. Erler
jeffe@bellnunnally.com

John R. Carr, III
jrciii@acs-law.com

Stephen A. Weigand
sweigand@ficlaw.com

Robert Hughes Foree
robertforee@bellsouth.net

John Hunt Lovell
john@lovell-law.net

Edward M King
tking@fbtlaw.com

Bret S. Clement
bclement@acs-law.com

John Frederick Massouh
john.massouh@sprouselaw.com

Kim Martin Lewis
kim.lewis@dinslaw.com

Jeremy S Rogers
Jeremy.Rogers@dinslaw.com

Meredith R. Thomas
mthomas@daleeke.com

Charles R. Wharton
Charles.R.Wharton@usdoj.gov

David L. LeBas
dlebas@namanhowell.com

Jessica E. Yates
jyates@swlaw.com

Laura Day Delcotto
ldelcotto@dlgfirm.com

Ross A. Plourde
ross.plourde@mcafeetaft.com

Todd J. Johnston
tjohnston@mcjllp.com

Karen L. Lobring
lobring@msn.com

Elliott D. Levin
robin@rubin-levin.net
edl@trustesolutions.com

Sean T. White
swhite@hooverhull.com

Michael W. McClain
mike@kentuckytrial.com

James Edwin McGhee
mcghee@derbycitylaw.com

Jerald I. Ancel
jancel@taftlaw.com

David Alan Domina
dad@dominalaw.com

Jill Zengler Julian
Jill.Julian@usdoj.gov

Michael Wayne Oyler
moyler@rwsvlaw.com

James E. Rossow
jim@rubin-levin.net

Ivana B. Shallcross
ibs@gdm.com

William Robert Meyer, II
rmeyer@stites.com

James Bryan Johnston
bjtexas59@hotmail.com

Judy Hamilton Morse
judy.morse@crowedunlevy.com

John Huffaker
john.huffaker@sprouselaw.com

Kelly Greene McConnell
lisahughes@givenspursley.com

Walter Scott Newbern
wsnewbern@msn.com

Timothy T. Pridmore
tpridmore@mcjllp.com

Sandra D. Freeburger
sfreeburger@dsf-atty.com

John M. Rogers
johnr@rubin-levin.net

Robert H. Foree
robertforee@bellsouth.net

William E Smith
wsmith@k-glaw.com

Thomas C Scherer
tscherer@binghammchale.com

Jeffrey J. Graham
jgraham@taftlaw.com

Kent A Britt
kabritt@vorys.com

Jeffrey L Hunter
jeff.hunter@usdoj.gov

Jason W. Cottrell
jwc@stuartlaw.com

James B. Lind
jblind@vorys.com

Deborah Caruso
dcaruso@daleeke.com

Allen Morris
amorris@stites.com

James T. Young
james@rubin-levin.net

John M. Thompson
john.thompson@crowedunlevy.com

Matthew J. Ochs
matt.ochs@moyewhite.com

T. Kent Barber
kbarber@dlgfirm.com

Kirk Crutcher
kcrutcher@mcs-law.com

Theodore A Konstantinopoulos
ndohbky@jbandr.com

Lisa Koch Bryant
courtmail@fbhlaw.net

John David Hoover
jdhoover@hooverhull.com

Sarah Stites Fanzini
sfanzini@hopperblackwell.com

Susan K. Roberts
skr@stuartlaw.com

David A. Laird
david.laird@moyewhite.com

Trevor L. Earl
tearl@rwsvlaw.com

Joshua N. Stine
jnstine@vorys.com

Amelia Martin Adams
aadams@dlgfirm.com

Robert A. Bell
rabell@vorys.com

Melissa S. Giberson
msgiberson@vorys.com

I further certify that on June 5, 2012, a copy of the foregoing pleading was served via electronic mail transmission on the following:

Ashley S. Rusher
asr@blancolaw.com

Darla J. Gabbitas
darla.gabbitas@moyewhite.com

/s/ James A. Knauer
James A. Knauer,
Chapter 11 Trustee
111 Monument Circle, Suite 900
Indianapolis, Indiana 46204-5125
Telephone: 317-692-9000
Facsimile: 317-777-7451
jak@kgrlaw.com