UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

IN RE:                                )
                                      )
EASTERN LIVESTOCK CO., LLC            )          CASE NO. 10-93904-BHL-11
                                      )
             Debtor.                  )

**SUPPLEMENTAL OBJECTION TO *REPORT OF THE TRUSTEE, JAMES A. KNAUER REGARDING INVESTIGATION AND ANALYSIS OF POTENTIAL CLAIMS AGAINST FIFTH THIRD BANK***

Superior Livestock Auction, Inc. ("Superior"), a creditor in the above-captioned

proceeding, by counsel, hereby submits its Supplemental Objection[1] to the *Report of the Trustee,*

*James A. Knauer Regarding Investigation and Analysis of Potential Claims Against Fifth Third*

*Bank* ("the Report"):

**Factual Background**

1.      The Debtor's major lender, Fifth Third Bank ("Fifth Third"), asserts a secured

claim of over $35 million, the amount alleged to be owing after it received nearly $20 million in

payments in the two months before bankruptcy.  For most creditors, the outcome of this case

largely depends on the treatment of Fifth Third's claim.

2.      In early 2011, the Trustee retained the law firm of Hoover Hull as Special Counsel

to investigate Fifth Third's claim and the estate's potential causes of action relating to the bank

because the Trustee and his general counsel, Faegre Baker Daniels ("FBD"), both represent Fifth

Third in other matters, and do not have Fifth Third's consent to commence any action against

Fifth Third.

---

[1]This objection is intended to supplement Superior's Preliminary Objection to the Report filed on June 8, 2012 and the related Motion to Strike Trustee's Report on Claims filed by Superior on June 18, 2012.

3.    Creditors raised concerns, however, when it was subsequently learned (from fee applications) that the Trustee had suspended Hoover Hull's limited review in April of 2011, and that the Trustee and FBD were negotiating a proposed plan with Fifth Third. At a hearing held on December 14, 2011, this Court directed Hoover Hull to file a report describing  its investigations and conclusions regarding Fifth Third's claim and the estate's potential causes of action.

4.    Thereafter, Hoover Hull filed a "preliminary report" on March 16, 2012, which generally described its resumed investigations and stated that Hoover Hull expected to file a final report within 30 days, thereafter extended until May 31 and later until June 5, 2012.

5.    However, Hoover Hull has not filed any final report, and apparently does not intend to do so. Instead, on June 5, 2012, the Trustee filed his Report, which represents that it was filed "at the direction of the Court." REPORT, PG. 1, NOTE 1.

6.    For the reasons stated in Superior's previously filed Preliminary Objection, the Report is neither an independent report by Special Counsel as directed by the Court, nor a meaningful assessment of claims. It is unclear to what extent Special Counsel even participated in preparing the Report, or agrees with its conclusions.  The Report acknowledges it was prepared with the advice and analysis of FBD, the same counsel whose conflict of interest lead to the appointment of Hoover Hull as Special Counsel. The Report also indicates the Trustee and FBD negotiated a settlement with Fifth Third before Hoover Hull completed its review, which is alleged in the Report to be preferable to pursuing any estate claims against Fifth Third. *See* REPORT, PGS. 26-29.

2

7.     The unmistakable objective of the Report is simply to solicit support for the Trustee's undisclosed settlement and plan, by providing a relentlessly negative assessment of potential claims, dwelling almost exclusively on Fifth Third's possible defenses, and omitting mention of potential recoveries or supporting facts. Unfortunately, creditors may be compelled to "accept" the Trustee's settlement with Fifth Third simply because it may soon be impossible to do anything else. The problems facing the estate because of the Trustee's failure to independently investigate and disclose facts for well over a year include:

(a)     The rapid approach of the statute of limitations deadline for filing actions;

(b)     The fact that the Trustee has not retained counsel (or made effort to seek counsel) that *could* pursue any action against Fifth Third;

(c)     The fact that professional fees of nearly $6 million have been incurred by the Trustee and his representatives, while the Financing Order negotiated by the Trustee with Fifth Third does not allow borrowing in excess of $4 million, with the result that any further administration of the estate would require a new agreement with Fifth Third;

(d)     The inability of creditors to file competing plans unless they make exorbitant expenditures of time and money to do the Trustee's job of analyzing estate causes of action; and

(e)     The obvious fact that Fifth Third, being well aware of all of the foregoing, and of the Trustee's clear decision not to pursue any claims, has no reason to seriously negotiate.

## THE ESTATE HAS MERITORIOUS CLAIMS THAT SHOULD BE PURSUED

8.    The purpose of this Supplemental Objection to the Report is to document the existence of substantial claims that the Trustee has failed to adequately disclose or assess, which must be seriously pursued by a party committed to maximizing recovery. While it may not be necessary to actually litigate such claims, negotiation or even evaluation of any settlement at least requires a meaningful and unbiased assessment of claims.

