UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| IN RE: | : | CASE NO. 10-93904-BHL-11 |
| EASTERN LIVESTOCK CO., LLC, | : | (Judge Basil H. Lorch III) |
| Debtor. | : | **RENEWAL OF OBJECTION OF** |
| | | **THE FIRST BANK AND TRUST** |
| | : | **COMPANY TO APPLICATION TO** |
| | | **EMPLOY BAKER & DANIELS, LLP** |
| | : | **(n/k/a FAEGRE BAKER DANIELS** |
| | | **LLP) AS COUNSEL TO CHAPTER** |
| | : | **11 TRUSTEE** |

_____

I.        INTRODUCTION AND SUMMARY

This involuntary Chapter 11 proceeding has drawn the attention of the United

States Department of Agriculture, the Federal Bureau of Investigation, the Attorney General of

the Commonwealth of Kentucky, the National Cattlemen's Beef Association, the Livestock

Marketing Association, and numerous livestock industry trade journals.  The concept that a "too

big to fail" cattle broker/dealer/agent collapsed under the weight of a check kite that lasted

months, if not years, will leave a permanent mark upon the fed-cattle industry.  The ripple effect

has harmed not only large financial institutions and agricultural lenders, but also has hurt the

small American farmer who traded one 4-H Club prize-winning steer for a check bearing a Fifth

Third Bank stamp "refer to maker."  Accordingly, where, if not here, must the Trustee and his

team of professionals be completely beyond reproach in order for the innumerable sellers of

livestock who are left holding worthless checks to have any confidence in the United States

Bankruptcy System?

Fortunately, for those affected persons following the proceedings, the Bankruptcy Code and the progeny of cases interpreting it apply high standards of "disinterestedness" and "disclosure" to a Trustee and his professionals that mandates "any reasonable doubts regarding the relevance of a particular set of circumstances should be resolved in favor of full disclosure. See In re Leslie Fay Cos., 175 B.R. 525, 533 (Bankr. S.D.N.Y. 1994)."  U. S. Department of Justice, Chapter 11 Trustee Handbook, p. 10 (May, 2004).  Unfortunately for those unsecured creditors in this proceeding, who will be part of its permanent legacy, the Affidavits of Disinterestedness of the Trustee and his Primary Counsel – which were amended only once in direct response to an Objection at the outset of the case – are now known to be bereft of the "full disclosure" mandated by the Code.  First Bank immediately identified the Trustee's lack of full disclosure in connection with its request to expedite a hearing on its motion to strike the Trustee's "Report" because First Bank viewed the disclosure issues as "threshold" that require a prompt hearing.  After the Trustee suggested he is a short time away from submitting a Plan of Reorganization for Eastern Livestock, the Court denied the request to expedite the hearing, but recognized that if the parties believe there are fundamental threshold issues to be addressed before consideration of a Plan, then the parties should present them to the Court.  Accordingly, as described more fully below, First Bank renews its threshold Objection to the Application to Employ Trustee Counsel and asks the Court to sustain the original Objection and reject the role of Trustee's Counsel as void ab initio.

The First Bank and Trust Company ("First Bank"), by counsel renews its Objection of the First Bank and Trust Company to Application to Employ Baker & Daniels LLP as Counsel to the Chapter 11 Trustee [Dkt. No. 181] filed January 10, 2011 and further states as follows:

2

1.      The bankruptcy of Eastern Livestock Co., LLC ("Eastern Livestock") is one of the largest in Indiana and has been reported in industry journals since its inception as having a significant adverse effect upon the fed-cattle industry as a whole.  This proceeding has two large United States banking institutions participating together as the major secured creditors: Fifth Third Bank ("Fifth Third") and Wells Fargo Bank ("Wells Fargo").  Despite the Trustee's and his Primary Counsel's, Faegre Baker & Daniels LLP, significant and ongoing representation of Wells Fargo, neither the Trustee nor his Primary Counsel have ever disclosed their relationships with Wells Fargo, a **$10 million participant** in Fifth Third's line of credit with Eastern Livestock.  The Trustee and his Primary Counsel, based on a limited review of the time records filed in this case, have been in close communication with Wells Fargo throughout this bankruptcy proceeding.  The Trustee's Primary Counsel also drafted and secured a conflict waiver from Wells Fargo.  Despite this tacit recognition of a conflict, the Trustee and his Primary Counsel have operated in the dark and have failed to meet the high standards of disclosure (and disinterestedness) in the Bankruptcy Code and this Court's Local Rules.  Creditors in this case have repeatedly – and for over a year – pointed out serious concerns relating to the lack of disclosure and at least the appearance of the lack of disinterestedness in this case.  Yet, the Trustee and his Primary Counsel chose to accept the risk of a lack of disclosure.  Unlike the conflicts in this case, the standards for disclosure and disinterestedness are no secret under Seventh Circuit law.  This court should remove the Trustee's Primary Counsel and order disgorgement of fees.

II.         A TRUSTEE AND HIS PRIMARY COUNSEL HAVE BROAD – AND
            CONTINUING – DISCLOSURE OBLIGATIONS

2.      The Rule 2014 disclosure obligation is a critical one:  "[T]he duty to disclose under Bankruptcy Rule 2014 is considered sacrosanct because the complete and candid

disclosure by an attorney seeking employment is indispensable to the court's discharge of its duty to . . . make an informed decision on whether the engagement is in the best interest of the estate." In re eToys, 331 B.R. 176, 189 (Bankr. D. Del 2005).  The professional – whether a Trustee or his Primary Counsel – must disclose all connections.  Neither the Trustee nor his Primary Counsel may pick and choose which connections to disclose and which to ignore as unimportant or trivial.  In re Jore Corp., 298 B.R. 703, 725 (Bankr. D. Mont. 2003).  Neither the Trustee nor his Primary Counsel may leave the court or other parties in interest to search the record for such relationships or otherwise to ferret them out.  In re B H & P, Inc., 949 F.2d 1300, 1317-18 (3d Cir. 1991).

