UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

IN RE:                                )
                                      )
EASTERN LIVESTOCK CO., LLC            )        CASE NO. 10-93904-BHL-11
                                      )
            Debtor.                   )


**TRUSTEE'S RESPONSE TO OBJECTIONS TO AND MOTIONS TO
STRIKE THE TRUSTEE'S REPORT**

**I.    Introduction**

On June 5, 2012, James A. Knauer (the "Trustee") filed his 27 page report (Dock. No. 1166) (the "Trustee's Report") summarizing his investigation and analysis of potential claims against Fifth Third Bank ("Fifth Third").    Thereafter, Superior Livestock Auction, Inc. ("Superior") and the First Bank and Trust Company ("First Bank") filed objections (the "Objections") to and motions to strike (the "Motions") the Trustee's Report.  Certain other parties (the "Joining Objectors") joined in the Objections and/or Motions[1].

The Trustee's Report advised the creditors of Eastern Livestock Co., LLC ("ELC" or "Debtor") and the Court 1) about the nature and extent of the factual investigation conducted by the Trustee and his Special Counsel, Hoover Hull LLP, concerning the secured lending relationship between Fifth Third and ELC, 2) how creditors may access the factual information gathered from that investigation, and 3) of the Trustee's assessment of the best way to proceed regarding potential claims that the ELC estate might assert against Fifth Third.  The Trustee's Report also confirmed the Trustee's intent to propose a chapter 11 plan for consideration by

---

[1] Attached as <u>Exhibit A</u> is a schedule of the various filings that comprise the Objections and Motions, including the filings by the Joining Objectors.

ELC's creditors and the Court that would, if confirmed, effect a settlement of estate claims against Fifth Third.

On July 23, 2012, the Trustee filed the "Trustee's Chapter 11 Plan of Liquidation" (Dock. No. 1255) (the "Plan") and the "Disclosure Statement for Trustee's Chapter 11 Plan of Liquidation" (Dock. No. 1256) (the "Disclosure Statement"). The filing of the Plan and Disclosure Statement (scheduled for hearing on September 7, 2012) moots the issues raised by the Objections and Motions. The filing of the Plan and Disclosure Statement obviated any legitimate need to proceed with expensive discovery against the Trustee and his Special Counsel recently undertaken by Superior and First Bank, eliminated the need for further briefing concerning the Trustee's Report and the Objections and Motions, and avoided the need for another hearing on the Objections and Motions. The Trustee's Report merely advised creditors and the Court regarding the Trustee's analysis of potential claims against Fifth Third and his decision to recommend a chapter 11 plan. Now that the Trustee has filed his proposed Plan, the only real issues are whether the Court should approve the Disclosure Statement and confirm the Plan.

The fact that, after the filing of the Plan and Disclosure Statement, counsel for Superior and First Bank (as well as at least some of the Joining Objectors) did not withdraw the Motions and Objections but instead want to continue to spend enormous sums of their clients' and the ELC estate's money to litigate about the Trustee's Report (as opposed to raising and resolving objections regarding the Plan and Disclosure Statement) speaks volumes about their litigation strategies. They are attempting to exhaust and misdirect the Trustee's efforts and resources so that he will not be able to effectively litigate with them to recover monies for the benefit of ELC's real creditors.

Under the Trustee's proposed Plan, Fifth Third would 1) allow its cash collateral to be used to fund a proportionate amount (projected to be approximately 2/3) of litigation and other administrative expenses incurred to recover monies for distribution to creditors, 2) allow creditors to receive all of the $4.7 million that was seized from Tommy Gibson's Your Community Bank account, and 3) agree to pay over to unsecured creditors as much as 20% of the net proceeds recovered from the collection or other disposition of Fifth Third's collateral.  In the Trustee's professional and business judgment, the Plan is likely to produce a better outcome for unsecured creditors than if the Trustee were to prosecute lengthy and expensive litigation against Fifth Third.

The Trustee's Report did not ask the Court to grant any relief.  It merely advised creditors and the Court of what was done to investigate and analyze potential claims against Fifth Third and, in general, the conclusions drawn by the Trustee that convinced the Trustee that his recommended Plan is sound and in the best interest of creditors.

Mindful that the Court may not confirm the Plan, the Trustee provided an analysis in the Trustee's Report regarding potential claims against Fifth Third that is not definitive.   The Trustee's Report tried to walk a fine line of providing enough analysis to satisfy and guide the Court and creditors regarding the Trustee's proposed course of action without unduly prejudicing the possibility that some estate claims might later need to be asserted against Fifth Third, if the Court does not confirm the Plan.

Meanwhile, Superior and First Bank have filed a series of papers denunciating the Trustee's Report, the Trustee, and the professionals employed by the Trustee.  The Objections and Motions assert ethical attacks, challenge the professionalism and integrity of the Trustee and his professionals, and assert that the Trustee's legal conclusions regarding potential estate claims

against Fifth Third will mislead creditors. The Objections and Motions insist that the Trustee show all of his cards regarding the strength or weakness of the estate's claims against Fifth Third even if doing so may prejudice the later assertion of those same claims.

The Objections and Motions assume the tone of righteous indignation by <u>alleged</u> unsecured creditors who assert that their potential recoveries and the potential recoveries of other unsecured creditors are being wrongfully prejudiced by acts and omissions of the Trustee and his professionals. There is so much apparent vitriole in the Objections and Motions that the Court and other parties may justifiably ask, "What is going on here?" and "Are the Trustee and his professionals somehow in cahoots with Fifth Third and are they shirking their duties to ELC's unsecured creditors?"

The short answer is that in the Trustee's professional judgment, the proposed settlement in the Plan promises the best and quickest recovery for creditors. Moreover, Superior, First Bank, and the Bluegrass Entities (who are Joining Objectors) are not valid unsecured creditors of the ELC estate and are not raising legitimate objections to the Trustee's Report to protect unsecured creditors. Instead, as litigants in ongoing litigation with the Trustee, these parties are staunchly resisting the efforts of the Trustee to recover millions of dollars of ELC assets for the benefit of unsecured creditors. The Objections and Motions attempt to misdirect the Trustee's attention and the resources of the ELC bankruptcy estate away from pursuit of claims that are adverse to Superior, First Bank and Bluegrass Stockyards. The positions of at least some, if not most, of the other Joining Objectors (while on a smaller scale) are similar to the litigation stances taken by Superior, First Bank, and Bluegrass Stockyards.

## II. Superior, First Bank, and Bluegrass Stockyards Are Not Unsecured Creditors

Superior, First Bank, and Bluegrass Stockyards refer to themselves as "creditors" of ELC. Their Objections and Motions purport to raise issues in support of the interests of unsecured

creditors of ELC.  The Trustee does not believe that they are valid unsecured creditors.

## Superior's Proof of Claim

On November 9, 2010, an Ohio state court appointed Elizabeth Lynch as the receiver for ELC.  Meanwhile, Superior and Tom Gibson were in the process of completing a purported assignment from ELC to Superior of ELC's interest in 500 contracts[2] (the "Buy Contracts") by which ELC contracted to purchase approximately 27,500 head of cattle (the "Livestock").  See the "Assignment of Livestock Contracts" a copy of which is attached hereto as Exhibit B (the "Assignment").[3]

Superior filed a proof of claim on May 2, 2011.  Superior's proof of claim (the "Superior POC") asserts a claim in the total amount of $13,621,110.24.  As the basis for its claim, Superior asserts that ELC, as the buyer of the Livestock from auction sellers using Superior's auction house, is obligated to Superior under the Buy Contracts for the full amount claimed in the Superior POC.  Superior claims that it stands in the shoes of the auction sellers to ELC of the Livestock, under the Buy Contacts.  However, in the Assignment, Superior "agrees to perform Assignor's [ELC's] purchase obligations and other obligations under the Livestock Contracts [the Buy Contracts]".  Because Superior agreed to perform all of ELC's obligations under the Buy Contracts and those obligations are the purported bases for the Superior POC, Superior cannot hold a valid claim and is not a creditor.

On May 21, 2012, the Trustee and one of his counsel met with Superior's counsel, Elliot Levin and John Rogers, at their request, to explain the draft analysis prepared by Development Specialists, Inc. "'DSI') and Trustee's counsel regarding a potential "improvement in position"

---

[2] A count reveals that there are actually 501 ELC "Buy Contracts" that are the subjects of the Assignment.
[3] A copy of the Assignment is attached as Exhibit B to the Complaint of Superior Livestock Auction, Inc. for Declaratory Relief filed on April 12, 2011 to indicate Adversary Proceeding Number 11-59088.

preference claim against Fifth Third (described below).  As discussed below, at that meeting and in response to a later request from Mr. Rogers the Trustee provided a detailed financial analysis that DSI (with assistance of the Trustee's counsel) prepared regarding the potential "improvement in position" preference claim.  The Trustee and his counsel also explained the logical "disconnect" regarding the Assignment and Superior's POC to Messrs. Rogers and Levin, counsel for Superior, and challenged them to demonstrate why the Trustee should consider Superior to be a creditor in this case.  Messrs. Rogers and Levin responded that Superior <u>may</u> eventually hold a claim against the ELC estate if, when and to the extent that the Trustee avoids the Assignment and makes a monetary recovery from Superior 1) with respect to all or some part of the millions of dollars collected by Superior from persons to whom ELC contracted to sell some of the Livestock or 2) with respect to Superior's seizure of Livestock that the Trustee contends belonged to ELC.  The Trustee and counsel explained to them that pursuant to Bankruptcy Code § 502(d) the Superior POC will be disallowed unless and until Superior disgorges the monies payable to ELC that Superior collected and the value of Livestock seized, all purportedly done by Superior pursuant to the Assignment.  Messrs. Levin and Rogers said that they would respond with a further justification of Superior's claim to "creditor" status, but they have not done so.

## First Bank's Proofs of Claim

First Bank never loaned funds to the Debtor.  First Bank made loans to Tom and Patsy Gibson (the "Gibsons") to finance the Gibsons' purchase of approximately 8,000 head of cattle (the "First Bank Cattle").  On November 7, 2011 First Bank filed its first proof of claim (Claim 252-1) (the "1st POC").  On January 9, 2012 First Bank filed its second proof of claim (Claim 253-2) (the "2nd POC" and collectively with the 1st POC, "the First Bank POCs").  In the 1st POC,

First Bank asserts a <u>secured</u> claim in the amount of $6,935,497.88 plus interest, costs, and attorneys' fees.  The 1st POC asserts "a security interest in any and all proceeds paid to or which remain owing to ELC to the extent any of the [First Bank Cattle] …were transferred" to ELC.  The 1st POC explains that such transfers may have occurred 1) by sales of the First Bank Cattle from the Gibsons to ELC, 2) sales to others in one or more transactions in which ELC was a "strawman", 3) sales by others without the knowledge of the Gibsons or outside the ordinary course of business, or 4) transfers recoverable by the Gibsons' bankruptcy trustee pursuant to Bankruptcy Code § 544-548.  The key is that in the 1st POC First Bank asserts a *secured claim* and targets funds that the Trustee is trying to recover for the benefit of ELC's unsecured creditors, asserting that such funds constitute the identifiable proceeds of First Bank's collateral, the First Bank Cattle.  Thus, First Bank is fighting against the Trustee and the ELC estate with respect to 1) specific funds that are the subjects of the interpleader adversary proceedings, 2) approximately $4.7 million that was in Tommy Gibson's bank account at Your Community Bank when the involuntary petition was filed and that was seized in a civil forfeiture action by the United States Attorney for the Eastern District of Kentucky, and 3) certain specific funds collected from the Trustee's sale of cattle and that the Trustee is holding in "escrow" pending the determination of adverse ownership and lien claims.  The 1st POC does not assert any unsecured claim against the ELC estate that could be impacted by the alleged misconduct by the Trustee and his professionals that First Bank asserts as the basis for its Objection and Motion.

