UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

IN RE:                              )
                                    )
EASTERN LIVESTOCK CO., LLC          )          CASE NO. 10-93904-BHL-11
                                    )
                Debtor.             )

**REPLY BY SUPERIOR LIVESTOCK AUCTION, INC.
TO TRUSTEE'S RESPONSE TO OBJECTIONS AND MOTIONS TO STRIKE
THE TRUSTEE'S REPORT**

Superior Livestock Auction, Inc. ("Superior"), a creditor in the above-captioned case,

submits the following Reply to the Trustee's *Response to Objections to and Motions to Strike the*

*Trustee's Report* ("Trustee's Response"):

      I.      <u>The Trustee's Investigation of Claims is Irrevocably Tainted by Continuing
Conflicts of Interest</u>

The Trustee claims the issues raised by objections to his *Report of the Trustee, James A.*

*Knauer Regarding Investigation and Analysis of Potential Claims Against Fifth Third Bank* filed

on June 5, 2012 ("the Report") are "moot" because the Report has been replaced by a Disclosure

Statement which incorporates the information in the Report.

While it is certainly true the Disclosure Statement has replaced the Report in procedural

significance, the issue raised by objections to the Report by Superior and others -- the fact there has

never been an independent assessment of claims against Fifth Third by parties unaffected by

conflicts of interest -- is still of fundamental importance.   Absent such an objective review, how

can creditors meaningfully evaluate the Trustee's Plan and Disclosure Statement?

An independent report by Special "conflicts counsel"[1] was surely the intent when the Court directed Hoover Hull LLP ("Hoover Hull") to file the Report.[2]   Hoover Hull was retained as Special Counsel to investigate potential claims against Fifth Third Bank ("Fifth Third") because general counsel for the Trustee, Faegre Baker Daniels ("FBD") serves as counsel for Fifth Third.[3] It was later learned FBD also represents Wells Fargo, as does the Trustee himself.

The Trustee concedes that the Report -- which was not filed or even signed by Hoover Hull -- is not independent, but a collaborative effort of Hoover Hull, the Trustee, and FBD.   (Report, p. 8) In a pleading "adopting" the Report weeks later, Hoover Hull states it never even *understood* it was precluded from receiving "assistance" from counsel representing the banks. (Doc. 1221, pp. 1-2). The extent of such assistance is unknown, however, because all parties refuse to elaborate, claiming "privilege."

No problem, the Trustee suggests, because there is no conflict of interest that would preclude the involvement of parties representing the banks in an investigation of claims against the banks. According to the Trustee, because Fifth Third and Wells Fargo allegedly only prohibit the

---

[1]*See* page 5 of the *Trustee's Response to Renewal of Objection of First Bank to Application to Employ Baker & Daniels LLP (nka Faegre Baker Daniels LLP as Counsel to the Trustee and the Bluegrass Joinder Thereto* referring to Hoover Hull as "Special conflicts counsel."

[2]The Court ordered Hoover Hull to file the report at a hearing on December 14, 2011, and in pleadings Hoover Hull indicated *it* would be filing the report, up until a few days before the Report was instead filed by the Trustee, without explanation.

[3] In its Amended Affidavit in support of its retention as general counsel, filed January 24, 2011, FBD states in paragraph 10:
> In preparation for any potential conflict that may arise, the Trustee has filed an application to employ as special counsel the firm of Hoover Hull LLP, with respect to the investigation and prosecution of any claims or objections that may be asserted by the Trustee against Fifth Third or to any claim that may be asserted by Fifth Third in the case.

Trustee and FBD from filing suit, but have allowed them to investigate *whether* to file suit, any conflict of interest is simply a figment of the imaginations of objecting parties. He suggests that *any* involvement by Hoover Hull is sufficient to "cure" a conflict which does not exist, even if Hoover Hull receives "assistance" from conflicted counsel in investigating potential claims, and is not included at all in settlement of those claims with the banks.

