UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA

IN RE:                         .    Case No. 10-93904-BHL-11
                               .
EASTERN LIVESTOCK CO., LLC,    .
                               .    110 U.S. Courthouse
                               .    121 West Spring Street
                               .    New Albany, IN  47150
         Debtor.               .
                               .    August 20, 2012
. . . . . . . . . . . . . . .       10:01 a. m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE BASIL H. LORCH, III
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For James A. Knauer:      Faegre Baker Daniels, LLP
                          By:  JAMES M. CARR, ESQ.
                               TERRY E. HALL, ESQ.
                               KEVIN M. TONER, ESQ.
                          300 N. Meridian St., Suite 2700
                          Indianapolis, IN  46204-1750

                          Hoover Hull, LLP
                          By:  SEAN T. WHITE, ESQ.
                          111 Monument Circle, Suite 4400
                          Indianapolis, IN 46444

For Fifth Third Bank:     Vorys, Sater, Seymour and Pease, LLP
                          By:  RANDALL D. LaTour, ESQ.
                          52 East Gay Street, P.O Box 1008
                          Colombus, OH  43216-1008


Audio Operator:           Amy Massey


Proceedings recorded by electronic sound recording, transcript
              produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**
**(609)586-2311     Fax No. (609) 587-3599**

APPEARANCES:   (Cont'd)

| | |
|---|---|
| For First Bank: | Faruki Ireland & Cox, P.L.L.<br>By:  DANIEL J. DONNELLON, ESQ.<br>     STEPHEN A. WEIGAND, ESQ.<br>201 East Fifth Street, Suite 1420<br>Cincinnati, OH  45202 |
| For Blue Grass<br>Stockyards, et al.: | DelCotto Law Group, PLLC<br>By:  LAURA DAY DelCOTTO, ESQ.<br>     AMELIA MARTIN ADAMS, ESQ.<br>200 North Upper Street<br>Lexington, KY  40507-1017 |
| For CPC Livestock, LLC<br>et al.: | W. Scott Newbern, PL<br>By:  WALTER SCOTT NEWBERN, III, ESQ.<br>2982 East Gevemy<br>Tallahassee, FL  32309 |
| For Kentucky Cattlemen's<br>Association: | Brammell & Clubb, PSC<br>By:  JOSHUA ELLIOTT CLUBB, ESQ.<br>18 Berry Street<br>New Castle, KY 40050 |
| For Superior Livestock<br>Auction, et al.: | Rubin & Levin, P.C.<br>By:  JOHN M. ROGERS, ESQ.<br>     ELLIOTT D. LEVIN, ESQ.<br>     CHRISTOPHER M. TRAPP, ESQ.<br>500 Marott Center<br>342 Massachusetts Avenue<br>Indianapolis, IN  46204-2161 |
| For Joplin Regional<br>Stockyards, et al.: | Bingham Greenebaum Doll<br>By:  C.R. BOWLES, JR., ESQ.<br>     JOHN W. AMES, ESQ.<br>3500 National City Tower<br>101 South Fifth Street<br>Louisville, KY  40202 |
| For the U.S. Trustee: | Office of the U.S. Trustee<br>By:  CHARLES R. WHARTON, ESQ.<br>     RONALD MOORE, ESQ.<br>101 West Ohio Street, Suite 1000<br>Indianapolis, IN  46204 |
| For Fifth Third Bank: | Frost Brown Todd, LLC<br>By:  EDWARD M. KING, ESQ.<br>400 West Market Street, 32nd Floor<br>Louisville, KY 40202 |

3

APPEARANCES:    (Cont'd)

For Your Community Bank:  Reed Weitkamp Schell & Vice, PLLC
                          By:  MICHAEL WAYNE OYLER, ESQ.
                          500 West Jefferson Street, Suite 2400
                          Louisville, KY 40202

TELEPHONIC APPEARANCES:

For Anna Gayle Gibson:    Deitz, Shields & Freeburger, LLP
                          By:  SANDRA D. FREEBURGER, ESQ.
                          101 First Street, 2nd Floor
                          Henderson, KY  42420

For Trustee James         Faegre Baker Daniels, LLP
Knauer:                   By:  HARMONY A. MAPPES, ESQ.
                               WENDY W. PONADER, ESQ.
                               SHAWNA M. EIKENBERRY, ESQ.
                          300 North Meridian Street, Suite 2700
                          Indianapolis, IN  46204

For J&F Oklahoma          Naman, Howell, Smith & Lee, PLLC
Holdings, Inc.:           By:  DAVID L. LeBAS, ESQ.
                          8310 North Capital of Texas Highway
                          Suite 490
                          Austin, TX  78731

For Agri Beef:            Givens Pursley, LLP
                          By:  KELLY GREENE McCONNELL, ESQ.
                          401 West Bannock Street
                          Boise, ID 83702

For Bank First and        Redman Ludwig, PC
Strickland Farms:         By:  ERIC COLLINS REDMAN, ESQ.
                          151 North Delaware Street, Suite 1106
                          Indianapolis IN 46204

For Trustee James         Kroger Gardis & Regas, LLP
Knauer:                   By:  JENNIFER WATT, ESQ.
                          111 Monument Circle, suite 900
                          Indianapolis, IN 46204-5125

For Peoples Bank of       Moye White, LLP
Coldwater Kansas:         By:  DAVID A. LAIRD, ESQ.
                          16 Market Square, 6th Floor
                          1400 16th Street
                          Denver, CO 80202

For Trustee Kathryn Pry   Dale & Eke, P.C.
in Gibson Case:           By:  MEREDITH R. THOMAS, ESQ.
                          9100 Keystone Crossing, Suite 400
                          Indianapolis, IN 46204

TELEPHONIC APPEARANCES:   (Cont'd)

For Indiana Bank and        Ayres Carr & Sullivan, P.C.
Trust:                      By:  JOHN R. CARR, III, ESQ.
                                 BRET S. CLEMENT, ESQ.
                            251 East Ohio Street, Suite 500
                            Indianapolis, IN 46204


For National Cattlemen      Devine & Donley, LLC
Associate:                  By:  ALLIE DEVINE, ESQ.
                            534 South Kansas Avenue, Suite 1420
                            Topeka, KA 66603

For Robert Nichols and      Miller Dollarhide
Nichols Livestock:          By:  JACK S. DAWSON, ESQ.
                            100 Park Avenue, 2nd Floor
                            Oklahoma City, OK 73102

For Fifth Third Bank:       Vorys, Sater, Seymour and Pease, LLP
                            By:  ERIC W. RICHARDSON, ESQ.
                            301 East Fourth Street, Suite 3500
                            Great American Tower
                            Cincinnati, OH 45202

For Friona Industries:      Sprouse Shrader Smith, PC
                            By:  JOHN FREDERICK MASSOUH, ESQ.
                            701 South Taylor Street, Suite 500
                            Amarillo, TX 79101

For Cactus Growers:         Lovell, Lovell, Newson & Isern, LLP
                            By:  JOHN HUNT LOVELL, ESQ.
                            112 West 8th Avenue, Suite 1000
                            Amarillo, TX 79101

- - -

<u>I N D E X</u>

| **WITNESSES** | | **PAGE** |
|---|---|---|
| JAMES A. KNAUER | | |
| Direct Examination by Mr. Donnellon | | 48 |
| Cross Examination by Mr. Toner | | 58 |
| Redirect Examination by Mr. Donnellon | | 60 |
| Recross Examination by Mr. Toner | | 63 |
| Further Redirect Examination by Mr. Donnellon | | 63 |
| Further Recross Examination by Mr. Toner | | 96 |
| Further Redirect Examination by Donnellon | | 98 |
| | | |
| TERRY HALL | | |
| Direct Examination by Mr. Donnellon | | 149 |
| Cross Examination by Ms. DelCotto | | 192 |

| **EXHIBITS** | | **ID**. | **EVD**. |
|---|---|---|---|
| CREDITOR-1 | Wells Fargo & Company Policy Regarding Legal Conflicts of Interest | 64 | -- |
| CREDITOR-2 | E-mail Thread - Mr. Foster and Mr. Hubbard | 152 | -- |
| | January 28 Memorandum - James Carr to Randall LaTour | 185 | -- |
| Deposition Documents | Except for 5, 10, 12, 27 | -- | 104 |

1          THE COURT:  Good morning.  Be seated.  All right.

2    We're on the record in the matter of Eastern Livestock.  I have

3    appearances -- well, let's do them both.  Let's do, first of

4    all, the live appearances.  Someone start.

5          MR. CARR:  I'll start, Your Honor.  Jim Carr, Terry

6    Hall, Kevin Toner, Sean White, all for the trustee.  And the

7    Trustee James Knauer, is here, as well.

8          MR. LaTOUR:  Good morning, Your Honor.  Randall

9    LaTour from Vorys, Sater, Seymour and Pease, LLP representing

10   Fifth Third Bank.

11         THE COURT:  Mr. Donnellon, don't get up.

12         MR. DONNELLON:  Thank you, Your Honor.  Dan

13   Donnellon, Faruki, Ireland & Cox for First Bank.

14         MR. WEIGAND:  Steve Weigand with Faruki, Ireland &

15   Cox, also for First Bank.

16         MS. DelCOTTO:  Good morning, Your Honor.  Laura Day

17   DelCotto and Amelia Adams appearing this morning for the Blue

18   Grass Stockyards companies.  Also present as a representative

19   of Blue Grass is Mr. Jim Akers.  We also appear for our other

20   clients, Alton Darnell, East Tennessee Livestock Center,

21   Moseley Cattle Auction, Piedmont Livestock Company and

22   Southeast Livestock Exchange.

23         MR. NEWBURN:  Scott Newburn, Your Honor, for four

24   creditors and CPC Livestock.

25         MR. CLUBB:  Good morning, Your Honor.  Josh Clubb,

1  I'm here this morning on behalf of Kentucky Cattlemen's

2  Association.  With me is the president of the Kentucky

3  Cattlemen's Association, Dave Maples.

4          MR. ROGERS:  Good morning, Your Honor.  John Rogers,

5  Elliot Levin and Chris Trapp from Rubin Levin on behalf of

6  Superior Livestock Auction.

7          MR. BOWLES:  I'm here with John Ames, Chip Bowles of

8  Bingham, Greenebaum & Doll for Joplin Regional.

9          MR. WHARTON:  Your Honor, Chuck Wharton and Ron Moore

10 for the United States Trustee.

11         MR. KING:  Good morning, Your Honor.  Ted King,

12 Frost, Brown, Todd for Fifth Third.

13         THE COURT:  Appearing by phone.

14         MS. FREEBURGER:  This is Sandra Freeburger for Anna

15 Gayle Gibson.

16         MS. PONADER:  Good morning, Your Honor.  Wendy

17 Ponader, Faegre Baker Daniels on behalf of the trustee.

18         MS. MAPPES:  Also Harmony Mappes from Faegre, Baker,

19 Daniels on behalf of the trustee.

20         MR. LeBAS:  David LeBas for J&F Oklahoma.  Also for

21 Friona Industries to the extent their primary counsel is unable

22 to appear.

23         MS. McCONNELL:  Good morning, Your Honor.  Kelly

24 McConnell, counsel for Agri Beef.

25         MR. REDMAN:  Eric Redman for Bank First and

1  Strickland Farms Partnership.

2          THE COURT:  Is that it?

3                  (No audible response)

4          THE COURT:  All right.  There are a number of things

5  on the agenda this morning.  Let's consider first any matters

6  that will allow the parties who are just peripherally involved,

7  or involved in a discreet issue, to participate and then go do

8  something more pleasant.

9          MR. TONER:  Kevin Toner for the trustee, Your Honor.

10  On the proposed agenda, Item A is a number of status conference

11  and pretrial conferences.  I don't know whether I heard any of

12  the counsel for the defendants in those adversary proceedings

13  on the telephone.  But I think in 10 minutes we could probably

14  go through them and update the Court so that we don't have to

15  roll them again to the next get together.

16          THE COURT:  All right.  Let's do that.

17          MR. TONER:  Okay.  In the matter of Atkinson

18  Livestock I can report that the parties are actively involved

19  in settlement negotiations and exchanging numbers to

20  compromise.  At this time I would ask that the Court just hold

21  the -- any deadlines in the case in advance so that they can

22  conclude that in the next 30 to 60 days in the Court filing.

23          In the matter of Corey Kay and Schroeder Farms, there

24  is an agreement to an amount to settle; however, there's still

25  some give and take over the actual terms of the settlement

1   document.  And I have every reason to believe that in the next

2   30 days we'll be filing a motion to approve  settlement in that

3   matter.

4            In the matter of Demaio Farms, attorney Jeff Graham

5   with the Taft firm has just very recently entered his

6   appearance.  He has jointly agreed with us that we should move

7   off the deadline to file the joint pretrial statement for 30

8   days.  And that motion has been prepared and should be filed, I

9   think, yet today.

10           THE COURT:  All right.

11           MR. TONER:  In the matter of Allen Barry, there is no

12  appearance for defendant.  We have started preparing a default

13  judgment and will present that to the Court before the end of

14  the week.

15           In the next matter, Pesetsky Land and Cattle, we have

16  reason to believe that Pesetsky Land has dissolved, as the mail

17  keeps being returned to us.  What we would ask for, and what --

18  we're putting this in a written motion, is for an additional 30

19  days to try and accomplish service or dismiss the adversary

20  proceeding.

21           THE COURT:  All right.

22           MR. TONER:  In the matter of Ron Shephard, no one has

23  entered for Defendant Shephard.  And that is another case in

24  which we are preparing a motion for default judgment to present

25  to the Court by the end of the week.

1         That leaves four matters, and I understand Jennifer

2  Watt from the Kroger Gardis & Regas firm is on the line to

3  comment on those four.  Are you there, Jennifer?

4         MS. WATT:  I am, thank you.  Good morning, Your

5  Honor.  On behalf of Mr. Knauer, the trustee, I'm Jennifer Watt

6  representing the status in the matters of (indiscernible) Salem

7  Livestock.  Mr. Graham, Jeff Graham has appeared.  He has filed

8  a motion for additional time for pretrial order and time to

9  answer.  Those matters I don't believe have been granted yet.

10 We don't have an objection to either.

11        THE COURT:  All right.  I'll grant those.

12        MS. WATT:  Okay.  With respect to Tennessee Valley

13 Livestock, the parties agreed to an agreement in principle.

14 The agreement is out -- temporary agreement is out for

15 signature and once that is accomplished, we will be filing a

16 motion with the Court for settlement.

17        THE COURT:  Okay.

18        MS. WATT:  On Sand Mountain, we have filed a motion

19 to settle that matter and that is out on notice for all the

20 parties.

21        THE COURT:  Okay.

22        MS. WATT:  And with respect to Gene Stoops, Mr.

23 Stoops has not filed a response or appearance.  A motion for

24 default was filed on the 16th.

25        THE COURT:  All right.  Very good.  Anybody else want

1   to be heard on any of the adversary matters that were just ran

2   down?

3                    (No audible response)

4            THE COURT:  Any other attorneys appearing in those

5   matters?

6                    (No audible response)

7            THE COURT:  All right.

8            MS. HALL:  The only other item, Your Honor, on the

9   agenda that may not be contested, although I don't think I

10  heard any attorneys entering an appearance for it, is the

11  related case of the Gibson bankruptcy on the Intrust Bank's

12  motion for relief from stay, which is at the end of the agenda.

13           THE COURT:  Does anybody here on any matter in either

14  East-West Trucking or in the matter of Thomas and Patsy Gibson?

15                   (No audible response)

16           THE COURT:  All right.  Do they have no -- have you

17  been in communication with them concerning your rep -- I don't

18  know if it was an objection or -- limited objection to their

19  motion for relief from stay?

20           MS. HALL:  We have not, Your Honor.  It was scheduled

21  for a hearing today.

22           THE COURT:  All right.

23           MS. HALL:  Maybe we should just continue that.

24           THE COURT:  I'll continue that to -- do we have a

25  next omnibus date?

1          COURT CLERK:  (Indiscernible).

2          THE COURT:  We'll have to talk later in the hearing

3  as to when we'll continue that to.  All right.  Next we have a

4  variety of motions concerning a variety of things.  We have

5  motion to remove the trustee, motion to strike the appearance

6  of Baker Daniels -- Faegre Baker Daniels as counsel, et cetera.

7          You know, I'd like to just have a little discussion

8  with everyone here about this matter before we would get into

9  it.  I'm not -- I really think we've gotten to a point here

10 where we can't see the forest or the trees.  We're so caught up

11 in process that -- and I've read, you know, 0hundreds of pages

12 of contentious sniping back and forth about these issues.  And

13 no one seems to, or to varying degrees, no one seems to really

14 focus on what the objective is here.

15         If you can boil down what everyone over here is upset

16 about, and when I say over here, I mean the parties that have

17 sought removal of the trustee and counsel, and further

18 disclosure of documents, and et cetera.  Well, I mean, look,

19 don't let me say it for you.  I guess what I come to is you

20 don't think that there's been a neutral evaluation of whether

21 or not it's in the best interest of the estate to sue the bank

22 or to settle with the bank.  Is that correct?  Don't stand up.

23         MR. DONNELLON:  Okay.  Your Honor, respectfully, I

24 don't think that's the issue here.  That's not the issue at

25 all.

1          THE COURT:  What is the issue, then?

2          MR. DONNELLON:  This goes back to the very inception

3    of this case when my client was the first one to object to the

4    professionals, understanding that this is a case that is going

5    to have a dramatic effect on the livestock industry as a whole,

6    and needs to be very transparent, very neutral.  Understanding,

7    that this may not be your typical Chapter 11 where there's 20

8    to 40 cents on the dollar to go around and the secured

9    creditors get everything.  And we've raised these issues as a

10   threshold matter early on in the case and it's a fundamental

11   question.  It has nothing to do with whether the trustee has

12   exercised his business judgment correctly, from my perspective.

13         THE COURT:  Well, no, but it has to do with -- I

14   mean, what does it have to do with if it doesn't have to do

15   with, ultimately, what's the best way to recover monies for

16   unsecured creditors in this case?  Isn't that the ultimate end

17   question?

18         MR. DONNELLON:  Certainly, the ultimate end question

19   is the best way to recover monies for creditors of the estate.

20         THE COURT:  All right.  Let me stop you there.  Let

21   me stop you there.  And -- so we're all in agreement on that.

22   Does anybody disagree with that?

23                   (No audible response)

24         THE COURT:  All right.  So here we are after two

25   years and we're going to fight about what the best way to

1  recover -- the best way to reach that objective, right.  And

2  you say, well, it should have been done differently from the

3  beginning.  You say you don't like -- we should strike Sean

4  White's report.  You say that you need to see more documents

5  about communication.  Let's say that we do that, we go that

6  route, and, ultimately, there is a new trustee.  First of all,

7  that's going to take a while, you understand that.

8          MR. DONNELLON:  Certainly.  I would imagine it's not

9  going to be overnight.

10          THE COURT:  And then, I guess, you're going to --

11  there will be another investigation, which you want to be --

12  which you will be satisfied with that is more neutral that will

13  take place, right?

14          MR. DONNELLON:  Any neutral investigation, my

15  clients, and I believe the other creditors, as well, would be

16  satisfied with.

17          THE COURT:  Now, there -- let me stop you there.  So

18  if someone that you were convinced was totally neutral came to

19  the same conclusion that this trustee did, you would not oppose

20  it, is that what you're telling me?

21          MR. DONNELLON:  I would have to say yes, but we're on

22  the hypothetical, we're well putting --

23          THE COURT:  Do you agree with that, Ms. DelCotto?

24          UNIDENTIFIED SPEAKER:  Pardon?

25          THE COURT:  Do you agree with that, Mr. Rogers, Mr.

1  Clubb?  If someone who you had no question was neutral and we

2  didn't -- had no connect -- had never even heard the words

3  Wells Fargo or Fifth Third, taken to the same conclusion, would

4  you object to it?

5       MR. ROGERS:  I don't believe so, but I would say -- I

6  do want to clarify that the conclusion we're talking about here

7  is I don't think anybody who's made objections is saying we

8  want to sue Fifth Third, we have to sue Fifth Third.  I don't

9  think we're opposed to the idea of a settlement at all, but I

10 think --

11      THE COURT:  What are --

12      MR. ROGERS:  -- you'd question, can you settle if you

13 have a conflict and if you don't have anybody who can bring a

14 suit?

15      THE COURT:  Well, first of all, I think you have

16 someone who can bring a suit.  Now, I read them -- I may read

17 those documents differently than you do, but I think it states

18 pretty clearly that it says we might sue you down the road.

19 Now, we can talk about that, but that's not answering my

20 question.  My question is, if you were satisfied with the total

21 neutrality of whoever made the decision and that person's

22 decision was still that it's economically and pragmatically and

23 legally in the best interest of the creditors, the unsecured

24 creditors in this case to settle with Fifth Third instead of

25 sue, would you agree with that?

1          MR. ROGERS:  And that's the distinction I was making,

2    was settle on what terms?

3          THE COURT:  Well, now, wait a minute.  You already

4    have every means to oppose the proposed settlement on its

5    terms.  You can -- you and your clients can vote against the

6    plan, right?

7          MR. ROGERS:  Only -- well, yes, Your Honor.

8          THE COURT:  Maybe, if you even have a claim in the

9    case, you can vote against the plan.

10          MR. ROGERS:  And we think it's clear we do, so, yes,

11    Your Honor.

12          THE COURT:  I understand.  That's been tossed around

13    a little bit, too.  And Mr. Donnellon may not have a claim in

14    the case.

15          MR. DONNELLON:  Can I address the hypothetical that I

16    had trouble with before, Your Honor, because I think this is

17    fundamental to -- you had us all agree that the best interest

18    is getting and maximizing the value for the creditors.  And I

19    think it's easy to find Waldo in the picture once you've

20    already found him the first time.  It's easier to solve a maze

21    puzzle when you start at the end and go back to the beginning.

22    And, so, it's certainly easy to say here hypothetically, if we

23    had an independent, completely neutral trustee who agreed to

24    settle with Fifth Third, perhaps, on exactly these same terms,

25    would we be okay with that.  The problem is maximizing value

1   for the creditors in a Chapter 11 --

2              THE COURT:  Well, let me interrupt.

3              MR. DONNELLON:  --- is governed by a set of rules

4   that weren't followed.

5              THE COURT:  Let me ask you this, Mr. Donnellon.  You

6   sat in on all of these depositions that Sean White took of the

7   bank.

8              MR. DONNELLON:  Almost all of them, yes, sir.

9              THE COURT:  And you asked questions.

10             MR. DONNELLON:  Very infrequently, but, yes, sir, I

11  had the opportunity.

12             THE COURT:  All right.  And did you come to the

13  conclusion, based upon the discovery that you participated in,

14  that suing the bank is a better alternative than settling with

15  the bank?

16             MR. DONNELLON:  Absolutely -- well, the bank has

17  never offered to settle with my client, but at this point I

18  have a lawsuit filed.

19             THE COURT:  And there's nothing to stop you from

20  doing that, right?  You're still pursuing that avenue, also.

21             MR. DONNELLON:  Absolutely.  But under the terms of

22  this plan that's been proposed that I think is tainted because

23  of the departure from the rules, the trustee has made it clear

24  in his deposition that he's giving a global release to Fifth

25  Third and to himself and to Baker & Daniels.  And that he is

1  releasing claims that he claims he couldn't even bring fraud

2  and that he testified if Fifth Third wants to come in our

3  separate proceeding in state court and say, I've already been

4  released by all these claims by the trustee, that's my problem,

5  not his.  And, so, if I were in a position where I felt that

6  the settlement --

7          THE COURT:  Well, now, wait a minute.  I thought

8  under the terms of the plan you had a right not to participate

9  in the distribution by Fifth Third and to sue them?

10         MR. DONNELLON:  That's the way the plan reads on its

11  face.

12         MR. ROGERS:  But not as to any estate plan.  Not

13  anything that would overlap an estate plan, which we assume

14  they're going to say is everything.

15         THE COURT:  Wouldn't you rather have a claim that is

16  not an estate claim?  I mean, don't your clients have

17  individual claims?

18         UNIDENTIFIED SPEAKER:  Yes.

19         MR. LEVIN:  Your Honor, the creditors can't bring

20  improvement of position claims --

21         THE COURT:  I can't hear you, Mr. Levin.

22         MR. LEVIN:  The creditors can't bring improvement of

23  position claims, preference claims, against the bank.

24  Creditors can't bring --

25         UNIDENTIFIED SPEAKER:  (Indiscernible) --

1          MR. LEVIN:  -- claims against the bank.  These are

2   all estate causes of action that are being waived in the plan

3   and the estate is not getting anything for those causes of

4   action.

5          MR. ROGERS:  That's their --

6          MS. DelCOTTO:  Your Honor, I'd like to be able to

7   speak on your hypothetical before we go too far afield.

8          THE COURT:  All right.

9          MS. DelCOTTO:  Your hypothetical is would the

10  creditors of the estate be happy if they had had a neutral

11  investigation.  That is what they're entitled to by law.  And,

12  so, the issue is not about the results of the investigation.

13  The issue is about, there has not been a fiduciary --

14         THE COURT:  That's right.

15         MS. DelCOTTO:  -- and neutral investigation because

16  of the non-disclosed material limitations on judiciary --

17         THE COURT:  Well, see, that's where you and I

18  disagree, Ms. DelCotto.  I don't think that's the ultimate

19  question.  I think that's the process.  And I understand that

20  you have problems with the process and you think that the

21  process taints the answer.  But what I'm trying to get to --

22  and, you know, I think some of your clients want a speedy

23  resolution to this matter.  I can't see how anything that

24  you're proposing isn't -- will lead to a speedy resolution of

25  anything.

1            MS. DelCOTTO:  Well, there are a number of exit

2  strategies that I think are obvious to everyone.

3            THE COURT:  Name me one.

4            MS. DelCOTTO:  There's conversion.

5            THE COURT:  All right.  Let's talk about --

6            MS. DelCOTTO:  There's removal.

7            THE COURT:  Well, wait a minute.

8            MS. DelCOTTO:  There's derivative standing.

9            THE COURT:  Wait a minute.  Wait a minute.  Wait a

10 minute.  Wait a minute.  I get to interrupt.  Let's talk about

11 conversion.

12           MS. DelCOTTO:  Well, that --

13           THE COURT:  So we would appoint a 7 trustee, all

14 right, and I guess your hope is that trustee would sue the

15 bank.  Who's going to fund that?

16           MS. DelCOTTO:  My hope is that that trustee would

17 have the ability to sue the bank --

18           THE COURT:  And how is that going to be funded?

19           MS. DelCOTTO:  --  which this trustee does not.

20           THE COURT:  And how is that going to be funded?

21           MS. DelCOTTO:  By contingency counsel who have agreed

22 to accept and pursue that, which this trustee is by request to

23 investigate contingency counsel refused to do so.  There are

24 contingency counsel who would represent a neutral trustee in

25 bringing claims, not bringing claims, whatever that neutral

1 | trustee elected.

2 |         THE COURT:  All right.  And tell me how many years

3 | you think that would take?

4 |         MS. DelCOTTO:  Your Honor, my clients want to settle.

5 | My clients want people to talk to each other and get in a room.

6 | That has been my consistent message since the very beginning.

7 | And I have always wondered why a trustee would not want to

8 | begin to slowly untangle the web and try to resolve matters in

9 | this case.  And now -- the only conclusion I can reach now that

10 | I know what I know, and the exercise of my ethical duties to my

11 | client, is that had we all gotten in a room, it might have come

12 | out that there were undisclosed material limitations because

13 | the bank knew and the trustee knew and the trustee's counsel

14 | knew.  And had we gotten in a room to begin to speak like

15 | lawyers normally speak to each other to see if we can narrow

16 | issues and not spend all the creditor's money on the legal

17 | fees, why did we never do that, I've always racked my brain why

18 | we never did.  And now the only --

19 |         THE COURT:  First of all, it wasn't the creditor --

20 | it's not -- it's a far cry from establishing that any of this

21 | money that has been paid is the creditors' money.  It was all

22 | subject to the bank's lien.  It's only the creditors' money if

23 | you can defeat the lien, right?

24 |         MS. DelCOTTO:  I don't agree with that.  I believe

25 | some of the claim is disallowable entirely.  I believe

1  there's --

2          THE COURT:  That's what I just said.  It's only the

3  creditors' money if you can defeat the lien.

4          MR. ROGERS:  Or determine there's preferential --

5          MS. DelCOTTO:  I believe there's trust issues.  I

6  believe there's lost of issues.  But, yes, you would have

7  to --

8          THE COURT:  You'd have to litigate --

9          MS. DelCOTTO:  -- overcome --

10         THE COURT:  -- and overcome a presumption --

11         MS. DelCOTTO:  -- a bank's position that it has a

12  valid claim.

13         THE COURT:  Exactly.  So it's not -- it's far from

14  being determined that any creditors' money has been spent at

15  all, unsecured creditors.  And some of the, you know -- and it

16  is true that everyone that's at this table is also a defendant.

17  You know, the -- Superior did an assignment just before the

18  filing that greatly enhanced its position.  Your client that

19  likes -- at least I never have seen you refute this, and they

20  bring it up every time, somebody brought a wad of 70 million --

21  no, $700,000 worth of checks and paid your client after, right?

22         MS. DelCOTTO:  Paid 400 farmers, Your Honor, but we

23  don't need to go into that.

24         THE COURT:  Well, but that preferred --

25         MS. DelCOTTO:  There is a lawsuit that against Blue

23

1   Grass.

2          THE COURT:  -- that those farmers more than other

3   farmers in other states got, though, didn't it?

4           MS. DelCOTTO:  There is a lawsuit against Blue

5   Grass.  That's correct.

6          THE COURT:  That's right.  Blue Grass is no -- is not

7   one of the little farmers that we're concerned about here,

8   right?

9          MR. CARR:  But, Your Honor, there's, we think, at

10  least on behalf of Superior, a very compelling claim against

11  the bank for improvement of the position that we would not say

12  would have to be litigated, but could certainly be settled, we

13  think, on far more favorable terms, in part, because the

14  trustee concludes he has no claims.  And we have a situation

15  where the apparent collateral existing 90 days before the

16  filing on the date of filing is exactly the same, and in

17  between time the debt was reduced by 17, $18 million.  And the

18  trustee concludes there's no claim to bring.  Now, I don't know

19  how the trustee can settle with the bank and get a good

20  settlement if the starting point is we don't have a claim.

21         THE COURT:  Well, their analysis is a little bit

22  different than yours is, you understand, and I don't know who's

23  right or wrong on that.  But it's -- there's certainly two

24  sides to that story.

25         MR. CARR:  And I think the problem I'm trying to get

1  at, as the Court said, we can challenge a settlement.  We can

2  take those steps and the trustee will respond.  If the trustee

3  doesn't respond --

4          THE COURT:  Well, you could even file your own plan,

5  couldn't you?

6          MS. DelCOTTO:  Yes.  That's another possible exit

7  strategy.

8          THE COURT:  Why don't you?

9          MR. CARR:  It's tempting to, Your Honor, but it's --

10         THE COURT:  There hasn't been exclusivity in this

11 case for months.

12         MR. DONNELLON:  From the beginning, Your Honor.

13         THE COURT:  Ever.

14         MR. CARR:  But it's -- at the same time --

15         THE COURT:  But you got to be a creditor first and,

16 you know, you all have some questions about that, right.  I

17 mean, at least that's been raised.

18         MR. DONNELLON:  Your Honor, let me address the point.

19 You said --

20         THE COURT:  As to your client, also.

21         MR. DONNELLON:  Right.  -- you are all defendants.

22 We are not a defendant in any adversary proceeding.

23         THE COURT:  But you're not even a creditor.

24         MR. DONNELLON:  That's the point I want to make, is

25 that we're not even a creditor.

