UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CASE NO. 10-93904-BHL-11 |
| | ) | |
| EASTERN LIVESTOCK CO., LLC, | ) | Hon. Basil H. Lorch, III |
| | ) | |
| Debtor. | ) | |

**OBJECTION TO DISCLOSURE STATEMENT FOR THE TRUSTEE'S
CHAPTER 11 PLAN OF LIQUIDATION**

COMES NOW Alabama Livestock Auction, Inc.; Sealy And Sons Livestock, LLP; Athens Stockyard, LLC; Billingsley Auction Sale, Inc.; CPC Livestock, LLC; Carroll County Livestock Sales Barn, Inc.; E4 Cattle Co., LLC; Edward J. Edens, IV; Macon Stockyards, Inc.; Edwin A. Strickland; and Robert Rawls d/b/a Robert Rawls Livestock (collectively "Livestock Creditors"), by and through undersigned counsel, and state as follows:

1. Before the Court for consideration is the Disclosure Statement for the Trustee's Chapter 11 Plan Of Liquidation. For reasons outlined below Livestock Creditors assert that the Disclosure Statement is flawed, inadequate, and premature.

**LEGAL STANDARD**

> In submitting a disclosure statement, the debtors have a duty to provide "adequate information," defined as "information of a kind, and in sufficient detail as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor ... to make an informed judgment about the plan....

*In re Scott*, 172 F.3d 959 (C.A.7 (Ill.), 1999) citing 11 U.S.C. §1125

2. The fiduciary duty of the Trustee in this instance to the beneficiaries of the estate in this instance is not dissimilar to that owed to investors by an issuer or bond indenture

1

trustee—full disclosure of all aspects of the transaction to enable 'a hypothetical investor to make an informed judgment about the Plan." As asserted by Superior Livestock Auction, Inc. in its Objection (Doc. 1469), standing alone, absent the knowledge gained from direct participation in this and related proceedings, a claimant reading the Trustee's Disclosure Statement and Plan would end up both uninformed and misinformed. The Disclosure Statement fails to meet the required standard under 11 U.S.C. §1125.

## DISCUSSION

3.  Livestock Creditors represent claimants to the Debtor's bankruptcy estate and defendants in adversary proceedings brought against them by the Trustee or both. Uniformly, however, they are lifetime participants in the cattle business with a wealth of knowledge and experience in how the business is conducted. Livestock Creditors are for the most part family run businesses with a long history of operational success where the original contract was little more than a handshake. E4 Cattle Co., for instance, is successor to the business founded in 1886 by Mr. Edens great grandfather and has been continuously operated since. Comparatively speaking, the parties responsible for the preparation of the Disclosure Statement and the Chapter 11 Plan Of Liquidation ("Plan") are at best neophytes—namely James Knauer, Trustee; Fifth Third Bank; their counsel and Development Specialists, Inc. ("DSI").

4.  This characterization is important, even critical, because at its core the Disclosure Statement and Plan are fundamentally flawed. Flawed because they perpetuate and perpetrate a fraud in assuming that the Trustee and Fifth Third Bank are legally entitled to all of the assets in which they claim an interest and they claim an interest in all of the assets.

5.  Certain fundamental assumptions underlying the Disclosure Statement concerning the reach and scope of Eastern's ownership interests and accordingly Fifth Third's lien have not been determined. A determination contrary to the conclusory assumptions of the Trustee and

2

Fifth Third would have a dramatic effect on the payout to supposedly unsecured and subordinate creditors.

(i) For instance, on or about November 2, 2010, Fifth Third dishonored with refer to maker Eastern checks totaling approximately $28 million (more if Gary Seals and E4 Cattle are included) issued in payment for livestock. The Court has yet to determine the effect of UCC § 2-511(3) where "[p]ayment by check is conditional and is defeated as between the parties by dishonor of the check on due presentment." See *Rowse v. Platte Valley Livestock, Inc.*, 604 F.Supp. 1463 (D. Neb., 1985). If this were to apply to the present situation the Estate's and Fifth Third's interest in the claimed collateral of livestock sales proceeds totaling the amount of dishonored checks would disappear.

