**<u>EXHIBIT B</u>**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| EASTERN LIVESTOCK CO., LLC, | ) | Case No. 10-93904-BHL-11 |
| | ) | |
| Debtor. | ) | |

**[PROPOSED]**

**FIRST AMENDED DISCLOSURE STATEMENT FOR TRUSTEE'S
FIRST AMENDED CHAPTER 11 PLAN OF LIQUIDATION**

Counsel for James A. Knauer, Chapter 11 Trustee:

FAEGRE BAKER DANIELS LLP
James M. Carr (#3128-49)
Kevin M. Toner (#11343-49)
Terry E. Hall (#22041-49)
Harmony Mappes (#27237-49)
Dustin R. DeNeal (#27535-49)
300 N. Meridian Street, Suite 2700
Indianapolis, IN 46204-1782
Telephone: (317) 237-0300
Facsimile: (317) 237-1000
jim.carr@faegrebd.com
kevin.toner@faegrebd.com
terry.hall@faegrebd.com
harmony.mappes@faegrebd.com
dustin.deneal@faegrebd.com

Wendy W. Ponader (#14633-49)
600 East 96th Street, Suite 600
Indianapolis, IN 46240
Telephone: (317) 569-9600
Facsimile: (317) 569-4800
wendy.ponader@faegrebd.com

HOOVER HULL LLP
John David Hoover (#7945-49)
Sean T. White (#20428-49)
111 Monument Circle, Suite 4400
P.O. Box 44989
Indianapolis, IN 46244-0989
Telephone: (317) 822-4400
Facsimile: (317) 822-0234
jdhoover@hooverhull.com
swhite@hooverhull.com

BDDB01 9526463v1

# DISCLAIMER

The purpose of this disclosure statement ("Disclosure Statement") is to provide the creditors of Eastern Livestock, Co., LLC with sufficient information to allow them to make a decision to accept or reject the proposed first amended chapter 11 plan (the "Plan") that accompanies this Disclosure Statement. Eastern Livestock, Co., LLC is referred to as ELC or Debtor in this Disclosure Statement and the Plan.

This Plan is being proposed by James A. Knauer, the Chapter chapter 11 Trustee trustee (the "Trustee") appointed by the United States Bankruptcy Court for the estate of ELC. This Disclosure Statement describes, among other things, the pre-bankruptcy business of ELC; the events that led to the commencement of the ELC chapter 11 case; a summary of the certain proceedings in the chapter 11 case to date; causes of action that the ELC estate may have against certain parties to recover money or other property; proposed settlements that the Trustee has submitted to the Court for approval with certain parties in the chapter 11 case, a proposed settlement of possible ELC estate causes of action with ELC's principal secured lender, Fifth Third Bank ("Fifth Third" or the "Bank") and an opportunity under the Plan for creditors to "opt in" by settling claims they might assert against Fifth Third and thereby receive a larger recovery; a description of ELC's property available or that could be become available to pay its ELC's creditors; an analysis of the claims creditors have asserted against ELC; and the estimated payments that the Trustee projects may be made to creditors under the proposed Plan.

A copy of the proposed Plan is attached to this Disclosure Statement as "Exhibit 1". Words and phrases that are not proper names but are capitalized in this Disclosure Statement, if not otherwise defined in the Disclosure Statement, are defined in Article II of the Plan.

PLEASE BE ADVISED OF THE FOLLOWING:

1.      THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN FINANCIAL INFORMATION. ALTHOUGH THE TRUSTEE BELIEVES THAT THOSE SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF THE PLAN OR STATUTORY PROVISIONS. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS DERIVED FROM ELC'S BOOKS AND RECORDS AND FACTS DISCOVERED DURING THE CHAPTER 11 CASE AND ASSOCIATED LITIGATION, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE TRUSTEE DOES NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

2.      THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS FOR THE PURPOSE OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY OTHER PURPOSE. NO PERSON MAY MAKE ANY REPRESENTATION, OTHER THAN THE REPRESENTATIONS CONTAINED

IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN. ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETIES BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

       3.     THIS DISCLOSURE STATEMENT HAS BEEN PREPARED AND APPROVED BY THE COURT IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NONBANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS AGAINST ELC IN THE CHAPTER 11 CASE SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSES FOR AND CIRCUMSTANCES UNDER WHICH THEY WERE PREPARED. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE OF THIS DISCLOSURE STATEMENT AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.

       4.     AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER LITIGATION OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN ATTEMPTED COMPROMISE AND SETTLEMENT OF CERTAIN OF SUCH ACTIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NONBANKRUPTCY PROCEEDING, NOR SHALL IT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR INTERESTS IN ELC. BY PROVIDING THIS DISCLOSURE STATEMENT, THE TRUSTEE DOES NOT INTEND TO WAIVE OR PREJUDICE IN ANY MANNER ANY ATTORNEY-CLIENT OR OTHER PROFESSIONAL PRIVILEGE OR WORK PRODUCT PROTECTION FROM DISCLOSURE OF INFORMATION OTHERWISE AVAILABLE TO THE TRUSTEE OR THE ELC ESTATE.

       5.     IF THE PLAN IS CONFIRMED BY THE COURT AND BECOMES EFFECTIVE, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE WHO REJECTED OR WHO ARE DEEMED TO HAVE REJECTED THE PLAN AND THOSE WHO DID NOT SUBMIT BALLOTS TO ACCEPT THE PLAN) WILL BE BOUND BY THE APPLICABLE TERMS OF THE PLAN.

# TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................................................................... 1

II.  EXECUTIVE SUMMARY OF THE PLAN ........................................................................ **12**

III.  BACKGROUND ...................................................................................................................... **20**

    *A.*  The Business ............................................................................................................... 20

    *B.*  The Financing ............................................................................................................. 26

    *C.*  The Kiting and the Shut Down .................................................................................. 28

    *D.*  The Chapter 11 Case .................................................................................................. 32

    *E.*  Financing Order ......................................................................................................... 34

IV.  ADMINISTRATION OF THE ESTATE ........................................................................... **35**

    *A.*  Asset Recovery and Liquidation ............................................................................... 35

    *B.*  Current Status of Asset Collection ............................................................................ 43

    *C.*  Litigation Summary ................................................................................................... 43

V.  CLAIMS ANALYSIS ............................................................................................................ **49**

VI.  INVESTIGATION AND ANALYSIS OF ESTATE'S POTENTIAL CLAIMS AGAINST FIFTH THIRD ........................... **51**

    *A.*  Tort Claims Against Fifth Third ................................................................................ 53

    *B.*  Trustee's Right to Stand in the Shoes of a Judgment Creditor Under  11 U.S.C. § 544 (a) ........................... 59

    *C.*  Preference Claims ...................................................................................................... 60

    *D.*  Possible Application of Bankruptcy Code § 553 ....................................................... 75

    *E.*  Equitable Subordination ............................................................................................ 83

    *F.*  Avoidance of Fifth Third's Security Interest Under Good Faith Purchaser Analysis ..................... 89

VII.  SUMMARY OF THE PLAN ................................................................................................ **99**

    *A.*  Defined Terms ............................................................................................................ 99

    *B.*  In General ................................................................................................................... 99

    *C.*  Treatment of Unclassified Claims ........................................................................... 101

    *D.*  Classification of Claims and Interests .................................................................... 102

    *E.*  Treatment of Claims and Interests .......................................................................... 103

    *F.*  Implementation of the Plan ..................................................................................... 104

*G.*  *Treatment of Executory Contracts* ................................................................................................ *108*

*H.*  *Modification of the Plan* ........................................................................................................................ *109*

*I.*  *Plan Controls* .......................................................................................................................................... *109*

*J.*  *Continuance of Estate* ......................................................................................................................... *109*

*K.*  *Binding Effect* ........................................................................................................................................ *109*

**VIII.**    **PLAN VOTING INSTRUCTIONS AND PROCEDURES** ............................................................ **110**

*A.*  *Notice to Holders of Claims and Holders of Interests* ............................................................... *110*

*B.*  *Solicitation Package, Voting Procedures, Ballots, and Voting Deadline* ............................ *110*

*C.*  *Confirmation Hearing and Deadline for Objections to Confirmation* .............................. *111*

**IX.**    **CONSIDERATIONS AND RISKS** ........................................................................................................ **112**

*A.*  *Estimated Recoveries and Estimated Participation Rates of Opt In Creditors* .................. *112*

*B.*  *Certain Bankruptcy Considerations* ............................................................................................... *112*

*C.*  *Timing of Distributions* ....................................................................................................................... *114*

*D.*  *Alternatives to the Plan* ....................................................................................................................... *114*

**X.**    **FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** ............................................... **115**

**XI.**    **CONFIRMATION REQUIREMENTS** ............................................................................................. **115**

*A.*  *Classification of Claims and Interests* ............................................................................................ *116*

*B.*  *Best Interests Test* .................................................................................................................................. *116*

*C.*  *Liquidation Analysis* ............................................................................................................................. *118*

*D.*  *Feasibility* ................................................................................................................................................. *118*

*E.*  *Confirmation without Acceptance by All Impaired Classes* .................................................. *118*

**XII.**    **Recommendation** ................................................................................................................................. **120**

iv

# I.    INTRODUCTION

ELC is no longer in business.  Its offices are closed, the employment by ELC of its employees has been terminated, some of its principals have been indicted and convicted,[1] and ELC's license as a cattle dealer has been revoked.  This Plan is not a plan of reorganization but rather a proposal to distribute the recovered and recoverable cash value of assets of ELC and to settle claims of the Trustee against Fifth Third in exchange for Fifth Third contributing part of its collateral proceeds to those unpaid cattle sellers, truckers, feeders and other unsecured creditors who choose to opt in to the settlement. including a larger part of such collateral proceeds to those creditors who choose to "Opt In" to a settlement with Fifth Third.  The Trustee has reached proposed settlements with certain parties that have been active in the chapter 11 case and approvals of those settlements are pending at the time of filing this Disclosure Statement and are described herein.  Under the Plan the Trustee proposes to continue to cooperate with the United States Attorney's office in the Western District of Kentucky, the trustee appointed in the bankruptcy case of Thomas and Patsy Gibson (the "Gibsons"), and certain other parties to arrive at a proposed agreed entry to administer the distribution of $4.7 million in seized funds to unpaid creditors/victims of ELC's failed business and Thomas Gibson.  To those ends, what might be a usual and customary detailed description of the business and operations of ELC in a disclosure statement is somewhat truncated in favor of setting forth more fully material information regarding potential litigation claims by the Trustee and the terms of the settlement proposed settlements and Plan in order for the Court and the creditors to decide whether the Plan is in the best interests of creditors and for creditors to vote in favor of or against its confirmation.

---

[1]    *See* e.g. "Exhibit 2" containing the indictments in Kentucky state and federal courts.

This Plan is offered by the Trustee.  It represents the Trustee's business and professional judgment that creditors of ELC will likely receive more money sooner under the Plan than they would if the Trustee were to engage in complex, lengthy and costly litigation with ELC's principal secured lender, Fifth Third and the other settling parties.

The Trustee has investigated and analyzed potential claims that the ELC estate might bring against Fifth Third to reduce, avoid, or disallow Fifth Third's claims and security interests and/or make an affirmative recovery against Fifth Third.  The Trustee hired experienced litigation counsel, Hoover Hull, LLP ("Special Counsel"), to assist the Trustee in this endeavor, and, if so determined, to prosecute claims against Fifth Third.  The Trustee's experienced bankruptcy counsel, Faegre Baker Daniels LLP ("FBD"), likewise assisted Special Counsel in analyzing legal issues relating to the potential claims that Special Counsel investigated and in responding to some creditors' questions, suggestions, and critiques.  In addition, the Trustee used his own extensive legal experience, as both a chapter 11 trustee and a practicing bankruptcy lawyer, to evaluate the claims that might be brought against Fifth Third.  While the Trustee has not determined that Fifth Third has no exposure to litigation, the Trustee has determined that the costs of litigation, the time the litigation would take, and the probability of succeeding would very likely result in less value returned to ELC's creditors than is projected under the proposed Plan.

Under the proposed Plan settlement, Fifth Third has agreed to will contribute up to 2010% of the value of its collateral (net of a proportionate charge for administrative expenses) recovered by the Trustee to "Optbe distributed to the holders of allowed general unsecured claims against ELC in consideration of the release of the Trustee's claims against Fifth Third.  In" addition, Fifth Third is offering  an additional 10% of the value of its collateral (again, net of a

proportionate charge for administrative expenses) to general unsecured creditors ~~of ELC~~who "Opt In" in exchange for the release of any claims that the ~~Trustee and the~~ "Opt In" creditors might ~~bring~~hold and assert in their individual capacity against Fifth Third.

It is important to note that the Plan will not automatically release the claims of any creditor against Fifth Third and any creditor who wishes to file a lawsuit against Fifth Third or continue to prosecute an already filed lawsuit against Fifth Third raising claims that are not Estate claims may do so.  Only those creditors who affirmatively and in writing "Opt In" after the Plan is confirmed will release their claims against Fifth Third in exchange for sharing in ~~a~~the additional distribution ~~of proceeds from Fifth's Third's collateral~~offered by Fifth Third.

Regardless of whether a creditor opts in or opts out, all general unsecured creditors will ~~share in any~~receive a pro rata payment from monies recovered by the Trustee that are not part of Fifth Third's collateral.  Based on preliminary estimates, creditors who opt in and release their claims will receive about ~~20~~11 cents more on the dollar than creditors who do not opt in and retain ~~the right~~their rights to sue Fifth Third.

The Trustee's administration of the estate and his negotiation and proposal of this Plan have been criticized in many pleadings filed by certain creditors including Superior Livestock Auction, Inc. ("Superior"), the Bluegrass Entities Et Al[2], CPC Livestock and other persons represented by a single attorney ("CPC & Others")[3], and First Bank & Trust ("First Bank")

---

[2]   The Bluegrass Entities Et Al are Bluegrass Stockyards, LLC; Bluegrass Stockyards of Campbellsville, LLC; Bluegrass Stockyards East, LLC; Bluegrass-Maysville Stockyards, LLC; Bluegrass Stockyards of Richmond, LLC; and Bluegrass South Livestock Market, LLC. (collectively "Bluegrass Entities"), Alton Darnell, Piedmont Livestock Company, Inc., Southeast Livestock Exchange LLC, Mosely Cattle Auction, LLC , and East Tennessee Livestock Center, Inc. (collectively, "Non-Bluegrass Group").

[3]   The "Others" are Alabama Livestock Auction, Inc., Sealy And Sons Livestock, LLP, Athens Stockyard, LLC, Billingsly Auction Sale, Inc., Carroll County Livestock Sales Barn, Inc., E4 Cattle Co., LLC, Edward J. Edens, IV, Macon Stockyards, Inc., Edwin A. Strickland, and Robert Rawls dba Robert Rawls Livestock.

BDDB01 9526463v1

(collectively, the "Objector(s)").")[.")].[4] The ~~Objectors are three livestock auction houses and a Virginia bank.  While the~~ Trustee has ~~carefully considered their concerns, suggestions and criticisms, he also notes that three of these Objectors may hold over $20 million of the Estate's assets (the amount could be more once discovery is concluded) that the Trustee believes could and should be paid over by the Objectors and used to pay ELC's creditors.  The Trustee is currently in litigation~~reached potential settlements with Superior and ~~the Bluegrass Entities and will be filing an action against CPC Livestock.~~ First Bank~~,~~. Some of the ~~fourth Objector, is~~remaining objectors are not ~~believed to be a creditor~~current creditors of the ELC estate, but are defendants in lawsuits brought by the Trustee to recover monies under avoidance or other actions for the benefit of ~~ELC and should not be eligible to receive any recovery from ELC's assets~~creditors.  The compositions of certain of the objector groups have changed over time as certain attorneys lost and gained clients during the Chapter 11 Case.

~~Superior (1) purports to have taken, on the eve of the ELC state court receivership, an assignment from ELC of some five hundred ELC contracts to buy about 29,500 head of cattle (the "Buy Contracts"), including those where ELC had already sold the cattle purchased under the Buy Contracts to third parties, (2) kept approximately $1.8 million in down payment money already paid to Superior by ELC, (3) represented to parties that bought ELC cattle that they should pay Superior[5] instead of ELC, and (4) is now asserting that the ELC estate should pay Superior an additional $13 million.  If Superior succeeds on its theories, it will have removed at~~

---

[4] There was a fifth frequently objecting group composed of certain Florida livestock auctions and others ("Florida Creditors").  The Trustee has settled those claims and in the process resolved one of the four interpleader actions in this chapter 11 Case, saving significant litigation expenses.

[5] ~~According to Superior's proof of claim (Claim # 177), Superior has collected $5,649,506.79 for itself from the buyers of ELC's cattle.~~

4

least $20 million from the ELC estate that could have been used to pay ELC's creditors.One series of objections raised by certain of the objectors was to the continued appointment of the Trustee and the employment of his general counsel, FBD.  The Objectors accused the Trustee and his counsel, FBD, of not adequately disclosing  unrelated representations of a participant (a Wells Fargo affiliate) in the loans made to ELC by Fifth Third.  The dispute was briefed and the Court entered orders ("Trustee Order" and "Counsel Order" respectively) overruling the objections and finding that the disclosure was not required under the Bankruptcy Code or the Bankruptcy Rules, but compensating the ELC estate by denying certain fees and expenses of the Trustee and FBD for defending themselves against the charges.  Superior, First Bank, the Bluegrass Entities Et Al, and CPC & Others separately filed four appeals of the Trustee Order (separately an "Appeal" and collectively, the "Appeals") and the Appeals are pending in the United States District Court for the Southern District of Indiana at this time.  The Appeals filed by Superior and First Bank are currently stayed pending approval of the proposed settlements. The Trustee disputes the appropriateness of the Appeals, the standing of certain of the appellants to prosecute the Appeals of the Trustee Order as well as the appellants' legal positions raised by the Appeals.  A more detailed discussion is disclosed in Article IV of this Disclosure Statement.

While the Trustee has carefully considered the concerns, suggestions and criticisms made by a handful of persons to the proposed Plan and Disclosure Statement, he also notes that certain of the objectors may hold Estate assets that the Trustee believes could and should be paid over to the Estate for the benefit of all ELC's creditors.  The Trustee will be filing actions against some of the objectors, such as CPC Livestock, who are not currently subject to litigation.

BDDB01 9526463v1

The Trustee and Superior have been engaged in various disputes from the beginning of the Chapter 11 Case over various issues.  These issues are proposed to be settled pursuant to the pending settlement.

Tommy Gibson, the CEO and principal owner of ELC, was also a part owner of some of the Bluegrass Entities.  As ELC entered its final meltdown, Tommy Gibson and Willie Downs (one of ELC's branch managers) took a fistful of checks payable to ELC for ELC cattle, deposited the checks to Willie Downs' personal bank account and then wrote checks for an estimated $702,000 to the Bluegrass Entities[6].  The Trustee is suing some of the Bluegrass Entities to have that money returned for distribution to ELC's creditors.  The Trustee may also bring additional claims against the Bluegrass Entities if his investigation reveals other payments to or the involvement of the Bluegrass Entities in ELC's failed business.  The Trustee continues to investigate potential recoverable payments to the Non-Bluegrass Group.

CPC Livestock and MMB Livestock (an entity that the Trustee believes to be an affiliate of CPC Livestock) received a payment payments from one of the buyers to whom ELC sold cattle.  CPC Livestock is also claiming claims a significant portion of the money in the interpleaders.  The Trustee intends to bring a lawsuit one or more lawsuits against CPC Livestock and MMB Livestock to recover the payment payments and will continue to contest CPC Livestock's right to any of the interpleader funds.

First Bank financed the personal cattle sales and purchases of Tommy Gibson and, on information and belief, was also the lender to Grant Gibson, one of the persons along with Tommy Gibson that pled guilty to fraud with respect to ELC's business.  First Bank is not and

---

[6]   Mr. Downs preferentially paid other creditors as well.  The Trustee is currently aware of an estimated $1.755 million in diverted cattle payments to certain favored parties.

6

never was a lender to ELC.  ~~It~~First Bank has filed proofs of claim in the ELC Chapter 11 Case asserting "secured" creditor rights in various funds claimed by the Trustee for the benefit of ELC's creditors.  The disputes between the Trustee and First Bank are proposed to be settled by the pending settlement motion.

Tommy Gibson ran most of his cattle purchases and sales through ELC.  First Bank asserts that some of the cattle it financed for Tommy Gibson got caught in ELC when ELC ceased its business operations, and First Bank hopes to trace those cattle to receivable payments collected by the Trustee and somehow resurrect ~~its~~First Bank's security interest in the sales proceeds.  That is, First Bank may only recover if (1) it can actually identify the sale by ELC of particular cattle as cattle sold to ELC by Tommy Gibson, and (2) win on its theory that First Bank's security interest survived in those cattle or proceeds.  First Bank will not share in any general distribution from the ELC estate or from any recovery that the Trustee might get were the Trustee to litigate and win against Fifth Third.  First Bank has filed a lawsuit directly against Fifth Third in Ohio ~~because~~.  First Bank understands that it will not be paid from the ELC estate, unless First Bank proves that certain cattle and proceeds are not property of ELC's estate or that ~~its~~First Bank's lien in ~~those~~ particular cattle survived and holds a higher priority than the security interests of Fifth Third.[7]

In the Trustee's view, these facts place the ~~Objectors~~non-settling objectors in positions that are ~~squarely~~ adverse to the ELC estate.  Claims by the Trustee against the ~~Objectors~~non-settling objectors or the Trustee's claims against funds the ~~Objectors~~non-settling objectors are competing to recover represent the source of significant potential monies for ELC's creditors~~,~~

---

[7]    *See The First Bank & Trust v. Fifth Third Bank and Fifth Third Bancorp,* Case No. A1203855, Common Pleas Court of Hamilton County, Ohio, filed May 16, 2002.

BDDB01 9526463v1

hence and the Objectors' motivation inTrustee believes that encouraging the Trustee to devote significant resources in litigation against Fifth Third rather than them may reasonably be questioned.  Of the over 500 creditors and parties in interest in this Chapter 11 Case, the Objectorsnon-settling objectors represent some 20 possible creditors, yet they at times assert that they speak for "all creditors" and that "all creditors" share their concerns. This is simply not true as the Trustee and his financial advisors have spoken to many of the creditors of ELC, and what these creditors are telling the Trustee is that they are interested in receiving some payment on their claims as soon as possible.

As of the date of the filing of this First Amended Disclosure Statement, the Trustee has reached proposed settlement agreements with Superior and First Bank ("Superior Settlement" and "First Bank Settlement", respectively), that if approved by the Court resolve all of the Superior and First Bank disputes with the Trustee including their objections raised in the Chapter 11 Case to the Disclosure Statement and Plan and their Appeals of the Trustee Order.  Motions to approve the Superior Settlement and the First Bank Settlement are pending before the Court and are described in more detail in Article IV of this Disclosure Statement.  The proposed settlement with Superior, in which Superior is releasing its claims against the Estate, will mean that significant monies held by the Trustee or that are the subject of interpleader actions will become available for distribution to creditors.  In consideration of waiving its claims, Superior shall also be included in the release given to Fifth Third by "Opt In" creditors.  To the extent any settlements agreements describing the Superior Settlement and the First Bank Settlement, respectively, differ from the descriptions of the settlements described herein or in the Plan, such settlements agreements and any Final Order approving such settlements will control.

BDDB01 9526463v1

The Trustee has followed with interest the efforts and actions of the trustee appointed in the bankruptcy of Bernard L. Madoff.[8]  The financial calamities of the last few years ~~has~~have resulted in the exposure of numerous Ponzi schemes and other creditor frauds as the ability to hide sham transactions was hindered by the drying up of credit and investment.  The Madoff trustee has sued many of the financial and other large institutions that were used by Madoff in his Ponzi scheme.  The Madoff trustee has asserted against some of those financial institutions various claims of collusion, bad faith, conspiracy, and aiding and abetting Madoff's fraud.  So far, the Madoff trustee has consistently lost in that litigation, though he is appealing certain of his losing judgments.  The Madoff trustee lost on most of his claims because of a legal proposition that says essentially "thieves can't sue thieves."[9]

While the Madoff trustee is not a "thief," by law and in certain circumstances he "stands in the shoes of Madoff."  That is, as the trustee of the Madoff bankruptcy estate, the Madoff trustee can mostly bring only those claims that could ~~be~~have been brought by Madoff himself.  If Madoff could not win on a fraud claim against his bank, then, since the Madoff trustee has no better rights than Madoff, the trustee could also not win.  Notwithstanding that, the Madoff trustee has advanced novel legal theories to try and get around the "thieves can't sue thieves" problem.  The administration of the Madoff bankruptcy estate, including professional fees for litigation and investigation, has cost $554 million over the last three years.  Luckily for the creditors of Madoff, these costs have been picked up by the Securities Investor Protection Corporation ("SIPC") and not paid from the gross recoveries that would otherwise be available to

---

[8]   *In re Bernard L. Madoff Inv. Securities LLC,* Case No. 08-1789, 2008.

[9]   The legal name for this proposition is *"in pari delicto."*  It is also discussed in Article VI of this Disclosure Statement.

creditors. This is because the Madoff bankruptcy case involves securities fraud and the SIPC by law is charged with the costs. Therefore, the Madoff trustee did not have to fully consider the costs of losing when deciding whether to sue.

Just like the Madoff trustee, the Trustee for ELC ~~has~~may have no greater claims or causes of action against Fifth Third for fraud than ELC itself would. This means that ELC would not likely be successful in asserting fraud claims against Fifth Third (or conspiracy to commit fraud, or aiding and abetting ELC's fraud) since ELC was a participant in the fraud.[10] However, the fact that the Trustee cannot bring such claims does not prevent the creditors of ELC from asserting their own claims against Fifth Third, if they so choose. In addition to First Bank's lawsuit against Fifth Third, lawsuits have been filed by unpaid creditors of ELC against Fifth Third in Kentucky.

Laying aside the claims that the Trustee may not bring due to the "thieves can't sue thieves" doctrine, there are claims against Fifth Third that the Trustee is not prevented from bringing. These claims would seek to recover alleged preference payments or avoid or subordinate Fifth Third's security interests in the ELC estate assets. If successful, these claims would make more monies available to pay the ELC unsecured creditors by compromising Fifth Third's secured position. The Trustee and his advisors have analyzed these claims from legal, factual and economic ~~perspective~~perspectives, and the Trustee has reasonably determined that the costs of litigation and the probability of winning project a lower and slower recovery than would be provided to creditors under the Plan's proposed settlement~~.~~ with Fifth Third. The Trustee's analysis is more fully explained in Article VI of this Disclosure Statement. It should be

---

[10]   The Trustee has not found any substantial evidence~~,~~ that, in the Trustee's opinion, would support a finding that Fifth Third was a participant in ELC's fraud.

BDDB01 9526463v1

noted that the Plan proposes a settlement with Fifth Third and should the Plan not be confirmed, the Trustee may still bring those claims against Fifth Third that he believes have the best chance of being successful.  For that reason, the Trustee has tried to walk a fine line between providing ELC's creditors with sufficient information to allow them to determine whether or not to support the Plan, and not compromising the Trustee's legal position should the Plan not be confirmed.

Aside from the potential claims against Fifth Third, certain parties have asserted claims under a theory of "constructive trust," under the Packers & Stockyard Act ("PSA") and/or the Food Security Act of 1985 ("FSA").  The Court determined in an order issued in one of the Interpleader Actions, but applicable to all similar claims asserted in other actions, that a constructive trust did not survive the filing of a bankruptcy case unless the constructive trust had been awarded by a court to a particular creditor as a judgment remedy prior to the filing of the bankruptcy case.  The Trustee is not aware of any pre-bankruptcy judgment awarding a constructive trust to any creditor.

