UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| EASTERN LIVESTOCK CO., LLC, | ) | Case No. 10-93904-BHL-11 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| JAMES A. KNAUER, CHAPTER 11 | ) | |
| TRUSTEE OF EASTERN LIVESTOCK CO., | ) | |
| LLC | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Proc. No. |
| | ) | |
| v. | ) | |
| | ) | |
| LARRY ZEIEN, JR.; MICHAEL STEVEN | ) | |
| MCDONALD; ROBERT RUFENACHT; | ) | |
| RUFENACT COMMODITIES, INC.; and | ) | |
| ADM INVESTOR SERVICES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT**

James A. Knauer, as Chapter 11 Trustee for Eastern Livestock Co., LLC, by counsel, for his complaint against Larry Zeien, Jr., Michael Steven McDonald, Robert Rufenacht, Rufenacht Commodities, Inc., and ADM Investor Services, Inc., states as follows:

**Jurisdiction & Parties**

1.  The above-captioned adversary proceeding (the "Adversary Proceeding") arises in and is related to the above-captioned bankruptcy case (the "Chapter 11 Case"), which is currently pending under chapter 11 of title 11 of the United States Code

(the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Indiana, New Albany Division (the "Court").

2.  This Adversary Proceeding is brought pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure.

3.  This Court has jurisdiction over the subject matter of this Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

4.  This Adversary Proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b), (e), (f), and (h).

5.  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409(b).

6.  Pursuant to S.D. Ind. B-7008-1, the Trustee hereby consents to entry of final orders or judgments by the Bankruptcy Judge.

7.  Eastern Livestock Co., LLC ("Debtor" or "ELC") was one of the largest cattle dealers in the United States, with operations and assets located in at least eleven states. ELC was headquartered in New Albany, Indiana, with branch locations across several states.

8.  On November 9, 2010, Fifth Third Bank filed suit against ELC in the Hamilton County (Ohio) Court of Common Pleas, in a matter captioned *Fifth Third Bank v. Eastern Livestock Co, LLC*, Case Number A 1010267 (the "Ohio Litigation").

9.  On November 10, 2010, Elizabeth M. Lynch was appointed receiver over ELC in the Ohio Litigation (the "Receiver").

10.  Certain petitioning creditors commenced the Chapter 11 Case on December 6, 2010, (the "Petition Date") by filing an involuntary petition for relief under

the Bankruptcy Code. The Bankruptcy Court entered the Order For Relief in An Involuntary Case and Order to Complete Filing on December 28, 2010.

11. On December 28, 2010, James A. Knauer ("Plaintiff" or "Trustee") was appointed as the Chapter 11 Trustee for ELC.

12. Defendant Larry Zeien, Jr. ("Zeien") is a "person" as defined in Section 101(41) of the Bankruptcy Code residing in and/or conducting business in the United States.

13. Defendant Michael Steven McDonald ("McDonald") is a "person" as defined in Section 101(41) of the Bankruptcy Code residing in and/or conducting business in the United States.

14. Defendant Robert D. Rufenacht ("Rufenacht") is a "person" as defined in Section 101(41) of the Bankruptcy Code residing in and/or conducting business in the United States.

15. Defendant Rufenacht Commodities, Inc. ("Rufenacht Commodities") is a "person" as defined in Section 101(41) of the Bankruptcy Code residing in and/or conducting business in the United States.

16. Defendant ADM Investor Services, Inc. ("ADMIS") is a "person" as defined in Section 101(41) of the Bankruptcy Code residing in and/or conducting business in the United States.

17. At all relevant times material hereto, each of the Defendants maintained a business relationship with ELC, its agents, or its affiliates.

**Background of the Parties**

18. ELC is a Kentucky limited liability company. It was one of the largest cattle dealers in the United States until its closure on and around November 2, 2010, processing cattle sales and operating branch facilities in eleven states. The company's principal office is located in New Albany, Indiana.

19. Thomas Parish Gibson ("Gibson") was an owner of ELC and manager of the business during all times pertinent.

20. McDonald was employed in an administrative position with ELC. Among the responsibilities assigned to McDonald was management and oversight of the line of credit established by ELC with Fifth Third Bank on August 9, 2004, as defined and more fully described below.