### A. "Improvement in Position" Claim

9.    Most significantly, the estate has a *prima facie* claim to recover many millions of dollars of payments received by Fifth Third in the months preceding the bankruptcy because such payments created a preferential "improvement in position" under 11 U.S.C. §547(c)(5).

10.    As the Trustee acknowledges in his report, where an undersecured creditor has a "floating" lien on inventory and accounts receivable, §547(c)(5) allows the estate to avoid the lien, and to recover payments, to the extent the ratio of debt to collateral was improved on the date of the filing when compared with such ratio 90 days before the filing. The purpose of §547(c)(5) is to

> strike a balance between recognition of the floating lien and protection of unsecured creditors, whose interests in the debtor's estate could otherwise be defeated by the secured creditor's manipulation of debt balances in the critical weeks preceding bankruptcy.

*In re Paolella & Sons, Inc.,* 1991 Bankr. LEXIS 1181, 1194 (Bkrtcy. E.D. Penn. 1991);

11.    Improvement in position is an obvious claim to consider where, as here, in the months before bankruptcy a lender ceased making advances, the debtor acquired collateral (cattle) through fraud (bad checks), and the cattle either became part of the lender's inventory

4

collateral, or were reduced to sales proceeds applied to reduce the lender's debt. Due to the volume of Eastern's business and the fact that Fifth Third dishonored checks during the peak of the cattle market season, the estate's potential improvement in position claim against Fifth Third is huge.

12.    Unfortunately, despite having well over a year to investigate the claim, and $6 million of incurred professional fees, the Report contains only a superficial discussion, devoid of facts, which utilizes illogical factual assumptions to reach a "conclusion" that the estate may or may not have a claim.

13.    Without providing any facts or figures, and no citation to authority, the Report merely offers the Trustee's view that some analysis done by his advisor, DSI (which is not attached) can be interpreted in various ways.  His ultimate "conclusion" is merely that it is "a very difficult claim to assess at this time."  Of course, because the Report also states that the Trustee intends to file a plan which includes a settlement he has already negotiated with Fifth Third, it is obvious he does not intend to further assess the claim *at any time*.

14.    Contrary to the Trustee's opinion, *the actual data provided by DSI to the Trustee indicates that the debt-to-collateral ratio on the two relevant dates improved, to the benefit of Fifth Third, by over $18 million.*  In effect, Fifth Third was able to eliminate its exposure from the check kite during the period shortly before bankruptcy.  Such preferential payments are clearly recoverable under §547. *See, e.g., In re Ebbler Furniture,* 804 F.2d 87 (7th Cir. 1986)*; In re Montgomery,* 983 F.2d 1389 (6th Cir. 1993).

15.    According to DSI,[2] after adjusting for bogus receivables, the gross value of all collateral on the two relevant dates was nearly the same (within hundreds of dollars), while the debt declined from $54 million on September 7 to $35.8 million on December 6. This is basically what one would expect based on Eastern's banking records, which show that deposits of over $17 million were received and applied to Fifth Third's debt in November and December 2010, after the bank stopped making advances.  The fact that the gross value of collateral on the two dates was nearly the same (after eliminating bogus receivables associated with the kite) is also not surprising because the volume of Eastern's legitimate business activity was fairly consistent, as the Trustee has previously acknowledged.[3]

16.    Without reference to any of these numbers, however, or citation to authority, the Trustee vaguely claims "the unique circumstances surrounding the actual filing of ELC's bankruptcy case" make analysis and comparison "exceedingly difficult." REPORT, ¶45. As discussed below, the facts are not particularly unusual, and the Trustee's analysis is only difficult because it involves speculative and improper adjustments and assumptions.

17.    The alleged complexity apparently arises from the Trustee's belief that the gross numbers provided by DSI must be substantially adjusted to reflect alleged differences in the "realizable value" of collateral on September 7 and December 6 – differences which the Trustee attributes to the one-month receivership.  The Report vaguely states:

---

[2]The Report references an analysis prepared by DSI with the assistance of Trustee's counsel which is not described in detail or attached to the Report, but which the Trustee has shared with counsel for Superior by request.

[3]This is noted in the *First Report of James A. Knauer, Trustee of the Estate of Eastern Livestock Co., LLC Pursuant to 11 U.S.C. 1106(a)* filed on March 16, 2012, pgs. 12-13.