3.     A professional's duty to disclose is broad and involves identification of even those relationships that may faintly color the independence required by the Code or that otherwise do not rise to the level of a conflict.  In re Granite Partners, L.P., 219 B.R. 22, 35 (S.D.N.Y. Bankr. 1998) ("The applicant and the professional must disclose all connections and not merely those that rise to the level of conflicts. . . . The professional must disclose all facts that bear on its disinterestedness . . . and cannot usurp the court's function by choosing, ipse dixit, which connections impact disinterestedness and which do not.  The existence of an arguable conflict must be disclosed if only to be explained away.  The professional's duty to disclose is self-policing.") (internal citations omitted); In re Crivello, 134 F.3d 831, 835 (7th Cir. 1998) (stating that the scope of a disinterested professional is "sufficiently broad to include any professional with an 'interest or relationship that would even faintly color the independence and impartial attitude required by the Code.'") (citation omitted).

4.     A professional has a continuing obligation to disclose.  In re Granite Partners, L.P., 219 B.R. at 35 ("[S]ection 327(a) implies a duty of continuing disclosure, and

requires professionals to reveal connections that arise after their retention. . . . Continuing

disclosure is necessary to preserve the integrity of the bankruptcy system by ensuring that the

trustee's professionals remain conflict free.").  The U.S. Department of Justice's <u>Chapter 11</u>

<u>Trustee Handbook</u> provides:

> "The determination of 'disinterestedness' does not end with the
> appointment.  Any new connections that the trustee or examiner, or
> any other professional employed by the trustee or examiner
> establishes or discovers after appointment should be brought to the
> attention of the court and the United States Trustee through the
> filing of a supplemental verified statement.  <u>See</u> <u>e.g.</u>, <u>In re Granite</u>
> <u>Partners, L.P.</u>, 219 B.R. 22, 35 (S.D.N.Y. 1998) (Rule 2014 and §
> 327 contain implied duty of continuing disclosure).  Failure to
> reveal connections that are later determined to have rendered the
> trustee or examiner not 'disinterested' could result in removal as
> well as the denial or disgorgement of compensation.  <u>See</u> 11
> U.S.C. §§ 327, 328; <u>United States v. Schilling</u> (<u>In re Big Rivers</u>
> <u>Elec. Corp.</u>), 355 F.3d 415 (6th Cir. 2004)."

<u>Chapter 11 Trustee Handbook</u>, Department of Justice (May 2004), p. 10.  Under the Local Rules

of this Court, a professional, as part of his continuing obligation, must "promptly" disclose

material information relating to the professional's employment:  "Promptly after discovering any

additional material information relating to such employment (such as additional potential or

actual conflicts of interest) the Applicant and Professional shall file and serve a supplemental

affidavit disclosing the additional information."  S.D. Ind. B-2014-1(a).

   5. The court may find a disclosure violation even where it would have

otherwise found that the professional was disinterested had there been timely and complete

disclosure of a connection.   <u>In re Granite Partners, L.P.</u>, 219 B.R. at 34-35. A disclosure

violation, even one that is merely negligent rather than willful, and even one that causes no harm,

may nonetheless result in sanctions that include disqualification and disallowance of fees.  <u>B H</u>

<u>& P</u>, 949 F.2d at 1318.  As the Seventh Circuit has plainly stated, '"[A] bankruptcy court should

punish a willful failure to disclose connections required by Fed. R. Bankr. P. 2014 as severely as an attempt to put forth a fraud upon the court.'" In re Crivello, 134 F.3d at 839.

6.     Where, as here, the Trustee and his Primary Counsel have failed to disclose timely and completely their connections to, and significant representation of, Wells Fargo, revocation of employment and denial of compensation is appropriate:  "[C]ounsel who fail to disclose timely and completely their connections proceed at their own risk because failure to disclose is sufficient grounds to revoke an employment order and deny compensation."  In re Crivello, 134 F.3d at 836.

III.          CONFLICTS EXISTED SINCE THE INCEPTION OF THIS PROCEEDING

7.     This proceeding originated as a state court receivership initiated by Fifth Third with its recommended receiver appointed ex parte on the same day it filed the state court action.  Before the appointment of James A. Knauer to serve as Trustee ("Trustee Knauer") in this Chapter 11 proceeding, the receiver/custodian reported that the known liabilities of Eastern Livestock far outweighed the identified assets, even well beyond what was expected when the receivership commenced.  Thus, this proceeding immediately brought national attention and scrutiny, particularly since the United States Department of Agriculture had promptly taken interest and filed its own separate action under the Packers & Stockyards Act, styled In re Eastern Livestock Co. LLC and Thomas P. Gibson, P & S No. D-11-0062, United States Department of Agriculture (Nov. 19, 2010).  With this intense and heightened scrutiny, the need for completely disinterested professionals acting as fiduciaries of the Estate is perhaps at its apex and public confidence in the bankruptcy system may hang in the balance.

8.    On December 23, 2010, the Office of the United States Trustee submitted a Notice of Appointment and Application for Order Approving Appointment of Trustee [Dkt. No. 98], naming James A. Knauer.    Exhibit B to that Application included the Affidavit of Disinterest ("Knauer Affidavit") [Dkt. No. 98-2], in which Mr. Knauer made the following statements about his and his firm's contacts with Fifth Third Bank: "I have never represented Fifth Third Bank, however the Firm presently has five open matters for Fifth Third Bank, three of which were opened during the preceding twelve months.  Four of those matters involve the preparation of loan documents for transactions between Fifth Third and its customers."  Knauer Affidavit, ¶ 4.  The Knauer Affidavit, however, made no reference to Wells Fargo.  Thus, the creditors were left to rely only upon the following statement that he has no connection to any party in interest:   "Neither the affiant, his law firm or any other member, associate or professional employee of his law firm has any connection with the Debtor, the creditors, any other party in interest . . . except as discussed herein."  Id. ¶ 3 (emphasis added).  Trustee Knauer entered his appearance on December 27, 2010 [Dkt. 101] and promptly applied to employ counsel.