In the 2nd POC, First Bank asserts a claim for $640,693.76.  The bases for this claim are First Bank's assertions that 1) the Gibsons sold certain of the First Bank Cattle to ELC outside the ordinary course of business, 2) First Bank's security interest remained in and against the First Bank Cattle in ELC's hands, and 3) that ELC resold the First Bank's Cattle to various buyers who

in turn paid ELC or the Trustee for the livestock and such payments constitute identifiable proceeds of First Bank's collateral.[4]  Therefore, the 2nd POC is filed "with respect to those funds held in escrow by the Trustee representing the proceeds of certain specific lots of cattle sold to Eastern Livestock, as described herein…in which First Bank held a purchase money security interest which interest First Bank contends survived the sale(s) and is perfected in the proceeds so held."  By this language, First Bank refers to the Court's orders authorizing the Trustee to complete sales of cattle and hold the proceeds in escrow pending a process by which various parties, including First Bank, may assert their liens or other rights in and against such proceeds. (See Dock. Nos. 233 and 234.)

Once again by the 2nd POC, First Bank asserts only a secured claim and lien rights in and to certain specific funds claimed by the Trustee on behalf of the ELC estate.  None of the alleged wrongful conduct that form the basis of First Bank's Objection or Motion nor the outcome of any litigation that the Trustee might or might not pursue against Fifth Third could impact First Bank's asserted secured claim against those specific funds in any manner.  Either First Bank is right about its alleged security interest in the escrowed funds and other specified monies that First Bank is fighting to recover (and will therefore receive the funds) or First Bank is wrong and the ELC estate will receive and benefit from the contested funds.

Neither winning nor losing by First Bank would give rise to any unsecured claim by First Bank against the general ELC estate.  Therefore, First Bank has no standing to assert its Objection and Motion filed with respect to the Trustee's Report.  See In re Marvin E. Moye, 2012 Bankr. LEXIS 3622 (Bankr. S.D. Tex. Aug 7, 2012); In re Runnels Broadcasting Sys., LLC, 2009 WL 4611447 at FN3 (Bankr. D.N.M. 2009).

---

[4] First Bank has sued Fifth Third in an Ohio State Court asserting that the same $640,693.76 was deposited by ELC into the Fifth Third Secured Collection Account and applied by Fifth Third to ELC's secured obligations.

**<u>Bluegrass Entities' Claims</u>**

Tommy Gibson, the CEO and principal owner of ELC, was also part owner of some of the Bluegrass Entities.  As ELC entered its final meltdown, Tommy Gibson and Willie Downs (one of ELC's branch managers) took a fistful of checks payable to ELC for ELC cattle, deposited the checks to Willie Downs' personal bank account and then wrote checks on Down's account for an estimated $702,000 to the Bluegrass Entities.  The Trustee is suing the Bluegrass Entities to have that money returned for distribution to ELC's creditors[5].

Once again pursuant to Bankruptcy Code § 502(d) the Bluegrass Entities do not hold allowable unsecured claims and will not hold such claims unless and until the Bluegrass Entities disgorge the funds received as a result of avoidable transfers from ELC.

Since neither Superior, First Bank, nor Bluegrass hold valid unsecured claims in and against the ELC estate, their Objections and Motions are nothing more than litigation tactics intended to distract the Trustee from pursuit of actions adverse to them and (in the case of First Bank) to contest First Bank's claims with respect to specified funds held by the Trustee or that the Trustee is trying to recover for the benefit of the ELC estate.  Superior, First Bank, and Bluegrass assert litigation positions that are directly adverse to the ELC estate and the interests and potential recoveries by ELC's real unsecured creditors.  Their effort to clothe themselves with the status of "creditors" is nothing more than the actions of wolves proceeding in sheeps' clothing.

**III.    The Objections and Motions are Not Supported by the Facts or Law**

---

[5] Mr. Downs preferentially paid another creditor as well, Laurel Livestock.  The Trustee is currently aware of an estimated $850,000 of diverted cattle payments through Willie Downs.

**A.     The Motions Provide No Basis to "Strike" the Trustee's Report.**

In its Motion, First Bank rehashes arguments about the participation of Faegre Baker Daniels, LLP ("FBD") in advising the Trustee regarding matters pertaining to Fifth Third and criticizes Hoover Hull's involvement or alleged lack of involvement in the investigation and analysis of potential claims against Fifth Third.   However, what First Bank's Motion clearly <u>does</u> <u>not</u> do is suggest any legal basis to "strike" the Trustee's Report.   Other than perhaps the quite novel assertion (discussed below) made by Superior that the Trustee's Report should be stricken as an unapproved solicitation of a chapter 11 plan that the Trustee had not proposed at the time he filed the Trustee's Report, the Trustee believes the only possible basis for a motion to "strike" is found in Bankruptcy Rule 7012(f) which is based on F.R.C.P. 12(f).   That rule provides:

> (f)     Motion to Strike.  The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.  The court may act:
>> (1) on its own; or
>> (2) on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading.

The obvious deficiencies with the Motions are that the Trustee's Report 1) is not a "pleading", 2) does not assert any defense, and 3) is not even alleged to contain "redundant, immaterial, impertinent, or scandalous matter."

As noted above in its Motion, Superior seeks to "strike" the Trustee's Report as an illegal chapter 11 plan solicitation.

Superior's Motion asserts that the purpose of the Trustee's Report is "…*merely to garnish support for a settlement and plan to be filed by the Trustee, without disclosure of any plan or terms, based on a misleading assessment of claims and alternatives*."   Superior argues that under 11 U.S.C. § 1125(b), the Trustee's Report is an improper solicitation of creditors to vote for a

plan (Motion ¶ 5). Yet, in the very next paragraph (Motion ¶6), Superior states "…*it is true that the Trustee's Report does not explicitly urge creditors to "vote" in favor of the Trustee's Plan…*"

After admitting that the Trustee's Report does not solicit votes in favor of any then proposed plan, the Motion goes on to criticize the Trustee's Report because it "…*includes no description of the settlement and plan being touted…*"

Thus in the same Motion, Superior claims that the Trustee's Report is an improper solicitation, admits that the report is not really a solicitation and immediately thereafter complains that the Trustee's Report fails to give any description of the unfiled plan that is the subject of alleged solicitation[6].

Superior's Motion is nothing more than another attack by Superior on the Trustee's Report because the Trustee's Report fails to come to conclusions that would best serve Superior's litigation strategy. The overwhelming weight of authority holds that the term "solicitation" as used in Bankruptcy Code § 1125(b) should be narrowly construed. A very thorough discussion of the boundaries of forbidden solicitation is set forth by <u>Century Glove, Inc. v. First American Bank of New York</u> which explained:

> Century Glove argues, and the bankruptcy court assumed, that only approved statements may be communicated to creditors. The statute, however, never limits the facts which a creditor may receive, but only the *time* when a creditor may be solicited. Congress was concerned not that creditors' votes were based on misinformation, but that they were based on no information at all. *See* H.R. 95-595, at pp. 225-25, 95th Cong. 2d Sess., 124 Congr. Rec. ---, *reprinted in*, 1978 U.S.C.C.A.A.N. 5963, 6185 (House Report). Rather than limiting the information available to a creditor, § 1125 seeks to guarantee a minimum amount of information to the creditor asked for its vote. *See* S.R. 95-989, at pp. 121, 95th Congr., 2d Sess., 124 Congr. Rec. ---, *reprinted in*,

---

[6] Presumably Superior would also have complained if the Trustee's Report had contained a detailed description of the then unfiled Plan, saying that the Trustee's Report should not have given any plan details as that is the role of a disclosure statement.

1978 U.S.C.C.A.A.N. 5787, 5907 ("A plan is necessarily predicated on knowledge of the assets and liabilities being dealt with and on factually supported expectations as to the future course of the business…") (Senate Report).  The provision sets a floor, not a ceiling.  Thus, we find that § 1125 does not on its face empower the bankruptcy court to require that all communications between creditors be approved by the Court.

As the district court pointed out, allowing a bankruptcy court to regulate communications between creditors conflicts with the language of the statute.  A creditor may receive information from sources other than the disclosure statement.  Section 1125 itself defines "typical investor" of a particular class in part, as one having "such ability to obtain such information from sources other than the disclosure required by this section…" 11 U.S.C. § 1125 (a)(2)(C).    In  enacting  the  bankruptcy  code,  Congress contemplated that the creditors would be in active negotiations with the debtor over the plan.  *See infra*, part V.  The necessity of "adequate information" was intended to help creditors in their negotiations.    *See In re Gulph Woods*, 83 B.R. 339 (Bankr. E.D.Pa.1988).    Allowing  the  bankruptcy  court  to  regulate communications between creditors under the guide of "adequate information"  undercuts  the  very  purpose  of  the  statutory requirement.

Lastly, Century Glove's reading of § 1125 creates procedural difficulties.    Century Glove provides this court no means to distinguish  predictably  between  mere  interpretations  of  the approved  information,  and  additional  information  requiring separate approvals.  Therefore, to be safe, the creditor must seek prior court approval for every communication with another creditor (or refrain from communication), whether soliciting a rejection or an acceptance.  Congress can hardly have intended such a result.  It would multiply hearings, hence expense and delay, at a time when efficiency is greatly needed.  We also note that, as expressed in the House report, Congress evidently contemplated a single hearing on the adequacy of the disclosure statement.  *See* House report, 1978 U.S.C.C.A.A.N. at 6186.

Century Glove, Inc. v. First Am. Bank of New York, 860 F.2d 94, 100-01 (3d Cir. 1988)

The Sixth and Ninth Circuits have made similar holdings:

The term solicitation as used in § 1125(b) has been narrowly interpreted to mean nothing short of a "specific request for an

> official vote". Id. at 101; In re Snyder, 51 B.R. 432, 437 (Bankr. D. Utah 1985). Most courts have reasoned that a broader construction of the term would curtail free and honest negotiations among creditors and, therefore, inhibit creditor participation in the debtor's reorganization. *Century Glove*, 860 F.2d at 100-01.

In re California Fid., Inc., 198 B.R. 567, 571-72 (B.A.P. 9th Cir. 1996).

> The terms "solicit" and "solicitation," as used in § 1125(b) of the Code, must be interpreted very narrowly to refer only to a specific request for an official vote either accepting or rejecting a plan of reorganization. The terms do not encompass discussions, exchanges of information, negotiations, or tentative arrangements that may be made by the various parties in interest in a bankruptcy case which may lead to the development of a disclosure statement or plan of reorganization, or information to be included therein. If these activities were prohibited by Section 1125(b), meaningful creditor participation in Chapter 11 cases would cease to exist. It follows that an unauthorized "solicitation" would include a specific request for an official vote for or against a plan of reorganization (a) that is made before dissemination to parties in interest of an approved disclosure statement, or (b) that is made after the dissemination of a disclosure statement, and which contains misrepresentations or deliberate falsehoods and misleading statements calculated to deceive parties entitled to vote, or (c) that refers to a plan of reorganization predicated upon arrangements that were arrived at by fraud or that were not adequately disclosed to the court and to parties in interest in the approved disclosure statement. *In re Snyder,* 51 B.R. 432, 437 (Bankr. D. Utah 1985);

Zentek GBV IV v. Vesper, 19 F. App'x 238, 247-48 (6th Cir. 2001)

Superior's "illegal solicitation" argument has no basis in law or fact and Superior's Motion therefore should be overruled.