On this point, which defies commonsense, the Trustee cites no law. Suffice it to say, there is none. The minimal standards of Rule 1.7 of the Indiana Rules of Professional Conduct prohibit representation of one client which is adverse to another client or if "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client," unless *both* clients give "*informed consent, confirmed in writing.*" A conflict does not disappear simply because *one* of the affected parties gives a waiver.[4]

It is undisputed there was no informed consent by the bankruptcy estate. To the contrary, when FBD was hired, it was with the express representation that separate counsel would be retained to handle conflicts relating to Fifth Third. Hoover Hull was hired as Special conflicts counsel "to investigate and prosecute claims and objections against Fifth Third or claims asserted by Fifth Third in this case." As for Wells Fargo, there could be no informed consent, because both the Trustee and FBD did not even disclose their extensive representation.

No matter, the Trustee again argues, because Wells Fargo is not a creditor or even a party in interest. He is again wrong, for two reasons.  First, the fact that the Trustee and his counsel obtained waivers from Wells Fargo,[5] including a waiver in which FBD acknowledged that adverse

---

[4]  Moreover, the waiver obtained by the Trustee from Wells Fargo is not limited in such fashion. It states the Trustee will abide by all requirements of the Rules of Professional Responsibility.

[5]  Although in the case of the Trustee it could scarcely be called a "waiver" since he explicitly

action against Fifth Third would necessarily be adverse to Wells Fargo, was itself a fact which should be disclosed so the Court, the estate, and the Trustee's own Special Counsel[6] so they can make their own assessment of how the agreements might affect the professionals. A party with whom a bankruptcy professional has a written conflict waiver agreement is a connection worthy of disclosure, including all of the details necessary for the Court and all parties to fully understand the scope and nature of the limitations created by any such agreements.    *See, e.g., In re Jore Corp.*, 298 B.R. 703, 726 (Bankr. D. Mont. 2003); *In re Lewis Road, LLC*, No. 09-37672, 2011 WL 6140747, *10 (Bankr. E.D. Va. Dec. 9, 2011). Professionals are not entitled, as a matter of law, to "pick and choose" which connections are worthy of disclosure. *See*, *e.g.*, *U.S. v. Gellene*, 182 F.3d 578, 588 (7th Cir. 1999) (an applicant "cannot pick and choose which connections are irrelevant or trivial."); *In re Gluth Bros. Const., Inc.*, 459 B.R. 351, 364 (Bankr. N.D. Ill. 2011) ("No 'matter how trivial a connection appears to the professional seeking employment, it must be disclosed.'"); *In re Leslie Fay Cos.*, 175 B.R. 525, 533 (Bankr. S.D.N.Y. 1994).

Second, Wells Fargo *is* quite clearly a party in interest because any estate claims for improvement in position preferences and similar causes of action would have to be considered, and almost certainly asserted, against Wells Fargo as well as Fifth Third.   This is an issue the Trustee has simply ignored his pleadings (which only address whether Wells Fargo was a creditor), and apparently also ignored in his investigation of claims. As a participant owner of part of the loan to Eastern, Wells Fargo is certainly a "transferee" of any preference, and probably the *only* potential defendant as to its percentage share. ).

---

represents to Wells that he will abide by all provisions of the Rules of Professional Conduct.

[6] It is unknown to what degree if any Special Counsel was advised of the Wells Fargo waivers, although it appears he had access to at least redacted copies of the documents.

4

As the Court is aware, Sections 547 and 550 of the Bankruptcy Code work in tandem with respect to actions involving preferences: Section 547 permits a trustee to avoid the transfer, and Section 550 permits the debtor or trustee, to actually recover the property transferred or the value thereof from the "initial transferee" or "any immediate or mediate transferee of such initial transfer." 11 U.S.C. §§ 547, 550; *see* Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy, Vol. 5, P 550.02 at n. 1 (15th ed. rev. 2007). Although the term "initial transferee" is not defined by the Bankruptcy Code, one might assume (as the Trustee apparently does) that only the "lead bank" in a loan participation could ever be the "initial transferee." But the matter is not so simple. In a leading opinion regarding the issue, the Seventh Circuit in *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890 (7th Cir. 1988) draws an important distinction between parties who receive payments as "transferees," and those who are mere "conduits" for others. The Court held in *Bonded* that in order to be a transferee and not a mere conduit, a party must have dominion over the money or other asset and the right to put the money to use for one's own purposes. *Id.* at 893.   Receiving a payment from the debtor does not make one a transferee if the recipient is merely the agent for another. *Id.* Courts interpret "dominion" or "control" to mean *legal* dominion or control, as opposed to mere physical possession. *Security First Nat'l Bank v. Brunson* (In re Coutee), 984 F.2d 138, 141, n. 4 (5th Cir. 1993) (emphasis added).