1          THE COURT:  Well, are you?

2          MR. ROGERS:  They say that you're a secured creditor.

3          MR. DONNELLON:  They say we're a secured --

4          MR. CARR:  No, you claim to be a secured creditor is

5    what we said.

6          MR. DONNELLON:  We claim to be a secured creditor.

7    We are in the interpleaders.  We have the adverse of a

8    contested matter of $647,000 that we've traced the cattle to

9    that we offered to mediate months ago.

10          THE COURT:  You're an active participant, I would

11   agree to that.

12          MR. DONNELLON:  The more fundamental point is, I

13   know, and the research I've done on this extensively, there's

14   no case law that says, well, you should examine the motives of

15   the persons who are raising the possibility that disclosures

16   were not appropriately made.  It is not -- we could be Satan

17   incarnate raising these issues --

18          THE COURT:  I'm not really talking about --

19          MR. DONNELLON:  -- the disclosures we've made.

20          THE COURT:  I'm not really talking about the

21   disclosures at this point.

22          MR. DONNELLON:  Well, I think that's the fundamental

23   issue, is --

24          THE COURT:  No, it's not.  It's process.  I mean, it

25   doesn't -- it's not the end of -- it's not what you're seeking

1 ultimately, is it, the removal of the trustee?  It's not what

2 you're seeking ultimately.  It's a step that you have alleged

3 will get you to where you want to be ultimately.

4 MR. DONNELLON:  Okay.  I understand what you're

5 saying.  Yes, sir, I agree with that.

6 THE COURT:  All right.

7 MR. DONNELLON:  Ultimately, but it's an essential

8 next step.

9 THE COURT:  Well, that's --

10 MR. DONNELLON:  It's a simple step that should have

11 been twenty ten.

12 MR. ROGERS:  And I think this step was taken by some

13 creditors because everything else that was attempted didn't

14 seem to be offering any hope for the recovery they hoped for.

15 And I would say, at least I know on our behalf, the hope was --

16 the report from independent counsel was going to establish --

17 THE COURT:  Let's talk about that.  What did you

18 think the report from independent counsel is going to do?  What

19 did you think the scope of his employment was?

20 MR. ROGERS:  Well, I would say from our point of view

21 we first thought it would come from independent counsel and

22 that it wouldn't involve the participation of the parties

23 having a conflict of interest, particularly Faegre Baker

24 Daniels.

25 THE COURT:  So did you think that the trustee would

1   need to follow the advice of the independent counsel?  In other

2   words, let's say the independent counsel said sue Fifth Third.

3   Can Mr. Knauer still say, no, I've thought about your report,

4   thanks a lot, but I'm still the trustee, I'm still in charge of

5   this case, and I'm not going to do it?

6         MR. ROGERS:  I don't know the answer to that, but at

7   least in challenging his decision, we could say, here's the

8   report of your independent counsel that's totally different.

9         THE COURT:  Okay.  So why -- now correct --

10        MR. ROGERS:  And he may have reached a different

11   decision if he -- my understanding is --

12        THE COURT:  So you have the suspicion, I guess, Mr.

13   Rogers, that Sean White did not really come to an independent

14   legal conclusion not to sue, that's not really his opinion?  He

15   is just -- he is just marching in line with Faegre Baker

16   Daniels and the trustee, and the trustee is doing this because

17   his firm used to do some reaffirmations for Fifth Third.  Is

18   that what you're afraid happened here?

19        MR. ROGERS:  No, Your Honor.  I don't think that --

20   I'll say I don't really know what he thinks because we don't

21   have his report.  But I suspect, or believe that his

22   involvement in some of the potential causes of action was very

23   great and others, particularly the improvement and position

24   analysis was probably very little, which I think is based on

25   less bankruptcy experience.  And, so, I believe he went along

1   with conclusions that were reached that he might not have been

2   terribly knowledgeable about, frankly.

3           THE COURT:  All right.

4           MR. ROGERS:  And those conclusions, that in my view,

5   are strangely supportive of the bank.  I could understand how

6   the bank could assert the position.  I can't understand why the

7   trustee would say let's adjust the apparent value of collateral

8   on the two dates and arrive at the conclusion that there's no

9   improvement of position when there's absolutely no case law or

10  anything that would require that.

11          THE COURT:  All right.  Well, you know, some of the

12  points that you all make, I think, are good.  I think I've

13  shown you that I think some are better than others.  I think

14  maybe it would have been good if the discussion of the

15  settlement had been more inclusive, but I think that was

16  complicated by the fact that the parties that are here were

17  potential, and in some cases actual defendants in litigation.

18  But I don't know that that should have precluded it.

19          I've thought, also, about the list that I interrupted

20  Ms. DelCotto on when I thought about what's the best way to do

21  this.  You could -- I could allow a competing plan to be filed.

22  We can send them both out and see what the creditors think.

23  The creditors who don't have, you know, multi -- or let's just

24  say claims against -- let's see what -- you know, everybody

25  wants to talk about let the small farmer in this case.  Well,

1  let's at some point let the small farmers vote.  Let's see what

2  they say.  We could do that.

3       I could appoint somebody else to look at this.  I

4  could appoint a special mediator, which I've done in a case

5  before, and give him or her broad powers to negotiate with all

6  parties and perform an independent investigation as to what the

7  best way to proceed.  I don't know that there's a lot -- one of

8  the reasons that I was pressing you all earlier, I don't know

9  there's a lot to be gained by that if at the end of the day

10 that person comes to a similar conclusion and we still have the

11 same fight.  Maybe there'd still be some progress be able to be

12 made then.

13      I could convert it to a 7 and let a trustee step in.

14 I used to be a 7 trustee.  And so one of the reasons -- that's

15 the reason -- the first question I asked you, who's going to

16 pay for that.  You know, the trustee may just say it's a no

17 asset case and then you all can sue the bank in state court,

18 which some of you are already doing, and some of you -- and all

19 of you still have the right to do.  I don't know what a trustee

20 will decide, but it will certainly be a neutral decision.  I

21 can appoint a new trustee in this case.

22      Did you have others on your list, Ms. DelCotto?

23      MS. DelCOTTO:  The only other one, Your Honor, I

24 think is the derivative standing type of motion, that there's a

25 colorable claim and that this trustee is unable to bring it

1  because of his conflict labor agreement.  And, so, others

2  should be given standing to bring claims of the estate.  And

3  the claims of the estate are significant and there are

4  significant claims that only belong to the estate, not

5  independent creditors.

6          MR. ROGERS:  And I think --

7          THE COURT:  Well, let's talk about that.  What are

8  the -- well, there's the preference claims.  There's the --

9  what other claims do you think exclusively -- are any -- well,

10 you tell me, don't let me guess.

11         MS. DelCOTTO:  Avoidance action is a preference claim

12 and fraudulent transfer claims.  And then as I understand it,

13 there's some split of authority about whether equitable

14 subordination claims belong solely to the estate.  There's some

15 law that insinuates that it can also belong to individual

16 creditors, but to me the general consensus is that that is an

17 estate claim and I believe that has great merit.  If the

18 trustee wants to write a 10-page brief with one side, I can

19 give you the 10-page brief for the other side.  The trustee has

20 not addressed the issues of insider and non-insider.  And I

21 know Mr. Knauer knows that law because one of the other counsel

22 pointed me to his report in OneStar, which went through both

23 sides of cases and an analysis.  And that is what I find

24 lacking in this case, is the ability of the trustee to speak in

25 the record in any manner directly adverse to either bank

1  because he is prohibited from doing so in his Wegner agreement,

2  which has never been disclosed.

3          THE COURT:  Are you prohibited from doing that, Mr.

4  Knauer?

5          MR. KNAUER:  No, sir.

6          MS. DelCOTTO:  Your Honor, he testified -- I'm the

7  only one who thinks this is important, and I am reading between

8  the lines a little bit, but in two different places in his

9  deposition.  One has to do with the financing motion and the

10 fact that when the trustee originally brought that, there was

11 no reservation of the claims.  And the response to that was,

12 well, you know, another creditor could say that and then if the

13 judge ordered it and, you know, that is what would happen.  And

14 then way later at a different point in the deposition there was

15 discussion about the trustee's disclosure statement, and don't

16 you think that your creditors might want to know some other

17 information that you didn't put in there.  And, again, the

18 response was, well, you know, it's common practice that

19 somebody else could say these other things that I'm not saying

20 and then the judge might decide to put that in the disclosure

21 statement.

22          And just as a lawyer, what that was saying to me was,

23 I'm not going to say it because I might be crossing the line on

24 my waiver with Wells Fargo and my ethical obligations which say

25 I will not act directly adverse to them by discussing the other

1  side of the merits.  But if somebody else wants to say it, if

2  somebody else wants to object, then that might get put in the

3  disclosure statement and then they raised it.  So I'm very

4  concerned about the undisclosed issues and the ability of the

5  trustee to act.

6          MR. ROGERS:  I think what's important to the

7  settlement, also, Your Honor, is the sort of selling point here

8  is it will be faster, it's efficient.  The projections in the

9  plan all depend on litigation that's still going to go on for a

10 long time.  So that's one issue.  The --

11         THE COURT:  That's a valid point.

12         MR. ROGERS:  The funds -- nothing -- or whatever

13 comes into the estate by virtue of releasing the banks is

14 insignificant.  Any significant payment to creditors and its --

15         THE COURT:  Well, then don't you think all of the

16 creditors, when you explain that to them, if I let you file a

17 plan, are going to vote your way?

18         MR. ROGERS:  I don't know, Your Honor.

19         THE COURT:  Well, I mean, why wouldn't they?

20 Insignificant versus potentially millions and millions of

21 dollars; that's a pretty easy call, isn't it?

22         MR. ROGERS:  I think it depends on the extent to

23 which they understand the facts.  The disclosure statement says

24 $4.7 million comes into the estate by virtue of the settlement.

25 The only problem is, it doesn't.

1          THE COURT:  Of course, when you have to file your

2   plan, I guess you're going to have to say whether the estate is

3   going to recovery anything from your client or not.

4          MR. ROGERS:  Your Honor, I don't know that we intend

5   to file a plan, but we're not asking the Court to not permit

6   them to sue us.

7          THE COURT:  Well, they've already sued you.

8          MR. ROGERS:  Exactly.

9          THE COURT:  Or you sued them, I forget how that

10  lawsuit got started.

11         MR. ROGERS:  So the -- and in addition, I don't know

12  how any creditor could decide is it better for him to release

13  his individual claims and get whatever he may get by opting in

14  when, as Ms. DelCotto says, it's hard to figure out what

15  individual claims are here.  He may be releasing something that

16  has significant more value than whatever he might give to the

17  estate.  The trustee may object to his claim and he gets

18  nothing.

19         THE COURT:  Well, isn't that what -- don't we do that

20  all the time when we give creditors options to choose?  We say,

21  we don't know what you might get here, it could be a lot more,

22  but if you want X cents on the dollar, check box B.  And let

23  them make the judgment whether they want to pursue it or not

24  because --

25         MR. ROGERS:  Should they have to give up their

1  individual claims just to get any benefit from the estate

2  claim?

3        THE COURT:  Well, we need to talk about -- we need to

4  talk about to what extent they would be giving up their

5  individual claims.  I think there might be some disagreement as

6  to that.  But --

7        MR. ROGERS:  I think the release is absolutely --

8        THE COURT:  -- I thought they were going to give up

9  the estate -- oh, you mean to participate in the bank's

10  payment?

11        MR. ROGERS:  No.  In order to -- if the settlement

12  funds are a settlement of the estate's claims against the bank,

13  the bank gets released even if nobody opts in.  But in order to

14  get anything as a result of that release, a creditor has to

15  release any individual claims that the creditor has against the

16  banks, the trustee, the trustee's profession.  I don't see any

17  reason why they should have to give up individual claims

18  against the bank that they may not even know what they are in

19  order to get any benefit from release of the estate's claims

20  against the bank.  I thought the priorities of the code said

21  you always get that by virtue of being a creditor.

22        THE COURT:  Well, that's a good reason to object to

23  the plan.

24        MR. ROGERS:  We will.

25        THE COURT:  And I may not confirm the plan if you

1  persuade me that --

2       MR. ROGERS:  But we find it objectionable that it's

3  been proposed.

4       THE COURT:  Well, the last I checked, creditors don't

5  have a right to say what the trustee or debtor can propose.

6  They have a right to object to it and hope the Court sustains

7  their objection.

8       MR. ROGERS:  I understand, Your Honor.  But,

9  certainly, the response to many of our objections is you're

10 arguing with my business judgment, and we recognize that is a

11 powerful tool.  But because it's powerful, it's extremely

12 important that the disclosure requirements be observed.

13      THE COURT:  All right.  Let's -- we're going to take

14 a short break here in just a moment and then we can get more

15 specific.  But what if I did appoint a special mediator?

16      MS. DelCOTTO:  My clients wholeheartedly support

17 that.  And I have filed some industry letters because I have

18 clients that are in the industry, and if you read those, Your

19 Honor, I believe the entire livestock industry --

20      THE COURT:  Ms. DelCotto, let me make a brief comment

21 about that.  Well, I probably shouldn't --

22      MS. DelCOTTO:  I understand that they should appear

23 if they want to be heard.

24      THE COURT:  I really don't think the best way to

25 communicate with the Court is have a non-party write a letter

1   to the judge and tell him what he should do.  I may be --

2            MS. DelCOTTO:  I did not solicit those or what the

3   content --

4            THE COURT:  I know you didn't write it, but it's not

5   real effective.

6            MS. DelCOTTO:  I promise Your Honor I did not.

7            THE COURT:  All right.  That's my only comment.

8            MS. DelCOTTO:  But when the trustee called into

9   question I believe that the -- you know, all the other

10  non-parties support what is happening here and that made its

11  way to the industry and concern was expressed.

12           THE COURT:  I know there's a lot of concern.  But

13  I've got to try to --

14           MS. DelCOTTO:  I will not do that again procedurally.

15           THE COURT:  I try to conduct this as a legal

16  proceeding and try to make decisions based upon argument of

17  counsel and pleadings and evidence.  And I know there's concern

18  and I've had other cases where a lot of people's lives are

19  affected.  I'm very much aware of that.  But that can't be part

20  of the decision making of this Court.  All right.

21           MS. DelCOTTO:  Again, speaking for my clients alone,

22  they support business people with economic interest getting in

23  a room together, decision makers, and seeing if they can do

24  better than the lawyers have done so far to bring closure to

25  this promptly.

1          MR. CARR:  Can I speak on this last point, Your
2     Honor?

3          THE COURT:  You may.

4          MR. CARR:  Obviously, I'm almost bursting here.  And
5     I know what you're doing and I won't comment on everything
6     that's been said other than to say, obviously, we disagree with
7     virtually everything that's been said.  But on this last one --

8          THE COURT:  Including everything I said?

9          MR. CARR:  No.

10                         (Laughter)

11         MR. CARR:  I agree wholeheartedly with what you said
12    and I think you're exactly on point.  The issue here is the
13    quality of the plan and there is a neutral party that's going
14    to pass on the quality of the plan; that's you.  And you're
15    going to get, obviously, lots of law and lots of facts and
16    they're all out on the table.

17         On this last point because I disagree so much with
18    what Mr. Rogers says about the improvement in position test.
19    He's just absolutely wrong.  The idea of having some kind of a
20    mediator come in and look at that and decide whether I'm right
21    or he's right is a wonderful idea.

22         MR. ROGERS:  I certainly don't oppose that, Your
23    Honor.

24         THE COURT:  I bet the bank's not too happy about
25    that.

1          MR. LaTOUR:  Your Honor, the bank's not too happy

2    about that.  First of all, everything I've heard this morning

3    constitutes a bid for a second bite at the apple with the

4    apparent idea, well, we've got a floor built with the plan as

5    proposed, now let's try to sweeten the deal by bringing in a

6    second look and a third look and waving some process flags.

7    That is not something that anybody better depend on.  The bank

8    is not going to endure endless litigation and still settle.

9    And the bank is not going to offer up this plan as a floor and

10   then let everybody see if they can improve it from that.

11          And at the end of the day, Your Honor, it doesn't

12   matter what plan gets proposed; some people are going to

13   object.  We're going to have a contested confirmation hearing

14   and we might as well have it and let you evaluate the strengths

15   and weaknesses of what's proposed.

16          THE COURT:  But here's the problem.  I don't have any

17   problem with having that, but I want to take all of this

18   question about the independent neutral evaluation out of it.  I

19   don't like it as being a part of the argument.  I want to deal

20   with it as a substantive matter of law.

21          UNIDENTIFIED SPEAKER:  Exactly.

22          THE COURT:  That's my goal here.  That's -- you know,

23   we can spend months here fighting.  And if we go to

24   confirmation under this -- under the current set of

25   circumstances, then I'm going to hear from one side.  And I'm

1   going to have to ultimately decide whether -- even though I

2   might come to the agreement, I might be persuaded, and I have

3   not been persuaded by either side as to the ultimate -- I've

4   only read this plan, I think, once.  And I'm, obviously, going

5   to have to spend a lot more time with it before I decide

6   whether we can confirm it and hear a lot of evidence.  So I did

7   not come to any conclusion as to whether this plan can be

8   confirmed or not.  But I don't think that's what I'll be

9   hearing if we go to confirmation.  We may eventually get to

10  that.  I'm going to hear that the whole thing is tainted.

11          MR. LaTOUR:  Your Honor, you're going to hear that

12  something is tainted no matter how this goes.

13          THE COURT:  That's why I started off the day the way

14  I did.  To try to see if there's any way we could get beyond

15  that.  Now, I don't think that if we appointed such a person

16  that that person is going to have to star from square one.  I

17  mean, obviously, he's not going to have to depose the bank

18  again.  He might have some questions for a bank, he or she

19  might, but there's lots of questions that have been answered by

20  the bank.  And as you point out to me repeatedly, there's lots

21  of documents that have been produced by the bank.  So I

22  understand that.

23          And I think it's, like Mr. Rogers and Mr. Carr have

24  already drawn some distinctions today as to what they think is

25  one major difference in their valuation of the situation.

1        MR. ROGERS:  And, Your Honor, if I can just say, the

2 reason I find it as a little hard to escape the question of

3 neutrality, though I would be glad to, is if the business

4 judgment rule moves its head at every argument and by default

5 anybody opposing it loses, then the only question becomes is

6 this the right person to exercise the business judgment.

7        MR. LaTOUR:  And, Your Honor, therein will be the

8 basis of the argument for tainting.  If the person has the

9 temerity to agree with the assessment of Mr. Knauer, the

10 argument will be he was uninformed or he was misguided or he

11 was somehow tainted, there will be problem.  There will be a

12 bid for a third bite at the apple.

13        THE COURT:  Well, let me --

14        MR. ROGERS:  I don't think I should be misjudged that

15 way.  I don't know what --

16        THE COURT:  Hold on.

17        MR. LaTOUR:  Can I please finish, Your Honor?

18        THE COURT:  Let's not go back and forth.  Yes, finish

19 your statement.

20        MR. LaTOUR:  Let me please finish.  A mediator got

21 appointed in this case.  A mediator approached Ms. DelCotto;

22 did not get any response.  Other people have not availed

23 themselves of the mediator.  I asked Ms. DelCotto to make a

24 settlement offer to me.  The answer was, I don't have authority

25 to make a settlement offer.  So to stand here and say if we all

1  just got in a room, we would have worked this out like nice

2  people a year-and-a-half ago is disingenuous to the Nth degree.

3  That is not what's going to happen in the future; that's not

4  what happened in the past.  This is a case that's going to get

5  resolved by you, Your Honor.  Not by bringing in a mediator to

6  sort of make everybody feel good about the process.  This is a

7  simple attempt, after putting my client through excruciating

8  amounts of disclosure, to take a second bite at the apple.  It

9  is utterly unfair.  It is not the way this ought to proceed.

10          THE COURT:  All right.  Thank you for your input.

11          MS. DelCOTTO:  Your Honor, I'll just state and say

12  that is incorrect and I disagree with this.

13          THE COURT:  All right.

14          MR. ROGERS:  And although it may not be described as

15  a personal attack, Your Honor, I think it is a personal attack

16  for counsel to say no matter who was here, you would say this,

17  Mr. Rogers.  I'm not irrational.

18          THE COURT:  I'll stipulate to that, Mr. Rogers, most

19  of the time.  But, you know -- all right.  I'm going to take --

20  as I said, I'm going to take a short break here.  Were any of

21  you in the <u>Lauth</u> case?  Yes, some of you were.

22          MR. DONNELLON:  Suing Wells Fargo, yes, Your Honor.

23          THE COURT:  Yes.  I pointed out -- in that case, I

24  appointed somebody who we called a special mediator, who really

25  wasn't a traditional mediator, but had the right to talk to all

1  parties and to make an independent assessment and file a report

2  with the Court.   In that case it was a lawyer; it could be a

3  judge, a former judge.   Somebody that -- and I would be

4  thinking in terms of a very short time that that person file a

5  report with the Court because I'm interested in moving this

6  along.

7           The other thing that I'm very serious about is a

8  competing plan.   I can see these -- we can send out two plans,

9  two disclosure statements and let people vote.   Even though you

10 say I ultimately have to decide this, and you're quite correct

11 about that, Chapter 11 also has a lot of provisions for

12 creditors to vote, and a judge can only confirm a plan if it

13 reaches a certain threshold of creditor approval.   So it's --

14 the buck stops here, but it makes a few stops along the way.

15          So let's take a 10 minute break and everybody think

16 rationally and I'll get back to you.

17                          (Recess)

18          THE COURT:   All right.   I'm going to go through the

19 matters, beginning on Page 2 of the agenda.   The first motion

20 is the motion to compel testimony and production of documents.

21 And, I guess, in response to that there's a motion for a

22 protective order --

23          UNIDENTIFIED SPEAKER:   They are related.

24          THE COURT:   -- and the Rule 45 objections concerning

25 the deposition of Mr. Knauer.   Who wants to go first?

1      MR. DONNELLON:  Your Honor, we captioned this as a

2  motion in limine slash motion to compel because we thought it

3  was a threshold matter, is that during the examination of the

4  trustee there were questions raised about the conflict waiver

5  letter that he obtained from Wells Fargo, the nature of the

6  conflict waiver letter, what was discussed, when it was

7  discussed, what was involved in the decision not to disclose

8  Wells Fargo.  Some of that has subsequently come out in the

9  briefs about this analysis that Wells Fargo was a participant,

10  and there was some analysis of their role in the bankruptcy and

11  their ability to participate in the role of the bankruptcy.

12  But Mr. Knauer, as we quoted in that brief, was instructed not

13  to answer questions with respect to key issues relating to

14  those disclosure elements.

15      We cited numerous case law that there is no

16  expectation of confidentiality with respect to what's going to

17  go into a 2007.1 affidavit.  So, therefore, communications with

18  your attorney about what you should put in there, what you

19  should not put in there are not privileged, or not subject to

20  attorney/client privilege.  Moreover, as we cited in our -- in

21  the brief that was just recently filed, under the local rules

22  of this district, conflict waiver letters are required to be

23  filed.  So to refuse to produce conflict waiver letters, as

24  Baker & Daniels has done, to refuse to answer questions about

25  the drafting of those conflict waiver letters, as the trustee

1  has done, really run afoul not only of the case law about the

2  lack of privilege in these issues, but also run afoul of the

3  local rule itself.

4          For example, one fundamental question --

5          THE COURT:  I understand your position.  What's your

6  response?

7          MR. TONER:  Thank you, Your Honor.  Kevin Toner.  On

8  the motion to compel, I think we have to look quickly at who is

9  asking for an order and what order are they asking for.  Those

10 asking for an order, First Bank, Blue Grass parties, CPC

11 Livestock didn't ask for any discovery.  That was Superior and

12 Superior has not moved to compel.  What are they asking for?

13 They're asking to compel the trustee to talk about this

14 conversation with my partner Jim Carr about disclosures and

15 about the case.  Conversations with a prospective lawyer are

16 privileged.

17         THE COURT:  You said two different things there.

18         MR. TONER:  Okay.

19         THE COURT:  You said about disclosures and about the

20 case.  Let's talk about the disclosures.  This is a privilege a

21 lot more limited when it comes to -- or maybe nonexistent when

22 it comes to disclosures because of the local rule.  And isn't

23 that kind of information a lot more analogous to the case, I

24 think it's White, where the Court said if it's something that

25 you've got to prepare or to disclose in order to file as part

1  of your filings, then it's not privileged.

2        MR. TONER:  The trustee has produced his

3  communications with Wells Fargo.  They have a copy of these

4  consent letters.  As to the cases they've cited, the closest

5  they've been able to come to is a case holding that the fact of

6  a representation with your counsel and the amount of

7  compensation, the compensation arrangement with your counsel

8  are not covered by the privilege.  But there is no case that

9  says legal analysis and work product about disclosure

10  requirements, about the law are not covered by the privilege.

11  Whether Jim Carr and the rest of us are hired or not, it's

12  still protected.  There's an expectation of confidentiality.

13        THE COURT:  Do you think the disclosure document is

14  prohibited -- I mean is protected, the disclosure -- excuse me.

15        MR. TONER:  The consent letter of the waiver --

16        THE COURT:  The consent of the waiver --

17        MR. TONER:  I don't think it is, no.  Wells Fargo has

18  asserted that it is confidential material and should be subject

19  to the protective order.  And I think they've worked that out

20  with First Bank to some extent.

21        THE COURT:  So do you have the waiver letter now?

22        MR. DONNELLON:  We do.  We have the --

23        THE COURT:  That's what you just filed a motion to

24  file under seal, right?

25        MR. DONNELLON:  No, no, no.  What we filed under seal

1  is the Baker Daniels waiver letter and some other

2  correspondence with Wells Fargo.  Just in speed of cooperation,

3  we agreed to file those under seal.  The Wells Fargo & Company

4  conflicts of interest policy is available on the internet, so

5  we disagree with them that it could possibly be something

6  that's confidential.  But rather than force Kutak Rock to

7  burden Your Honor with a motion for protective order, we said

8  we'll defer that, we'll file it under seal.

9       The waiver e-mail from Mr. Knauer has been produced

10 and is part of the record.  We have it.  Not all the other

11 creditors have it under the local rule; we have it.  There's

12 the -- the key question that came up, though, is there's a

13 reference in Mr. Knauer's e-mail waiver to Wells Fargo

14 ampersand Company.  He was asked at deposition, What did you

15 mean by Wells Fargo & Company, and he testified at Page 49,

16 That meant Wells Fargo Business Credit.  Then I asked, Was

17 there any particular reason you chose the name Wells Fargo &

18 Company instead of Wells Fargo Business Credit, and he said,

19 There's no particular reason.

20      We later then obtained a copy of the Wells Fargo &

21 Company policy regarding legal conflicts of interest that's

22 referenced in the Faegre Baker Daniels letter.  And Wells

23 Fargo & Company globally defining all the Wells Fargo

24 affiliated and related entities mandates that you use the

25 language Wells Fargo & Company and mandates very strict waiver

1  language.  So I asked the trustee at his deposition, Where did

2  you come up with this language, Wells Fargo & Company and

3  agreeing to be bound by all the rules of the professional

4  conduct, and he refused to answer under privilege.  It appears

5  that it came from the Wells Fargo policy that Baker & Daniels

6  has, but he wasn't allowed to answer the question, while at the

7  same time he voluntarily answered that he meant something else

8  and that there was no particular reason he chose that.  And

9  those are some of the key issues that we think need to be

10  answered before we can go forward on this -- the next phase,

11  which is the motion to remove.  In order to have a complete

12  record, we need to have answers to those.

13          THE COURT:  How many questions do you want to ask in

14  that regard?

15          MR. DONNELLON:  From my own standpoint -- and to

16  answer Mr. Toner's other portion.  There's a deposition

17  protocol.  Superior noticed it and asked for the subpoena duces

18  tecum and it's our understanding that not everybody has to

19  re-issue a notice, we're all participants in that.  And that's

20  why we plea we have standing and filed this.  I would think

21  there's maybe five or ten questions.  I can't speak for --

22          THE COURT:  Call the trustee and we'll take it

23  question by question.  I'll tell you whether he has to answer

24  or not.

25          MR. DONNELLON:  And we also still don't have the

1 Baker & Daniels Fifth Third letter; we requested that.  That's

2 part of the same motion to compel.

3          MR. TONER:  There's been no discovery served on Baker

4 & Daniels.

5          MR. DONNELLON:  It's required by the rule --

6          MR. TONER:  On Faegre Baker Daniels.

7          THE COURT:  Give him that letter, okay?

8          MR. DONNELLON:  Okay.

9          THE COURT:  Mr. Knauer.

10 J A M E S   A.   K N A U E R, TRUSTEE, SWORN

11          THE COURT:  You may be seated.

12          MR. DONNELLON:  I'm going to stay seated, if you

13 don't mind, Your Honor.

14          THE COURT:  I wish you would.

15          MR. DONNELLON:  I ask Mr. Weigand to present any

16 documents or exhibits.

17                    DIRECT EXAMINATION

18 BY MR. DONNELLON:

19 Q    Good morning, Mr. Knauer.  When you filed your original

20 affidavit, the only affidavit of disinterestedness in support

21 of your application to become trustee, you indicated that you

22 did not have access at the time to all of the debtor's 20

23 largest creditors and other information, since this was a new

24 involuntary, is that correct, sir?

25 A    I don't remember exactly what it said, but if that's what

Knauer - Direct/Donnellon                    49

1  it said, that's what I said.

2  Q    We'll get a copy of it for you.

3         MR. DONNELLON:  This came rather suddenly, Your

4  Honor.  I would have had all this lined up and prepared.

5         THE COURT:  That's all right.  We've got lots of

6  time.

7  Q    Mr. Knauer, Mr. Newburn just handed you -- we've now

8  marked as an Exhibit, it's a public filing in the case, Docket

9  Entry 98.  And I'll direct your attention to 98-2; it starts on

10  the third to last page.  And that is the affidavit of

11  disinterestedness, starting at the beginning, James A. Knauer

12  under penalty of perjury states, and then there are 10 numbered

13  paragraphs followed by your signature at the end, is that

14  correct, sir?

15  A    Yes.

16  Q    And you swore or affirmed that all the information

17  contained in the numbered paragraphs was true and accurate at

18  the time you executed this affidavit of disinterestedness?

19  A    Yes.

20  Q    I want to direct your attention to the second paragraph.

21  In preparing this affidavit, I submitted, or caused to be

22  submitted for review pursuant to the firm's conflict check

23  system the names of all persons or entities that I was able to

24  identify from the filed appearances on docket entries of the

25  debtor, given that no schedules have been filed and there is no

Knauer - Direct/Donnellon                    50

1  list of the 20 largest creditors.  Did I read that correctly,

2  sir?

3  A    Yes.

4  Q    So in order to determine whether you needed to disclose a

5  connection with a particular creditor or debtor or other party

6  in interest, you looked to, among other things, the docket

7  entries?

8  A    Is that a question?

9  Q    Yes.

10 A    Yes, I did.

11 Q    And that would have been as of the 23rd of December, the

12 date that this is notarized and signed by Ms. Skyler, correct?

13 A    Yes.

14 Q    Did you examine the docket entries for the original motion

15 for the involuntary proceeding that took place on December 7 of

16 2010, Docket Entry 28?

17 A    I looked at the docket.

18 Q    You looked at all the docket entries that preceded the

19 date of signing the affidavit of disinterestedness?

20 A    Yes.

21 Q    Did you notice on those docket entries an appearance by

22 Jeffrey Wegner for Wells Fargo Capital?

23 A    There is no such appearance on the docket.

24 Q    I apologize if I misspoke, Mr. Knauer.  Your affidavit of

25 disinterestedness says, You are able to identify from the filed

Knauer - Direct/Donnellon                    51

1  appearances and the docket entries of the debtor, and I'm

2  referring to the docket entries.  Did you review the docket

3  entry from the December 7th original emergency telephonic

4  hearing on motion for authority -- for emergency authority to

5  permit the custodian to act as a receiver?