(ii) Additionally, whether Eastern could pass good title to Fifth Third Bank as a "good faith purchaser for value" has not been determined by the Court. Fifth Third Bank's role has certainly been called into question by separate litigation against Fifth Third Bank by a group of livestock claimants in Metcalf County, KY and by First Bank and Trust Company in Hamilton County, OH. Were Fifth Third Bank determined by the Court not to be a good faith purchaser and there is certainly plenty evidence to suggest this is the case, its interests would be totally subordinated to the unsecured creditors.

(iii) Finally, the Court has not determined the role of the Packers and Stockyards Act of 1921, 7 U.S.C. §§ 181, et seq. and governing regulations, 9 C.F.R. §§201, et seq. ("Stockyards Act") in protecting payments for livestock purchases made to market agencies selling on commission or when Eastern acted as "Clearing Agency" for a group of "Clearees" listed under its bond filing with the USDA, Grain Inspection Packers and Stockyards Administration ("PSA"). See 9 C.F.R. §201.42.

6. This proceeding is rapidly approaching its two (2) year anniversary and fundamental questions governing Eastern's interests in assets remain unknown and cannot truthfully be determined prior to the December 6, 2012 deadline. What is known is that potential claims against Fifth Third Bank will not be asserted by this Trustee and his law firms, both his own firm, Faegre Baker Daniels, and Hoover Hull. The return to the Estate for this complete release is at best not clear.

7. For instance, there are several key dates to be considered for a complete cash flow analysis of Debtor's, Fifth Third's, and Creditors' interests:

    (i) 90 days prior to filing or September 7, 2010;

    (ii) date of the freezing of Debtor's accounts or November 2, 2010;

    (iii) date of maximum build up in Debtor's accounts or November 9, 2010; and

    (iv) petition filing date of December 6, 2010

The Disclosure Statement does not present a complete analysis and disclosure of the book assets and livestock purchase payments of Debtor leading up to the account freeze; or the loan and account balances of Fifth Third before and after Debtor's accounts were frozen; or the total collections in book value and real cash utilized as a loan offset by Fifth Third. The Disclosure Statement suggests approximately $28 million in checks for legitimate cattle purchase payments were returned, including approximately $9 million of Superiors. The amount of purchases for which no check was issued is ignored. The Disclosure Statement fails to indentify exactly how much in advance and loans to Debtor were outstanding prior to the account freeze and how much in cash was collected by Fifth Third prior to the Receivership and Petition filing that was applied to offset those loans and advances. This reconciliation is, at the very lease, an important piece of

4

the puzzle to valuing the Trustee's release of Fifth Third. The Disclosure Statement is inadequate in this regard.

8.      What is estimated from the various sources available but not identified in the Disclosure Statement is that on September 3, 2010, the Friday prior to Labor Day, Monday, September 6, 2010 Fifth Third's line of credit was maxed out at $32,431,451.01 and with an additional $27,219,245.48 in advances against collections for livestock purchases for a total of $54,438,490.96. Advances above the actual credit line between $10-30 million were a regular thing. Included in these advances were the payments by Eastern as broker, dealer, and clearing agency due on livestock sales to market agencies selling on commission and others. These payments were the "trust funds" described under 9 C.F.R. §201.42:

> (a)     Payments for livestock are trust funds.  Each payment that a livestock buyer makes to a market agency selling on commission is a trust fund. Funds deposited in custodial accounts are also trust funds.

Over the three (3) plus years since Eastern's accounts were first flagged by Fifth Third's software for kiting activity in 2007, Fifth Third and its "Permission To Kite" had allowed the float to bloat to roughly equal the main line of credit. In many respects what happened is like a security broker borrowing money on his clients' portfolios and selling the securities leaving the debt with the client. The Trustee stepping into the shoes of Eastern not unexpectedly asserts the funds belong not to the clients but to the bank.

9.      Had the float been allowed to unwind, the "kite" would have washed out, cattle would have been delivered, sellers would have been paid, but Fifth Third would have been left with a largely unsecured $32,431,451.01 line of credit with Wells Fargo participating and an insolvent borrower. Indeed, Fifth Third knew its collateral position was suspect many months prior to the events of November 2010.