Claims asserted by creditors under the PSA are currently being litigated.  It is the Trustee's position that ELC, as a dealer licensed under GIPSA, was not required under the PSA to maintain a custodial account for the benefit of the persons from whom ELC bought cattle nor are the payments ELC received for cattle it sold held in trust under PSA for the benefit of unpaid cattle sellers.  ELC was never required by GIPSA to maintain or fund any such custodial account.  The Trustee's analysis of the law is that the PSA provides protections for unpaid cattle sellers only when cattle are sold by an auction house (market agency) that sells cattle on a consignment/commission basis or when the cattle are sold to a packer.  The Trustee has not found any credible evidence that ELC was either (1) a market agency selling cattle on a commission basis (that is cattle sellers did not consign their cattle to ELC to sell for them), or (2)

11

that ELC was a packer.  In the absence of a valid legal basis to set aside certain funds under PSA, the Trustee cannot award certain funds to certain creditors over the objection and to the prejudice of other creditors.  Unless the issue is otherwise settled, the final resolution of claims under PSA awaits final briefing and a decision by the Court.

Finally, the Trustee understands the frustrations of the people and businesses caught up and harmed by the fraud perpetrated by the principals of ELC.  However, not every unfair harm has a fair remedy.  Weighing all the costs, risks, and needs, the Trustee believes that the proposed Plan will return more money in less time to ELC's creditors than long, costly, litigation with Fifth Third that the Trustee could lose.

## II.    EXECUTIVE SUMMARY OF THE PLAN

**The following summary is qualified in its entirety by the more detailed information in the Plan and in this Disclosure Statement.  Please read the entire Disclosure Statement and Plan before voting to accept or reject the Plan.**

The Plan describes how the Trustee will make payments to creditors who hold valid "allowed" claims against ELC.  ~~The Plan proposes two sources~~All holders of ~~payment to~~allowed unsecured ~~creditors~~ claims will receive a "Pro Rata share of money the Trustee collects from liquidating ELC's assets in which Fifth Third ~~Settlement Monies" and~~does not have a security interest (called the "Recovery Fund~~."  The Fifth Third Settlement Monies consists of a contribution~~") plus a Pro Rata Share of the payment by Fifth Third of ~~up to 20~~10% of the net proceeds of ELC's assets that secure (serve as collateral~~)~~ for) Fifth Third's claim against ELC~~.  The Recovery~~ ("Fifth Third Estate Settlement Fund~~consists of the cash value of ELC's assets recovered by the Trustee that are not subject to the security interests of Fifth Third.  The Fifth Third Settlement Monies will be derived from the Net Collateral Fund which will (after being~~

12

charged with payment of a proportionate part of administrative expenses) consist of the net dollar value of all the assets of the estate recovered by the Trustee that are subject to Fifth Third's security interests.").

All unsecured creditors will share in the Recovery Fund.  However, only creditors who "opt in" will also share in the Fifth Third Settlement Monies.

The Fifth Third Settlement MoniesIn addition to the above payment, creditors who "Opt In" and agree to settle their individual claims, if any, against Fifth Third will receive a Pro Rata share of up to an additional 10% of the net proceeds of Fifth Third's collateral ("Fifth Third Claim Settlement Fund).   The Fifth Third Estate Settlement Fund and the Fifth Third Claim Settlement Fund are part of the Collateral Fund which is composed of the proceeds of the ELC assets securing the allowed secured claim of Fifth Third.

The Fifth Third Estate Settlement Fund (and the offer of the Fifth Third Claim Settlement Fund) is the result of the proposed settlement of the ELC estate's claims against Fifth Third in exchange for Fifth Third contributing up to 20% (depending on the percentage of Opt In Claims) of the net cash value of the assets securing its claim against ELC's estate (e.g., Fifth Third's collateral).  As described in more detail later in this Disclosure Statement, the Trustee believes that the value of the contributioncontributions by Fifth Third exceeds the value of what the ELC estate would likely recover (after deducting the costs of litigation) from Fifth Third by litigating the ELC estate's claims against Fifth Third.  This belief considers the cost of prosecuting thepossible claims against Fifth Third, the relative strengths and weaknesses of the claims, and the likely delay of making payments to creditors while the litigation goes on.proceeds.

If the proposed Plan is approved by the Court, each creditor will have thirty days after the Court confirms the Plan to "opt in" to share in the Fifth Third Claim Settlement MoniesFund.  By

13

opting in, creditors will agree to release whatever individual claims they may have against Fifth

Third that relate to ELC– in other words, opting in creditors would settle with Fifth Third just

like the Trustee. ~~Both creditors who opt in and creditors who do not opt in will receive a pro rata~~

~~share of the Recovery Fund.  However, those creditors who do not opt in will retain their claims,~~

~~if any, against Fifth Third and will be free to litigate with Fifth Third.~~ settled the estate's claims

against Fifth Third and would receive an additional payment from Fifth Third's net collateral

proceeds.  A creditor who wants to Opt In will execute and deliver a release in the form of

Exhibit B attached to the Plan.  That document would cause a release of Fifth Third from any

claim the creditor may hold against Fifth Third.  The release also releases any claims the creditor

may have against the Trustee in consideration of the negotiation by the Trustee of the settlement

and releases Superior in consideration of the waiver of its large claims against the ELC Estate.

The settlement and release of the ELC Estate claims against Fifth Third or Superior will not

release or discharge any individual claim of a creditor that does not opt-in nor will it release the

claim of any non-creditor.  Creditors who do not Opt In will retain their personal claims, if any,

against Fifth Third and Superior.  The Plan has an exculpation clause that will act as a release of

any claims against the Trustee and his professionals for administering the ELC Estate (including

negotiating and proposing the Plan).

PLEASE NOTE that by opting in, a creditor is not releasing any claim that the creditor

holds that a certain asset is not property of the ELC Estate, ONLY IF such a claim is asserted and

filed in the Chapter 11 Case prior to the creditor executing the Opt In Agreement.  If a creditor

that is holding a claim that asserts a dispute with Fifth Third as to the validity or priority of the

Fifth Third lien in all or some property of the Estate and that creditor opts in, the creditor will

release that claim.  This is true whether the contested asset is in the possession of the Trustee or

14

in the treasury of the Court as part of an interpleader or the asset is not yet collected or even known.

Each of the Collateral Fund and the Recovery Fund will be charged on a pro rata basis with funding the administration of the ~~estate~~Estate – that is paying the costs of recovering assets (including professional fees for litigation), filing tax returns and other required governmental reports, paying fees associated with the Chapter 11 Case, and determining the allowability and amounts of claims and distributing money to the claim holders.  The administrative charges will be assessed against each fund proportionately based on each fund's relative size.  For example only, if the Recovery Fund is $10 million and the Collateral Fund is $20 million, then the administrative costs will be surcharged 1/3 to the Recovery Fund and 2/3 to the Collateral Fund. ~~(~~Please note that the first $2 million of the Recovery Fund will be used to repay Fifth Third for the $2 million (the "Trustee Loan") Fifth Third loaned to ~~ELC~~the Trustee under the Financing Order entered by the Court earlier in the Chapter 11 Case.  Other administrative costs already incurred or paid up to $2 million have been charged against proceeds of Fifth Third's Collateral as allowed under the "Carve-Out" provided in the same Financing Order.

The total amount of the Fifth Third Claim Settlement ~~Monies~~Fund will depend on the aggregate dollar amounts of creditors' claims who opt in.  For example if 60% of the total dollar amount of unsecured non-Fifth Third claims opt in, then the Fifth Third Claim Settlement ~~Monies~~Fund (as calculated after the administrative surcharge) will be multiplied by 60%, resulting in a ~~12~~6% fund -- .6 x .~~2=.12~~1=.06.  The purpose of determining the amount of the Fifth Third Claim Settlement ~~Monies~~Fund based on the dollar amount of non-Fifth Third unsecured claims deciding to ~~opt in~~Opt In is to prevent the payment to any ~~opt in~~Opt In creditor from being unfairly impacted.

15

The Recovery Fund and the Fifth Third Estate Settlement Fund will be distributed pro rata to the holders of Allowed Class 4 unsecured claims based on the total Allowed Class 4 Claims – including any deficiency claim of Fifth Third.  In arriving at the amount of Fifth Third's deficiency claim the full amount of the Collateral Fund will be deducted from the total Fifth Third claim, including whatever monies Fifth Third ultimately contributes as the Fifth Third Estate Settlement Monies.Fund and the Fifth Third Claim Settlement Fund.  PLEASE NOTE that payments received from the Fifth Third Claim Settlement MoniesFund by creditors who opt inOpt In will not reduce the amounts of their claims for purposes of calculating their percentage payment from the Recovery Fund. This mechanism ensures that creditors who opt inOpt In receive full consideration for their settlement and release of their claims against Fifth Third. However, any creditor, including Fifth Third, that receives payments on its claim from a third party source – for example, any creditor who receives payment from ELC's bond, the funds seized by the United StatesU.S. Attorney if such fund is not administered by the Trustee cooperatively with the US Attorney (the Gibson bank accounts), restitution monies from the settlement of criminal charges against officers of ELC, or lawsuits against third parties —will have their total claim reduced by the amount of any such payment.

Because the Trustee is not familiar with the circumstances of any creditor's particular potential claim against Fifth Third, the Trustee is not in a position to advise any general unsecured creditor as to the value of any claim that such creditor may hold against Fifth Third and thus assist the creditor in deciding whether to Opt In and release any such claim in exchange for an additional payment from Fifth Third.  The Trustee has set forth in this Disclosure Statement his analysis of the Estate's claims against Fifth Third and has determined that the value of the settlement offered by Fifth Third in actual dollars and certainty is more than the value of

prosecuting the Estate's claims against Fifth Third factoring in the costs, the time, and the risks of litigating. The Trustee will make available the information he has accumulated during this Chapter 11 Case that is held in the secure litigation database to creditors, but such availability will be subject to the orders entered by the Court as to the confidentiality of the information and access.

The goal of the Plan is to distribute as much money to creditors as quickly as reasonably feasible.  The Trustee has provided in the Plan initial estimates of the dollar amounts of all valid creditor claims, the deficiency claim of Fifth Third, and the expected monies in each of the Collateral Fund and the Recovery Fund.  The Plan establishes an appropriate reserve in each fund to limit estimation errors and to allow for periodic true-ups of distributed amounts.

Procedurally, the calculation and distribution of payments under the Plan will be as follows~~follows~~folllows:

1.      The Trustee will file a notice with the Bankruptcy Court identifying the total amount of opt in claims and the total amount of unsecured claims that did not opt in.  This report will also identify those claims that the Trustee has initially determined will be allowed and those claims ~~that~~to which the Trustee might or will object ~~to~~.  Finally, the report will project the amounts in each of the Collateral Fund and Recovery Fund (after reserving for estimation and administrative costs) that are available for distribution.  The Trustee will also make ~~"Initial Estimates"~~initial estimates of the dollar amounts of various components of the formulas used to calculate amounts of interim distributions.

2.      On or before the last business day of the month following the end of each calendar quarter, the Trustee will file a notice with the Court detailing the amount and source of any new asset recovery, the proposed fund (Collateral or Recovery) the money will be allocated

17

to, the incurred administrative expenses and the surcharge percentage against each fund, the revised totals of opt in and opt out claims following objections and/or allowances, and the proposed distribution, if any, to creditors, including to Fifth Third.  These quarterly reports will "true-up" any prior estimates based on the allowance of claims or the settlement of litigation.

3.      At the conclusion of the Chapter 11 Case, the Trustee will make a final report and a final "true-up" of distributions to all creditors from both funds.

4.      Administrative costs of the ~~estate~~Estate, including professional fees and costs, will no longer be required to be reported or assessed under the "may-do", "must-do" categories of the Financing Order and will be paid quarterly in the ordinary course, however, all professional fees and costs will remain subject to objection and will continue to be reported and requested on periodic fee applications filed with the Court.

Initial estimates of the potential ~~recovery~~recoveries to creditors under the proposed Plan are as follows (assuming all reserves have been released and all disputes resolved in favor of the estate for distribution to all creditors~~)~~.).  Please note the Trustee has conservatively estimated certain litigation recoveries.  At the time of filing this Amended Disclosure Statement, these estimates take into consideration the proposed settlements the Trustee has pending with Superior and First Bank.

| Sources of Asset Recovery | Other Information | Collateral Fund | Recovery Fund |
|---|---|---|---|
| Assets Collected through May 30, 2012 | | ~~$~~ $    16,546,710 | $            86,331 |
| Estimated assets to be collected through litigation and settlement | | ~~$        10,760,000~~ $ 11,121,750 | |
| Preference recoveries net of contingency costs | | | $      3,~~800~~000,000 |
| Seized bank account of Tommy Gibson | | | $      4,~~700~~000,000 |
| Other estimated non-collateral settlements | | | $           350,000 |
| Repayment of Trustee Loan | | | $      (2,000,000) |

18

| | | | |
|---|---|---|---|
| Operating Expenses Paid - receivership | | $ (240,546) | |
| Professional Fees Paid - receivership | | $ (632,841) | |
| Operating Expenses Paid - chapter 11 | | $ (733,744) | |
| Professional Fees Paid - chapter 11 (carve-out only, the remaining fees are in the trustee loan repayment taken against the recovery fund) | | $ (1,106,450) | |
| **TOTALS** | | $ 24,~~593,129~~**954,879** | $ ~~6,936~~**5,436,331** |
| Estimated ~~Recovery Expenses~~administrative surcharge | | $ (4,~~797,029~~**516,169**) | $ ~~(1,352,971~~**(983,831)** |
| Adjusted ~~Totals~~TOTALS | | $ ~~19,796,100~~**20,438,710** | $ ~~5,583,360~~**4,452,500** |

| ~~Estimated Claims and Recoveries~~ | ~~Other Information~~ | ~~Collateral Fund~~ | ~~Recovery Fund~~ |
|---|---|---|---|
| ~~Fifth Third Allowed Claim~~ | ~~$ 35,833,415~~ | ~~-~~ | |
| ~~Fifth Third Secured Claim (includes $2 million Trustee Loan repayment)~~ | ~~$ 26,593,129~~ | ~~-~~ | |
| ~~Fifth Third Deficiency Claim~~ | ~~$ 9,240,286~~ | ~~-~~ | |
| ~~Estimated Total Other Unsecured Claims~~ | | | ~~$ 19,933,000~~ |
| ~~Estimated Opt In Claims~~ | ~~0.7~~ | ~~$ 13,953,100~~ | ~~-~~ |
| ~~Settlement Fund (70% of 20%)~~ | | ~~$ 3,443,038.1~~ | ~~-~~ |
| ~~Estimated Cents Per Dollar Recovery before administrative costs~~ | | ~~$ 0.25~~ | ~~$ 0.24~~ |
| ~~Estimated Cents Per Dollar Recovery after administrative costs.~~ | | ~~$ 0.20~~ | ~~$ 0.19~~ |
| ~~-~~ | ~~-~~ | ~~-~~ | ~~-~~ |

| **ESTIMATED CLAIMS AND RECOVERIES** | **Other Information** | **Collateral Fund** | **Recovery Fund** |
|---|---|---|---|
| Fifth Third Allowed Claim | $35,833,415 | | |
| Fifth Third Secured Claim | $27,668,460 | | - |
| Fifth Third Deficiency Claim | $ 8,164,955 | | - |
| Estimated Total Other Unsecured Claims | | | $18,246,750 |
| Estimated Opt-In Claims | 0.7 | $ 12,772,725 | - |
| Settlement Payment for Estate Claims (10%) | | $ 2,043,871 | - |
| Settlement Payment Opt In Claims (70% of 10%) | | $ 1,430,710 | - |
| Estimated Cents Per Dollar Recovery after administrative costs - Estate Claim Release | | $ 0.08 | - |
| Estimated Cents Per Dollar Recovery after administrative costs - Opt In Claim Release | | $ 0.11 | - |

19

| Estimated Recovery Fund Recovery - All  unsecured claims after administrative costs | | | $          0.17 |
|---|---|---|---|

As shown above, the Trustee projects and estimates a recovery by an ~~opt in~~Opt In creditor of approximately $0.~~39~~36 on each $1 of allowed unsecured claim and for an opt out creditor of about $0.~~19~~25 for each $1 of allowed unsecured claim.  The actual recoveries could vary materially depending upon a variety of circumstances affecting the Trustee's assumptions and projections, and the course of litigation.

### III.     BACKGROUND

**A.     The Business**

ELC was started by Thomas P. Gibson ("Tommy") and John Gibson in 1982.  Originally organized as a "C" corporation, ELC was reorganized as an Indiana limited liability company in 2000.  John Gibson died in 2006.  On the Petition Date, Tommy held 61% of the membership interests in ELC, the Thomas P. Gibson Generation Skipping Trust held 34.86% of the membership interests in ELC, and Patsy Gibson (Tommy's wife) held 4.14% of the membership interests in ELC.  Tommy was the Chief Executive Officer of ELC.  The beneficiaries of the Thomas P. Gibson Generation Skipping Trust are four children, eleven grandchildren, and one great grandchild of Thomas and Patsy Gibson.  Grant Gibson and Scott Gibson are sons of Tommy and Patsy and were involved in the business.

ELC was engaged primarily in buying and selling cattle for its own account and was registered as a dealer[11] with the Grain Inspection Packers & Stockyards Administration

---

[11]   Certain parties in interest have asserted that ELC was also a "Market Agency" under the PSA and contend that as a "Market Agency," ELC was required to maintain a custodial account and to hold the proceeds of a cattle sale in trust for the person that sold the cattle to ELC.   The Trustee has found no factual evidence that ELC was a Market Agency subject to maintaining a custodial account or holding the proceeds of cattle sales in trust for

*Footnote continued on next page . . .*

20

("GIPSA"), a division of the United States Department of Agriculture and the department that regulates and enforces the laws and regulations under the Packers & Stockyards Act of 1921 (as amended, the "PSA").  As a dealer under PSA, ELC was required to post a bond (the "Bond") for the benefit of parties from whom ~~it~~ELC purchased cattle to protect ~~them~~sellers against non-payment.  On the Petition Date, the Bond amount required by GIPSA and posted by ELC was $875,000.  Approximately $36 million of claims have been asserted against the Bond ~~($19 million of which is claimed by one claimant — Superior).~~.  The Trustee, in his separate capacity as "Bond Trustee," has filed an action in the United States District Court for the Southern District of Indiana to resolve the asserted claims against the Bond.

ELC also acted at times as a "clearing agent" for certain persons who were buying and selling cattle but were not themselves registered as dealers.  ELC listed on its Bond application those parties (known as "Clearees") for which ~~it~~ELC might clear transactions with GIPSA.  These Clearees for the most part were also buyers of cattle for ELC.  They placed orders to buy and sell cattle for ELC's account as well as potentially for their own accounts.  As a clearing agent, ELC would issue a check drawn on ELC's account to pay for ~~the~~ cattle bought by a Clearee and issue an invoice on ELC's own invoice forms for cattle sold by a Clearee.  For its services as a clearing agent, ELC would receive various fees that would be deducted from the sales proceeds when received.

---

cattle sellers.  The complaint filed by the USDA against ELC states that ELC was a dealer and a "clearee".  *See* "Exhibit 3" attached, *USDA v. Eastern Livestock, LLC,* P&S ~~Docket~~Dock. No. D-11-0062, United States Dept. of Agriculture.  The CEO of the Bluegrass Entities wrote an entire article about ELC and its bankruptcy in which he cautioned cattle sellers to sell through auction houses, like his company, rather than directly to dealers, like ELC, specifically because, as a dealer, ELC was not required to hold cattle sales proceeds in trust as were the Bluegrass Entities. *See* "Exhibit 4" attached.  Documents produced by Fifth Third during discovery include opinion statements by Fifth Third employees and consultants expressing concerns about ELC being subject to trust requirements, but these opinion statements are not supported by any facts the Trustee has yet found.

21

ELC's business of buying and selling cattle was conducted both from its main office and through its eighteen branches located in twelve states.[12]  These branches were not analogous to divisions within a single company, but operated more like associated parties with ELC in that the branch managers would also buy and sell cattle for their own accounts, in addition to buying and selling for ELC.  Tommy Gibson also bought and sold for his own account and owned (or operated) companies that ~~were~~ also ~~buying~~bought and ~~selling~~sold cattle.  In many instances, the cattle in these transactions were also run through ELC. Tommy Gibson had his own line of credit with First Bank to finance his buying and selling of cattle.

The cattle bought and sold by ELC were located ~~in~~on ranches and farms throughout the country, where calves ~~are~~were born and raised up to a certain age at which time they might begin a journey that involved multiple transfers of ownership and multiple transfers of location until finally being sold to a packer for slaughter and delivery to the consumer/retail markets.  The aggregation of these small and large lots of cattle through a process from calf to meat has given rise to an industry with certain partially defined roles.  There are the cattle growers who maintain the cows that produce the calves.  There are dealers (like ELC) that buy the calves and other cattle somewhere on their journey to the packers and then re-sell the cattle (perhaps after sorting them into like lots) to feedlots that may specialize in certain types or life stages of cattle or to growers who pasture the cattle until they reach a certain size and weight to continue the journey.  Then there are the feedlots that may sell to other feedlots for finishing the cattle or sell directly to the packers.  A party wanting to sell cattle might sell directly to a dealer, like ELC, or it might use an intermediary such as a livestock auction house and sell to dealers, like ELC, at ~~the~~an

---

[12]  *See* "Exhibit 5" for a listing of the branches and branch managers.

BDDB01 9526463v1

auction.  The multiple purchases and sales of single animals pervasive in the live cattle industry, the high volume/low margin that characterized the business, and the short lives of the cattle from birth to slaughter, provided a fertile ground for the kinds of wrongful conduct engaged in by the principals of ELC.

ELC bought both from individual cattle sellers and from livestock auction houses and sold to individuals (including its branch managers and principals) and to feedlots.  ELC did not sell to packing houses.  ELC arranged for trucking cattle it bought to ELC's buyers' premises, but rarely took physical possession of cattle.  Most of the cattle purchased were identified for sale to a buyer on the same day that ELC purchased the cattle.  The cattle that ELC sold were either immediately delivered to ELC's buyer or remained at the seller's premises until they were delivered to ELC's buyer.  In most instances, ELC had two contracts with respect to particular cattle – one to buy and one to sell. When a sale was closed, but the delivery was later, ELC would often, but not always, pay "down money" to the seller and receive "down money" from its buyer, with the final payment to the seller and the final receipt of monies from the buyer to be completed when the cattle were delivered.

In a few instances, ELC entered into a sort of "equity" arrangement, where the cattle bought by ELC would be sent to a feedlot or a pasturing operation, with ELC and the feedlot/pasture operator both owning the expected proceeds less the costs charged by the feedlot/pasture operator.  In the final years of ELC's business, ELC and certain of its branch managers appeared to use these kinds of arrangements to inflate ELC's assets as reported on its borrowing base certificates.  A variation of this kind of transaction was to "double finance" the cattle by ELC financing the purchase through its line of credit with Fifth Third and then having the branch manager or one of ELC's affiliated companies finance the same cattle.  Sometimes,

23

the cattle purchase transactions that were subject to either of these kinds of treatment (before any payment was received from other bank or the feedlot/pasture operator) would be simply "credited off" the books of ELC and placed in the branch manager's separate inventory. Once that occurred, the same cattle could be "re-used" for similar transactions numerous times until either the other bank loan came due, the feedyard finished feeding the cattle, or the receivable became ineligible for inclusion on ELC's borrowing base. In each turn of the same cattle, the invoices would be changed just enough so that tracing the cattle was very difficult.

The Trustee has identified certain of ELC's branch managers and branches that appear to have been involved in transactions or activities that adversely affected ELC. Grant Gibson (Tommy Gibson's son) manager of Branch 31 has pled guilty to participation in the fraud. Gary Seals and Willie Downs (the Trustee filed an adversary proceeding against Mr. Downs and has settled with Mr. Seals), appear to have been involved in diverting customer deposits to the payment of preferred creditors and potentially participating in the check kiting. The Trustee has also filed suit against Ed Edens, manager of Branch 24, and continues to investigate other ELC branch managers.

While the Trustee is still investigating and determining the extent of related parties and related party transactions, the summary below is what is known or believed at this time.

- Eastern Cattle Co., LLC ("Eastern Cattle") was organized as a limited liability company in 2003 for the purpose of owning and feeding long term cattle. Tommy Gibson held two-thirds of the membership units of Eastern Cattle and the remaining one-third was owned by the Irrevocable Generation Skipping Trust. Eastern Cattle had a line of credit with Intrust Bank, N.A. which matured and was reduced to a note. Cattle of Eastern Cattle were held in Kansas, Colorado, Oklahoma and Texas.

- Tommy Gibson had a line of credit with First Bank for the purpose of buying cattle for holding for an intermediate period of 30 to 180 days and then selling. With First Bank's full knowledge, Tommy Gibson used ELC for his personal sales and purchases. In a typical transaction, Tommy Gibson would have ELC purchase certain cattle and then sell

24

the cattle to him.  He would finance his purchase of the cattle from ELC though First Bank and then sell the cattle back to ELC once they had finished their pasturing.  ELC would then sell the cattle to one of its buyers and pay Tommy Gibson making funds available that could have been used to pay his loan at First Bank.  The Trustee is continuing to investigate situations where ELC paid for cattle it bought from Tommy Gibson, but did not get paid and the ELC estate has asserted a multi-million dollar claim in Tommy Gibson's bankruptcy case.

- Okie Farms, LLC ("Okie") was owned 100% by ELC.  Okie owned 47.92425% of Cattlemen's Feedlot, Ltd. ("Cattlemens").  Cattlemens was involved in a transaction with EW Trucking (see below) related to cattle bought by ELC and sold to EW Trucking with the purchase by EW Trucking financed by Cattlemens.  This transaction was the subject of litigation in the EW Trucking bankruptcy case.  Under a settlement approved by the Court with Cattlemens and EW Trucking, ELC's interest in Okie was sold for $3 million and those monies are now in ELC's estate.

- Culleoka Stockyards ("Culleoka") is a partnership owned 33.3% by Tommy Gibson, 16.7% by John Gibson (Tommy's son) and 50% by Vernon Inman. Culleoka owns (or owned) a sorting facility and realty in Culleoka, Tennessee.  Culleoka was Branch 4 of ELC.

- West Kentucky Livestock Market, LLC ("West Kentucky") is a Kentucky limited liability company owned 66.7% by Tommy Gibson and 33.3% by Grant Gibson (Tommy's son).  West Kentucky owns and operates a stockyard in Marion, Kentucky that was leased to ELC.

- Edmonton Cattle Co., LLC is a Kentucky limited liability company that owns and operates a stockyard in Edmonton, Kentucky which was leased to ELC for $1.00 per head.  Edmonton is owned 16.7% by Tommy Gibson, 50% by Grant Gibson, and 33% by the Tommy P. Gibson Generation Skipping Trust.  Edmonton operated as Branch 13 of ELC.

- EW Trucking is an Indiana limited liability company owned 100% by Tommy Gibson that was organized to own and operate livestock trailers and transport cattle primarily for ELC.  EW Trucking is in chapter 7 bankruptcy and its assets have been liquidated.  First Bank & Trust was EW Trucking's lender.

- Bluegrass Stockyards LLC ("Bluegrass") is a Kentucky limited liability company that operates six stockyards and buying stations in Kentucky.  Tommy Gibson owned 8.33% of the membership interests in Bluegrass.  The trustee of Tommy's bankruptcy estate sold Tommy's interest in Bluegrass back to Bluegrass.

- Rocking E Feeders, LLC ("Rocking E") is a Kansas limited liability company in Ulysses, Kansas that was owned 2/3 by Tommy Gibson and 1/3 by the Thomas P. Gibson Irrevocable Generation Skipping Trust.  Rocking E had lines of credit and notes with

Intrust Bank, N.A. that were personally guaranteed by Tommy Gibson. Rocking E may have been sold and the circumstances are being investigated.