21. Zeien was employed in an administrative position with ELC. Among the responsibilities assigned to Zeien was management and oversight of ELC's risk management program. On information and belief, Zeien was also an agent of Rufenacht Commodities. Immediately after the appointment of the Receiver, ELC representatives, to include counsel for ELC, represented to the Receiver that Zeien operated the Rufenacht Commodities office at ELC. Based on those representations, Zeien was permitted to depart the ELC facilities with a computer processing unit identified as property of Rufenacht Commodities.

22. On information and belief, Rufenacht is an owner and agent of Rufenacht Commodities and Rufenacht Land and Cattle Co., Inc., an Arizona company authorized to do business in Indiana.

23. On information and belief, Rufenacht was a branch manager and a financial consultant for ADM Securities, Inc., a subsidiary of ADMIS.

24. Rufenacht Commodities is an Arizona company, with its principal place of business in Phoenix, AZ.

25. A branch office of Rufenacht Commodities was located in ELC's New Albany, Indiana, office. However, Rufenacht Commodities was not authorized by the Indiana Secretary of State to conduct business within Indiana.

26. On information and belief, Zeien was responsible for the management and daily operations of the Rufenacht Commodities branch office located at ELC

27. ADMIS is a wholly-owned commodity futures brokerage subsidiary of the multi-national agribusiness giant Archer Daniels Midland Company ("ADM"). ADM employees 30,000 people around the globe and their net sales for the fiscal year ended June 30, 2011, were $81 billion.

28. ADMIS specializes in providing commercial hedgers, traders, brokers and risk managers with execution and clearing services. ADMIS bills itself as offering a range of risk management tools to assist clients in the management of exposure to excessive risk and hedge their business activities.

29. As set forth below, ADMIS played an integral role in the organization and transactions that resulted in the transfer of millions of dollars of ELC funds.

30. ADMIS works through a network of Introducing Brokers ("IB"), non-clearing futures commission merchants, branch offices, subsidiaries and sister companies across the United States and around the globe.

31. The Commodity Exchange Act requires all futures commission merchants (FCMs) and introducing brokers (IBs) to register as such, unless they qualify for an exemption.

32. ADMIS is a FCM.

33. On information and belief, at all times relevant, ADMIS engaged Rufenacht Commodities as an IB. ADMIS is responsible for the actions of Rufenacht Commodities.

34. On information and belief, Rufenacht is an agent of ADMIS.

35. All registered FCMs and IBs are required to be members of the National Futures Association ("NFA"), and may also be members of one or more designated contract markets (commodity exchanges). The NFA and the commodity exchanges are self-regulatory organizations that are required to enforce Commodities Future Trading Commission ("CFTC")-approved minimum financial and reporting requirements for their members.

36. On information and belief, Zeien, McDonald, and Rufenacht intended for themselves, Rufenacht Commodities, and ADMIS to profit from the check kiting scheme, described below, through the generation of commissions and fees.

37. On information and belief, at all times relevant, Gibson maintained one or more financial services accounts at ADMIS ("ADMIS Accounts").

38. On information and belief, Rufenacht and/or Rufenacht Commodities conspired with Gibson to create the ADMIS Accounts.

39. Rufenacht was previously a branch manager of a Phoenix, AZ, branch of an ADMIS subsidiary and a financial consultant at the branch.

6

## Transfers Complained Of

40. Section 101(54) of the Bankruptcy Code applicable to this Adversary Proceeding defines "transfer" as, "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption."

41. Plaintiff is informed and believes and, based thereon, alleges, that Gibson made transfers of property from ELC deposit accounts and/or accounts under the control of ELC to ADMIS on or within two years before the Petition Date, that is between December 6, 2008 and December 6, 2010, inclusive (the "<u>Transfers</u>"). Applicable Transfers for calendar year 2010 are reflected on **Exhibit A** attached hereto and made part hereof.

42. The Transfers were transfers of interests of ELC's property.

43. The Transfers were made while ELC was insolvent.

## The Check Kiting Scheme

44. In order to facilitate its daily business operations, ELC entered into credit and security agreements with Fifth Third Bank ("<u>Fifth Third</u>") on August 9, 2004. Under the terms of these agreements, Fifth Third extended a revolving line of credit to ELC ("<u>Line of Credit</u>").