The existence of a highly publicized interim receivership that did not provide the benefits of an automatic stay (inherent in a typical bankruptcy) complicates the analysis.  For almost 30 days between the appointment of the receiver and the chapter 11 petition date, many things occurred that would almost certainly not have happened (or would have been more readily avoidable had they occurred) had a bankruptcy been filed on September 7 without an intervening receivership.  For example, immediately before and during the receivership, millions of dollars of ELC's receipts were diverted away from ELC's Fifth Third collection account. Interpleader actions that would have been barred under 11 U.S.C. §362 were filed in six states resulting in enormous litigation expenses. Cattle were repossessed or taken without legal right.  Records were removed or destroyed.

18.    After making the fanciful argument that all problems of collection in the case arise from a one-month receivership, the Trustee essentially argues that Fifth Third's collateral should be valued on September 7 as if there were a voluntary bankruptcy petition filed by a going concern, while the value of similar collateral on December 7 should be based on the actual collections (to date) by the Trustee in this involuntary liquidating case.  Such an apples-to-oranges comparison would obviously greatly diminish an improvement in position claim, but is not supported by the facts or by any legal authority.

19.    The "facts" assumed by the Trustee's legal analysis are not supported by authority or common sense.  For example, it is beyond dispute that Eastern was *not* a "going concern" on September 7, 2010, or anytime in the recent past.  Eastern was operated by felons who diverted inventory and funds, did not keep accurate books and records, were kiting $20 million in checks every day, would never have filed a voluntary bankruptcy petition, and did not cooperate with the involuntary petition in this case.

20.    Contrary to the statements made in the Report, the Trustee has previously acknowledged that collection problems arose not because of a "highly publicized receivership,"

7

but because "Eastern Livestock's troubles became public when they began to bounce checks in late October of 2010."  As stated in the Trustee's internet "blog" posting for October 24, 2011, "[t]he bounced checks caused concerns by buyers who were getting demands from cattle sellers, truckers and others not to pay Eastern, fearing that Eastern would take buyers money and continue to issue bad checks to the sellers, truckers and others."

21.    The Trustee's Report also offers no reasoning for the contention that if a bankruptcy had been filed without a receivership, the automatic stay would have miraculously saved "enormous litigation expenses" related to interpleader actions.  The same lawsuits could have been filed in a bankruptcy under Bankruptcy Rule 7022, and were quickly removed to the Bankruptcy Court by the Trustee.  Moreover, the state court order appointing the receiver *did* include protections virtually identical to those in the automatic stay of §362.[4]  The Trustee's analysis regarding the effect of the receivership apparently did not include a review of the receivership order itself, or input from DSI, since Elizabeth Lynch of DSI is surely familiar with the order appointing her as receiver.   The Trustee also does not attempt to explain what the receivership had to do with records being removed or destroyed or the alleged diversion of funds "before and during the receivership"[5] from ELC's Fifth Third collection account.

---

[4]One of the many provisions in the receivership order similar in effect to the automatic stay states that "[a]ll creditors, claimants, bodies politic, parties in interest, and their respective attorneys, servants, agents, and employees, and all other persons, firms, and corporations be, and they hereby are, jointly and severally, enjoined and stayed from commencing or continuing any action at law or suit or proceeding in equity to foreclose any lien or enforce any claim against Eastern Livestock or its Books and Records or Property, . . . ."

[5]The Trustee provides no specifics, and does not explain how funds could be diverted from a Fifth Third collection account without Fifth Third's consent.  It is apparent that any such diversions which occurred "before" the receivership were not caused by the receivership.

22.     The Trustee's approach of using going concern value on September 7 and liquidation value on December 6 is not supported by the language of §547 or the holding of any reported case.  The statute simply requires a determination of collateral "value" on two dates. While some cases debate whether the value in question should be "going concern" or "liquidation," they uniformly apply the same test on both dates, and do not engage in speculation about events (such as a voluntary reorganization by a criminal enterprise) that would never occur. As discussed below, the great weight of authority holds that value on both dates should be estimated based *on what the creditor would receive through enforcement of its rights in the usual course.*

23.     The leading case in the Seventh Circuit is *In re Ebbler Furniture,* 804 F.2d 87 (7th Cir. 1986), involving a creditor's appeal from a bankruptcy court determination that there had been an avoidable improvement in position.  The case was a Chapter 7, involving a preference action brought by the trustee, where the bankruptcy court used a "cost" approach to determine collateral value on both dates because it was consistent with the parties' practice. On appeal, the creditor argued the court should have used a "going concern" valuation method.