9.    On December 30, 2010, Trustee Knauer filed an application to employ Baker & Daniels LLP as Trustee's counsel [Dkt. No. 113].  On January 10, 2011, First Bank objected to the Trustee's application due to questions as to whether Baker & Daniels was disinterested within the meaning of Bankruptcy Code § 327(a) because of the relationship between Fifth Third Bank and Baker & Daniels LLP [Dkt. No. 181].  As noted in that filing, the fundamental precept for the objection was the fact that Baker & Daniels turned down a request by First Bank to serve as its counsel due to a conflict with the firm's representation of Fifth Third.  The objection was rather straightforward:  if Baker & Daniels had a significant enough

conflict to reject the representation of First Bank, then how could that conflict free the firm from the high standard of "disinterestedness" under the bankruptcy rules?

IV.              FIRST BANK OBJECTED TO THE EMPLOYMENT OF BAKER & DANIELS, AND SPECIAL COUNSEL WAS RETAINED TO INVESTIGATE AND PROSECUTE "ANY AND ALL CLAIMS" AGAINST FIFTH THIRD

          10.    It is important to note that the original affidavit of disinterestedness filed by Baker & Daniels, LLP played down the firm's representation of Fifth Third Bank and made absolutely no mention of the fact that the firm deemed this representation as such an impediment to its loyalties that it could not accept the relatively small role of local counsel for First Bank. It was only because First Bank had the fortuitous benefit of knowing that Fifth Third had instigated the state court proceeding as a major secured creditor, and that Baker & Daniels had declined to represent First Bank due to Baker & Daniels' representation of Fifth Third, that the significance of the potential conflict was fully disclosed. On January 24, 2011, Baker & Daniels properly amended the firm's affidavit of disinterestedness to identify the conflicts of interest with Fifth Third and the alleged reasons it could still remain "disinterested." Amended Affidavit of Terry E. Hall in Support of Application to Employ Baker & Daniels, LLP as Counsel to Chapter 11 Trustee ("Amended Affidavit") [Dkt. No. 235]. The alleged reasons included the retention of Special Conflicts Counsel to deal with Fifth Third which, ostensibly, would never have occurred had First Bank not raised its Objection. This Amended Affidavit specifically states, "to the best of my knowledge, other than as disclosed herein, the Firm has no present connection with Debtor's Estate, **its creditors or any other party in interest**." Amended Aff. ¶ 4 (emphasis added).

         11.    As a further effort to assuage First Bank's concerns and induce it to withdraw the Objection, the Trustee filed an application to hire Hoover Hull LLP as special

counsel on January 18, 2011 [Dkt. No. 219].  In his application to employ Hoover Hull, upon which First Bank expressly relied, the Trustee stated, "Hoover Hull's primary role as special counsel to the Trustee will be to <u>investigate and prosecute claims and objections against Fifth Third</u> or claims asserted by Fifth Third in this case."  Application to Employ Hoover Hull LLP as Special Counsel to Chapter 11 Trustee, ¶ 3 [Dkt. No. 219] (emphasis added).  In addition, the Trustee explained that Hoover Hull would "serve as Trustee's special counsel with respect to the <u>investigation and prosecution of any and all claims or objections that may be asserted by the Trustee against Fifth Third, N.A.</u> . . . or with respect to any claim that may be asserted herein by Fifth Third."  <u>Id</u>. (introductory paragraph) (emphasis added).

12.    If, in fact, the representations relating to the complete and independent role of Hoover Hull were put into effect as described in the application, and if, in fact, the amended affidavit now fully disclosed all conflicts of interest, then First Bank would have reason to believe its concerns would be relieved.  Therefore, on January 27, 2011, First Bank withdrew its objection to the Trustee's application to employ Baker & Daniels **"[i]n reliance upon the amended affidavit and the retention of Hoover Hull as special counsel."**  The First Bank and Trust Company's Withdrawal of Objection to Employment of Baker & Daniels LLP as Counsel to Chapter 11 Trustee [Dkt. No. 241] (emphasis added).

V.    THE TWO CONDITIONS UPON WHICH FIRST BANK WITHDREW ITS OBJECTION (1) THE ACCURACY OF THE AMENDED AFFIDAVIT AND (2) THE ROLE OF HOOVER HULL HAVE NOT BEEN FULFILLED

13.    After more than one year into these proceedings, First Bank has found that its "reliance upon the amended affidavit and the retention of Hoover Hull as special counsel" were both based upon false premises.

A.     Baker & Daniels Has Never Disclosed that Wells Fargo is a Client
(Perhaps a Significant One of the New Faegre Baker Daniels firm)

14.     The Amended Affidavit failed to address the firm's significant and active representation of Wells Fargo who, as noted, is a joint participant, secured lender holding more than $10 million of the Eastern Livestock debt.  A review of the time and billing records submitted by Baker & Daniels LLP [Dkt. No. 820-1] (filed on November 11, 2011) that represent time billed through August 31, 2011, indicates that from the very inception of the proceedings, Baker & Daniels' lawyers were in close discussions with Wells Fargo and billed the Estate for preparing waiver letters to address conflicts of interest with Wells Fargo:

- 12/28/2010 Hall, Terry E. 2.00 $ 700.00 **Draft letter to obtain consent from Wells Fargo** regarding loan participant with Fifth Third **and coordinate conflict waiver**

- 12/28/2010 Foster, David A. 0.30 $ 123.00 Telephone call with J. Knauer regarding Wells Fargo's role in case

- 12/28/2010 Foster, David A. 1.60 $ 656.00 **Coordinate obtaining consents from Wells Fargo for B&D engagement**

- 12/28/2010 Foster, David A. 0.50 $ 205.00 **Draft consent letter**

- 12/29/2010 Foster, David A. 0.20 $ 82.00 **Review revised Wells Fargo consent letter**

- 12/29/2010 Foster, David A. 0.20 $ 82.00 **Correspondence with G. Heck regarding same**

These entries show that prior to amending the affidavit of disinterestedness to address the lack of adequate disclosure relating to the firm's representation of Fifth Third, and while engaged in active discussions with counsel for First Bank relating to amended disclosures to cure the defects of the original Affidavit, **Baker & Daniels was actively addressing potential conflicts of**

10

**interest with Wells Fargo relating to the firm's potential role as counsel to the Trustee**. The Amended Affidavit, however, does not disclose any relationship with Wells Fargo; and, therefore, led First Bank and the other creditors to believe "the Firm has no present connection with" the joint participant and $10 million secured creditor, Wells Fargo. Moreover, only with the benefit of hindsight, and subsequent to First Bank's discovery of the Trustee's active representation of Wells Fargo, has First Bank learned the significance of Wells Fargo to the Baker & Daniels law firm. Attorney David A. Foster, who <u>billed time to this Estate</u> for the preparation of "consent letters," lists on his attorney profile for Faegre Baker Daniels[1] that he is "Counsel to Wells Fargo in senior lending facility originations."