**B.      The Trustee's Positions on "Good Faith Purchaser for Value" and "Improvement of Position" Are Sound**

In the midst of vague and general grumbling about the possible settlement of estate claims against Fifth Third (that the Trustee had not proposed as of the filing of the Trustee's Report), Superior asserts two specific criticisms of the Trustee's analysis of potential claims against Fifth Third. Superior says the Trustee is wrong regarding 1) a "good faith purchaser for

13

value" challenge to the attachment of Fifth Third's security interest, and 2) an "Improvement in Position Preference" analysis.  There is of course no reason for the Court to pre-decide the merits of Superior's Objection to the Trustee's analysis now (as opposed to in connection with the proposed Disclosure Statement and Plan).  Nonetheless, the positions set forth in the Trustee's Report on both issues are correct.

### (1)    The Good Faith Purchaser For Value Challenge

Superior rejects the Trustee's conclusion that he may not avoid Fifth Third's perfected security interest in certain cattle ("Unpaid for Cattle") under the circumstances that 1) ELC agreed with sellers to purchase the Unpaid for Cattle, 2) the sellers delivered the Unpaid for Cattle to ELC, 3) ELC in turn sold the Unpaid for Cattle to third party buyers, and 4) ELC then either a) deposited the sale proceeds into the Fifth Third collateral "Collection Account" and Fifth Third applied the sale proceeds to ELC's secured obligations to Fifth Third, b) the Trustee received payment of the sale proceeds from the third party buyers and is holding the proceeds in escrow, or c) the sale proceeds are now subjects of pending interpleader adversary proceedings. Superior contends that under U.C.C. § 2-403, the Trustee could avoid the "attachment" of Fifth Third's security interest to the Unpaid for Cattle or the proceeds described above because, Superior asserts, Fifth Third is not a "good faith purchaser for value" as to such Unpaid for Cattle.  (See Superior's Objection at paragraphs 32 – 40.)

Superior concedes the Trustee is correct in asserting that U.C.C. Article 9 (specifically U.C.C. § 9-203) and not Article 2 (U.C.C. § 2-403) governs the conditions under which a secured creditor's security interest *attaches* to goods (including a debtor's inventory and accounts receivable) and to the identifiable proceeds thereof.  For attachment of a security interest, U.C.C. § 9-203 requires the satisfaction of three conditions.  They are:  1) the secured creditor has given

14

value (the loan from Fifth Third to ELC), 2) the debtor (ELC) has authenticated (i.e. executed) a security agreement that provides a description of the collateral, and 3) the debtor (ELC) has "rights in the collateral or the power to transfer rights in the collateral to a secured party". Superior does not argue with the satisfaction of either of conditions "1)" or "2)" for attachment of Fifth Third's security interest. Instead, Superior focuses on condition "3)" and asserts that to satisfy that condition for attachment, Fifth Third must be a "good faith purchaser for value". In making this argument, Superior conflates and confuses 1) the issue of whether Fifth Third's security interest "attached" in and to the Unpaid for Cattle (and proceeds) (the "Good Faith Attachment Defense") with 2) the question of whether that attached security interest would have a higher priority and therefore defeat the reclamation claim of an unpaid seller of the Unpaid for Cattle, if such an unpaid seller properly pursued the rights and interests conferred under Article 2 of the U.C.C. (U.C.C. §2-702) to reclaim the Unpaid for Cattle (the "Unpaid Seller versus Secured Creditor Priority Issue").

Whether ELC held full (or "non-voidable") "title" to the Unpaid for Cattle is not material to the "attachment" of Fifth Third's security interest. *See First Nat'l Bank of Elkhart v. Smoker*, 286 N.E. 2d 203 (Ind. Ct. App. 1972). *Kunkel v. Sprague Nat'l. Bank* supports the attachment of Fifth Third's security interest to the Unpaid for Cattle and resulting proceeds, notwithstanding the failure of ELC to fully pay for such cattle and irrespective of any acts or omissions by Fifth Third. 128 F.3d 636, 641-643 (8th Cir. 1997). In the past there was significance to whether a floating secured creditor like Fifth Third could qualify as a "good faith purchaser for value" but *only* when the secured creditor was confronted with a conflicting, properly exercised, written reclamation claim asserted by an unpaid seller under U.C.C. § 2-702. Said another way, whether a secured creditor is a "good faith purchaser for value" is relevant only to the priority issue that

15

may arise if an unpaid seller properly asserts a conflicting reclamation claim; that issue is not relevant to whether the secured creditor's security interest attached to the collateral; what is referred to herein as the Unpaid Seller versus Secured Creditor Priority Issue.

A perfect example of the conflict between a reclaiming seller who arguably had properly asserted his reclamation claim and a floating lien creditor claiming "good faith purchaser for value" status is examined in *In the Matter of Samuels & Co., Inc.*, 526 F.2d 1238 (5th Cir. 1976). *Samuels* determined that where a floating lien secured creditor could demonstrate that it was a good faith purchaser for value, the secured creditor would defeat the reclamation claim of an unpaid seller. However, in the ELC case, very few unpaid sellers, (and not Superior), have properly asserted reclamation claims under U.C.C. § 2-072. In addition, as a result of BAPCPA, Bankruptcy Code § 546 (c)(1) may now provide that even a properly asserted reclamation claim is defeated by a perfected floating security interest without regard to whether the secured creditor satisfies the "good faith purchaser for value" standard.

Counsel for CPC (one of the Joining Objectors) is correct that previously, as part of his analysis of the Good Faith Attachment Defense, the Trustee and his counsel did not study the Kansas Supreme Court's 1984 decision in *Iola State Bank*. However, they had extensively studied the *Samuels* decision. *Iola State Bank* calls *Samuels* "The leading case of a battle between an unpaid seller and a third-party secured creditor." *Iola State Bank,* supra, at 181.

*Samuels* has much to teach us in connection with any ongoing struggle by unpaid sellers of the Unpaid for Cattle to establish winning claims against Fifth Third and to recover proceeds from the sale by ELC of the Unpaid Cattle. *Samuels* arose from the bankruptcy of Samuels & Co., Inc. ("Samuels"), a meatpacking firm that purchased cattle from farmers/sellers and then processed the cattle into meat. "Stowers" (like several other similarly situated unpaid sellers)

16

was a farmer/seller who made cash sales of cattle to Samuels in exchange for checks that bounced. C.I.T. financed Samuels' operations on a secured lending basis taking a floating Article 9 security interest in all of Samuels' inventory, including purchased cattle and proceeds. After the Samuels bankruptcy was commenced, C.I.T. attempted to recover, as its collateral, cattle that Stowers sold to Samuels and proceeds therefrom. Samuels had not paid Stowers and Stowers asserted his right to reclaim the cattle and proceeds, asserting that his reclamation claim primed C.I.T.'s security interest. The 5th Circuit initially found in favor of Stowers and against C.I.T. However, C.I.T. appealed to the United States Supreme Court (*Mahon v. Stowers,* 416 U.S. 100, 94 S.Ct. 1626 (1974)). After remand, the 5th Circuit reversed itself and found in favor of C.I.T., adopting what had been the dissenting opinion by Judge Godbold in the 5th Circuit's initial ruling. Judge Godbold framed the issue as follows:

> "This case raised one primary question: under the Uniform Commercial Code as adopted in Texas, is the interest of an unpaid cash seller [Stowers] in goods already delivered to a buyer [Samuels] superior or subordinate to the interest of a holder of a perfected security interest in those same goods [C.I.T.]?"

*Samuels,* supra, at 1241.

Before proceeding to meticulously analyze the U.C.C.'s provisions regarding both 1) attachment of C.I.T.'s security interest to the cattle (the "Good Faith Attachment Defense"), and 2) the relative priority of that attached security interest vis a vis Stowers' reclaiming seller rights (the "Unpaid Seller versus Secured Creditor Priority Issue"), Judge Godbold explained:

> "My brothers have not concealed that their orientation in the case before us is to somehow reach a result in favor of the sellers of the cattle, assumed by them to be 'little fellows,' and against a large corporate lender, because it seems the 'fair' thing to do. We do not sit as federal chancellors confecting ways to escape the state law of commercial transactions when that law produces a result not to our tastes…"

*Samuels*, supra, at 1242.

Judge Godbold then examined the facts and U.C.C. § 9-203 to determine whether C.I.T.'s security interest attached to the cattle.  He applied the same three conditions to the attachment test discussed above and when he came to "condition 3)" (the requirement that the debtor, Samuels, had rights in the cattle/collateral), the Judge held that Samuels had acquired sufficient rights in the cattle as a result of Stowers' delivery of the cattle to Samuels.  Because of such delivery, Samuels <u>could</u> under U.C.C. § 2-403 pass good title to the cattle to a good faith purchaser (either a third party buyer or an Article 9 secured creditor).  Judge Godbold cited as authority for this proposition regarding attachment and the irrelevance of whether the debtor/buyer, Samuels,  held good and full "title" to the cattle the Indiana Court of Appeals decision in *First National Bank of Elkhart City vs. Smoker,* 286 N.E. 2d 203 (Ind. Ct. App. 1972).  The <u>ability</u> (i.e. power) of a debtor (such as Samuels or ELC) to be able to transfer title to a buyer is sufficient to give the debtor "rights in the collateral" and therefore satisfy "condition 3)" for attachment of the security interest.  Judge Godbold explained:

> "Therefore, since a defaulting cash buyer *has the power* to transfer a security interest to a lien creditor, including an Article Nine secured party, the buyer's rights in the property, however marginal, must be sufficient to allow attachment of a lien.  And this is true even if, arguendo, I were to agree that the cash seller is granted reclamation rights under Article Two."

*Samuels,* supra, at 1243.

Judge Godbold then explained that separate and distinct from the issue of whether the security interest of C.I.T. attached to the cattle is the issue of whether such security interest primed or lost to the rights of Stowers as a reclaimer seller.  As to that priority issue, Judge Godbold looked to U.C.C. § 2-403 to determine whether C.I.T. satisfied the "good faith purchaser for value" standard.  His analysis of that issue may be instructive in our case, with

respect to any unpaid seller to ELC of the Unpaid for Cattle who has properly asserted a reclamation claim under U.C.C. § 2-702. The Trustee believes, however, there only a few unpaid sellers who have properly asserted such reclamation claims.

Informatively, Judge Godbold noted that to meet the "good faith purchaser for value" standard, C.I.T. need not show that it was unaware of the fact that Samuels had purchased the cattle in exchange for an "NSF" check. Judge Godbold explained:

> "However, even if evidence had established that C.I.T. knew of Samuels' nonpayment and of Stowers' claim, C.I.T.'s status as an Article Two good faith purchaser would be unaffected."

*Samuels,* supra, at 1243.

Another case that is very close to if not on "all fours" with ours on this issue is *In re M. Paolella & Sons*, *Inc*. 161 B.R. 107 (E.D. Pa 1993) ("Paolella & Sons"). In that case, the district court reversed a finding by the bankruptcy court that a floating lien secured creditor ("MNC") was not a "good faith purchaser for value" and therefore reversed the bankruptcy court's ruling that reclamation claims by unpaid sellers of tobacco products to the debtor wholesaler defeated MNC's floating security interest in the tobacco products as part of the debtor's inventory. The unpaid reclaiming sellers argued that MNC acted in bad faith by timing its lien enforcement action against the debtor so as to maximize the value of inventory to which MNC's lien attached (including inventory that MNC knew the debtor had not paid for). The district court explained:

> In determining the meaning of "good faith" under Pennsylvania law, we predict that the Supreme Court of Pennsylvania would follow the reasoning of the Pennsylvania Superior Court as set forth in *Creeger Brick v. Mid-State Bank,* 385 Pa. Super. 30, 560 A.2d 151 (1989). The *Creeger* court pointed out that the definition of "good faith" as defined in section 1201 of the UCC is similar to the definition of "good faith" under section 205 of the Restatement (Second) of Contracts. *Id.* 560; A.2d at 154. The *Creeger* court also stated that "the Supreme Court of Pennsylvania has refused to impose a duty of good faith

which would modify or defeat the legal rights of a creditor" and concluded that:

It seems reasonably clear from the decided cases that a lending institution does not violate a separate duty of good faith by adhering to its agreement with the borrower or by enforcing its legal and contractual rights as a creditor. The duty of good faith imposed upon contracting parties does not compel a lender to surrender rights which it has been given by statute or by the terms of its contact. Similarly, it cannot be said that a lender has violated a duty of good faith merely because it has negotiated terms of a loan which are favorable to itself… A lending institution also is not required to delay attempts to recover from a guarantor after the principal debtor has defaulted.