Applying the *Bonded* standard to facts virtually identical to those here, the recent opinion in *Northern Capital, Inc. v. Stockton Nat'l Bank* (In re Brooke Corp.), 458 B.R. 579, 588 (Bankr. D. Kan. 2011), holds that as to its purchased share of a loan, a participant bank *must* be named as the transferee defendant in a preference action. The Court stated the issue, which it identified as a matter of first impression, as whether "[f]or purposes of § 550(a), is a lead bank holding a note of

the debtor an initial transferee or a conduit when it receives allegedly preferential payments from the debtor and, in accord with the participation agreement, immediately forwards the payments to the participants?" *Brooke,* 458 B.R. 579.   It concluded the participant was the initial transferee who must be sued, and the lead bank merely a conduit.

The facts in *Brooke* were as follows:   The "lead bank" held a promissory note executed pre-bankruptcy by debtor. Thereafter, the lead bank sold percentage ownership of the note to various loan participants, retaining a percentage for itself and continuing to administer the loan as lead bank. Pursuant to the terms of the participation agreements executed by the parties, the lead bank would receive all payments on the loan, apply them to the debtor's account, and hold the payments for the benefits of the participants until the payments are actually paid to and received by the participants. Alleged preferential payments of $487,973.29 were made to the lead bank by the debtor within ninety days of the debtor's bankruptcy, and the trustee sued to avoid the payments as preferences under § 547 of the Bankruptcy Code.

The lead bank moved for partial summary judgment as to the amounts ultimately paid to the participating banks, contending there was no genuine issue of material fact that it was not an "initial transferee" but merely a conduit as to those funds.   The bankruptcy court in *Brooke* agreed, based on reasoning that the legal effect of the sale of interests in the loan is that each participant is "deemed to 'own' a portion of the loan and to acquire (by assignment from the lead bank) all of the rights attendant thereto." The Court found it was irrelevant under the reasoning of *Bonded* that the underlying Note remained payable to the lead bank, or that it "commingled" funds, because the lead bank could not use the funds for its own purposes without breaching its agreement with participants, and accordingly merely acted as agent to collect and service the loan on behalf of

6

the participant.

The same facts are present here. The Participation Agreement between Wells Fargo and Fifth Third expressly involves "sale" of interests in the "Loan Documents, the Collateral, and the Collections," where the lead merely services and administers the loan, must promptly pay Collections to the purchaser participants, the relationship between lead and participant is expressly that of seller and purchaser and "not a debtor-creditor relationship," and the lead retains physical possession of loan documents "on behalf of the Lead and the Participant." Participation Agreement, Sections 2.7, 3.2, 3.3, 5.1, 5.8.

Even if this Court were to disagree with the apparently sound reasoning of *Brooke* (though bound by the holding of *Bonded*), the substantial issue would plainly require that representation of Wells Fargo be disclosed by the Trustee and his counsel. Because they chose not to do so, obtained no waivers from the estate, and obviously did not even consider causes of action against Wells Fargo, any "investigation" of claims is certainly irrevocably tainted.

II.    <u>The New "Issues" Raised by the Trustee are Groundless</u>

Having no response to the fatal conflict issues, the Trustee instead opts to slander the objectors. Complaining "it is a shame that the estate and various parties will be charged with the additional cost of unnecessary briefing," he proceeds to devote 51 pages to attacking the "standing" and motives of objecting parties, based on nothing more than his own opinions, while simultaneously misrepresenting the terms of his Plan.

Although these new unsupported "arguments" are not properly before the Court, the fact that they have been raised requires the Objecting parties to address at least some of the more egregious misstatements:

7

A.  <u>The Motives of Objecting Parties</u>

According to the Trustee, the Court should ignore the Objections simply because the same

parties keep raising the same arguments about the Trustee's lack of objectivity and transparency.