6  A    Well, I guess we need to define what we mean by docket

7  entries.  I reviewed the online docket entry.  I did not open

8  every hyperlink of every docket entry.  I read what I call the

9  docket entries, which are the docket entries that show

10 appearances, they show what pleadings have been filed and they

11 show what transactions took place.  If you're asking me if I

12 opened the docket entry of the telephone conference call that

13 was noted on the docket and read the hyperlink entry that

14 you're referring to, the answer is, no, I did not.

15 Q    Well, what did you mean in your affidavit when you stated

16 that you were able to identify from filed appearances and

17 docket entries?  What other docket entries are there other than

18 the minute orders and noting appearances of parties that appear

19 in the case?

20 A    I don't remember all the docket entries.  I think there

21 was 60 some at the time.  And if you're asking me if I opened

22 every single hyperlink and read every word of every pleading,

23 the answer is, I did not do that.

24 Q    I'm going to hand you -- Mr. Weigand is going to hand you

25 a collection of documents that are docket entries in the case

Knauer – Direct/Donnellon                          52

1  starting with 28 proceeding to 68 and continuing to 380.

2        MR. TONER:  I'm going to object to counsel's

3  characterization of the document.  It's entitled Minute Entry

4  Order, not Docket Entry Order.

5        THE COURT:  Let me see it.  That's not a docket

6  entry.  I do think we're talking about semantics here.

7        MR. DONNELLON:  Okay.  Let me rephrase the question.

8        THE COURT:  All right.

9  Q    Mr. Weigand's handed to you the admitted entry order from

10 December 7th hearing, telephonic emergency hearing, and the

11 December 14th telephonic hearing, the first two pages of the

12 collective exhibit.  You note on that document both of them

13 list Jeff Wegner, attorney for Wells Fargo Capital?

14 A    I see Mr. Wegner's name and I see Wells Fargo Capital,

15 yes, sir.

16 Q    And you had not reviewed that at the time you executed

17 your affidavit of disinterestedness?

18 A    I reviewed the docket.  I did not see an appearance by

19 Mr. Wegner or Wells Fargo on the docket.

20 Q    At any time, did you ask Mr. Wegner why he appeared at the

21 initial two telephonic emergency motion hearings on behalf of

22 Wells Fargo Capital?

23 A    I wasn't aware that he had, so I couldn't ask him that,

24 nor did he tell me that.

25        MR. WEIGAND:  May I approach, Your Honor?

1  Q    Mr. Weigand's handed you what's been marked as Deposition

2  Exhibit Number 3 from your prior deposition, which is documents

3  you produced, JAK417 and 418 at the bottom.  Do you have that

4  in front of you, sir?

5  A    Yes, I do.

6  Q    I'm going to direct your attention to the first paragraph.

7  You wrote this to Mr. Gary Heck and Mr. J. Michael Watson,

8  correct, sir?

9  A    Yes.

10 Q    Gary Heck is in-house counsel with Wells Fargo?

11 A    That's my understanding.

12 Q    Did you know at the time you wrote this that Gary Heck was

13 in-house counsel with Wells Fargo responsible for clearing

14 legal conflicts of interest?

15 A    I did not know that was his function.  I understood that

16 he was the person to whom I should write to seek the consent.

17 Q    And how did you obtain that understanding?

18 A    From my counsel.

19 Q    The first paragraph states, I am writing to request your

20 specific consent to my service as bankruptcy trustee in a

21 bankruptcy proceeding which could result in an indirect

22 conflict of interest.  The debtor in the case is a borrower

23 under certain loans held by Fifth Third Bank, NA.  I have

24 become aware that Wells Fargo & Company has a participatory

25 interest, though I'm not presently informed concerning the

Knauer - Direct/Donnellon                        54

1  specifics of participation agreement.  Did I read those first

2  sentences correctly, sir?

3  A    Yes.

4  Q    And isn't it true that you obtained the reference Wells

5  Fargo & Company as the entity to whom to refer from your

6  counsel at Baker & Daniels?

7  A    I obtained the firm of this letter e-mail from my counsel.

8  Q    Did your counsel draft it for you and you simply cut and

9  pasted it, or did you -- did they suggest language?  I

10 apologize.  That's a compound question.  Could you explain to

11 me how it came to pass that your counsel provided you with the

12 information for this?

13 A    My understanding was that Wells Fargo required a request

14 to generally be in this form, and I made whatever modifications

15 were necessary to adapt it to the fact that I was serving as a

16 trustee and to identify this case.

17 Q    At the time you sent this e-mail dated September 28th, did

18 you have in your possession a copy of the policy -- Wells Fargo

19 & Company policy regarding legal conflicts of interest revised

20 as of October 14th, 2010?

21 A    I don't know.

22 Q    Do you know whether your counsel did?  Did anyone from

23 your counsel inform you that they did?

24 A    I don't believe we discussed it.

25 Q    Who was it within Baker & Daniels that you were discussing

Knauer - Direct/Donnellon                            55

1  the form and substance of Exhibit 3?

2  A     Terry Hall.

3  Q     Was there anyone else involved in that discussion?

4  A     Of this communication, the form?

5  Q     Yes.

6  A     No.

7  Q     Am I correct from interpreting that statement in the first

8  paragraph that you are not presently informed concerning the

9  specifics of the participation agreement, that you had not yet

10 read the participation agreement at the time you sent this

11 conflict waiver letter?

12 A     That's correct.

13 Q     Had you made a determination that as of sending this

14 e-mail to Mr. Heck that you did not intend to amend your

15 affidavit of disinterestedness to disclose your relationship

16 with Wells Fargo?

17         MR. TONER:  At that point, Your Honor, I think that

18 he's asking for work product.

19         MR. DONNELLON:  That's a yes or no on timing.

20         THE COURT:  Overruled.  I'll allow him to answer

21 that.

22 A     I don't know if the determination was made at this time,

23 immediately before it, or immediately after, but it was either

24 immediately before, at the time of, or immediately after.

25 Q     Did you discuss with your counsel whether Bankruptcy Local

Knauer - Direct/Donnellon                    56

1  Rule 24 -- or, excuse me, Bankruptcy Local Rule 2014-1 would

2  require you to produce to the creditors in the case a copy of

3  this e-mail that we see marked as Exhibit 3?

4              MR. TONER:  Objection, Your Honor.  Invades the

5  attorney/client privilege.

6              THE COURT:  Overruled.

7  A    I do not recall discussion like that.

8  Q    And do you frequently practice in this jurisdiction, where

9  we are here today in Bankruptcy Court New Albany?

10 A    Yes.

11 Q    Are you familiar with the local rules?

12 A    I'm familiar with it, but in all the years I've been

13 practicing, I've never once been served with a conflict waiver.

14 Q    Did you consider yourself whether you had to serve a copy

15 of Exhibit 3 to all the creditors in the case pursuant to the

16 local rules?

17             MR. TONER:  Objection.  Work product.

18             THE COURT:  He said did he consider himself whether

19 had -- so I don't think --

20             MR. TONER:  The party can still have work product,

21 Your Honor.  It's not just subject to counsel.

22             THE COURT:  I think the trustee can answer that

23 question.  Overruled.

24 A    I did not consider it.

25 Q    At some point, did you collectively decide with your

Knauer - Direct/Donnellon                    57

1  counsel at Baker & Daniels that you did not need to amend your

2  affidavit to disclosure in connection with Wells Fargo?

3  A    Yes.

4  Q    At the time you made the determination that you did not

5  need to disclose your connection with Wells Fargo, had you read

6  the participation agreement between Fifth Third Bank and Wells

7  Fargo Business Creditor's assignee?

8  A    No.

9  Q    Were you aware at the time of your discussions with your

10 counsel about whether to amend your own affidavit of

11 disinterestedness that Baker & Daniels had also represented

12 Wells Fargo & Company?

13 A    Yes.

14       MR. DONNELLON:  I don't have anything else on this

15 particular subject, Your Honor.  The other things were covered

16 in the deposition.  I may have follow-up if Mr. Toner asks

17 questions.

18       MR. TONER:  A couple of quick questions on cross

19 examination.

20                      CROSS EXAMINATION

21 BY MR. TONER:

22 Q    Mr. Knauer, have you since reviewed the participation

23 agreement between Wells Fargo Business Credit, Inc. and Fifth

24 Third Bank?

25 A    Yes.

1  Q    Did reviewing that cause you to re-evaluate and change

2  your view of what it provided concerning who was a creditor and

3  who was a party of interest in this case?

4  A    No.

5  Q    If you would, please, look at the Minute Entry Order

6  Document you were presented.  And if you look a third of the

7  way down the page, I want to direct your attention to an entry

8  under appearances that says Liz Lynch, receiver.  Are you

9  familiar with Liz Lynch?

10 A    Yes, I am.

11 Q    Do you know whether she has made any formal appearance in

12 this case?

13 A    Not to my knowledge.

14 Q    Who is she?

15 A    She is formally the receiver.  She is -- I'm not sure

16 principal is the right word, but she is an employee of DSI, the

17 financial consultants for the trustee in this case.

18 Q    She's not an attorney?

19 A    No, she's not.

20 Q    Do you seen an entry there at the bottom of that list to a

21 Patrick O'Malley?

22 A    Yes.

23 Q    Would you please tell the Court who that is?

24 A    Mr. O'Malley is also an employee of DSI.

25 Q    Do you know Mr. O'Malley to be an attorney?

Knauer - Cross/Toner                                    59

1 A    No, sir.

2 Q    Do you believe that information describing Patrick

3 O'Malley attorney for DSI to be accurate?

4 A    Yes.

5 Q    Okay.

6 A    I'm sorry.  Attorney?

7 Q    Attorney.

8 A    No, he's not an attorney.  He's a CPA.

9         MR. TONER:  Thank you.  That's all I have.

10        MR. DONNELLON:  One short item follow-up.  We're now

11 presenting one of the documents that was filed under seal, Your

12 Honor.  This was part of the conflict waiver policy that Wells

13 Fargo's asked us to maintain confidentiality.  I don't know if

14 anyone from Kutak Rock is on the phone, but they said they have

15 no problem with us using the document in court.  It should be

16 filed under seal so it's not part of the PACER record, but they

17 -- we would intend to move forward, unless anyone objects.

18        THE COURT:  Does anybody object?

19              (No audible response)

20        THE COURT:  All right.

21              REDIRECT EXAMINATION

22 BY MR. DONNELLON:

23 Q    Mr. Knauer, I'm showing you what's been marked as

24 deposition Exhibit 2 from your deposition.  This is a document

25 stamped confidential marked WF012639 through 41.  It's a series

Knauer - Redirect/Donnellon                    60

1  of e-mails, beginning with one from Jeffrey T. Wegner to Terry

2  Hall, with copy to, among others, yourself.  Do you recall

3  receiving this, sir?

4  A    I don't recall.  It looks familiar, I'm pretty sure.  I

5  know I received it.  I don't know when I first read it, but

6  I've certainly seen it.

7  Q    That's fine.  I only want to direct your attention to the

8  beginning e-mail thread, December 28, 2010 at three o'clock.

9  It's from Jeffrey.Wegner@KutakRock.  Did you know at the time

10 -- let me rephrase.

11          In late December, had you had any discussions with

12 Jeffrey Wegner from Kutak Rock, either via correspondence or

13 telephonically?

14 A    Sometime in late December I talked with Mr. Wegner.

15 Q    Did Mr. Wegner indicate to you that he had appeared

16 telephonically at two of the initial motion hearings before the

17 Court?

18 A    I don't recall.  I couldn't rule it out.

19 Q    Did you ever have any discussion with Mr. Wegner

20 specifically to whether he would enter an appearance in the

21 Eastern Livestock case on behalf of his client, Wells Fargo?

22 A    I don't recall any discussion like that.

23 Q    Let me see if I can rephrase the question.  I didn't want

24 it to be awkward.  You testified previously in your affidavit

25 of disinterestedness you looked to filed appearances in the

Knauer - Redirect/Donnellon                          61

1  case.  And I just want to make sure that we're on the same

2  page, that when an attorney files their notice of appearance,

3  they're affirmatively stating to the Court, I intend to be

4  involved in this, here is my name as attorney for, this is my

5  client I represent; fair?

6  A    Yes.

7  Q    Did you ever have any discussions with Mr. Wegner whether

8  he would or would not formally file such an appearance himself,

9  or anyone at Kutak Rock on behalf of Wells Fargo?

10 A    I can't recall any discussion like that.

11 Q    Are you denying that it happened, or are you saying you

12 may have had it, you simply don't remember as you sit here

13 today?

14 A    I just don't remember any discussion about Mr. Wegner

15 filing an appearance.

16 Q    Had you had any other involvement with the Kutak Rock firm

17 and its client Wells Fargo -- rephrase.  Have you ever had any

18 other involvement with the Kutak Rock firm relating to its

19 representation of Wells Fargo other than in the Eastern

20 Livestock case?

21 A    Prior to Mr. Wegner's call to me, I had never had any

22 involvement with anyone at Kutak Rock about anything.

23 Q    When did Mr. Wegner call you?

24 A    It must have been within a day or so of when I wrote that

25 e-mail to Mr. Heck.  A day or so before that.

Knauer - Redirect/Donnellon                                    62

1   Q    So Mr. Wegner contacted you before you wrote to obtain a

2   conflict waiver from Wells Fargo through Mr. Heck?

3   A    I believe, although I can't specifically recall, it was

4   from Mr. Wegner that I found out that Wells Fargo was a

5   participant.

6   Q    Did you ever have any discussion with Mr. Wegner whether

7   you did or did not intend to amend your affidavit of

8   disinterestedness to disclose your own connection to Wells

9   Fargo?

10  A    No.

11  Q    Did you ever have any such discussion with Mr. Gary Heck,

12  in-house counsel at Wells Fargo?

13  A    No.

14          MR. DONNELLON:  Nothing else, Your Honor, on this

15  issue.

16          MR. TONER:  First, Your Honor, I'd like the Court to

17  take judicial notice that no written appearance has been filed

18  by Mr. Wegner in this case on behalf of Wells Fargo, or any

19  related affiliated of Wells Fargo & Company.

20          THE COURT:  I will so note.

21                    RECROSS EXAMINATION

22  BY MR. TONER:

23  Q    Mr. Knauer, while you still have deposition Exhibit 2 in

24  front of you, at the bottom of the first page, do you see the

25  e-mail that says, Terry and David, I have one issue with this

Knauer - Recross/Toner                              63

1  request at present.  While it is clear Bakers & Daniels would

2  bring any action against Wells Fargo, I believe we would also

3  need that condition to include a prohibition on bringing any

4  action against Fifth Third Bank, as well.  Did I read that part

5  of it correctly?

6  A    Yes.

7  Q    Can you show me on Exhibit 3 any similar instructions

8  concerning a limitation on you that would bring an action

9  against either Wells Fargo or Fifth Third Bank?

10  A    There were no limitations on me.

11  Q    Have you had such a discussion with Mr. Wegner or Mr. Heck

12  or anyone connected with Wells Fargo at any time?

13  A    About there being any limitation?

14  Q    Imposing any restriction on you to bring suit either

15  against Fifth Third Bank or Wells Fargo?

16  A    No.

17              MR. TONER:  Thank you.

18              MR. DONNELLON:  I have a short follow-up.

19                   FURTHER REDIRECT EXAMINATION

20  BY MR. DONNELLON:

21  Q    Am I correct, Mr. Knauer, that the language of the first

22  paragraph -- I'm sorry -- first sentence of the fourth

23  paragraph, if you consent to my service --

24  A    Are you talking about Exhibit 3?

25  Q    I'm sorry.  Exhibit 3.  I apologize.  If you consent to my

Knauer - Further Redirect/Donnellon                64

1  service as bankruptcy trustee in this matter, I acknowledge and

2  agree that the service will be subject to all applicable rules

3  of professional conduct.  That portion came from the sample

4  requirement from Wells Fargo as to what must go into a conflict

5  and consent waiver if you wished to obtain it from Wells Fargo,

6  correct?

7  A    I don't know.  I mean, this is the language I was told

8  that they wanted.

9  Q    Did you ask why they wanted that specific language?

10 A    No.

11 Q    I'm going to hand you --

12        MR. DONNELLON:  We'll need to mark this.  We have

13 not.

14        THE COURT:  You want to mark it?

15        MR. DONNELLON:  Yes.  For the record, this is the

16 Wells Fargo & Company Policy Regarding Legal Conflicts of

17 Interest, revision as of October 14, 2010.  It is not stamped

18 confidential.  It was given to us by the Faegre Baker Daniels

19 firm, and Wells Fargo has asked in the interim, until we

20 resolve these issues, that we maintain its confidentiality.  So

21 out of professionalism and abundance of caution, we've agreed

22 to file it under seal, even though it's not stamped

23 confidential.

24        THE COURT:  All right.

25 Q    If you turn to Exhibit B-1 of the document -- I'd like to

Knauer -  Further Redirect/Donnellon                65

1  refer to it by number, but I don't know it.  I believe it's the

2  6th page.  It starts with Exhibit B, form of e-mail request for

3  specific consent.  Are you on that page, sir?

4  A    Yes.

5  Q    This has the reference to Wells Fargo & Company as the

6  recipient for their conflicts of interest, same as you wrote to

7  Mr. Heck, correct?

8  A    Are you asking me if it contains the same language?

9  Q    With respect to Wells Fargo & Company in the first

10 paragraph.  That's how Wells Fargo wishes you to define their

11 entities, correct?

12 A    Looks like that.

13 Q    And if you direct your attention to the bottom paragraph,

14 it states, If you consent to our representation, and it has the

15 insert, in this matter, we acknowledge and agree that the

16 representation will be subject to all applicable rules of

17 professional conduct.  Did I read that correctly, sir?

18 A    Yes.

19 Q    And that's the exact same language that you had in your

20 e-mail letter to Mr. Heck?

21 A    Yes.

22 Q    So you understood that, vis-a-vis Wells Fargo, you would

23 still have to maintain in the course of your service as trustee

24 all of your loyalties under the rules of professional conduct,

25 correct?

1      MR. TONER:  I object, Your Honor.  He's not acting as

2  --

3      UNIDENTIFIED SPEAKER:  I'll stop it for you for a --

4  hold.

5      MR. TONER:  Your Honor, he's the trustee in this

6  case, not counsel in this case.

7      MR. DONNELLON:  I believe the case law says that the

8  trustee who is an attorney is also bound by the same ethical

9  rules, but it's the language he chose.

10     UNIDENTIFIED SPEAKER:  Rule 2014, is that right?

11     THE COURT:  What's the pending question?

12 Q   The pending question over lots of appearances was you

13 understood that in connection with your service as trustee, you

14 are required to maintain all loyalties to Wells Fargo that are

15 required of you under the code of professional conduct?

16 A   I don't know that I split the hair that fine, but I used

17 that language.

18     MR. DONNELLON:  That's it.  Nothing further on this

19 issue.

20     THE COURT:  All right.

21     MR. TONER:  Nothing further.

22     THE COURT:  Okay.  Now, do you have what you need to

23 proceed with your motion to remove the trustee?

24     MR. DONNELLON:  I believe so, Your Honor.

25     THE COURT:  All right.  Do you want Mr. Knauer to

1  remain up here?  Are you going to have any questions of him, or

2  you have other witnesses?

3       MR. DONNELLON:  I'd sort of like to have some

4  guidance from the Court on how you wish to proceed with this.

5  I believe that based upon -- Mr. Knauer can step down for right

6  now, if you don't mind.  I believe that since Mr. Knauer is a

7  party as the trustee, the Court can accept his deposition in

8  its entirety as if it is offered at the hearing, and we need

9  not go through two hours of testimony from his deposition.

10  Under Civil Rule 30, the deposition of a party can be used for

11  any purpose for a trial.  And then with the other documents

12  that are in the record, I believe the record is sufficiently

13  complete, assuming --

14       THE COURT:  Does anyone object to the admission of

15  his deposition?

16       MR. TONER:  Well, it contains a lot of material that

17  doesn't have to do with this precise motion, Your Honor.  A lot

18  of discussion about the plan and disclosure statements, and

19  that sort of thing.  Secondly, there hasn't been time to

20  prepare an errata sheet for Volume II.  Mr. Knauer did prepare

21  an errata sheet for Volume I and Mr. Donnellon was able to

22  examine on that during the second session.  So the clock just

23  hasn't run to make it a finished final deposition yet.

24       MR. DONNELLON:  That's fine.  We can put Mr. Knauer

25  on the stand.  I was just trying to move this along and save

1  the Court time on that.  I don't know that you need to --

2          THE COURT:  I don't know if it's going to save me a

3  lot of time if I still have to read it, so --

4          MR. DONNELLON:  Okay.

5          THE COURT:  -- I'll allow you to put him on.

6          MR. DONNELLON:  Okay.  Would Your Honor please

7  indulge a short break?  I'm due for antibiotics that will take

8  me about a half an hour.

9          THE COURT:  All right.  We'll take a half an hour

10 lunch break.

11         MR. DONNELLON:  Thank you.

12                        (Recess)

13         THE COURT:  Good afternoon.  Be seated.  All right.

14 I think we have some attorneys on the line who were joining us

15 at various times throughout the morning.  We have your names,

16 so we don't have to do appearances again, but I think maybe a

17 couple of you have matters that might be able to be very

18 quickly resolved, is that correct?

19         MR. DAWSON:  That was Number 8 on Page 3, all we need

20 is the page number --

21         THE COURT:  Who's --

22         MR. DAWSON:  I don't know that opposing counsel is on

23 that.

24         THE COURT:  Okay.  State your name for the record,

25 please.

1        MR. DAWSON:  Yes, sir.  My name is Jack Dawson and I

2  represent Robert and Jen Nichols.  John Lovell represents

3  Cactus, he was on before the break.

4        MR. LeBAS:  Your Honor, this is David LeBas for J&F

5  Oklahoma.  We had submitted a motion to alter or amend with

6  respect to some language used in the order, rather than on the

7  merits.  Mr. Lovell is representing Cactus Growers and I don't

8  know if he's gotten back on the call or not.

9        THE COURT:  Okay.  Well, I'll tell you what I'll do.

10 There's no use you all waiting around the rest of the afternoon

11 to resolve that matter.  Why don't you get together and call my

12 courtroom deputy, Kristin.  And do you want to be involved in

13 that call?

14       MR. LaTOUR:  Yes, Your Honor.  The particular matter

15 that was up for hearing was narrowed.  The holding came out

16 broader than the hearing.  I'd like to file papers suppressing

17 that issue.

18       UNIDENTIFIED SPEAKER:  I'm sorry, I didn't hear that,

19 Your Honor.

20       THE COURT:  The -- you mean the fact that in the

21 order I said that the issue was the damages under a theory of

22 quantum meruit?

23       MR. LaTOUR:  There are several aspects of that that

24 caught me quite by surprise, Your Honor.

25       First of all, the initial dispute was whether or not

1  the litigation had to take place here, or it could take place

2  in a different venue.  That's what was originally put forth.

3  Mr. Nichols did not even claim the money in the interpleader;

4  it was an argument about jurisdiction.  And then the next thing

5  I know there is an order describing a resolution on the merits

6  without the participation briefing by Fifth Third with respect

7  to what has been identified in this motion to alter or amend;

8  hence, the law of anticipatory repudiation and the law -- and

9  the shelter rule under the UCC.  And I am concerned that while

10  this particular dispute is actually rather narrow and should be

11  held to its own terms, that it will be actually cited to for

12  the broader proposition that just because Eastern was

13  insolvent, that means all contracts go away.  And that is

14  certainly not the case and I definitely will be joining in the

15  motion to alter or amend, and would like the opportunity to

16  brief that issue.

17            THE COURT:  All right.  Who just joined?

18            MR. LOVELL:  John Lovell for Cactus Growers.

19            THE COURT:  Okay, Mr. Lovell.  We're talking about

20  that matter right now to see if we could resolve it quickly.

21  That doesn't seem to be the case, so --

22            MR. DAWSON:  Well --

23            THE COURT:  Go ahead.

24            MR. DAWSON:  If the Court please, Jack Dawson.  I

25  really don't even know what the other lawyers are talking

1  about, but I'll find out because I'll read the papers.  But

2  what Mr. Lovell and I need, what you were going to do is

3  establish a hearing on the amount of damages.  And what I was

4  going to suggest to you is that, we're only talking about -- if

5  we took Cactus' numbers, it's 104,000; if we take Nichols'

6  numbers, it's 110,000; we're actually talking about somewhere

7  between 5 and $6,000.  Couldn't we do that in writing rather

8  than come to Indiana and have an evidentiary hearing?

9           THE COURT:  Well, that would be fine with me.

10          MR. DAWSON:  What do you think, Mr. Lovell?

11          MR. LOVELL:  We're discussing the possibility of

12  reaching a stipulation with you.

13          MR. DAWSON:  Yes.

14          MR. LOVELL:  We'll need to discuss what it's

15  stipulated under.

16          MR. DAWSON:  Okay.  Hopefully we can do that.  I'll

17  do anything.

18          THE COURT:  Okay.  Well, here's what I'll do.  I'll

19  schedule this for the next omnibus date.  If we need to have a

20  hearing on a motion to alter or amend or anything else, I'll

21  hear it at that date and we'll establish that date by the end

22  of the hearing today or tomorrow, and that will be posted

23  online.

24          MR. LeBAS:  Your Honor, David LeBas.  I would request

25  that the Court consider whether or not the language in the

1  order be reviewed, whether or not Cactus Growers and Mr.

2  Nichols are able to make an agreement.  We're concerned about

3  the effect of the language, as Mr. Toner mentioned a minute ago

4  -- I should say Mr. LaTour mentioned a minute ago, not only for

5  this case, but this is a closely watched piece of litigation.

6  The order's out on Westlaw.  We want to make sure that for

7  future generations the language is consistent with the way we

8  understand the UCC showing was to operate.

9           THE COURT:  All right.  Well, send me a -- well, in

10 that case what you're telling is that we need to have a hearing

11 on your motion to alter or amend no matter if you all come to a

12 number or not?

13          MR. LeBAS:  That's our view, Your Honor.

14          THE COURT:  All right.  Okay.  Well, we'll set it for

15 the next omnibus date.

16          MR. LeBAS:  Thank you.

17          THE COURT:  All right.  Anyone else?  Wasn't someone

18 on for the Tommy Gibson estate now?

19          MS. THOMAS:  Yes, Your Honor.  This is Meredith

20 Thomas for Katherine Pry, Chapter 7 Trustee.  We have a hearing

21 scheduled on Intrust Bank's motion for relief from stay.  I'm

22 not sure if anyone is there on behalf of Intrust.  But there

23 has been -- there's been two objections filed to it.  The

24 trustee did extend her deadline to object and then decided,

25 ultimately, not to object to the motion for relief from stay

1  and filed her notice of abandonment on July 23rd of the

2  Prudential policies.  Intrust did file an objection to the

3  notice of abandonment; however, no hearing has been set on the

4  notice of abandonment.  The trustee would just like the policy

5  abandoned from the bankruptcy estate.

6          THE COURT:  All right.  So as to the motion for

7  relief, though, you have no objection to that?

8          MS. THOMAS:  No, we have no objection to it.  And

9  then Eastern Livestock's trustee and Fifth Third Bank filed an

10  objection.  However, if I remember correctly, their objection

11  was to an asset that has subsequently been taken off from the

12  motion by -- amended by Intrust.

13          MR. CARR:  Your Honor, John Carr for First Bank.  We

14  have no objection to the abandonment of policies from the

15  estate.  We do object to the apparent conditions that Intrust

16  tried to impose in its objection.  We think that those were

17  improperly raised and would have to be subject to an

18  independent motion to avoid a surcharge order previously

19  entered by the Court.

20          THE COURT:  All right.

21          MS. THOMAS:  Your Honor, the trustee agrees with John

22  Carr.

23          THE COURT:  All right.  So the motion for relief can

24  be granted, the objections having been resolved?

25          MS. THOMAS:  Yes, Your Honor.

1          THE COURT:  All right.  Then you submit an order that

2    does that.  And we'll set the -- we'll set the motion for

3    abandonment of the asset -- that's a separate motion, right?

4          MS. THOMAS:  Your Honor, the trustee filed a notice

5    of abandonment and Intrust filed a late objection trying to put

6    some conditions on the abandonment that the trustee doesn't

7    necessarily agree with.

8          THE COURT:  Okay.  So I'll set that for the next

9    omnibus date.

10          MS. THOMAS:  All right.  Thank you, Your Honor.

11          THE COURT:  All right.  Thank you.  Anyone else have

12    a matter that they think can be quickly resolved to bring

13    before the Court?

14               (No audible response)

15          THE COURT:  Okay.  That gets us back to the agenda.

16          MR. DONNELLON:  Motion to remove?

17          THE COURT:  Motion to remove.

18          MR. DONNELLON:  Your Honor, a couple of housekeeping

19    matters first.  As I understand from -- I intend to call Mr.

20    Knauer to go briefly through some of the issues that are of

21    import, but as I understand it, also Volume I of the

22    deposition, which was filed under seal out of an abundance of

23    caution with Wells Fargo.  Subject to the errata sheet, any

24    objections to the form of the question is offered into the

25    record, is that correct, Mr. Toner?

1          MR. TONER:  Yes.  In fact, I withdraw any objection

2     to offering the transcript into the record.  It occurred to me

3     that there are a number of citations in movant's papers to the

4     transcript, and there's no reason why the Court shouldn't have

5     the full text surrounding those questions.  However, there are

6     exhibits to the deposition that we can't stipulate to; they

7     have handwriting on them and things like that.  There's just no

8     foundation.  So it's really more of a mechanical thing.  If

9     counsel would agree to submit just the deposition and if we

10    could work through which exhibits we object to maybe at a

11    break, perhaps we can shorten the examination on the stand.

12          MR. DONNELLON:  Yes.  I'm willing to talk about it.

13    That was my next housekeeping matter.  Is Mr. Toner had

14    previously discussed stipulating as to the business records of

15    the documents produced by Wells Fargo.  I can understand

16    objection to foundation to things that are handwritten, but

17    there are number e-mails and other correspondence with Wells

18    Fargo that are often numeric and a number of those are part of

19    Docket 1248.  We have discussed stipulating in the business

20    records of Wells Fargo, and if Mr. Toner doesn't wish to, I can

21    call Mr. Fife (phonetic), who's here, to establish how those

22    documents were obtained from Wells Fargo.  But, perhaps, we

23    could -- Mr. Toner and I, at a convenient time could go through

24    which if there are any that you could stipulate to?

25          MR. TONER:  I can stipulate to all of them except the

Knauer - Further Redirect/Donnellon                76

1   ones that are covered with handwriting, the handwritten notes.

2           MR. DONNELLON:  Let's talk about that at a short

3   recess --

4           MR. TONER:  We're talking of three -- probably

5   documents.

6           MR. DONNELLON:  Okay.  But we can talk about at a

7   short recess and I'll recall Mr. Knauer at this point.

8           THE COURT:  All right.  Mr. Knauer?  You're still

9   under oath.

10          THE WITNESS:  Yes, Your Honor.

11  BY MR. DONNELLON:

12  Q    Good afternoon, Mr. Knauer, and I thank you and the Court

13  for indulging my need for a short break.  Am I correct that you

14  as part of your law firm at Kroger, Gardis & Regas represented

15  Wells Fargo in connection with the In re Lauth Investment

16  Properties case?

17  A    Yes.

18  Q    And you had the understanding as of December 23rd of 2010

19  that there was some relationship or connection between Wells

20  Fargo Business Credit, Inc. and Wells Fargo Bank, N.A.?

21  A    I assume that.

22  Q    You also understand that under certain sections of the

23  bankruptcy code that result in your appointment as trustee you

24  had requirements relating to the disclosure of your connections

25  to the debtor, its creditors and other parties in interest, is

Knauer - Further Redirect/Donnellon                    77

1  that fair?