5

10. Supported by their auditors' negligence or worse, Eastern Livestock perpetrated a fraud upon a financial institution acting in willful disregard of client and loan transactional activity. In 2007 when the kite identification software is first known to have informed, Fifth Third Bank assumed that all of the $40 million plus in cattle receivables and $3 million plus in cattle inventory actually existed and were owned by Eastern in a manner that allowed structured or other direct financing. Neither Fifth Third nor Eastern's auditors, Buetow, LeMastus & Dick, PLLC, conducted adequate field audits of Eastern's cattle business nor investigated the impact of the different roles and activities Eastern engaged in that controlled who owned what, when, where, and how much in each transaction.

11. The fact specific transactional nature of the livestock assets in question and Eastern's ownership rights has been deliberately ignored. The fiction in the paperwork and financial statement that Eastern employed to perpetrate the fraud upon Fifth Third and others, is now the gospel relied upon by the Trustee, Fifth Third, and DSI to claim Eastern ownership and Fifth Third lien rights in assets due on payment for livestock. It is no less a fraud now that when employed by Eastern. With many millions of dollars at stake, Fifth Third has chosen over a legitimate objection by the Trustee not to pursue Buetow, LeMastus & Dick, PLLC not create a question into the true ownership of its "collateral."

12. The Disclosure Statement is wholly inadequate in identifying how much was owed to Fifth Third and the cattle industry participants, how much was collected and offset and deposited, and how much is now owed to Fifth Third and the cattle industry participants.

13. That a principal component of the Disclosure Statement and Plan is a systematic shakedown of the livestock industry to pay off claimants and the bankruptcy overhead is another deficiency.

14. Eastern advertised itself as the one of largest cattle "brokers" in the country—a phrase initially repeated often by the Trustee and counsel until the impact became clear that brokers are agents. Brokers act typically as commission agents for principals buying and selling on account. In most cases Eastern did not undertake transaction risk, laying this off onto others. However, Eastern registered with the PSA under the Stockyards Act only as a Condition Clause No. 2 "Dealer" buying and selling livestock for its own account and the account of others and as a Condition Clause No. 3 "Clearing Agency" providing clearing services for specific registered market agencies. See 9 C.F.R. §§201.29-31. Contrary to its registration, Eastern is known to have operated as a Condition No. 1 "Market Agency" selling on commission. *Id.*; see Bluegrass Supplemental Opposition To Motion Partial Summary Judgment Statutory Trust, Case No. AP 11-59093, (Doc 463), at 7. The Disclosure Statement fails to clarify these issues.

15. Finally, the discussion above ignores the issue of the Trustee's claimed lack of disinterestedness and the now known issue of conflict currently on appeal. It is an undeniable fact that the Trustee concurrently represented Wells Fargo in another matter before this Court while Wells Fargo was also the major loan participant to Fifth Third Bank's $32 million credit facility to Debtor Eastern. The taint surrounding this proceeding as viewed by the fully informed livestock industry is unrelenting and continuing. With this underpinning there is nothing that this Trustee can do, no matter how apparently favorable to creditors, that will remove the taint and reflect favorably on this Court and this proceeding.

WHEREFORE the above listed Livestock Creditors request the Court to direct the Trustee to amend the Disclosure Statement and provide the information requested above, including allowing sufficient time to allow for determination of threshold issues of law and for

making appropriate amendments to the Plan as may be required following true arms length negotiations "In The Sunshine," and grant such further and additional relief as is just and proper.

Respectfully submitted this 16th day of October 2012,

W. SCOTT NEWBERN, PL

/s/ Walter Scott Newbern

W. Scott Newbern
2982 East Giverny
Tallahassee, FL 32309
(T) 850.591.1707
(F) 850.8940871
wsnewbern@msn.com

### CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of October 2012, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties through the Court's Electronic Case Filing System. Parties may access this filing through the Court's system.

/s/ W. Scott Newbern
W. SCOTT NEWBERN

8