- Crow Hollow, LLC ("Crow Hollow") is a Texas limited liability company that operates a feed yard in Hedley, Texas that was owned 2/3 by Tommy Gibson and 1/3 by John Gibson and financed by Intrust Bank, N.A. Crow Hollow was sold to Cattlemen's Feedlot in 2007.

- Gibson Farms, LLC ("Gibson Farms") is a Kentucky limited liability company that owns and operates a cattle facility in Providence, Kentucky. Gibson Farms is owned 100% by the John S. Gibson Living Trust (as corrected from the Trustee's initial reporting by Deitz, Shields and Freeburger, LLP).

- Taylor County Stockyards, LLC ("Taylor") is a Kentucky limited liability company that owns and operates a stockyard in Campbellsville, Kentucky originally owned 100% by Tommy Gibson. The assets of Taylor were sold to Bluegrass Stockyards of Campbellsville, LLC in 2007.

- TPG Cattle is a DBA designation of Tommy Gibson under which he bought and sold cattle usually through ELC's books and bank accounts.

## B.    The Financing

ELC's bank financing was provided by Fifth Third under a revolving line of credit (the "Revolver").[13] The original loan was documented in 2004 and had a maximum borrowing limit of $22.5 million. The loan was amended and extended many times. In February of 2005, Wells Fargo Business Credit, Inc. ("Wells Fargo") purchased a $10 million participation in the Revolver and the borrowing limit increased to $32.5 million. The final extension on the Revolver expired on October 18, 2010.

Loan availability under the Revolver was determined under a borrowing base formula calculated as a percentage of ELC's eligible receivables and inventory. ELC usually operated

---

[13] All of the loan documents related to Fifth Third's financing of ELC's operations are collected and available in a database maintained by the Trustee. Parties in interest in the Chapter 11 Case who have signed the Court approved confidentiality and use agreement have full access to these documents as well as other documents produced during the various litigation matters in this Chapter 11 Case. For access to the database, please contact Harmony Mappes, litigation counsel to the Trustee at harmony.mappes@faegrebd.com.

with the Revolver fully drawn, meaning that ELC had to maintain a certain level of collateral (receivables and cattle) to support being able to use the full $32.5 million.  ELC was limited by the borrowing base as to the number of cattle that could be in its "inventory" – that is purchased, but not yet sold.  ELC's desire (or necessity in order to stay ahead of the kite) to hold greater levels of inventory appears to have caused ELC to utilize off-balance sheet transactions with related parties or branches to transfer inventory and finance purchases using the related party's separate banking relationship or alternatively to finance cattle purchases under an "equity" split transaction where the cattle were recorded as a receivable on ELC's books, but were in fact owned by ELC.  The Trustee continues investigating the entities that cooperated with ELC in these kinds of transactions to determine if Estate assets were taken or are being held by the entities.  Reconciling ELC's cattle inventory and receivables has been affected by these off-book transactions and the Trustee continues to identify cattle and their proceeds that may have been converted by parties that assisted ELC in these transactions.  The Trustee is also investigating whether these entities may have assisted or aided, wittingly or unwittingly, in ELC's fraud.

Under the Revolver, ELC's access to the loan funds was controlled by the use of integrated deposit and controlled disbursement accounts.  All of ELC's revenues from selling cattle were deposited into its collection account at Fifth Third.  These monies were then transferred to a funding account and applied against the Revolver, pursuant to the current borrowing base limits, with the excess transferred to a disbursement account to cover checks ELC would write to pay for its cattle purchases and operating expenses.  ELC had an additional disbursement account established to cover "field checks" that ELC gave its branch managers to allow them to write checks in the field for cattle purchases.

ELC's business required significant liquidity as it depended on a high volume of transactions with small profit margins.  During the summer and fall of 2010, ELC conducted between $10 million and $20 million of average daily check transactions.  ELC's lending relationship with Fifth Third customarily included Fifth Third giving ELC "provisional" credit for the cattle payment checks ELC deposited in the collection account.  When a check is deposited in a bank, it may take a few days before the bank that has the check receives the money from the bank on which the check is drawn.  In the meantime, the bank that is waiting for the funds may allow its customer to use some of the anticipated check proceeds by writing checks against the not-yet-collected deposit.  If the check deposit is ultimately not paid, the depository bank may revoke this provisional credit by returning checks written against the uncollected deposit.

## C.    The Kiting and the Shut Down

No one is quite sure what caused ELC to start fabricating false cattle purchases and sales, complete with checks flying between banks supposedly for these false purchases or sales.  It may be that in such a high volume, low margin business it does not take many days of making too many losing purchases and sales to get behind.  Various inquiries, legal and otherwise, into ELC's business indicate that ELC may have begun the fraudulent portion of its business in 2009.  The Metcalf County, Kentucky indictment[14] filed by the Kentucky Attorney General, asserts that ELC's check kiting scheme traces back to 2004.  In a reported Eighth Circuit decision dating from 1975[15] (and describing activities that occurred as early as 1969), a party named "Tom

---

[14]   See Trustee's blog: www.easternlivestockbkinfo.com.

[15]   *First National Bank of Sikeston v. Transamerica Company*, 514 F.2d 981 (8th Cir. 1975).

BDDB01 9526463v1

Gibson"[16], part owner of a company named Gibson Cattle, engaged in activity that involved kiting checks between two banks and encouraging a third bank to give immediate credit on deposited but yet uncollected funds supported by the kite.  In September 2009 (ELC's fiscal year ended in September) ELC's annual revenues were reported as $1.3 billion.  One year later, in September 2010, its revenues were $3.9 billion.  The $2.6 billion increase can be traced to $1.8 billion in kited checks and most of the rest to fake cattle purchases and sales by cooperative third parties and affiliates.  ELC had historically averaged about $1 billion in annual revenues.

ELC perpetrated three types of fraud in its lending relationship with Fifth Third.  First, it falsified its cattle receivable balance by inventing purchases and sales of cattle among its affiliates (including its branches and principals) making it appear that ELC had a higher receivable balance than it actually did.  Second, ELC deposited and wrote checks for these phony purchases and sales taking advantage of the collection "float" time between banks and Fifth Third's practice of giving provisional credits on ELC's deposits to generate immediate cash to cover its actual cattle purchases.  Finally, ELC reported certain transactions as sales (with an accompanying receivable reported on its borrowing base), when in fact the cattle were transferred to a cooperating entity who then financed the cattle through its own lender.

When the Revolver matured for the last time on October 18, 2010, the ELC banking arrangements at Fifth Third were changed.  Prior to the maturity, ELC had asked Fifth Third to renew the Revolver and increase the loan by $10 million to bring the total loan up to $42.5 million.  While these negotiations were going on, Fifth Third allowed ELC to use the monies ELC deposited from its "customers" in the collection account to pay cattle sellers and ELC's

---

[16]    Thomas Parrish Gibson, the principal of Eastern Livestock was born in 1940.

operating expenses as long as the amount of collateral ELC was reporting on the borrowing base certificates supported the fully drawn maximum borrowing of $32.5 million.[17]  During these loan extension negotiations, Fifth Third did not apply the monies deposited by ELC to pay down the Revolver even though it had matured.  Fifth Third also continued to give provisional credit to ELC on the deposits, allowing ELC to "use" the monies deposited in the collateral account before Fifth Third actually collected the funds from purported cattle buyers' banks.

Fifth Third stopped allowing ELC to use the monies deposited in the collateral account on November 2, 2010.  Fifth Third's employee, Tim Spurlock, has testified that he notified ELC of the account freeze on the morning of November 3, 2010 and instructed ELC to not write any more checks on its account.[18]  On November 5, Spurlock set up a meeting with the officers of ELC for the following Monday, November 8, 2010.  On that Monday, however, ELC refused to allow Fifth Third's representatives to meet with them or to review ELC's records.  The following day, November 9, 2010, Fifth Third filed a lawsuit against ELC in Ohio and requested the immediate appointment of a receiver over ELC's business and operations (the "Receivership Action").  Elizabeth Lynch was appointed as receiver ("Receiver") on November 9, 2010 and took over ELC's assets the next day, November 10, 2010.

When the hold was placed on ELC's accounts and Fifth Third began returning checks, 124 checks totaling $54,658,888 payable to Tommy Gibson and Grant Gibson (as part of the kite) were returned.  An additional 22 checks payable to Ed Edens, Gary Seals, and Willie

---

[17]  Beginning in October 2010, ELC began depositing checks from Tommy Gibson and GP Cattle directly into the operating account.

[18]  Mr. Spurlock in an earlier deposition conducted by First Bank in the Receivership Action testified that he notified ELC on November 5, 2010.  In his subsequent 2004 examination by the Trustee he stated he notified ELC on November 3, 2010.

Downs (all branch managers and implicated in the fake cattle invoicing and kiting activity) totaling $3,158,736 were also returned.  Checks returned that were owed for what appeared to be real cattle transactions totaled $28,752,965 ~~of which $8,957,675 were checks written to Superior~~.[19]  Fifth Third returned these checks marked "Refer to Maker" and later "Non-Sufficient Funds."

About $53.6 million of deposits against which Fifth Third had granted provisional credits were later dishonored and returned unpaid to Fifth Third by drawee banks, like YCB.  This $53.6 million was roughly the volume of kiting activity going on at ELC.[20]  In addition, certain real deposits for actual cattle sales were revoked by the cattle purchasers stopping payment.  Of the $21,526,374.00 in deposits from cattle sales deposited by ELC in the Fifth Third collateral account following the freeze of ELC's accounts on November 2, 2010, cattle purchasers stopped payment on $4,222,749.00, resulting in $17,303,625.00 deposited from cattle sales and applied to ELC's outstanding obligations to Fifth Third.

By dishonoring and returning checks ELC wrote, Fifth Third effectively ~~withdrew~~refused to provide provisional credits ~~it had granted~~ to ELC on account of certain kite checks deposited during the period October 29, 2010 to November 2, 2010.  Fifth Third's records suggest that it had initially believed that it was going to have kite debt exposure of in excess of $13 million.  However as ELC briefly continued to make deposits of cash collateral receipts and Fifth Third dishonored and returned checks, the loss with respect to kite debt ultimately was reduced to

---

[19]   Certain reports put out by USDA and picked up in other publications have reported that some $130 million worth of checks written by ELC were returned to sellers, giving the impression that $130 million of value was removed from the live cattle industry.  In the confusion of those first days when ELC was shut down, it is understandable that numbers might be inflated.  $29 million is bad enough, but the lower number is an indication of why the whole industry did not come tumbling down when ELC failed.

[20]   Daily kiting activity approximated $19.9 million.

31

$2,728,493.48. Fifth Third reduced the amount of kite debt by applying funds representing Fifth Third's cash collateral deposited from and after November 1 to the kite debt instead of to the Revolver Debt. The net effect of applying the deposited proceeds of cattle sales in the Collateral Account, cattle buyers stopping payment on deposited checks, the return by Fifth Third of kite checks and payment checks resulted in a total outstanding loan obligation (including interest and fees) by ELC to Fifth Third of $35.834 million.

**D.     The Chapter 11 Case**

Some thirty (30) days after the Receiver took over, ~~Superior and 14 others, all represented by one law firm,~~certain creditors filed an involuntary chapter 11 bankruptcy petition on December 6, 2010. The Trustee was appointed and assumed his duties on December 27, 2010.

The Receiver's company ("DSI") was subsequently approved to serve as the financial advisor to the Trustee. By the time the Trustee assumed his duties, ELC had ceased business operations and the management of ELC had been removed. Thomas and Patsy Gibson filed their own joint bankruptcy petition under chapter 7 of the Bankruptcy Code on December 1, 2010. East-West Trucking Co., LLC ("EW Trucking"), a related entity to ELC also filed a bankruptcy petition under chapter 7 of the Bankruptcy Code on November 23, 2010. Both cases remain pending.

Immediately after the filing of the involuntary petition for relief, the petitioning creditors and Elizabeth Lynch sought and obtained orders from the Court ~~i~~(1) authorizing Ms. Lynch to administer the Estate and continue cattle sales pending the appointment of a Trustee and ~~ii~~(2) prohibiting ELC's management and owners from exercising any rights with respect to ELC's property. [*See* Dock. Nos. 11, 14, 15, 27 and 52.]

32

After his appointment, the Trustee was faced with the difficult task of analyzing and learning ELC's business operations, assets and liabilities without the help of necessary books and records and while at the same time ELC's cattle inventory and contracts required immediate action. Accordingly, the Trustee filed a series of motions asking for authority to complete sales of ELC's cattle inventory, collect proceeds, and settle Debtor's contracts regarding the purchase and sale of cattle. [*See* Dock. Nos. 133, 141 and 143.] These motions were granted by the Court [*See* Dock. Nos. 133, 233 and 234] and the Trustee began trying to collect proceeds of various cattle and sales.

At the same time, the Trustee faced several stay relief motions filed by parties in interest. Many of the stay relief motions sought relief from the automatic stay to continue interpleader actions that had been commenced in various jurisdictions around the country with regard to proceeds of ELC's prepetition cattle sales. Other stay relief motions sought stay relief to continue the sales of Debtor's cattle inventory and/or foreclose on real estate owned by ELC. The Trustee successfully preserved the Estate's rights to these various assets, worked out a beneficial lease of Debtor's headquarters, transferred all of the interpleader actions to this Court, and is now litigating the Estate's rights to the proceeds involved in those actions.

Faegre Baker Daniels, LLP was approved as counsel to the Trustee by order entered by the Court on February 1, 2011 [Dock No. 248]. Hoover Hull, LLP and Kroger, Gardis & Regas, LLP were approved as special counsel to the Trustee by orders entered by the Court on February 10, 2011 [Dock. No. 267] and March 13, 2012 [Dock. No. 1084], respectively.

The Trustee has obtained authority from the Court to employ Phillip L. Kunkel as a special mediator in the Chapter 11 Case to mediate and assist in the resolution of certain claims by and between the Estate and Other Creditors. [*See* Dock. No. 968.] The Court also approved

33

the appointment of Robert Fishman as a mediator with respect to mediation among the Trustee and various parties on September 24, 2012 [*See* Dock. No.1438].

**E.      Financing Order**

On March 18, 2011, following a contested hearing and negotiation among the Trustee and those objecting, the Court entered the negotiated Final Order (I) Approving Chapter 11 Trustee Financing; (II) Authorizing Use of Cash Collateral and Obtaining Credit Pursuant to Sections 361, 363 and 364 of the Bankruptcy Code; (III) Modifying the Automatic Stay; (IV) Providing Adequate Protection; and (V) Sealing Certain Documents [~~Docket~~Dock. No. 400] ('Financing Order").

Pursuant to the Financing Order, Fifth Third's ~~Claim in the case~~Allowed Claim in the case was determined to be $35,833,415.00 (including interest and attorneys' fees).  The Fifth Third Allowed Claim was allowed as a secured claim to the extent of the value of its collateral and as an unsecured claim to the extent its claim exceeded the value of its collateral.  The Financing Order did not waive claims or rights the Trustee or any other party may have against Fifth Third and Fifth Third retained all of its rights, claims, and defenses.

The Financing Order provided for funds to administer the ELC estate, from a "carve-out" of $2 million from the liens in ELC property held by Fifth Third and a loan by Fifth Third to the Trustee of up to $2 million which would be paid back from assets that were not subject to a security interest of Fifth Third.  Virtually the full $4 million in carve-out and loan funds have been expended in the administration of the ELC estate and there is an estimated additional $4 million in operating costs, litigation expenses, and professional fees incurred and outstanding.

BDDB01 9526463v1

The Financing Order also recognized that the budgets required under the financing with Fifth Third would contain estimates of potential litigation recoveries and were therefore shielded from any discovery absent further order of the Court.

## IV.    ADMINISTRATION OF THE ESTATE

### A.    Asset Recovery and Liquidation

The Estate has the following types of assets that could be available for liquidation and distribution to the holders of Allowed Claims against the Estate:

- cash;

- contracts for the purchase of cattle for which ELC had paid "down" money;

- contracts for the sale of cattle for which ELC may have received "down" money;

- cattle in "inventory" that had been paid for and sold to a buyer but for which ELC had not yet received payment;

- cattle delivered to a buyer for which ELC had not yet been paid;

- real property;

- ownership interests in other entities;

- stock and memberships in dividend type organizations;

- off-balance sheet transactions with related parties;

- promissory notes to related parties and others; and

- preference and fraudulent transfer recoveries.

Having identified the types of assets that should be available for liquidating, the actual task of accomplishing the liquidation has been complicated by several factors, some of which are outlined here and others still being discovered.  First, ELC's business was primarily conducted on paper invoices, written notations from phone calls and facsimile transmittal.  ELC's two story

BDDB01 9526463v1

building was packed full of shelves and boxes of paper records and though the Trustee had the services of some of ELC's former employees, management was gone and it appeared that so were some of the records.  Second, it appears that Tommy Gibson realized at least as early as November 2010 that ELC's bank accounts were going to be shut down.  He either directed (and/or acquiesced to the direction of others) a series of actions that resulted in customer payments received by ELC being diverted, some of which was used to pay preferred vendors; erased recorded cattle purchases and cattle sales from ELC's books; alerted certain vendors to come and pick up cattle from locations where they had already been delivered; and purportedly assigned millions of dollars of ELC's valuable contracts to other parties.  Third, the fake invoices for cattle sales and cattle purchases that had been created as a paper trail to support the kiting activity and to further support the borrowing base were recorded on the books as if such purchases and sales had in fact taken place, thereby inflating the accounts receivable and the cattle inventory.  Fourth, because ELC dealt in live animals, cattle under contract or that had been purchased and were ready to be sold or hauled to the buyer needed immediate attention so as not to lose the value to the estate.  Fifth, the "equity" transactions that ELC had entered into with other parties, such as EW Trucking, in order to finance cattle purchases, were off book transactions and difficult to find except by the absence of matching information for buy/sell transactions.  Sixth, it appears that some of the branch records had their own reconciliation problems that appear to have nothing to do with ELC's actions, but were in fact mini-frauds on ELC.  Finally, the regular use of ELC's accounts to host the personal cattle buying and selling of Tommy Gibson and certain of the branch managers resulted in paper trails leading to nowhere.

During this time of turmoil, certain customers and trade partners of ELC were taking their own actions.  The Trustee continues to uncover records evidencing that some parties

36

engaged in self-help by moving cattle from locations where they were supposed to be according to ELC's records, still others attempted to reduce their liabilities to ELC by reporting a high percentage of dead cattle in lots ELC had paid for or held contract rights while others took over ELC's contracts, soliciting payment to themselves from parties who owed ELC. In those instances where Tommy Gibson or others had erased such transactions from ELC's records, the Trustee has only been able to determine that a transaction had existed and a payment or asset was diverted. The true extent of those kinds of actions (diversion of payments and/or cattle) may never be known; however, discovery and investigations remain under way.

As a result of the Trustee's investigations, he has recovered certain assets for ELC's estate and is engaged in litigation with parties whom the Trustee believes diverted or converted property of ELC's estate and to claim property of the estate that has been interpled by certain parties in legal actions that have been transferred to the Bankruptcy Court.

### 1.    ELC's Cash and Accounts

On the Petition Date, ELC had no cash and a significant negative balance in its accounts at Fifth Third.

### 2.    ELC's Contracts for Cattle Purchases and Sales

On the Petition Date, ELC's records indicated that it had numerous contracts to purchase cattle that were matched with contracts to sell cattle with the net value to ELC of an estimated $1.6 million and for which ELC had already paid $528,170 in down money. The Trustee began efforts to recover this value for the estate by negotiating with the contract buyers and also marketing the contracts for sale. As part of this process the Trustee became aware that many more contracts that had been on ELC's books had purportedly been "assigned" by Tommy Gibson (purportedly acting for ELC) to ~~Superior Livestock Auction, Inc.,~~certain parties

BDDB01 9526463v1

including but not limited to Agri Beef Co., Stockman Oklahoma Livestock Marketing, Inc., and others and as part of those purported assignments, ELC's down money had been forfeited and the value of those contracts had been ~~taken~~realized by others.  In addition, parties to other contracts were reporting that there were no cattle, they did not have any paperwork on any contract, or the cattle had already been sold to someone else.  These clouds of doubt surrounding the ability of ELC to assume and assign any of the contracts (and thus bring value to the Estate's creditors) due to the actions taken by the contract parties caused the entities that had expressed an interest in purchasing the contracts to withdraw their interest.  The Trustee has subsequently learned of additional contracts that had purportedly been assigned or unilaterally cancelled with, in some instances, the forfeiture of large dollars in down money that ELC had paid.  The Trustee is preparing litigation to recover for the benefit of ELC's creditors as much value as he is able to from these "contract" parties.

The Trustee ~~is currently~~and Superior have reached a potential settlement, as described in this Disclosure Statement that will settle the current litigation with Superior ~~(discussed below) and has investigated other purported assignments of ELC's contract rights and additional actions are being prepared to recover the assets to~~as well as all claims that the ~~Estate for the benefit of creditors~~Trustee may have against Superior.

### 3.    ELC's Inventory of Cattle

DSI completed its final reconciliation of ELC's cattle inventory (subject to any ongoing discovery of new facts during litigation~~.~~).  That reconciliation reveals that ELC should have had about $11.6 million in real cattle inventory at the time ELC ceased business.  Cattle inventory represents cattle ~~for which~~that ELC had ~~paid~~purchased, but not yet sold or had not yet received payment for the sale of the cattle.  In most instances cattle were carried in inventory for 24 to 48

38

hours representing the time between the cutting of a check for payment to sellers and the invoicing of a sale to buyers.  However, in some cases, cattle were kept at some branches that had grow lots for short periods of time usually less than 45 days.  Of that $11.6 million in cattle inventory per ELC's records (including the branch records), DSI was able to locate or create invoices for only $4.2 million as part of the reconciliation of the accounts receivable.  While the cattle in the inventory are of course long gone, this reconciliation (as it may be amended) will allow the Trustee to further investigate those branch operators whose records indicate high levels of inventory unmatched by corresponding invoices to determine what happened to the cattle or the sales those cattle represented.  In some instances, the Trustee has already determined that branch managers directed ELC's buyers to pay ELC's sellers directly, thus at least removing both the down money and the potential profit from ELC's estate.  These "diverted payments" total at least $1.3 million not inclusive of certain settlements and not including the $5.6 million paid to Superior on ELC's contracts..  The Trustee also believes that cattle belonging to ELC were physically moved to other locations and as the Trustee concludes his investigations into the Branches, what happened to the cattle may become known.

The Trustee may file lawsuits against certain of the ELC branch managers to recover for the benefit of creditors of the ELC estate proceeds of ELC cattle.

### 4.    ELC's Accounts Receivable

DSI has similarly completed an analysis of ELC's accounts receivable as of the Petition Date.  The total of accounts receivable has been as of the date of this Disclosure Statement reconciled at $40,135,000.  Approximately $8.9 million of the receivables are part of the interpleader actions currently being litigated in the Bankruptcy Case where feed yards and others interplead monies owed to ELC when they were notified of competing claims.  A further portion

of the receivables are claimed by ~~Superior and~~ others as part of the supposed contract assignments.  The Trustee is currently litigating with some of the account debtors to recover these funds for ELC's creditors.

### 5. ELC's Real Property

ELC owned real property that served as its headquarters in New Albany, Indiana. Because the mortgage on the property exceeded its value, the property was abandoned from the Estate. ELC also owned other real property located in Harrison County, Indiana that was sold pursuant to the terms of a Court-approved settlement agreement with People Bank & Trust Company of Pickett County, the bank that held a first position mortgage lien on the property. The sale of the Harrison County, Indiana real estate netted $81,341.14 in proceeds for the Estate. [*See* Dock. No. 1146.]

### 6. ELC's Interests in Other Entities and Cattle Equity Transactions

The Trustee has sold ELC's interest in Okie Farms, LLC and is marketing ELC's interests in US Premium Beef.[21]  ELC also has ownership interests in a company called ~~Clicker weight~~ClicRweight, LLC.  The Trustee is continuing his investigation into the prior dispositions of ELC's ownership of other entities as well as investigating ELC's involvement in the various off-book equity transactions to recover monies that were owed to ELC under those arrangements, including arrangements where ELC used a related party to front these transactions, though ELC made the actual investment.

### 7. Collection of Promissory Notes and Branch Manager Accounts

---

[21]   To date, the US Premium Beef investment has brought in roughly $1.2 million to ELC's estate.

The Trustee has discovered numerous promissory notes in ELC's files, only some of which were recorded on ELC's records. These notes include related party notes as well as unrelated party notes. The Trustee is in the process of sending demand letters to the holders of all promissory notes and is preparing litigation to collect the notes. The Trustee is also reconciling ELC's branch manager accounts where commissions were credited and shortages should have been debited to determine if ELC is owed monies by the branch managers from the branch manager accounts.

### 8. Avoidance Actions

Finally, the Trustee has undertaken an analysis of the potential avoidance actions based upon ELC's transfers. Demand letters have been mailed to certain preference defendants that are not insiders. The Trustee's evaluation of insider transfers continues as part of the investigation into the actions of the insiders in the year preceding the Petition Date, and in some instances looking back longer under fraudulent transfer laws.

### 9. Assets Outside of the Estate That May Pay Estate Claims

About $4.8 million of ELC funds was located in accounts owned by Tommy Gibson at MF Global Inc. and at Your Community Bank in New Albany, Indiana ("YCB"). The trustee for the Gibson estate recovered about $84,000 held in MF Global, Inc. and one of the accounts at YCB, and the United States Government seized about $4.75 million in the remaining account at YCB and those funds are currently the subject of an asset forfeiture action pending before the United States District Court for the Western District of Kentucky.[22] The Trustee has preserved

---

[22] The trustee for the Gibson estate also seized certain funds in one of Tommy Gibson's brokerage accounts. The Trustee has not completed his investigation of ELC's claims to those funds.

the Estate's rights to assert claims to the forfeited funds and has been engaged in discussions with the Justice Department attorneys related to the forfeited funds.  Currently, the forfeiture action is stayed by agreement into ~~September, 2012.~~January 2013.  The Trustee is negotiating with the US Attorney's Office ~~to coordinate~~and the ~~payment of~~other parties that have preserved a right to assert an ownership claim to the seized funds to cooperatively distribute those funds to the valid claims of creditor/victims of ELC's actions and Tommy Gibson's fraud.  Under the pending settlement with First Bank, the Trustee and First Bank will work towards an agreement with the US Attorney such that approximately $4 million of the seized funds will be directed to the creditor/victims of ELC and approximately $700,000 will be directed to the creditor/victims of Tommy Gibson.

ELC maintained the Bond pursuant to its license as a cattle dealer under GIPSA.  The Trustee also serves as the trustee of the Bond and has filed a complaint in Federal District Court of the Southern District of Indiana (Case No.4:11-cv-00144-SEB-WGH) to pay claims asserted against the Bond.  The Trustee expects to return the $875,000 bond proceeds to the Bond claimants, less costs of administering and processing the payments.  Payments from the Bond reduce claims against the Estate by the amounts received on the Bonds.

The Kentucky Attorney General sued some of the principals of ELC in Kentucky State Court on various counts of fraud seeking criminal convictions and restitution for ~~the~~certain unpaid cattle sellers (not all) in Kentucky victimized by ELC's actions.  Guilty pleas have been accepted and a restitution fund of $890,000 has been established of which Grant Gibson agreed to $680,000 and ~~Darrin~~Darren Brangers agreed to $210,000 of restitution.  This fund will be distributed to certain "victims" in Kentucky identified by the Kentucky Attorney General.  To the extent that claimants receive these restitution funds, any payments received from the Estate will

42

be reduced by the amounts received.  The Trustee understands that about two-thirds of the restitution money has been collected and paid to those certain Kentucky cattle sellers.