45. Initially, the Line of Credit was in the amount of $22.5 million, which Fifth Third secured by receiving security interests in assets owned by ELC, including its bank accounts, equipment, livestock, and accounts receivable. In or about 2008, Wells Fargo came in as a participant in Fifth Third's loan to ELC and the Line of Credit was

7

increased from $22.5 million to $32.5 million, with Wells Fargo Bank assuming the benefit and liability of $10 million of the $32.5 million Line of Credit extended to ELC. Accessing funds from the Line of Credit on a daily basis was essential to the operation of ELC because the monies were needed by ELC to make timely payments for cattle it purchased on a daily basis. ELC represented that it purchased, on average, $10 to $20 million worth of cattle every day. The reality was that ELC was purchasing on average approximately $3.5 million worth of cattle per day, with the remainder of the purported volume being bogus cattle transactions.

46. Under the terms of its credit agreement with Fifth Third, funds were extended to ELC based, in part, on the value of ELC's outstanding accounts receivable, which were reported by ELC to the bank on a daily basis through submission of a Borrowing Base Certificate. McDonald, at the direction of Gibson, was responsible for causing the preparation and submission of the Borrowing Base Certificates on a daily basis to Fifth Third.

47. Also under the terms of its credit agreement with Fifth Third, ELC maintained a Cash Collateral Account with Fifth Third, into which ELC deposited, on a daily basis, receipts from operation of its business, which were principally derived from ELC's sale of cattle. Funds deposited into the Cash Collateral Account were automatically transferred by Fifth Third to make payments against ELC's $32.5 million Line of Credit. These payments reduced the balance owed on the Line of Credit, thereby increasing the amount of available funds for use by ELC. ELC used the funds from the Line of Credit on a daily basis to fund checks being presented for payment to ELC and to conduct its daily business as a cattle dealer. The availability of

8

approximately $10 to $20 million in cash on a daily basis from the Line of Credit was essential to the operation of ELC's business.

48. From on or about and between August 9, 2004, and November 2, 2010, , Gibson and McDonald, aided and abetted by one another and others, devised and attempted to devise a scheme and artifice to defraud Fifth Third and Wells Fargo, both financial institutions whose deposits were then and there insured by the Federal Deposit Insurance Corporation, and cattle sellers, and to obtain money and property from Fifth Third, Wells Fargo Bank, and cattle sellers to ELC, by means of false and fraudulent pretenses and representations, knowing that the pretenses and representations were false and fraudulent when made.

49. Per the terms of the Line of Credit, it was set to expire on October 15, 2010.

50. Gibson and McDonald, aided and abetted by one another and others, knowingly and intentionally engaged in a check-kiting scheme by causing billions of dollars of checks issued from various bank accounts, including Gibson's personal account with Your Community Bank ("TPG/YCB Account") and bank accounts belonging to agents and business associates of Gibson and McDonald, in amounts which exceeded available balances in the affected accounts, causing artificially inflated balances in ELC's Cash Collateral account. The purpose for engaging in the check-kiting scheme described above was to induce Fifth Third, through fraud and deceit, to continue the release of funds to ELC under the Line of Credit.

51. It was further a part of the conspiracy that McDonald, at the direction and with the consent of Gibson, knowingly and intentionally prepared and caused to be

prepared and submitted to Fifth Third fraudulent Borrowing Base Certificates, which contained falsely inflated accounts receivable figures, consistent with amounts of check-kiting occurring each day.  The purpose for the preparation and submission to Fifth Third of false and fraudulent Borrowing Base Certificates was to fraudulently induce the bank to continue to release funds to ELC under the Line of Credit.

52. The Line of Credit expired on October 15, 2010, and was not, thereafter, renewed by the bank. It was further a part of the scheme and artifice to defraud that, after the Line of Credit expired, Gibson and McDonald, and others, continued the execution of a check-kiting scheme against Fifth Third by causing deposits of millions of dollars worth of checks issued from various bank accounts, including the TPG/YCB Account, and bank accounts belonging to agents and business associates of Gibson and McDonald, in amounts which exceeded available balances in the affected accounts, into one of ELC's operating accounts with Fifth Third, causing artificially inflated balances in this account, until the account was closed by the bank on November 2, 2010. During time periods when these deposits were being made into one of ELC's operating accounts, Gibson and McDonald also caused the issuance of millions of dollars worth of checks from this same account, causing a financial loss to Fifth Third and others.