24.     In rejecting the creditor's argument and affirming the bankruptcy court's decision, the Seventh Circuit notes that Collier, various cases, and commentators have all suggested that liquidation values are proper in liquidation cases, while "going concern" methods may be more appropriate in Chapter 11 and 13 reorganizations. *Id.* at 90, n.2, citing *In re Lackow Bros., Inc.,* 752 F.2d 1529 (11th Cir. 1985), 4A Collier on Bankruptcy, ¶547.41 at 547-135, and Cohen, *"Value" Judgments: Account Receivable Financing and Voidable Preferences under the New*

9

*Bankruptcy Code,* 66 Minn. L. Rev. 639, 664 (1982). The Court quotes, with apparent approval, a law professor's observation that:

> courts should look at the actual manner in which the collateral was liquidated, i.e., cost or ongoing concern. Whatever method is used to dispose of the collateral. . . should be used to value the collateral 90 days before the filing of the bankruptcy petition.

804 F.2d at 90, n.2.

25.     While clearly in agreement with this reasoning, the opinion in *Ebbler* ultimately determines it would be "inappropriate to bind this circuit to these distinctions at the present time," to further the case-by-case flexibility apparently intended by Congress' failure to specifically define "value" in §547. The opinion accordingly merely affirms the bankruptcy court's ruling on the grounds it certainly was not "clearly erroneous" to use a cost approach in a Chapter 7.

26.     In a concurring opinion in *Ebbler,* Judge Easterbrook endeavors to provide more guidance because "we need not leave bankruptcy judges adrift." *Id.* at 91. Consistent with the various authorities quoted with approval in the majority opinion, Judge Easterbrook expressly states that the method to determine value for purposes of §547 ultimately "depends on what the Bank could do, outside of bankruptcy, to realize on its security." *Id.* at 92, citing Jackson, *Avoiding Powers in Bankruptcy,* 36 Stan. L. Rev. 725, 756-77(1984). This approach and the reasoning of Profs. Cohen and Jackson has been adopted in numerous subsequent cases. *E.g., In re Clark Pipe & Supply Co., Inc.,* 893 F.2d 693 (5th Cir. 1990)*; In re Missionary Baptist Foundation of America,* 796 F.2d 752 (5th Cir., 1986); *In re Paolella & Sons, Inc.,* 1991 Bankr.

LEXIS 1181 (Bkrtcy. E.D. Penn. 1991); *In re Joe Flynn Rare Coins, Inc.,* 81 B.R. 1009 (Bkrtcy.

D. Kan. 1988);. As stated in *Clark Pipe & Supply:*

> Cases that have addressed the valuation of inventory in the "improvement in position" test have repeatedly focused on value in the hands of the creditor. *See, e.g., In re Ebbler Furniture and Appliances, Inc.*, 804 F.2d at 89 ("Section 547(c)(5) prevents a secured creditor from improving its position at the expense of an unsecured creditor during the 90 days prior to filing the bankruptcy petition."); *Matter of Lackow*, 752 F.2d 1529, 1530 (11th Cir. 1985) ("In order to fall within [the § 547(c)(5)] exception to preferential transfers a creditor'[s] financial position [must not have] improve[d] within the ninety days prior to bankruptcy."). The bankruptcy court's adoption of a debtor perspective, by valuing inventory based upon a realization percentage to the debtor, contravenes the time-honored creditor focus of section 547(c)(5) and undermines the purposes of that provision. Thus, the courts below erred in valuing inventory from the perspective of Clark, rather than Associates. *The appropriate measure of collateral value here is the net amount that could be received by Associates if, and when, it could have seized and sold the inventory. [4] See, e.g., In re Ebbler Furniture and Appliances, Inc., 804 F.2d at 92  ("The value of [a secured party's]  interest depends on what [it] could do, outside of bankruptcy, to realize on its security. What it could do is seize and sell the inventory.") (Easterbrook, J., concurring).*

893 F.2d at 698. (Emphasis added.) *Accord, In re Paolella & Sons, Inc.; In re Joe Flynn*

*Rare Coins, Inc.,* 81 B.R. at 102  ("It just does not make sense to value the security as 'an

ongoing concern' if the secured party, not the debtor, could not sell the security for the

ongoing concern value.")

27.     In the present case, it is obvious that Fifth Third's options to recover its collateral

would never include filing a reorganization petition for Eastern, and presumably not working

with the felons who were kiting checks at the bank in order to sell collateral as a going concern.

One would expect Fifth Third to take precisely the same actions in September that it took a

couple of months later – discontinuing lending, dishonoring checks, and appointing a receiver to

collect and liquidate assets. What else could it do? The Trustee's speculations aside, there is no

reason to suppose these actions would have a completely different effect in September than they did a couple of months later — certainly nothing that would erase a *prima facie* preference claim of over $18 million.