15.     At the same time, Baker & Daniels was working on the Amended Affidavit to respond to First Bank's Objection, Mr. Foster, who actively represented the $10 million joint participant, Wells Fargo, was actively working on the response to First Bank's objection:

- 1/11/2011 Foster, David A. Partner 3.30 $ 1402.50 Review and analyze First Bank objection (.8); research issues concerning relationship with Fifth Third and disinterestedness standard (2.5)

- 1/11/2011 Ponader, Wendy W. Of Counsel 2.5 $ 1037.50 Confer with J. Carr and D. Foster regarding First Bank & Trust objection (.4); review filings (.6); research regarding Section 327 issues (1.5)

- 1/12/2011 Foster, David A. Partner 3.40 $ 1445.00 Drafting response to objection of First Bank to B&D engagement

---

[1] Effective January 1, 2012, Baker & Daniels merged with Faegre & Benson to form the new entity "Faegre Baker Daniels." Thus, the citation to Mr. Foster's profile is from the new Faegre Baker Daniels firm. Importantly, however, Trustee's counsel failed to make any amended disclosure to address any new or additional conflicts for the new entity, <u>and</u> Mr. Foster was a partner in the Baker & Daniels legacy of the new entity.

- 1/13/2011 Foster, David A. Partner 1.0 $425.00 Finalize response to First Bank objection

- 1/14/2011 Ponader, Wendy W. Of Counsel .60 $ 249.00 Telephone call with T. Hall regarding First Bank issue(.2); telephone call with D. Donnellon regarding First Bank issue, "bottom line" issues (.4)

- 1/19/2011 Ponader, Wendy W. Of Counsel .20 $ 83.00 Telephone call with T. Hall regarding meeting with Donnellon January 20, 2011, other information

- 1/21/2011 Ponader, Wendy W. Of Counsel 1.40 $ 581.00 Confer with T. Hall regarding January 20 discussions with First Bank counsel on objection to engagement (.2); prepare e-mail to D. Donnellon regarding same (.2); prepared Amended Hall Affidavit (.8); prepare e-mail to D. Donnellon delivering revised Affidavit (.2)

- 1/24/2011 Ponader, Wendy W. Of Counsel 1.20 $ 498.00 Further e-mail discussion with D. Donnellon regarding First Bank issues on Amended Affidavit (.6); further amend Affidavit with limited additional changes (.3); final e-mail exchange with Donnellon regarding filing of Amended Affidavit, First Bank position (.3)

- 1/26/2011 Ponader, Wendy W. Of Counsel .30 $ 124.50 Telephone call with J. Carr regarding withdrawal of First Bank Objection, follow-up telephone call regarding timing of withdrawal

As noted, Baker & Daniels filed the firm's Amended Affidavit on January 24, 2011 [Dkt. No. 235], approximately two weeks after Mr. Foster, who identifies himself as counsel for Wells Fargo, obtained a Wells Fargo consent letter and drafted a brief opposing First Bank's objection to the lack of full disclosure relating to Fifth Third. Accordingly, there was more than ample opportunity to disclose fully the Wells Fargo conflict of interest and attempt to explain it away at the outset of the case, yet counsel ***deliberately chose to remain silent***.

16.     Both before and after First Bank withdrew its impediment to Baker & Daniels acting as a representative of the Trustee who could serve the important fiduciary role of

Primary Counsel, Baker & Daniels and the Trustee actively participated in discussions and

strategy sessions with the Trustee's and Primary Counsel's own client, Wells Fargo:

- 1/4/2011 Carr, James M. Partner 1.80 $ 990.00 Telephone calls representatives Fifth Third and Wells Fargo regarding conduct of case and funding of administrative expenses

- 1/11/2011 Carr, James M. 0.60 $ 330.00 Telephone calls J. Knauer regarding status and January 12 hearings and request by Wells Fargo for conference

- 1/11/2011 Carr, James M. 0.50 $ 275.00 Conference telephone call with Wells Fargo and counsel regarding forensic accounting and other issues

- 3/3/2011 Ponader, Wendy W. 2.60 $ 1,079.00 Conference call with R. LaTour. J. Bosco, DSI and W. Ponader regarding review of Budget, bank issues, questions (.7); prepare email to J. Carr and J. A. Knauer regarding providing Wells Fargo with copy of Budget (.2) . . . .

- 3/21/2011 Carr, James M. 0.50 $ 275.00 Review report from Wells Fargo forensic account and J. Knauer email regarding possible claim against auditors

- 4/18/2011 Hall, Terry E. 0.10 $ 37.00 Telephone call with Wells Fargo attorney regarding DSI

- 5/23/2011 Hall, Terry E. 0.3 $ 111.00 Telephone call with Wells Fargo counsel regarding forfeiture action

- 7/7/2011 Hall, Terry E. Partner 0.1 $ 37.00 Return telephone call to J. Wegner (Wells Fargo) regarding update on case

- 7/19/2011 Toner, Kevin M. 0.7 $ 308.00  Prepare for and participate in conference call with Wells Fargo, Trustee, DSI regarding status and expected developments in adversary proceedings

      17.    The ability to analyze Primary Counsel's time and billing records is an

essential key to identifying the conflicts (particularly where such conflicts were not disclosed in

the first instance) and the actions of the lawyers in dealing with both participant lenders, Fifth