*Id.* Similarly, Judge Easterbrook reasoned in *Kham & Nate's Shoes:*

Firms that have negotiated contracts are entitled to enforce them to the letter, even to the great discomfort of their trading partners, without being mulcted for lack of "good faith." Although courts often refer to the obligation of good faith that exists in every contractual relation, this is not an invitation to the court to decide whether one party ought to have exercised privileges expressly reserved in the document. "Good faith" is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties. When the contract is silent, principles of good faith— such as the UCC's § 1-201(19) … fill the gap. They do not block use of terms that actually appear in the contract.

*Kham & Nate's Shoes,* 908 at 1357 (citations omitted). Thus, it is plain that under Pennsylvania law, a creditor that enforces a financing agreement in a manner consistent with the clear terms of the agreement and the expectations of the parties acts in "good faith."

In this case, the contract that must be examined to determine whether MNC acted in "good faith" is the financing agreement between MNC and the debtor. The Bankruptcy Judge found that MNC's overall plan, *i.e.*, to gather information without alerting the other creditors of its future plan to cease funding the debtor when the warehouse was full, constituted inequitable conduct that

deprived MNC of its status as a "good faith purchaser" under
section 2702(b). Notably, the Bankruptcy Judge did not find that
any of these actions were outside the scope of the financing
agreement. It is clear from the Bankruptcy Judge's exhaustive
ninety-three page opinion that MNC did not overstep its rights
under the financing agreement. To defeat MNC's security interest,
the tobacco company plaintiffs must show that MNC violated the
subjective "honesty in fact" standard of section 1201. The
companies have failed to offer such evidence.

*Paolella & Sons*, 161 B.R. at 19-20.

The point in quoting from the *Samuels* opinion at 1243 and citing *Paolella & Sons* is that
the Trustee analyzed a potential "Good Faith Attachment Defense" as to Fifth Third's security
interest (and concluded that the defense/attack would be problematic at best and probably
unsuccessful) even *assuming* that Fifth Third could not meet the "good faith purchaser for value"
test of U.C.C. § 2-403. Given the explications of that test by *Samuels* and *Paolella & Sons* as
applied to the facts uncovered by the factual investigation by Special Counsel, it is far from
certain that Fifth Third would fail the "good faith" test. Thus, there is good reason for the
Trustee to conclude that there is a second level of deficiency to the possible assertion of a Good
Faith Attachment Defense, even if Superior were somehow correct that "good faith" is a
condition to attachment.

Judge Godbold in *Samuels* next analyzed the relative priority rights of 1) Stowers as a
reclaiming seller under U.C.C. §§ 2-507 and 2-702 and 2) C.I.T. as a "good faith purchaser for
value" under U.C.C. § 2-403. This can be referred to as the "Unpaid Seller versus Secured
Creditor Priority" issue. Judge Godbold found in favor of C.I.T. on the basis of each of the
following: 1) Stowers did not send a written demand for reclamation within 10 days of
delivering the cattle to Samuels as required by U.C.C. § 2-702, 2) Stowers' target was proceeds
of the processed cattle (meat) not the cattle, and 3) C.I.T., as a good faith purchaser of the cattle,

held priority over Stowers' reclamation claims.  Therefore, C.I.T.'s lien rights beat whatever Stowers' reclaiming seller rights might be.  *Samuels,* supra, 1244-1245.

Finally, Judge Godbold looked at the relative rights of 1) Stowers, with respect to his reservation of title in the cattle until he was paid, versus 2) the Samuels' bankruptcy trustee's strong arm powers as a hypothetical execution lien creditor (then under the Bankruptcy Act § 70 now under Bankruptcy Code § 544).  The Judge concluded that if C.I.T. were not in the picture, the bankruptcy trustee would defeat Stowers' reserved lien.  *Samuel*s, supra, at 1248.

Similarly the Eighth Circuit in *Kunkel v. Sprague Nat. Bank,* 128 F.3d 636, 641-644 (8th Cir. 1997) ("*Kunkel*") held that where an unpaid cash seller of cattle delivered cattle to a debtor who resold the cattle (like the Unpaid for Cattle), the debtor had sufficient "rights in the collateral" for an Article 9 security interest to attach under U.C.C. § 9-203, irrespective of the "good faith purchaser for value" status of the secured creditor.  *Kunkel* explains that if a secured creditor does meet the "good faith purchaser for value" test, then its lien rights in the cattle/collateral are 1) greater than the rights of the debtor and 2) can defeat a reclaiming seller (once again addressing the "Unpaid Seller versus Secured Creditor Priority Issue" described above).  See *Kunkel,* supra at 643.  *Kunkel* notes that *Iola State Bank* had cited *Samuels* with approval on the issue of whether a defaulting buyer had sufficient "rights in the collateral" to allow for attachment of a security interest.  See *Kunkel,* supra at 643.

*Iola State Bank* was a priority fight between unpaid sellers of goods (grain) and the bank claiming a security interest.  It appears to turn on the priority issue of the competing interests (the "Unpaid Seller versus Secured Creditor Priority Issue").  Because of the bank's wrongful actions, the bank in *Iola State Bank* did not qualify as a "good faith purchaser of value" and it lost that priority fight.  The lesson is:  *maybe* unpaid reclaiming sellers of *some* of the Unpaid for Cattle

have superior reclamation rights to and/or a direct claim against Fifth Third, based upon the particular facts related to the sale of certain of the Unpaid for Cattle and Fifth Third's acts or omissions in connection therewith.  Still, *Iola State Bank* does not suggest any general ability of the Trustee to avoid the attachment of Fifth Third's security interest in Unpaid for Cattle based upon an alleged lack by Fifth Third of "good faith purchaser for value" status.

In its Supplemental Objection, Superior asserts, "Although counsel for Superior had provided the Trustee with a <u>detailed memorandum of law</u> on the issue, the [Trustee's] Report simply concludes, 'This theory is not actionable,' without discussion of the statute, relying on general statements of law from two cases that are not on point…." <u>See</u> *Supplemental Objection, 32.*  Superior's Counsel*, Mr. Rogers, sent the "detailed memorandum of law" referred to above to the Trustee's Special Counsel on March 14, 2012.  The detailed memorandum of law (like all of the Objections) fails to cite or refer to *Samuels, Paolella & Sons,  Kunkel v. Sprague*, or *First National Bank of Elkhart v. Smoker* (Mr. Rogers' "detailed memorandum of law" and the Superior Supplemental Objection also fail to mention the *Iola State Bank* case).   So the most important question is not, "Why did the Trustee miss the decision of the Kansas Supreme Court in *Iola State Bank*?"  It is, "Why would Superior and CPC Livestock fail to cite any of the leading cases on this issue (most of which would have been found by shepardizing *Iola State Bank*)?"   One likely answer to that second question is that Superior and the Joining Objectors do not truly want to assess the good and bad aspects of potential claims against Fifth Third, but instead want to either force the Trustee to assert such claims (whether they are meritorious or not) and thereby exhaust scarce funds available to support litigation against them <u>or</u> blacken the Trustee for failing to assert such claims.

### **(2)  The Improvement in Position Preference Analysis**

The Superior criticism of the Trustee's analysis of a possible "improvement in position" preference claim against Fifth Third is misguided with respect to both the material facts and the law.  The Superior criticism is additional strong evidence that Superior wants to misdirect the attention (and resources) of the Trustee, the Court, and the true creditors away from the massive pre-bankruptcy diversion by Superior and others of ELC's cattle, cattle sale proceeds, and receivables (in collusion with Tommy Gibson) and foist the assertion of problematic claims against Fifth Third onto the estate which has virtually no unencumbered funds to finance such litigation.

Superior's criticism is disengenuous and plays fast and loose with the Court.  Superior asserts that the Trustee's analysis of a possible "improvement in position" preference claim in the Trustee's Report lacks detailed financial analysis.  However, before he filed the Trustee's Report, the Trustee and his counsel provided detailed financial analysis of the "improvement in position" claim to counsel for Superior (along with back-up calculations). They also met with Superior's counsel, Messrs. Rogers and Levin, to explain to them "face to face" that analysis.

Superior asserts that the Trustee and his professionals are guilty of making "speculative and improper adjustments and assumptions."  (¶ 16).  However, there is nothing speculative about the fact that Superior (and several other parties) acting in concert with Tom Gibson (who Superior characterizes as one of the "felons who diverted inventory and funds…") diverted away from the ELC estate more than $14 million of ELC cattle, cattle sale proceeds, and receivables. Superior accomplished its part of this massive diversion by causing Gibson to execute the Assignment (See p. 3 above) no earlier than just before DSI was appointed as receiver for ELC. These diversions caused the true value of Fifth Third's inventory and receivables collateral to be

decimated and steeply reduced from the nominal value shown on ELC's books as of December 6, 2010.

Certainly in deciding whether Fifth Third's inventory and receivables collateral (the "Collateral") position was improved during the 90 days prior to bankruptcy, the Trustee needed to consider not only 1) the potential additions to Fifth Third's Collateral position that occurred because ELC made additional sales of cattle during the 90-day preference period and, thereby, increased the nominal "book" value of ELC's receivables, but also 2) the massive subtractions from the realizable value of Fifth Third's Collateral that occurred because Gibson, acting in concert with Superior, Bluegrass, Messrs. Seals and Downs, and others ("Superior et al") diverted millions of dollars of cattle, cattle sales proceeds, and  receivables during the final weeks before the December 6, 2010 bankruptcy filing.

The proposed Disclosure Statement filed on July 23, 2012 (Dock. 1256) at pages 55 – 74, includes a legal and factual analysis of potential preference claims against Fifth Third that might be asserted under Bankruptcy Code § 547 and 553.  That analysis is more expansive and detailed than the analysis in the Trustee's Report.  That expanded analysis of a potential "improvement in position" preference claim under Bankruptcy Code § 547 (c)(5) is set forth on pages 64 – 66 of the Disclosure Statement and in Exhibit 6 attached to the Disclosure Statement  and will be referred to as the Trustee's "June 2, 2012 Shortfall Analysis".  Before he filed the Trustee's Report, the Trustee provided a copy of the June 2, 2012 Shortfall Analysis to Mr. Rogers, Superior's counsel.  The Trustee incorporates and further explains that Disclosure Statement analysis here.  For purposes of this discussion, the defined terms utilized in the Disclosure Statement analysis are used here.

The Trustee has consistently acknowledged that performing an "improvement in position" preference analysis is difficult and an inexact science at best.  Counsel for the Trustee has likewise attempted to read virtually every reported case regarding application of the § 547(c)(5) improvement in position test.  There are not many such cases and each focuses on a particular fact pattern that is not helpful to the analysis in this case.  None of the cases reviewed by the Trustee's counsel involved a substantial diversion of the debtor's inventory and receivables between the "Start Date" and "End Date" of the kind that occurred in this case.

Application of the analysis is particularly difficult because the Bankruptcy Code and case law do not provide any clear blueprint or instructions as to what assumptions should be made when projecting back to calculate the dollar value that would likely have been realized from a hypothetical liquidation of a secured creditor's (Fifth Third's) inventory and accounts receivable collateral on a "Start Date" 90 days prior to a bankruptcy.  Presumably (but again without explicit directions to do so in the Bankruptcy Code) the Trustee should look at the "real life" actual "shortfall" that will likely result from the liquidation of Fifth Third's Collateral as the Collateral existed on the petition date, (December 6, 2010), which is referred to as the "End Date".  To make that actual "End Date" calculation, the Trustee and his professionals have the benefit of more than nineteen months of experience in attempting to collect Fifth Third's Collateral.