This is proof, the Trustee suggests, that objectors are not sincere but are merely seeking to the

prevent progress of his lawsuits against them. After deriding the lack of "professionalism" of those

who dare to question his judgment, he proceeds to repeatedly denounce the alleged motives of

virtually all other counsel active in the case, as well as their clients.

Certainly nobody likes to be sued, as is apparent from the reactions of the Trustee and his

counsel to pending motions. There are few parties involved in the case (apart from Fifth Third and

Wells Fargo) who are *not* the subject of lawsuits or claims by the Trustee. The dogged persistence

of objecting parties arises, however, not from a desire to "misdirect" estate resources, but from the

Trustee's one-sided administration of the estate for the benefit of the banks, evidenced by virtually

every action the Trustee has undertaken in incurring $6 million of administrative expenses.

These include:

- ✓ Pushing through a Financing Order protecting the banks' "cash collateral," allowing their claim and providing substantial concessions, prior to any consideration of preference actions or other claims against the banks;

- ✓ Requiring parties to pay disputed funds into "escrow," followed by a Claims Report asserting that no party other than the banks can have a security interest in the funds, and a request that they be determined to be bank collateral;

- ✓ Extensive proceedings to disallow any claims for constructive trust, statutory trust, or any other interest which might compete with the banks' liens;

✓ Filing a growing multitude of preference actions against creditors, while finding that any action against the banks for an apparent $18 million preference is too complicated to pursue;

✓ Employing counsel representing the banks to "assist" in preparing a Report about potential claims against the banks which primarily focuses on potential or contrived defenses; and

✓ Proposing a "settlement" with the banks which brings virtually nothing into the estate and but requires release not only of the estate's claims but claims of individual creditors against the banks, the Trustee, and all their professionals for creditors to receive any benefit.

Simply stated, parties are regularly objecting because they have very good reasons.

B.  The Trustee's Challenge to Superior's "Standing" is Groundless and Disingenuous

Superior filed a Proof of Claim on April 29, 2011, to which are attached invoices and millions of dollars of checks written to Superior by Eastern which were dishonored by Fifth Third. In addition, the Schedules filed by the Trustee identify Superior as a creditor for "cattle payables."

Nonetheless, in the guise of a "reply" to Superior's Objections regarding the Trustee's Report, the Trustee makes two challenges to Superior's standing: First, it claims that based on the Trustee's interpretation of an Assignment of contracts to Superior made by the debtor after Eastern defaulted in payments, Superior allegedly gave up any right to recover its losses by agreeing to perform obligations under the assigned contracts.   Second, the Trustee contends that any claim by Superior must be disallowed under 11 U.S.C. § 502(d) until alleged preferences are repaid.

9

Both of these arguments are nothing more than self-serving assumptions about disputed issues which have not even been placed before the Court, much less decided, and for which the Trustee cites no evidence. Indeed, the first argument files in the face of the Trustee's *own* position that the Assignment of contracts is not even valid.   Similarly, the Trustee has not even *filed* the action for alleged preferences which he claims must be repaid, although Superior has a pending motion for summary judgment relating to its potential defenses, for which the Trustee has sought extensions of time to respond. Evidently, the Trustee believes that because he mentioned his argument in a discussion of counsel, the Court should determine that Superior has no standing.[7]

Moreover, even if the Trustee were correct that Superior received some preference, Section 502(d) does not deprive a party of *standing*, but merely prohibits allowance of claims until payment of any preference is made.   11 U.S.C. § 502(d).

C.   <u>The Trustee's Response Includes a New and Misleading Characterization of the Proposed Settlement and Plan</u>

Although the Trustee's proposed Plan was filed after the Report and Objections, and hence has nothing to do with a proper "reply" to the Objections, the Trustee's Response seeks to influence the Court's ruling on the Objections by offering an inaccurate and misleading characterization of Plan provisions.

---

[7] With respect to the Trustee's account of discussions at a meeting described on page 6 of the Trustee's Response, Superior's counsel simply state that they vigorously dispute the Trustee's version of alleged statements and that Superior's counsel clearly advised the Trustee at the same meeting that *any discussion regarding Superior's claim should be conducted with co-counsel at Bingham Greenebaum Doll because Rubin & Levin is precluded from representing Superior in matters other than those adverse to Fifth Third,* pursuant to the Court's ruling on objections made by the Trustee himself to retention of Rubin & Levin in the associated Gibson proceeding. The Trustee apparently never contacted Binham Greenebaum Doll on this issue.