2  A    Yes.

3  Q    You understand that you're required to disclose items that

4  are conceivable conflicts of interest in connection with your

5  representation?

6  A    I think the way the rule reads you're supposed to disclose

7  connections with creditors and parties in interest.

8  Q    Would you agree with me that if you can still eliminate

9  the conflict of interest you still need to disclose the

10 connection?

11 A    If you have a conflict of interest and you eliminated -- I

12 guess it depends on the circumstances.  I think you asked me

13 that question in deposition.  I think I said yes.

14 Q    I just want to make sure the record's very clear here.  If

15 you have a connection to a party -- let me rephrase.  If you

16 have a connection to a debtor, creditor or other party in

17 interest of the estate, even if you can eliminate that as a

18 conflict of interest you still need to disclose the connection,

19 correct?

20 A    Yes.

21 Q    And if you can't eliminate them as a conflict of interest

22 you probably can't be retained, is that correct?

23 A    Yes.

24 Q    Upon learning that Wells Fargo Business Credit was a

25 participant in the Fifth Third loan you felt it necessary to

Knauer - Further Redirect/Donnellon                    78

1  obtain a consent and waiver letter from Wells Fargo & Company,

2  correct?

3  A    Yes.

4  Q    And we've already seen that introduced in today's

5  proceedings as Deposition Exhibit 3, is that correct, sir?  We

6  don't need to belabor that.

7  A    Yes.

8  Q    And do you have that in front of you, sir, Exhibit 3, your

9  conflict waiver letter or e-mail?

10 A    Yes.

11 Q    If I can direct your attention to the third paragraph

12 which states, "Since Wells Fargo is a participant in the

13 secured loan to the debtor my appointment, although not

14 directly adversarial in nature, could ultimately result in my

15 being adverse to Fifth Third and in turn to the interest of

16 Wells Fargo."  Did I read that correctly, sir?

17 A    Yes.

18 Q    And in response to the e-mail that you wrote on December

19 28, 2010 at 4:05 p.m., Gary Heck, in house counsel at Wells

20 Fargo, wrote, Jim, thank you for calling me on this.  On behalf

21 of Wells Fargo I agree to waive the conflict subject to the

22 terms described in your e-mail below.  Do you see that, sir?

23 A    Yes.

24 Q    And so he did agree subject to the language of your e-mail

25 that he would waive conflict of interest in your representation

1  of Wells Fargo in <u>Lauth</u> and your role as trustee in the Eastern

2  Livestock case, correct?

3  A    Yes.

4  Q    After you obtained your conflict waiver letter or e-mail

5  from Mr. Heck that we see as Deposition Exhibit 3, am I correct

6  that you called the Office of the United States Trustee and

7  talked to Mr. Chuck Wharton?

8  A    Yes.

9  Q    And you called him to inform him that you subsequently

10 learned Wells Fargo Business Credit was a participant and that

11 both you and Baker & Daniels had previous business

12 relationships with Wells Fargo Bank?

13 A    Yes.

14 Q    In fact, at that time when you contacted Mr. Wharton you

15 had an active relationship with Wells Fargo Bank, correct?

16 A    Yes.

17 Q    And, in fact, Baker Daniels had a longstanding

18 relationship representing Wells Fargo Bank, correct?

19 A    I don't -- didn't know anything about the nature and

20 extent of their relationship at the time.

21 Q    Did anyone from Wells Fargo inform you that Baker &

22 Daniels had a longstanding relationship with Wells Fargo Bank?

23 A    No.  I just knew Mr. Carr was adverse to them at the time.

24 Q    Can you turn to Exhibit 2 that's already been marked

25 Deposition Exhibit 2?  It's already been marked in front of

Knauer - Further Redirect/Donnellon                    80

1  you, sir.  If you can turn to the second page.  That's the

2  beginning of the e-mail thread from Mr. Jeffrey Wegner to Terry

3  Hall, copy to yourself among others, including Mr. Randall

4  LaTour and Mel Bedree of the Vorys firm.  Do you see that, sir?

5  A    The second page?

6  Q    It is the second page, the one's that at the bottom,

7  WF012640.

8  A    I'm not sure.  Are you referring to some language in it?

9  Q    I'm just trying to orient you to the e-mail that I'm about

10 to ask a question on.

11 A    All right.

12 Q    There's an e-mail from December 28th from Mr. Wegner to

13 Terry Hall on which you were copied.

14 A    3 p.m.

15 Q    Correct, sir.

16 A    Yes.

17 Q    And Mr. Wegner writes, we are representing Wells Fargo in

18 connection with its participation in the credit agreement dated

19 August 9, 2004 as amended between Fifth Third Bank and Eastern

20 Livestock Company, LLC.  Did I read that correctly, sir?

21 A    Yes.

22 Q    So you understood that Mr. Wegner was representing Wells

23 Fargo in connection with the Eastern Livestock estate?

24 A    If I read this I did.

25 Q    Do you deny reading this?

Knauer - Further Redirect/Donnellon                    81

1  A    No, I just don't have any particular recollection of it.

2  Q    Romanette II in the first paragraph states, your firm has

3  a longstanding relationship with Wells --

4           THE COURT:  Wait a minute.  You said two different

5  things there.  You said when you read that -- read it to me

6  again.  Insofar as the participation in what?

7           MR. DONNELLON:  We are representing Wells Fargo in

8  connection with its participation interest in the credit

9  agreement dated as of August 9, 2004 as amended between Fifth

10 Third Bank and Eastern Livestock Company, LLC.

11          THE COURT:  Well, then you said, and so you knew that

12 he was representing in the Eastern Livestock estate.

13          MR. DONNELLON:  In connection with.  His word was in

14 connection with.

15          THE COURT:  No --

16          MR. CARR:  In connection with the participation

17 agreement, not the estate.

18          THE COURT:  I thought he said in connection with the

19 participation agreement.

20          MR. DONNELLON:  And I'm not asking you what the

21 e-mail said.  I want to understand what his understanding was

22 and he said he doesn't even remember reading it, so it's a

23 non-issue.

24          MR. TONER:  Object to the form of the question, Your

25 Honor.

1          THE COURT:  Well, I've already objected to the form

2     of the question.

3          MR. DONNELLON:  It's withdrawn.  It's withdrawn.  The

4     witness didn't answer it anyway.

5          THE COURT:  All right.

6     BY MR. DONNELLON:

7     Q    He also says, Romanette (ii), "Your firm has a

8     longstanding relationship with Wells Fargo and has current

9     active engagements with Wells Fargo."  Did I read that

10    correctly, sir?

11    A    Yes.

12    Q    Did you have any understanding as of December 28 whether

13    Baker & Daniels had a longstanding relationship with Wells

14    Fargo?

15    A    Mr. Donnellon, I had an understanding on the date this

16    e-mail was written that Baker & Daniels did work for Wells

17    Fargo.  If you're asking me if I recall receiving this e-mail

18    with the word longstanding, I do not.  But I probably did and I

19    probably read it.

20    Q    Mr. Knauer, I'm not trying to argue with you or trick you

21    or confuse you.  I was trying to get back to you had testified

22    that you called Mr. Wharton and told them that both you and

23    Baker & Daniels had previously represented Wells Fargo and I'm

24    trying to put that in context.  Did you understand that Baker &

25    Daniels was an active and longstanding relationship?

1  A    I have no recollection of the nature and extent of their

2  relationship with Wells Fargo other than they told me that they

3  did work for Wells Fargo.

4  Q    And what is it that you conveyed to Mr. Wharton about the

5  nature of Baker Daniels' representation of Wells Fargo?

6  A    I don't recall anything other than informing him that I

7  had discovered that they were a loan participant and that both

8  our firm and Baker & Daniels did -- had done work or were doing

9  work for Wells Fargo.  And I believe at the time we had  --

10  were obtaining or had obtained, but it all happened within a

11  period of 24 hours or so and that we had -- were obtaining or

12  were requesting or had obtained waivers.

13  Q    Am I correct that you felt the need to inform Mr. Wharton

14  of your decision not to amend your affidavit because you

15  thought he needed to be informed?

16  A    I thought that we should tell him that we had made that

17  decision.

18  Q    And, in fact, it was your understanding that if he had

19  objected you would've amended your disclosure statement?

20  A    I think you asked me a hypothetical question, and I said

21  you -- I think you asked me if he had objected would we have

22  amended our disclosure statement, and I believe I said I think

23  that we would have.  I don't remember specifically.

24  Q    I'm not asking you what I previously asked or anything

25  else.  I'm asking as you sit here today under oath if Mr.

Knauer - Further Redirect/Donnellon                    84

1  Wharton had objected would you have amended your disclosure

2  statement.

3  A    Yes, we would've.

4  Q    Going back to your waiver e-mail in Exhibit 3, am I

5  correct that you did not consider the possibility that if Wells

6  Fargo refused to provide you with a consent waiver whether you

7  would step down as trustee at that time?

8  A    I think that my belief was it was so unlikely that I

9  didn't consider it.  No, I did not.

10  Q    Going back to the third paragraph of your waiver letter,

11  you state, since Wells Fargo's a participant in this secured

12  loan to the debtor my appointment, although not directly

13  adversarial in nature, could ultimately result in my being

14  adverse to Fifth Third, and in terms of the interest of Wells

15  Fargo.  Did I read that correctly, sir?

16  A    Yes.

17  Q    And you understood that by making that statement to Wells

18  Fargo if you are to bring an action against Fifth Third that

19  could affect the recoveries by any participant, including Wells

20  Fargo?

21  A    I understood that if we made a recovery from Fifth Third

22  of some type that would either reduce their claim or recovered

23  funds from them that any loan participant would be affected by

24  that action.

25                              (Pause)

Knauer - Further Redirect/Donnellon                85

1  Q    Just one moment, sir.  I'm sorry.  When you had your

2  discussion with Mr. Wharton you thought it was certainly

3  possible that he would object to your decision not to amend

4  your affidavit?

5  A    Anything's possible.

6  Q    I'm not asking you to speculate.  When you called him it

7  was within the realm of your understanding that Mr. Wharton may

8  object to your decision not to disclose?

9  A    Yes.

10 Q    Am I correct that you had regular or somewhat regular

11 update phone calls from a Fifth Third representatives and Wells

12 Fargo representatives in connection with your role as trustee?

13 A    For some period of time there were calls, yes.

14 Q    And you shared with Wells Fargo budgets that you were

15 working on from this trustee?

16 A    I think Fifth Third shared them.

17 Q    Did you, in fact, share budgets with Wells Fargo?

18 A    I didn't.  DSI may have.  I don't know what -- I don't

19 remember.  I didn't send budgets to anyone.

20 Q    Were you aware of whether your counsel shared with Wells

21 Fargo a draft memorandum relating to the proposed motion for

22 financing however in this particular matter?

23 A    No, I'm not aware of that.

24 Q    Did you authorize your counsel at Baker & Daniels to share

25 items such as internal memoranda relating to the financing

1  motion with Wells Fargo?

2  A    I don't recall authorizing or not authorizing anything

3  like that.  I just don't have a recollection.

4  Q    Do you recall having a conversation with representatives

5  of Wells Fargo and Fifth Third in August of 2011 where you

6  discussed the potential omnibus hearing that was planned for

7  that month?

8  A    No.

9  Q    Do you deny having a conversation with representatives of

10 Wells Fargo where you discussed strategy for the omnibus

11 hearing on August -- in August of 2011?

12 A    I deny ever having a conversation specifically with Wells

13 Fargo about anything going on in the case after the first few

14 days I was appointed.  I had some calls with Fifth Third in

15 which Wells Fargo was also on the phone, but I never had any

16 calls with Wells Fargo individually about anything in this case

17 after I was appointed --

18 Q    I apologize for being -- lack of clarity.

19 A    -- other than the engagement of some financial

20 consultants.

21 Q    You had -- and I apologize for the lack of clarity.  I'm

22 not trying to suggest you had private conferences with Wells

23 Fargo, but am I correct that you had regular conference updates

24 with Fifth Third during which telephone conferences

25 participants from Wells Fargo would also participate?

1  A    Yes.

2  Q    And do you recall having one such teleconference in August

3  relating to a possible money transfer of the August 2011

4  omnibus hearing?

5  A    Not in particular, no.

6  Q    Am I correct that in your conference calls with Wells

7  Fargo and Fifth Third the bank group asked you in every call

8  when they could get some money that you had collected?

9  A    I think any time -- yes.  I think that the subject of when

10  will we get some money was often brought up in the calls.

11  Q    And you, in fact, have a vivid recollection that it was a

12  new loan on Fifth Third's plate and you're sure also Wells

13  Fargo, that they had the same interest and getting some of the

14  money that you had collected?

15  A    The banks wanted to know when they would get some money

16  out of the case.  That was generally a subject of discussion in

17  many of the calls.

18  Q    When did you -- let me rephrase it.  At any time during

19  your update calls with Fifth Third and Wells Fargo did you tell

20  anyone from Wells Fargo that you intended on working on a

21  global settlement in the Eastern Livestock matter?

22  A    I did not unless it pertained to some group of cases we

23  were handling in some of the adversary proceedings.  I mean I

24  don't know how that -- where that term came from.

25  Q    During August of 2011 had you authorized your counsel at

1  Faegre Baker Daniels to engage in settlement discussions with

2  Fifth Third Bank?

3  A    Yes.

4  Q    And did you authorize your counsel to prepare a term sheet

5  in August of 2011?

6  A    That was within the scope of what they were doing.

7  Q    Mr. Knauer, Mr. Weigand's going to hand you what was

8  marked at your deposition as Exhibit Number 10.  It's a

9  multi-page document from your files JAK567 through 571.  First

10 of all, am I correct that the JAK alpha numeric document

11 production indicates that those were produced by you in

12 response to the subpoena duces tecum prior to your deposition?

13 A    Yes, it is.

14 Q    And the second to last page is actually the beginning of

15 the e-mail thread.  It's from Randall LaTour to James Carr.

16 Jim, is there any chance that the quote, term sheet, closed

17 quote, will be available today?  The bank people are having a

18 meeting this afternoon and the proposal will be an appropriate

19 agenda item.  Did I read that correctly, sir?

20          MR. LaTOUR:  Your Honor, I'd like to interpose an

21 objection.  This communication is a settlement discussion

22 between myself and counsel.  It is not admissible into evidence

23 and it is not appropriate for being dissected by a person who

24 while copied on it was not a participant in the conversation.

25 So his impressions of these meetings are not relevant.

1        MR. TONER:  We join in the objection, Your Honor.

2   Rule 408 offered a compromised document.  It's inadmissible.

3        MR. DONNELLON:  Well, Your Honor, 408's very narrow,

4   and with respect to when.  In fact, it doesn't -- it's not a

5   blanket shield on all documents that in any way reference

6   settlement being inadmissible.  It's inadmissible to show

7   liability, but the facts that are set forth in a document are

8   certainly admissible.  And this is not some sort of admission

9   against interest to show that Fifth Third has some liability

10  for any purpose other than the fact that the trustee was copied

11  on the subsequent e-mail that's set forth in response to a,

12  quote, term sheet, close quote.  And it's not governed by 408

13  which prohibits uses --

14       MR. TONER:  Your Honor --

15       MR. DONNELLON:  -- to show -- disprove the validity

16  or amount of the disputed claim or to show liability.

17       MR. TONER:  Your Honor, it appears to me the document

18  is offered to show that the settlement negotiations were, in

19  fact, going on as the witness already admitted to.  What other

20  purpose it has about the precise terms is precisely within Rule

21  408.  The parties should be able to freely negotiate.

22       THE COURT:  Well, this doesn't contain anything about

23  the terms though, does it?

24       MR. TONER:  It does indeed, the major terms of the

25  settlement that were being discussed.

Knauer - Further Redirect/Donnellon                    90

1              THE COURT:  Then maybe --

2              MR. TONER:  That it's not final, it's preliminary in

3    the negotiations, but that's the point of the rule.

4              THE COURT:  Oh, the attachment?

5              MR. DONNELLON:  Yes.  The first three pages are the

6    tort sheet response -- responsive to Mr. Jim Carr, but, Your

7    Honor, 408(b) specifically says the Court may admit evidence

8    even if it is privileged settlement discussions for another

9    purpose such as proving a witness is bias or prejudice or

10   negating a contention of undue delay or proving an effort to

11   obstruct criminal investigation or prosecution.  Part of what

12   we're here to discuss today is the witness' bias or prejudice,

13   it certainly should come in.

14             THE COURT:  All right.  Well, let's be clear here.

15   What are we talking about?  You referenced an e-mail to me that

16   -- it's on Page 4 that just says --

17             MR. DONNELLON:  Correct.

18             THE COURT:  -- is there any chance the term sheet

19   will be available today.  All right, that -- I don't think

20   that's admissible.  So that raises then what else are you

21   trying to get at?

22             MR. DONNELLON:  In response to that e-mail from Mr.

23   Jim Carr, writes back to Randall LaTour and also copies Mr.

24   Knauer, Ms. Hall, Mr. Toner and Liz Lynch and sets forth below

25   discussions on a possible plan.

1          THE COURT:  I don't think that's admissible.  I think

2    that is protected by the rule.  So I'll admit it in part and

3    sustain the objection to the remaining part of it, too.

4    BY MR. DONNELLON:

5    Q    You're aware now or are you not, Mr. Knauer, that during

6    the month of August your special counsel at Hoover Hull had

7    billed no time to this estate?

8    A    I'm aware of that.

9    Q    In fact, Hoover Hull had billed no time for the month of

10   May, June, July, August and September?

11   A    Four or five months.  I'm aware of that.

12   Q    And it's your understanding that there was simply a

13   miscommunication between yourself and your counsel as to what

14   Hoover Hull was supposed to be doing to investigate potential

15   claims against Fifth Third?

16   A    Yes.

17   Q    You're aware also that you were at the same time in the

18   summer of 2011 preparing and producing budgets for distribution

19   to Fifth Third and also in turn to Wells Fargo?

20   A    I was not.  DSI was.

21   Q    Do you review those budgets before they are given?

22   A    Typically no.  I usually got them probably at the same

23   time.  No, I didn't review them before they were disseminated.

24   Q    And you're aware that the budgets that were prepared July

25   19, 2011 and prepared October 28, 2011 all showed DSI as

Knauer - Further Redirect/Donnellon                    92

1  budgeted for zero dollars from July, August, September, October

2  and November?

3  A    You mean Hoover Hull?

4  Q    I apologize.  Let me rephrase.  You're aware that the July

5  19, 2011 and October 28, 2011 budgets showed zero dollars

6  budgeted for Hoover Hall during July, August, September,

7  October and November?

8  A    I am now.

9  Q    Did DSI have the same misunderstanding that you had with

10 respect to whether Mr. White would be doing any work to

11 investigate the financial claims against Fifth Third?

12        UNIDENTIFIED ATTORNEY:  Object to the form of the

13 question.

14 A    I don't know what their understanding was.

15        THE COURT:  I'll overrule it.

16 A    DSI would call each party, and if someone provided them

17 figures they put them in the budget.  They often called me and

18 I didn't have any figures to give them so they made

19 assumptions.  Hoover Hull provided them figures.  They put them

20 in.  If they didn't they may not have put anything in.  I

21 really haven't asked them.

22 Q    Would you agree with me that even if a party -- let me

23 rephrase.  Would you agree with me that even if an entity

24 involved in a bankruptcy estate did not have formal standing to

25 appear and be heard in the case they could still be a party in

1  interest for purposes of acquiring disclosure in a 2007

2  affidavit?

3        UNIDENTIFIED ATTORNEY:  I think now we're just asking

4  about questions of law that are within the Court's province,

5  Your Honor.  I don't see the relevance.

6        THE COURT:  I'll let the trustee state an opinion on

7  that.

8  A    I'm not sure I followed your question.

9        MR. DONNELLON:  The audio recording or do I have to

10 repeat it?

11       THE COURT:  Repeat it, please, for us.

12 BY MR. DONNELLON:

13 Q    Do you have an understanding that an entity with a

14 connection to a bankruptcy estate even though it does not have

15 standing to appear and be heard could still be a party

16 requiring disclosure in an affidavit of disinterest in this?

17 A    That sounds like quite a stretch to me.

18 Q    Is that a yes or a no?

19 A    That's a probably no.

20 Q    Am I correct that at the time you made the decision not to

21 amend your affidavit of disinterestedness to disclose Wells

22 Fargo you had not made a specific determination under the

23 participation agreement whether Wells Fargo would be a

24 necessary party to any preference action if Fifth Third was, in

25 fact, a conduit?

1  A    I've done a fair amount of loan documentation in my time

2  and there are big bank agreements and small bank agreements.

3  And good bank agreements generally to my understanding give

4  their participants virtually no rights.  And based on my

5  understanding of big bank participation agreements it was my

6  opinion that Wells Fargo had few if any rights under the

7  agreement which turns out to be the case other than to be paid.

8  Q    And I apologize if my question wasn't clear.  I'm not

9  asking about your general understanding and your vast

10 experience, I'm asking about in this particular instance at the

11 time you made the decision not to amend your affidavit, am I

12 correct that you did not conduct any analysis as to whether

13 Wells Fargo may eventually be a necessary party in any

14 preference loan against Fifth Third?

15 A    Well, that wouldn't be true.  I don't know what you mean

16 by analysis.  I based it on my experience and my counsel's

17 experience and my familiarity with participation agreements and

18 their familiarity with participation agreements.  And based on

19 our experience there was in our opinion virtually no chance

20 that we would have any claims against Fifth Third.

21         THE COURT:  You mean against Wells Fargo?

22 A    So, yes, if you're asking me if I had the participation

23 agreement, I didn't have it.

24         THE COURT:  You said against Fifth Third.  Did you

25 mean against Wells Fargo?

Knauer - Further Redirect/Donnellon                95

1       THE WITNESS:  I'm sorry.  I meant Wells Fargo, Judge.

2   Q    Right.  And I want to followup, and you said based on your

3   experience and your counsel's vast experience you made a

4   determination that there was virtually no chance that the

5   participant wouldn't have any rights that would require you to

6   sue them as a necessary party, is that correct?

7   A    Your question was did we do any analysis.  I don't know

8   what any analysis means, but if you're asking me if we got the

9   participation agreement and read it the answer is we did not.

10  We did not have it.

11  Q    And following up on your testimony you just gave you

12  reached a conclusion that there was virtually no chance that

13  this participation agreement would require you to sue Wells

14  Fargo in a preference claim, fair?

15  A    I think virtually is conciliatory.  We could envision.  We

16  did not envision any circumstance that would cause us to be

17  asserting claims against Fifth Third.

18       UNIDENTIFIED ATTORNEY:  Wells Fargo.

19       UNIDENTIFIED ATTORNEY:  Wells Fargo.

20  A    Right, I'm sorry.  Wells Fargo.

21  Q    Would you agree with me, Mr. Knauer, that you now wish you

22  had made the additional disclosure relating to Wells Fargo and

23  regret that you did not do so?

24  A    Yes.

25       MR. DONNELLON:  Pass the witness.

1          MS. DelCOTTO:  Your Honor, for purposes of my motion

2     to remove the trustee, other than the items already mentioned,

3     the transcript of the testimony today, the exhibits today, the

4     final two transcripts of Mr. Knauer's deposition and the Faegre

5     Baker Daniel conflict waiver letter with Fifth Third, I would

6     like those matters placed in the record along with all of the

7     other matters that already in the court record and believe that

8     would complete my record.

9          MR. DONNELLON:  Excuse me.  Are you passing this

10    witness, because I'm not finished with my record?  I just want

11    to know if you're passing this witness.

12         MS. DelCOTTO:  I have no questions at this time.

13         MR. DONNELLON:  Mr. Toner?

14         MR. TONER:  I do have a few questions.  Thank you.

15                    FURTHER RECROSS EXAMINATION

16    BY MR. TONER:

17    Q    Mr. Knauer, now that you've reviewed the participation

18    agreement do you feel that you were right in your initial

19    instincts about how it restricted Wells Fargo?

20         MR. DONNELLON:  Objection.  Leading.

21         THE COURT:  Overruled.

22    A    Yes, I do.

23    Q    Back to the matter of budgets that DSI prepared, what's

24    your understanding of how contemporaneously those were prepared

25    in what was going on in the case?

1  A    Some of the budgets were prepared after the fact.  The

2  specific budgets that Mr. Donnellon asked me about, I don't

3  know whether they were or not, but I know some of them were

4  because the bank wanted them for its I guess other people in

5  the bank who were asking questions.  So when DSI got behind on

6  budgets they would go back and prepare them and mark them as

7  budgets but, in fact, in some of those instances the time had

8  well passed.

9  Q    Looking back over the many months now you've served as

10 trustee in this proceeding what's your understanding of the

11 restrictions that were placed on you in your ability to bring

12 claims against Fifth Third Bank?

13 A    None.

14 Q    What's your understanding of the restrictions that were

15 placed on you in your ability to do anything adverse to Wells

16 Fargo or its affiliates on behalf of this bankruptcy estate?

17 A    None.

18 Q    As we sit here today in 2012 in the month of August what

19 monies have been paid from this estate to Fifth Third Bank?

20 A    None.

21            MR. TONER:  Thank you.

22            THE COURT:  Further questions?

23            UNIDENTIFIED ATTORNEY:  I have no questions, Your

24 Honor.

25            UNIDENTIFIED ATTORNEY:  I have no questions, Your

1  Honor.

2                    FURTHER REDIRECT EXAMINATION

3  BY MR. DONNELLON:

4  Q    Mr. Knauer, you testified that the -- you felt there were

5  no restrictions placed upon you in your ability to be adverse

6  to Wells Fargo, is that correct?

7  A    Yes.

8  Q    Do the rules of professional conduct place any

9  restrictions upon your ability to act adverse to a client from

10 whom you've obtained a waiver letter that says you'll abide by

11 the rules of professional conduct?

12 A    I don't believe under the circumstances that I received

13 this waiver there are any restrictions on my taking action

14 against Wells Fargo if it were -- if I -- if the estate had a

15 claim against it.

16          THE COURT:  Let me ask you this.  Would you have any

17 claim against Wells Fargo that would be separate from a claim

18 you would have against Fifth Third?

19          THE WITNESS:  I don't see how that's possible, Judge.

20 I understand from the briefing that someone has cited a case

21 where a participant was deemed to be subject to bankruptcy

22 claim because the lead lender was a mere conduit, but I

23 certainly knew from the outset of this case that Fifth Third

24 was not a conduit.

25          THE COURT:  I'm sorry I interrupted you, Mr.

Knauer - Further Redirect/Donnellon                     99

1  Donnellon.  Go ahead.

2  BY MR. DONNELLON:

3  Q    And I'm trying to be respectful of attorney/client

4  privilege in this so I'm trying to ask for just a yes or a no

5  question.  Did you specifically give special counsel any

6  instructions with respect to examining Wells Fargo witnesses?

7  A    I don't know that Wells Fargo's ever been a witness

8  anywhere.  I'm not sure.  I don't understand your question.

9  Q    Are you aware that your special counsel took no

10  depositions of any witnesses of Wells Fargo?

11  A    Oh, yes.  Yes.  True.

12  Q    Are you aware that Wells Fargo produced documents that

13  suggest that it considered pursuing claims against Fifth Third?

14  A    No, I'm not.

15  Q    Did you ever -- yes or no.  Did you ever discuss with

16  special counsel whether he could obtain valuable evidence for

17  his investigation against Fifth Third by examining witnesses

18  from Wells Fargo?

19  A    No, I did not.

20          MR. DONNELLON:  I have nothing else.

21          THE COURT:  Excuse me?

22          MR. DONNELLON:  I don't have anything else, Your

23  Honor --

24          THE COURT:  Oh.

25          MR. DONNELLON:  -- on -- with this witness.

1          THE COURT:  All right.  You may step down.  Thank

2     you.

3          UNIDENTIFIED ATTORNEY:  Your Honor, I believe Ms.

4     DelCotto proffered the entire deposition transcript and all of

5     the exhibits.

6          THE COURT:  All right.

7          UNIDENTIFIED ATTORNEY:  I just want to make sure

8     we're clear on our views about the exhibits.

9          THE COURT:  We'll still go through the same process.

10         MR. DONNELLON:  Yes.  I was hoping that we could take

11    just a couple minutes, Mr. Toner and myself, to review what we

12    could and couldn't stipulate to.  We don't need to waste the

13    Court's time with that if --

14         THE COURT:  Do you need a break or do you want me to

15    call --

16         MR. DONNELLON:  I'd rather have a break because I

17    don't want to necessarily call Mr. White if I don't have to.

18         THE COURT:  All right.  How long do you need?  I mean

19    -- well, let me ask you this.  You know, I thought -- you all

20    had cited deposition testimony in your pleadings.  Is that what

21    we're -- I mean can't I just admit the deposition testimony

22    that's incorporated into the plea?

23         MR. DONNELLON:  Yes.  That's what I was suggesting

24    earlier this morning, but that's --

25         THE COURT:  Well -

1          MR. TONER:  Yes, you can.  The only problem is these

2    exhibits to that testimony include handwritten notes from

3    unidentified people.

4          THE COURT:  Well, then -- but I mean do I have to --

5    are we all in agreement -- because I've read your pleadings and

6    I've read the deposition excerpts that are included therein.

7    Are there any other portions of the depositions that I need to

8    have read?

9          MR. TONER:  Not from our perspective.

10         UNIDENTIFIED ATTORNEY:  I agree with him.

11         THE COURT:  All right.

12         MR. DONNELLON:  I mean I don't see any problem with

13   putting the entire transcript in without the exhibit because

14   the exhibits have separate foundational objections that were

15   never resolved at a deposition of course, but the testimony

16   itself, albeit one can come in, he has testified here today,

17   and to the extent that Your Honor reviews that and believes

18   anything else contradicts that it's up to you.

19         THE COURT:  Well, in other words, you don't see any

20   problem as long as I'm willing to read the whole thing.

21         MR. DONNELLON:  You could read the excerpts even.

22         THE COURT:  I've read the excerpts if they were in

23   your pleadings.  I mean -- you all take a break and decide what

24   you want to do.  I'll go -- I don't really care.  I'm not going

25   to make any -- whatever you think is helpful to you and it can

1  come in without objection I'll let in.  So take a break and let

2  me know.

3                          (Recess)

4          THE COURT:  Okay.  Where are we?

5          MR. DONNELLON:  Your Honor, Mr. Toner and I discussed

6  the remaining exhibits that were marked as part of the

7  trustee's deposition.  He objects to the admission of Exhibits

8  10, 12 and 27.  All the others can be admitted.  And -- what's

9  that?

10         MR. TONER:  5 you missed.

11         MR. DONNELLON:  Oh, I'm sorry, 5 -- 5, 10, 12 and 27.

12 All the rest can be admitted.  We would ask that in response to

13 those four identified exhibits to the trustee's deposition as

14 well as the documents that are attached to the demonstrative

15 prepared as Docket 1298, those documents aren't -- they were

16 produced by Wells Fargo, they were uploaded into the document

17 repository, so they're presumed to be genuine and authentic.

18         With respect to any hearsay that's not cured by the

19 fact that we can't stipulate they're business records of Wells

20 Fargo & Company, we're not offering those documents for the

21 truth of their contents, we're simply offering them to show

22 that meetings did, in fact, take place.  Whether someone

23 recorded handwritten notes that the trustee said X or the

24 trustee said Y is irrelevant.  What we're -- the purpose of

25 that demonstrative on –

1          THE COURT:  Well --

2          MR. DONNELLON:  -- the exhibits that are attached to

3  it are simply that the meetings took place which I don't think

4  the trustee denies so the documents could be admitted for that

5  limited purpose.

6          THE COURT:  Why do you need documents to prove the

7  fact that the meetings took place when Mr. Knauer just

8  testified that he would have phone calls and never on the phone

9  call?  So I mean is there really any dispute about that?