**B.**    **Current Status of Asset Collection**

The Trustee files monthly reports with the Court listing the current account balances, collection of assets, and paid and incurred expenses of the Estate administration.  A summary of the assets collected as of July 20, 2012 is as follows:

| | |
|---|---|
| A/R Collection/Cattle Inventory Sales | $12,051,483.40 |
| Contract Settlement | $     129,560.00 |
| US Premium Beef | $ 1,197,674.89 |
| Notes Receivable | $       44,870.44 |
| Miscellaneous | $     128,088.22 |
| Asset Sale | $ 3,081.341.14 |
| TOTAL | $16,633,018.09 |

**C.**    **Litigation Summary**

**1.**    **Interpleaders**

As word of ELC's financial difficulties spread, certain parties who owed money to ELC for cattle began receiving conflicting payment demands from other parties who were claiming rights to the payment.  The result was the filing of four interpleader actions in four different jurisdictions – Texas, Colorado, Kansas, and Wisconsin.[23]  The Wisconsin interpleader has recently been settled resulting in a recovery to the Estate of $100,098 along with the release of claims of the Florida Creditors' claims against the Estate.   The funds at issue in the remaining three interpleaders aggregate to approximately $8.7 million.  The Trustee has asserted claims to these interpleader funds on the basis that the funds represent the proceeds of sales of ELC cattle.  Other parties have asserted claims to the same funds.  The Trustee filed summary judgment

---

[23]    All four interpleaders were removed and transferred to the Court and filed as separate adversary proceedings in the Chapter 11 Case.

43

motions seeking an early legal determination as to certain claims made by certain cattle sellers, stockyards, and banks.  The Court disposed of one type of claim finding in favor of the Trustee and determining that the unpaid cattle sellers could not be paid from the funds by asserting a constructive trust unless they had received a judgment against ELC prior to the Chapter 11 Case.[24]  Discovery and motion practice are active in the remaining interpleaders.  These cases may not be resolved until 2013.

The Trustee has also reached a tentative settlement agreement with certain Texas feed yards that interpled the funds into the Interpleader Actions that recognizes certain setoff rights of the feed yards related to down payment monies and other amounts that they believe they are owed.  This proposed settlement is pending before the Court for approval, and, if approved will resolve more of the litigation existing in the Interpleader Actions.

### 2.    Collection Actions for Accounts Receivable and Promissory Notes

The Trustee has identified certain accounts receivable where parties who bought cattle from ELC have not paid for the cattle and the payments are not part of the interpleader actions. The Trustee has, as of the date of this Disclosure Statement, filed seven adversary proceedings to collect these receivables.  The Trustee is investigating and negotiating other resolutions of open account receivables and may file in 2012 additional proceedings to collect those accounts.

The Trustee has also identified certain promissory notes in various amounts from related and unrelated parties that appear to represent amounts due to ELC.  The Trustee is locating the makers of the promissory notes and pursuing the unpaid obligations.  In the event the Trustee

---

[24]    Parties in these cases admitted that no such prepetition judgments were entered against ELC.

BDDB01 9526463v1

does not receive payments on the notes or is unable to settle disputes, the Trustee may bring actions to collect on the promissory notes.

### 3.    Superior Livestock Auction Litigation

~~The Trustee is currently litigating with~~ Superior and the Trustee are currently involved in disputes in two different adversary proceedings. ~~Superior is a party in the Texas interpleader cases discussed above.  Superior claims that more than $2 million of the interpleaded~~, disputes as to certain ~~are not assets of the estate and should be distributed only to Superior.~~ in the Trustee's Escrow Fund as well as other disputes.  These disputes have been suspended pending the Court's consideration of the proposed settlement.

The Trustee and ~~other parties now are litigating~~Superior have reached a proposed agreement to ~~defeat Superior's claim to those funds.~~

~~Another adversary proceeding is one that Superior initiated against the Trustee.  Superior asks the Court, among other things, to declare that the more than $5 million Superior has collected for cattle previously sold to ELC through Superior's auctions should not be paid to the estate.  Superior claims that ELC assigned approximately 500 cattle purchase contract to Superior and that it was entitled to sell the cattle and/or to collect amounts due from ELC's customers for those cattle.  The Trustee (and others) has asked the Court to reject Superior's arguments, to declare that approximately half of the cattle purchase contracts were already performed and never assigned to Superior, and to order Superior to return the full value of the contracts, cattle, and accounts receivable that ELC transferred to Superior, which totals between $18 and $23 million.  Discovery and motion practice in this case are ongoing and expected to continue for many months.  This adversary proceeding likely will not be resolved until 2013 or thereafter.~~settle the claims of the ELC Estate against Superior and Superior's claims against the

45

estate. The proposed settlement essentially effects a "walk-away" in which Superior will retain the proceeds of certain cattle sales it collected, down payment money paid by ELC to Superior for cattle that were not ultimately delivered to ELC and Superior will receive an additional $279,000 payment from the ELC Estate with the consent of Fifth Third, as Fifth Third asserts a security interest in generally all the prepetition assets of ELC.  In exchange Superior will release all of its claims to any ELC assets in the Chapter 11 Case including its $13 million proof of claim, claims against an estimated $3.4 million in interpleader funds and about $1.78 million in collected funds held in the Trustee's escrow account. The ongoing litigation with Superior would represent significant administrative costs and the settlement will result in significant savings in administrative expenses resulting in more funds available for distribution.

### 4.      Branch Manager Litigation

The Trustee initiated an adversary proceeding against Willie Downs, one of ELC's former branch managers in Kentucky. Several of the Bluegrass Entities and also Laurel Livestock were later added as additional defendants. The Trustee claims these parties owe a combined total of approximately $750,000 from ELC's customer checks that ELC hand delivered to Willie Downs instead of depositing them at Fifth Third. Discovery and motion practice is ongoing and the case may not be resolved until sometime in 2013.

The Trustee filed an adversary complaint against Ed Edens IV, ELC's former branch manager in Mississippi, and E4 Cattle Company alleging breach of contract, conversion, bailee liability, breach of fiduciary obligation, and both Bankruptcy Code and Indiana law based fraudulent transfer liability. The complaint requests alternative theories of recovery, with the contract counts totaling about $4.4 million, the bailee liability count requesting about $3.8 million and conversion count seeking about $3.6 million, potentially trebled to about $10.8

BDDB01 9526463v1

million.  The breach of fiduciary obligation count and fraudulent transfer counts are alternate theories of recovery for the amounts described above.  These claims total about $11.8 million (or about $19 million including the trebled claims for conversion).

The Trustee also tentatively settled preference and fraudulent transfer claims against Gary Seals, a former ELC branch manager in Tennessee.[25]  Under the settlement, Seals will pay the estate $1.6 million over 18 months; however, if each payment is timely or if the settlement is prepaid, the last three payments will be excused and the estate will receive a total of $1.375 million.

### 5.    Purchase Money Contested Matters

Certain contested matters relating to objections that were filed to the Trustee's Purchase Money Claims Report, Motion to Transfer Funds and Notice of Release of Proceeds from Account [Dock. No. 501] (the "Purchase Money Claims Report") remain pending.  By the Purchase Money Claims Report, the Trustee sought authority to transfer certain cattle sales proceeds from escrow to his general operating account.  Several objections were filed asserting claims to certain of the cattle sales proceeds, which initiated contested matters (the "Purchase Money Contested Matters").  Purchase Money Contested Matters involving Joplin, First Bank, the Bluegrass Entities, Piedmont, Brent ~~Kuehny~~Kuehny, Stockman Oklahoma Livestock Marketing and Coffeyville Livestock Market remain pending and involve approximately $940,000 in escrowed cattle sales proceeds.  The Trustee believes that the Purchase Money Contested Matters will be resolved by February 2013.

---

[25] The Trustee's motion to approve this settlement is set for hearing before the Court on August 20, 2012.

BDDB01 9526463v1

The Trustee has reached a proposed settlement with First Bank of all its claims in the Chapter 11 Case that is described in more detail in Section D below.

### 6. Other Avoidance Actions and Fraudulent Transfer Claims

The Trustee and his advisers have reviewed and analyzed ELC's transfers during the 90 day period immediately prior to the petition. Approximately 400 transferees received transfers that total more than $11,725,000.[26] The Trustee and his counsel are corresponding with these transferees. This has resolved claims with some of the transferees which are pending the Court's approval. The Trustee has initiated adversary proceedings against ~~three~~certain transferees who denied the claims or failed to respond. The Trustee may make demands on all of the 400 transferees and, if necessary, commence litigation against them before ~~December 2012.~~the two year anniversary of the order for relief in the Chapter 11 Case.

### D. Settlements

As discussed elsewhere in this Disclosure Statement, the Trustee has reached proposed settlements with Superior, First Bank and certain Texas feed yards. These settlements are pending before the Court. The Superior Settlement would result in the mutual release of claims between Superior on the one hand and the Trustee and Fifth Third on the other hand. Superior will withdraw all of its claims in the Chapter 11 Case including the Appeal and the Trustee and Fifth Third will pay Superior $279,000 of Estate funds in which Fifth Third claims a security interest. The release of Superior's claims and the cessation of litigation will result in significant monies held in the interpleaders and in the Trustee's escrow account becoming available for

---

[26] This estimation does not include fraudulent transfers.

distribution and the savings of significant administrative costs.  In consideration of the release of claims, the Trustee has agreed to include Superior as a released party in the Opt In Agreement.

The proposed settlement with First Bank will result in the withdrawal of all claims against the estate and the withdrawal of all litigation claims including the Appeal.  First Bank will receive a payment of $350,000, with the consent of Fifth Third, from Estate assets.  First Bank and the Trustee will work cooperatively to reach agreement with the US Attorney to allow approximately $700,000 of the seized funds to be distributed to the victim/creditors of Tommy Gibson in the Gibson chapter 7 case and approximately $4 million of the seized funds to be distributed to the victim/creditors of ELC.  First Bank will retain its claims against Fifth Third and will be able to continue its lawsuit against Fifth Third filed in Ohio.

The settlement with the Texas feed yards allows and pays the setoff claims asserted by the feed yards in the interpleader actions, discounted by five percent,  and allows an unsecured claim for the discounted amount to be asserted as a Class 4 general unsecured claim.

## V.    CLAIMS ANALYSIS

On March 31, 2011, the Court entered the *Order Establishing Bar Dates For Filing Proofs Of Claim And Equity Interests, And Approving The Proposed Form And Manner Of Notice Thereof* [Dock. No. 416], establishing May 2, 2011 (June 30, 2011 for Governmental Units) as the deadline for filing proofs of claim in the Chapter 11 Case, including claims entitled to administrative expense priority pursuant to 11 U.S.C. § 503(b)(9).  Because of the state of ELC's books and records, the Schedules did not list any Claims as undisputed, noncontingent or liquidated, meaning that to participate in recoveries from the Estate, a creditor was required to file a proof of claim.

49

Five hundred and eight (508) proofs of claim totaling $158,884,024 have been filed. About $3.8 million of this amount are duplicate claims. Some of the claims assert secured and/or priority status, but include no valid factual or legal basis that would justify that status.[27] Other claims are subject to disallowance under 11 U.S.C. § 502 because the Estate has an avoidance claim that has not been paid. The estimates in this analysis will be affected by the outcome of certain litigation in the Chapter 11 Case.

Claims totaling $68,093,265 were filed as "secured" claims. Of this amount, Fifth Third's claim makes up $35,833,415 of the total. The Trustee estimates that the Allowed Secured Claim of Fifth Third, treated under Class 1 of the Plan, will be approximately $26.627.7 million. Of course, the Trustee's estimate of the amount of the Allowed Secured Claim of Fifth Third assumes recoveries of accounts and notes receivable and other assets that are the subject of litigation. As a result, the estimate of the amount of the Allowed Secured Claim of Fifth Third may be off by several million dollars.

After deducting the asserted secured claim of Fifth Third, there remains $32,259,850 of other asserted secured claims against the Estate. Some of these asserted secured claims may be allowed under Class 2 of the Plan on account of setoff rights asserted in the Interpleaders. The proposed settlement with the Texas Feed Yards will result in the allowance of $1,686,250 in setoff claims being Allowed and paid from the funds in the Interpleader Actions. The Trustee disputes all other asserted secured claims which appear to have been filed with no legal or factual basis to assert secured status, or if asserted as a constructive trust, such secured status has been

---

[27] To the extent a claimant asserts a secured claim under the theory of constructive trust, the Trustee will seek to have all of those claims reclassified as unsecured.

determined invalid.  Many of these claims will be disallowed in their entirety while others may be allowed as general unsecured claims.

There ~~are~~is $516,976 in asserted priority claims that would be classified as Class 3 Claims under the Plan.  The Trustee believes that none of these asserted priority claims are entitled to priority treatment under the Bankruptcy Code.  The Trustee believes that there will be no allowed priority claims.

The Trustee believes that all other allowed claims, including the Allowed Fifth Third Deficiency Claim, will be general unsecured claims and treated in Class 4 of the Plan.  If the Fifth Third Deficiency Claim is estimated at about $~~9.2~~8.1 million, the Trustee estimates that the total amount of Allowed General Unsecured Claims in Class 4 of the Plan will approximate $~~29.2~~27 million.  Of course, this estimate is subject to the results of current and as yet to be filed litigation and claims objections that the Trustee will begin filing with this Disclosure Statement.

## VI.    INVESTIGATION AND ANALYSIS OF ESTATE'S POTENTIAL CLAIMS AGAINST FIFTH THIRD

The Trustee filed his Report of the Trustee, James A. Knauer, Regarding Investigation And Analysis of Potential Claims Against Fifth Third Bank on June 5, 2012 [~~Docket~~Dock. No. 1166].  The report was prepared with the assistance and advice of Special Counsel.  The report summarizes the Trustee's conclusions as to the likelihood of succeeding on claims against Fifth Third and includes the Trustee's initial conclusion that given the costs of litigation, the time such litigation may take, and the likelihood of succeeding (or even being able to bring certain claims), a better use of estate assets is to settle with Fifth Third and distribute monies to creditors under the Plan.  The Trustee believes that under such a settlement monies will come into the Estate for distribution to creditors faster, at a lower cost and with greater certainty.  What follows is a more robust discussion of the claims proposed to be settled.

51

Facts revealed as a result of the Trustee's investigation, including the review of tens of thousands of pages of Fifth Third documents and numerous depositions of Fifth Third personnel are available from the Trustee's electronic repository.[28]   Certain analyses prepared by DSI are attached as "Exhibit 6" and are referenced by the name and page number listed on Exhibit 6.

Counsel for other parties in this Chapter 11 Case also provided information, suggestions, and proposed legal analysis to the Trustee and his counsel.  Some of them also attended the depositions of Fifth Third personnel.  The Trustee has encouraged suggestions regarding potential recoveries from Fifth Third or other sources by any creditor and has from the beginning of this Chapter 11 Case solicited advice from counsel who have participated in this Chapter 11 Case.  The primary parties in interest who have offered advice and critique are Superior, First Bank, CPC, and the Bluegrass Entities.

The Trustee considered and analyzed with his counsel and financial advisor, DSI, the following potential claims against Fifth Third based upon the following theories of recovery: (a) tort claims, including fraud, aiding and abetting or conspiracy to commit fraud, breach of fiduciary duty, liability for failure to place a hold at some earlier point in time on ELC's accounts or the alleged failure to promptly advice ELC of the implementation of the freeze on ELC's accounts, contribution as a joint tortfeasor with ELC, (b) common law claims belonging to a judgment creditor under 11 U.S.C. §544(a), (c) preference claims under § 547 including an "improvement in position" claim under 11 U.S.C. § 547(c)(5), (d) setoff avoidance under 11 U.S.C. § 553, (e) equitable subordination of Fifth Third's entire claim, and (f)  avoidance of Fifth

---

[28]   All of the documents and transcripts of all of the depositions conducted are available on the Trustee's document review site to any party in interest who has expressly agreed to the protocols and confidentiality restrictions governing the use of the information posted there.

Third's security interest based on the theory that Fifth Third must (and cannot) demonstrate that it had standing as a "good faith purchaser" under UCC § 2-403(1).

The following are the Trustee's analyses of and assessments of the potential claims by the Trustee against Fifth Third:

## A.    Tort Claims Against Fifth Third

Assuming for purposes of this Disclosure Statement that some or all of the potential non-bankruptcy claims (e.g. tort claims) against Fifth Third have some validity, virtually all counsel active in these proceedings are aware that analysis of the success of such claims, regardless of the strength of the factual underpinnings, requires the Trustee to consider his standing to assert to assert such claims (as opposed to the standing of creditors of ELC) and, if standing exists, the necessity of overcoming the defense of *in pari delicto*.

### 1.    Standing

A "[t]rustee lacks standing under the Bankruptcy Code ... to pursue claims that properly belong to creditors—....  Instead, he is empowered to pursue only those claims that properly belonged to the debtor before it entered bankruptcy." *Picard v. JPMorgan Chase & Co.*, 460 B.R. 84, 91 (S.D.N.Y. 2011)

When a third party has injured not the bankrupt entity itself, the debtor, but a creditor of that debtor, the trustee in bankruptcy cannot bring suit against the third party. He has no interest in the suit. *Steinberg v. Buczynski*, 40 F.3d 890, 892–93 (7th Cir.1994).

> It is well settled that a bankruptcy trustee has no standing generally to sue third parties on behalf of the estate's creditors, but may only assert claims held by the bankrupt corporation itself. Wagoner, 944 F.2d at 118 (citing *Caplin v. Marine Midland Grace Trust Co. of N.Y.*, 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972)); see also *Wornick v. Gaffney,* 544 F.3d 486, 490 (2d Cir.2008); *Wight*, 219 F.3d at 86; *In re Mediators, Inc.*, 105 F.3d 822 (2d Cir.1997);

BDDB01 9526463v1

> *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1093 (2d Cir.1995).

*Picard v. JPMorgan Chase & Co.,* 460 B.R. 84, 91 (S.D.N.Y. 2011).

In the ongoing and much publicized bankruptcy case of Madoff Securities, the liquidating trustee, Irving H. Picard, brought an action against JPMorgan Chase and other financial institutions arguing that they aided and abetted the debtor's fraud by facilitating or willfully failing to uncover the Madoff Ponzi scheme. The trustee asserted common law damage claims for aiding and abetting fraud, breach of fiduciary duty, "fraud on the regulator," unjust enrichment, conversion, aiding and abetting conversion, knowing participation in a breach of trust, and contribution.  In considering Picard's standing, as trustee, to bring those claims, U.S. District Court Judge McMahon noted:

> To determine whether an action accrues individually to a claimant or generally to the corporation, a court must look to the injury for which relief is sought and consider whether it is peculiar and personal to the claimant or general and common to the corporation and creditors.

*Picard,* 460 B.R. at 96 *(quoting Koch Refining v. Farmers Union Cent. Exchange, Inc.*, 831 F.2d 1339, 1349 (7th Cir.1987)).  In analyzing the Seventh Circuit's *Koch* decision, the Madoff Securities judge agreed that a claim which is common to all creditors could be brought by a trustee, but unless every creditor could bring it, then the claim does not belong to the estate.  The district court then concluded that the Madoff Securities trustee was pursuing claims that were held by some creditors, but not others.

> It is true that allowing the Trustee to pursue claims that belong properly to individual creditors would accrue to the benefit of all creditors by augmenting the bankruptcy estate. But under settled law, this is not enough to make them "general" within the meaning of *Koch* and *St. Paul Fire. See Pereira,* 413 F.3d at 342; *In re Stanwich Financial Services Corp.,* 317 B.R. 224 (Bnkr.D.Conn 2004). Rather, any recovery on these claims will not necessarily

54

> accrue to the benefit of all creditors harmed by the fraud, at least
> not in the same way.

*Picard,* 460 B.R. at 96.

Assuming liability were established on the part of Fifth Third under one or more of the non-bankruptcy theories, the Court could conclude that not all creditors of ELC were harmed the same way.  For example, a cattle seller who received a bad check might be entitled to seek relief against Fifth Third, assuming the seller could prove Fifth Third's complicity or willful disregard of ELC's activities in running a kiting scheme and the subsequent decision to freeze ELC's disbursement account constituted an actionable wrong as to the seller.  Yet many other creditors of ELC are merely owed money because they never received a check from ELC at all.  Whether the Trustee would have standing to assert such claims is difficult to determine with certainty.

As an example, First Bank has filed a lawsuit against Fifth Third in the state of Ohio.  First Bank's suit encompasses, at least in part,[29] many of the same common law theories analyzed by the Trustee. While First Bank's lawsuit seeks special damages unique to First Bank, it also asserts the same claims upon which an action by the Trustee might proceed.  Creditors and a trustee cannot assert the same claims against a third party.  If they were to do so, one of the suits would be dismissed.  This typifies the standing problem that would face the Trustee in pursuing such claims against Fifth Third.

### 2.    *In Pari Delicto*

---

[29]    First Bank's suit seeks damages for conversion, fraud, aiding and abetting, negligent misrepresentation and Ohio RICO.  Although First Bank distinguishes itself to some degree in asserting a security interest in specific ELC account deposits, nevertheless, it seeks recovery, for the most part based on many of the same claims that might be brought by the Trustee.  Interestingly, First Bank has advised the Trustee that it is not seeking any recovery that would interfere with Estate property, seeming to take the position that these are claims that could not be asserted successfully by the Trustee.

The expression '*in pari delicto*' is a portion of the longer Latin sentence, *'In pari delicto potior est conditio defendentis,'* which means that where the wrong of both parties is equal, the position of the defendant is the stronger. Or, as it is more often described, one who is of equal fault cannot maintain a cause of action against others alleged to be involved in the same act or omission. *See*, *e.g.*, *Theye v. Bates*, 337 N.E.2d 837, 844 (Ind. Ct. App. 1975).

Bankruptcy trustees for debtors that have committed fraud face a heady burden in suing third parties who are alleged to have facilitated the fraud in some fashion absent being able to prove the third party's active participation coupled with receipt of a "benefit". The 6th, 8th, 10th, and 11th Circuits all have opined that *in pari delicto* applies to a bankruptcy trustee and provides a defense to a third party allegedly participating with the debtor's agents in bad acts. *See Grassmueck v. Am. Shorthorn Ass'n*, 402 F.3d 833, 837 (8th Cir.2005); *Terlecky v. Hurd* (*In re Dublin Sec.*), 133 F.3d 377, 381 (6th Cir.1997); *Sender v. Buchanan* (*In re Hedged-Inv. Assocs.*), 84 F.3d 1281, 1285 (10th Cir.1996); *Official Committee of Unsecured Creditors of PSA, Inc., et al., on Behalf of PSA, Inc., et al.* 437 F.3d 1145 (11th Cir. 2006).

Application of the *in pari delicto* doctrine to insolvency proceedings has been criticized. *See* Jeffrey Davis, Ending the Nonsense: the In Pari Delicto Doctrine Has Nothing to Do with What is Section 541 Property of the Bankruptcy Estate, 21 Emory Bankr.Dev. J. 519 (2005); Gerald L. Baldwin, In Pari Delicto Should Not Bar a Trustee's Recovery, 23-8 Am. Bankr.Inst. J. 8 (2004); Tanvir Alam, Fraudulent Advisors Exploit Confusion in The Bankruptcy Code: How In Pari Delicto Has Been Perverted To Prevent Recovery for Innocent Creditors, 77 Am. Bank. L.J. 305 (2003); Robert T. Kugler, The Role of Imputation and In Pari Delicto in Barring Claims Against Third Parties, 1 No. 14 Andrews Bankr.Litig. Rep. 13 (2004); Making Sense of the In Pari Delicto Defense: "Who's Zoomin' Who?" 23 No. 11 Bankr. Law Letter 1 (Nov.2003).

Yet, despite such criticism, in this district and in the Seventh Circuit, *in pari delicto* remains a viable defense; except in cases where the target defendant participated knowingly and reaped the benefits of the scheme (other than fees or charges it received) or received a fraudulent conveyance. *Knauer v. Jonathon Roberts Fin. Group, Inc.*, IP 01-1168-C-K/T, 2002 WL 31431484 (S.D. Ind. Sept. 30, 2002) aff'd, 348 F.3d 230 (7th Cir. 2003); *Marwil v. Farah*, 1:03-CV-0482-DFH, 2003 WL 23095657 (S.D. Ind. Dec. 11, 2003); *Baker O'Neal Holdings, Inc. v. Ernst & Young LLP,* 1:03-CV-0132-DFH, 2004 WL 771230 (S.D. Ind. Mar. 24, 2004).

As evidenced by the first citation in the foregoing paragraph, this Trustee has more than a passing experience with the *in pari delicto* defense as does his Special Counsel.  *See Baker O'Neal, supra*.

Departing somewhat from other circuits, the Seventh Circuit has recognized that where a receiver sues to recover a fraudulent conveyance, *in pari delicto* will not necessarily be an available defense.  *Scholes v. Lehmann*, 56 F.3d 750, 754-55 (7th Cir.1995) (citing *McCandless v. Furlaud*, 296 U.S. 140, 160, 56 S.Ct. 41, 80 L.Ed. 121 (1935)). In a number of instances, plaintiff bankruptcy trustees (and some legal writers) have claimed that *Scholes* puts the Seventh Circuit at odds with other circuits in terms of allowing exceptions to the *in pari delicto* defense. Just this past April, the Seventh Circuit commented on *Scholes*:

> We added: "Put differently, the defense of *in pari delicto* loses its sting when the person who is *in pari delicto* is eliminated." That sentence is dictum; *Scholes* did not entail a *pari delicto* defense. It has nothing to do with § 541 of the Bankruptcy Code; *Scholes* was not a bankruptcy proceeding. And it does not stand for the proposition that federal law overrides state-law defenses; ... More importantly, the law of fraudulent conveyances—both in Illinois and under the Bankruptcy Code, see 11 U.S.C. §§ 547–50—is one of those bodies that does supersede private-law definitions of legal entitlements. The recipient of a fraudulent or preferential transfer usually has a right to the money as a matter of contract, but when

57

the transfer injures other creditors it can be recouped for their benefit. ***Scholes* should not be generalized beyond the law of fraudulent conveyances and preferential transfers**.

*Peterson v. McGladrey & Pullen, LLP,* 676 F.3d 594, 599 (7th Cir. 2012) [emphasis supplied].

One recognized exception to the availability of the *in pari delicto* defense is the "adverse interest exception".  Essentially, "[a]n agent's knowledge will not be imputed to the principal where the agent's conduct creates a presumption that the agent would not communicate his knowledge. *Mid–Continent Paper Converters, Inc. v. Brady, Ware & Schoenfeld, Inc.,* 715 N.E.2d 906, 910 (Ind.Ct.App.1999); *Knauer, supra.*  Thus, the acts of the agent are not the acts of the principal and the participation of a third party will not render the entity "of equal fault".  However, where the person(s) committing the fraud and the owners of the entity are the same, the adverse interest exception will not apply.

The Sixth Circuit's decision in *In re Dublin Secs., Inc.*, 133 F.3d 377, 380 (6th Cir. 1997) is instructive.  In *Dublin*, a debtor corporation had engaged in fraudulent securities transactions.  The debtor's bankruptcy trustee brought state law claims of negligence, breach of fiduciary duty, negligent misrepresentation, recklessness, common law fraud, and right of contribution against a law firm who had represented the debtor corporation.  The Sixth Circuit affirmed the district court's dismissal based on *in pari delicto*.  *Dublin*, 133 F.3d at 379.  The court reasoned that although the individual officers and directors acted adversely to the corporation's interest, the trustee recognized that they "so dominated and controlled the corporations that the corporation had no separate mind, will, or existence of its own." *Id*. at 380.  The court concluded that the officers and directors were the "alter egos" of the debtor corporation and, therefore, their malfeasance was directly attributable to the debtor corporations.  *Id*.