53. It was further a part of the scheme and artifice to defraud that Gibson and McDonald, knowingly caused checks to be drawn in amounts substantially exceeding available funds from business accounts belonging to agents and associates of Gibson and McDonald, which checks were, thereafter, deposited into ELC's Cash Collateral and operational accounts with Fifth Third.  Gibson and McDonald caused these checks to be

deposited into ELC's Cash Collateral and operational accounts for the purpose of maintaining the fraudulent check kiting scheme described above.

54. On information and belief, McDonald, and Zeien would frequently meet in the ELC offices, with Gibson periodically joining them.

55. On information and belief, McDonald, Zeien, and Gibson (when available) met in furtherance of the check kiting scheme.

56. Gibson and McDonald caused checks to be drawn on ELC's operational account and deposited in the TPG/YCB Account.

57. Gibson, McDonald, and Defendant Zeien would cause checks to be written out of the TPG/YCB Account, payable to ADM Investor Services, C/O Rufenacht Commodities, Inc (the "**ADMIS Checks**"), identified as follows:

```
ADM INVESTOR SERVICES
C/O RUFENACHT COMMODITIES, INC
5050 N. 40TH ST, SUITE 106
PHOENIX, AZ 85018
```

An example of one such check is attached hereto as **Exhibit B**.

58. On information and belief, the ADMIS checks were sent to Rufenacht in Phoenix, Arizona, and subsequently deposited by Rufenacht into an ADMIS account owned by Gibson.

59. ADMIS would then subsequently wire funds directly to the TPG/YCB Account (the "**ADMIS Wires**").

60. The ADMIS Wires contained the following information:

```
Wire Transfer Credit
ADM INVESTOR SERV. INC CUST SE
ATTN: THOMAS KADLEC
SUITE 1600A
CHICAGO, IL 60604
```

11

An example of one such wire as it appeared on the TPG/YCD account statement is attached hereto as **Exhibit C**.

61. Thomas Kadlec is currently the President of ADMIS. At all times relevant to this Complaint, Kadlec was either the Chief Financial Officer or President of ADMIS.

62. After the TPG/YCB Account received the wires, Gibson would write a check to ELC for deposit into ELC's account at Fifth Third.

63. On information and belief, the ADMIS Checks and ADMIS Wires had no legitimate business purpose. Rather, the transfer of funds was merely part of the check kiting scheme.

64. The implementation of the ADMIS Checks and ADMIS Wires portion of the check kiting scheme, along with other unsupported sales and purchases of fake cattle, resulted in fraudulent reports of business activity, which resulted in an increase in the amount of cash available to ELC by $20 million on a given day and falsely reporting approximately $2.5 billion in revenues in calendar year 2010.

65. In furtherance of the check kiting scheme set forth above, an amount not less than $26,767,650.00 of ELC funds was transferred to ADMIS.

66. On information and belief, ADMIS permitted the transfer of funds into Gibson's personal account which ADMIS knew to be from ELC.

67. On information and belief ADMIS permitted the immediately foregoing transfers to be carried in accounts in the name of Gibson, individually.

68. Pursuant to the rules and regulations promulgated by the NFA and CFTC, ADMIS was required to supervise the activities of its agents so as to prevent their agents from engaging in illegal activity such as that described herein. Final

responsibility for supervision rested with ADMIS, who was required to supervise the activity of their agents to prevent and/or detect the type of activity described herein.

69.    On or about September 21, 2011, Gibson and McDonald were charged with Mail Fraud in violation of 18 U.S.C. §1341 in the United States District Court for the Western District of Kentucky under cause number 3:11-cr-00123-TBR-1, for actions related to the Check Kiting Scheme.  On or about December 13. 2012, Gibson plead guilty to the federal charge of Mail Fraud and is awaiting sentencing.