28.     In short, there is no support in the facts or law for using a going concern value of collateral on one date and a liquidation value on the other. Based on the data provided by DSI, it hardly matters what valuation method may be used to adjust "gross value" to arrive at "realizable" value *so long as the same method is used for both September 7 and December 6.*  As noted earlier, the data indicates the gross value of collateral was the same on the two dates, while the debt declined by $18 million due to payments received by Fifth Third in November and December, 2010.  A different valuation approach focusing on realizable value may yield smaller values for both September 7 and December 6, but the improvement in overall position would be the same – over $18 million.

29.     Thus, contrary to the Trustee's superficial analysis, it is apparent the estate has a very substantial claim against Fifth Third, the benefits of which should be received by creditors without any release of the bank.

## B. Additional Claims

30.     The Report similarly provides only a superficial and blatantly pessimistic assessment of other potential claims.

31.     It is difficult to comprehend, for example, the Trustee's particular reasons for characterizing the estate's potential claim for equitable subordination as being merely "colorable," given the fact such claims are highly fact-sensitive, no specific facts are discussed in

12

the Report, and only preliminary discovery has been done thus far.[6] *See* REPORT, ¶38. The known

facts are certainly analogous to those in cases where creditor claims have been subordinated. *See,*

*e.g.,* Judge Fox's opinion in *In re Paolella & Sons, Inc.,* 1991 Bankr. LEXIS 1181 (Bkrtcy. E.D.

Penn. 1991) (creditor claim equitably subordinated as to benefit resulting from creditor's control

of debtor arising from controlled disbursement account and timing of decision to declare default,

despite longstanding breach, when inventory and payables were relatively high and misleading

others as to aim). However, the Trustee instead chooses to cite negative authorities which are

factually distinguishable, such as *In re Summit Financial Services, Inc.,* 240 B.R. 105 (Bankr.

N.D. Ga. 1999), which did not involve a claim for equitable subordination but *did* include a

specific finding that the relevant bank was not aware of the check kite. *See* REPORT, ¶42.  Here,

as the Trustee begrudgingly acknowledges earlier in his Report, there is "considerable evidence"

that Fifth Third ignored safeguards designed to alert the bank to the existence of check kiting and

fraudulent reporting of receivables and inventory, and "an inference could be drawn from the

bank's repeated decisions to ignore such warnings, that it willfully ignored them in pursuit of

profits from the account." REPORT, ¶15. The Report goes on to suggest that a successful

subordination claim could be limited "to the extent of the Bank's profits on the account received

over some period of time," but does not even mention the range of such profits, which Superior

understands included not only interest and default interest, but hundreds of thousands of dollars

per year just for allowing Eastern to have immediate use of deposits.

---

[6]The preliminary discovery by the Trustee's Special Counsel did not include a number of key Fifth Third former employees such as the head of Fifth Third's Fraud and Detection team, Michael Herr, and Fifth Third has refused to produce numerous documents based on claims of privilege which were disputed by Special Counsel.

32.    The Report also summarily dismisses in *one paragraph* a potentially significant challenge to Fifth Third's secured claim based on whether Fifth Third is a "good faith purchaser for value" within the meaning of  UCC §2-403(1).  REPORT, ¶48. Although counsel for Superior had provided the Trustee with a detailed memorandum of law on the issue, the Report simply concludes "this theory is not actionable," without any discussion of the statute, relying on general statements of law from two cases that are not on point and the following "analysis:"

> The attachment of Fifth Third's security interest in cattle purchased by ELC (or the proceeds of receivables from the sale of such cattle) is governed by Article 9 of the U.C.C. (specifically § 9-203) not article 2 (specifically § 2-403).

*Id.*

33    This conclusion scarcely qualifies as a legal argument. Suffice it to say, where a lender takes a security interest in the assets of a borrower like Eastern engaged in buying and selling goods, the secured creditor's lien rights often involve consideration of Articles 2 *and* 9, the interrelationship of which has been the subject of countless disputes and scholarly articles for decades. [7]

34.    As the Trustee correctly states, Article 9 addresses the creation, perfection and general priority of security interests.  It is axiomatic that, in order for a security interest to be effective between the debtor and the secured creditor, the security interest must "attach." *Citizens Nat'l Bank v. Wedel*, 489 N.E.2d 1203, 1205 (Ind. Ct. App. 1986).  In Indiana, the requirements for attachment are set forth in Ind. Code § 26-1-9.1-203(b), which requires that (1)

---

[7]Indeed, the Trustee himself (in an unsuccessful summary judgment motion supported by Fifth Third) has relied on a mistaken reading of UCC §2-401 to suggest the debtor acquired "good title" to cattle which are subject to Fifth Third's security interest despite assignment of contracts to Superior.  *See* December 27, 2011 Brief in Support of Motion for Summary Judgment, pgs. 10-11 filed in Adv. Proc. No. 11-59088.

value has been given, (2) *the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party*, and (3) the debtor has authenticated a security agreement that provides the description of the collateral or another condition of that subsection is met. (Emphasis added).  With respect to subpart (b)(2), a debtor may grant a security interest in whatever rights a debtor may have in the Collateral, "no matter how broad or how narrow." *Nat'l City Bank of Ind. v.  All-Phase Elec. Supply Co.*, 790 N.E.2d 488, 490 (Ind. Ct. App. 2003).