Third and Wells Fargo.  Perhaps more importantly, it was only upon examining the time and billing records for Hoover Hull that First Bank and other creditors were able to discern that the Trustee had suddenly suspended all activity of Hoover Hull, before any real investigation began, in April, 2011, shortly after the Trustee obtained his Financing Order to fund the activities of himself and his professionals.  It is quite curious, therefore, that despite the magnitude of this Estate, the enormous professional fees incurred, and the intense government and industry scrutiny, no professional has submitted any detailed time and billing records since November 2011, and there are no records of billed time for whatever the Trustee and Primary Counsel have been doing for nearly one year.  Moreover, despite the merger of Baker & Daniels, LLP to form the new Faegre Baker Daniels, LLP at the beginning of 2012, there has been no amended affidavit of disinterestedness to address any conflicts arising from the old Faegre & Benson firm, and no time and billing records of Faegre Baker Daniels, LLP for the creditors to evaluate.[2]

           B.      Special Counsel's Role Was Limited Initially, Then Reinvigorated Only With the Consultation, Advice, and Participation of the Trustee's Conflicted Primary Counsel

        18.      The role of Hoover Hull has been anything but an independent "conflicts counsel" to relieve Primary Counsel from addressing issues with a client of the firm.  Specifically, on February 11, 2011, the Trustee filed his Motion to Approve Trustee's Borrowing and Use of Cash Collateral, Modify the Automatic Stay, Provide Adequate Protection Payments, Protect Confidential Information and Schedule Final Hearing ("Financing Motion") [Dkt. No. 271], which sought not only to establish Fifth Third Bank as a fully secured priority creditor, but

---

[2] On information and belief, Faegre & Benson actively represented, and the new firm continues to represent, the $10 million participant lender Wells Fargo.  But, the new firm has chosen not to make any amended disclosures so the creditors can evaluate the significance, if any, of this conflict.  Similarly, it would stand to reason that professionals at Baker & Daniels who sought conflicts of interest waiver letters from Fifth Third Bank and Wells Fargo would seek new such letters with the emergence of the new professional legal entity.

also to grant Fifth Third, extraordinary "super-priority administrative expense claim, and valid,

binding, enforceable and first perfected liens and security interests given and granted to Fifth

Third in and against the Chapter 5 Actions and shall be repayable from the first recoveries from

the Chapter 5 Actions."  Financing Motion, p. 5.  At that time, however, Special Counsel Hoover

Hull had billed only 15.9 hours over four days essentially doing nothing more than confirming

that Fifth Third had properly filled out its UCC financing statements.  Several objectors,

including First Bank, asked the Court to put the brakes on such a runaway train and to preserve,

at the very least, the ability to examine preferences and equitable subordination as to Fifth Third.

       19.    At the March 11, 2011 hearing on the Trustee's Financing Motion, this

Court asked the essential question that has repeatedly answered itself:

> THE COURT:  Which brings us to the fundamental question in
> this case that this motion I think poses.  Are we just – are we
> administering this case for the benefit of Fifth Third?
>
> MR. CARR: No.
>
> MR. ROGERS: Yes.
>
> MR. CARR:  No, we're not.  No, you're – you want me to answer
> or do you want Mr. Rogers to answer?
>
> THE COURT:  I want you to answer first.[3]

This exchange even prompted the Court to urge primary counsel to remove his "agreeable-with-

the-bank hat"[4] and to urge the parties to negotiate a resolution.  The parties then carefully crafted

an agreed order that would limit the allowance of the Fifth Third claim and preserve rights after a

full investigation of Fifth Third's conduct.  But, little did the constituent creditors know, what the

---

[3] March 11, 2011 Transcript of Proceedings, p. 57.

[4] March 11, 2011 Transcript of Proceedings, pp 58-59.

Court properly forecast was precisely what would continue throughout this proceeding.  Despite

nearly six million in professional fees, Primary Counsel and the Trustee have been

"administering this case for the benefit of Fifth Third" -- and its participant Wells Fargo --

through virtually every course and action.

20.     At the time of the March 11 hearing, the Trustee's constituent creditors

had every reason to believe that Special Counsel would be proceeding with a diligent and robust

investigation of Fifth Third.  Such was not the case.  Just 48 days after the hearing, Hoover Hull,

at the direction of the Trustee, ceased ALL ACTIVITY in the engagement.  Exhibit A to First

Interim Application of Hoover Hull LLP for Compensation and Reimbursement of Expenses

[Dkt. No. 819-1].  Quite simply, the Trustee and Hoover Hull had done nothing to investigate the

conduct of Fifth Third.  At the same time, Baker & Daniels has overstepped its role by

repeatedly engaging in conduct and taking legal positions on behalf of the Trustee that were

properly reserved for Hoover Hull.

21.     While the constituent creditors remained unaware the investigation had

been shut down, Baker & Daniels continued to assert positions on behalf of the Trustee,

essentially disregarding the reservations against Fifth Third in the Financing Order.  Meanwhile,

the Trustee had actively led the creditor constituents to believe a full investigation was ongoing.

a.     First, despite the lack of a determination that Fifth Third is fully secured

and highest priority, and despite the constituent creditors believing this issue was still

under investigation, on May 23, 2011, the Trustee filed the Trustee's Purchase Money

Claims Report, Motion to Transfer Funds and Notice of Release of Proceeds from

Account [Dkt. No. 501] ("Purchase Money Claims Report") asserting that Fifth Third's

security and priority position had been resolved:

> "After review of the timely filed 'Purchase Money Claims' and
> legal and factual research conducted regarding such claims, the
> Trustee has concluded that no person other than Fifth Third can
> assert a valid perfected lien in or to the Cattle Sales Proceeds . . . ."
> Purchase Money Claims Report, pp. 1-2.

> "Since entry of the Cattle Payments Order, the Trustee has further
> researched the facts relating to Debtor's business operations,
> applicable state law and the PSA and determined that the only
> Third Party that holds a valid lien in or claim against the Cattle
> Sales Proceeds is Fifth Third.

> Other than Fifth Third, no Third Party can assert a valid perfected
> lien in or to the Cattle Sales Proceeds."  Purchase Money Claims
> Report, p. 3.