What the cases do instruct is that the Trustee is to project back to calculate a hypothetical Start Date dollar "shortfall" between 1) the amount of the debt owed by ELC to Fifth Third minus 2) the realizable value of the Collateral.  The Trustee must then do a similar calculation of the dollar "shortfall" between 1) the amount of the debt minus 2) the realizable value of the Collateral on the End Date.  If and to the extent the shortfall on the End Date is smaller than the

shortfall on the Start Date, then the Trustee <u>may</u> have a valid "improvement in position" preference claim.

The June 2, 2012 Shortfall Analysis tried to calculate the 1) Start Date Shortfall and 2) the End Date Shortfall, based in part upon assumptions that the Trustee's counsel advised DSI to make. DSI was instructed that in calculating the Start Date Shortfall, DSI should assume a hypothetical bankruptcy filing by ELC on September 7, 2010 and then calculate the likely dollar shortfall that would have resulted. Whether DSI assumed a bankruptcy on the September 7 Start Date or just a commercially reasonable liquidation of the Collateral beginning on that date is irrelevant. In either case the analysis required the backward calculation of the amount that would have been realized from the Collateral without importing into the past later events that had not occurred as of the Start Date.

Based upon that assumption, DSI calculated a Total Debt [7] on the Start Date of $54,381,000. Banking records indicate that $12,299,000 of checks payable to ELC by cattle sellers were received at ELC's offices on September 7.

As of that Start Date, there would have been on ELC's books an additional $32,578,000 of "valid" (non-bogus/kite generated) accounts receivables owing to ELC from purchases of cattle by third party unaffiliated buyers. The June 2, 2012 Shortfall Analysis assumed that a bankruptcy trustee (or Fifth Third) could have collected approximately 85% of those "valid" receivables (or $27,691,000). The June 2, 2012 Shortfall Analysis further assumed that a bankruptcy trustee would have expended about $1,076,000 (3% of the realizable "valid" receivable amount) to collect those "valid" receivables. DSI estimated inventory on ELC's books as of the Start Date having a book value of $10,460,000 and realizable value of $4,100,000. Based upon these amounts, the "Shortfall" as of the Start Date is $11,277,000.00.

---

[7] See Disclosure Statement at page 60 for definition of "Total Debt" as Revolver Debt plus Kite Debt.

Correspondingly, the June 2, 2012 Shortfall Analysis showed that as of the End Date (December 6, 2010) 1) ELC's Total Debt to Fifth Third was $35,834,000, 2) the realizable value of Fifth Third's Collateral was $27,288,000 and 3) the estimated cost to collect and realize the projected value of the Collateral was $6,000,000.

Based upon those valuations and estimates, the "Shortfall" as of the End Date is $14,093,000.  Since the indicated Shortfall on the End Date is substantially larger than the Shortfall projected on the Start Date, no recoverable preference is indicated.

Set forth below is a chart that extracts certain dollar amounts from the June 2, 2012 Shortfall Analysis to provide a somewhat clearer "shortfall" comparison.

| Improvement in Position Preference Analysis (in thousands) | | | | |
|---|---|---|---|---|
| | Sept. 7, 2010 "Start Date" | Notes | Dec. 6, 2010 "End Date" | Notes |
| Revolver Debt | 32,431 | | 32,718 | |
| Kite Debt | 21,950 | | 2,663 | ← A |
| **Total Debt** | **54,381** | | **35,834** | |
| | | | | |
| Value of Valid Accounts Receivable | 39,990 | ← B | 26,536 | ← C |
| Value of Inventory | 4,190 | | 752 | |
| **Total Value of Collateral** | **44,180** | | **27,288** | |
| | | | | |
| Collateral Collection Costs | -1,076 | | -6,000 | |
| | | | | |
| **Shortfall** | **-11,277** | | **-14,093** | |

NOTE A:  Represents (1) the amount of Kite Debt as of the freeze by Fifth Third of ELC's operating account less (2) the application by Fifth Third of $17,304 of receipts to the pay down of the Kite Debt

NOTE B: Includes (1) $12,299 in checks made by cattle buyers to ELC received by ELC on the Start Date and (2) 85% of the book value of ELC's other "valid" accounts receivable as of the Start Date

NOTE C: Represents the ELC "book" value of "valid" receivables less discounts due to actions taken by Superior and others to divert cattle purchased by ELC and proceeds from ELC's sale of cattle

Superior argues with the discount made to ELC's End Date "book" receivables in arriving at a projected realizable value for the End Date receivables. However, that discount is directly attributable to the fact that, during the few weeks between the ELC shutdown and the End Date, Superior and other parties working in collusion with Tommy Gibson diverted over $14 million[8] of ELC cattle, cattle sales proceeds, and receivables owing to ELC from cattle sales.

In an effort to fabricate a seemingly plausible argument, Superior asserts that the Trustee used two different standards of valuation of the Collateral in his analysis; "going concern value" on the Start Date (September 7, 2010) and "liquidation value" on the End Date (December 6, 2010). The Trustee did no such thing. The Trustee's professionals projected back to the Start Date, September 7, 2010, and tried to recreate what would have likely happened if ELC were liquidated beginning on that date. As to the End Date, December 6, 2010, they tried to assess how much will ultimately be realized from the Bank's Collateral as a result of 1) the Trustee's efforts to date and 2) litigation moving forward.

In both instances (the Trustee's estimates of "Start Date" recoveries and "End Date" recoveries), the Trustee used liquidation values.

The Seventh Circuit in *Ebbler Furniture and Appliances v. Aton Banking & Trust* stressed that for a § 547(c)(5) analysis, "we are to determine value on a case-by-case basis taking

_____

[8] Superior was responsible for over $8.1 million of those diversions.

into account the facts of each case…". 804 F.2d 87, 90 (7th Cir. 1986) (quoting *Matter of Lackon Bros., Inc.*, 752 F.2d 1529, 1532 (11th Cir. 1985)).  The Trustee's analysis fairly reflects the facts uncovered to date with respect to both additions to Fifth Third's Collateral package during the preference period and subtractions that occurred based upon the diversions by Superior, et al.  It would be illogical to count against Fifth Third as "improved" receivables the face "book" amount of Collateral that Superior et al. diverted to themselves and that can only be recovered, if at all, through strenuous, lengthy and expensive litigation by the Trustee. Would it really make sense to assert that Fifth Third's position was improved by amounts that Superior et al. diverted away from Fifth Third and is strenuously resisting disgorgement to the Trustee?  Would it be equitable to force Fifth Third to "disgorge", as preferences, amounts that are still in the hands of Superior et al?  The June 2, 2012 Shortfall Analysis projected recoveries from ELC's End Date receivables totaling $26,536,000.  If the actual dollar amount of recoveries turns out to be smaller than projected, then the lack of "improvement" in Fifth Third's position will grow, so that Fifth Third's shortfall on the End Date will also grow and become even relatively larger than the projected Start Date shortfall, as projected by the Trustee.  In the almost 19 months since the End Date, the Trustee has been able to recover only about $11.5 million of those End Date receivables, which is more than $14 million short of the amount projected in the June 2, 2012 Shortfall Analysis.

## IV.    The Analysis in the Trustee's Report Regarding Equitable Subordination Is Correct and Supported by Very Recent 7th Circuit Precedent

Superior questions the Trustee's characterization of the estate's potential action to seek equitable subordination of Fifth Third's secured and unsecured claims as merely "colorable". Superior asserts that the Trustee's analysis is flawed because 1) efforts to obtain equitable subordination are fact sensitive; 2) no facts are discussed in the Report; 3) only preliminary

discovery has been completed thus far; and 4) the known facts are analogous to cases in which creditor claims have been subordinated (Superior cites *American Cigar Co., et al v. MNC Commercial Corp.* (*In re Paolella & Sons, Inc.*), Bankr. No. 86-00495F, Adversary Nos. 87-1007F, 88-0232F) 1991 Bankr. Lexis 1181 (Bankr. E.D. Pa. April 15, 1991)). *Supp. Objection* pp. 12-13.

Superior's criticism is wrong. The analysis in the Trustee's Report is correct and is further supported by a decision that the Seventh Circuit handed down last week. *In re: Sentinel Management Group, Inc.* Nos. 10-3787, 10-3990 and 11-1123, 2012 WL 3217614 (7th Cir. Aug. 9, 2012) (a copy of which is attached hereto as <u>Exhibit C</u>). In *Sentinel*, the Seventh Circuit held that just because a secured lender is or should be suspicious of a debtor's wrongful activity, (in our case ELC's check kiting/in Sentinel co-mingling of client funds that were required to be segregated with the debtor's funds pledged to the lender), and the lender negligently ignores such activity, those facts will not support a finding that the lender's conduct was sufficiently egregious to impose equitable subordination. *Id*. at 21. Likewise, *Sentinel* reaffirms that a lender's lack of care or incompetence (such as failing to discover a check-kiting operation, phony receivables or inventory) and its undue delay in taking enforcement action, does not rise to the level of the egregious misconduct required for equitable subordination.

*Paolella & Sons*, the case that Superior contends is analogous to the facts in this case, was reversed on appeal to the district court and is in fact (contrary to Superior's assertion), strong support for the Trustee's analysis of a potential equitable subordination action. *See Waslow v. MNC Commercial Corp.* (*In re Paolella & Sons, Inc.*), 161 B.R. 119 (E.D. Pa. 1993).

Superior is very familiar with the applicable historical "facts" of the ELC case, as its counsel was present at all thirteen of the Rule 2004 Examinations of Fifth Third personnel and

consultants.  When time permitted, Superior's counsel was afforded the opportunity to question the witnesses.  Contrary to Superior's assertion, far more than "preliminary discovery" was completed.  Special Counsel conducted twelve Rule 2004 Examinations of Fifth Third former and current personnel – including six members of the "bank protection" business unit; three members of the "line of business" business unit; one member of the credit department; and two members of the field examination group.  In addition, Special Counsel conducted a Rule 2004 Examination of Wayne Stoffel, an agricultural business consultant who performed the May and October 2010 field exams of ELC for Fifth Third.

Special Counsel also reviewed and analyzed in excess of 50,000 pages of documents produced by Fifth Third, Mr. Stoffel, Wells Fargo, and documents received from Metcalfe County, Kentucky.  With the exception of the documents received from Metcalfe County Court,[9] all of the documents as well as the transcripts and exhibits from the Rule 2004 Examinations, are available on the Trustee's shared repository.

The Trustee's assessment of a potential equitable subordination action was neither superficial nor unduly pessimistic.  The Trustee recognizes that a "colorable" action for equitable subordination may exist, but acknowledges that such an action against a third party, like Fifth Third, (as opposed to a potential debtor insider) faces a very high standard of proof and is rarely successful.  That is why the Trustee proposes a settlement as opposed to protracted, expensive litigation that would likely result in an unfavorable ruling.  *See, e.g.*, *In re: Sentinel Management Group, Inc.* Nos. 10-3787, 10-3990 and 11-1123 (7th Cir. Aug. 9, 2012).

In the Trustee's Report, the Trustee noted that until the fall of 2010, Fifth Third failed to take enforcement action in the face of internal and external warnings designed to alert the Bank

---

[9] Metcalfe County is where the criminal proceedings against Thomas and Grant Gibson, Stephen McDonald and Darren Brangers are pending.

to the existence of potential check kiting and ELC's fraudulent reporting of receivables and inventory.[10]  As explained in the Trustee's Report, it is not beyond the realm of possibility that an inference could be drawn from the Bank's repeated decisions to take no action in the face of such warnings, that Fifth Third consciously ignored the warnings in pursuit of profits from the account.  To that end, Fifth Third earned approximately $2 million in 2009 from its relationship with ELC and another $1.7 million in 2010.