A key example of such misstatements is the Trustee's assertion that "under the Trustee's proposed Plan, Fifth Third will . . . allow creditors to receive all of the $4.7 million that was seized from Tommy Gibson's Your Community Bank account." This is untrue.

In fact, the Plan and Disclosure Statement say *nothing* about such a concession, nor does the Disclosure Statement explain what, if any, legitimate claim Fifth Third could have to such funds. The Plan says nothing about these issues because, as the Trustee acknowledged in his recent deposition*, the funds in the bank account are not part of the bankruptcy estate, are not subject to the Bankruptcy Court's jurisdiction or the Plan, and are subject to determination by the FBI*. (Deposition of James Knauer Volume II, 64:14-20, 65:2-8, and 65:17-20). He also acknowledged there is no agreement about how the funds may be distributed by the FBI.   (*Id*. at 67:25 – 68:4; 68:5-12). The Trustee's description of his settlement and the Plan also fails to note other key limitations, such as the condition that creditors receive none of the alleged consideration from Fifth Third for release of the estate's claims unless they also provide broad releases for any *individual* claims they may have to Fifth Third, the Trustee, and all his professionals.

D.  <u>The Trustee's Revised Analysis of "Improvement in Position" is Misleading</u>

The Trustee's Response also offers a revised analysis of whether Fifth Third preferentially improved its position, though it remains based on illogical speculation which includes allegations about actions of Superior which the Trustee knows (or should know) are misleading and groundless.

In his initial Report, the Trustee says virtually nothing about this preference claim or his analysis, except that it involved computations by DSI, unspecified assumptions by the Trustee's counsel, and the conclusion he is unsure whether there is a claim but confident his settlement is

preferable. However, in the Plan and Trustee's Response filed a short time later, the Trustee changes his opinion to say there is no viable improvement in position claim, despite the fact that according to DSI the debt owing to Fifth Third was reduced by $18 million in the course of the 90 days, while the gross value of collateral remained the same.

To arrive at this surprising conclusion, the Trustee admits he makes radically different assumptions for the two relevant dates, just 3 months apart, about the "realizable" value of the collateral and the costs of collection. As noted, DSI determined that the face amount of all collateral including accounts receivable was nearly the same on the two dates. But according to the Trustee, what would otherwise appear to be an $18 million preference claim disappears because he believes the gross values should be adjusted (in favor of Fifth Third) to reflect his assumptions about radically different "realizable" value and collection costs for September and December, of the same year.[8]

Obviously, such extreme adjustment over a short period of time in favor of the potential defendant is an unusual position for a Trustee to take in the absence of law compelling such result – which the Trustee neither alleges nor cites. In his Report, the Trustee attributed the different assumptions to speculation about "many things . . .that would almost certainly not have happened (or would have been more readily avoidable had they occurred) had a bankruptcy been filed on September 7 without an intervening receivership." He points to the absence of an "automatic stay" in the receivership that would prevent actions by creditors (including Superior) to protect their

---

[8] Specifically, he assumes that 85% of accounts receivable would be recovered in a hypothetical bankruptcy on September 7, while a much smaller percentage (55%, though not disclosed) would be recovered three months later –   reducing the improvement by roughly $13 million.   He similarly adjusts the inventory figures, and collection costs, which he assumes would increase by 4 times from September to December ($1.4 million vs. $6 million.)

rights, and "enormous litigation expenses" from interpleader actions and disputes. However, Superior pointed out, in its objection to the Report, that it was Fifth Third's dishonor of millions of dollars in checks prior to the receivership -- which would occur in September or any time Fifth Third attempted to halt the kite and collect – which understandably prompted disputes and actions by creditors. Superior also noted that Fifth Third could not file a bankruptcy for Eastern, would have taken the same actions in September or December, and that the receivership did have a stay comparable to Section 362.

In his current response, the Trustee now omits any discussion of a hypothetical bankruptcy in September, automatic stays or the alleged effect of a receivership, and simply relies on his default position of blaming Superior and others. He now says a 30% discount in receivables and similar discount in inventory is mandated in determining value in December (but not September) solely because of unproven accusations that "Superior and other parties working in collusion with Tommy Gibson diverted over $14 million of ELC cattle, cattle sales proceeds, and receivables owing to ELC from cattle sales." Trustee's Response, page 29. As in the past, he cites nothing.