10          MR. DONNELLON:  I think it establishes the frequency

11  of those meetings and generally the topic areas discussed which

12  were topic areas that were not discussed with other creditors

13  and there were no such meetings with other creditors.  If Your

14  Honor's suggesting it would be cumulative that may be a basis

15  to deny their admission, but I'm simply saying we're not --

16  that they could be considered business records.  We don't have

17  a representative from Wells Fargo.

18          I asked Mr. White if he obtained an affidavit of

19  records custodian at the time of the subpoena and they didn't

20  recall so I don't need -- feel the need to belabor that with

21  testimony from Mr. White.  I'm simply stating that for purposes

22  of this record they can supplement the evidence of the -- that

23  meetings took place and they're not necessarily offered for the

24  truth of the matters asserted therein.  They are offered to

25  show that Wells Fargo representatives, persons within Fifth

1   Third and the trustee engaged in these meetings on a regular

2   and frequent basis.

3          THE COURT:  Would you stipulate to that?

4          MR. TONER:  We stipulate to the fact that some

5   meetings took place, but we don't stipulate to the fact that

6   the trustee participated in every one of those meetings.  He's

7   testified at his deposition he didn't recall quite a few of

8   them.  They are cumulative --

9          THE COURT:  I mean --

10          MR. TONER:  -- to the issue, and they're written by

11   an unknown person at an unknown time in handwriting without

12   any --

13          THE COURT:  I'm going to sustain the objection to

14   those.  I know the meetings took place.  I just heard the

15   testimony.  If you want to supplement that to the extent that

16   you want to count up how many of those that were in and say

17   that there were -- that notes were produced showing ten

18   meetings without going into content of the notes are 12

19   meetings or six meetings or whatever I'll allow it to that

20   extent.

21          MR. DONNELLON:  That's in our brief.

22          THE COURT:  Okay.  Then the objection is sustained.

23          MR. DONNELLON:  And then I'd like the Court to take

24   -- before we rest the Court to take judicial notice of all of

25   the proceedings in the In re Lauth Properties case in which Mr.

1  Knauer and his firm participated on behalf of Wells Fargo.

2         THE COURT:  All right.  Well, there's a lot of those.

3  I don't know that they -- I didn't even remember them

4  participating in, and where were --

5         MR. CARR:  He's local counsel, Your Honor --

6         THE COURT:  For whom?

7         MR. CARR:  -- for the Sidley Austin firm.  You may

8  remember.

9         THE COURT:  Oh, for Sidley Austin.

10        MR. CARR:  Right.

11        MR. DONNELLON:  But we did establish at the --

12        THE COURT:  Yes.  That's fine.  I'll take -- he just

13 testified that they did that, so, yes, I'll take judicial

14 notice of that fact also.

15        MS. DelCOTTO:  Your Honor, I guess I'm just -- we

16 will complete the record with the items from today.  And the

17 testimony today, the exhibits today, and the Court has ordered

18 today that bank group produce their conflict letter.

19        THE COURT:  Yes.

20        MS. DelCOTTO:  And Volume II of the transcript when

21 it's finalized.

22        MR. DONNELLON:  Yes.  I think we should probably be

23 able to stipulate --

24        MS. DelCOTTO:  It's admitted only as --

25        MR. TONER:  -- signatures.  Just typos.

1          THE COURT:  All right.

2          MR. DONNELLON:  We don't have the Faegre -- or the

3  Baker & Daniels waiver letter to Fifth Third but you ordered it

4  to be produced and I think we'd probably like to supplement

5  that by filing it with the Court --

6          THE COURT:  All right.

7          MR. DONNELLON:  -- as part of this record.

8          THE COURT:  Okay.

9          MR. DONNELLON:  And with that the movants will rest

10 for today.

11         MS. DelCOTTO:  Unless you want oral argument about

12 the law, Your Honor, and --

13         MR. DONNELLON:  Yes, I think we'd like to have

14 some --

15         MS. DelCOTTO:  -- give some guidance.

16         MR. DONNELLON:  Unless there are any evidence to

17 present via trustee we'd like to have some oral argument

18 opportunity if it's --

19         THE COURT:  Okay.

20         MR. DONNELLON:  -- the Court would indulge.

21         THE COURT:  All right.  Sure.  Go ahead.

22         MS. DelCOTTO:  Your Honor, I believe that a number of

23 the cases are cited in the papers.  I don't know if you're

24 going to allow any post-hearing briefing, but I believe that

25 the record is clear.  We have moved for a removal of the

1 trustee under Section 324.  That section provides that the

2 Court may remove for a showing of cause after notice an

3 opportunity for hearing.  So the real question is what

4 constitutes cause under the law, and there are cases cited to

5 that effect.

6          We believe that adequate cause has been shown under

7 the cases as a matter of law because the leading cases go

8 through difference scenarios where cause has been proven.  So

9 there's case law that holds that cause is proven if there is a

10 non-disclosure in and of itself.  Cause is proven if there is a

11 lack of disinterestedness on the part of the trustee.  Cause is

12 proven if the trustee holds any kind of adverse inference to

13 the estate.  Cause is proven if the trustee has breached any

14 fiduciary duties that he owes to the estate, and case law

15 holding that cause is proven if there is a discord and a

16 disharmony that has developed in the case that has caused a

17 lack of confidence in the trustee.  Each of those in and of

18 itself is cause.  If it's not you have to prove all of those.

19 Any one of those can be cause.

20          Now, obviously, Your Honor, the case law also said

21 this is the matter for the discretion of the Court, so you do

22 have discretion.  But I would submit to you that your

23 discretion today is somewhat limited by the Seventh Circuit law

24 regarding intentional non-disclosures.  The record is clear

25 because it's been testified to and admitted that discussions

1  were had, decisions were made, and this trustee made a

2  conscious and wilful decision in the exercise of his judgment

3  that he was not required and did not have to disclose the

4  connection with Wells Fargo.

5          We have cited law, Your Honor.  I do not believe that

6  is the law, and I will just rely on the papers without going

7  through all the cases again.  But I do think, Your Honor, you

8  must follow <u>Crivello</u> and <u>Geleen</u> (phonetic) which basically both

9  say separately and apart on different issues, neither one of

10 those are a removal case of course, but that if there is any

11 evidence which exists to support an inference of an intentional

12 non-disclosure we believe the bankruptcy court should punish

13 that as severely as an attempt to put forth a fraud upon the

14 court.  That is the language of the Seventh Circuit which I

15 believe is relevant to the elements for cause on the removal,

16 Your Honor.

17         Some cases also cite in addition to showing cause we

18 need to show some harm to the estate or even a fraud has been

19 committed.  Not all cases say that, but if the Court were to

20 look to those cases and those are not controlling I would

21 submit that the record also -- there is sufficient proof that

22 there has been harm here and that the disharmony and discord

23 and expert proceedings that have multiplied as the result of

24 the decision not to disclose in and of itself has produced

25 harm, and as the Seventh Circuit said, should be treated as

1  being akin to a fraud upon the court.

2          The trustee has responded to the arguments as to

3  cause.  Your Honor, I think the response is very telling.

4  There could have been a response that said mea culpa and we

5  have made a mistake here.  We should not have taken it upon

6  your ourselves as a matter of law to decide what to do.  That

7  is within the provident of the Court.  We wish we would've done

8  it differently.  We understand there could be problems now for

9  us, but we are very sorry for what we did.  That is not the

10 nature of the response that we received here, Your Honor, and I

11 believe the Court must look to the response itself as part of

12 our showing on the cause.

13         So basically, Your Honor, the trustee in his response

14 I guess has said that everyone else is wrong, that he is still

15 correct, and that we have created a sideshow by bringing this

16 matter to court in the way that we have.  We would submit to

17 you that this all directly relates to choices that the trustee

18 made along with his counsel.

19         Secondly, he argues even to this day that as a matter

20 of law he still does not have to disclose anything with regard

21 to Wells Fargo, that they are not -- they do not rise to the

22 level of staying a party in interest.  And so under a very

23 technical and literal ruling, interpretation of Rule 2007 that

24 he's still correct and that he's never had to disclose even to

25 this day, that is not the law.  Again, this is not about sort

1  of right, wrong or indifferent.  Had he ever disclosed it you

2  would decide whether it was a disqualifying interest or not.

3  This is about taking it upon themselves to decide not to.

4       Wells Fargo factually has acted as a party in

5  interest.  Wells Fargo's counsel has made some appearances on

6  some phone calls.  We believe in connection with the claims of

7  the estate Wells Fargo legally is a party in interest because

8  any objection to the claim of Fifth Third necessarily affects

9  their interest which is acknowledged as a matter of law and the

10  equitable subordination, any preference claims.

11       So we believe their rights in their economic

12  interests are definitely affected.  But again, Your Honor, we

13  can't hold our hat today on trying to decide some kind of

14  technicality about whether Wells Fargo is the party in interest

15  because that's not the test today.  The test is should there

16  have been a disclosure, was there a disclosure, and has this

17  now created some kind of adverse interest which the Seventh

18  Circuit again says if anything that even creates the appearance

19  of some kind of lack of impartiality which I think the record

20  shows here.

21       Another argument that's been a distinction between

22  the Wells Fargo entities which -- project orange that happened

23  in that case when counsel again to try to backtrack and

24  differentiate between different GE entities among 50 or, you

25  know, multiple, multiple entities, I think that's a complete

1  red herring factually and legally.  Factually because the

2  record reflects they obtained a conflict waiver for the entire

3  Wells Fargo entity, and we believe that this does not hold

4  water under the broad disclosure requirements.

5          The trustee says that the matters have been waived

6  and that when these matters were brought to the Court's

7  attention and in entering a fee application objection that I

8  filed in December of last year to which there was no response

9  at all in the record that somehow raising that and the Court

10 not ordering any further disclosures at that time which I had

11 requested, that that is a Rule 60 final order and these matters

12 cannot be addressed today or especially disagree about the law

13 on interim fee orders, and presume the Court is familiar with

14 that law as is the other bankruptcy counsel.  There is no

15 waiver and there is no finality to interim fee orders.

16         Finally, Judge, I know that the trustee has

17 characterized this matter as something about really being about

18 something else, that there's a hidden agenda here, that this is

19 all about people wanting to retrade and do this and do that.

20 Again, Your Honor, that's just not what we're here to talk

21 about.  We're here to talk about whether an adequate cause has

22 been shown today to remove the trustee who has admitted that he

23 made a decision not to disclose information about a written

24 conflict waiver that he obtained with Wells Fargo.

25         Your Honor, we've also cited law.  It is the duty of

1  counsel when there are some kind of issues swirling around

2  their employment.  It is their duty and obligation to bring

3  that to the Court promptly.  There's law that says that.

4  That's not what happened here.  In fact, it just continues to

5  be an evasion and really no answer to anything other than just

6  to go off in different directions and might bring a focus back

7  to the non-disclosure which is where we believe it needs to be.

8         So again, Your Honor, just -- I guess if you have

9  questions for me on the law I'm happy to address those.  I

10 don't want to duplicate everything that's in the record.  I

11 will just encourage the Court while this is discretionary,

12 while -- we are all cognizant that this is a disruptive matter

13 and somewhat out of the ordinary, but I also believe that the

14 Seventh Circuit does give some very clear guidance about the

15 severity of these matters that the Court needs to take into

16 consideration.  Thank you.

17        THE COURT:  Thank you.

18        MR. DONNELLON:  Your Honor, I -- oh, I'm sorry, Your

19 Honor.

20        THE COURT:  All right.  Do you want to supplement

21 that?

22        MR. DONNELLON:  Yes.  I'd like to start with some of

23 the comments that you made this morning.  You started out by

24 saying you've read hundreds of pages of briefs maybe back and

25 forth.  And I'll submit to you that none of the ones offered by

1  Mr. Weigand or myself contain ad hominem attacks, inflammatory

2  adjectives, attacks on the reputation and integrity.  I even

3  put in one notation we are not attacking the character and

4  reputation of these individuals because the case law does not

5  require us to do so.

6         Despite all of the rhetoric on all of the attacks and

7  suspicions of the timing, this is a fairly simple question for

8  you, is did the trustee fail to disclose a connection with

9  Wells Fargo that was something that should have been considered

10  with respect to his disinterestedness, and the answer is simply

11  yes.  Not only was he required to disclose that connection with

12  Wells Fargo, but also to produce to the Court and the creditors

13  a copy of the consent and waiver agreement.

14         The sheer fact that the trustee would call Mr.

15  Wharton of the U.S. Trustee's Office to bounce off of him the

16  idea that we're not amending our disclosures, there's plenty of

17  cases that we cited that that alone rises to the level even if

18  as I had the trustee on the stand and asked him, even if you

19  can identify and resolve it and determine yourself that it's

20  not a conflict, it still rises to the level that you must

21  disclose.

22         The only sideshow or distraction that's gone on in

23  this proceeding is the belated explanation that Wells Fargo is

24  not really a party in interest that requires some disclosure.

25  And we've cited authority that regardless of the standing to

1  appear and be heard in court as an other party in interest, if

2  you have a connection to the case that can affect the conflict

3  of the disinterested professional it has to be disclosed.

4       All of the reasons we've heard here today, the

5  questions of Mr. Toner or the trustee, do you have any

6  impediment to you standing up here and suing Fifth Third, do

7  you have any impediment to your being adverse to Wells Fargo?

8  Although we can all disagree on the extent of the limited

9  waiver from Wells Fargo about the adherence to the rules of

10 professional conduct, those are all issues that should have

11 been decided by Your Honor in December of 2010 or January 2011.

12      Those could've been brought forward.  They could've

13 been put on the table that although I represent Wells Fargo

14 Bank, N.A. in another proceeding I don't have a conflict here

15 because this particular Wells Fargo entity is a participant in

16 the loan.  This particular Wells Fargo entity controls nothing

17 in the bankruptcy, and I have no problem being adverse here for

18 all to see as my conflict waiver letter so that we could

19 discuss at that time whether the code of professional conduct

20 that he had promised us to adhere to would be an impediment.

21 We were not given that opportunity.

22      Your Honor also talked about this morning about the

23 end game and this being a process.  And I submit to you by

24 analogy, and I'm not trying to impugn or cast dispersions

25 against anyone's reputation, but by analogy if a person cheats

1   on a test and gets an A it's not about coming back to the

2   teacher and saying, well, I probably would have gotten an A

3   anyway and isn't it all about the process.  It goes back to the

4   fundamental beginnings.

5           Your Honor's already been told by LeBas here today

6   that a simple decision on the Nichols (phonetic) matter on

7   summary judgment has blown up on Westlaw because of the close

8   following of this particular case.  If you were to rule today

9   that these disclosures did not have to be made you'll be

10  creating law that will be cited for years to come to

11  potentially conceal disclosures that aren't made in future

12  cases.

13          It is a very simple matter.  The trustee represented

14  Wells Fargo, he obtained a conflict of interest waiver letter

15  from Wells Fargo, he bounced it off Mr. Wharton of the U.S.

16  Trustee's Office, and he and his counsel made a deliberate

17  decision not to include that in their affidavits of

18  disinterestedness.

19          And what troubles me more particularly is, as I said

20  this morning, we were the first ones to come forward having

21  been involved in the receivership cases and intervener, having

22  understood the background of Eastern Livestock and the

23  complexities of its business and having understood the broad

24  powers given to this receiver at the time and the potential

25  that may occur with self-dealing and with taking contracts and

1    with taking cattle and fistfuls of checks.

2          We address these issues as a threshold to say this is

3    a very important matter to the livestock industry.  The

4    professionals have to be held to their highest degree of

5    disinterestedness.  And that's not what happened.  And it is

6    not the fault of these particular objectors that we only

7    discovered this in June of 2012.  Within three days of my

8    discovering the trustee's role in the <u>Lauth</u> case I brought this

9    to the attention of the Court in connection with the expedited

10   hearing motion.  It wasn't a motion to remove the trustee.  It

11   wasn't an objection to Baker & Daniels.  I felt as an officer

12   of the Court a duty to come forward at the first opportunity to

13   say that there is a non-disclosure that occurred here and it is

14   an important one to this bankruptcy estate.

15         The trustee has testified that when he first signed

16   his affidavit of disinterestedness this was a very new case, an

17   erupting case and he didn't know all the creditors.  But he

18   also said he looked at the notices of appearance, and we have

19   some dispute of whether the docket entries, admitted entries,

20   or something that was or wasn't looked at.  But anyone who

21   participated in those first two threshold hearings would've

22   heard Jeff Wegner from Kutak Rock as counsel to Wells Fargo

23   Capital.

24         It was on the radar screen at least for the trustee

25   and his counsel from the beginning of the case and there was no

1  disclosure.  Then at the time when the trustee learns, and

2  Baker Daniels' brief says they learned from Fifth Third that

3  Wells Fargo is a $10 million participant, there's a

4  determination that we both have to get conflict waiver letters

5  from Wells Fargo.

6          There are cases that we've cited to you that that

7  fact alone, if it's somebody -- whether they're a party in

8  interest, a creditor, a debtor, if I feel that I have to under

9  my rules of professional responsibility go obtain a consent of

10  conflict waiver from them then I have to disclose it and

11  explain it away to the creditors in the case.  I have no

12  choice.

13          Ms. DelCotto said you have a lot of discretion in

14  connection with the motion to remove the trustee.  Under the

15  legion of cases we've cited I would submit we do not have a lot

16  of discretion here.  The case law is very clear.  It doesn't

17  matter if you can now come forward and you can now say in

18  hindsight I have now read the participation agreement and my

19  instinct was right at the time, they don't have standing to

20  appear in the case.

21          It doesn't matter that you can now come forward and

22  say I didn't do anything wrong and I have stepped forward and I

23  have held the feet to the fire of Fifth Third and Wells Fargo.

24  It doesn't matter that this plan that was proposed is the

25  golden egg for the creditors.  The problem is the entire

1    process from the beginning was tainted.

2           This is not about forcing some suit against Fifth

3    Third.  As I've said in our briefs, my client already has a

4    suit against Fifth Third so it can't be about that motivation

5    for First Bank.  This is an issue of the fundamental integrity

6    of this process.  In Exhibit 3 which we introduced with the

7    trustee's testimony was this 12/28 e-mail conflict waiver.  And

8    he states that his representation as trustee -- his service as

9    trustee, excuse me, could result in being adverse to the

10   interests of Wells Fargo which is precisely why the creditors

11   in the case and the Court were entitled to know that, that the

12   -- and that's where the hairsplitting of is a Wells Fargo

13   Business Credit, Wells Fargo Business Credit assignee, or one

14   of the other hundreds of Wells Fargo entities evaporates.

15          The trustee testified here today that Wells Fargo &

16   Company is what that mammoth bank instructs its counsel to

17   refer to it as when it's seeking a conflict of interest.  Wells

18   Fargo engages in no such hairsplitting.  If you're going to be

19   adverse to Wells Fargo equipment leasing or Wells Fargo

20   consumer credit your representation of Wells Fargo Bank, N.A.,

21   it all comes under that umbrella.

22          This 2010 Wells Fargo & Company policy reinforces

23   that with choosing this exact language that must go into the

24   conflict waiver.  It's the precise language that is in Exhibit

25   3 that the trustee testified to.  Despite getting that conflict

1    waiver and still not amending or disclosing violates the case

2    law from the Seventh Circuit, violates the case law we cited,

3    and violates Local Bankruptcy Rule 2014.  If a professional

4    seeks to resolve any potential conflict of interest

5    concerning any other client or former client, the professional

6    shall comply with all rules of professional conduct.  All

7    consents or waivers of conflicts of interest shall be in

8    writing.  The Professional shall serve copies of all such

9    waivers upon the applicant and the service list with the

10   employment application or promptly following receipt by the

11   professional of a waiver.

12          It does not say only if they are another party in

13   interest, only if they are a creditor, only if you've made the

14   determination that a conflict may exist.  It is resolute that

15   once a conflict waiver is obtained everyone else who's in the

16   case is entitled to know about it so that they can resolve

17   these issues at the beginning and that it does not resort to

18   snaking and arguing and questioning the timing of bringing

19   these matters before the Court.  It is absolute.

20          And to make the matters worse the trustee mentioned

21   that he discussed the decision to amend with a U.S. Trustee,

22   Mr. Wharton.  And he also said, and I asked if it was possible

23   that Mr. Wharton would suggest he needed to amend, and of

24   course he said, well, anything is possible.  And I followed up.

25   In your mind was it something that you anticipated that Mr.

1  Wharton could say you need to amend?  At that point alone under

2  the cases that rises to the level that the conflict must be

3  disclosed, disclosing it to the U.S. Trustee's Office is not

4  enough, and it is not something that's, for this case, to throw

5  Mr. Wharton under the bus to say, well, he knew about it, so

6  therefore I'm immune.  I did the right thing.

7          The fact of the matter is disclosure needs to be made

8  to the Court and to all the creditors so that we can go through

9  this exact evaluation that we did today of does this affect

10 disinterestedness or not.  Under the Crivello and Granite

11 Partners cases that we cited --

12         THE COURT:  How would it affect disinterestedness any

13 differently than the Fifth Third position affected

14 disinterestedness?

15         MR. DONNELLON:  I'm sorry?

16         THE COURT:  I said how would it affect

17 disinterestedness any differently than the Fifth Third position

18 affected disinterestedness?

19         MR. DONNELLON:  What Fifth Third position are you

20 speaking of, the --

21         THE COURT:  The relationship between Baker & Daniels

22 with Fifth Third --

23         MR. DONNELLON:  Well, first of --

24         THE COURT:  -- or the trustee with Fifth Third.

25         MR. DONNELLON:  Well, first of all, he's -- because

1  he's the trustee in the case he is entitled to all the business

2  judgment deference.  But let me go back to the brief that I

3  filed in December where I said Baker Daniels shouldn't have

4  been in the case then because at some point you're going to

5  have to sit across the table and negotiate with your own

6  client.  And we've learned from the Book of Matthew a man can't

7  serve two masters.  At some point human instinct tells you

8  you're going to have some conflict in there of loyalty.

9        THE COURT:  Well, that's a whole different argument

10  though that didn't need to be made and the decision was made

11  quite some time ago that Baker & Daniels was going to represent

12  the trustee, right?

13        MR. DONNELLON:  Exactly.  And that's when --

14        THE COURT:  With a disclosure -- that was made with

15  the disclosure of the Fifth Third representation.

16        MR. DONNELLON:  Without disclosure of the waiver

17  letter.  We still don't know what that one says.

18        THE COURT:  All right.  But you knew that they had

19  represented them and --

20        MR. DONNELLON:  Correct.  We objected to it.

21        THE COURT:  Yes.  And you didn't appeal the decision.

22        MR. DONNELLON:  No.

23        THE COURT:  Right.

24        MR. DONNELLON:  And --

25        THE COURT:  So I'm asking how is -- if you had known

1   also about Wells Fargo how does that change anything?

2       MS. DelCOTTO:  Your Honor, we're talking about the

3   trustee motion.

4       THE COURT:  I'm not -- no, let him answer.  Let him

5   answer.  Yes, I know we're talking about the trustee at this

6   point.

7       MR. DONNELLON:  Well, you know, from the one

8   standpoint Wells Fargo is a much larger client to Baker Daniels

9   which we only found out now.  How does it change the

10  disinterestedness?  That's the question that respectfully we

11  don't need to answer because of the fact that --

12      THE COURT:  No, no, but just for the fun of it tell

13  me how it does.

14      MR. DONNELLON:  Because we know, for one, there was a

15  significant gap in the document production from the Wells Fargo

16  documents that were produced.  We know special counsel never

17  deposed a single person from Wells Fargo.  We know Wells Fargo

18  conducted its own forensic audit that showed issues on the

19  check had gone back to 2008 that Mr. White never saw.

20      THE COURT:  So let me ask you this.  At the stage

21  that we are in this litigation you feel as a lawyer that there

22  could be claims arising out of this loan against Wells Fargo

23  that don't exist against Fifth Third.  Have you come to any

24  preliminary conclusion about that?

25      MR. DONNELLON:  No, sir.  I'm not sure I'm following

1  you because I think it's hand in glove with --

2          THE COURT:  That's -- let me ask it again if you're

3  not following me.  The -- at this stage of this proceeding have

4  you come to any preliminary conclusion -- I know it hasn't been

5  fully litigated -- that there are -- there's a possibility of

6  independent claims against Wells Fargo arising out of this

7  loan.  In other words a claim --

8          MR. DONNELLON:  I understand what you're saying.

9          THE COURT:  -- that you might have against Wells

10 Fargo arising out of this loan that you don't have against

11 Fifth Third.

12         MR. DONNELLON:  Different from the claims we have

13 against Fifth Third in entirely?

14         THE COURT:  Yes.

15         MR. DONNELLON:  I'm going to respectfully decline to

16 answer that because we do have pending litigation against Fifth

17 Third which would be subject to amendment to add Wells Fargo.

18 And we do know that Wells Fargo was involved in many of the

19 field audits and -- that's as far as I can answer, Your Honor,

20 respectfully.

21         THE COURT:  So your answer is you think you might

22 have an independent claim.  The Wells Fargo did something in

23 connection with this loan that would give you an independent

24 claim against them that you don't have against Fifth Third.

25 That's what you're telling me.  That's where we sit today.  You

1  think that kind of claim might exist?  All right.  I thought --

2  well, maybe I have a misunderstanding.  I thought Fifth Third

3  was doing all the administering of this loan.

4          MR. DONNELLON:  Not entirely, no.

5          THE COURT:  So Wells Fargo administered it to a

6  certain extent?

7          MR. DONNELLON:  You have to tell me what you mean by

8  administer.  I'll give you an example.  During the 2008 check

9  kite investigation Wells Fargo was side by side with Fifth

10  Third doing the field audit work and investigating the check

11  kite.  And whether that comes within your definition of

12  administering the loan or not, I don't know, but what I

13  understood you to say was Fifth Third ran this completely

14  independent of Wells Fargo and occasionally cut checks or

15  reported and that's it, and that's not the case.  And I'm

16  trying to delicately balance Rule 11 obligations and making our

17  arguments against Wells Fargo.  That's why I'm trying to

18  decline to answer.  But I think --

19          THE COURT:  Okay.  That's fine.  I understand your

20  position.  All right.  Let's hear some response.

21          MR. CARR:  Your Honor, I'll start right back where

22  you were.  The answer is, no, there's not any claim against

23  Wells Fargo that would be different than the claims against

24  Fifth Third.  There's only one secured loan.  The holder of

25  that secured loan is Fifth Third.  They're the only party that

1  filed a proof of claim.

2         The -- you have in front of you the participation

3  agreement.  It makes it very clear under the Seventh Circuit

4  law that we've cited to you that was relied upon in the O'Curra

5  (phonetic) case that Wells Fargo is a pure participant.  They

6  don't have any claim against Eastern Livestock.  They don't

7  have any rights in any of the assets.

8         A case was cited to try to counter that in some way.

9  I think it's the Brook case.  And the argument was, well, hey,

10 here's the Brook case, and there, there was a participation

11 agreement, and there the Court determined that the lead bank in

12 that case was a mere conduit and the payments were flowing

13 through to the participant.  Well, we actually went out and got

14 the participation agreement in the Brook case.  You can do that

15 by going online and finding the briefs.

16        The participation agreement, and it's reflected in

17 the opinion as well, is completely different from the

18 participation agreement that Wells Fargo has with Fifth Third.

19 In the participation in the Brook case they actually sold to

20 the participants 96 percent of the loan and sold them interest

21 in the loan documents.  And there was a requirement that monies

22 be held in trust and passed along to the participants who were

23 called then co-lenders.  That's not the arrangement that's

24 here.

25        As we've cited to the Court the arrangement that's

1    here is completely passive.  Wells Fargo has no right to take

2    any action with regard to Eastern Livestock, and has expressly

3    agreed that it couldn't become a party in interest in this

4    case, that it couldn't come in and participate in any way,

5    shape or form in this Chapter 11 case.

6          So the idea that somehow there's some case law that

7    they've come up with that reverses the conclusion that the

8    trustee made about the nature of the Wells Fargo interest is

9    just wrong.  I'm not going to go back and talk about all the

10   things we've put in our brief.  I'll allude to them a little

11   bit, but I do want to -- there's some things that happened in

12   the most recent replies that this may be my only opportunity to

13   talk about.

14         And one of the things that happened in the most

15   recent reply was that Mr. Donnellon said that he found a case

16   where a professional's connection to a participant lender

17   should not only be disclosed but may be a sufficient basis on

18   which to disallow the professional's employment based on

19   potential conflicts of interest and the appearance of

20   propriety.  And he cites the case of In re Hubb Business Forms,

21   Inc.

22         I just gave you a quote.  And the way I understand

23   that is, he's telling the Court that he's found a case that

24   says that connection to a participant may be the basis to

25   disqualify the employment of the professional.  Let me read to

1   you from that case.  I won't read a long time, but it's very

2   telling.

3        And this has to do -- the professional involved is an

4   outfit called B&B, and the debtor is Winthrop.  Winthrop's

5   application to employ B&B disposes that B&B is counsel to East

6   Boston Savings Bank which is a participant in a loan secured by

7   a mortgage on a building owned by Winthrop.  Winthrop asserts,

8   though, that B&B does not represent East Boston Savings Bank

9   and any matters involving Winthrop and that counsel to the lead

10  bank of the loan is handling that matter.

11       The application to employ B&B further discloses that

12  B&B holds a prepetition unsecured claim for legal services.  In

13  addition, Ralph Bagley (phonetic), a stockholder of B&B is on

14  the Winthrop's board of trustees.  The application of employees

15  states that Ralph Bagley received no compensation.  The

16  unsecured creditors committee has filed an objection to the

17  application to employee B&B.  The committee objects to the

18  application because of Ralph Bagley's position on the board of

19  trustees.

20       For the reasons set forth in the committee's

21  objection the Court shall not approve the employment of B&B.

22  In light of the potential conflict and the period of

23  improprieties that the creditors committee raised, which was

24  the issue that he served on the board of trustees, no mention

25  at all in the Court's decision -- no mention in the objection

1  to employment about the representation of the participant bank,

2  no mention in the Court's decision that that had anything to do

3  with the disqualification of the professional, instead had to

4  do with the fact that the professional sat on the board of

5  trustees of the debtor.  And that's the case that Mr. Donnellon

6  cites to you and says it stands for the proposition that a

7  participant lender should not only be disclosed but may be

8  sufficient basis on which to disallow the professional's

9  employment based on potential conflicts of interest and the

10  appearance of impropriety.

11        I want to say something briefly about what Ms.

12  DelCotto said which was, she asserted that we had argued that

13  there was a Rule 60 blockage to raising this issue.  That's not

14  true at all.  We raised that issue with regard to the objection

15  with regard to Faegre Baker Daniels, we said that question had

16  been raised in the past and had been completely resolved by a

17  final order and therefore couldn't be re-raised.  We didn't

18  raise it with regard to the trustee.

19        Instead what we said about the trustee is, Mr.

20  Donnellon says that he woke up one day in July I think and said

21  he first found out about this issue, when in fact there's half

22  a page of discussion of this issue in a brief that Ms. DelCotto

23  filed in December of 2011.  So we just -- we raise that not

24  because of a Rule 60 blockage, but because that issue had been

25  raised before.

1        One other issue that's been talked about quite a bit

2   today is the idea that there's some black and white rule under

3   the Local Rule 2014-1 about disclosing conflict waiver letters.

4   Bankruptcy Rule -- Local Rule 2014-1 is the analog to

5   Bankruptcy Rule 2014, and it's applicable when an applicant

6   seeks court approval of the employment of a professional person

7   pursuant to 11 U.S.C. Section 327 1103(a) or 1114, which is not

8   what Mr. Knauer did.  This rule is not applicable to an

9   application to employ a trustee.  Instead it would be

10  applicable to us.  It's applicable to our application to be

11  employed.