The actions of ELC's key officers (as described in the indictments and subsequent guilty pleas) can hardly be distinguished from *Dublin,* so the adverse interest exception should not likely operate to preclude an *in pari delicto* defense. Merely concluding that Fifth Third's conduct could be actionable by the Trustee under one or more common law theories is problematic in that such claims may not be property of the estate (and therefore the Trustee lacks standing to pursue them). Even if the claims are property of the estate, the Trustee's ability to successfully recover against Fifth Third would require overcoming the defense of *in pari delicto.*

### 3.      Joint Tortfeasor Liability

The Trustee considered whether Fifth Third might have liability as a joint tortfeasor with ELC and its principals, assuming that Fifth Third was acting in concert with or aiding and abetting ELC in its unlawful activity. Among joint tortfeasors there is no defense of *in pari delicto*. However, the claim that arises between joint tortfeasors is one for co*ntribution.* The Trustee assumed that the applicable law would be either Indiana or Ohio. Indiana does not recognize a right for one joint tortfeasor to seek contribution from another. Ohio does allow contribution among joint tortfeasors, however the right arises only after the tortfeasor seeking contribution has paid his share. As this applies to ELC, the Trustee cannot conceive that ELC's liability could ever be less than 50% of the damages to its creditors (assuming that only Fifth Third and ELC were liable). Thus until ELC were to pay its creditors more than 50% of their claims, no claim for contribution against Fifth Third could exist.

### B.      Trustee's Right to Stand in the Shoes of a Judgment Creditor Under 11 U.S.C. § 544 (a)

11 U.S.C. §544(a) states:

(a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, *or may avoid any* transfer of

property of the debtor or any obligation incurred by the debtor that is voidable by—

(1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;

(2) a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists ...

The Trustee considered whether he could bring any of the identified potential common law claims as a judgment creditor under this section. The weight of authority precludes this. The principal reason is that the claim is deemed to be acquired "at the commencement of the case". Thus, the hypothetical creditor in whose shoes the Trustee would seek to stand was not the holder of a claim when the complained of actions occurred since he acquired his claim at the moment of the bankruptcy. "[I]f the hypothetical judgment lien creditor extended credit only on the date of commencement of the bankruptcy case, how can she sue based on a wrong that occurred before the extended credit?" *In re Greater Southeast Community Hospital Corp.*, 333 B.R. 506, 520 (Bnkr.D.D.C.2005).

**C.    Preference Claims**

Generally a prima facie preference claim under 11 U.S.C. § 547 exists with respect to a "transfer" of the debtor's (ELC's) money or other property occurring within 90 days before the commencement of a bankruptcy case (here between September 7 and December 6, 2010 - the "Preference Period") if the following additional elements are present:

1.    the transfer was to or for the benefit of a creditor,
2.    for or on account of an antecedent debt,

60

      3.      made while the debtor was insolvent (presumed during the Preference Period), and

      4.      the transfer enables the creditor to receive more than the creditor would have received in a chapter 7 liquidation of the debtor's estate commenced as of the petition date for the bankruptcy. *In re Smith*, 966 F.2d 1527, 1529 FN1 (7th Cir. 1992).

During the 90 day Preference Period Fifth Third held two types of claims against ELC (i.e., two types of possible "antecedent debts" owing by ELC to Fifth Third). Each of the two types is referred to herein as a "Debt". To facilitate this discussion, the lending arrangements and the kiting scenario is set forth again below.

The first type of Debt is ELC's obligation, that existed from time to time, with respect to the total amount of unpaid advances made by Fifth Third to ELC and associated interest, fees, and expenses ("Revolver Debt") under the Revolver. The Revolver and the Revolver Debt were 1) provided for and governed by the "Credit Agreement Between Borrower and Bank" dated as of August 9, 2004 (as amended twelve times) (the "Credit Agreement"), 2) evidenced by the "Eleventh Amended and Restated Revolving Credit Promissory Note" made by ELC to the order of Fifth Third  in the principal amount of $32.5 million (the "Note"), and 3) secured by the Security Agreement between ELC and Fifth Third dated as of August 9, 2004 (the "Security Agreement"). The Credit Agreement, Note, Security Agreement and related documents are referred to herein generally as the "Loan Documents".

Under the Loan Documents the Revolver matured as of (and Fifth Third made no further advances to ELC under the Revolver from and after) October 18, 2010[30] (almost half way through the 90 day Preference Period). After September 16, 2010 the parties did not further

---

[30]  The Revolver initially matured on September 3, 2010. On September 16, 2010 the parties executed a twelfth amendment to the Credit Agreement effective as of September 3, 2010. That twelfth amendment extended the maturity of the Revolver to October 18, 2010.

BDDB01 9526463v1

amend or replace the Loan Documents.  From October 18 through November 2, 2010 Fifth Third allowed ELC to use Fifth Third's cash collateral as ELC deposited checks payable to ELC that represented proceeds of Fifth Third's collateral.

The second type of Debt ("Kite Debt") arose because Fifth Third provided "provisional credits" to ELC with respect to certain checks payable by certain affiliates to ELC that ELC deposited into accounts established with Fifth Third ("Kite Checks")[31].  Those Kite Checks were made payable to ELC by Gibson and his affiliates (including GP Cattle and VTIK).  The Kite Checks were drawn on accounts at Your Community Bank ("YCB") or other banks.  The Kite Checks were purportedly made in payment for ELC's sales of cattle but in reality they were issued as part of a check and inventory kiting scheme (the "Kite").[32]  The Kite provided liquidity for ELC's operations because of the "float" created by Fifth Third's grant of provisional credits with respect to Kite Checks.  Fifth Third allowed ELC to use the provisional credits to cover checks that ELC issued to various payees.  Some of the checks were payable to Kite participants ("Bad Disbursements") and others were payable to bona fide sellers of cattle to ELC or other valid ELC creditors ("Good Disbursements").  The Kite Debt arose from and after October 18, 2010 after the Revolver matured.

There are three fact patterns that could potentially give rise to prima facie preference claims against Fifth Third.  They are:

---

[31]  The Bank provided ELC with provisional credits with respect to all deposits and checks, not just Kite Checks.

[32]  For a general description of a check kiting scheme *See* FN 1 to "What Goes UP Must Come Down: Check Kiting, the UCC and the Trustee's Avoiding Powers," 77 Am. Bankr. Law Journal 333.

1)     during the Preference Period either Kite Debt or Revolver Debt was repaid by the application of cash (checks) deposited by ELC with Fifth Third (an "Application Preference");

2)     during the Preference Period a Kite Debt arose (as an antecedent debt) when Fifth Third provided provisional credit(s) to ELC with respect to one or more Kite Checks and ELC made a transfer to Fifth Third to "repay" that Kite Debt if and when Fifth Third withdrew the provisional credit by refusing to honor Disbursements checks drawn against the provisional credit (a "PC Withdrawal Preference"); or

3)     Fifth Third's total loss exposure existing at the beginning of the Preference Period (September 7, 2010) with respect to the total Debt (Revolver Debt plus Kite Debt) was reduced by virtue of an increase as of December 6, 2010 in the total of deposited cash, accounts receivable, and inventory that served as Fifth Third's collateral under the circumstances described in Bankruptcy Code § 547(c)(5) (an "Improvement in Position Preference").

## 1.    Application Preference Claims

The facts and applicable law do not support the assertion of Application Preference claims.

The Security Agreement provides that Fifth Third's collateral (generally "all assets" of ELC) secures all "Obligations" as defined in the Credit Agreement. The Credit Agreement defines Obligations to mean all "Indebtedness" (a very broadly defined term), including Indebtedness ". . . arising out of overdrafts on checking, deposits or other accounts or electronic funds transfer (whether through wire transfers, automatic clearing houses or otherwise) or out of Lender's non-receipt of, or inability to collect, funds or otherwise not being made whole in connection with depository transfer checks or other similar arrangements . . ." Both Revolver

63

Debt and Kite Debt were secured by Fifth Third's collateral.  Generally, receipt during the Preference Period by a secured party of cash proceeds from collateral as to which the secured party was perfected before the Preference Period and application of such cash proceeds to debt secured by the collateral cannot be the basis for a valid preference claim.

A "transfer" for preference purposes includes "the creation of a lien".  *See* Bankruptcy Code § 101(54)(A) and 101(36).  Here, a security interest in receivables, inventory and proceeds was perfected before the beginning of the Preference Period.  A "transfer" occurred each time Fifth Third's security interest attached to a newly arising item of collateral (a new receivable for example).  Each such transfer took place when the "transfer [took] effect between" the debtor (ELC) and the secured creditor (the "Bank") but in no event before the debtor (ELC) had rights in the collateral.  *See* 11 U.S.C. § 547(e)(2)(A) and (3).  Pursuant to UCC § 9-203(a) and (b), Fifth Third's perfected security interest in ELC's receivables, inventory and proceeds that arose during the Preference Period attached and became enforceable (i.e. took effect) as soon as ELC obtained rights in each of those items of collateral.

11 U.S.C. § 547(c)(5) begins by providing a general (default) rule that; "(c) The trustee may not avoid under this section a transfer - . . . . (5) that creates a perfected security interest in inventory or a receivable or the proceeds of either, . . .".  Therefore (subject to the improvement in position exception to be discussed below) as new ELC receivables (or rarely, inventory) and proceeds in the form of Receipt Checks arose during the Preference Period and Fifth Third's previously perfected security interest attached to those items of collateral, the mere addition of such items of collateral to Fifth Third's collateral package did not create a preference claim.

Because the payment of both Kite Debt and Revolver Debt was secured by Fifth Third's perfected security interests in those new items of collateral, payment of those Debts with Fifth

Third's collateral should not by itself give rise to a valid preference claim because the payment "transfer" (i.e. application of cash collateral to either Kite Debt or Revolver Debt) would not in and of itself enable Fifth Third to receive more than Fifth Third would have received in a chapter 7 liquidation of ELC.  Therefore 1) payment using Fifth Third's cash collateral (even though the collateral came into being during the Preference Period) in and of itself does not satisfy the preference claim element number 4 (as set forth in *In re Smith* above), and 2) there should be no valid Application Preference claims against Fifth Third.  However, as discussed below, there is a major exception to the general (default) rule that excludes the creation of previously perfected security interests in new inventory, receivables and proceeds; it is the improvement in secured position test set forth in the 11 U.S.C. § 547(c)(5) which might give rise to a possible Improvement in Position Preference claim.

### 2.    PC Withdrawal Preference Claim

The law with regard to a potential PC Withdrawal Preference claim against Fifth Third is less clear.  The general questions are 1) When does a "Kite Debt" as an "antecedent debt" arise: when the provisional credit is granted or when a lender (Bank) advances funds against a provisional credit (by honoring a check for a Disbursement)?; and 2) If an antecedent debt arises at the time the provisional credit is granted, is there a "transfer" from the debtor (ELC) to the creditor (Bank) on account of that antecedent debt when the creditor (Bank) revokes the provisional credit?

Applicable law provides that no antecedent Kite Debt arose at the point in time when Fifth Third granted a provisional credit to ELC.  Instead, Kite Debt arose when Fifth Third advanced funds against a provisional credit by honoring one or more Payment Checks. Therefore Fifth Third's dishonor of Payment Checks on and after November 2 did not constitute

transfers or payments of any antecedent Kite Debt that could form the bases for valid PC Withdrawal Preference claims.

In *In re Smith*, the Seventh Circuit said that because a provisional credit is revocable by a bank the mere granting of a provisional credit (without the bank advancing funds against the provisional credit) cannot constitute a "loan" or create an antecedent debt. The Seventh Circuit explained at 966 F.2d 1530 that the Uniform Commercial Code as adopted in Indiana (same version in Ohio) "does address, however, the general rights of parties when a bank extends provisional credit. In order to facilitate efficiency and rapid check processing, the Commercial Code gives protection to banks that extend provisional credit to customers on the basis of a deposited item. While the proceeds of the provisional credit are in a customer's account, the bank is given the right of chargeback, which is a claim or lien against the customer's account. *Yoder v. Cromwell State Bank*, 478 NE 2d 131, 135 (Ind App 1985); Ind. Code § 26-1-4-212." *Smith* explains further that when a customer has withdrawn or applied the provisionally credited funds "the bank's interest rises to a security interest in the item or proceeds thereof. Ind. Code § 26-1-4-208(1)". In *Smith* the bankruptcy trustee asserted a preference claim against the recipient of a payment from the debtor. Citing Ind. Code § 26-1-4-213(4), the defendant/payee argued that "provisionally credited funds did not become available for withdrawal <u>as of right</u> until the provisional credit becomes final (that is until the item supporting the provisional credit clears)." In *Smith* the debtor had issued a check to the defendant/payee against the provisionally credited items and the check had cleared. The central issue in the case was whether the funds transferred to the defendant/payee were the debtor's property or property of the bank.

Almost certainly the state law that is applicable is the law of Ohio. The Trustee does not believe that applicable Ohio law would suggest conclusions contrary to those made below.

66

*In re Spring Grove Livestock Exchange, Inc.* was a Minnesota bankruptcy case for a cattle dealer that appears to have operated under circumstances similar to ELC, including kiting of checks among the debtor and affiliates of its principal John Morken (the Tom Gibson in the Spring Grove case). Like Gibson, Morken also filed a bankruptcy case. Charles Ries was the Spring Grove bankruptcy trustee and Philip Kunkel (our standing mediator) was the Morken bankruptcy trustee. Kunkel sued Morken's bank Firstar Milwaukee ("FM") asserting a variety of claims, including preference claims. Kunkel argued that when FM granted provisional credits to Morken totaling about $73 million, an antecedent debt arose from Morken to FM. Kunkel asserted that when FM withdrew those provisional credits, Morken in effect repaid the antecedent debt and a preference claim arose. The bankruptcy court entered summary judgment in favor of FM on Kunkel's preference claim. *In re Spring Grove Livestock Exchange, Inc.*, 205 B.R. 149, 154-155 (Bk. Ct. D. Minn. 1997).

The bankruptcy court relied upon the 8th Circuit's decision in *Laws v. United Missouri Bank*, 98 F.3d 1047 (8th Cir. 1996). *Laws* held that there are three different points in time when an antecedent debt might arise in a provisional credit situation. Those are (1) when a bank provisionally credits the debtor's (ELC's) account for a deposited check; (2) when the customer debtor (ELC) uses the provisional credit by "drawing down the account" (i.e. when the debtor writes checks against the provisional credit); or (3) when the deposited check is dishonored.

*Laws* rejected (1) and (2) as the points in time when an antecedent debt arises. *Laws* likened the circumstances existing at points (1) and (2) as the offering of an undrawn line of credit. *Laws* at 1050 ("A provisional credit, like a line of credit, is no more than the opportunity to obtain funds."). *Laws* also holds that even when the customer draws on the provisional credit (i.e. writes checks against the credit) that is not equivalent to incurring a debt (an antecedent

debt).  *Laws* further concluded that "routine advances against uncollected deposits do not create a 'debt' to the bank."  *Laws* at 1051.  On the basis of *Laws* the bankruptcy court in *Spring Grove* concluded:  "I find that [FM]'s extension of provisional credit to the Morken and SGLE account did not create an antecedent debt.  Therefore, the reversal of these credits cannot constitute a transfer on account of an antecedent debt."  *In re Spring Grove* at 155.

Kunkel appealed to the Minnesota district court.  The district court partially reversed the grant of summary judgment regarding the $73 million preference claim in an unreported opinion (the "District Court Opinion").  The District Court Opinion followed the basic holding of *Laws* that the mere grant of provisional credit does not create an antecedent debt.  However the District Court found that material issues of fact existed as to whether FM's "advances" extended by FM (The Trustee believes the Court meant checks Morken wrote against provisional credits were "routine").  The District Court partially reversed summary judgment and sent the case back to the bankruptcy court to determine if the parties (Morken and FM) treated the "advances" as "loans".  The District Court said that evidence that the bankruptcy court might consider would include 1) whether and at what point FM began charging interest (including possible fees charged in lieu of interest) on the "advances", 2) whether FM representatives referred to the "advances" as loans, and 3) whether FM's policies dealt with over advances (based upon the reversal of provisional credits) as loans.

The District Court Opinion in footnote 8 notes "Other courts have refused to hold that extension of provisional credit creates bankruptcy debt.  *See* 966 F.2d 1527, 1535 n. 12 (7th Cir. 1992); *In re Frigitemp Corp.*, 34 B.R. 1000, 1015-16 (S.D.N.Y. 1983); *In re Hudson Valley Quality Meats Inc*., 29 B.R. 67, 77 (Bankr. N.D.N.Y. 1982) (bank that granted provisional credit to a check kite received no preference when deposited funds collected.)"

68

The District Court Opinion is ambiguous. In determining when an antecedent debt arises the opinion seems to conflate 1) the grant of provisional credits and 2) honoring checks drawn against such provisional credits. Therefore the opinion does not squarely (or convincingly) hold that the mere grant of a provisional credit gives rise to an antecedent debt for preference purposes. Moreover, in this Chapter 11 Case Fifth Third stopped making additional advances (i.e. loans) under the Revolver as of October 18. Therefore it appears that the District Court Opinion cannot support a PC Withdrawal Preference Claim against Fifth Third.

In an e-mail to Special Counsel dated January 31, 2012, one of the Objectors cites *Moseley v. Arth,* 2003 Bankr. Lexis 1437 (Bankr. Ct. M.D.N.C. 2003) to support "the notion of a bank improving its position, under the bankruptcy code, through actions it took when it halted a check kiting scheme." That case holds that an antecedent debt arises when the debtor draws upon a provisional credit citing *McElmore v. Third National Bank in Nashville*, 123 B.R. 801, 811 (Bankr. M.D. Tenn. 1991). The *Moseley* court explained "When a customer draws upon a provisional credit, the customer becomes obligated to the bank to pay the amount advanced by the bank as a result of the use of the provisional credit." *Moseley* held that an antecedent debt arose when the bank advanced funds to the debtor on the basis of a provisional credit.

No decision persuasively supports the notion that Kite Debt, as an antecedent debt, arose when t Fifth Third granted a provisional credit. Therefore Fifth Third's withdrawal of provisional credits by dishonoring checks would appear to not give rise to a valid PC Withdrawal Preference claim.

### 3. Improvement In Position Preference Claim

Perhaps the most difficult analysis is regarding a possible Improvement In Position Preference claim. Such a claim is based on the remaining part of 11 U.S.C. § 547(c)(5)

(following the part quoted above).  That part provides that a preference claim can be based upon the creation of security interests in receivables, inventory or proceeds that arise during the Preference Period if and; ". . . to the extent that the aggregate of all such transfers to the transferee [Fifth Third] caused a reduction, as of the date of the filing of the petition [December 6, 2010] and to the prejudice of other creditors holding unsecured claims, of any amount by which the debt secured by such security interest exceeded the value of all security interests for such debt . . . 90 days before the date of the filing of the petition [ September 7, 2010] . . ." September 7, 2010 is referred to as the "Start Date" and December 6, 2010 as the "End Date" and both may be referred to as the "Dates").  Bankruptcy Code §547(c)(5) requires the Trustee to take "snapshots" on each of the Dates to determine the amount of shortfall between 1) the total of Kite Debt plus Revolver Debt ("Total Debt") and 2) the value of Fifth Third's collateral package (the "Collateral Value").  If and to the extent the amount of such a shortfall on the End Date is smaller than the amount of shortfall on the Start Date we may have the basis for a valid Improvement in Position Preference claim.  *See Ebbler Furniture and Appliances v. Alton Banking & Trust*, 804 F.2d 87 (7th Cir. 1986).  What may or may not have happened regarding such a shortfall in the days during the Preference Period between the Start Date and End Date appear to be immaterial to the application of the Improvement in Position Preference Test.

~~Attached as "Exhibit 6" is a June 2, 2012 analysis of the shortfalls existing on each of the Dates ("Shortfall Analysis").  The Shortfall Analysis was prepared by DSI based in part on assumptions provided by the Trustee's counsel.  The Shortfall Analysis indicates that 1) the Total Debt on the Start Date was $54,381,000, 2) the net Collateral Value was $47,764,000, and 3) the Shortfall was $6,617,000.  As of the End Date 1) the Total Debt was $35,834,000 (the amount asserted in Fifth Third's proof of claim), 2) the net Collateral Value~~

70

~~was $25,727,000, and 3) the shortfall was $10,107,000.  Because the shortfall on the End Date appears to exceed the shortfall on the Start Date, no valid Improvement in Position Preference claim appears to exist.~~

~~This analysis is somewhat problematic for many reasons.~~Analyzing the relative change in position between debt and collateral value is problematic.  Case law is ambiguous and contradictory on this provision and even current controlling Seventh Circuit precedent does not answer some of the specific issues relevant here.  Among the most difficult valuations are 1) the projection backwards of the amount of the Kite Debt as of the Start Date and 2) the calculation of the realizable Collateral Value as of both the Start Date and End Date.  ~~Superior (and perhaps other~~Certain parties~~)~~ have ~~argued about~~questioned what the correct methodology for calculating the assumed variables is.  A report on possible claims against Fifth Third filed by the Trustee recognized that "*Reasoned arguments can be made that Fifth Third's position did - or did not - improve during the 90 days prior to bankruptcy.*"  However, given the time, expense and wide variety of assumptions that can be argued for or against the proposition that Fifth Third's position improved, the Trustee believes that the proposed settlement with Fifth Third takes into account the value of a potential Improvement in Position Preference claim.  The Trustee sets forth certain issues below.

Attached as "Exhibit 6" is an updated analysis through August 31, 2012 of the shortfalls existing on each of the Dates ("Shortfall Analysis).  The updated analysis restates certain facts on the Start Date and the End Date to allow a more consistent comparison of the collateral and obligations as they relate to the improvement in position analysis.  The Shortfall Analysis was prepared by DSI based in part on assumptions provided by the Trustee's counsel.

Section 547(c)(5) of the Bankruptcy Code shields undersecured creditors that have floating liens on a debtor's inventory and receivables from a trustee's avoiding powers except to the extent the creditor became less undersecured during the 90 days prior to the bankruptcy and this reduction prejudiced other unsecured creditors.  There is relatively little case law on this particular provision of the Bankruptcy Code and the guidance provided by the reported cases is often incomplete and/or applicable to the specific facts of the decided case.   The Trustee's counsel has not found a single case that addresses a fact pattern similar to ELC's, where third-parties took action during the 90 day preference period that materially diminished the nominal value of a secured lender's inventory and receivables collateral package.

One part of the analysis is not disputed – the amount the creditor is undersecured is to be compared only at two specific dates without regard to any fluctuations in between.  Those dates are the petition date, (referred to herein as the "End Date") and September 7, 2010, the date that is 90 days prior to the petition date, (referred to herein as the "Start Date").  If the amount by which an "undersecured" creditor is undersecured is less on the End Date than on the Start Date, then a trustee may avoid the amount of the "improvement" in the undersecured creditor's position if such improvement prejudiced other unsecured creditors.  While it is relatively simple to determine the debt balances on the two dates, determining the value of the receivables and inventory collateral on each of the two dates has been more problematic.  When the provision was adopted, the methodology to value the collateral was not agreed upon and so it was left to the discretion of each bankruptcy court on a "case by case" basis.  There has been some consensus reached among the cases that whatever valuation method is employed, the same methodology should be used at both valuation dates.  Certain parties in this Chapter 11 Case have asserted that the Trustee has not adhered to this "same valuation" requirement in his

72

analysis of whether Fifth Third's position improved – they are incorrect in this assertion.  In his analysis, the Trustee used the liquidation value of the Collateral both at the End Date and at the Start Date.  These objectors have not taken into consideration the fact that the character of the Collateral changed during the 90 day preference period due to the actions of Tommy Gibson and certain third parties that were doing business with ELC.

At the Start Date (September 7, 2010) on a gross "book" basis, Fifth Third was fully secured with a $205,000 cushion.  At the End Date on a gross "book" basis, Fifth Third remained fully secured and some $17.847 million would have been available for distribution to unsecured creditors.  However when the collateral package is adjusted to reflect realizable net liquidation values, Fifth Third is undersecured by $10.952 million at Start Date and undersecured by $11.432 million on the End Date.

Certain parties in the Chapter 11 Case find this result counter-intuitive because the loan balance decreased from $42.082 million to $35.834 million during the 90 days so how could that result in a decrease in Fifth Third's secured position.  However, the comparison is not the change in loan balance, but the change (reduction) in the amount that the undersecured creditor is unsecured (i.e., the delta between debt and net realizable collateral value).  This provision of the Bankruptcy Code subjects secured creditors to a preference recovery not for being paid on their collateral, as payment of collateral proceeds does not prejudice unsecured creditors, but only for realizing fuller recovery from collateral on the End Date than on the State Date that does result in prejudice to unsecured creditors.  That in fact could have occurred here, but for the actions of Tommy Gibson and third parties that dissipated assets that would appear to be Fifth Third's collateral – by converting receivable payments and cattle, reporting high cattle deaths, and affecting ELC's contracts resulting in the loss of cash deposits and causing buyers' setoffs.

73

Because of these actions, the collateral package on the End Date was greatly diminished in liquidation value from the liquidation value of the collateral package on the Start Date. Liquidating an intact collateral package and a dissipated/contested collateral package logically requires the application of different recovery percentages – but that does not make the analysis inconsistent or mean that a "going concern" value was used at one end and a "liquidation" value at the other.  Using an "adjusted" smaller recovery percentage for the End Date analysis simply recognizes that the character and collectability of the collateral has suffered a substantial negative change during the weeks preceding the Petition Date.

Certain parties have asserted that any analysis should include an assumption that the collateral package on the State Date would have been dissipated by third parties' actions prior to the 90 days just as it was by their actions prior to the End Date.  This assertion seems inconsistent with the fact that the improvement in position test is one of determining whether the secured creditor's position improved during the actual 90 days, and so the analysis must be of the value of collateral as it actually existed on the two dates without supposing hypothetical pre or post 90 days actions to dissipate the value of the collateral.  If one were to transport to the End Date the collateral package as it existed on the Start Date and compare it with the collateral package as it existed in fact on the End Date, the relative value (realization on liquidation) of the collateral would be quite different.  Under this analysis which the Trustee believes would be asserted by Fifth Third and considered by the Court, the Trustee believes that his ability to prevail and assert that Fifth Third did in fact improve its position is at best a fifty-fifty proposition.  At the very least, the litigation over this issue – which would naturally include litigation over the conversion of collateral by Tommy Gibson and those third parties —  would be both lengthy and costly and possibly result in the Trustee losing the issue.

74

**D.     Possible Application of Bankruptcy Code § 553**

~~Counsel for Superior has~~Certain parties have suggested that Fifth Third may have

effected a "setoff" against deposits made by ELC during the Preference Period.  If Fifth Third

effected such setoffs the Trustee might assert a claim to avoid and recover amounts from Fifth

Third under Bankruptcy Code § 553 (a "553 Claim").  A 553 Claim would exist if and to the

extent setoffs by Fifth Third caused Fifth Third's "insufficiency" (defined as the positive

difference between 1) the amount of Fifth Third's claim against ELC less 2) ELC's claim against

Fifth Third) on September 7, 2010 to become less than the insufficiency at points during the

Preference Period.

Arguably Fifth Third effected setoffs when Fifth Third applied deposited checks, after

Fifth Third froze the Funding Account and disbursement accounts on November 2, 2010.  By

applying deposited checks Fifth Third did not effect setoffs; instead, the deposit of checks into

the collection account and Fifth Third's application of those deposits to pay down the Kite Debt

constituted either 1) transfers (i.e., payments) made directly to Fifth Third or 2) Fifth Third's

exercise of its rights to take control of its collateral after default.