70.    Further, Gibson, McDonald, and two others were indicted by a Kentucky grand jury of 17 counts of theft by deception over $10,000, 144 counts of theft by deception over $500 and under $10,000 and 11 counts of theft by deception under $500.  Gibson and McDonald plead guilty to all of the state charges and were both sentenced to ten years in prison.

## Count I
## Avoidance of Transfers as Fraudulent Transfers (11 U.S.C. § 548(a)(1)(A))

71.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 70, inclusive, as if fully set forth herein.

72.    Plaintiff is informed and believes and, based thereon, alleges that the Debtor made the Transfers with the actual intent to hinder, delay, or defraud one or more of Debtor's creditors. On information and belief, each of the Defendants herein aided and abetted and conspired with Gibson to cause the Transfers.

73.    Plaintiff is entitled to avoid the Transfers and recover the value of the Transfers from the Defendants under Sections 544 and 548(a)(1)(A) of the Bankruptcy Code.

## Count II
## Avoidance of Transfers as Fraudulent Transfers (11 U.S.C. § 548(a)(1)(B))

74. This Count II is in the alternative to Count I.

75. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 74, inclusive, as if fully set forth herein.

76. Under Section 548(a)(1)(B) of the Bankruptcy Code, the Plaintiff may avoid the value of Transfers made if the Debtor received less than reasonably equivalent value in exchange for the Transfers and Debtor (i) was insolvent at the time of the Transfers or became insolvent as a result of any of the Transfers, (ii) was engaged in business or a transaction, or was about to engage in a business or transaction, for which any property remaining with the Debtor was unreasonably small capital; (iii) intended to incur or believed that it would incur debts that would be beyond its ability to pay as they matured, or (iv) made such transfers to or for the benefit of an insider under an employment contract and not in the ordinary course of business.

77. ELC received less than reasonably equivalent value in exchange for the Transfers.

78. Debtor was insolvent on the date the Defendants received each of the Transfers.

79. The Transfers were made within two (2) years of the Petition Date.

80. Plaintiff is entitled to avoid the Transfers and recover the value of the Transfers from the Defendants under Section 548(a)(1)(B) of the Bankruptcy Code.

## Count III
## Recovery of Avoided Transfers (11 U.S.C. § 550)

81.     Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 80, inclusive, as if fully set forth herein.

82.     Plaintiff is informed and believes and, based thereon, alleges that the Plaintiff is entitled to avoid the Transfers under Sections 544, 547 (b) and 548(a)(1)(A) of the Bankruptcy Code, and recover for the benefit of the Debtor's estate, the proceeds or the value of the Transfers from the Defendants or any immediate or mediate transferee of the Defendants, or any of them, under Section 550(a)(1) of the Bankruptcy Code.

## Count IV
## Claim for Damages for Violation of
## Indiana's Racketeer Influenced and Corrupt Organizations Act

83.     The Trustee, for his Claim for Damages for Violation of Indiana's Racketeer Influenced and Corrupt Organizations Act against Zeien, McDonald, Rufenacht, Rufenacht Commodities, and ADMIS, and ("RICO Defendants"), incorporates paragraphs 1 through 82 as if fully stated herein.

84.     Section 35-45-6-2 of the Indiana Code ("Indiana RICO") provides that:

> A person: (1) who is knowingly or intentionally received any proceeds directly or indirectly derived from a pattern of racketeering activity, and who uses or invests those proceeds or the proceeds derived from them to acquire an interest in property or to establish or to operate an enterprise; (2) who through a pattern of racketeering activity, knowingly or intentionally acquires or maintains, either directly or indirectly, an interest in or control of property or an enterprise; or (3) who is employed by or associated with an enterprise, and who knowingly or intentionally, conducts or otherwise participates in the activities of that enterprise through a pattern of racketeering activities; commits corrupt business influence, a class C felony.

15

85. Indiana Code § 35-45-6-1(c) defines enterprise as "(1) A sole proprietorship, corporation, limited liability, partnership, business trust, or governmental entities; or (2) a union, an association, or a group, whether a legal entity or merely associated in fact."

86. The Trustee complains of RICO Defendants, Gibson, and other non-parties to this lawsuit that they jointly acted in concert and as an enterprise, and knowingly or intentionally conducted or otherwise participated in the activities of that enterprise through a pattern of racketeering activities to further the Check Kiting Scheme.