35.    To determine the "rights" in collateral of a debtor engaged in buying and selling goods, and the debtor's "power to transfer rights in the collateral to a secured party," one must then look to Article 2. One of the provisions addressing such rights is UCC § 2-403(1), which states:

> A purchaser of goods acquires all title which his transferor had or had power to transfer except that a purchaser of a limited interest acquires rights only to the extent of the interest purchased. *A person with voidable title has power to transfer a good title to a good faith purchaser for value.* When goods have been delivered under a transaction of purchase the purchaser has such power even though
>
> (a)    the transferor was deceived as to the identity of the purchaser, or
>
> (b)    *the delivery was in exchange for a check which is later dishonored*, or
>
> (c)    it was agreed that the transaction was to be a "cash sale", or
>
> (d)    the delivery was procured through fraud punishable as larcenous under the criminal law.

(Emphasis added).

36.    In Indiana and elsewhere,  §2-403(1) has been applied to conclude that when a debtor acquires goods through fraud, a check returned for insufficient funds, or other similar misconduct, the debtor only acquires "voidable title" and can only convey good title to a "good

15

faith purchaser for value." *See, e.g. B.R.L. Equip. Rentals, Ltd. v. Seabring Marine Indus., Inc*., 168 F.3d 413, 415 (11th Cir. 1999) (". . . possessor of property obtained via a worthless check has 'voidable' title to the property – the possessor has title, but the seller can avoid that title as against the buyer upon discovery of the fraud); *Met-Al, Inc. v. Hansen Storage Co*., 844 F. Supp. 485, 490 (E.D. Wis. 1994).[8] This rule applies to secured parties as well as other "purchasers" by virtue of the UCC's definition of "purchase" to include "taking by sale, discount, negotiation, mortgage, pledge, *lien, security interest,* issue or reissue, gift, or any other voluntary transaction creating an interest in property."[9] ( Emphasis added.) Under Ind. Code § 26-1-1-201(33), a "purchaser" is simply "a person who takes by "purchase."  Thus, §2-403(1) limits the rights of any "purchaser," including a secured creditor, who fails to provide value or act in good faith where the debtor only has voidable title.

37.    In the present case, there is overwhelming evidence of fraud by Eastern giving rise to voidable title within the meaning of § 2-403. Eastern's bankruptcy filing occurred because the company's "business model" involved a check-kiting scheme, bogus purchases and sales of cattle on a massive scale, and a total absence of  accurate books and records.  Eastern's fraudulent conduct was the basis of Eastern's state court receivership, the Bankruptcy Court's Order

---

[8]While the UCC does not define the term "voidable title" used in § 2-403(1), it supplements and incorporates existing law, as emphasized by the statement in the Official Comments that drafters intended "the continued applicability to commercial contracts of all supplemental bodies of law except insofar as they are explicitly displaced by this Act." Official UCC Comment to § 1-103.

[9]There really is no dispute over the fact that an Article 9 secured creditor falls within the definition of "purchaser". *See, e.g., In re Circuit City Stores, Inc.,* 441 B.R. 496, 509 (Bankr. E.D. Va. 2010); *In re Bensar Co., Inc.,* 36 B.R. 699, 703 (Bankr. S.D. Ohio 1984); *In re Wathen's Elevators, Inc.,* 32 B.R. 912, 919-920 (Bankr. W.D. Ky. 1983).

appointing the Trustee, and criminal indictments and convictions of its principals. *See* DOC. NO.

77. As the Court has previously stated in its ruling on one of the motions for partial summary

judgment in this case:

> The objecting defendants certainly were defrauded according to the
> definition of fraud employed by the Uniform Commercial Code, which
> "takes as its base line the proposition that any receipt of goods on credit by
> an insolvent buyer amounts to a tacit business misrepresentation of
> solvency and therefore is fraudulent as against the particular seller." UCC
> §2-702 Comment 2.

FEBRUARY 10, 2012 ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT IN ADV.