> "The Cattle Sales Proceeds to be transferred to the Trustee's
> general operating account represent funds as to which no third
> party other than Fifth Third can assert a valid lien or claim."
> Purchase Money Claims Report, p. 6.

Of course, it goes without saying that if no party has priority over the lien of Fifth Third

(and hence Wells Fargo), then that lien must be senior and not subject to any

subordination.  But, Special Counsel had no role in the Purchase Money Claims Report

and, in fact, it had ceased all investigatory work to even assist the Trustee in reaching

such a conclusion.

      b.     Second, on August 3, 2011, the Trustee voluntarily appeared at the annual

meeting of the National Cattlemen's Beef Association and made a presentation to a large

number of creditor constituents in attendance.  Although Special Counsel was doing

absolutely nothing to investigate Fifth Third or to advise the Trustee with respect to Fifth

Third's claims, the Trustee included the following bullet point slide as part of his presentation:



Certainly, the creditor constituents in attendance had every reason to believe something was still active for the "sole job" of "independent counsel."  Moreover, since Special Counsel had done absolutely nothing in the 100 days prior to this presentation, *it could only have been the conflicted Baker & Daniels firm advising the Trustee* on the "validity of 5/3 lien" and conducting "negotiations with 5/3" which would, in turn, benefit Wells Fargo.

22.    In addition, as set forth in the Objection to First Interim Fee Application of Hoover Hull LLP [Dkt. No. 857] (incorporated by reference), Hoover Hull's investigation of Fifth Third had been limited and was ostensibly on at least a four-month hiatus, as no time was

billed between April 28, 2011 and August 31, 2011.  Hoover Hull's fee application, however, showed no entries that suggest any fact investigation of Fifth Third had been completed.  On December 7, 2011, First Bank filed Objections [Dkt. No. 870] (incorporated by reference) to the fee applications of Baker & Daniels, Hoover Hull, and the Trustee based primarily upon:  (a) the fact that First Bank relied upon the representations Hoover Hull would "serve as Trustee's special counsel with respect to the investigation and prosecution of any and all claims or objections that may be asserted by the Trustee against Fifth Third, N.A. . . . or with respect to any claim that may be asserted herein by Fifth Third"[5] and (b) despite these representations, the Trustee had directed Hoover Hull to discontinue its investigation, and made tremendous concessions to the benefit of Fifth Third, as early as April, 2011 before any substantive investigation had been conducted, much less completed.[6]

          23.    At the Omnibus hearing on December 14, 2011, the objections to the fee applications were on the agenda for hearing.[7]  Two important events occurred at the December Omnibus hearing that are noteworthy for this Renewal of First Bank's Objection.  First, lead counsel for the Trustee announced – quite contrary to the Trustee's representations in the application to employ Hoover Hull – that "[t]he only limitation that was imposed upon [his firm] is that [his firm] couldn't sue [Fifth Third]."  December 14, 2011, Transcript of Telephone

---

[5] Application to Employ Hoover Hull, p. 1.

[6] Objection to Professional's Applications for Compensation and Reimbursement of Expenses [Dkt. No. 870] ("Hoover Hull's investigation of Fifth Third had been limited and was ostensibly on at least a four-month hiatus, as no time was billed between April 28, 2011 and August 31, 2011[;]" "[t]he Trustee promised such an investigation [by Hoover Hull] to all his other constituents, then terminated it, before it began, in April, 2011, for his own, undisclosed reasons.")

[7] The Court entertained various discussions surrounding the role of FBD and Hoover Hull as well as a potential "concession" counsel for Fifth Third claimed the Trustee extracted from Fifth Third to move toward a Plan of Reorganization.  Transcript of Telephonic Hearings ("December 2011 Hearings") [Dkt. No. 931].  Notably, however, Hoover Hull had done virtually no investigation of Fifth Third at that time to evaluate the propriety or strength of such a "concession."  The Court granted *interim orders* approving the fee applications.

Hearings [Dkt. No. 931], p. 53.  This position has been and is a misapprehension not only of the

Seventh Circuit standards for "disinterestedness," but also of the Employment Application to

Retain Hoover Hull [Dkt. No. 219].  Second, this Court directed Hoover Hull to conduct a

complete investigation and to file a report regarding potential causes of action against Fifth

Third, in response to questions raised by creditors regarding potential claims and the

independence of the Trustee and his Primary Counsel.  December 14, 2011, Transcript of

Telephone Hearings [Dkt. No. 931].  Specifically, the Court asked Hoover Hull when the

investigation would be complete, to which Hoover Hull responded "we would try and complete

the investigation within the next 120 days."  Id. at p. 44.  Accordingly, the Court journalized a

minute entry [Dkt. No. 910] stating that the "Court orders Hoover Hull to submit a preliminary

report within 90 days as to equitable subordination and/or any other causes of action.  Any party

will be able to review documents on the Trustee's website."

        24.    Once again, this gave the creditor constituents the glimmer of hope that a

thorough and independent investigation, free from conflicts and true to the fiduciary role of

disinterested professionals would result.  To their credit, Hoover Hull, led by partner Sean White,

conducted many hours of depositions and examined thousands of documents.  But, when it came

time to produce an independent report of the investigation, no such report materialized.  Rather,

the Trustee submitted his own report essentially giving up, without explanation or detail, on

claims against Fifth Third (to the benefit of Fifth Third and its participant lender Wells Fargo)

and instead opting for "negotiation" to obtain concessions from the banks.[8]  Once again,

---

[8] Indeed, it is preposterous for a disinterested professional to file a public document reciting that he has no confidence in pursuing claims against the interest of Wells Fargo and Fifth Third, and at the same time suggesting he has some point of strength to extract a favorable settlement in negotiations.

however, such negotiations are not being conducted by any disinterested professionals, but rather

by the same counsel and the Trustee with inexorable conflicts of interest.

VI.        THE REPORT OF THE TRUSTEE IS ONLY THE LATEST EXAMPLE OF
           WORK THAT FAILS TO INSPIRE CONFIDENCE IN THE
           DISINTERESTEDNESS OF THE ESTATE'S PROFESSIONALS.