Yet, as expressed by Fifth Third's officers in their Rule 2004 examinations, the idea of shutting down ELC's business with revenues of several billion dollars a year and the inevitable repercussions (especially potential lender liability exposure) from such an action gave pause to the bankers, as it would anyone with an ounce of common sense.  "[E]ven when a kite is suspected, there may be a number of reasons banks move slowly to accuse an account holder of kiting."  *Firstar Bank*, *Sioux City N.A. v. Beemer Enterprises, Inc.* 976 F. Supp. 1233, 1241 (N. D. Iowa 1997) (citing *First Nat'l Bank in Harvey v. Colonial Bank*, 898 F. Supp. 1220, 1223 (N.D. Ill. 1995) (describing the difficulties in determining when a customer is kiting or engaging in legitimate movement of funds, and noting that banks may be reluctant to take any action on a suspected kite for fear of liability to a customer for wrongful dishonor of checks or defamation, or fear of angering a customer, if no kiting is in fact occurring).

As Superior and the other objectors well know, actions seeking equitable subordination against a lender, such as Fifth Third, are difficult to successfully prosecute and, on balance, many more have been lost than have been won by trustees, indicating the reluctance of courts to subordinate secured claims of institutional, non-insider lenders absent proof of actual culpability and even then, not necessarily the entirety of the claim.  *See, e.g., Waslow v. MNC Commercial*

---

[10] That evidence is available to all creditors on the Trustee's shared repository https://eastlivestock.brickftp.com.

*Corp.* (*In re Paolella & Sons, Inc.*), 161 B.R. 119 (E.D. Pa. 1993) ("Equitable subordination has seldom been invoked, much less successfully so, in cases involving non-insiders and/or non-fiduciaries."); s*ee also* 2003 Ann. Surv. Of Bankr. Law 19, 24 (2003); *see also Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1356 (7th Cir. 1990) ("Cases subordinating the claims of creditors that dealt at arm's length with the debtor are few and far between."); *In re Hedged-Investments Associates, Inc.*, 380 F.3d 1292, 1302 (10th Cir. 2004) (refusing to apply equitable subordination even where lender was arguably negligent in extending credit to debtor engaged in Ponzi scheme); *Stratton v. Equitable Bank, N.A.*, 104 B.R. 713, 731 (D. Md. *1989) (imposing no equitable subordination even where lender was* arguably negligent in continuing to lend to grossly undercapitalized debtor).    *Paolella* reversed the bankruptcy court opinion cited by Superior.    The District Court which based its decision upon facts very analogous to the facts in this case acknowledged:

> *Equitable subordination is an extraordinary remedy, which is generally not invoked against a non-insider creditor unless a claimant can demonstrate that the creditor has engaged in gross or egregious misconduct tantamount to fraud, overreaching or spoliation.*

*Paolella & Sons* 161 B.R. at 122 (emphasis added).

Superior's reliance on the bankruptcy court decision in *Paolella & Sons* is extremely troubling, since the District Court reversed the bankruptcy court in a decision, published years ago.    The district court reversed the bankruptcy court's judgment (on which Superior relies) in favor of the impaired tobacco suppliers on their claim for equitable subordination.    *Paolella & Sons* 161 B.R. at 122.

In *Paolella & Sons,* the debtor was a wholesale distributor of tobacco, candy and sundry items (the "Wholesaler").    On January 26, 1982, the Wholesaler and its secured lender, "MNC", entered into a financing arrangement, whereby MNC agreed to provide the Wholesaler with a

34

line of credit and term loan in exchange for a blanket security interest in virtually all of the Wholesaler's assets. The financing arrangement provided the Wholesaler could borrow against 85% of the eligible receivables and 60% of the eligible inventory. The loan agreement, which was initially for two years, was renewed until January 26, 1986.

In 1982, the Wholesaler requested MNC to increase the line of credit to allow it to participate in a special credit purchase program offered by its tobacco suppliers. Following that increase, the Wholesaler's loan was always out of formula. In other words, the amount advanced by MNC always exceeded the sum of 85% of the eligible receivables plus 60% of the eligible inventory. Although the parties discussed proposals to bring the loan back within the borrowing base formula, the Wholesaler never succeeded in doing so. MNC nevertheless agreed to increase the amount of the overadvance to allow the Wholesaler to participate in special credit purchase programs offered by its tobacco suppliers.

Each business day, the Wholesaler submitted daily reports to MNC as to receivables and weekly inventory. Pursuant to the financing arrangement, MNC was entitled reasonable access to the Wholesaler's premises to conduct audits. MNC conducted quarterly audits. MNC used this information to calculate the value of its collateral, the daily loan balance, and the additional loan sums available to the Wholesaler. Each morning Mr. Paolella, the Wholesaler's president, would call MNC to discuss (1) the checks to be presented to MNC's subsidiary bank; and (2) the funds that MNC would make available to honor those checks. The Wholesaler's operating cash was located in MNC's subsidiary bank whereas all receivables were placed in an account controlled by MNC at Continental Bank. The financing agreement provided MNC the right to demand immediate payment of the overadvance and, if not repaid, declare the loan in immediate

default.  MNC also had the right to refuse additional loan advances or make available to the Wholesaler its receivables.

By early 1984, MNC became concerned about the Wholesaler's ability to repay the loan. At that time, MNC classified the loan in the "watch" category and subsequently reduced it to "substandard" by October 1985.  In late 1985, Mr. Stewart, MNC's president, assumed final decision making authority over the loan previously overseen by Cromwell.

In May 1985, MNC and the Wholesaler discussed plans to cooperate in a liquidation of the Wholesaler's assets and repay all of its creditors.  In the fall of 1985, the Wholesaler began to sell its assets including certain of its subsidiaries.  The proceeds of those sales were used to pay down MNC's line of credit.  During the winter of 1985, MNC elected to physically count all of the Wholesaler's inventory of tobacco products.  Prior audits had been conducted by MNC's audit manager and only samples counted.  An MNC executive, not the audit manager, conducted the audit in the overnight hours when the Wholesaler was closed and no one was present except the audit team and a representative of the Wholesaler.  Unaware of the executive's audit, the audit manager conducted a regular audit shortly thereafter.

In anticipation of its liquidation, Mr. Paolella, the Wholesaler's principal, informed certain of the Wholesaler's tobacco suppliers that he would not renew his personal guarantees but he did not inform them of the Wholesaler's liquidation plan to which MNC and the Wholesaler had agreed.  One supplier had obtained a letter of credit from MNC's subsidiary bank.  The bank sent notice to the tobacco supplier that the letter of credit would not be renewed. The Wholesaler and the bank both informed the tobacco supplier that the decision not to renew the letter of credit was made by the Wholesaler, not the bank.

In December 1985, the tobacco suppliers announced a price increase and special buying credit programs in advance of the increase.  The Wholesaler took full advantage of the credit program with the consent of MNC.  The effect of the Wholesaler's participation was to increase its unpaid for tobacco inventory from mid December 1985 through early January 1986, the target date for the liquidation.

On December 31, 1985, the Wholesaler's union contract expired although the parties continued to negotiate.  On Friday, January 24, 1986, the Wholesaler a sent a letter to the union informing it of the debtor's plan to liquidate and terminate operations as soon as possible.  On that same date, the Wholesaler informed MNC that a large check would be presented on Monday, January 27, 1986, for payment.  On Tuesday, January 28, 1986, MNC elected not to honor the Wholesaler's checks presented the previous day.  MNC informed the Wholesaler of the decision on Wednesday, January 29.  On Thursday, January 30, MCN notified the Wholesaler it was in default and demanded immediate repayment of the entire balance and possession of all collateral.  MNC's president claimed that the decision to cease funding was triggered by the union letter and the fear of a violent strike.

Three of the tobacco suppliers sought to equitably subordinate MNC's secured claim based upon the alleged harm they suffered from the Wholesaler participating in their special purchase credit programs in December 1985.  The other two suppliers based their subordination claim on MNC's failure to disclose that it, not the debtor, decided not to renew the letter of credit.  The Wholesaler's bankruptcy trustee, on the other hand, sought to subordinate MNC's entire secured claim to all unsecured claims.  The trustee and the suppliers argued that MNC exercised control over the Wholesaler's operations and cash.  Given the structure of the lending relationship and the deposit of all the debtor's operating proceeds into MNC's subsidiary bank,

the Wholesaler had no funds to pay bills or otherwise operate without MNC's approval. However, MNC's power was the result of the Wholesaler's loan being out of formula. The trustee and the suppliers suggested that MNC induced the Wholesaler to be out of formula and that it lasted so long that MNC acquiesced to it.

The loan agreement, however, provided that all modifications had to be in writing and the failure of MNC to enforce a particular provision did not constitute a waiver. Because MNC allowed the Wholesaler to remain out of formula for so long, the trustee and the suppliers argued that MNC could only enforce this provision on reasonable terms. In response, MNC claimed all it did was exercise its rights and remedies under the financing agreement.

The bankruptcy court found that MNC's conduct with respect to the tobacco suppliers who permitted the Wholesaler to participate in special purchase credit programs was inequitable to the extent of the additional credit provided by those programs in December 1985. As a result, the bankruptcy court held that to the extent the tobacco suppliers supplied additional credit to the Wholesaler, equitable subordination was appropriate.

In contrast, the bankruptcy court rejected the trustee's attempt to subordinate MNC's secured claim to the claims of all unsecured creditors. *Id*. at * 56-57. The bankruptcy court found that the secured creditor had no duty to permit the debtor to liquidate on its terms or that such liquidation would have permitted unsecured creditors a dividend. *Id; see* also *American Cigar*, 1991 Bankr. Lexis 1181 (quoting *Kham & Nates Shoes*, *No. 2, Inc. v. First Bank*, 908 F.2d 1351, 1356-57 (7th Cir. 1990)) where the Seventh Circuit expressly rejected the contention that a lender who acts in conformity with the provisions of its loan agreement acts inequitably:

> We are not willing to embrace a rule that requires participants in commercial transactions not only to keep their contracts but also do "more" – just how much more resting in the discretion of a bankruptcy judge assessing the situation years later. … Unless pacts are enforced according to their terms, the institution of

contract, with all the advantages private negotiation and agreement brings, is jeopardized.

MNC appealed the adverse judgment to the district court.  The district court found that MNC's conduct did not rise to the level of gross or egregious misconduct tantamount to fraud or overreaching required to equitably subordinate the claim of a non-insider.  *Paolella & Sons*, 161 B.R. 107, 120.  In reaching its decision, the district court in *Paolella* relied upon the Seventh Circuit's decision in *Kham & Nate's Shoes No. 2, Inc. v. First Bank*, 908 F.2d 1351 (7th Cir. 1990) which stated that:

> Generally, a creditor does not act inequitably in exercising its contractual rights. Judge Easterbrook, writing for the Seventh Circuit Court of Appeals, stated: "Firms that have negotiated contracts are entitled to enforce them to the letter, even to the great discomfort of their trading partners, without being mulcted for their lack of 'good faith.' " *Kham & Nate's Shoes,* 908 F.2d at 1357. "There is no doubt that ... the banks kept careful watch on what was going on at Grant; they would have been derelict in their duty to their own creditors and stockholders if they had not." *W.T. Grant,* 699 F.2d at 610 (Friendly, J.). In *In re Clark Pipe & Supply Co.,* 893 F.2d 693, 700 (5th Cir.1990), the Fifth Circuit Court of Appeals held that there was no subordination where there was no evidence that the creditor "exceeded its authority under the loan agreement or that [the creditor] acted inequitably in exercising its rights under that agreement." Our attention has not been called to any case wherein a court has equitably subordinated the claim of a non-insider who adhered to the terms of a loan agreement.