There is absolutely no basis for this contention. The Trustee does not identify the alleged grounds for his accusations, but they presumably involve his arguments about the validity of contract Assignments to Superior.   These arguments have not even been placed before the Court, much less decided. Moreover, there is a fatal problem with his contention, even if the Trustee were to successfully challenge the Assignments.   Specifically, the Trustee fails to acknowledge that *none* of the accounts which are the subject of the Assignments were included in DSI's estimate of valid accounts receivable[9] on December 6.   Obviously, because the assigned accounts were not

---

9  This is shown by comparison of the $43 million in accounts receivable shown on Schedule B-16 of the Amended Schedules prepared by DSI with the list of accounts associated with the assignment shown by Exhibit B to the

included in the "gross" value of valid accounts receivable in the first place, the alleged "diversion" is no reason to discount that value. [10]  To the contrary, if the Trustee were to successfully challenge the assignments, the value of Fifth Third collateral (and hence its improvement in position) would be *increased*.

For all of these reasons, the Court should disregard the unsupported, groundless and misleading accusations made in the Trustee's Response, and should determine that the Report is not an independent assessment of potential claims, but is unavoidably tainted by conflicts of interest, and as such provides no basis for a Disclosure Statement or evaluation of the Trustee's plan.

Respectfully submitted,

RUBIN & LEVIN, P.C.

By:   /s/ John M. Rogers
Elliott D. Levin
John M. Rogers, Atty. No. 6182-49
Christopher M. Trapp, Atty No. 27367-53
RUBIN & LEVIN, P.C.
342 Massachusetts Avenue
Indianapolis, IN 46204
(317) 634-0300; FAX (317) 453-8601
johnr@rubin-levin.net

ONE OF COUNSEL FOR SUPERIOR
LIVESTOCK AUCTION, INC.

---

Trustee's Response, which reveals no accounts in common.

10 In addition, the Trustee's argument makes no sense even if this were not the case. By definition, accounts receivable are funds owed by *some* party to the debtor, and if Superior "diverted" funds Eastern would have claims against two parties – Superior and the customer who mistakenly paid Superior. The Trustee has asserted such claims against Superior, for the benefit of Fifth Third. Moreover, Superior alone would likely be a better account debtor than many of Eastern's defrauded customers.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 16, 2012, a copy of the foregoing *Reply by Superior Livestock Auction, Inc. to Trustee's Response to Objections and Motions to Strike the Trustee's Report* was filed electronically. Notice of this filing will be sent to the following parties through the Court's Electronic Case Filing System.   Parties may access this filing through the Court's system:

| | |
|---|---|
| David L. Abt | davidabt@mwt.net |
| John W Ames | jwa@gdm.com, |
| | shm@gdm.com;tlm@gdm.com;rtrowbridge@kslaw.com |
| T. Kent Barber | kbarber@dlgfirm.com, dlgecf@dlgfirm.com;dlgecfs@gmail.com |
| C. R. Bowles | crb@gdm.com, shm@gdm.com;lgw@gdm.com |
| Lisa Koch Bryant | courtmail@fbhlaw.net |
| James M. Carr | james.carr@bakerd.com, patricia.moffit@bakerd.com |
| John R. Carr | jrciii@acs-law.com, sfinnerty@acs-law.com |
| Deborah Caruso | dcaruso@daleeke.com, |
| | lharves@daleeke.com;mthomas@daleeke.com |
| Bret S. Clement | bclement@acs-law.com, sfinnerty@acs-law.com |
| Jesse Cook-Dubin | jcookdubin@vorys.com, vdarmstrong@vorys.com |
| Kirk Crutcher | kcrutcher@mcs-law.com, |
| | jparsons@mcs-law.com;cmarshall@mcs-law.com |
| Dustin R. DeNeal | dustin.deneal@bakerd.com, patricia.moffit@bakerd.com |
| Laura Day DelCotto | ldelcotto@dlgfirm.com, dlgecf@dlgfirm.com;dlgecfs@gmail.com |
| David Alan Domina | dad@dominalaw.com, |
| | KKW@dominalaw.com;efiling@dominalaw.com |
| Daniel J. Donnell on | ddonnellon@ficlaw.com, knorwick@ficlaw.com |
| Robert Hughes Free | robertforee@bellsouth.net |
| Sandra D. Freeburger | sfreeburger@dsf-atty.com, smattingly@dsf-atty.com |
| Terry E. Hall | terry.hall@bakerd.com, sharon.korn@bakerd.com |
| John Huffaker | john.huffaker@sprouselaw.com, |
| | lynn.acton@sprouselaw.com;rhonda.rogers@sprouselaw.com |
| James Bryan Johnston | bjtexas59@hotmail.com, bryan@ebs-law.net |
| Todd J. Johnston | tjohnston@mcjllp.com |
| Edward M King | tking@fbtlaw.com, dgioffre@fbtlaw.com |
| James A. Knauer | jak@kgrlaw.com, hns@kgrlaw.com |
| Theodore A Konstantinopoulos | ndohbky@jbandr.com |
| Randall D. LaTour | rdlatour@vorys.com, khedwards@vorys.com |
| David L. LeBas | dlebas@namanhowell.com, koswald@namanhowell.com |
| Elliott D. Levin | edl@rubin-levin.net |
| Kim Martin Lewis | kim.lewis@dinslaw.com, |
| | lisa.geeding@dinslaw.com;patrick.burns@dinslaw.com |
| Karen L. Lobring | lobring@msn.com |
| John Hunt Lovell | john@lovell-law.net, sabrina@lovell-law.net |

| | |
|---|---|
| John Frederick Massouh | john.massouh@sprouselaw.com |
| Kelly Greene McConnell | lisahughes@givenspursley.com |
| William Robert Meyer | rmeyer@stites.com |
| Allen Morris | amorris@stites.com, dgoodman@stites.com |
| Judy Hamilton Morse | judy.morse@crowedunlevy.com, ecf@crowedunlevy.com;donna.hinkle@crowedunlevy.com;karol.brown@crowedunlevy.com |
| Walter Scott Newbern | wsnewbern@msn.com |
| Matthew J. Ochs | matt.ochs@moyewhite.com, kim.maynes@moyewhite.com |
| Ross A. Plourde | ross.plourde@mcafeetaft.com, erin.clogston@mcafeetaft.com |
| Timothy T. Pridmore | tpridmore@mcjllp.com, lskibell@mcjllp.com |
| Jeffrey E. Ramsey | jramsey@hopperblackwell.com, mhaught@hopperblackwell.com |
| Mark A. Robinson | mrobinson@vhrlaw.com, dalbers@vhrlaw.com |
| Jeremy S Rogers | Jeremy.Rogers@dinslaw.com, joyce.jenkins@dinslaw.com |
| Ivana B. Shallcross | ibs@gdm.com |
| Robert K Stanley | robert.stanley@bakerd.com |
| Meredith R. Thomas | mthomas@daleeke.com, kmark@daleeke.com |
| John M. Thompson | john.thompson@crowedunlevy.com, jody.moore@crowedunlevy.com,donna.hinkle@crowedunlevy.com |
| U.S. Trustee | ustpregion10.in.ecf@usdoj.gov |
| Stephen A. Weigand | sweigand@ficlaw.com |
| Charles R. Wharton | Charles.R.Wharton@usdoj.gov, Charles.R.Wharton@usdoj.gov |
| James T. Young | james@rubin-levin.net, ATTY_JTY@trustesolutions.com;kim@rubin-levin.net;lemerson@rubin-levin.net |

I further certify that on August 16, 2012, a copy of the foregoing *Reply by Superior Livestock Auction, Inc. to Trustee's Response to Objections and Motions to Strike the Trustee's Report* was mailed by first-class U.S. Mail, postage prepaid, and properly addressed to the following:

National Cattlemen's Beef Association
c/o Alice Devine 6031 SW 37th St.,
Topeka, KA 66610

/s/ John M. Rogers
John M. Rogers

F:\WP80\GENLIT\Farm Credit West-Eastern Livestock-85021201\Pleadings\Final Reply to Trustee's Response.docx

16