12        I want to talk at some point, and I don't know if now

13  is the right time to talk about it or not, but I want to talk

14  about something the Court alluded to earlier which is how

15  strange this case is from one perspective, and that is in all

16  the cases I've been -- I've dealt with over the years, and I'm

17  sure most of the Chapter 11 cases that the Court's been

18  involved with, usually have a three-legged stool.  You have a

19  debtor, you have a bank, and you have unsecured creditors.

20        In this case we don't have that.  We do have a bank,

21  we do have a bank that claims a lien on all of the assets of

22  the estate, and the Court's raised the issue from the very

23  beginning of this case, how are we going to run this case so

24  it's not just for the benefit of the bank.  And we've been very

25  cognizant of that and it explains why we've done a lot of the

1  things we've done.

2         But there isn't a debtor.  There's a trustee who's a
3  neutral, and then there are a lot of unsecured creditors.
4  There are about 500 of them.  They are farmers and ranchers and
5  producers who sold cattle to Eastern Livestock.  Then there's
6  this shadow group.  And we hear a lot from these people.  It's
7  First Bank, it's Superior, it's Blue Grass.  There are also a
8  number of other parties who are in this group but we don't hear
9  from much, including the branch managers who work for ELC, and
10 these folks are not unsecured creditors.

11        We've pointed out in depth about the position of
12 First Bank.  First Bank has asserted two claims in this case
13 asserting that it's a secured creditor, not by virtue of the
14 fact they loaned any money, fees or livestock, but instead
15 because it loaned money to Tommy Gibson, and it claims that its
16 proceeds got into our hands.  They never denied that, they
17 never argued with that, and yet here they are.

18        And you've got to ask yourself, the issues that they
19 are raising, that they supposedly are raising on behalf of
20 unsecured creditors won't change whether a dime gets into their
21 pockets.  And, in fact, a keystone of our plan is that there's
22 $4.7 million in an account at Your Community Bank, and we've
23 negotiated an arrangement whereby if we get this plan confirmed
24 the bank will release any claim it has to that money and that
25 money will go almost instantly, as soon as we can resolve

1  claims, to those creditors -- unsecured creditors in this case.

2  And the chief impediment to getting that done is First Bank who

3  is going to fight us over that money.

4         And for them to now come in here and say that they

5  are representing the interests of those unsecured creditors is

6  incredibly and fundamentally disingenuous.  If we got that

7  money, if we weren't opposing getting that money by First Bank,

8  our calculations show that we would produce almost instantly a

9  24 percent dividend for general unsecured creditors.

10        And that goes right back to what the Court said at

11 the beginning of all of this which is we all know that this is

12 a court of commerce.  We all know that this is a very practical

13 court, and that what we're trying to do is maximize recovery

14 for the estate and for the legitimate creditors of this estate.

15 And they don't want to talk about what all of the cases say

16 which is that in looking at a question of removing the trustee

17 the Court has to take into account the impact on the unsecured

18 creditors.  And the impact on the unsecured creditors would be

19 devastating.

20        It may be good news for First Bank because First Bank

21 won't have an opponent that it has now, and resisting its

22 efforts to take money out of this estate First Bank won't have

23 an opponent who we believe -- we may have a very sizeable

24 Section 550 claim against First Bank that we're going to assert

25 against them.

1    So it won't be bad news for First Bank if the trustee

2  is gone.   It won't be bad news for Blue Grass who we're suing

3  for something like $700,000 of checks that were taken on the

4  last days before the receiver came in and weren't deposited in

5  the bank account but instead went through one of these branch

6  managers that got turned over to Blue Grass, and, in fact, if

7  that intermediary, who I think is Mr. Downs (phonetic), if some

8  of his checks hadn't bounced they wouldn't be here at all.

9  They would've gotten paid off.   They'd be here only as a

10 defendant.

11    So it won't be bad news for them if the trustee gets

12 removed, but it's going to be a dreadful situation for the true

13 unsecured creditors in this case.   And the Court certainly has

14 to take that into consideration.   We've laid out in our briefs

15 what the rules require.   The rules require disclosure with

16 regard to connections with creditors and parties in interest.

17 We've cited the law to the Court that established that Wells

18 Fargo was neither of those.

19    Yes, we regret not having disclosed it.   If we had

20 known where this was going to bring us we certainly would've

21 liked to have had it out in the beginning, and we submit to the

22 Court just what you were saying right now just a moment ago, it

23 would've had no impact because what was disclosed was the

24 unconnected representations of both the trustee and Faegre

25 Baker Daniels with the holder of the secured claim in this

1  case, Fifth Third, and we've resolved that with the engagement

2  of conflicts counsel, we defined what the restriction was on

3  Faegre Baker Daniels which was that we can't sue the secured

4  party.  That was the -- that's the restriction.  The trustee

5  has no such restriction, but we did bring in special counsel so

6  that if we got to the position where we decided we needed to

7  sue the bank we would do that.

8          So we have rules.  We think we complied with the

9  rule.  If the question is do we wish we could've gone further

10 than what the rule required, yes, we do wish we had gone

11 further than what the rule required, but we did satisfy the

12 rule, and there is absolutely no basis for moving this trustee,

13 and to do so would be a disaster.

14         MR. CLUBB:  Judge, may I speak briefly on behalf of

15 Kentucky Cattlemen's Association?

16         UNIDENTIFIED ATTORNEY:  Your Honor, I object to this.

17         THE COURT:  Yes, I mean the objection has been raised

18 that you're neither a party in interest nor a creditor in this

19 case.  So what is your relationship to the case?

20         MR. CLUBB:  Your Honor, I represent Kentucky

21 Cattlemen's Association which is an association that represents

22 -- has numerous members in the State of Kentucky that

23 represents interest in the cattle industry both for large and

24 small beef and livestock producers and farmers as well as some

25 stockyards.

1          Judge, Robert Foree entered an appearance on behalf

2    of the Kentucky Cattlemen's Association probably around 18

3    months ago.  There was never an objection filed with that.  I

4    believe he spoke to you on one of the first hearings back in

5    December of 2010.  No one raised an objection to any comments

6    he made at that time.

7          So we've been involved in monitoring this case.

8    Been involved, been showing up to court for quite some time.

9    The trustee as the Court as well has said, claims that they are

10   interested in the interest of small farmers.  We represent

11   those interests, Your Honor.

12         THE COURT:  So you do have an appearance on -- I know

13   you filed appearance, but do you represent a creditor?

14         MR. CLUBB:  Kentucky Cattlemen's Association is not a

15   creditor, Judge, but that is who I represent.

16         THE COURT:  All right.  I'll allow you to speak

17   briefly today.

18         MR. CLUBB:  I'll be very brief, Judge.  We agree with

19   the trustee on a couple of points, Judge.  Number 1 is, we're

20   first and foremost worried about the small farmers in the State

21   of Kentucky.  Around the nation there have been some devastated

22   by the fraud that was perpetrated by Eastern Livestock.  We

23   also agree, Judge, that the trustee should've disclosed more.

24   And the reason we believe that, Judge, is we feel that this is

25   a threshold issue that if this had been disclosed from the very

1  beginning there might not be a time for this proceeding at all.

2         My client and my client's members will have known

3  that there may have been a problem, but the problem is now,

4  Judge, we're two years into this.  My client is just now

5  finding out about there may be an impartial -- there may be a

6  lack of impartiality on behalf of the trustee.  Our farmers,

7  Judge, had lost confidence in this proceeding long ago.  These

8  issues are not helping that whatsoever.  These people are two

9  months into the crop that they -- crop of cattle that they

10 raised two years ago.  They've still not seen any money.

11 Because of that and because of the impartial questions that

12 have been raised we would join in the motions of both Mr.

13 Donnellon and Ms. DelCotto.

14        THE COURT:  Have you advised your clients that that

15 could result in delay in this case?

16        MR. CLUBB:  Judge, my clients are aware that there

17 could be delay with removal of the trustee, but we feel

18 obligated on behalf of the members to --

19        THE COURT:  Did your clients understand what -- that

20 there was a conflict with Fifth Third two years ago that was

21 disclosed and did that bother them?

22        MR. CLUBB:  Judge, I don't want to say exactly what

23 they were aware of.  I do believe that they were aware that

24 that was disclosed.  The problem is, Judge, is if there were

25 other conflicts they also needed to be disclosed at the same

1   time and they weren't.

2          THE COURT:  And that's the issue, isn't it?  Thank

3   you.

4          MR. CLUBB:  Thank you.

5          THE COURT:  All right.  Anyone else want to be heard

6   on this matter?  All right.  Let's --

7          MR. MASSOUH:  Your Honor, this is John Massouh on

8   behalf of Friona Industry.  I don't believe there is a dispute

9   that Friona is a creditor in the case.  And he touched on the

10   exact point that I want to raise, is that if this trustee is

11   removed there will be significant delays, additional

12   administrative costs associated with that, and that's something

13   that on behalf of Friona I was really not looking forward to.

14          We believe that the trustee and his counsel have done

15   a very adequate job in this matter and are not in favor of his

16   removal at least for the mere fact that, you know, this is a

17   court of equity and if this happened and the delay -- this

18   adversary -- the interpleader proceedings which involves a lot

19   of small farmers, it involves a lot of parties has been

20   languished in this courtroom of two years because of various

21   delays and the trustee's removal is a way to continue and the

22   -- on top of that the additional administrative expense that

23   would be in recovery for any unsecured creditors in this case.

24          THE COURT:  All right.  Anybody else want to be heard

25   on that?  Mr. LaTour?

1          MR. LaTOUR:  Your Honor, you've been presented today

2    with an either/or choice, and I'm going to suggest that there's

3    a third choice which is based on proportionality.  Case law

4    requires you to balance the prejudice of both sets of actions

5    and it seems to me don't have to either remove the trustee or

6    agree that everything he did was perfect.  You can pick the

7    sanction for which you believe is the value of the mistake if

8    you decide one was made, but you don't have to say the

9    trustee's on the way out or the trustee was perfect.

10          I think that because this is a court of equity,

11   because you're required to balance the respective harm to the

12   parties, and because I've heard these parties say today that

13   that if these disclosures have been made way back when there

14   probably wouldn't have been a problem, it suggests to me that

15   the proportionate response is the appropriate response.

16          THE COURT:  And what would that be?

17          MR. LaTOUR:  Some sort of adjustment to the fee

18   application, Your Honor.

19          THE COURT:  All right.  Anything else on this matter?

20   Let's move on to the motion to remove Faegre Baker Daniels as

21   counsel.  You want to call a witness?

22          MR. DONNELLON:  May I make a couple of short comments

23   in response to what Mr. Carr said on the last issue?

24          THE COURT:  Okay.

25          MR. DONNELLON:  Very -- I promise to be very terse.

1        THE COURT:  Should I let him respond after you do?

2  When are we going to stop?

3        MR. DONNELLON:  Well, it was my motion, and normally

4  the procedure would be I go first and --

5        THE COURT:  All right.  We'll let the jury hear from

6  you last then.

7        MR. DONNELLON:  Thank you.  The first issue is that

8  of Local Rule 2014.  We're saying it's inapplicable because

9  this is a 2007 matter.  We've cited plenty of cases that the

10 trustee has to be held to the same standard as professionals

11 and it would be turning those cases on its head to say that the

12 disclosure of the conflict waiver letter did not have to be

13 made simply because that is an analog to Bankruptcy Rule 2014

14 and 2007.

15       With respect to Mr. Carr's recitation of this Hubb

16 Business System's case he's far more skilled in these

17 bankruptcy issues than I.  The only thing we put in our brief

18 is that the Court found it may be some grounds.  The more

19 important threshold point from that is that there is law that a

20 participant needs to be disclosed, whether they rise to the

21 level of a party interest or not.

22       With respect to the government seizure case, we are

23 working with the government, and the fact that we are viewed as

24 an impediment to that is only because the government recognizes

25 the standpoint of First Bank as being an innocent owner of some

1   of the (indiscernible).

2          THE COURT:  Well, isn't he -- maybe I'm wrong about

3   this, but it would seem very logical to me that you're arguing

4   that it belongs to Mr. Baker and where -- the estate to which

5   -- that's where you'd like to see it end up as opposed to the

6   eastern estate, right, or am I wrong about that?

7          UNIDENTIFIED ATTORNEY:  Mr. Gibson.

8          MR. DONNELLON:  Mr. Gibson.

9          THE COURT:  I meant Mr. Gibson.

10          MR. DONNELLON:  Absolutely.  Is that -- well, without

11   getting too much into detail on it there's -- they're under an

12   innocent owner.  If it's -- if there's a legitimate business

13   operating within the fraud --

14          THE COURT:  But that's -- but the point he was

15   making, and I don't think you really dispute this, is that if

16   you prevail that money won't come in for the creditors of

17   Eastern Livestock.  It'll go to Tommy Baker's creditors and

18   your bank.

19          MR. DONNELLON:  Yes.  And I don't disagree with that.

20   But that --

21          THE COURT:  Okay.

22          MR. DONNELLON:  My point is --

23          THE COURT:  But that does present a -- that does just

24   raise the question as to whose side you're on, right?

25          MR. DONNELLON:  I don't think so because none of the

1   case law that I've seen raises the notion that the motivation

2   of the party objecting to a non-disclosure is an issue at all.

3            THE COURT:  You certainly have a right to advocate

4   and protect every claim that your client has, but you are not

5   trustee.  You are not in a position that the bottom line for

6   you is to increase the dividend to the unsecured creditors in

7   Eastern Livestock.

8            MR. DONNELLON:  I agree.

9            THE COURT:  You'd rather have money go to your

10  bank --

11           MR. DONNELLON:  I agree with you.

12           THE COURT:  -- and that's your job.

13           MR. DONNELLON:  Absolutely.  We're on the same page.

14           THE COURT:  Okay.

15           MR. DONNELLON:  The final point was with respect to

16  -- I think it's inconsistent to on the one hand say First Bank

17  should not be heard here because we don't have an interest in

18  getting more money to the unsecured creditors because we never

19  did any business with Eastern, and on the other hand, after we

20  raise these issues, suddenly we're the target of some

21  fraudulent conveyance when we never, ever did business with

22  Eastern.

23           And my only point being these are matters, perhaps as

24  Mr. LaTour says, that are dealt with -- there is an

25  impropriety.  It did occur.  It doesn't matter why, when or how

1  it's raised.  The fact of the matter is there was a

2  non-disclosure of Wells Fargo.

3         THE COURT:  Well, I certainly hope you would agree

4  with me that you've never had any trouble being heard in this

5  court.

6         MR. DONNELLON:  I would have to agree with that, Your

7  Honor, and I appreciate you indulging me by propping up my leg

8  even --

9         THE COURT:  Oh, that's quite all right.

10        MR. DONNELLON:  No disrespect to the Court.

11        THE COURT:  No, I understand.

12        MR. DONNELLON:  Are we moving --

13        THE COURT:  I wished I could've continued this at

14  your request but I think we're too far into the pool.

15        MR. DONNELLON:  I ultimately did not request that

16  because I knew that would create more harm than good.

17        THE COURT:  All right.  Yes.  We're waiting for the

18  motion --

19        MR. DONNELLON:  Are we moving to the Baker & Daniels

20  issue or are we skipping over the objections to the report?

21        THE COURT:  Well, we'll talk about it.  Let's skip

22  over the report.  I mean you know really, and I'm not ruling, I

23  don't care if we have a report or not.  We can strike the

24  report as far as I'm concerned if that'll all go away.  It

25  doesn't -- I don't think it's going to change the trustee's

1  opinion but that's what I mean when I say why fight about the

2  process.   The trustee has reached a conclusion.   The only

3  question in my mind is whether, you know, it's neutral or it's

4  been somehow a tainted opinion.   If you want to strike it, I

5  might do that.   Then do we have to talk about it?

6              MR. ROGERS:   Your Honor, could I --

7              MR. DONNELLON:   I defer to Mr. Rogers on that.

8              MR. ROGERS:   -- briefly address that as -- on behalf

9  of a party who's filed a number of the motions relating to the

10  report.   It's true the trustee has said, we think this is all

11  moot, there's a plan, there's a disclosure statement.   If by

12  moot the trustee means this report isn't important anymore for

13  any purpose, then I think we would agree.

14          The problem I have is that it's frequently used as a

15  response to the conflicts arguments to say there's been an

16  independent investigation, there's been an independent report,

17  so on and so forth, and to that degree certainly it's not moot.

18  We obviously dispute that there's an independent report filed

19  by the trustee and all counsel who have a conflict of interest,

20  as well as Hoover Hull, but if the Court were to strike it and,

21  therefore, the argument that this is the independent report

22  then I think --

23              THE COURT:   I mean I don't know what -- I'm not even

24  sure what it is.   I can't tell if it's like vegetable, mineral

25  or -- because it's not really a pleading.   It's –

1          MR. ROGERS:  Just a comment, Your Honor.

2          THE COURT:  What is it?

3          MR. ROGERS:  Are you referring to the comments filed

4   after the report?

5          THE COURT:  No, I'm talking about the report itself.

6          MR. ROGERS:  Oh.

7          THE COURT:  I mean I'm not going to grant it or

8   overrule it.  It's not a judgment.  It's just one of these

9   things we do in bankruptcy that other lawyers shake their head

10  at and this is probably one of the reasons why.

11         MR. ROGERS:  And I think --

12         THE COURT:  I don't even know why necessarily it had

13  be a pleading.  He could have just e-mailed you a copy and

14  said, here's what I think, and --

15         MR. ROGERS:  I certainly agree, Your Honor.  It

16  doesn't ask for any relief.  It's effectively been replaced by

17  the disclosure statement and as long as it's not touted and

18  used as an independent report by special counsel then I don't

19  think we care, but we certainly don't think it is an

20  independent report by special counsel.  And to the degree it's

21  used as a response to arguments on conflict --

22         THE COURT:  Well, what do you mean used as response?

23  All right.  Let's talk about that.  So can the trustee say in

24  its disclosure statement -- can he come to some of the same

25  conclusions that are in the report or does he have to have a

1 different opinion?

2          MR. ROGERS:  Certainly he can come to the

3 conclusions.  If he says these are the conclusions of my

4 independent counsel who's independently investigated it --

5          THE COURT:  All right.  Let's --

6          MR. ROGERS:  -- we have a problem with it.

7          THE COURT:  All right.  Let's come back to that.  I

8 think maybe we can resolve that one way or the other pretty

9 promptly.  Let's talk about the motion to remove counsel.  We

10 have witnesses on this issue?

11          MR. DONNELLON:  I would like to call Ms. Hall, but,

12 Your Honor, I'd also like to make sure I have the Faegre Baker

13 -- or Baker & Daniels waiver letter to Fifth Third that you

14 ordered to be produced which we still don't have yet.  So I

15 think no matter how far we get we're going to have to continue

16 this in progress until I can --

17          MR. CARR:  Well, can I ask about that, Your Honor?

18 Are we going to relitigate the Fifth Third disclosure and the

19 employment of Faegre Baker & Daniels with respect to Fifth

20 Third, is that what we're going to relitigate?

21          THE COURT:  No, we're not going to litigate that.

22 That's not your intention, is it?

23          MR. CARR:  So what would be the function of doing

24 that?

25          MS. DelCOTTO:  Your Honor, there's been a description

1 that there is a written waiver.  The waiver has been described

2 in the record by counsel.

3          MR. CARR:  It was described in the affidavit.

4          THE COURT:  Let her finish.

5          MS. DAY:  So the Court and the counsel just need to

6 see the document.

7          THE COURT:  Though this is the Fifth Third waiver?

8          MR. CARR:  Yeah, that's what they're talking about.

9 They have the Wells Fargo.  So back in --

10          THE COURT:  I thought the basis of your motion to

11 remove them as counsel was the Wells Fargo non-disclosure, not

12 the Fifth Third disclosure.

13          MR. DONNELLON:  It's combined.  I don't intend to

14 relitigate the Fifth Third issue, but I think it certainly goes

15 -- they're hand in glove because the original objection was

16 based upon Fifth Third's.  We didn't know about Wells Fargo at

17 the time, and I don't intend to --

18          MR. CARR:  And that original objection was overruled

19 almost two years and now they want to relitigate it.

20          MR. DONNELLON:  No, it wasn't.

21          MR. ROGERS:  I think, Your Honor, it's the existence

22 of the terms of the waiver have been used in response to a

23 number of motions including ones I've filed of the report.

24          THE COURT:  All right.  How long will it take you to

25 fax that down here or do you have it on your computer?

1          MR. CARR:  We can hand it to him right now.

2          THE COURT:  All right.

3          MR. DONNELLON:  Your Honor, it wasn't overruled, that

4    objection.

5          THE COURT:  Well, we'll talk about that in a moment.

6    Well, I mean they were hired.

7          UNIDENTIFIED ATTORNEY:  They were hired by --

8          MR. DONNELLON:  They were hired.  It was --

9          MR. ROGERS:  With the representation that special

10   counsel was being retained to handle the conflict.

11         MR. DONNELLON:  To handle --

12         MR. CARR:  That's not true.  The papers are there,

13   Your Honor.  You can read it what it says in the application,

14   as we laid it out in the response.  We filed an application.

15   We said these are the things we're going to do.  We said that

16   we have a consent from Fifth Third that prohibits us from suing

17   Fifth Third.  We said we're going to get special counsel to

18   resolve that which is to sue Fifth Third if we need to sue

19   Fifth Third.  We then hired -- we then came to you and all

20   those papers are right there in front of you.  This was all

21   done back in February of -- January, February of 2011 and the

22   idea that we're going to re-litigate that now just makes no

23   sense whatsoever.

24         MR. DONNELLON:  And as I said it's not my intention

25   to relitigate it.  It's -- the notion was it was never ruled

1   upon.  We engaged in discussions with -- I did with Ms. Hall.

2   There was never a memorandum in opposition to --

3           THE COURT:  What was not ruled on?

4           MR. DONNELLON:  The objection to retention of Faegre

5   Baker Daniels.

6           THE COURT:  Well, that was ruled on when I approved

7   their employment.

8           MR. DONNELLON:  It was withdrawn.

9           MR. CARR:  No.

10          MR. DONNELLON:  It wasn't -- Mr. Carr is saying --

11          THE COURT:  Oh, the objection.

12          MR. DONNELLON:  -- we're going to relitigate it.  It

13  was never litigated.  You approved their employment.

14          THE COURT:  Well, it's litigated.  If you raise it

15  and then you withdraw it and let an order go in approving it

16  it's litigated.

17          MR. DONNELLON:  The withdrawal of the objection was

18  based very specifically on the accuracy of the amended

19  affidavit and the retention of special counsel to handle

20  everything with respect to Fifth Third.

21          MR. CARR:  That -- Your Honor, that is a -- you can

22  read the papers.  It doesn't say we're going to hire special

23  counsel to handle everything to do with Fifth Third.  Those

24  papers are in front of you and if we're going to let these guys

25  recharacterize what's in those papers then we're never going to

 1  get anywhere.

 2          THE COURT:  All right.  Do you have the papers?

 3  They're looking for the papers.

 4          MS. HALL:  I have the e-mail.

 5          THE COURT:  The e-mail?

 6          MS. HALL:  It's an e-mail.

 7          THE COURT:  That's the -- the waiver is an e-mail?

 8          MS. HALL:  No.

 9          THE COURT:  Can you send it to them?  Do you have a

10  computer --

11          MS. TONER:  Mr. Donnellon, can you receive it by

12  e-mail?

13          MR. DONNELLON:  Yeah, you can send it to Dan --

14          MS. HALL:  Just Dan?

15          MR. DONNELLON:  -- number four --

16          MS. HALL:  Oh.

17          MR. DONNELLON:  No, there's a whole --

18          MS. HALL:  Do you want me to send it to Kristin?

19          UNIDENTIFIED ATTORNEY:  Yeah, I would --

20          MR. DONNELLON:  No, send it to Kristin.  She can

21  print it out.  Could we take a very short --

22          THE COURT:  Yes, we'll take a short break.

23                      (Recess)

24          THE COURT:  All right.  Who's going to take the lead

25  on this motion?

Hall - Direct/Donnellon                    149

1          MR. DONNELLON:  I will.  We call Ms. Hall to the

2   stand, please.

3          THE COURT:  Raise your right hand.

4                TERRY HALL, WITNESS, SWORN

5          THE COURT:  You may be seated.

6                DIRECT EXAMINATION

7   BY MR. DONNELLON:

8   Q    Good afternoon, Ms. Hall.

9   A    I can't -- wait a minute, I can't see.  I can't move the

10  chair or the --

11         UNIDENTIFIED ATTORNEY:  Do you need help?

12         UNIDENTIFIED ATTORNEY:  The screen is right in the

13  way now.

14         THE COURT:  I think the screen moves, doesn't it?

15         UNIDENTIFIED ATTORNEY:  No.

16         THE COURT:  No, it doesn't.  No, don't break it.

17         COURTROOM DEPUTY:  It does move.  It just sticks.

18         THE WITNESS:  Oh.

19  BY MR. DONNELLON:

20  Q    Ms. Hall, Mr. Weigand is going to hand you part of -- it

21  was marked as deposition of Mr. Knauer as Exhibit 1.  It's

22  Docket 113 which was the original application to employ Baker &

23  Daniels, LLP which has attached to it a affidavit of Terry Hall

24  in support of application.  Could you turn to that portion

25  marked affidavit which is four pages into the document -- five

Hall - Direct/Donnellon                    150

1  pages into the document now?  Did you, in fact, sign this under

2  penalty of perjury on December 30, 2010, Docket 114-1?

3  A    Yes.

4  Q    If you can turn to Paragraph 5.  It states current

5  representations that the firm believes will not represent a

6  conflict of the terms and conditions set forth herein include

7  the firm's representation of Fifth Third Bank, N.A.  The firm

8  currently represents Fifth Third in matters unrelated to the

9  Chapter 11 case or the debtor.  Fifth Third is a creditor of

10 the estate and has consent to the firm's representation of the

11 trustee.  Did I read that correctly, ma'am?

12 A    Yes.

13 Q    Baker & Daniels did not, however, obtain a written

14 conflict waiver from Fifth Third, isn't that true?

15 A    No.

16 Q    Was there an oral waiver confirmed via e-mail?

17 A    There was a written waiver in the e-mail.

18         THE COURT:  When you say, no, do you mean --

19         THE WITNESS:  It was not true.

20         THE COURT:  Okay.

21 Q    Can you explain your answer?  I asked as a followup was

22 there an oral waiver that was confirmed via e-mail or is there

23 something else you're referring to?

24 A    My knowledge of the waiver is the e-mail that was

25 transmitted to the Court that you have a copy of.

Hall - Direct/Donnellon                    151

1  Q    Had you seen the e-mail at the time that you executed the

2  affidavit that's marked as Knauer Deposition Exhibit 1?

3  A    Yes.

4  Q    This is a -- Mr. Weigand is going to show you now a

5  document that was just produced to us this afternoon.

6          MR. DONNELLON:  Oh, do we have an extra copy to mark,

7  Kevin?  I --

8          MR. TONER:  Sure.

9          MR. DONNELLON:  -- marked on this one.  Here.

10          THE COURT:  She'll mark it.

11          MR. DONNELLON:  She'll mark it and you can hand it to

12  -- what did we mark this as?

13          MR. WEIGAND:  Two.

14          THE COURT:  What was it marked as?

15  Q    We've -- Mr. Weigand has handed you what's been as

16  Creditor's Exhibit Number 2.  This is an e-mail thread that

17  begins from David A. Foster dated Sunday, December 26th, with

18  -- to Jim Hubbard with a response to Mr. Hubbard Monday,

19  December 27.  Have you seen this document before, ma'am?

20  A    Yes.

21  Q    And is this Exhibit 2 what you're referring to as the

22  written waiver --

23  A    Yes.

24  Q    -- from Fifth Third?

25  A    Yes.

Hall - Direct/Donnellon                    152

1  Q    And had you seen this Exhibit 2 prior to the time you

2  executed the affidavit of disinterestedness?

3  A    I believe so, yes.

4  Q    If you can -- if I can direct your attention to the bottom

5  portion of the e-mail thread from David Foster, who is that?

6  A    One of my partners.

7  Q    Is he a Baker & Daniels partner who's responsible for the

8  Wells Fargo engagement?

9  A    I think he's responsible for the Fifth Third engagement.

10 Q    Is he also responsible for the Wells Fargo engagement?

11 A    I don't know.  I think he is.

12 Q    It states in its entirety, Jim, Dave Fisher (phonetic) and

13 I would like to you Monday about a potential Baker & Daniels

14 engagement which would require a five, three consent.  Dave is

15 out of the office, but can be available between 8 and 10 a.m.

16 Monday.  Can you respond back and let me know if you can talk

17 some time during that period?  I can setup a three-way call or

18 dial in if necessary.  Thanks, Dave.  Did I read that

19 correctly, ma'am?

20 A    Yes.

21 Q    There's no reference to Eastern Livestock or the estate of

22 Eastern Livestock or role of the trustee in Eastern Livestock

23 in the original contents of Mr. Foster's e-mail, correct?

24 A    That's correct.

25 Q    Is there any way based upon looking at Exhibit 2 that you

1 can confirm for us that this, in fact, relates to the Eastern

2 Livestock engagement?

3 A    It was sent to me when I asked for the conflict waiver

4 with Fifth Third related to the Eastern Livestock's engagement.

5 So that's how I -- I mean that was sent to me by David Foster.

6 Q    I appreciate that and that's not a response to my

7 question.  Is there anything looking at Exhibit 2 in itself

8 that would indicate that it relates specifically to

9 representation of Trustee Jim Knauer in the Eastern Livestock

10 matter?

11 A    Within those two pages, no.

12 Q    Is there any additional part of this e-mail that's missing

13 from what was produced this afternoon?

14 A    As far as I know, no.

15 Q    Is it your understanding based upon what's been

16 represented to you that Exhibit 2 is, in fact, the waiver that

17 relates to Eastern Livestock?

18 A    Yes.

19 Q    You would agree with me that in the original e-mail from

20 Mr. Foster there's no description of the client or the extent

21 of the engagement or any potential conflicts that may be

22 arising?

23 A    Not in this e-mail, but it was -- Mr. Foster had told me.

24 Q    I'm sorry?

25 A    Not in this e-mail, but when it was sent to me this is

Hall - Direct/Donnellon                    154

1  what it was -- it was told to me that this was the Fifth Third

2  conflict waiver.

3  Q    Is there any other writing that sets forth for purposes of

4  Fifth Third's informed consent the nature of the representation

5  in connection with Eastern Livestock and the potential

6  conflicts that may arise?

7  A    Not to my knowledge.

8  Q    If you --

9  A    The e-mail seems to reference the representation described

10 below, but there's not a description.

11 Q    The response from Mr. Hubbard that I believe you're

12 referring to says, I've discussed this with senior management,

13 Fifth Third is willing to waive the conflict presented by the

14 representation described below, but you would agree with me

15 there's no specific representation described in the below

16 e-mail thread?

17 A    Not in this e-mail.

18 Q    And is there any other writing that would describe more

19 fully that representation in connection with Eastern Livestock?

20 A    I haven't seen a writing.

21        MR. CARR:  Of course, that's other than the

22 application that was filed with this Court that describes it in

23 full and was served on Fifth Third's counsel, of course other

24 than that, that's right.

25        THE COURT:  What –

1    MR. DONNELLON:  Your Honor, can we have an

2  instruction that counsel will either object or --

3    MR. CARR:  Yeah, I object to the question --

4    MR. DONNELLON:  -- cross the witness.

5    MR. CARR:  -- because it assumes a fact not in

6  evidence, Your Honor, because what is evidence is that there

7  was an application filed with this court that described

8  completely what the representation would be and described what

9  the Fifth Third consent was and was served on Fifth Third's

10  counsel.  And so I object to the question because it assumes a

11  fact not in evidence.

12    MR. DONNELLON:  The question has already been

13  answered so I don't know that it needs a ruling.