11 U.S.C. § 553 governs the exercise of setoff rights in bankruptcy and in the 90 days

immediately prior to the filing of a bankruptcy.  11 U.S.C. § 553 does not create a right of setoff,

but instead recognizes whatever rights of setoff a creditor may have under applicable

nonbankruptcy law.  11 U.S.C. § 553(a).  While 11 U.S.C. § 553, does not create an affirmative

right of setoff, it does place certain limits on the otherwise valid exercise of setoff rights. One of

those limits is found in § 553(b)(1), which provides:

> Except with respect to a setoff of a kind described in section
> 362(b)(6), 362(b)7), 363(b)(17), 362(b)(27), 555, 556, 559, 560,
> 561, 365(h), 546(h), or 365(i)(2) of this title, if a creditor offsets a
> mutual debt owing to the debtor against a claim against the debtor

> on or within 90 days before the date of the filing of the petition,
> then the trustee may recover from such creditor the amount so
> offset to the extent that any insufficiency on the date of such setoff
> is less than the insufficiency on the later of—
> (A) 90 days before the date of the filing of the petition; and
> (B) the first date during the 90 days immediately preceding the
> date of the filing of the petition on which there is an insufficiency.

11 U.S.C. § 553(b)(2) defines "insufficiency" as "the amount, if any, by which a claim against

the debtor exceeds a mutual debt owing to the debtor by the holder of such claim."

While 11 U.S.C. § 553(b) does not specifically mention the term "improvement in

position", the section was clearly adopted as an alternative to 11 U.S.C. § 547(c): "Congress has

adopted the improvement of position test of section 553 from the test in section 547(c)"

H.R.Rep. No. 95–595, 95th Cong. 1st Sess. 185, U.S.Code Cong. & Admin.News 1978, pp.

5963, 6145; *In re Van Shop* 8 B.R. 73 (Bkrtcy. Ohio 1980); *In re Balducci Oil Co. Inc.* 33 B.R.

847, 852 (Bkrtcy.Colo.1983).  A Seventh Circuit case explained Congress's intent as follows:

> When drafting the new Bankruptcy Code, therefore, Congress
> decided to impose certain limitations on the right of setoff. One
> possible limitation proposed in the original House Resolution was
> to include "setoff" in the general definition of transfer, thus
> enabling its consideration under section 547(b). The Senate
> rejected this approach of treating setoffs as transfers, however, and
> chose instead to subject them to special rules. *See* Statement by
> Senator DeConcini, Senate Debate on the Compromise Bill to H.R.
> 8200, 124 Cong. Rec. at 33,993 (95th Cong.2d Sess. October 5,
> 1978).

*In re Prescott,* 805 F.2d 719, 730 (7th Cir. 1986).

Congress clearly contemplated that a bank's actions could constitute a "transfer" avoidable under

11 U.S.C. §§ 547(c) or a "setoff" avoidable under 11 U.S.C. § 553(b), but not both.

To determine if 11 U.S.C. § 553(b), as opposed to 11 U.S.C. § 547(c), applies, a court

must first determine whether an otherwise valid setoff has occurred.  The Supreme Court, in

*Citizens National Bank of Maryland v. Strumpf*, stated that, "as a general rule, setoff does not occur unless three steps have been taken "(i) a decision to effectuate a setoff, (ii) some action accomplishing the setoff, and (iii) a recording of the setoff." 516 U.S. 16, 19 (1995). Under Indiana law, "a set-off exists between two persons, 'each of whom under an independent contract, express or implied, owes an ascertained amount to the other.'" *American Management, Inc. v. MIF Realty, L.P.*, 666 N.E.2d 424 (Ind. Ct. App. 1996). If the court finds that an otherwise valid setoff has occurred, the court then must apply the two-part "insufficiency" test of 11 U.S.C. § 553(b).

Fifth Third did not effect setoffs. First, there can be no setoff in the absence of mutual debts owing from Fifth Third to ELC and from ELC to Fifth Third. Second, there must be some affirmative act by Fifth Third accomplishing a setoff.

The Trustee has not seen any documents that would evidence a debt owed from Fifth Third to ELC or any affirmative action by Fifth Third to effectuate a setoff. It might be assumed that ELC maintained a normal deposit and/or checking account at Fifth Third such that ELC's deposit of checks into such account created a contractual obligation by Fifth Third to repay those funds to ELC (or ELC's designees). However, ELC did not maintain any deposit or checking account with Fifth Third and, if it did, it did not deposit any checks into such an account from and after September 7, 2010.[33] As a result, there was no debt owed from the Fifth Third to ELC against which Fifth Third could have setoff obligations of ELC to Fifth Third. The Credit Agreement by and between Fifth Third and ELC provided that all deposits into the "Collection

---

[33]  However, beginning in October 2010, ELC began depositing checks from Tommy Gibson and GP cattle directly into the operating account.

BDDB01 9526463v1

Account" (see below) were outright transfers to Fifth Third to be applied against ELC's outstanding "Obligations" to the Fifth Third:

> Borrower has established and will maintain an account at Lender or an affiliate of Lender (the "Collection Account") in accordance with Lender's (or as applicable, the applicable Lender's affiliate's) policies and procedures (current account number: ----------).  Each Business Day, Borrower will deposit at Lender's New Albany, Indiana branch all Remittances to the Collection Account.  Any Remittance received by Borrower shall be deemed held by Borrower in trust and as fiduciary for Lender.  Pending such deposit in the Collection Account, Borrower will not commingle any such Remittance with any of Borrower's other funds or property, but Borrower will hold it separate and apart therefrom in trust for Lender.  ***All deposits to the Collection Account will be Lender's property to be applied against the Obligations*** in such order and method of application as may be elected by Lender in its discretion exercised in good faith and will be subject only to the signing authority designated from time to time by Lender, and ***Borrower shall have no interest therein or control over such deposits or funds***.

> Credit Agreement, ¶ 2.2(b) (emphasis added).

Instead of a depository relationship, ELC maintained a cash management/controlled disbursement arrangement with Fifth Third (for which Fifth Third was entitled to be paid a servicing fee).  Pursuant to the Credit Agreement, ELC did not have any contractual right to funds it deposited with Fifth Third, meaning that no debt from Fifth Third to ELC arose upon the deposit of checks.  Instead, and in the normal course of business, ELC's operations were funded by advances that Fifth Third made under the Revolver.  Pursuant to the Credit Agreement, advances on the Revolver would be transferred into ELC's "Funding Account", which would then be made available to ELC via a/an "Controlled Disbursement Account(s)" (provided that ELC was not in default of the Credit Agreement or other loan documents).  Credit Agreement, ¶ 2.2(a).  All funds received by ELC (i.e., "Remittances") were to be deposited into the Collections

Account (transferred to Fifth Third).  As a result, none of ELC's accounts were deposit or

checking accounts by which Fifth Third was obligated to make any or all of the sums deposited

available to ELC.  Unlike other cases where a debt arose from the depository bank to the

depository debtor, Fifth Third did not owe any debt to ELC as a result of the deposit of checks

into the Collection Account and a setoff could not occur.  Further, pursuant to the unambiguous

terms of the Credit Agreement, the deposit of any funds into the Collection Account was an

outright transfer to Fifth Third.[34]  Accordingly, Fifth Third did not affect a setoff and 11 U.S.C. §

---

[34]   In *In re Prescott,* the Seventh Circuit discussed the effect of a deposit into a general account as opposed to a deposit that was to be applied to a debt:

> Deposits into bank accounts clearly can be transfers under the new Bankruptcy Code.  As the Senate Report stated, "The definition of transfer is as broad as possible.... A deposit in a bank account or similar account is a transfer." S.Rep. No. 989. 95th Cong., 2d Sess. 27, *reprinted in* 1976 U.S. Code Cong. & Ad. News, 5787, 5813; *Redmond v. Tuttle,* 698 F.2d 414, 417 n. 8 (10th Cir. 1983). However, under established caselaw, to the extent a deposit is made into an unrestricted checking account, in the regular course of business and withdrawable at the depositor's will, it is not avoidable by the trustee.  *Katz v. First National Bank of Glen Head,* 568 F.2d 964, 969, (2nd Cir. 1977).  This is because a deposit that is subject to withdrawal at the depositor's will does not deplete the bankruptcy estate.  *See* 4 Collier on Bankruptcy ¶ 547-16, at 547-59 ("The reasoning has been that the ordinary deposit results in substituting for currency, bank notes, checks, drafts and other bankable items as corresponding credit with the bank which may be checked against or withdrawn, and which provide the depositor with the medium of exchange in the transaction of business"); *see also Citizens National Bank v. Lineburger,* 45 F.2d 522 (4th Cir. 1930).

> The depositor does not have freedom to withdraw when the deposit is applied as payment for an antecedent debt. As the court said in *Miller v. Wells Fargo Bank International Corp.,* 406 F.Supp. 452 (S.D.N.Y.1975):

> If the deposit is accepted by the bank with an intent to apply it "on a pre-existing claim against the depositor rather than to hold [it] subject to the depositor's checks in ordinary course," ... the deposit is viewed legally as a transfer in payment of the debt. As such, it may be recovered by the trustee where the elements of a voidable preference are otherwise satisfied.

> *Id.* at 467, *aff'd,* 540 F.2d 548 (2d Cir.1976); *see also Katz,* 568 F.2d at 970.

> Here, to the extent the deposits compensated for overdrafts, they were payments on an obligation. Prescott had no right to keep using the money deposited. Nor

*Footnote continued on next page . . .*

79

553 does not apply.[35]  Fifth Third's preference exposure with respect to inventory and receivables collections must be analyzed under 11 U.S.C. § 547 (*See* Section III. C.).

In addition, and even if the Trustee could find some debt or affirmative act of setoff by Fifth Third, § 9-607(a)(2) and (4) of the UCC clearly contemplates that after default a depository bank may apply proceeds of its collateral that are in its possession.  The application of collateral in satisfaction of a secured debt is a transfer and not a setoff.  *See Smith v. Mark Twain Nat'l Bank*, 805 F.2d 278, 291 (8th Cir. 1986).  UCC § 9-607(a)(4) provides that if a secured party holds a security interest in a deposit account perfected by control under § 9-104(a)(1) the secured party may apply balances of deposit accounts to the obligation secured by the deposit account.  Application of collateral after default differs from setoff.  Courts facing this issue have generally found that 11 U.S.C. § 553 does not apply to the foreclosure of a security interest and/or application of collateral upon default, but some have come out the other way.  *See Smith v. Mark Twain Nat'l Bank*, 805 F.2d 278, 291 (8th Cir. 1986) ("we therefore hold that 11 U.S.C. § 553 is

---

does it matter that the bank was tolerant of Prescott's overdrafts. That the bank had earlier allowed Prescott to maintain overdrafts does not mean that Prescott had a right to continue the practice. Therefore the trustee could avoid deposits that were applied against Prescott's March 16 overdrafts insofar as they preferred Marine and indirectly preferred Gateway over other creditors.

805 F.2d 719, 729 (7th Cir. 1986)

[35]  A law review article written by Robert Laurence and Jill Jacoway (hereafter, the "Article") provides clear support for this argument.  12 Bankr. Dev. J. 101 (1995-1996).  Specifically, pages 112-13 of the Article state: "When a customer of a bank makes payment on a specific obligation, such as a mortgage indebtedness, the bank does not have the choice to apply the payment to some other indebtedness." Hence, the receipt of a mortgage payment does not create the common law right of setoff, and the bank's application of the payment to the mortgage is not an exercise of the right of setoff. On the other hand, a deposit made into a general checking account is money advanced by the depositor to the bank, without any ear-marking for a specific purpose. It is this kind of general, unrestricted deposit that creates the right of setoff. "A bank... has the right to pay a debt due to it out of the money in the possession of such bank to the *general* credit of such customers .... ,"' The application of section 553(b) turns, then, on whether the deposit is made into a general account or into one set aside for receiving payments on specific obligations."

BDDB01 9526463v1

inapplicable to valid foreclosures of security interests")[36]; *In re Intermountain Porta Storage, Inc.*, 74 B.R. 1011, 1017 (D. Col. 1987) ("The trustee maintains that contrary to the bankruptcy court's holding [11 U.S.C. § 553(b)] does apply to secured claims.  I reject this proposition."); *In re 4-S Corporation*, 69 B.R. 499, 501 (Bankr. W.D. Mo. 1987) ("the Court finds the bank's action in this case constituted foreclosure of a security interest in proceeds under UCC Article 9 and is not subject to an action to recover the funds as a setoff under 11 U.S.C. 553(b)."); *In re Union Carthage Co.*, 38 B.R. 134, 138) (Bankr. D. Ohio 1986) (same with regard to fully secured claim); *In re Moody & Newton, Inc.*, 64 B.R. 211, 212 (Bankr. M.D. Fla. 1986) (same with regard to fully secured claims); *but see In re First Ambulance Center of Tennessee, Inc.*, 182 B.R. 198, 202 (Bankr. M.D. Tenn. 1995) (finding that 11 U.S.C. § 553 applies to both secured and unsecured claims; *In re Haynes*, 309 B.R. 577 (Bankr. D. Ariz. 2004) (finding that setoffs are avoidable as to undersecured creditors); *In re Fox Bean Co., Inc.*, 287 B.R. 270, 285 (Bankr. D. Idaho 2002) (relying on 9th Circuit precedent in *In re Bakersfield Westar Ambulance, Inc.*, 123 F.3d 1243 (9th Cir. 1997) to hold that 11 U.S.C. § 553(b) "applied regardless of whether the bank's claim against the debtor was secured.")  The cases that apply 11 U.S.C. § 553(b) to secured claims argue that the plain language of 11 U.S.C. § 553 does not differentiate between a secured and unsecured claim:

> More importantly, however, § 553(b)(1) does not differentiate between secured and unsecured claims in determining insufficiencies. It merely says "claim" which is defined under §

---

[36]  *Smith* also states: "Various authorities, cases and commentators have noted that the rules in section 553 'do not apply with respect to 'set-offs' that are in fact seizure of property subject to a security interest.' 1A Bkr. L. Ed. § 6:225, at 401 (Lawyers Cooperative Publishing Co. 1981); *see Rankin v. First National Bank*, 416 So. 2d 738, 740 (Al. 1982); *In re Herren*, 10 B.R. 252, 255-56 (Bankr. N.D. Ala. 1981); Ahart, Alan M., Bank Setoff Under the Bankruptcy Reform Act of 1978, 53 Am. Bankr. L.J. 205, 227-29 (1979); G. Gilmore, Security Interests in Personal Property § 10.7, at 315-16 (1965))." 805 F.2d at 290.

> 101(5) to mean any "right to payment, whether ... secured or
> unsecured." This is in contrast to, for instance, § 547(c)(5), which
> specifically takes into account a creditor's secured status during the
> 90–day period.  Clearly, when Congress intends for a creditor's
> secured status to be relevant, it knows how to draft a statute
> accordingly. The absence of such clear language in § 553(b)
> indicates that secured status was not to be considered in the
> calculation of insufficiencies. *See BFP v. Resolution Trust Corp.,*
> 511 U.S. 531, ——, 114 S.Ct. 1757, 1761, 128 L.Ed.2d 556 (1994)
> ("It is generally presumed that Congress acts intentionally and
> purposely when it includes particular language in one section of a
> statute [here, the Bankruptcy Code] but omits it in another.").
> Further, under § 506(a), a setoff claim is itself considered a
> secured claim. To exempt secured claims from § 553(b)(2) would
> therefore render that section meaningless. *See Smith v. Babcock,*
> 19 F.3d 257, 263 (6th Cir. 1994) (court must avoid interpretation
> which renders some portion of statute meaningless or superfluous).

*In re First Ambulance Center of Tennessee, Inc.*, 182 B.R. 198, 202 (Bankr. M.D. Tenn. 1995).

These courts ignore the provisions of sections 9-607(a)(2) and (a)(4) of the UCC, which allow a

secured party to "take any proceeds to which the secured party is entitled" and "apply the balance

of the deposit account to the obligation secured by the deposit account" after default.  The Article

provides further support for the argument that the application of collateral after default is a

transfer, and not a setoff.  The Article provides, in part, that:

> The bank itself might be either unsecured in the indebtedness
> represented by the negative balance in the checking account, or
> secured, independent of setoff, under a valid security agreement. If
> the bank is, in fact, fully secured for the negative balance, the
> entire analysis changes. The application of the deposit to the
> negative balance would necessarily free up otherwise encumbered
> property and would neither improve the bank's position nor deplete
> the estate. Under such circumstances, neither § 547 nor § 553
> would require the deposit to be surrendered.  ***Even if the bank is
> unsecured in the negative balance, the deposit still could be
> collateral with respect to some other loan to the debtor - perhaps
> because the deposit is proceeds of other collateral. In this case
> the seizing of the deposit for its own purposes by the bank would
> not be a setoff to which § 553(b) applies, but rather an
> enforcement of Article 9 rights in collateral***. Article 9 of the

82

> Uniform Commercial Code forbids direct security interests in
> deposit accounts, U.C.C. § 9-104(1972), but a bank could be
> secured in the account if the funds are proceeds of some other
> collateral. *See* U.C.C. § 9-306(2) (1972); *see generally Four Circle
> Co-op v. Kansas State Bank & Trust Co.*, 771 F. Supp. 1144, 1145-
> 46 n.1 (D. Kan. 1991).

Article, p. 124, FN 90 (emphasis supplied).

Setoff avoidance

## E.    Equitable Subordination

The Trustee considered whether it would succeed in having the Court equitably

subordinate part or all of Fifth Third's claim.  The Sixth and Seventh Circuits, like most courts,

apply the equitable subordination standard set forth in *Matter of Mobile Steel Co.*, 563 F.2d 692

F.2d 692, 699-700 (5th Cir. 1977).  *See In re Baker & Getty Financial Services*, 974 F.2d 712,

717 (6th Cir. 1992) (noting that "[m]ost courts have uniformly followed and applied the *Mobile

Steel* test); *In re Lifschultz Fast Freight*, 132 F.3d 339, 344-45 (7th Cir. 1997) (applying *Mobile

Steel* in Seventh Circuit).  Under the *Mobile Steel* test, a party seeking equitable subordination

must demonstrate, by a preponderance of the evidence, three conditions:

a.    The claimant must have engaged in some type of inequitable
conduct[37].

b.    The misconduct must have resulted in injury to the creditors of the
bankrupt or conferred an unfair advantage on the claimant.

c.    Equitable subordination of the claim must not be inconsistent with
the provisions of the Bankruptcy Act.

---

[37] Although courts offer various permutations of what constitutes "inequitable conduct," it is clear that courts
require more than negligence.  "[M]ere negligence cannot be basis for inequitable conduct sufficient to support a
claim for equitable subordination."  *Southwest Bank of Texas v. Whippler*, No. 4:03-cv-1816, 2005 WL 2647948,
*5 (E.D. Mo. Oct. 17, 2005) (citing *Maryland Nat'l Bank v. Vessel Madam Chapel*, 46 F.3d 895, 901 (9th Cir.
1995)).

*Id.* at 718 (citing *Mobile Steel*, 563 F.2d at 699-700).

The critical inquiry, and the first step in any equitable subordination analysis, is whether there has been "inequitable conduct."  *See Lifschultz*, 132 F.3d at 344 (noting that, if there is no inequitable conduct, "then the bankruptcy court cannot subordinate a claim").  Where the claimant is a non-insider, as is the case with Fifth Third, the severity of inequitable conduct that must be demonstrated is much higher than in cases dealing with insiders:

> Where the claimant is a non-insider, egregious conduct must be proven with particularity.  It is insufficient for the objection in such cases merely to establish sharp dealing; rather, he must prove that the claimant is guilty of gross misconduct tantamount to "fraud, overreaching or spoliation to the detriment of others."

*In re Baker & Getty Financial Services*, 974 F.2d at 718 (quoting *Matter of Teltronics Serv., Inc.*, 29 B.R. 139, 169 (Bankr. E.D.N.Y. 1983) (citations omitted)).[38]  Courts have noted that "inequitable conduct" generally falls within the following categories: "(1) fraud, illegality, breach of fiduciary duties; (2) undercapitalization; and (3) claimant's use of the debtor as a mere instrumentality or alter ego."  *In re Lifschultz Fast Freight*, 132 F.3d at (quoting *In re Missionary Baptist Found. of America*, 712 F.2d 206, 212 (5th Cir. 1983)); *see also In re Bellanca Aircraft Corp.*, 850 F.2d 1275, 1282-82 (8th Cir. 1988).

In considering equitable subordination, assuming a case successfully could be made, the extent to which a claim is actually subordinated is also a factor.  A court will only equitably subordinate, if appropriate under the circumstances, to the extent necessary to compensate other creditors for the harm resulting from the creditor's misconduct.  *See, e.g.*, *In re N&D Prop., Inc.*, 799 F.2d 726, 732-33 (11th Cir. 1986).  It is not axiomatic that a bad acting creditor's entire claim

---

[38] "Where the claimant is an insider, his dealings with the debtor will be subjected to more exacting scrutiny."  *In re Baker & Getty Financial Services, Inc.*, 974 F.2d at 718.

is to be subordinated.  For example, one scenario is that a successful subordination of Fifth Third's claim would result in a subordination to the extent of Fifth Third's profits on the account received over some period of time.  Conversely, successful subordination of Fifth Third's entire claim would likely be a massive windfall from which creditors might receive 100 cents on the dollar.

The Trustee believes that a colorable cause of action may exist to seek equitable subordination of part of Fifth Third's claim.  The Trustee discovered evidence that until the fall of 2010 Fifth Third failed to fully heed internal and external safeguards designed to alert it to the existence of check kiting and the fraudulent reporting of receivables and inventory.  That evidence is available to all creditors subject to the confidentiality requirements on the Trustee's electronic repository (including the transcripts of the thirteen Rule 2004 exams, exhibits thereto and documents from Fifth Third, Wells Fargo and Wayne Stoffel).  It is not beyond the realm of possibility that an inference could be drawn from Fifth Third's failure to heed such warnings, that it ignored them in pursuit of fees from the account.  To that end, Fifth Third earned approximately $2 million in 2009 from its relationship with ELC and another $1.7 million in 2010.

Yet, as expressed by Fifth Third's officers in their Rule 2004 examinations, the idea of shutting down a business with such large revenues, such as ELC, and the inevitable repercussions (especially lender liability) from such an action gave pause to the bankers, as it would to most businesses.[39]

---

[39] "[E]ven when a kite is suspected, there may be a number of reasons banks move slowly to accuse an account holder of kiting." *Firstar Bank*, 976 F. Supp. at 1241 (citing *First Nat'l Bank in Harvey v. Colonial Bank*, 898 F. Supp. 1220, 1223 (N.D. Ill. 1995) (describing the difficulties in determining when a customer is kiting or

*Footnote continued on next page . . .*

BDDB01 9526463v1

Claims of equitable subordination against lenders are difficult to successfully prosecute and, on balance, many more such claims have been lost than have been successful, indicating the reluctance of courts to subordinate secured claims of institutional, non-insider lenders absent proof of actual culpability and even then, not necessarily the entirety of the claim. *See, e.g.,* 2003 Ann. Surv. Of Bankr. Law 19, 24 (2003); *see also Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1356 (7th Cir. 1990) ("Cases subordinating the claims of creditors that dealt at arm's length with the debtor are few and far between."); *In re Hedged-Investments Associates, Inc.*, 380 F.3d 1292, 1302 (10th Cir. 2004) (refusing to apply equitable subordination even where lender was arguably negligent in extending credit to debtor engaged in Ponzi scheme); *Stratton v. Equitable Bank, N.A.*, 104 B.R. 713, 731 (D. Md. *1989)* (imposing no equitable subordination even where lender was arguably negligent in continuing to lend to grossly undercapitalized debtor).

In *In re Hedged-Investments Associates, Inc.*, the Tenth Circuit held that a lender's lack of due diligence in making a loan to a thinly capitalized corporate debtor that was being operated by its principal as part of a Ponzi scheme did not rise to the level of inequitable conduct required for equitable subordination. *380 F.3*d at 1302. The court reasoned that "[f]ailure to conduct due diligence was certainly bad business practice, . . . but these facts do not amount to blatant fraud or other illegality at the expense of . . . other creditors." *Id.*

Similarly, in *Stratton v. Equitable Bank, N.A.*, the United States Bankruptcy Court for the District of Maryland granted summary judgment to a lender on an equitable subordination claim

---

engaging in legitimate movement of funds, and noting that banks may be reluctant to take any action on a suspected kite for fear of liability to a customer for wrongful dishonor of checks or defamation, or fear of angering a large customer, if no kiting is in fact occurring)).

where the lender was not certain that the debtor was engaging in fraud but may have acted negligently in continuing to lend to a grossly undercapitalized debtor committing potential illegalities.  104 B.R. at 731.  The court reasoned that, while the lender's "business decisions were ill-advised, . . . these facts fall far short of establishing the type of self-dealing or otherwise inequitable conduct which courts have found necessary for . . . equitable subordination."  It further noted that, while the lender "did know of irregularities in the debtor's operations, and some of its employees may even have suspected that [borrower] was engaging in fraudulent activities[,] . . . knowledge of bookkeeping irregularities of a depositor or suspicions of a few employees of a large banking institution are not equivalent of knowledge that another party doing business with the bank's depositor is being defrauded."  *Id.* at 731.  Indeed, the bank itself was being defrauded by the depositor.  *Id.*

On facts similar to those in this case, the Spring Grove Livestock Exchange trustee moved the court to equitably subordinate the claims of two banks, contending that the banks' return of kited checks constituted misconduct that conferred an unfair advantage on the banks, while unfairly affecting other creditors.  *See In re Spring Grove Livestock Exchange, Inc.*, 205 B.R. 149 (Bankr. D. Minn. 1997).  The United States Bankruptcy Court for the District of Minnesota rejected the trustee's claims, and applying the *Mobile Steel* factors, concluded that the banks' actions could not be construed as misconduct:

> In light of the facts of this case, I felt it would require a creatively strained judicial construction to construe the defendants' actions as misconduct.  Simply put: The defendants' legal dishonor of kited checks does not rise to the level of misconduct necessary to warrant the equitable subordination of their claims.  In fact, I am hard pressed to describe the defendants' actions as *mis*conduct at all.  Furthermore, I find it somewhat incongruous for the trustees to invoke an equitable remedy in the wake of the debtor's multi-

87

> million dollar check kiting scheme.  Indeed, a bankruptcy court
> may not invoke its equitable powers to perpetrate inequity.

*Id.* at 162-63 (citing *Pepper v. Litton*, 308 U.S. 303-05 (1939)).

~~Superior has~~Certain parties have questioned the Trustee's characterization in the Trustee's Report of the Estate's potential equitable subordination claim as "colorable" ~~given the fact (1)~~when it is asserted that no specific facts are discussed~~; and (2)~~ the Trustee has conducted only preliminary discovery~~ has been conducted.  First, Superior knows the "facts" as its counsel was present at all thirteen (13) of the Rule 2004 Examinations.  Second, contrary to Superior's assertion, more than "preliminary discovery" has been done thus far~~.  However, Special Counsel conducted twelve (12) Rule 2004 Examinations of Fifth Third former and current personnel - six (6) members of the "bank protection" business unit; three (3) members of the "line of business" business unit; one (1) member of the credit department; and two (2) members of the field examination group.  In addition, Special Counsel conducted a Rule 2004 Examination of Wayne Stoffel, an agricultural business consultant who performed the May and October 2010 field exams of ELC for Fifth Third.

Special Counsel also reviewed and analyzed in excess of 50,000 pages of documents produced by Fifth Third, Mr. Stoffel, Wells Fargo and documents received from Metcalfe County, Kentucky.  With the exception of the documents received from Metcalfe County Court[40] (which are subject to a different court's confidentiality order) all of the documents are available on the Trustee's shared repository subject to the confidentiality agreement.

---

[40] Metcalfe County is where the Kentucky criminal proceedings against Thomas and Grant Gibson, Stephen McDonald and Darren Brangers are pending.