87. Indiana Code § 35-45-6-1 defines "pattern of racketeering activity" as "[e]ngaging in at least two incidents of racketeering activity that have the same or similar intent, results, accomplice, victim or method of compensation, or that are otherwise interrelated by distinguishing characteristics that are not isolated incidents."

88. Indiana Code §35-45-6-1(e) defines racketeering activity as "to commit, to attempt to commit, to conspire to commit a violation of, or abiding and abetting in a violation of any of the following . . . (17) fraud . . . "

89. The actions of the RICO Defendants constitute fraud under the Indiana Code.

90. The actions of the RICO Defendants described herein that furthered the check kiting scheme were "racketeering activities" and constitute a "pattern of racketeering activities" within the meaning of Indiana RICO.

91. Through their pattern of racketeering activities, which created and furthered the Check Kiting Scheme, the RICO Defendants committed the crime of "corrupt business influence," a Class C felony. I.C. § 35-45-6-2.

92. The racketeering activities of the RICO Defendants were knowing and/or intentional, and injured ELC, who is an "aggrieved persons" within the meaning of Indiana Code § 34-24-2-6.

93. A "aggrieved person" may bring a private action against a person who has violated Indiana RICO for damages suffered as a result of a corrupt business influence, and may recover an amount up to three (3) times the person's actual damages, the costs of the action, a reasonable attorney's fee and punitive damages. I.C. § 34-24-2-6.

94. On information and belief, Zeien, McDonald, Rufenacht, Rufenacht Commodities, and ADMIS profited in the series of transactions and were aware of the illegal nature of the control and transfer of the ELC funds.

## Count V
## Disallowance of Claim Pursuant to 11 U.S.C. § 502(D)

95. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 94, inclusive, as if fully set forth herein.

96. Plaintiff is informed and believes, and based thereon, alleges that Defendants have or may assert a claim against the Debtor's estate.

97. Pursuant to Section 502 (d) of the Bankruptcy Code, Plaintiff requests that any claim asserted by Defendants be disallowed for the failure to repay the Transfers.

THEREFORE, the Plaintiff requests that the Bankruptcy Court enter judgment in its favor and against Defendants as follows:

## ON COUNTS I AND II

A.  Declaring that the Transfers identified herein are avoided and set aside as fraudulent conveyances under Sections 544 and 548(a)(1)(A) and (B) of the Bankruptcy Code;

## ON COUNT III

B.  Directing and ordering that the Defendants, or any immediate or mediate transferee of the Defendants, turn over to the Plaintiff the full sum of the proceeds or value of the Transfers (and any other avoided Transfers discovered after the date of this Complaint) pursuant to Section 550 of the Bankruptcy Code;

C.  Awarding judgment against the Defendants and in favor of the Plaintiff in an amount determined by the Court;

## ON COUNT IV

D.  Order the Defendants to reimburse the Trustee for all funds received from ELC;

E.  Award the Trustee actual and consequential damages flowing from the Defendants' conduct and assess punitive damages in an amount sufficient to deter such conduct in the future;

F.  Award the Trustee treble damages, all costs of this action, attorneys' fees and all other relief to which the Trustee may be entitled pursuant to I.C. § 34-24-2-6;

**ON COUNT V**

G. Disallowing any and all claims of the Defendants against the ELC bankruptcy estate under Section 502(d) of the Bankruptcy Code;

**ON ALL CLAIMS FOR RELIEF**

H. Pre-judgment interest at the maximum legal rate running from the time of the Transfers until the date of judgment herein;

I. Post-judgment interest at the maximum legal rate running from the date of judgment herein until the date the judgment is paid in full; and

J. Fees and costs incurred by the Plaintiff in this suit;

K. Such other and further relief as is necessary and proper.

Respectfully submitted,

KROGER, GARDIS & REGAS, LLP

By: /s/ Jay P. Kennedy
Jay P. Kennedy, Attorney No. 5477-49
Steven E. Runyan, Attorney No. 25771-29
Counsel for James A. Knauer, Trustee
111 Monument Circle, Suite 900
Indianapolis, Indiana 46204-5125
(317) 692-9000