PROC. 11-59093, DOC. NO. 379, P. 3. Thus, there is clear support for the conclusion that

Eastern acquired only voidable title from defrauded sellers.

38.     The question then becomes whether Fifth Third was a "good faith

purchaser for value." Because it clearly was a "purchaser" under the Code, and did

provide value, the crucial issue is whether Fifth Third acted in "good faith," which is

defined as "honesty in fact in the conduct or transaction concerned."

39.     Obviously, this involves a fact-sensitive analysis. However, there is

evidence in this case analogous to that found by courts to constitute absence of good faith

within the meaning of  a § 2-403(1). *See, e.g., In re Paolella & Sons, Inc., supra*; *Iola

State Bank v. Bolan*, 679 P.2d 720 (Kan. 1984) and  *Monsanto Co. v. Walter E. Heller &

Co*., 449 N.E.2d 993 (Ill. App. 1983) (secured creditors using knowledge of debtor's

insolvent condition in effort to prevail over reclaiming sellers did not act in good faith

and security interest did not attach against the sellers).

40.     Here, as noted previously, the Trustee agrees there is at least a colorable claim against Fifth Third for equitable subordination, which by definition includes some significant form of misconduct or inequitable conduct. *In re Lifschultz Fast Freight*, 132 F.3d 339, 343 (7th Cir. 1997). It is undisputed that Eastern's check kite greatly increased in size over a period of years, accompanied by diversion of funds, all of which ultimately resulted in greater losses to defrauded sellers. The Trustee also agrees the evidence supports an inference that Fifth Third knowingly allowed the kite to be perpetuated to maximize its profits, which included substantial fees for allowing Eastern's immediate use of uncollected funds. REPORT, ¶15. Accordingly, the same evidence reviewed by the Trustee in making his determination there is a "colorable" claim for equitable subordination is also available to the Trustee to show there is a colorable claim that Fifth Third Bank was not a good faith purchaser for value. *See, e.g., In re Paolella & Sons, Inc., supra* ("[t]o the extent that a secured creditor engages in conduct warranting equitable subordination of the claim. . . the parties acknowledge and I agree that such conduct also may render the secured creditor not a good faith purchaser. . . .")

## CONCLUSION

The independent report by Special Counsel directed by this Court has not been filed, nor has the Trustee performed an objective assessment of potential claims against Fifth Third Bank. The apparent purpose of the Report filed by the Trustee is simply to garner support for a settlement negotiated by the Trustee. Contrary to the opinions and superficial analysis contained in the Report, the estate has substantial, meritorious claims

– including a prima facie preference claim of over $18 million –  which should be seriously addressed and pursued by a party committed to maximizing recovery.

Respectfully submitted,

RUBIN & LEVIN, P.C.

By:   /s/ John M. Rogers
Elliott D. Levin,  Atty. No. 8785-49
John M. Rogers, Atty. No. 6182-49
Christopher M. Trapp, Atty. No. 27367-53
RUBIN & LEVIN, P.C.
342 Massachusetts Avenue
Indianapolis, IN 46204
(317) 634-0300; FAX (317) 453-8601
johnr@rubin-levin.net

ONE OF COUNSEL FOR SUPERIOR
LIVESTOCK AUCTION, INC.

## CERTIFICATE OF SERVICE

I hereby certify that on June 22, 2012, a copy of the foregoing  Motion to Strike Report of the Trustee, James A. Knauer Regarding Investigation and Analysis of Potential Claims Against Fifth Third Bank was filed electronically. Notice of this filing will be sent to the following parties through the Court's Electronic Case Filing System. Parties may access this filing through the Court's system:

| | |
|---|---|
| David L. Abt | davidabt@mwt.net |
| John W Ames | jwa@gdm.com, |
| | shm@gdm.com;tlm@gdm.com;rtrowbridge@kslaw.com |
| T. Kent Barber | kbarber@dlgfirm.com, |
| | dlgecf@dlgfirm.com;dlgecfs@gmail.com |
| C. R. Bowles | crb@gdm.com, shm@gdm.com;lgw@gdm.com |
| Lisa Koch Bryant | courtmail@fbhlaw.net |
| James M. Carr | james.carr@bakerd.com, patricia.moffit@bakerd.com |
| John R. Carr | jrciii@acs-law.com, sfinnerty@acs-law.com |
| Deborah Caruso | dcaruso@daleeke.com, |
| | lharves@daleeke.com;mthomas@daleeke.com |
| Bret S. Clement | bclement@acs-law.com, sfinnerty@acs-law.com |
| Jesse Cook-Dubin | jcookdubin@vorys.com, vdarmstrong@vorys.com |