            25.      Shortly after the Trustee discontinued the investigation of Hoover Hull

and moved for super-priority claim status in the favor of Fifth Third (and thus Wells Fargo), the

Trustee announced his settlement negotiations with the two banks would yield favorable

concessions.  After the filing of the Report, prepared by conflicted counsel and submitted by a

conflicted Trustee, nothing had changed.  First Bank then moved to strike the Trustee's Report

for various reasons, not the least of which is that the Trustee's Report was never prepared or

completed by Hoover Hull.  Motion of The First Bank and Trust Company to Strike Trustee's

Report [Dkt. No. 1204] (incorporated fully by reference).  Hoover Hull made an effort, once

again, to simply placate the concerns by submitting its own Comments and Adoption by Hoover

Hull, LLP to Report of Trustee, James A. Knauer, Regarding Investigation and Analysis of

Potential Claims Against Fifth Third Bank ("Hoover Hull Comments") [Dkt. No. 1221], which

contained numerous hearsay opinions not supported by any evidence.  At least one thing is

patently observable from the Hoover Hull Comments: the firm did not act independently.

Hoover Hull admitted that it did not act independently (Hoover Hull Comments, ¶¶ 1-2), as

Hoover Hull was assisted and directed by Faegre Baker Daniels with respect to some of the most

important potential claims for the creditors of this Estate: equitable subordination, improvement

of position, and whether Fifth Third's liens (which would include Wells Fargo's interests) should

not attach because they were not good faith purchasers for value.

VII.     FIRST BANK AND OTHER CREDITORS HAVE LEARNED ONLY
         RECENTLY OF THE TRUSTEE'S AND HIS PRIMARY COUNSEL'S
         SIGNIFICANT RELATIONSHIPS WITH WELLS FARGO

26.     First Bank only recently learned of at least the appearance of impropriety which could explain the blurred lines of the Trustee's use of Special Counsel (as conflicts counsel) in a manner that departs from the January, 2011 efforts to placate First Bank and induce it into withdrawing its original Objection to the Employment of Baker & Daniels.  On June 26, 2012, First Bank learned that the Trustee and his firm had been actively representing the joint participant secured lender, Wells Fargo.  Reply Memorandum of The First Bank and Trust Company to Memorandum in Opposition to Motion for Expedited Hearing [Dkt. No. 1219] (incorporated fully by reference).  As stated therein, the Trustee's Affidavit of Disinterest [Dkt. No. 98-2], was incomplete when the Trustee stated that "[n]either the affiant, his law firm or any other member, associate or professional employee of his law firm has any connection with the Debtor, the creditors, any other party in interest . . . except as discussed herein."  (emphasis added).  The Trustee was actively representing Wells Fargo in another proceeding and he, and his counsel who also represented Wells Fargo, were in active consultation with representatives of Wells Fargo in this proceeding.

VIII.    THE DOCUMENT PRODUCTION BY WELLS FARGO BANK RAISES
         FURTHER RED FLAGS SUGGESTING AT LEAST THE APPEARANCE OF
         FAVORITISM TOWARD AN UNDISCLOSED CONFLICT

27.     As part of the Trustee's investigation conducted by Hoover Hull, Special Counsel requested documents from Wells Fargo.  Unbeknownst to the creditor constituents at the time, Special Counsel was in fact, sending a document subpoena to his client's client.  Wells Fargo's document production raises additional concerns that contribute to the appearance of

favoritism toward a $10 million participant and significant client of the Trustee and his Primary Counsel.

28. Special Counsel has represented that "all of the documents are available on the Trustee's shared website repository." Hoover Hull Comments, ¶ 9. The Wells Fargo documents posted on the Trustee's shared website repository, however, contain significant gaps in the production, including the following:

- The first folder "001-WF001" contains a load file for WF00001-6402 but contains only an image for WF004994; none of the other more than 6000 pages of documents are in the folder;

- There are no folders referencing or containing documents WF006403-006432;

- The folder marked "008- 8122-8483" is missing documents in the alphanumeric sequence WF008383-8392 and WF008438-8461; and

- The document identified as "009- WF20122203" is missing numbers WF010663-64.

29. In addition to the gaps in the production, many of the Wells Fargo documents contain inexplicable redactions with seemingly no legal basis. For example, the document labeled WF012639-WF012641 is an email string from December 2010 among counsel for the Trustee, Wells Fargo, and Fifth Third – the content of which has been redacted in its entirety even though there is ostensibly no privilege for such communication or other grounds to redact the entire substantive portion of this email string (even though the subject line of the email appears to bear directly on the conflict issues raised in this Renewed Objection). Likewise, the

document labeled WF012643 is a letter from December 2010 from Baker & Daniels to Senior

Counsel with Wells Fargo, the content of which has been redacted in its entirety.  Unless Baker

& Daniels was and is representing Wells Fargo in this proceeding and there is a basis to claim

attorney-client privilege (which raises a host of additional conflicts-related concerns), the basis

for such a redaction is unfounded.  These two documents are only a sampling of other documents

with no legal basis for complete redactions of the contents.

   30. As set forth above, Wells Fargo's production of documents in this

bankruptcy proceeding raise several red flags that suggest favoritism toward an undisclosed

conflict.

IX.   <u>CONCLUSION</u>

   31. Although the Trustee's Affidavit of Disinterest referenced his firm's

representation of Fifth Third, the Trustee's Affidavit of Disinterest made no mention of Wells

Fargo.  The Trustee has never disclosed the relationship with, connections with, or conflicts of

interest related to, Wells Fargo, which directly contravenes the governing standard of the Code

and Seventh Circuit caselaw.

   32. Both the Trustee and his Primary Counsel have lulled the creditors into an

improper sense of security by failing to disclose conflicts affecting disinterestedness and by

suggesting – without actual action – that the disclosed conflicts with Fifth Third would be

handled by an independent, conflict-free fiduciary.  These actions contravene the rules of

disinterestedness of Chapter 11 professionals, and after $6 million of professional fees, it is high

time the Court correct these fundamental problems with this Estate.