*Waslow*, 161 B.R. at 120.

The *Paolella & Sons* district court rejected the bankruptcy court's conclusion that MNC acted inequitably when it :

> consciously embark[ed] on a policy to garner additional information so as to exercise its contractual right not to lend at a propitious time for it relative to tobacco company creditors and held that such actions cannot constitute inequitable conduct for purposes of equitable subordination.

*Id*. (A*ccord In re Clark Pipe,* 870 F.2d 1022, 1024 (5th Cir.1989), *withdrawn by* 893 F.2d 693 (5th Cir.1990) ("[I]t is not gross or egregious misconduct warranting equitable subordination of a lender's claim to monitor the debtor closely; to extend sufficient funds so as to improve the

lender's position at the expense of the other creditors; and to refuse to supply further funds at a propitious moment on a loan that is in default.")

Similarly, the district court found that MNC had no duty to inform other creditors of the basis for its decision not to renew the letter of credit or the Wholesaler's financial condition. *Paolella*, 161 B.R. at 121.  Since the tobacco suppliers could not show that the MNC had engaged in gross or egregious conduct tantamount to fraud or overreaching or that they had relied to their detriment on MNC's misconduct, the district court reversed the bankruptcy court's judgment in favor of the tobacco suppliers.  *Id*. at 122.

Many of ELC's creditors have suggested that Fifth Third acted inequitably by timing the decision to place a hold on ELC's operating checking account in order to maximize the recovery by Fifth Third and by failing to inform ELC's creditors of the hold on ELC's account.  Superior et al. assert that Fifth Third knew or should have known that ELC's inventory was at its peak in the fall of 2010 based upon its audits of ELC.  Consequently, a creditor could argue Fifth Third waited until early November 2010 when ELC's inventory was at its peak to place the hold on ELC's operating account.  However, if the Trustee asserted an action based upon such assertions, Fifth Third could rely upon *Paolella & Sons* (which Superior contends is factually analogous to the basis for an alleged subordination of Fifth Third's claim) to argue that Fifth Third was free to monitor ELC's inventory and payables to determine when they were at their peak to time its decision to pull the plug in order to maximize the Bank's recovery. *Id.* ("For purposes of the doctrine of equitable subordination, it is not inequitable for a non-inside creditor to monitor a debtor closely, pursuant to a valid financing agreement, for the purpose of choosing the most advantageous time to foreclose on a loan that has been out of formula for several years.  Not only is it not inequitable conduct, but MNC would have been derelict in its duty to own stockholders

and depositors, if it had failed to obtain additional information so as to exercise its contractual right not to lend at a propitious time relative to tobacco company creditors.") (emphasis added). Moreover, Fifth Third had no duty to advise ELC's creditors of ELC's financial condition. *Paolella & Sons*, 161 B.R. at 120 ("In equitable subordination, there are no cases that go so far as to require a security holder to advise other creditors that it is discontinuing a letter of credit because its client is in poor financial condition."). Based upon *Paolella & Sons,* a court would likely find that the type of actions that Superior et al. cite as the basis for an action against Fifth Third do not rise to the level of egregious misconduct required for equitable subordination.

In his recent opinion, *Sentinel,* Judge Tinder of the Seventh Circuit Court of Appeals confirmed the accuracy of the Trustee's assessment of the difficulty of pursuing an equitable subordination claim against a non-insider secured creditor like Fifth Third.  Judge Tinder's opinion in *Sentinel* reinforces *Paolella & Sons* and other precedent that a secured creditor must engage in inequitable conduct tantamount to fraud, overreaching, or breach of fiduciary duty to allow a court to impose equitable subordination.  In contrast, a secured creditor's negligence or incompetence is insufficient to require equitable subordination of a secured creditor's claim.

Sentinel was an investment manager that marketed itself to its customer as providing a safe place to put their excess capital, assuring solid short-term returns, but promising ready access to the capital.  Sentinel's primary customers were futures commission merchants ("FCM") who operate in the commodity industry akin to the securities industry's broker-dealers. Sentinel represented that it would maintain customer funds in segregated accounts as required under the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.*  "Maintaining segregation meant that it at all times a customer's accounts held assets equal to the amount Sentinel owed the customer and treated and dealt with the assets 'as belonging to such customer.'"  Maintaining segregation

41

served as the commodity customer's primary legal protection against wrongdoing or insolvency by FCM's and their depositories as contrasted to depositors' FDIC protection or securities investors' SIPC protection.  Sentinel, however, held its and its customers' assets as a single, undifferentiated pool of cash and securities.  When customers would request their capital back, Sentinel would sell the securities or borrow the money.

Sentinel had an overnight loan it maintained with the Bank of New York which allowed it to borrow large amounts of cash while pledging customers' securities as collateral.  The relationship with the Bank began in 1997 in the institutional custody division but within months moved to the clearing division.  Under the initial arrangement, for each segregated account, Sentinel had a cash account for customer deposits and withdrawals.  Customers' assets could not leave segregation without a corresponding transfer from a cash account.  In an e-mail, one bank official said in reference to Sentinel's original arrangement that "THIS ACCOUNT IS AN ACCIDENT WAITING TO HAPPEN. … I AM NOTIFYING YOU THAT I NO LONGER FEEL COMFORTABLE CLEARING THESE TRANSACTIONS AND REQUEST AN IMMEDIATE RESPONSE FROM YOU.  THANK YOU." *Id*. at *5.

Sentinel could independently transfer assets among the accounts by using electronic desegregation instructions without significant bank knowledge or involvement.  This system allowed Sentinel to orchestrate hundreds of thousands of trades worth trillions of dollars every day at the bank.  Sentinel, not the bank, maintained responsibility for keeping assets at appropriate levels of segregation.  In contrast, the bank's primary concern was ensuring Sentinel has sufficient collateral in the lienable accounts to keep its overnight loan secured.  If Sentinel sought to extend the line of credit beyond the value of the assets held in lienable accounts, the bank required Sentinel to move enough collateral into the lienable accounts.

Sentinel used the cash from the overnight loan for customers' redemption or failed trades and provided collateral in the form of customers' redeemed securities. In 2001 and to a greater extent 2004, Sentinel started using the loan to fund its own proprietary repurchase arrangements with counterparties such as FIMAT USA and Cantor Fitzgerald & Co. Sentinel would finance most of the security's purchase price by transferring ownership of the security to a counterparty who would lend Sentinel an amount equal in cash to a percent of the assets' market value. Sentinel used the overnight loan to cover the difference between the securities and the repo loan. At some point, Sentinel had to buy back the security for the amount of the loan plus interest. By 2007, Sentinel had more than $2 billion in securities through repo arrangements. Sentinel's bank loan grew from $30 million in May of 2004 to a peak of $573 million in 2007. By 2004, Sentinel faced a segregation shortfall of about $150 million. By July 2007 the shortfall reached nearly $1 billion.

During the summer of 2007, the liquidity and credit crunch settled in. During June of 2007, a bank official emailed other various bank officials involved with the Sentinel account asking how Sentinel had "so much collateral?" With less than $20MM in capital I have to assume most of this collateral is for somebody else's benefit. Do we really have rights on the whole $300MM??"[11] After speaking to several bank officers, a client executive responded, "We have a clearing agreement which gives us a full lien on the box position outlined below." *Id*. at 8-9.

In August, Sentinel could not hang on and told customers it was halting redemption because of problems in the credit market. After Sentinel told the bank about the decision, the

---

[11] The official was actually referencing Sentinel's $2 million in capital, even though he seemed to think Sentinel had ten times that amount. He was closer in referring to the bank's $300 million in collateral, which at that point apparently reached $302 million.

bank demanded full repayment of the loan and threatened to liquidate the collateral. On August 17, the Sentinel filed for bankruptcy owing the bank $312,247,000.

The bankruptcy and litigation trustee appointed under a confirmed chapter 11 plan for Sentinel filed an adversary proceeding against the bank alleging that the bank fraudulently used customer assets to finance the loan to cover its trading activity and the bank knew about it and acted inequitably. The bank moved for summary judgment. The district court reserved ruling on the bank's motion and held a bench trial that lasted seventeen days. The district court rejected the equitable subordination claim because the bank's conduct was not "egregious or conscience shocking" but was at worst negligent. *Id*. at 21. The trustee argued that the district court erred by applying a subjective – intent standard and that the bank's acceptance of customer assets as collateral for Sentinel's loan constituted inequitable conduct because the bank knew that Sentinel had its segregation duty and that Sentinel could not use customer's assets as collateral.

The Seventh Circuit affirmed the district court's judgment in favor of the bank finding that the trustee failed to show that the district court clearly erred in finding the bank did not engage in the type of misconduct that warranted equitable subordination. *Id.* at 20. Since the bank was not an insider, the trustee had to provide evidence of "gross and egregious conduct" such as fraud, spoliation, or overreaching on the bank's part. *Id*. at 20. (citation omitted). Based upon the evidence presented at trial * * *

> The district court found that the bank and Sentinel had a typical ten year relationship that only came into trouble in August 2007. Sentinel assured the bank that it could use customers securities as collateral and that its customers knew about Sentinel's leveraged trading strategy. The bank could not see collateral moving to and from segregated accounts and there was no particular reason for the bank to see or track each transfer. The bank also lacked any motivation to lend millions of dollars simply to earn extra overnight interest. At worst, bank officials acted negligently, but not fraudulently. The district court's finding that the bank officers were suspicious, as exemplified by the email change between bank officials over how Sentinel was able to pledge $300 million in collateral with only $2 million in capital, doesn't require a finding that the bank's

> conduct was sufficiently egregious. Perhaps the bank should have known that Sentinel violated segregation requirements, but as the district court found, "such a lack of care does not rise to the level of the egregious misconduct necessary for equitable subordination.

*Id.* at 20-21.

Although the district court did not believe the bank officials' testimony, the district court did not believe that the witnesses were covering up knowledge of Sentinel's "pre-collapse mess." Rather they were simply trying to cover up their own incompetence. *Id.* at 22 ("Incompetence alone, however problematic, won't require the equitable subordination of the bank's lien.")

Superior, Bluegrass, and First Bank have suggested to the Trustee, that Fifth Third must have known that ELC was engaged in check kiting for many weeks (if not months) before Fifth Third pulled the plug. In response, Fifth Third will state that it acted upon its suspicions and took enforcement action at the time the Bank deemed such action to be prudent and in Fifth Third's best interests. Fifth Third will argue that it acted in a reasonable fashion throughout. For example, when ELC alerted on Fifth Third's check kiting software, Fifth Third investigated the transactions. Fifth Third conducted a special audit of ELC in May 2009 and ultimately determined that there was no kiting evident. To the extent Fifth Third failed to properly or timely investigate the kiting alerts or timely conduct a special audit to ferret out ELC's fraud, Fifth Third will argue that any negligence or incompetence on its part is <u>not</u> sufficiently egregious misconduct required to equitably subordinate its claim. Fifth Third would find strong support for its position in *Sentinel* and *Paolella & Sons*.[12]

---

[12] Likewise, Fifth Third will contend it made no economic sense to risk $32.5 million dollars for rough $2 million in fees annually. One court considered a defendant bank's motion for summary judgment seeking to dismiss claims based upon the assertion that a bank would risk a loss of $22 million to reap less than $1 million in fees earned by ignoring a check kiting scheme. *Firstar Bank Sioux City, N.A., v. Beemer Enterprises, Inc.*, 976 F. Supp. 1233, (N.D. Iowa 1997). The court in *Firstar Bank* indicated that if it were the trier of fact (as opposed to entertaining a motion for summary judgment), it would dismiss the claims against the bank as economically implausible *i.e.* "They make no economic sense." *Id*.