14  Q    That second sentence states Fifth Third is willing to

15  waive the conflict presented by the representation described

16  below subject to the limitation you mentioned in our

17  conversation that in the event the relationship becomes

18  litigious or adversarial Baker would pay conflicts counsel to

19  handle the dispute.  Did I read that correctly, ma'am?

20  A    Yes.

21  Q    Do you know with whom the conversation took place that

22  this waiver letter relates to?

23  A    I believe it was with Mr. Foster.

24  Q    What does it mean when it -- what did you understand it to

25  mean when you prepared your affidavit that in the event the

Hall - Direct/Donnellon                          156

1  relationship becomes litigious or adversarial Baker would seek

2  conflicts counsel?

3  A    That we were -- we would not sue Fifth Third directly in

4  the adversarial proceeding or bring a -- represent the trustee

5  in an action by the trustee against Fifth Third.

6  Q    Is it your understanding that the reference to adversarial

7  relates only to bringing litigation?

8  A    Yes.

9  Q    So it would be duplicative to say litigious or adversarial

10 because they mean the same thing?

11 A    Yes.

12 Q    And am I correct that at no time did Baker & Daniels or

13 Faegre Baker & Daniels produce to the Court and the creditors

14 in the estate the terms of any written conflict waiver obtained

15 from Fifth Third until today?

16 A    Other than what we described in our application for

17 employment, no.

18 Q    I'm not sure I understand your answer.  I'm not asking

19 about what was described in the application which we have --

20       THE COURT:  Well, you said the terms of the -- I --

21 and I think the terms are what she's referring to that are --

22       MR. DONNELLON:  Okay.  I apologize.

23       THE COURT:  -- included in the application.

24       MR. DONNELLON:  My question was perhaps unclear.

25 Q    I believe you are familiar with the United States

1  Bankruptcy Court for the Southern District of Indiana Local

2  Rules effective June 1, 2010, amended January 1, 2012?

3  A    Generally.

4  Q    Am I correct that you were on the rules committee?

5  A    Yes.

6  Q    You were involved in reviewing and drafting those rules?

7  A    Certain of them.

8          MR. DONNELLON:  I don't know that we need to -- is

9  this published by the court, the Local Rules, Your Honor?  I

10  don't know that we need to mark it as an exhibit then unless

11  the witness needs to see a copy.

12          THE COURT:  I'll take judicial notice of the Local

13  Rules.

14  Q    Ma'am, I'm reading from Local Rule 2014-1, Part B,

15  Romanette II, conflicts, if a professional seeks to resolve any

16  potential conflict of interest concerning any client or former

17  client, the professional shall comply with applicable Rules of

18  Professional Conduct.  All consents or waivers of conflicts of

19  interest ("waivers") shall be in writing.  The professional

20  shall serve copies of all such waivers upon the applicant and

21  the service list with the employment application or promptly

22  following receipt by the professional of a waiver.  Are you

23  familiar with that rule, ma'am?

24          MR. TONER:  Your Honor, may I provide the witness

25  with a copy of the long rule that was just read?

Hall - Direct/Donnellon                    158

1          THE COURT:  You may.

2          MR. TONER:  Sure.

3   A    I'm familiar with it now.

4   Q    You were not familiar with it at the time that you were

5   involved in the rules committee?

6   A    It was not one of the rules I believe that we discussed.

7   Q    I'm sorry.  I couldn't hear you.

8   A    No.

9   Q    Do you understand what the Rules of Professional Conduct

10  require for written waivers when it relates to informed

11  consent?

12  A    Do I understand?

13         MR. DONNELLON:  I withdraw the question.

14  Q    Am I correct that you did not serve copies of Creditor's

15  Exhibit 2 upon the service list in Eastern Livestock in

16  connection with your application --

17  A    I did not.

18  Q    -- for employment?  And you did not serve it upon the

19  service list promptly after obtaining a receipt from Fifth

20  Third?

21  A    No.

22  Q    I am correct that you did not serve?

23  A    You are correct.  I did not serve.

24  Q    If you could look at the last sentence of the third

25  paragraph of the affidavit.  It states, moreover, to the best

Hall - Direct/Donnellon                    159

1  of my knowledge other than as disclosed herein the firm has no

2  present connection with the debtor's estate, its creditors or

3  any other party in interest.  Did I read that correctly?

4  A    Yes.

5  Q    Isn't it true less than 48 hours prior to executing that

6  affidavit you obtained a conflict waiver from Wells Fargo?

7  A    Yes.

8  Q    And did you have an understanding at the time you obtained

9  that conflict waiver that Wells Fargo was, in fact, a

10 longstanding client of Baker & Daniels?

11 A    I don't really have that much familiarity with Wells Fargo

12 and its connection to the firm.  I'm familiar with the e-mail

13 from Mr. Wegner?

14 Q    Could you turn to Exhibit -- Knauer Deposition Exhibit 2,

15 that's in front of you, please?

16 A    This one, oh.

17 Q    If you can turn to the third page, that's actually where

18 the e-mail thread begins with the Tuesday, December 28, 2010, 3

19 p.m. e-mail from Jeffrey Wegner to Terry Hall, do you see that,

20 ma'am?

21 A    Yes.

22 Q    And are you the person who received this e-mail?

23 A    Yes.

24 Q    Do you recall receiving it?

25 A    It's hard to know whether I recall receiving it or whether

1  it's I recall it because I've had this in front of me many,

2  many times.

3  Q    You don't have any present recollection of vividly

4  receiving this.  It's just something that you've been looking

5  at recently so it -- that's the extent of your recollection, is

6  that fair?

7  A    I remember getting the conflict waiver from Wells Fargo.

8  Q    Mr. Wegner states the trustee, James Knauer, is in the

9  process of engaging your firm in the Eastern Livestock matter

10 and has apprized you of Wells Fargo's interest in the case.

11 Did I read that correctly?

12 A    Uh-huh.

13 Q    What had -- is that a yes?

14 A    Yes.

15 Q    What had the trustee apprized you of with respect to Wells

16 Fargo's interest in the case?

17 A    To the best I can remember Mr. Knauer called me and told

18 me that he had understood that Wells Fargo was a participant in

19 a loan.  That's --

20 Q    Had you previously reached out to anyone from Kutak Rock

21 or Wells Fargo prior to receiving this e-mail from Mr. Wegner?

22 A    I don't think so.

23 Q    So it's fair to say that this e-mail from Mr. Wegner was

24 your first contact directly with someone who was representing

25 Wells Fargo in --

Hall - Direct/Donnellon                    161

1  A    I think so.

2  Q    -- in any way in connection with the Eastern Livestock?

3  A    I think so.

4  Q    Romanette II states your firm has a longstanding

5  relationship with Wells Fargo and has current active

6  engagements with Wells Fargo, you don't have any reason to

7  dispute that as you sit here today, do you?

8  A    I don't have any -- at this point I don't have any

9  independent knowledge of Wells Fargo's longstanding

10 relationship or -- with the firm or not.

11 Q    At the time you executed the original affidavit of

12 disinterestedness did you have an understanding of whether

13 Wells Fargo was a larger client of Baker & Daniels than was

14 Fifth Third?

15 A    No, I knew that they were not -- that Wells Fargo was not

16 a creditor or party in interest in the case.

17 Q    Romanette III says, you or one of your partners is

18 pursuing a written conflict waiver from Wells Fargo, do you see

19 that, ma'am?

20 A    Yes.

21 Q    Do you have any understanding of what that means, you or

22 one of your partners is pursuing a written conflict?  Had you

23 reached out to Wells Fargo --

24 A    No.

25 Q    -- prior to this done?

Hall - Direct/Donnellon                    162

1  A    No.

2  Q    Do you know who of your partners would have reached out to

3  Wells Fargo to obtain that conflict waiver?

4  A    I would assume it was Mr. Foster.  He is the relationship

5  manager.  It may have been Mr. DeNeal who's also on the e-mail.

6  Q    Do I understand your testimony correctly when I asked you

7  about your understanding of whether Wells Fargo was a larger

8  client of Baker & Daniels than Fifth Third as of December 28,

9  is it your testimony that you understood at that time that

10 Wells Fargo was not a party in interest in the Eastern

11 Livestock case?

12 A    I think I discussed with my partners what Wells Fargo's --

13 and with the trustee and I'm just -- to be best of my

14 recollection here what Wells Fargo's role was potentially in

15 the Eastern Livestock case and it was determined that they were

16 a participant in the loan.  Participants are not normally

17 creditors or parties in interest and they're restricted, and so

18 that was my understanding of their role.

19 Q    Have you ever in connection with an affidavit of

20 disinterestedness disclosed a potential connection to a loan

21 participant?

22 A    I don't recall.

23 Q    You don't recall one way or the other?

24 A    I don't recall one way or the other.

25 Q    Mr. Wegner instructs you to expedite matters by contacting

1  Gary Heck, senior counsel at Wells Fargo directly, correct?

2  A    Are you referring to the --

3  Q    Bottom portion --

4  A    -- e-mail?

5  Q    -- of the e-mail.

6  A    Yes.

7  Q    What was your next step in the process after receiving the

8  letter from -- the e-mail, excuse me, from Mr. Heck?

9  A    I think I contacted David Foster.

10 Q    Did you at that time prepare a draft consent and conflicts

11 waiver?

12 A    I don't remember if I did or Mr. Foster did.  I think Mr.

13 Foster did.

14 Q    Are you aware of the Wells Fargo & Company policy

15 regarding legal conflicts of interest that's marked as

16 Creditor's Exhibit 1?

17 A    Am I aware of it?

18 Q    I apologize.  Were you aware of it as of December 28 of

19 2010?

20 A    To the extent it was referenced in the letter, yes.

21 Q    Were you the primary drafter of the consent and conflict

22 waiver that ultimately ended up being issued to Wells Fargo?

23 A    You've asked me that before.  I don't remember.  I have a

24 feeling -- I think it was Mr. Foster.

25 Q    I apologize.  I don't mean to duplicate the questions.  So

Hall - Direct/Donnellon                    164

1   in any event you -- am I correct that you did send a draft

2   request for consent to conflict waiver or initial letter to Mr.

3   Heck on the 28th at 4:59 prior to him writing back to you?

4   A     Yes.

5   Q     And on your e-mail to Mr. Heck you did not include a cross

6   copy to David Foster, correct?

7   A     No.

8   Q     Mr. Heck writes back on December 29 at 10:34 and he writes

9   jointly to you and Mr. Foster on the first page of Knauer

10  Exhibit 2, correct?

11  A     Yes.

12  Q     He also copies -- cross copies to Mr. Knauer and Mr.

13  Wegner, Kutak Rock, as well as your partner Mr. Carr, correct?

14  A     Yes.

15  Q     And he states, Terry and David, I have one issue with this

16  request at present.  While it is clear Baker & Daniels would

17  not bring any action against Wells Fargo I believe we would

18  need that condition to include a prohibition on bringing any

19  actions against Fifth Third bank, as well, since we could be

20  directly impacted by such claims to the extent they affect the

21  loan/collateral rights in which we are a participant.  In those

22  instances the trustee would need to retain alternate counsel.

23  If you're willing to include that in the conditions, as well, I

24  would favorably on agreeing to the waiver.  Did I read that

25  correctly?

Hall - Direct/Donnellon                    165

1   A    Yes.

2   Q    What did you understand Mr. Heck to mean when he said

3   actions against Fifth Third Bank could be -- since we -- let me

4   rephrase, what did you understand Mr. Heck to mean when he

5   writes that Wells Fargo could be directly impacted by claims

6   against Fifth Third?

7   A    I'm not sure I had any particular conclusion at the time.

8   Q    Did you ask Mr. Heck?

9   A    No.

10  Q    Did you ask anyone else that was in the Baker, Daniels,

11  what in the world could a participant mean when he says they

12  could be directly impacted by claims?

13  A    I think I had a conversation with Mr. Carr.

14  Q    And what was the sum and substance of that conversation

15  with Mr. Carr?

16          MR. CARR:  I'm going to object to the question

17  because it calls for our work product.

18          MR. DONNELLON:  I think since it goes to the issue of

19  disclosure there's no expectation of confidentiality in it.

20          MR. CARR:  No, what's -- there's no expectation of

21  confidentiality in what's disclosed.  There certainly is an

22  expectation of confidentiality in discussions about what does

23  and doesn't -- isn't required by the rules for disclosure.

24          MR. DONNELLON:  And I think we're looking at the gray

25  of a black and white area.  If there's no confidentiality in

1   what's disclosed there should be no confidentiality, Your

2   Honor, in what's intentionally not disclosed.

3          MR. CARR:  That's absolutely wrong.  So when you file

4   a brief do we get to then examine you about the discussions you

5   had with your partners and colleagues before you filed the

6   brief?  No, those are your mental processes that led to what

7   you put in front of the Court.  Same thing is true here.  He's

8   trying to inquire into the mental processes of lawyers and to

9   why they did what they did as opposed to looking at the

10  disclosures that were actually made.

11         MR. DONNELLON:  I believe you overruled a similar

12  objection before, Your Honor.  When it goes to what should and

13  should not be in the disclosures the privilege doesn't apply.

14         THE COURT:  I'll overrule the objection.  I'll allow

15  you to answer the question.

16  BY MR. DONNELLON:

17  Q    So the question was what was the sum and substance of your

18  discussion with Mr. Carr relating to how a participant could be

19  directly impacted by such claims?

20  A    I don't think we discussed that.

21  Q    My question earlier was did you give any consideration by

22  what participant could be directly impacted by such claims, you

23  said you discussed it with Mr. Carr.  So I really -- what is

24  that you discussed with Mr. Carr in that regard?

25  A    I think what I discussed with Mr. Carr was that Wells

1  Fargo wanted us to agree in our conflicts letter with them that

2  we would not sue Fifth Third Bank.

3  Q    Is there any particular reason you raised that with Mr.

4  Carr?

5  A    He is the lead counsel on this case.

6  Q    So let me go back to my earlier question.  Did you discuss

7  with anyone, Mr. Heck, Mr. Carr or anyone, the reference to how

8  a participant could be directly impacted by claims brought

9  against Fifth Third as referenced by Mr. Heck?

10 A    I know that we had discussions related to whether the

11 participant in a loan is a creditor or a party in interest.  I

12 truly -- I just don't -- I don't have any independent memory of

13 exactly who I talked to or when I talked to them.  This was --

14 it was Christmas.  It was a lot of things were happening.  Mr.

15 Knauer was asking for stuff and this was one of those things.

16 Q    Okay.  At the time Mr. Heck asked you to include a

17 prohibition on bringing any actions against Fifth Third Bank on

18 December 29 at 10:30 am I correct that you had already obtained

19 the what you described as the written conflict waiver that's

20 marked as Objecting Creditor's Exhibit 2?

21 A    My understanding was that we already had a waiver from

22 Fifth Third at that point.

23 Q    Why not tell Mr. Heck we already have given Fifth Third a

24 waiver that if the relationship becomes litigious or

25 adversarial we'll seek different counsel to handle the dispute?

Hall - Direct/Donnellon                    168

1  A    I think I did say that in the e-mail.  It's says, Gary, I

2  have revised the letter to include Fifth Third Bank.  We had

3  earlier agreed with Fifth Third that we would not represent the

4  trustee in any action or adversary proceeding against it.

5  Q    Why would you need to revise the letter if you had already

6  agreed to that with Fifth Third?

7            THE COURT:  The letter --

8  A    The --

9            THE COURT:  -- wasn't to Fifth Third.  Why would you

10 need to revise a letter to Wells Fargo?

11 Q    Yes, you testified that you said, Gary, I revised the

12 letter, do you mean the Wells Fargo letter, correct?

13 A    Right.

14 Q    To include Fifth Third Bank?

15 A    Correct.

16 Q    And then you went on to say we had earlier agreed with

17 Fifth Third that we would not represent the trustee in any

18 action or adversary proceeding against it?

19 A    Right.

20 Q    Why would you need to revise the Wells Fargo letter if you

21 had already agreed with Fifth Third that you would not be --

22            THE COURT:  Because Wells Fargo said they wanted it

23 in their letter, too.

24            MR. CARR:  Exactly, Your Honor.

25            THE COURT:  That's what we just went over.

1  A    That's why it was in there and that's why I responded that

2  way and that's why we decided that it didn't matter that Wells

3  Fargo wanted that.

4  Q    Mr. Weigand is going to hand you what's been marked as

5  deposition -- Knauer Deposition Exhibit 4 and this has the --

6  it says stamped confidential, was filed under seal at the

7  request of Wells Fargo.  It's Docket Number WF012642 and 643.

8  Is this, in fact, the revised waiver letter that you're

9  referring to in the Wednesday, December 29, 9:50 a.m. e-mail to

10 Mr. Heck?

11 A    I guess.  I haven't -- I didn't memorize.  It's in my

12 system.

13 Q    I can represent to you that Wells Fargo produced it in the

14 document production as an attachment to this e-mail, do you

15 have any reason to dispute that?

16 A    No.

17 Q    Were you in the courtroom earlier during the oral argument

18 with respect to the motion to remove the trustee?

19 A    Yes.

20 Q    And you heard Mr. Carr, your partner, say that Local Rule

21 2014-1 does not apply to Mr. Knauer, but would apply to Baker &

22 Daniels?

23 A    Yes.

24 Q    Do you agree with that?

25 A    Yes.

1 Q    And you also agree with me that at no time to the present

2 have you ever served on the service list in the case the

3 written consent waiver that we see obtained from Wells Fargo

4 marked as Knauer Deposition Exhibit 4?

5 A    That's correct.  I actually became aware of that rule,

6 Local Rule, in your pleading, and like Mr. Knauer I don't think

7 I've ever been served by a written conflict waiver by anybody.

8 Q    Is it your understanding that a professional sought to be

9 engaged under Rule 2014 can obtain a written conflict waiver to

10 represent a client under the Rules of Professional Conduct and

11 not disclose the connection with that client in the affidavit

12 of disinterestedness?

13 A    I'm sorry.  Can you say that one more time?

14 Q    Sure.  Is it your understanding that under the

15 requirements of Bankruptcy Rule 2014 a professional sought to

16 be retained by the estate can obtain a written consent and

17 conflict waiver from a client under the Rules of Professional

18 Conduct yet not identify the connection with that client as

19 part of an affidavit of disinterestedness?

20 A    I'm not sure I can answer that question.  I mean we did

21 not disclose it in the affidavit of disinterestedness for the

22 reasons that we put forward in our briefs.  You're asking me

23 about the Local Rule and I haven't looked at the Local Rule in

24 relation to other parts of the Local Rules.

25 Q    And I --

Hall - Direct/Donnellon                    171

1   A    I don't --

2   Q    -- don't mean to confuse me.  I'm not talking about any

3   Local Rule.  I'm talking about Bankruptcy Rule 2014.  Is it

4   your understanding --

5   A    What is Bankruptcy Rule 2014?

6   Q    -- that a professional sought to be retained under Rule

7   2014 can obtain a written consent and conflict waiver from a

8   client of that firm without disclosing the connection to that

9   client in the affidavit of disinterestedness?

10  A    I don't know what Rule 2014 says, as I sit here.  There's

11  a bankruptcy underneath that.

12  Q    Would you agree with me in general terms that if a firm's

13  connection to a client is important enough to trigger an

14  obligation under the Rules of Professional Conduct to obtain a

15  consent and conflict waiver it would be important enough that

16  it could potentially arise to the level of conflict in order to

17  disclose it in an affidavit of disinterestedness?

18  A    I'm sorry.  That question is so hypothetical and filled

19  with so many qualifiers that I'm not sure I can answer that.

20  Q    You understand that the requirements of Rule 2014 require

21  the professionals to disclose connections --

22  A    To the debtor, the creditors, any other party in interest,

23  their respective attorneys and accountants, the United States

24  Trustee or anybody employed in the Office of the United States

25  Trustee.  That's what 2014 says.

Hall - Direct/Donnellon                    172

1  Q    And you understand that the case law interpreting Rule

2  2014 requires disclosures even if there's not an actual

3  conflict, if there's a potential for the conflict the

4  disclosure is required?

5  A    No, I'm not sure that I do agree with your interpretation

6  of the cases that you cited.

7  Q    After the application to employ Baker & Daniels do you

8  recall being served with an objection to that application filed

9  by First Bank and Trust?

10 A    Yep, yes.

11 Q    Am I correct that the Baker & Daniels firm never filed a

12 formal memorandum or response to that objection with the Court?

13 A    I think we entered into negotiations with you.

14 Q    Am I correct that there was no formal response to the

15 objection filed?

16 A    I don't remember if we did or not, Dan.

17 Q    Do you know whether Mr. David Foster billed the estate for

18 preparing an objection in response?

19 A    I don't know.

20 Q    Do you know whether he at the same time billed the estate

21 for researching the disinterestedness standard under 2014?

22 A    I don't know.

23 Q    Do you have any reason to dispute the time and billing

24 entries filed with the Court with respect to Mr. Foster?

25 A    I'm not familiar with the time and billing entries.

1  Q    So with the lack of familiarity do you have reason to

2  dispute them or you don't know one way or the other because

3  you're not familiar?

4  A    I haven't read them, Dan, and if I -- or if I read them I

5  don't remember them.

6  Q    Do you recall making representations that the Hoover Hull

7  firm would be engaged to handle all claims, defenses and

8  actions relating to Fifth Third in the case?

9        MR. CARR:  I'm going to object to the question, Your

10 Honor.  It assumes a fact not in evidence.  The application to

11 employ Hoover Hull on its face says what the trustee

12 represented to the Court Hoover Hull would be engaged to do.

13       MR. DONNELLON:  I -- let me withdraw the question

14 because I'm not -- that's not where I was -- I understand why

15 you're objecting.  That's not where I was going.

16 Q    You've read the application to retain Hoover Hull that was

17 filed with the Court?

18 A    At some point I did, yes.

19 Q    And you believe that that document is the best evidence of

20 its contents as to what you were representing to the creditors

21 Hoover Hull would be engaged to do?

22 A    That I was representing?

23 Q    Your firm.

24 A    Did we file the application to employ Hoover Hull?

25 Q    Okay.  And I want to go back because I was trying to cure

Hall - Direct/Donnellon                    174

1  Mr. Carr's objection without devolving into a lot of issues.

2  In connection with your efforts to resolve the objection of

3  First Bank you said you engaged in negotiations and

4  discussions, correct?

5  A    I actually think that Wendy Ponader did most of that.

6  Q    And you understood, did you not, that in part to resolve

7  the objections of First Bank to the retention of Baker &

8  Daniels related to the conflict with Fifth Third the trustee

9  would retain special counsel Hoover Hull?

10 A    No, I don't think we engaged -- I don't think that the

11 discussion was revolving around engaging Hoover Hull to satisfy

12 your objection.  I think in our application to be employed we

13 said that we would engage conflicts counsel or that the trustee

14 would engage conflicts counsel.  We didn't employ Hoover Hull

15 because of you.

16 Q    I'm going to hand you what's already in the record at

17 Docket 235.  This is amended affidavit of Terry Hall in support

18 of application to employ Baker & Daniels, LLP as counsel to

19 Chapter 11 Trustee.  Ms. Hall, did you sign this document under

20 penalty of perjury on the 24th of January 2011?

21 A    I believe so.  The music seems to have an affinity for

22 you, Dan.

23          UNIDENTIFIED ATTORNEY:  (Indiscernible).

24 Q    Paragraph 10 on Page 4 it states Fifth Third is a creditor

25 of the estate and has consented to the firm's representation of

Hall - Direct/Donnellon                    175

1  the trustee.  However, Fifth Third has not consented to the

2  firm's representation of the trustee with respect to any

3  adversary proceeding or other action that the trustee may

4  commence directly against Fifth Third.  Fifth Third has advised

5  the trustee of this exception to the consent received from

6  Fifth Third and the trustee accepts this exception.  So had you

7  provided the trustee with a copy of the e-mail that we've

8  marked as Creditor's Exhibit 2?

9  A    I don't have an independent recollection that I did.

10 Q    What did you mean when you testified that the firm has

11 advised the trustee of this exception to the consent received

12 from Fifth Third and the trustee accepts this exception?

13 A    Discussions with the trustee are (indiscernible).

14 Q    Had you ever discussed with the trustee Mr. Hubbard's

15 statement that he expects Baker & Daniels would not be

16 adversarial to Fifth Third as contained in Creditor's Exhibit

17 2?

18 A    You mean Wells Fargo's request that we give -- put in our

19 letter with them the same thing that we put in Fifth Third's

20 letter?

21 Q    No, no.  This is referring -- this -- Paragraph 10 is

22 referring to Fifth Third as a creditor to the estate, the firm

23 -- Paragraph 10, the firm has advised the trustee of this

24 exception to the consent received from Fifth Third and the

25 trustee accepts this exception.  Do you see that, ma'am?

Hall - Direct/Donnellon                    176

1  A    Yes, sir.

2  Q    And I asked have you ever provided the trustee with a copy

3  of the e-mail thread between Mr. Foster and Mr. Hubbard that's

4  marked as Creditor's 2, I believe you said you don't recall, is

5  that correct?

6  A    Are you talking about -- let me find two here just so --

7  this is the one from -- I don't have a specific memory that I

8  provided it to him.

9  Q    You testified that you discussed with the trustee Fifth

10 Third's consent to Baker, Daniels representation, correct?

11 A    Yes.

12 Q    Did you ever inform the trustee that Mr. Hubbard had

13 written on December 27, 2010, that Fifth Third was willing to

14 waive the conflict presented by the representation in the event

15 that the relationship became litigious or adversarial Baker

16 would seek conflicts counsel to handle the dispute?

17 A    Is your question did we -- did I send him this e-mail, is

18 that your question?

19 Q    No, did you ever discuss the specific terms of Mr.

20 Hubbard's statement that he would expect separate counsel if

21 the relationship between Baker & Daniels and Fifth Third

22 became, quote, litigious or adversarial, end quote?

23 A    I don't have an independent recollection of using those

24 specific words.  I know that we had discussed our

25 representation of Fifth Third and the limitations on it with

Hall - Direct/Donnellon                    177

1  the trustee and our understanding of it, as well as what we

2  understood Fifth Third meant it to mean.

3  Q    Let's continue on in Paragraph 10, the third line up from

4  the bottom starts a new sentence, in preparation for any

5  conflict that may arise, do you see that, ma'am?

6  A    Yes.

7  Q    The trustee has filed an application to employ as special

8  counsel the firm of Hoover Hull, LLP with respect to the

9  investigation and prosecution of any claims or objections that

10 may be asserted by the trustee against Fifth Third or to any

11 claim that may be asserted in the case by Fifth Third.  Did I

12 read that correctly, ma'am?

13 A    Yes.

14 Q    Now, getting back to my question -- and that references

15 Docket 219, do you see that?

16 A    (No audible response).

17 Q    Is it your understanding that Docket 219, the application

18 to employ Hoover Hull, is the best evidence of the description

19 of what Hoover Hull was retained to do in connection with the

20 Eastern Livestock estate?

21         MR. TONER:  I don't think it's been offered.

22 A    What is Docket 219?

23         MR. TONER:  It hasn't been offered.

24         MR. DONNELLON:  It's part of the -- I'm trying to

25 respond to Mr. Carr's objection before that the document speaks

Hall - Direct/Donnellon                    178

1  for itself.

2           MR. CARR:  That's fine.  It does.

3  Q    What did you understand to be the role of Hoover Hull with

4  respect to representation of the trustee in this case?

5  A    They were going to potentially represent the trustee in

6  the areas where Baker & Daniels was not allowed to.

7  Q    So any place where, as Mr. Hubbards write, the

8  relationship become adversarial or litigious it was your

9  understanding Hoover Hull was to represent the trustee, is that

10  correct?

11  A    It was my understanding that Hoover Hull was going to

12  represent the trustee and -- in litigation against Fifth Third

13  if it came to that.

14  Q    Is that the full extent of your understanding of Hoover

15  Hull's role, that they were to represent the trustee in

16  litigation against Fifth Third if it came to that?

17  A    I'm not sure that Hoover Hull was restricted to that, but

18  that was the primary reason for being employed.

19  Q    If you can turn back to the original application to employ

20  Baker & Daniels.

21  A    Is this Knauer 1?

22  Q    Yeah, I believe so.  Paragraph 5 states subject to the

23  Court's approval and it lists the attorneys and paralegals with

24  B&D who will represent the trustee in their current standard

25  hourly rates.  It has James Carr, Robert Stanley, Terry Hall,

1  Dustin DeNeal, Harmony Mappes and Sarah Laughlin, is that

2  correct, ma'am?

3  A    Are we on -- okay, yeah --

4  Q    Paragraph 5.  It's --

5  A    Are you asking me did you read that correctly?

6  Q    Yes.

7  A    Yes.

8  Q    And that was the anticipated professionals who would be

9  representing the trustee at the -- as of December 30th?

10  A    Yes.

11  Q    Do you know why it was that Mr. Foster was tasked to draft

12  the objection -- or response to the objection of First Bank and

13  Trust to the retention of Baker & Daniels?

14  A    No.

15  Q    He's not listed on the sheet?

16  A    No.

17  Q    Do you know why it was Mr. Foster was tasked to research

18  the disinterestedness standard?

19  A    No.

20  Q    As of the --

21  A    I don't know that he was tasked.  I mean I'm just

22  responding I don't know what Dave's involvement was.

23  Q    Is there any particular reason when you filed the amended

24  affidavit of Terry Hall after already having received an

25  objection to your employment application that you did not go

Hall - Direct/Donnellon                    180

1   forward and also disclose the firm's relationship with Wells

2   Fargo?

3   A    Was there any additional reason, is that what you're

4   asking?

5   Q    Was there any reason?

6   A    I mean we filed the amended affidavit because you had made

7   an assertion that we somehow spurned your employment and took

8   the trustee's is the main -- that was the whole point of the

9   amended affidavit was Paragraph 5.

10  Q    Was there any discussion at that time while we're amending

11  our affidavit perhaps we ought to disclose the relationship

12  with Wells Fargo?

13  A    No, we had not changed our opinion that Wells Fargo was

14  not a creditor nor a party in interest.

15  Q    Were you aware in May 2011 that Hoover Hull was not

16  billing any time to the estate?

17  A    No.

18  Q    When did you first become aware that Hoover Hull had not

19  been billing any time to this estate for the months of May,

20  June, July, August and September?

21  A    I don't know.  I had plenty of work to do.

22  Q    During the course and scope of your representation of the

23  trustee did you personally interact with representatives of

24  Wells Fargo?

25  A    By representatives do you mean employees of Wells Fargo?

1  Q    Or their counsel.

2  A    I think I was contacted by Mr. Wegner, I don't know,

3  three, four times either by phone or by e-mail related to the

4  employment of RSI.

5  Q    Were you involved in, I just want a yes or no, advising

6  the trustee whether RSI should be engaged to conduct a

7  forensics audit?

8  A    I don't think I was involved in advising him.

9  Q    Did you ever have any discussions with business

10 representatives of Wells Fargo and employees and their

11 management team?

12 A    I think I was asked by DSI to participate on one of the

13 calls that she would have with the bank periodically to give an

14 update on the case and I think I did that once or twice.

15 Q    When you say calls she would have with the bank who are

16 you referring to?

17 A    She, Liz Lynch.

18 Q    So Liz Lynch would have calls with Fifth Third and Wells

19 Fargo?

20 A    She would have calls with Fifth Third.  I don't know -- I

21 mean I don't know if Wells Fargo was on all of them or some of

22 them or none of them.

23 Q    My question to you was were you ever involved in

24 discussions with business representatives of Wells Fargo and

25 then you made the reference to Ms. Lynch.  That's all.  I was

Hall - Direct/Donnellon                    182

1  just trying to followup.

2  A    I was on two -- I think either one or two bank calls, and

3  I frankly don't remember if -- I know Fifth Third -- I don't

4  remember the gentlemen's name, Lez (phonetic) was on.  I don't

5  think Jim Knauer was on.  I would give a two to three minute

6  here's what's going on in the case, update and get off.