Some have suggested that the Trustee should examine *American Cigar Co., et al v. MNC Commercial Corp.* (*In re Paolella & Sons, Inc.*), Bankr. No. 86-00495F, Adversary Nos. 87-1007F, 88-0232F) 1991 Bankr. Lexis 1181 (Bankr. E.D. Pa. April 15, 1991).  Reliance on this case is misplaced.  In *Paolella*, the bankruptcy court rejected the trustee's attempt to subordinate the secured creditor's claim to the claims of all unsecured creditors.[41]  *Id*. at * 56-57.  The court found that the secured creditor had no duty to permit the debtor to liquidate on its terms or that such liquidation would have permitted unsecured creditors a dividend.  *Id; see* also *American Cigar*, 1991 Bankr. Lexis 1181 (quoting *Kham & Nates Shoes, No. 2, Inc. v. First Bank*, 908 F.2d 1351, 1356-57 (7th Cir. 1990)) where the Seventh Circuit expressly rejected the contention that a lender who acts in conformity with the provisions of its loan agreement acts inequitably:

> We are not willing to embrace a rule that requires [*47] participants in commercial transactions not only to keep their contracts but also do "more" – just how much more resting in the discretion of a bankruptcy judge assessing the situation years later. …  Unless pacts are enforced according to their terms, the institution of contract, with all the advantages private negotiation and agreement brings, is jeopardized.

Moreover, apropos to any effort by the Trustee to equitably subordinate all or part of Fifth Third's Claim is the principle established by at least one court that a lender, like Fifth Third, does not have a duty to advise other creditors of the fact that the lender suspects that its debtor is engaged in check kiting.  *See*, *Pereira v. United Jersey Bank, N.A.*, 201 B.R. 644, 674-75 (Bankr. Ct. S.D.N.Y 1996).

**F.      Avoidance of Fifth Third's Security Interest Under Good Faith Purchaser Analysis**

---

[41]   The bankruptcy court in *Paolella* did, however, equitably subordinate the secured creditor's claim to the extent of the amount of excess credit provided by the debtor's tobacco suppliers.

Counsel for Superior and other Objectors have asserted that Fifth Third's security interest could not attach to cattle purchased by ELC and receivables generated by ELC's sale of cattle unless Fifth Third was as to such cattle and receivables, a "good faith purchaser [from ELC] for value". This theory (the "Good Faith Theory") assumes that ELC had no more than "voidable" title to those cattle and receivables.[42] The Trustee contends that the Good Faith Theory is wrong. Even if one assumes that ELC took only "voidable" title to the subject cattle (which is legally incorrect), Fifth Third's security interest still attached to ELC's (and the estate's) rights in those cattle, whatever those rights may have been and whether or not Fifth Third was a "good faith purchaser [from ELC] for value".[43]

---

[42] "A secured creditor's interest in collateral in which the debtor only has voidable title can only attach if the secured creditor is a 'good faith purchaser for value.'" (Memo from John Rogers, counsel for Superior, p. 1).

[43] The Good Faith Theory also ignores that Fifth Third probably qualifies as a "good faith purchaser for value." Knowledge of third party claims has no bearing on a secured party's status as a "good faith purchaser for value." *See In re Samuels & Co., Inc.*, 526 F.2d 1238, 1243-44 (5th Cir. 1976) ("the Code's definition of an Article Two good faith purchaser does not expressly or impliedly include lack of knowledge of third party claims as an element."); *Shell Oil Co., v. Mills Oil Co., Inc.*, 717 F.2d 208 (5th Cir. 1983) (secured party's knowledge of unpaid seller's reliance did not compel a finding that secured party was not a good faith purchaser for value); *U.S. v. Wyoming Nat'l Bank of Casper*, 505 F.2d 1064, 1068 (10th Cir. 1974) (Secured party's security interest attached upon delivery and had priority over unpaid seller); *Maryott v. Oconto Cattle Co.*, 607 N.W.2d 820 (Neb. 2000) (finding that lender, as secured creditor with a perfected security interest in cattle which resulted from an after-acquired property clause, qualified as a good faith purchaser for value and received priority over retained interest in cattle of unpaid seller: "In this case, lack of notice is not required under the UCC in order for a purchaser to act in good faith."); *First Nat'l Bank of Elkhart v. Smoker*, 286 N.E.2d 203 (Ind. Ct. App. 1972) (Indiana cattle case finding that once a debtor has acquired possession, he or she has acquired sufficient rights to allow security interest of creditor to attach); *Kennett Murray & Co. v. Pawnee Nat. Bank*, 598 P.2d 274 (Okla. App. 1979) (holding that UCC limits the remedies of an unpaid seller to reclamation and citing several cases that hold that secured party can qualify as a good faith purchaser for value); *Dixie Bonded Warehouse and Grain Co., Inc. v Allstate Fin. Corp.*, 755 F. Supp. 1543, 1552 (D.C. GA. 1991) ("any knowledge of outstanding third party claims, while relevant in some bona fide purchaser contexts, is not relevant to the analysis of Allstate's Article Two good faith purchaser's status."); *Cooperative Fin. Ass. Inc. v. B&J Cattle Co.*, 937 P.2d 915, 920 (Colo. Ct. App. 1997) (citing cases and holding that "a perfected security interest resulting from an after-acquired property clause prevails over the retained interest of an unpaid cash seller." Also, stating: "***We recognize that Cooperative may, in essence, realize a windfall at the expense of B&J. We note, however, that the secured creditor with an after-acquired property clause is frequently a line-of-credit lending institution which can, and sometimes does, elect without notice to terminate advances on the line of credit and then dishonors drafts issued in reliance on the line of credit. In that instance, the secured creditor may well enhance its secured position at the expense of the unpaid cash seller. Even under these circumstances, however, the secured party prevail.***"); *MBank Waco, N.A. v. L&J, Inc.*, 754 S.W.2d 245 (Tex. Ct. App. 1988) (denying constructive trust

*Footnote continued on next page . . .*

90

Those parties asserting the Good Faith Theory for attacking Fifth Third's secured creditor position conflate the "good faith purchaser" requirement of UCC § 2-403(1) with the requirements for attachment of an Article 9 security interest set forth in UCC § 9-203.  UCC § 9-203 does not use the phrase "good faith purchaser".  Additionally, they misread UCC § 2-403(1).

First, UCC § 9-203, and not UCC § 2-403(1), governs the attachment of an Article 9 security interest.  *See* UCC  § 2-403(4) ("The rights of other purchasers of goods and of lien creditors are governed by the Articles on Secured Transactions (Article 9), Bulk Sales (Article 6) and Documents of Title (Article 7)."); *see also* Official UCC Comment to § 1-103, No. 4.  UCC § 9-203(a) provides that "a security interest attaches to collateral when it becomes enforceable against the debtor", and UCC § 9-203(b) requires for a security interest to be enforceable "against the debtor and third parties" that (1) value has been given by the secured creditor, (2) *the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party*, and (3) the debtor has authenticated a security agreement that provides the description of the collateral or another condition of that subsection is met.  (Emphasis added).  In this case, none of these three elements is missing.  Challengers to Fifth Third's secured position seem to take issue with the second element (that ELC had "rights in collateral"), but this cannot logically be correct.  If ELC did not have rights in the collateral (cattle), then ELC could not have sold the cattle to third party purchasers giving rise to receivables and Receipt Checks (as proceeds).  Moreover the "collateral" that Fifth Third has not yet recovered could not become estate property and the question of whether Fifth Third's security interest attached would not be relevant to this

claim and finding that MBank was a good faith purchaser for value as a secured party with after-acquired property clause).

chapter 11 case.  UCC § 9-203 makes clear that if ELC had "rights in the collateral", then Fifth

Third's security interest attached to those rights.[44]

Whether Fifth Third qualified as a "good faith purchaser [from ELC] for value" would

have no effect on the attachment of its security interest under UCC § 9-203.  Nothing in UCC §

9-203 requires that the secured party be a "good faith purchaser" for attachment of its security

interest. UCC § 9-203 only requires that ELC have "rights in the collateral *or* the power to

transfer rights in the collateral to a secured party."  The key phrase is "rights in the collateral",

not "good faith purchaser for value."  While the UCC does not define the phrase "rights in

collateral", courts have generally held that possession plus some additional right is all that is

necessary for a security interest to attach.  For example, the Eighth Circuit in *Kunkel v. Sprague

Nat'l Bank* held that a cattle buyer/debtor had sufficient "rights in collateral" for Sprague's

security interest to attach to cattle that remained in the unpaid seller's possession.  128 F.3d 636

(1997).  Sprague had a perfected blanket security interest in the debtor/cattle buyer's inventory

and receivables, including after-acquired property.  The Eighth Circuit looked to Article 2 to help

determine whether the debtor had "rights in collateral" under Kansas' version of UCC § 9-203

and ultimately concluded, without any discussion or analysis of the debtor's status as a "good

faith purchaser", that the debtor/cattle buyer had sufficient "rights in the collateral" for the

---

[44]  Official Comment No. 6 to UCC § 9-203 states "subsection (b)(2) conditions attachment on the debtor's having 'rights in the collateral or the power to transfer rights in the collateral to a secured party.'  *A debtor's limited rights in collateral, short of full ownership, are sufficient for a security interest to attach.*  However, in accordance with basic personal property conveyancing principles, the baseline rule is that a security interest attaches only to whatever rights a debtor may have, broad or limited as those may be."  (Emphasis added).

attachment of the lender's lien.[45]  Because *Kunkel* is directly on point, the court's analysis of the

provisions of the UCC applicable to cattle sales deserves repeating here:

> "The phrase "rights in the collateral" is not defined in the UCC. "If the debtor owns the collateral outright, it is obvious that the security interest may attach...." B. Clark, *The Law of Secured Transactions Under the Uniform Commercial Code* ¶ 2.04[1], at 2-43 (Rev. ed.1993). It is also well-settled, however, that "rights in the collateral" may be an interest less than outright ownership, but must be more than the mere right of possession. *See id.; see also* 4 J. White & R. Summers, *Uniform Commercial Code* 126 (4th ed. 1995) ("It follows that almost any 'rights in the collateral' will suffice under 9-203."). The concept of "title" is not determinative. *See* Kan. Stat. Ann. § 84-9-202. "An agreement to purchase can give rise to sufficient rights in the debtor to allow a security interest to attach, regardless of whether the debtor has technically obtained title to the property." *United States v. Ables,* 739 F. Supp. 1439, 1444 (D. Kan. 1990). Courts consider factors such as the extent of the debtor's control over the property and whether the debtor bears the risk of ownership. *See, e.g., Kinetics Tech. Int'l Corp. v. Fourth Nat'l Bank,* 705 F.2d 396, 399 (10th Cir. 1983) (debtor's control); *Chambersburg Trust Co. v. Eichelberger,* 403 Pa. Super. 199, 588 A.2d 549, 552-53 (1991) (debtor had risk of ownership). The debtor need not have possession in order to pledge the property; the UCC expressly contemplates that the secured party may retain possession of the collateral. *See* Kan. Stat. Ann. § 84-9-305.
>
> The district court looked to Article 2 of the UCC, which governs sales, to determine whether Morken had "rights in the collateral." It was appropriate to consider Article 2 principles. "In many cases the secured creditor may turn to Article 2 of the UCC to measure the debtor's 'rights' with respect to collateral." Kan. Stat. Ann. § 84-9-203 Kan. cmt. (1996). The district court erred, however, in its interpretation of Article 2 and its conclusion that the cattle transactions did not bestow Morken with "rights in the collateral."[1] As will be seen, the cattle were sold and delivered by Hoxie to Morken and Morken thus acquired "rights in the collateral."

---

[45]   The Eighth Circuit went on to find that the seller maintained priority because it retained a properly perfected purchase money security interest by possession, but only after explicitly overruling the district court's finding that Sprague's security interest did not attach.

A "sale" is the passing of title from buyer to seller for a price. Kan. Stat. Ann. § 84-2-106(1). Where delivery of the goods is made without moving the goods, title passes from buyer to seller at the time parties contracted if the goods are identified at that time. *Id.* § 84-2-401(3)(b). When identification occurs, the buyer acquires a "special property" and, importantly, any title interest retained by the seller is limited to the reservation of a security interest. *Id.* § 84-2-401(1). Physical receipt of the goods by the debtor is not necessary; rather, a sale may take place if the goods are constructively delivered to the buyer through delivery to the buyer's agent or bailee. "Delivery is not required for a 'sale' to take place, and the buyer does not even need any right to possession of the goods in question." B. Clark, *The Law of Secured Transactions* ¶ 3.04[2], at 3-48.[2]

By analogy here, delivery of the cattle to Morken occurred, even though he was still obligated to pay Hoxie for the cattle, and even though Hoxie retained possession of the cattle on Morken's behalf. Thus, the sales were complete. The district court erred in holding that the sale arrangements were executory contracts just because Morken had not paid Hoxie. "An executory contract is one the obligation of which relates to the future." *Wagstaff v. Peters,* 203 Kan. 108, 453 P.2d 120, 124 (1969). "However, a contract is not executory merely because it has not been fully performed by payment, if all the acts necessary to give rise to the obligation to pay have been performed." *Id.* Thus, the fact that Morken had not fulfilled his payment obligations did not make the agreements executory.

In this case, the cattle were identified in the invoices and other transaction documents, and the parties agreed that delivery would be made to Morken by delivering the cattle to Hoxie at its feedlot. The feedlot agreements recited that the cattle belonged to Morken. Morken solely bore the risk that the venture would not generate a profit. Hoxie became a bailee of the cattle because it took "delivery of property for some particular purpose on an express or implied contract that after the purpose has been fulfilled the property will be returned to the bailor, or dealt with as he directs." *M. Bruenger & Co., Inc. v. Dodge City Truck Stop, Inc.,* 234 Kan. 682, 675 P.2d 864, 868 (1984) (quoting 8 C.J.S. Bailments § 1). Even though Hoxie had the right to deduct the costs of purchasing and caring for the cattle from the sale proceeds, the parties viewed Morken as owner of the cattle,[3] and Morken determined when cattle would be sold and at what price. In sum, Morken became the owner of an interest in the cattle, and Hoxie's interest in the cattle was therefore limited to that of a bailee and secured party.[4]

94

Here, in contrast, the parties had agreed that the cattle would be constructively delivered to the Hoxie feedlot, and this happened. Thus, the sales were consummated, and Morken acquired "rights in the collateral."

In similar circumstances, other courts have held that the debtor acquired "rights in the collateral" even though the debtor received only constructive delivery of the cattle to a feedlot. *See, e.g., The Cooperative Fin. Ass'n, Inc. v. B & J Cattle Co.,* 937 P.2d 915, 917, 920-21 (Colo.Ct.App.1997) (debtor acquired rights when cattle were delivered to a third party feedlot; secured creditor prevailed over unpaid cattle seller); *O'Brien v. Chandler,* 107 N.M. 797, 765 P.2d 1165, 1168-69 (1988) (same); *see also The Hong Kong & Shanghai Banking Corp. v. HFH USA Corp.,* 805 F.Supp. 133, 142-43 (W.D.N.Y.1992) (physical possession of the collateral is not necessary for the debtor to have rights).

Hoxie contends that the sale transactions were not completed because it had the right to stop delivery of the cattle upon discovering Morken's insolvency. *See* Kan. Stat. Ann. § 84-2-702. Hoxie lost its Article 2 right to stop delivery, however, when the cattle were constructively delivered to Morken and Hoxie acknowledged to Morken in the feedlot agreements and other transaction documents that Morken had purchased the cattle and Hoxie was holding them for Morken for feeding and sale purposes. *See id.* § 84-2-705(2)(b); *see also Abilene Nat'l Bank v. Fina Supply, Inc. ( In re Brio Petroleum, Inc.),* 800 F.2d 469, 472 (5th Cir. 1986) ("the Code makes clear that a seller's right to stop goods in transit may continue after delivery and until the buyer is in actual, physical or constructive possession of them"); *Ramco Steel, Inc. v. Kesler (In re Murdock Mach. & Eng'g Co.),* 620 F.2d 767, 773 (10th Cir. 1980) (same).

Moreover, in some circumstances, the debtor can transfer greater rights in the collateral to a third party than the debtor himself holds. Thus, "[a] person with voidable title has power to transfer a good title to a good faith purchaser for value." Kan. Stat. Ann. § 84-2-403(1). "Purchase" includes taking an interest in property by mortgage, pledge, or lien. *Id.* § 84-1-201(32). Therefore, a secured party such as Sprague can be a "good faith purchaser"[5] which can acquire an interest in the collateral greater than the interest of the debtor, Morken, and superior to the interest of an unpaid seller such as Hoxie. The leading case on this point is *Stowers v. Mahon (In re Samuels & Co., Inc.),* 526 F.2d 1238 (5th Cir.) (en banc) (per curiam), *cert. denied,* 429 U.S. 834, 97 S.Ct. 98, 50 L.Ed.2d 99 (1976), pitting a creditor with a security interest in the debtor's

BDDB01 9526463v1

cattle against the unpaid seller of the cattle. The court held that the secured creditor's interest was superior to the unpaid seller's interest under UCC § 2-403 which "gives good faith purchasers of even fraudulent buyers-transferors greater rights than the defrauded seller can assert." *Id.* at 1242. As to whether the debtor had "rights in the collateral," the court reasoned that the UCC's priority scheme of elevating a "good faith purchaser" over an unpaid seller necessarily requires that the debtor had "rights in the collateral" even though it had not paid for the cattle:

The existence of an Article Nine interest presupposes the debtor's having rights in the collateral sufficient to permit attachment, § 9-204(a). Therefore, since a defaulting cash buyer has the power to transfer a security interest to a lien creditor, including an Article Nine secured party, the buyer's rights in the property, however marginal, must be sufficient to allow attachment of a lien. *Id.* at 1243.[6] Thus, the debtor had "rights in the collateral," even though it had not paid the seller for those cattle.[7]

In summary, when the dust had settled after each of the five cattle transactions: (a) a sale had occurred; (b) Hoxie had constructively delivered the cattle to Morken and had possession of the cattle on Morken's behalf; (c) Morken had title to and owned the cattle; (d) the only interest retained by Hoxie in the cattle was a security interest and interest as bailee; (e) Hoxie's UCC Article 2 remedy of refusing to deliver the cattle had been cut off; and (f) Morken had "rights in the collateral" sufficient for Sprague's security interest to attach. Accordingly, we hold that Sprague had a perfected security interest in the cattle and reverse the district court on this issue."

---

[1] "The court also erred in concluding that Morken had "rights in the collateral" sufficient for Hoxie's security interest to attach but not Sprague's security interest. The "rights in the collateral" inquiry focuses on the debtor's relation to the collateral, and does not vary from one secured party to another. Thus, Morken either had "rights in the collateral" and both security interests attached, or he had no rights and neither security interest attached."

[2] "The district court quoted *Lakeview Gardens, Inc. v. State ex rel. Schneider,* 221 Kan. 211, 557 P.2d 1286 (1976), for the proposition that a completed delivery can occur, even though the goods remain in the seller's possession, if "nothing further remains to be done by either party to complete the sale." 198 B.R. at 739 (quoting 557 P.2d at 1291). Because Morken still had the duty to

pay Hoxie, the court reasoned that neither delivery nor a completed sale had occurred. The *Lakeview Gardens* case, however, reaches the opposite conclusion. The case involved the plaintiff's "preneed" sale of caskets to individuals who would purchase by paying cash or making installment payments. 557 P.2d at 1290. The casket would then be identified by number and stored in the seller's warehouse until requested by the buyer. The Supreme Court of Kansas held that constructive delivery of the caskets had occurred, even though the buyers might still have owed for their casket under an installment contract, and even though the seller retained possession of the caskets on behalf of the buyers. *Id.* at 1291."

[3] "In addition to the evidence recited above, the record contains other evidence that the parties viewed Morken as owner. Hoxie stated in its interrogatory responses that the cattle were owned and placed in the feedlot by Morken, and letters from Hoxie's counsel prior to this litigation also stated that Morken owned the cattle."

[4] "*Crocker National Bank v. Ideco Division of Dresser Industries, Inc.,* 839 F.2d 1104 (5th Cir. 1988), cited by the district court and relied upon by Hoxie, is factually distinguishable. The buyer and seller had agreed that the drilling rigs at issue would be delivered to a common carrier, which never occurred. *Id.* at 1107. Therefore, delivery did not take place, the sale was not consummated, and the buyer never acquired "rights in the collateral." *Id.* at 1107-09."

[5] "To receive good title under Kan. Stat. Ann. § 84-2-403(1), Sprague would have to be a "purchaser," act in "good faith," and provide "value." Sprague was a purchaser because it took a security interest in the cattle and provided value through extending credit, but we do not reach the good faith issue because of our holding in Part III. Even assuming that Sprague was a "good faith purchaser for value," Hoxie nevertheless prevails because Hoxie has a "superpriority" purchase money security interest. *See* Kan. Stat. Ann. § 84-9-312(3)."

[6] "Although the debtor in *In re Samuels & Co.* had taken actual possession of the cattle, and the debtor here took constructive possession of the cattle, this distinction does not alter the rule that the secured party's interest in the collateral is superior to the unpaid seller. As explained above, the debtor can acquire "rights in the collateral" through both actual and constructive possession."

97

[7] "Kansas courts have cited *In re Samuels & Co.* with approval. *See, e.g., Iola State Bank v. Bolan,* 235 Kan. 175, 679 P.2d 720, 726-27 (1984); *see also Holiday Rambler Corp.v. Morris,* 32 UCC Rep. Serv. 1222, 1225-26 (D.Kan.1981) (debtor had rights in goods even though it failed to pay seller)."

*Kunkel v. Sprague Nat'l Bank*, 128 F.3d at 640-44. Thus, because "good faith" is not one of the requirements for attachment under UCC § 9-203, Fifth Third' security interest attached to ELC's rights in and to the subject cattle (and receivables generated from the resale of the cattle) as soon as ELC obtained rights in or to those cattle and receivables.

Article 2 of the UCC makes clear that Fifth Third did not need to be a "good faith purchaser for value" for its security interest to attach to ELC's rights to the cattle and receivables. ~~Superior's counsel misreads~~ Certain parties that disagree with the Trustee's analysis may be misreading UCC § 2-403(1) by applying the exception in the second sentence to the general rule that a transferor can transfer its interests to anyone. The first sentence of UCC § 2-403(1) establishes this general rule, stating that "a purchaser of goods acquires all title which his transferor had or had power to transfer…".[46] The second sentence of UCC § 2-403(1) expands on that general rule and provides that "a person with voidable title has power to transfer a ***good title*** to a good faith purchaser for value." (Emphasis added). That second sentence clearly expands on, as opposed to limits, the general rule announced in the first sentence of UCC § 2-403(1) that "a purchaser acquires all title which his transferor had". ELC may not have been able to transfer "good title" to someone other than a "good faith purchaser for value", but ELC could

---

[46]   A secured creditor such as Fifth Third is a "purchaser" under the UCC.  *See* UCC § 1-201(33) ("purchaser" means "a person who takes by purchase") and UCC § 1-201(32) ("purchase includes taking by sale, discount, negotiation, mortgage, pledge, **lien, security interest**, issue or reissue, gift, or any other voluntary transaction creating an interest in property.") (Emphasis added).

still transfer (i.e., grant a security interest in) its own rights and title, whether those rights and that title was voidable or not. Any argument otherwise misreads the applicable provisions of the UCC.

Whether or not Fifth Third was a "good faith purchaser for value" in connection with the attachment of its security interest in cattle that ELC purchased, that were delivered to ELC, but that ELC failed to pay for ("Unpaid For Cattle"), may be relevant to the relative <u>priority</u> of Fifth Third's security interest vis-à-vis rights unpaid sellers may have to reclaim the Unpaid For Cattle pursuant to UCC § 2-702. In his response filed on August 13, 2012 ~~[Dock. No. ___]~~ to objections to the Trustee's Report, the Trustee explained at length the fact that the "Good Faith Theory" may have application to claims that unpaid sellers might assert against Fifth Third, but not to potential claims of the Trustee against Fifth Third. There are only a few unpaid sellers who appear to have made timely written demands for reclamation under UCC § 2-702 as to a small number of cattle.

## VII.    SUMMARY OF THE PLAN

### A.    Defined Terms

The following summary uses terms defined in Article II of the Plan. Please refer to the Plan, attached as <u>Exhibit 1</u>, to this Disclosure Statement. To the extent this summary differs from the Plan, the Plan controls.

### B.    In General

The Plan generally provides for all of the property of the Estate to be liquidated over time and paid to holders of allowed claims. All allowed administrative and priority claims are proposed to be paid in full. Fifth Third's Secured Claim will be satisfied by the collection and liquidation of its collateral. All allowed general unsecured claims (including any unsecured

claim held by Fifth Third) will receive Pro Rata distributions of the Recovery Funds. Allowed Opt In Claims will also receive distributions of the Fifth Third Settlement Monies as part of the settlement and compromise provided by the Plan. Owners of ELC will not receive a distribution under the Plan.

The Trustee has negotiated a proposed settlement and compromise with Fifth Third in which Fifth Third agrees to contribute ~~up~~10% of its net Collateral Funds for distribution to ~~20~~general unsecured creditors in consideration of the release of the Estate's claims and up to an additional 10% of its collateral recovery to creditors who agree to opt in to the proposed settlement. In exchange for the opting in and releasing their claims against Fifth Third, the Opt In Creditors receive distributions of the Fifth Third Claim Settlement ~~Monies~~Fund. Any Creditor may choose to opt in by submitting a fully executed copy of the Opt In Agreement to the Trustee on or before the Opt In Deadline (thirty (30) days after the Plan is confirmed). A creditor may choose to opt in whether that creditor accepted the Plan, rejected the Plan, or did not vote. The amount of the Fifth Third Claim Settlement ~~Monies~~Fund payable to Opt In Creditors is determined by multiplying the Fifth Third Claim Settlement Percentage by the amount of the Net Collateral Funds. Use of this method is intended to ensure that the distribution from the Fifth Third Claim Settlement ~~Monies~~Fund to any single Opt In Creditor is adversely impacted by the number of creditors who decide to Opt In.

Payment of the Fifth Third Claim Settlement ~~Monies~~Fund to Opt In Creditors represents a settlement and compromise by and between the Opt In Creditors, Fifth Third and the Estate and will be approved in the Confirmation Order. Because the proposed sharing of the Fifth Third Claim Settlement ~~Monies~~Fund and the Fifth Third Estate Settlement Fund is a proposed settlement among Fifth Third and Opt In Creditors, and not a finding of liability by Fifth Third or

100

an entitlement, absent settlement, creditors who do not opt in will not receive any of the Fifth

Third Claim Settlement Monies, but will receive distributions from the Net Recovery Fund.

Distributions will be made from time to time as claims are allowed and assets

become available for distribution. The Trustee will periodically make "true-up" distributions.

## C.    Treatment of Unclassified Claims

In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims

and Priority Tax Claims of the kinds specified in Sections 507(a)(1) and 507(a)(8) of the

Bankruptcy Code, respectively, have not been classified. Administrative Claims include, but are

not limited to, a Claim for payment of an administrative expense of a kind specified in Section

503(b) of the Bankruptcy Code and entitled to priority pursuant to order of the Court or Sections

507(a)(1), 507(b) or 1114 (e)(2) of the Bankruptcy Code and include, without limitation, (a)

Fifth Third's Claim for repayment of the Trustee Loan, (b) Professional Fee Claims, (c) the

actual, necessary costs and expenses, incurred on or after the Petition Date, of preserving the

Estate, including without limitation wages, salaries or commissions for services rendered after

the commencement of the Chapter 11 Case, and (d) all fees and charges assessed against the

Estate under Chapter 123 of Title 28 of the United States Code.

Administrative Claims. The Trustee Loan shall be repaid to Fifth Third from the first

dollars distributed from the Recovery Fund if and as soon as such funds are recovered by the

Trustee. After repayment of the Trustee Loan, each Holder of an unpaid Allowed Administrative

Claims (i.e., those that will not be paid and/or have not already been paid from the Carve Out

provided by the Financing Order or otherwise) shall be paid from the Collateral Fund and the

Recovery Fund according to the Recovery Expense Pro Rata Application. In connection with the

allowance and payment of Administrative Claims, there will be no ongoing requirement to

101

allocate any portion of such Administrative Claim to any particular task (like the "May Do/Must Do" required by the Financing Order) or to either of the Recovery Fund or Collateral Fund. Allowed Administrative Claims will be paid from the Trustee's operating account as authorized by the Court. All parties will retain normal rights provided by the Bankruptcy Code and Bankruptcy Rules to object to any requests for the allowance and payment of Administrative Claims including all interim and final Professional Fee Applications.