| | |
|---|---|
| Kirk Crutcher | kcrutcher@mcs-law.com, jparsons@mcs-law.com;cmarshall@mcs-law.com |
| Dustin R. DeNeal | dustin.deneal@bakerd.com, patricia.moffit@bakerd.com |
| Laura Day DelCotto | ldelcotto@dlgfirm.com, dlgecf@dlgfirm.com;dlgecfs@gmail.com |
| David Alan Domina | dad@dominalaw.com, KKW@dominalaw.com;efiling@dominalaw.com |
| Daniel J. Donnell on | ddonnellon@ficlaw.com, knorwick@ficlaw.com |
| Robert Hughes Free | robertforee@bellsouth.net |
| Sandra D. Freeburger | sfreeburger@dsf-atty.com, smattingly@dsf-atty.com |
| Terry E. Hall | terry.hall@bakerd.com, sharon.korn@bakerd.com |
| John Huffaker | john.huffaker@sprouselaw.com, lynn.acton@sprouselaw.com;rhonda.rogers@sprouselaw.com |
| James Bryan Johnston | bjtexas59@hotmail.com, bryan@ebs-law.net |
| Todd J. Johnston | tjohnston@mcjllp.com |
| Edward M King | tking@fbtlaw.com, dgioffre@fbtlaw.com |
| James A. Knauer | jak@kgrlaw.com, hns@kgrlaw.com |
| Theodore A Konstantinopoulos | ndohbky@jbandr.com |
| Randall D. LaTour | rdlatour@vorys.com, khedwards@vorys.com |
| David L. LeBas | dlebas@namanhowell.com, koswald@namanhowell.com |
| Elliott D. Levin | edl@rubin-levin.net |
| Kim Martin Lewis | kim.lewis@dinslaw.com, lisa.geeding@dinslaw.com;patrick.burns@dinslaw.com |
| Karen L. Lobring | lobring@msn.com |
| John Hunt Lovell | john@lovell-law.net, sabrina@lovell-law.net |
| John Frederick Massouh | john.massouh@sprouselaw.com |
| Kelly Greene McConnell | lisahughes@givenspursley.com |
| William Robert Meyer | rmeyer@stites.com |
| Allen Morris | amorris@stites.com, dgoodman@stites.com |
| Judy Hamilton Morse | judy.morse@crowedunlevy.com, ecf@crowedunlevy.com;donna.hinkle@crowedunlevy.com; karol.brown@crowedunlevy.com |
| Walter Scott Newbern | wsnewbern@msn.com |
| Matthew J. Ochs | matt.ochs@moyewhite.com, kim.maynes@moyewhite.com |
| Ross A. Plourde | ross.plourde@mcafeetaft.com, erin.clogston@mcafeetaft.com |
| Timothy T. Pridmore | tpridmore@mcjllp.com, lskibell@mcjllp.com |
| Jeffrey E. Ramsey | jramsey@hopperblackwell.com, mhaught@hopperblackwell.com |
| Mark A. Robinson | mrobinson@vhrlaw.com, dalbers@vhrlaw.com |
| Jeremy S Rogers | Jeremy.Rogers@dinslaw.com, joyce.jenkins@dinslaw.com |

| | |
|---|---|
| Ivana B. Shallcross | ibs@gdm.com |
| Robert K Stanley | robert.stanley@bakerd.com |
| Meredith R. Thomas | mthomas@daleeke.com, kmark@daleeke.com |
| John M. Thompson | john.thompson@crowedunlevy.com, jody.moore@crowedunlevy.com,donna.hinkle@crowedunlevy.com |
| U.S. Trustee | ustpregion10.in.ecf@usdoj.gov |
| Stephen A. Weigand | sweigand@ficlaw.com |
| Charles R. Wharton | Charles.R.Wharton@usdoj.gov, Charles.R.Wharton@usdoj.gov |
| Jessica E. Yates | jyates@swlaw.com, edufficy@swlaw.com |
| James T. Young | james@rubin-levin.net, ATTY_JTY@trustesolutions.com;kim@rubin-levin.net;lemerson@rubin-levin.net |

I further certify that on June 22, 2012, a copy of the foregoing Motion to Strike Report of the Trustee, James A. Knauer Regarding Investigation and Analysis of Potential Claims Against Fifth Third Bank was mailed by first-class U.S. Mail, postage prepaid, and properly addressed to the following:

National Cattlemen's Beef Association
c/o Alice Devine
6031 SW 37th St.
Topeka, KA 66610

/s/ John M. Rogers

John M. Rogers

G:\WP80\GENLIT\Farm Credit West-Eastern Livestock-85021201\Pleadings\Supplemental Objection to Report.wpd