WHEREFORE, First Bank renews its Objection to the Application of Employment of Baker & Daniels, LLP (now known as Faegre, Baker, Daniels, LLP) and asks the Court to disallow this employment <u>ab initio</u> with a hearing on disgorgement of fees paid at a subsequent date after new counsel is properly retained.

Respectfully submitted,


/s/ Daniel J. Donnellon
Daniel J. Donnellon, pro hac vice
Stephen A. Weigand, pro hac vice
FARUKI IRELAND & COX P.L.L.
201 East Fifth Street, Suite 1420
Cincinnati, OH  45202
Telephone:  (513) 632-0300
Telecopier:  (513) 632-0319
Email:  ddonnellon@ficlaw.com
         sweigand@ficlaw.com

Attorneys for The First Bank and Trust Company

## CERTIFICATE OF SERVICE

I certify that on the 10th day of July, 2012, I electronically filed the foregoing Renewal of Objection of The First Bank and Trust Company to Application to Employ Baker & Daniels, LLP (n/k/a Faegre Baker Daniels LLP) as Counsel to Chapter 11 Trustee with the Clerk of Courts using the CM/ECF system, which will send notification of such filing to CM/ECF participants:

David L. Abt
davidabt@mwt.net

C.R. Bowles, Jr
crb@gdm.com

James A. Knauer
jak@kgrlaw.com

John Hunt Lovell
john@lovell-law.net

Mark A. Robinson
mrobinson@vhrlaw.com

Jeffrey R Erler
jeffe@bellnunnally.com

Edward M King
tking@fbtlaw.com

Randall D. LaTour
rdlatour@vorys.com

Bret S. Clement
bclement@acs-law.com

John R. Carr, III
jrciii@acs-law.com

James M. Carr
jim.carr@bakerd.com

Robert K. Stanley
robert.stanley@bakerd.com

Terry E. Hall
terry.hall@bakerd.com

Dustin R. DeNeal
dustin.deneal@bakerd.com

John Frederick Massouh
john.massouh@sprouselaw.com

John W. Ames
jwa@gdm.com

Robert Hughes Foree
robertforee@bellsouth.net

Kim Martin Lewis
kim.lewis@dinslaw.com

Jeremy S Rogers
Jeremy.Rogers@dinslaw.com

Ivana B. Shallcross
ibs@gdm.com

Deborah Caruso
decaruso@daleek.com

Meredith R. Thomas
mthomas@daleeke.com

William Robert Meyer, II
rmeyer@stites.com

Christie A. Moore
cm@gdm.com

Allen Morris
amorris@stites.com

James Bryan Johnston
bjtexas59@hotmail.com

James T. Young
james@rubin-levin.net

David L. LeBas
dlebas@namanhowell.com

Judy Hamilton Morse
judy.morse@crowedunlevy.com

John M. Thompson
john.thompson@crowedunlevy.com

Jessica E. Yates
jyates@swlaw.com

Matthew J. Ochs
matt.ochs@moyewhite.com

Laura Day Delcotto
ldelcotto@dlgfirm.com

Kelly Greene McConnell
lisahughes@givenspursley.com

T. Kent Barber
kbarber@dlgfirm.com

Ross A. Plourde
ross.plourde@mcafeetaft.com

Walter Scott Newbern
wsnewbern@msn.com

Kirk Crutcher
kcrutcher@mcs-law.com

Todd J. Johnston
tjohnston@mcjllp.com

Timothy T. Pridmore
tpridmore@mcjllp.com

Theodore A Konstantinopoulos
ndohbky@jbandr.com

Karen L. Lobring
lobring@msn.com

Sandra D. Freeburger
sfreeburger@dsf-atty.com

Lisa Kock Bryant
courtmail@fbhlaw.net

Elliott D. Levin
robin@rubin-levin.net
edl@trustesoultions.com

John M. Rogers
johnr@rubin-levin.net

Jeremy S. Rogers
Jeremy.rogers@dinslaw.com

John David Hoover
jdhoover@hovverhull.com

Sean T. White
swhite@hooverhull.com

Robert H. Foree
robertforee@bellsouth.net

Sarah Stites Fanzini
sfanzini@hopperblackwell.com

Michael W. McClain
mike@kentuckytrial.com

William E. Smith
wsmith@k-glaw.com

Susan K. Roberts
skr@stuartlaw.com

James Edwin McGhee
mcghee@derbycitylaw.com

Thomas C. Scherer
tscherer@binghammchale.com

David A. Laird
david.laird@moyewhite.com

Jerald I. Ancel
jancel@taftlaw.com

Jeffrey J. Graham
jgraham@taftlaw.com

Trevor L. Earl
tearl@rwsvlaw.com

Christopher E. Baker
cbaker@hklawfirm.com

David Alan Domina
dad@dominalaw.com

Kent A Britt
kabritt@vorys.com

Joshua N. Stine
jnstine@vorys.com

Jill Zengler Julian
Jill.Julian@usdoj.gov

Jeffrey L. Hunter
jeff.hunter@usdoj.gov

Amelia Martin Adams
aadams@gldfirm.com

Michael Wayne Oyler
moyler@rwsvlaw.com

Jason W. Cottrell
jwc@stuartlaw.com

Robert A. Bell
rabell@vorys.com

Andrea L. Wasson
andreawassonatty@gmail.com

Anthony G. Raluy
traluy@fbhlaw.net

Harmony A. Mappes
Harmony.mappes@faegrebd.com

James B. Lind
jblind@vorys.com

James E. Rossow, Jr.
jim@rubin-levin.net

Jeffrey R. Erler
jeffe@bellnunnally.com

Kelly Greene McConnell
lisahughes@givenspursley.com

Kevin M. Toner
Kevin.toner@faegrebd.com

Kim Martin Lewis
Kim.lewis@dinslaw.com

Melissa S. Giberson
msgiverson@vorys.com

John Huffaker
John.huffaker@sprouselaw.com

Shawna M. Eikenberry
Shawna.eikenberry@faegrebd.com

Wendy W. Ponader
Wendy.ponader@faegrebd.com

/s/ Daniel J. Donnellon
Daniel J. Donnellon