V.       **The Involvement of FBD Is Not a Valid Reason to Object To or Strike the Trustee's Report**

First Bank, Superior and Bluegrass rehash arguments they have made in the past that FBD should not have been involved in the analysis of potential claims against Fifth Third or in the negotiation of the proposed settlement with Fifth Third that is contained in the Plan. Those same arguments were made and resolved by the Court against the objectors at the hearing on December 14, 2011 on an FBD fee application. Those arguments still have no merit.

On December 30, 2010, the Trustee filed his application to employ FBD as his counsel (Dock. No. 113). In that application the Trustee requested that FBD be employed to represent the Trustee with regard to a number of matters including "(b) representation with regard to investigation and prosecution of demands, claims, and causes of action that the Trustee may hold". To support the Trustee's application an affidavit of Terry E. Hall, of FBD, was submitted (Dock. No.114). That affidavit included disclosure of FBD's representation of Fifth Third in unrelated matters. The Hall affidavit contained the following disclosure: "The Firm [FBD] currently represents Fifth Third in matters unrelated to the chapter 11 case or the Debtor. Fifth Third is a creditor of the estate and has consented to the Firm's representation of the Trustee. However, Fifth Third has not consented to the Firm's representation of the Trustee with respect to any adversary proceeding or other action that the Trustee may commence directly against Fifth Third. The Firm has advised the Trustee of this exception to the consent received from Fifth Third and the Trustee accepts this exception... In the event a conflict develops, the Firm will assist the Trustee in hiring conflicts counsel and notify the Court and the U.S. Trustee".

On January 18, 2011, the Trustee applied to the Court to employ Hoover Hull as Special Counsel (Dock. No. 219). As part of that application the Trustee recited, "Hoover Hull's primary

role as special counsel to the Trustee will be to investigate and prosecute claims and objections against Fifth Third or claims asserted by Fifth Third in this case." On February 10, 2011, the Court approved the employment of Hoover Hull as Special Counsel (Dock. No. 267).

On February 1, 2011, the Court approved the Trustee's employment of FBD by a final order (Dock. No. 248). That order did not limit in any manner the scope of FBD's services as counsel for the Trustee. The only restriction on what FBD could do in this case as the Trustee's counsel comes from the carve-out from the consent that Fifth Third provided to FBD. That consent is mirrored in the consent that FBD obtained from Wells Fargo & Company, which is discussed in the Trustee's response to the "renewed objections" asserted by First Bank and Bluegrass et al. to FBD's ongoing employment.

FBD explained in open court on December 14, 2011, that FBD's only limitation with respect to the Fifth Third consent and to FBD's representation of the Trustee is that FBD may not represent the Trustee in connection with any lawsuit, adversary proceeding or other action commenced by the Trustee against Fifth Third. There is no limitation or restriction upon FBD's ability to conduct legal research concerning or analysis of any potential claim against Fifth Third. Moreover, FBD is not constrained from advising the Trustee with respect to the merits of potential actions against Fifth Third or defenses against Fifth Third's secured or unsecured claim. There is no restriction that would bar FBD from participating, as it has, in the negotiation of a settlement with Fifth Third of the kind that is contained in the Plan. The suggestions by the objectors to the contrary are fabricated and totally without merit.

## VI. Conclusion

It is a shame that the estate and various parties will be charged with the additional cost of unnecessary briefing and a hearing regarding the Motions and Objections. Promptly following the July 23 filing of the Trustee's Disclosure Statement and Plan, Superior, First Bank, and the

Joining Objectors should have withdrawn their Motions and Objections as being "moot".  The real issues are now whether the Disclosure Statement and Plan should be approved by the Court not whether the Trustee's Report is good, bad, or indifferent.  There is so little merit (virtually none) in the arguments made by Superior, First Bank and the Joining Objectors that the Court should overrule them.  But beyond that, the motivations and agendas of those parties, their lack of real unsecured creditor status, and their failure to cite to the Court important if not controlling precedent (such as *Samuels*, *Kunkel*, E*lkhart v. Smoker*, and the district court opinion in *Paolella & Sons* that reversed the bankruptcy court decision that Superior cited as support) raise serious additional questions about the actions and roles of those parties in this case.  The Trustee asks the Court to overrule the Objections, deny the Motions and grant the Trustee all additional appropriate relief.

Respectfully submitted,

*/s/* James A. Knauer
*Chapter 11 Trustee*

James A. Knauer
111 Monument Circle, Suite 900
Indianapolis, Indiana 46204-5125
Telephone: 317-692-9000
Facsimile: 317-777-7451
jak@kgrlaw.com

48

HOOVER HULL LLP


By:  /s/ Sean T. White

Sean T. White (#20428-49)                         *Special Counsel for James A. Knauer, Chapter 11*
Hoover Hull LLP                                   *Trustee*
111 Monument Circle, Suite 4400
P.O. Box 44989
Indianapolis, IN  46244-0989
Telephone:  (317) 822-4400
Facsimile:  (317) 822-0234
swhite@hooverhull.com




FAEGRE BAKER DANIELS LLP


By:   /s/ James M. Carr

James M. Carr (#3128-49)              *Counsel for James A. Knauer, Chapter 11 Trustee*
Kevin M. Toner (#11343-49)
Terry E. Hall (#22041-49)
Dustin R. DeNeal (#27535-49)
300 N. Meridian Street, Suite 2700
Indianapolis, IN 46204-1782
Telephone: (317) 237-0300
Facsimile: (317) 237-1000
jim.carr@faegrebd.com
kevin.toner@faegrebd.com
terry.hall@faegrebd.com
dustin.deneal@faegrebd.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 13, 2012, a copy of the foregoing pleading was filed electronically.  Notice of this filing will be sent to the following parties through the Court's Electronic Case Filing System.  Parties may access this filing through the Court's system.

| | | |
|---|---|---|
| David L. Abt<br>davidabt@mwt.net | C. R. Bowles, Jr<br>cbowles@ bgdlegal.com | John Hunt Lovell<br>john@lovell-law.net |
| Mark A. Robinson<br>mrobinson@vhrlaw.com | Jeffrey R. Erler<br>jeffe@bellnunnally.com | Edward M King<br>tking@fbtlaw.com |
| Randall D. LaTour<br>rdlatour@vorys.com | John R. Carr, III<br>jrciii@acs-law.com | Bret S. Clement<br>bclement@acs-law.com |
| Daniel J. Donnellon<br>ddonnellon@ficlaw.com | Stephen A. Weigand<br>sweigand@ficlaw.com | John Frederick Massouh<br>john.massouh@sprouselaw.com |

49

John W. Ames
james@bgdlegal.com

Jeremy S Rogers
Jeremy.Rogers@dinslaw.com

Meredith R. Thomas
mthomas@daleeke.com

Charles R. Wharton
Charles.R.Wharton@usdoj.gov

David L. LeBas
dlebas@namanhowell.com

Jessica E. Yates
jyates@swlaw.com

Laura Day Delcotto
ldelcotto@dlgfirm.com

Ross A. Plourde
ross.plourde@mcafeetaft.com

Todd J. Johnston
tjohnston@mcjllp.com

Karen L. Lobring
lobring@msn.com

Elliott D. Levin
edl@rubin-levin.net

Sean T. White
swhite@hooverhull.com

Michael W. McClain
mike@kentuckytrial.com

James Edwin McGhee
mcghee@derbycitylaw.com

Jerald I. Ancel
jancel@taftlaw.com

David Alan Domina
dad@dominalaw.com

Jill Zengler Julian
Jill.Julian@usdoj.gov

Michael Wayne Oyler
moyler@rwsvlaw.com

James E. Rossow
jim@rubin-levin.net

Steven A. Brehm
sbrehm@bgdlegal.com

James M. Carr
james.carr@faegrebd.com

Shawna M. Eikenberry
shawna.eikenberry@faegrebd.com

James A. Knauer
jak@kgrlaw.com

Robert Hughes Foree
robertforee@bellsouth.net

Ivana B. Shallcross
ishallcross@ bgdlegal.com

William Robert Meyer, II
rmeyer@stites.com

James Bryan Johnston
bjtexas59@hotmail.com

Judy Hamilton Morse
judy.morse@crowedunlevy.com

John Huffaker
john.huffaker@sprouselaw.com

Kelly Greene McConnell
lisahughes@givenspursley.com

Walter Scott Newbern
wsnewbern@msn.com

Timothy T. Pridmore
tpridmore@mcjllp.com

Sandra D. Freeburger
sfreeburger@dsf-atty.com

John M. Rogers
johnr@rubin-levin.net

Jay P. Kennedy
jpk@kgrlaw.com

William E Smith
wsmith@k-glaw.com

Thomas C Scherer
tscherer@bgdlegal.com

Jeffrey J. Graham
jgraham@taftlaw.com

Kent A Britt
kabritt@vorys.com

Jeffrey L Hunter
jeff.hunter@usdoj.gov

Jason W. Cottrell
jwc@stuartlaw.com

James B. Lind
jblind@vorys.com

Anthony G. Raluy
traluy@fbhlaw.net

Jack S. Dawson
jdawson@millerdollarhide.com

Terry E. Hall
terry.hall@faegrebd.com

Erick P. Knoblock
eknoblock@daleeke.com

Kim Martin Lewis
kim.lewis@dinslaw.com

Deborah Caruso
dcaruso@daleeke.com

Allen Morris
amorris@stites.com

James T. Young
james@rubin-levin.net

John M. Thompson
john.thompson@crowedunlevy.com

Matthew J. Ochs
kim.maynes@moyewhite.com

T. Kent Barber
kbarber@dlgfirm.com

Kirk Crutcher
kcrutcher@mcs-law.com

Theodore A Konstantinopoulos
ndohbky@jbandr.com

Lisa Koch Bryant
courtmail@fbhlaw.net

John David Hoover
jdhoover@hooverhull.com

John R. Burns
john.burns@faegrebd.com

Kayla D. Britton
kayla.britton@faegrebd.com

David A. Laird
david.laird@moyewhite.com

Trevor L. Earl
tearl@rwsvlaw.com

Joshua N. Stine
kabritt@vorys.com

Amelia Martin Adams
aadams@dlgfirm.com

Robert A. Bell
rabell@vorys.com

Melissa S. Giberson
msgiberson@vorys.com

U.S. Trustee
ustpregion10.in.ecf@usdoj.gov

Dustin R. DeNeal
dustin.deneal@faegrebd.com

Jay Jaffe
jay.jaffe@faegrebd.com

Harmony A. Mappes
harmony.mappes@faegrebd.com

| | | |
|---|---|---|
| Christie A. Moore<br>cm@gdm.com | Shiv Ghuman O'Neill<br>shiv.oneill@faegrebd.com | Wendy W. Ponader<br>wendy.ponader@faegrebd.com |
| Peter M. Gannott<br>pgannott@gannottlaw.com | Eric C. Redman<br>ksmith@redmanludwig.com | Joe T. Roberts<br>jratty@windstream.net |
| Joseph H. Rogers<br>jrogers@millerdollarhide.com | James E. Smith<br>jsmith@smithakins.com | Robert K. Stanley<br>robert.stanley@faegrebd.com |
| Andrew D. Stosberg<br>astosberg@lloydmc.com | Kevin M. Toner<br>kevin.toner@faegrebd.com | Andrea L. Wasson<br>andrea@wassonthornhill.com |
| Christopher M. Trapp<br>ctrapp@rubin-levin.net | Eric W. Richardson<br>ewrichardson@vorys.com | Joshua Elliott Clubb<br>joshclubb@gmail.com |

I further certify that on August 13, 2012, a copy of the foregoing pleading was served via electronic mail transmission on the following:

| | |
|---|---|
| Ashley S. Rusher<br>asr@blancolaw.com | Darla J. Gabbitas<br>darla.gabbitas@moyewhite.com |

/s/  James M. Carr