7  Q    So to your best of your recollection representatives of

8  Wells Fargo may have participated in the bank calls that you

9  were involved in?

10  A    They -- yeah, they could have been.

11  Q    When did the Baker & Daniels firm merge with the Faegre &

12  Benson firm?

13  A    It was effective January 1 of this year.

14  Q    Was there ever any consideration given as to whether the

15  new Faegre Baker & Daniels firm should make additional or

16  amended disclosures in connection with the Eastern Livestock

17  case as a result of the merger with the Faegre & Benson firm?

18  A    I don't remember that discussion topic coming up.

19  Q    Do you know whether Wells Fargo was a client of Faegre &

20  Benson prior to the merger?

21  A    Do I know?  No.

22  Q    That was a poor question.  Do you know as you sit here

23  today whether Wells Fargo was a client of the Faegre & Benson

24  firm?

25  A    I think they were, yeah.

Hall - Direct/Donnellon                    183

1  Q    And did you know that at the time of the merger?

2  A    I'm not -- I wasn't really involved in all of that.  I

3  didn't know it.  If -- I didn't have any personal knowledge

4  about it.

5  Q    Were you involved in drafting a January 28, 2011,

6  memorandum outlining the proposal by the trustee for the

7  general proposed course in action of funding, certain costs and

8  expenses by Fifth Third Bank and its participant Wells Fargo?

9  A    I don't know what you're talking about.

10 Q    Okay.  You recall the trustee filing a financing motion?

11 A    Yes.

12 Q    And were you involved in the drafting of the financing

13 motion?

14 A    I don't think so.  I think I received drafts of it as it

15 was being drafted, but I don't remember.

16 Q    And do you ever recall seeing an internal Baker & Daniels

17 memorandum outlining proposals for the financing motion with

18 the must do and may do actions?

19 A    Yes, there were a lot of them.

20 Q    And you know that the draft memorandum outlining the

21 proposal for the financing motion was shared with Wells Fargo

22 to obtain its consent?

23 A    I don't know that.

24 Q    Do you believe that Wells Fargo's consent was necessary in

25 order to obtain the financing motion that allowed the use of

Hall - Direct/Donnellon                    184

1  what Fifth Third claimed was its cash collateral in Eastern

2  Livestock?

3  A    I don't think so.

4  Q    I want to make sure we're clear on that.  You don't think

5  Wells Fargo's consent was necessary or you don't think you know

6  whether it was?

7  A    Well, I don't think -- it seems to me that it wasn't

8  necessary.  The person in charge of the case and the only party

9  -- the only party eligible to be involved in the case in

10  insolvency was Fifth Third.  So I would think we would be

11  negotiating with Fifth Third.

12        MR. DONNELLON:  Your Honor, I've got one document

13  that I want to mark.  It is stamped confidential.  It was

14  produced by Wells Fargo.  It's not under the documents that we

15  filed under seal.  I would perhaps tend to agree with Wells

16  Fargo on this one that it could be kept confidential and

17  perhaps we could -- perhaps I can discuss it with opposing

18  counsel.  We can stipulate to its admission and file it under

19  seal.

20        THE COURT:  All right.  Show it to them.

21        MR. DONNELLON:  I don't know that I need to show it

22  to this witness because it's -- well -- Mr. Weigand's going to

23  show you a January 28 memorandum from Baker & Daniels from Mr.

24  Jim Carr that was sent to Randall LaTour and also sent to --

25        MR. CARR:  Could we see them?

1          UNIDENTIFIED ATTORNEY:  Yes.

2          MR. CARR:  And Ms. Hall --

3          MR. DONNELLON:  -- Wells Fargo.

4          MR. CARR:  -- wasn't copied on this?

5          MR. DONNELLON:  It doesn't indicate she was, but she

6    testified she was involved in some of the drafting.

7          MR. CARR:  But you're going to ask her questions

8    about a document, and she's never seen those drafts?

9          MR. DONNELLON:  I don't know whether she's seen it

10   till I ask her.

11         MR. CARR:  I understand, but there's no indication

12   that she's ever seen it.

13         MR. DONNELLON:  Right.

14         MR. LaTOUR:  Your Honor, apparently it's a discussion

15   of tentative negotiation with respect to the -- what it

16   ultimately became, a financing order.  A negotiation that took

17   place over a period of months.  So, again, under Rule 408 this

18   would not be something that's admissible in court.  Moreover,

19   the final document was entered by this Court as an order and so

20   this doesn't have any more probative value than what that final

21   order already says.

22         MR. DONNELLON:  And I would disagree because it has

23   significant probative value in that it's a memorandum relating

24   to the financing order that specifically refers to including

25   Wells Fargo and it was specifically shared with Wells Fargo

1  which regardless of the terms of it and whether it was

2  negotiated or it's in final form or not it shows that Wells

3  Fargo was considered to be certainly more than a mere

4  participant by virtue of the fact that they're sharing --

5           UNIDENTIFIED ATTORNEY:  Yep.

6           MR. DONNELLON:  -- internal Baker & Daniels memoranda

7  relating to the financing order and soliciting input from Wells

8  Fargo.

9           MR. CARR:  Now, let's go back a few steps.  Where's

10  the evidence that this was shared with Wells Fargo?

11           MR. DONNELLON:  The document, the production number

12  at the bottom.

13           MR. CARR:  So you got this from Wells Fargo?

14           MR. DONNELLON:  Well, special counsel did.

15           MR. CARR:  Okay.  Now, are -- where's the evidence

16  that it was shared with Wells Fargo by Baker & Daniels?

17           MR. DONNELLON:  (No audible response).

18           MR. CARR:  Because it wasn't.

19           MR. DONNELLON:  Well, I don't know that it was or

20  wasn't.  It's --

21           MR. CARR:  Well, it wasn't.  I'm the author of the

22  document.  I didn't send it to Wells Fargo.

23           MR. LaTOUR:  Nor did I.

24           MR. CARR:  And neither did Randy LaTour.  So he's

25  going to ask a witness who's not a party to the document and

Hall - Direct/Donnellon                    187

1    there's no foundation that shows it was ever sent by us to

2    Wells Fargo.  And I'm the author of the document, I'll

3    represent to the Court that I didn't send it to Wells Fargo.

4    So it sounds fair to me.  Go right ahead.

5                MR. DONNELLON:  Well --

6                THE COURT:  Well --

7                MR. DONNELLON:  -- I don't think that's the important

8    point here, Your Honor, and as I've said --

9                THE COURT:  What is the important point?

10               MR. DONNELLON:  The important point is that this

11   document relating to the financing order was produced to us by

12   Wells Fargo whether they got it from Baker & Daniels, they got

13   it from Mr. LaTour or they got it from Ms. Hall, whether they

14   got it from Mr. Toner or they got it from Mr. White.  It's not

15   material.  The fact of the matter is they want to stand here

16   and say Baker -- and stand here and say Wells Fargo did not

17   need to be disclosed because they're a mere participant, they

18   didn't have anything to do with anything in this case and they

19   --

20               THE COURT:  Well, why wouldn't a participant or even

21   a mere participant be sent by the bank, that is the lead bank,

22   a copy of what they're negotiating in terms of a finance order?

23   I mean that -- doesn't everyone seem to think that's what

24   happened here?

25               MR. DONNELLON:  I think a party in interest would get

1  a copy of the finance --

2          THE COURT:  Well, now --

3          MR. CARR:  No, a participant would get a copy.

4          THE COURT:  But, now see that's the whole -- that's

5  the legal conclusion you want me to jump to is that makes them

6  a party in interest.  You know, we've got an interested party

7  sitting right behind you, but he's not a party in interest.

8  The -- you know, we're talking -- you're talking about legal

9  definition versus -- of course they're interested.  That's --

10  you know, they'd like to know -- they're a participant in a

11  loan.  I don't have any -- I have already concluded that if

12  that's your concern.  I already know they're interested and I

13  -- but now if the point you're trying to make is that Baker &

14  Daniels or anyone thought it was necessary to get their

15  approval then I think it is important to know whether Baker &

16  Daniels sent them that.  So ask her or ask Mr. Carr, whoever

17  you want, or Mr. LaTour.

18          UNIDENTIFIED ATTORNEY:  Your Honor, if I could direct

19  your attention to the participation agreement you'll see that

20  there are no approvals required.

21          THE COURT:  I read the participation agreement, but

22  that doesn't mean you wouldn't share information with a

23  participating bank or that your bank --

24          MR. LaTOUR:  As a matter of fact, Your Honor, I

25  suspect that one of the business people at Fifth Third shared

Hall - Direct/Donnellon                          189

1  with their participants --

2              THE COURT:  Well, that's exactly what I just said.

3              MR. LaTOUR:  -- as a party.

4              THE COURT:  Yes.

5              MR. LaTOUR:  It's certainly not from me and

6  apparently not from Mr. Carr.

7              MR. CARR:  It did not -- I did not send that document

8  to Wells Fargo, Your Honor.  I had no contact with anybody

9  representing Wells Fargo in connection with it.

10             MR. DONNELLON:  Well, and -- and I think we can --

11 I'm sensitive to Mr. Carr's objection and I don't want to be

12 examining a witness at 4:30 on a document that she's not

13 necessarily an author of or ever saw.

14             THE COURT:  Well, ask her if she's an author of it

15 and ever saw it.

16             MR. DONNELLON:  Okay.

17             THE COURT:  Let's not speculate as to that.

18 BY MR. DONNELLON:

19 Q    Have you ever seen the document that's presented in front

20 of you, the January 28 memorandum from Baker & Daniels to Mr.

21 LaTour, which was produced to us by Wells Fargo?

22 A    I don't know.  Dan, you need to understand I get copied on

23 every e-mail in this case.  It's probably up to 15,000 e-mails.

24 There were a lot of e-mails related to the financing

25 negotiation.  I was not materially involved in the financing –

Hall - Direct/Donnellon                    190

1  I didn't even attend the hearing.  So did I see this particular

2  one?  Maybe, maybe not.  I don't know.

3  Q    Was there any discussions in which you were involved that

4  the use of collateral that Wells Fargo may have a participant

5  --

6  A    No.

7  Q    -- interest --

8  A    I didn't discuss Wells Fargo.

9  Q    Well, can I finish the question?

10 A    Sure.

11 Q    Was there any discussion which you were involved that the

12 use of Eastern Livestock's collateral to secure a new loan as

13 per the financing order would give Wells Fargo rights to

14 approve under the participation agreement?

15 A    No.

16 Q    Did you understand the financing order to be a new loan

17 secured by Eastern Livestock's collateral?

18 A    No.  Frankly, Dan, I was not materially involved in the

19 financing order.  I really -- you know, to this day if you --

20 Q    Okay.

21 A    -- ask me to -- if you cross examine me on the Court's

22 order I'd have to read it and study it.

23 Q    Okay.  I'm trying to move this along so let me see.

24 A    I mean I was the scrivener --

25            THE COURT:  There's not --

Hall - Cross/DelCotto                    191

1  A     -- back at the office.  That's it.

2            THE COURT:  There's not a question.

3            MR. DONNELLON:  There's not a question pending.

4  Q     Were you aware of the objection of several parties to the

5  fee applications of Baker & Daniels in December of 2011?

6  A     Yes.

7  Q     Did Baker & Daniels ever file any formal memorandum

8  opposing that objection?

9  A     No, my memory is that they were filed on the 8th and the

10 hearing was the 14th.

11 Q     Is there any particular reason of which you're aware that

12 Baker & Daniels has not filed any additional time and billing

13 records in the case since the objection to the prior fee

14 application?

15 A     No.

16           MR. DONNELLON:  Okay.  I'm going to pass the witness

17 to Ms. DelCotto and try to go through my notes so we can speed

18 this along.

19           THE COURT:  Ms. DelCotto?

20                     CROSS EXAMINATION

21 BY MS. DelCOTTO:

22 Q     Ms. Hall, I'm referring you back to Docket Numbers 114 and

23 235, your two affidavits, is it your understanding that you

24 speak on behalf of the entire firm when you submit these

25 affidavits?

1   A    Yes.

2   Q    So I would like to clarify your testimony today.  Is it

3   your testimony on behalf of the firm that the only writing that

4   pertain to the scope and terms of the conflict waiver with

5   Fifth Third are the writings that are contained in your two

6   affidavits and this e-mail?

7   A    That's my understanding.

8   Q    And you speak for the entire firm or you just speak for --

9   A    That's my --

10  Q    -- yourself?

11  A    -- understanding of your question and my answer right now.

12  Q    So others at the firm may have additional understandings?

13  A    I don't -- I believe that this is it.  I don't --

14  Q    I'm trying to ask the question just to be very clear, on

15  behalf of the firm do you not agree that the firm needs to make

16  that information available in the court record?

17  A    I'm sorry.  I don't understand your question.

18  Q    Are you giving testimony today of your personal knowledge?

19  A    I think so.

20  Q    And are you giving testimony today on behalf of the firm?

21  A    I don't know what you're asking me for.

22  Q    Is it possible others at the firm --

23  A    As far as I know --

24  Q    -- would know that there are additional writings?

25  A    I am not aware of anybody else at the firm that knows of

1  any additional writings.

2  Q    And is your understanding since you're the person who's

3  given the affidavits on behalf of the firm that you have some

4  due diligence obligation to determine that and if there are

5  such additional writings that you would be the person we would

6  address our questions to since you are the person who's given

7  the affidavits?

8  A    Since all this has come up I have asked, I have not

9  receive any other additional writings from any person.

10  Q    Referencing you to Docket 114, in the middle of Paragraph

11  4, the sentence that begins with however.

12  A    What is 114?

13  Q    Your original affidavit.

14  A    Okay.

15  Q    Paragraph 5, and I will read the sentence, it speaks for

16  itself, however, Fifth Third has not consented to the firm's

17  representation of the trustee with respect to any adversary

18  proceeding or other action that the trustee may commence

19  directly against Fifth Third, is that correct?

20  A    That's correct.

21  Q    Is it your testimony today that that sentence means the

22  same thing as what is contained in the Creditor's Exhibit 2

23  which is the e-mail?

24  A    That is my understanding of what the waiver was that the

25  firm got from Fifth Third.  That was the restriction.

1  Q    And is there any policy document that Fifth Third Bank has

2  that's similar to the Wells Fargo's policy to your knowledge?

3  A    I don't know.

4  Q    Who at the firm would know that?

5  A    I don't know.

6  Q    Could you please read the last two sentence of Paragraph 9

7  in Docket 114?

8  A    In view of the forgoing I believe that Baker & Daniels,

9  LLP, (I), does not hold or represent an interest diverse to the

10 estate and, (ii), is a disinterested person as that term is

11 defined in Section 101(14) of the Bankruptcy Code.  Baker &

12 Daniels, LLP understands its continuing responsibility to be

13 aware of and to further disclose any relationship or connection

14 between it and other parties in interest in the debtor's

15 bankruptcy case, the estate and cases as they appear or become

16 reorganized during the case, accordingly we reserve the right

17 to and shall supplement this disclosure if necessary as more

18 information becomes known to us.

19 Q    Is that still your understanding --

20 A    Yes.

21 Q    -- today?  And is that same language in your supplemental

22 affidavit, Docket 235?

23 A    Probably.

24 Q    Paragraph 14.

25 A    Yes.

Hall - Cross/DelCotto                    195

1  Q    Does Baker & Daniels have a written engagement letter with

2  Mr. Knauer acting on behalf of the estate?

3  A    I don't know.  I think we do.

4  Q    Is that then placed in the court record?

5  A    Not that I know of.

6  Q    Does that contain further description about the trustee's

7  consent to the Fifth Third relationship that was disclosed to

8  the trustee?

9  A    I don't recall.

10 Q    Who would recall that?

11 A    I don't know.  I think that -- I don't know.

12 Q    Turning to Docket 235 again, Paragraph 5, my

13 interpretation of that paragraph is even though Baker & Daniels

14 did not believe it rose to the level necessary to be a

15 connection to the estate, creditors or other party in interest

16 Baker & Daniels disclosed further information with regard to

17 First Bank, is that correct?

18 A    Is that -- is your interpretation correct?  No, your

19 interpretation is not correct.

20 Q    And we agree that Paragraph 5 says what it says?

21 A    Paragraph 5 says what it says.  It was a response to Mr.

22 Donnellon's objection to our application.

23 Q    And would this be an example of an occasion when Baker &

24 Daniels felt that there was some connection that did not rise

25 to the level of being a connection with the estate, creditors

1  or any of the other party in interest where Baker & Daniels

2  nevertheless made a further disclosure?

3  A    It's an example of settling a fee -- an objection to the

4  fee application because Mr. Donnellon had made certain

5  assertions in his objection that were -- we disagreed with.  It

6  was heavily negotiated with Mr. Donnellon is my understanding.

7  Q     In any other Chapter 11s you've participated in have you

8  ever made any disclosures that perhaps did not technically

9  involve a creditor or party in interest, but nonetheless out of

10  an abundance of caution you made additional disclosures?

11  A    I don't recall.

12  Q    Do you know whether there's an engagement letter between

13  Hoover Hull and the trustee?

14  A    I don't know.

15  Q    Have you ever seen such a letter in the record?

16  A    What record?

17  Q    The court record.

18  A    I don't recall.

19  Q    And is it your testimony today you do not know whether

20  there are any additional writings between Faegre Baker Daniels

21  and Wells Fargo or Fifth Third after the merger?

22  A    I'm sorry.  That's so broad I have no idea what you're

23  asking.

24  Q    Have there been further written conflict or other

25  documents regarding your firm's participation in this case

1  after the merger?

2  A    I don't know of any.

3  Q    Who would know on behalf of the law firm?

4  A    I don't know.

5  Q    Who would be expected to file any such documents if there

6  are any?

7  A    I don't know.

8              MS. DelCOTTO:  That's all I have, Your Honor.

9              THE COURT:  All right.  Do you all want to ask --

10             UNIDENTIFIED ATTORNEY:  No questions.

11             THE COURT:  All right.  You may step down.  How many

12  more witnesses do we have?

13             MR. DONNELLON:  Can I confer with counsel.  Your

14  Honor, I think the only thing we're missing is, and perhaps

15  counsel could stipulate that -- there's a little gap in the

16  testimony, if we can stipulate there are no additional writings

17  between Baker & Daniels and Fifth Third on the one hand and

18  between Baker & Daniels and Wells Fargo on the other hand

19  relating to these issues of conflict waiver.  I think other

20  than this --

21             MR. CARR:  We know of none.

22             MR. DONNELLON:  Okay.  Then if we can stipulate to

23  that then I don't think we have any other witnesses to call.

24             THE COURT:  All right.  That's a stipulation?

25             MR. CARR:  Yes, Your Honor.

1          THE COURT:  All right.  What does that leave -- I

2     mean do you all want to come back in the morning or do you want

3     to --

4          MR. DONNELLON:  I'd prefer to come back in the

5     morning.  I'm a little worn.

6          MR. CARR:  To do what?

7          THE COURT:  Well, tell me what's left I guess --

8          MR. DONNELLON:  Oh.

9          THE COURT:  -- was my question.

10         MR. DONNELLON:  We could conclude with oral argument

11    and make sure that all the exhibits are in on this issue.

12    We've still got other items on the docket I believe -- the

13    agenda.

14         UNIDENTIFIED ATTORNEY:  (Indiscernible).

15         THE COURT:  The -- I don't know that I need oral

16    arguments on this issue.  I mean you all have briefed this

17    extensively.  I mean you basically -- and this afternoon didn't

18    change my opinion to this extent, I think it's basically a

19    question of law and that is were they required to make this

20    disclosure, is that a party in interest as -- is a participant

21    in a loan a party in interest, and I know -- I'm not saying

22    that's the only factor and I understand there's other elements

23    here, but I think that's at the crux --

24         MR. DONNELLON:  Your Honor, there is one --

25         THE COURT:  -- of the matter.

1          MR. DONNELLON: -- other thing, and I apologize, I'm

2     just -- in going through my notes I don't know whether the

3     participation agreement itself is in evidence.  We've talked

4     about it extensively.

5          MR. TONER:  He raises an excellent point.  There was

6     a pending motion to present that under seal.

7          THE COURT:  Yes, I -- I'll grant that motion.

8          MR. DONNELLON:  Okay.

9          THE COURT:  I've already opened it so it's really not

10    under seal anymore, but I --

11         MR. DONNELLON:  Then if Your Honor's willing to

12    entertain just a couple more minutes tonight I think there is

13    -- there has been some new developments on this issue with the

14    application to employ that I could be very brief.  I think --

15         THE COURT:  I'll give you five minutes.

16         MR. DONNELLON:  That's plenty.  I think what we've

17    learned as we come through today is that the issue with respect

18    to the failure to fully disclose is even more insidious than we

19    thought before because the waiver with Fifth Third is only an

20    oral waiver.  The e-mail, the beginning part of it is not --

21    could not possibly be informed consent.  The e-mail itself

22    doesn't even mention Eastern Livestock.  Then from Mr. Hubbard

23    there's a recitation of a telephone conversation that simply

24    says you won't be adversarial in nature.

25         Now, we layer that upon a very detailed and thorough

1  conflict waiver e-mail in accordance with the form from Wells

2  Fargo that says not only will you refrain from being -- uphold

3  all Rules of Professional Conduct with respect to Wells Fargo,

4  but it should also refrain from being adverse to Fifth Third in

5  that very same waiver letter.  That makes the Wells Fargo

6  waiver letter even more important.

7          The fact that we didn't know there was an oral waiver

8  with Fifth Third is of no moment.  I'm not trying to --

9          THE COURT:  Who said it's an oral waiver?  What --

10 and why isn't the e-mail a written waiver?

11         MR. DONNELLON:  To rise to a level of a conflict

12 waiver under the Rules of Professional Responsibility it's got

13 to have informed consent, it's got to detail what the issue is,

14 and this is all in our brief, it's got to detail what the

15 extent of the representation is, and it's got to discuss where

16 the issues and conflicts could arise.  This doesn't even state

17 the representation.  It doesn't even say Eastern Livestock.

18         The only thing that it references is is a telephone

19 conversation where we discussed this representation.  That

20 means it's an oral waiver.  It's confirmed in an e-mail.  We've

21 got a written confirmation of an oral waiver, but it clearly is

22 just an oral waiver and you -- my point only is you layer that

23 on top of the undisclosed Wells Fargo conflict where there's a

24 conflict waiver letter obtained from Wells Fargo that's even

25 more detailed and has additional items with respect to Fifth

1  Third.  We were entitled to know that at the beginning of this

2  case so that we could properly address the role.

3         If you look at the <u>Crivello</u> standard anything that

4  may faintly color the independence of counsel is what has to be

5  disclosed, and when we're talking about conflict waiver letter

6  as detailed as it is with Wells Fargo and a conflict waiver

7  oral that it is from Fifth Third the extent of the conflict

8  waivers and the extent of the representation of the waiver from

9  Wells Fargo needed to be disclosed by Baker & Daniels.

10         THE COURT:  All right.

11         MR. CARR:  Your Honor, could I --

12         THE COURT:  Five minutes.

13         MR. CARR:  Yeah, it's going to be less than that.

14  Obviously my partner got on the phone with the chief legal

15  counsel of Fifth Third, described to him exactly what we were

16  going to do.  We got a written conflict waiver.  Mr. Donnellon

17  can say oral as many times as he wants, but it's on paper.

18         We then filed two affidavits in which Ms. Hall put

19  down on a piece of paper exactly what we were going to do and

20  exactly what we thought were the restrictions of our

21  employment.  It was handed to counsel for Fifth Third.  They

22  knew exactly what we were representing to the Court was our

23  restriction and obviously Fifth Third didn't say, wait a

24  minute, that's not our conflict waiver.  In fact, they affirmed

25  that that was the conflict waiver.

1          So the idea that now this isn't a conflict waiver

2   that Fifth Third agreed to can't bear any weight whatsoever,

3   and all that the Wells Fargo consent did was repeat what we'd

4   already agreed and told the Court and told everybody else was

5   the case that we could not sue Fifth Third Bank, and we agreed

6   with Wells Fargo that we wouldn't sue Fifth Third Bank.

7          We never restricted ourselves from taking any other

8   action to do legal research or advise.  Conflicts counsel was

9   hired for the purpose of coming in and assisting, but it wasn't

10  an exclusive path.  They like -- they would like for the Court

11  to say, well, wait a minute, once Hoover Hull was in the field

12  was cleared, FBD had no further role.  That's not what it says,

13  and so all the papers before the Court and -- once again it

14  would be a great thing for First Bank if we were taken out of

15  this case because then they wouldn't have an adversary.  That's

16  not to say it would be good for the creditors of this estate.

17          THE COURT:  All right.

18          MR. TONER:  Your Honor, on the agenda.

19          THE COURT:  Yes.

20          MR. TONER:  Consistent with going home tonight, Item

21  Number 7 was a motion for reconsideration on your ruling on the

22  motion for enlargement of time that Superior raised.  Superior

23  would agree that instead Your Honor resolved that on the

24  papers.  The trustee would be fine with that, as well.

25          THE COURT:  I'm going to deny that motion to

1   reconsider.  I had already considered that motion to reconsider

2   it, and I'm going to give the trustee the time to answer that.

3   The -- I think there were the sealed motions, basically are

4   without objection.  Maybe they're not -- didn't even make the

5   agenda that were filed --

6        MR. LaTOUR:  Your Honor, may I interrupt?  I heard

7   you say you're going to give the trustee time to answer.  Are

8   you also giving Fifth Third the same time to answer?

9        THE COURT:  And Fifth Third's, yes.

10        MR. LaTOUR:  Thank you.

11        THE COURT:  Oh, yes, Number 6, trustee's motion for

12   leave to file document under seal.  I think --

13        UNIDENTIFIED ATTORNEY:  You ruled on that.

14        THE COURT:  Yes, I already ruled on that.  That's

15   granted.

16        MS. HALL:  First Bank's motion to seal that was filed

17   on Saturday and I don't think there's -- it didn't make the

18   agenda.

19        THE COURT:  That's the Wells Fargo document that you

20   agreed to --

21        MR. DONNELLON:  It's the Wells Fargo documents and

22   they're in the evidentiary hearing in this case.  So I mean I

23   think they should just be filed under seal and if we can

24   resolve that with Wells Fargo.  They've been reasonable.  They

25   just wanted to take more time to confirm that the 2010 version

1  was, in fact, on the internet and then they'll agree they're

2  not confidential.

3         THE COURT:  All right.  I'll grant that motion to

4  file that under seal.

5         UNIDENTIFIED ATTORNEY:  We, of course, have the

6  issues relating to the report that we talked about --

7         THE COURT:  Oh, yes, we've got the report issue.

8         MR. DONNELLON:  Oh, and if I may update, Your Honor,

9  we had a very excellent meeting with Chief Judge Lloyd.  We

10 would be reporting more detail, but my hospital state prevented

11 that, but I think that we're going to come to some resolution.

12 We'll just continue those to the next omnibus, those protective

13 order issues and the -- everything she mediated we'll just

14 continue to next omnibus, if that's okay.

15        THE COURT:  Okay.  That will be fine.

16        MR. DONNELLON:  We -- I think we have it resolved.

17 It's purely -- I was supposed to draft something and send it to

18 Mr. LaTour's partners, and I ended up being distracted.

19        THE COURT:  I can understand that.  All right.  I'll

20 set the omnibus date on the date that's currently set on the

21 disclosure statement, and I'll decide -- I'll issue an order --

22 here's what I'd like, I'd like both sides or some

23 representative of each side to file a proposed findings and

24 conclusions on the -- both the trustee and the attorney issue

25 and I'll give you five days to do that, and you can –

1          MR. CARR:  So does that mean Monday, Your Honor?

2          THE COURT:  Well, the quicker I get them the quicker

3     I can incorporate them.

4          MR. CARR:  If you want them Friday we'll give them to

5     you Friday.

6          THE COURT:  What do you think, Mr. Toner?

7          MR. TONER:  We can do it.

8          THE COURT:  You're probably going to -- unless that

9     goes further down the chain.

10         MR. TONER:  We can do it.

11         THE COURT:  Yes, we can do it.  All right.  Can you

12    -- by Friday?

13         MR. DONNELLON:  By Friday.

14         THE COURT:  Let me have them by Friday.  I'll get you

15    an order on that.  I told you earlier that there's a lot of

16    things going through my mind.  The -- I'm concerned about

17    neutrality.  I don't -- I'm clearly not as upset as you are

18    about some of the things that happened here.  I would -- I can

19    kind of agree that I wish things had been done differently, but

20    I don't know that we wouldn't still be in the same place that

21    we are.

22         I'm very concerned about how it's going to delay the

23    case if whatever step I take -- I am concerned about trying to

24    resolve this case, trying to benefit the unsecured creditors,

25    if possible.  There's been a lot of people hurt by this and the

1  Court's very much aware of that.  As anyone who's observed

2  today can tell though there's no easy issues in this case.  At

3  least I haven't found them yet or maybe they never get to me.

4       The -- I'd like -- I'm going to order that within

5  seven day the -- or let's say 10 day, this -- either this week

6  or the first part of next week that the parties conduct

7  something similar to a Rule 16 conference, although it doesn't

8  have anything to do with discovery, let's say a settlement

9  conference.  And I know that you're not going to -- I'm not

10  intending on you to settle the issues that you've presented

11  today by evidence, but I would like for you to talk about some

12  of the things that I talked about this morning.

13       You know, I'm not opposed to considering appointing

14  another special counsel in theory or a special mediator in

15  theory, and I'm not opposed to other possibilities in this

16  case, but the -- I'd like to keep this case on track as much as

17  possible and get to the heart.

18       I'm not opposed -- I'm certainly not opposed to

19  competing plans even though every time I say that Mr. Bowles

20  shakes his head.  I'm still not opposed to it.  The -- you

21  know, as I said earlier at some point, you know, let the people

22  speak.  There's lots of small people out there that have been

23  affected and I'd love to see how they vote, but I understand

24  that, you know, at least some feel that, well, if it went out

25  in the current situation that's not fair because there's not

1   been adequate input as the one point of view.  So there are

2   potential remedies for that.  There's, of course, amending the

3   disclosure statement or putting an alternative statement in the

4   disclosure statement prepared by creditors, you know, and the

5   disclosure statement said the creditors object to this plan and

6   for a variety of reasons and here they all are and let them

7   detail them and they feel like it would be better to further to

8   do this, X, Y and Z.

9          So I want you all to have -- I want you all to talk

10  first of all to your clients and to your -- each of you talk to

11  your own team and then I want the two teams to talk, three

12  teams.

13         UNIDENTIFIED ATTORNEY:  Do I get a (Indiscernible)?

14         THE COURT:  Or four teams if you count Wells Fargo.

15  So --

16         MR. LaTOUR:  Your Honor, may I point out --

17         MR. DONNELLON:  You mean Fifth Third.

18         THE COURT:  Yes, no, I --

19         MR. LaTOUR:  Your Honor, may I point out that humor

20  does not translate on a transcripts so for the record that a

21  joke.

22         THE COURT:  That was a joke for the transcript --

23  well, I -- yes, you're right, humor is wasted on this case I

24  think.  All right.  I'm going to adjourn and so you won't have

25  to come back tomorrow and good luck on your recovery, Mr.

1  Donnellon.

2          MR. DONNELLON:  Thank you, Your Honor.

3          UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

4          UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

5                    * * * * *

6

**C E R T I F I C A T I O N**

         We, KAREN DeLUCIA, KATHLEEN BETZ and COLETTE MEHESKI,
court approved transcribers, certify that the foregoing is a
correct transcript from the official electronic sound recording
of the proceedings in the above-entitled matter, and to the
best of our ability.


/s/ Karen DeLucia
KAREN DeLUCIA


/s/ Kathleen Betz
KATHLEEN BETZ


/s/ Colette Meheski
COLETTE MEHESKI
J&J COURT TRANSCRIBERS, INC.   DATE:   September 11, 2012