Priority Tax Claims. Each Holder of an Allowed Priority Tax Claim shall be entitled to receive, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Priority Tax Claim, (i) Cash equal to the unpaid portion of such Allowed Priority Tax Claim, or (ii) such other treatment to which such Holder and ELC have agreed in writing. Payment shall be made on the Effective Date. The Trustee is not aware of any Allowed Priority Tax Claims that could be asserted against the Estate.

**D.        Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code requires that a Chapter 11 plan classify the claims of a debtor's creditors and the interests of its equity holders. The Bankruptcy Code also provides that, except for certain claims classified for convenience, a plan may place a claim of a creditor or an interest of an equity holder in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class. The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the holder of a particular claim or interest agrees to a less favorable treatment of its claim or interest. ELC believes that the Plan complies with this standard.

The Plan divides Claims against and Interests in ELC into the following Classes:

Class 1 (Allowed Secured Claim of Fifth Third). Class 1 consists of the Allowed Secured Claim of Fifth Third.

Class 2 (Other Allowed Secured Claims).  Class 2 consists of all other Allowed Secured Claims.  The Trustee does not anticipate any other Allowed Secured Claims.

Class 3 (Allowed Non-Tax Priority Claims).  Class 3 consists of Allowed Claims entitled to priority pursuant to Section 507(a) of the Bankruptcy Code, other than Priority Tax Claims and Administrative Claims.  The Trustee does not anticipate any Allowed Non-Tax Priority Claims.

Class 4 (Allowed General Unsecured Claims).  Class 4 consists of Allowed General Unsecured Claims, including the Allowed Fifth Third Deficiency Claim, Allowed Opt In Claims and Allowed Opt Out Claims.

Class 5 (Interests).  Class 5 consists of the Interests in Debtor.

**E.     Treatment of Claims and Interests**

The Plan provides for the following treatment of Claims and Interests:

Class 1:  Allowed Secured Claim of Fifth Third.  The Class 1 Allowed Secured Claim of Fifth Third shall be Allowed, settled, compromised and satisfied in full by payment to Fifth Third as soon as reasonably practical of all Net Collateral Funds remaining after payment of the Fifth Third Settlement Monies to the Opt In Creditors.  Payments on the Class 1 Claim shall not exceed the amount of the Fifth Third Allowed Claim less the Carve-Out.  Class 1 is Impaired under the Plan and the Holder of the Class 1 Claim is entitled to vote on the Plan.

Class 2:  Other Allowed Secured Claims.  In full and complete satisfaction, discharge and release of a Class 2 Claim, the Holder of an Allowed Class 2 Claim, shall receive, at the option of the Trustee, either  (i) the proceeds of the sale or disposition of the collateral securing the Allowed Class 2 Claim to the extent of the value of the Holder's Secured interest in such collateral, net of the costs of disposition of such collateral, (ii) such other distribution as necessary to satisfy the requirements of the Bankruptcy Code, including the surrender of any such collateral, or (iii) such other treatment as the Trustee and the Holder of an Allowed Class 2

103

Claim may agree.  Class 2 is not Impaired under the Plan, is deemed to have accepted the Plan and is therefore not entitled to vote on the Plan.

Class 3:  Non-Tax Priority Claims.  Each Holder of an Allowed Class 3 Non-Tax Priority Claim shall be paid in full by the Trustee from Cash to the full extent permitted under Section 507(a) of the Bankruptcy Code, but without interest, as soon as practicable following the Effective Date or the date such Claim becomes an Allowed Claim.  Class 3 is not Impaired under the Plan, is deemed to have accepted the Plan, and is therefore not entitled to vote on the Plan. The Trustee is not aware of any Claims that may become an Allowed Class 3 Claim.

Class 4:  General Unsecured Claims.  In full and complete satisfaction, discharge and release of a Class 4 Claim, the Holder of an Allowed Class 4 Claim shall receive its Pro Rata share of the Net Recovery ~~Funds~~Fund and the Fifth Third Estate Settlement Fund payable on Distribution Dates.  Each Holder of a Class 4 Claim that Opts-In will also receive its Pro Rata Share of the Fifth Third Claim Settlement ~~Monies~~Fund payable on Distribution Dates.  Class 4 is impaired under the Plan and Holders of Allowed Class 4 Claims are entitled to vote on the Plan.

Class 5:  Interests.  Holders of Interests will not receive a distribution under the Plan. ~~On the Effective Date, all Interests will be cancelled.~~  Class 5 is deemed to have rejected the Plan.

**F.      Implementation of the Plan**

**1.      Liquidation of Assets**

On and after the Confirmation Date, and subject to the Effective Date, the Trustee may (1) use, sell, assign, transfer, abandon or otherwise dispose of at a public or private sale assets of the Estate, if any, for the purpose of liquidating and converting such assets into Cash, making distributions and fully consummating the Plan and (2) settle and compromise any Cause of Action, all subject to Court authority and approval.

## 2.    Claims Administration

The Trustee will retain responsibility for administering, disputing, objecting to, compromising, or otherwise resolving all Claims against the Estate.  Unless otherwise extended by the Court, any objections to Claims shall be served and filed on or before the Claims Objection Deadline.  The Trustee shall establish the Disputed Claims Reserve for amounts otherwise distributable to Disputed Claims.

No payments or distributions will be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order, and the Disputed Claim has become an Allowed Claim.

## 3.    Distribution Procedures

Within sixty (60) days of the Effective Date, the Trustee shall file with the Court the Initial Estimates.  The Initial Estimates will be revised and adjusted as the amounts of Allowed Opt In Claims, Allowed Opt Out Claims and the Fifth Third Deficiency Claim become final.

The Trustee shall establish reasonable reserves with respect to Claims that are disputed when calculating periodic distributions.  The Trustee shall make the Initial Distribution based on the Initial Estimates (as they may have been subsequently revised) on the first Distribution Date to occur more than one hundred twenty (120) days after the Effective Date.  Concurrently with the Initial Distribution and continuing for each distribution thereafter until a Disputed Claim becomes either an Allowed Claim or a Disallowed Claim, the Trustee shall deposit in the Disputed Claims Reserve sufficient Cash to pay each Disputed Claim's share of the distributions in full.  When a Disputed Claim has become either an Allowed Claim or a Disallowed Claim, the Trustee shall, as applicable, either transfer the applicable portion of the Disputed Claims Reserve

BDDB01 9526463v1

to the Holder of the Allowed Claim or transfer the applicable portion to the Trustee's operating account for distribution on the next Distribution Date.

The Trustee shall make the Final Distribution when, in the reasonable judgment of the Trustee all assets of the Estate have been liquidated and there are no potential sources of additional Cash for distribution, there remain no Disputed Claims, and the Trustee is in a position to make the Final Distribution in accordance with applicable law. The date on which the Final Distribution is made is referred to as the "Termination Date." The Trustee shall provide at least thirty (30) days prior notice of the Termination Date to Holders of all Claims, except to the extent such Claims have been disallowed, withdrawn or paid or satisfied in full as of the time such notice is provided. On the Termination Date, the Trustee shall distribute all remaining Cash to Holders of Allowed Claims in accordance with the Plan and promptly thereafter, request that the Court enter an order closing the Chapter 11 Case.

### 4. Trustee Release of Fifth Third

Effective as of the Confirmation Date, but subject to the occurrence of the Effective Date, and except as otherwise provided in the Plan or the Confirmation Order, to the fullest extent permitted under applicable law, and in consideration for the obligations of Fifth Third set forth in this Plan and, if applicable, the Cash and other agreements or documents to be delivered in connection with this Plan, the Trustee and his successors and assigns for and on behalf of himself and the Estate, shall be deemed to have forever waived, released and discharged Fifth Third and its officers, directors, employees, shareholders, attorneys, insurers, agents and affiliates, predecessors, successors and assigns from any and all claims, obligations, suits, judgments, damages, rights, Causes of Action and liabilities, whether for tort, fraud, contract, violations of federal or state securities laws, or otherwise, whether liquidated or unliquidated, fixed or

106

contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise arising on or prior to the Effective Date relating to ELC or any Affiliates of ELC, the Chapter 11 Case or this Plan.

**5.     Release by Opt In Creditors**

Effective as of the Confirmation Date, but subject to the occurrence of the Effective Date, and except as otherwise provided in the Plan or the Confirmation Order, to the fullest extent permitted under applicable law, in consideration for the obligations of Fifth Third, the settlement and release of Superior's claims and the Trustee set forth in this Plan and, if applicable, the Cash and other agreements or documents to be delivered in connection with this Plan, each Holder of an Opt In Claim (creditors must execute and return the Opt In Agreement to become an Opt In Creditor) and any affiliate of such Holder shall be deemed to have forever waived, released and discharged Fifth Third , Superior, the Trustee and each's respective officers, directors, employees, shareholders, attorneys, insurers, agents and affiliates, predecessors, successors and assigns from any and all claims, obligations, suits, judgments, damages, rights, Causes of Action and liabilities, whether for tort, fraud, contract, violations of federal or state securities laws, or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise held by such Holder arising on or prior to the Effective Date relating to ELC or any Affiliates of ELC, the Chapter 11 Case, Property of the Estate or this Plan.  As provided in the Opt In Agreement, this release shall not affect any claim held by the older of an Opt In Claim that certain property is not Property of the Estate if such claim is formally asserted and filed prior to the execution of the Opt In Agreement.  The foregoing Third Party Release does not release or discharge any claim of a creditor who fails to opt-in or of any non-creditor.

107

### 6. Preservation of Causes of Action

In accordance with Section 1123(b)(3) of the Bankruptcy Code and except as otherwise provided in the Plan, the Trustee will retain and may (but is not required to) enforce all Retained Actions and all other similar claims arising under applicable state laws, including, without limitation, fraudulent transfer claims, if any, and all other Causes of Action. A more detailed description of the Retained Actions is set forth on Exhibit C to the Plan. **Creditors are encouraged to review Plan Exhibit C prior to voting on the Plan.**

### 7. Exemption From Certain Transfer Taxes and Recording Fees

Pursuant to Section 1146(c) of the Bankruptcy Code, any transfers from the Estate or to any other Person or entity pursuant to the Plan will not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### G. Treatment of Executory Contracts

Any Executory Contract to which ELC is a party or is bound (and as to which the counterparty has not previously committed a material default) that has not already been rejected by an order of the Court shall be rejected as of the Confirmation Date. Counterparties to Executory Contracts rejected pursuant to the Confirmation Order shall have thirty (30) days from the Confirmation Date to file a proof of Claim for any damages arising from the rejection or be forever barred from asserting such Claim.

108

**H.    Modification of the Plan**

The Plan may be altered, amended or modified before or after the Confirmation Date in accordance with Section 1127 of the Bankruptcy Code.

**I.    Plan Controls**

In the event and to the extent that any provision of the Plan is inconsistent with the provisions of this Disclosure Statement or any other agreement or instrument required or contemplated to be executed by the Trustee, the provisions of the Plan shall control, except as such provisions may have been modified by the Confirmation Order.

**J.    Continuance of Estate**

On the Effective Date, the Property of the Estate will <u>not</u> revest in the Debtor and the Estate will remain in existence holding all Property.  All Causes of Action that are not expressly released pursuant to the Plan will vest in ~~an~~<u>and</u> be retained by and asserted exclusively by the Trustee.

**K.    Binding Effect**

The provisions of the Plan and the Confirmation Order shall be binding and inure to the benefit of, the Holders of Claims against, and Interests in, ELC and its respective successors, assigns, heirs and personal representatives, whether or not such persons voted to accept or reject the Plan.

BDDB01 9526463v1

## VIII.   PLAN VOTING INSTRUCTIONS AND PROCEDURES

**A.     Notice to Holders of Claims and Holders of Interests**

This Disclosure Statement is being transmitted to certain Holders of Claims against and Interests in ELC.  The purpose of this Disclosure Statement is to provide adequate information to enable the Holders of Claims against and Interests in ELC to make reasonably informed decisions with respect to the Plan prior to exercising their right to vote to accept or reject the Plan.  All Holders of Claims against and Interests in ELC are encouraged to read the Disclosure Statement and Plan carefully and in their entirety before deciding to vote either to accept or to reject the Plan.

**B.     Solicitation Package, Voting Procedures, Ballots, and Voting Deadline**

The Trustee will file by separate motion proposed notices, solicitation procedures, and Ballots to be used in soliciting votes on the Plan.

Pursuant to the provisions of the Bankruptcy Code, only classes of Claims and Interests that are Impaired under the terms and provisions of the Plan are entitled to vote to accept or reject the Plan (except for classes receiving no distribution, which are deemed to have rejected the Plan).  The classes entitled to vote on the Plan are 1 and 4.  Claims in Classes 2 and 3 are not impaired under the Plan and therefore are deemed under Section 1126(f) of the Bankruptcy Code to accept it.  Interests in Class 5 will not receive or retain any property under the Plan and therefore, under Section 1126(g) of the Bankruptcy Code, are deemed to reject the Plan.

Ballots for acceptance or rejection of the Plan will be provided only to members of the voting Classes with respect to the Plan.  Other forms of ballot are not acceptable and will not be counted.  Each Holder of a Claim in a Voting Class with respect to the Plan should read this

Disclosure Statement and the Plan in their entirety.  After carefully reviewing the Plan, this

Disclosure Statement and the detailed instructions accompanying your Ballot, please indicate

your acceptance or rejection of the Plan by voting in favor of or against the Plan on the Ballot

that has been provided for you.

The completed Ballot must be mailed to counsel for the Trustee: Faegre Baker Daniels

LLP, 300 North Meridian Street, Suite 2700, Indianapolis, Indiana 46204, attn: Dustin R.

DeNeal.  IN ORDER TO BE TABULATED, YOUR BALLOT MUST BE RECEIVED AT THE

INDICATED ADDRESS NOT LATER THAN, _____ __, 2012.

If more than one-half in number of the voting creditors of a Class vote to accept the Plan

and at least two-thirds in amount of the Allowed Claims of such voting creditors are voted in

favor of the Plan, such Class will be determined to have accepted the Plan.  All Unimpaired

Classes are deemed to have accepted the Plan.  For purposes of determining whether a Class of

Claims has accepted or rejected the Plan, only the votes of those creditors who have timely

returned their Ballots will be considered.  Failure to vote or a vote to reject the Plan will not

affect the treatment to be accorded a Claim or Interest if the Plan is confirmed by the Court.

**C.      Confirmation Hearing and Deadline for Objections to Confirmation**

Pursuant to Section 1128 of the Bankruptcy Code and Federal Rule of Bankruptcy

Procedure 3017(c), the Court has scheduled a Confirmation Hearing on the Plan for

_____ , at _.m before the Honorable Basil H. Lorch, at the United States Courthouse,

_____.  The Confirmation Hearing may be adjourned from time to time by

the Court without further notice, except for the announcement of the adjournment date made at

the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.  The Court has

BDDB01 9526463v1

directed that objections, if any, to Confirmation of the Plan be filed with the Clerk of the Court

and served so that they are received on or before _____ __, 2012 by:

<u>Counsel to the Trustee</u>:

Faegre Baker Daniels LLP
300 North Meridian Street, Suite 2700
Indianapolis, IN  46204
Attention:      James M. Carr, Terry E. Hall

## IX.    CONSIDERATIONS AND RISKS

THE HOLDER OF A CLAIM AGAINST OR INTEREST IN ELC SHOULD READ AND CAREFULLY CONSIDER THE FOLLOWING FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND IN THE PLAN BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR TO REJECT THE PLAN.

### A.    Estimated Recoveries and Estimated Participation Rates of Opt In Creditors

The estimated and projected recoveries to creditors under the Plan are based on the Trustee's considered estimates of successes in certain litigation matters, the costs of completing the litigation and administering the case to closure, and the claim value of creditors who may opt in to the proposed Fifth Third Settlement.

The Trustee has relied on his experience with the assistance of his counsel and financial advisors and has proposed what he believes to be conservative estimates.  However, given certain untested legal theories being advanced by some creditors and the large dollar amounts at risk in some of the litigation, the estimated payments to creditors may not be as estimated and may vary materially.  Notwithstanding this, unless a party is successful in voiding or limiting the secured interests of Fifth Third in some kind of litigation, general unsecured creditors will likely not see any recovery.

### B.    Certain Bankruptcy Considerations

#### 1.    General Risk of Non-Confirmation of the Plan

112

If the Plan is not confirmed and consummated, there can be no assurance that the Chapter 11 Case will continue rather than be converted to a liquidation under chapter 7 of the Bankruptcy Code or that any alternative plan of liquidation would be on terms as favorable as the terms of the Plan.  If a chapter 7 liquidation were to occur, there is a substantial risk that the case would be administratively insolvent.

### 2.      Non-Consensual Confirmation

Pursuant to the "cram down" provisions of Section 1129(b) of the Bankruptcy Code, the Court may confirm the Plan at the Trustee's request if at least one Impaired Class has accepted the Plan (with such acceptance being determined without including the acceptance of any insider in such Class), and as to each Impaired Class that has not accepted the Plan, the Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to Impaired Classes.  In accordance with Section 1129(a)(8) of the Bankruptcy Code, the Trustee may request confirmation of the Plan without the acceptance of all Impaired Classes entitled to vote in accordance with Section 1129(b) of the Bankruptcy Code.

### 3.      Possible Adverse Effects from Delays of Confirmation And/Or Effective Date

Any delays of either Confirmation or effectiveness of the Plan could result in, among other things, (a) increased Professional Fee Claims and/or (b) adverse effects on the liquidation value of the Estate's assets.  Either of these or any other negative effects of delays of either Confirmation or effectiveness of the Plan could endanger the ultimate approval of the Plan by the Court.

The Trustee also reserves the right to modify the terms of the Plan, as necessary to obtain Confirmation without the acceptance of all Impaired Classes.  Such modifications could result in

BDDB01 9526463v1

a less favorable treatment of any non-accepting Class or Classes, as well as of any Classes junior to such non-accepting Classes, than the treatment currently provided in the Plan.

## C.      Timing of Distributions

Except to the extent that the assets of the Estate have already been reduced to Cash, the Trustee's ability to make the distributions described in the Plan depends upon the liquidation of the Estate's assets. Although the Trustee will endeavor to liquidate the assets as expeditiously as possible, and in such a manner as to maximize the Cash realized from their disposition, the Trustee cannot warrant either the timing or the amount of distributions under the Plan.

## D.      Alternatives to the Plan

After careful review of the Estate's assets and liabilities, estimated recoveries in a chapter 7 liquidation scenario, difficulties inherent in prosecuting certain alleged claims and prospects by other means, the Trustee has concluded that recovery to creditors will be maximized by the proposed Plan, especially as a result of the proposed settlement by and between the Trustee, Fifth Third and Opt In Creditors.

Based upon the information available and known by the Trustee, the Trustee has concluded that distributions to creditors will occur much sooner and have greater value to creditors under the Plan than under any other alternative. Should the Plan not be confirmed, it is likely that the distributions to creditors would be delayed and could be materially reduced by the additional fees and other costs associated with extended proceedings to propose and confirm an alternative Plan, or if the case were converted to a Chapter 7 liquidation. Accordingly, the Trustee believes that the Plan offers the best prospects of recovery for the Holders of Claims against ELC and recommends that Holders of Claims and Interests vote to accept the Plan.

## X.    FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

There should be no federal income tax consequences in connection with the distributions to creditors under the Plan other than consequences normally attendant to payment or partial payment of an obligation by a debtor to a creditor.

THE FOREGOING DESCRIPTION OF FEDERAL INCOME TAX CONSEQUENCES IS INTENDED MERELY AS AN AID FOR CREDITORS AND EQUITY SECURITY HOLDERS AND NEITHER THE TRUSTEE NOR HIS ATTORNEYS ASSUME ANY RESPONSIBILITY IN CONNECTION WITH THE INCOME TAX LIABILITY OF ANY CREDITOR OR HOLDER OF AN INTEREST.  EACH HOLDER OF A CLAIM SHOULD CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FOREIGN, FEDERAL, STATE, AND LOCAL TAX CONSEQUENCES OF THE PLAN.

## XI.    CONFIRMATION REQUIREMENTS

In order to confirm the Plan, the Bankruptcy Code requires that the Court make a series of determinations concerning the Plan, including that (a) the Plan has classified Claims and Interests in a permissible manner; (b) the Plan complies with the technical requirements of Chapter 11 of the Bankruptcy Code; (c) the Trustee proposed the Plan in good faith, and (d) the Trustee's disclosures as required by Chapter 11 of the Bankruptcy Code have been adequate and have included information concerning all payments made or promised by the Trustee in connection with the Plan.  The Trustee believes that all of these conditions will have been met by the date set for the Confirmation Hearing and will seek rulings from the Court to such effect at the Confirmation Hearing.

The Bankruptcy Code also requires that the Plan shall have been accepted by the requisite votes of creditors and equity security holders (except to the extent that a "cram down" is

115

available under Section 1129(b) of the Bankruptcy Code); that such Plan be feasible; and that such Plan is in the "best interests" of all impaired creditors and equity security holders (that is, that impaired creditors and equity holders will receive at least as much pursuant to such Plan as they would receive in a chapter 7 liquidation).  To confirm the Plan, the Court must find that all of these conditions are met with respect to the Plan.  Thus, even if the creditors and equity security holders of ELC accept the Plan by the requisite votes, the Court must make independent findings respecting such Plan's feasibility and whether it is in the best interests of ELC's creditors and equity security holders before it may confirm such Plan.

## A.    Classification of Claims and Interests

The Bankruptcy Code requires that a Chapter 11 plan place each creditor's claim and each equity security holder's interest in a class with other Claims and Interests that are "substantially similar." As set forth therein, the Trustee believes that the Plan meets the classification requirements of the Bankruptcy Code.

## B.    Best Interests Test

Before the Plan may be confirmed, the Court must find (with certain exceptions) that the Plan provides, with respect to each Class, that each Holder of a Claim or Interest in such Class either (i) has accepted the Plan or (ii) will receive or retain under the Plan property of a value that is not less than the value of the distribution that such Holder would receive or retain if ELC were liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date.  The Trustee believes that the Plan meets this "best interests" test.

In Chapter 7 liquidation cases, creditors and interest holders of a debtor are paid from available assets generally in the following order, with no lower priority class receiving any

payments until all amounts due to senior priority classes have been paid fully or payment provided for:

    a.     Secured creditors (to the extent of the value of their collateral).
    b.     Priority creditors.
    c.     Unsecured creditors.
    d.     Debt or penalties expressly subordinated by its terms, by the Bankruptcy Code, or by order of the bankruptcy court.
    d.     Equity interest holders.

The Trustee believes that the value of distributions in a Chapter 7 liquidation would be less than the value of the distributions to be made under the Plan, for the following reasons:

*Increased Expenses.*  If ELC was liquidated under Chapter 7, a chapter 7 trustee would mandatorily be appointed to take possession of the Estate and conduct the liquidation of remaining assets and distribution of net proceeds to creditors.  In order to realize the value of those assets, the Chapter 7 trustee and its counsel and other professionals would need to become familiar with ELC's prior operations, and the terms of numerous underlying transactions giving rise to the various claims, Causes of Action, and rights of the Trustee.  Such a process would involve substantial time and expense.  The Chapter 7 trustee's professionals would be entitled to compensation at their normal hourly rates and to reimbursement of costs incurred in this process. In addition, the Chapter 7 trustee would be entitled to a fee of up to three percent (3%) of the monies disbursed to creditors in the Chapter 7 case.  These fees and expenses would be in addition to the fees and expenses of the Trustee's Professionals incurred during the Chapter 11 Case.  The additional fees and expenses attributable to the Chapter 7 case would be deducted from assets otherwise available for distribution to creditors under the Plan.

*Reduced Proceeds.*  If ELC's remaining assets were liquidated under Chapter 7, the proceeds of those assets would be no greater than the proceeds available for distribution under

117

the Plan and might well be less. Under the Plan, the Trustee will liquidate ELC's remaining assets for distribution to creditors. The Trustee is a person who has the requisite knowledge, experience and skill necessary to maximize the value of ELC's assets for the benefit of creditors and there can be no assurance that a trustee appointed in a Chapter 7 liquidation would have the same degree of expertise as the Trustee. In addition, to the extent ELC's remaining assets deteriorate in value over time, the delay arising from conversion of ELC's Chapter 11 Case to Chapter 7 could also result in reduced recoveries to creditors.

*Delayed Distributions.* Distributions in a Chapter 7 case may not occur for a substantial period of time, thereby reducing the present value of such distributions.

## C.    Liquidation Analysis

The Plan generally provides for the prompt distribution of the proceeds of the liquidation of the assets of the Estate. The Trustee has negotiated a significantly larger recovery for General Unsecured Creditors who "Opt In" which would not be available in a Chapter 7 bankruptcy. In addition, to the extent that distributions in a Chapter 7 liquidation likely would be made at a later date than under the Plan, the difference in the present value of the Chapter 7 and Chapter 11 recoveries would be greater than the nominal amounts presented above.

## D.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires a finding that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization (unless such liquidation is proposed in the plan). As the Plan is itself a plan of liquidation, the Trustee believes that the Plan is feasible and that the Court will so find.

## E.    Confirmation without Acceptance by All Impaired Classes

BDDB01 9526463v1

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan, even if such plan has not been accepted by all impaired classes entitled to vote on such plan, provided that such plan has been accepted by at least one impaired class (without including any acceptance of the Plan by an insider). It is also possible that one or more other Classes will reject the Plan. Section 1129(b) of the Bankruptcy Code states that notwithstanding the failure of an impaired class to accept a plan of reorganization, such plan shall be confirmed, on request of the proponent of the plan, in a procedure commonly known as a "cram down," so long as the plan does not "discriminate unfairly," and is "fair and equitable" with respect to each class of claims or interests that is impaired under and has not accepted the plan.

The condition that a plan be "fair and equitable" with respect to a class of secured claims requires either: (i) that the plan provide that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by ELC or transferred to another entity, to the extent of the allowed amount of such claims; and that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property, or (ii) that the plan provide for the sale, subject to Section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this paragraph or (iii) that the plan provide for the realization by such holders of the indubitable equivalent of such claims.

The condition that a plan be "fair and equitable" with respect to a non accepting class of unsecured claims includes the requirement that either: (i) such class receive or retain under the

119

plan property of a value as of the effective date of the plan equal to the allowed amount of such claim or (ii) if the class does not receive such amount, no class junior to the non accepting class may receive a distribution under the plan.  No class junior to Class 4 will receive any value and thus the Plan is fair and equitable with respect to Class 4 and should such Class not accept the Plan, the Trustee will seek confirmation over such non-acceptance.

The Trustee believes that it will be able to obtain Confirmation in accordance with Section 1129(b) of the Bankruptcy Code.

## XII.    Recommendation

The Trustee believes that the Plan is preferable to a liquidation under Chapter 7 of the Bankruptcy Code.  Conversion of the Chapter 11 Case would result in: (i) delays in the distribution of proceeds available under such alternative; (ii) increased administrative costs; and (iii) increased uncertainty as to whether Allowed General Unsecured Claims would receive any distribution.

**THE TRUSTEE RECOMMENDS THAT YOU VOTE IN FAVOR OF THE PLAN.**

BDDB01 9526463v1

JAMES A. KNAUER, CHAPTER 11 TRUSTEE OF
EASTERN LIVESTOCK CO., LLC as PLAN
PROPONENT


/s/  James A. Knauer

BDDB01 9526463v1